**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| CATHERINE ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| TAKE-TWO INTERACTIVE SOFTWARE, INC., | ) | CASE NO. 3:18-CV-966-SMY-MAB |
| 2K GAMES, INC.; 2K SPORTS, INC.; WORLD | ) | |
| WRESTLING ENTERTAINMENT, INC.; | ) | |
| VISUAL CONCEPTS ENTERTAINMENT; | ) | |
| YUKE'S CO., LTD.; AND YUKE'S LA, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS TAKE-TWO**
**INTERACTIVE SOFTWARE, INC., 2K GAMES, INC., 2K SPORTS, INC.,**
**AND VISUAL CONCEPTS ENTERTAINMENT'S**
**MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND .................................................................................... 3

I.    THE TATTOOS................................................................................................ 3

II.   TAKE-TWO'S *WWE 2K* VIDEO GAME SERIES.......................................... 4

III.  TAKE-TWO'S USE OF THE TATTOOS IN *WWE 2K* .................................. 5

IV.   PLAINTIFF CATHERINE ALEXANDER AND THE MARKET FOR
      TATTOOS ........................................................................................................ 6

ARGUMENT ............................................................................................................ 6

I.    TAKE-TWO'S USE OF THE TATTOOS WAS AUTHORIZED BY AN
      IMPLIED LICENSE ........................................................................................ 7

II.   TAKE-TWO'S USE OF THE TATTOOS IS FAIR USE ................................. 9

      A.    Factor One: Take-Two's Use Is for a Transformative Purpose ............. 9

      B.    Factor Two: The Tattoos Are Not Creative and Were Published........ 13

      C.    Factor Three: Take-Two's Copying Was Reasonable In Light of Its
            Purpose................................................................................................... 14

      D.    Factor Four: Take-Two Has Not Harmed the Market for the Tattoos.... 15

      E.    Considerations of the Public Interest Favor Take-Two ........................ 17

III.  TAKE-TWO'S USE OF THE TATTOOS IS *DE MINIMIS* ........................... 18

V.    PLAINTIFF CANNOT SHOW THAT SHE IS ENTITLED TO DAMAGES ............... 19

CONCLUSION........................................................................................................ 20

## TABLE OF EXHIBITS

| Exhibit No. | Description of Document |
|---|---|
| 1 | Declaration of Mark Little, dated November 8, 2019 attaching appendixes<br>    Appendix A - Video Recording of WWE 2K16 Gameplay<br>    Appendix B - Video Recording of WWE 2K17 Gameplay<br>    Appendix C - Video Recording of WWE 2K18 Gameplay |
| 2 | Declaration of Randy Orton, dated Nov. 4, 2019 |
| 3 | Declaration of Gary Glatstein, dated Nov. 27, 2018 |
| 4 | Expert Report and Declaration of Ian Bogost, Ph.D., dated Feb. 5, 2019 |
| 5 | Expert Report and Declaration of Nina Jablonski, Ph.D., dated Jan. 24, 2019 |
| 6 | Declaration of E. Deborah Jay, dated Nov. 4, 2019, attaching appendixes<br>    Appendix A - WWE 2K Survey Report, dated Jan. 2019 |
| 7 | Declaration of James Malackowski, dated Nov. 4, 2019 attaching appendixes<br>    Appendix A - Expert Report of J. Malackowski, dated Feb. 6, 2019<br>    Appendix B - Rebuttal Expert Report of J. Malackowski, dated Mar. 7, 2019 |
| 8 | Opening Expert Report of J. Zagal, dated Nov. 14, 2018 |
| 9 | Excerpts from the Deposition Transcript of Plaintiff Catherine Alexander dated Jan. 15, 2019 |
| 10 | Excerpts from the Deposition Transcript of Jose Zagal, dated Aug. 1, 2019 |
| 11 | Excerpts from the Deposition Transcript of Ryan Clark, dated Sept. 12, 2019 |
| 12 | Excerpts from the Deposition Transcript of Mark Little, dated Aug. 14, 2019 |
| 13 | Plaintiff's Objections and Responses to Defendants Take-Two Interactive Software, Inc., 2K Games, Inc., 2K Sports, Inc., and Visual Concepts Entertainment's First Set of Interrogatories to Plaintiff Catherine Alexander dated Oct. 15, 2018 |
| 14 | License Agreement between World Wrestling Entertainment, Inc. and Take-Two Interactive Software, Inc., dated Feb. 11, 2013 |
| 15 | Amendment Number One to License Agreement Between World Wrestling Entertainment Inc. and Take-Two Interactive Software, Inc., dated Jan. 6, 2016 |
| 16 | Physical Exhibit: *WWE 2K16* for XBox One |

| Exhibit No. | Description of Document |
|---|---|
| 17 | Physical Exhibit: *WWE 2K17* for XBox One |
| 18 | Physical Exhibit: *WWE 2K18* for XBox One |
| 19 | Certificate of Registration VAu 1-345-102, "Dove" |
| 20 | Certificate of Registration VAu 1-345-109, "Rose" |
| 21 | Certificate of Registration VAu 1-345-112, "Skulls" |
| 22 | Certificate of Registration VAu 1-345-106, "Tribal Addition Design" |
| 23 | Certificate of Registration VAu 1-345-100, "Tribal Design" |
| 24 | Letter from the U.S. Copyright Office Denying Registration of "Bible Verse Design" |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015)............................................................13, 16

*Bell v. Powell*,
    350 F. Supp. 3d 723 (S.D. Ind. 2018) ..........................................11

*Bell v. Taylor*,
    827 F.3d 699 (7th Cir. 2016) ........................................................19

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)...................................................... *passim*

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006)..........................................................17

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
    737 F.3d 932 (4th Cir. 2013) ..................................................... *passim*

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) ..........................................................9

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)............................................................9, 12, 15

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
    150 F.3d 132 (2d Cir. 1998)..........................................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................6

*Consumers Union of U.S. v. Gen. Signal Corp.*,
    724 F.2d 1044 (2d Cir. 1983)........................................................14

*Dash v. Mayweather*,
    731 F.3d 303 (4th Cir. 2013) ........................................................20

*Denison v. Larkin*,
    64 F. Supp. 3d 1127 (N.D. Ill. 2014) ...........................................15

*Eltra Corp. v. Ringer*,
    579 F.2d 294 (4th Cir. 1978) ........................................................13

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)............................................................................13

*Frank Music Corp .v. Metro-Goldwyn-Mayer, Inc.*,
    886 F.2d 1545 (9th Cir. 1989) .........................................................20

*G.R. Leonard & Co. v. Stack*,
    386 F.2d 38 (7th Cir. 1967) ...............................................................18

*Galvin v. Ill. Republican Party*,
    130 F. Supp. 3d 1187 (N.D. Ill. 2015) ...............................13, 14, 15

