# EXHIBIT 1

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

EAST ST. LOUIS DIVISION


CATHERINE ALEXANDER,

     Plaintiff,

vs.                              No. 3:18-cv-966-MJR-DGW

TAKE-TWO INTERACTIVE SOFTWARE, INC.,
2K GAMES, INC.; 2K SPORTS, INC.; WORLD
WRESTLING ENTERTAINMENT, INC.;
VISUAL CONCEPTS ENTERTAINMENT;
YUKE'S CO., LTD.; AND YUKE'S LA, INC.,

     Defendants.


HIGHLY CONFIDENTIAL


VIDEOTAPED DEPOSITION OF RYAN CLARK

September 12, 2019

St. Louis, Missouri


Reported by:

Pamela Watson Harrison

Job no: 26039

HIGHLY CONFIDENTIAL

Page 44

1        A.    Yeah, I do recall that.  It was part of

2    a video game of how -- how they do that, how the

3    video game designers are able to mimic their

4    moves.  It's -- and it just stuck in my memory

5    because that makes sense to me because it's like

6    how would you do that, and without having them

7    hooked up to some kind of software computer to be

8    able to do that, right, because otherwise you'd

9    have to draw it out and I think that would be

10   pretty time-consuming.  I'm not a video game

11   expert.  I will admit that.

12        Q.    Have you spoken with any of the other

13   experts in this case?

14        A.    No.

15        Q.    You haven't spoken with Mr. Zagal?

16        A.    No.

17        Q.    You did review Mr. Zagal's report in

18   this case, right?

19        A.    Correct.

20        Q.    Did you also review Mr. Zagal's

21   deposition transcript?

22        A.    No.

23        Q.    You do offer some opinions on design

24   choices in your report, right?

25        A.    No.

HIGHLY CONFIDENTIAL

Page 45

1        Q.   So you do not have any opinion on design

2    choices?

3             MR. FRIEDMAN:  Object to form.

4    QUESTIONS BY MR. ILARDI:

5        Q.   In the WWE 2K games.

6             MR. FRIEDMAN:  Same objection.

7        A.   Can you read the question back to me?

8    QUESTIONS BY MR. ILARDI:

9        Q.   You do not have any opinion on the

10   design choices made in the WWE 2K games?

11            MR. FRIEDMAN:  Same objection.

12       A.   My opinions are in my report, and

13   they're rebuttal opinions of Mr. Malackowski; and

14   I don't have an opinion on a design of a game.

15            MR. FRIEDMAN:  Counsel, we've been going

16   for about an hour.

17            MR. ILARDI:  Sure.

18            MR. FRIEDMAN:  If you're starting a

19   new --

20            MR. ILARDI:  Yeah.

21            MR. FRIEDMAN:  -- session --

22            MR. ILARDI:  Fair enough.  If you'd like

23   a break, I'm happy to accommodate.

24            THE WITNESS:  Sure.

25            MR. ILARDI:  Okay.

HIGHLY CONFIDENTIAL

Page 46

1          THE VIDEOGRAPHER:  This ends media

2     number 1.  We're off the record.  It is 9:56 a.m.

3               (Off the record from 9:56 a.m.

4               until 10:05 a.m.)

5          THE VIDEOGRAPHER:  This begins media

6     number 2.  We're back on the record.  It is

7     10:05 a.m.

8     QUESTIONS BY MR. ILARDI:

9          Q.   Mr. Clark, before we broke, we were

10    talking earlier this morning about the fact that

11    you have played video games before?

12         A.   Correct.

13         Q.   And do you enjoy playing them?

14         A.   Yes.

15         Q.   Are video games a form of art?

16         A.   I don't have an opinion on that.  I

17    don't know what you mean by that.

18         Q.   You do have opinions on whether or not

19    realism is important to consumers of video games;

20    is that correct?

21         A.   Based off of Dr. Zagal's report.  And in

22    realism being a driver of consumer demand and

23    essentially based off of what Dr. Zagal has opined

24    to.

