IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CATHERINE ALEXANDER,          )
          )
          )
     Plaintiff,          )
          )    Case no: 3:18-cv-0966-SMY
v.          )
          )    JURY TRIAL DEMANDED
TAKE-TWO INTERACTIVE SOFTWARE, INC.; )
2K GAMES, INC.; 2K SPORTS INC.;      )    FILED UNDER SEAL
WORLD WRESTLING ENTERTAINMENT,    )
INC.; VISUAL CONCEPTS ENTERTAINMENT; )
YUKE'S CO., LTD.; and YUKE'S LA INC.,   )
          )
     Defendants.       )

**PLAINTIFF CATHERINE ALEXANDER'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 2

ARGUMENT ............................................................................................................................ 3

   I.  DEFENDANTS HAVE FAILED TO PROVE THAT THEY ARE AUTHORIZED TO USE THE COPYRIGHTS AS A MATTER OF LAW. ............................................... 3

      A.    There Can Be No Implied Copyright "Sublicense" to Defendants ....................... 6

      B.    Plaintiff Did Not Grant An Implied License to Mr. Orton For The Particular Use of Reproducing the Tattoos in Video Games ..................................................... 7

  II. DEFENDANTS HAVE FAILED TO PROVE FAIR USE AS A MATTER OF LAW .............................................................................................................................. 9

      A.    Factor One: Purpose and Character of the Use ..................................................... 9

      B.    Factor Two: Nature of the Work ......................................................................... 12

      C.    Factor Three: Amount and Substantiality .......................................................... 14

      D.    Factor Four: Effect on Potential Market or Value of Copyrighted Work .......... 15

      E.    Public Interest Factors Favor Plaintiff ............................................................... 16

  III.  DEFENDANTS HAVE FAILED TO PROVE THAT NO DISPUTED MATERIAL FACTS EXIST AND THAT THEIR USE OF THE COPYRIGHTED MATERIALS IS *DE MINIMIS* AS A MATTER OF LAW ............................................................. 17

  IV.   PLAINTIFF IS ENTITLED TO DAMAGES UNDER THE COPYRIGHT ACT 19

  V.    CONCLUSION ........................................................................................................ 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bell v. Taylor*,
    827 F.3d 699 (7th Cir. 2016) ..................................................................................... 19

*Bill Graham Archives v. Dorling Kindersley, Ltd.*,
    448 F.3d 605 (2d Cir. 2006).................................................................................. 1, 11

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006).................................................................................... 13

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)............................................................................... 9, 13, 14, 15

*Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*,
    150 F.3d 132 (2d Cir. 1998).............................................................................. 15, 16

*Catalogue Creatives, Inc. v. Pacific Spirit Corp.*,
    No. 03-cv-966-MO, 2005 WL 1950231 (D. Or., Aug. 15, 2005)............................. 4

*Crispin v. Christian Audigier, Inc.*,
    839 F.Supp.2d 1086 (C.D. Cal. Dec. 12, 2011) .................................................. 7, 8

*Effects Assocs. v. Cohen*,
    908 F.2d 555 (9th Cir. 1990) ......................................................................... 3, 4, 5, 6

*Estate of Hevia v. Portrio Corp.*,
    602 F.3d 34 (1st Cir. 2010).................................................................................... 4, 5

*G.R. Leonard & Co. v. Stack*,
    386 F.2d 38 (7th Cir. 1967) ................................................................................... 17

*Glovaroma, Inc. v. Maljack Productions, Inc.*,
    No. 96-cv-3985, 1998 WL 102742 (N.D. Ill. Feb. 26, 1998).................................. 6

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539; 105 S.Ct. 2218; 85 L.Ed.2d 588 (1985)...................................... 9, 15

*I.A.E., Inc. v. Shaver*,
    74 F.3d 768 (7th Cir. 1996) ............................................................................. 4, 6, 8

*Isringhausen Imports, Inc. v. Nissan N. Am., Inc.*,
    No. 10-cv-3523, 2011 WL 6029733 (C.D. Ill. Dec. 5, 2011)............................... 17

*Kienitz v. Sconnie Nation LLC*,
    766 F.3d 756 (7th Cir. 2014) ................................................................................. 15

*Marketing Technology Solutions, Inc. v. Medizine LLC*,
  2010 WL 2034404 (S.D.N.Y. May 18, 2010) ........................................... 18

*Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distributors*,
  983 F. Supp. 1167 (N.D. Ill. 1997) ......................................................... 14

*Muhammad-Ali v. Final Call, Inc.*,
  832 F.3d 755 (7th Cir. 2016) ......................................................... 4, 5, 6

*N.A.D.A. Servs. Corp. v. Bus. Data of Virginia, Inc.*,
  651 F. Supp. 44 (E.D. Va. 1986) ............................................................. 7

*North Jersey Media Group, Inc. v. Pirro*,
  74 F.Supp.3d 605 (S.D.N.Y 2015) ......................................................... 14

*Photographic Illustrators Corp. v. Orgill, Inc.*,
  370 F.Supp.3d 232 (D. Mass., 2019) ..................................................... 4, 5

*Ringgold v. Black Entertainment Television, Inc.*,
  126 F.3d 70 (2d Cir. 1997) ................................................................... 18

*Stewart v. Abend*,
  495 U.S. 207 (1990) ............................................................................... 9

*Ty, Inc. v. Publications Int'l Ltd.*,
  292 F.3d 512 (7th Cir. 2002) ................................................................... 9

*Vault Corp. v. Quaid Software, Ltd.*,
  847 F.2d 255 (5th Cir. 1988) ................................................................. 18

