# EXHIBIT A

# EXHIBIT 14

**Take-Two Interactive Software, Inc.**
**622 Broadway**
**New York, NY 10012**
**(646) 536-2842  Fax (646) 536-2923**

## World Wrestling Entertainment – Terms of License ("License")

**LICENSOR:**   World Wrestling Entertainment, Inc. ("Licensor")

**LICENSEE:**   Take-Two Interactive Software, Inc. ("Licensee")

**PROPERTY:**   Licensor intellectual property including, but not limited to, trademarks (*e.g.*, WWE, Raw, Legends, ECW), trade names, logos, copyrights, characters, storylines, and other indicia and intellectual property related to or associated with the professional wrestling activities of Licensor and its professional wrestling events, products and services.  The Property includes, solely to the extent owned or controlled by Licensor, all music, still photography and video footage, art and sound assets relating to Licensor's professional wrestling activities (the "Multimedia Rights"), *provided, however,* that Licensee will pay Licensor for all direct costs incurred by Licensor (including, but not limited to, all out-of-pocket costs as well as a reasonable allocation of costs for internal resources and personnel) for music and video footage provided to Licensee by Licensor for use in connection with the Games, as defined below.  Licensee acknowledges that some of the Multimedia Rights may not be owned or controlled by Licensor, and nothing contained herein shall require Licensor to procure such Multimedia Rights.  The Property further includes right of publicity, namely the likenesses, physical characteristics, personalities, characters, and personas of all Licensor Talent (namely, all individuals who are under a booking contract, independent contract or other similar agreement with Licensor and have granted Licensor the licensing rights relating to Licensor's professional wrestling activities for use in connection with the Games).  Licensor shall make Licensor Talent available for 3D scanning and photography at no cost to Licensee (to the extent needed and subject to Licensor Talent's scheduling availability).  Licensor shall make Licensor Talent available for voice-over recording and non-contact motion capture (to the extent needed and subject to Licensor Talent's scheduling availability) at no cost to Licensor (but without Licensor receiving any profit therefrom and with the parties working together in good faith to minimize the costs to Licensee) and Licensor shall provide reasonable access to Licensor Talent for publicity events.  It is understood and agreed that the Property does not include , (i) any film, comic, cartoon, animated designs and/or characterizations of Talent (i.e. not live action simulation), (ii) any brand extension including Talent that is not engaged in unarmed combat for a significant portion of the Game (*e.g.* Stone Cold Hunting Game, a Talent racing or card game, etc) or (iii) any assets of WWE Studios, Inc. and its subsidiaries ("WWE Studios"), all of which may be exploited by Licensor in its sole discretion except as follows.

CONFIDENTIAL
1

 TAKE-TWO_0000498

Notwithstanding the exclusion from the licensed Property of

███ in clause (i), with respect to any interactive entertainment software game using

███), (1) Licensor shall deliver to Licensee a "request for proposal" which will outline Licensor's requirements for the game and associated license; (2) Licensee shall provide its proposal to Licensor within thirty (30) days after receipt of Licensor's request and shall otherwise comply with Licensor's reasonable scheduling requirements; and (3) if Licensee submits a proposal, such proposal shall be subject to good faith negotiations between Licensor and Licensee for a period of ███. If Licensee does not submit a proposal timely or if the parties are unable to agree in good faith upon the terms of the license, then Licensor shall be free to license such interactive entertainment software game to any other party (subject to the provisions below in this Section "Property").

Notwithstanding the exclusion from the licensed Property of ███ and its subsidiaries set forth above, the provisions of this paragraph shall apply unless such rights would conflict with third party agreements then in effect that relate to the rights to a ███ generally (such as, without limitation, a production agreement or a distribution agreement). If WWE Studios wants to license for an interactive entertainment software game its owned and controlled intellectual property which is derived from a

███) then (1) Licensor shall deliver to Licensee a "request for proposal" which will outline Licensor's requirements for the game and associated license; (2) Licensee shall provide its proposal to Licensor within thirty (30) days after receipt of Licensor's request and shall otherwise comply with Licensor's reasonable scheduling requirements; and (3) if Licensee submits a proposal, such proposal shall be subject to good faith negotiations between Licensor and Licensee for a period of ███. If Licensee does not submit a proposal timely or if the parties are unable to agree in good faith upon the terms of the license, then Licensor shall be free to license such interactive entertainment software game to any other party (subject to the provisions below in this Section "Property").

Notwithstanding the foregoing, Licensor shall not release an ███ in a

CONFIDENTIAL

game console format (it being agreed that platforms other than console games such as

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

) prior to January 1, 2015 nor within the ninety (90) days immediately preceding, or the ninety (90) days immediately after, the release by Licensee of a Game pursuant hereto. Moreover, if such a console game is released in accordance with the immediately preceding sentence (the "Third-Party Game Termination Trigger"), Licensee may, during a period of forty-five (45) days immediately following the release of such game by Licensor, on prior written notice, terminate this Agreement either (a) immediately upon such notice without the benefit of clause (c) below, or (b) in accordance with clause (c) below, in either case (a) or (b) without further liability on the part of either party other than those provisions which remain in effect pursuant to their terms or by necessary implication (such as indemnities, obligations to pay for product sold, Licensee's sell off rights provided for in Section L(15) of the Standard Terms and Conditions, etc.), and (c) provided, however, that notwithstanding anything to the contrary in this Agreement, in the event of termination pursuant to clause (b) above, Licensee shall have the right and obligation to release the Game(s) then in development and exercise the manufacture, distribution, sale and related rights with respect to such Game(s) (for example, if Licensee terminated the Agreement on February 1, 2016 in accordance with this paragraph, then Licensee would continue to have right and obligation to release the Game in calendar year 2016 as well as the sell-off rights with respect to such Game, but Licensee would have no further right or obligation for new Games after calendar year 2016). Continuing such example, in the event Licensee terminates the Agreement in accordance with this paragraph on February 1, 2016, Licensee shall have the obligation to pay a Guaranteed Minimum for the Game released in calendar 2016 but shall not have any obligation to pay any Guaranteed Minimum for a Game in respect of any years after 2016  For further avoidance of doubt, any

released by Licensor or any third party in accordance with this paragraph shall not consist primarily of ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

In the event Licensee is interested in utilizing Multimedia Rights that are not owned and controlled by Licensor, Licensor and Licensee shall reasonably consult and, if Licensor agrees to the inclusion of such Multimedia Rights in a Game(s), Licensor will reasonably assist Licensee in procuring such rights at the lowest cost to Licensee (and, in any event, without profit to Licensor). In addition, if Licensee is granted permission by Licensor, in writing, to license other third party intellectual property (including, without limitation, any professional wrestler formerly

CONFIDENTIAL
3

associated with Licensor agreed upon in the exercise of good faith by the parties), directly from the third party, Licensee agrees to pay such third party all sums due for the use of the rights and to provide Licensor with documentation of same.

**RIGHTS:** Exclusive rights to develop, use, advertise, market, exhibit, manufacture, distribute, sell, copy, host and otherwise exploit interactive entertainment software games, including catalog THQ titles ("Catalog Titles"), based on the Property in any and all manner now known or hereinafter invented and as more fully described in the Section "Platforms" ("Games").

**PLATFORMS:** Except as provided below,

and any successors thereto, including, without limitation, all PC, console and handheld platforms, all mobile devices, including phones, tablets and other similar devices (collectively, "Mobile Rights"), so-called "cloud" computing systems (wherein the Games are synchronized, rendered, and stored on a remote server and delivered online, e.g., OnLive), CD, CD-ROM, DVD, HD, DVD, Blu-Ray or other hardware to play the game; and online rights and multi-player capabilities relating thereto, including digital download rights, DLC, micro-transactions, subscription services, MMOs, web browser-based games and social games (collectively, "Online Rights"). (Online Rights with respect to digital download rights, downloadable content and microtransactions are referred to herein as "DLC Online Rights" and all other Online Rights are referred to herein as "Other Online Rights".) Licensee shall also have the right to distribute game peripherals such as memory cards and strategy guides relating to the Games ("Associated Products") on a non-exclusive basis. Specifically excluded from the Platforms are:

- all coin-operated arcade games and other coin-operated machines, tabletop games.
- DVD-based board games.
- Topps (or any other third party trading card licensee) online community (e.g., Toppstown.com), trading cards and stickers, including all interactive gameplay elements thereof.
- "plug and play" type games.

Licensor acknowledges that the rights granted to Licensee hereunder to produce Games include the right to develop, distribute and/or make accessible and/or actively operate social networking applications and/or on-line communities designed to interact with, promote and market the Games, and the parties agree to discuss in good faith opportunities to jointly promote the Games through social networking applications and/or on-line communities.

**CONFIDENTIAL** **TAKE-TWO_0000501**

Licensee acknowledges that the rights granted to Licensee hereunder do not preclude or prevent Licensor from using the Property to license others to engage in or directly engage in (i) activities (but not games, except as set forth in clause (iii) below) over so-called open-ended social network websites such as, but not limited to, MySpace, Facebook, Cyworld, and Bebo, and closed social networking sites operated by hardware manufacturers; (ii) activities (but not games, except as set forth in clause (iii) below) over web-based "virtual world" sites (including, without limitation, the sale of "virtual goods"), regardless of whether such applications include interactive activities generally which may also appear in interactive game products (for convenience "game-like activities"), and regardless of the device through which such applications may be accessed by an end-user and/or (iii)

for promotional, sponsorship or commercial purposes so long as these games are not (A) initially released in a launch marketing window for a Game (i.e. 45 days immediately prior to, during and 45 days immediately following the commercial release of a Game) or (B) "competitive" with the Games (it being agreed that, if they are "competitive" Licensor shall not use the Property to license others to engage, or directly engage, in these activities). For purposes of the foregoing, a game shall be deemed "competitive" if (a)

or (b) is developed or published (i.e., this does not include distribution where such distributor does not develop or publish) by one of the following competitors of Licensee:

, or (c) is developed or published by one of the following online-based developers or publishers:

. In the event that Licensor desires to use the Property to license or itself engage in the activities permitted by clauses (i), (ii) or (iii) above, (1) Licensor shall deliver to Licensee a "request for a proposal" which will outline Licensor's requirements for the production and delivery of software required for the specified activity; (2) Licensee shall provide its proposal to Licensor within

) after receipt of Licensor's request and shall otherwise comply with Licensor's reasonable scheduling requirements; and (3) if Licensee submits a proposal, such proposal shall be subject to good faith negotiations between Licensor and Licensee for a period of             (ten (10) business days, in the case of simple promotional or sponsorship games). If Licensee does not submit a proposal timely or if the parties are unable to agree in good faith upon the terms by

CONFIDENTIAL
5

which Licensee shall produce and deliver such software within the applicable ▮ business day period, then Licensor shall be free to engage any other party (except a party listed in clauses (b) or (c) above) to produce (or produce itself) such software without further obligation to Licensee. The parties' actions contemplated by this Section shall be subject to the parties' good faith and fair dealing. Notwithstanding the foregoing, the parties acknowledge and agree that Licensor went through the foregoing process with respect to certain Online Rights with its former licensee and the list attached hereto as Schedule A reflects current partners of Licensor, and the performance of Licensor's obligations with such partners, and any extension, renewal, amendment or new agreement with such partners that is in accordance with the provisions of this Agreement other than the first look procedures included in this paragraph shall not constitute a breach of this Agreement, provided nothing herein shall permit such partners to release games for console platforms.

**TERRITORY and LANGUAGES:**     Worldwide; all languages.

**TERM:**     Commencing on the Effective Date and continuing through ▮ ; provided, however, the rights and obligations hereunder shall be of no effect and consequence unless and until (i) Licensee and Yuke's Co., Ltd. ("Yuke's") enter into a Master Developer Agreement ("MDA"), satisfactory to Licensee in its sole discretion, regarding the development of the Games, (ii) the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") enters an order, satisfactory to both parties in their discretion, approving THQ Inc.'s ("THQ") motion seeking approval of THQ's rejection of that certain License Agreement, dated as of December 22, 2009, as amended, by and between THQ and WWE, (iii) the Bankruptcy Court enters an order, satisfactory to both parties in their sole discretion, approving the transfer of all of THQ's right, title and interests in all assets owned by THQ and executory contracts relating to video games based on the Intellectual Property produced or developed by THQ free and clear of all interests, liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code, or (iv) those members of the THQ "Fight Team" who are THQ employees and are crucial to the development of WWE games have agreed to be employed by Licensee on terms satisfactory to Licensee in its sole discretion, in each of cases (i)-(iv), on or prior to February 22, 2013 (the date on which the latest to occur of the events set forth in clauses (i) to (iv), the "Effective Date"). Both parties shall use reasonable commercial efforts to fulfill the conditions to the effectiveness of this Agreement. If despite such efforts, the Effective Date does not occur by February 22, 2013 either party shall have the right, upon written notice to the other party prior to the above conditions in clauses (i) through (iv) having been satisfied, to terminate this Agreement and upon such termination notice, this Agreement shall immediately become null

CONFIDENTIAL

and void and have no effect, no party shall have any past or future obligation under this Agreement, and all rights and obligations of the parties hereunder shall automatically terminate.

Licensee shall have a nine (9) month sell-off period from the termination (other than as a result of Licensee's material breach) or expiration date of this License to continue to distribute, market and sell such Game or any products or services related to the Property authorized hereunder ("Licensed Products"), provided that: (i) during the first three (3) months of the sell-off period only, Licensee shall be entitled to have manufactured units of Games that Licensee reasonably anticipates will be necessary to meet forecasted demand for the remainder of the sell-off period; and (ii) all sales during the sell-off period shall be subject to the royalties specified herein. The parties acknowledge that, unless prohibited by a new agreement fully executed and delivered by the parties hereto covering the subject matter hereof, Licensor may, on or after January 15, 2016, begin negotiating and/or enter into any agreement with any entity regarding the terms of a videogame license commencing on January 1, 2018. Should Licensor enter into such a new videogame license, the new licensee may: (1) develop and manufacture games on or after January 15, 2016; and (2) market, sell to retailers and/or ship to retailers on or after March 15, 2018; provided, however, no games may be sold at retail under the new license prior to July 1, 2018.

**DISTRIBUTION:** Unless specifically stated to the contrary herein (or approved in advance in writing by Licensor), the rights granted to Licensee shall not include the right to sell, distribute, manufacture, market, display and/or advertise the Games through any of the following channels of distribution which are reserved specifically for use by Licensor: (i)                    ; and (ii)

provided, that all Games sold by Licensor through such channels of distribution shall be purchased directly from Licensee in accordance with this Agreement.

**NONRECOUPABLE
GAME FEE:** Within ten (10) days after the release of WWE '14 and, in any event, on or before December 31, 2013 (i.e. whether or not WWE '14 is then or thereafter actually released), Licensee shall pay to Licensor
                    as a nonrecoupable, nonrefundable fee for the first game (WWE 2014) and second game (WWE 2015).

**RECOUPABLE GUARANTEED
MINIMUM:**

Unless terminated earlier and subject to conditions set forth below, the recoupable (as provided below) Guaranteed Minimum for the License Term shall be as follows:

payable on the Effective Date, which shall be recoupable against Licensor Royalties earned for the first console Game released after execution of this License ("WWE 2014") and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products; provided, however, in the event that both following conditions have been met prior to January 1, 2015: (x) such Game (WWE 2014) does not generate in excess of
and (y) that Guaranteed Minimum has not been fully recouped by Licensee, then Licensor will credit

(the "WWE 2014 Credit") against future payments of Guaranteed Minimums (but not royalties or other fees hereunder) due hereunder and the Guaranteed Minimum for WWE '14 shall be reduced by such amount.

payable on January 1, 2014, which shall be recoupable against Licensor Royalties earned for the second console Game released after execution of this License ("WWE 2015") and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products other than the main console simulation Games released in prior years; provided, however, in the event that both following conditions have been met prior to January 1, 2016: (x) such Game (WWE 2015) does not generate in excess of
of Net Sales and (y) that Guaranteed Minimum has not been fully recouped by Licensee, then Licensor will credit Licensee
(the "WWE 2015 Credit") against future payments of Guaranteed Minimums (but not royalties or other fees hereunder) due hereunder and the Guaranteed Minimum for WWE 2015 shall be reduced by such amount.

In the event that Licensee terminates this Agreement either for Licensor's breach of the Agreement or for the Third-Party Game Termination Trigger, and following such termination there are no future Guaranteed Minimums against which to credit the WWE 2014 Credit or WWE 2015 Credit, if applicable, then Licensor shall instead pay the amount of such credits, if applicable, directly to Licensee within fifteen (15) days of such termination.

payable on January 1, 2015 and each successive January 1 thereafter during the Term, each of which        annual payment shall be recoupable against Licensor Royalties earned for the Game released in that year (i.e. cross collateralization is

allowed between years but not between annually released main simulation Games) and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products other than the main console simulation Games released in prior years.

**MOBILE GAMES:**

Licensee shall use reasonable efforts to develop, market and sell at least ███████, including, but not limited to, the iPhone, iPod Touch, iPad and other tablets and Android platforms. Such Game may be a version of the annual console Game or a different Game developed specifically for such platforms.

**LICENSOR ROYALTIES:**

Royalties payable to Licensor by Licensee hereunder shall be as follows:



| Game Released in Calendar Year | Platform | Royalty (expressed as a percentage of Net Sales) |
|---|---|---|
| (a) | | |
| (b) | | |



(c)     In subsections (a) and (b), Net Sales of Mobile Rights and Online Rights shall be counted as Net Sales for purposes of calculating royalties break points above. All Catalog Titles will earn royalties, which will be used to recoup Guaranteed Minimums as set forth under Section "Recoupable Guaranteed Minimum". Such Catalog Title royalties shall be ▮ of Net Sales. Net Sales of Catalog Titles shall count for purposes of calculating break points above.

(d)     Licensor agrees to consider in good faith Licensee's requests to bundle the Games with other comparable platform interactive entertainment software games created by the Licensee (provided that Licensor hereby approves a bundle of NBA 2K13 with WWE 2013); it being agreed that Licensor may deny such requests in its good faith discretion for any reason such as, without limitation, brand or content avoidance or perceived quality discrepancies. In the event such bundling is allowed by Licensor, Net Sales for the Games will equal Net Sales for the bundle divided by the number of interactive entertainment software games (including the Games) included in the bundle.

(e)     In-Game Advertising (all years): ▮ split of revenue after deduction of ▮▮▮▮.

(f)     Associated Products: ▮▮▮▮▮

(g)     "Net Sales" with respect to all Platforms other than Mobile Rights and Online Rights is defined as Licensee's gross invoiced billing price to its customers or distributors for the Licensed Product less only: (i) volume discounts, markdowns, allowances, and rebates (it being agreed that Licensee is free to grant all of these in its sole discretion, but the aggregate maximum deducted from Net Sales for these purposes is capped at ▮▮ ▮▮ of the total gross invoiced billing price for that title); (ii) credits issued or monies paid to customers pursuant to a co-op and retail marketing funds of an amount not to exceed ▮ of the gross sales by title, for shipments to Licensee's customers based on life to date sales of the title; and (iii) credit or adjustments for returns, subject to a cap of ▮▮ of gross invoiced billing price for that title. Licensee shall include a column on the quarterly royalty statements showing the actual co-op and retail marketing fund deductions. For the avoidance of doubt, Licensee shall not be entitled to deduct

CONFIDENTIAL

shipping or warehouse price allowances or deductions from Net Sales. If the Licensee sells a Game to a subsidiary or other entity which is an "affiliate" (as defined in Regulation 240.10A-3(e)(1) promulgated under the Securities Exchange Act of 1934), the Licensor royalties hereunder shall be computed on the basis of the Net Sales price for such Game charged by such affiliate on resale of the Game, provided, however, Licensee shall pay only one royalty and only on a resale if such resale price is higher than the price charged by Licensee to the affiliate.

"Net Sales" with respect to Mobile Rights and Online Rights is defined as Licensee's actual gross sales of the Licensed Products received by Licensee, less only unaffiliated third-party expenses actually incurred by Licensee in the form of: (i) customary distribution royalties or similar fees or charges paid to sites, services or platforms through which the Licensed Products are distributed, playable or otherwise made available, (ii) credits, refunds or charge backs for returned or canceled Licensed Product orders subject to a cap of               of gross invoiced billing price for that title, (iii) amounts solely and directly attributable to fraudulent or invalid transactions, (iv) with respect to Online Rights an allocable portion of reasonable out-of-pocket, customer service costs not to exceed               of gross revenues from the sale of Licensed Products if Licensee operates such Licensed Product directly (i.e., without any online partner or similar third party), and (v) with respect to Online Rights, server hosting charges if Licensee operates a Licensed Product directly (i.e., without any online partner or similar third party). Notwithstanding anything in the Standard Terms and Conditions to the contrary, the parties hereby acknowledge and agree that currently many digital distributors collect and remit sales, use, value added, good and services and/or similar taxes, which amounts shall not be included in Net Sales, and the parties further acknowledge and agree that to the extent that Licensee is responsible for the collection or remittance of such taxes, such taxes shall not be included in Net Sales.

(h) All royalty payments, together with a royalty statement, shall be due within forty-five (45) days following the end of each calendar quarter. All royalties due Licensor shall accrue upon the sale of the Games, regardless of the time of collection by Licensee.

**MARKETING COMMITMENT:** For each Contract Year, Licensor shall spend               to advertise the Games, including via television, internet and/or social media, radio or billboards, and/or any other form of advertising in accordance with the marketing plan further described in the "Marketing and Sales Plans/Quarterly Reports" section below. Licensee shall keep accurate account and copies of all documents and records relating to said advertising expenditures and shall be required to

CONFIDENTIAL
11

CONFIDENTIAL                                                                    TAKE-TWO_0000508

send in reports on a semi-annual basis describing the nature and amount of advertising.

**NON-COMPETE:** Licensee, its parent, subsidiaries, affiliates, successors, and assigns agree that they shall not, while this License Agreement remains in effect, produce any wrestling videogame products using: (a) the names, logos or other trademarks or service marks associated with any professional wrestling organization (other than Licensor); or (b) the names, trademarks or service marks, logos and/or likenesses of any professional wrestlers not associated with Licensor.

**PRODUCT RELEASE:** Licensee shall use its commercially reasonable efforts to exploit the rights granted hereunder. Licensee shall ▮▮▮▮▮

**MARKETING AND SALES PLANS/**
**QUARTERLY REPORTS:** Once a year, Licensee shall provide Licensor with a written marketing plan (in a form to be reasonably agreed) with respect to the Games. Each such marketing and sales plan shall include, for each Game, a marketing timetable, sales projections, channels and methods of distribution, nature and amount of advertising and advertising expenditures. Each marketing plan shall contain specific information for the one-year period immediately succeeding its submission and general estimates or projections for subsequent periods during which this License remains in effect. All marketing plans and information therein provided by Licensee to Licensor shall be formulated by Licensee after meaningful consultation with WWE and treated as the confidential information of Licensee. Licensee will provide Licensor semi-annually with reports (in a form to be reasonably agreed) updating the marketing and sales plan going forward for at least the next twelve (12) months and detailing the implementation of the marketing and sales plan and the advertising and marketing expenditures made by Licensee for the past six months.

**SALES TO LICENSOR:** Licensee agrees to sell to Licensor a reasonable amount of product produced hereunder at the lowest legally permissible preferential pricing which, in any event, will be above Licensor's cost for such products, for re-sale on Licensor's website or catalog. Such product will be sold to Licensor with a royalty rate ▮▮▮ less than the royalties mentioned above. Such sales shall be recoupable by Licensee against the Minimum Guarantee owed in the year in which such sales are made to Licensor.

**INSURANCE:** Licensee shall obtain during the term a comprehensive general liability insurance policy which shall include coverage for product liability from an insurance company which maintains an A.M. Best rating of at least A- (A minus) or higher and is

CONFIDENTIAL
12

reasonably acceptable to Licensor providing protection (at a minimum, in the amount of Two Million US Dollars ($2,000,000.00 USD) per occurrence and Four Million US Dollars ($4,000,000.00 USD) annual aggregate) applicable to any claims, liabilities, damages, costs, or expenses, arising out of or caused in connection with any defects, alleged defects or deficiencies in the Games.

**INTELLECTUAL PROPERTY:**  Licensee acknowledges Licensor's sole and exclusive ownership of (i) all rights in and to the intellectual property rights being licensed hereunder, and (ii) any intellectual property rights in and to all materials created by Licensee or its developer hereunder as and to the extent provided in, and subject to, Sections E and F of the Standard Terms and Conditions.

Licensee agrees and shall undertake to attach to each licensed product and/or its container an "Officially Licensed WWE Product" hologram tag or label in a form prescribed and/or approved by Licensor ("Official Tag"); provided, however, the exact size, placement and prominence of any such Official Tag shall be determined by Licensee in its reasonable discretion and subject to any applicable guidelines or requirements of any third party Platform manufacturer. During the Term hereof, Licensee agrees to purchase its Official Tag(s) at its own cost and expense. Licensee agrees to purchase its Official Tag(s) from Licensor's approved hologram supplier, but any costs in excess of $0.03 per Official Tag shall be borne by Licensor.

**GOVERNING LAW/ JURISDICTION:**  All disputes, claims, or legal actions arising directly or indirectly out of this License shall be governed by the laws of the State of New York without regard to principle of conflicts of Law, and Licensee and Licensor agree to submit to the exclusive jurisdiction of the United States District Court for the State of New York and the Supreme Court of New York.

CONFIDENTIAL

GENERAL TERMS:

This License is subject to all of the provisions of the Standard Terms and Conditions, which are attached to and made a part of this License by reference. In the event of a conflict between the License and the Standard Terms and Conditions, the language of this License shall govern.

WORLD WRESTLING
ENTERTAINMENT, INC.
("Licensor")

By:_____
Casey Collins
EVP, Consumer Products

Date:_____2/11/18_____

TAKE-TWO INTERACTIVE
SOFTWARE, INC.
("Licensee")

By:_____

Print Name:_____
Title:_____
Date:_____

CONFIDENTIAL

**GENERAL TERMS:** This License is subject to all of the provisions of the Standard Terms and Conditions, which are attached to and made a part of this License by reference. In the event of a conflict between the License and the Standard Terms and Conditions, the language of this License shall govern.

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC. ("Licensor") | TAKE-TWO INTERACTIVE SOFTWARE, INC. ("Licensee") |
| By:________________ | By: [signature] |
| Casey Collins | Print Name: SLATOFF |
| EVP, Consumer Products | Title: CEO |
| Date:________________ | Date: Feb. 11, 2013 |

**EXHIBIT A**
**Online Game Rights**


1.  <u>Apptivity</u> – game app for use with a tablet supporting Mattel's WWE Rumblers line;

2.  <u>Genera</u> – WWE Slingshot, 3D Fights, SlideShow Ranking, Bobble and Battle Cry;

3.  Java – based WWE poker tournament;

4.  SummerSlam free online promotional digital games;

5.  Social Channel (in connection with Live Gamer) online social media designed to enhance WWE fan base by engaging users in competitions/achievement including game-style mechanics (specifically excluding any in ring activity) with microtransactions and virtual currency;

6.  The Rock "freemium" mobile app on iOS and Android smart phones and tablets first person game owned and published by the Licensor wherein The Rock in live action tries to solve a mystery behind people trying to kill him. He utlitizes fighting moves without guns, and users can buy (via micro transactions) upgrades to his strength and fighting tools (but no guns). The game will launch on or about April 2013.

