**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CATHERINE ALEXANDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 18-cv-966-SMY |
| | ) |
| TAKE-TWO INTERACTIVE SOFTWARE, INC. 2K GAMES, INC., 2K SPORTS INC., WORLD WRESTLING ENTERTAINMENT, INC., VISUAL CONCEPTS ENTERTAINMENT, YUKE'S CO., LTD, YUKES LA INC., | ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM AND ORDER**

**YANDLE, District Judge:**

Plaintiff Catherine Alexander filed the instant lawsuit against Defendants Take-Two Interactive Software, Inc., 2K Games, Inc., 2K Sports Inc., Visual Concepts Entertainment (the "Take-Two Defendants"), and World Wrestling Entertainment, Inc. ("WWE") asserting copyright infringement under 17 U.S.C. § 501. The case is now before the Court for consideration of Plaintiff's Motion for Partial Summary Judgment (Doc. 139) and the Motion for Summary Judgment filed by the Take-Two Defendants (Doc. 141). The parties have filed responses (Docs. 170 and 215). For the following reasons, Plaintiff's Motion is **GRANTED,** and Defendants' Motion is **DENIED**.[1]

---

[1] Defendant WWE's motion to join the motion for summary judgment filed by the Take-Two Defendants (Doc. 138) and Plaintiff's Motion to Supplement Summary Judgment Evidence with Recent Deposition Transcript of Defendant WWE (Doc. 207) are **GRANTED**.

### Material Facts

Catherine Alexander is a former tattoo artist who inked six tattoos on WWE professional wrestler Randy Orton between 2002 and 2008 (Doc. 142-17, at pp. 93, 97-98, 110, 113; Doc. 142-5, at ¶¶ 8, 10, 12-17). The tattoos include tribal tattoos on Orton's forearm, a Bible verse on his arm, a dove, a rose, and a skull. *Id*. at p. 124; Doc. 142-5, at ¶¶ 10, 12. Orton had a "tribal design" on his back created by another tattooist which Alexander also extended at Orton's request (Doc. 142-17, pp. 93, 97-98, 110, 113, 124).

Defendant Take-Two is the creator of the *WWE 2K* series of video games (Doc. 142-1 at ¶ 2). *WWE 2K* is a realistic depiction of WWE wrestling and includes elements that appear in real world wrestling (Doc. 142-18, at pp. 71-72; Doc. 142-20, at p. 43; pp. 106-107). To depict Orton in *WWE 2K* as he appears in real life, Take-Two replicated his likeness, including the Alexander tattoos (Doc. 142-20, at p. 43, pp. 106-107). Take-Two accomplished this by copying Orton's tattoos and reproducing them digitally in the video games. *Id.* at 154. This process is referred to as "photo reference" in the video game industry and required no artistic input other than a "rote" recreation of a reference photograph of Orton's tattoos. *Id.* at 149. The in-game reproduction of Orton in *WWE 2K* games is neither a photograph, video, nor live broadcast; it is a digitally created, authentic, re-creation of photographs of Orton (Doc. 142-20, pp. 139-144).

Take-Two obtained a license to portray Orton's likeness in *WWE 2K* from WWE, which itself was licensed by Orton (Doc. 142-5, at ¶ 22; Doc. 142-1, at ¶ 7; Doc. 145-22, Doc. 145-23). WWE's agreement with Take-Two obligated WWE to approve or disapprove of the subject video games before Take-Two could release and market the games. (Doc. 217-1, pp. 24-25; pp. 36-44). WWE's review process included reviewing Orton's tattoos to make sure they were accurate. *Id*. at pp. 68-73. WWE would have rejected Orton's videogame persona if it appeared without his

tattoos or appeared with tattoos that were different than Orton's actual tattoos as WWE would not have considered it an accurate depiction of Orton. *Id.*

Alexander has not worked in the tattoo industry full time since 2009 and has never licensed any tattoo to be included in video games or anywhere else. (Doc. 142-17, at pp. 179-181, 188). During her deposition, Alexander testified she has never told a client they needed her permission to appear in different media, such as photographs, tv shows, or videogames (Doc. 142-17, pp. 65-66, pp. 182-183), nor has she ever given permission to any of her clients to use copies of her tattoo work in video games. *Id.*, at 204. She would "take issue" if any client were to replicate her tattoos in a manner other than in photos or videos, including using her tattoo works to print and sell other commercial items, such as T-shirts. *Id.*, at 203.

In 2009, Alexander contacted WWE's legal department to negotiate about a possible faux sleeve product depicting her tattoo works (Doc. 215-3, p. 25). A WWE representative laughed at her and stated she had no grounds and that they could do what they wanted with Orton's images because he was their wrestler. *Id.* at pp. 30-31. WWE then offered Alexander $450 for extensive rights to use and produce the tattoo designs on WWE products. Alexander declined the offer and advised WWE that she did not grant it any permission to copy, duplicate, or otherwise reproduce any of her designs. Defendants have released and promoted wrestling video games titled "WWE 2K16", "WWE 2K17", and "WWE 2K18" which feature Orton. *Id.* at p. 205.