*Great Minds v. FedEx Office & Print Servs., Inc.*,
    886 F.3d 91 (2d Cir. 2018)...................................................................7

*I.A.E., Inc. v. Shaver*,
    74 F.3d 768 (7th Cir. 1996) .................................................................7

*Incredible Techs., Inc. v. Virtual Techs., Inc.*,
    400 F.3d 1007 (7th Cir. 2005) ..........................................................14

*Isringhausen Imports, Inc. v. Nissan N. Am., Inc.*,
    No. 10 Civ. 3253, 2011 WL 6029733 (C.D. Ill. Dec. 5, 2011) ...........18

*ITOFCA, Inc. v. MegaTrans Logistics, Inc.*,
    322 F.3d 928 (7th Cir. 2003) ..............................................................7

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ...............................................11, 14, 15

*Kienitz v. Sconnie Nation LLC*,
    965 F. Supp. 2d 1042 (W.D. Wis. 2013) ............................10, 13, 15, 16

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*,
    No. 13 Civ. 4664, 2014 WL 3368893 (N.D. Ill. Jul. 8, 2014)..................9

*LimeCoral, Ltd. v. CareerBuilder, LLC*,
    889 F.3d 847 (7th Cir. 2018) ..............................................................7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................6

*MiTek Holdings, Inc. v. Arce Eng'g Co.*,
    89 F.3d 1548 (11th Cir. 1996) ...........................................................19

*Neri v. Monroe*,
    429, No. 11 Civ. 2014 WL 793336 (W.D. Wis. Feb. 26, 2014)............9, 10, 15, 17

*Nunez v. Caribbean Int'l News Corp.*,
　235 F.3d 18 (1st Cir. 2000) ............................................................................15

*Ocean Atl. Woodland Corp. v. DRH Cambridge Homes, Inc.*,
　262 F. Supp. 2d 923 (N.D. Ill. 2003) .........................................................19, 20

*Red Label Music Publ'g, Inc. v. Chila Prods.*,
　388 F. Supp. 3d 975 (N.D. Ill. 2019) .............................................. *passim*

*Ringgold v. Black Entm't Television, Inc.*,
　126 F.3d 70 (2d Cir. 1997) ............................................................................18

*Sandoval v. New Line Cinema Corp.*,
　147 F.3d 215 (2d Cir. 1998) ..........................................................................19

*Seltzer v. Green Day, Inc.*,
　725 F.3d 1170 (9th Cir. 2013) ...................................................................14, 15

*SOFA Entm't, Inc. v. Dodger Prods., Inc.*,
　709 F.3d 1273 (9th Cir. 2013) .......................................................................10

*Sullivan v. Flora, Inc.*,
　No. 15 Civ. 298, 2017 WL 1487624 (W.D. Wis. Apr. 25, 2017) ........................19

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
　756 F.3d 73 (2d Cir. 2014) .......................................................................13, 16

*Theotokatos v. Sara Lee Pers. Prods.*,
　971 F. Supp. 332 (N.D. Ill. 1997) .................................................................14

*Wilchombe v. TeeVee Toons, Inc.*,
　555 F.3d 949 (11th Cir. 2009) ........................................................................8

**Statutes**

17 U.S.C. § 103(b) .............................................................................................14

17 U.S.C. § 106 ..................................................................................................7

17 U.S.C. § 501 ..................................................................................................7

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................6

**Regulations**

37 C.F.R. § 202.1(e) ...........................................................................................13

## PRELIMINARY STATEMENT

Tattoos are an increasingly popular mode of personal self-expression, reflecting an individual's struggles or successes, memorializing lost relatives, and even serving as religious or spiritual reminders. Tattoos are also permanent—getting them inked is painful and lengthy, and once inked, they cannot easily be removed or covered up. Randy Orton, a professional World Wrestling Entertainment, Inc. ("WWE") wrestler with multiple tattoos, many of which are not at issue, chose the tattoos at issue in this lawsuit, including a biblical verse and his daughter's name, because they were meaningful to him and reflected his identity. As a famous wrestler, Mr. Orton regularly appears in media, television, and video games, tattoos and all. He does so with the reasonable expectation that his identity is his own and that, once inked, he can go about his life without asking his tattooist for permission to be depicted as he actually looks.

This lawsuit attempts to undercut these fundamental expectations about tattoos. From 2003 to 2008, Plaintiff Catherine Alexander ("Plaintiff") inked six tattoos on Mr. Orton's body (the "Tattoos"). Compl. (Dkt. 1) ¶¶ 41–56. Now, Plaintiff seeks to impose an unprecedented obligation on Mr. Orton, and the companies with whom he collaborates, by asserting they needed her permission to depict Mr. Orton's likeness realistically. Without permission and a financial payment, she argues, the realistic depiction of Mr. Orton in Defendants Take-Two Interactive Software, Inc., 2K Games, Inc., 2K Sports, Inc., and Visual Concepts Entertainment (collectively, "Take-Two") *WWE 2K16*, *WWE 2K17*, and *WWE 2K18* video games (collectively "*WWE 2K*") infringes her purported copyrights in the Tattoos. Plaintiff's attempt to create new liability and hinder personal expression fails as a matter of law for three independent reasons.

***First***, Plaintiff's claim fails because Mr. Orton is impliedly licensed to disseminate his likeness, including his Tattoos, for use in video games. There is extensive evidence in the record that when a client is inked, both the client and the tattooist expect that the tattoo will become part

- 1 -

of the client's body, image and identity, and that the client is then free to disseminate his likeness without the tattooist's permission.  The parties' conduct in this case confirms this expectation: Plaintiff never told Mr. Orton that he needed her permission to display the Tattoos.  Even as Mr. Orton appeared in numerous media outlets and video games after Plaintiff first inked him, Plaintiff did not object to his appearance therein. Ex. 2 at 6–7, 18; Ex. 9 at 181:6–9.  Mr. Orton authorized the WWE to license his likeness, including the Tattoos, and WWE in turn licensed his likeness to Take-Two.  Thus, because Take-Two had permission to show Mr. Orton's likeness (Tattoos and all), Take-Two is not liable for copyright infringement.

*Second*, Take-Two's depiction of the Tattoos is fair use because each one of the fair use factors weighs in favor of Take-Two.  Critically, the parties use the Tattoos for fundamentally different purposes.  Whereas Plaintiff inked the Tattoos to reflect Mr. Orton's personal expression, Take-Two included the Tattoos in *WWE 2K* to make Mr. Orton look realistic.  Depicting the Tattoos was necessary to achieve this purpose.  Moreover, the Tattoos are, at best, entitled to thin copyright protection because of the common elements and pre-existing works they incorporated.  They appear in *WWE 2K* only fleetingly among innumerable other visual and auditory elements.  And importantly, there is no market for depicting the Tattoos in a video game, so their inclusion in *WWE 2K* does not harm Plaintiff's market.