25         Q.   You're not offering any of your own

HIGHLY CONFIDENTIAL

Page 47

1   opinion on whether realism drives consumer

2   demands?

3        A.   No.

4        Q.   And do you offer any opinions beyond

5   what Mr. Zagal talks about, about the video game

6   industry?

7        A.   Well, my opinions are separate from

8   Dr. Zagal's opinions, and I believe where it is --

9   there's some overlap is on the tattoos and

10  Mr. Malackowski's opinion that zero profits and

11  sales are attributable to, you know, the tattoos.

12       Q.   You do offer opinions on the concept of

13  whether the profits are attributable to the

14  tattoos?

15       A.   Yes.

16       Q.   To be clear, when I say "the," I mean

17  you offer opinions on whether Take-Two's profits

18  are attributable to the tattoos?

19       A.   That's correct.  I agree with

20  Mr. Malackowski that zero -- or zero contribution

21  of the accused tattoos.

22       Q.   In your opinion, there is some

23  contribution of the accused tattoos to Take-Two's

24  profits in selling WWE 2K?

25       A.   Yes.

HIGHLY CONFIDENTIAL

Page 54

1        Q.    And, specifically, in WWE 2K, there are

2    many design choices made for that game?

3        A.    Okay.

4        Q.    And is it your opinion that every single

5    design choice could possibly impact Take-Two's

6    profits?

7        A.    No.

8        Q.    So there is some sliding scale about

9    which -- which design choices impact profits and

10   which ones won't?

11            MR. FRIEDMAN:  Objection.  It

12   mischaracterizes.

13       A.    I haven't referenced a sliding scale.

14   You have to clarify what you mean by that.

15   QUESTIONS BY MR. ILARDI:

16       Q.    So you agree that there are some design

17   choices that are not going to have an impact on

18   Take-Two's profits?

19            MR. FRIEDMAN:  Objection.  Asked and

20   answered.

21       A.    As I mentioned previously, I haven't

22   done an analysis of the numerous design choices

23   and their impact on profits.

24   QUESTIONS BY MR. ILARDI:

25       Q.    It's possible that if the designers

HIGHLY CONFIDENTIAL

Page 55

1    added or had a crowd size of 10,001 instead of

2    10,000, that extra one person is going to impact

3    Take-Two's profits?

4         A.   It's possible that it will?

5         Q.   That's my question.

6         A.   Again, I don't -- I don't know if it

7    would or would not.  I've not done that analysis.

8         Q.   What analysis on design choices have you

9    done?

10        A.   So I am not -- as I mentioned earlier,

11   I'm not a video game designer.  Just a user,

12   player of the games.  And my opinions are related

13   to the economics, the damages in this case.  It's

14   Dr. Zagal who has opinions on the design choices

15   in the game and the impact those design choices

16   would have on the game itself as well as sales and

17   profits of those games.

18        Q.   But you do offer an opinion that the

19   inclusion of specific tattoos on the Orton

20   character in the WWE 2K series was motivated by a

21   desire to increase profits?

22        A.   My opinion is I disagree with

23   Mr. Malackowski that none of the profits of

24   Take-Two are attributable to the accused tattoos,

25   based on the testimony and facts in evidence in

HIGHLY CONFIDENTIAL

Page 76

1      Q.   You also haven't done an analysis on how

2   the depiction of the -- depiction of the tattoos

3   in the accused video games impacts Take-Two's

4   profits?

5      A.   That's correct.

6      Q.   Can you describe for me what your

7   assignment was in this matter?

8      A.   Yes.  And it's outlined in my report

9   under Section 1.2.

10      Q.   Okay.

11      A.   And it was to provide an analysis of the

12   validity and reliability of the opinions of the

13   defendants' damages expert, James Malackowski.

14      Q.   And fair to say that your report

15   contains all of your opinions concerning

16   Mr. Malackowski's damages opinions?

17      A.   Yes.

18      Q.   Is everything that you disagree with

19   Mr. Malackowski in your report?

20      A.   No.

21      Q.   There are things other -- there are

22   things not written in your report -- actually, let

23   me rephrase that.