*Warner Bros. Inc. v. Am. Broad. Companies, Inc.*,
  720 F.2d 231 (2d Cir. 1983) ................................................................. 17

**Statutes**

17 U.S.C. § 106 ...................................................................................... 15

17 U.S.C. § 107 ................................................................... 14, 15, 18, 19, 20

17 U.S.C. § 204 ........................................................................................ 9

17 U.S.C. § 504 ...................................................................................... 24

**Other Authorities**

*See* Melville B. Nimmer & David Nimmer, *3 Nimmer* § 10.03 ........................... 9

**Rules**

Fed. R. Civ. P. 56 .................................................................................... 8

Plaintiff Catherine Alexander submits this Memorandum of Law in support of her response in opposition to the motion for summary judgment filed by Defendants Visual Concepts Entertainment, 2K Games, Inc., Take-Two Interactive Software, Inc., and 2K Sports, Inc. (collectively, "Defendants").

## PRELIMINARY STATEMENT

This case is unlike many other reported copyright cases in which a defendant asserts theories of an implied license, fair use or *de minimis* use.  In most cases, a photograph or reproduction of an original work is used and distributed in the defendant's work; but this is not the case here.  In *Bill Graham Archives v. Dorling Kindersley, Ltd.*, cited extensively by Defendants, for example, a copyright holder in artistic Grateful Dead posters alleged infringement by a biographer of the band who included reproductions of the posters in a book. 448 F.3d 605 (2d Cir. 2006).  The *use* of the posters by the biographer was fair because his purpose was to emphasize the poster's "historical rather than creative value." *Id.*, 612-613.  The *WWE 2K* video games at issue here do not "use," "display," or "distribute" Plaintiff's copyrighted tattoo works as photos or videos.  Far from it.  Defendants engaged in a complex, technological process, in order to digitally *re-create* Plaintiff's tattoo works, for the purpose of displaying them exactly as they are displayed in real-life on the wrestler Randy Orton.  There are no photos or videos of Plaintiff's tattoo works in the *WWE 2K* games and analogies to Mr. Orton's undeniable right to have himself photographed or video-recorded are *not* at issue here. Mr. Orton himself does not appear in *WWE 2K* video games; rather his likeness was digitally re-created by Defendants, tattoos and all.  This was not mere "use" or "display" in a video game, it was very sophisticated and purposeful copying, for the express and admitted purpose of showing Mr. Orton's tattoo works as they exist on his body – as Plaintiff intended them to exist on Mr.

1

Orton's body – in order to achieve authenticity.  Defendants copied Plaintiff's tattoo works *in their entirety* for the purpose of authenticity, which drives sales of "real-life" sports video game franchises like *WWE 2K*.  Such use is neither fair nor *de minimis*.

## FACTUAL BACKGROUND

Plaintiff Catherine Alexander inked six tattoos on Randy Orton between approximately 2002 through approximately 2008.  D.I. 142-5 (Ex. 2, Decl. Orton) at ¶¶ 8, 10, 12-17.  Plaintiff holds copyrights in the tattoos that she inked on Mr. Orton.  Ex. A.  Plaintiff did not assign or license her copyrights to Mr. Orton, either explicitly or impliedly.

Defendant Take-Two creates the *WWE 2K* series of video games.  D.I. 142-5 (Ex. 1, Decl. Little) at ¶ 2.  Take-Two portrays the wrestlers in the video games, including Mr. Orton's in-game persona, realistically.  Ex. B, Little Tr. at 43:13-24; 106:24-107:11.  With respect to Mr. Orton, Take-Two does this by *copying* Mr. Orton's tattoos and *reproducing* them digitally in the video games.  *Id.* at 154:14-20.  In the video game industry, the process used is called "photo reference" and requires no artistic input other than a "rote" recreation of a reference photograph of Mr. Orton's tattoos.  *Id.* at 149:1-18.  Such a process is not "wildly creative," but rather, its "objective is to re-create [a photograph] as authentically as possible."  *Id.*  That Defendants *copied* Plaintiff's copyrighted tattoos and *re-produced* them into the *WWE 2K* video games is not in dispute.

The in-game reproduction of Mr. Orton in the *WWE 2K* games is neither a photograph, a video, nor a live broadcast; it is a digitally created, authentic, re-creation of photographs of Mr. Orton.  Ex. B, Little Tr., 139:2-144:12.  So too the copyrighted tattoos that appear on Mr. Orton.

Take-Two obtained a license to portray Mr. Orton's likeness in *WWE 2K* from WWE, which itself was licensed to WWE by Mr. Orton.  D.I. 142-5 ((Ex. 2, Decl. Orton) at ¶ 22; (Ex. 1,

Dec. Little) at ¶ 7); D.I. 142-22 (Exs. 14-15).  Absent from the record – because it doesn't exist – is any evidence that Mr. Orton obtained an explicit or implicit license from Plaintiff to use her copyrighted tattoo works in video games.  Thus, whatever right to his likeness Mr. Orton granted to the WWE, which were in turn granted to Defendant Take-Two, could not have included the right to reproduce Plaintiff's copyrights in video games.

Mr. Orton is a popular WWE Superstar and a popular character in the *WWE 2K* games. Ex. D, Zagal Op. Rpt., 6-7.  Mr. Orton's character and Plaintiff's copyrighted tattoos appear in the *WWE 2K* games.  It was important for Defendants to copy Mr. Orton's tattoos in the video games because it served their goal of contributing to the "authenticity" of the video games.  Ex. B, Little Tr. at 159:3-11.  Take-Two could have edited or modified the in-game tattoos during its "photo reference" process but chose not to.  *Id.* at 158:11-160:25.  Take-Two made the affirmative choice to include Mr. Orton's tattoos in the game, despite not having a license to Plaintiff's copyrights, because it valued "authenticity" in the *WWE 2K* series.