CONFIDENTIAL                                                  TAKE-TWO_0000513

## WORLD WRESTLING ENTERTAINMENT, INC.
## STANDARD TERMS AND CONDITIONS

DEFINITIONS.  For purposes of these Standard Terms and Conditions (together with the Terms of License, this "Agreement") the following definitions shall apply:

a)  The term "Advertising Materials" shall mean all advertising and promotional materials and all packaging, wrapping, and labeling materials for the Licensed Products (including, by way of illustration but not limitation, television commercials, radio ads, print ads, catalogs, trade advertisements, sweepstakes, promotions, flyers, sales sheets, labels, package inserts, hangtags, and displays) which are produced by or for the Licensee and which make use of, reference and/or exploit the Intellectual Property.

b)  The term "Intellectual Property" shall mean the Property licensed to Licensee as described in the Terms of License to which these Standard Terms and Conditions are attached.

c)  The term "Licensed Products" shall collectively mean the use of the WWE Intellectual Property in a form and manner approved by WWE pursuant to the terms hereof, on the following items only:

- *Games (as such term is defined in the Terms of License between World Wrestling Entertainment, Inc. and Take-Two Interactive Software, Inc. dated January ___, 2013, hereinafter the "Terms of License"))*

### SECTION A.   QUALITY CONTROLS AND APPROVAL PROCEDURES FOR LICENSED PRODUCTS AND ADVERTISING MATERIALS

A(1)   Warranty of Quality.  The Licensee warrants, represents and guarantees that the Licensed Products and packaging therefor will be of good quality in design, material, and workmanship and will be suitable for their intended purpose; that no injurious, deleterious, or toxic substances will be used in or on the Licensed Products; that the Licensed Products will not cause harm when used as instructed and with ordinary care for their intended purpose; and that the Licensed Products will be manufactured, sold, and distributed in strict compliance with all applicable laws and regulations. The foregoing shall not be deemed a representation that the Licensed Products shall be free from deficiencies, provided, however, that Licensee shall use all commercially reasonable efforts to correct any and all material deficiencies that affect gameplay, cause user system failures or cause a Game to include unauthorized content (it being agreed that this clause relates to such content included without the knowledge or approval of Licensee and nothing contained herein shall limit any of Licensor's rights in the event Licensee knowingly allows such content unauthorized by Licensor to be included in a Game) in a timely manner and will not ship, sell or have its manufacturer(s) ship or sell any Licensed Products that

1

N:\TK2NYC\Legal\OTHER DOCUMENTS\GREG GIBSON\2K Deals\WWE\WWE - T2 Standard Terms and Conditions
DRAFT 20130211(9) clean.docx

it knows to contain such problems unless a patch is available therefor and acceptable to Licensor in its good faith discretion.

    A(2)    <u>Approval Procedures for Licensed Products and Advertising Materials; Approval Standards; Time for Approval by WWE</u>.

    a)    <u>General</u>.  Licensee shall comply with the approval requirements and steps outlined in the following subsections of Section A and such other procedures as agreed in writing by the parties from time to time during the Term.  Licensee agrees to retain all materials relating to approvals in its files while this Agreement remains in effect and for one (1) year thereafter.

    b)    <u>Approval of Licensed Products</u>.  With respect to each different Licensed Product (including each individual title for each individual platform) which the Licensee proposes to manufacture or otherwise create (such as in the case of Online Rights) and sell under this Agreement, Licensee shall submit to WWE for its review and approval (such approval right to be exercised in good faith and in a timely fashion) the following materials:

    i)    During the development of the Licensed Products (including the design of components of the game), Licensee shall submit to WWE for approval all in-game content, user interface and feature sets, all character renderings and models, all environments and arenas, and a list of all music selections, it being understood that the selection of Talent and other professional wrestlers associated or formerly associated with WWE, music and environment shall be by mutual agreement of the parties.

    ii)    Licensee shall also submit for WWE's approval all Licensed Products at the following stages of development: feature complete build, code complete build, quality assurance verifiable build, tuning complete build and gold master submission candidates (prior to submission to a platform manufacturer for approval for manufacture).

    iii)    Twelve (12) identical production samples of each of the Licensed Product to be submitted promptly upon commencement of production.

    iv)    Licensee shall comply with all the foregoing approval steps for each Licensed Product, obtaining WWE's written approval at each step of the procedure unless by prior written notice from WWE it is exempted from any such step with respect to a specific Licensed Product.

    c)    <u>Approval of Advertising and Promotional Materials</u>.  With respect to each different item of advertising or promotional material which Licensee (or any party acting on its behalf) proposes to produce and use or sell under this Agreement, Licensee shall submit to WWE for its review and approval (such approval right to be exercised in good faith and in a timely fashion) the following materials, in the order stated:

    i)    proposed written copy for the item of advertising or promotional material, with attached rough art showing how the Intellectual Property will be used in connection with the copy; and

2

TAKE-TWO_0000515

       ii)   a final printed sample of the item, where feasible (as, for example, in the case of printed brochures, catalogs, and the like).

       d) <u>Approval of Commercial Announcements</u>.    For any commercial announcements which Licensee (or a third party acting on its behalf) proposes to produce with respect to the Licensed Products, Licensee shall submit to WWE for its review and approval (such approval right to be exercised in good faith and in a timely fashion) the following:

       i)   proposed written copy with story boards for the commercial;

       ii)   the rough cut of the commercial; and

       iii)  the final version of the commercial.

       e) <u>Approval of Press Releases</u>.  Neither party shall distribute any written release, promotional literature, publicity or news story regarding the subject matter of this Agreement or the other party without the other party's prior written approval in each instance, which approval shall not be unreasonably conditioned, withheld or delayed.  The parties shall mutually agree upon and distribute a release regarding the parties entering into this Agreement.

       f) <u>Approval Standards</u>.  WWE shall have the right to disapprove any materials submitted to it under Sections A(2)(b), A(2)(c) or A(2)(d) if it determines, in its discretion (such approval right to be exercised in good faith and in a timely fashion), that the materials in question would impair the value and good will associated with the Intellectual Property, Talent (as such term is defined in the Terms of License) or WWE events; provided, however, that the WWE acknowledges and agrees that it is the intent of the parties that Licensee be permitted to depict characters, environments and arenas, and performances realistically (e.g., images, costumes and props used, locations used, and actions and happenings occurring, during WWE televised or live program or event).

       g) <u>Time for Approval by WWE</u>.  WWE agrees to use reasonable efforts to notify the Licensee in writing of its approval or disapproval of any materials submitted to it under Sections A(2)(b), A(2)(c) and A(2)(d) within ten (10) days after its receipt of such materials, and agrees, in the case of its disapproval, to notify the Licensee in writing of its reasons for disapproval.  In the event WWE fails to approve or disapprove of any materials submitted as provided for above within ten (10) days after WWE's receipt of such materials, Licensee shall notify WWE, in writing, of that fact.  Upon receipt of such written notice, WWE shall have until the end of the second business day thereafter to either approve or disapprove the materials.  If WWE has not responded by the end of the second business day, such material shall be deemed approved.  For this clause (g), notices in writing may be via email.

       h) <u>Maintenance of Quality of Licensed Products</u>.  Licensee agrees to maintain the quality of each Licensed Product manufactured under this Agreement at or above the specifications, quality, and finish of the production sample for such Licensed Product as originally approved by WWE under Section A(2)(b) WWE shall have the right to inspect Licensee's inventory of such Licensed Product upon reasonable request during normal business hours to insure such quality, with forty-eight (48) hours' prior written notice.

<div align="center">3</div>

                            

i) <u>Limitations on Approval</u>.  WWE's approval of a Licensed Product shall not be construed in any way as an acknowledgement that such Licensed Product is in compliance with the warranty of quality asserted by Licensee in Section A(1) above and/or that such Licensed Product is in compliance with any and all applicable laws, regulations and industry standards. With regard to the Licensed Products' compliance with the warranty of quality asserted in subsection A(1) and/or in all applicable laws and regulations in the Territory, it is understood and agreed that WWE shall rely solely on the representations and warranties of Licensee hereunder.

j) <u>Change of WWE Marks or Logos or Intellectual Property in the Licensed Products</u>.  WWE shall have the right in its sole discretion and for whatever reason, to change the WWE marks or logos and Licensee shall, to the extent possible, upon written notice make all commercially reasonable efforts to do so as soon as practicable; <u>provided that</u> the parties equally bear the costs of Licensee's compliance.  WWE shall also have the right to change the Intellectual Property in the event of an occurrence or factor connected with the Intellectual Property which, in the reasonable opinion of WWE, reflects unfavorably upon the professional or business reputation of WWE, and Licensee shall, to the extent possible, upon written notice, make all commercially reasonable efforts to do so as soon as practical; <u>provided that</u> the parties equally bear the costs of Licensee's compliance. No such changes or Licensee's inability to comply (despite its commercially reasonable efforts) shall result in a breach of this Agreement. It is understood that the Intellectual Property shall not include any printed or written or other visual form or orally the initials "WWF" (in any form including in any logo), the name or phrase "World Wrestling Federation", and/or any words or any combination of words that may be shortened to the initials "WWF" ("Prohibited Marks").  Notwithstanding any other provision of this Agreement, Licensee shall not use the Prohibited Marks on or in any advertising or marketing materials, packaging materials, and/or the exterior of goods, in any form or medium. For the avoidance of doubt, use of the Prohibited Marks incorporated within any THQ Catalog Titles (e.g, in-game content, as opposed to advertising, marketing, packaging, or the exterior of any goods) shall be permitted hereunder.

A(3)  <u>Miscellaneous</u>.

a) <u>Translations</u>.  All translations of written material used on or in connection with the Licensed Products or Advertising Materials shall be accurate and to the extent a word or phrase does not have an applicable translation the English word or phrase shall be used.  No translation shall be made for a Talent name, a logo, the name World Wrestling Entertainment, Inc. or any other trademark or element as specified by WWE.  In all other circumstances the Licensee, when submitting the Licensed Products and the Advertising Materials for approval, shall provide WWE with translations of all such written materials in English.  All translations shall be created as works made for hire and to the extent that they are not created as works made for hire, all right title and interest, including but not limited to copyright in such translations shall be assigned solely and exclusively to WWE and Licensee shall provide WWE with documentation of such work made for hire or assignment agreements.

b) <u>No Endorsement</u>.  Other than as permitted under the terms of this Agreement, Licensee will not use the name or likeness of any Talent or any items contained within the

4

TAKE-TWO_0000517

definition of Intellectual Property as set forth above as an endorsement of the Licensee and/or any of the Licensee's products or services, without WWE's prior written consent.

      c)  Use of Intellectual Property on Licensee Business Forms.  No use of the Intellectual Property will be printed by Licensee on its stationery, envelopes, business cards, invoices, statements, packing slips or other similar documents or materials.

      d)  Cheat Codes and Hidden Content.  Licensee shall not knowingly include any cheat codes, "Easter eggs" or hidden features, including but not limited to any objectionable content, in the Licensed Products, without previous written approval from WWE, and will move quickly to address any such issue as to which it becomes aware as contemplated in Section (A)(1).

      SECTION B. EFFORTS TO MANUFACTURE, DISTRIBUTE, SELL AND OTHERWISE EXPLOIT THE LICENSED PRODUCTS; RESTRICTIONS ON SALE; COMPLIANCE; CHANNELS OF DISTRIBUTION.

      B(1)  Efforts to Design and Manufacture the Licensed Products.  Licensee shall use its commercially reasonable efforts to exploit the rights granted to it for each individual title.

      B(2)  Efforts to Distribute the Licensed Products. In the event Licensee sells or distributes other licensed merchandise of a similar grade or quality as the Licensed Products, but which do not bear the Intellectual Property, Licensee will not discriminate, in a manner which adversely impacts the Licensed Product, in the granting of commissions and discounts to salesmen, dealers and distributors between the Licensed Products and the licensed products of any third party.  Licensee may not package the Licensed Products in combination with other products, whether similar or different, without the prior written approval of WWE as provided in the Terms of License.

      B(3)  Selling Practices.  Licensee acknowledges WWE's legitimate and reasonable interest in protecting the value of the Intellectual Property and maximizing the effectiveness of WWE's advertising, promotion and distribution efforts by segmenting the classes of trade into which its licensees sell.  Therefore, Licensee will only sell the Licensed Products to a buyer that, to its knowledge, (i) purchases Licensed Products from Licensee solely for sale directly to the consumer and operates a retail or online distribution establishment that supports the high quality and image of WWE officially licensed products or (ii) sells to retailers or online distributors that support the high quality and image of WWE officially licensed products.

      B(4)  Restrictions on the Marketing, Promotion, Advertising and Sale of the Licensed Products.

      a)  Prohibition Against Premiums: The term "Premiums" shall mean anything given free or sold at substantially less than its usual selling price (but does not include sales made pursuant to periodic price reductions resulting from "specials," "sales" or volume pricing discounts) for the purpose of increasing the sale of, or publicizing, any product or service, or such other giveaway or promotional purposes.  The exploitation of any and all "Premiums" as it concerns the Licensed Products  by either party shall be by mutual agreement of the parties.

CONFIDENTIAL

b) Promotions; Sweepstakes for the Licensed Products.  Under no circumstances will lotteries, games of chance, sweepstakes or any such other contest or similar type of promotion ("Promotions") be permitted in connection with the Licensed Products without the advance written approval of WWE, not to be unreasonably withheld, conditioned or delayed.  In the event WWE approves such Promotions for Licensee, it is understood that Licensee will be responsible for (i) compliance with all Federal, State and local rules and regulations concerning the Promotions, (ii) implementation and administration of the Promotion including collection of any and all the entries related thereto, the selection of the winners and awarding the prizes; and (iii) the completion of any such other element of the Promotions in order to ensure its fulfillment.

c) Prohibition Against Modifying Licensed Products:  Licensee will not manufacture, sell or distribute the Licensed Products with any party or entity who changes, alters, or adds to the Licensed Products in any manner whatsoever and then resells or distributes the Licensed Products to retailers, wholesalers, vendors or the general public, unless approved in advance in writing by WWE, not to be unreasonably withheld, conditioned or delayed.

B(6)   Compliance.

a) Licensee will, and will use commercially reasonable efforts to assure that Licensee's representatives will, manufacture, sell, promote, advertise and distribute the Licensed Product(s) in a legal and ethical manner and in accordance with the terms and intent of this Agreement.  To that end, Licensee agrees on behalf of itself, its manufacturers, distributors, agents and/or representatives (collectively referred to throughout the remainder of this subsection B(6) as "Licensee") to adhere to (and ensure compliance by its manufacturers, distributors, agents and/or representatives) WWE's Code of Conduct (attached hereto as Exhibit 1).

b) Licensee will furthermore at all times conduct all aspects of its business in a fair and reasonable manner and in compliance with all shipment tracking, identification and anti-counterfeiting systems and labels (including the use and display of the Official Tag as provided in Section B(6)(e) and (f) below) that WWE may establish from time to time and all applicable laws, government rules and regulations, court and administrative decrees and the highest standard of business ethics then prevailing in the industry.  Licensee will, and will use commercially reasonable efforts to assure that Licensee's representatives will, use its commercially reasonable efforts to ensure that all channels of distribution purchasing Licensed Products comply with the current WWE anti-counterfeiting systems and labels established and as from time to time thereafter amended by WWE.

c) It will be Licensee's or Licensee's representatives' sole responsibility, at its sole expense, to obtain all approvals (including approvals of certain Licensed Products and/or Advertising Materials but not including trademark applications or other applications to register intellectual property in any jurisdiction around the world) of all governmental authorities which may be necessary in connection with Licensee's performance under this Agreement.

d) Licensee acknowledges and fully understands the following meanings established for "Counterfeit Goods" and "Diverted Goods":

6

CONFIDENTIAL

TAKE-TWO_0000519

- "Counterfeit Goods" shall mean and include by way of example and not limitation (i) any goods, material, product or otherwise that bear any Intellectual Property that has been reproduced and/or affixed thereto without authorization from WWE; (ii) goods that bear any Intellectual Property produced for any source in excess of the amount ordered by WWE licensee or designated customer or distributor; and (iii) any goods that bear any Intellectual Property, hereto that has been rejected by or never approved by WWE and nevertheless entered into the stream of commerce.

- "Diverted Goods" shall mean and include any goods produced by someone acting on behalf of Licensee, wherein such goods are not delivered by the producer to Licensee or to a person designated by such Licensee to receive such goods.

If permitted by applicable law Licensee will use all commercially reasonable means to prevent the recreation of any Counterfeit Goods and/or Diverted Goods involving Intellectual Property by its employees, agents, representatives or any others operating under its direction, supervision or control.

e)   Licensee agrees and shall undertake to attach to each Licensed Product and/or its container an "Officially Licensed WWE Product" hologram tag or label in a form prescribed and/or approved by WWE ("Official Tag").   During the Term hereof, Licensee agrees to purchase at its own cost and expense its Official Tag(s) from WWE's approved hologram supplier.   The specific details and instructions necessary for the purchase of the Official Tag(s) shall be provided to Licensee shortly after the execution of this Agreement.   In addition, Licensee shall also cause its own name to appear on a tag or label on each Licensed Product and/or its container in a form prescribed and/or approved (such approval right to be exercised in good faith and in a timely fashion) by WWE.

f)   Licensee understands and agrees that it shall not knowingly supply any images it obtains from WWE's artbank, the password to the artbank, any duplicates of films, or any photographs, artwork, video footage or other reproductive media incorporating the Intellectual Property or music to any third party (including other WWE licensees) without the specific written permission of WWE; provided that Licensee may supply such images to its developer for use in accordance with this Agreement.

SECTION C.   ROYALTY STATEMENTS AND PAYMENTS

C(1)   Computation of Royalties.   All royalties due WWE shall accrue upon the sale of the Licensed Products, regardless of the time of collection by the Licensee.   For purposes of this Agreement, a Licensed Product shall be considered "sold" as of the date on which such Licensed Product is billed, invoiced, shipped or processed, whichever event occurs first.

C(2)   Time of Payment.   All royalty payments shall be made in accordance with the mandatory payment schedule set forth in the Terms of License and/or as otherwise directed in Section C(5) below.   All royalty amounts in this Agreement are stated in US Dollars and all royalty payments shall be made in US Dollars.   All royalty statements required to be submitted by the Licensee shall accompany the royalty payments made to WWE.

7

CONFIDENTIAL

C(3)   <u>Deductions; Taxes</u>.

a) There shall be no deduction from the royalties owed to WWE for uncollectible accounts or for taxes (such as value added taxes or goods and services taxes), and for fees, assessments, quotas, licenses, contingents, commissions, import or export taxes, import or expert permits, similar levies, fees or charges imposed or levied or any other expenses of any kind which may be incurred or paid by WWE or the Licensee in connection with: (i) royalty payments to WWE; (ii) the manufacture, sale, distribution, or advertising of the Licensed Products in the Territory; or (iii) the transfer of funds or royalties or the conversion of any currency into U.S. Dollars (if applicable). It shall be the Licensee's sole responsibility at its expense to obtain the approval of any foreign authorities; to take whatever steps may be required to effect the payment of funds from abroad; to minimize or eliminate the incidence of foreign taxes, fees, or assessments which may be imposed; to protect its investments in foreign territories; to enable it to commence or continue doing business in any foreign territory; and to comply in any and all respects with all applicable laws and regulations.

b) Notwithstanding the provisions of the preceding Section C(3)(a), if (i) any country imposes a withholding tax against WWE, as licensor, with respect to the royalties payable to WWE by the Licensee on sales of the Licensed Products in such country, (ii) such tax is paid by the Licensee on behalf of WWE, and (iii) such tax is an income tax as to which a foreign tax credit is allowable to WWE under Section 901 of the Internal Revenue Code of 1986, as amended, the Licensee may deduct the amount of such withholding tax from the royalties owing to WWE. In connection therewith Licensee shall furnish to WWE such information and documentation as WWE requires to evidence WWE's right to credit such withholding tax against its federal income tax liability in the United States.

C(4)   <u>Royalty Statements</u>. Licensee shall furnish to WWE within forty-five (45) days after the close of each and every calendar quarter during the Term hereof, as defined in the Terms of License, along with any royalty payments then due, if any, full, complete and accurate statements in the form attached hereto as Schedule B, showing the number of each type of Licensed Product sold during the calendar quarter in question, the total gross sales revenues for each such Licensed Product in U.S. Dollars, an itemization of all allowable deductions taken pursuant to the definition of Net Sales, if any, the Net Sales for each Licensed Product sold, the amount of royalties due with respect to such sales, and all information necessary for the calculation of the Net Sales together with such other pertinent information as WWE may reasonably request from time to time. All payments shall be made in U.S. Dollars.

C(5)   <u>Royalty Adjustments</u>. The receipt or acceptance by WWE of any royalty statements furnished pursuant to this Agreement or the receipt or acceptance of any royalty payments made, shall not preclude WWE from questioning their accuracy at any time within two (2) years from the conclusion of any audit relating thereto allowed under this Agreement. If any inconsistencies or mistakes are discovered in such statements or payments, appropriate adjustments shall be made immediately by the parties. The Licensee shall pay WWE interest on a late royalty payment at the then current prime rate (as announced by JP Morgan Chase Bank, New York branch) from the date such amount should have been paid until the date of payment.

8

C(6)  Method of Payment.  Simultaneous with the submission of each and every royalty statement due during the Term of this Agreement, Licensee will make payment of any and all royalties then due, as required by the Terms of License, by electronic transfer directly to WWE in accordance with the following instructions (or such other wire transfer information as WWE shall provide):

Bank Name:  JP Morgan Chase
Bank Address: 270 Park Avenue
41st Floor
New York, NY 10017



C(7)  Reserves.  Licensee shall be entitled to establish each quarter a reserve of █████ of "Gross Sales" (as defined herein) for all platforms existing and distributed for sale (with the exception of personal computer ("PC") game platforms for which the reserve shall be ███ of Gross Sales); provided, however, that any reserve taken shall be liquidated within █████ months of the date the reserve is first taken.  For purposes of this subsection, "Gross Sales" shall be defined as the dollar amount equal to the number of individual units of Licensed Products sold multiplied by the Licensed Product's price charged to the retailer before any deductions, credits and/or allowances.  Further, Licensee shall provide a line item detail with respect to any such reserves in the royalty statements (as more fully described in Section C(4) above).

## SECTION D.  BOOKS OF ACCOUNT AND OTHER RECORDS; AUDITS

D(1)  Retention of Records.  While this Agreement remains in effect and for two years thereafter, the Licensee shall keep full and accurate books of account and copies of all documents and other material relating to this Agreement at the Licensee's principal office. WWE, by its duly authorized agents and representatives, shall have the right, upon at least thirty (30) days written notice, to have a nationally recognized independent third party accounting firm reasonably acceptable to Licensee audit such books, documents, and other material relating to this Agreement, and shall have access thereto during ordinary business hours no more than once during any calendar year soley for purposes of the audit and such information shall not be disclosed to Licensor except as necessary to report the results of the audit in customary form. Any period being audited may only be done so once during the Term of the Agreement. All material obtained during any such audit shall be confidential information of Licensee. At the request of such accounting firm, the Licensee shall provide an authorized employee to assist in the examination of the Licensee's records.

D(2)  Audits by WWE.  If any audit of the Licensee's books and records reveals that the Licensee has failed properly to account for and pay royalties owing to WWE, and the amount of

9

any royalties which the Licensee has failed properly to account for and pay for any quarterly accounting period exceeds, by ten percent (10%) or more, the royalties actually accounted for and paid to WWE for such period, then Licensee shall, in addition to paying WWE such undisputed past due royalties, reimburse WWE for its direct out-of-pocket expenses incurred in conducting such audit, together with interest on the overdue royalty amount at the then current prime rate (as announced by JP Morgan Chase Bank, New York branch) from the date such amount should have been paid until the date of payment.

D(3)   Rights Reserved by WWE.   Except as provided in Section C(5), the exercise by WWE, in whole or in part or at any time or times, of the right to audit records and accounts or of any other right herein granted under Section D, the acceptance by WWE of any statement or statements or the receipt and deposit by WWE of any payments tendered by or on behalf of Licensee shall be without prejudice to any rights or remedies of WWE, whether at law, equity or otherwise, and WWE shall not be stopped or prevented from thereafter disputing the accuracy of any such statement or payment.

SECTION E.   TRADEMARK PROTECTION

E(1)   Trademark Uses Inure to WWE's Benefit.   Licensee recognizes the exclusive right of WWE to all Intellectual Property and any translations thereof and will not use such Intellectual Property or any such translations in any manner or for any reason except as expressly contemplated by this Agreement. All uses of the Intellectual Property owned by the WWE and any translations thereof by Licensee will inure to the exclusive benefit of WWE, which will own all rights, including trademark rights, created by such uses of such Intellectual Property and/or translations, together with the goodwill of the business in connection with which such trademarks are used. Nothing herein shall be deemed to give WWE any rights in and to any trademarks owned and/or controlled by Licensee, including, but not limited to, its corporate name and all associated trademarks.

E(2)   Trademark Registrations.   WWE will have the exclusive right, but not the obligation, to file at its own expense trademark applications relating to the use or proposed use by Licensee of any of WWE's Intellectual Property and any translations thereof in connection with the Licensed Products, specifically excluding Licensee Intellectual Property (as defined below); provided that, upon reasonable request by Licensee to register such a trademark that may be used against actual or potential competitors to Game, WWE shall file, pursue and maintain appropriate applications in appropriate jurisdictions around the world. Any and all such filings will be made in the name of WWE or its designee. Licensee will execute all documents and perform such other acts as may be reasonably necessary to secure, perfect, or record WWE's or its designee's trademark rights, provided, however, WWE shall reimburse Licensee for any reasonable expenses incurred in connection therewith beyond the mere execution of the documents. Licensee and/or its employees, agents, contractors, and representatives will not (a) oppose, petition to cancel, or otherwise contest WWE's trademarks, trademark applications, and/or trademark registrations or (b) challenge WWE's ownership of and/or the validity of WWE's trademarks, trademark applications, and/or trademark registrations. The provisions of Section E(2) will survive any termination or expiration of this Agreement.

10

TAKE-TWO_0000523

E(3)   <u>Records Relative to Trademark Uses</u>.   Licensee will keep appropriate records (including copies of pertinent invoices and correspondence) relating to the dates each of the Licensed Products is first placed on sale or sold in each country of the Territory and the dates of first use in each country of each different element of the Intellectual Property and any translations on the Licensed Products and Advertising Materials.  If requested to do so by WWE in writing, Licensee will supply WWE with samples of the trademark usage in question and other information which will enable WWE to complete and obtain trademark applications or registrations, or to evaluate or oppose any trademark applications, registrations, or uses of other parties.   The provisions of Section E(3) will survive any termination or expiration of this Agreement.

E(4)   <u>Registered User Laws</u>.   As to those countries which require applicants to register Licensee as a registered user of a trademark or other element of the Intellectual Property or any translations used on or in connection with the Licensed Products or which require the recordation of this Agreement, Licensee will execute and deliver to WWE such documents as may be necessary and as are furnished by WWE for such purposes.