## Discussion

Alexander moves for partial summary judgment on the issue of copying. Defendants move for summary judgment, arguing Alexander's copyright claim fails as a matter of law for three independent reasons: Take-Two's use of the tattoos was authorized by an implied license; the fair use doctrine insulates their utilization of the tattoos in the *WWE 2K* videogames; and the tattoos

are a *de minimis* part of *WWE 2K*. Defendants further argue Alexander cannot prove actual damages.

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

### Alexander's Motion for Partial Summary Judgment (Doc. 139)

The owner of a copyright has the exclusive right to reproduce the copyrighted work. 17 U.S.C. § 106(1). Copyright infringement occurs when anyone violates the exclusive rights of a copyright owner. 17 U.S.C. § 501(a). "A plaintiff alleging copyright infringement must establish two elements: (1) ownership of a valid copyright, and (2) copying of the constituent elements of the work that are original." *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017).

"Some minimal degree of creativity," or "the existence of ... intellectual production, of thought, and conception" is required for copyright protection. *JCW Investments, Inc. v. Novelty, Inc.,* 482 F.3d 910, 914–15 (7th Cir. 2007) (quoting *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 362 (1991)). Copyright protection begins at the moment of creation of "original works of authorship fixed in any tangible medium of expression," including

"pictorial, graphic, and sculptural" works and sound recordings. 17 U.S.C. § 102(a). A work is "fixed" in a tangible medium of expression "when its embodiment in a copy ... is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *JCW Investments*, 482 F.3d at 915; 17 U.S.C. § 101. A certificate of copyright is *"prima facie* evidence" of the copyright's validity. *Id*.; 17 U.S.C. § 410(c). If a plaintiff establishes a valid copyright, copying of the protected work by a defendant can be proven either by direct evidence or inferred where the defendant had access to the copyrighted work and the work is substantially similar to the copyrighted work. *Id.; see also Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries,* 272 F.3d 441, 450 (7th Cir. 2001).

Alexander argues there is no dispute of material facts as to the issue of copying because Defendants have admitted to copying her original copyrighted tattoo artworks without permission. Defendants admit to copying Alexander's tattoos in their entirety in order to depict Orton in *WWE 2K* as he appears in real life (factual copying). However, citing Second and Fifth Circuit decisions, they argue Alexander cannot establish legally actionable copying, which she must also prove.

Defendants' argument is contrary to Seventh Circuit copyright law under which Alexander only needs to show that Defendants used her property; the burden of proving the use was authorized falls squarely on Defendants. *See Muhammad-Ali v. Final Call, Inc.,* 832 F.3d 755, 761 (7th Cir. 2016) (The burden is on the alleged infringer to show that the use was authorized – not on the plaintiff to show it was not). It is undisputed that Alexander holds valid copyrights for the five tattoos at issue and that Defendants copied her copyrighted works. Accordingly, Alexander's Motion for Partial Summary Judgment as to the copying element is **GRANTED**.

**Defendants' Motion for Summary Judgment (Doc. 141)**

Because Defendants admit to copying Alexander's copyrighted tattoos, they are liable for copyright infringement unless they can establish an affirmative defense to their usage. In that vein, Defendants assert three affirmative defenses to their utilization of the tattoos. First, Defendants claim the use of the tattoos was authorized by an implied license. Next, they contend the use of the tattoos is protected by the fair use doctrine. Finally, Defendants argue the use of the tattoos is *de minimis*.

### *Implied License*

A copyright owner holds exclusive rights to copy or distribute copies of their work. 17 U.S.C. § 106; *Final Call,* 832 F.3d at 762. The owner may authorize another person to do so through an exclusive written license, 17 U.S.C. § 101, or a nonexclusive oral or implied license. *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir. 1996). An implied nonexclusive license does not transfer ownership of the copyright to the licensee. *Final Call*, 832 F.3d at 762. It merely permits the use of a copyrighted work in a particular manner. *Id.* An implied license is created when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute her work. *Id.* at 776 (citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)). A factfinder may look to objective evidence of the copyright owner's intent in determining the existence of an implied license. *Id*.

According to Defendants, Alexander impliedly licensed Orton to disseminate and display the tattoos as part of his likeness. They contend that Alexander created the tattoos at Orton's request and never told him that further use of the tattoos would be infringement. Orton granted WWE the right to license his likeness to third parties and WWE then licensed Take-Two to use

Orton's likeness in the *WWE 2K* games. The first and second prongs of the analysis are not contested; the dispute surrounds Alexander's intent and the scope of any implied license.