*Third*, the Tattoos are a *de minimis* part of *WWE 2K*.  When users play *WWE 2K*, they choose from hundreds of real-world wrestlers, such that Mr. Orton and his Tattoos often will not appear at all.  When Mr. Orton does appear, he and his Tattoos necessarily appear smaller than in real life because of the size of the TV monitor on which video games are typically played.  The Tattoos are often blurry, obstructed, and accompanied by so many other game elements that the ordinary game user will perceive the Tattoos as a kind of visual noise, creating realism but being

no more noticeable than a wrestler's nose shape or hairstyle.

Plaintiff's copyright claim thus fails as a matter of law. Moreover, Plaintiff cannot show that any damages or profits are attributable to the alleged infringement. Accordingly, Take-Two respectfully requests that this Court grant its summary judgment motion, dismiss Plaintiff's copyright infringement case, and hold that, in any case, Plaintiff is not entitled to damages.

## FACTUAL BACKGROUND

### I.    THE TATTOOS

Randy Orton has been a professional wrestler for the WWE since 2001, in which role he appears in media bearing various tattoos, including those at issue here. Ex. 2 ¶¶ 2, 5. The Tattoos reflect his "personal expression" and identity. Ex. 2 ¶ 5; Ex. 9 at 22:24–23:5, 143:11–145:6; Ex. 10 at 90:19–91:6.

Before meeting Plaintiff, Mr. Orton had a "tribal design" on his back created by another tattooist (top right). Ex. 3 ¶ 5. Without feeling that she needed permission, Plaintiff copied and extended it at Mr. Orton's request (bottom right) (the "Upper Back Tattoo"). *Id.* ¶¶ 7–8; Ex. 9 at 93:10–13, 97:20–98:1, 110:20–24, 113:13–16. Plaintiff then inked additional tattoos on Mr. Orton. Ex. 9 at 124:12–24. First, Mr. Orton asked Plaintiff to replicate the original back tattoo on Mr. Orton's forearms, which she did (middle right) (the "Tribal Additional Designs"). *Id.*; Ex. 13 at Rog Resp. 1; Ex. 2 ¶¶ 10, 12. Second, Mr. Orton brought a biblical verse to Plaintiff that was "meaningful to him due to his battle with substances," and she inked it on his arm (bottom right) ("Bible Verse Design").[1] Ex. 9 at

---

[1]   The Copyright Office refused to register the Bible Verse Design. Ex. 24. As the Copyright Office explained, the Bible Verse Design "will not support a claim to copyright" based on considerations of originality, including independent creation and creativity. *Id.*

143:11–144:11; Ex. 2 ¶ 14.  Third, at Mr. Orton's request, Plaintiff inked a dove on Mr. Orton's arm, which he instructed her to keep "soft" with "no black tones" (top right) ("Dove").  Ex. 2 ¶ 15; Ex. 9 at 155:3–155:18.  Fourth, at Mr. Orton's request, Plaintiff inked a rose on his arm, which was meaningful to him because it was for his daughter and included her name (middle right) ("Rose").  Ex. 2 ¶ 16; Ex. 9 at 136:16–20.  Finally, Mr. Orton asked Plaintiff for a tattoo of skulls, which she inked on his arm (bottom right) ("Skulls").  For each, Mr. Orton provided "direction and ideas" for the tattoos and their locations.  Dkt. 95 at RFA Resp. 1–6.

Consistent with the standards of the tattoo industry, Plaintiff testified that, when clients leave her tattoo shop, they are "free to go about their life without needing to get permission as to how they are depicted with their tattoos."  Ex. 9 at 66:2–8.  She has never told any of her clients, including Mr. Orton, that she owned copyrights in the tattoos she inks or that they needed her permission to appear in different media, including video games.  *Id.* at 65:2–5, 65:19–23, 89:1–89:9; *see also* Ex. 3 ¶ 11.  She admitted that she did not tell Mr. Orton that he needed to get her permission or pay her money to show the Tattoos.  Dkt. 95 at RFA Resp. 116–117.  Mr. Orton also understood that he could do whatever he wanted with the Tattoos, including display them and allow others to depict him with them.  Ex. 2 ¶ 6.

## II.    TAKE-TWO'S *WWE 2K* VIDEO GAME SERIES

Take-Two creates the *WWE 2K* wrestling simulation video game series.  Ex. 1 ¶ 2.  *WWE 2K* is a realistic depiction of WWE wrestling and includes a number of elements that appear in real world wrestling.  Ex. 10 at 71:2–72:23; Ex. 12 at 43:13–24.  The game's wrestlers are depicted using photo reference and photogrammetry, in which numerous photos of each wrestler are taken to depict them realistically.  Ex. 12 at 151:22–152:5; Ex. 10 at 72:24–73:7.

In *WWE 2K*, "the player's typical experience will involve looking at the wrestling ring in

- 4 -

a manner similar to that of a television viewer or a fan watching the match from the stands."  Ex.
4 ¶ 51.  As can be seen from recordings of *WWE 2K* gameplay, Ex. 1 ¶ 11 & Apps. A–D, "as the
wrestling match takes place—including grapples, throws, submissions, attacks, tag-ins, and other
ordinary actions of professional wrestling—the camera view adjusts accordingly, in a manner
similar to the way a televised broadcast might appear."  Ex. 4 ¶ 53; Ex. 1 ¶¶ 4, 9–10.  Users
"play action-oriented bouts of simulated wrestling, either alone against the computer or with
other people," and can interact with over a hundred WWE wrestlers.  Ex. 4 ¶ 49.  Other visual
elements of *WWE 2K* include "the movement and behavior of the crowd, other wrestlers, the
referees" and other "contextual events and situations associated with live and televised
professional wrestling," *Id.* ¶ 55.  *WWE 2K* also includes auditory components such as realistic
announcers, *id.* ¶ 55; Ex. 10 at 74:16–75:18, as well as "the sound of wrestler voices; the noise of
the crowd, the ring of the wrestling bell; and generally the voices, noises, and soundtrack one
would normally associate with televised, professional wrestling."  Ex. 4 ¶ 56.

## III.    TAKE-TWO'S USE OF THE TATTOOS IN *WWE 2K*

To depict Mr. Orton in *WWE 2K* as he appears in real life, Take-Two realistically
replicated his likeness, including the Tattoos.  Ex. 13 at Rog Resp. 1; Ex. 12 at 43:13–24; Ex. 9
at 21:1–9, 171:2–8, 173:16–2; Dkt. 95 at RFA Resp. 38.  This is because, as Plaintiff admitted,
"Mr. Orton wouldn't look as much like Mr. Orton without his tattoos."  Ex. 9 at 21:17–20.  Even
Plaintiff's expert, Jose Zagal, agreed that it is "essential" to depict Mr. Orton with his Tattoos in
*WWE 2K* "to achieve verisimilitude sufficient to meet consumer's demands for realism."  Ex. 8
at 5.  Take-Two obtained a license to portray Mr. Orton's likeness in *WWE 2K* from WWE,
which itself was licensed by Mr. Orton.  Ex. 2 ¶ 22; Ex. 1 ¶ 7; Exs. 14–15.