24          There are things that Mr. Malackowski

25   has opined on that you disagree with but that you

HIGHLY CONFIDENTIAL

Page 86

1    portrayal of athletes and characters in these

2    video games and the degree that the video game

3    designers will go to achieve that realism for

4    their consumers.

5         Q.   But this is about a video game that's

6    not part of the present lawsuit?

7         A.   That's correct.

8         Q.   As for Mr. Orton, you have no opinion on

9    whether his tattoos are part of his persona and

10   identity?

11        A.   That's correct.

12        Q.   And as for Mr. Orton, you have no idea

13   whether it -- if his tattoos weren't shown,

14   whether it would really be a depiction of

15   Mr. Orton?

16        A.   That's correct.

17        Q.   You say you have -- you've seen

18   wrestling matches before, right?

19        A.   Correct.

20        Q.   And agree that professional wrestlers --

21   they do their wrestling in public?

22        A.   Okay.  Correct.

23        Q.   When they're in real life, when their

24   wrestling's at an arena, the crowd can see them?

25        A.   Correct.

HIGHLY CONFIDENTIAL

Page 120

1    direct or variable costs associated with

2    manufacturing those products.

3        Q.    In this lawsuit, you did not attempt to

4    make an allegation of those -- of the direct and

5    variable costs associated with the accused video

6    games?

7        A.    I don't have the information to do it.

8        Q.    Well, you said in another case you used

9    a 10-K to do that, right?

10       A.    I clarified that and said that I used

11   the companywide financial statements.  We had an

12   account-by-account analysis, was able to talk to

13   the controller of the business, and talk about the

14   components, the various expense items, and ran a

15   couple other calculations that we typically use to

16   determine direct costs associated with operating

17   overhead.

18            In this case it's a manufacturer, so

19   that makes sense.  Here, you know, my

20   understanding is a lot of these games are put

21   together by an outside party.  So, you know, I

22   understand that they have a marketing budget and

23   they track that.  That seems appropriate as a

24   direct expense.  But as I mentioned, here, the

25   gross profit margin is substantially lower than --

HIGHLY CONFIDENTIAL

Page 121

1    than the total company, and I have no way of

2    checking it, understanding of why that is.

3            You can't -- to answer your question,

4    you can't do it with the 10-K.  And I didn't do it

5    with the 10-K.  I haven't -- I am not representing

6    that their profit margin should what the 10-K is.

7    I want to be clear on that.

8        Q.   So to be clear, your opinion is not that

9    Take-Two's profit margins for the accused video

10   games are what the companywide profit margins are

11   as reported in the 10-K?

12       A.   I never wrote that.  Or I never

13   testified to that.  It's what Mr. Malackowski said

14   in his report and wrote in his report, and that's

15   where I was mentioning I disagree with that.

16       Q.   What additional, I guess, document was

17   required to track direct and variable costs for

18   the accused video games?

19       A.   Well, what additional documents would I

20   like to review, I guess, is your question; and I

21   would want -- I would want to know what overhead

22   has been allocated.  I would want to take that out

23   of the cost of sales, and then do an analysis on

24   the operating expense.

25           Now, we -- they're representing that the

HIGHLY CONFIDENTIAL

Page 130

1      A.    That's correct.

2      Q.    Do you provide any opinions on how much

3  higher those costs are?

4      A.    No.

5      Q.    Did you calculate the delta between the

6  10-Ks and the information reported in Exhibit 2?

7      A.    Yes.

8      Q.    And did you include that information in

9  your report?

10      A.    No.

11      Q.    Do you intend to testify as to that

12  information at trial?

13      A.    Yes.

14      Q.    And you are aware that your report has

15  to contain all of the facts and bases for your

16  opinions that you intend to testify at trial?