The Defendants know that tattoo works are subject to copyright protection and, in fact, Defendant Take-Two itself paid a another tattoo artist to create tattoos designs to include in the *WWE 2K* games.  Ex. B, Little Tr. at 49:6-14.

## ARGUMENT

Courts grant summary judgment when there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## I.     DEFENDANTS HAVE FAILED TO PROVE THAT THEY ARE AUTHORIZED TO USE THE COPYRIGHTS AS A MATTER OF LAW.

A copyright owner may transfer to another person any of the exclusive rights the owner has in the copyright; however, such a transfer must be made in writing.  17 U.S.C. § 204(a); *see also Effects Assocs. v. Cohen*, 908 F.2d 555, 557-58 (9th Cir. 1990), *cert. denied*, 498 U.S. 1103

(1991).  Section 101 of the Copyright Act, however, excludes nonexclusive licenses from the

Section 204(a) writing requirement.  Nonexclusive licenses therefore may be granted orally or, in

certain limited circumstances, implied by conduct.  *See* Melville B. Nimmer & David Nimmer, *3*

*Nimmer* § 10.03[A] at 10-40.1.  An implied nonexclusive license does not transfer ownership of

the copyright but rather permits the use of a copyrighted work by the recipient in a particular

manner.  *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996).  An implied nonexclusive

license may exist when (1) a person requests creation of a work; (2) the creator makes that

particular work and delivers it to the licensee who requested it, and (3) the licensor intends that

the licensee-requestor copy and distribute his works.  *I.A.E., Inc.*, 74 F.3d at 776 (*citing Effects*,

908 F.2d at 558-59)).  In the Seventh Circuit, "[t]o establish an implied license, a party *must*

show" all three elements.  *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 762 (7th Cir. 2016)

(emphasis added).

Implied nonexclusive licenses, as a form of copyright transfer, are rare and a "narrow

exception to the writing requirement."  *Effects, Inc.*, 908 F.2d at 558.  Such licenses result from

"conduct manifesting the owner's intent" and are not "an everyday occurrence in copyright

matters."  *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 41 (1st Cir. 2010).  Implied

nonexclusive licenses exist "only in narrow circumstances."  *Id.*

Defendants do not argue, and there is little authority on, whether implied nonexclusive

licenses may embrace implied nonexclusive *sublicenses*.  In *Catalogue Creatives, Inc. v. Pacific*

*Spirit Corp.*, the district court called an implied sublicense a "legal impossibility" and

"decline[d] to expand that 'narrow' circumstances under which a party may grant an implied

license to use copyrighted materials."  No. 03-cv-966-MO, 2005 WL 1950231 at *2 (D. Or.,

Aug. 15, 2005).  In *Photographic Illustrators Corp. v. Orgill, Inc.*, the district court recognized

that the issue of the legality of an "implied sublicense" is a "novel question."  370 F.Supp.3d

232, 245 (D. Mass., 2019), appeal docketed, No. 19-1452 (1st Cir. May 14, 2019) ("*PIC*").

Following First Circuit precedent, the *PIC* court rejected the argument that there is a "strict

three-part test for an implied license that requires proof of request, delivery and intent" and

instead focused on intent as the "'touchstone for finding an implied license.'"  *Id.* (*citing Estate*

*of Hevia*, 602 F.3d at 41.); *but see Muhammad-Ali*, 832 F.3d at 762 ("To establish an implied

license, a party must show..." the three-part *Effects* test).  The *PIC* court therefore found that an

implied sublicense had been granted "[s]ince only intent, not request and delivery, is a necessary

element for finding an implied sublicense."  *Id.*, 370 F.Supp.3d at 246-247.  Plaintiff is not aware

of any Seventh Circuit precedent that bears on the issue of the propriety of implied *sublicenses.*

An implied *sublicense* cannot meet the threshold *Effects* requirements for the creation of

an implied license, namely, that the sublicensee "requested" the work and that the implied-

licensor "created" and "delivered" the work to the sublicensee.

Defendants are not entitled to summary judgment on an implied license theory because

there are disputed material facts concerning the existence and scope of any implied license or, for

that matter, sublicense.  Plaintiff never had contact with the Defendants during the time she

inked Mr. Orton.  Plaintiff's only contacts were with Mr. Orton, and therefore it is impossible

that the Defendants ever requested Plaintiff's work, or that Plaintiff ever delivered work to the

Defendants.  There can therefore be no implied *sublicense* from Plaintiff to Defendants.  *See*

*Effects*, 908 F.2d at 558-59.

And even if an implied sublicense could exist, any sublicense granted from Mr. Orton to

the Defendants could not exceed the scope of the implied license granted from Plaintiff to Mr.

Orton.  It is undisputed that Plaintiff did not explicitly give permission to Mr. Orton to copy and

reproduce her works in video games.  Plaintiff testified, however, that she has never given permission to any of her clients, including Mr. Orton, to use copies of her tattoo works in video games.  Ex. C, Alexander Tr. at 204:9-12.  Thus, even if the Court finds an implied license exists, and an implied sublicense is permissible, there is a genuine dispute concerning the scope of that license/sublicense, namely whether Plaintiff gave permission to use her tattoo works in the "particular manner" of reproduction in video games.  *See I.A.E.,* 74 F.3d at 774.