E(5)   <u>Trademark Notices</u>.   Licensee will affix or cause its authorized manufacturing sources to affix to the Licensed Products, the Advertising Materials and any other materials containing the Intellectual Property trademark notices in the name of WWE as provided by WWE in each instance or as follows: the names of all World Wrestling Entertainment televised and live programming, talent names, images, likenesses, slogans and wrestling moves and all World Wrestling Entertainment logos are trademarks which are the exclusive property of World Wrestling Entertainment, Inc.  All other trademarks are the property of their respective owners. The exact site, placement and prominence of any such notices shall be reasonably agreed upon by the Parties and subject to the approval of third party platform providers such as Sony, Nintendo and Microsoft.

## SECTION F.   COPYRIGHT PROVISIONS

F(1)   <u>Copyright Notices</u>.   The authorization by WWE to Licensee to make public distribution of the Licensed Products and Advertising Materials is expressly conditioned upon the following agreement of Licensee: Licensee will place on all Licensed Products, on all Advertising Materials and on any other materials containing the Intellectual Property the copyright notice or notices in the name of WWE as follows: "©20xx World Wrestling Entertainment, Inc. All Rights Reserved"; or as otherwise directed in writing by WWE.

F(2)   <u>Design Work</u>.   Licensee acknowledges that all designs of the Licensed Product, including drawings, artwork, sketches, layouts, patterns and material compositions, employed or developed for the production (through CAD/CAM or otherwise) of the Licensed Products, and the codification, recording and reproduction, thereof, however maintained, organized, or derived therefrom including any computer tapes, hard copy of machine readable copies (collectively, the "Specs") are created and developed for the sole benefit of WWE and any and all proprietary interests and ownership rights related thereto including but not limited to copyright belong exclusively to WWE, provided, however, nothing herein is intended, or shall vest, ownership in the underlying source or object code in the Games in WWE, and Licensee or its developer shall

11

CONFIDENTIAL

TAKE-TWO_0000524

retain sole ownership thereof. Furthermore, gameplay mechanisms and/or controls shall be owned by Licensee.

F(3)   <u>Work For Hire</u>.   Licensee acknowledges that all material created under this Agreement (the "Work") was specifically ordered or commissioned by the WWE; that the Work constitutes and will constitute a work-made-for-hire as defined in the United States Copyright Act of 1976; that WWE is and will be the author of the Work and the owner of all rights in and to the Work throughout the universe, in perpetuity, in all languages, for all now known or hereafter existing uses, media and forms, including the copyrights therein and thereto throughout the universe for the initial term and any and all extensions and renewals thereof; and that the WWE will have the right to make such changes therein and such uses thereof as it may deem necessary or desirable.   The term "Work" will include any and all material and information created by Licensee in the course of or as a result of the terms and conditions of this Agreement that are fixed in a tangible medium of expression, including without limitation the Specs, Licensed Products, Games, Advertising Materials, translations, composite works, notes, drawings, memoranda, correspondence, documents, records, notebooks, flow charts, and derivative works, regardless of the medium in which they are fixed.   The "Work" shall not include: (i) the source or object code to any underlying software; and (ii) any intellectual property rights already owned by Licensee or developer prior to the execution of the Agreement. For the sake of clarity, Licensee or its developer shall be the sole and exclusive owner of any and all underlying software (including object and source code), tools, subroutines, engines used in connection with or embodied in the Games (which, together with Licensee's trademarks and logos shall collectively be referred to as "Licensee Intellectual Property").

F(4)   <u>Assignment by Licensee</u>.   In addition to Section F(3), and to the extent that the Work is not recognized as a "work-made-for-hire," Licensee hereby sells, assigns, and transfers to WWE its entire, worldwide right, title and interest in perpetuity in and to the Work, specifically excluding Licensee Intellectual Property.   If parties who are not employees of Licensee (or who are employees of Licensee acting outside the scope of their employment) make or have made any contribution to the creation of the Work so that such parties might be deemed to be "authors" of such Work as the term "author" is used under present or future United States copyright law, or other such applicable laws, then Licensee will obtain from such parties a full assignment of rights so that the foregoing assignment by Licensee vests in WWE full and absolute right and title in the Work free of any claims, interests, or rights of other parties. Licensee will not permit any of its employees to obtain or reserve by oral or written employment agreements any rights as "authors" of any such Work.   At WWE's request, Licensee will furnish WWE with any and all information concerning the creation of any Work and with any and all copies of the assignments of rights obtained from the foregoing parties.

F(5)   <u>Copyright Registrations</u>.   WWE will have the exclusive right, but not the obligation, to file at its own expense copyright applications for the Work.   In the event WWE elects not to file copyright applications for the Work after receiving a written request to do so from Licensee, Licensee will have the right to do so.   Any and all copyright filings (whether by WWE or Licensee) will be made in the name of WWE, provided, however, Licensee or its developer shall be listed as the owner of the Licensee Intellectual Property.   As is reasonably practicable, Licensee will execute all documents and perform such other acts as WWE may deem

12

CONFIDENTIAL

TAKE-TWO_0000525

necessary to secure, perfect, or record WWE's or its designee's copyrights. Licensee and/or its employees, agents, contractors, and representatives will not (a) oppose, petition to cancel, or otherwise contest WWE's copyright, copyright applications, and/or copyright registrations or (b) challenge WWE's ownership of and/or the validity of WWE's copyrights, copyright applications, and/or copyright registrations. The provisions of Section F(5) will survive any termination or expiration of this Agreement.

F(6)   Waiver of Moral Rights. Licensee waives any and all of its moral rights, including but not limited to rights of attribution, paternity, and integrity, arising under any federal or state law of the United States or any law of any other region, country, or subdivision thereof in and to the Work, and any contribution thereto, for any and all past, present, or future uses or purposes now known or hereafter discovered, including without limitation the right to modify said work, ("Moral Rights") in favor of WWE and its predecessors, successors, assigns and licensees or sub-licensees. If other parties, including but not limited to Licensee's employees, agents, and subcontractors, have made any contribution to the creation of the Work so that such parties might be deemed to have Moral Rights under present or future United States law or any law of any other region, country, or subdivision thereof, then, to the extent possible under applicable laws, Licensee will obtain from such parties a full waiver of any and all of his or her Moral Rights in favor of WWE and its predecessors, successors, assigns and licensees or sub-licensees.

F(7)   Enforcement. Licensee warrants that the covenants contained in this Agreement are reasonable, that valid considerations have been and will be received therefor and that the terms set forth in this Agreement are the result of arms-length negotiations between the parties to this Agreement. Licensee recognizes the vital importance to the continuing welfare of the WWE and its affiliates of (x) the provisions of Sections E and F; and (y) the uninterrupted continuation of its videogame business in the event of a valid termination of this Agreement by Licensor due to a material breach by Licensee; and that in either clause (x) or (y) money damages may not be an adequate remedy for any violation thereof. Therefore, in either such case, WWE and its affiliates, in addition to any other remedies they may have available to them pursuant to this Agreement or any other agreement, or whether at law or in equity, will have the right to seek equitable relief including continuing access to Licensee Intellectual Property that is owned by Licensee and solely as embodied in the Licensed Products and solely to the extent necessary to put Licensor in the same position as it would be if the Licensee had not materially breached this Agreement, if such equitable relief is granted by a court of competent jurisdiction.

SECTION G.   REPRESENTATIONS AND WARRANTIES

G(1)   WWE's Representation and Warranty. WWE hereby covenants, represents and warrants that it is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated; that it is the sole and exclusive proprietor of the Intellectual Property, has the full right, power, legal capacity and authority to enter into this Agreement, to carry out the terms hereof and to grant Licensee the rights and privileges granted hereunder. WWE also covenants, represents and warrants that (i) WWE has the right to license the exploitation rights granted in this Agreement and that the rights granted herein will not violate or infringe upon the rights of any third persons and/or parties, (ii) WWE has not

13

TAKE-TWO_0000526

granted, assigned, licensed, in any manner encumbered, committed to perform any act by which the rights granted herein and to be granted herein to Licensee could or will be encumbered, diminished, or impaired; (iii) the Intellectual Property or any part thereof does not constitute libel, slander, or unfair competition; (iv) the Intellectual Property has not used the name or personality of any person so as to constitute an invasion of the right of privacy; (v) any and all permissions and clearances to the Intellectual Property for its authorized use as contemplated herein (to the extent the Intellectual Property does not include Multimedia Rights not owned or controlled by WWE) have been obtained by WWE; (vi) WWE shall be responsible for any and shall pay any third party payments or residuals for use of the Intellectual Property as contemplated and to be allowed hereunder (to the extent the Intellectual Property does not include Multimedia Rights not owned or controlled by WWE); (vii) WWE has no knowledge of any claim which, if sustained, would be contrary to WWE's warranties, representations, and agreements herein contained; and (viii) WWE shall comply with all applicable laws, rules, and regulations. WWE hereby agrees that its covenants, representations, warranties and agreements are of the essence to this Agreement and shall survive the expiration or termination of the Term.

      G(2)   Licensee's Covenants, Warranty and Representation.

      a) Licensee hereby covenants, represents and warrants that it is a corporation duly incorporated, validly existing and in good standing of the laws of the jurisdiction in which it was incorporated; that it has full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms hereof. Licensee further covenants, represents, and warrants that, with the exception of WWE's Intellectual Property, it owns or has the rights to any and all designs, products, artwork, photographs and intellectual property Licensee uses to develop, create and/or manufacture the Licensed Product, including without limitation any algorithms, software, hardware, processes, patents, copyrights and/or trade secrets. It is understood and agreed that during the Term of this Agreement, Licensee and WWE, either individually or collectively may be considered the promoter and advertiser of the Licensed Products. In those circumstances, Licensee acknowledges and agrees that on behalf of itself and on behalf of WWE it shall comply with all federal, state and local laws, rules, regulations and industry standards concerning the manufacture, promotion and advertisement of the Licensed Products and Licensee furthermore agrees not to engage in any unconscionable commercial practice, fraud, false pretense, false promise, knowing misrepresentation, or the knowing concealment, suppression of omission of any material fact in the manufacture, advertising or promotion of the Licensed Products ("Product Compliance"). To that end, in addition to the indemnification provisions set forth throughout this Agreement, Licensee agrees to fully indemnify, defend and hold WWE harmless from any and all claims, damages or injuries relating to, in connection with or arising out of Product Compliance for the Licensed Products, unless such Product Compliance claims are the direct result of actions of WWE, or the Intellectual Property as provided by WWE.

      b) Licensee hereby agrees that its covenants, representations, warranties and agreements are of the essence to this Agreement and shall survive the expiration of the Term.

      SECTION H.   INDEMNIFICATION; PRODUCT LIABILITY INSURANCE

<div align="center">14</div>

TAKE-TWO_0000527

H(1)   <u>Licensee's Indemnification</u>.   Licensee will be solely responsible for and will indemnify, defend and hold WWE and its successors and assigns, parent corporations, subsidiaries and affiliates and its and their respective officers, directors, stockholders, employees, advertisers, insurers, and representatives (collectively referred to as "Indemnified Parties") harmless from any and all claims, suits, liabilities, judgments, penalties. losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fees arising from or by reason of or in connection with the manufacture, distribution, advertising, promotion, offering for sale and sale of the Licensed Products which includes any claims or suits against the Indemnified Parties by reason of: (i) any unauthorized use, infringement or alleged infringement of any trademark, service mark, copyright, patent, process, trade secret, algorithm, software, method or device owned or controlled by a third party and exploited by Licensee in connection with the Licensed Products, the Advertising Materials and/or this Agreement, specifically excluding claims directly related to Licensee's use of the Intellectual Property in accordance with the terms of this Agreement; (ii) any defects, alleged defects and/or deficiencies (whether obvious or hidden and whether or not present in any sample approved by WWE) in said Licensed Products or the use thereof, or for any false advertising, fraud or misrepresentations or other claims related to the Licensed Products and/or the Advertising Materials (not involving a claim of right to the Intellectual Property or Licensee's use thereof in the development, marketing and sale of Games in accordance with the terms hereof) or in any packaging or other materials relating to the Licensed Products (including Advertising Materials); (iii) any claim that the use of any audio, music, design or other graphic component of any Licensed Product (other than the Intellectual Property) violates or infringes upon the trademark, copyright or other intellectual property rights (including trade dress, right of publicity or right of privacy) of a third party; (iv) any uses of the Licensed Products or Advertising Materials by Licensee not in accordance with this Agreement; (v) any libel or slander against, or invasion of the right of privacy, publicity or property of, or in violation or misappropriation of any other right of any third party as it relates in any manner whatsoever to the exploitation of Licensee's rights under this Agreement other than those directly related to Licensee's use of the Intellectual Property in accordance with the terms of this Agreement; (vi) any agreements or alleged agreements, whether written or oral, made or entered into by or with Licensee to effectuate the terms of this Agreement, including any employment or consulting agreements entered into by Licensee related in any manner to the exploitation of this Agreement and any such other agreements entered into by Licensee that relates to the manufacture, distribution, exploitation, advertising, sale or use of the Licensed Products by Licensee, its agents and/or representatives; (vii) any Promotions or contests conducted by Licensee related to this Agreement; (viii) any breach of the terms, representations and warranties under this Agreement by Licensee, its subsidiaries, manufacturers, distributors, advertisers or other persons, employees or agents of any of the foregoing; (ix) any act concerning the unconscionable commercial practice, fraud, false pretense, false promise, knowing misrepresentation, or the knowing concealment, suppression of omission of any material fact in the advertising or promotion of the Licensed Products; or (x) any failure to comply with the terms and conditions of Section B(6)(e) which includes without limitation Licensee's failure to affix the Official Tag and its own name to any Licensed Product or its container.

H(2)   <u>WWE's Indemnification</u>.   WWE agrees to indemnify, defend and hold the Licensee and its successors and assigns, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, stockholders, employees, advertisers, insurers and

15

CONFIDENTIAL

representatives harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fee (but excluding lost profits or consequential damages) made by third parties against the Licensee (i) based on a claim of right in one or more elements of the Intellectual Property or (ii) any breach of WWE's representations, warranties, covenants or obligations under this Agreement.

H(3)   Claims Procedures.  With respect to any claims falling within the scope of the foregoing indemnifications:  (a) each party agrees promptly to notify in writing the other party of, and to keep the other party fully advised with respect to, such claims and the progress of any suits in which the other party is not participating; (b) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (c) each party shall have the right to participate, at its sole expense, in any suit instituted against it and/or to approve any attorneys selected by the other party to defend it, which approval shall not be unreasonably withheld, conditioned or delayed; and (d) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld, conditioned or delayed.

H(4)   Insurance.  The Licensee agrees to obtain and maintain during the Term of this Agreement, at its own expense, a comprehensive general liability insurance policy which shall include coverage for product liability from an insurance company which maintains an A.M. Best rating of at least A- (A minus) or higher and is reasonably acceptable to WWE providing protection (at a minimum, in the amount of Two Million US Dollars ($2,000,000.00 USD) per occurrence, Four Million US Dollars ($4,000,000.00 USD) annual aggregate) applicable to any claims, liabilities, damages, costs, or expenses, arising out of or caused in connection with any defects, alleged defects or deficiencies in the Licensed Products. Such insurance shall also include coverage of WWE, its directors, officers, shareholders, affiliates, employees, agents, licensees, insurers, advertisers, assignees, and successors. Within thirty (30) days after execution of this Agreement by WWE and again within thirty (30) days of the policy's renewal date, the Licensee shall cause the insurance company issuing such policy to issue a duplicate original certificate to WWE naming WWE as an additional insured together with evidence of current payments for the policy, confirming that such policy has been issued and is in full force and effect and provides coverage for WWE as required by this Section H(4). Said insurance policy shall also contain an endorsement that the insurance coverage shall not be reduced, modified or cancelled and that the insurance company will use best efforts to inform WWE of changes.

SECTION I.   RESERVATION OF RIGHTS

Except as provided for under the Terms of License, all rights in and to the Intellectual Property (including any premium rights related to the Licensed Products) are retained by WWE for its own use and exploitation (including the right to license said rights or portion thereof to third parties for their exploitation).  Licensee shall not acquire any rights whatsoever in the Intellectual Property as a result of its use hereunder and all use of the Intellectual Property will inure to WWE's benefit. For the purpose of absolute certainty, it is understood and agreed that WWE reserves the right to use, and to license other parties to use, the Intellectual Property within the Territory for any purpose WWE may determine in its sole discretion, provided such

16

use does not violate the exclusivity provisions hereunder. All use of the Licensee Intellectual Property shall inure to the benefit of Licensee.

SECTION J.    INFRINGEMENTS; CLAIMS

J(1)    Representations and Warranties by Licensee.  Licensee represents and warrants to WWE that all designs and products submitted for approval (other than the Intellectual Property) are not subject to any valid patent, copyright, trademark or other proprietary rights of any third party, provided, however, with respect to patents such representation is made to the best of Licensee's knowledge.  It is understood and agreed that WWE shall not be liable (and Licensee shall fully indemnify and hold WWE harmless therefrom) for any activities of Licensee under this Agreement that may infringe or alleged to infringe any patent, copyright, trademark or other proprietary rights belonging to any third party, or for damages or costs involved in any proceeding based upon such infringement or alleged infringement, or for any royalty or obligation incurred by Licensee because of any patent, copyright, trademark or other proprietary interest held by a third party, other than claims based solely upon a right to or in one or more elements of the Intellectual Property

J(2)    Infringements.  When either party learns that a third party is making unauthorized uses of the Intellectual Property or the Licensee Intellectual Property, such party agrees to promptly give the other party written notice containing full and complete information with respect to the actions of such party.  Each party agrees not to make any demands or claims, bring suit, effect any settlements, or take any other action against such infringing third party without the prior written consent of WWE in the case of Intellectual Property or the Licensee in the case of Licensee Intellectual Property.  Each party agrees to cooperate with the other party in connection with any action taken by the owner to terminate infringements of its intellectual property.

J(3)    Claims.

a)  If claims or suits are made against WWE or the Licensee by a party asserting the ownership of rights in a name or design which is the same as or similar to one of the elements of the Intellectual Property, and asserting further that the use of a particular element of the Intellectual Property by the Licensee infringes the rights of such party, or if the parties learn that another party has or claims rights in a trademark, name or design which would or might conflict with the proposed or actual use of an element of the Intellectual Property by the Licensee, WWE and the Licensee agree in any such case to consult with each other on a suitable course of action. In no event shall the Licensee have the right, without the prior written consent of WWE, to acknowledge the validity of the claim of such third party, to obtain or seek a license from such third party, or to take any other action which might impair the ability of WWE to contest the claim of such third party if WWE so elects.  The Licensee agrees at the request and cost of WWE to make any and all reasonable modifications requested by WWE in the Licensee's use of the element of the Intellectual Property in question or to discontinue use of such element in the country of the territory in question on the particular Licensed Product or Licensed Products which are involved, if WWE, in its sole discretion, reasonably exercised, determines that such action is necessary or desirable to resolve or settle a claim or suit or eliminate or reduce the

17

TAKE-TWO_0000530

threat of a claim or suit by such party.  WWE shall have the right to participate fully at its own expense in the defense of any claim or suit instituted against the Licensee with respect to the use by the Licensee of an element of the Intellectual Property.

b)  If claims or suits are made against the Licensee or WWE by a party asserting the ownership of rights in a name or design which is the same as or similar to one of the elements of the Licensee Intellectual Property, and asserting further that the use of a particular element of the Licensee Intellectual Property by WWE infringes the rights of such party, or if the parties learn that another party has or claims rights in a trademark, name or design which would or might conflict with the proposed or actual use of an element of the Licensee Intellectual Property by WWE, Licensee and WWE agree in any such case to consult with each other on a suitable course of action.  In no event shall WWE have the right, without the prior written consent of the Licensee, to acknowledge the validity of the claim of such third party, to obtain or seek a license from such third party, or to take any other action which might impair the ability of the Licensee to contest the claim of such third party if the Licensee so elects.  WWE agrees at the request of the Licensee to make any and all reasonable modifications requested by the Licensee in WWE's use of the element of the Licensee Intellectual Property in question or to discontinue use of such element in the country of the territory in question on the particular Licensed Product or Licensed Products which are involved, if Licensee, in its sole discretion, reasonably exercised, determines that such action is necessary or desirable to resolve or settle a claim or suit or eliminate or reduce the threat of a claim or suit by such party.  Licensee shall have the right to participate fully at its own expense in the defense of any claim or suit instituted against the WWE with respect to the use by WWE of an element of the Licensee Intellectual Property.

SECTION K.   NO   SUBLICENSING   OF   RIGHTS;   AGREEMENTS   WITH MANUFACTURERS

K(1)   Sublicensing.  The Licensee shall not have the right to sublicense any of the rights granted to it under this Agreement except (i) to a subsidiary wholly owned by Licensee solely in respect of the period during which the sublicense remains a wholly-owned subsidiary of Licensee, (ii) to a developer of a Game (solely to the extent required in order to allow such developer to create the Game) and (iii) otherwise with WWE's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.  To the extent that a distributor is in any way involved in duplication, manufacturing, advertising, marketing, or promotion of the Licensed Products, such entity shall be considered a sublicensee.  For the sake of clarity, to the extent a distributor is solely involved with the sale of finished Licensed Products, consent shall not be required.  No sublicense shall terminate or limit any of Licensee's obligations hereunder, and Licensee shall be responsible for any sublicensee's acts and omissions hereunder.

K(2)   Agreements with Manufacturers.  For purposes of this Agreement, Licensee is the manufacturer of the Licensed Products.  With the prior written approval of WWE, Licensee may arrange with another party to manufacture the Licensed Products or components of the Licensed Products for exclusive sale, use and distribution by the Licensee, which manufacturers shall each be considered sublicensees.  In that instance, Licensee agrees to enter into a written agreement with all such manufacturers, and agrees to incorporate into such written agreements all of the provisions, for the protection of the rights of WWE.  Licensee further agrees to furnish WWE,

18

within thirty (30) days of their execution, copies of all agreements with such manufacturers. Notwithstanding the foregoing, WWE acknowledges and accepts that third-party platform providers such as Sony, Nintendo and Microsoft will only sign their own form of manufacturing agreements. No agreement with a manufacturer shall terminate or limit any of Licensee's obligations hereunder, and Licensee shall be responsible for any manufacturer's acts and omissions hereunder.

    K(3)   <u>Enforcement of Manufacturer Agreements</u>.  The Licensee agrees strictly to enforce against its manufacturers all of the provisions which are required to be included in such agreements for the protection of WWE, as provided in Section K(2), to advise WWE of any violations thereof by manufacturers, and of corrective actions taken by the Licensee and the results thereof; and at the request of WWE to terminate such an agreement with any manufacturer which violates any such provisions; all for the protection of WWE.

<u>SECTION L.    BREACH AND TERMINATION; EXPIRATION OF AGREEMENT</u>

    L(1)   <u>Right Of Termination</u>.

        a)  <u>WWE Rights of Termination</u>.

            i)   <u>Immediate Right of Termination</u>.  In addition to the termination rights stated elsewhere in this Agreement, WWE will have the right to terminate this Agreement immediately, by giving written notice to Licensee, in the event Licensee either willfully and knowingly breaches any of the material terms of this Agreement, or is grossly negligent and such gross negligence causes Licensee to breach any of the material terms of this Agreement, and such willful and knowing breach or such gross negligence causing Licensee to breach any of the material terms of this Agreement materially and detrimentally impacts the WWE brand.  WWE shall abide by the principals of good faith and fair dealing in making such a determination.

            ii)   <u>Right to Terminate upon Ten (10) Days Written Notice</u>.  WWE shall have the right to terminate this Agreement if Licensee breaches any financial term of this Agreement, including without limitation, failing to make any payments in excess of Two Hundred Fifty Thousand US Dollars ($250,000.00 USD) by the date such payment is required under the provisions of this Agreement or if Licensee fails to submit royalty statements and/or any other statements to WWE during the time periods specified in the Terms of License and/or Section C, and Licensee fails to cure the breach within ten (10) days after receipt of a written default notice from WWE by registered, express or certified mail.

            iii)   <u>Right to Terminate upon Thirty (30) Days Written Notice (curable breach)</u>.  If Licensee breaches any of the following material terms and provisions of this Agreement, and Licensee fails to cure the breach within thirty (30) days after receiving written notice by registered, express or certified mail from WWE specifying the particulars of the breach, then WWE will have the right to terminate this Agreement immediately, as of the thirty first (31) day, in the form of written notice to Licensee by registered, express or certified mail.

        (1)   If Licensee has failed to comply with any requirements of quality or the approval process for Licensed Products or advertising and promotional materials, including

<div align="center">19</div>

TAKE-TWO_0000532

without limitation those described in Sections A(1), A(2)(b), A(2)(c), A(2)(d) and A(2)(e);

(2)   If Licensee makes, sells, offers for sale, or distributes or uses any Licensed Product or Advertising Material without having the prior written approval of WWE, as required by Section A, or makes any use of the Intellectual Property, if applicable, not authorized under this Agreement at any time thereafter;

(3)   If Licensee fails to comply with the terms and conditions of Section B(6)(e);

(4)   If Licensee fails to comply with the terms and conditions of Section B(6)(f);

(5)   If Licensee fails to deliver to WWE or to maintain in full force and effect the insurance referenced to in Section H of this Agreement;

(6)   If Licensee fails to deliver any statements or notices required to be delivered to WWE under the terms of this Agreement, retain all records pursuant to the terms of this Agreement or to give access to the premises and/or licensing records pursuant to the provisions of this Agreement to WWE or WWE's authorized representatives for the purposes permitted under this Agreement;

(7)   If Licensee fails to comply the terms and conditions of the Code of Conduct contained in Section B(6)(a);

(8)   If Licensee knowingly improperly distributes the Licensed Products to retailers or distributors outside of the scope of this Agreement;

(9)   If Licensee sells to any third party that Licensee knows, or has reason to know, is altering or modifying the Licensed Products prior to sale to the ultimate customer;

(10)  If Licensee fails to comply with the terms and conditions contained in Section E(4) concerning Licensee's execution and delivery of documents required to register Licensee as a registered user of the Intellectual Property or if License fails to take any actions reasonably necessary in order for WWE to perfect its ownership rights in the Intellectual Property, as required by the Terms of License;

(11)  If in any material manner, a governmental agency or court of competent jurisdiction determines that the Licensed Product(s) is subject to a required recall;

(12)  If, other than under Chapter 11 of the United States Code which is covered under Section L(2) hereof, Licensee becomes subject to any voluntary or involuntary insolvency, cession, bankruptcy, or similar proceedings, or an assignment for the benefit of creditors is made by Licensee, or an agreement between Licensee and its creditors generally is entered into providing for extension or composition of debt, or a receiver is appointed to administer the assets of Licensee, or the assets of Licensee are liquidated, or any distress, execution, or attachment is levied on such of its manufacturing or other equipment as is used in the production and

20

                                                                 TAKE-TWO_0000533

distribution of the Licensed Products and remains undischarged for a period of thirty (30) days;

(13) If Licensee discloses any material Confidential Information concerning this Agreement, as defined in Section N(12), which, it acknowledges, it may become privy to during the Term of this Agreement;

(14) If Licensee fails to comply with the terms and conditions of Section N(1) relating to Licensee's assignment of its rights under this Agreement and Section K relating to sublicenses and agreements with manufacturers; or

(15) If Licensee fails to make any payment due under the Terms of License in excess of Fifty Thousand US Dollars ($50,000.00 USD) up to Two Hundred Fifty Thousand US Dollars ($250,000.00 USD) by the date such payment is required under the provisions of this Agreement;

(16) If Licensee sells, distributes, manufactures, markets, displays or advertises the Licensed Products in the channels of distribution reserved to WWE in the Terms of License;

(17) If Licensee spends less than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for each Contract Year to advertise the Licensed Products as required in the Terms of License;

(18) If Licensee breaches the Non-Compete clause of the Terms of License in any material respect;

(19) If Licensee fails to use its commercially reasonable efforts to exploit the rights granted hereunder, including the release of a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; provided, however, solely with respect to calendar years 2013 and 2014, the failure to release an original title caused solely by a breach by Yuke's Co., Ltd, the Licensee's developer ("Yukes"), of its development agreement with Licensee (which failure occurs despite all reasonable commercial efforts of Licensee to mitigate Yukes' breach) shall not be deemed a breach of this Agreement by the Licensee and will not allow termination under this provision but all Guaranteed Minimums for such unreleased Game(s) shall be paid by Licensee to Licensor in accordance with the terms of the License.