By Declaration, Orton states that he understood the tattoos were his personal expression and that Alexander never told him he needed her permission any time his likeness would be shown with his tattoo visible. Alexander testified that she has never given permission to any of her clients to use copies of her tattoo works in videogames and argues that Defendants are conflating Orton's rights to his own likeness and right to appear in media with an implied license to use her copyrights in unlimited and other commercial ways, such as in video games.

It is unclear whether Alexander and Orton discussed permissible forms of copying and distributing the tattoo works or whether any implied license included sublicensing rights such that Orton could give permission for others to copy Alexander's tattoo works. Thus, the evidence raises a triable issue of fact as to the existence and scope of an implied license and Defendants' motion is denied as to this affirmative defense.

*Fair Use*

The broad exclusive rights afforded copyright owners do not extend to certain forms of copying which are considered indispensable to education, journalism, history, criticism, humor and other informative endeavors. The doctrine of fair use encapsulates this category of permissible copying. 17 U.S.C. § 107; *see also Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014). Under the doctrine, using another's copyrighted work is "fair" for such purposes as "criticism, comment, news reporting, teaching, scholarship, or research" and is therefore "not an infringement of copyright." *Id.*; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

In determining whether the doctrine applies, courts consider the following non-exhaustive factors: (1) the purpose and character of the use, including whether such use is of a commercial

nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107; *see Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 692–93 (7th Cir. 2012). "Fair use is a mixed question of law and fact, which means that it may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion--but not otherwise."  *Ty, Inc. v. Publ'ns Int'l*, 292 F.3d 512, 516 (7th Cir. 2002) (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560 (1985))

The inquiry into the purpose and character of the use entails an examination of the extent to which the use is complementary rather than merely substitutive of the original work and whether the use is for a nonprofit educational purpose, as opposed to a commercial purpose.  A use is appropriate or "fair" where a defendant changes a plaintiff's copyrighted work or uses the work in a different context such that the plaintiff's work is transformed into a new creation. Here, Defendants contend that Take Two's use of the copyrighted tattoos is "transformative; that Alexander inked the tattoos at Orton's request to reflect his personal expression whereas Defendants depicted the tattoos in *WWE 2K* to depict Orton realistically.  More specifically, relying on *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 607 (2d Cir. 2006), they contend their use is transformative because the size of the tattoos are small and difficult to observe, the videogame is an entire virtual world whereby the tattoos are an element utilized to create a "fun, lush experience for game users," and the tattoos are a tiny fraction of the videogames.

In *Bill Graham*, the Second Circuit Court of Appeals affirmed summary judgment in favor of the defendant publishers of *Grateful Dead: The Illustrated Trip,* a 480–page coffee table book that provides a history of the Grateful Dead through the use of a timeline and over 2000 images.

*Bill Graham*, 448 F.3d at 606.  The plaintiff claimed to own the copyright to seven of the images which the defendants reproduced without permission.  *Id.* at 607.  The court concluded that the first factor weighed in the defendants' favor because their purpose in using the copyrighted image (as historical artifacts to document the Grateful Dead concert events featured in the book's timeline) was plainly different from the plaintiff's dual purposes of artistic expression and promotion – the images were originally used as concert posters to generate public interest in the band's upcoming events.  *Id.* at 609.

Unlike in *Bill Graham*, there is a factual dispute in this case as to Defendants' purpose in using the tattoo works. Alexander contends she created the tattoos for the purpose of displaying them on Orton's body and that Defendants used the tattoos for the same purpose; to display them on Orton's body in the videogames.  Alexander also disputes Defendants' characterization of the size of the tattoos and maintains they are prominently displayed and clearly visible in the videogames.  These are material factual disputes.

The second factor focuses on the nature of the copyrighted work.  17 U.S.C. § 107(2).  "In general, the more creative the work, the more protection it should be accorded from copying; correlatively, the more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense." (internal quotation omitted).  *Neri v. Monroe*, 2014 WL 793336, at *7 (W.D. Wis. Feb. 26, 2014) *aff'd,* 567 Fed.Appx. 465 (7th Cir. 2014).  Defendants argue the tattoos are not, or at best minimally, protected by copyright law.  The Court disagrees.  Alexander has a copyright for five of Orton's tattoos.  The art of creating a tattoo naturally entails creative and expressive efforts.  Although Orton gave Alexander direction and input as to the tattoos, it was Alexander's creativity and design choices that were ultimately inked.