There are hundreds of wrestlers from which to select to play *WWE 2K*.  Ex. 4 ¶¶ 65, 67.
As the Tattoos only appear when Mr. Orton is depicted, when he is not selected, the Tattoos do

not appear.  Ex. 4 ¶ 69; Ex. 1 ¶ 8.  Given the average screen size on which *WWE 2K* is played, the Tattoos appear far smaller in *WWE 2K* than they do in real life and are often obstructed, out of focus, or difficult to notice among the rapid movements of the wrestling match.  Ex. 4 ¶¶ 51, 82–88.  Thus, "no matter the camera configuration or zoom, the ordinary player will perceive the Tattoos as a kind of visual noise creating realism in the environment and the character."  *Id*. ¶ 89.

## IV.   PLAINTIFF CATHERINE ALEXANDER AND THE MARKET FOR TATTOOS

Plaintiff has not worked in the tattoo industry full time since 2009.  Ex. 9 at 188:7–12. She has never licensed any tattoo to be included in a video game, or anywhere else, nor has she asserted her copyrights in tattoos prior to this lawsuit,  *id*. at 179:2–11, 180:22–181:5; Dkt. 95 at RFA Resp. 97; Dkt. 108 at RFA Resp. 138, and she is not aware of any instance in which such a license has been sought or issued. Ex. 9 at 181:6–9. As Take-Two does not ink tattoos on people, Plaintiff admits that it does not compete with her, Ex. 9 at 176:2–8, 176:24–177:5, and Plaintiff is not aware of any business that she lost as a result of *WWE 2K*.  *Id.* at 186:3–13.  While Mr. Orton has appeared in video games since 2012, Plaintiff did not assert rights in his Tattoos until this lawsuit.  Ex. 1 ¶ 6.  Many of the wrestlers in *WWE 2K* have tattoos, but Plaintiff is the only tattooist to bring a lawsuit for the realistic depiction of tattoos in the series.  *Id.*

## ARGUMENT

Courts grant summary judgment if there is "no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant informs "the district court of the basis for its motion" and the matter "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Then, the non-moving party must present competent evidence establishing disputed issues as to material facts.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Conclusory allegations or unsupported speculation are insufficient.  *See id.*

## I.    TAKE-TWO'S USE WAS OF THE TATTOOS AUTHORIZED BY AN IMPLIED LICENSE

Plaintiff's copyright claim fails because Take-Two's use of the Tattoos was authorized by an implied license.  As the Copyright Act prohibits only unauthorized use of a copyrighted work, 17 U.S.C. §§ 106, 501, a "copyright owner waives the right to sue . . . for uses of copyrighted material that are authorized[.]"  *Great Minds v. FedEx Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996) (finding no copyright infringement where use was impliedly authorized).  As discussed below, Plaintiff impliedly licensed Mr. Orton to disseminate and display the Tattoos as part of his likeness.  Mr. Orton then granted WWE the right to license "his likeness to third-parties," Ex. 2 ¶ 22, and WWE licensed Take-Two to use Mr. Orton's likeness in *WWE 2K*.  Ex. 1 ¶ 7; Exs. 14–15.  Thus, under copyright law, Plaintiff impliedly authorized the inclusion of the Tattoos in *WWE 2K*.

A license may "be granted orally, or . . . by the parties' conduct." *I.A.E.*, 74 F.3d at 772, 775.  It is implied "when [1] a person (the licensee) requests the creation of a work, [2] the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and [3] the licensor intends that the licensee-requestor copy and distribute [the] work."  *Id.* at 776.  A key fact showing that an implied license exists is "the delivery of the copyrighted material without warning that its further use would constitute copyright infringement."  *Id.*; *LimeCoral, Ltd. v. CareerBuilder, LLC*, 889 F.3d 847, 851 (7th Cir. 2018) (finding that a copyrighted work conveyed without "a limitation imposed on the license at the time the[] work[] w[as] delivered" impliedly granted to defendant all of the rights of plaintiff as a copyright holder).[2]  Courts also look at common practices in the relevant industry to determine whether an

---

[2]    "In fact, consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing."  *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 940 (7th Cir. 2003).

implied license has been created.  *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (looking at music industry practice to determine parties entered implied license).

As to the first and second prongs, each Tattoo was created at Mr. Orton's request.  *Supra* at 3–4.  As to the third prong, when Plaintiff inked the Tattoos, despite knowing Mr. Orton appeared on television with his Tattoos visible, Ex. 9 at 96:16–97:7, she did not tell Mr. Orton that further use of the Tattoos would be infringement.  Ex. 2 ¶ 18.  Rather, Mr. Orton understood that his Tattoos are "part of [his] body and how [he] look[s]" and he can authorize their use in connection with his likeness in creative works, like video games.  *Id*.  Indeed, Mr. Orton actively participated in the creation of *WWE 2K* to ensure that his likeness therein would be accurate.  Ex. 1 ¶ 7.  Plaintiff also admitted at her deposition that Mr. Orton was free to go about his life showing his Tattoos, and noted that she has never told a client, including Mr. Orton, that the client needed her permission before showing his tattoos in media.  Ex. 9 at 66:2–8.  Since Mr. Orton first appeared in video games bearing the Tattoos, Plaintiff never objected to his inclusion in the games, and never informed him that he needed her permission before disseminating his likeness for use in video games or any other media.  Ex. 9 at 182:24–183:8; Ex. 2 ¶ 7.

Moreover, Plaintiff's and Mr. Orton's understanding of what Mr. Orton could do with his tattoos is consistent with industry practice: Dr. Jablonski, Take-Two's tattoo industry expert, offered unrebutted testimony that, "[o]nce a tattoo has been inked on to the client's skin, the tattooist exercises no control over it because the tattoo itself is part of the client's body."  Ex. 5 ¶ 30.  Tattooists and clients "intend the client to be free to display the tattoo himself or herself and be permitted to license to others the ability to display the tattoo."  *Id.* ¶ 32.  Likewise, the tattooist who inked Mr. Orton's original tribal tattoo agrees, "when a client is tattooed, the understanding of both tattooist and client is that the client can go about his business with the

- 8 -

tattoo being seen or depicted as just another part of his body."  Ex. 3 ¶ 11; *see also* Ex. 5 at

Appendixes 3–5 (professional tattooists describing tattoo industry norms).  Thus, Mr. Orton "is

free to authorize the use or dissemination of his . . . likeness in whatever way he . . . sees fit

without the necessity of seeking permission from the tattoist."  Ex. 5 ¶ 32.  He did so here,

making *WWE 2K* an authorized non-infringing use of the Tattoos.