17      A.    I understand as rebuttal expert my

18  opinion is I disagree with Mr. Malackowski's

19  calculation of 2K's gross profits and that's my

20  opinion, and the basis for that is his report and

21  what he relies upon in his report.  And as far as

22  explaining, I've explained some of that in my

23  report as well as here at deposition.

24      Q.    So in -- your testimony is that by

25  saying Mr. Malackowski's calculation is wrong, you

HIGHLY CONFIDENTIAL

Page 131

1    are now allowed to testify at trial as to any

2    reason you think that's wrong regardless of

3    whether that reason appears in your report?

4        A.   I think as long as it is within the

5    opinion of my opinion on his calculation of gross

6    profit and explanation of why it's incorrect, yes,

7    I believe I can provide an explanation for that.

8        Q.   Certainly you wouldn't just write a

9    report saying "I disagree with Mr. Malackowski"

10   and expect to then be able to testify later why

11   you disagreed, right?

12       A.   Yes.  And I've noted why I disagree.

13   But here's the challenge, is I don't have it

14   quantified of what the actual number is because I

15   don't -- the data is insufficient to do so.  So

16   how can I opine on why I disagree with him when I

17   don't have the information to be able to provide

18   the explanations of that?

19       Q.   You've provided new opinions today about

20   overhead allocation, right?

21       A.   It's not a new opinion.  My opinion is I

22   disagree with his gross profit calculation, one of

23   the reasons being it includes -- appears to

24   include an allocation of overhead.

25       Q.   And that reason that you just stated

HIGHLY CONFIDENTIAL

Page 134

1    their gross profit, which I mentioned I do not

2    agree with the calculation of gross profit.  And

3    one of the reasons could be because there's an

4    overhead allocation in that number.

5        Q.   In the report, the full basis for your

6    disagreement with the calculation of gross profits

7    does not include a disagreement with overhead

8    allocation, correct?

9        A.   That's correct, because all I had at the

10   time of my report was Document 1332 and a

11   description of cost of goods sold including

12   overhead allocation and that's it.

13       Q.   Your criticism of overhead allocation

14   today is no different than one you could have

15   provided at the time you put it in your report?

16       A.   That's true because no additional

17   information has been provided.  That's a correct

18   statement.

19       Q.   Are there other criticisms of

20   Mr. Malackowski's opinion that you have that you

21   did not include in your report but you plan to

22   testify to at trial?

23       A.   Yes.  Under second opinion B, where I

24   disagree with Mr. Malackowski's calculation of

25   Take-Two's operating profit earned from its sale

HIGHLY CONFIDENTIAL

Page 135

1    of accused video games.  And to explain, I've

2    notated that he's included ███████████

3    ███████████████████████████████████, and

4    I believe he's included indirect expenses in his

5    calculation.  So, therefore, his calculation of

6    operating profit is incorrect.

7         Q.   Is that opinion written in your report?

8         A.   Yeah.  But it's footnoted and implied.

9         Q.   Is it your testimony that you are

10   going -- that you at trial will testify as to

11   implied opinions?

12        A.   Well, my -- so you keep asking me about

13   opinions within my opinions and I have three

14   opinions, and I plan to testify on those three

15   opinions; and when asked questions about why I

16   disagree with Mr. Malackowski in those three

17   areas, I'm going to provide that testimony.  I

18   didn't write down every bit of expected testimony

19   in that area.

20        Q.   So it's fair to say you did not write

21   down every reason that you have for your three

22   opinions?

23             MR. FRIEDMAN:  Object to form.

24        A.   I would say that's not correct.  I was

25   careful not to make a statement that was not

HIGHLY CONFIDENTIAL

Page 137

1    Take-Two's finance person, Mr. Charleton.  So I

2    don't have that information.  I also don't have

3    the information of the internal financial

4    statements that it's my understanding this

5    document could be reconciled with.  So he --

6    Mr. Malackowski didn't include that.  So have the

7    same criticism of him.

8         Q.   I'm asking you if you are now saying you

9    are going to testify at trial as to facts or

10   reasons that are not explicitly included in your

11   report.