### A.    There Can Be No Implied Copyright "Sublicense" to Defendants

Plaintiff never inked anything on Defendants.  Plaintiff inked six tattoos on Mr. Orton between approximately 2002 to 2008.  D.I. 142-5 (Ex. 2, Decl. Orton) at ¶ 8.  In order to find an implied sublicense, the Court *must* find that (1) a person requests creation of a work; (2) the creator makes that particular work and delivers it to the person who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his works.  *I.A.E., Inc.,* 74 F.3d at 776 (*citing Effects,* 908 F.2d at 558-59)); *Muhammad-Ali,* 832 F.3d at 762.  Defendants fail the three-part test for an implied license because (1) Defendants never requested the creation of a work; and (2) Plaintiff never delivered any works to Defendants.  *See Glovaroma, Inc. v. Maljack Productions, Inc.*, No. 96-cv-3985, 1998 WL 102742 at *2 (N.D. Ill. Feb. 26, 1998) (The implied license theory "does not apply because [the creator] did not create the videotapes at [the alleged sublicensee's] request.").  Defendants' argument that its *WWE 2K* video games do not infringe Plaintiff's copyrights because it has an implied license therefore fails as a matter of law because Plaintiff did not, and could not have, legally granted any implied license/sublicense rights to Defendants.

6

**B.      Plaintiff Did Not Grant An Implied License to Mr. Orton For The Particular Use of Reproducing the Tattoos in Video Games**

"Where a license or its terms may be implied, '[f]inding there was an implied license does not end the inquiry.  We must also ask what the scope of the license was, and whether [Defendant] exceeded it.'"  *Crispin v. Christian Audigier, Inc.*, 839 F.Supp.2d 1086, 1093 (C.D. Cal. Dec. 12, 2011) (alternations in original).

It is undisputed that Plaintiff did not grant an express license to Mr. Orton.  Therefore, if any license from Plaintiff to Mr. Orton existed, it must be implied.  Assuming that a sublicense from Mr. Orton to the Defendants is permissible, the scope of that sublicense could not exceed any implied license from Plaintiff to Mr. Orton.  Plaintiff, however, did not grant an implied license to Mr. Orton to use Plaintiff's works *in video games* because there was no meeting of the minds between Plaintiff and Mr. Orton concerning such a particular use.  *See N.A.D.A. Servs. Corp. v. Bus. Data of Virginia, Inc.*, 651 F. Supp. 44, 49 (E.D. Va. 1986) ("The creation of an implied license, as in the creation of any implied contract, requires a meeting of the minds."); *Pavlica v. Behr*, 397 F. Supp. 2d 519, 526 (S.D.N.Y. 2005) ("To establish that there was an implied license, defendants must show that there was a meeting of the minds as determined by contract law.").

Plaintiff never gave permission to Mr. Orton to use copies of her tattoo work in video games.  Ex. C, Alexander Tr., 204:9-12.  Upon seeing the video of the *WWE 2K* games – well after Defendant's copyright infringement – Plaintiff "couldn't believe the quality of the graphics in the game" which were so realistic they "looked like a movie."  *Id.*, 18:21-20:24.  Plaintiff testified that she would take issue if any client, including Mr. Orton, were to replicate her tattoo works in a manner other than in photos or videos.  *Id.*, 203:4-7.  For example, Plaintiff would have taken issue with any client who used her tattoo works to print and sell other commercial

7

items, such as T-shirts.  *Id.*, 203:8-13.  Plaintiff has never given permission to any of her clients to use copies of her tattoos work in video games.  *Id.*, 204:9-12.  Mr. Orton does not say, in his Declaration (Ex. 2 to Defendants' Motion for Summary Judgment) that he discussed use of the tattoos works in video games with Plaintiff at the time.  Defendants conflate Mr. Orton's rights to his own likeness and undeniable right to appear in media with an implied license to use Plaintiff's copyrights in unlimited other commercial ways, such as in video games.  Plaintiff never game Mr. Orton permission to copy or use Plaintiff's works in video games (Ex. C, Alexander Tr., 204:9-12) and, in the only exchange she had with a Defendant in this case, Plaintiff was explicit that she granted them "no rights or permission to use or reproduce any of [her] artwork" without her permission (Ex. C, Alexander Tr., 205:1-10).   Therefore, there could not have been a meeting of the minds between Plaintiff and Mr. Orton concerning use of the tattoo work in video games because Plaintiff never gave permission for use in that "particular manner."  *I.A.E., Inc.* 74 F.3d at 774 (In an implied license, the "copyright owner simply permits the use of a copyrighted work in a *particular manner*.") (emphasis added).

Whatever "implied license" Mr. Orton may have received from Plaintiff did not include the rights to copy and reproduce the tattoos in video games.  Nor did it include any sublicensing rights.  *See supra*, Section I.A.  Assuming Plaintiff did grant an implied license to Mr. Orton, there is at least a genuine dispute over the scope of such a license, and whether it included the use of the works in video games.  *See Crispin*, 839 F.Supp.2d at 1093 (Finding the scope of an implied license concerning tattoos genuinely disputed "because the license here is implied and because much of the evidence bearing on the parties' understanding is oral, it is difficult to determine the scope of the license.").   Defendants have failed to show that there is no genuine

dispute over the existence and scope of an implied license.  Defendants' Motion for Summary
Judgment should be denied.