(20) If Licensee fails to sell product to WWE as required under the Terms of License.

a) <u>Right of Termination</u>. Either party shall have the right to immediately terminate this Agreement, by giving written notice to the other party, in the event that (i) Licensee and Yuke's Co., Ltd. fail to enter into a Master Developer Agreement, satisfactory to Licensee in its sole discretion, regarding the development of the Games, (ii) the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") does not enter an order, satisfactory to both parties in their sole discretion, approving THQ Inc.'s ("THQ") motion

21

seeking approval of THQ's rejection of that certain License Agreement, dated as of December 22, 2009, by and between THQ and WWE, (iii) the Bankruptcy Court does not enter an order, satisfactory to both parties in their sole discretion, approving the transfer of all of THQ's right, title and interests in all assets owned by THQ and all executory contracts relating to video games based on the Intellectual Property produced or developed by THQ free and clear of all interests, liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code or (iv) those members of the "Fight Team" who are THQ employees and are crucial to the development of WWE Games have agreed to be employed by Licensee on terms satisfactory to Licensee in its sole discretion, in each case, on or prior to February 22, 2013.  Both parties shall use reasonable commercial efforts to fulfill the conditions to the effectiveness of this Agreement.  If despite such efforts, the Effective Date does not occur by February 22, 2013 either party shall have the right, upon written notice to the other party prior to the above conditions in clauses (i) through (iv) having been satisfied, to terminate this Agreement and upon such termination notice, this Agreement shall immediately become null and void and have no effect, no party shall have any past or future obligation under this Agreement, and all rights and obligations of the parties hereunder shall automatically terminate.

        b) <u>Licensee Cure Period</u>.  With respect to any non-monetary breach, failure or default by Licensee, in the event that Licensee cannot cure same with the exercise of reasonable diligence within thirty (30) days, then WWE's right to terminate this Agreement shall be tolled for thirty (30) days provided Licensee uses its best efforts to commence taking steps to cure the breach, failure or default within the initial thirty (30) day period and completes such cure within the subsequent thirty (30) day period.

        L(2)   <u>Assumption and Rejection Pursuant to United States Bankruptcy Code</u>.  After any order for relief under the Bankruptcy Code is entered against the Licensee, the Licensee must assume or reject this Agreement within sixty (60) days after the order for relief is entered.  If the Licensee does not assume this Agreement within such sixty (60) day period, WWE may, at its sole option, terminate this Agreement immediately by giving written notice to the Licensee, without further liability on the part of WWE.

        L(3)   <u>Effect of Termination</u>.  Termination of this Agreement shall be without prejudice to any rights or claims which a party may otherwise have against the other for a breach hereof prior to such termination.

        L(4)   <u>Discontinuance of Use of Intellectual Property, etc.</u>  Subject to the provisions of Section L(5), upon the expiration or earlier termination of this Agreement, the Licensee agrees promptly and permanently to discontinue manufacturing, selling, advertising, distributing, and using the Licensed Products and Advertising Materials; promptly and permanently to discontinue using the Intellectual Property; immediately to destroy (unless advised otherwise by counsel) any films, molds, dies, CD's, electronic data files, patterns, or similar items from which the Licensed Products and Advertising Materials were made, where any element of the Intellectual Property is an integral part thereof; and in an orderly fashion to terminate all agreements with manufacturers, distributors, and others which relate to the manufacture, sale, distribution, and use of the Licensed Products.

CONFIDENTIAL

TAKE-TWO_0000535

L(5)    Disposition of Inventory Upon Expiration.  Notwithstanding the provisions of Section L(4), if this Agreement expires in accordance with its terms, or is terminated for a reason other than a material breach by Licensee, the provisions of this Section L(5) apply.  Licensee shall have the right to distribute and sell any Licensed Products for a period of nine (9) months from the termination or expiration date of the License subject to the payment of royalties to WWE on any such sales in accordance with the terms of this Agreement.  During the first three (3) months of the sell-off period, Licensee shall have the right to cause to be manufactured units of Games Licensee reasonably anticipates will be necessary to meet forecasted demand for the remainder of the sell-off period.

L(6)    Equitable Relief.    Licensee acknowledges that WWE is entering into this Agreement not only in consideration of the royalties paid, but also for the promotional value, goodwill and intrinsic benefit resulting from the manufacture, advertisement, distribution, sale and promotion of the Licensed Products by Licensee within the Territory.  Licensee further acknowledges that the Intellectual Property, possesses a special, unique and extraordinary character that cannot be replaced or the loss thereof adequately compensated for in money damages and that any breach by Licensee of this Agreement may cause irreparable injury and harm to the WWE.  Therefore, if it is alleged by the WWE or any third party affiliated with the WWE that (i) Licensee has failed to manufacture, advertise, distribute, market, promote and/or sell the Licensed Products in strict accordance with the terms of this Agreement and/or (ii) Licensee has used the Intellectual Property in an unauthorized manner, as WWE will determine in its sole discretion, then, in each such case, WWE, any third party affiliated with the WWE and/or their assignees (in addition to any other remedies that may be available to them under this Agreement, at law or in equity or pursuant to such other applicable laws) will have the right to seek from any court having jurisdiction such equitable relief as may be available and appropriate, including such necessary injunctive relief.

SECTION M.    DISPOSAL OF SECONDS

If, during the manufacture of the Licensed Products, any seconds (the "Seconds") are produced, Licensee will destroy such Seconds and will send WWE an affidavit attesting to the destruction.  The provisions of this Section will not apply to any Seconds from which all references to the Intellectual Property are completely and permanently obliterated, which Seconds shall be disposed of as Licensee elects in its sole discretion.

SECTION N.    MISCELLANEOUS PROVISIONS

N(1)    Restriction on Assignments. Without the prior written consent of WWE, (which consent may be withheld in WWE's sole discretion) the Licensee shall not, directly or indirectly, assign, hypothecate, convey, pledge, encumber or otherwise transfer ("Transfer") any of its rights under this Agreement.  For example, a Transfer which requires the consent of WWE as provided in this Section shall include without limitation (i) any assignment, sale, conveyance, transfer, hypothecation, pledge, encumbrance or other transfer of 50% or more of stock of Licensee within any consecutive 12 month period, (ii) the sale of all or substantially all of the assets of Licensee, (iii) any merger, consolidation or reorganization into or with the assignor, regardless of whether Licensee is the surviving entity and (iv) any other action or event which

23

                                                    TAKE-TWO_0000536

would constitute a transfer of the benefits of this Agreement by operation or force of law.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of WWE.

N(2)    Independent Contractor Relationship:  Parties Not Joint Venturers.  At all times the parties hereto shall be considered independent contractors and this Agreement shall not create an agency, franchise, partnership or employment relationship between the parties and nothing contained in this Agreement shall be construed so as to make the parties partners or joint venturers or to permit the either party to bind the other to any agreement or purport to act on behalf of the other party in any respect.

N(3)    Modifications of Agreement; Remedies.  No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by the respective duly authorized representatives of each of the parties.  Failure by either party to enforce any rights under this Agreement shall not be construed as a waiver.

N(4)    No Waiver of Termination Rights. The waiver, expressed or implied, by either party of any rights hereunder or either party's failure to perform or act upon any provision of this Agreement, will not constitute or be deemed a waiver of any of such party's rights hereunder and such rights shall be exercisable when it is deemed appropriate by such party.

N(5)    Invalidity of Separable Provisions. If any provision or clause of this Agreement, or portion thereof, will be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision will not thereby be affected and will be given full effect, without regard to the invalid portion.  It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unforceable in such jurisdiction, the remainder of such provision will not thereby be affected and will be given full effect, without regard to the invalid portion.  It is intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court will reduce or modify the duration, area or matter of such provision, and, in its reduced or modified form, such provision will then be enforceable and will be enforced.

N(6)    Notices.  All notices to be given under this Agreement shall be in writing and shall be delivered either by personal delivery, regular mail, overnight courier or facsimile (provided that a copy of such notice is also given by mail on the same day) (except as herein otherwise expressly provided) at the respective addresses of the parties as set forth above, unless notification of a change of address is given in writing.  Notice given by regular mail shall be deemed given on the date of mailing thereof and notice given by facsimile shall be deemed given on the date of confirmation of receipt of such facsimile (provided a copy of such notice is also sent by regular mail).

N(7)    Headings.  The paragraph and section headings of this Agreement are inserted only for convenience and shall not be construed as a part of this Agreement.

24

TAKE-TWO_0000537

N(8)   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

N(9)   Interpretation.  Each party, with the assistance of its respective counsel, has read this agreement and has had an opportunity to negotiate fully the terms of this Agreement. Accordingly, any rule of construction seeking to resolve ambiguities against the drafting party shall not be applicable in the interpretation of this Agreement.

N(10)   No Third Party Beneficiaries. There are no intended third party beneficiaries to this Agreement.

N(11)   Disclaimer.

a)   Disclaimer.  Each party disclaims all warranties of any kind, except for the warranties contained in Section G(1) hereof.

b)   Limitation of Liability.  Except in the case of a violation of any provision herein protective of a party's intellectual property, no party will be liable to the other party for any indirect, incidental, reliance, special or consequential damages (including but not limited to lost profits or revenue or any expense or cost related to or arising out of any inventory or goods on hand or any expense or cost incurred with regard to the research and development of the Licensed Product) arising out of or related to this Agreement, however caused and by any theory (including negligence of any kind or degree) and regardless of whether such party has been advised of the possibility of such damages and whether such damages were foreseeable.

c)   Subject to Section N(11)(b), in the event Licensee breaches the terms of this Agreement, WWE shall be entitled to seek a recovery based on any and all remedies available at law and/or equity, including any additional monetary damages related to or caused by the breach by Licensee.

N(12)   Confidential Information.

a) During the Term of this Agreement, each party may have access to confidential information of the other party ("Confidential Information").  Confidential Information for the purposes of this Agreement shall be defined to include, but not be limited to, software (regardless of the stage of development), designs, drawings, specifications, models, technical information, unreleased or undisclosed Intellectual Property or Licensee Intellectual Property, as applicable, hardware, source codes, object codes, documentation diagrams, flow charts, marketing and development plans, business plans, or records, financial information, market reports, customer lists, talent lists, storylines, scripts, story boards or ideas, employee lists, business manuals, policies and procedures, the terms and conditions of this Agreement, billing information and procedures and all other information; provided such information shall be marked "confidential" or "proprietary".  The parties agree both during the Term and for a period of five (5) years after the expiration or termination of this Agreement for any reason whatsoever to hold each other's Confidential Information in confidence, employing the same degree of care that the party employs for its own proprietary information.  The parties agree not to make each other's

25

Confidential Information available in any form to any third party, except as otherwise permitted in this Agreement, or to use each other's Confidential Information for any purposes other than for the implementation or exploitation of this Agreement.

b) Notwithstanding the foregoing, the parties' obligations of confidentiality shall not include information which:

i) at the time of disclosure was in the public domain;

ii) after such disclosure, becomes generally available to the public other than through any act or omission by the party herein releasing said information;

iii) is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to the non-disclosing party in a timely manner in order to afford such party an opportunity to seek a protective order against such disclosure and the disclosure is strictly limited to the information which the disclosing party is required or compelled to disclose;

iv) was already known to the non-disclosing party without restriction, prior to receipt from the disclosing party

v) is lawfully disclosed to the non-disclosing party by a third party who is not under any obligation, whether contractual, fiduciary, statutory, or otherwise, of confidentiality to the disclosing party with respect to such Confidential Information; or

vi) is at any time developed by the non-disclosing party independently (as shown by documents and other competent evidence) without use of, or reference to, the Confidential Information of the disclosing party.

N(13)  Binding Effect. The parties represent and warrant that the person executing this Agreement has the authority to bind the party on behalf of which he/she is signing.

N(14)  Rules of Construction. As used in this Agreement, unless the context otherwise requires (i) references to " "Sections" are to the sections of the Standard Terms and Conditions of this Agreement; (ii) all "Exhibits" and "Schedules" referred to in this Agreement are to Exhibits and Schedules attached to this Agreement and are incorporated into this Agreement by reference and made a part of this Agreement; (iii) "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (iv) the singular includes the plural, (v) the masculine, feminine and neutral genders include the others; and (vi) headings of the various Sections and subsections are for convenience of reference only and will not be given any effect for purposes of interpreting this Agreement. Furthermore, unless specifically stated to the contrary in the Terms of License, all of the rights and licenses granted to Licensee under this Agreement shall be deemed non-exclusive.

26

 TAKE-TWO_0000539

N(15) Force Majeure. If either party is prevented from performing its obligations under this Agreement as a result of a force majeure event, then the non-performing party will not be liable to the other parties for its failure to perform such obligations. As used in this Agreement, force majeure will mean any act of God, fire, flood, war, public disaster, other calamity, strike, or labor difficulties, or any governmental determination, action, regulation, or order, or any other occurrence beyond the reasonable control of the non-performing party, which, despite the non-performing party's reasonable efforts, prevents the performance of its obligations under this Agreement.

WORLD WRESTLING ENTERTAINMENT, INC. ("WWE")

By: [signature]
Casey Collins
EVP, Consumer Products

Date: 2/11/13

TAKE-TWO INTERACTIVE SOFTWARE, INC. ("Licensee")

By:____________________

Print Name:
Title:
Date:____________________

N(15) <u>Force Majeure</u>. If either party is prevented from performing its obligations under this Agreement as a result of a force majeure event, then the non-performing party will not be liable to the other parties for its failure to perform such obligations. As used in this Agreement, force majeure will mean any act of God, fire, flood, war, public disaster, other calamity, strike, or labor difficulties, or any governmental determination, action, regulation, or order, or any other occurrence beyond the reasonable control of the non-performing party, which, despite the non-performing party's reasonable efforts, prevents the performance of its obligations under this Agreement.

WORLD WRESTLING
ENTERTAINMENT, INC.
("WWE")

By:_____
Casey Collins
EVP, Consumer Products

Date:_____

TAKE-TWO INTERACTIVE
SOFTWARE, INC.
("Licensee")

By:_____

Print Name: SLATURE
Title: COC
Date: Feb. 11, 2013

27

**CONFIDENTIAL**

**TAKE-TWO_0000541**

EXHIBIT 1

WWE'S CODE OF CONDUCT

COMPLIANCE WITH APPLICABLE LAWS.  Licensee shall comply with all applicable laws and regulations of the countries, states and localities in which it operates.

EMPLOYMENT PRACTICES.  Licensee must comply with the following employment practices:

- Wages and Benefits: Licensee shall provide wages, overtime compensation and benefits at not less than the minimum levels required by applicable laws and regulations or the prevailing local industry levels, if higher.

- Working Hours: Licensee shall, at a minimum, comply with all applicable working hours' laws and regulations.

- Child Labor: Licensee shall not employ any person under the age of 15 (or 14 where allowed by local law) or under the local age for completing compulsory education, if higher.

- Forced Labor: Licensee shall not use any corporal punishment, threats of violence or other forms of physical abuse, forced labor, whether in the form of prison labor, indentured labor, bonded labor or otherwise.

- Non discrimination: Licensee shall not discriminate in employment practices on the basis of race, religion, age, nationality, social or ethnic origin, gender, sexual orientation or disability.

- Health and Safety: Licensee shall provide employees with a safe and healthy working environment.

ENVIRONMENTAL REQUIREMENTS. Licensee shall comply with all applicable environmental laws and regulations.

28

CONFIDENTIAL

TAKE-TWO_0000542

# EXHIBIT 15

# Amendment Number One

This Amendment (this **"Amendment"**), dated as of December ___, 2015 (the **"Effective Date"**), is made and entered into by Take-Two Interactive Software, Inc. (**"Licensee"**) and World Wrestling Entertainment, Inc. (**"Licensor"**) (each a **"Party"** and collectively the **"Parties"**).  Reference is made to the World Wrestling Entertainment – Terms of License, effective as of February 19, 2013, by and between the Parties (the **"Agreement"**).  Capitalized terms that are used but not defined herein shall be as defined in the Agreement.  The following, when signed by Licensee and Licensor, will modify the Agreement.

## TERMS

1. <u>First Right of Refusal for Optional Products</u>.  With respect to interactive entertainment products and services for which the Agreement grants Licensee certain negotiation rights as specified in the Sections "Property" and "Platforms" (e.g., Animated Wrestling Games, Studios Wrestling Games and certain online or wireless social gaming, web-enabled toys, and certain activities on social networks and virtual worlds) (individually and collectively, **"Optional Product(s)"**), the following terms shall apply:

   (a) Licensor shall notify (in accordance with Section N(6) of the Standard Terms and Conditions) Licensee of any intent or proposal to license any Optional Product (an **"Optional Product Notice"**, and the date of such notice shall be referred to as the **"Optional Product Notice Date"**) and, in the event that Licensor desires to license such Optional Product on an exclusive basis, Licensor's notice shall set forth the exclusivity terms, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (and provided that if during Licensor's negotiations with third parties, Licensor desires to offer an exclusivity time period greater than three months more than included in Licensor's notice to Licensee, Licensor shall notify Licensee anew and the terms of this Section 1 shall apply to such new Optional Product Notice);

   (b) Licensor and Licensee shall abide by the applicable proposal delivery and negotiation time lines set forth in the Agreement;

   (c) With respect to any Optional Product Notice for a non-exclusive license to develop or publish such Optional Product (an **"Optional Non-Exclusive Product"**), if the Parties fail to enter into an agreement, in the time period provided therefor in the Agreement, to develop or publish such Optional Non-Exclusive Product (a **"2K-Passed Non-Exclusive Product"**), then Licensor shall have the right for a period of twenty (20) months from the Optional Product Notice Date (the **"Optional Non-Exclusive Product Negotiation Period"**) to enter into one or more non-exclusive licenses  with a third party for such 2K-Passed Non-Exclusive Product, subject to any conditions, restrictions or other terms of the Agreement applicable to any such Optional Product.  Further, once entered, Licensor may enter into any extension, renewal, amendment or new agreement thereof or therefor (in each case limited to the subject matter of the original Optional Product Notice and normal variants/updates thereof, provided any such normal variant/updates thereof shall be limited to updates consistent with the type of game, type of platforms and non-exclusivity terms as the original deal (e.g., a yearly update with new talent rosters for the same type of game is acceptable);

   (d) With respect to any Optional Product Notice for an exclusive license to develop or publish such Optional Product (an **"Optional Exclusive Product"**), if the Parties fail to enter into an agreement, in the time period provided therefor in the Agreement, to develop or publish such Optional Exclusive Product (a **"2K-Passed Exclusive Product"**), then Licensor shall have the right for a period of twelve (12) months from the date that Licensee passes on such Optional Product (the **"Optional Exclusive Product Negotiation Period"**) to enter into one exclusive license (solely to the extent of the exclusivity terms set forth in the Optional Product Notice) with a third party for such 2K-Passed Exclusive Product, subject to any conditions, restrictions or other terms of the Agreement applicable to any such Optional Product.  Further, once entered, Licensor may enter into any extension, renewal, amendment or new agreement thereof or therefor (in each case limited to the subject matter of the original Optional Product Notice and normal variants/updates thereof, provided any such normal variant/updates thereof shall be limited to updates consistent with the type of game, type of platforms and ▮▮▮▮▮▮▮▮▮▮▮ as the original deal (e.g., a yearly update with new talent rosters for the same type of game is acceptable)), and provided further that Licensor shall send Licensee notice of any such extension, renewal, amendment or new agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ;

1

(e) In the event Licensor fails to enter into any license pursuant to Section 1(c) above prior to the expiration of the applicable Optional Non-Exclusive Product Negotiation Period or pursuant to Section 1(d) above prior to the expiration of the applicable Optional Exclusive Product Negotiation Period, Licensor shall not license any third party for such Optional Product without sending Licensee a new Optional Product Notice and complying with the terms above;

(f) Nothing in this Amendment shall modify or amend Licensee's termination rights in connection with a Third-Party Game Termination Trigger as set forth in the Agreement. Notwithstanding anything to the contrary herein, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████), provided that Licensor shall not exercise its approval rights in a manner to deprive Licensee of the benefit of this sentence; and

(g) Notwithstanding the foregoing, the parties acknowledge and agree that Licensor went through the applicable notice and negotiation process with respect to certain Online Rights (with its former licensee, THQ) and with respect to certain Online Rights and Mobile Rights (with Licensee hereunder) and the lists attached hereto as Exhibit A-1 (Prior Permitted Games) and Exhibit A-2 (Recent Permitted Games) reflect current partners of Licensor, and the performance of Licensor's obligations with such partners shall not constitute a breach of this Agreement and any extension, renewal, amendment or new agreement (in each case, limited to the subject matter of the original Optional Product Notice and normal variants/updates thereof, provided any such normal variant/updates thereof shall be limited to updates consistent with the type of game, type of platforms and non-exclusivity terms █████████████████████████████████████████████████ as the original deal (e.g., a yearly update with new talent rosters for the same type of game is acceptable) with such partners that is in accordance with the provisions of this Agreement (other than the first look procedures included in the Agreement as updated by this Amendment) shall not constitute a breach of this Agreement. To the extent that Exhibit A-1 or Exhibit A-2 contain Optional Products for which Licensor has not yet entered into a signed third party agreement (e.g., Items 9 and 10 on Exhibit A-2), such Optional Products shall be deemed to be 2K-Passed Products with Optional Product Notice Dates of the Effective Date of this Amendment.

2. <u>Renewing the Agreement for an Extended Term</u>. The Term of the Agreement shall extend for an additional period from ███████ through ███████ (the "**Extended Term**"). The Term of the Agreement shall be understood to include the original Term (the "Original Term") and the Extended Term. As a result, the Section entitled "Term" of the Agreement shall be amended by being deleted in its entirety and replaced with the following:

"Commencing on ███████ and continuing to and including ███████ (for purposes hereof, the period from ███████ through ███████, is defined herein as the "Extended Term," the entire term is defined as the "Term" and each calendar year during the Term is referred to herein as a "Contract Year" or "contract year".) Licensee shall have a ███████ sell-off period from the termination (other than as a result of Licensee's material breach) or expiration date of this License to continue to distribute, market and sell Games and other products and services related to the Property authorized hereunder ("Licensed Products"), provided that: (i) during the first three (3) months of the sell-off period only, Licensee shall be entitled to have manufactured only units of Games that Licensee reasonably anticipates will be necessary to meet forecasted demand for the remainder of the sell-off period; and (ii) all sales during the sell-off period shall be subject to the royalties specified herein. The parties acknowledge that, unless prohibited by a new agreement fully executed and delivered by the parties hereto covering the subject matter hereof, Licensor may, on or after ███████, begin negotiating and/or enter into any agreement with any entity regarding the terms of a videogame license commencing on ███████. Should Licensor enter into such a new videogame license, the new

2

TAKE-TWO_0000544

licensee may: (1) develop and manufacture games on or after ███ ████; and (2) market, sell to and/or ship to retailers or online distributors on or after ████ ██; provided, however, no games may be sold at retail or through online distributors under the new license prior to ███ ██."

3. The following paragraph shall be added after the last paragraph in the Section entitled "Recoupable Guaranteed Minimum" set forth in the Terms of License of the Agreement, and the reference to "Term" in the fifth paragraph of such Section shall be deemed to be refer only to the Original Term:

"During the Extended Term only, the Extended Term MG Amount with respect to such calendar year (as set forth below) payable on ████ ██ and each successive January 1 thereafter during the Extended Term, each of which annual payments shall be recoupable against Licensor Royalties earned for that year's main console Game (the "Main Franchise Game") released in that year (i.e. cross collateralization is allowed between years but not between annually released Main Franchise Games) and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products other than the Main Franchise Games released in prior years.

| Calendar Year | Extended Term MG Amount |
|---|---|
| ███ | ████ |
| ███ | ████ |
| ███ | ████ |
| ███ | ████ |

4. Section (b) of the Section entitled "Licensor Royalties" set forth in the Terms of License of the Agreement shall be revised such that the existing Section (b) shall be renamed "(b)(1)" and a new subsection "(b)(2)" shall be added as follows:



5. Section (f) of the Section entitled "Licensor Royalties" set forth in the Terms of License of the Agreement shall be revised such that the reference to ████ ████ shall be deleted and replaced with ████ ███ (i.e., the royalty rate for Associated Products during the Extended Term shall be the same royalty rate as applies to the last four years of the Original Term).