The third factor involves consideration of the portion of the work used by the alleged infringers "in relation to the copyrighted work as a whole" in order to determine whether the portion used was reasonable given the purpose of copying. 17 U.S.C. § 107(3). *See*, *Campbell*, 510 U.S. at 586–87 ("the extent of permissible copying varies with the purpose and character of the use."). Thus, the focus is not on how much of the work was taken, but the extent to which the protected elements were copied from the original and whether that amount was needed to further the purpose of the use. *Neri*, 2014 WL 793336, at *7. Defendants assert that it was necessary to copy each tattoo in its entirety in order to depict real life accurately. But Alexander argues that Defendants made no attempt to copy just those elements of the tattoo works necessary to create the realism Defendants' sought. Although wholesale copying does not preclude fair use *per se*, it militates against a finding of fair use. *Id. See also, Kelly*, 336 F.3d at 820.

The fourth factor, the effect of the use upon the potential market for or value of the copyrighted work, "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. The 'market' in fair use cases includes the potential market for not only the original work, but also derivative uses and licensing rights." *Red Label Music Publ'g, Inc.*, 388 F. Supp. 3d at 987. Defendants argue that Alexander is attempting to create a market in this case that has never existed before and would not be reasonable or likely to be developed – a market for licensing tattoos. Alexander maintains that Defendants' use will create a trend whereby other video game manufacturers, and others similarly situated, take advantage of and fail to pay licensing fees for copyrighted works (above and beyond just tattoos) unilaterally deemed necessary to create "realism."

Market harm is a matter of degree and the importance of this factor varies depending on the amount of harm and relative strength of the showing on the other factors." *Id.* at 590 n.21. Here, as previously noted, the remaining factors do not weigh in favor of fair use as a matter of law. As such, Defendants' fair use defense cannot be properly resolved on summary judgment.

### *De Minimis Use*

Defendants also argue that Alexander's copyright claim fails because Take-Two's use of the tattoos is *de minimis*. More specifically, Defendants assert that Orton is one of many wrestlers in *WWE 2K*, that it is difficult to see his tattoos during the videogame, and that the tattoos are a small percentage of the videogame data.

The *de minimis* defense, recognized in some circuits, protects a defendant from liability for technical copyright violations if the copying is "so trivial as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying." *See Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70, 77 (2d Cir. 1997). The qualitative component concerns the degree of similarity between the two works, focusing on "whether an average lay observe would recognize the alleged copy as having been appropriated form the copyrighted work." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.*), 71 F.3d 996, 1002 (2d Cir. 1995) (internal quotation marks, citation, and alterations omitted). "The quantitative component generally concerns the amount of the copyrighted work that is copied, a consideration that is especially pertinent to exact copying." *Ringgold*, 126 F.3d at 75 (internal citation omitted).

Whether the Seventh Circuit recognizes this defense to copyright infringement claims is an open question. The parties cite no Seventh Circuit decisions applying the defense and this Court is aware of none. Given the overlap between the defense and actionable copying, which Alexander is not required to prove to sustain her case in this circuit, the Court doubts the defense is viable

generally. That said, the Court finds Defendants' specific *de minimis* argument unavailing. The defense has been successfully invoked to allow copying of a small and usually insignificant portion of the copyrighted works, not the wholesale copying of works in their entirety as occurred here. Accordingly, Defendants' motion is also denied as to this affirmative defense.

### *Damages*

"The Copyright Act permits a copyright owner to recover actual damages suffered as a result of the infringing activity and any profits of the infringer resulting from the infringement that are not otherwise taken into account in calculating actual damages." *Bell v. Taylor,* 827 F.3d 699, 709 (7th Cir. 2016) (quoting *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003)). Actual damages are "usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer." *Id.* A jury may consider either a hypothetical lost license fee or the value of the infringing use to the infringer to determine actual damages, provided the amount is not based on "undue speculation." *Id.* At minimum, the plaintiff must prove a causal connection or nexus between the infringement and defendant's gross revenues. *See Bell,* 827 F.3d at 710.

Defendants argue they are entitled to summary judgment because Alexander cannot show that she is entitled to actual damages or Take-Two's profits. While Alexander testified that she was not aware of any business she lost due to the depiction of the tattoos in *WWE 2K*, she may establish actual damages using either a hypothetical lost license fee or the value of the infringing use to the infringer.

There is disputed evidence regarding the value of the copyright tattoo works to the videogames. Defendants argue the evidence establishes that consumers do not purchase *WWE 2K* because of the tattoos. But other evidence shows that consumers did purchase *WWE 2K* for its

authenticity to the wrestlers' appearance.  In particular, Defendants admit that consumer response is a consideration to their development of *WWE 2K* and the design choices made.  They also acknowledge that consumers expect there to be authenticity in the videogames and that WWE would have rejected Orton's videogame persona if it appeared without his tattoos or appeared with tattoos that were different than Orton's actual tattoos.  Additionally, Alexander's expert addresses the importance of authenticity to drive sales and profits.  Thus, an issue of material fact exists as to whether Alexander suffered actual damages based on the value of the infringing use, defeating summary judgment.

    **IT IS SO ORDERED.**

    **DATED:  September 26, 2020**

**STACI M. YANDLE**
**United States District Judge**