## II.    TAKE-TWO'S USE OF THE TATTOOS IS FAIR USE

Plaintiff's copyright claim also fails because, as discussed below, each of the four fair use

factors weighs in favor of Take-Two and the public interest considerations favor Take-Two.

### A.    <u>Factor One: Take-Two's Use Is for a Transformative Purpose</u>

The first fair use factor considers two sub-factors regarding use of the copyrighted work:

(1) transformative use and (2) commercial use.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S.

569, 578–79 (1994).  Whether the works serve distinct purposes is key to the transformative use

analysis; specifically, courts consider, "whether the new work merely supersedes the original

work, or instead adds something new with a further purpose or of a different character."

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 693 (7th Cir. 2012); *Leveyfilm, Inc.*

*v. Fox Sports Interactive Media, LLC*, No. 13 Civ. 4664, 2014 WL 3368893, at *9 (N.D. Ill. Jul.

8, 2014).  As the Tattoos inked on Mr. Orton serve a far different purpose in *WWE 2K* than that

for which they were originally created, this factor weighs strongly in favor of Take-Two.

Courts repeatedly have held that the use of a visual work to document reality serves a

different purpose from the visual work's original expressive purpose.  For example, in *Neri v.*

*Monroe*, the court found that the defendant's photograph of a hallway where a sculpture was

installed served a different purpose from the sculpture itself, as the new purpose was to depict

the sculpture's location realistically.  No. 11 Civ. 429, 2014 WL 793336, at *1 (W.D. Wis. Feb.

26, 2014) (inclusion of sculpture was "incidental"), *aff'd*, 567 F. App'x 465 (7th Cir. 2014);

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 940 (4th Cir. 2013) (use "not for [work's] expressive content" but for its "factual content" as a "historical guidepost" was transformative).[3]  Similarly, in *Red Label Music Publishing, Inc. v. Chila Productions*, the court found that using film footage to tell the Chicago Bear's history was fair use.  388 F. Supp. 3d 975, 984–85 (N.D. Ill. 2019).  Both cases relied on *Bill Graham Archives v. Dorling Kindersley Ltd.*, in which the defendant included entire, original Grateful Dead posters in its biography of the famous band.  448 F.3d 605, 609–10 (2d Cir. 2006).  This was fair use because its purpose was to "document and represent the actual occurrence of Grateful Dead concert events."  *Id.*

Likewise, here, the parties' purposes are fundamentally different.  Whereas Plaintiff inked the Tattoos at Mr. Orton's request to reflect his personal expression, Ex. 2 ¶ 18; Ex. 9 at 22:24–23:5, 143:11–145:6; Ex. 10 at 90:19–91:6, Take-Two depicted the Tattoos in *WWE 2K* to depict Mr. Orton as he looks in real life.  Ex. 12 at 43:13–24.  Like *Neri*, the inclusion of the Tattoos is incidental to Take-Two's underlying goal of realism.  *See* 2014 WL 793336, at *6 (purpose of sculpture to "beautify" different from defendant's use to "document"); *Kienitz v. Sconnie Nation LLC*, 965 F. Supp. 2d 1042, 1050 (W.D. Wis. 2013) (plaintiff's candid, serious photograph served different purpose from defendant's use for "sophomoric humor"), *aff'd*, 766 F.3d 756 (7th Cir. 2014).  This weighs in favor of fair use.

Courts evaluate three other considerations in analyzing the first fair use factor.  **First**, courts consider the size of the reproduction of the plaintiff's work.  In *Bill Graham*, the posters were small enough to "permit readers to recognize the historical significance of the posters," but "inadequate to offer more than a glimpse of their expressive value."  448 F.3d at 611.  As the defendant "used the minimal image size necessary to accomplish its" purpose, the use was

---

[3]     *SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (transformative to use *Ed Sullivan Show* clip "as a biographical anchor").

transformative.  *Id.*  Similarly, in *Kelly v. Arriba Soft Corp.*, while the defendant "made exact replications of Kelly's images," the thumbnails that actually were displayed were "smaller, lower-resolution images," making it less likely that they would substitute for the original.  336 F.3d 811, 818 (9th Cir. 2003).  Here, Take-Two's video game expert, Dr. Ian Bogost reached an unrebutted calculation that, in *WWE 2K*, the Tattoos appear "14.35%–15.58% the size they appear in real life."  Ex. 4 ¶¶ 73–74, 91–92.  And the Tattoos are difficult to observe in *WWE 2K* at all.  *See supra* 6; *infra 19*.   This too weighs in favor of a finding of fair use.

>   **Second**, courts consider the context in which the reproduction appears, including the presence of other textual, graphic, or creative content.  When the "expressive value of the reproduced" material is "minimized" by combining it with other materials, a transformative use finding is more likely.  *Bill Graham*, 448 F.3d at 611 (book included a "prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book;" layout "ensures that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, not to exploit copyrighted artwork for commercial gain").  For example, in *Red Label*, the court found that the inclusion of "new narratives" in defendant's work weighed in favor of fair use.  388 F. Supp. 3d at 984–8 (finding plaintiff's work, "used insignificantly, no longer serves the same intrinsic purpose as the original" (internal quotation marks omitted)); *see also Bell v. Powell*, 350 F. Supp. 3d 723, 728–30 (S.D. Ind. 2018) (defendant's use of text and photographs, in addition to plaintiff's photograph, supported finding of fair use); *Bouchat*, 737 F.3d at 941 (logo "used only fleetingly and insignificantly . . . limit[ed] its expressive value").

>   Here, *WWE 2K* is an entire virtual world, with many components, including graphics, characters, a fictitious plot, gameplay, and music.  Exs. 16–18; Ex. 4 ¶ 67; Ex. 10 at 71:5–75:18.

These elements create a fun, lush experience for game users.  Thus, "when the Tattoos are depicted, they appear among a plethora of other visual and auditory elements, including other tattoos." Ex. 4 ¶ 67.  Far from being prominent in *WWE 2K*, Dr. Bogost's unrebutted conclusion is that the Tattoos are "visual noise creating realism," without making a visual impact, akin to hairstyles or facial features, and "subordinated to the display of the arena and the wrestlers in competition." Ex. 4 ¶¶ 81, 89.  Any expressive value of the Tattoos has been diminished significantly by *WWE 2K*'s other elements, particularly as the Tattoos appear on fluid, moving 3D wrestlers while the user tries to play a fast-moving, interactive game, making it even less likely that the user has a chance to focus on them.  *See id.* ¶¶ 47, 63; Exs. 16–18.