12        A.   I disagree with that.

13        Q.   But you do agree that at least the

14   overhead allocation criticism is not explicitly

15   written in your report?

16        A.   It's encompassed in the first and second

17   opinion that I disagree with Mr. Malackowski's

18   gross profit and operating profit calculations.

19        Q.   I'm not able to ask you questions about

20   the reasons that you haven't written in your

21   report or that you haven't told me about today; is

22   that fair?

23        A.   That's fair.

24        Q.   If you had not raised overhead

25   allocation this morning, it's fair to say that I

Page 138

1    may not have even been able to ask you questions

2    about it?

3         A.    Okay.

4         Q.    So are there other -- are there other

5    areas or other reasons you have that you disagree

6    with Mr. Malackowski that you plan on testifying

7    to at trial?

8         A.    Not that come to mind right now.

9         Q.    The only additional -- the only new

10   opinion is about overhead allocation?

11        A.    It's not --

12             MR. FRIEDMAN:   Objection.

13   Mischaracterizes.

14        A.    Right.  It's not a new opinion.

15   QUESTIONS BY MR. ILARDI:

16        Q.    Is it a new criticism?

17        A.    No.

18        Q.    Is it a criticism not within your

19   report?

20        A.    It is a criticism that is not written in

21   my report.

22        Q.    Okay.  If you look at the second

23   sentence in Section 3A, it says:  "Interestingly,

24   Take-Two recorded the company earned gross profits

25   of 45.1 percent of total net revenue for the

HIGHLY CONFIDENTIAL

Page 139

1    period covering April 2015 through March 31, 2018,

2    see attached Exhibit C, Schedule 301."

3              Is that right?

4    A.    Yes.

5    Q.    Exhibit C, Schedule 301, is information

6    based off of Take-Two's 10-Ks for the fiscal year

7    2017 to 2018?

8    A.    And 2016.

9    Q.    Right.  But you only --

10   A.    Correct.

11   Q.    So you cited 2017.  That includes all

12   the way back to, I think, 2015 or 2016?

13   A.    To 2016, correct.

14   Q.    It goes back several years?

15   A.    Correct.

16   Q.    The next -- the next sentence in 3A is:

17   "The external development costs, license, internal

18   royalties, internal development costs included in

19   Mr. Malackowski's gross profits calculations are

20   significantly higher as a percentage of total net

21   revenue than the amounts reported on Take-Two's

22   Form 10-Ks."

23              And that information again comes from

24   Take-Two's Form 10-Ks compared to

25   Mr. Malackowski's calculation, correct?

HIGHLY CONFIDENTIAL

Page 140

1          A.    Correct.

2          Q.    The next sentence you report on what the

3     10-K reported; that "The software and development

4     costs and royalties included 24.6 million and

5     21.1 million of stock-based compensation expense

6     in 2018 and 2017, respectively."

7               Once again, that information comes from

8     Take-Two's Form 10-K, right?

9          A.    Correct.

10         Q.    And then you also include a sentence:

11     "Take-Two reported its research and development

12     costs increased for the fiscal year ended

13     March 31, 2018, as compared to the prior year due

14     primarily because of increased personnel expense

15     due to increased head count including our

16     acquisition of Social Point and higher stock-based

17     compensation."

18         A.    Correct.

19         Q.    The information for that sentence,

20     again, comes from Take-Two's Form 10-K?

21         A.    Correct.

22         Q.    And the only other sentence that appears

23     in this section is your statement:

24     "Mr. Malackowski's calculation of Take-Two's gross

25     profits erroneously includes costs not directly

HIGHLY CONFIDENTIAL

Page 145

1          Q.    On the tables on pages 28 through 29?

2          A.    No.  But in the footnotes of the 10-K.

3          Q.    Right.  Okay.  If you look back at

4     page 27.

5          A.    Okay.

6          Q.    This has a listing of product releases

7     for 2018, right?

8          A.    Yes.

9          Q.    And this lists a number of different

10    video games, correct?