## II.     DEFENDANTS HAVE FAILED TO PROVE FAIR USE AS A MATTER OF LAW

Defendants have failed to establish that their use is fair use as a matter of law.  The fair
use doctrine is an "equitable rule of reason which permits courts to avoid rigid application of the
copyright statue when, on occasion, it would stifle the very creativity that law is designed to
foster."  *Stewart v. Abend,* 495 U.S. 207, 236 (1990) (internal citations omitted). "'Fair use is a
mixed question of law and fact,' *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S.
539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), which means that it 'may be resolved on
summary judgment if a reasonable trier of fact could reach only one conclusion'—but not
otherwise." *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002) (citation in
original).  As a statutory defense, the factors that shall be considered in determine whether there
is fair use are listed at 17 U.S.C. § 107.  Section 107 provides that copying "for purposes such as
criticism, comment, news reporting, teaching...scholarship, or research is not an infringement of
copyright.  The statutory factors (Section 107(1)-(4)) are discussed below.

### A.     Factor One: Purpose and Character of the Use

The first fair use factor may consider two sub-factors regarding use of the copyrighted
work: (1) transformative use and (2) commercial use.  *Campbell v. Acuff-Rose Music, Inc.*, 510
U.S. 569, 578-79 (1994).  The Seventh Circuit has noted that "transformative use" is "not one of
the [17 U.S.C. § 107] statutory factors" and is skeptical of "asking exclusively whether
something is 'transformative'" because that "not only replaces the list in § 107 but also could
override 17 U.S.C. § 106(2), which protects derivative works."

Defendants argue that their use of Plaintiff's copyrights is for a different purpose than that to which Plaintiff intends to use the same, and thus should qualify as transformative. However, Defendants assume incorrectly that use of another's copyright in a manner not yet used by the owner is somehow transformative when copied with the intention of strict duplication.  Plaintiff created the tattoo works for the purpose of displaying the same on Mr. Orton's body.  Ex. C, Alexander Tr., 96:20-24.  This is the *same purpose* for which the Defendants use the tattoos: to display on Mr. Orton's body in the *WWE 2K* video games.  There is no transformation here because the tattoo works are copied faithfully and completely, for an identical purpose as the original.  Defendants used a "photo reference" technique to copy the tattoo works to be as "authentic as possible."  Ex. B, Little Tr., 106:24-107:11.  The goal of the *WWE 2K* games is to show the wrestlers, such as Mr. Orton, "[a]s authentic as [Defendants] can."  *Id.*, 111:16-24.  The copying process is "a rote function of trying to re-create" Mr. Orton as he exists in real life; it is not a "wildly creative process" whose "goal, and the objective is to re-create [Mr. Orton] as authentically as [Defendants] can."  *Id.*, 149:5-18.

Defendants do not contend that the use of Plaintiff's tattoo works was for any purpose listed in 17 U.S.C. § 107 (criticism, comment, news reporting, teaching, scholarship or research). Defendants' use is, in fact, for the same purpose as Plaintiffs, namely, to display on the body of Mr. Orton, in their quest for realism.  Defendants argue that Plaintiff's purpose was to reflect Mr. Orton's personal expression, but this was apparently Mr. Orton's purpose in receiving tattoos, not necessarily Plaintiff's.  D.I. 142-5 (Ex. 2, Orton Decl.) at ¶ 18.  There is genuine fact issue concerning what Plaintiff's purpose was, which was not necessarily co-extensive with Mr. Orton's.  Plaintiff was Mr. Orton's tattoo artist.  *Id.* at ¶ 8.  She learned her art through an apprenticeship and has been recognized for her artistry in her field.  Ex. C, Alexander Tr., 74:2-

3; 86:11-17.  She inked Mr. Orton as part of practicing her craft and as an artistic expression of her own.  Plaintiff's purpose in creating the tattoos works was artistic and to display them on the body of Mr. Orton.  As this is the exact same purpose used by Defendants (to achieve their goal of authenticity), this factor weighs in favor of Plaintiff.

Defendants argue that, due to the smaller size of the tattoo works as they appear on the average television screen versus in real-life, that Defendants' copies are difficult to observe in *WWE 2K*.  In fact, the exact opposite is true, as Defendants have done their best to ensure that the tattoo works are highly recognizable by consumers, copying every element of the works in an effort to expressly duplicate them element by element.  The tattoo works, as displayed on the athletes within *WWE 2K*, clearly portrays the tattoos as they would be displayed in real-life, through the television screen, as if watching a WWE broadcast.  Defendants have sought to create as close of a replication of the tattoo works within their *WWE 2K* video games for the sole purpose of promoting the games' "authentic" experience to the consuming public.  Ex. B, Little Tr., 160:15-25.

Defendants rely on *Bill Graham* to argue that the use of the tattoo works was more for the "historical significance" of the tattoo works, rather than their "expressive value."  448 F.3d at 608.  This argument fails, however because the use of the tattoo works does not reference an event or provide any commentary on the images.  To the contrary, the *WWE 2K* video games are not historical documents, and Mr. Orton is clearly displayed in the same way he appears in real-life.  Ex. B, Little Tr., 154:14-20.  Unlike in *Bill Graham*, Defendants use does not commemorate certain events or individuals, rather Defendants used the tattoos to entertain and further promote to consumers within the professional wrestling market.  Nor has the size of the tattoos been reduced to make them "difficult to observe."  Consumers can view the tattoos, as

displayed on Mr. Orton, on big screen televisions, projectors, and computer screens, which, in relation to the size of Mr. Orton on the screen, are identical.   Accordingly, the tattoo works cannot be argued as significantly reduced, and this factor does not weigh in favor of fair use.