6. The Section entitled "Marketing Commitment" set forth in the Terms of License of the Agreement is amended by adding the following new Section entitled "WWE Dedicated Marketing Commitment" thereto in respect of the period beginning ████████ and for the balance of the Original Term and the full Extended Term (with the commitment of Licensee for the Original Term up to ████ ██ as set forth in the original unamended "Marketing Commitment" Section remaining in full force and effect):

"WWE Dedicated Marketing Commitment:

The **"Annual WWE Dedicated Marketing Commitment"** shall refer to annual aggregate payments by Licensee of no less than (i) ████████ for each contract year beginning ███████ and continuing until the end of the Original Term; and (ii) ██████████ for each contract year during the Extended Term, provided that in the event that in any contract year beginning ██████ and continuing through the Extended Term, Licensee achieves Net Sales of the █████ and any ███████ in such contract year of █████████ and ██████ the Annual WWE Dedicated Marketing Commitment for each contract year in the

3

TAKE-TWO_0000545

remainder of the Extended Term shall be ███████████████ Licensee shall pay to WWE and its affiliates (except as noted below for certain music costs) no less than the Annual WWE Dedicated Marketing Commitment to advertise, market and promote the Games including, without limitation, on the following items that shall be reasonably agreed upon by the parties from time to time and credited toward fulfillment of the Annual WWE Dedicated Marketing Commitment:

(i) Media plan across Licensor-controlled media assets that may include the following: television, radio, print, billboards, internet and/or social media ("**WWE Media**"), including, without limitation, any WWE websites, WWE Network, WWE Smackdown and WWE RAW;

(ii) Sponsorship, marketing or promotional agreements with Licensor or its affiliates, including, without limitation, sponsorship of a pay-per-view event, WWE tour or other event ("**WWE Sponsorships**"), provided that Licensee shall secure at least one pay-per-view event sponsorships per calendar year ("**Yearly WWE Pay-Per-View Sponsorships**") (e.g., the "Hell In A Cell" event), and, solely in the event that Licensee's Annual WWE Dedicated Marketing Commitment is ██████ or more, the Parties will use reasonable commercial efforts to agree to a second event with Licensee as a co-presenting sponsor such as one of the following: Fastlane, TLC, Survivor Series, Elimination Chamber, Extreme Rules or Night of Champions; provided, however, that the failure to reach agreement on such second event shall not constitute a breach hereunder;

(iii) Talent costs (for Talent then under contract with WWE) for cover or highlight rights, including, without limitation, in-game integrations, product packaging, cover athlete rights, sponsorships, and appearances at industry events or media ("**WWE Talent Costs**");

(iv) With respect to music owned or controlled by WWE or any "entrance" music for any wrestler (and specifically excluding third-party soundtrack or out of context music that is not owned or controlled by WWE or that is not the "entrance" music for any wrestler), music licensing costs for in-game use, trailers or other marketing assets ("**WWE Music Costs**"), paid to WWE, music co-owners or third party administrators for such songs; provided, however, that to the extent WWE Music Costs in the aggregate exceed Three Hundred Fifty Thousand US Dollars ($350,000) in any calendar year, then with respect to the amount in excess of $350,000 (the "**Extra Music Costs**"), 50% of such Extra Music Costs shall be credited to the Annual WWE Dedicated Marketing Commitment;

(v) Solely with respect to the Extended Term and solely in the event that Licensee's Annual WWE Dedicated Marketing Commitment is ██████ or more, the costs associated with any merchandise items each contract year, to be included as a gift with purchase or other similar method, including as part of a digital or retail program to market or promote the Game, with such costs to be billed by Licensor to Licensee at Licensor's actual and reasonable cost ("**WWE Merchandise Costs**"), provided that up to One Hundred Thousand US Dollars ($100,000) of WWE Merchandise Costs per applicable contract year (the "**WWE Merchandise Costs Cap**") shall be credited to the Annual WWE Dedicated Marketing Commitment, provided further that if such WWE Merchandise Costs are not used in any applicable contract year, then the WWE Merchandise Costs Cap for the subsequent contract year shall be increased by the unused portion of such WWE Merchandise Costs, but subject to an overall cap for any such contract year of Two Hundred Thousand US Dollars ($200,000); and/or

(vi) any other amounts paid to Licensor or its affiliates in order to advertise, market and promote the Games (this specifically excludes the NBCU Spend, defined below).

Licensor shall provide Licensee in each contract year media assets, rights, licenses and other benefits generally consistent with the benefits, and the costs thereof, set forth on <u>Schedule B-1</u>.

In addition, in connection with the ████████ contract years, Licensor shall use commercially reasonable efforts to provide to Licensee, at no cost to Licensee, an aggregate of one hundred thousand (100,000) items with a retail value of Thirty US Dollars ($30) per item that may be used by Licensee, for example in connection with special editions of the Games. Such items may include WWE Network monthly subscriptions or other mutually agreed items such as t-shirts and merchandise.

4

CONFIDENTIAL



In addition to the WWE Dedicated Marketing Commitment, Licensee shall spend no less than ███ ███ each contract year to purchase media through ███ to advertise, market and promote the Games; provided, however, if Licensee reasonably demonstrates to WWE that no ███ advertising channel (taking into consideration all ███ advertising channels including, without limitation, cable and broadcast channels, theme parks, websites, films, etc.) would be a commercially reasonable mechanism to reach potential purchasers of the Games, then the parties will reasonably negotiate to amend this provision by expanding the potential channels for such advertising beyond ███ or, if the parties reasonably agree that there are none, reducing Licensee's obligation commensurately until a viable alternative(s) within ███ or such other potential channel(s) arise(s).

7. The Section entitled "Product Release" shall be amended by adding the following sentence to the end of the Section.

> "For purposes of protecting the launch of all WWE games, Licensee shall give Licensor notice of the scheduled launch windows for all Games at least ███ in advance, and Licensee shall update Licensor on a monthly basis thereafter with any variations from such launch windows; provided, however, no such variation shall change any launch exclusivity period nor impact any then existing exclusivity periods WWE has granted other parties in reliance on the original launch date, provided that Licensor has provided Licensee with notice of any such exclusivity periods prior to the time Licensor grants such exclusivity period to any third party."

8. Commencing ███ and continuing during the Term, in order for the Parties to review builds of the Game each year, the Parties shall meet four (4) times during the period from January 1 through October 31 of each year according to the following schedule (which schedule coincides to a Game with a commercial release date in Fall of such year, and any different release date would require a revised mutually agreed schedule; provided that Licensee may reasonably alter such schedule depending on development progress throughout the year by providing notice to Licensor at least thirty (30) days in advance of the meeting dates specified below):

   (a) Licensor shall finalize the roster of Talent no later than the preceding December 1, which shall be a requirement in order for Licensee to prepare the materials for the first meeting. In order to finalize the roster of Talent by December 1, Licensee agrees to provide Licensor with a list of requested Talent, a previously approved Showcase/narrative mode synopsis and a list of Showcase/narrative mode matches no later than the preceding October 1; provided that if Licensee is delayed in providing such information, the foregoing reference to December 1 shall be modified to be the date that is sixty days after Licensee provides such information; and provided further that (1) no later than the preceding September 1, Licensor shall provide Licensee with notice of any Talent who will be unavailable for inclusion in the next years' game, including, without limitation, due to the expiration of the agreement between Licensor and Talent, (2) with respect to active roster Talent proposed by Licensee, Licensor shall provide approval or disapproval of any such active roster Talent no later than twenty (20) days following Licensee's active roster request, and (3) with respect to roster "Legends" Talent (or other similar Talent programs in existence) proposed by Licensee, Licensor shall provide approval or disapproval of any such roster Talent no later than sixty (60) days following Licensee's request for such Legends roster Talent.

   (b) First meeting on or before January 31, at which the following materials will be presented and discussed: high level feature list, key new features, core game improvements and areas of focus based on consumer feedback, as well as a high level project schedule with assigned dates for key milestones for informational purposes only.

   (c) Second meeting on or before May 31, at which the following materials will be presented and discussed: first playable build, update on previously presented information, a draft DLC plan and a

<div align="center">5</div>

general update on development progress and any risks, as well as an updated DLC plan and project schedule.

(d) Third meeting on or before July 31, at which the following materials will be presented and discussed: updated build, update on previously presented information, and a general update on development progress and any risks.

(e) Fourth meeting on or before September 31, at which the following materials will be presented and discussed: updated build, update on DLC progress and any risks, and overall expectation of game quality at release to be discussed.

The failure of either party to meet the foregoing scheduled dates despite good faith efforts shall not result in any breach of the Agreement which shall only occur if a reasonably detailed notice of such failure is provided together with a statement as to the type of damages that will be caused to the non-breaching party at a specified future date, and such failure is not cured prior to such specified date.

9. Commencing with the period beginning ▮▮▮▮▮ and for the remainder of the Original Term and the full Extended Term, Section L(1)(a)(iii)(17) of the Standard Terms and Conditions shall be deleted and replaced with the following:

   " (17) If Licensee spends less than the Annual WWE Dedicated Marketing Commitment or ▮▮▮▮▮ required for each Contract Year to advertise the Licensed Products as required in the Terms of License, as amended, provided that deviations of ▮▮▮▮▮▮▮▮▮▮▮▮ or less per contract year in Licensee's spend on any Annual WWE Dedicated Marketing Commitment or ▮▮▮▮ shall not be deemed a breach;"

10. Section L(1)(a)(iii)(19) of the Standard Terms and Conditions shall be deleted and replaced with the following:

   " (19) If Licensee fails to use its commercially reasonable efforts to exploit the rights granted hereunder, including the release of a minimum of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ;"

11. Order of Precedence. This Amendment is supplementary to and modifies the Agreement. The terms of this Amendment supersede provisions in the Agreement only to the extent that the terms of this Amendment and the Agreement expressly conflict. However, nothing in this Amendment should be interpreted as invalidating the Agreement, and provisions of the Agreement will continue to govern relations between the parties insofar as they do not expressly conflict with this Amendment.

[Remainder of page intentionally left blank.]

6

12. <u>Counterparts</u>. This Amendment may be executed by facsimile and in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment as of the date written above.

WORLD WRESTLING ENTERTAINMENT, INC.

By: _____

Print Name: Casay Collins

Title: EVP, Consumer Products

Date: 1/6/2016

TAKE-TWO INTERACTIVE SOFTWARE, INC.

By: _____

Print Name: Karl Slatoff

Title: President, Take-Two

Date: 1-6-16

7

CONFIDENTIAL

TAKE-TWO_0000549

Exhibit A-1

Prior Permitted Games

1.  Apptivity – game app for use with a tablet supporting Mattel's WWE Rumblers line;

2.  Genera – WWE Slingshot, 3D Fights, SlideShow Ranking, Bobble and Battle Cry;

3.  Java – based WWE poker tournament;

4.  SummerSlam free online promotional digital games;

5.  Social Channel (in connection with Live Gamer) online social media designed to enhance WWE fan base by engaging users in competitions/achievement including game-style mechanics (specifically excluding any in ring activity) with microtransactions and virtual currency;

6.  The Rock "freemium" mobile app on iOS and Android smart phones and tablets first person game owned and published by the Licensor wherein The Rock in live action tries to solve a mystery behind people trying to kill him. He utilizes fighting moves without guns, and users can buy (via micro transactions) upgrades to his strength and fighting tools (but no guns). The game will launch on or about April 2013.

Exhibit A-2

Recent Permitted Games



8

CONFIDENTIAL

TAKE-TWO_0000550



9

CONFIDENTIAL

Schedule B-1

**WWE Dedicated Marketing Commitment**

Summary of Costs (2015 contract year)



Sponsorship Deal
- See the attached <u>Appendix A</u> (Partnership Program).

Talent Costs
- At least one cover athlete, and at least six other highlight athletes; see the attached <u>Appendix B</u> (Talent Costs).

Music Costs
- Covers all music owned or controlled by WWE or any "entrance" music for any wrestler (and specifically excluding third-party soundtrack or out of context music that is not owned or controlled by WWE or that is not the "entrance" music for any wrestler) , for in-game use, trailers or other marketing assets, paid to WWE, music co-owners or third party administrators for such songs; with the costs of such songs generally consistent with the cost of the songs included in the attached <u>Appendix C</u> (Music Costs) and subject to the sharing arrangement set forth in Section 6(iv) above.

European Sponsorship Deal
- Consistent with Licensee's past European sponsorship deals; see the attached <u>Appendix D</u> (European Sponsorships).

<u>Appendix A</u> -- See Appendix A in Excel Document.

<u>Appendix B</u> -- See Appendix B in Excel Document.

<u>Appendix C</u> -- See Appendix C in Excel Document.

<u>Appendix D</u> -- See Appendix D in Excel Document.

**CONFIDENTIAL**

**TAKE-TWO_0000552**

CONFIDENTIAL



CONFIDENTIAL

CONFIDENTIAL

TAKE-TWO_0000555

CONFIDENTIAL

TAKE-TWO_0000556

CONFIDENTIAL



TAKE-TWO_0000557



CONFIDENTIAL



CONFIDENTIAL

**Take-Two Interactive Software, Inc.**
**622 Broadway**
**New York, NY 10012**
**(646) 536-2842 Fax (646) 536-2923**

## World Wrestling Entertainment – Terms of License ("License")

**LICENSOR:** World Wrestling Entertainment, Inc. ("Licensor")

**LICENSEE:** Take-Two Interactive Software, Inc. ("Licensee")

**PROPERTY:** Licensor intellectual property including, but not limited to, trademarks (*e.g.*, WWE, Raw, Legends, ECW), trade names, logos, copyrights, characters, storylines, and other indicia and intellectual property related to or associated with the professional wrestling activities of Licensor and its professional wrestling events, products and services. The Property includes, solely to the extent owned or controlled by Licensor, all music, still photography and video footage, art and sound assets relating to Licensor's professional wrestling activities (the "Multimedia Rights"), *provided, however,* that Licensee will pay Licensor for all direct costs incurred by Licensor (including, but not limited to, all out-of-pocket costs as well as a reasonable allocation of costs for internal resources and personnel) for music and video footage provided to Licensee by Licensor for use in connection with the Games, as defined below. Licensee acknowledges that some of the Multimedia Rights may not be owned or controlled by Licensor, and nothing contained herein shall require Licensor to procure such Multimedia Rights. The Property further includes right of publicity, namely the likenesses, physical characteristics, personalities, characters, and personas of all Licensor Talent (namely, all individuals who are under a booking contract, independent contract or other similar agreement with Licensor and have granted Licensor the licensing rights relating to Licensor's professional wrestling activities for use in connection with the Games). Licensor shall make Licensor Talent available for 3D scanning and photography at no cost to Licensee (to the extent needed and subject to Licensor Talent's scheduling availability). Licensor shall make Licensor Talent available for voice-over recording and non-contact motion capture (to the extent needed and subject to Licensor Talent's scheduling availability) at no cost to Licensor (but without Licensor receiving any profit therefrom and with the parties working together in good faith to minimize the costs to Licensee) and Licensor shall provide reasonable access to Licensor Talent for publicity events. It is understood and agreed that the Property does not include , (i) any film, comic, cartoon, animated designs and/or characterizations of Talent (i.e. not live action simulation), (ii) any brand extension including Talent that is not engaged in unarmed combat for a significant portion of the Game (*e.g.* Stone Cold Hunting Game, a Talent racing or card game, etc) or (iii) or any assets of WWE Studios, Inc. and its subsidiaries ("WWE Studios"), all of which may be exploited by Licensor in its sole discretion except as follows.

CONFIDENTIAL
1

**Exhibit**
**Exhibit 3**
08-4-2020

Notwithstanding the exclusion from the licensed Property of

▮▮▮▮ in clause (i), with respect to any interactive entertainment software game using ▮

▮▮▮▮ (1) Licensor shall deliver to Licensee a "request for proposal" which will outline Licensor's requirements for the game and associated license; (2) Licensee shall provide its proposal to Licensor within thirty (30) days after receipt of Licensor's request and shall otherwise comply with Licensor's reasonable scheduling requirements; and (3) if Licensee submits a proposal, such proposal shall be subject to good faith negotiations between Licensor and Licensee for a period of ▮ ▮▮▮▮ If Licensee does not submit a proposal timely or if the parties are unable to agree in good faith upon the terms of the license, then Licensor shall be free to license such interactive entertainment software game to any other party (subject to the provisions below in this Section "Property").

Notwithstanding the exclusion from the licensed Property of ▮ ▮▮▮▮ and its subsidiaries set forth above, the provisions of this paragraph shall apply unless such rights would conflict with third party agreements then in effect that relate to the rights to a ▮▮ generally (such as, without limitation, a production agreement or a distribution agreement). If WWE Studios wants to license for an interactive entertainment software game its owned and controlled intellectual property which is derived from a ▮

▮▮▮▮ then (1) Licensor shall deliver to Licensee a "request for proposal" which will outline Licensor's requirements for the game and associated license; (2) Licensee shall provide its proposal to Licensor within thirty (30) days after receipt of Licensor's request and shall otherwise comply with Licensor's reasonable scheduling requirements; and (3) if Licensee submits a proposal, such proposal shall be subject to good faith negotiations between Licensor and Licensee for a period of ▮ ▮▮▮▮ If Licensee does not submit a proposal timely or if the parties are unable to agree in good faith upon the terms of the license, then Licensor shall be free to license such interactive entertainment software game to any other party (subject to the provisions below in this Section "Property").

Notwithstanding the foregoing, Licensor shall not release an ▮▮▮▮ in a

CONFIDENTIAL
2

game console format (it being agreed that platforms other than console games such as ███████

███████ prior to January 1, 2015 nor within the ninety (90) days immediately preceding, or the ninety (90) days immediately after, the release by Licensee of a Game pursuant hereto. Moreover, if such a console game is released in accordance with the immediately preceding sentence (the "Third-Party Game Termination Trigger"), Licensee may, during a period of forty-five (45) days immediately following the release of such game by Licensor, on prior written notice, terminate this Agreement either (a) immediately upon such notice without the benefit of clause (c) below, or (b) in accordance with clause (c) below, in either case (a) or (b) without further liability on the part of either party other than those provisions which remain in effect pursuant to their terms or by necessary implication (such as indemnities, obligations to pay for product sold, Licensee's sell off rights provided for in Section L(15) of the Standard Terms and Conditions, etc.), and (c) provided, however, that notwithstanding anything to the contrary in this Agreement, in the event of termination pursuant to clause (b) above, Licensee shall have the right and obligation to release the Game(s) then in development and exercise the manufacture, distribution, sale and related rights with respect to such Game(s) (for example, if Licensee terminated the Agreement on February 1, 2016 in accordance with this paragraph, then Licensee would continue to have right and obligation to release the Game in calendar year 2016 as well as the sell-off rights with respect to such Game, but Licensee would have no further right or obligation for new Games after calendar year 2016). Continuing such example, in the event Licensee terminates the Agreement in accordance with this paragraph on February 1, 2016, Licensee shall have the obligation to pay a Guaranteed Minimum for the Game released in calendar 2016 but shall not have any obligation to pay any Guaranteed Minimum for a Game in respect of any years after 2016   For further avoidance of doubt, any ███████

███████ released by Licensor or any third party in accordance with this paragraph shall not consist primarily of ███████
███████

In the event Licensee is interested in utilizing Multimedia Rights that are not owned and controlled by Licensor, Licensor and Licensee shall reasonably consult and, if Licensor agrees to the inclusion of such Multimedia Rights in a Game(s), Licensor will reasonably assist Licensee in procuring such rights at the lowest cost to Licensee (and, in any event, without profit to Licensor). In addition, if Licensee is granted permission by Licensor, in writing, to license other third party intellectual property (including, without limitation, any professional wrestler formerly

CONFIDENTIAL
3

associated with Licensor agreed upon in the exercise of good faith by the parties), directly from the third party, Licensee agrees to pay such third party all sums due for the use of the rights and to provide Licensor with documentation of same.

**RIGHTS:**

Exclusive rights to develop, use, advertise, market, exhibit, manufacture, distribute, sell, copy, host and otherwise exploit interactive entertainment software games, including catalog THQ titles ("Catalog Titles"), based on the Property in any and all manner now known or hereinafter invented and as more fully described in the Section "Platforms" ("Games").

**PLATFORMS:**

Except as provided below,
and any successors thereto, including, without limitation, all PC, console and handheld platforms, all mobile devices, including phones, tablets and other similar devices (collectively, "Mobile Rights"), so-called "cloud" computing systems (wherein the Games are synchronized, rendered, and stored on a remote server and delivered online, e.g., OnLive), CD, CD-ROM, DVD, HD, DVD, Blu-Ray or other hardware to play the game; and online rights and multi-player capabilities relating thereto, including digital download rights, DLC, micro-transactions, subscription services, MMOs, web browser-based games and social games (collectively, "Online Rights"). (Online Rights with respect to digital download rights, downloadable content and microtransactions are referred to herein as "DLC Online Rights" and all other Online Rights are referred to herein as "Other Online Rights".) Licensee shall also have the right to distribute game peripherals such as memory cards and strategy guides relating to the Games ("Associated Products") on a non-exclusive basis. Specifically excluded from the Platforms are:

- all coin-operated arcade games and other coin-operated machines, tabletop games.
- DVD-based board games.
- Topps (or any other third party trading card licensee) online community (e.g., Toppstown.com), trading cards and stickers, including all interactive gameplay elements thereof.
- "plug and play" type games.

Licensor acknowledges that the rights granted to Licensee hereunder to produce Games include the right to develop, distribute and/or make accessible and/or actively operate social networking applications and/or on-line communities designed to interact with, promote and market the Games, and the parties agree to discuss in good faith opportunities to jointly promote the Games through social networking applications and/or on-line communities.

CONFIDENTIAL
4

WWE_Alexander0000030

Licensee acknowledges that the rights granted to Licensee hereunder do not preclude or prevent Licensor from using the Property to license others to engage in or directly engage in (i) activities (but not games, except as set forth in clause (iii) below) over so-called open-ended social network websites such as, but not limited to, MySpace, Facebook, Cyworld, and Bebo, and closed social networking sites operated by hardware manufacturers; (ii) activities (but not games, except as set forth in clause (iii) below) over web-based "virtual world" sites (including, without limitation, the sale of "virtual goods"), regardless of whether such applications include interactive activities generally which may also appear in interactive game products (for convenience "game-like activities"), and regardless of the device through which such applications may be accessed by an end-user and/or (iii)

for promotional, sponsorship or commercial purposes so long as these games are not (A) initially released in a launch marketing window for a Game (i.e. 45 days immediately prior to, during and 45 days immediately following the commercial release of a Game) or (B) "competitive" with the Games (it being agreed that, if they are "competitive" Licensor shall not use the Property to license others to engage, or directly engage, in these activities). For purposes of the foregoing, a game shall be deemed "competitive" if (a)

or (b) is developed or published (i.e., this does not include distribution where such distributor does not develop or publish) by one of the following competitors of Licensee:

or (c) is developed or published by one of the following online-based developers or publishers:

In the event that Licensor desires to use the Property to license or itself engage in the activities permitted by clauses (i), (ii) or (iii) above, (1) Licensor shall deliver to Licensee a "request for a proposal" which will outline Licensor's requirements for the production and delivery of software required for the specified activity; (2) Licensee shall provide its proposal to Licensor within

after receipt of Licensor's request and shall otherwise comply with Licensor's reasonable scheduling requirements; and (3) if Licensee submits a proposal, such proposal shall be subject to good faith negotiations between Licensor and Licensee for a period of (ten (10) business days, in the case of simple promotional or sponsorship games). If Licensee does not submit a proposal timely or if the parties are unable to agree in good faith upon the terms by

CONFIDENTIAL
5

which Licensee shall produce and deliver such software within the applicable ▮ business day period, then Licensor shall be free to engage any other party (except a party listed in clauses (b) or (c) above) to produce (or produce itself) such software without further obligation to Licensee. The parties' actions contemplated by this Section shall be subject to the parties' good faith and fair dealing. Notwithstanding the foregoing, the parties acknowledge and agree that Licensor went through the foregoing process with respect to certain Online Rights with its former licensee and the list attached hereto as Schedule A reflects current partners of Licensor, and the performance of Licensor's obligations with such partners, and any extension, renewal, amendment or new agreement with such partners that is in accordance with the provisions of this Agreement other than the first look procedures included in this paragraph shall not constitute a breach of this Agreement, provided nothing herein shall permit such partners to release games for console platforms.

**TERRITORY and LANGUAGES:**       Worldwide; all languages.

**TERM:**       Commencing on the Effective Date and continuing through ▮ provided, however, the rights and obligations hereunder shall be of no effect and consequence unless and until (i) Licensee and Yuke's Co., Ltd. ("Yuke's") enter into a Master Developer Agreement ("MDA"), satisfactory to Licensee in its sole discretion, regarding the development of the Games, (ii) the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") enters an order, satisfactory to both parties in their discretion, approving THQ Inc.'s ("THQ") motion seeking approval of THQ's rejection of that certain License Agreement, dated as of December 22, 2009, as amended, by and between THQ and WWE, (iii) the Bankruptcy Court enters an order, satisfactory to both parties in their sole discretion, approving the transfer of all of THQ's right, title and interests in all assets owned by THQ and executory contracts relating to video games based on the Intellectual Property produced or developed by THQ free and clear of all interests, liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code, or (iv) those members of the THQ "Fight Team" who are THQ employees and are crucial to the development of WWE games have agreed to be employed by Licensee on terms satisfactory to Licensee in its sole discretion, in each of cases (i)-(iv), on or prior to February 22, 2013 (the date on which the latest to occur of the events set forth in clauses (i) to (iv), the "Effective Date"). Both parties shall use reasonable commercial efforts to fulfill the conditions to the effectiveness of this Agreement. If despite such efforts, the Effective Date does not occur by February 22, 2013 either party shall have the right, upon written notice to the other party prior to the above conditions in clauses (i) through (iv) having been satisfied, to terminate this Agreement and upon such termination notice, this Agreement shall immediately become null

CONFIDENTIAL
6

and void and have no effect, no party shall have any past or future obligation under this Agreement, and all rights and obligations of the parties hereunder shall automatically terminate.

Licensee shall have a nine (9) month sell-off period from the termination (other than as a result of Licensee's material breach) or expiration date of this License to continue to distribute, market and sell such Game or any products or services related to the Property authorized hereunder ("Licensed Products"), provided that: (i) during the first three (3) months of the sell-off period only, Licensee shall be entitled to have manufactured units of Games that Licensee reasonably anticipates will be necessary to meet forecasted demand for the remainder of the sell-off period; and (ii) all sales during the sell-off period shall be subject to the royalties specified herein. The parties acknowledge that, unless prohibited by a new agreement fully executed and delivered by the parties hereto covering the subject matter hereof, Licensor may, on or after January 15, 2016, begin negotiating and/or enter into any agreement with any entity regarding the terms of a videogame license commencing on January 1, 2018. Should Licensor enter into such a new videogame license, the new licensee may: (1) develop and manufacture games on or after January 15, 2016; and (2) market, sell to retailers and/or ship to retailers on or after March 15, 2018; provided, however, no games may be sold at retail under the new license prior to July 1, 2018.

**DISTRIBUTION:**

Unless specifically stated to the contrary herein (or approved in advance in writing by Licensor), the rights granted to Licensee shall not include the right to sell, distribute, manufacture, market, display and/or advertise the Games through any of the following channels of distribution which are reserved specifically for use by Licensor: (i)                                        ; and (ii)

provided, that all Games sold by Licensor through such channels of distribution shall be purchased directly from Licensee in accordance with this Agreement.

**NONRECOUPABLE**
**GAME FEE:**

Within ten (10) days after the release of WWE '14 and, in any event, on or before December 31, 2013 (i.e. whether or not WWE '14 is then or thereafter actually released), Licensee shall pay to Licensor

as a nonrecoupable, nonrefundable fee for the first game (WWE 2014) and second game (WWE 2015).

Confidential

WWE_Alexander0000033

**RECOUPABLE GUARANTEED
MINIMUM:**

Unless terminated earlier and subject to conditions set forth below, the recoupable (as provided below) Guaranteed Minimum for the License Term shall be as follows:

payable on the Effective Date, which shall be recoupable against Licensor Royalties earned for the first console Game released after execution of this License ("WWE 2014") and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products; provided, however, in the event that both following conditions have been met prior to January 1, 2015: (x) such Game (WWE 2014) does not generate in excess of
and (y) that Guaranteed Minimum has not been fully recouped by Licensee, then Licensor will credit

(the "WWE 2014 Credit") against future payments of Guaranteed Minimums (but not royalties or other fees hereunder) due hereunder and the Guaranteed Minimum for WWE '14 shall be reduced by such amount.

payable on January 1, 2014, which shall be recoupable against Licensor Royalties earned for the second console Game released after execution of this License ("WWE 2015") and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products other than the main console simulation Games released in prior years; provided, however, in the event that both following conditions have been met prior to January 1, 2016: (x) such Game (WWE 2015) does not generate in excess of
of Net Sales and (y) that Guaranteed Minimum has not been fully recouped by Licensee, then Licensor will credit Licensee

(the "WWE 2015 Credit") against future payments of Guaranteed Minimums (but not royalties or other fees hereunder) due hereunder and the Guaranteed Minimum for WWE 2015 shall be reduced by such amount.