       *Third*, courts consider the quantitative proportion of the copied material in relation to the new work as a whole.  *See Bill Graham*, 448 F.3d at 611 (images appeared on seven pages).  For instance, in *Red Label*, the court found that the fact that the defendant used only eight seconds of a work in a 100 minute documentary "reinforc[es] the finding" that the defendant's purpose was different from the original.  388 F. Supp. 3d at 984.  Here, the Tattoos are a tiny fraction of *WWE 2K*.  In terms of data, it is unrebutted that they conservatively are only 0.008% of *WWE 2K*.  Ex. 4 ¶ 99.  In terms of visuals, the Tattoos often do not appear at all.  *Id.* ¶¶ 93, 98.  When they do, they are dwarfed by the "plethora of other visual and auditory elements, including other tattoos," in *WWE 2K*.  *Id.* ¶ 67.  They certainly are far less of *WWE 2K* than the 0.2% that was found to support transformative use in *Bill Graham*.  This further supports transformativeness.

       *Finally*, as to commercial use, "the more transformative the new work, the less will be the significance of other factors, like commercialism." *Campbell*, 510 U.S. at 579.  In fact, commercial use "really only comes up when the alleged infringement substitutes for the copyrighted work in the market." *Red Label*, 388 F. Supp. 3d at 985.  Thus, courts have rejected

the contention that commercial motivation should outweigh a convincing transformative purpose and absence of significant substitutive competition with the original. *See e.g.*, *Sconnie Nation*, 965 F. Supp. 2d at 1049–50 (fair use even where use was "part [of] a commercial venture"). Here, survey expert, Dr. Deborah Jay, conducted a survey and found that "no consumers bought the relevant *WWE 2K* video games for Randy Orton's tattoos, let alone the tattoos at issue in this case." Ex. 6 at App. A, p. 22. This is unrebutted and supports a finding of fair use. *See Red Label*, 388 F. Supp. 3d at 985.[4] Accordingly, the first fair use factor weighs in favor of fair use.

**B.    Factor Two: The Tattoos Are Not Creative and Were Published**

The second fair use factor considers "whether the original work is more creative or factual in nature and whether it was published at the time of the allegedly infringing use." *Galvin v. Ill. Republican Party*, 130 F. Supp. 3d 1187, 1194 (N.D. Ill. 2015). Although it "has rarely played a significant role in the determination of a fair use dispute," *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015), and this factor is less useful where there is a strong showing on factor one, *Red Label* 388 F. Supp. 3d at 985, it nonetheless favors Take-Two.

*First*, the Tattoos are not, or at best are minimally, protected by copyright law. The Copyright Office refused to register the Bible Verse Design, a line from the Bible, Ex. 9 at 143:11–144:11, Ex. 2 ¶ 14, because it is not copyrightable. *Supra* 4 n.1. This makes sense as Plaintiff did not create the tattoo's biblical phrase, *Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 346 (1991) (independent creation required), and a "typeface has never been considered entitled to copyright." *See Eltra Corp. v. Ringer*, 579 F.2d 294, 298 (4th Cir. 1978); 37 C.F.R. § 202.1(e). Plaintiff likewise merely copied a pre-existing tattoo without permission to create the Upper Back Tattoo and the Tribal Additional Designs. Ex. 3 ¶¶ 5, 7–8. As

---

[4]    *See also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (giving "little weight" to commercial nature of use given "attenuated" link between commercial gain and copying).

unauthorized derivative works, they are not copyrightable.  *See* 17 U.S.C. § 103(b); *Theotokatos*

*v. Sara Lee Pers. Prods.*, 971 F. Supp. 332, 340 (N.D. Ill. 1997) (copyright in

derivative work "does not extend to any part of the work" using unauthorized preexisting

material).   And under the doctrine of *scenes-a-faire*, "incidents, characters or settings" which are

"standard, in the treatment of a given topic" are not protectable.  *See Incredible Techs., Inc. v.*

*Virtual Techs., Inc.*, 400 F.3d 1007, 1012 (7th Cir. 2005) (finding common golf elements in

video game about golf not protectable).   Each Tattoo used common elements, such as skulls and

doves, that Plaintiff does not own.  Ex. 9 at 98:15–21; Ex. 5 ¶ 44 (finding it is "common to have

tribal designs in tattoos"); Dkt. 108 at RFA Resps. 133–36.

  **Second**, any creativity that the Tattoos have must be weighed against the fact that Take-

Two copied the Tattoos to depict real-world subject matter realistically.  *See Consumers Union*

*of U.S. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) (copying plaintiff's work "in

the interest of accuracy" did not weigh against fair use); *Bouchat*, 737 F.3d at 943 (where use is

related to work's role as "historical facts, then the creative nature of the work matters much less

than it otherwise would" (internal quotation marks omitted)).  Plaintiff has conceded that *WWE*

*2K* is more realistic because it includes the Tattoos.  Dkt. 95 at RFA Resp. 38.

  **Third**, as the Tattoos were published prior to their inclusion in *WWE 2K*, Exs. 19–23, this

too weighs in favor of fair use.  *See Galvin*, 130 F. Supp. 3d at 1195; *see also Seltzer v. Green*

*Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013) ("Published works are more likely to qualify as

fair use because the first appearance of the artist's expression has already occurred."); *Kelly*, 336

F.3d at 820 (photographs posted on the Internet).  This factor thus supports Take-Two.

  **C.**  **Factor Three: Take-Two's Copying Was Reasonable In Light of Its Purpose**

  The third factor considers the amount used "in relation to the copyrighted work as a

whole."  *Red Label*, 388 F. Supp. 3d at 986.  "[T]he extent of permissible copying varies with the

purpose and character of the use." *Campbell*, 510 U.S. at 586–87.  In other words, if "copying a work as a whole . . . is necessary to the purpose and character of the use," doing so does not weigh against fair use.  *See Neri*, 2014 WL 793336, at *7 (necessary to copy substantial portions of sculpture to realistically depict hallway where sculpture was installed); *see Galvin*, 130 F. Supp. 3d at 1195 ("a reasonable reproduction can include substantial portions of the original"); *Denison v. Larkin*, 64 F. Supp. 3d 1127, 1134–35 (N.D. Ill. 2014) (fair use where defendants copied plaintiff's "entire Blog" as it was necessary to effect defendants' purpose).[5]

Here, where Take-Two's goal was to depict real life accurately, using the entire Tattoos is permissible as using less would not achieve Take-Two's purpose of making *WWE 2K* realistic.  *See supra* 4–5.  Thus, this factor weighs in favor of fair use.  Moreover, it is well-established that when images are reproduced in a "reduced size," the "visual impact of their artistic expression is significantly limited," which indicates that the use "is tailored to further [the defendant's] transformative purpose."  *Bill Graham*, 448 F.3d at 613.  As the Tattoos appear smaller than they do in real life,[6] and only to make *WWE 2K* realistic, Ex. 4 ¶ 7, 89, this too favors fair use.