11         A.    Correct.

12         Q.    Do you know how many video games

13    Take-Two has sold -- how many different types of

14    video games Take-Two has sold since 2015?

15         A.    No.

16         Q.    How many -- how many different titles

17    Take-Two has sold since 2015?

18         A.    No.

19         Q.    On this list, I think there are -- I

20    counted about 10 different titles.  You can check

21    me on that.  But it's fair to say Take-Two has at

22    least 10 different titles in 2018?

23         A.    That's fair to say, yes.

24         Q.    And those titles do not, as far as you

25    know, encompass every title that they released

HIGHLY CONFIDENTIAL

Page 164

1    or this analysis, are you relying, then, on your

2    own expertise?

3        A.    Well, I mean, yes.  An expertise in

4    working in these types of engagements, having

5    experience in reviewing other expert reports and

6    understanding other types of technology.  I have

7    to be able to do that to understand the facts and

8    circumstances surrounding the alleged

9    infringement.  So, you know, I'm able to also have

10   the benefit of having experts in those fields to

11   be able to explain and provide additional

12   information in areas that I'm not an expert in.

13   That also ties in with the damages.

14       Q.    In this sentence, you're not providing

15   any additional information, are you?

16       A.    Which sentence?

17       Q.    The sentence that starts with "one way

18   the developers" and continues on, the second

19   sentence in Section 3D.

20       A.    Okay.

21       Q.    In that sentence, you're not providing

22   any additional opinion or expertise beyond what's

23   already been stated in this case?

24       A.    I'd agree with that, yes.  An

25   observation.

HIGHLY CONFIDENTIAL

```
 1        A.    Correct.

 2        Q.    And here you have declined to provide

 3   any percentage?

 4        A.    I have not, that's correct.  I have not

 5   provided -- I haven't declined.  I have disagreed

 6   with Mr. Malackowski that it is zero percent.

 7        Q.    That means, in your opinion, if

 8   Mr. Orton's character was shown without his

 9   tattoos, that would negatively impact Take-Two's

10   profits?

11        A.    Yes.

12        Q.    And people would buy -- people would

13   buy -- let me rephrase that.

14              There would be less sales of the accused

15   video games if Mr. Orton was shown without the

16   tattoos in the accused video games?

17        A.    That's not my opinion.  That's

18   Dr. Zagal's opinion that there would be less

19   sales.  But it seems like a reasonable opinion and

20   a reasonable basis for that, I believe.

21        Q.    There's some number of consumers who

22   otherwise would have purchased WWE 2K who now

23   would not purchase it if Mr. Orton was not shown

24   with his tattoos?

25        A.    I think that is a true statement
```

HIGHLY CONFIDENTIAL

Page 172

1    because, essentially, what is being quantified

2    is -- what the other experts are trying to

3    quantify is what that profit contribution

4    percentage is.  And if it's something greater than

5    zero, then what's been concluded is that there

6    is -- copyrighted work is contributing to the

7    profits of the company and if -- you know, profits

8    of company of sales and expenses.  I think that's

9    an accurate statement.

10        Q.   Are there some people who buy WWE 2K

11   because of the tattoos that appear on Mr. Orton?

12        A.   So, again, you're getting outside of my

13   area of my opinions.

14        Q.   Well, the way I read your opinions, I

15   don't think we are -- unless you're not going to

16   offer the opinions in Section 3D, you do offer

17   opinions that the design choices, including the

18   tattoos, had an impact on profits, don't you?

19        A.   Yes, based off of the expert in the

20   video game industry, based off of some survey data

21   from Take-Two's video game surveyor.  There was

22   some percentage of the consumers that valued, you

23   know, the realism of characters; and that's

24   something that I'll leave to those experts to talk

25   about.

HIGHLY CONFIDENTIAL

Page 181

1    3 percent of the respondents to the survey stated

2    that the game's realism or lifelike characters was

3    the main reason for buying the game."

4            Do you see that?

5        A.   Yes.

6        Q.   And you reviewed Dr. Jay's report in

7    preparing your report; is that correct?