Defendants next argue that the "tiny fraction" of the tattoo images – calculated as a percentage of computer disk space used – weighs in favor of fair use.  This argument fails because there is no relationship between the percentage of disk space used and whether Defendants' use is transformative or fair.  The percentage of disk space used by, for example, the WWE-logo (or other valuable intellectual property), would be comparatively small, but its commercial value is undeniable.  *See, e.g.*, D.I. 142-22 (Ex. 14, License Agreement).

Finally, Defendants argue that the commercial use factor weighs in their favor because consumers allegedly do not buy the *WWE 2K* games for Mr. Orton's tattoos.  Defendants readily admit, however, that consumers do value authenticity and that their overriding goal in creating the *WWE 2K* games, and including the tattoo works, was to create authenticity.  Ex. B, Little Tr., 157:8-23; 159:3-18.

There exists a genuine dispute concerning the purpose and character of the tattoo works. It is not sufficient for Defendants' to ascribe Mr. Orton's purpose in receiving a tattoo with Plaintiff's purpose in creating the copyrighted works.  The consumer (Mr. Orton) does not determine the purpose of the artist's (Plaintiff's) works.  In fact, the purpose of the tattoo works and of Defendants' copying of the works is the same to the extent that both were intended to mark Mr. Orton and display art on his body.  This fair use factor weighs in favor of Plaintiff.

## B.    Factor Two: Nature of the Work

The second statutory element of fair use is "the nature of the copyrighted work."  17 U.S.C. § 107(2).  It "calls for recognition that some works are closer to the core of intended

copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell,* 510 U.S. at 586.  Two distinctions regarding the copyrighted work are considered when evaluating this factor: (1) whether the work is expressive or creative, or more factual, with a greater leeway allowed for a claim of fair use where the work is factual or informational; and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works considerably narrower. *Blanch v. Koons,* 467 F.3d 244, 253 (2d Cir. 2006).

The copyrighted tattoo works were inked on Mr. Orton by Plaintiff, a trained tattoo artist. The asserted works are subject to valid copyright protection.  Ex. A.  The tattoo works on Mr. Orton clearly reflect the creative and expressive efforts of Plaintiff and are not factual or information" in nature.   Mr. Orton asked Plaintiff to "*create* new pieces" to add to the tribal design on his back.  Ex. C, Alexander Tr., 97:20-24 (emphasis added).  Plaintiff sketched some "scribbles" of what she intended to design for Mr. Orton but "ultimately just drew [] on his skin." *Id.*, 113:2-6.  It was Plaintiff's creativity and design choices that were ultimately inked. Mr. Orton "didn't know what [Plaintiff] was going to be doing.  It was he trusted me." *Id.*, 113:7-12.  Inking tattoos "often looks different on skin than on paper...[and] once it's on skin, I [Plaintiff] have my creative liberties to alter it to fit properly." *Id.*, 129:17-22.  Even after a customer's approval of a design or concept, the tattoo artist is "given liberties to – with my [Plaintiff's] creativity to do what I want after that." *Id.*, 132:2-7.  With minimal input from Mr. Orton, Plaintiff "took a pen and drew [designs] and tattooed them." *Id.*, 149:14-21.  She did this without stenciling but by drawing "directly on [Mr. Orton's] body." *Id.*, 149:22-24; 153:10-13. The process used by Plaintiff, as is customary in a field as individualized as tattoo artistry, is a unique and subjective approach, that is creative and expressive.

There is a genuine dispute concerning the nature of the copyrighted works, which are more creative and expressive than factual.  Defendants have failed to show that this factor weighs in their favor.

### C.     Factor Three: Amount and Substantiality

The third fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  The relevant question is whether "'the quantity and value of the materials used,' are reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586 (citation omitted).  Courts routinely conclude that copying in the entirety weighs against fair use.  *See, e.g., Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distributors*, 983 F. Supp. 1167, 1176 (N.D. Ill. 1997) (Third factor weighing in favor of plaintiff because the court determined the defendant "copied the first three volumes in their entirety."); *North Jersey Media Group, Inc. v. Pirro,* 74 F.Supp.3d 605, 621 (S.D.N.Y 2015).

Defendants' copied and reproduced the entirety of Plaintiff's tattoo works.  Their justification that copying the works in their entirety was to depict Mr. Orton realistically; this justification is inconsistent with Defendant's argument that the copied works amount to mere "visual noise" (D.I. 142, 19) and obscures the fact that there was no attempt made to copy just those elements of the tattoo works necessary to create realism.  Defendants' copying of Plaintiff's tattoo works in their entirety was therefore not reasonable even for their stated purpose of creating realism.

There is a genuine dispute concerning whether copying Plaintiff's works in their entirety was necessary, or just "visual noise," in the creation of an "authentic" professional wrestling video game.  Defendants have failed to show that this factor weighs in their favor.

14

### D.       Factor Four: Effect on Potential Market or Value of Copyrighted Work

The final fair use statutory factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The Supreme Court has stated that, in general, when a use is commercial, market harm to the copyright owner is presumed. *Campbell*, 510 U.S. at 591. That is, Defendant has the burden of rebutting the presumption by demonstrating that its use will not cause harm to an existing or potential market for the original work. *Id.* "To negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." *Harper & Row Publishers*, 471 U.S. at 568. Impact on the market can be proven even when the plaintiff does not exploit the market for derivative works or cannot show that the infringing work diminishes the work's profitability. *See Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 145-146 (2d Cir. 1998) (nothing that although the plaintiff had little interest in exploiting the market for derivative works based on the copyrighted material, "the copyright law must respect that creative and economic choice."). The Seventh Circuit looks at whether the infringing use disrupts plans to license the copyrighted works or may injure plaintiff's "long-range financial opportunities," regardless of whether it reduces the value derived from a particular copyright. *See Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 759 (7th Cir. 2014). Thus, Plaintiff need not be in competition with Defendants, nor do Defendants' copies need to be precisely substitutable with Plaintiff's works.