In the event that Licensee terminates this Agreement either for Licensor's breach of the Agreement or for the Third-Party Game Termination Trigger, and following such termination there are no future Guaranteed Minimums against which to credit the WWE 2014 Credit or WWE 2015 Credit, if applicable, then Licensor shall instead pay the amount of such credits, if applicable, directly to Licensee within fifteen (15) days of such termination.

payable on January 1, 2015 and each successive January 1 thereafter during the Term, each of which                annual payment shall be recoupable against Licensor Royalties earned for the Game released in that year (i.e. cross collateralization is

CONFIDENTIAL
8

allowed between years but not between annually released main simulation Games) and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products other than the main console simulation Games released in prior years.

**MOBILE GAMES:**

Licensee shall use reasonable efforts to develop, market and sell at least █████████████████████████████████ including, but not limited to, the iPhone, iPod Touch, iPad and other tablets and Android platforms. Such Game may be a version of the annual console Game or a different Game developed specifically for such platforms.

**LICENSOR ROYALTIES:**

Royalties payable to Licensor by Licensee hereunder shall be as follows:



| Game Released in Calendar Year | Platform | Royalty (expressed as a percentage of Net Sales) |
| --- | --- | --- |
| (a) ████████████ | | |
| (b) ████████ | | |

CONFIDENTIAL
9

WWE_Alexander0000035



(c)     In subsections (a) and (b), Net Sales of Mobile Rights and Online Rights shall be counted as Net Sales for purposes of calculating royalties break points above. All Catalog Titles will earn royalties, which will be used to recoup Guaranteed Minimums as set forth under Section "Recoupable Guaranteed Minimum". Such Catalog Title royalties shall be ▮ of Net Sales. Net Sales of Catalog Titles shall count for purposes of calculating break points above.

(d)     Licensor agrees to consider in good faith Licensee's requests to bundle the Games with other comparable platform interactive entertainment software games created by the Licensee (provided that Licensor hereby approves a bundle of NBA 2K13 with WWE 2013); it being agreed that Licensor may deny such requests in its good faith discretion for any reason such as, without limitation, brand or content avoidance or perceived quality discrepancies. In the event such bundling is allowed by Licensor, Net Sales for the Games will equal Net Sales for the bundle divided by the number of interactive entertainment software games (including the Games) included in the bundle.

(e)     In-Game Advertising (all years): ▮ split of revenue after deduction of ▮

(f)     Associated Products: ▮

(g)     "Net Sales" with respect to all Platforms other than Mobile Rights and Online Rights is defined as Licensee's gross invoiced billing price to its customers or distributors for the Licensed Product less only: (i) volume discounts, markdowns, allowances, and rebates (it being agreed that Licensee is free to grant all of these in its sole discretion, but the aggregate maximum deducted from Net Sales for these purposes is capped at ▮ of the total gross invoiced billing price for that title); (ii) credits issued or monies paid to customers pursuant to a co-op and retail marketing funds of an amount not to exceed ▮ of the gross sales by title, for shipments to Licensee's customers based on life to date sales of the title; and (iii) credit or adjustments for returns, subject to a cap ▮ of gross invoiced billing price for that title. Licensee shall include a column on the quarterly royalty statements showing the actual co-op and retail marketing fund deductions. For the avoidance of doubt, Licensee shall not be entitled to deduct

CONFIDENTIAL
10

Confidential                                                   WWE_Alexander0000036

shipping or warehouse price allowances or deductions from Net Sales. If the Licensee sells a Game to a subsidiary or other entity which is an "affiliate" (as defined in Regulation 240.10A-3(e)(1) promulgated under the Securities Exchange Act of 1934), the Licensor royalties hereunder shall be computed on the basis of the Net Sales price for such Game charged by such affiliate on resale of the Game, provided, however, Licensee shall pay only one royalty and only on a resale if such resale price is higher than the price charged by Licensee to the affiliate.

"Net Sales" with respect to Mobile Rights and Online Rights is defined as Licensee's actual gross sales of the Licensed Products received by Licensee, less only unaffiliated third-party expenses actually incurred by Licensee in the form of: (i) customary distribution royalties or similar fees or charges paid to sites, services or platforms through which the Licensed Products are distributed, playable or otherwise made available, (ii) credits, refunds or charge backs for returned or canceled Licensed Product orders subject to a cap of                        of gross invoiced billing price for that title, (iii) amounts solely and directly attributable to fraudulent or invalid transactions, (iv) with respect to Online Rights an allocable portion of reasonable out-of-pocket, customer service costs not to exceed                        of gross revenues from the sale of Licensed Products if Licensee operates such Licensed Product directly (i.e., without any online partner or similar third party), and (v) with respect to Online Rights, server hosting charges if Licensee operates a Licensed Product directly (i.e., without any online partner or similar third party). Notwithstanding anything in the Standard Terms and Conditions to the contrary, the parties hereby acknowledge and agree that currently many digital distributors collect and remit sales, use, value added, good and services and/or similar taxes, which amounts shall not be included in Net Sales, and the parties further acknowledge and agree that to the extent that Licensee is responsible for the collection or remittance of such taxes, such taxes shall not be included in Net Sales.

(h)     All royalty payments, together with a royalty statement, shall be due within forty-five (45) days following the end of each calendar quarter. All royalties due Licensor shall accrue upon the sale of the Games, regardless of the time of collection by Licensee.

**MARKETING COMMITMENT:**     For each Contract Year, Licensor shall spend                        to advertise the Games, including via television, internet and/or social media, radio or billboards, and/or any other form of advertising in accordance with the marketing plan further described in the "Marketing and Sales Plans/Quarterly Reports" section below. Licensee shall keep accurate account and copies of all documents and records relating to said advertising expenditures and shall be required to

Confidential

WWE_Alexander0000037

send in reports on a semi-annual basis describing the nature and amount of advertising.

**NON-COMPETE:**

Licensee, its parent, subsidiaries, affiliates, successors, and assigns agree that they shall not, while this License Agreement remains in effect, produce any wrestling videogame products using: (a) the names, logos or other trademarks or service marks associated with any professional wrestling organization (other than Licensor); or (b) the names, trademarks or service marks, logos and/or likenesses of any professional wrestlers not associated with Licensor.

**PRODUCT RELEASE:**

Licensee shall use its commercially reasonable efforts to exploit the rights granted hereunder. Licensee shall

**MARKETING AND SALES PLANS/
QUARTERLY REPORTS:**

Once a year, Licensee shall provide Licensor with a written marketing plan (in a form to be reasonably agreed) with respect to the Games. Each such marketing and sales plan shall include, for each Game, a marketing timetable, sales projections, channels and methods of distribution, nature and amount of advertising and advertising expenditures. Each marketing plan shall contain specific information for the one-year period immediately succeeding its submission and general estimates or projections for subsequent periods during which this License remains in effect. All marketing plans and information therein provided by Licensee to Licensor shall be formulated by Licensee after meaningful consultation with WWE and treated as the confidential information of Licensee. Licensee will provide Licensor semi-annually with reports (in a form to be reasonably agreed) updating the marketing and sales plan going forward for at least the next twelve (12) months and detailing the implementation of the marketing and sales plan and the advertising and marketing expenditures made by Licensee for the past six months.

**SALES TO LICENSOR:**

Licensee agrees to sell to Licensor a reasonable amount of product produced hereunder at the lowest legally permissible preferential pricing which, in any event, will be above Licensor's cost for such products, for re-sale on Licensor's website or catalog. Such product will be sold to Licensor with a royalty rate ▮ less than the royalties mentioned above. Such sales shall be recoupable by Licensee against the Minimum Guarantee owed in the year in which such sales are made to Licensor.

**INSURANCE:**

Licensee shall obtain during the term a comprehensive general liability insurance policy which shall include coverage for product liability from an insurance company which maintains an A.M. Best rating of at least A- (A minus) or higher and is

CONFIDENTIAL
12

reasonably acceptable to Licensor providing protection (at a minimum, in the amount of Two Million US Dollars ($2,000,000.00 USD) per occurrence and Four Million US Dollars ($4,000,000.00 USD) annual aggregate) applicable to any claims, liabilities, damages, costs, or expenses, arising out of or caused in connection with any defects, alleged defects or deficiencies in the Games.

**INTELLECTUAL PROPERTY:** Licensee acknowledges Licensor's sole and exclusive ownership of (i) all rights in and to the intellectual property rights being licensed hereunder, and (ii) any intellectual property rights in and to all materials created by Licensee or its developer hereunder as and to the extent provided in, and subject to, Sections E and F of the Standard Terms and Conditions.

Licensee agrees and shall undertake to attach to each licensed product and/or its container an "Officially Licensed WWE Product" hologram tag or label in a form prescribed and/or approved by Licensor ("Official Tag"); provided, however, the exact size, placement and prominence of any such Official Tag shall be determined by Licensee in its reasonable discretion and subject to any applicable guidelines or requirements of any third party Platform manufacturer. During the Term hereof, Licensee agrees to purchase its Official Tag(s) at its own cost and expense. Licensee agrees to purchase its Official Tag(s) from Licensor's approved hologram supplier, but any costs in excess of $0.03 per Official Tag shall be borne by Licensor.

**GOVERNING LAW/**
**JURISDICTION:** All disputes, claims, or legal actions arising directly or indirectly out of this License shall be governed by the laws of the State of New York without regard to principle of conflicts of Law, and Licensee and Licensor agree to submit to the exclusive jurisdiction of the United States District Court for the State of New York and the Supreme Court of New York.

Confidential WWE_Alexander0000039

GENERAL TERMS:

This License is subject to all of the provisions of the Standard Terms and Conditions, which are attached to and made a part of this License by reference. In the event of a conflict between the License and the Standard Terms and Conditions, the language of this License shall govern.

WORLD WRESTLING
ENTERTAINMENT, INC.
("Licensor")

By: _____
Casey Collins
EVP, Consumer Products

Date: __2/11/13_____

TAKE-TWO INTERACTIVE
SOFTWARE, INC.
("Licensee")

By: _____

Print Name: _____
Title: _____
Date: _____

CONFIDENTIAL
14

Confidential

WWE_Alexander0000040

**GENERAL TERMS:**    This License is subject to all of the provisions of the Standard Terms and Conditions, which are attached to and made a part of this License by reference. In the event of a conflict between the License and the Standard Terms and Conditions, the language of this License shall govern.

WORLD WRESTLING                    TAKE-TWO INTERACTIVE
ENTERTAINMENT, INC.                SOFTWARE, INC.
("Licensor")                       ("Licensee")

By:_____         By:_____
Casey Collins
EVP, Consumer Products

                                   Print Name:___SLATOFF___
                                   Title:_____CJO_____
Date:_____       Date:___Feb. 11, 2013____

Confidential                                          WWE_Alexander0000041

**EXHIBIT A**
**Online Game Rights**

1.  <u>Apptivity</u> – game app for use with a tablet supporting Mattel's WWE Rumblers line;

2.  <u>Genera</u> – WWE Slingshot, 3D Fights, SlideShow Ranking, Bobble and Battle Cry;

3.  Java – based WWE poker tournament;

4.  SummerSlam free online promotional digital games;

5.  Social Channel (in connection with Live Gamer) online social media designed to enhance WWE fan base by engaging users in competitions/achievement including game-style mechanics (specifically excluding any in ring activity) with microtransactions and virtual currency;

6.  The Rock "freemium" mobile app on iOS and Android smart phones and tablets first person game owned and published by the Licensor wherein The Rock in live action tries to solve a mystery behind people trying to kill him.  He utilizes fighting moves without guns, and users can buy (via micro transactions) upgrades to his strength and fighting tools (but no guns).  The game will launch on or about April 2013.

CONFIDENTIAL
15

WWE_Alexander0000042

WORLD WRESTLING ENTERTAINMENT, INC.
STANDARD TERMS AND CONDITIONS

DEFINITIONS.  For purposes of these Standard Terms and Conditions (together with the Terms of License, this "Agreement") the following definitions shall apply:

a)  The term "Advertising Materials" shall mean all advertising and promotional materials and all packaging, wrapping, and labeling materials for the Licensed Products (including, by way of illustration but not limitation, television commercials, radio ads, print ads, catalogs, trade advertisements, sweepstakes, promotions, flyers, sales sheets, labels, package inserts, hangtags, and displays) which are produced by or for the Licensee and which make use of, reference and/or exploit the Intellectual Property.

b)  The term "Intellectual Property" shall mean the Property licensed to Licensee as described in the Terms of License to which these Standard Terms and Conditions are attached.

c)  The term "Licensed Products" shall collectively mean the use of the WWE Intellectual Property in a form and manner approved by WWE pursuant to the terms hereof, on the following items only:

- *Games (as such term is defined in the Terms of License between World Wrestling Entertainment, Inc. and Take-Two Interactive Software, Inc. dated January ___, 2013, hereinafter the "Terms of License"))*

SECTION A.   QUALITY CONTROLS AND APPROVAL PROCEDURES FOR LICENSED PRODUCTS AND ADVERTISING MATERIALS

A(1)   Warranty of Quality.  The Licensee warrants, represents and guarantees that the Licensed Products and packaging therefor will be of good quality in design, material, and workmanship and will be suitable for their intended purpose; that no injurious, deleterious, or toxic substances will be used in or on the Licensed Products; that the Licensed Products will not cause harm when used as instructed and with ordinary care for their intended purpose; and that the Licensed Products will be manufactured, sold, and distributed in strict compliance with all applicable laws and regulations. The foregoing shall not be deemed a representation that the Licensed Products shall be free from deficiencies, provided, however, that Licensee shall use all commercially reasonable efforts to correct any and all material deficiencies that affect gameplay, cause user system failures or cause a Game to include unauthorized content (it being agreed that this clause relates to such content included without the knowledge or approval of Licensee and nothing contained herein shall limit any of Licensor's rights in the event Licensee knowingly allows such content unauthorized by Licensor to be included in a Game) in a timely manner and will not ship, sell or have its manufacturer(s) ship or sell any Licensed Products that

1

Confidential

WWE_Alexander0000043

it knows to contain such problems unless a patch is available therefor and acceptable to Licensor in its good faith discretion.

A(2)   Approval Procedures for Licensed Products and Advertising Materials; Approval Standards; Time for Approval by WWE.

a)   General.  Licensee shall comply with the approval requirements and steps outlined in the following subsections of Section A and such other procedures as agreed in writing by the parties from time to time during the Term.  Licensee agrees to retain all materials relating to approvals in its files while this Agreement remains in effect and for one (1) year thereafter.

b)   Approval of Licensed Products.  With respect to each different Licensed Product (including each individual title for each individual platform) which the Licensee proposes to manufacture or otherwise create (such as in the case of Online Rights) and sell under this Agreement, Licensee shall submit to WWE for its review and approval (such approval right to be exercised in good faith and in a timely fashion) the following materials:

i)   During the development of the Licensed Products (including the design of components of the game), Licensee shall submit to WWE for approval all in-game content, user interface and feature sets, all character renderings and models, all environments and arenas, and a list of all music selections, it being understood that the selection of Talent and other professional wrestlers associated or formerly associated with WWE, music and environment shall be by mutual agreement of the parties.

ii)   Licensee shall also submit for WWE's approval all Licensed Products at the following stages of development: feature complete build, code complete build, quality assurance verifiable build, tuning complete build and gold master submission candidates (prior to submission to a platform manufacturer for approval for manufacture).

iii)   Twelve (12) identical production samples of each of the Licensed Product to be submitted promptly upon commencement of production.

iv)   Licensee shall comply with all the foregoing approval steps for each Licensed Product, obtaining WWE's written approval at each step of the procedure unless by prior written notice from WWE it is exempted from any such step with respect to a specific Licensed Product.

c)   Approval of Advertising and Promotional Materials.  With respect to each different item of advertising or promotional material which Licensee (or any party acting on its behalf) proposes to produce and use or sell under this Agreement, Licensee shall submit to WWE for its review and approval (such approval right to be exercised in good faith and in a timely fashion) the following materials, in the order stated:

i)   proposed written copy for the item of advertising or promotional material, with attached rough art showing how the Intellectual Property will be used in connection with the copy; and

2

WWE_Alexander0000044

ii)    a final printed sample of the item, where feasible (as, for example, in the case of printed brochures, catalogs, and the like).

d)  Approval of Commercial Announcements.    For any commercial announcements which Licensee (or a third party acting on its behalf) proposes to produce with respect to the Licensed Products, Licensee shall submit to WWE for its review and approval (such approval right to be exercised in good faith and in a timely fashion) the following:

i)    proposed written copy with story boards for the commercial;

ii)   the rough cut of the commercial; and

iii)  the final version of the commercial.

e)  Approval of Press Releases.  Neither party shall distribute any written release, promotional literature, publicity or news story regarding the subject matter of this Agreement or the other party without the other party's prior written approval in each instance, which approval shall not be unreasonably conditioned, withheld or delayed.  The parties shall mutually agree upon and distribute a release regarding the parties entering into this Agreement.

f)  Approval Standards.  WWE shall have the right to disapprove any materials submitted to it under Sections A(2)(b), A(2)(c) or A(2)(d) if it determines, in its discretion (such approval right to be exercised in good faith and in a timely fashion), that the materials in question would impair the value and good will associated with the Intellectual Property, Talent (as such term is defined in the Terms of License) or WWE events; provided, however, that the WWE acknowledges and agrees that it is the intent of the parties that Licensee be permitted to depict characters, environments and arenas, and performances realistically (e.g., images, costumes and props used, locations used, and actions and happenings occurring, during WWE televised or live program or event).

g)  Time for Approval by WWE.  WWE agrees to use reasonable efforts to notify the Licensee in writing of its approval or disapproval of any materials submitted to it under Sections A(2)(b), A(2)(c) and A(2)(d) within ten (10) days after its receipt of such materials, and agrees, in the case of its disapproval, to notify the Licensee in writing of its reasons for disapproval.  In the event WWE fails to approve or disapprove of any materials submitted as provided for above within ten (10) days after WWE's receipt of such materials, Licensee shall notify WWE, in writing, of that fact.  Upon receipt of such written notice, WWE shall have until the end of the second business day thereafter to either approve or disapprove the materials.  If WWE has not responded by the end of the second business day, such material shall be deemed approved.  For this clause (g), notices in writing may be via email.

h)  Maintenance of Quality of Licensed Products.  Licensee agrees to maintain the quality of each Licensed Product manufactured under this Agreement at or above the specifications, quality, and finish of the production sample for such Licensed Product as originally approved by WWE under Section A(2)(b) WWE shall have the right to inspect Licensee's inventory of such Licensed Product upon reasonable request during normal business hours to insure such quality, with forty-eight (48) hours' prior written notice.

3

     i)  <u>Limitations on Approval</u>.  WWE's approval of a Licensed Product shall not be construed in any way as an acknowledgement that such Licensed Product is in compliance with the warranty of quality asserted by Licensee in Section A(1) above and/or that such Licensed Product is in compliance with any and all applicable laws, regulations and industry standards.  With regard to the Licensed Products' compliance with the warranty of quality asserted in subsection A(1) and/or in all applicable laws and regulations in the Territory, it is understood and agreed that WWE shall rely solely on the representations and warranties of Licensee hereunder.

     j)  <u>Change of WWE Marks or Logos or Intellectual Property in the Licensed Products</u>.  WWE shall have the right in its sole discretion and for whatever reason, to change the WWE marks or logos and Licensee shall, to the extent possible, upon written notice make all commercially reasonable efforts to do so as soon as practicable; <u>provided that</u> the parties equally bear the costs of Licensee's compliance.   WWE shall also have the right to change the Intellectual Property in the event of an occurrence or factor connected with the Intellectual Property which, in the reasonable opinion of WWE, reflects unfavorably upon the professional or business reputation of WWE, and Licensee shall, to the extent possible, upon written notice, make all commercially reasonable efforts to do so as soon as practical; <u>provided that</u> the parties equally bear the costs of Licensee's compliance. No such changes or Licensee's inability to comply (despite its commercially reasonable efforts) shall result in a breach of this Agreement.  It is understood that the Intellectual Property shall not include any printed or written or other visual form or orally the initials "WWF" (in any form including in any logo), the name or phrase "World Wrestling Federation", and/or any words or any combination of words that may be shortened to the initials "WWF" ("Prohibited Marks").  Notwithstanding any other provision of this Agreement, Licensee shall not use the Prohibited Marks on or in any advertising or marketing materials, packaging materials, and/or the exterior of goods, in any form or medium.  For the avoidance of doubt, use of the Prohibited Marks incorporated within any THQ Catalog Titles (e.g, in-game content, as opposed to advertising, marketing, packaging, or the exterior of any goods) shall be permitted hereunder.

   A(3)  <u>Miscellaneous</u>.

     a)  <u>Translations</u>.  All translations of written material used on or in connection with the Licensed Products or Advertising Materials shall be accurate and to the extent a word or phrase does not have an applicable translation the English word or phrase shall be used.  No translation shall be made for a Talent name, a logo, the name World Wrestling Entertainment, Inc. or any other trademark or element as specified by WWE.  In all other circumstances the Licensee, when submitting the Licensed Products and the Advertising Materials for approval, shall provide WWE with translations of all such written materials in English.  All translations shall be created as works made for hire and to the extent that they are not created as works made for hire, all right title and interest, including but not limited to copyright in such translations shall be assigned solely and exclusively to WWE and Licensee shall provide WWE with documentation of such work made for hire or assignment agreements.

     b)  <u>No Endorsement</u>.  Other than as permitted under the terms of this Agreement, Licensee will not use the name or likeness of any Talent or any items contained within the

4

definition of Intellectual Property as set forth above as an endorsement of the Licensee and/or any of the Licensee's products or services, without WWE's prior written consent.

    c) <u>Use of Intellectual Property on Licensee Business Forms</u>.  No use of the Intellectual Property will be printed by Licensee on its stationery, envelopes, business cards, invoices, statements, packing slips or other similar documents or materials.

    d) <u>Cheat Codes and Hidden Content</u>.  Licensee shall not knowingly include any cheat codes, "Easter eggs" or hidden features, including but not limited to any objectionable content, in the Licensed Products, without previous written approval from WWE, and will move quickly to address any such issue as to which it becomes aware as contemplated in Section (A)(1).

    <u>SECTION B</u>.  <u>EFFORTS TO MANUFACTURE, DISTRIBUTE, SELL AND OTHERWISE EXPLOIT THE LICENSED PRODUCTS; RESTRICTIONS ON SALE; COMPLIANCE; CHANNELS OF DISTRIBUTION.</u>

B(1)  <u>Efforts to Design and Manufacture the Licensed Products</u>.  Licensee shall use its commercially reasonable efforts to exploit the rights granted to it for each individual title.

B(2)  <u>Efforts to Distribute the Licensed Products</u>.  In the event Licensee sells or distributes other licensed merchandise of a similar grade or quality as the Licensed Products, but which do not bear the Intellectual Property, Licensee will not discriminate, in a manner which adversely impacts the Licensed Product, in the granting of commissions and discounts to salesmen, dealers and distributors between the Licensed Products and the licensed products of any third party.  Licensee may not package the Licensed Products in combination with other products, whether similar or different, without the prior written approval of WWE as provided in the Terms of License.

B(3)  <u>Selling Practices</u>.  Licensee acknowledges WWE's legitimate and reasonable interest in protecting the value of the Intellectual Property and maximizing the effectiveness of WWE's advertising, promotion and distribution efforts by segmenting the classes of trade into which its licensees sell.  Therefore, Licensee will only sell the Licensed Products to a buyer that, to its knowledge, (i) purchases Licensed Products from Licensee solely for sale directly to the consumer and operates a retail or online distribution establishment that supports the high quality and image of WWE officially licensed products or (ii) sells to retailers or online distributors that support the high quality and image of WWE officially licensed products.

B(4)  <u>Restrictions on the Marketing, Promotion, Advertising and Sale of the Licensed Products</u>.

    a) <u>Prohibition Against Premiums</u>: The term "Premiums" shall mean anything given free or sold at substantially less than its usual selling price (but does not include sales made pursuant to periodic price reductions resulting from "specials," "sales" or volume pricing discounts) for the purpose of increasing the sale of, or publicizing, any product or service, or such other giveaway or promotional purposes.  The exploitation of any and all "Premiums" as it concerns the Licensed Products  by either party shall be by mutual agreement of the parties.

5

WWE_Alexander0000047

b) <u>Promotions; Sweepstakes for the Licensed Products</u>.  Under no circumstances will lotteries, games of chance, sweepstakes or any such other contest or similar type of promotion ("Promotions") be permitted in connection with the Licensed Products without the advance written approval of WWE, not to be unreasonably withheld, conditioned or delayed.  In the event WWE approves such Promotions for Licensee, it is understood that Licensee will be responsible for (i) compliance with all Federal, State and local rules and regulations concerning the Promotions, (ii) implementation and administration of the Promotion including collection of any and all the entries related thereto, the selection of the winners and awarding the prizes; and (iii) the completion of any such other element of the Promotions in order to ensure its fulfillment.

c) <u>Prohibition Against Modifying Licensed Products</u>:  Licensee will not manufacture, sell or distribute the Licensed Products with any party or entity who changes, alters, or adds to the Licensed Products in any manner whatsoever and then resells or distributes the Licensed Products to retailers, wholesalers, vendors or the general public, unless approved in advance in writing by WWE, not to be unreasonably withheld, conditioned or delayed.

B(6)   <u>Compliance</u>.

a)  Licensee will, and will use commercially reasonable efforts to assure that Licensee's representatives will, manufacture, sell, promote, advertise and distribute the Licensed Product(s) in a legal and ethical manner and in accordance with the terms and intent of this Agreement.  To that end, Licensee agrees on behalf of itself, its manufacturers, distributors, agents and/or representatives (collectively referred to throughout the remainder of this subsection B(6) as "Licensee") to adhere to (and ensure compliance by its manufacturers, distributors, agents and/or representatives) WWE's Code of Conduct (attached hereto as Exhibit 1).

b)  Licensee will furthermore at all times conduct all aspects of its business in a fair and reasonable manner and in compliance with all shipment tracking, identification and anti-counterfeiting systems and labels (including the use and display of the Official Tag as provided in Section B(6)(e) and (f) below) that WWE may establish from time to time and all applicable laws, government rules and regulations, court and administrative decrees and the highest standard of business ethics then prevailing in the industry.  Licensee will, and will use commercially reasonable efforts to assure that Licensee's representatives will, use its commercially reasonable efforts to ensure that all channels of distribution purchasing Licensed Products comply with the current WWE anti-counterfeiting systems and labels established and as from time to time thereafter amended by WWE.

c)  It will be Licensee's or Licensee's representatives' sole responsibility, at its sole expense, to obtain all approvals (including approvals of certain Licensed Products and/or Advertising Materials but not including trademark applications or other applications to register intellectual property in any jurisdiction around the world) of all governmental authorities which may be necessary in connection with Licensee's performance under this Agreement.

d)  Licensee acknowledges and fully understands the following meanings established for "Counterfeit Goods" and "Diverted Goods":

6

- "<u>Counterfeit Goods</u>" shall mean and include by way of example and not limitation (i) any goods, material, product or otherwise that bear any Intellectual Property that has been reproduced and/or affixed thereto without authorization from WWE; (ii) goods that bear any Intellectual Property produced for any source in excess of the amount ordered by WWE licensee or designated customer or distributor; and (iii) any goods that bear any Intellectual Property, hereto that has been rejected by or never approved by WWE and nevertheless entered into the stream of commerce.

- "<u>Diverted Goods</u>" shall mean and include any goods produced by someone acting on behalf of Licensee, wherein such goods are not delivered by the producer to Licensee or to a person designated by such Licensee to receive such goods.