### D.    Factor Four: Take-Two Has Not Harmed the Market for the Tattoos

The fourth fair use factor is "usually . . . the most important."  *Sconnie Nation*, 766 F.3d at 758.  It considers whether the use will "result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590 (internal quotation marks omitted).  The Seventh Circuit considers whether the copy disrupts plans to license the original or otherwise reduces demand for the original work.  *See Sconnie Nation*, 766 F. 3d at 759 (fourth factor

---

[5]    *See also Bouchat*, 737 F.3d at 949; *Seltzer*, 725 F.3d at 1178; *Kelly*, 336 F.3d at 820–21; *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000).

[6]    Given the average screen size on which *WWE 2K* is played, the Tattoos "are depicted about 14.35–15.58% the size they appear in real life."  Ex. 4 ¶¶ 73–74.

favored fair use where products were not substitutes and plaintiff could not say "that defendants disrupted a plan to license this work" nor could plaintiff argue that defendants "reduced the demand for the original work"); *see also Google*, 804 F.3d at 223 (considering "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original").

Plaintiff ***admitted*** that she does not compete with Take-Two.  Ex. 9 176:2–8, 176:24–5. Plaintiff's expert ***admitted*** that *WWE 2K* is not a substitute for the Tattoos.  *See* Ex. 10 at 178:16–179:1.  Indeed, Plaintiff is not aware of any business that she lost due to the depiction of Mr. Orton in *WWE 2K*.  *Id.* at 186:3–14.  This weighs in favor of fair use.  *See Sconnie Nation*, 766 F.3d at 759 (fair use where defendant's product did not reduce demand for original).

Moreover, Plaintiff has not established that there is a market for licensing the Tattoos. "[I]t is a given in every fair use case that plaintiff suffers a loss of a *potential* market if potential is defined as the theoretical market for licensing the very use at bar." *Swatch*, 756 F.3d at 91.  To "guard against this vice of circular reasoning," the factor four inquiry is limited "to a use's impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Id.* (internal quotation marks omitted).  "[W]ere a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder." *Bill Graham*, 448 F.3d at 614.

Dr. Bogost, Dr. Jablonski, and Take-Two's damages expert, Mr. Malackowski, offered ***unrebutted*** testimony that video games are not a reasonable, traditional, or likely to be developed market for tattoos.  Ex. 4 ¶ 101; Ex. 5 ¶ 45; Ex. 9 at 181:6–9; Ex. 3 ¶¶ 11–12; Ex. 7 at App. A, p.

4, App. B, p. 2.  This makes sense for three reasons.  *First*, as Plaintiff admits, tattoos have not been licensed for video games before.  Ex. 9 at 180:22–181:9.  *Second*, Take-Two minimally uses the Tattoos to depict Mr. Orton realistically.  "The video game industry would not reasonably anticipate licensing the Tattoos" for this purpose.  Ex. 4 ¶ 103; *see also Bouchat*, 737 F.3d at 943 (market harm unlikely where use is "transient and fleeting" as well as for "its factual, and not its expressive, content").  *Third*, a "tattooist would not want to encumber his or her clients by" requiring a license under these circumstances.  Ex. 5 ¶¶ 46–47.

Additionally, Plaintiff conceded that (a) she is unaware of anyone licensing tattoos for use in video games; and (b) she has not licensed tattoos for use on people in video games or for any form of media at all.  Ex. 9 at 179:2–180:2.  These admissions are fatal to Plaintiff's case.  *Neri*, 2014 WL 793336, at *9 ("[D]efendants' activities could not have affected a non-existent market."); *see also Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006) (fair use where plaintiff "never licensed any of her photographs").  As Plaintiff is trying to "create a market in this case that has never existed before and would not be reasonable or likely to be developed based on the customs and practices of the tattoo industry," Ex. 5 ¶ 45, this factor weighs toward fair use.

## E.   Considerations of the Public Interest Favor Take-Two

"Ultimately, the test of fair use is whether copyright law's goal of promoting the Progress of Science and useful Arts . . . would be better served by allowing the use than by preventing it."  *Neri*, 2014 WL 793336, at *5 (quotation marks omitted; *citing Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998)).  Fair use protects secondary users "from the inevitable chilling effects of allowing an artist too much control over the dissemination of his or her work for historical purposes."  *Bouchat*, 737 F.3d at 944.  Were courts to "require those wishing to produce [new works] to receive permission from copyright holders for fleeting factual uses of their works, [they] would allow those copyright holders to exert enormous influence over

- 17 -

new depictions of historical subjects and events . . . This would align incentives in exactly the wrong manner, diminishing accuracy and increasing transaction costs, all the while discouraging the creation of new expressive works." *Id.* at 944–45.

Here, a finding of copyright infringement will discourage the creation of new works, resulting in fewer tattoos because, if clients continually must go back to the tattooist for permission, it would likely deter people from expressing themselves through their tattoos.  Ex. 5 ¶ 28.  It also would deter video game developers from creating realistic games, as they are not likely to engage in the herculean task of identifying and negotiating with tattooists for each tattoo.  Ex. 1 ¶¶ 12–13.  Finding each tattooist may be impossible if the inked individual does not remember the tattooist, or the tattooist retired, moved, or passed away.  *Id.* ¶ 17.  It would also hamper the creation of other works in which professional wrestlers appear, including telecasts, photographs, and news programs.  *Id.* ¶ 17.  Thus, *WWE 2K* makes fair use of the Tattoos.

## III.    TAKE-TWO'S USE OF THE TATTOOS IS *DE MINIMIS*

Plaintiff's copyright claim also fails as Take-Two's use of the Tattoos is *de minimis*. Copying is *de minimis* if the amount of "protected material" copied "is so trivial as to fall below the quantitative threshold" for infringement.  *Isringhausen Imports, Inc. v. Nissan N. Am., Inc.*, No. 10 Civ. 3253, 2011 WL 6029733, at *6 (C.D. Ill. Dec. 5, 2011); *see also G.R. Leonard & Co. v. Stack*, 386 F.2d 38, 40 (7th Cir. 1967) (copying five of 90,000 entries in travel guide was *de minimis* and not infringement).  That is determined by considering the "observability of the copied work—the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting, camera angles, and prominence."  *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997).