8        A.   That's correct.

9        Q.   In your opinion, is Dr. Jay's survey

10   reliable?

11       A.   I don't have an opinion on it.

12       Q.   You do rely on it, though, don't you?

13       A.   As does Mr. Malackowski, yes.

14       Q.   You do not have opinion on reliability

15   of Dr. Jay's survey, but you do rely on it to

16   support your opinion?

17       A.   It's part of my opinion that part of

18   Mr. -- sorry -- Dr. Jay's survey there were some

19   responses related to the reason for buying the

20   game, the realism of it, of the characters, as

21   well as is the depiction of Mr. Orton in the game.

22       Q.   Did you attempt to analyze whether

23   Dr. Jay's findings were reliable on something that

24   you can provide -- you can rely on to provide an

25   opinion?

HIGHLY CONFIDENTIAL

Page 190

1    that information is not available.

2    QUESTIONS BY MR. ILARDI:

3        Q.   So it's not your opinion that consumers

4    purchased the game because of Mr. Orton's tattoos?

5            MR. FRIEDMAN:   Object to form.

6        A.   I don't have -- that's -- my opinions

7    are right here.   So I disagree with

8    Mr. Malackowski's opinion that none of the profits

9    of Take-Two are attributable to the depiction of

10   tattoos in the accused video games.

11   QUESTIONS BY MR. ILARDI:

12       Q.   And you don't have any opinion, one way

13   or the other, whether that has anything to do with

14   people purchasing the games because of the

15   tattoos?

16       A.   That's right.   Because that's out --

17   that's out of my area of expertise.   That's --

18   that's for the video game experts, their opinions,

19   their testimony.   That's outside of my area.

20       Q.   Is that a different area of expertise

21   than opining that there are some profits

22   attributable to the depiction of the tattoos in

23   the accused video games?

24       A.   You're just asking the question in a

25   different way.   So I don't know.   My opinion is

HIGHLY CONFIDENTIAL

Page 191

1    that there has to be some profit contribution

2    based off -- I'm relying upon the evidence in the

3    case and another expert that is opining that

4    Take-Two's sales and profits would have been

5    negatively affected if Mr. Orton's tattoos were

6    not included in the game.

7         Q.   Is Section 3D within your area of

8    expertise?

9         A.   Yes.  Because it's -- it relates to the

10   profits.  I disagree that it's zero.

11   Mr. Malackowski is just concluded that, that it's

12   zero, and I believe that it's not because it's --

13   because of the other testimony available in the

14   case.

15        Q.   So what -- what within your area of

16   expertise are you opining on in Section 3D?

17             MR. FRIEDMAN:  Object to form.

18        A.   So as an expert in damages and

19   economics, as we talked about earlier, there's

20   technical issues, in this case, software design

21   issues that other experts opine on that can rely

22   upon that.  That's what I've done.

23   Mr. Malackowski -- my criticism is that he

24   disregards Dr. Jay's survey data and essentially

25   opines that none of the profits are attributable

HIGHLY CONFIDENTIAL

Page 192

1    to the copyrighted tattoos.

2    QUESTIONS BY MR. ILARDI:

3         Q.   So I'm clear on this, the area of

4    expertise that you have in Section 3D is

5    interpreting Dr. Jay's survey data?

6         A.   No.

7              MR. FRIEDMAN:   Objection.

8    Mischaracterizes.

9         A.   No.  No, that's not what I said.

10   QUESTIONS BY MR. ILARDI:

11        Q.   Then can you list for me what within

12   Section 3D is not you just saying what another

13   expert said?

14        A.   The quote from LeBron James'

15   declaration.

16        Q.   The quote from LeBron James'

17   declaration.

18             Is there anything else?

19        A.   And everything else is my understanding

20   of the facts in the case, my understanding of the

21   opinions of both sides in the case, and the survey

22   data in the case.  And I disagree with

23   Mr. Malackowski that it's zero contribution to

24   profits.  I have not quantified it.  I simply

25   disagree with him.