Defendants are using Plaintiff's tattoo works, in their entirety, without consent or compensation, as an important aspect of the successful *WWE 2K* video game series. Defendants diminished the commercial value of Plaintiff's tattoo artwork in the marketplace for licensing in other works including, but not limited to, video games, apparel, and memorabilia. At one point,

for example, Plaintiff contacted the WWE with concerns that it was infringing her copyrights by marketing "faux sleeves" featuring her tattoo works. Ex. C, Alexander Tr., 25:24-31:11. She was rebuffed and chose not to press the issue. *Id.* The same copyrighted works are now being copied by Defendants in their entirety not in the apparel market but the video game market. If Defendants are left unchecked, the marketplace will believe that it can use the tattoo copyrights as they choose, without any consequence, since Defendants' use is admittedly intended to duplicate the asserted copyrights as directly as possible. Defendants' use will create a trend – that is evolving currently – whereby other video game manufacturers, and others similarly situated, take advantage of and fail to pay licensing fees for copyrighted works (above and beyond just tattoos) unilaterally deemed necessary to create "realism." The fourth factor only demands harm in potential markets. As such, this factor favors Plaintiff.

### E.   Public Interest Factors Favor Plaintiff

At its core, "[t]he ultimate test of fair use, therefore, is whether the copyright law's goal of 'promot[ing] the Progress of Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, 'would be better served by allowing the use than by preventing it." *Castle Rock Entertainment,* 150 F.3d at 141. Defendants present their fair use defense, at its core, as an affront to creativity, deterring everyone from video game makers, tattoo artists, and tattoo recipients from engaging in economic and self-expression. D.I. 142, 25. What Defendants are actually advocating is to be given a free hand to trample the rights of copyright holders in their quest for "realism" when, in fact, Defendants selectively purchase tattoo copyrights when necessary, as they did for the *WWE 2K* games. Ex. B, Little Tr., 49:6-50:11. Defendants essentially advocate for the elimination of copyright protection for tattoo artists because, by their nature, tattoos are part of an individual's "identity" and their appropriation is necessary to create "realism" in any work featuring that

16

individual.  The public is not served by the wholesale downgrading of an entire industry's rights.

The public interest factor weighs in favor of Plaintiffs.

## III.   DEFENDANTS HAVE FAILED TO PROVE THAT NO DISPUTED MATERIAL FACTS EXIST AND THAT THEIR USE OF THE COPYRIGHTED MATERIALS IS *DE MINIMIS* AS A MATTER OF LAW

Defendants fail to establish that their use of Plaintiff's copyrights is *de minimis* as a

matter of law.  Defendants' argument here is belied by their *admission* that they used Plaintiff's

tattoo works *in their entirety*.  D.I. 142, 5 ("To depict Mr. Orton in *WWE 2K* as he appears in real

life, Take-Two realistically replicated his likeness including the Tattoos."); 15 ("Here, where

Take-Two's goal was to depict real life accurately, using the entire Tattoos is permissible...").

Copying is only *de minimis* if the amount of "protected material" copied "is so trivial as to fall

below the quantitative threshold" for infringement.  *Isringhausen Imports, Inc. v. Nissan N. Am.,*

*Inc.*, No. 10-cv-3523, 2011 WL 6029733 at *6 (C.D. Ill. Dec. 5, 2011).  As an example, in *G.R.*

*Leonard & Co. v. Stack*, copying five out of 100 "fictitious entries" from a copyrighted travel

guide was found to be *de minimis* and not infringement.  386 F.2d 38, 40 (7th Cir. 1967).

Defendants advance three arguments for their *de minimis* use defense: (1) Mr. Orton is

one of many wrestlers in *WWE 2K*; (2) it is difficult to see Mr. Orton's tattoos ("visual noise")

during when Defendants' expert Dr. Bogost played the games; and (3) the copied tattoos are a

small percentage of overall *WWE 2K* game data.  Defendants' arguments, however, invert the

standard for the *de minimis* defense.  As the "*de minimis* rule has been applied, [it allows] the

literal copying of a small and usually insignificant portion of the plaintiff's work."  *Warner Bros.*

*Inc. v. Am. Broad. Companies, Inc.*, 720 F.2d 231, 242 (2d Cir. 1983).  The *de minimis* doctrine

is not to be used to immunize a defendant who copies the work *in its entirety* just because the

copy itself becomes part of a larger work of the defendant.  "[T]he concept of *de minimis* is

17

useful in insulating trivial types of coping from liability (the photocopied cartoon on the refrigerator)..." *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 76 (2d Cir. 1997); *see also Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255, 267 (5th Cir. 1988) (30 characters copied out of 50 pages of source code held *de minimis*).

The *Ringgold* case is distinguishable.  In *Ringgold*, the factors of "observability of the copied [visual] work – the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting, camera angles, and prominence" were considered by the court with respect to the "substantial similarity" factor of fair use.  126 F.3d at 75.  The *Ringgold* court held that the *de minimis* concept "is an inappropriate one to be enlisted in fair use analysis." *Id.* at 75-76.  And, like here, copying in *Ringgold* was undisputed, and the court found that the *de minimis* threshold had been crossed. *Id.* at 76.