If permitted by applicable law Licensee will use all commercially reasonable means to prevent the recreation of any Counterfeit Goods and/or Diverted Goods involving Intellectual Property by its employees, agents, representatives or any others operating under its direction, supervision or control.

e)   Licensee agrees and shall undertake to attach to each Licensed Product and/or its container an "Officially Licensed WWE Product" hologram tag or label in a form prescribed and/or approved by WWE ("Official Tag").   During the Term hereof, Licensee agrees to purchase at its own cost and expense its Official Tag(s) from WWE's approved hologram supplier.  The specific details and instructions necessary for the purchase of the Official Tag(s) shall be provided to Licensee shortly after the execution of this Agreement.   In addition, Licensee shall also cause its own name to appear on a tag or label on each Licensed Product and/or its container in a form prescribed and/or approved (such approval right to be exercised in good faith and in a timely fashion) by WWE.

f)   Licensee understands and agrees that it shall not knowingly supply any images it obtains from WWE's artbank, the password to the artbank, any duplicates of films, or any photographs, artwork, video footage or other reproductive media incorporating the Intellectual Property or music to any third party (including other WWE licensees) without the specific written permission of WWE; provided that Licensee may supply such images to its developer for use in accordance with this Agreement.

<u>SECTION C.</u>     <u>ROYALTY STATEMENTS AND PAYMENTS</u>

C(1)   <u>Computation of Royalties</u>.  All royalties due WWE shall accrue upon the sale of the Licensed Products, regardless of the time of collection by the Licensee.  For purposes of this Agreement, a Licensed Product shall be considered "sold" as of the date on which such Licensed Product is billed, invoiced, shipped or processed, whichever event occurs first.

C(2)   <u>Time of Payment</u>.  All royalty payments shall be made in accordance with the mandatory payment schedule set forth in the Terms of License and/or as otherwise directed in Section C(5) below.  All royalty amounts in this Agreement are stated in US Dollars and all royalty payments shall be made in US Dollars.  All royalty statements required to be submitted by the Licensee shall accompany the royalty payments made to WWE.

7

WWE_Alexander0000049

C(3)   <u>Deductions; Taxes.</u>

a) There shall be no deduction from the royalties owed to WWE for uncollectible accounts or for taxes (such as value added taxes or goods and services taxes), and for fees, assessments, quotas, licenses, contingents, commissions, import or export taxes, import or expert permits, similar levies, fees or charges imposed or levied or any other expenses of any kind which may be incurred or paid by WWE or the Licensee in connection with: (i) royalty payments to WWE; (ii) the manufacture, sale, distribution, or advertising of the Licensed Products in the Territory; or (iii) the transfer of funds or royalties or the conversion of any currency into U.S. Dollars (if applicable).  It shall be the Licensee's sole responsibility at its expense to obtain the approval of any foreign authorities; to take whatever steps may be required to effect the payment of funds from abroad; to minimize or eliminate the incidence of foreign taxes, fees, or assessments which may be imposed; to protect its investments in foreign territories; to enable it to commence or continue doing business in any foreign territory; and to comply in any and all respects with all applicable laws and regulations.

b) Notwithstanding the provisions of the preceding Section C(3)(a), if (i) any country imposes a withholding tax against WWE, as licensor, with respect to the royalties payable to WWE by the Licensee on sales of the Licensed Products in such country, (ii) such tax is paid by the Licensee on behalf of WWE, and (iii) such tax is an income tax as to which a foreign tax credit is allowable to WWE under Section 901 of the Internal Revenue Code of 1986, as amended, the Licensee may deduct the amount of such withholding tax from the royalties owing to WWE. In connection therewith Licensee shall furnish to WWE such information and documentation as WWE requires to evidence WWE's right to credit such withholding tax against its federal income tax liability in the United States.

C(4)   <u>Royalty Statements.</u> Licensee shall furnish to WWE within forty-five (45) days after the close of each and every calendar quarter during the Term hereof, as defined in the Terms of License, along with any royalty payments then due, if any, full, complete and accurate statements in the form attached hereto as Schedule B, showing the number of each type of Licensed Product sold during the calendar quarter in question, the total gross sales revenues for each such Licensed Product in U.S. Dollars, an itemization of all allowable deductions taken pursuant to the definition of Net Sales, if any, the Net Sales for each Licensed Product sold, the amount of royalties due with respect to such sales, and all information necessary for the calculation of the Net Sales together with such other pertinent information as WWE may reasonably request from time to time.  All payments shall be made in U.S. Dollars.

C(5)   <u>Royalty Adjustments.</u>  The receipt or acceptance by WWE of any royalty statements furnished pursuant to this Agreement or the receipt or acceptance of any royalty payments made, shall not preclude WWE from questioning their accuracy at any time within two (2) years from the conclusion of any audit relating thereto allowed under this Agreement.  If any inconsistencies or mistakes are discovered in such statements or payments, appropriate adjustments shall be made immediately by the parties.  The Licensee shall pay WWE interest on a late royalty payment at the then current prime rate (as announced by JP Morgan Chase Bank, New York branch) from the date such amount should have been paid until the date of payment.

8

WWE_Alexander0000050

C(6)    Method of Payment. Simultaneous with the submission of each and every royalty statement due during the Term of this Agreement, Licensee will make payment of any and all royalties then due, as required by the Terms of License, by electronic transfer directly to WWE in accordance with the following instructions (or such other wire transfer information as WWE shall provide):

> Bank Name:    JP Morgan Chase
> Bank Address: 270 Park Avenue
>               41st Floor
>               New York, NY  10017



C(7)    Reserves. Licensee shall be entitled to establish each quarter a reserve of of "Gross Sales" (as defined herein) for all platforms existing and distributed for sale (with the exception of personal computer ("PC") game platforms for which the reserve shall be of Gross Sales); provided, however, that any reserve taken shall be liquidated within months of the date the reserve is first taken. For purposes of this subsection, "Gross Sales" shall be defined as the dollar amount equal to the number of individual units of Licensed Products sold multiplied by the Licensed Product's price charged to the retailer before any deductions, credits and/or allowances. Further, Licensee shall provide a line item detail with respect to any such reserves in the royalty statements (as more fully described in Section C(4) above).

## SECTION D.    BOOKS OF ACCOUNT AND OTHER RECORDS; AUDITS

D(1)    Retention of Records. While this Agreement remains in effect and for two years thereafter, the Licensee shall keep full and accurate books of account and copies of all documents and other material relating to this Agreement at the Licensee's principal office. WWE, by its duly authorized agents and representatives, shall have the right, upon at least thirty (30) days written notice, to have a nationally recognized independent third party accounting firm reasonably acceptable to Licensee audit such books, documents, and other material relating to this Agreement, and shall have access thereto during ordinary business hours no more than once during any calendar year soley for purposes of the audit and such information shall not be disclosed to Licensor except as necessary to report the results of the audit in customary form. Any period being audited may only be done so once during the Term of the Agreement. All material obtained during any such audit shall be confidential information of Licensee. At the request of such accounting firm, the Licensee shall provide an authorized employee to assist in the examination of the Licensee's records.

D(2)    Audits by WWE. If any audit of the Licensee's books and records reveals that the Licensee has failed properly to account for and pay royalties owing to WWE, and the amount of

9

                                                    WWE_Alexander0000051

any royalties which the Licensee has failed properly to account for and pay for any quarterly accounting period exceeds, by ten percent (10%) or more, the royalties actually accounted for and paid to WWE for such period, then Licensee shall, in addition to paying WWE such undisputed past due royalties, reimburse WWE for its direct out-of-pocket expenses incurred in conducting such audit, together with interest on the overdue royalty amount at the then current prime rate (as announced by JP Morgan Chase Bank, New York branch) from the date such amount should have been paid until the date of payment.

D(3)   Rights Reserved by WWE.  Except as provided in Section C(5), the exercise by WWE, in whole or in part or at any time or times, of the right to audit records and accounts or of any other right herein granted under Section D, the acceptance by WWE of any statement or statements or the receipt and deposit by WWE of any payments tendered by or on behalf of Licensee shall be without prejudice to any rights or remedies of WWE, whether at law, equity or otherwise, and WWE shall not be stopped or prevented from thereafter disputing the accuracy of any such statement or payment.

SECTION E.   TRADEMARK PROTECTION

E(1)   Trademark Uses Inure to WWE's Benefit.  Licensee recognizes the exclusive right of WWE to all Intellectual Property and any translations thereof and will not use such Intellectual Property or any such translations in any manner or for any reason except as expressly contemplated by this Agreement. All uses of the Intellectual Property owned by the WWE and any translations thereof by Licensee will inure to the exclusive benefit of WWE, which will own all rights, including trademark rights, created by such uses of such Intellectual Property and/or translations, together with the goodwill of the business in connection with which such trademarks are used. Nothing herein shall be deemed to give WWE any rights in and to any trademarks owned and/or controlled by Licensee, including, but not limited to, its corporate name and all associated trademarks.

E(2)   Trademark Registrations.  WWE will have the exclusive right, but not the obligation, to file at its own expense trademark applications relating to the use or proposed use by Licensee of any of WWE's Intellectual Property and any translations thereof in connection with the Licensed Products, specifically excluding Licensee Intellectual Property (as defined below); provided that, upon reasonable request by Licensee to register such a trademark that may be used against actual or potential competitors to Game, WWE shall file, pursue and maintain appropriate applications in appropriate jurisdictions around the world.  Any and all such filings will be made in the name of WWE or its designee.  Licensee will execute all documents and perform such other acts as may be reasonably necessary to secure, perfect, or record WWE's or its designee's trademark rights, provided, however, WWE shall reimburse Licensee for any reasonable expenses incurred in connection therewith beyond the mere execution of the documents.  Licensee and/or its employees, agents, contractors, and representatives will not (a) oppose, petition to cancel, or otherwise contest WWE's trademarks, trademark applications, and/or trademark registrations or (b) challenge WWE's ownership of and/or the validity of WWE's trademarks, trademark applications, and/or trademark registrations.  The provisions of Section E(2) will survive any termination or expiration of this Agreement.

10

WWE_Alexander0000052

E(3)   <u>Records Relative to Trademark Uses</u>.  Licensee will keep appropriate records (including copies of pertinent invoices and correspondence) relating to the dates each of the Licensed Products is first placed on sale or sold in each country of the Territory and the dates of first use in each country of each different element of the Intellectual Property and any translations on the Licensed Products and Advertising Materials.  If requested to do so by WWE in writing, Licensee will supply WWE with samples of the trademark usage in question and other information which will enable WWE to complete and obtain trademark applications or registrations, or to evaluate or oppose any trademark applications, registrations, or uses of other parties.  The provisions of Section E(3) will survive any termination or expiration of this Agreement.

E(4)   <u>Registered User Laws</u>.  As to those countries which require applicants to register Licensee as a registered user of a trademark or other element of the Intellectual Property or any translations used on or in connection with the Licensed Products or which require the recordation of this Agreement, Licensee will execute and deliver to WWE such documents as may be necessary and as are furnished by WWE for such purposes.

E(5)   <u>Trademark Notices</u>.  Licensee will affix or cause its authorized manufacturing sources to affix to the Licensed Products, the Advertising Materials and any other materials containing the Intellectual Property trademark notices in the name of WWE as provided by WWE in each instance or as follows: the names of all World Wrestling Entertainment televised and live programming, talent names, images, likenesses, slogans and wrestling moves and all World Wrestling Entertainment logos are trademarks which are the exclusive property of World Wrestling Entertainment, Inc.  All other trademarks are the property of their respective owners.  The exact site, placement and prominence of any such notices shall be reasonably agreed upon by the Parties and subject to the approval of third party platform providers such as Sony, Nintendo and Microsoft.

<u>SECTION F</u>.    <u>COPYRIGHT PROVISIONS</u>

F(1)   <u>Copyright Notices</u>.  The authorization by WWE to Licensee to make public distribution of the Licensed Products and Advertising Materials is expressly conditioned upon the following agreement of Licensee: Licensee will place on all Licensed Products, on all Advertising Materials and on any other materials containing the Intellectual Property the copyright notice or notices in the name of WWE as follows: "©20xx World Wrestling Entertainment, Inc. All Rights Reserved"; or as otherwise directed in writing by WWE.

F(2)   <u>Design Work</u>.  Licensee acknowledges that all designs of the Licensed Product, including drawings, artwork, sketches, layouts, patterns and material compositions, employed or developed for the production (through CAD/CAM or otherwise) of the Licensed Products, and the codification, recording and reproduction, thereof, however maintained, organized, or derived therefrom including any computer tapes, hard copy of machine readable copies (collectively, the "Specs") are created and developed for the sole benefit of WWE and any and all proprietary interests and ownership rights related thereto including but not limited to copyright belong exclusively to WWE, provided, however, nothing herein is intended, or shall vest, ownership in the underlying source or object code in the Games in WWE, and Licensee or its developer shall

11

WWE_Alexander0000053

retain sole ownership thereof. Furthermore, gameplay mechanisms and/or controls shall be owned by Licensee.

F(3)   <u>Work For Hire</u>.   Licensee acknowledges that all material created under this Agreement (the "Work") was specifically ordered or commissioned by the WWE; that the Work constitutes and will constitute a work-made-for-hire as defined in the United States Copyright Act of 1976; that WWE is and will be the author of the Work and the owner of all rights in and to the Work throughout the universe, in perpetuity, in all languages, for all now known or hereafter existing uses, media and forms, including the copyrights therein and thereto throughout the universe for the initial term and any and all extensions and renewals thereof; and that the WWE will have the right to make such changes therein and such uses thereof as it may deem necessary or desirable.   The term "Work" will include any and all material and information created by Licensee in the course of or as a result of the terms and conditions of this Agreement that are fixed in a tangible medium of expression, including without limitation the Specs, Licensed Products, Games, Advertising Materials, translations, composite works, notes, drawings, memoranda, correspondence, documents, records, notebooks, flow charts, and derivative works, regardless of the medium in which they are fixed.   The "Work" shall not include: (i) the source or object code to any underlying software; and (ii) any intellectual property rights already owned by Licensee or developer prior to the execution of the Agreement. For the sake of clarity, Licensee or its developer shall be the sole and exclusive owner of any and all underlying software (including object and source code), tools, subroutines, engines used in connection with or embodied in the Games (which, together with Licensee's trademarks and logos shall collectively be referred to as "Licensee Intellectual Property").

F(4)   <u>Assignment by Licensee</u>.   In addition to Section F(3), and to the extent that the Work is not recognized as a "work-made-for-hire," Licensee hereby sells, assigns, and transfers to WWE its entire, worldwide right, title and interest in perpetuity in and to the Work, specifically excluding Licensee Intellectual Property.   If parties who are not employees of Licensee (or who are employees of Licensee acting outside the scope of their employment) make or have made any contribution to the creation of the Work so that such parties might be deemed to be "authors" of such Work as the term "author" is used under present or future United States copyright law, or other such applicable laws, then Licensee will obtain from such parties a full assignment of rights so that the foregoing assignment by Licensee vests in WWE full and absolute right and title in the Work free of any claims, interests, or rights of other parties. Licensee will not permit any of its employees to obtain or reserve by oral or written employment agreements any rights as "authors" of any such Work.   At WWE's request, Licensee will furnish WWE with any and all information concerning the creation of any Work and with any and all copies of the assignments of rights obtained from the foregoing parties.

F(5)   <u>Copyright Registrations</u>.   WWE will have the exclusive right, but not the obligation, to file at its own expense copyright applications for the Work.   In the event WWE elects not to file copyright applications for the Work after receiving a written request to do so from Licensee, Licensee will have the right to do so.   Any and all copyright filings (whether by WWE or Licensee) will be made in the name of WWE, provided, however, Licensee or its developer shall be listed as the owner of the Licensee Intellectual Property.   As is reasonably practicable, Licensee will execute all documents and perform such other acts as WWE may deem

12

WWE_Alexander0000054

necessary to secure, perfect, or record WWE's or its designee's copyrights. Licensee and/or its employees, agents, contractors, and representatives will not (a) oppose, petition to cancel, or otherwise contest WWE's copyright, copyright applications, and/or copyright registrations or (b) challenge WWE's ownership of and/or the validity of WWE's copyrights, copyright applications, and/or copyright registrations. The provisions of Section F(5) will survive any termination or expiration of this Agreement.

F(6)   Waiver of Moral Rights.   Licensee waives any and all of its moral rights, including but not limited to rights of attribution, paternity, and integrity, arising under any federal or state law of the United States or any law of any other region, country, or subdivision thereof in and to the Work, and any contribution thereto, for any and all past, present, or future uses or purposes now known or hereafter discovered, including without limitation the right to modify said work, ("Moral Rights") in favor of WWE and its predecessors, successors, assigns and licensees or sub-licensees.   If other parties, including but not limited to Licensee's employees, agents, and subcontractors, have made any contribution to the creation of the Work so that such parties might be deemed to have Moral Rights under present or future United States law or any law of any other region, country, or subdivision thereof, then, to the extent possible under applicable laws, Licensee will obtain from such parties a full waiver of any and all of his or her Moral Rights in favor of WWE and its predecessors, successors, assigns and licensees or sub-licensees.

F(7)   Enforcement.   Licensee warrants that the covenants contained in this Agreement are reasonable, that valid considerations have been and will be received therefor and that the terms set forth in this Agreement are the result of arms-length negotiations between the parties to this Agreement.   Licensee recognizes the vital importance to the continuing welfare of the WWE and its affiliates of (x) the provisions of Sections E and F; and (y) the uninterrupted continuation of its videogame business in the event of a valid termination of this Agreement by Licensor due to a material breach by Licensee; and that in either clause (x) or (y) money damages may not be an adequate remedy for any violation thereof.   Therefore, in either such case, WWE and its affiliates, in addition to any other remedies they may have available to them pursuant to this Agreement or any other agreement, or whether at law or in equity, will have the right to seek equitable relief including continuing access to Licensee Intellectual Property that is owned by Licensee and solely as embodied in the Licensed Products and solely to the extent necessary to put Licensor in the same position as it would be if the Licensee had not materially breached this Agreement, if such equitable relief is granted by a court of competent jurisdiction.

SECTION G.   REPRESENTATIONS AND WARRANTIES

G(1)   WWE's Representation and Warranty.   WWE hereby covenants, represents and warrants that it is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated; that it is the sole and exclusive proprietor of the Intellectual Property, has the full right, power, legal capacity and authority to enter into this Agreement, to carry out the terms hereof and to grant Licensee the rights and privileges granted hereunder. WWE also covenants, represents and warrants that (i) WWE has the right to license the exploitation rights granted in this Agreement and that the rights granted herein will not violate or infringe upon the rights of any third persons and/or parties, (ii) WWE has not

13

WWE_Alexander0000055

granted, assigned, licensed, in any manner encumbered, committed to perform any act by which the rights granted herein and to be granted herein to Licensee could or will be encumbered, diminished, or impaired; (iii) the Intellectual Property or any part thereof does not constitute libel, slander, or unfair competition; (iv) the Intellectual Property has not used the name or personality of any person so as to constitute an invasion of the right of privacy; (v) any and all permissions and clearances to the Intellectual Property for its authorized use as contemplated herein (to the extent the Intellectual Property does not include Multimedia Rights not owned or controlled by WWE) have been obtained by WWE; (vi) WWE shall be responsible for any and shall pay any third party payments or residuals for use of the Intellectual Property as contemplated and to be allowed hereunder (to the extent the Intellectual Property does not include Multimedia Rights not owned or controlled by WWE); (vii) WWE has no knowledge of any claim which, if sustained, would be contrary to WWE's warranties, representations, and agreements herein contained; and (viii) WWE shall comply with all applicable laws, rules, and regulations. WWE hereby agrees that its covenants, representations, warranties and agreements are of the essence to this Agreement and shall survive the expiration or termination of the Term.

G(2)   Licensee's Covenants, Warranty and Representation.

a) Licensee hereby covenants, represents and warrants that it is a corporation duly incorporated, validly existing and in good standing of the laws of the jurisdiction in which it was incorporated; that it has full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms hereof.   Licensee further covenants, represents, and warrants that, with the exception of WWE's Intellectual Property, it owns or has the rights to any and all designs, products, artwork, photographs and intellectual property Licensee uses to develop, create and/or manufacture the Licensed Product, including without limitation any algorithms, software, hardware, processes, patents, copyrights and/or trade secrets.   It is understood and agreed that during the Term of this Agreement, Licensee and WWE, either individually or collectively may be considered the promoter and advertiser of the Licensed Products. In those circumstances, Licensee acknowledges and agrees that on behalf of itself and on behalf of WWE it shall comply with all federal, state and local laws, rules, regulations and industry standards concerning the manufacture, promotion and advertisement of the Licensed Products and Licensee furthermore agrees not to engage in any unconscionable commercial practice, fraud, false pretense, false promise, knowing misrepresentation, or the knowing concealment, suppression of omission of any material fact in the manufacture, advertising or promotion of the Licensed Products ("Product Compliance").   To that end, in addition to the indemnification provisions set forth throughout this Agreement, Licensee agrees to fully indemnify, defend and hold WWE harmless from any and all claims, damages or injuries relating to, in connection with or arising out of Product Compliance for the Licensed Products, unless such Product Compliance claims are the direct result of actions of WWE, or the Intellectual Property as provided by WWE.

b) Licensee hereby agrees that its covenants, representations, warranties and agreements are of the essence of this Agreement and shall survive the expiration of the Term.

SECTION H.   INDEMNIFICATION; PRODUCT LIABILITY INSURANCE

14

Confidential                                                           WWE_Alexander0000056

H(1)   _Licensee's Indemnification._  Licensee will be solely responsible for and will indemnify, defend and hold WWE and its successors and assigns, parent corporations, subsidiaries and affiliates and its and their respective officers, directors, stockholders, employees, advertisers, insurers, and representatives (collectively referred to as "Indemnified Parties") harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fees arising from or by reason of or in connection with the manufacture, distribution, advertising, promotion, offering for sale and sale of the Licensed Products which includes any claims or suits against the Indemnified Parties by reason of: (i) any unauthorized use, infringement or alleged infringement of any trademark, service mark, copyright, patent, process, trade secret, algorithm, software, method or device owned or controlled by a third party and exploited by Licensee in connection with the Licensed Products, the Advertising Materials and/or this Agreement, specifically excluding claims directly related to Licensee's use of the Intellectual Property in accordance with the terms of this Agreement; (ii) any defects, alleged defects and/or deficiencies (whether obvious or hidden and whether or not present in any sample approved by WWE) in said Licensed Products or the use thereof, or for any false advertising, fraud or misrepresentations or other claims related to the Licensed Products and/or the Advertising Materials (not involving a claim of right to the Intellectual Property or Licensee's use thereof in the development, marketing and sale of Games in accordance with the terms hereof) or in any packaging or other materials relating to the Licensed Products (including Advertising Materials); (iii) any claim that the use of any audio, music, design or other graphic component of any Licensed Product (other than the Intellectual Property) violates or infringes upon the trademark, copyright or other intellectual property rights (including trade dress, right of publicity or right of privacy) of a third party; (iv) any uses of the Licensed Products or Advertising Materials by Licensee not in accordance with this Agreement; (v) any libel or slander against, or invasion of the right of privacy, publicity or property of, or in violation or misappropriation of any other right of any third party as it relates in any manner whatsoever to the exploitation of Licensee's rights under this Agreement other than those directly related to Licensee's use of the Intellectual Property in accordance with the terms of this Agreement; (vi) any agreements or alleged agreements, whether written or oral, made or entered into by or with Licensee to effectuate the terms of this Agreement, including any employment or consulting agreements entered into by Licensee related in any manner to the exploitation of this Agreement and any such other agreements entered into by Licensee that relates to the manufacture, distribution, exploitation, advertising, sale or use of the Licensed Products by Licensee, its agents and/or representatives; (vii) any Promotions or contests conducted by Licensee related to this Agreement; (viii) any breach of the terms, representations and warranties under this Agreement by Licensee, its subsidiaries, manufacturers, distributors, advertisers or other persons, employees or agents of any of the foregoing; (ix) any act concerning the unconscionable commercial practice, fraud, false pretense, false promise, knowing misrepresentation, or the knowing concealment, suppression of omission of any material fact in the advertising or promotion of the Licensed Products; or (x) any failure to comply with the terms and conditions of Section B(6)(e) which includes without limitation Licensee's failure to affix the Official Tag and its own name to any Licensed Product or its container.

H(2)   _WWE's Indemnification._  WWE agrees to indemnify, defend and hold the Licensee and its successors and assigns, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, stockholders, employees, advertisers, insurers and

15

WWE_Alexander0000057

representatives harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fee (but excluding lost profits or consequential damages) made by third parties against the Licensee (i) based on a claim of right in one or more elements of the Intellectual Property or (ii) any breach of WWE's representations, warranties, covenants or obligations under this Agreement.

H(3)   <u>Claims Procedures</u>.  With respect to any claims falling within the scope of the foregoing indemnifications:  (a) each party agrees promptly to notify in writing the other party of,  and to keep the other party fully advised with respect to, such claims and the progress of any suits in which the other party is not participating; (b) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (c) each party shall have the right to participate, at its sole expense, in any suit instituted against it and/or to approve any attorneys selected by the other party to defend it, which approval shall not be unreasonably withheld, conditioned or delayed; and (d) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld, conditioned or delayed.

H(4)   <u>Insurance</u>.  The Licensee agrees to obtain and maintain during the Term of this Agreement, at its own expense, a comprehensive general liability insurance policy which shall include coverage for product liability from an insurance company which maintains an A.M. Best rating of at least A- (A minus) or higher and is reasonably acceptable to WWE providing protection (at a minimum, in the amount of Two Million US Dollars ($2,000,000.00 USD) per occurrence, Four Million US Dollars ($4,000,000.00 USD) annual aggregate) applicable to any claims, liabilities, damages, costs, or expenses, arising out of or caused in connection with any defects, alleged defects or deficiencies in the Licensed Products. Such insurance shall also include coverage of WWE, its directors, officers, shareholders, affiliates, employees, agents, licensees, insurers, advertisers, assignees, and successors. Within thirty (30) days after execution of this Agreement by WWE and again within thirty (30) days of the policy's renewal date, the Licensee shall cause the insurance company issuing such policy to issue a duplicate original certificate to WWE naming WWE as an additional insured together with evidence of current payments for the policy, confirming that such policy has been issued and is in full force and effect and provides coverage for WWE as required by this Section H(4). Said insurance policy shall also contain an endorsement that the insurance coverage shall not be reduced, modified or cancelled and that the insurance company will use best efforts to inform WWE of changes.

<u>SECTION I.</u>        <u>RESERVATION OF RIGHTS</u>

Except as provided for under the Terms of License, all rights in and to the Intellectual Property (including any premium rights related to the Licensed Products) are retained by WWE for its own use and exploitation (including the right to license said rights or portion thereof to third parties for their exploitation).  Licensee shall not acquire any rights whatsoever in the Intellectual Property as a result of its use hereunder and all use of the Intellectual Property will inure to WWE's benefit.  For the purpose of absolute certainty, it is understood and agreed that WWE reserves the right to use, and to license other parties to use, the Intellectual Property within the Territory for any purpose WWE may determine in its sole discretion, provided such

16

WWE_Alexander0000058

use does not violate the exclusivity provisions hereunder. All use of the Licensee Intellectual Property shall inure to the benefit of Licensee.