Here, Take-Two's use is *de minimis*.  **First**, it is undisputed that the Tattoos often do not appear in *WWE 2K*, as they only appear when Mr. Orton is selected from the hundreds of

wrestlers available.  Ex. 4 ¶¶ 65, 67.  *Second*, even when Mr. Orton is selected, it is difficult to

pick out the six, small Tattoos on Mr. Orton as he moves and grapples in the arena, *id.*¶ 63, 82–

88, 98, particularly as they are depicted about 14.35%–15.58% the size they appear in real life,

*id.* ¶ 73–74.  Moreover, numerous other game elements—like clothing, other wrestlers and

referees, camera angles, and set pieces—may block a user's view of the Tattoos.  *Id.*  The

Tattoos are surrounded by a host of visual and auditory elements, including the physical ring,

insignia, spectators, the arena, the game clock, *id.* ¶ 62, as well as wrestler voices, noisy crowds,

bells, and music, *id.* ¶ 56.  Combined, these elements make make it such that "the ordinary player

will perceive the Tattoos as a kind of visual noise," "creating realism" but being no more

noticeable than a "simulated wrestler's nose shape or hairstyle."  *Id.* ¶ 89.  Users may see a

Tattoo for a moment, but such quick glimpses are *de minimis* use.  *Sandoval v. New Line Cinema

Corp.*, 147 F.3d 215, 216 (2d Cir. 1998) (display of plaintiff's work for 1.5 minutes *de minimis*).

     **Third**, the Tattoos are a fractional piece of *WWE 2K*.  Each Tattoo comprises, at most,

0.008% of *WWE 2K's* game data, according to Dr. Bogost's unrebutted calculation.  Ex. 4 ¶ 8.

This too weighs in favor of a finding of *de minimis* use.  *See MiTek Holdings, Inc. v. Arce Eng'g

Co.*, 89 F.3d 1548, 1560 (11th Cir. 1996) (no infringement as protectable elements "were not of

such significance to the overall program to warrant an ultimate finding of substantial similarity").

## IV.    PLAINTIFF CANNOT SHOW THAT SHE IS ENTITLED TO DAMAGES

     Plaintiff cannot show that she is entitled to either actual damages or Take-Two's profits

and, thus, Take-Two is entitled to summary judgment on this issue.  As copyright infringement is

a "form of tort," Plaintiff must show causation to receive actual damages.  *Ocean Atl. Woodland

Corp. v. DRH Cambridge Homes, Inc.*, 262 F. Supp. 2d 923, 927 (N.D. Ill. 2003); *Bell v. Taylor*,

827 F.3d 699, 710 (7th Cir. 2016).  Similarly, Plaintiff must prove a causal connection between

the alleged infringement and Take-Two's profits to receive a portion thereof.  *See Sullivan v.*

*Flora, Inc.*, No. 15 Civ. 298, 2017 WL 1487624, at *1 (W.D. Wis. Apr. 25, 2017).  "[W]here the

relationship between the profit and infringement is . . . attenuated or speculative, the plaintiff is

not entitled to recover defendant's profits."  *Ocean*, 262 F. Supp. 2d at 927 (*citing Frank Music

Corp .v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1553 (9th Cir. 1989)).

As to actual damages, Plaintiff is not aware of any business that she lost due to the

depiction of the Tattoos in *WWE 2K*.  Ex. 9 at 186:3–13.  She has never made any money from

licensing any tattoos to anyone, *id.* at 179:2–6, and there is no market for the Tattoos in video

games, *see supra* 16–17.  In fact, Plaintiff's purported damages expert, Ryan Clark, admitted that

he (1) "can't say one way or the other if there are actual damages in this lawsuit," (2) "[he's] not

going to offer any opinion on actual damages," and (3) "[he's] not going to offer any opinions on

whether there's a market for licensing tattoos for depiction in video games" or "whether such a

market is likely to develop."  Ex. 11 at 39:17–25, 80:14–23.[7]

As to profits, Plaintiff has similarly not presented *any* evidence of a causal link between

the purported infringement and Take-Two's revenues.  *See Dash v. Mayweather*, 731 F.3d 303,

309 –10 (4th Cir. 2013) (summary judgment as no evidence of link).  In stark contrast with

Plaintiff's lack of proof,[8] the available evidence shows that no such link exists.  Dr. Jay's

unrebutted survey shows that no consumers purchased *WWE 2K* because of the Tattoos.  Ex. 6 at

App. A, p. 22.  Thus, summary judgment on this issue is appropriate as well.

## CONCLUSION

Take-Two respectfully requests that this Court grant its motion in its entirety.

---

[7]  Mr. Clark also admitted that he does not have an opinion on whether "[t]here would be less sales of the accused video games if Mr. Orton was shown without the tattoos in the accused video game."  Ex. 11 at 171:14–20.

[8]  Although Plaintiff may rely on Dr. Zagal, he testified only that the inclusion of Mr. Orton in the game impacted sales of the game (and even this evidence was not supported by any facts or data).  *See* Defs.' Mot. to Exclude the Testimony of J. Zagal.  He could not testify as to whether the Tattoos themselves impacted sales of the game.  Ex. 10 at 158:19–160:4.

Dated: November 8, 2019

Respectfully submitted,

/s/ Dale M. Cendali

Dale M. Cendali (admitted *pro hac vice*)
Joshua L. Simmons (admitted *pro hac vice*)
Christopher T. Ilardi (admitted *pro hac vice*)
Miranda D. Means (admitted *pro hac vice*)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com
miranda.means@kirkland.com

Michael J. Nester (#02037211)
Donovan Rose Nester P.C.
15 North 1st Street, Suite A
Belleville, Illinois 62220
Telephone: (618) 212-6500
mnester@drnpc.com

*Attorneys for Defendants Take-Two Interactive Software, Inc., 2K Games, Inc., 2K Sports, Inc., and Visual Concepts Entertainment*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| CATHERINE ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| TAKE-TWO INTERACTIVE SOFTWARE, INC.,| ) | |
| 2K GAMES, INC.; 2K SPORTS, INC.; WORLD | ) | Case No. 3:18-cv-966-SMY-MAB |
| WRESTLING ENTERTAINMENT, INC.; | ) | |
| VISUAL CONCEPTS ENTERTAINMENT; | ) | |
| YUKE'S CO., LTD.; AND YUKE'S LA, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2019, I electronically filed the foregoing **Memorandum of Law in Support of Defendants' Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Anthony G. Simon | asimon@simonlawpc.com |
| Benjamin R. Askew | baskew@simonlawpc.com |
| Anthony R. Friedman | afriedman@simonlawpc.com |
| Carrie L. Roseman | croseman@simonlawpc.com |
| R. Seth Crompton | scrompton@allfela.com |
| Tracey Blasa | tblasa@allfela.com |
| Jerry McDevitt | jerry.mcdevitt@klgates.com |
| Curtis Krasik | curtis.krasik@klgates.com |

*/s/ Dale M. Cendali*

Dale M. Cendali (admitted *pro hac vice*)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

*Attorney for Defendants Take-Two Interactive Software, Inc., 2K Games, Inc., 2K Sports, Inc., and Visual Concepts Entertainment*