Defendants fail to explain how the percentage of overall game data consumed by the copied tattoos is even relevant to the issue of infringement.  There is no evidence that this novel metric has any bearing on the amount of time the tattoo works are displayed, or how integral they are to the realism of the game.  In any event, Defendants copied the *entirety* of the tattoo works. Their presence on the screen during game play is purely a function of the video game player's choices and is an issue of fact.  There is a genuine dispute concerning the amount of time the tattoo works appear on the screen which is not resolved by Defendants' expert Dr. Bogost's own play experiences.

The issue of *de minimis* use is widely regarded as not being ripe even at the summary judgment stage. *See, e.g., Marketing Technology Solutions, Inc. v. Medizine LLC*, 2010 WL 2034404 at *3 (S.D.N.Y. May 18, 2010) (holding that "[t]he qualitative value in the equation, on the present record...remains an issue of fact").  A fact-finder may conclude that the use of the

tattoo works by Defendants is *de minimis*, but the present record, with the expert's report, does not allow such a finding to be made as a matter of law.

## IV.    PLAINTIFF IS ENTITLED TO DAMAGES UNDER THE COPYRIGHT ACT

Plaintiff seeks damages under 17 U.S.C. § 504, which states that the copyright owner is entitled to "any profits of the infringer that are attributable to the infringement." The "copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyright work." *Id.* The plaintiff "must show a causal nexus between the infringement and the gross revenues." *Bell v. Taylor*, 827 F.3d 699, 710 (7th Cir. 2016). Plaintiff has amply satisfied this standard and Defendants' motion should accordingly be denied.

Defendants' corporate designee Mark Little testified that – and Defendants admit – that Defendants copied Plaintiff's tattoo works for the purpose of achieving authenticity or realism in the *WWE 2K* games. Ex. B, Little Tr., 158:11-159:18; *see also* D.I. 142, 5, 15. Consumer response is a consideration to Defendants' development of *WWE 2K* and the design choices Defendants made. Ex. B, Little Tr., 169:20-170:14. Consumers have an expectation that there be authenticity in *WWE 2K* games. *Id.*, 171:8-172:24 (Defendants "need to have the game be authentic because as a WWE video game, that's kind of an expectation there."). Authenticity is therefore a design choice made by Defendants for the purposes of satisfying customer expectations and, ultimately, driving sales. A part of the authenticity of the *WWE 2K* games comes from Defendants' copying of Plaintiff's tattoo works.

Plaintiff's expert Jose Zagal, a professor in the University of Utah's nationally-ranked Entertainment Arts & Engineering program, opined that, in video games such as *WWE 2K*, the decision of which characters to include is generally based on the perceived value of a particular

19

character and that when real-life persons appear in video games, their characters' appearances are very important to the game playing public. Ex. D, 2; 4-5. Licensed intellectual property (such as WWE IP) is used in video games in order to satisfy consumer demand and, to an extent, drive sales and/or profits. *Id.*, 4. Accordingly, consumers demand that games of these types achieve authenticity or verisimilitude. *Id.* To achieve that goal, satisfy consumers and drive sales, Defendants copied Plaintiff's tattoo works for the Mr. Orton character. To do otherwise – that is, to have not include the tattoo works – would have drawn the ire of consumers and critics. *Id.*, 4. The negative attention from failing to achieve authenticity, from a fan base that is notorious for high demands and scathing criticism, would dampen sales and profits. *Id.*

Defendants admit copying Plaintiff's tattoos in their entirety. Defendants admit copying for the purpose of achieving authenticity. Defendants admit that consumers demand authenticity and that Defendants are responsive to consumer's demands. Thus, some portion of the revenue and profits of the *WWE 2K* video games is *attributable* to Plaintiff's tattoo works, which assisted Defendants in achieving authenticity and driving sales. *See* 17 U.S.C. § 504. While Plaintiff expects Defendants to argue that a small portion of their success is due to Plaintiff's tattoo works, they cannot say that it is zero. There is a causal nexus between Plaintiff's tattoo works and the authenticity of the *WWE 2K* series.

There are genuine issues of fact in dispute concerning the extent of which sales are driven by authenticity of the *WWE 2K* games and the contribution of the Plaintiff's tattoo works.

## V.    CONCLUSION

For at least the foregoing reasons, Defendants' Motion for Summary Judgment should be denied. If the Court would find it helpful, Plaintiff requests oral argument.

Dated:  December 9, 2019                    Respectfully submitted,

                                           */s/ Anthony G. Simon*
                                           Anthony G. Simon, IL 6209056
                                           Benjamin R. Askew, IL 6291366
                                           Anthony R. Friedman, IL 6299795
                                           THE SIMON LAW FIRM, P.C.
                                           800 Market Street, Suite 1700
                                           St. Louis, Missouri  63101
                                           Phone:  (314) 241-2929
                                           Fax:  (314) 241-2029
                                           asimon@simonlawpc.com
                                           basekew@simonlawpc.com
                                           afriedman@simonlawpc.com

                                           R. Seth Crompton
                                           THE HOLLAND LAW FIRM
                                           300 N Tucker, Suite 801
                                           St. Louis, Missouri 63101
                                           scrompton@allfela.com
                                           Phone: (314) 241-8111
                                           Facsimile: (314) 241-5554

                                           *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon all counsel of record this

9th day of December, 2019 via the Court's CM/ECF system.

                                           */s/ Anthony G. Simon*

21