SECTION J.    INFRINGEMENTS; CLAIMS

J(1)    Representations and Warranties by Licensee. Licensee represents and warrants to WWE that all designs and products submitted for approval (other than the Intellectual Property) are not subject to any valid patent, copyright, trademark or other proprietary rights of any third party, provided, however, with respect to patents such representation is made to the best of Licensee's knowledge. It is understood and agreed that WWE shall not be liable (and Licensee shall fully indemnify and hold WWE harmless therefrom) for any activities of Licensee under this Agreement that may infringe or alleged to infringe any patent, copyright, trademark or other proprietary rights belonging to any third party, or for damages or costs involved in any proceeding based upon such infringement or alleged infringement, or for any royalty or obligation incurred by Licensee because of any patent, copyright, trademark or other proprietary interest held by a third party, other than claims based solely upon a right to or in one or more elements of the Intellectual Property

J(2)    Infringements. When either party learns that a third party is making unauthorized uses of the Intellectual Property or the Licensee Intellectual Property, such party agrees to promptly give the other party written notice containing full and complete information with respect to the actions of such party. Each party agrees not to make any demands or claims, bring suit, effect any settlements, or take any other action against such infringing third party without the prior written consent of WWE in the case of Intellectual Property or the Licensee in the case of Licensee Intellectual Property. Each party agrees to cooperate with the other party in connection with any action taken by the owner to terminate infringements of its intellectual property.

J(3)    Claims.

a)    If claims or suits are made against WWE or the Licensee by a party asserting the ownership of rights in a name or design which is the same as or similar to one of the elements of the Intellectual Property, and asserting further that the use of a particular element of the Intellectual Property by the Licensee infringes the rights of such party, or if the parties learn that another party has or claims rights in a trademark, name or design which would or might conflict with the proposed or actual use of an element of the Intellectual Property by the Licensee, WWE and the Licensee agree in any such case to consult with each other on a suitable course of action. In no event shall the Licensee have the right, without the prior written consent of WWE, to acknowledge the validity of the claim of such third party, to obtain or seek a license from such third party, or to take any other action which might impair the ability of WWE to contest the claim of such third party if WWE so elects. The Licensee agrees at the request and cost of WWE to make any and all reasonable modifications requested by WWE in the Licensee's use of the element of the Intellectual Property in question or to discontinue use of such element in the country of the territory in question on the particular Licensed Product or Licensed Products which are involved, if WWE, in its sole discretion, reasonably exercised, determines that such action is necessary or desirable to resolve or settle a claim or suit or eliminate or reduce the

17

threat of a claim or suit by such party.  WWE shall have the right to participate fully at its own expense in the defense of any claim or suit instituted against the Licensee with respect to the use by the Licensee of an element of the Intellectual Property.

b)  If claims or suits are made against the Licensee or WWE by a party asserting the ownership of rights in a name or design which is the same as or similar to one of the elements of the Licensee Intellectual Property, and asserting further that the use of a particular element of the Licensee Intellectual Property by WWE infringes the rights of such party, or if the parties learn that another party has or claims rights in a trademark, name or design which would or might conflict with the proposed or actual use of an element of the Licensee Intellectual Property by WWE, Licensee and WWE agree in any such case to consult with each other on a suitable course of action.  In no event shall WWE have the right, without the prior written consent of the Licensee, to acknowledge the validity of the claim of such third party, to obtain or seek a license from such third party, or to take any other action which might impair the ability of the Licensee to contest the claim of such third party if the Licensee so elects.  WWE agrees at the request of the Licensee to make any and all reasonable modifications requested by the Licensee in WWE's use of the element of the Licensee Intellectual Property in question or to discontinue use of such element in the country of the territory in question on the particular Licensed Product or Licensed Products which are involved, if Licensee, in its sole discretion, reasonably exercised, determines that such action is necessary or desirable to resolve or settle a claim or suit or eliminate or reduce the threat of a claim or suit by such party.  Licensee shall have the right to participate fully at its own expense in the defense of any claim or suit instituted against the WWE with respect to the use by WWE of an element of the Licensee Intellectual Property.

SECTION K.   NO SUBLICENSING OF RIGHTS; AGREEMENTS WITH MANUFACTURERS

K(1)   Sublicensing.  The Licensee shall not have the right to sublicense any of the rights granted to it under this Agreement except (i) to a subsidiary wholly owned by Licensee solely in respect of the period during which the sublicense remains a wholly-owned subsidiary of Licensee, (ii) to a developer of a Game (solely to the extent required in order to allow such developer to create the Game) and (iii) otherwise with WWE's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.  To the extent that a distributor is in any way involved in duplication, manufacturing, advertising, marketing, or promotion of the Licensed Products, such entity shall be considered a sublicensee.  For the sake of clarity, to the extent a distributor is solely involved with the sale of finished Licensed Products, consent shall not be required.  No sublicense shall terminate or limit any of Licensee's obligations hereunder, and Licensee shall be responsible for any sublicensee's acts and omissions hereunder.

K(2)   Agreements with Manufacturers.  For purposes of this Agreement, Licensee is the manufacturer of the Licensed Products.  With the prior written approval of WWE, Licensee may arrange with another party to manufacture the Licensed Products or components of the Licensed Products for exclusive sale, use and distribution by the Licensee, which manufacturers shall each be considered sublicensees.  In that instance, Licensee agrees to enter into a written agreement with all such manufacturers, and agrees to incorporate into such written agreements all of the provisions, for the protection of the rights of WWE.  Licensee further agrees to furnish WWE,

18

WWE_Alexander0000060

within thirty (30) days of their execution, copies of all agreements with such manufacturers. Notwithstanding the foregoing, WWE acknowledges and accepts that third-party platform providers such as Sony, Nintendo and Microsoft will only sign their own form of manufacturing agreements.   No agreement with a manufacturer shall terminate or limit any of Licensee's obligations hereunder, and Licensee shall be responsible for any manufacturer's acts and omissions hereunder.

K(3)   Enforcement of Manufacturer Agreements.   The Licensee agrees strictly to enforce against its manufacturers all of the provisions which are required to be included in such agreements for the protection of WWE, as provided in Section K(2), to advise WWE of any violations thereof by manufacturers, and of corrective actions taken by the Licensee and the results thereof; and at the request of WWE to terminate such an agreement with any manufacturer which violates any such provisions; all for the protection of WWE.

SECTION L.        BREACH AND TERMINATION; EXPIRATION OF AGREEMENT

L(1)   Right Of Termination.

a)   WWE Rights of Termination.

i)      Immediate Right of Termination.   In addition to the termination rights stated elsewhere in this Agreement, WWE will have the right to terminate this Agreement immediately, by giving written notice to Licensee, in the event Licensee either willfully and knowingly breaches any of the material terms of this Agreement, or is grossly negligent and such gross negligence causes Licensee to breach any of the material terms of this Agreement, and such willful and knowing breach or such gross negligence causing Licensee to breach any of the material terms of this Agreement materially and detrimentally impacts the WWE brand.   WWE shall abide by the principals of good faith and fair dealing in making such a determination.

ii)     Right to Terminate upon Ten (10) Days Written Notice.   WWE shall have the right to terminate this Agreement if Licensee breaches any financial term of this Agreement, including without limitation, failing to make any payments in excess of Two Hundred Fifty Thousand US Dollars ($250,000.00 USD) by the date such payment is required under the provisions of this Agreement or if Licensee fails to submit royalty statements and/or any other statements to WWE during the time periods specified in the Terms of License and/or Section C, and Licensee fails to cure the breach within ten (10) days after receipt of a written default notice from WWE by registered, express or certified mail.

iii)    Right to Terminate upon Thirty (30) Days Written Notice (curable breach).   If Licensee breaches any of the following material terms and provisions of this Agreement, and Licensee fails to cure the breach within thirty (30) days after receiving written notice by registered, express or certified mail from WWE specifying the particulars of the breach, then WWE will have the right to terminate this Agreement immediately, as of the thirty first (31) day, in the form of written notice to Licensee by registered, express or certified mail.

(1)   If Licensee has failed to comply with any requirements of quality or the approval process for Licensed Products or advertising and promotional materials, including

19

without limitation those described in Sections A(1), A(2)(b), A(2)(c), A(2)(d) and A(2)(e);

(2) If Licensee makes, sells, offers for sale, or distributes or uses any Licensed Product or Advertising Material without having the prior written approval of WWE, as required by Section A, or makes any use of the Intellectual Property, if applicable, not authorized under this Agreement at any time thereafter;

(3) If Licensee fails to comply with the terms and conditions of Section B(6)(e);

(4) If Licensee fails to comply with the terms and conditions of Section B(6)(f);

(5) If Licensee fails to deliver to WWE or to maintain in full force and effect the insurance referenced to in Section H of this Agreement;

(6) If Licensee fails to deliver any statements or notices required to be delivered to WWE under the terms of this Agreement, retain all records pursuant to the terms of this Agreement or to give access to the premises and/or licensing records pursuant to the provisions of this Agreement to WWE or WWE's authorized representatives for the purposes permitted under this Agreement;

(7) If Licensee fails to comply the terms and conditions of the Code of Conduct contained in Section B(6)(a);

(8) If Licensee knowingly improperly distributes the Licensed Products to retailers or distributors outside of the scope of this Agreement;

(9) If Licensee sells to any third party that Licensee knows, or has reason to know, is altering or modifying the Licensed Products prior to sale to the ultimate customer;

(10) If Licensee fails to comply with the terms and conditions contained in Section E(4) concerning Licensee's execution and delivery of documents required to register Licensee as a registered user of the Intellectual Property or if License fails to take any actions reasonably necessary in order for WWE to perfect its ownership rights in the Intellectual Property, as required by the Terms of License;

(11) If in any material manner, a governmental agency or court of competent jurisdiction determines that the Licensed Product(s) is subject to a required recall;

(12) If, other than under Chapter 11 of the United States Code which is covered under Section L(2) hereof, Licensee becomes subject to any voluntary or involuntary insolvency, cession, bankruptcy, or similar proceedings, or an assignment for the benefit of creditors is made by Licensee, or an agreement between Licensee and its creditors generally is entered into providing for extension or composition of debt, or a receiver is appointed to administer the assets of Licensee, or the assets of Licensee are liquidated, or any distress, execution, or attachment is levied on such of its manufacturing or other equipment as is used in the production and

20

distribution of the Licensed Products and remains undischarged for a period of thirty (30) days;

(13) If Licensee discloses any material Confidential Information concerning this Agreement, as defined in Section N(12), which, it acknowledges, it may become privy to during the Term of this Agreement;

(14) If Licensee fails to comply with the terms and conditions of Section N(1) relating to Licensee's assignment of its rights under this Agreement and Section K relating to sublicenses and agreements with manufacturers; or

(15) If Licensee fails to make any payment due under the Terms of License in excess of Fifty Thousand US Dollars ($50,000.00 USD) up to Two Hundred Fifty Thousand US Dollars ($250,000.00 USD) by the date such payment is required under the provisions of this Agreement;

(16) If Licensee sells, distributes, manufactures, markets, displays or advertises the Licensed Products in the channels of distribution reserved to WWE in the Terms of License;

(17) If Licensee spends less than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for each Contract Year to advertise the Licensed Products as required in the Terms of License;

(18) If Licensee breaches the Non-Compete clause of the Terms of License in any material respect;

(19) If Licensee fails to use its commercially reasonable efforts to exploit the rights granted hereunder, including the release of a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ provided, however, solely with respect to calendar years 2013 and 2014, the failure to release an original title caused solely by a breach by Yuke's Co., Ltd, the Licensee's developer ("Yukes"), of its development agreement with Licensee (which failure occurs despite all reasonable commercial efforts of Licensee to mitigate Yukes' breach) shall not be deemed a breach of this Agreement by the Licensee and will not allow termination under this provision but all Guaranteed Minimums for such unreleased Game(s) shall be paid by Licensee to Licensor in accordance with the terms of the License.

(20) If Licensee fails to sell product to WWE as required under the Terms of License.

a) <u>Right of Termination</u>. Either party shall have the right to immediately terminate this Agreement, by giving written notice to the other party, in the event that (i) Licensee and Yuke's Co., Ltd. fail to enter into a Master Developer Agreement, satisfactory to Licensee in its sole discretion, regarding the development of the Games, (ii) the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") does not enter an order, satisfactory to both parties in their sole discretion, approving THQ Inc.'s ("THQ") motion

21

seeking approval of THQ's rejection of that certain License Agreement, dated as of December 22, 2009, by and between THQ and WWE, (iii) the Bankruptcy Court does not enter an order, satisfactory to both parties in their sole discretion, approving the transfer of all of THQ's right, title and interests in all assets owned by THQ and all executory contracts relating to video games based on the Intellectual Property produced or developed by THQ free and clear of all interests, liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code or (iv) those members of the "Fight Team" who are THQ employees and are crucial to the development of WWE Games have agreed to be employed by Licensee on terms satisfactory to Licensee in its sole discretion, in each case, on or prior to February 22, 2013. Both parties shall use reasonable commercial efforts to fulfill the conditions to the effectiveness of this Agreement. If despite such efforts, the Effective Date does not occur by February 22, 2013 either party shall have the right, upon written notice to the other party prior to the above conditions in clauses (i) through (iv) having been satisfied, to terminate this Agreement and upon such termination notice, this Agreement shall immediately become null and void and have no effect, no party shall have any past or future obligation under this Agreement, and all rights and obligations of the parties hereunder shall automatically terminate.

b) <u>Licensee Cure Period</u>. With respect to any non-monetary breach, failure or default by Licensee, in the event that Licensee cannot cure same with the exercise of reasonable diligence within thirty (30) days, then WWE's right to terminate this Agreement shall be tolled for thirty (30) days provided Licensee uses its best efforts to commence taking steps to cure the breach, failure or default within the initial thirty (30) day period and completes such cure within the subsequent thirty (30) day period.

L(2)    <u>Assumption and Rejection Pursuant to United States Bankruptcy Code</u>. After any order for relief under the Bankruptcy Code is entered against the Licensee, the Licensee must assume or reject this Agreement within sixty (60) days after the order for relief is entered. If the Licensee does not assume this Agreement within such sixty (60) day period, WWE may, at its sole option, terminate this Agreement immediately by giving written notice to the Licensee, without further liability on the part of WWE.

L(3)    <u>Effect of Termination</u>. Termination of this Agreement shall be without prejudice to any rights or claims which a party may otherwise have against the other for a breach hereof prior to such termination.

L(4)    <u>Discontinuance of Use of Intellectual Property, etc.</u> Subject to the provisions of Section L(5), upon the expiration or earlier termination of this Agreement, the Licensee agrees promptly and permanently to discontinue manufacturing, selling, advertising, distributing, and using the Licensed Products and Advertising Materials; promptly and permanently to discontinue using the Intellectual Property; immediately to destroy (unless advised otherwise by counsel) any films, molds, dies, CD's, electronic data files, patterns, or similar items from which the Licensed Products and Advertising Materials were made, where any element of the Intellectual Property is an integral part thereof; and in an orderly fashion to terminate all agreements with manufacturers, distributors, and others which relate to the manufacture, sale, distribution, and use of the Licensed Products.

22

L(5)   <u>Disposition of Inventory Upon Expiration</u>.  Notwithstanding the provisions of Section L(4), if this Agreement expires in accordance with its terms, or is terminated for a reason other than a material breach by Licensee, the provisions of this Section L(5) apply.  Licensee shall have the right to distribute and sell any Licensed Products for a period of nine (9) months from the termination or expiration date of the License subject to the payment of royalties to WWE on any such sales in accordance with the terms of this Agreement.  During the first three (3) months of the sell-off period, Licensee shall have the right to cause to be manufactured units of Games Licensee reasonably anticipates will be necessary to meet forecasted demand for the remainder of the sell-off period.

L(6)   <u>Equitable Relief</u>.   Licensee acknowledges that WWE is entering into this Agreement not only in consideration of the royalties paid, but also for the promotional value, goodwill and intrinsic benefit resulting from the manufacture, advertisement, distribution, sale and promotion of the Licensed Products by Licensee within the Territory.  Licensee further acknowledges that the Intellectual Property, possesses a special, unique and extraordinary character that cannot be replaced or the loss thereof adequately compensated for in money damages and that any breach by Licensee of this Agreement may cause irreparable injury and harm to the WWE.  Therefore, if it is alleged by the WWE or any third party affiliated with the WWE that (i) Licensee has failed to manufacture, advertise, distribute, market, promote and/or sell the Licensed Products in strict accordance with the terms of this Agreement and/or (ii) Licensee has used the Intellectual Property in an unauthorized manner, as WWE will determine in its sole discretion, then, in each such case, WWE, any third party affiliated with the WWE and/or their assignees (in addition to any other remedies that may be available to them under this Agreement, at law or in equity or pursuant to such other applicable laws) will have the right to seek from any court having jurisdiction such equitable relief as may be available and appropriate, including such necessary injunctive relief.

<u>SECTION M.</u>     <u>DISPOSAL OF SECONDS</u>

If, during the manufacture of the Licensed Products, any seconds (the "Seconds") are produced, Licensee will destroy such Seconds and will send WWE an affidavit attesting to the destruction.  The provisions of this Section will not apply to any Seconds from which all references to the Intellectual Property are completely and permanently obliterated, which Seconds shall be disposed of as Licensee elects in its sole discretion.

<u>SECTION N.</u>     <u>MISCELLANEOUS PROVISIONS</u>

N(1)   <u>Restriction on Assignments</u>. Without the prior written consent of WWE, (which consent may be withheld in WWE's sole discretion) the Licensee shall not, directly or indirectly, assign, hypothecate, convey, pledge, encumber or otherwise transfer ("Transfer") any of its rights under this Agreement.  For example, a Transfer which requires the consent of WWE as provided in this Section shall include without limitation (i) any assignment, sale, conveyance, transfer, hypothecation, pledge, encumbrance or other transfer of 50% or more of stock of Licensee within any consecutive 12 month period, (ii) the sale of all or substantially all of the assets of Licensee, (iii) any merger, consolidation or reorganization into or with the assignor, regardless of whether Licensee is the surviving entity and (iv) any other action or event which

23

would constitute a transfer of the benefits of this Agreement by operation or force of law.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of WWE.

N(2)   <u>Independent Contractor Relationship:  Parties Not Joint Venturers</u>.  At all times the parties hereto shall be considered independent contractors and this Agreement shall not create an agency, franchise, partnership or employment relationship between the parties and nothing contained in this Agreement shall be construed so as to make the parties partners or joint venturers or to permit the either party to bind the other to any agreement or purport to act on behalf of the other party in any respect.

N(3)   <u>Modifications of Agreement; Remedies</u>.  No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by the respective duly authorized representatives of each of the parties.  Failure by either party to enforce any rights under this Agreement shall not be construed as a waiver.

N(4)   <u>No Waiver of Termination Rights</u>. The waiver, expressed or implied, by either party of any rights hereunder or either party's failure to perform or act upon any provision of this Agreement, will not constitute or be deemed a waiver of any of such party's rights hereunder and such rights shall be exercisable when it is deemed appropriate by such party.

N(5)   <u>Invalidity of Separable Provisions</u>. If any provision or clause of this Agreement, or portion thereof, will be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision will not thereby be affected and will be given full effect, without regard to the invalid portion.  It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unforceable in such jurisdiction, the remainder of such provision will not thereby be affected and will be given full effect, without regard to the invalid portion.  It is intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court will reduce or modify the duration, area or matter of such provision, and, in its reduced or modified form, such provision will then be enforceable and will be enforced.

N(6)   <u>Notices</u>.  All notices to be given under this Agreement shall be in writing and shall be delivered either by personal delivery, regular mail, overnight courier or facsimile (provided that a copy of such notice is also given by mail on the same day) (except as herein otherwise expressly provided) at the respective addresses of the parties as set forth above, unless notification of a change of address is given in writing.  Notice given by regular mail shall be deemed given on the date of mailing thereof and notice given by facsimile shall be deemed given on the date of confirmation of receipt of such facsimile (provided a copy of such notice is also sent by regular mail).

N(7)   <u>Headings</u>.  The paragraph and section headings of this Agreement are inserted only for convenience and shall not be construed as a part of this Agreement.

<center>24</center>

WWE_Alexander0000066

N(8)   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

N(9)   Interpretation.  Each party, with the assistance of its respective counsel, has read this agreement and has had an opportunity to negotiate fully the terms of this Agreement. Accordingly, any rule of construction seeking to resolve ambiguities against the drafting party shall not be applicable in the interpretation of this Agreement.

N(10)   No Third Party Beneficiaries. There are no intended third party beneficiaries to this Agreement.

N(11)   Disclaimer.

a)   Disclaimer.  Each party disclaims all warranties of any kind, except for the warranties contained in Section G(1) hereof.

b)   Limitation of Liability.  Except in the case of a violation of any provision herein protective of a party's intellectual property, no party will be liable to the other party for any indirect, incidental, reliance, special or consequential damages (including but not limited to lost profits or revenue or any expense or cost related to or arising out of any inventory or goods on hand or any expense or cost incurred with regard to the research and development of the Licensed Product) arising out of or related to this Agreement, however caused and by any theory (including negligence of any kind or degree) and regardless of whether such party has been advised of the possibility of such damages and whether such damages were foreseeable.

c)   Subject to Section N(11)(b), in the event Licensee breaches the terms of this Agreement, WWE shall be entitled to seek a recovery based on any and all remedies available at law and/or equity, including any additional monetary damages related to or caused by the breach by Licensee.

N(12)   Confidential Information.

a) During the Term of this Agreement, each party may have access to confidential information of the other party ("Confidential Information").  Confidential Information for the purposes of this Agreement shall be defined to include, but not be limited to, software (regardless of the stage of development), designs, drawings, specifications, models, technical information, unreleased or undisclosed Intellectual Property or Licensee Intellectual Property, as applicable, hardware, source codes, object codes, documentation diagrams, flow charts, marketing and development plans, business plans, or records, financial information, market reports, customer lists, talent lists, storylines, scripts, story boards or ideas, employee lists, business manuals, policies and procedures, the terms and conditions of this Agreement, billing information and procedures and all other information; provided such information shall be marked "confidential" or "proprietary".  The parties agree both during the Term and for a period of five (5) years after the expiration or termination of this Agreement for any reason whatsoever to hold each other's Confidential Information in confidence, employing the same degree of care that the party employs for its own proprietary information.  The parties agree not to make each other's

25

Confidential Information available in any form to any third party, except as otherwise permitted in this Agreement, or to use each other's Confidential Information for any purposes other than for the implementation or exploitation of this Agreement.

      b) Notwithstanding the foregoing, the parties' obligations of confidentiality shall not include information which:

      i) at the time of disclosure was in the public domain;

      ii) after such disclosure, becomes generally available to the public other than through any act or omission by the party herein releasing said information;

      iii) is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to the non-disclosing party in a timely manner in order to afford such party an opportunity to seek a protective order against such disclosure and the disclosure is strictly limited to the information which the disclosing party is required or compelled to disclose;

      iv) was already known to the non-disclosing party without restriction, prior to receipt from the disclosing party

      v) is lawfully disclosed to the non-disclosing party by a third party who is not under any obligation, whether contractual, fiduciary, statutory, or otherwise, of confidentiality to the disclosing party with respect to such Confidential Information; or

      vi) is at any time developed by the non-disclosing party independently (as as shown by documents and other competent evidence) without use of, or reference to, the Confidential Information of the disclosing party.

      N(13)  <u>Binding Effect</u>. The parties represent and warrant that the person executing this Agreement has the authority to bind the party on behalf of which he/she is signing.

      N(14)  <u>Rules of Construction</u>. As used in this Agreement, unless the context otherwise requires (i) references to " "Sections" are to the sections of the Standard Terms and Conditions of this Agreement; (ii) all "Exhibits" and "Schedules" referred to in this Agreement are to Exhibits and Schedules attached to this Agreement and are incorporated into this Agreement by reference and made a part of this Agreement; (iii) "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (iv) the singular includes the plural, (v) the masculine, feminine and neutral genders include the others; and (vi) headings of the various Sections and subsections are for convenience of reference only and will not be given any effect for purposes of interpreting this Agreement. Furthermore, unless specifically stated to the contrary in the Terms of License, all of the rights and licenses granted to Licensee under this Agreement shall be deemed non-exclusive.

Confidential                                                                                                                      WWE_Alexander0000068

N(15)  Force Majeure.  If either party is prevented from performing its obligations under this Agreement as a result of a force majeure event, then the non-performing party will not be liable to the other parties for its failure to perform such obligations.  As used in this Agreement, force majeure will mean any act of God, fire, flood, war, public disaster, other calamity, strike, or labor difficulties, or any governmental determination, action, regulation, or order, or any other occurrence beyond the reasonable control of the non-performing party, which, despite the non-performing party's reasonable efforts, prevents the performance of its obligations under this Agreement.

WORLD WRESTLING
ENTERTAINMENT, INC.
("WWE")

By: _____
Casey Collins
EVP, Consumer Products

Date: _____
2/11/13

TAKE-TWO INTERACTIVE
SOFTWARE, INC.
("Licensee")

By: _____

Print Name: _____
Title: _____
Date: _____

27

Confidential

N(15) <u>Force Majeure</u>.  If either party is prevented from performing its obligations under this Agreement as a result of a force majeure event, then the non-performing party will not be liable to the other parties for its failure to perform such obligations.  As used in this Agreement, force majeure will mean any act of God, fire, flood, war, public disaster, other calamity, strike, or labor difficulties, or any governmental determination, action, regulation, or order, or any other occurrence beyond the reasonable control of the non-performing party, which, despite the non-performing party's reasonable efforts, prevents the performance of its obligations under this Agreement.


WORLD WRESTLING                          TAKE-TWO INTERACTIVE
ENTERTAINMENT, INC.                      SOFTWARE, INC.
("WWE")                                  ("Licensee")


By:_____            By:_____
Casey Collins
EVP, Consumer Products
                                         Print Name:  SLATOFF
                                         Title:       CDC
Date:_____            Date:_____Feb. 11, 2013_____


27

Confidential                                                     WWE_Alexander0000070

EXHIBIT 1

WWE'S CODE OF CONDUCT


COMPLIANCE WITH APPLICABLE LAWS.  Licensee shall comply with all applicable laws and regulations of the countries, states and localities in which it operates.

EMPLOYMENT PRACTICES.  Licensee must comply with the following employment practices:

- Wages and Benefits: Licensee shall provide wages, overtime compensation and benefits at not less than the minimum levels required by applicable laws and regulations or the prevailing local industry levels, if higher.

- Working Hours: Licensee shall, at a minimum, comply with all applicable working hours' laws and regulations.

- Child Labor: Licensee shall not employ any person under the age of 15 (or 14 where allowed by local law) or under the local age for completing compulsory education, if higher.

- Forced Labor: Licensee shall not use any corporal punishment, threats of violence or other forms of physical abuse, forced labor, whether in the form of prison labor, indentured labor, bonded labor or otherwise.

- Non discrimination: Licensee shall not discriminate in employment practices on the basis of race, religion, age, nationality, social or ethnic origin, gender, sexual orientation or disability.

- Health and Safety: Licensee shall provide employees with a safe and healthy working environment.

ENVIRONMENTAL REQUIREMENTS. Licensee shall comply with all applicable environmental laws and regulations.

28

WWE_Alexander0000071