# EXHIBIT A

Transcript of Edward M. Kiang
Conducted on August 4, 2020

---

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF ILLINOIS

3    ----------------------------    x

4    CATHERINE ALEXANDER,            :

5         Plaintiff,                 :

6    v.                             :

7    TAKE-TWO INTERACTIVE SOFTWARE,  : Cause No.

8    INC., 2K GAMES, INC., 2K        : 3:18-CV-0966-SMY

9    SPORTS, INC., WORLD WRESTLING   :

10   ENTERTAINMENT, INC., and        :

11   VISUAL CONCEPTS ENTERTAINMENT,  :

12        Defendants.                :

13   ----------------------------    x

14

15           Zoom Video Deposition of

16              EDWARD M. KIANG

17           Tuesday, August 4, 2020

18         9:04 a.m. CST to 12:24 p.m. CST

19

20

21

22   Job No.: 311575

23   Pages: 1 - 122

24   Reported by: Melody Stephenson

25   BBA, FCRR, CRR, CRC, RPR, RSA, MO CCR #406
```

---

**Page 2**

```
1       Zoom Video Deposition of EDWARD M. KIANG.

2

3

4

5       Pursuant to agreement, before

6    Melody Stephenson, Certified Court Reporter in and

7    for the State of Missouri.

8

9

...
```

---

**Page 3**

```
1                A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF CATHERINE ALEXANDER:

3         ANTHONY R. FRIEDMAN, ESQUIRE

4         THE SIMON LAW FIRM, P.C.

5         800 Market Street, Suite 1700

6         St. Louis, MO 63101

7         (314) 241-2929

8

9    ON BEHALF OF DEFENDANT WORLD WRESTLING

10   ENTERTAINMENT, INC., and WITNESS EDWARD M.

11   KIANG:

12        CURTIS B. KRASIK, ESQUIRE

13        K&L GATES

14        K&L Gates Center

15        210 Sixth Avenue

16        Pittsburgh, PA 15222-2613

17        (412) 355-8696

18

19   ON BEHALF OF DEFENDANTS TAKE-TWO INTERACTIVE

20   SOFTWARE, INC.; 2K GAMES, INC.; 2K SPORTS,

21   INC.; and VISUAL CONCEPTS ENTERTAINMENT:

22        JOSHUA L. SIMMONS, ESQUIRE

23        KIRKLAND & ELLIS LLP

24        601 Lexington Avenue

25        New York, NY 10022
          (212) 446-4989
```

---

**Page 4**

C O N T E N T S

EXAMINATION OF EDWARD M. KIANG                    PAGE
  By Mr. Friedman                        7
                 * * * * *
           E X H I B I T S
          (Electronically attached)
DEPOSITION EXHIBIT                           PAGE
  1      Plaintiff's Amended Notice of       12
         30(b)(6) Deposition of
         Defendant World Wrestling
         Entertainment, Inc.
  2      World Entertainment, Inc.'s         16
         Booking Contract
  3      World Entertainment, Inc. -         17
         Terms of License
  4      WWE Source Product Submission       78
         #3540 (Bates WWE_Alexander
         109-110)
  5      WWE Source Product Submission       88
         #17984 (Bates WWE_Alexander
         207-214)
  6      WWE Source Product Submission       95
         #4073 (Bates WWE_Alexander
         112-119)
  7      Bryce Yang's 8-6-14 email chain    115
         (Bates WWE_Alexander 94-98)

Transcript of Edward M. Kiang
Conducted on August 4, 2020

---

**Page 5**

1          P R O C E E D I N G S
2       VIDEOGRAPHER:  Here begins disk number one
3  in the remote video deposition of Ed Kiang in the
4  matter of Alexander v. Take-Two Interactive
5  Software, Inc., et al., in the United States
6  District Court for the Southern District of
7  Illinois, Case Number 3:18-CV-0966-SMY.
8       Today's date is Tuesday, August 4th.  The
9  time on the video monitor is 9:04 a.m.  The remote
10 videographer today is Kevin Offett representing
11 Planet Depos.  All parties of this deposition are
12 attending remotely.
13      Would counsel please voice identify
14 themselves and state whom they represent?
15      MR. FRIEDMAN:  This is Tony Friedman from
16 the Simon Law Firm.  I represent the plaintiff,
17 Catherine Alexander.
18      MR. KRASIK:  Curt Krasik on behalf of the
19 defendant, World Wrestling Entertainment, Inc.,
20 and the witness.
21      MR. SIMMONS:  This is Joshua Simmons from
22 Kirkland & Ellis on behalf of Take-Two Interactive
23 Software, 2K Games, and 2K Sports, and Visual
24 Concepts Entertainment.
25      VIDEOGRAPHER:  The court reporter today is

**Page 6**

1  Melody Stephenson representing Planet Depos.
2       Would the reporter please swear in the
3  witness.
4       COURT REPORTER:  Yes.  I will read in the
5  stipulation.  "Will counsel please stipulate that
6  in lieu of formally swearing in the witness, the
7  reporter will instead ask the witness to
8  acknowledge that their testimony will be true
9  under the penalties of perjury, that counsel will
10 not object to the admissibility of the transcript
11 based on proceeding in this way, and that the
12 witness has verified that he is in fact Ed Kiang.
13      MR. KRASIK:  We'll stipulate to that.
14      COURT REPORTER:  Mr. Friedman?
15      MR. FRIEDMAN:  Yes.  I stipulate to that.
16      COURT REPORTER:  And this is to the
17 witness.  "Do you hereby acknowledge that your
18 testimony will be true under the penalties of
19 perjury?"
20      THE WITNESS:  I do.
21      COURT REPORTER:  Thank you.
22      You may proceed.
23      MR. FRIEDMAN:  Thank you.
24 Whereupon,
25           EDWARD M. KIANG,

**Page 7**

1  acknowledging that his testimony will be true
2  under the penalties of perjury, and verifying he
3  is in fact said named witness, was examined and
4  testified as follows:
5            DIRECT EXAMINATION
6  QUESTIONS BY MR. FRIEDMAN:
7       Q  Good morning, Mr. Kiang.  Could you please
8  state your full name for the record?
9       A  Edward M. Kiang.
10      Q  Thank you.
11      And are you currently employed?
12      A  I am.
13      Q  And who is your employer?
14      A  World Wrestling Entertainment, Inc.
15      Q  And what position do you hel- -- hold with
16 World Wrestling Entertainment or the WWE?
17      A  Vice president interactive media
18 licensing.
19      Q  How long have you been employed by WWE?
20      A  Approximately seven years.
21      Q  And has your title always been for that
22 seven years vice president of interactive media
23 licensing?
24      A  That's correct.
25      Q  Where were you employed prior to the WWE?

**Page 8**

1       A  Vocativ.
2       Q  What position did you hold at Vocativ when
3  you left?
4       A  Head of marketing.
5       COURT REPORTER:  Excuse me please.
6       Kevin, are you able to pick up the witness
7  clearly and loudly?
8       VIDEOGRAPHER:  I was about to interrupt
9  myself.
10      Can you just speak a little louder or get
11 a little closer to your computer, sir?
12      THE WITNESS:  Sure.
13      VIDEOGRAPHER:  You're very quiet.
14      THE WITNESS:  How's that?  Can you hear me
15 better?
16      VIDEOGRAPHER:  A little better.  Just --
17 just try to remember to speak up as best you can.
18 Thank you.
19      THE WITNESS:  No problem.
20      A  Do you want me to repeat my answer?
21      Q  (By Mr. Friedman)  Well, I -- I got the
22 last one.
23      You stated you were the head of marketing
24 at Vocativ when you left, correct?
25      A  Correct.

**9**

1    Q  How long were you employed by Vocativ?
2    **A  Approximately one and a half years.**
3    Q  And where did you work prior to Vocativ?
4    **A  Wind-Up Entertainment or Wind-Up Records.**
5    Q  How long were you employed by Wind-Up
6  Records?
7    **A  Approximately 12 years.**
8    Q  And what was your title when you left
9  Wind-Up Records?
10   **A  Vice president digital platforms group.**
11   Q  Where were you employed prior to Wind-Up
12  Records?
13   **A  JPMorgan.**
14   Q  And what was your title when you left
15  JPMorgan?
16   **A  Portfolio analyst.**
17   Q  And what were you doing prior to JPMorgan?
18   **A  That was my first job out of college.  I**
19  **was working part time.**
20   Q  And -- and where did you attend college?
21   **A  Columbia University.**
22   Q  What degree did you receive?
23   **A  A bachelor of arts in Urban Studies.**
24   Q  I'm sorry.  In what studies?
25   **A  Urban Studies.**

**10**

1    Q  What year did you graduate?
2    **A  1999.**
3    Q  Okay.  Do you hold any other university or
4  college degrees?
5    **A  I do not.**
6    Q  Okay.  All right.  You stated you are
7  currently the vice president in interactive media
8  licensing at the WWE.  Did I get that right?
9    **A  That's correct.**
10   Q  Okay.  Broadly, what are your job duties
11  as vice president?
12   **A  I handle the licensing for a variety of**
13  **interactive products including video games, home**
14  **video, publishing, and location-based**
15  **entertainment.**
16   Q  Okay.  And do those job duties include
17  licensing for the WWE 2K series of video games
18  that are the subject of this litigation?
19   **A  That's correct.**
20   Q  And you were in your job position for the
21  past seven years.  So were you involved in the
22  licensing of the WWE 2K series starting with the
23  2K15?
24   **A  Corr- --- yes.  So I did not sign the**
25  **original deal with Take-Two.  That happened prior**

**11**

1  to my employment, but I have been involved with
2  the game since I've been working here.  That --
3  that began with 2K14 actually.
4    Q  2K14.  All right.  So you were involved
5  with WWE 2K14, 15, 16, 17, 18, is that correct?
6    **A  That's correct.**
7    Q  Okay.  Thank you.
8       Mr. Kiang, have you ever been deposed
9  before?
10   **A  I have not.**
11   Q  Okay.  So I perhaps should've provided
12  some of these statements a little bit earlier,
13  although you're doing just fine, but this is a
14  deposition.  The testimony you provide is -- is
15  sworn testimony.  I'll be asking you a series of
16  questions.  Afterwards, your attorney or another
17  attorney may ask you some questions.
18      I ask you to make sure that your responses
19  to me are verbal responses.  Although this is
20  being video recorded, it's important that your
21  responses are verbal because the court reporter is
22  writing down furiously everything that you say,
23  and it's important that we have a good transcript.
24      So in addition to that, I will avoid
25  speaking over you, and I'd ask that you avoid

**12**

1  speaking over me to make for a cleaner transcript.
2  Okay?
3    **A  Understood.**
4    Q  Okay.  And if you don't understand a
5  question I ask, I -- I ask that you please ask me
6  to clarify.  Is that all right?
7    **A  No problem.**
8    Q  Okay.  Okay.  I'd like to mark an exhibit
9  as Exhibit 1.  And these exhibits are not
10  premarked, so there is a tech online right now who
11  has those exhibits, but I believe you may have
12  paper copies of them in front of you.
13      So as Exhibit 1, I'd like to mark an
14  document entitled, "Plaintiff Catherine
15  Alexander's Amended Notice of Rule 30(b)(6)
16  Deposition of Defendant World Wrestling
17  Entertainment, Inc."
18      Do you have a copy of that document in
19  front of you, Mr. Kiang?
20   **A  I -- I do now.**
21   VIDEOGRAPHER:  Do you want me to pull that
22  up, Counsel?
23      MR. FRIEDMAN:  No.  I don't think that's
24  necessary because the witness has it in front of
25  him.  But for the record, it's a four-page

Transcript of Edward M. Kiang
Conducted on August 4, 2020

---

**13**

1  document with the title that I just mentioned.
2      On page 4 -- Mr. Kiang, if you could
3  follow along, page 4 has the title, or the
4  heading, rather, of "Deposition Topics".
5      Do you see that?
6  **A I do.**
7      Q Okay. And I -- I should ask, have you
8  seen this document before, this notice of
9  deposition, this amended notice of deposition?
10  **A I have.**
11     Q Okay. And do you understand that you are
12  here today to provide testimony on the topics 1
13  through 7 on page 4 of Exhibit 1?
14  **A I do.**
15     Q Okay. And do you understand that the
16  testimony you're providing is testimony on behalf
17  of the defendant WWE?
18  **A Yes.**
19     Q Okay. And it's my understanding that you
20  will be testifying on every one of the topics 1
21  through 7, is that correct?
22  **A That's correct.**
23     Q Okay. Thank you.
24     Now, you can set that aside. We may refer
25  to it later.

**14**

1      We'll be discussing today a series of
2  video games that we mentioned briefly a moment ago
3  discussing at least the WWE 2K16, 17, and 18
4  games. Is that your understanding.
5  **A That is my understanding.**
6      Q Okay. I'm going to refer to those broadly
7  as the WWE 2K Games so I don't have to repeat that
8  every time. Is that all right?
9  **A That's fine.**
10     Q Okay. In addition, we're going to be
11  talking about some tattoos of which -- my client
12  Catherine Alexander holds copyrights for tattoos
13  that are marked on the wrestler Randy Orton.
14     There's a number of those tattoos, including a
15  Bible verse, a dove, a rose, a skull sleeve, and
16  tribal designs. I'm just going to refer to those
17  as the tattoos or Randy Orton's tattoos.
18     Is that all right?
19     MR. KRASIK: Yeah. I'll just object that
20  the legal status of the tattoos is -- is -- is --
21  in some dispute, but no problem with the
22  collective definition for purposes of the
23  deposition.
24     Do you understand, Mr. Kiang?
25     THE WITNESS: I do.

**15**

1      Q (By Mr. Friedman) Okay. Thank you.
2      I think that might help us be a bit --
3      MR. SIMMONS: And I'll inter- --
4      Q (By Mr. Friedman) -- a little bit bet- --
5      MR. SIMMONS: Objection. I'll interpose
6  an objection that one of the tattoos, the Bible
7  verse, is no longer part of the case.
8  ==Q (By Mr. Friedman) All right. Mr. Kiang,==
9  ==did the WWE receive permission from the plaintiff==
10 ==to copy Randy Orton's tattoos for the use in the==
11 ==WWE 2K Games?==
12     MR. KRASIK: Objection to form. Lacks
13  foundation.
14  ==A My understanding is that WWE entered into==
15 ==an agreement with Randy Orton to use his name and==
16 ==likeness for a variety of products and video==
17 ==games, and we, in turn, have granted those rights==
18 ==to Take-Two in the development of the games of 2K==
19 ==Games.==
20     Q (By Mr. Friedman) Did the WWE -- well,
21  strike that.
22     Did the WWE receive permission from the
23  plaintiff, Catherine Alexander, to copy the
24  tattoos for use in the WWE 2K Games?
25     MR. KRASIK: Objection to form. Lack of

**16**

1  foundation. Calls for a legal conclusion.
2      But you can answer.
3  **A We've done extensive preparation for this**
4  **proceeding. We have not found any form of**
5  **communications with a tattooist. Again, our**
6  **understanding is that we licensed the rights from**
7  **Randy Orton and provided that in the games of 2K**
8  **or Take-Two.**
9      Q (By Mr. Friedman) Okay. So just to be
10  clear then, the WWE did not receive explicit
11  permission from Plaintiff Alexander to copy the
12  Randy Orton tattoos for use in the WWE 2K Games,
13  is that right?
14     MR. KRASIK: Objection to form. Lack of
15  foundation. Calls for a legal conclusion, and
16  asked and answered now.
17     You can answer one more time.
18  **A WWE has a -- has a -- an agreement with**
19  **Randy Orton for his name and likeness. We have**
20  **not had any communication to my knowledge with the**
21  **tattooist.**
22     Q (By Mr. Friedman) Okay. All right.
23  Thank you. Let's mark two more exhibits. I'm
24  going to call these Exhibits 2 and 3.
25     And, Kevin, if you have these available,

Transcript of Edward M. Kiang
Conducted on August 4, 2020

5 (17 to 20)

17

1  or, Mr. Kiang, if you have these in front of you,
2  I think that's the easiest way to do it.
3      So I'm going to mark as Exhibit 2 a
4  document that was produced by WWE bearing Bates
5  numbers WWE_Alexander0000001 through 26.
6  Exhibit 1 is -- Exhibit 2 is entitled World
7  Wrestling Entertainment, Inc., Booking Contract.
8      Do you have a copy of that document in
9  front of you, Mr. Kiang?
10  **A  I do.**
11     Q  Thank you.  And thank you, Curt.
12     I'd like to mark as Exhibit 3 a document
13  bearing Bates numbers WWE_Alexander0000027 through
14  71.  The title of this document is World Wrestling
15  Entertainment-Terms of License.
16     Do you have a copy of Exhibit 3 in front
17  of you, Mr. Kiang?
18  **A  I do.**
19     Q  Okay.  Thank you.
20     Now, I marked both of these because we
21  might refer to both of them through the next
22  series of questions so you have them in front of
23  you.  Let's take a look at Exhibit 2.
24     And, Mr. Kiang, you can refer to any
25  portion of this document you'd like to to answer

18

1  my questions.  But have you seen this document
2  before?
3  **A  I have seen it once in preparation for**
4  **today.**
5     Q  Okay.  And -- and what is this?
6  **A  This is a booking contract for Randy**
7  **Orton.**
8     Q  Okay.  And if you flip over to page -- you
9  know what?  We'll look at the first page.  Do you
10  see at the top there the first paragraph?  There's
11  an effective date of September 1st, 2009.
12     Do you see that?
13  **A  I do.**
14     Q  Okay.  So that would be the effective date
15  of this booking contract, correct?
16  **A  Correct.**
17     Q  Okay.  And you stated that the parties to
18  this booking contract are the defendant, WWE, and
19  the wrestler, Randall Orton, is that right?
20  **A  Correct.**
21     Q  Mr. Kiang, to your knowledge, is this the
22  ear-- -- earliest booking contracts that exist
23  between the WWE and Mr. Orton?
24  **A  I -- I believe.  I'm not certain.  I don't**
25  **believe so.  I believe he's been working with us**

19

1  for much longer than that.
2     Q  Well, there is -- okay.  Do you know of a
3  booking contract with Mr. Orton that exists prior
4  to this September 1st, 2009, booking contract?
5  **A  I have not seen one.  I presume that one**
6  **probably exists.**
7     Q  Do you know how long Mr. Orton has been
8  working for the WWE?
9  **A  I do not know.**
10     COURT REPORTER:  I'm sorry?
11  **A  I do not know.**
12     Q  (By Mr. Friedman)  You stated that you
13  believe he was working for the WWE --
14     MR. KRASIK:  I'm -- I'm sorry.  I'm sorry.
15  I think inherent in this process is we might talk
16  over each other a little bit unintentionally.  I
17  obviously did not intend to do that.  I just
18  wanted to say -- object to the last two questions
19  as being outside the scope of the 30(b)(6) notice.
20  But he can -- Mr. Kiang's free to answer in his
21  individual capacity.
22     Q  (By Mr. Friedman)  Okay.  Mr. Kiang, I --
23  I believe you stated that it was your
24  understanding that Mr. Orton worked for the WWE
25  for some time prior to 2009.

20

1     Did I hear that correctly?
2  **A  That's correct.**
3     Q  Okay.  Do you know for how long Mr. Orton
4  has worked for the WWE?
5     MR. KRASIK:  Just -- same objection.
6  Outside the scope of the 30(b)(6) notice.
7     But you can answer.
8  **A  I -- I -- I'm certain, but I'm sure I**
9  **could get that information.**
10     Q  (By Mr. Friedman)  Do you know about what
11  year he may have started working for the WWE?
12     MR. KRASIK:  Same objection.  Outside the
13  scope of the 30(b)(6).
14  **A  I do not know.**
15     Q  (By Mr. Friedman)  Mr. Kiang, do you know
16  whether there are additional booking contracts
17  perhaps dated after Exhibit 2 that exist between
18  the WWE and Mr. Orton?
19     MR. KRASIK:  Same objection.  Outside the
20  scope of the notice.
21     You can answer.
22  **A  I -- I am uncertain.  I -- I'm prepared to**
23  **talk about Randy Orton with respect to 2K16, 17,**
24  **and 18.**
25     Q  (By Mr. Friedman)  Okay.  I understand

Transcript of Edward M. Kiang
Conducted on August 4, 2020

---

21

1  that. But is it -- is it -- is it correct that
2  your testimony is that you do not know whether
3  there are additional booking contracts that exist
4  between the WWE and Mr. Orton?
5      MR. KRASIK: Objection. Outside the scope
6  of the notice.
7      You can answer.
8  **A That's correct.**
9      Q (By Mr. Friedman) Who at WWE would know
10 whether there are additional booking contracts
11 that exist?
12 **A Probably, the legal department within our**
13 **account relations group.**
14     Q Within what group? I'm sorry?
15 **A Well, it would be in the legal team. It**
16 **would be the legal team.**
17     Q Are you a member of the legal department?
18 **A I am not.**
19     Q Okay. Do you oversee the legal department
20 in any way?
21 **A I do not.**
22     Q When you say "legal department," who --
23 who is the -- who is the head of the legal
24 department?
25 **A The head of our legal department is**

---

22

1  **Brian Nurse. He's our general counsel.**
2      Q Okay. Okay. All right. I'll -- I'll
3  refer to Exhibit 2 as the booking contracts.
4  Let's take a look at Exhibit 3.
5      Have you seen this document before?
6  **A I have.**
7      Q Okay. And what is this document?
8  **A This is the licensing agreement between**
9  **Take-Two and WWE.**
10     Q And if we look at page 27, there's a --
11     MR. KRASIK: I'm sorry to interrupt. Do
12 you mean 27 like a Bates Number 27 --
13     MR. FRIEDMAN: Yes.
14     MR. KRASIK: -- or like 27 of the
15 document?
16     MR. FRIEDMAN: You're right, Curt. Thank
17 you for that note. Twenty-seven of the document.
18 So that would be Bates Number WWE_Alexander 69.
19     MR. KRASIK: Give me a minute.
20     MR. FRIEDMAN: Take your time.
21     MR. KRASIK: Okay.
22     Q (By Mr. Friedman) All right. Do you see
23 a signature block for World Wrestling
24 Entertainment on page Bates 69?
25 **A I do.**

---

23

1      Q Okay. And the date there as -- a- -- as
2  signed, appears to be February 11, 2013?
3      Do you see that?
4  **A Okay. That's correct.**
5      Q All right. And it's signed by a Casey
6  Collins. Do you know Casey Collins?
7  **A I do.**
8      Q Okay. Is Casey Collins still employed by
9  WWE?
10 **A He is not.**
11     Q Okay. All right. You can go back to the
12 first page which is Bates WWE 27. There's the
13 long paragraph on that first page. About midway
14 through, there's a sentence that starts "The
15 property further includes." Let me know when
16 you're there. I want to ask you a question about
17 that.
18 **A Okay.**
19     Q Okay. So I -- I'll read a portion of
20 this. "The property further includes right of
21 publicity, namely, the likeness, physical
22 characteristics, personalities, characters and
23 personas of all licensor talent." And then in
24 parentheses, "namely all individuals who are under
25 a booking contract" and it -- and it continues.

---

24

1      Do you see that?
2  **A Mm-hmm.**
3      Q Okay.
4  **A Yes.**
5      Q The booking contract that is referenced
6  here, is that the same booking contract in -- that
7  we see in Exhibit 2?
8      MR. KRASIK: Objection to form.
9      You can answer.
10 **A Yes.**
11     Q (By Mr. Friedman) Okay. So the reference
12 to a booking contract with licensor talent in
13 Exhibit 3 refers to at least the booking contract
14 between the WWE and Mr. Orton in Exhibit 2, is
15 that right?
16     MR. KRASIK: Objection to form, among
17 others.
18     But you can answer.
19 **A Correct.**
20     Q (By Mr. Friedman) Okay. Thank you.
21     All right. Now, you said that you've seen
22 Exhibit 3 before. What is Exhibit 3?
23 **A The licensing agreement between WWE and**
24 **Take-Two.**
25     Q And as stated on the first page, the

---

Transcript of Edward M. Kiang
Conducted on August 4, 2020

7 (25 to 28)

25

1  licensor is the defendant World Wrestling
2  Entertainment, correct?
3      A Correct.
4      Q And the licensee is Take-Two Interactive
5  Software, also a defendant in this case, correct?
6      A Correct.
7      Q Okay. So this license agreement --
8  what -- what i- -- what is the effect of this
9  license agreement? What's your understanding of
10 it?
11     MR. SIMMONS: Objection. Legal
12 conclusion.
13     MR. KRASIK: Objection. Calls for a legal
14 conclusion.
15     But you can answer.
16     A It allows -- it -- it -- it's WWE granting
17 rights to IP that -- pardon me -- WWE owns and
18 operates or controls for the creation of a game by
19 Take-Two.
20     Q (By Mr. Friedman) And -- all right. And
21 specifically, this license agreement is -- it is
22 an instance in which the WWE is licensing the
23 rights that were assigned to it pursuant to
24 Mr. Orton's booking contract in Exhibit 2 over to
25 Take-Two, isn't that right?

26

1      MR. KRASIK: Objection to form. Go ahead.
2      A It's inclusive of -- of IP far beyond
3  that, but it is also inclusive of Randy Orton's
4  booking contract, correct.
5      Q (By Mr. Friedman) Okay. All right.
6  Looking closer at Exhibit 2, the booking contract,
7  I'll refer you over to Bates stamp page number
8  WWE_Alexander 3, specifically paragraph 3.1.
9      Are you there?
10     A Yes.
11     Q Okay. And in this paragraph of the
12 booking contract between Mr. Orton and the WWE, we
13 see here, it -- you -- you referred to -- strike
14 that.
15     You referred earlier to the -- Mr. Orton
16 assigning his likeness over to the WWE. Is this
17 what you were referring to, this paragraph?
18     A That's correct.
19     Q Okay. I note that within this
20 paragraph -- and you're welcome to read it or any
21 other section -- but there is reference to
22 Exhibit A.
23     Do you see that?
24     A The reference, yes.
25     Q What's your understanding of what the

27

1  purpose of Exhibit A is in this booking contract?
2      A It's identifying the talent Randy Orton.
3      COURT REPORTER: I'm sorry. Could you
4  repeat that answer please?
5      A It is identifying the talent Randy
6  Orton --
7      Q (By Mr. Friedman) Okay.
8      A -- and his IP.
9      Q What was that last part?
10     A And -- and his intellectual property.
11     Q And just reading from Exhibit 2, when you
12 say "and his intellectual property," what's listed
13 here is all service marks, trade marks, and other
14 distinctive and identifying indicia used by the
15 wrestler Mr. Orton prior to the effective date in
16 connection with the business of professional
17 wrestling -- I'm going to skip around -- including
18 his likeness, personality, and so on. So we have
19 the word "likeness" there. So the -- these are
20 the -- these are -- you refer broadly to
21 intellectual properties.
22     Is this the intellectual property you're
23 referring to, everything that's listed out here?
24     MR. KRASIK: Objection. Calls for a legal
25 conclusion.

28

1      You can answer.
2      A We're referring to his -- his likeness as
3  a person Randy Orton.
4      Q (By Mr. Friedman) Okay. And so if you
5  look at Exhibit A over on Bates stamp page 24,
6  what I see included here is the names Randal Orton
7  and Randy Orton.
8      Do you see that?
9      A I do.
10     Q And so it -- it -- is it your
11 understanding that this is a listing of
12 Mr. Orton's likeness that's being assigned to the
13 WWE?
14     MR. KRASIK: Objection. Calls for a legal
15 conclusion.
16     You can answer if you understand.
17     A Yes. It's my understanding that this is
18 inclusive of everything about Randy Orton
19 inclusive of his likeness.
20     Q (By Mr. Friedman) Okay. Within
21 Exhibit 2, the booking contracts, including
22 Exhibit A, I see no references to Mr. Orton's
23 tattoos. Is that correct?
24     A There's ref- -- only references to his
25 likeness which would be incorporated.

Transcript of Edward M. Kiang
Conducted on August 4, 2020

29

1    Q  Okay.  All right.  And within the --
2  complex Mr. Orton's likeness and -- and other
3  things listed in paragraph 3.1 are referred
4  collectively --
5      MR. KRASIK:  You were muffled for a
6  second.  Could you restate the question, Tony?
7      MR. FRIEDMAN:  Sure.  Sure.
8    Q  (By Mr. Friedman)  Just broadly, so we can
9  discuss this, I'm just going to point out the
10  definition in e-- in paragraph 3.1 that wrestler
11  inter-- intellectual property or Mr. Orton's
12  intellectual property includes his likeness and a
13  variety of other -- other -- other things, is that
14  right?
15      MR. KRASIK:  Objection.  Calls for a legal
16  conclusion.
17      You can answer.
18    **A  That's correct.**
19    Q  (By Mr. Friedman)  So is it correct that
20  the WWE views Mr. Orton's tattoos as part of his
21  likeness?
22    **A  Correct.**
23    Q  All right.  I'd like to look for a moment
24  at page WWE_Alexander 7 of Exhibit 2.  There's a
25  section titled "Payments/Royalties."  It's

30

1  section 7.
2      Do you see that?
3    **A  Yes.**
4    Q  Okay.  So within here, there are
5  provisions about payments and royalties.  I want
6  to look at -- look at -- within paragraph 7.3
7  which is entitled --
8      COURT REPORTER:  I'm sorry.  You muffled
9  again.
10      MR. FRIEDMAN:  Sorry.  I'm sorry.  Maybe
11  I'll bring this a little bit closer to myself.
12  You're just going to see me even larger than life
13  here.
14    Q  (By Mr. Friedman)  Okay.  Do you see
15  paragraph 7.3 within that same section at page 8?
16    **A  Yes.**
17      MR. FRIEDMAN:  I hear pages rustling.
18    Q  (By Mr. Friedman)  But you-- you're
19  welcome to review this section or any other
20  portion.  But my question is, Mr. Kiang, is it
21  accurate that Mr. Orton is entitled to a portion
22  of the licensed products' net receipts of the WWE
23  2K video games that are the subject of this
24  litigation?
25      MR. KRASIK:  Calls for a legal conclusion.

31

1      You can answer.
2    **A  That is correct.  He would get a pro rata**
3    **share of the portion of sales.**
4    Q  (By Mr. Friedman)  So is it correct that
5  the better the games sell, the more money
6  Mr. Orton makes?
7    **A  It would be correct to say that the better**
8    **the game does, the better all the talent are paid**
9    **inclusive of Randy.**
10    Q  Do you know -- do you know how much
11  Mr. Orton has received from sales of the video
12  games?
13      MR. KRASIK:  Objection.  Outside the scope
14  of the 30(b)(6) notice.
15      But you can answer.
16    **A  I -- I am uncertain.**
17    Q  (By Mr. Friedman)  Mr. Kiang -- Mr. Kiang,
18  has the WWE ever sought a license for any of its
19  wrestler's tattoos from a tattoo artist?
20    **A  Not to my knowledge within the scope of**
21    **video games licensing.**
22    Q  Okay.  What about outside the scope of
23  video game licensing?  Has the WWE to your
24  knowledge ever sought a license for a tattoo on
25  one of its wrestlers from a tattoo artist or

32

1  another person?
2      MR. KRASIK:  Objection.  Outside the scope
3  of the 30(b)(6) notice and calls for a legal
4  conclusion.
5      But you can answer.
6    **A  I'm -- I'm uncertain with respect to other**
7    **businesses --**
8      COURT REPORTER:  I'm sorry.  Could you
9  raise your voice please and repeat your answer?
10      THE WITNESS:  Sure.  Sorry.
11    **A  I -- I -- I am uncertain outside of any**
12    **businesses -- outside -- I mean for any licenses**
13    **outside of my businesses.**
14    Q  (By Mr. Friedman)  All right.  Thank you.
15  If you could turn to Exhibit 3, the license
16  agreement between WWE and Take-Two.  I'm going to
17  look over at page WWE_Alexander 35, the section
18  entitled "Licensor Royalties."  Are you there?
19    **A  I am.**
20    Q  And -- and what is -- what is this
21  section -- what is this section about?
22    **A  This lays out the royalty rates that WWE**
23    **would receive for the sale of -- of the games.**
24    Q  Okay.  And this is the schedule of
25  payments that shows what royalties are to be paid

Transcript of Edward M. Kiang
Conducted on August 4, 2020

33

1  to the WWE from Take-Two, correct?
2  **A  That is correct.**
3  Q  Okay.  And -- strike that.
4  Did the WWE receive any reimbursements
5  from Take-Two outside of the royalties that it
6  received regarding costs that WWE may have
7  incurred in connection with the sales of the video
8  games?
9  MR. KRASIK:  Objection to form.
10  You can answer.
11  **A  I -- I'm -- I'm not sure I understand your**
12  **question.  Could -- could you rephrase that?**
13  Q  (By Mr. Friedman)  I can rephrase it.
14  Has the WWE received any reimbursements
15  from Take-Two for costs that the WWE may have
16  expended in connection with sales of the video
17  games?
18  MR. KRASIK:  Objection.  Lack of
19  foundation.
20  You can answer.
21  **A  I -- I -- I'm unaware of any costs that**
22  **two -- Take-Two would've paid WWE with respect to**
23  **the license.**
24  Q  (By Mr. Friedman)  Okay.  Do you know
25  whether WWE has incurred any costs in connection

34

1  with sales of the video games?
2  **A  No.**
3  Q  Okay.  Do you know whether WWE has spent
4  any money on advertising or marketing of the video
5  games?
6  **A  Not that I can think of.**
7  Q  Okay.  I'll note -- and we can pull up the
8  document if you'd like to but -- well --
9  Mr. Kiang, did you review the WWE's
10  interrogatory answers in preparation for this
11  deposition?
12  **A  I have seen them.**
13  Q  Okay.  So we can take a look at that, if
14  you'd like, but I'll state that the WWE responded
15  to plaintiff's interrogatory number 10 in a
16  supplemental answer providing some of the dollar
17  amounts that the WWE has received from Take-Two.
18  MR. KRASIK:  I believe we have a -- a copy
19  of it, Tony, I can get.
20  MR. FRIEDMAN:  All right.  Well, let's
21  take a look at -- we don't need to mark it, but
22  I've got a copy here as well.  That's
23  interrogatory number 10 WWE's supplemental answer.
24  MR. KRASIK:  One moment, please.
25  **A  Okay.  Bullet -- bullet ten?**

35

1  MR. KRASIK:  Number 10.
2  **A  I mean number ten.  Yes.  Sorry.**
3  Q  (By Mr. Friedman)  Pages 8 and 9.  All
4  right.  So WWE's response was that --
5  MR. KRASIK:  I'm sorry.  One second.
6  THE WITNESS:  Okay.  I'm ready.
7  Q  (By Mr. Friedman)  Okay.  On page 9, WWE's
8  response is that as of June 30, 2019, it was paid
9  royalties on the sales of WWE 2K Games as follows.
10  Do you see that?
11  **A  I do.**
12  Q  And for the WWE 2K16 game as of that date,
13  WWE had received $19,232,358, is that right?
14  **A  That is correct.**
15  Q  And in connection with the WWE 2K17 game
16  as of that date, the WWE had received $17,274,280,
17  is that right?
18  **A  That's correct.**
19  Q  And in connection with the WWE 2K18 game
20  as of that date, the WWE had received $13,051,966,
21  is that right?
22  **A  Yes.**
23  Q  Okay.
24  **A  You muffled a little bit, but I believe**
25  **you said 66, yes.**

36

1  Q  Okay.  Well, whatever is stated in
2  response to interrogatory number 10, correct?
3  **A  Correct.**
4  Q  Now, my question is why is the date of
5  June 30, 2019, provided there in response?
6  **A  That was the date that the report was**
7  **pulled from our finance group.**
8  Q  Okay.  Do you know what the current
9  figures are?
10  **A  I do not.**
11  Q  Okay.  Is June 30, 2019, the end of a
12  fiscal year for the WWE?
13  MR. KRASIK:  Objection.  Outside the scope
14  of the notice.
15  **A  No, I don't believe so.**
16  Q  (By Mr. Friedman)  All right.  Thanks.
17  You can set that aside.  Let's look again at the
18  Exhibit 3 which is the license agreement.  Let me
19  get my pages -- all right.  Let's -- it's kind of
20  a two-step process here.  Let's take a look at
21  page Bates Number WWE 41.
22  **A  The signature page?**
23  Q  Yeah, the signature page.  But above that,
24  there's a paragraph general terms.  And -- and
25  within it is stated "this license," referring to

Transcript of Edward M. Kiang
Conducted on August 4, 2020

10 (37 to 40)

37

1  Exhibit 3, "is subject to all the provisions of
2  the standard terms and conditions."
3      Do you see that?
4  A I do.
5  Q All right. And what's referenced there is
6  standard terms and conditions. Is that what's
7  contained just two pages later at WWE 43?
8  A That is correct.
9  Q Okay. And that portion of the document --
10 still within Exhibit 3 -- is entitled "World
11 Wrestling Entertainment, Inc., Standard Terms and
12 Conditions," correct?
13 A That is correct.
14 Q Okay. Now, if you look at Bates stamp
15 WWE 57, we're still within the standard terms and
16 conditions. There's paragraph 8.2, "WWE's
17 indemnification."
18     Do you see that?
19 A I do.
20 Q Is it your understanding that WWE has a
21 responsibility to indemnify Take-Two for any
22 liability that may arise in connection with
23 Exhibit 3?
24     MR. SIMMONS: I'm sorry. I missed the end
25 of that question.

38

1      MR. KRASIK: Ask the question again
2  please, and then I'll object.
3      MR. FRIEDMAN: Sure. Sure.
4  Q (By Mr. Friedman) Mr. Kiang, is it your
5  understanding that pursuant to this paragraph H(2)
6  of WWE's standard terms and conditions that the
7  defendant, WWE, is required to indemnify Take-Two
8  for any liability that may arise under the terms
9  of the license agreement Exhibit 3?
10     MR. KRASIK: Objection. Calls for a legal
11 conclusion.
12 A I'm -- I'm not a lawyer, but my
13 understanding is that, yes, this states that we
14 indemnify them under certain scenarios.
15 Q (By Mr. Friedman) Okay. Is it your
16 understanding that the WWE would be required to
17 indemnify Take-Two for any judgment that the
18 plaintiff may be awarded in this case?
19     MR. KRASIK: Objection. Calls for a legal
20 conclusion.
21     MR. SIMMONS: Objection. Foundation.
22 A Sorry. Could -- could you repeat that?
23 Q (By Mr. Friedman) Sure. My question is,
24 is it your understanding, Mr. Kiang, that the WWE
25 will be required to indemnify the defendant

39

1  Take-Two for any judgment that may be awarded in
2  favor of the plaintiff in this case?
3      MR. KRASIK: Same objections.
4      MR. SIMMONS: Same objection.
5  A I -- I am uncertain.
6  Q (By Mr. Friedman) All right. Let's look
7  a little bit more on the standard terms and
8  conditions. The first page of the standard terms
9  and conditions, on Bates page WWE 43, there's a
10 definition of -- I'll -- I'll wait till you get
11 there.
12 A Forty-three. I'm here.
13 Q Yes. Thank you.
14     There's a definition on paragraph (c) of
15 the "Definitions" section, quote, licensed
16 products.
17     Do you see that?
18 A I do.
19 Q Okay. According to WWE's standard terms
20 and conditions, "Licensed products" -- and I'm
21 reading here -- "shall collectively mean the use
22 of the WWE intellectual property in a form and
23 manner approved by WWE."
24     Do you see that?
25 A I do.

40

1      Q My question is, is it accurate to say that
2  without WWE approval, Take-Two cannot have
3  utilized WWE intellectual property?
4      MR. KRASIK: Objection. Calls for a legal
5  conclusion.
6      You can answer.
7      MR. SIMMONS: Objection. Foundation.
8  A Correct. Without the license, they could
9  not use the IP that WWE owns and controls.
10 Q (By Mr. Friedman) Okay. There's a --
11 i- -- are there -- is there an additional
12 requirement that the WWE needs to approve any
13 licensed products pursuant to the license
14 agreement?
15     MR. KRASIK: Objection. Calls for a legal
16 conclusion.
17 A WWE has the right to approve how the -- is
18 used within the product.
19 Q (By Mr. Friedman) okay. Is the WWE's
20 approval required for any licensed products to be
21 sold?
22     MR. KRASIK: Objection. Calls for a legal
23 conclusion.
24 A If what you mean is in the development of
25 the product, we provide approvals for how the

Transcript of Edward M. Kiang
Conducted on August 4, 2020

11 (41 to 44)

---

**41**

1 brand is utilized, but put in place prior to going
2 on sale.
3     Q  (By Mr. Friedman)  Yes.  Is that the case?
4     A  That's correct.
5     Q  Okay.  So stated another way, Take-Two
6 needed WWE's approval for video game content in
7 order to sell the video games.  Is that accurate?
8     A  Take-Two required WWE's approval in order
9 to create WWE licensed product.  If they wanted to
10 make a wrestling game without our IP, they could
11 do that.
12     Q  Okay.  And in connection with obtaining
13 WWE's approval, what types of content did WWE have
14 the obligation to approve?
15     MR. KRASIK:  Objection.  Calls for a legal
16 conclusion.  Lack of foundation.
17     You can answer.
18     A  2K would've submitted a variety of assets
19 including talent models, gear, arenas, lighting,
20 music, entrance themes.  I'm sure there's more I'm
21 missing.
22     Q  (By Mr. Friedman)  Okay.  Why -- why did
23 WWE need to approve -- I'll use the term
24 broadly -- video game content?
25     MR. KRASIK:  Objection.  Calls for a legal

**42**

1 conclusion.
2     You can answer.
3     A  When you say "video game content," I'm not
4 sure.  Do -- do you mean features within the game
5 or do you mean the WWE licensed elements?
6     Q  (By Mr. Friedman)  Let's discuss the WWE
7 licensed elements.  So you provided a list of
8 licensed elements.  One of those licensed elements
9 was talent models, is that right?
10     A  Sure.
11     Q  Okay.  So why does WWE want to approve WWE
12 licensed content in the WWE 2K video games?
13     A  Sure.  It's part of our brand assurance
14 process.  The idea is to ensure that the -- the
15 depiction of our brand in the product is
16 appropriate.
17     Q  Okay.  And -- that WWE licensed
18 content includes talent models.  Is that -- that
19 was your phrase, right?
20     A  Among other things, correct.
21     Q  Okay.  When you say "talent model" -- when
22 you say "talent models," what are you referring
23 to?
24     A  The wrestlers within the game that are --
25 appear on our TV programming are depicted within

**43**

1 the video game as well, the video game product.
2     Q  Okay.  And one of those talent models, of
3 course, would be the video game depiction of
4 Randy Orton, is that right?
5     A  That's correct, among the other 200
6 superstars in the game.
7     Q  Right.  So is it accurate to say that when
8 the video games were developed, given this
9 approval requirement, it -- it was WWE that really
10 decided whether the games could be marketed by
11 Take-Two or not given its ability to approve WWE
12 licensed content?
13     MR. KRASIK:  Objection.  Lack of
14 foundation.  Calls for a legal conclusion.
15     A  WWE approved the elements that go into the
16 game as well as the marketing elements that --
17 that Take-Two uses prior to release of the game.
18     Q  (By Mr. Friedman)  Okay.  So would
19 Take-Two have released the video games without the
20 WWE's approval?
21     MR. KRASIK:  Objection.  Calls for a legal
22 conclusion.
23     You can answer.
24     A  A Take -- Take-Two could not have released
25 the game without WWE approving certain elements

**44**

1 within the game.
2     Q  (By Mr. Friedman)  Okay.  Including the
3 depiction of Randy Orton, correct?
4     A  That's correct.  The model -- a number of
5 other things that get approved into the product.
6     Q  Including the talent models, right?
7     A  Yes.  Like I was saying before, talent
8 models, music, arenas, you know, graphics within,
9 you know, venue systems.  It's all -- you know,
10 any- -- anything that touches a WWE brand is an
11 element that -- that we would approve.
12     Q  Okay.  Thank you.
13     Okay.  Now, does there exist a formal
14 approval process within the WWE to approve WWE
15 licensed content with respect to the WWE 2K Games?
16     A  Yes.
17     Q  Okay.  And I recall that there were a
18 number of documents produced by the WWE entitled
19 "Product Submissions."
20     Are you familiar with those types of
21 documents?
22     A  I am.
23     Q  Okay.  And we can look at those a little
24 bit down the road, but I want to speak more
25 broadly about the approval process at WWE during

Transcript of Edward M. Kiang
Conducted on August 4, 2020

45

1  the development of the -- of the video games,
2  okay?
3       What -- let's -- let's refer specifically
4  to talent models.  I don't -- I don't want to be
5  too broad or too narrow here.  So -- well, let me
6  start off like this.  So strike that previous
7  statement.
8       What is the WWE looking for when it is
9  reviewing potential -- the potential use of WWE
10 intellectual property in the video games?
11 **A So within the context of video games**
12 **and -- and, you know, our portfolio of the games,**
13 **we are looking to ensure that -- that, you know,**
14 **the depiction of the overall IP is -- is -- is**
15 **accurate and properly representative of the brand.**
16 Q  What do you mean by "accurate?"
17 **A That it would be consistent with how we**
18 **produce our programming.  So, for example, you**
19 **know, marketing assets that -- that might get**
20 **created the way they're posed, the way that -- you**
21 **know, in -- in the same way that our TV group may**
22 **produce a -- a -- a poster for our pay per view,**
23 **we would ensure the marketing elements within the**
24 **game are consistent with how we brand our product,**
25 **our -- our -- our core product.**

46

1       Q  And when you refer to core products, does
2  that include what I will call the wrestlers,
3  right?  Or the -- the WWE talent?
4  **A I -- I -- I -- I -- I don't know that I**
5  **would call them products.  I -- I -- I was**
6  **referring to our TV shows and our pay per views.**
7  **So Raw, SmackDown, and then, you know,**
8  **WrestleMania, SummerSlam.**
9  ==Q  Okay.  Now, with respect to these video==
10 ==games, the WWE 2K video games, there was an==
11 ==approval process in place at WWE, right?==
12 ==**A That's correct.**==
13 ==Q  Okay.  And within that approval process,==
14 ==some of the elements that were -- that were==
15 ==reviewed and eventually approved by the WWE==
16 ==included character models, isn't that right?==
17 ==**A That is correct.**==
18 ==Q  Including character models of Randy Orton,==
19 ==right?==
20 ==**A That is correct.**==
21 Q  Okay.  When the WWE reviewed character
22 models -- strike that.
23      Who provided character models for the WWE
24 for review?
25 **A There's a variety of people depending on**

47

1  **the asset type and the content that they find.**
2  **It -- in general, the process goes -- you know, if**
3  **2K would submit an asset, it would get sent to a**
4  **cross-functional team of subject matter experts,**
5  **some of whom know particular talent, some of**
6  **whom -- you know, including our legal**
7  **department -- could weigh in on any legal issues,**
8  **our copyrighting team, our brand team, as well as**
9  **our video game team.**
10 Q  Okay.  And then I take it there's some
11 back and forth between 2K and WWE about the asset
12 under review, is that right?
13 **A So typically in that process, there will**
14 **be some internal review first, and then a -- a**
15 **collective pull together of comments will go back**
16 **to Take-Two.**
17 Q  Okay.  So with respect to character
18 models, or what you referred to as talent models,
19 what is it that the WWE is looking for when
20 reviewing a -- a -- a talent model?
21 **A Typically what we're looking for is that**
22 **it's an accurate representation of how that talent**
23 **would appear in programming.  So, you know, does**
24 **the body shape look right?  Is the haircut the**
25 **current haircut?  Is he wearing the proper gear**

48

1  **for what his current gear is?  When he's posed, is**
2  **he doing a pose the way he would appear in the**
3  **ring?  Some- -- something that's consistent**
4  **with -- with, you know, maintaining the -- the --**
5  **the -- the persona and likeness of -- of that**
6  **particular talent model.**
7       Q  Okay.  Were -- was -- was the WWE looking
8  for accuracy in its talent models?
9  **A It depends on what you define as accuracy.**
10 **I mean, yes, we have -- we have different ways**
11 **of -- of evaluating that.  I think, you know, with**
12 **some of the other games in our portfolio, you'll**
13 **find that we have different grade of direction in**
14 **our artistic styles.  So it's a matter of, you**
15 **know, again, maintaining the -- the fact that**
16 **our -- our brand is being properly depicted within**
17 **the art style of that particular game --**
18 Q  All right.  Let's --
19 **A In certain instances, accuracy -- you**
20 **know, it -- it -- it depends, right?  Sometimes we**
21 **have certain talents who complain that they**
22 **have -- you know, their love handles are too big.**
23 **So sometimes we -- we move away from accuracy**
24 **to -- to -- to give that heroic look that they**
25 **want to look like that we end up doing on our**

Transcript of Edward M. Kiang
Conducted on August 4, 2020

13 (49 to 52)

**49**

1  pay-per-view posters. But, again, trying to keep
2  it consistent with the overall theme of -- of how
3  we present our brand in our core products.
4      Q. Okay. Thank you.
5      Let's just -- let's just talk about the
6  WWE 2 cames -- 2K Games, okay, and the WWE
7  approval process. So in conducting the approval
8  processes for IP elements in the WWE 2K Games, was
9  the WWE looking for realism?
10     A. I don't know that -- so realism isn't
11  really a criteria for us. It's -- it is -- you
12  know, again, we -- we just try to ensure that
13  it -- it looks consistent with how we represent
14  the talent in our shows.
15     Q. And when you say "shows" --
16     A. Realism is more of a function of, you
17  know, how good the technology is for any
18  particular year.
19     Q. Sure. Sure. But when you say "how your
20  talent looks in the shows," are you referring to
21  the television programming?
22     A. Correct, and pay per views.
23     Q. Okay. So is one of the goals that WWE is
24  trying to achieve in its approval process
25  attempting to achieve an accurate representation

**50**

1  in comparison with the television programming? Is
2  that right?
3      MR. KRASIK: Objection. Misstates his
4  testimony.
5      MR. SIMMONS: Objection. Mischaracterizes
6  the witness's testimony.
7      A. With respect to these games, I think one
8  of the goals is -- is to try to, again, give --
9  give the fans an authentic WWE experience that
10  represents what they're familiar with seeing in
11  our TV programming.
12     Q. (By Mr. Friedman) Okay. So -- so --
13     A. Ultimately, it still needs to be fun,
14  though. I mean, it's -- it's a game. You know,
15  we're -- we're -- we're not trying to create or
16  you're not making a TV show. You're playing a
17  game.
18     Q. Sure. So it -- it's accurate to say,
19  though, that the WWE wanted the -- the video game
20  characters to look like they looked on television,
21  isn't that right?
22     A. Yeah. I mean, at -- at the end of the
23  day, I think, you know, 2- -- 2K will submit a --
24  at least -- again, with respect to these games,
25  2- -- 2K will submit models looking like what they

**51**

1  want them to look like and -- and, you know, based
2  off of the art style and direction they're going
3  for, we try to look for, you know, whether or not
4  there are any inaccuracies with respect to how
5  they portray the talent. But -- but, you know,
6  I -- I wouldn't say that -- WWE does not art
7  direct 2K. 2K decides what product they want to
8  produce, how it should look, and we provide them
9  guidance if we feel like it's incorrect in some
10  manner.
11     Q. Okay. And I think you touched upon this
12  before, but does that approval process for talent
13  models include reviewing the character's body
14  type?
15     A. That's correct. It could be -- it can be
16  inclusive of that.
17     Q. Okay. So -- so is it -- so the WWE was
18  looking to make sure that its talent models'
19  bodies look like they look on television, is that
20  right?
21     A. Yeah. So that they look the way that we
22  would want them portrayed in our programming --
23     Q. Okay.
24     A. -- and in our other marketing collaterals.
25     Q. So -- all right. If, for instance,

**52**

1  Take-Two had presented to WWE a talent model with
2  a body type that was much different than how that
3  talent model appeared on television, what would
4  WWE do?
5      MR. KRASIK: Objection. Form.
6      Go ahead and answer if you can.
7      A. We -- we would probably have some
8  questions with the team. You know, again, it
9  depends -- if we're talking specifically for this
10  product, we would tell them that it probably
11  looked inaccurate and would want to understand
12  their rationale for why they do that.
13     There could be instances where, you know,
14  and -- and for certain games, there are story
15  modes where maybe it goes in a different
16  direction. You know, for example, I don't believe
17  it was in one of the games in this round, but
18  it -- in one of our more recent games, the story
19  line went into the future and someone had a bionic
20  arm.
21     You know, so that -- that's a conversation
22  of understanding, okay, well, this is not past
23  brand assurance, but in the context of the story
24  you're trying to create, we'll allow this.
25     Q. (By Mr. Friedman) Okay. I think you used

Transcript of Edward M. Kiang
Conducted on August 4, 2020

53

1  the phrase "accurate representation" earlier.  So
2  let's try and understand what -- what would WWE do
3  in the event that it received from Take-Two or 2K
4  a talent model product that was under review that
5  was not an accurate representation in WWE's view?
6      MR. KRASIK:  Objection.  Mischaracterizes
7  prior testimony.  It involves a hypothetical to a
8  fact witness.
9      A  If we received a submission that looked
10 inaccurate, we would -- again, assuming that we
11 noticed it, we would flag it for comment and --
12 and -- and have to make an adjustment.
13     Q  (By Mr. Friedman)  Okay.  Would WWE
14 approve a submission for the video games that was
15 not in WWE's view an accurate representation?
16     MR. KRASIK:  Objection.  Calls for
17 speculation.
18     A  Again, without knowing if there were
19 particular context or why they might make that
20 change, it's hard to say.
21     Q  (By Mr. Friedman)  Okay.  All right.  Are
22 you familiar with Andre the Giant?
23     A  I am.
24     Q  Okay.  And Andre the Giant is a very tall
25 man, right?

54

1      A  That's correct.
2      Q  Do you know how tall he was?
3      A  I -- I do not.
4      MR. KRASIK:  That's a closely guarded
5  secret.
6      Q  (By Mr. Friedman)  Now, An- -- Andre the
7  Giant has been a featured wrestler in the WWE 2K
8  Games, is that right?
9      A  He has been featured in the game, yes.
10     Q  Okay.  As one of the main WWE wrestlers
11 in -- in the roster of the video games, right?
12     A  That is correct.
13     Q  Let's use a specific example.  If Take-Two
14 had submitted a talent model of Andre the Giant
15 that appeared to be about 4 feet tall, what would
16 the WWE --
17     MR. SIMMONS:  Objection.  Incomplete
18 hypothetical.
19     A  Yeah.  We would flag it saying that does
20 not look like an accurate -- you know, or An- --
21 Andre the giant looks too small.
22     Q  (By Mr. Friedman)  Okay.
23     A  Understand why you would try to do that.
24     Q  And let's assume that the WWE would not
25 consider a 4-foot tall Andre the Giant to be an

55

1  accurate representation of the WWE intellectual
2  property.  Is that fair to assume?
3      A  Yes.  Without context, we would -- we
4  would probably reject that.
5      Q  Okay.  All right.  That -- that was going
6  to be my next question.
7      So but the WWE obviously has the right to
8  not approve or reject content that it finds in its
9  opinion is not an accurate representation, is that
10 right?
11     A  If we feel that it does not properly
12 reflect the brand.
13     Q  Okay.  And in those instances, WWE has the
14 decision to make whether to approve or not approve
15 a particular talent model or other submission,
16 right?
17     A  That is correct.
18     Q  Why is it that the WWE might withhold
19 approval from something that is not an accurate
20 representation of WWE intellectual property?
21     A  Well, it -- we feel like it wouldn't
22 depict the brand in -- in the proper light in
23 terms of, you know, providing a -- a, you know,
24 WWE experience to our fans.
25     Q  All right.  You mentioned not depicting

56

1  the brand.  What -- and let's -- I -- I'm -- I'm
2  thinking of specifically the talent models here,
3  right?  So what is the WWE's interest in
4  protecting the likeness of the talent models that
5  are used in the video games?
6      MR. KRASIK:  Objection.  The first part of
7  your question mischaracterized his testimony.
8      But you can answer.
9      A  Well, we -- we look at the talent that --
10 and -- and the IP that they bring to the company
11 as part of our -- our, you know, portfolio within
12 WWE and -- and then, you know, collectively,
13 the -- the talent and the story lines and the
14 spectacle and -- and the set design are -- are
15 all together comprise the WWE brand experience.
16     Q  (By Mr. Friedman)  Okay.  And to protect
17 that WWE brand, I mean, there's some connection, I
18 expect, to video game sales, right?
19     MR. KRASIK:  Objection to form.  Lack of
20 foundation.
21     A  Sorry.  Could you -- could you rephrase
22 that?
23     Q  (By Mr. Friedman)  Yeah.  What's the -- is
24 there a connection to sales of the video games
25 in -- in WWE's protection of its intellectual

57

1 property? What's the point? What's the point of
2 protecting WWE's intellectual property in the
3 video games?
4    A Well, it -- it -- you know, we look at
5 video games as an extension of the brand. It --
6 it's part of the -- the brand experience to our
7 fans. And we think it's important that when --
8 when someone buys a WWE product that -- that they
9 feel like it's -- it's -- it's an officially
10 licensed product that has a -- you know, meets a
11 certain quality bar for -- for the overall game
12 play experience.
13    Part of that could be inclusive of -- of
14 proper representation of the brand as well as
15 just, you know, a -- a, you know, fun game
16 experience. You know, I -- I -- I think above and
17 beyond just the -- the sales of our games is that,
18 you know, it's -- it's a -- you know -- you know,
19 we -- we find that video games are a good way to
20 interact and engage with fans, you know, outside
21 of the -- the -- the weekly tentpole programming
22 that we have on TV.
23    Q Okay. Do fans of the video games expect
24 accurate representations of the WWE talent models?
25    MR. KRASIK: Objection. Calls for

58

1 speculation.
2    A I -- you know, I -- I -- I can't be
3 certain with respect to all audiences. You know,
4 I think that -- and certainly within, as I've
5 noted before, you know, we do have different games
6 that have different art styles. But with respect
7 to these games, I -- I think that, yeah, there's
8 a -- there's an expectation that -- that the
9 models look similar to what they're used to seeing
10 on TV.
11    Q (By Mr. Friedman) All right. And as far
12 as this accurate representation goes, in
13 connection with WWE's approval process, part of
14 what WWE is looking at -- or does that include
15 tattoos on its talent models?
16    MR. KRASIK: Objection to form.
17 Mischaracterized his prior testimony.
18    A We don't really look at tattoos
19 specifically as part of the review process. You
20 know, they -- they will submit a model. We'll
21 look to see whether or not the model looks
22 accurate and provide them feedback on said model.
23 But the tattoo, I guess, would be inclusive of the
24 model submission.
25    Q (By Mr. Friedman) So in that sense, is --

59

1 does the WWE review the tattoos on its -- on the
2 talent models that are su- -- that are submitted
3 to it by Take-Two?
4    A In -- in -- as noted before, we're --
5 we're not looking specifically at tattoos. If we
6 see that the model looks different than, say,
7 reference photos that we have, we -- we'd note
8 something's different.
9    Q Okay. Are you familiar with the wrestler
10 Brock Lesnar?
11    A I am.
12    Q And Brock Lesnar has a tattoo on his chest
13 and stomach, doesn't he?
14    A I -- I believe so. Yes.
15    Q Okay. Do you know what that tattoo is?
16    A I --
17    MR. KRASIK: Objection. Outside the scope
18 of the notice.
19    But you can answer.
20    A I -- I think it's the sword one, unless
21 that one's his back. I can't remember off the top
22 of my head.
23    Q (By Mr. Friedman) Yeah. I think he's got
24 a big sword or a knife tattooed on his chest and
25 stomach, okay? I'd say that's a pretty striking

60

1 characteristic of Brock Lesnar. Would you agree?
2    MR. KRASIK: Objection to form.
3    A Sure.
4    Q (By Mr. Friedman) It's almost a -- a --
5 sort of a -- a -- a defining feature of Brock
6 Lesnar. Would you agree with that?
7    MR. KRASIK: Objection to form.
8    A I mean it's -- it's something that some
9 folks might recognize.
10    Q (By Mr. Friedman) Okay. Some folks like
11 WWE fans might recognize the tattoo on Brock
12 Lesnar, right?
13    MR. KRASIK: Objection. Calls for
14 speculation.
15    You can answer.
16    A Potentially, yes.
17    Q (By Mr. Friedman) Okay. Let's say that
18 WWE was reviewing a talent model of Brock Lesnar.
19 I think I'm saying his name right. I'll start
20 over.
21    If WWE were reviewing a talent model of
22 Brock Lesnar and his signature knife tattoo was
23 absent, do you think WWE would approve that model?
24    MR. KRASIK: Objection. Calls for
25 speculation and outside the scope of the 30(b)(6).

Transcript of Edward M. Kiang
Conducted on August 4, 2020

16 (61 to 64)

---

61

1     You can answer.
2     MR. SIMMONS: Objection. Incomplete
3  hypothetical.
4     **A  If we were to see a model that was missing**
5  **the knife tattoo and, presumably, our -- our**
6  **reviewers would note if it -- a disconnect with**
7  **his reference photos and would flag that.**
8     Q  (By Mr. Friedman) Okay. Would WWE
9  approve something like that?
10    MR. KRASIK: Objection. Calls for
11 speculation. Outside the scope of the 30(b)(6).
12    You can answer.
13    **A  As mentioned before, it really just**
14 **depends on the context. You know, there -- there**
15 **may be certain instances where there is a -- a --**
16 **a story line where we're going, you know, back**
17 **into historicals and, you know, before he had**
18 **certain tattoos, or it is a story line for the**
19 **future where he's saying he covered his tattoos**
20 **with something new. It -- it really just depends**
21 **on the context.**
22    Q  (By Mr. Friedman) Sure.
23    **A  But we would certainly flag it to -- to**
24 **your point.**
25    Q  Okay. Do the video games that we've been

---

62

1  talking about, the WWE 2K Games, do those include
2  any futuristic or historical scenarios?
3     **A  The -- some games in the 2K franchise do.**
4  **I -- I -- I'd have to go back and look at 2K16,**
5  **17, and 18 specifically. I believe there is a --**
6  **by career that it's -- it has certain hypothetical**
7  **situations. I do not know if the showcase modes**
8  **had an -- future scenarios or not.**
9     Q  Okay. All right. But --
10    MR. KRASIK: Tony, whenever you're done
11 with the line of questioning, I could use a
12 restroom break.
13    MR. FRIEDMAN: Oh, if it's a restroom
14 break, let's just take it right now.
15    How about that?
16    MR. KRASIK: Sounds good.
17    MR. FRIEDMAN: Okay. See you in five or
18 ten, okay?
19    MR. KRASIK: We'll keep the screen going.
20 We're stepping out.
21    COURT REPORTER: Kevin?
22    VIDEOGRAPHER: Yeah. I'm -- I'm here.
23 The time is 10:15 a.m., and we are off the record.
24    (A recess was taken.)
25    VIDEOGRAPHER: The time on the video

---

63

1  monitor is 10:30 a.m., and we are back on the
2  record.
3     Q  (By Mr. Friedman) Welcome back -- back,
4  Mr. Kiang. When we left for the break, we were
5  talking about Brock Lesnar, and we were talking
6  about the WWE approval process for talent models
7  and other WWE intellectual property all in
8  connection with the -- the WWE 2K Games, okay?
9     And my -- my question to you has to do
10 with what would happen if WWE was reviewing a
11 submission of Brock Lesnar's talent model that
12 didn't include his knife tattoo? What do you
13 think WWE would do during that scenario?
14    MR. KRASIK: Objection. Calls for
15 speculation. Outside of the scope of the 30(b)(6)
16 notice.
17    **A  We would reject the submission and ask for**
18 **some context on why they've made that change, see**
19 **if it's fitting to our brand guidelines.**
20    COURT REPORTER: I'm sorry. Could you
21 repeat your answer and louder please? You were
22 cutting out.
23    THE WITNESS: Sorry.
24    **A  We -- we would reject the submission and**
25 **request additional context to see if there's a**

---

64

1  **rationale for why we -- why we might approve it as**
2  **it's, you know, to adhere to our brand guidelines.**
3     Q  (By Mr. Friedman) What if the talent
4  model of Brock Lesnar, rather than being devoid of
5  a tattoo, had had a different tattoo? What --
6  what would WWE have done?
7     MR. KRASIK: Objection. Calls for
8  speculation. Outside the scope of the 30(b)(6)
9  notice.
10    MR. SIMMONS: Objection. Incomplete
11 hypothetical.
12    **A  It would be the same response. We -- we**
13 **would reject it and ask for rationale why so that**
14 **we could further evaluate.**
15    Q  (By Mr. Friedman) Okay. And would WWE
16 have rejected a Brock Lesnar submission if the
17 tattoo was just blurred out?
18    MR. KRASIK: Objection. Calls for
19 speculation. Outside the scope of the 30(b)(6)
20 notice.
21    **A  Correct. We -- it's -- again, same**
22 **answer. We would reject it and ask for a -- a**
23 **reason why.**
24    Q  (By Mr. Friedman) Okay. All right. Now,
25 this case is -- is obviously not about Brock

---

Transcript of Edward M. Kiang
Conducted on August 4, 2020

**65**

1  Lesnar or Brock Lesnar's tattoos. We're here with
2  respect to the tattoos that are on Mr. Orton or
3  certain tattoos that are on Mr. Orton.
4      So did WWE go through an approval process
5  for a Randy Orton talent model that's contained in
6  the WWE 2K Games?
7      A You -- you muffled out. I believe you
8  said talent model?
9      Q Yes.
10     A Yes. They would have submitted a model,
11  and we would have reviewed it.
12     Q Okay. And just so I'm using the terms
13  correctly, when I say "talent model," does that
14  include the look of the Orton video game character
15  that's in the WWE 2K Games?
16     A That's correct.
17     Q And does that include the Orton character
18  as he is played by the user of the video games?
19     A That's correct.
20     Q Does that also include what the Orton
21  character might look like in menu screens or
22  videos and the like that are contained in the WWE
23  2K Games?
24     A That's correct, assuming that he's in
25  those particular elements.

**66**

1      Q Sure. I'm just trying to understand what
2  is a talent model. So is it fair to say that a
3  talent model of Randy Orton that might be reviewed
4  by the WWE i- -- includes, you know, the instances
5  in which the character Randy Orton would appear in
6  the WWE 2K Games?
7      A Correct. It's a -- it's a three
8  dimensional rendering of Randy Orton as he appears
9  in the game.
10     Q Okay. Thank you.
11     So I'm going to use the term "talent
12  model," now we know that we're on the same page
13  when we're talking about talent model, okay?
14     Now, you stated that the WWE went through
15  a review and approval process with respect to the
16  Orton talent model, is that right?
17     A That's correct.
18     Q And in connection with that review
19  process, did Take-Two submit a talent model for
20  WWE to review?
21     A Sorry. Can you say that one more time?
22     Q Within that review process, did Take-Two
23  submit a -- a Randy Orton talent model for WWE to
24  review?
25     A Yes.

**67**

1      Q Okay. And, eventually, WWE approved the
2  Randy Orton talent model, is that right?
3      A That's correct.
4      Q Because without the WWE's approval, the
5  Randy Orton talent model would not have appeared
6  in the marketed video games, isn't that right?
7      A That's correct.
8      Q Okay. If -- if Take-Two had submitted a
9  Randy Orton talent model that had -- that had no
10  tattoos on it, would the WWE have approved it?
11     MR. KRASIK: Objection. Calls for
12  speculation. Outside the scope of the 30(b)(6)
13  deposition notice.
14     You can answer.
15     A Similar to the Brock Lesnar response,
16  we -- we would've flagged it and asked for
17  rationale for why we should approve it within our
18  brand guidelines.
19     Q (By Mr. Friedman) Okay. Would the WWE
20  have rejected a Randy Orton talent model that
21  lacked any tattoos?
22     MR. KRASIK: Objection. Calls for
23  speculation.
24     A Again, it just depends on the context for
25  why it was being submitted into the game that way.

**68**

1  If there was historical context for an earlier
2  period in his life when he didn't have said
3  tattoos, it might've been approved.
4      Q (By Mr. Friedman) Looking at the way in
5  which the Orton character exists in the WWE 2K
6  Games, that Orton character contains tattoos,
7  isn't that right?
8      A That's correct.
9      Q So had that Orton talent model been
10  submitted to the WWE without any tattoos, would
11  WWE have approved it?
12     MR. KRASIK: Objection. Calls for
13  speculation, and now asked and answered.
14     You can answer it one more time.
15     A No, it would not have been approved for
16  the uses that are, you know, within the standard
17  play of the game.
18     Q (By Mr. Friedman) All right. Thank you.
19     Had the Orton talent model been submitted
20  with tattoos that were different from the tattoos
21  that Mr. Orton has in real life, would the WWE
22  have approved that talent model?
23     MR. KRASIK: Objection. Calls for
24  speculation.
25     A Again, without further context, we

Transcript of Edward M. Kiang
Conducted on August 4, 2020

69

1  would've flagged it for further comment and tried
2  to ascertain why they would've made that change.
3  Q  (By Mr. Friedman)  All right.  Given the
4  way in which the Orton character appears in the
5  WWE 2K Games, had that Orton character talent
6  model been submitted with tattoos that were
7  different from the tattoos Mr. Orton has in real
8  life, would the WWE have rejected that talent
9  model?
10  A  That's correct.
11    MR. KRASIK:  Objection.  Calls for
12  speculation.
13    You can answer.
14  A  That's correct.
15  Q  (By Mr. Friedman)  Had Take-Two submitted
16  a Randy Orton talent model in which his tattoos
17  were all blurred out, do you think WWE would've
18  approved that talent model?
19    MR. KRASIK:  Objection.  Calls for
20  speculation.
21  A  I -- we would not have approved it unless
22  we had a reason to approve it.
23  Q  (By Mr. Friedman)  Now, given those
24  scenarios that we just discussed, why is it that
25  the WWE would not have approved a Orton talent

70

1  model that lacked any tattoos?
2    MR. KRASIK:  Tony, you muffled on a word
3  in your question.  Would you mind restating it
4  please?
5    MR. FRIEDMAN:  Sure.
6  Q  (By Mr. Friedman)  Why is it that WWE
7  would not have approved an Orton talent model that
8  lacked any tattoos?
9  A  Because it would not have been an -- a
10  accurate depiction of Randy Orton the person.
11  Q  Why is it that the WWE would have rejected
12  a Randy Orton talent model that had tattoos that
13  were different from the tattoos that Randy Orton
14  has in real life?
15  A  Again, it -- it would not be an accurate
16  depiction of Randy Orton.
17  Q  Okay.  Thank you.
18    And similarly, why is it that the WWE
19  would have rejected a Randy Orton talent model in
20  which the character's tattoos were blurred out?
21  A  It would not have been an accurate
22  depiction of Randy Orton as he appears in our
23  program.
24  Q  Okay.  So was it important to the WWE that
25  the Randy Orton talent model be realistic?

71

1  A  Again, I think realistic is a little
2  subjective.  For us, it's -- it -- you know, we
3  want to maintain that there's a -- a level of
4  accuracy to the brand.  Inclusive of that could be
5  Randy Orton's tattoos on Randy Orton's body.
6  Q  Okay.  And that was an important
7  consideration for the WWE, is that right?
8  A  I wouldn't -- I wouldn't characterize it
9  as saying that his tattoos are an important
10  decision within our approval process, but it
11  would, you know, wholistically, it would be
12  something that would be noticed.
13  Q  Okay.  But the tattoos on Randy Orton were
14  important enough that without accurate
15  representation of the tattoos, the Orton talent
16  model would not have been approved, isn't that
17  right?
18  A  Presumably.  Again, it -- it's hard --
19  it's hard to speculate unless we know the
20  difference that we're talking about.  Some things
21  might go unnoticed depending on the resolution
22  and -- and type of change but --
23  Q  In order to approve the Randy Orton talent
24  model, does -- did the WWE need to make a
25  determination that his tattoos were an accurate

72

1  representation of his tattoos in real life?
2  A  Again, I -- I don't know that we would
3  look at it in so far as saying, you know, is
4  that -- is the -- the tattoo specifically
5  accurate.  I think it's a question of do we feel
6  like there's enough of an inaccuracy that we would
7  flag it whether it was the tattoo or some other
8  part of his body.
9  Q  Okay.  But the WWE at least wanted the
10  tattoos on the Orton talent model to be an
11  accurate representation.  Isn't that what you
12  said?
13    MR. KRASIK:  Objection.  Mischaracterizes
14  his prior testimony.
15  A  Yeah.  We're -- we -- I don't think that
16  we made any comment with respect to telling
17  Take-Two how to represent his tattoos.  You know,
18  for us, it's -- it's more a function of
19  wholistically looking at Randy Orton the person
20  and -- and whether or not we feel that the
21  character -- the 3D model that was created
22  wholistically is a good representation of him as
23  he appears in our show.
24  Q  (By Mr. Friedman)  Okay.  Including his
25  tattoos?

Transcript of Edward M. Kiang
Conducted on August 4, 2020

73

1    A  Including the tattoos.
2    Q  Do you believe that Take-Two succeeded in
3  creating an accurate representation of Randy
4  Orton?
5    A  I do.
6    Q  Are you familiar with the technical
7  process that Take-Two used in order to generate
8  the Randy Orton talent model?
9    A  I have a high-level understanding of how
10  it works.
11    Q  Tell me -- what is your understanding of
12  how that process occurred?
13    A  Well, with respect to the models
14  themselves, I believe that they have talent enter
15  a -- a scanning booth.  They take pictures --
16  three -- 360-degree pictures to create a map of --
17  of what the talent looks like.  And then they
18  apply that towards the -- the skeleton that they
19  create and also attach it to the motion captures
20  that -- that they do in terms of capturing
21  life-like movements.  They may also use reference
22  photos from stills.
23    Q  Were you involved in that process at all?
24    A  I personally was not, but my team was
25  involved with helping to schedule talent to be

74

1  made available for the scans.
2    Q  Okay.  All right.  Is it the case that in
3  order to create an accurate representation of
4  Mr. Orton's tattoos, those tattoos need to be
5  copied onto the Randy Orton talent model?
6    A  I'm not sure what you mean by "copied."
7  I -- I -- you know, so they -- they -- they take
8  reference photos, and they, I guess, apply that
9  towards the model.
10    Q  Okay.
11    A  I -- I'm not certain the technical way,
12  if -- if that then gets hand drawn, if that's
13  scanned with a computer or, you know, from -- from
14  that I couldn't tell you.  I -- I know that they
15  take scans and -- and then they submit models for
16  us to review.
17    Q  Okay.  Understood.  Thank you.
18    Mr. Kiang, do you think that WWE fans
19  recognize their favorite wrestlers?
20    MR. KRASIK:  Objection.  Calls for
21  speculation.  Outside the scope of the 30(b)(6)
22  notice.
23    A  I -- I -- I believe it's fair to say that
24  fans would recognize who their favorite talents
25  are.

75

1    Q  (By Mr. Friedman)  Okay.  And are fans of
2  the WWE one of the target audiences for the WWE 2K
3  Games?
4    A  That's correct.
5    Q  And do WWE fans know their favorite
6  wrestler's personalities?
7    MR. KRASIK:  Objection.  Calls for
8  speculation.  Outside the scope of the 30(b)(6)
9  notice.
10    A  What do you mean by "personalities?"
11    Q  (By Mr. Friedman)  Their -- their -- I
12  guess you'd call it personas, right?  Their
13  in-ring personas.
14    A  So are -- so are you asking if they're
15  familiar with who they portray in the show or are
16  you asking if -- if --
17    Q  Yeah.
18    A  -- they're familiar with those are
19  personas and not --
20    Q  I can rephrase that.
21    Do you think that -- WWE fans know and
22  understand, you know, who their favorite WWE
23  wrestlers are, right?
24    A  Yes.
25    MR. KRASIK:  Objection.  Calls for

76

1  speculation.  Outside the scope of the 30(b)(6)
2  notice.
3    You've answered it.
4    Q  (By Mr. Friedman)  In addition, do you
5  think that WWE fans know what their favorite
6  wrestlers look like?
7    MR. KRASIK:  Objection.  Calls for
8  speculation.  Outside the scope of the 30(b)(6)
9  notice.
10    A  Yes.
11    Q  (By Mr. Friedman)  Okay.  And that would
12  include that the fans know, you know, what their
13  wrestlers' body types are, right?
14    MR. KRASIK:  Same objection.
15    A  Yeah.  I -- I -- I would -- I would say
16  depending on the degree of fandom, some -- some
17  will be more familiar than others.  But yes --
18    Q  (By Mr. Friedman)  Okay.
19    A  -- there would certainly be some that have
20  a very good knowledge.
21    Q  Okay.  Would you agree, too, then, that
22  WWE fans generally would know what their favorite
23  wrestler's tattoos look like?
24    MR. KRASIK:  Objection.  Calls for
25  speculation.  Outside the scope.

Transcript of Edward M. Kiang
Conducted on August 4, 2020

20 (77 to 80)

77

1      A  I -- I think, you know, some would
2  recognize more than others.
3      Q  (By Mr. Friedman)  Yeah.
4      MR. FRIEDMAN:  I'm hearing kind of a
5  strange noise coming in on the video feed.  It
6  kind of sounds a -- something's churning?
7      MR. KRASIK:  We don't hear it.
8      THE WITNESS:  We're not hearing anything.
9      MR. FRIEDMAN:  Not that I need to put that
10  on the record but --
11      MR. SIMMONS:  I'm on mute in my office if
12  it -- even though it doesn't show in -- in Zoom.
13  So I don't think it's me.
14      Melody, are you -- are you on -- off mute?
15      VIDEOGRAPHER:  I'm not hearing anything.
16      COURT REPORTER:  I don't have anything on
17  my end going --
18      MR. FRIEDMAN:  Okay.
19      COURT REPORTER -- unless it's air
20  conditioning but --
21      MR. FRIEDMAN:  It -- it might be.  It
22  seems to have -- it seems to have dissipated.
23  Sorry about that.
24      Q  (By Mr. Friedman)  All right.  All right.
25  Mr. Kiang, I'd like to talk a little bit about the

78

1  mechanics of the approval process that we've been
2  discussing, okay?  And we touched upon this a
3  little bit, but I'd like to get into it a little
4  bit more.
5      Let's take a look at another exhibit.  I
6  think we're on four now.  So I'm going to mark as
7  Exhibit 4 -- and, Curt, I think this is one that
8  you'll have with you.  It's a document entitled
9  product submission starting at WWE_Alexander 109.
10  Let me know if you have that, otherwise, we can
11  pull it up.
12      MR. KRASIK:  I'm sorry, Tony.  109?
13      MR. FRIEDMAN:  109.
14      MR. KRASIK:  Okay.  We have that.
15      MR. FRIEDMAN:  You do.  Okay.
16      MR. KRASIK:  Got it.
17      Q  (By Mr. Friedman)  Okay.  Mr. Kiang, I'm
18  going to mark as Exhibit Number 4 a document
19  bearing Bates numbers WWE_Alexander 109
20  through 110.  It's a two-page document.  At the
21  top it says "Product Submission."
22      Mr. Kiang, have you seen this document
23  before?
24      A  I have.
25      Q  Okay.  Is this one of the documents you

79

1  reviewed in preparation for this deposition?
2      A  That's correct.
3      Q  And in the course of your job
4  responsibility with WWE, do you review product
5  submission documents like this?
6      A  From time to time.  I don't review every
7  one of them.
8      Q  Do you know if you reviewed product
9  submission documents in connection with -- with
10  the WWE 2K Games?
11      A  From time to time, cor-- -- yes.
12      Q  All right.  The question is how -- how is
13  this document created?
14      A  The -- the contents of the document?
15      Q  Yes.  How was the document put together?
16  Where did it come from?
17      A  So we -- we have a submission website for
18  approval.  It's called WWE Source.  Take-Two,
19  whether it's, you know, the 2K team or the visual
20  concepts team, will submit assets into WWE Source.
21  And I think, as I had mentioned before, it then
22  gets circulated to a cross-functional team of --
23  of subject matter experts, depending on the type
24  of content that it is.
25      And there is a series of internal comments

80

1  that get recorded through the website.  One of the
2  reviewers will compile any feedback and send that
3  back as an external response back to the
4  appropriate team at Take-Two.  And then,
5  presumably, someone just printed this from the old
6  archives.
7      Q  From the what archives?  I'm sorry.
8      A  From -- from just the database.  For --
9  for these purposes, someone just printed out the
10  template.  But normally, it's accessed through the
11  website.
12      Q  Understood.  Thank you.
13      So it sounds like this WWE Source website
14  is a place where, you know, folks internal or
15  external to the WWE company can collaborate on
16  particular electronic files.  Is that fair to say?
17      MR. KRASIK:  Objection.  Form.
18  Mischaracterized his testimony.
19      You can answer.
20      A  That's correct.
21      Q  (By Mr. Friedman)  All right.  Let's take
22  a look at this one as an example, Exhibit 4.  I
23  see a submission number up at the top left.
24  "Licensee name.  Take-Two Interactive Software,
25  Incorporated."  That's the defendant in this case,

Transcript of Edward M. Kiang
Conducted on August 4, 2020

---

81

1  correct?  Right?
2  **A  That's correct.**
3  Q  All right.  Is that -- is that indicative
4  of who submitted a particular piece of content to
5  the WWE Source website?
6  **A  The licensee name?**
7  Q  Yes.
8  **A  It would've been that company.  The -- the**
9  **contact would've been Dino.**
10  Q  Okay.  So is it -- yeah.  Well, let me ask
11  it this way.  With respect to this product
12  submission, what piece of product content is --
13  is -- is -- is discussed in this product
14  submission document?
15  **A  The Randy Orton model for Xbox One and**
16  **PlayStation 4.**
17  Q  And where are you getting that from?
18  **A  In the attached files on the bottom of**
19  **page 109.**
20  Q  Okay.  All right.  I see down there it
21  says "CG Randy Orton."
22    What does -- what does that mean?
23  **A  The -- the -- the computer -- you know,**
24  **computer graphics.  It's what we refer to as it's**
25  **a -- it's a rendered model.**

---

82

1  Q  Okay.  Is that the same as the talent
2  model that we've been talking about?
3  **A  Correct.**
4  Q  And then the second line in that "attached
5  files" box says, I mean, "WWE16 XB1_PS4, what --
6  what does all that refer to?  Could you decipher
7  all that for me?
8  **A  A- -- a- -- a- -- again, they -- so these**
9  **would've been assets for approval for the Randy**
10  **Orton model.  So in particular for the WWE 2K16**
11  **game in use for the Xbox One and PS4 consoles as**
12  **opposed to Xbox 360 or PS3.**
13  Q  And there'd be different talent models for
14  each platform, is that right?
15  **A  That's correct.**
16  Q  Okay.  And a separate approval process for
17  each talent model, is that right?
18  **A  Same process, different submission.**
19  Q  Different submission.  Okay.  Thank you.
20    Okay.  Now, going back up to the top, the
21  contact name underneath Take-Two is Dino Zucconi.
22    Do you see that?
23  **A  Yes.**
24  Q  Okay.  I may be mispronouncing that, but
25  who is Dino Zucconi?

---

83

1  **A  Dino works on the -- I believe the Visual**
2  **Concepts side.**
3  Q  Not a WWE employee, right?
4  **A  That's correct.**
5  Q  All right.  Down a little bit further, it
6  says "created by Dino Zucconi."
7    What does that mean?
8  **A  It means that he was the one who created**
9  **the ticket.**
10  Q  Does that --
11  **A  He submitted the creation within the**
12  **system.**
13  Q  Okay.  Within the WWE Source website
14  system, right?
15  **A  Correct.**
16  Q  Does that indicate -- or is there an
17  indication on this Exhibit 4 who created the
18  talent model for Randy Orton that's under
19  submission?
20  **A  Do you mean a person?**
21  Q  A person or a -- sure.  Yes.
22  **A  Take -- Take-Two would've created the**
23  **model for the submission.  I -- I don't know who**
24  **at Take-Two would've necessarily created it.**
25  Q  Okay.  You don't --

---

84

1  **A  -- source.**
2    COURT REPORTER:  I'm sorry.  The last
3  part?
4  **A  I -- I -- I was just saying that that**
5  **information is not tracked in WWE Source.**
6  Q  (By Mr. Friedman)  Thank you.
7    All right.  Let's flip to page 2 of
8  Exhibit 4.  What -- what is this -- what does this
9  table represent here on page 2?
10  **A  So this is a history of the comments**
11  **provided by our reviewers --**
12  Q  Okay.
13  **A  -- starting with number one, then up to**
14  **number be seven.**
15  Q  Okay.  So it goes in reverse chronological
16  order it looks like.  So looking at the one that's
17  labeled number one is the entry at the bottom of
18  the table.  And it says "By: Ashley Zuzik."
19    All right.  It -- who is Ashley Zuzik?
20  **A  Ashley's a member of our brand assurance**
21  **team.  The tickets will go to her first, and then**
22  **she'll forward it to the appropriate team members**
23  **in the review process.**
24  Q  Okay.  And the indication on this table is
25  it says "Type: Internal."

---

85

1   What does that mean?
2   **A That means that only WWE can see these**
3   **notes, that our licensee cannot.**
4   Q Okay.
5   **A Internal comments.**
6   Q Right. And is that also an indication
7   that the person whose created the note here is a
8   WWE employee?
9   **A Correct.**
10   Q Thank you.
11   I note everyone -- well, I note that not
12   everyone on this table is a WWE employee. It
13   appears that way to me. Is that correct?
14   **A In -- in this -- in this table, everyone**
15   **here is a WW- -- or -- or at the time was a WWE**
16   **employee.**
17   Q Okay. Let's -- let me look -- take a --
18   **A I was --**
19   Q Go ahead please.
20   **A I -- I was going to say in -- in some**
21   **instances, but not this one, we will send an**
22   **external comment and then we'll receive an in- --**
23   **an external comment back. In this case, this is**
24   **us sending notes out, but we did not appear to**
25   **have received a response.**

86

1   Q Okay. Thank you.
2   In entry number 6 and 7, at the top of
3   this page, it says "Type: External."
4   What -- what does that mean?
5   **A That -- that means that the response was**
6   **sent back to Take-Two.**
7   Q I see. Okay. That is not an
8   indication --
9   **A I -- that's unusual.**
10   COURT REPORTER: Excuse me. We need to be
11   careful about speaking on top of each other.
12   Mr. Friedman, could you repeat your
13   question please?
14   Q (By Mr. Friedman) Well, I was going to
15   say I apologize, Mr. Kiang, for speaking over you.
16   You said something was unusual. What -- what was
17   that?
18   **A I -- I was saying it's unusual for us to**
19   **have to -- to -- to send the approval twice.**
20   **Normally, once it's been approved, it's done.**
21   **I -- I don't -- this looks like it was some sort**
22   **of mistake, that it didn't publish correctly.**
23   Q Okay. All right. So let me see -- just
24   make sure I understand this. In -- let's just
25   look at entry number 6 here. It -- it looks like

87

1   "By: Diane Udin."
2   Diane is a WWE employee or was?
3   **A Correct. She no longer works at WWE, but**
4   **she used to.**
5   Q Okay. And the external comment here means
6   that her comment was forwarded outside of the --
7   of -- outside of the WWE company, is that correct?
8   **A Correct. Correct.**
9   Q Thank you. Just briefly, and I -- I --
10   I'm not asking or seeking any answers from you
11   that might implicate attorney/client privilege or
12   any communications you've had with any attorneys,
13   whether internal or external.
14   But entry number five here, there's a
15   redaction on the comments. And your attorneys
16   provided a privilege log and stated that that was
17   privileged communication. That's fine.
18   My question is this Laura Middlen, is she
19   an attorney at WWE?
20   **A That's correct.**
21   Q Okay. And do you know her -- her title?
22   MR. KRASIK: I think it's Lauren.
23   **A It's Lauren. Lauren.**
24   Q (By Mr. Friedman) Lauren. Okay.
25   And what is her title?

88

1   **A I believe she's senior vice president of**
2   **legal and business affairs.**
3   Q Okay. And is it the case that the legal
4   department regularly is involved in WWE Source
5   communications approving submissions?
6   **A That's correct. They are -- they are part**
7   **of the review process.**
8   Q Okay. All right. Thank you.
9   And so similarly, the indication that the
10   communication by Ms. Middlen was internal, does
11   that indicate that her redacted comments were only
12   shared within WWE?
13   **A That's correct.**
14   Q Her comments didn't go outside of WWE
15   as -- as shown here?
16   **A Correct.**
17   Q Okay. All right. Thank you, Mr. Kiang.
18   You can put Exhibit 4 down. I'd like to get
19   another one of these product submission pages.
20   And if we could take a look at WWE 207, we'll mark
21   that as Exhibit 5.
22   **A I have it in front of me.**
23   Q Okay. Thank you.
24   Okay. Have -- have you -- have you seen
25   this document before?

Transcript of Edward M. Kiang
Conducted on August 4, 2020

89

1    A  I have reviewed it in preparation for
2  today.
3    Q  Okay.  And I'll note for the record this
4  is Exhibit 5 WWE_Alexander 207 through 214.
5      Okay.  So on the first page of Exhibit 5,
6  there's a heading that says "IP" and then a whole
7  lot of names are listed there.
8      What -- what is -- what is this in
9  reference to?
10   A  On the first page?
11   Q  The first page.
12   A  Oh.  Sorry.  Yeah.  Okay.
13   Q  All right.  There's a category labeled
14  "IP" and then a whole lot of names.
15     What -- what is all this in reference to?
16   A  They were submitting a variety of assets
17  that included three -- the various IPs that you
18  see listed here.
19   Q  Okay.  So this particular product
20  submission ac- -- actually includes many more
21  assets for talent models than just one, is that
22  right?
23   A  That's correct.
24   Q  All right.  On the second page of
25  Exhibit 5, we've got a number of attached files

90

1  similar to -- similar to what we saw in Exhibit 4.
2      But what -- what -- what are the
3  references here in these attached files?  "WWE16
4  Renders," what does that mean?
5    A  Again, these are in reference to the 3D
6  models.
7    Q  Okay.  Of the talent?
8    A  Of the talent.
9    Q  Okay.  That's listed under the IP
10  category, right?
11   A  Correct.
12   Q  Is there -- what -- what -- what's the
13  significance of the other two attached files?
14  Renders_1, RESUB, Renders RESUB_3, what is all
15  that?
16   A  So within Source, as we get feedback, they
17  can make adjustments based off the feedback and
18  resubmit them as new files.  That will get -- in
19  order to kind of keep track of all the feedback
20  for all the submissions, it gets reattached to the
21  same submission file, but gets an new
22  submission -- gets an -- an -- an -- an updated
23  number so that we can tell the version --
24   Q  And we can --
25   A  -- and how it -- how -- the last round of

91

1  feedback.
2      COURT REPORTER:  I'm sorry.
3    Q  Thank you.
4      COURT REPORTER:  The last part of the
5  answer was cut out.  You were talking on top of
6  each other.
7    A  I -- I -- I was just stating that --
8      MR. KRASIK:  How it was related --
9    A  -- that --
10     MR. KRASIK:  I believe he said and how it
11  related to the last round of feedback.
12     THE WITNESS:  That's correct.
13     COURT REPORTER:  Thank you.
14   Q  (By Mr. Friedman)  That's what I heard,
15  too.  Thank you.
16     All right.  And I note -- I -- I see that
17  there are different upload dates for the different
18  attached files.  So is it the case that WWE can go
19  back through its WWE Source website and track not
20  only the comments that are provided, but the
21  changes that were made and can look at a -- a time
22  line of -- of the iterative process of creating
23  talent models that are eventually approved.
24     Is that -- is that what's happening here?
25   A  That's correct.

92

1    Q  All right.  Thank you.
2      So I want to look just -- if you could
3  flip over to WWE 209, this gets into some of the
4  comments that are made.  There's a -- one marked
5  number five by Dino Zucconi.  I just want to go
6  through some of these.  There's -- stated here it
7  says under- -- I don't know if you're following
8  along.  "Undertaker - Hat is too big.  Looks small
9  overall."
10     Do you see that?
11   A  I do.
12   Q  What -- what -- what -- what is being
13  represented here by Dino Zucconi?
14     MR. KRASIK:  Objection.  Calls for
15  speculation.
16     But you can answer.
17   A  So what would've happened is that in one
18  of the earlier rounds, we would've made a comment
19  that Undertaker's hat is too big and then he looks
20  too small overall, and Dino was making a reference
21  that they can't edit the model but will change the
22  pose.
23     Presumably, they -- they felt that the
24  size issue for his model is really more about
25  directionally how he was posed and then -- and

93

1 that they could scale down the hat to -- to look
2 more appropriate on his head.
3     Q  Okay.  It -- it appears that, then, based
4 on Dino's comment here and then other comments
5 that may have occurred earlier in time, this is
6 really a -- an example of the process that WWE
7 goes through to review and approve specific talent
8 models, in this case, the Undertaker, is that
9 right?
10    A  That is correct.
11        MR. SIMMONS:  Objection.  Mischaracterizes
12 the witness's testimony.
13    Q  (By Mr. Friedman)  Okay.  If you look a
14 little bit further down, I see on the same comment
15 box "Shane Jersey - Make updates to the hair color
16 and shape.  Face looks old."
17        Do you see that?
18    A  I do.
19    Q  Does this mean that at one point the WWE
20 believed that the talent model for Shane Jersey
21 needed to update his hair color and shape?
22    A  That's correct.
23    Q  Okay.  And what would be the purpose of
24 that?
25        MR. KRASIK:  Objection.  Calls for

94

1 speculation.
2        You can answer.
3     A  Presumably, it -- it did not reflect
4 our -- our depiction of that character and what he
5 currently looks like.
6     Q  (By Mr. Friedman)  Because WWE is trying
7 to get an accurate representation, correct?
8        MR. KRASIK:  Objection.  Mischaracterizes
9 his prior testimony.
10       You can answer.
11    A  Yes.  Presumably, in order to maintain
12 just the depiction within the brand.
13    Q  (By Mr. Friedman)  Going -- let's turn to
14 page WWE 214.  There's a picture here.
15       What -- what's this a picture of?
16    A  This is a picture of the Randy Orton
17 model.
18    Q  Okay.  Of the -- of the talent model of
19 Randy Orton, right?
20    A  Correct.
21    Q  Okay.  Do you know if this is a picture of
22 the approved talent model?
23    A  I am not certain.  I believe so.
24    Q  But this is a -- a -- an example of the
25 talent models that are submitted to WWE for

95

1 approval and that go through this approval process
2 that's reflected in Exhibit 5, right?
3     A  That's correct.  They -- they sent them in
4 different forms, but this is one way that they
5 might send them.
6     Q  Okay.  Okay.  You can set Exhibit 5 down.
7 We don't need that no more.
8        Mr. Kiang, did Randy Orton himself have
9 the ability to approve or reject how his talent
10 model looked?
11    A  I don't believe so.  I am unaware of any
12 feedback that he's given.
13    Q  Okay.  Do you know whether WWE solicited
14 Mr. Orton's comments when reviewing a Randy Orton
15 talent model?
16    A  Typically, that is not part of our
17 process.  It -- it varies from talent to talent.
18 We have some talent that complain about the way
19 they look.  And so in certain instances, we'll say
20 "Does this look okay?"  Randy Orton is not one of
21 the talents that has -- has ever asked for changes
22 to his -- how he's represented in games.
23    Q  Okay.  Let's take a look -- I'll mark as
24 Exhibit 6 WWE_Alexander 112, 1-1-2.
25        MR. KRASIK:  Six you said, Tony?

96

1        MR. FRIEDMAN:  Say it again?
2        MR. KRASIK:  Exhibit 6?
3        MR. FRIEDMAN:  Yes.  I believe we're on
4 six.
5     A  Okay.  I have it in front of me.
6     Q  (By Mr. Friedman)  All right.  Exhibit 6,
7 which we've just marked as WWE_Alexander 112
8 through 119.
9        And this is another product submission
10 packet, isn't that right, Mr. Kiang?
11    A  That is correct.
12    Q  And it looks like this is in reference to
13 "WWE16 Character Renders."  You see that down in
14 the description.
15       Do you see that?
16    A  Yes.
17    Q  Okay.  All right.  Let's turn to the last
18 page, 119.  One of the internal comments, which is
19 on this page, the last page here on Exhibit 6, by
20 Joe Giorno, there's a statement here that says, "I
21 believe image of Randy Orton is no longer approved
22 by him.  Confirm with creative."
23       Do you see that?
24    A  I do.  Yes.
25    Q  Do -- do you know what -- whether or

Transcript of Edward M. Kiang
Conducted on August 4, 2020

25 (97 to 100)

97

1  not -- or do you know what the reference is here
2  to Randy Orton's ability to approve the -- this
3  particular talent model?
4      MR. SIMMONS: Objection. Foundation.
5  Form. Mischaracterizes the document.
6      **A I am not certain with respect to this**
7  **particular comment.**
8      COURT REPORTER: I'm sorry. Could you
9  speak louder please?
10     **A I'm saying I am not certain with respect**
11 **to this particular comment.**
12     Q (By Mr. Friedman) Like you said, you're
13 not aware generally of -- of Mr. Orton having the
14 ability to approve or reject talent models, right?
15     MR. KRASIK: Objection. Mischaracterizes
16 his testimony. Let's just get a clear record on
17 that.
18     **A Yeah. So -- so in general, our -- our**
19 **talent did not have the right -- or at least Randy**
20 **Orton does not have the right to approve or reject**
21 **images. We will take into account any feedback**
22 **that he gives us. I am -- I am not certain**
23 **whether or not this particular comment was with**
24 **respect to maybe the -- the gear he was wearing.**
25     **Oftentimes, our talent will change their**

98

1  **apparel, and so the color schemes may get noted by**
2  **our brand assurance team saying that, you know,**
3  **Randy doesn't like that pose anymore, you know.**
4  **So -- but that -- that wouldn't be video game**
5  **specific. That would be just be comments that --**
6  **and -- and I think that's why they're -- they're**
7  **pointing to, you know, confirming with -- with**
8  **creative services that those are the guys that --**
9  **that kind of speak to him with respect to the**
10 **brand and other creative uses for it for his look.**
11     Q (By Mr. Friedman) Okay. But sitting here
12 today, you don't know what it was that Randy Orton
13 maybe had a comment about or -- or in the words of
14 this one, "no longer approved," right?
15     **A I -- I do not know.**
16     Q Could it have been in reference to his
17 tattoos?
18     MR. KRASIK: Objection. Calls for
19 speculation. Lack of foundation.
20     **A I -- I have no idea.**
21     Q (By Mr. Friedman) Okay. You mentioned
22 that it's possible that it could've been in
23 reference to the Orton talent model's costume.
24     And were you just speculating there or do
25 you -- do you have any basis for that?

99

1      MR. SIMMONS: Objection. Mischaracterizes
2  the witness's testimony and the document.
3  Foundation.
4      **A I -- I am -- I am not certain what -- what**
5  **the edit could've covered.**
6      Q (By Mr. Friedman) Okay. On the previous
7  page of Exhibit 6, Bates 118, there's another
8  reference in -- in comment number seven, towards
9  the bottom, this one by Ms. Zuzik. It says,
10 "Checked Randy image and it does not look like one
11 he did not approve."
12     Do you know what this comment by Ms. Zuzik
13 is referring to?
14     **A I do not.**
15     Q You mentioned -- I think you called it
16 creative services, the group within WWE that would
17 be responsible for communicating with Mr. Orton.
18     What was the name of that group?
19     MR. KRASIK: Objection. Mischaracterized
20 his testimony.
21     Go ahead.
22     **A So our -- our creative services team helps**
23 **to create the pay-per-view art and TV graphics.**
24 **And it -- I believe that's what was referenced**
25 **when they said, "Check with creative."**

100

1      Q (By Mr. Friedman) Okay. Is -- is
2  Ms. Zuzik a member of that creative services team?
3      **A No.**
4      Q Okay. Is Joe Giorno a member of the
5  creative services team?
6      **A No.**
7      Q Do you see any names here on the comments
8  that you know are associated or a part of the
9  creative services team?
10     **A No.**
11     Q If you wanted to find out what issues
12 Mr. Orton may or may not have had with this
13 particular talent model, who would you ask?
14     MR. SIMMONS: Objection. Mischaracterizes
15 the testimony and the document.
16     MR. KRASIK: Same objection.
17     **A I would ask Joe Giorno to find out -- the**
18 **creative services team is quite large. I -- I**
19 **don't know if he had a specific image in mind. I**
20 **would've asked Joe to get more information.**
21     Q (By Mr. Friedman) Okay. Okay. Thank
22 you. You can put Exhibit 6 aside.
23     Okay. Mr. Kiang, we looked at a license
24 agreement between Take-Two and the WWE.
25     Does WWE have any contracts or agreements

Transcript of Edward M. Kiang
Conducted on August 4, 2020

26 (101 to 104)

101

1  with 2K Sports specifically?
2  **A Not to my knowledge.**
3      MR. SIMMONS: Objection to form.
4      THE WITNESS: Sorry. I didn't catch that.
5      MR. KRASIK: We -- Josh, you broke up. Do
6  you want to restate the objection?
7      MR. SIMMONS: Oh, I'm sorry. Objection.
8  Form.
9  **A I -- I -- I'm aware of we only have an**
10 **agreement with Take-Two.**
11 Q (By Mr. Friedman) Okay. Are you aware of
12 any agreements between the WWE and 2K Games?
13     MR. SIMMONS: Objection. Form.
14 **A No. I think that would be encompassed**
15 **within the Take-Two agreement.**
16 Q (By Mr. Friedman) Okay. Are you aware of
17 any agreements between the WWE and Visual Concepts
18 Entertainment?
19     MR. SIMMONS: Objection. Form.
20 **A Again, no. Not -- it would be encompassed**
21 **with the Take-Two agreement.**
22 Q (By Mr. Friedman) Okay. All right.
23     COURT REPORTER: I'm sorry. That did not
24 come across. Your answer again please?
25 **A I would say that I was not aware of any**

102

1  **agreement with Visual Concepts and that it would**
2  **be -- it would have been encompassed within the**
3  **Take-Two agreement.**
4      MR. FRIEDMAN: I'm at a good break point,
5  so let's go off the record for a moment.
6      MR. KRASIK: How long do you want to
7  break, Tony?
8      MR. FRIEDMAN: Just -- just for a moment.
9  I just will move on to another -- another area
10 here. So not too much -- I don't have too much
11 more left either.
12     MR. KRASIK: We're at -- we're at 12:20
13 Eastern Time. When were you thinking about a
14 lunch break?
15     MR. FRIEDMAN: Well, if Mr. Kiang wants a
16 lunch break now, that's fine with me. I expect
17 and -- and realistically have about another hour
18 of questioning. So if you want to power through
19 and beat the hurricane, it -- it's totally up to
20 you. It's completely up to you.
21     MR. SIMMONS: It's too late now. I can
22 tell you from New York, it's too -- you know, the
23 tropical storm is here but --
24     MR. FRIEDMAN: Well, we're not -- we're
25 not worried about Josh. It's whatever Mr. Kiang

103

1  wants. You're stuck here, Josh.
2      MR. SIMMONS: I defer to the witness as
3  well and -- and to -- and to Mr. Krasik.
4      VIDEOGRAPHER: Sorry. Sorry to interrupt.
5  Let me just -- let me interrupt. The time is
6  11:21, and we're off the record.
7      (A lunch recess was taken.)
8      VIDEOGRAPHER: The time on the video
9  monitor is 12 p.m., and we are on the record.
10 Q (By Mr. Friedman) Welcome back,
11 Mr. Kiang.
12     Earlier, we discussed a little bit about
13 the Exhibits 2 and 3, the Take-Two and WWE license
14 agreement and -- and the Randy Orton booking
15 contract.
16     My question for you is did -- did WWE have
17 any obligation to spend money on marketing or
18 advertising for the video games?
19     MR. KRASIK: Objection. Calls for a legal
20 conclusion.
21     You can answer.
22 **A No, we do not have a -- any marketing**
23 **commitment --**
24 Q (By Mr. Friedman) Okay.
25 **A -- for the games.**

104

1  Q Do you know whether or not WWE spent any
2  money marketing their vid- --
3  **A To my knowledge, WWE has not spent any**
4  **money marketing the game.**
5  Q All right. Thank you.
6      Mr. Kiang, is Randy Orton a popular WWE
7  wrestler?
8  **A He's a popular wrestler within WWE. We**
9  **also have, you know, a number of WWE superstars**
10 **who are even more popular than he is.**
11 Q Okay. What -- what is a WWE superstar?
12 **A Sorry. That -- that's what we refer to as**
13 **our -- our wrestlers. That's just a term that**
14 **gets battered into our heads.**
15 Q And I've used the term myself, too. My --
16 I guess my question is, is there any distinction
17 within WWE as to who achieves superstar status
18 versus, you know, a typical wrestler?
19 **A I -- I would -- I would use them**
20 **interchangeably.**
21 Q Okay. So is it the case that you believe
22 or agree that Mr. Orton is a popular WWE
23 superstar?
24     MR. KRASIK: Objection. Mischaracterizes
25 his prior testimony.

Transcript of Edward M. Kiang
Conducted on August 4, 2020

105

1    A  I -- I would say that most of our talent
2  are -- are popular which is why they -- you know,
3  we're -- we're the preeminent promotion within,
4  you know, professional wrestling.  So he -- he is
5  among many popular wrestlers within WWE.
6    Q  (By Mr. Friedman)  All right.  Do you
7  believe that Mr. Orton is one of the more popular
8  WWE superstars within WWE?
9    A  I -- I -- I think that's a -- I -- I mean
10 it's -- it's a relative question.  He's -- he's
11 among some of the more popular ones as -- as noted
12 before.  You know, we have many others that are --
13 probably ex- --- exceed his level of popularity as
14 well.
15   Q  Is Mr. Orton within the top tier of
16 popularity for WWE superstars?
17   A  I -- I'm not certain how I would define a
18 top tier of -- of superstars.  He's popular.
19 And -- and as I noted before, we -- we have a
20 number of popular talent.
21   Q  Yes.  Okay.  Has Mr. Orton headlined WWE
22 live events?
23   A  I --
24     MR. SIMMONS:  Objection.  Form.
25   A  I -- I -- I believe so.  I can't think of

106

1  any off the top of my head, at least within the
2  context of the three games that we're discussing.
3    Q  (By Mr. Friedman)  Okay.  Has Mr. Orton
4  been a featured performer in WWE live events?
5     MR. SIMMONS:  Objection.  Form.
6     MR. KRASIK:  I'm going to object to the
7  form.  Just so the record's clear, explain what
8  you mean by that answer however you think is
9  appropriate.
10   A  Yeah.  I -- I -- you know, I -- I believe
11 that at some of our live events, he is one of many
12 featured performers.  It's possible that -- when
13 we look at live events, we -- we talk about our
14 shows, Raw and SmackDown, as well as our pay per
15 views, as well as our what we refer to as "dark
16 shows" which are nontelevised events.  We do over
17 somewhere between 350 and 500 live events a year.
18 I believe that there are instances where he has
19 main evented some of those shows.  I -- I -- I
20 couldn't tell you which ones --
21   Q  (By Mr. Friedman)  Okay.  Thank you.
22   A  -- or how frequently.
23   Q  Okay.  And has Mr. Orton been a featured
24 performer on WWE DVDs?
25   A  Again, I'm -- I'm not certain within the

107

1  time frame that -- has he ever been a featured
2  performer on a DVD?
3    Q  Yes.
4    A  I -- I believe so.  I, again, don't know
5  off the top of my head if we've -- if he has been
6  a featured talent on the DVD within the last few
7  years.
8    Q  Okay.  But Mr. Orton has been a WWE
9  superstar for over a decade now, right?
10   A  That's correct.
11     MR. SIMMONS:  Objection.  Form.
12   Q  (By Mr. Friedman)  And does the WWE sell
13 merchandise featuring Mr. Orton?
14     MR. SIMMONS:  Objection.  Form.
15   A  WWE sells merchandise incorporating his
16 IP.
17   Q  (By Mr. Friedman)  Do you believe that
18 Mr. Orton has his own fan base?
19     MR. KRASIK:  I'm sorry.  The question
20 didn't come through clearly.
21     Could you restate it, Tony?
22     MR. FRIEDMAN:  Sure.
23   Q  (By Mr. Friedman)  Mr. Kiang, do you
24 believe that Mr. Orton has his own fan base?
25     MR. KRASIK:  Objection to form.  Calls for

108

1  speculation.  Outside the scope of the 30(b)(6)
2  notice.
3    You can answer.
4    A  I -- I'm uncertain if there's a
5  distinction between his -- his own fan base versus
6  his fans with WWE.  I -- I suspect there are some
7  people who like him as a person.
8    Q  (By Mr. Friedman)  I don't mean as a
9  person.  I mean, you know, within hi- -- within
10 the context of Mr. Orton being a WWE superstar, do
11 you believe that he has his own fan base of --
12 within the -- the -- the context of WWE fans?
13     MR. KRASIK:  Objection.  Calls for
14 speculation.  Outside the scope of the 30(b)(6)
15 notice.
16   A  I -- I -- I believe that he has fans who
17 watch him through our WWE programming, if that's
18 what you mean.
19   Q  (By Mr. Friedman)  Okay.  And do you agree
20 that Mr. Orton has his own social media following?
21     MR. KRASIK:  Objection.  Calls for
22 speculation.  Outside the scope of the 30(b)(6)
23 notice.
24     You can answer.
25   A  He has a social media following.  I

Transcript of Edward M. Kiang
Conducted on August 4, 2020

28 (109 to 112)

**109**

1 believe that he works in coordination with
2 probably our -- our social media team. But he has
3 fans on social media. He clearly has followers
4 there.
5     Q (By Mr. Friedman) Does the WWE, you know,
6 encourage its superstars to utilize social media?
7         MR. KRASIK: Objection. Outside the scope
8 of the 30(b)(6) notice.
9         But you can answer if you know.
10    A I -- I -- I'm not part of the team that
11 would've -- that works on social media, so I'm not
12 certain. I -- I believe that we look at --
13 that -- that we recognize that social media is a
14 powerful form of reaching fans.
15        And so insofar as talent Randy Orton may
16 be interested in using social media, we'd probably
17 help with that. But I -- I don't have a lot of
18 details on how we would do it.
19    Q (By Mr. Friedman) Understood. Do you
20 know whether the WWE monitors Mr. Orton's social
21 media activities?
22        MR. KRASIK: Objection. Outside the scope
23 of the 30(b)(6) notice. The witness can answer
24 individually.
25        COURT REPORTER: I didn't catch your

**110**

1 objection if you could restate it louder please.
2         MR. KRASIK: Sure. Objection that the
3 question's outside the scope of the Rule 30(b)(6)
4 notice. I told the witness he could answer
5 individually.
6     A Sorry. Could you repeat the question?
7     Q (By Mr. Friedman) Sure. Does the W- --
8 do you know whether the WWE monitors Mr. Orton's
9 social media activities?
10        MR. KRASIK: Same objection.
11    A I -- I -- I am uncertain. I -- I -- I
12 could speculate that he's probably followed by our
13 social media team. I -- I don't know what level
14 of monitoring occurs, but they probably follow
15 what he posts.
16    Q (By Mr. Friedman) Do you know whether the
17 WWE monitors social media commentary regarding the
18 video games?
19    A I don't believe that -- I don't think
20 there's a process for monitoring social media
21 feedback. I -- I think, you know, on an ad hoc
22 basis, people may kind of go online and see what
23 people are saying.
24    Q Would that be a part of the social media
25 team that you referenced earlier?

**111**

1     A No. I don't think that they -- I don't
2 think that they manage -- I guess what I would
3 clarify is that, you know, the social media team
4 is primarily focused on getting -- you know,
5 raising awareness around our programming and --
6 and -- and and pay-per-view events.
7         And -- and to the extent that some of our
8 talent are -- are, you know, posting on social
9 media, they don't really -- un- -- unless it's
10 something that's done through kind of paid
11 advertising, they -- they don't often get very
12 involved with licensed product because it would be
13 considered third party.
14    Q Thank you.
15        Do you know whether the WWE monitors media
16 reviews of the video games?
17    A Again, there's -- there's not a step
18 process for monitoring any of that kind of stuff.
19 It may just be kind of ad hoc looking at reviews
20 online or going to metacritic.com.
21    Q Is -- is that something that WWE would
22 rely on the third party to -- to keep track on?
23    A Sorry. Could you rephrase that?
24    Q Is that something that WWE would rely on
25 the third party, like Take-Two, to -- to monitor,

**112**

1 you know, critic and media commentary on the video
2 games?
3     A I mean, Take-Two --
4         MR. SIMMONS: Objection. Calls for
5 speculation. Objection. Incomplete hypothetical.
6 And objection. Foundation.
7     A I mean, Take-Two provides us annually with
8 a recap report that -- that does touch on like
9 overall -- you know, just overall trends in terms
10 of -- of fan feedback and -- and critic reviews.
11 But yeah, within WWE, we don't really have a
12 process for that.
13    Q (By Mr. Friedman) Okay. Do you know
14 whether or not Take-Two --
15        COURT REPORTER: I'm sorry.
16        Mr. Simmons, I think you've left your
17 audio on. We have typing.
18        MR. SIMMONS: Got it. Sorry. I got it.
19        COURT REPORTER: Okay. Could you
20 repeat your question please.
21        MR. FRIEDMAN: Sure.
22    Q (By Mr. Friedman) Do you know whether
23 Take-Two monitors media and critical reviews of
24 the video games?
25        MR. SIMMONS: Objection. Form.

113

1    A I -- I believe that they track some level
2 of information to an extent, but, you know, I -- I
3 couldn't say.
4    Q  (By Mr. Friedman)  Okay.  But it's your
5 understanding that they do at least at some level,
6 correct?
7    A I'd --
8       MR. SIMMONS:  Objection.  Mischaracterizes
9 the witness's testimony.
10    A I mean we -- we receive a report.
11 Suppose- -- presumably, that report is based off
12 of some level of monitoring or research.
13    Q  (By Mr. Friedman)  And the report that WWE
14 receives, do you receive that personally?
15    A It is -- it is presented to the company.
16 I'm a -- and I'm -- I'm part of that group.
17    Q  How often does Take-Two provide that
18 report?
19    A Once annually.
20    Q  Okay.
21    A From time to time, we may get intermedia
22 emails, ad hoc reports.
23    Q  Okay.  Do you know why Take-Two monitors
24 media and critical reviews of the video games?
25       MR. SIMMONS:  Objection.  Go ahead, Curt.

114

1 I'm sorry.
2       MR. KRASIK:  No.  I was objecting based on
3 calling for speculation.  Lack of foundation.
4       MR. SIMMONS:  And I'll object that it
5 mischaracterizes the witness's testimony.
6    A Sorry.  Just there was a -- I believe the
7 question was do I know why they monitor?  I --
8 I've -- I've never asked.  I -- presumably, they
9 feel that it provides them with some guidance on
10 how the game is being received.
11    Q  (By Mr. Friedman)  And do you know whether
12 Mr. Orton was used in any -- in any way to promote
13 or market the video games?
14       MR. KRASIK:  And -- and just when you say
15 "the video games," the -- 2K Games we're
16 talking about, right, Tony?
17       MR. FRIEDMAN:  That's correct.  Yes.  The
18 WWE 2K video games.
19       MR. KRASIK:  Sixteen, seventeen, and
20 eighteen.
21    A For the -- for the WWE 2K Games in
22 question, he was not a featured talent with
23 respect to -- you know, he was not a cover athlete
24 or -- or any of our highlight athletes in the
25 marketing.  He may have been included in some of

115

1 the key marketing beats in, like, when we do the
2 roster reveal.  But, again, that's kind of
3 showcasing all of the 200 superstars.
4    Q  (By Mr. Friedman)  It -- I think I may
5 have missed the word you said there.  You said --
6 "marketing beats" did you say?
7    A Yes, the k- -- the key beats for
8 marketing.
9    Q  Okay.  All right.  I think you might be
10 referring to something -- let me get in -- I'm not
11 trying to mischaracterize what you're saying, but
12 let's mark another exhibit.  I think we're on 7,
13 WWE_Alexander 94, an email.
14    A Okay.  I have it in front of me.
15    Q  Okay.  Thank you.
16       All right.  Exhibit 7 for the record bears
17 Bates stamps WWE_Alexander 94 through 98.
18       Mr. Kiang, have you seen this email
19 before?
20    A I have in preparation to this.
21    Q  Okay.  Are you the Ed Kiang on the "To"
22 line of the lead email here?
23    A Indeed.
24    Q  All right.  I see also some familiar
25 names:  Joe Giorno, Ashley Zuzik.  We saw those

116

1 names earlier with respect to the approval
2 processes.
3       Are -- are -- the folks in the "To" line,
4 are those all WWE employees if you know?
5    A Yes, they are.
6    Q  And in the "cc" line, I see a lot of 2K
7 references.
8       Is anybody on the "cc" line an employee of
9 WWE?
10    A No.
11    Q  All right.  And the author of the email,
12 Bryce Yang, it appears that he is a -- a 2K
13 employee.
14       Is it your understanding that he's not a
15 WWE employee?  Correct?
16    A That's correct.
17    Q  All right.  It looks like what Mr. Yang
18 is -- is sending you in this email, he writes:
19 "First screens of Randy Orton are going into
20 Mediabox now.  Attached."
21       What -- what -- what is Mr. Yang sending
22 to you in this email?
23    A So Bryce is send- -- or Bryce Yang is
24 sending screen shots within the -- within the
25 game, I believe, featuring John Cena and Randy

Transcript of Edward M. Kiang
Conducted on August 4, 2020

30 (117 to 120)

---

117

1  Orton.
2  Q  Okay.
3  A  And he's uploading it to Mediabox which
4  was the precursor to WWE Source.
5  Q  Is this for -- for the purpose of dov- --
6  of -- of gaining WWE's approval for the media?
7  A  I believe so.  Yes.
8  Q  Okay.  And is this for assets that are to
9  be incorporated into the video games?
10  A  Not to put into the game.  These --
11  these are screen captures of the game to be used
12  for marketing of the game.
13  Q  Okay.  So then is it accurate to say that
14  the screen shots of Randy Orton and John Cena from
15  the game are being used for purposes of marketing
16  the game?  Is that -- is that what's happening
17  here?
18  A  That's correct.
19  MR. SIMMONS:  Objection.  Form.
20  Mischaracterizes the document.
21  Q  (By Mr. Friedman)  All right.  The next
22  page here, it -- it represents the second email,
23  and you can see that on page 1, also, from
24  Mr. Yang.  I'm not going to need to go through the
25  whole email here, but I'll reference this question

118

1  here.
2  Down midway through, it says, "For
3  IGN - Cena versus Orton story."
4  What -- what is this in reference to?
5  A  So this is talking about an opportunity
6  with IGN, which is a video game website, and they
7  are looking to create a story about the
8  announcement of the game and the roster.
9  Again, this is, I think, outside the scope
10  of -- of doing these proceedings.  But I -- I -- I
11  believe this is for WWE 2K15.  And in this
12  instance, what they're saying is that they wanted
13  to give some graphics to give to IGN as part of
14  their story about that at this early stage of
15  development, because the game isn't done yet, the
16  Randy Orton character model and the John Cena
17  models are the furthest along.  So they wanted to
18  use the two that looked the best.  But as we have
19  more, we'll create more.
20  Q  Okay.  All right.  You can set that aside.
21  Mr. Kiang, are you aware of any contacts
22  that WWE has ever had with the plaintiff,
23  Catherine Alexander, in this case?
24  A  No.  We've -- we've done a lot of
25  preparation for -- for today's proceeding, and we

119

1  could find no record of any communications.
2  Q  Okay.  In -- in preparation for this
3  deposition, did you review the deposition
4  transcript of Ms. Alexander?
5  A  I don't believe I've seen that.  No.
6  Q  What did you do to prepare for this
7  deposition?
8  A  I was provided the materials that you sent
9  over and have reviewed them.
10  Q  Okay.  Did you meet with your attorney,
11  Mr. Krasik, to prepare?
12  MR. KRASIK:  Let me just caution you not
13  to reveal the substance of anything we talked
14  about.
15  But you can answer the question.
16  A  Yes.  We met yesterday.
17  Q  (By Mr. Freidman)  And for how long did
18  you meet?
19  A  Five or six hours, I think.
20  Q  Were there any other individuals present
21  during that meeting?
22  A  Yes.  We had one other lawyer.
23  Q  Okay.  And who was that?
24  A  Lauren Middlen.
25  Q  All right.  Did you speak to anybody at

120

1  WWE to prepare for this deposition?
2  A  Just Curt and Lauren.
3  Q  Okay.  Did you speak with anybody at
4  Take-Two to prepare for this deposition?
5  A  No.
6  Q  Did you review any documents besides the
7  ones that -- that my firm sent over?
8  A  I don't think -- no, I don't think so.
9  Q  And did you review any deposition
10  transcripts in preparation?
11  A  Unless it was included, I -- I -- I did
12  not review any.
13  Q  Okay.  Mr. Kiang, to your knowledge, has
14  the WWE ever obtained a license for a tattoo work
15  for -- for any -- for any WWE products?
16  MR. KRASIK:  Objection.  I believe that
17  was asked and answered a long time ago this
18  morning.
19  But feel free to answer again.
20  MR. SIMMONS:  I also will object to form.
21  A  I -- I'm not aware of any licenses
22  with respect to tattoos for -- for our game
23  products or any other products.
24  MR. FRIEDMAN:  Okay.  Mr. Kiang, I
25  appreciate the time.  I have no further questions

121

1  unless I follow-up to the extent that there's --
2  there's any redirect here.  Thank you.
3      THE WITNESS:  Okay.  Thank you.
4      MR. KRASIK:  I have no questions.
5      VIDEOGRAPHER:  All right.  Well, if there
6  are no questions, then this marks the end of the
7  video deposition.  The time on the video monitor
8  is 12:24 p.m.
9      MR. KRASIK:  We'll read and sign the
10 transcript.
11     (The Zoom remote video deposition was
12 concluded.)
13     (Signature is not waived.)
14     (Exhibits 1-7 are attached.)
15           * * * * *
16
17
18
19
20
21
22
23
24
25

122

1      CERTIFICATE OF SHORTHAND REPORTER
2      I, Melody Stephenson, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  said testimony was taken by me stenographically
7  and thereafter reduced to typewriting under my
8  direction; that reading and signing was requested;
9  and that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13
14
15    *Melody I. Stephenson*
16   Melody Stephenson, Certified Court Reporter
17    BBA, FCRR, CRR, CRC, RPR, RSA, MO CCR 406
18
19
20
21
22
23
24
25

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                                    32

| A |
|---|

**ability**
43:11, 95:9,
97:2, 97:14
**able**
8:6
**about**
8:8, 14:11,
20:10, 20:23,
23:13, 23:16,
28:18, 30:5,
31:22, 32:21,
44:25, 47:11,
49:5, 54:15,
62:1, 62:15,
63:5, 63:6,
64:25, 66:13,
71:20, 77:23,
77:25, 82:2,
86:11, 92:24,
95:18, 98:13,
102:13, 102:17,
102:25, 103:12,
106:13, 114:16,
118:5, 118:7,
119:14
**above**
36:23, 57:16
**absent**
60:23
**ac**
89:20
**accessed**
80:10
**according**
39:19
**account**
21:13, 97:21
**accuracy**
48:8, 48:9,
48:19, 48:23,
71:4
**accurate**
30:21, 40:1,
41:7, 43:7,
45:15, 45:16,
47:22, 49:25,

50:18, 53:1,
53:5, 53:15,
54:20, 55:1,
55:9, 55:19,
57:24, 58:12,
58:22, 70:10,
70:15, 70:21,
71:14, 71:25,
72:5, 72:11,
73:3, 74:3,
94:7, 117:13
**achieve**
49:24, 49:25
**achieves**
104:17
**acknowledge**
6:8, 6:17
**acknowledging**
7:1
**across**
101:24
**activities**
109:21, 110:9
**actually**
11:3, 89:20
**ad**
110:21, 111:19,
113:22
**addition**
11:24, 14:10,
76:4
**additional**
20:16, 21:3,
21:10, 40:11,
63:25
**adhere**
64:2
**adjustment**
53:12
**adjustments**
90:17
**admissibility**
6:10
**advertising**
34:4, 103:18,
111:11
**affairs**
88:2

**after**
20:17
**afterwards**
11:16
**again**
16:5, 30:9,
36:17, 38:1,
48:15, 49:1,
49:12, 50:8,
50:24, 52:8,
53:10, 53:18,
64:21, 67:24,
68:25, 70:15,
71:1, 71:18,
72:2, 82:8,
90:5, 96:1,
101:20, 101:24,
106:25, 107:4,
111:17, 115:2,
118:9, 120:19
**ago**
14:2, 120:17
**agree**
60:1, 60:6,
76:21, 104:22,
108:19
**agreement**
2:6, 15:15,
16:18, 22:8,
24:23, 25:7,
25:9, 25:21,
32:16, 36:18,
38:9, 40:14,
100:24, 101:10,
101:15, 101:21,
102:1, 102:3,
103:14
**agreements**
100:25, 101:12,
101:17
**ahead**
26:1, 52:6,
85:19, 99:21,
113:25
**air**
77:19
**al**
5:5

**alexander**
1:4, 3:2, 5:4,
5:17, 14:12,
15:23, 16:11,
118:23, 119:4
**alexander's**
12:15
**all**
5:11, 10:6,
11:4, 12:6,
14:8, 14:18,
15:8, 16:22,
22:2, 22:22,
23:5, 23:11,
23:23, 23:24,
24:21, 25:20,
26:5, 27:13,
29:1, 29:23,
31:8, 32:14,
34:20, 35:3,
36:16, 36:19,
37:1, 37:5,
39:6, 44:9,
48:18, 51:25,
53:21, 55:5,
55:25, 56:15,
58:3, 58:11,
62:9, 63:7,
64:24, 68:18,
69:3, 69:17,
73:23, 74:2,
77:24, 79:12,
80:21, 81:3,
81:20, 82:6,
82:7, 83:5,
84:7, 84:19,
86:23, 88:8,
88:17, 89:13,
89:15, 89:24,
90:14, 90:19,
90:20, 91:16,
92:1, 96:6,
96:17, 101:22,
104:5, 105:6,
115:3, 115:9,
115:16, 115:24,
116:4, 116:11,
116:17, 117:21,

Transcript of Edward M. Kiang
Conducted on August 4, 2020                    33

118:20, 119:25,
121:5
**allow**
52:24
**allows**
25:16
**almost**
60:4
**along**
13:3, 92:8,
118:17
**also**
25:5, 26:3,
65:20, 73:19,
73:21, 85:6,
104:9, 115:24,
117:23, 120:20
**although**
11:13, 11:19
**always**
7:21
**amended**
4:8, 12:15,
13:9
**among**
24:16, 42:20,
43:5, 105:5,
105:11
**amounts**
34:17
**analyst**
9:16
**andre**
53:22, 53:24,
54:6, 54:14,
54:21, 54:25
**announcement**
118:8
**annually**
112:7, 113:19
**another**
11:16, 32:1,
41:5, 78:5,
88:19, 96:9,
99:7, 102:9,
102:17, 115:12
**answer**
8:20, 16:2,

16:17, 17:25,
19:20, 20:7,
20:21, 21:7,
24:9, 24:18,
25:15, 27:4,
28:1, 28:16,
29:17, 31:1,
31:15, 32:5,
32:9, 33:10,
33:20, 34:16,
34:23, 40:6,
41:17, 42:2,
43:23, 52:6,
56:8, 59:19,
60:15, 61:1,
61:12, 63:21,
64:22, 67:14,
68:14, 69:13,
80:19, 91:5,
92:16, 94:2,
94:10, 101:24,
103:21, 106:8,
108:3, 108:24,
109:9, 109:23,
110:4, 119:15,
120:19
**answered**
16:16, 68:13,
76:3, 120:17
**answers**
34:10, 87:10
**anthony**
3:3
**any**
10:3, 16:4,
16:20, 17:24,
21:20, 26:20,
30:19, 31:18,
32:11, 32:12,
33:4, 33:14,
33:21, 33:25,
34:4, 37:21,
38:8, 38:17,
39:1, 40:12,
40:20, 44:10,
47:7, 49:17,
51:4, 62:2,
67:21, 68:10,

70:1, 70:8,
72:16, 80:2,
87:10, 87:12,
95:11, 97:21,
98:25, 100:7,
100:25, 101:12,
101:17, 101:25,
103:17, 103:22,
104:1, 104:3,
104:16, 106:1,
111:18, 114:12,
114:24, 118:21,
119:1, 119:20,
120:6, 120:9,
120:12, 120:15,
120:21, 120:23,
121:2, 122:10
**anybody**
116:8, 119:25,
120:3
**anymore**
98:3
**anything**
44:10, 77:8,
77:15, 77:16,
119:13
**apologize**
86:15
**apparel**
98:1
**appear**
42:25, 47:23,
48:2, 66:5,
85:24
**appeared**
52:3, 54:15,
67:5
**appears**
23:2, 66:8,
69:4, 70:22,
72:23, 85:13,
93:3, 116:12
**apply**
73:18, 74:8
**appreciate**
120:25
**appropriate**
42:16, 80:4,

84:22, 93:2,
106:9
**approval**
40:2, 40:20,
41:6, 41:8,
41:13, 43:9,
43:20, 44:14,
44:25, 46:11,
46:13, 49:7,
49:24, 51:12,
55:19, 58:13,
63:6, 65:4,
66:15, 67:4,
71:10, 78:1,
79:18, 82:9,
82:16, 86:19,
95:1, 116:1,
117:6
**approvals**
40:25
**approve**
40:12, 40:17,
41:14, 41:23,
42:11, 43:11,
44:11, 44:14,
53:14, 55:8,
55:14, 60:23,
61:9, 64:1,
67:17, 69:22,
71:23, 93:7,
95:9, 97:2,
97:14, 97:20,
99:11
**approved**
39:23, 43:15,
44:5, 46:15,
67:1, 67:10,
68:3, 68:11,
68:15, 68:22,
69:18, 69:21,
69:25, 70:7,
71:16, 86:20,
91:23, 94:22,
96:21, 98:14
**approving**
43:25, 88:5
**approximately**
7:20, 9:2, 9:7

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    34

**archives**
80:6, 80:7
**area**
102:9
**arenas**
41:19, 44:8
**arise**
37:22, 38:8
**arm**
52:20
**around**
27:17, 111:5
**art**
48:17, 51:2,
51:6, 58:6,
99:23
**artist**
31:19, 31:25
**artistic**
48:14
**arts**
9:23
**ascertain**
69:2
**ashley**
84:18, 84:19,
115:25
**ashley's**
84:20
**aside**
13:24, 36:17,
100:22, 118:20
**asked**
16:16, 67:16,
68:13, 95:21,
100:20, 114:8,
120:17
**asking**
11:15, 75:14,
75:16, 87:10
**asset**
47:1, 47:3,
47:11
**assets**
41:18, 45:19,
79:20, 82:9,
89:16, 89:21,
117:8

**assigned**
25:23, 28:12
**assigning**
26:16
**associated**
100:8
**assume**
54:24, 55:2
**assuming**
53:10, 65:24
**assurance**
42:13, 52:23,
84:20, 98:2
**athlete**
114:23
**athletes**
114:24
**attach**
73:19
**attached**
4:6, 81:18,
82:4, 89:25,
90:3, 90:13,
91:18, 116:20,
121:14
**attempting**
49:25
**attend**
9:20
**attending**
5:12
**attorney**
11:16, 11:17,
87:11, 87:19,
119:10
**attorneys**
87:12, 87:15
**audiences**
58:3, 75:2
**audio**
112:17
**august**
1:17, 5:8
**authentic**
50:9
**author**
116:11
**available**
16:25, 74:1

**avenue**
3:15, 3:24
**avoid**
11:24, 11:25
**awarded**
38:18, 39:1
**aware**
97:13, 101:9,
101:11, 101:16,
101:25, 118:21,
120:21
**awareness**
111:5
**away**
48:23

**B**

**b) (6**
4:9, 12:15,
19:19, 20:6,
20:13, 31:14,
32:3, 60:25,
61:11, 63:15,
64:8, 64:19,
67:12, 74:21,
75:8, 76:1,
76:8, 108:1,
108:14, 108:22,
109:8, 109:23,
110:3
**bachelor**
9:23
**back**
23:11, 47:11,
47:15, 59:21,
61:16, 62:4,
63:1, 63:3,
80:3, 82:20,
85:23, 86:6,
91:19, 103:10
**bar**
57:11
**base**
107:18, 107:24,
108:5, 108:11
**based**
6:11, 51:1,
90:17, 93:3,

113:11, 114:2
**basis**
98:25, 110:22
**bates**
4:17, 4:20,
4:23, 4:26,
17:4, 17:13,
22:12, 22:18,
22:24, 23:12,
26:7, 28:5,
36:21, 37:14,
39:9, 78:19,
99:7, 115:17
**battered**
104:14
**bba**
1:25, 122:17
**bearing**
17:4, 17:13,
78:19
**bears**
115:16
**beat**
102:19
**beats**
115:1, 115:6,
115:7
**because**
11:21, 12:24,
17:20, 67:4,
70:9, 94:6,
111:12, 118:15
**been**
7:19, 7:21,
11:1, 11:2,
11:8, 18:25,
19:7, 54:7,
54:9, 61:25,
68:3, 68:9,
68:15, 68:19,
69:6, 70:9,
70:21, 71:16,
78:1, 81:8,
81:9, 82:2,
82:9, 86:20,
98:16, 98:22,
102:2, 106:4,
106:23, 107:1,

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                      35

107:5, 107:8,
114:25
**before**
2:6, 11:9,
13:8, 18:2,
22:5, 24:22,
44:7, 51:12,
58:5, 59:4,
61:13, 61:17,
78:23, 79:21,
88:25, 105:12,
105:19, 115:19,
122:2
**began**
11:3
**begins**
5:2
**behalf**
3:2, 3:9, 3:19,
5:18, 5:22,
13:16
**being**
11:20, 19:19,
28:12, 48:16,
64:4, 67:25,
92:12, 108:10,
114:10, 117:15
**believe**
12:11, 18:24,
18:25, 19:13,
19:23, 34:18,
35:24, 36:15,
52:16, 59:14,
62:5, 65:7,
73:2, 73:14,
74:23, 83:1,
88:1, 91:10,
94:23, 95:11,
96:3, 96:21,
99:24, 104:21,
105:7, 105:25,
106:10, 106:18,
107:4, 107:17,
107:24, 108:11,
108:16, 109:1,
109:12, 110:19,
113:1, 114:6,
116:25, 117:7,

118:11, 119:5,
120:16
**believed**
93:20
**besides**
120:6
**best**
8:17, 118:18
**bet**
15:4
**better**
8:15, 8:16,
31:5, 31:7, 31:8
**between**
18:23, 20:17,
21:4, 22:8,
24:14, 24:23,
26:12, 32:16,
47:11, 100:24,
101:12, 101:17,
106:17, 108:5
**beyond**
26:2, 57:17
**bible**
14:15, 15:6
**big**
48:22, 59:24,
92:8, 92:19
**bionic**
52:19
**bit**
11:12, 15:2,
15:4, 19:16,
30:11, 35:24,
39:7, 44:24,
77:25, 78:3,
78:4, 83:5,
93:14, 103:12
**block**
22:23
**blurred**
64:17, 69:17,
70:20
**bodies**
51:19
**body**
47:24, 51:13,
52:2, 71:5,

72:8, 76:13
**booking**
4:13, 17:7,
18:6, 18:15,
18:18, 18:22,
19:3, 19:4,
20:16, 21:3,
21:10, 22:3,
23:25, 24:5,
24:6, 24:12,
24:13, 25:24,
26:4, 26:6,
26:12, 27:1,
28:21, 103:14
**booth**
73:15
**both**
17:20, 17:21
**bottom**
81:18, 84:17,
99:9
**box**
82:5, 93:15
**brand**
41:1, 42:13,
42:15, 44:10,
45:15, 45:24,
47:8, 48:16,
49:3, 52:23,
55:12, 55:22,
56:1, 56:15,
56:17, 57:5,
57:6, 57:14,
63:19, 64:2,
67:18, 71:4,
84:20, 94:12,
98:2, 98:10
**break**
62:12, 62:14,
63:4, 102:4,
102:7, 102:14,
102:16
**brian**
22:1
**briefly**
14:2, 87:9
**bring**
30:11, 56:10

**broad**
45:5
**broadly**
10:10, 14:6,
27:20, 29:8,
41:24, 44:25
**brock**
59:10, 59:12,
60:1, 60:5,
60:11, 60:18,
60:22, 63:5,
63:11, 64:4,
64:16, 64:25,
65:1, 67:15
**broke**
101:5
**bryce**
4:25, 116:12,
116:23
**bullet**
34:25
**business**
27:16, 88:2
**businesses**
32:7, 32:12,
32:13
**buys**
57:8

— C —

**c**
39:14
**call**
16:24, 46:2,
46:5, 75:12
**called**
79:18, 99:15
**calling**
114:3
**calls**
16:1, 16:15,
25:13, 27:24,
28:14, 29:15,
30:25, 32:3,
38:10, 38:19,
40:4, 40:15,
40:22, 41:15,
41:25, 43:14,

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    36

43:21, 53:16,
57:25, 60:13,
60:24, 61:10,
63:14, 64:7,
64:18, 67:11,
67:22, 68:12,
68:23, 69:11,
69:19, 74:20,
75:7, 75:25,
76:7, 76:24,
92:14, 93:25,
98:18, 103:19,
107:25, 108:13,
108:21, 112:4
**cames**
49:6
**can't**
58:2, 59:21,
92:21, 105:25
**cannot**
40:2, 85:3
**capacity**
19:21
**captures**
73:19, 117:11
**capturing**
73:20
**career**
62:6
**careful**
86:11
**case**
5:7, 15:7,
25:5, 38:18,
39:2, 41:3,
64:25, 74:2,
80:25, 85:23,
88:3, 91:18,
93:8, 104:21,
118:23, 122:10
**casey**
23:5, 23:6,
23:8
**catch**
101:4, 109:25
**category**
89:13, 90:10
**catherine**
1:4, 3:2, 5:17,

12:14, 14:12,
15:23, 118:23
**cause**
1:7
**caution**
119:12
**cc**
116:6, 116:8
**ccr**
1:25, 122:17
**cena**
116:25, 117:14,
118:3, 118:16
**center**
3:14
**certain**
18:24, 20:8,
38:14, 43:25,
48:19, 48:21,
52:14, 57:11,
58:3, 61:15,
61:18, 62:6,
65:3, 74:11,
94:23, 95:19,
97:6, 97:10,
97:22, 99:4,
105:17, 106:25,
109:12
**certainly**
58:4, 61:23,
76:19
**certificate**
122:1
**certified**
2:7, 122:16
**certify**
122:4
**cg**
81:21
**chain**
4:25
**change**
53:20, 63:18,
69:2, 71:22,
92:21, 97:25
**changes**
91:21, 95:21
**character**
46:16, 46:18,

46:21, 46:23,
47:17, 65:14,
65:17, 65:21,
66:5, 68:5,
68:6, 69:4,
69:5, 72:21,
94:4, 96:13,
118:16
**character's**
51:13, 70:20
**characteristic**
60:1
**characteristics**
23:22
**characterize**
71:8
**characters**
23:22, 50:20
**check**
99:25
**checked**
99:10
**chest**
59:12, 59:24
**chronological**
84:15
**churning**
77:6
**circulated**
79:22
**clarify**
12:6, 111:3
**cleaner**
12:1
**clear**
16:10, 97:16,
106:7
**clearly**
8:7, 107:20,
109:3
**client**
14:11, 87:11
**closely**
54:4
**closer**
8:11, 26:6,
30:11
**collaborate**
80:15

**collaterals**
51:24
**collective**
14:22, 47:15
**collectively**
29:4, 39:21,
56:12
**college**
9:18, 9:20,
10:4
**collins**
23:6, 23:8
**color**
93:15, 93:21,
98:1
**columbia**
9:21
**com**
111:20
**come**
79:16, 101:24,
107:20
**coming**
77:5
**comment**
53:11, 69:1,
72:16, 85:22,
85:23, 87:5,
87:6, 92:18,
93:4, 93:14,
97:7, 97:11,
97:23, 98:13,
99:8, 99:12
**commentary**
110:17, 112:1
**comments**
47:15, 79:25,
84:10, 85:5,
87:15, 88:11,
88:14, 91:20,
92:4, 93:4,
95:14, 96:18,
98:5, 100:7
**commitment**
103:23
**communicating**
99:17
**communication**
16:20, 87:17,

88:10
**communications**
16:5, 87:12,
88:5, 119:1
**company**
56:10, 80:15,
81:8, 87:7,
113:15
**comparison**
50:1
**compile**
80:2
**complain**
48:21, 95:18
**completely**
102:20
**complex**
29:2
**comprise**
56:15
**computer**
8:11, 74:13,
81:23, 81:24
**concepts**
1:11, 3:21,
5:24, 79:20,
83:2, 101:17,
102:1
**concluded**
121:12
**conclusion**
16:1, 16:15,
25:12, 25:14,
27:25, 28:15,
29:16, 30:25,
32:4, 38:11,
38:20, 40:5,
40:16, 40:23,
41:16, 42:1,
43:14, 43:22,
103:20
**conditioning**
77:20
**conditions**
37:2, 37:6,
37:12, 37:16,
38:6, 39:8,
39:9, 39:20

**conducting**
49:7
**confirm**
96:22
**confirming**
98:7
**connection**
27:16, 33:7,
33:16, 33:25,
35:15, 35:19,
37:22, 41:12,
56:17, 56:24,
58:13, 63:8,
66:18, 79:9
**consider**
54:25
**consideration**
71:7
**considered**
111:13
**consistent**
45:17, 45:24,
48:3, 49:2,
49:13
**consoles**
82:11
**contact**
81:9, 82:21
**contacts**
118:21
**contained**
37:7, 65:5,
65:22
**contains**
68:6
**content**
41:6, 41:13,
41:24, 42:3,
42:12, 42:18,
43:12, 44:15,
47:1, 55:8,
79:24, 81:4,
81:12
**contents**
79:14
**context**
45:11, 52:23,
53:19, 55:3,

61:14, 61:21,
63:18, 63:25,
67:24, 68:1,
68:25, 106:2,
108:10, 108:12
**continues**
23:25
**contract**
4:13, 17:7,
18:6, 18:15,
18:18, 19:3,
19:4, 23:25,
24:5, 24:6,
24:12, 24:13,
25:24, 26:4,
26:6, 26:12,
27:1, 103:15
**contracts**
18:22, 20:16,
21:3, 21:10,
22:3, 28:21,
100:25
**controls**
25:18, 40:9
**conversation**
52:21
**coordination**
109:1
**copied**
74:5, 74:6
**copies**
12:12
**copy**
12:18, 15:10,
15:23, 16:11,
17:8, 17:16,
34:18, 34:22
**copyrighting**
47:8
**copyrights**
14:12
**cor**
79:11
**core**
45:25, 46:1,
49:3
**corr**
10:24

**correct**
7:24, 8:24,
8:25, 10:9,
10:19, 11:5,
11:6, 13:21,
13:22, 18:15,
18:16, 18:20,
20:2, 21:1,
21:8, 23:4,
24:19, 25:2,
25:3, 25:5,
25:6, 26:4,
26:18, 28:23,
29:18, 29:19,
29:22, 31:2,
31:4, 31:7,
33:1, 33:2,
35:14, 35:18,
36:2, 36:3,
37:8, 37:12,
37:13, 40:8,
41:4, 42:20,
43:5, 44:3,
44:4, 46:12,
46:17, 46:20,
49:22, 51:15,
54:1, 54:12,
55:17, 64:21,
65:16, 65:19,
65:24, 66:7,
66:17, 67:3,
67:7, 68:8,
69:10, 69:14,
75:4, 79:2,
80:20, 81:1,
81:2, 82:3,
82:15, 83:4,
83:15, 85:9,
85:13, 87:3,
87:7, 87:8,
87:20, 88:6,
88:13, 88:16,
89:23, 90:11,
91:12, 91:25,
93:10, 93:22,
94:7, 94:20,
95:3, 96:11,
107:10, 113:6,

114:17, 116:15,
116:16, 117:18,
122:5
**correctly**
20:1, 65:13,
86:22
**costs**
33:6, 33:15,
33:21, 33:25
**costume**
98:23
**could**
7:7, 13:2,
20:9, 27:3,
29:6, 32:8,
32:15, 33:12,
38:22, 40:8,
41:10, 43:10,
43:24, 47:7,
51:15, 52:13,
56:21, 57:13,
62:11, 63:20,
64:14, 71:4,
82:6, 86:12,
88:20, 92:2,
93:1, 97:8,
98:16, 107:21,
110:1, 110:4,
110:6, 110:12,
111:23, 112:19,
119:1
**could've**
98:22, 99:5
**couldn't**
74:14, 106:20,
113:3
**counsel**
5:13, 6:5, 6:9,
12:22, 22:1,
122:9
**course**
43:3, 79:3
**court**
1:1, 2:7, 5:6,
5:25, 6:4, 6:14,
6:16, 6:21, 8:5,
11:21, 19:10,
27:3, 30:8,

32:8, 62:21,
63:20, 77:16,
77:19, 84:2,
86:10, 91:2,
91:4, 91:13,
97:8, 101:23,
109:25, 112:15,
112:19, 122:16
**cover**
114:23
**covered**
61:19, 99:5
**crc**
1:25, 122:17
**create**
41:9, 50:15,
52:24, 73:16,
73:19, 74:3,
99:23, 118:7,
118:19
**created**
45:20, 72:21,
79:13, 83:6,
83:8, 83:17,
83:22, 83:24,
85:7
**creating**
73:3, 91:22
**creation**
25:18, 83:11
**creative**
96:22, 98:8,
98:10, 99:16,
99:22, 99:25,
100:2, 100:5,
100:9, 100:18
**criteria**
49:11
**critic**
112:1, 112:10
**critical**
112:23, 113:24
**cross-functional**
47:4, 79:22
**crr**
1:25, 122:17
**cst**
1:18

**current**
36:8, 47:25,
48:1
**currently**
7:11, 10:7,
94:5
**curt**
5:18, 17:11,
22:16, 78:7,
113:25, 120:2
**curtis**
3:12
**cut**
91:5
**cutting**
63:22

D

**dark**
106:15
**database**
80:8
**date**
5:8, 18:11,
18:14, 23:1,
27:15, 35:12,
35:16, 35:20,
36:4, 36:6
**dated**
20:17
**dates**
91:17
**day**
50:23
**deal**
10:25
**decade**
107:9
**decided**
43:10
**decides**
51:7
**decipher**
82:6
**decision**
55:14, 71:10
**defendant**
3:9, 4:10,

5:19, 12:16,
13:17, 18:18,
25:1, 25:5,
38:7, 38:25,
80:25
**defendants**
1:12, 3:19
**defer**
103:2
**define**
48:9, 105:17
**defining**
60:5
**definition**
14:22, 29:10,
39:10, 39:14
**definitions**
39:15
**degree**
9:22, 73:16,
76:16
**degrees**
10:4
**department**
21:12, 21:17,
21:19, 21:22,
21:24, 21:25,
47:7, 88:4
**depending**
46:25, 71:21,
76:16, 79:23
**depends**
48:9, 48:20,
52:9, 61:14,
61:20, 67:24
**depict**
55:22
**depicted**
42:25, 48:16
**depicting**
55:25
**depiction**
42:15, 43:3,
44:3, 45:14,
70:10, 70:16,
70:22, 94:4,
94:12
**depos**
5:11, 6:1

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                        39

deposed
11:8
deposition
1:15, 2:1, 4:7,
4:9, 5:3, 5:11,
11:14, 12:16,
13:4, 13:9,
14:23, 34:11,
67:13, 79:1,
119:3, 119:7,
120:1, 120:4,
120:9, 121:7,
121:11, 122:3
description
96:14
design
56:14
designs
14:16
details
109:18
determination
71:25
developed
43:8
development
15:18, 40:24,
45:1, 118:15
devoid
64:4
diane
87:1, 87:2
difference
71:20
different
48:10, 48:13,
52:2, 52:15,
58:5, 58:6,
59:6, 59:8,
64:5, 68:20,
69:7, 70:13,
82:13, 82:18,
82:19, 91:17,
95:4
digital
9:10
dimensional
66:8

dino
81:9, 82:21,
82:25, 83:1,
83:6, 92:5,
92:13, 92:20
dino's
93:4
direct
7:5, 51:7
direction
48:13, 51:2,
52:16, 122:8
directionally
92:25
disconnect
61:6
discuss
29:9, 42:6
discussed
69:24, 81:13,
103:12
discussing
14:1, 14:3,
78:2, 106:2
disk
5:2
dispute
14:21
dissipated
77:22
distinction
104:16, 108:5
distinctive
27:14
district
1:1, 1:2, 5:6
document
12:14, 12:18,
13:1, 13:8,
17:4, 17:8,
17:12, 17:14,
17:25, 18:1,
22:5, 22:7,
22:15, 22:17,
34:8, 37:9,
78:8, 78:18,
78:20, 78:22,
79:13, 79:14,

79:15, 81:14,
88:25, 97:5,
99:2, 100:15,
117:20
documents
44:18, 44:21,
78:25, 79:5,
79:9, 120:6
doing
9:17, 11:13,
48:2, 48:25,
118:10
dollar
34:16
done
16:3, 62:10,
64:6, 86:20,
111:10, 118:15,
118:24
dov
117:5
dove
14:15
down
11:22, 44:24,
81:20, 83:5,
88:18, 93:1,
93:14, 95:6,
96:13, 118:2
drawn
74:12
during
44:25, 63:13,
119:21
duties
10:10, 10:16
dvd
107:2, 107:6
dvds
106:24

---
**E**
---

e
29:10
each
19:16, 82:14,
82:17, 86:11,
91:6

ear
18:22
earlier
11:12, 26:15,
53:1, 68:1,
92:18, 93:5,
103:12, 110:25,
116:1
earliest
18:22
early
118:14
easiest
17:2
eastern
102:13
ed
5:3, 6:12,
115:21
edit
92:21, 99:5
edward
1:16, 2:1,
3:10, 4:2, 6:25,
7:9
effect
25:8
effective
18:11, 18:14,
27:15
eighteen
114:20
either
102:11
electronic
80:16
electronically
4:6
element
44:11
elements
42:5, 42:7,
42:8, 43:15,
43:16, 43:25,
45:23, 46:14,
49:8, 65:25
ellis
3:23, 5:22

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    40

email
4:25, 115:13,
115:18, 115:22,
116:11, 116:18,
116:22, 117:22,
117:25
emails
113:22
employed
7:11, 7:19,
7:25, 9:1, 9:5,
9:11, 23:8,
122:10
employee
83:3, 85:8,
85:12, 85:16,
87:2, 116:8,
116:13, 116:15
employees
116:4
employer
7:13
employment
11:1
encompassed
101:14, 101:20,
102:2
encourage
109:6
end
36:11, 37:24,
48:25, 50:22,
77:17, 121:6
engage
57:20
enough
71:14, 72:6
ensure
42:14, 45:13,
45:23, 49:12
enter
73:14
entered
15:14
entertainment
1:10, 1:11,
3:10, 3:21,
4:11, 4:12,

4:14, 5:19,
5:24, 7:14,
7:16, 9:4,
10:15, 12:17,
17:7, 22:24,
25:2, 37:11,
101:18
entertainment-te-
rms
17:15
entitled
12:14, 17:6,
30:7, 30:21,
32:18, 37:10,
44:18, 78:8
entrance
41:20
entry
84:17, 86:2,
86:25, 87:14
esquire
3:3, 3:12, 3:22
et
5:5
evaluate
64:14
evaluating
48:11
even
30:12, 77:12,
104:10
event
53:3
evented
106:19
events
105:22, 106:4,
106:11, 106:13,
106:16, 106:17,
111:6
eventually
46:15, 67:1,
91:23
ever
11:8, 31:18,
31:24, 95:21,
107:1, 118:22,
120:14

every
13:20, 14:8,
79:6
everyone
85:11, 85:12,
85:14
everything
11:22, 27:23,
28:18
ex
105:13
examination
4:2, 7:5
examined
7:3
example
45:18, 52:16,
54:13, 80:22,
93:6, 94:24
exceed
105:13
excuse
8:5, 86:10
exhibit
4:7, 12:8,
12:9, 12:13,
13:13, 17:3,
17:6, 17:12,
17:16, 17:23,
20:17, 22:3,
22:4, 24:7,
24:13, 24:14,
24:22, 25:24,
26:6, 26:22,
27:1, 27:11,
28:5, 28:21,
28:22, 29:24,
32:15, 36:18,
37:1, 37:10,
37:23, 38:9,
78:5, 78:7,
78:18, 80:22,
83:17, 84:8,
88:18, 88:21,
89:4, 89:5,
89:25, 90:1,
95:2, 95:6,
95:24, 96:2,

96:6, 96:19,
99:7, 100:22,
115:12, 115:16
exhibits
12:9, 12:11,
16:23, 16:24,
103:13, 121:14
exist
18:22, 20:17,
21:3, 21:11,
44:13
exists
19:3, 19:6,
68:5
expect
56:18, 57:23,
102:16
expectation
58:8
expended
33:16
experience
50:9, 55:24,
56:15, 57:6,
57:12, 57:16
experts
47:4, 79:23
explain
106:7
explicit
16:10
extension
57:5
extensive
16:3
extent
111:7, 113:2,
121:1
external
80:3, 80:15,
85:22, 85:23,
86:3, 87:5,
87:13

**F**

face
93:16
fact
6:12, 7:3,

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    41

48:15, 53:8
**fair**
55:2, 66:2,
74:23, 80:16
**familiar**
44:20, 50:10,
53:22, 59:9,
73:6, 75:15,
75:18, 76:17,
115:24
**fan**
107:18, 107:24,
108:5, 108:11,
112:10
**fandom**
76:16
**fans**
50:9, 55:24,
57:7, 57:20,
57:23, 60:11,
74:18, 74:24,
75:1, 75:5,
75:21, 76:5,
76:12, 76:22,
108:6, 108:12,
108:16, 109:3,
109:14
**far**
26:2, 58:11,
72:3
**favor**
39:2
**favorite**
74:19, 74:24,
75:5, 75:22,
76:5, 76:22
**fcrr**
1:25, 122:17
**feature**
60:5
**featured**
54:7, 54:9,
106:4, 106:12,
106:23, 107:1,
107:6, 114:22
**features**
42:4
**featuring**
107:13, 116:25

**february**
23:2
**feed**
77:5
**feedback**
58:22, 80:2,
90:16, 90:17,
90:19, 91:1,
91:11, 95:12,
97:21, 110:21,
112:10
**feel**
51:9, 55:11,
55:21, 57:9,
72:5, 72:20,
114:9, 120:19
**feet**
54:15
**felt**
92:23
**few**
107:6
**figures**
36:9
**file**
90:21
**files**
80:16, 81:18,
82:5, 89:25,
90:3, 90:13,
90:18, 91:18
**finance**
36:7
**financial**
122:11
**find**
47:1, 48:13,
57:19, 100:11,
100:17, 119:1
**finds**
55:8
**fine**
11:13, 14:9,
87:17, 102:16
**firm**
3:4, 5:16,
120:7
**first**
9:18, 18:9,

18:10, 23:12,
23:13, 24:25,
39:8, 47:14,
56:6, 84:21,
89:5, 89:10,
89:11, 116:19
**fiscal**
36:12
**fitting**
63:19
**five**
62:17, 87:14,
92:5, 119:19
**flag**
53:11, 54:19,
61:7, 61:23,
72:7
**flagged**
67:16, 69:1
**flip**
18:8, 84:7,
92:3
**focused**
111:4
**folks**
60:9, 60:10,
80:14, 116:3
**follow**
13:3, 110:14
**follow-up**
121:1
**followed**
110:12
**followers**
109:3
**following**
92:7, 108:20,
108:25
**follows**
7:4, 35:9
**foregoing**
122:3, 122:4
**form**
15:12, 15:25,
16:4, 16:14,
24:8, 24:16,
26:1, 33:9,
39:22, 52:5,

56:19, 58:16,
60:2, 60:7,
80:17, 97:5,
101:3, 101:8,
101:13, 101:19,
105:24, 106:5,
106:7, 107:11,
107:14, 107:25,
109:14, 112:25,
117:19, 120:20
**formal**
44:13
**formally**
6:6
**forms**
95:4
**forth**
47:11
**forty-three**
39:12
**forward**
84:22
**forwarded**
87:6
**found**
16:4
**foundation**
15:13, 16:1,
16:15, 33:19,
38:21, 40:7,
41:16, 43:14,
56:20, 97:4,
98:19, 99:3,
112:6, 114:3
**four**
78:6
**four-page**
12:25
**frame**
107:1
**franchise**
62:3
**free**
19:20, 120:19
**freidman**
119:17
**frequently**
106:22

front
12:12, 12:19,
12:24, 17:1,
17:9, 17:16,
17:22, 88:22,
96:5, 115:14
full
7:8
fun
50:13, 57:15
function
49:16, 72:18
furiously
11:22
further
23:15, 23:20,
64:14, 68:25,
69:1, 83:5,
93:14, 120:25
furthest
118:17
future
52:19, 61:19,
62:8
futuristic
62:2

**G**

gaining
117:6
game
11:2, 25:18,
31:8, 31:23,
35:12, 35:15,
35:19, 41:6,
41:10, 41:24,
42:3, 42:4,
42:24, 43:1,
43:3, 43:6,
43:16, 43:17,
43:25, 44:1,
45:24, 47:9,
48:17, 50:14,
50:17, 50:19,
54:9, 56:18,
57:11, 57:15,
65:14, 66:9,
67:25, 68:17,

82:11, 98:4,
104:4, 114:10,
116:25, 117:10,
117:11, 117:12,
117:15, 117:16,
118:6, 118:8,
118:15, 120:22
games
1:8, 3:20,
5:23, 10:13,
10:17, 14:2,
14:4, 14:7,
15:11, 15:17,
15:18, 15:19,
15:24, 16:7,
16:12, 30:23,
31:5, 31:12,
31:21, 32:23,
33:8, 33:17,
34:1, 34:5,
35:9, 41:7,
42:12, 43:8,
43:10, 43:19,
44:15, 45:1,
45:10, 45:11,
45:12, 46:10,
48:12, 49:6,
49:8, 50:7,
50:24, 52:14,
52:17, 52:18,
53:14, 54:8,
54:11, 56:5,
56:24, 57:3,
57:5, 57:17,
57:19, 57:23,
58:5, 58:7,
61:25, 62:1,
62:3, 63:8,
65:6, 65:15,
65:18, 65:23,
66:6, 67:6,
68:6, 69:5,
75:3, 79:10,
95:22, 101:12,
103:18, 103:25,
106:2, 110:18,
111:16, 112:2,
112:24, 113:24,

114:13, 114:15,
114:18, 114:21,
117:9
gates
3:13, 3:14
gear
41:19, 47:25,
48:1, 97:24
general
22:1, 36:24,
47:2, 97:18
generally
76:22, 97:13
generate
73:7
getting
81:17, 111:4
giant
53:22, 53:24,
54:7, 54:14,
54:21, 54:25
giorno
96:20, 100:4,
100:17, 115:25
give
22:19, 48:24,
50:8, 50:9,
118:13
given
43:8, 43:11,
69:3, 69:23,
95:12, 122:5
gives
97:22
go
23:11, 26:1,
43:15, 47:15,
52:6, 62:4,
65:4, 71:21,
84:21, 85:19,
88:14, 91:18,
92:5, 95:1,
99:21, 102:5,
110:22, 113:25,
117:24
goals
49:23, 50:8
goes
47:2, 52:15,

58:12, 84:15,
93:7
going
14:6, 14:10,
14:16, 16:24,
17:3, 27:17,
29:9, 30:12,
32:16, 41:1,
51:2, 55:5,
61:16, 62:19,
66:11, 77:17,
78:6, 78:18,
82:20, 85:20,
86:14, 94:13,
106:6, 111:20,
116:19, 117:24
good
7:7, 11:23,
49:17, 57:19,
62:16, 72:22,
76:20, 102:4
grade
48:13
graduate
10:1
granted
15:17
granting
25:16
graphics
44:8, 81:24,
99:23, 118:13
group
9:10, 21:13,
21:14, 36:7,
45:21, 99:16,
99:18, 113:16
guarded
54:4
guess
58:23, 74:8,
75:12, 104:16,
111:2
guidance
51:9, 114:9
guidelines
63:19, 64:2,
67:18

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    43

guys
98:8

**H**

h(2
38:5
hair
93:15, 93:21
haircut
47:24, 47:25
half
9:2
hand
74:12
handle
10:12
handles
48:22
happen
63:10
happened
10:25, 92:17
happening
91:24, 117:16
hard
53:20, 71:18,
71:19
hat
92:8, 92:19,
93:1
head
8:4, 8:23,
21:23, 21:25,
59:22, 93:2,
106:1, 107:5
heading
13:4, 89:6
headlined
105:21
heads
104:14
hear
8:14, 20:1,
30:17, 77:7
heard
91:14
hearing
77:4, 77:8,

77:15
hel
7:15
help
15:2, 109:17
helping
73:25
helps
99:22
here
5:2, 11:2,
13:12, 24:6,
26:13, 27:13,
27:23, 28:6,
30:4, 30:13,
34:22, 36:20,
39:12, 39:21,
45:5, 56:2,
62:22, 65:1,
84:9, 85:7,
85:15, 86:25,
87:5, 87:14,
88:15, 89:18,
90:3, 91:24,
92:6, 92:13,
93:4, 94:14,
96:19, 96:20,
97:1, 98:11,
100:7, 102:10,
102:23, 103:1,
115:22, 117:17,
117:22, 117:25,
118:1, 121:2
hereby
6:17, 122:3
heroic
48:24
hi
108:9
high-level
73:9
highlight
114:24
himself
95:8
historical
62:2, 68:1
historicals
61:17

history
84:10
hoc
110:21, 111:19,
113:22
hold
7:15, 8:2, 10:3
holds
14:12
home
10:13
hour
102:17
hours
119:19
how's
8:14
however
106:8
hurricane
102:19
hypothetical
53:7, 54:18,
61:3, 62:6,
64:11, 112:5

**I**

idea
42:14, 98:20
identify
5:13
identifying
27:2, 27:5,
27:14
ign
118:3, 118:6,
118:13
illinois
1:2, 5:7
image
96:21, 99:10,
100:19
images
97:21
implicate
87:11
important
11:20, 11:23,

57:7, 70:24,
71:6, 71:9,
71:14
in-ring
75:13
inaccuracies
51:4
inaccuracy
72:6
inaccurate
52:11, 53:10
inc
1:8, 1:9, 1:10,
3:10, 3:20,
3:21, 4:11,
4:12, 4:14, 5:5,
5:19, 7:14,
12:17, 17:7,
37:11
include
10:16, 46:2,
51:13, 58:14,
62:1, 63:12,
65:14, 65:17,
65:20, 76:12
included
28:6, 46:16,
89:17, 114:25,
120:11
includes
23:15, 23:20,
29:12, 42:18,
66:4, 89:20
including
10:13, 14:14,
27:17, 28:21,
41:19, 44:2,
44:6, 46:18,
47:6, 72:24,
73:1
inclusive
26:2, 26:3,
28:18, 28:19,
31:9, 51:16,
57:13, 58:23,
71:4
incomplete
54:17, 61:2,

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    44

**64:10, 112:5**
**incorporated**
28:25, 80:25,
117:9
**incorporating**
107:15
**incorrect**
51:9
**incurred**
33:7, 33:25
**indeed**
115:23
**indemnification**
37:17
**indemnify**
37:21, 38:7,
38:14, 38:17,
38:25
**indicate**
83:16, 88:11
**indication**
83:17, 84:24,
85:6, 86:8, 88:9
**indicative**
81:3
**indicia**
27:14
**individual**
19:21
**individually**
109:24, 110:5
**individuals**
23:24, 119:20
**information**
20:9, 84:5,
100:20, 113:2
**inherent**
19:15
**insofar**
109:15
**instance**
25:22, 51:25,
118:12
**instances**
48:19, 52:13,
55:13, 61:15,
66:4, 85:21,
95:19, 106:18

**instead**
6:7
**intellectual**
27:10, 27:12,
27:21, 27:22,
29:11, 29:12,
39:22, 40:3,
45:10, 55:1,
55:20, 56:25,
57:2, 63:7
**intend**
19:17
**inter**
15:3, 29:11
**interact**
57:20
**interactive**
1:7, 3:19, 5:4,
5:22, 7:17,
7:22, 10:7,
10:13, 25:4,
80:24
**interchangeably**
104:20
**interest**
56:3, 122:11
**interested**
109:16
**intermedia**
113:21
**internal**
47:14, 79:25,
80:14, 84:25,
85:5, 87:13,
88:10, 96:18
**interpose**
15:5
**interrogatory**
34:10, 34:15,
34:23, 36:2
**interrupt**
8:8, 22:11,
103:4, 103:5
**involved**
10:21, 11:1,
11:4, 73:23,
73:25, 88:4,
111:12

**involves**
53:7
**ip**
25:17, 26:2,
27:8, 40:9,
41:10, 45:14,
49:8, 56:10,
89:6, 89:14,
90:9, 107:16
**ips**
89:17
**issue**
92:24
**issues**
47:7, 100:11
**iterative**
91:22

**J**

**jersey**
93:15, 93:20
**job**
1:22, 9:18,
10:10, 10:16,
10:20, 79:3
**joe**
96:20, 100:4,
100:17, 100:20,
115:25
**john**
116:25, 117:14,
118:16
**josh**
101:5, 102:25,
103:1
**joshua**
3:22, 5:21
**jpmorgan**
9:13, 9:15,
9:17
**judgment**
38:17, 39:1
**june**
35:8, 36:5,
36:11

**K**

**k**
115:7

**k&l**
3:13, 3:14
**keep**
49:1, 62:19,
90:19, 111:22
**kevin**
5:10, 8:6,
16:25, 62:21
**key**
115:1, 115:7
**kiang**
1:16, 2:1,
3:11, 4:2, 5:3,
6:12, 6:25, 7:7,
7:9, 11:8,
12:19, 13:2,
14:24, 15:8,
17:1, 17:9,
17:17, 17:24,
18:21, 19:22,
20:15, 30:20,
31:17, 34:9,
38:4, 38:24,
63:4, 74:18,
77:25, 78:17,
78:22, 86:15,
88:17, 95:8,
96:10, 100:23,
102:15, 102:25,
103:11, 104:6,
107:23, 115:18,
115:21, 118:21,
120:13, 120:24
**kiang's**
19:20
**kind**
36:19, 77:4,
77:6, 90:19,
98:9, 110:22,
111:10, 111:18,
111:19, 115:2
**kirkland**
3:23, 5:22
**knife**
59:24, 60:22,
61:5, 63:12
**knowing**
53:18

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                         45

knowledge
16:20, 18:21,
31:20, 31:24,
76:20, 101:2,
104:3, 120:13

L

labeled
84:17, 89:13
lack
15:25, 16:14,
33:18, 41:16,
43:13, 56:19,
98:19, 114:3
lacked
67:21, 70:1,
70:8
lacks
15:12
large
100:18
larger
30:12
last
8:22, 19:18,
27:9, 84:2,
90:25, 91:4,
91:11, 96:17,
96:19, 107:6
late
102:21
later
13:25, 37:7
laura
87:18
lauren
87:22, 87:23,
87:24, 119:24,
120:2
law
3:4, 5:16
lawyer
38:12, 119:22
lays
32:22
lead
115:22
least
14:3, 24:13,

50:24, 72:9,
97:19, 106:1,
113:5
left
8:3, 8:24, 9:8,
9:14, 63:4,
80:23, 102:11,
112:16
legal
14:20, 16:1,
16:15, 21:12,
21:15, 21:16,
21:17, 21:19,
21:22, 21:23,
21:25, 25:11,
25:13, 27:24,
28:14, 29:15,
30:25, 32:3,
38:10, 38:19,
40:4, 40:15,
40:22, 41:15,
41:25, 43:14,
43:21, 47:6,
47:7, 88:2,
88:3, 103:19
lesnar
59:10, 59:12,
60:1, 60:6,
60:12, 60:18,
60:22, 63:5,
64:4, 64:16,
65:1, 67:15
lesnar's
63:11, 65:1
let's
16:23, 17:23,
22:4, 34:20,
36:17, 36:19,
36:20, 39:6,
42:6, 45:3,
48:18, 49:5,
53:2, 54:13,
54:24, 56:1,
60:17, 62:14,
78:5, 80:21,
84:7, 85:17,
86:24, 94:13,
95:23, 96:17,

97:16, 102:5,
115:12
level
71:3, 105:13,
110:13, 113:1,
113:5, 113:12
lexington
3:24
liability
37:22, 38:8
license
4:15, 17:15,
25:7, 25:9,
25:21, 31:18,
31:24, 32:15,
33:23, 36:18,
36:25, 38:9,
40:8, 40:13,
100:23, 103:13,
120:14
licensed
16:6, 30:22,
39:15, 39:20,
40:13, 40:20,
41:9, 42:5,
42:7, 42:8,
42:12, 42:17,
43:12, 44:15,
57:10, 111:12
licensee
25:4, 80:24,
81:6, 85:3
licenses
32:12, 120:21
licensing
7:18, 7:23,
10:8, 10:12,
10:17, 10:22,
22:8, 24:23,
25:22, 31:21,
31:23
licensor
23:23, 24:12,
25:1, 32:18
lieu
6:6
life
30:12, 68:2,

68:21, 69:8,
70:14, 72:1
life-like
73:21
light
55:22
lighting
41:19
likeness
15:16, 16:19,
23:21, 26:16,
27:18, 27:19,
28:2, 28:12,
28:19, 28:25,
29:2, 29:12,
29:21, 48:5,
56:4
line
52:19, 61:16,
61:18, 62:11,
82:4, 91:22,
115:22, 116:3,
116:6, 116:8
lines
56:13
list
42:7
listed
27:12, 27:23,
29:3, 89:7,
89:18, 90:9
listing
28:11
litigation
10:18, 30:24
little
8:10, 8:11,
8:16, 11:12,
15:4, 19:16,
30:11, 35:24,
39:7, 44:23,
71:1, 77:25,
78:3, 83:5,
93:14, 103:12
live
105:22, 106:4,
106:11, 106:13,
106:17

llp
3:23
location-based
10:14
log
87:16
long
7:19, 9:1, 9:5,
19:7, 20:3,
23:13, 102:6,
119:17, 120:17
longer
15:7, 19:1,
87:3, 96:21,
98:14
look
17:23, 18:9,
22:4, 22:10,
28:5, 29:23,
30:6, 32:17,
34:13, 34:21,
36:17, 36:20,
37:14, 39:6,
44:23, 47:24,
48:24, 48:25,
50:20, 51:1,
51:3, 51:8,
51:19, 51:21,
54:20, 56:9,
57:4, 58:9,
58:18, 58:21,
62:4, 65:14,
65:21, 72:3,
76:6, 76:23,
78:5, 80:22,
85:17, 86:25,
88:20, 91:21,
92:2, 93:1,
93:13, 95:19,
95:20, 95:23,
98:10, 99:10,
106:13, 109:12
looked
50:20, 52:11,
53:9, 95:10,
100:23, 118:18
looking
26:6, 45:8,

45:13, 47:19,
47:21, 48:7,
49:9, 50:25,
51:18, 58:14,
59:5, 68:4,
72:19, 84:16,
111:19, 118:7
looks
49:13, 49:20,
54:21, 58:21,
59:6, 73:17,
84:16, 86:21,
86:25, 92:8,
92:19, 93:16,
94:5, 96:12,
116:17
lot
89:7, 89:14,
109:17, 116:6,
118:24
louder
8:10, 63:21,
97:9, 110:1
loudly
8:7
louis
3:6
love
48:22
lunch
102:14, 102:16,
103:7

### M

made
63:18, 69:2,
72:16, 74:1,
91:21, 92:4,
92:18
main
54:10, 106:19
maintain
71:3, 94:11
maintaining
48:4, 48:15
make
11:18, 12:1,
41:10, 51:18,

53:12, 53:19,
55:14, 71:24,
86:24, 90:17,
93:15
makes
31:6
making
50:16, 92:20
man
53:25
manage
111:2
manner
39:23, 51:10
many
89:20, 105:5,
105:12, 106:11
map
73:16
mark
12:8, 12:13,
16:23, 17:3,
17:12, 34:21,
78:6, 78:18,
88:20, 95:23,
115:12
marked
14:13, 17:20,
92:4, 96:7
market
3:5, 114:13
marketed
43:10, 67:6
marketing
8:4, 8:23,
34:4, 43:16,
45:19, 45:23,
51:24, 103:17,
103:22, 104:2,
104:4, 114:25,
115:1, 115:6,
115:8, 117:12,
117:15
marks
27:13, 121:6
materials
119:8
matter
5:4, 47:4,

48:14, 79:23
maybe
30:10, 52:15,
97:24, 98:13
mean
22:12, 32:12,
35:2, 39:21,
40:24, 42:4,
42:5, 45:16,
48:10, 50:14,
50:22, 56:17,
60:8, 74:6,
75:10, 81:22,
82:5, 83:7,
83:20, 85:1,
86:4, 90:4,
93:19, 105:9,
106:8, 108:8,
108:9, 108:18,
112:3, 112:7,
113:10
means
83:8, 85:2,
86:5, 87:5
mechanics
78:1
media
7:17, 7:22,
10:7, 108:20,
108:25, 109:2,
109:3, 109:6,
109:11, 109:13,
109:16, 109:21,
110:9, 110:13,
110:17, 110:20,
110:24, 111:3,
111:9, 111:15,
112:1, 112:23,
113:24, 117:6
mediabox
116:20, 117:3
meet
119:10, 119:18
meeting
119:21
meets
57:10
melody
1:24, 2:7, 6:1,

77:14, 122:2,
122:16
**member**
21:17, 84:20,
100:2, 100:4
**members**
84:22
**mentioned**
13:1, 14:2,
55:25, 61:13,
79:21, 98:21,
99:15
**menu**
65:21
**merchandise**
107:13, 107:15
**met**
119:16
**metacritic**
111:20
**middlen**
87:18, 88:10,
119:24
**midway**
23:13, 118:2
**might**
15:2, 17:21,
19:15, 45:19,
53:19, 55:18,
60:9, 60:11,
64:1, 65:21,
66:3, 71:21,
77:21, 87:11,
95:5, 115:9
**might've**
68:3
**mind**
70:3, 100:19
**minute**
22:19
**mischaracterize**
115:11
**mischaracterized**
56:7, 58:17,
80:18, 99:19
**mischaracterizes**
50:5, 53:6,
72:13, 93:11,

94:8, 97:5,
97:15, 99:1,
100:14, 104:24,
113:8, 114:5,
117:20
**mispronouncing**
82:24
**missed**
37:24, 115:5
**missing**
41:21, 61:4
**missouri**
2:8
**misstates**
50:3
**mistake**
86:22
**mm-hmm**
24:2
**mo**
1:25, 3:6,
122:17
**model**
42:21, 44:4,
47:20, 48:6,
52:1, 52:3,
53:4, 54:14,
55:15, 58:20,
58:21, 58:22,
58:24, 59:6,
60:18, 60:21,
60:23, 61:4,
63:11, 64:4,
65:5, 65:8,
65:10, 65:13,
66:2, 66:3,
66:12, 66:13,
66:16, 66:19,
66:23, 67:2,
67:5, 67:9,
67:20, 68:9,
68:19, 68:22,
69:6, 69:9,
69:16, 69:18,
70:1, 70:7,
70:12, 70:19,
70:25, 71:16,
71:24, 72:10,

72:21, 73:8,
74:5, 74:9,
81:15, 81:25,
82:2, 82:10,
82:17, 83:18,
83:23, 92:21,
92:24, 93:20,
94:17, 94:18,
94:22, 95:10,
95:15, 97:3,
100:13, 118:16
**model's**
98:23
**models**
41:19, 42:9,
42:18, 42:22,
43:2, 44:6,
44:8, 45:4,
46:16, 46:18,
46:22, 46:23,
47:18, 48:8,
50:25, 51:13,
51:18, 56:2,
56:4, 57:24,
58:9, 58:15,
59:2, 63:6,
73:13, 74:15,
82:13, 89:21,
90:6, 91:23,
93:8, 94:25,
97:14, 118:17
**modes**
52:15, 62:7
**moment**
14:2, 29:23,
34:24, 102:5,
102:8
**money**
31:5, 34:4,
103:17, 104:2,
104:4
**monitor**
5:9, 63:1,
103:9, 111:25,
114:7, 121:7
**monitoring**
110:14, 110:20,
111:18, 113:12

**monitors**
109:20, 110:8,
110:17, 111:15,
112:23, 113:23
**more**
16:17, 16:23,
31:5, 39:7,
41:20, 44:24,
49:16, 52:18,
66:21, 68:14,
72:18, 76:17,
77:2, 78:4,
89:20, 92:24,
93:2, 95:7,
100:20, 102:11,
104:10, 105:7,
105:11, 118:19
**morning**
7:7, 120:18
**most**
105:1
**motion**
73:19
**move**
48:23, 102:9
**movements**
73:21
**much**
19:1, 31:10,
52:2, 102:10
**muffled**
29:5, 30:8,
35:24, 65:7,
70:2
**music**
41:20, 44:8
**mute**
77:11, 77:14
**myself**
8:9, 30:11,
104:15

**N**

**name**
7:8, 15:15,
16:19, 60:19,
80:24, 81:6,
82:21, 99:18

named
7:3
namely
23:21, 23:24
names
28:6, 89:7,
89:14, 100:7,
115:25, 116:1
narrow
45:5
necessarily
83:24
necessary
12:24
need
34:21, 41:23,
71:24, 74:4,
77:9, 86:10,
95:7, 117:24
needed
41:6, 93:21
needs
40:12, 50:13
neither
122:9
net
30:22
never
114:8
new
3:25, 61:20,
90:18, 90:21,
102:22
next
17:21, 55:6,
117:21
noise
77:5
nontelevised
106:16
normally
80:10, 86:20
note
22:17, 26:19,
34:7, 59:7,
61:6, 85:7,
85:11, 89:3,
91:16

noted
58:5, 59:4,
98:1, 105:11,
105:19
notes
85:3, 85:24
notice
4:8, 12:15,
13:8, 13:9,
19:19, 20:6,
20:20, 21:6,
31:14, 32:3,
36:14, 59:18,
63:16, 64:9,
64:20, 67:13,
74:22, 75:9,
76:2, 76:9,
108:12, 108:15,
108:23, 109:8,
109:23, 110:4
noticed
53:11, 71:12
number
5:2, 5:7,
14:14, 22:12,
22:18, 26:7,
34:15, 34:23,
35:1, 35:2,
36:2, 36:21,
44:4, 44:18,
78:18, 80:23,
84:13, 84:14,
84:17, 86:2,
86:25, 87:14,
89:25, 90:23,
92:5, 99:8,
104:9, 105:20
numbers
17:5, 17:13,
78:19
nurse
22:1
ny
3:25
_____
       O
object
6:10, 14:19,

19:18, 38:2,
106:6, 114:4,
120:20
objecting
114:2
objections
39:3
obligation
41:14, 103:17
obtained
120:14
obtaining
41:12
obviously
19:17, 55:7,
64:25
occurred
73:12, 93:5
occurs
110:14
offett
5:10
office
77:11
officer
122:2
officially
57:9
often
111:11, 113:17
oftentimes
97:25
oh
62:13, 89:12,
101:7
old
80:5, 93:16
once
18:3, 86:20,
113:19
one
5:2, 8:22, 9:2,
13:20, 15:6,
16:17, 19:5,
31:25, 34:24,
35:5, 42:8,
43:2, 49:23,
50:7, 52:17,

52:18, 54:10,
59:20, 66:21,
68:14, 75:2,
78:7, 78:25,
79:7, 80:1,
80:22, 81:15,
82:11, 83:8,
84:13, 84:16,
84:17, 85:21,
88:19, 89:21,
92:4, 92:17,
93:19, 95:4,
95:20, 96:18,
98:14, 99:9,
99:10, 105:7,
106:11, 119:22
one's
59:21
ones
105:11, 106:20,
120:7
online
12:10, 110:22,
111:20
only
28:24, 85:2,
88:11, 91:20,
101:9
operates
25:18
opinion
55:9
opportunity
118:5
opposed
82:12
order
41:7, 41:8,
71:23, 73:7,
74:3, 84:16,
90:19, 94:11
original
10:25
orton's
14:17, 15:10,
25:24, 26:3,
28:12, 28:22,
29:2, 29:11,

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                              49

29:20, 71:5,
74:4, 95:14,
97:2, 109:20,
110:8
**other**
10:3, 19:16,
26:21, 27:13,
29:2, 29:13,
30:19, 32:6,
42:20, 43:5,
44:5, 48:12,
51:24, 55:15,
63:7, 72:7,
86:11, 90:13,
91:6, 93:4,
98:10, 119:20,
119:22, 120:23
**others**
24:17, 76:17,
77:2, 105:12
**otherwise**
78:10, 122:11
**out**
9:18, 27:23,
29:9, 32:22,
62:20, 63:22,
64:17, 65:7,
69:17, 70:20,
80:9, 85:24,
91:5, 100:11,
100:17
**outcome**
122:12
**outside**
19:19, 20:6,
20:12, 20:19,
21:5, 31:13,
31:22, 32:2,
32:11, 32:12,
32:13, 33:5,
36:13, 57:20,
59:17, 60:25,
61:11, 63:15,
64:8, 64:19,
67:12, 74:21,
75:8, 76:1,
76:8, 76:25,
87:6, 87:7,

88:14, 108:1,
108:14, 108:22,
109:7, 109:22,
110:3, 118:9
**over**
11:25, 12:1,
18:8, 19:16,
25:24, 26:7,
26:16, 28:5,
32:17, 60:20,
86:15, 92:3,
106:16, 107:9,
119:9, 120:7
**overall**
45:14, 49:2,
57:11, 92:9,
92:20, 112:9
**oversee**
21:19
**own**
107:18, 107:24,
108:5, 108:11,
108:20
**owns**
25:17, 40:9

**P**

**pa**
3:16
**packet**
96:10
**page**
4:2, 4:7, 13:2,
13:3, 13:13,
18:8, 18:9,
22:10, 22:24,
23:12, 23:13,
24:25, 26:7,
28:5, 29:24,
30:15, 32:17,
35:7, 36:21,
36:22, 36:23,
39:8, 39:9,
66:12, 81:19,
84:7, 84:9,
86:3, 89:5,
89:10, 89:11,
89:24, 94:14,

96:18, 96:19,
99:7, 117:22,
117:23
**pages**
1:23, 30:17,
35:3, 36:19,
37:7, 88:19
**paid**
31:8, 32:25,
33:22, 35:8,
111:10
**paper**
12:12
**paragraph**
18:10, 23:13,
26:8, 26:11,
26:17, 26:20,
29:3, 29:10,
30:6, 30:15,
36:24, 37:16,
38:5, 39:14
**pardon**
25:17
**parentheses**
23:24
**part**
9:19, 15:7,
27:9, 29:20,
42:13, 56:6,
56:11, 57:6,
57:13, 58:13,
58:19, 72:8,
84:3, 88:6,
91:4, 95:16,
100:8, 109:10,
110:24, 113:16,
118:13
**particular**
47:5, 48:6,
48:17, 49:18,
53:19, 55:15,
65:25, 80:16,
81:4, 82:10,
89:19, 97:3,
97:7, 97:11,
97:23, 100:13
**parties**
5:11, 18:17,

122:10
**party**
111:13, 111:22,
111:25
**past**
10:21, 52:22
**pay**
45:22, 46:6,
49:22, 106:14
**pay-per-view**
49:1, 99:23,
111:6
**payments**
29:25, 30:5,
32:25
**penalties**
6:9, 6:18, 7:2
**people**
46:25, 108:7,
110:22, 110:23
**performer**
106:4, 106:24,
107:2
**performers**
106:12
**perhaps**
11:11, 20:17
**period**
68:2
**perjury**
6:9, 6:19, 7:2
**permission**
15:9, 15:22,
16:11
**person**
28:3, 32:1,
70:10, 72:19,
83:20, 83:21,
85:7, 108:7,
108:9
**persona**
48:5
**personalities**
23:22, 75:6,
75:10
**personality**
27:18
**personally**
73:24, 113:14

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                        50

personas
23:23, 75:12,
75:13, 75:19
photos
59:7, 61:7,
73:22, 74:8
phrase
42:19, 53:1
physical
23:21
pick
8:6
picture
94:14, 94:15,
94:16, 94:21
pictures
73:15, 73:16
piece
81:4, 81:12
pittsburgh
3:16
place
41:1, 46:11,
80:14
plaintiff
1:5, 3:2, 5:16,
12:14, 15:9,
15:23, 16:11,
38:18, 39:2,
118:22
plaintiff's
4:8, 34:15
planet
5:11, 6:1
platform
82:14
platforms
9:10
play
57:12, 68:17
played
65:18
playing
50:16
playstation
81:16
please
5:13, 6:2, 6:5,

7:7, 8:5, 12:5,
27:4, 32:9,
34:24, 38:2,
63:21, 70:4,
85:19, 86:13,
97:9, 101:24,
110:1, 112:20
point
29:9, 57:1,
61:24, 93:19,
102:4
pointing
98:7
popular
104:6, 104:8,
104:10, 104:22,
105:2, 105:5,
105:7, 105:11,
105:18, 105:20
popularity
105:13, 105:16
portfolio
9:16, 45:12,
48:12, 56:11
portion
17:25, 23:19,
30:20, 30:21,
31:3, 37:9
portray
51:5, 75:15
portrayed
51:22
pose
48:2, 92:22,
98:3
posed
45:20, 48:1,
92:25
position
7:15, 8:2,
10:20
possible
98:22, 106:12
poster
45:22
posters
49:1
posting
111:8

posts
110:15
potential
45:9
potentially
60:16
power
102:18
powerful
109:14
precursor
117:4
preeminent
105:3
premarked
12:10
preparation
16:3, 18:3,
34:10, 79:1,
89:1, 115:20,
118:25, 119:2,
120:10
prepare
119:6, 119:11,
120:1, 120:4
prepared
20:22
present
49:3, 119:20
presented
52:1, 113:15
president
7:17, 7:22,
9:10, 10:7,
10:11, 88:1
presumably
61:5, 71:18,
80:5, 92:23,
94:3, 94:11,
113:11, 114:8
presume
19:5
pretty
59:25
previous
45:6, 99:6
primarily
111:4

printed
80:5, 80:9
prior
7:25, 9:3,
9:11, 9:17,
10:25, 19:3,
19:25, 27:15,
41:1, 43:17,
53:7, 58:17,
72:14, 94:9,
104:25
privilege
87:11, 87:16
privileged
87:17
pro
31:2
probably
19:6, 21:12,
52:7, 52:10,
55:4, 105:13,
109:2, 109:16,
110:12, 110:14
problem
8:19, 12:7,
14:21
proceed
6:22
proceeding
6:11, 16:4,
118:25
proceedings
118:10
process
19:15, 36:20,
42:14, 44:14,
44:25, 46:11,
46:13, 47:2,
47:13, 49:7,
49:24, 51:12,
58:13, 58:19,
63:6, 65:4,
66:15, 66:19,
66:22, 71:10,
73:7, 73:12,
73:23, 78:1,
82:16, 82:18,
84:23, 88:7,

91:22, 93:6,
95:1, 95:17,
110:20, 111:18,
112:12
**processes**
49:8, 116:2
**produce**
45:18, 45:22,
51:8
**produced**
17:4, 44:18
**product**
4:16, 4:19,
4:22, 40:18,
40:25, 41:9,
42:15, 43:1,
44:5, 44:19,
45:24, 45:25,
51:7, 52:10,
53:4, 57:8,
57:10, 78:9,
78:21, 79:4,
79:8, 81:11,
81:12, 81:13,
88:19, 89:19,
96:9, 111:12
**products**
10:13, 15:16,
30:22, 39:16,
39:20, 40:13,
40:20, 46:1,
46:5, 49:3,
120:15, 120:23
**professional**
27:16, 105:4
**program**
70:23
**programming**
42:25, 45:18,
47:23, 49:21,
50:1, 50:11,
51:22, 57:21,
108:17, 111:5
**promote**
114:12
**promotion**
105:3
**proper**
47:25, 55:22,

57:14
**properly**
45:15, 48:16,
55:11
**properties**
27:21
**property**
23:15, 23:20,
27:10, 27:12,
27:22, 29:11,
29:12, 39:22,
40:3, 45:10,
55:2, 55:20,
57:1, 57:2, 63:7
**protect**
56:16
**protecting**
56:4, 57:2
**protection**
56:25
**provide**
11:14, 13:12,
40:25, 51:8,
58:22, 113:17
**provided**
11:11, 16:7,
36:5, 42:7,
46:23, 84:11,
87:16, 91:20,
119:8
**provides**
112:7, 114:9
**providing**
13:16, 34:16,
55:23
**provisions**
30:5, 37:1
**ps3**
82:12
**ps4**
82:11
**publicity**
23:21
**publish**
86:22
**publishing**
10:14
**pull**
12:21, 34:7,

47:15, 78:11
**pulled**
36:7
**purpose**
27:1, 93:23,
117:5
**purposes**
14:22, 80:9,
117:15
**pursuant**
2:6, 25:23,
38:5, 40:13
**put**
41:1, 77:9,
79:15, 88:18,
100:22, 117:10

**Q**

**quality**
57:11
**question**
12:5, 23:16,
29:6, 30:20,
33:12, 36:4,
37:25, 38:1,
38:23, 40:1,
55:6, 56:7,
63:9, 70:3,
72:5, 79:12,
86:13, 87:18,
103:16, 104:16,
105:10, 107:19,
110:6, 112:20,
114:7, 114:22,
117:25, 119:15
**question's**
110:3
**questioning**
62:11, 102:18
**questions**
7:6, 11:16,
11:17, 17:22,
18:1, 19:18,
52:8, 120:25,
121:4, 121:6
**quiet**
8:13
**quite**
100:18

**quote**
39:15

**R**

**raise**
32:9
**raising**
111:5
**randal**
28:6
**randall**
18:19
**randy**
14:13, 14:17,
15:10, 15:15,
16:7, 16:12,
16:19, 18:6,
20:23, 26:3,
27:2, 27:5,
28:3, 28:7,
28:18, 31:9,
43:4, 44:3,
46:18, 65:5,
66:3, 66:5,
66:8, 66:23,
67:2, 67:5,
67:9, 67:20,
69:16, 70:10,
70:12, 70:13,
70:16, 70:19,
70:22, 70:25,
71:5, 71:13,
71:23, 72:19,
73:3, 73:8,
74:5, 81:15,
81:21, 82:9,
83:18, 94:16,
94:19, 95:8,
95:14, 95:20,
96:21, 97:2,
97:19, 98:3,
98:12, 99:10,
103:14, 104:6,
109:15, 116:19,
116:25, 117:14,
118:16
**rata**
31:2

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                          52

rates
32:22
rather
13:4, 64:4
rationale
52:12, 64:1,
64:13, 67:17
raw
46:7, 106:14
reaching
109:14
read
6:4, 23:19,
26:20, 121:9
reading
27:11, 39:21,
122:8
ready
35:6
real
68:21, 69:7,
70:14, 72:1
realism
49:9, 49:10,
49:16
realistic
70:25, 71:1
realistically
102:17
really
43:9, 49:11,
58:18, 61:13,
61:20, 92:24,
93:6, 111:9,
112:11
reason
64:23, 69:22
reattached
90:20
recall
44:17
recap
112:8
receipts
30:22
receive
9:22, 15:9,
15:22, 16:10,

32:23, 33:4,
85:22, 113:10,
113:14
received
31:11, 33:6,
33:14, 34:17,
35:13, 35:16,
35:20, 53:3,
53:9, 85:25,
114:10
receives
113:14
recent
52:18
recess
62:24, 103:7
recognize
60:9, 60:11,
74:19, 74:24,
77:2, 109:13
record
7:8, 12:25,
62:23, 63:2,
77:10, 89:3,
97:16, 102:5,
103:6, 103:9,
115:16, 119:1,
122:5
record's
106:7
recorded
11:20, 80:1
records
9:4, 9:6, 9:9,
9:12
redacted
88:11
redaction
87:15
redirect
121:2
reduced
122:7
ref
28:24
refer
13:24, 14:6,
14:16, 17:21,

17:24, 22:3,
26:7, 27:20,
45:3, 46:1,
81:24, 82:6,
104:12, 106:15
reference
24:11, 26:21,
26:24, 59:7,
61:7, 73:21,
74:8, 89:9,
89:15, 90:5,
92:20, 96:12,
97:1, 98:16,
98:23, 99:8,
117:25, 118:4
referenced
24:5, 37:5,
99:24, 110:25
references
28:22, 28:24,
90:3, 116:7
referred
26:13, 26:15,
29:3, 47:18
referring
26:17, 27:23,
28:2, 36:25,
42:22, 46:6,
49:20, 99:13,
115:10
refers
24:13
reflect
55:12, 94:3
reflected
95:2
regarding
33:6, 110:17
regularly
88:4
reimbursements
33:4, 33:14
reject
55:4, 55:8,
63:17, 63:24,
64:13, 64:22,
95:9, 97:14,
97:20

rejected
64:16, 67:20,
69:8, 70:11,
70:19
related
91:8, 91:11,
122:9
relations
21:13
relative
105:10
release
43:17
released
43:19, 43:24
rely
111:22, 111:24
remember
8:17, 59:21
remote
5:3, 5:9,
121:11
remotely
5:12
rendered
81:25
rendering
66:8
renders
90:4, 90:14,
96:13
renders_1
90:14
repeat
8:20, 14:7,
27:4, 32:9,
38:22, 63:21,
86:12, 110:6,
112:20
rephrase
33:12, 33:13,
56:21, 75:20,
111:23
report
36:6, 112:8,
113:10, 113:11,
113:13, 113:18
reported
1:24

reporter
2:7, 5:25, 6:2,
6:4, 6:7, 6:14,
6:16, 6:21, 8:5,
11:21, 19:10,
27:3, 30:8,
32:8, 62:21,
63:20, 77:16,
77:19, 84:2,
86:10, 91:2,
91:4, 91:13,
97:8, 101:23,
109:25, 112:15,
112:19, 122:1,
122:16
reports
113:22
represent
5:14, 5:16,
49:13, 72:17,
84:9
representation
47:22, 49:25,
53:1, 53:5,
53:15, 55:1,
55:9, 55:20,
57:14, 58:12,
71:15, 72:1,
72:11, 72:22,
73:3, 74:3, 94:7
representations
57:24
representative
45:15
represented
92:13, 95:22
representing
5:10, 6:1
represents
50:10, 117:22
request
63:25
requested
122:8
required
38:7, 38:16,
38:25, 40:20,
41:8

requirement
40:12, 43:9
research
113:12
resolution
71:21
respect
20:23, 32:6,
33:22, 44:15,
46:9, 47:17,
50:7, 50:24,
51:4, 58:3,
58:6, 65:2,
66:15, 72:16,
73:13, 81:11,
97:6, 97:10,
97:24, 98:9,
114:23, 116:1,
120:22
responded
34:14
response
35:4, 35:8,
36:2, 36:5,
64:12, 67:15,
80:3, 85:25,
86:5
responses
11:18, 11:19,
11:21
responsibility
37:21, 79:4
responsible
99:17
restate
29:6, 101:6,
107:21, 110:1
restating
70:3
restroom
62:12, 62:13
resub
90:14
resub_3
90:14
resubmit
90:18
reveal
115:2, 119:13

reverse
84:15
review
30:19, 34:9,
46:24, 47:12,
47:14, 53:4,
58:19, 59:1,
66:15, 66:18,
66:20, 66:22,
66:24, 74:16,
79:4, 79:6,
84:23, 88:7,
93:7, 119:3,
120:6, 120:9,
120:12
reviewed
46:15, 46:21,
65:11, 66:3,
79:1, 79:8,
89:1, 119:9
reviewers
61:6, 80:2,
84:11
reviewing
45:9, 47:20,
51:13, 60:18,
60:21, 63:10,
95:14
reviews
111:16, 111:19,
112:10, 112:23,
113:24
rights
15:17, 16:6,
25:17, 25:23
ring
48:3
road
44:24
rose
14:15
roster
54:11, 115:2,
118:8
round
52:17, 90:25,
91:11
rounds
92:18

royalties
29:25, 30:5,
32:18, 32:25,
33:5, 35:9
royalty
32:22
rpr
1:25, 122:17
rsa
1:25, 122:17
rule
12:15, 110:3
rustling
30:17

S

s
4:12
said
7:3, 24:21,
35:25, 58:22,
65:8, 68:2,
72:12, 86:16,
91:10, 95:25,
97:12, 99:25,
115:5, 122:6
sale
32:23, 41:2
sales
31:3, 31:11,
33:7, 33:16,
34:1, 35:9,
56:18, 56:24,
57:17
same
20:5, 20:12,
20:19, 24:6,
30:15, 39:3,
39:4, 45:21,
64:12, 64:21,
66:12, 76:14,
82:1, 82:18,
90:21, 93:14,
100:16, 110:10
saw
90:1, 115:25
say
11:22, 19:18,

21:22, 27:12,
31:7, 40:1,
42:3, 42:21,
42:22, 43:7,
49:15, 49:19,
50:18, 51:6,
53:20, 59:6,
59:25, 60:17,
65:13, 66:2,
66:21, 74:23,
76:15, 80:16,
85:20, 86:15,
95:19, 96:1,
101:25, 105:1,
113:3, 114:14,
115:6, 117:13
**saying**
44:7, 54:19,
60:19, 61:19,
71:9, 72:3,
84:4, 86:18,
97:10, 98:2,
110:23, 115:11,
118:12
**says**
78:21, 81:21,
82:5, 83:6,
84:18, 84:25,
86:3, 89:6,
92:7, 96:20,
99:9, 118:2
**scale**
93:1
**scanned**
74:13
**scanning**
73:15
**scans**
74:1, 74:15
**scenario**
63:13
**scenarios**
38:14, 62:2,
62:8, 69:24
**schedule**
32:24, 73:25
**schemes**
98:1

**scope**
19:19, 20:6,
20:13, 20:20,
21:5, 31:13,
31:20, 31:22,
32:2, 36:13,
59:17, 60:25,
61:11, 63:15,
64:8, 64:19,
67:12, 74:21,
75:8, 76:1,
76:8, 76:25,
108:1, 108:14,
108:22, 109:7,
109:22, 110:3,
118:9
**screen**
62:19, 116:24,
117:11, 117:14
**screens**
65:21, 116:19
**second**
29:6, 35:5,
82:4, 89:24,
117:22
**secret**
54:5
**section**
26:21, 29:25,
30:1, 30:15,
30:19, 32:17,
32:21, 39:15
**see**
13:5, 18:10,
18:12, 22:22,
23:3, 24:1,
24:7, 26:13,
26:23, 28:6,
28:8, 28:22,
30:2, 30:12,
30:14, 35:10,
37:3, 37:18,
39:17, 39:24,
58:21, 59:6,
61:4, 62:17,
63:18, 63:25,
80:23, 81:20,
82:22, 85:2,

86:7, 86:23,
89:18, 91:16,
92:10, 93:14,
93:17, 96:13,
96:15, 96:23,
100:7, 110:22,
115:24, 116:6,
117:23
**seeing**
50:10, 58:9
**seeking**
87:10
**seems**
77:22
**seen**
13:8, 18:1,
18:3, 19:5,
22:5, 24:21,
34:12, 78:22,
88:24, 115:18,
119:5
**sell**
31:5, 41:7,
107:12
**sells**
107:15
**send**
80:2, 85:21,
86:19, 95:5,
116:23
**sending**
85:24, 116:18,
116:21, 116:24
**senior**
88:1
**sense**
58:25
**sent**
47:3, 86:6,
95:3, 119:8,
120:7
**sentence**
23:14
**separate**
82:16
**september**
18:11, 19:4
**series**
10:17, 10:22,

**11:15, 14:1,**
17:22, 79:25
**service**
27:13
**services**
98:8, 99:16,
99:22, 100:2,
100:5, 100:9,
100:18
**set**
13:24, 36:17,
56:14, 95:6,
118:20
**seven**
7:20, 7:22,
10:21, 84:14,
99:8
**seventeen**
114:19
**shall**
39:21
**shane**
93:15, 93:20
**shape**
47:24, 93:16,
93:21
**share**
31:3
**shared**
88:12
**she'll**
84:22
**shorthand**
122:1
**shots**
116:24, 117:14
**should**
13:7, 51:8,
67:17
**should've**
11:11
**show**
50:16, 72:23,
75:15, 77:12
**showcase**
62:7
**showcasing**
115:3

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                                55

**shown**
88:15
**shows**
32:25, 46:6,
49:14, 49:15,
49:20, 106:14,
106:16, 106:19
**side**
83:2
**sign**
10:24, 121:9
**signature**
22:23, 36:22,
36:23, 60:22,
121:13
**signature-hl8sw**
122:14
**signed**
23:2, 23:5
**significance**
90:13
**signing**
122:8
**similar**
58:9, 67:15,
90:1
**similarly**
70:18, 88:9
**simmons**
3:22, 5:21,
15:3, 15:5,
25:11, 37:24,
38:21, 39:4,
40:7, 50:5,
54:17, 61:2,
64:10, 77:11,
93:11, 97:4,
99:1, 100:14,
101:3, 101:7,
101:13, 101:19,
102:21, 103:2,
105:24, 106:5,
107:11, 107:14,
112:4, 112:16,
112:18, 112:25,
113:8, 113:25,
114:4, 117:19,
120:20

**simon**
3:4, 5:16
**since**
11:2
**sir**
8:11
**sitting**
98:11
**situations**
62:7
**six**
95:25, 96:4,
119:19
**sixteen**
114:19
**sixth**
3:15
**size**
92:24
**skeleton**
73:18
**skip**
27:17
**skull**
14:15
**sleeve**
14:15
**smackdown**
46:7, 106:14
**small**
54:21, 92:8,
92:20
**social**
108:20, 108:25,
109:2, 109:3,
109:6, 109:11,
109:13, 109:16,
109:20, 110:9,
110:13, 110:17,
110:20, 110:24,
111:3, 111:8
**software**
1:7, 3:20, 5:5,
5:23, 25:5,
80:24
**sold**
40:21
**solicited**
95:13

**some**
11:12, 11:17,
14:11, 14:21,
19:25, 34:16,
46:14, 47:5,
47:10, 47:14,
48:3, 48:12,
51:9, 52:7,
56:17, 60:8,
60:10, 62:3,
63:18, 71:20,
72:7, 76:16,
76:19, 77:1,
85:20, 86:21,
92:3, 92:6,
95:18, 105:11,
106:11, 106:19,
108:6, 111:7,
113:1, 113:5,
113:12, 114:9,
114:25, 115:24,
118:13
**someone**
52:19, 57:8,
80:5, 80:9
**something**
48:3, 55:19,
60:8, 61:9,
61:20, 71:12,
86:16, 111:10,
111:21, 111:24,
115:10
**something's**
59:8, 77:6
**sometimes**
48:20, 48:23
**somewhere**
106:17
**sorry**
9:24, 19:10,
19:14, 21:14,
22:11, 27:3,
30:8, 30:10,
32:8, 32:10,
35:2, 35:5,
37:24, 38:22,
56:21, 63:20,
63:23, 66:21,

**some**
77:23, 78:12,
80:7, 84:2,
89:12, 91:2,
97:8, 101:4,
101:7, 101:23,
103:4, 104:12,
107:19, 110:6,
111:23, 112:15,
112:18, 114:1,
114:6
**sort**
60:5, 86:21
**sought**
31:18, 31:24
**sounds**
62:16, 77:6,
80:13
**source**
4:16, 4:19,
4:22, 79:18,
79:20, 80:13,
81:5, 83:13,
84:1, 84:5,
88:4, 90:16,
91:19, 117:4
**southern**
1:2, 5:6
**speak**
8:10, 8:17,
44:24, 97:9,
98:9, 119:25,
120:3
**speaking**
11:25, 12:1,
86:11, 86:15
**specific**
54:13, 93:7,
98:5, 100:19
**specifically**
25:21, 26:8,
45:3, 52:9,
56:2, 58:19,
59:5, 62:5,
72:4, 101:1
**spectacle**
56:14
**speculate**
71:19, 110:12

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    56

| | | | |
|---|---|---|---|
| **speculating** | **state** | **strange** | 50:25, 58:20, |
| 98:24 | 2:8, 5:14, 7:8, | 77:5 | 66:19, 66:23, |
| **speculation** | 34:14 | **street** | 74:15, 79:20 |
| 53:17, 58:1, | **stated** | 3:5 | **submitted** |
| 60:14, 60:25, | 8:23, 10:6, | **strike** | 41:18, 54:14, |
| 61:11, 63:15, | 18:17, 19:12, | 15:21, 26:13, | 59:2, 65:10, |
| 64:8, 64:19, | 19:23, 24:25, | 33:3, 45:6, | 67:8, 67:25, |
| 67:12, 67:23, | 36:1, 36:25, | 46:22 | 68:10, 68:19, |
| 68:13, 68:24, | 41:5, 66:14, | **striking** | 69:6, 69:15, |
| 69:12, 69:20, | 87:16, 92:6 | 59:25 | 81:4, 83:11, |
| 74:21, 75:8, | **statement** | **stuck** | 94:25 |
| 76:1, 76:8, | 45:7, 96:20 | 103:1 | **submitting** |
| 76:25, 92:15, | **statements** | **studies** | 89:16 |
| 94:1, 98:19, | 11:12 | 9:23, 9:24, | **substance** |
| 108:1, 108:14, | **states** | 9:25 | 119:13 |
| 108:22, 112:5, | 1:1, 5:5, 38:13 | **stuff** | **succeeded** |
| 114:3 | **stating** | 111:18 | 73:2 |
| **spend** | 91:7 | **style** | **suite** |
| 103:17 | **status** | 48:17, 51:2 | 3:5 |
| **spent** | 14:20, 104:17 | **styles** | **summerslam** |
| 34:3, 104:1, | **stenographically** | 48:14, 58:6 | 46:8 |
| 104:3 | 122:6 | **su** | **superstar** |
| **sports** | **step** | 59:2 | 104:11, 104:17, |
| 1:9, 3:20, | 111:17 | **subject** | 104:23, 107:9, |
| 5:23, 101:1 | **stephenson** | 10:18, 30:23, | 108:10 |
| **st** | 1:24, 2:7, 6:1, | 37:1, 47:4, | **superstars** |
| 3:6 | 122:2, 122:16 | 79:23 | 43:6, 104:9, |
| **stage** | **stepping** | **subjective** | 105:8, 105:16, |
| 118:14 | 62:20 | 71:2 | 105:18, 109:6, |
| **stamp** | **still** | **submission** | 115:3 |
| 26:7, 28:5, | 23:8, 37:10, | 4:16, 4:19, | **supplemental** |
| 37:14 | 37:15, 50:13 | 4:22, 53:9, | 34:16, 34:23 |
| **stamps** | **stills** | 53:14, 55:15, | **suppose** |
| 115:17 | 73:22 | 58:24, 63:11, | 113:11 |
| **standard** | **stipulate** | 63:17, 63:24, | **sure** |
| 37:2, 37:6, | 6:5, 6:13, 6:15 | 64:16, 78:9, | 8:12, 11:18, |
| 37:11, 37:15, | **stipulation** | 78:21, 79:5, | 20:8, 29:7, |
| 38:6, 39:7, | 6:5 | 79:9, 79:17, | 32:10, 33:11, |
| 39:8, 39:19, | **stomach** | 80:23, 81:12, | 38:3, 38:23, |
| 68:16 | 59:13, 59:25 | 81:14, 82:18, | 41:20, 42:4, |
| **start** | **storm** | 82:19, 83:19, | 42:10, 42:13, |
| 45:6, 60:19 | 102:23 | 83:23, 88:19, | 49:19, 50:18, |
| **started** | **story** | 89:20, 90:21, | 51:18, 60:3, |
| 20:11 | 52:14, 52:18, | 90:22, 96:9 | 61:22, 66:1, |
| **starting** | 52:23, 56:13, | **submissions** | 70:5, 74:6, |
| 10:22, 78:9, | 61:16, 61:18, | 44:19, 88:5, | 83:21, 86:24, |
| 84:13 | 118:3, 118:7, | 90:20 | 107:22, 110:2, |
| **starts** | 118:14 | **submit** | 110:7, 112:21 |
| 23:14 | | 47:3, 50:23, | |

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    57

suspect
108:6
swear
6:2
swearing
6:6
sword
59:20, 59:24
sworn
11:15
system
83:12, 83:14
systems
44:9

**T**

table
84:9, 84:18,
84:24, 85:12,
85:14
take
17:23, 22:4,
22:20, 34:13,
34:21, 36:20,
43:24, 47:10,
62:14, 73:15,
74:7, 74:15,
78:5, 80:21,
83:22, 85:17,
88:20, 95:23,
97:21
take-two
1:7, 3:19, 5:4,
5:22, 10:25,
15:18, 16:8,
22:9, 24:24,
25:4, 25:19,
25:25, 32:16,
33:1, 33:5,
33:15, 33:22,
34:17, 37:21,
38:7, 38:17,
39:1, 40:2,
41:5, 41:8,
43:11, 43:17,
43:19, 43:24,
47:16, 52:1,
53:3, 54:13,

59:3, 66:19,
66:22, 67:8,
69:15, 72:17,
73:2, 73:7,
79:18, 80:4,
80:24, 82:21,
83:22, 83:24,
86:6, 100:24,
101:10, 101:15,
101:21, 102:3,
103:13, 111:25,
112:3, 112:7,
112:14, 112:23,
113:17, 113:23,
120:4
taken
62:24, 103:7,
122:3, 122:6
talents
48:21, 74:24,
95:21
talk
19:15, 20:23,
49:5, 77:25,
106:13
talked
119:13
talking
14:11, 52:9,
62:1, 63:5,
66:13, 71:20,
82:2, 91:5,
114:16, 118:5
tall
53:24, 54:2,
54:15, 54:25
target
75:2
tattoo
31:19, 31:24,
31:25, 58:23,
59:12, 59:15,
60:11, 60:22,
61:5, 63:12,
64:5, 64:17,
72:4, 72:7,
120:14
tattooed
59:24

tattooist
16:5, 16:21
tattoos
14:11, 14:12,
14:14, 14:17,
14:20, 15:6,
15:10, 15:24,
16:12, 28:23,
29:20, 31:19,
58:15, 58:18,
59:1, 59:5,
61:18, 61:19,
65:1, 65:2,
65:3, 67:10,
67:21, 68:3,
68:6, 68:10,
68:20, 69:6,
69:7, 69:16,
70:1, 70:8,
70:12, 70:13,
70:20, 71:5,
71:9, 71:13,
71:15, 71:25,
72:1, 72:10,
72:17, 72:25,
73:1, 74:4,
76:23, 98:17,
120:22
team
21:15, 21:16,
47:4, 47:8,
47:9, 52:8,
73:24, 79:19,
79:20, 79:22,
80:4, 84:21,
84:22, 98:2,
99:22, 100:2,
100:5, 100:9,
100:18, 109:2,
109:10, 110:13,
110:25, 111:3
tech
12:10
technical
73:6, 74:11
technology
49:17
television
49:21, 50:1,

50:20, 51:19,
52:3
tell
52:10, 73:11,
74:14, 90:23,
102:22, 106:20
telling
72:16
template
80:10
ten
34:25, 35:2,
62:18
tentpole
57:21
term
41:23, 66:11,
104:13, 104:15
terms
4:15, 36:24,
37:2, 37:6,
37:11, 37:15,
38:6, 38:8,
39:7, 39:8,
39:19, 55:23,
65:12, 73:20,
112:9
testified
7:4
testifying
13:20
testimony
6:8, 6:18, 7:1,
11:14, 11:15,
13:12, 13:16,
21:2, 50:4,
50:6, 53:7,
56:7, 58:17,
72:14, 80:18,
93:12, 94:9,
97:16, 99:2,
99:20, 100:15,
104:25, 113:9,
114:5, 122:5,
122:6
thank
6:21, 6:23,
7:10, 8:18,

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    58

11:7, 13:23,
15:1, 16:23,
17:11, 17:19,
22:16, 24:20,
32:14, 39:13,
44:12, 49:4,
66:10, 68:18,
70:17, 74:17,
80:12, 82:19,
84:6, 85:10,
86:1, 87:9,
88:8, 88:17,
88:23, 91:3,
91:13, 91:15,
92:1, 100:21,
104:5, 106:21,
111:14, 115:15,
121:2, 121:3
**thanks**
36:16
**theme**
49:2
**themes**
41:20
**themselves**
5:14, 73:14
**thereafter**
122:7
**things**
29:3, 29:13,
42:20, 44:5,
71:20
**think**
12:23, 15:2,
17:2, 19:15,
34:6, 48:11,
50:7, 50:23,
51:11, 52:25,
57:7, 57:16,
58:4, 58:7,
59:20, 59:23,
60:19, 60:23,
63:13, 69:17,
71:1, 72:5,
72:15, 74:18,
75:21, 76:5,
77:1, 77:13,
78:6, 78:7,

79:21, 87:22,
98:6, 99:15,
101:14, 105:9,
105:25, 106:8,
110:19, 110:21,
111:1, 111:2,
112:16, 115:4,
115:9, 115:12,
118:9, 119:19,
120:8
**thinking**
56:2, 102:13
**third**
111:13, 111:22,
111:25
**three**
66:7, 73:16,
106:2
**through**
13:13, 13:21,
17:5, 17:13,
17:21, 23:14,
65:4, 66:14,
78:20, 80:1,
80:10, 89:4,
91:19, 92:6,
93:7, 95:1,
96:8, 102:18,
107:20, 108:17,
111:10, 115:17,
117:24, 118:2
**ticket**
83:9
**tickets**
84:21
**tier**
105:15, 105:18
**till**
39:10
**time**
5:9, 9:19,
14:8, 16:17,
19:25, 22:20,
62:23, 62:25,
66:21, 68:14,
79:6, 79:11,
85:15, 91:21,
93:5, 102:13,

103:5, 103:8,
107:1, 113:21,
120:17, 120:25,
121:7
**title**
7:21, 9:8,
9:14, 13:1,
13:3, 17:14,
87:21, 87:25
**titled**
29:25
**today**
5:10, 5:25,
13:12, 14:1,
18:4, 89:2,
98:12
**today's**
5:8, 118:25
**together**
47:15, 56:15,
79:15
**told**
110:4
**tony**
5:15, 29:6,
34:19, 62:10,
70:2, 78:12,
95:25, 102:7,
107:21, 114:16
**top**
18:10, 59:21,
78:21, 80:23,
82:20, 86:2,
86:11, 91:5,
105:15, 105:18,
106:1, 107:5
**topics**
13:4, 13:12,
13:20
**totally**
102:19
**touch**
112:8
**touched**
51:11, 78:2
**touches**
44:10
**towards**
73:18, 74:9,

99:8
**track**
90:19, 91:19,
111:22, 113:1
**tracked**
84:5
**trade**
27:13
**transcript**
6:10, 11:23,
12:1, 119:4,
121:10, 122:4
**transcripts**
120:10
**trends**
112:9
**tribal**
14:16
**tried**
69:1
**tropical**
102:23
**true**
6:8, 6:18, 7:1,
122:4
**try**
8:17, 49:12,
50:8, 51:3,
53:2, 54:23
**trying**
49:1, 49:24,
50:15, 52:24,
66:1, 94:6,
115:11
**tuesday**
1:17, 5:8
**turn**
15:17, 32:15,
94:13, 96:17
**tv**
42:25, 45:21,
46:6, 50:11,
50:16, 57:22,
58:10, 99:23
**twenty-seven**
22:17
**twice**
86:19

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                          59

**two**
16:23, 19:18, 33:22, 37:7, 90:13, 118:18
**two-page**
78:20
**two-step**
36:20
**type**
47:1, 51:14, 52:2, 71:22, 79:23, 84:25, 86:3
**types**
41:13, 44:20, 76:13
**typewriting**
122:7
**typical**
104:18
**typically**
47:13, 47:21, 95:16
**typing**
112:17

---
**U**
---

**udin**
87:1
**ultimately**
50:13
**un**
111:9
**unaware**
33:21, 95:11
**uncertain**
20:22, 31:16, 32:6, 32:11, 39:5, 108:4, 110:11
**under**
6:9, 6:18, 7:2, 23:24, 38:8, 38:14, 47:12, 53:4, 83:18, 90:9, 92:7, 122:7
**underneath**
82:21

**understand**
12:4, 13:11, 13:15, 14:24, 20:25, 28:16, 33:11, 52:11, 53:2, 54:23, 66:1, 75:22, 86:24
**understanding**
13:19, 14:4, 14:5, 15:14, 16:6, 19:24, 25:9, 26:25, 28:11, 28:17, 37:20, 38:5, 38:13, 38:16, 38:24, 52:22, 73:9, 73:11, 113:5, 116:14
**understood**
12:3, 74:17, 80:12, 109:19
**undertaker**
92:8, 93:8
**undertaker's**
92:19
**unintentionally**
19:16
**united**
1:1, 5:5
**university**
9:21, 10:3
**unless**
59:20, 69:21, 71:19, 77:19, 111:9, 120:11, 121:1
**unnoticed**
71:21
**unusual**
86:9, 86:16, 86:18
**update**
93:21
**updated**
90:22
**updates**
93:15

**upload**
91:17
**uploading**
117:3
**urban**
9:23, 9:25
**use**
15:10, 15:15, 15:24, 16:12, 39:21, 40:9, 41:23, 45:9, 54:13, 62:11, 66:11, 73:21, 82:11, 104:19, 118:18
**user**
65:18
**uses**
43:17, 68:16, 98:10
**using**
65:12, 109:16
**utilize**
109:6
**utilized**
40:3, 41:1

---
**V**
---

**varies**
95:17
**variety**
10:12, 15:16, 29:13, 41:18, 46:25, 89:16
**various**
89:17
**venue**
44:9
**verbal**
11:19, 11:21
**verified**
6:12
**verifying**
7:2
**verse**
14:15, 15:7
**version**
90:23

**versus**
104:18, 108:5, 118:3
**vice**
7:17, 7:22, 9:10, 10:7, 10:11, 88:1
**vid**
104:2
**video**
1:15, 2:1, 5:3, 5:9, 10:13, 10:14, 10:17, 11:20, 14:2, 15:16, 30:23, 31:11, 31:21, 31:23, 33:7, 33:16, 34:1, 34:4, 41:6, 41:7, 41:24, 42:3, 42:12, 43:1, 43:3, 43:8, 43:19, 45:1, 45:10, 45:11, 46:9, 46:10, 47:9, 50:19, 53:14, 54:11, 56:5, 56:18, 56:24, 57:3, 57:5, 57:19, 57:23, 61:25, 62:25, 65:14, 65:18, 67:6, 77:5, 98:4, 103:8, 103:18, 110:18, 111:16, 112:1, 112:24, 113:24, 114:13, 114:15, 114:18, 117:9, 118:6, 121:7, 121:11
**videographer**
5:2, 5:10, 5:25, 8:8, 8:13, 8:16, 12:21, 62:22, 62:25, 77:15, 103:4,

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    60

videos
65:22
view
45:22, 53:5,
53:15
views
29:20, 46:6,
49:22, 106:15
visual
1:11, 3:21,
5:23, 79:19,
83:1, 101:17,
102:1
vocativ
8:1, 8:2, 8:24,
9:1, 9:3
voice
5:13, 32:9

**W**

w
110:7
wait
39:10
waived
121:13
want
8:20, 12:21,
23:16, 30:5,
42:11, 44:24,
45:4, 48:25,
51:1, 51:7,
51:22, 52:11,
71:3, 92:2,
92:5, 101:6,
102:6, 102:18
wanted
19:18, 41:9,
50:19, 72:9,
100:11, 118:12,
118:17
wants
102:15, 103:1
watch
108:17
way
6:11, 17:2,

21:20, 41:5,
45:20, 45:21,
48:2, 51:21,
57:19, 67:25,
68:4, 69:4,
74:11, 81:11,
85:13, 95:4,
95:18, 114:12
ways
48:10
we'll
6:13, 14:1,
18:9, 52:24,
58:20, 62:19,
85:22, 88:20,
95:19, 118:19,
121:9
we're
14:10, 28:2,
37:15, 47:21,
50:15, 52:9,
59:4, 59:5,
61:16, 62:20,
65:1, 66:12,
66:13, 71:20,
72:15, 77:8,
78:6, 96:3,
102:12, 102:24,
103:6, 105:3,
106:2, 114:15,
115:12
we've
16:3, 61:25,
78:1, 82:2,
89:25, 96:7,
107:5, 118:24
wearing
47:25, 97:24
website
79:17, 80:1,
80:11, 80:13,
81:5, 83:13,
91:19, 118:6
weekly
57:21
weigh
47:7
welcome
26:20, 30:19,

63:3, 103:10
went
52:19, 66:14
whatever
36:1, 102:25
whenever
62:10
whereupon
6:24
whether
20:16, 21:2,
21:10, 33:25,
34:3, 43:10,
51:3, 55:14,
58:21, 72:7,
72:20, 79:19,
87:13, 95:13,
96:25, 97:23,
104:1, 109:20,
110:8, 110:16,
111:15, 112:14,
112:22, 114:11
whole
89:6, 89:14,
117:25
wholistically
71:11, 72:19,
72:22
wind-up
9:4, 9:5, 9:9,
9:11
withhold
55:18
within
21:12, 21:14,
26:19, 28:20,
29:1, 30:4,
30:6, 30:15,
31:20, 36:25,
37:10, 37:15,
40:18, 42:4,
42:24, 42:25,
44:1, 44:8,
44:14, 45:11,
45:23, 46:13,
48:16, 56:11,
58:4, 66:22,
67:17, 68:16,

71:10, 83:11,
83:13, 88:12,
90:16, 94:12,
99:16, 101:15,
102:2, 104:8,
104:17, 105:3,
105:5, 105:8,
105:15, 106:1,
106:25, 107:6,
108:9, 108:12,
112:11, 116:24
without
40:2, 40:8,
41:10, 43:19,
43:25, 53:18,
55:3, 67:4,
68:10, 68:25,
71:14
witness
3:10, 5:20,
6:3, 6:6, 6:7,
6:12, 6:17,
6:20, 7:3, 8:6,
8:12, 8:14,
8:19, 12:24,
14:25, 32:10,
35:6, 53:8,
63:23, 77:8,
91:12, 101:4,
103:2, 109:23,
110:4, 121:3
witness's
50:6, 93:12,
99:2, 113:9,
114:5
word
27:19, 70:2,
115:5
words
98:13
work
9:3, 120:14
worked
19:24, 20:4
working
9:19, 11:2,
18:25, 19:8,
19:13, 20:11

Transcript of Edward M. Kiang
Conducted on August 4, 2020                                    61

works
73:10, 83:1,
87:3, 109:1,
109:11
world
1:9, 3:9, 4:10,
4:12, 4:14,
5:19, 7:14,
7:16, 12:16,
17:6, 17:14,
22:23, 25:1,
37:10
worried
102:25
would've
33:22, 41:18,
67:16, 69:1,
69:2, 69:17,
81:8, 81:9,
82:9, 83:22,
83:24, 92:17,
92:18, 100:20,
109:11
wouldn't
51:6, 55:21,
71:8, 98:4
wrestlemania
46:8
wrestler
14:13, 18:19,
27:15, 29:10,
54:7, 59:9,
104:7, 104:8,
104:18
wrestler's
31:19, 75:6,
76:23
wrestlers
31:25, 42:24,
46:2, 54:10,
74:19, 75:23,
76:6, 76:13,
104:13, 105:5
wrestling
1:9, 3:9, 4:10,
5:19, 7:14,
7:16, 12:16,
17:7, 17:14,

22:23, 25:1,
27:17, 37:11,
41:10, 105:4
writes
116:18
writing
11:22
ww
85:15
wwe's
34:9, 34:23,
35:4, 35:7,
37:16, 38:6,
39:19, 40:19,
41:6, 41:8,
41:13, 43:20,
53:5, 53:15,
56:3, 56:25,
57:2, 58:13,
67:4, 117:6
wwe_alexander
4:17, 4:20,
4:23, 4:26,
17:5, 17:13,
22:18, 26:8,
29:24, 32:17,
78:9, 78:19,
89:4, 95:24,
96:7, 115:13,
115:17

**X**

xb1_ps4
82:5
xbox
81:15, 82:11,
82:12

**Y**

yang
116:12, 116:17,
116:21, 116:23,
117:24
yang's
4:25
yeah
14:19, 36:23,
50:22, 51:21,

54:19, 56:23,
58:7, 59:23,
62:22, 72:15,
75:17, 76:15,
77:3, 81:10,
89:12, 97:18,
106:10, 112:11
year
10:1, 20:11,
36:12, 49:18,
106:17
years
7:20, 7:22,
9:2, 9:7, 10:21,
107:7
yesterday
119:16
york
3:25, 102:22

**Z**

zoom
1:15, 2:1,
77:12, 121:11
zucconi
82:21, 82:25,
83:6, 92:5,
92:13
zuzik
84:18, 84:19,
99:9, 99:12,
100:2, 115:25

**$**

$13,051,966
35:20
$17,274,280
35:16
$19,232,358
35:13

**0**

0000001
17:5
0000027
17:13
04
1:18, 5:9

0966
1:8, 5:7

**1**

1-1-2
95:24
1-7
121:14
10
34:15, 34:23,
35:1, 36:2,
62:23, 63:1
10022
3:25
109
4:18, 78:9,
78:12, 78:13,
78:19, 81:19
11
23:2, 103:6
110
4:18, 78:20
112
4:24, 95:24,
96:7
115
4:25
118
99:7
119
4:24, 96:8,
96:18
12
1:18, 4:8, 9:7,
102:12, 103:9,
121:8
122
1:23
14
4:25, 11:3,
11:4, 11:5
15
10:23, 11:5,
62:23, 118:11
15222
3:16
16
4:12, 11:5,

Transcript of Edward M. Kiang
Conducted on August 4, 2020

62

14:3, 20:23,
35:12, 62:4,
82:5, 82:10,
90:3, 96:13
**17**
4:14, 11:5,
14:3, 20:23,
35:15, 62:5
**1700**
3:5
**17984**
4:20
**18**
1:8, 5:7, 11:5,
14:3, 20:24,
35:19, 62:5
**1999**
10:2
**1st**
18:11, 19:4

---
**2**
---

**2**
50:23, 50:25
**20**
102:12
**200**
43:5, 115:3
**2009**
18:11, 19:4,
19:25
**2013**
23:2
**2019**
35:8, 36:5,
36:11
**2020**
1:17
**207**
4:21, 88:20,
89:4
**209**
92:3
**21**
103:6
**210**
3:15
**212**
3:26

**214**
4:21, 89:4,
94:14
**24**
1:18, 28:5,
121:8
**241**
3:7
**26**
17:5
**2613**
3:16
**27**
22:10, 22:12,
22:14, 23:12
**2929**
3:7
**2k**
1:8, 3:20,
5:23, 10:17,
10:22, 10:23,
11:3, 11:4,
11:5, 14:3,
14:7, 15:11,
15:18, 15:24,
16:7, 16:12,
20:23, 30:23,
35:9, 35:12,
35:15, 35:19,
41:18, 42:12,
44:15, 46:10,
47:3, 47:11,
49:6, 49:8,
50:23, 50:25,
51:7, 53:3,
54:7, 62:1,
62:3, 62:4,
63:8, 65:6,
65:15, 65:23,
66:6, 68:5,
69:5, 75:2,
79:10, 79:19,
82:10, 101:1,
101:12, 114:15,
114:18, 114:21,
116:6, 116:12,
118:11

---
**3**
---

**3.1**
26:8, 29:3,

29:10
**30**
4:9, 12:15,
19:19, 20:6,
20:13, 31:14,
32:3, 35:8,
36:5, 36:11,
60:25, 61:11,
63:1, 63:15,
64:8, 64:19,
67:12, 74:21,
75:8, 76:1,
76:8, 108:1,
108:14, 108:22,
109:8, 109:23,
110:3
**311575**
1:22
**314**
3:7
**35**
32:17
**350**
106:17
**3540**
4:17
**355**
3:17
**360**
73:16, 82:12
**3:-cv--smy**
1:8, 5:7
**3d**
72:21, 90:5

---
**4**
---

**4-foot**
54:25
**406**
1:25, 122:17
**4073**
4:23
**41**
36:21
**412**
3:17
**43**
37:7, 39:9

**446**
3:26
**4989**
3:26
**4th**
5:8

---
**5**
---

**500**
106:17
**57**
37:15

---
**6**
---

**601**
3:24
**63101**
3:6
**66**
35:25
**69**
22:18, 22:24

---
**7**
---

**7.3**
30:6, 30:15
**71**
17:14
**78**
4:16

---
**8**
---

**8-6**
4:25
**8.2**
37:16
**800**
3:5
**8696**
3:17
**88**
4:19

---
**9**
---

**9**
1:18, 5:9
**94**
4:26, 115:13,

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CATHERINE ALEXANDER, | |
| Plaintiff, | |
| v. | Case No. 3:18-cv-0966-SMY |
| TAKE-TWO INTERACTIVE SOFTWARE, INC., 2K GAMES, INC., 2K SPORTS INC., WORLD WRESTLING ENTERTAINMENT INC. and VISUAL CONCEPTS ENTERTAINMENT, | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFF CATHERINE ALEXANDER'S AMENDED NOTICE OF RULE 30(B)(6) DEPOSITION OF DEFENDANT WORLD WRESTLING ENTERTAINMENT INC.**

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, Plaintiff Catherine Alexander ("Plaintiff") will take the deposition of World Wrestling Entertainment Inc. ("Defendant" or "WWE"), pursuant to Fed. R. Civ. P. 30(b)(6) on the topics set forth in Schedule A on August 4, 2020 at a mutually agreed upon time and location if the Court grants Plaintiff's Unopposed Motion for Leave to Take 30(b)(6) Deposition of Defendant World Wrestling Entertainment Inc. (Doc. 199) prior to that date.  The deposition will be recorded by stenographic means, videotaped, attended via video conference and will be taken before a Notary Public or other officer authorized by law to administer oaths by Planet Depos, LLC.

Plaintiff requests that Defendant identify which topics as set forth in Exhibit A each deponent will provide testimony to at least five (5) business days before the scheduled deposition.  The deposition will continue day to day until completed.

1



Exhibit

Exhibit 1

08-4-2020

exhibitsticker.com

Dated:  July 20, 2020

Respectfully submitted,

/s/ Anthony R. Friedman

Anthony G. Simon, IL 6209056
Anthony R. Friedman, IL 6299795
**THE SIMON LAW FIRM, P.C.**
800 Market Street, Suite 1700
St. Louis, Missouri  63101
Phone:  (314) 241-2929
Fax:  (314) 241-2029
asimon@simonlawpc.com
afriedman@simonlawpc.com

R. Seth Crompton
**THE HOLLAND LAW FIRM**
300 N. Tucker, Suite 801
St. Louis, Missouri 63101
scrompton@allfela.com
Phone: (314) 241-8111
Facsimile: (314) 241-5554

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon all counsel of record via electronic mail on July 20, 2020.

/s/ Anthony R. Friedman

## SCHEDULE A

## DEFINITIONS

As used in these deposition topics:

1.      The term "WWE" means World Wrestling Entertainment, Inc., as well as any

parents, subsidiaries, divisions, affiliates, predecessors, successors, and assigns, and all of the

WWE's current and former officers, directors, owners, shareholders, employees, contractors,

agents, attorneys and representatives or any other person or entity acting in whole or in part in

concert with any of the foregoing other named defendants in this lawsuit.

2.      The terms "Take-Two," "2K Games," "2K Sports," "Visual Concepts," "you,"

"your," "Take-Two Defendants," "Defendants" and/or "Co-Defendants" mean Take-Two

Interactive Software, Inc., 2K Games, Inc., 2K Sports, Inc. and Visual Concepts Entertainment,

other named defendants in this lawsuit.

3.      The terms "Plaintiff" or "Alexander" means Catherine Alexander.

4.      The terms "Videogames" or "Infringing Games" means videogames WWE 2K16,

WWE 2K17 and WWE 2K18, the videogames that provide the basis for the copyright

infringements asserted against WWE in this lawsuit.

5.      The terms "Tattoos" and "Tattoo Works" means the tattoo artwork at issue in this

lawsuit that Alexander tattooed on Randy Orton's back, neck, and arms.

6.      The term "Mr. Orton" refers to professional wrestler, Randy Orton.

7.      The term "Orton Character" refers to the digital representation of professional

wrestler, Randy Orton, in the Infringing Games.

## DEPOSITION TOPICS

1.      WWE's roles in creating, developing, programming, and marketing the Videogames, including WWE's role in any aspects of the design and/or artwork of the Videogames.

2.      The relationships between WWE and the Co-Defendants, including any authority WWE had over the Co-Defendants in the creation of the Videogames, decisions, including approvals, regarding the inclusion of the Tattoos in the Videogames and the Orton Character, and any other guidance or direction regarding how characters were selected to be in the Videogames and how characters were to be depicted in the Videogames.

3.      Randy Orton's relationship and agreements with the WWE, including any authority Randy Orton had regarding the creation of the Orton Character, and the inclusion of the Tattoos, in the Videogames.

4.      The contributions of Randy Orton, the Orton Character, and the Tattoos, to the success of the WWE and to the success of the Videogames.

5.      Sales of the Videogames, including WWE's gross revenues and profits derived from sales of the Videogames.

6.      WWE's agreements, relationships, and communications with tattoo artists, including Plaintiff.

7.      WWE's responses to Plaintiff's Interrogatories, Requests for Production and Requests for Admissions, including WWE's privilege log produced May 15, 2020, in this matter.

4

# WORLD WRESTLING ENTERTAINMENT, INC. ORIGINAL
## BOOKING CONTRACT

This World Wrestling Entertainment, Inc. Booking Contract ("Agreement"), made effective September 1, 2009 ("Effective Date"), by and between WORLD WRESTLING ENTERTAINMENT, INC., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "PROMOTER"), and RANDAL ORTON, an individual residing at 4352 Austin Pass Drive, St. Charles, Missouri 63304 (hereinafter referred to as "WRESTLER").

## PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business throughout the world of organizing, publicizing, arranging, staging, conducting professional wrestling exhibitions and/or Events, as defined below, and representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness and personality; and

WHEREAS, PROMOTER has established a worldwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and/or Events, as defined below, and PROMOTER has established a network of cable, satellite and internet organizations which regularly broadcast, transmit, stream and exhibit PROMOTER's professional wrestling Events on a pay-per-view and subscription basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or Events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and Events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange professional wrestling exhibitions and/or Events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound, do hereby agree as follows:

1

**Exhibit**

**Exhibit 2**

08-4-2020

# 1. BOOKING

1.1    WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)    During the Term, the exclusive worldwide rights to WRESTLER's services, appearances, and/or performances in the entertainment industry.  Without limiting the generality of the foregoing, such worldwide rights shall include, without limitation, the right to engage WRESTLER's services, appearances, and/or performances in: (i) those professional wrestling matches designated by PROMOTER and those other events, engagements, appearances, filmings, photography shoots, autograph signings and other business and charitable events designated by WWE relating to professional wrestling or sports entertainment, whether or not staged before a live audience, in a television broadcast studio, on location or otherwise (collectively, the "Events"); and (ii) all other events, engagements, appearances, filmings, photography shoots, autograph signings and other business and charitable events that are not related to professional wrestling or sports entertainment in connection with movies, films, commercials, product endorsements, videos, television programs, radio, magazines, books, theatre, Internet or any other media in the entertainment industry (collectively, "Other Appearances").  Pursuant to Section 13.5 herein and during the Term of this Agreement, WRESTLER acknowledges and agrees that PROMOTER, in its sole discretion, shall have the right to assign WRESTLER's obligations under this Agreement for any period of time as PROMOTER sees fit to other promoters in order to enhance or improve WRESTLER's overall wrestling abilities, in-ring skills, conditioning, or other attributes deemed necessary by PROMOTER.

(b)    During the Term and thereafter as provided for in this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as the right to exhibit, broadcast and transmit the Footage, as defined in Section 2.1, via closed circuit transmission, pay-per-view transmission, subscription transmission (e.g., subscription video on demand), video on demand transmission, video exhibition, or any other medium now known or hereinafter discovered.

(c)    During the Term of this Agreement and thereafter as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of WRESTLER Intellectual Property, as defined herein below, through any means whatsoever including internet websites, merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2    In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER faithfully and fully performs all obligations hereunder, PROMOTER shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in PROMOTER's sole discretion, in wrestling matches and at various Events.

# 2. WORKS

2.1    WRESTLER hereby grants to PROMOTER the exclusive right during the Term to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for or related to the Events or for or related to any and all of the services performed by

2

WRESTLER pursuant to the terms herein. (These recordings by tape, film, photograph, disc, or otherwise are collectively referred to herein as the "Footage").

2.2   Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, or otherwise disseminate the Footage in perpetuity by any form of media, now or hereafter devised (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television, the internet, video on demand, and subscription video on demand).

2.3   WRESTLER's appearance, performance and work product in connection in any way with the Events, Footage, WRESTLER's services and the rights granted herein shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all Footage and all of the rights, results, products and proceeds in and to, or derived from the Events, Footage, WRESTLER's services and the rights granted herein (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with the Events, Footage, WRESTLER's services and the rights granted herein) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of PROMOTER and/or on behalf of PROMOTER's designee.

2.4   If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and PROMOTER shall own such Development. All Footage and Developments referred to in this Agreement are collectively referred to as "Works".

2.5   All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement. To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby irrevocably assigns in perpetuity to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

## 3. INTELLECTUAL PROPERTY

3.1   All service marks, trademarks and  other distinctive and identifying indicia used by WRESTLER prior to the Effective Date in connection with the business of professional wrestling, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "WRESTLER Intellectual Property") are described and identified on Exhibit A attached hereto and

3

WWE_Alexander0000003

incorporated herein by reference.  WRESTLER hereby assigns to PROMOTER the right during the Term and thereafter as provided for in this Agreement including any Sell Off Period set forth in Section 4.3 and PROMOTER hereby accepts all worldwide right, title and interest in and to WRESTLER's Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the WRESTLER Intellectual Property. WRESTLER further acknowledges and agrees that PROMOTER shall own in perpetuity all Footage, as defined in Section 2.1 of the Agreement, and that PROMOTER shall have perpetual rights in the Footage, as set forth in Section 2.2 of this Agreement.

3.2     Except for the WRESTLER Intellectual Property specifically set forth on Exhibit A, any intellectual property rights, including but not limited to trademarks, service marks, copyrighted works, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which were procured, owned or created by PROMOTER during the Term or those which were procured, owned or created by PROMOTER prior to the Term and which are described and identified on Exhibit B attached hereto and incorporated herein by reference (collectively the "PROMOTER Intellectual Property") shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

3.3     PROMOTER may from time to time during the Term create or develop trademarks, service marks, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which WRESTLER acknowledges shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.  In addition, WRESTLER agrees to assign and relinquish to PROMOTER any and all claims of ownership and/or good will that may be acquired by WRESTLER now or in the future to and from such character name and image.  With respect to all of the foregoing, WRESTLER agrees to immediately execute an amendment to this Agreement to add to Exhibit B any additional intellectual property rights created pursuant to this Section 3.3 as PROMOTER Intellectual Property.

3.4     WRESTLER Intellectual Property and PROMOTER Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

3.5     WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving PROMOTER's rights in and to the Intellectual Property.  In connection herewith, WRESTLER acknowledges and hereby grants to PROMOTER the exclusive worldwide right during the Term of this Agreement (with respect to WRESTLER Intellectual Property) and in perpetuity (with respect to PROMOTER Intellectual Property) to apply for and obtain trademarks, service marks, copyrights and other registrations throughout the world in PROMOTER's name and/or on behalf of PROMOTER's designee and to enforce any and all of PROMOTER's rights therein.  At PROMOTER's

4

WWE_Alexander0000004

expense and request, PROMOTER and WRESTLER shall take such steps, as PROMOTER deems necessary, for any registration or any litigation or other proceeding, to protect and enforce any and all of PROMOTER's rights in the WRESTLER Intellectual Property and/or PROMOTER Intellectual Property and/or Works. Further, WRESTLER authorizes PROMOTER to execute any documents on his behalf that are required by the U.S. Patent and Trademark Office in order to protect the aforementioned Intellectual Property.

## 4. MERCHANDISING

4.1     WRESTLER hereby agrees that PROMOTER shall have the exclusive right in perpetuity to use and exploit WRESTLER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all copyrighted work incorporating the WRESTLER Intellectual Property.  PROMOTER shall own in perpetuity all copyrights in such copyrighted work and PROMOTER shall be entitled to obtain copyright registrations in PROMOTER's name or on behalf of its designee.  WRESTLER shall provide all reasonable assistance to PROMOTER in so obtaining such copyright registrations, and WRESTLER authorizes PROMOTER to execute any documents on WRESTLER's behalf as attorney-in-fact that are required by the United States Copyright Office.

4.2     In addition to the perpetual rights to use and exploit WRESTLER Intellectual Property as set forth in Section 4.1 of this Agreement, WRESTLER agrees that during the Term and any applicable Sell Off Period as provided for in this Agreement, PROMOTER shall have the exclusive right to use, exploit, and license the WRESTLER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of goods and merchandise incorporating the WRESTLER Intellectual Property.

4.3     <u>Sell Off Period</u>.  Upon the expiration or termination of this Agreement, PROMOTER shall have the right to sell any goods and merchandise in inventory, on hand or manufactured containing WRESTLER Intellectual Property for a period of ninety (90) days immediately following such expiration or termination ("Sell Off Period") provided, however, that: (i) there shall be no restriction on PROMOTER's rights to use or exploit WRESTLER Intellectual Property in connection with the perpetual rights granted herein by WRESTLER; and (ii) with respect to goods, merchandise and/or programming that include the WRESTLER Intellectual Property regarding which PROMOTER has made a material time, resources and/or financial investment prior to expiration or termination of this Agreement and which have a commercial life that extends beyond the Sell Off Period (including, without limitation, video games, animated books and/or television programs, etc.), PROMOTER shall have the right to continue development and exploitation of such goods, merchandise and/or programming until the end of the commercial life thereof.

4.4     <u>Book Rights</u>.  WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the licensing, sublicensing, manufacture, distribution, publication, and exploitation of WRESTLER's autobiography or authorized biography (collectively "Book Rights").

5

4.5     Publishing Rights.     WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the creation and sale of certain movies, or other forms of media now known or hereinafter discovered, as PROMOTER shall determine in its sole discretion (collectively "Publishing Rights").

4.6.     Auction Sale Rights.     WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to sell via the Internet, television or through any other distribution method now known or hereafter created, by an auction method, any item containing WRESTLER Intellectual Property which shall include but not be limited to items containing WRESTLER's signature ("Auction Sale").

## 5. EXCLUSIVITY

5.1     It is the understanding of the parties that, during the Term, the worldwide rights to WRESTLER's services, appearances and/or performances in the entertainment industry, whether related to professional wrestling, sports entertainment or Other Appearances, are exclusive to PROMOTER.  Without limiting the generality of the foregoing, it is the further understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER hereunder are exclusive to PROMOTER even to the exclusion of WRESTLER.

5.2     In the event WRESTLER desires upon reasonable notice to PROMOTER during the Term either individually or through his authorized representatives to participate in Other Appearances, whether or not procured by PROMOTER, WRESTLER may do so only subject to and conditioned upon PROMOTER's express, written approval and provided that a written sublicense is executed between PROMOTER, WRESTLER, and any relevant third parties ("Permitted Activities"), and further provided that WRESTLER shall not utilize the Intellectual Property in any manner in connection with such Permitted Activities without PROMOTER's written consent.   Notwithstanding the foregoing, it is agreed that PROMOTER retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term of this Agreement, as defined herein.   It is further agreed that PROMOTER shall receive from WRESTLER a management fee to reimburse PROMOTER for its reasonable administrative costs incurred in connection with WRESTLER's participation in each such Permitted Activity provided that PROMOTER's costs shall not be less than ten percent (10%) of any fees received by WRESTLER for each such Permitted Activity described herein. Additionally, all monies earned by WRESTLER from such Permitted Activities in a specific Contract Year shall be credited against the Minimum Annual Compensation for that Contract Year as set forth in paragraph 7.1 below.

## 6. TERM AND TERRITORY

6.1     Unless terminated pursuant to the terms herein, the term of this Agreement shall be for ten (10) years from the Effective Date ("Term").   Each consecutive twelve (12) month period during the Term commencing with the Effective Date shall be referred to as a "Contract Year".

6

WWE_Alexander0000006

6.2    Notwithstanding anything herein to the contrary, termination of this Agreement for any or no reason shall not affect PROMOTER's ownership of and rights in or to any intellectual property rights, including but not limited to, any Works, PROMOTER Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in  Sections 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.3    The territory of this Agreement shall be the world ("Territory").

## 7.  PAYMENTS/ROYALTIES

7.1    (a)    Unless terminated pursuant to the terms herein, PROMOTER shall pay WRESTLER each Contract Year the total sum of One Million Dollars ($1,000,000.00) (referred to hereinafter as "Minimum Annual Compensation").  PROMOTER agrees, commencing with the Effective Date, to pay WRESTLER the Minimum Annual Compensation in fifty-two (52) weekly installments consistent with PROMOTER's regular payment procedures.

       (b)    PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any fines levied against WRESTLER, as provided for in Sections 8.3 or 9.13(a); any costs or expenses paid by PROMOTER on behalf of WRESTLER, as provided for in Sections 8.1 and 9.13(b); or any deductions permitted as set forth in Section 7.13 and 10.2(b).  PROMOTER shall also have the right to credit against the Minimum Annual Compensation: (i) any royalties earned by WRESTLER; (ii) any payments made to WRESTLER by PROMOTER in accordance with Section 7.2; and/or (iii) any other payments due or earned by WRESTLER for the rights granted herein or pursuant to the terms of this Agreement.  For the purposes of this Agreement, any royalty payments due shall be deemed "earned" only at the time they are paid to WRESTLER.

       (c)    Unless terminated for breach pursuant to Sections  12.1(a) through (f) and 12.2, if applicable, at least one hundred twenty (120) days after each Contract Year, if it is determined that WRESTLER has earned more than the Minimum Annual Compensation for services rendered during that Contract Year, WRESTLER shall be paid subject to any permitted deductions or credits in accordance with Section 7.1(b), in one lump sum the difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during that Contract Year.

7.2    (a)    If WRESTLER appears and performs in any Non-Televised Live Event, defined as an Event produced by PROMOTER in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast as set forth in  Sections 7.2 (b) and 7.2 (c) below, WRESTLER shall be paid by PROMOTER an amount equal, in PROMOTER's sole discretion, to such percentage of the paid receipts for such Non-Televised Live Event only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such Non-Televised Live Event.

       (b)    If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is taped or broadcast for use on PROMOTER's television network ("TV Taping"), WRESTLER shall be paid by PROMOTER, in its sole discretion, an amount only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such TV Taping.

7

WWE_Alexander0000007

(c)     If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is aired or broadcast via satellite broadcast or pay-per-view distribution technology for use by PROMOTER ("Pay-Per-View"), WRESTLER shall be paid by PROMOTER an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3    Licensed Product Sale

(a)     Licensed Product Sale--Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to the Licensed Product Sale.  Licensed Products' Net Receipts means the gross amount received by PROMOTER from a Licensed Product Sale less expenses incurred by PROMOTER or its licensing agent.

"Licensed Product Sale" shall mean the sale, other than an Auction Sale as defined in Section 7.7, of any product, merchandise, consumer material or good, other than Books as defined in Section 7.8 and Pay Per View DVD/Home Videos as defined in Section 7.6(a), which is made pursuant to a license agreement between PROMOTER and a party wherein a party is granted the contractual right and obligation to manufacture, distribute, and sell the product, merchandise, consumer material or good to wholesale and/or retail customers through designated distribution channels.

"Other PROMOTER Talent" shall mean a professional wrestler who has an agreement with PROMOTER and to whom PROMOTER is obligated to pay royalties.

(b)     Licensed Product Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, PROMOTER shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.4    Direct Sale and Direct Venue Sale

(a)     Direct Sale---Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Sale, WRESTLER shall be paid five percent (5%) of the Direct Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Sale reduced by returns.  "Direct Sale" shall mean a sale by PROMOTER by any method other than a Licensed Product Sale, Auction Sale, or a Direct Venue Sale, as defined in Section 7.4(c), wherein PROMOTER has or retains the right and/or obligation to manufacture, distribute or sell any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, to an end user and where such sale may be made by any distribution method (e.g., catalog, television or any internet site owned or controlled by PROMOTER).

(b)     Direct Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Sale, PROMOTER shall allocate five percent (5%) of the Direct Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

8

(c)     Direct Venue Sale---Sole Performer.   In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, WRESTLER shall be paid five percent (5%) of the Direct Venue Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Venue Sale reduced by any expenses charged to PROMOTER by the venue for the sale of the product, merchandise, consumer materials or goods. "Direct Venue Sale" shall mean the sale by PROMOTER of any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, which occurs in or about the venue of a PROMOTER live event.

(d)     Direct Venue Sale---Other Performers.   In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, PROMOTER shall allocate five percent (5%) of the Direct Venue Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.5     Featured Performer

(a)     Licensed Product Sales.   If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Licensed Product Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.3(b), PROMOTER shall pay five percent (5%) of the Net Receipts paid to PROMOTER with respect to the Licensed Product Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(a) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.  For the purposes of this Section 7.5, PROMOTER shall determine in its sole discretion whether WRESTLER shall be deemed a "Featured Performer".

(b)     Direct Sale.   If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(b), PROMOTER shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(b) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

(c)     Direct Venue Sale.   If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Venue Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(d), PROMOTER shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Venue Sale of the DVD and/or home video to WRESTLER if WRESTLER is the

9

WWE_Alexander0000009

only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(c) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

7.6   Pay Per View DVD/Home Video

(a)   Sold By Licensees As A Single Unit.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of "Pay Per View DVD/Home Videos" which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(a) less any and all costs incurred by PROMOTER or its licensing agent. "Pay Per View/DVD Home Videos" shall mean a DVD and/or home video produced by PROMOTER which is a reproduction of an entire live pay per view event, as set forth in Section 7.2(c).

(b)   Sold By Licensees As A Collection Set.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a collection set featuring multiple Pay Per View DVD/Home Videos (e.g., Wrestlemania Box Set") ("Collection Set"), which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the Net Receipts as defined in Section 7.6(a) to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

(c)   Sold By PROMOTER As A Single Unit.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of Pay Per View DVD/Home Videos which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage, as set forth in Section 7.2(c), that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(c) less any and all costs incurred by PROMOTER or its licensing agent.

(d)   Sold By PROMOTER As A Collection Set.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a Collection Set which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the Net Receipts, as

10

defined in Section 7.6(c), to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

7.7    Auction Sale

(a)    Sole Performer.  In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent, WRESTLER shall be paid thirty five (35%) percent of the "Net Sales", defined as the gross revenue received for an Auction Sale less (i) the cost of goods related to the item sold; (ii) any shipping or freight charges; and (iii) PROMOTER's administrative fee which shall be equal to thirty (30%) percent of the gross revenue received from the Auction Sale of the item sold.

(b)    Other Performers.  In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used together with intellectual property of Other PROMOTER Talent, PROMOTER shall allocate thirty five (35%) percent of the "Net Sales" defined in Section 7.7 (a) to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such product pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.8    Book Sales.  In the event that pursuant to the rights granted in Section 4.4 above, PROMOTER publishes or grants to a third party the right to publish WRESTLER's autobiography ("Book"), WRESTLER shall be paid an amount which shall be equal to fifty percent (50%) of the "Licensed Products' Net Receipts" less the cost  of any photography, illustration and/or writer fees.  For the purpose of this Section 7.8, "Licensed Products' Net Receipts" shall mean the gross amount received by PROMOTER from the publication, sale and distribution of the Book less any out of pocket expenses incurred or paid by PROMOTER, other than photography, illustration and/or writer fees which are the sole responsibility of WRESTLER.

7.9    Publishing Rights.  As respects WRESTLER's compensation in connection with PROMOTER's or PROMOTER's designee's exploitation of the Publishing Rights granted to PROMOTER as set forth in Section 4.5, the parties shall negotiate in good faith for a period of thirty (30) days commencing immediately after PROMOTER advises WRESTLER that PROMOTER desires  to exploit the Publishing Rights ("Negotiation Period").  However, upon the expiration of the Negotiation Period, if the parties have not agreed on the compensation to be paid WRESTLER for PROMOTER's exploitation of the Publishing Rights, the parties agree that WRESTLER shall be paid an amount that is equal to the lowest compensation paid by PROMOTER within the previous three (3) years to Other PROMOTER Talent who have received payment for PROMOTER's exploitation of such talent's own Publishing Rights.

7.10    Subject to paragraph 12.2, as it relates to WRESTLER's appearance or performance of any services pursuant to this Agreement, including the appearance and or performance of WRESTLER's services at Events or at other activities conducted by PROMOTER, WRESTLER shall be eligible only for the payments and royalties specifically set forth in Sections 7.1 through 7.9.

11

7.11    No Royalties Paid to WRESTLER.  Except as specifically set forth in Section 7.1 through 7.9 above, WRESTLER shall not be eligible for any payment or royalties with respect to any other goods, services or otherwise including without limitation to the following: television license fees; television subscription fees; internet subscription fees; subscription video on demand fees; magazine subscription fees and/or advertising; and/or distribution fees of any kind paid to PROMOTER by any entity in connection with the exploitation of the Intellectual Property.

7.12    All payments made to WRESTLER are in full without withholding, except where required by law.  After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.13    If WRESTLER at any time during the Term is unable to wrestle for six (6) consecutive weeks due to an injury suffered while performing services at PROMOTER's direction, PROMOTER may: (i) for every Non-Televised Live Event or TV Taping, as described in Sections 7.2(a) and (b), reduce the Minimum Annual Compensation by .5%; and/or (ii) for every Pay-Per-View as described in Section 7.2(c), reduce the Minimum Annual Compensation by the average pay received by WRESTLER for the three (3) immediately preceding Pay-Per-Views or, if WRESTLER appeared in fewer than three (3) Pay-Per-Views, then the average WRESTLER receives for such similar events ("Similar Event") or .5% if WRESTLER did not appear in any such Similar Event.

7.14    (a)    PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

(b)    PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business.  WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice.  Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations.  WRESTLER shall not audit PROMOTER's books and records more than twice during any calendar year and no such audit shall be conducted later than six (6) months after the most recent statement of royalties is given, delivered or sent to WRESTLER.  Each audit is limited to five (5) days in duration.  Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

(c)    WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless an audit has been conducted by WRESTLER to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

(d)    No claim shall be filed pursuant to Section 13.8 below against PROMOTER or PROMOTER's affiliates that disputes any statement of royalties or accounting given by PROMOTER hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to

12

WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to Sections 7.14(b) and (c) above.

## 8. PROMOTER'S OBLIGATIONS

8.1     Although under Section 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER.   If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining such licenses, which shall include any permits, visas, or otherwise, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2     PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

(a)     In connection with WRESTLER's appearances and performance at any Events produced by PROMOTER and staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

(b)     In connection with the production, distribution, and exploitation of the Footage, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication; and

(c)     In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services.   In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3     PROMOTER shall schedule the Events and book WRESTLER for the Events.   In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event.   PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time.   If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then PROMOTER may fine, suspend or terminate WRESTLER in its sole discretion.

8.4     Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed.   For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond

13

WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

## 9. WRESTLER'S OBLIGATIONS

9.1     WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2     WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

(a)     WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise; and

(b)     WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs.

9.3     WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events (except for those transportation costs which are covered by PROMOTER's then current Travel Policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events.

9.4     WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5     WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to himself and to others in any and all Events. These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match.  In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6     WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this Section 9.6 shall cause a forfeiture of any payments due WRESTLER pursuant to Section 7 and shall entitle PROMOTER to

14

terminate this Agreement, or suspend WRESTLER without pay, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement. If PROMOTER in its discretion suspends this Agreement, when reinstated, PROMOTER may extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof and this Agreement will therefore continue to be of full force and effect throughout the remainder of the Term.

9.7     WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, including without limitation, appearing at and participating in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter discovered, including without limitation free, cable, pay cable, subscription video on demand, video on demand and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture and Internet), at times and places designated by PROMOTER, in connection therewith.

9.8     WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Footage and/or the exercise of any other rights respecting WRESTLER and/or PROMOTER Intellectual Property, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to the WRESTLER and/or PROMOTER Intellectual Property are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's written consent. WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.9     WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER's appearance and/or performance in a professional wrestling match.

9.10    WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them by reason of WRESTLER's breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of the harmless against any and all claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them, arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked.

15

9.11    WRESTLER shall be responsible for payment of all of WRESTLER's own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon retirement from professional wrestling.

9.12    (a)    **WRESTLER SHALL BE RESPONSIBLE FOR HIS OWN COMMERCIAL GENERAL LIABILITY INSURANCE, WORKER'S COMPENSATION INSURANCE, PROFESSIONAL LIABILITY INSURANCE, AS WELL AS ANY EXCESS LIABILITY INSURANCE, AS HE DEEMS APPROPRIATE TO INSURE, INDEMNIFY AND DEFEND WRESTLER WITH RESPECT TO ANY AND ALL CLAIMS ARISING OUT OF HIS OWN ACTS, TRANSACTIONS, OR CONDUCT AS A PROFESSIONAL WRESTLER.**

(b)    **WRESTLER ACKNOWLEDGES THAT THE PARTICIPATION AND ACTIVITIES REQUIRED BY WRESTLER IN CONNECTION WITH HIS PERFORMANCE IN A PROFESSIONAL WRESTLING EXHIBITION MAY BE DANGEROUS AND MAY INVOLVE THE RISK OF SERIOUS BODILY INJURY, INCLUDING DEATH. WRESTLER KNOWINGLY AND FREELY ASSUMES FULL RESPONSIBILITY FOR ALL SUCH INHERENT RISKS AS WELL AS THOSE DUE TO THE NEGLIGENCE OF PROMOTER OR OTHER WRESTLERS.**

(c)    **WRESTLER HEREBY RELEASES, WAIVES AND DISCHARGES PROMOTER FROM ALL LIABILITY TO WRESTLER AND COVENANTS NOT TO SUE PROMOTER FOR ANY AND ALL LOSS OR DAMAGE ON ACCOUNT OF INJURY TO THEIR PERSON OR PROPERTY OR RESULTING IN SERIOUS OR PERMANENT INJURY TO WRESTLER OR IN WRESTLER'S DEATH, WHETHER CAUSED BY NEGLIGENCE OF PROMOTER OR OTHER WRESTLERS UNDER CONTRACT TO PROMOTER.**

(d)    **WRESTLER MAY AT HIS ELECTION OBTAIN HEALTH, LIFE AND/OR DISABILITY INSURANCE TO PROVIDE BENEFITS IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF OTHER PROFESSIONAL ACTIVITIES; AND WRESTLER ACKNOWLEDGES THAT PROMOTER SHALL NOT HAVE ANY RESPONSIBILITY FOR SUCH INSURANCE OR PAYMENT IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF HIS PROFESSIONAL ACTIVITIES.**

(e)    **IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF WRESTLER'S PROFESSIONAL ACTIVITIES, WRESTLER ACKNOWLEDGES THAT AS AN INDEPENDENT CONTRACTOR HE IS NOT ENTITLED TO ANY WORKERS' COMPENSATION COVERAGE OR SIMILAR BENEFITS FOR INJURY, DISABILITY, DEATH OR LOSS OF WAGES; AND WRESTLER SHALL MAKE NO CLAIM AGAINST PROMOTER FOR SUCH COVERAGE OR BENEFIT.**

9.13    (a)    WRESTLER shall act at all times with due regard to public morals and conventions during the Term of this Agreement.  If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings WRESTLER into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures WRESTLER's reputation in PROMOTER's sole judgment, or diminishes the value of WRESTLER's professional wrestling services to the public or PROMOTER, then at the time of any such act, or any time

16

after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER; and PROMOTER shall have the right to immediately suspend WRESTLER and/or terminate this Agreement pursuant to Section 12.

(b)     Should at any time during the Term, WRESTLER be involved in any way with a criminal or civil legal proceeding or regulatory or administrative hearing (e.g., immigration hearing) or otherwise ("Proceeding"), PROMOTER shall have the right but not the obligation to retain counsel to represent WRESTLER in the Proceeding and PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any and all costs and expense (including attorney's fees) related to the Proceeding. WRESTLER agrees that should PROMOTER retain counsel pursuant to this Section 9.13(b), PROMOTER shall not be admitting that PROMOTER has any obligation, liability, and/or responsibility whatsoever in connection with the Proceeding.

9.14     During the Term, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity for any other martial arts or wrestling organization and/or entity not owned or controlled by PROMOTER or any affiliated or subsidiary company thereof, or otherwise in the entertainment industry, including without limitation appearances in live events, pay-per-view or other televised events.

## 10. WARRANTY

10.1     WRESTLER represents, warrants, and agrees that WRESTLER is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; WRESTLER has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no prior or pending claims, administrative proceedings, civil lawsuits, criminal prosecutions or other litigation matters, including without limitation any immigration or athletic commission related matters, affecting WRESTLER which would or might interfere with PROMOTER's full and complete exercise or enjoyment of any rights or licenses granted hereunder.  Any exceptions to this Warranty are set forth in Exhibit C, attached hereto.

10.2     (a)     WRESTLER represents and warrants that WRESTLER is in sound mental and physical condition; that WRESTLER is suffering from no disabilities or pre-existing conditions or injuries that would impair or adversely affect WRESTLER's ability to perform professional wrestling services; and that WRESTLER is free from the influence of illegal drugs or controlled substances, which can threaten WRESTLER's well being and pose a risk of injury to WRESTLER or others.  To insure compliance with this warranty, WRESTLER shall abide by any drug policy conveyed to WRESTLER and/or his representative(s) as well as any and all amendments, additions or modifications to any such drug policy, and WRESTLER further consents to sampling and testing, in accordance with any such drug policy.  In addition, WRESTLER agrees to submit no less than annually to complete physical examination(s) by a physician either selected or approved by PROMOTER.

(b)     In the event that WRESTLER is unable to wrestle for six (6) consecutive weeks during the Term of this Agreement, for any or no reason, including, without limitation, due to an injury suffered while performing services at PROMOTER's direction, PROMOTER shall have the right to thereafter: (i) terminate this Agreement; (ii) suspend WRESTLER either with or without pay; and/or (iii) extend the

17

Term of this Agreement for a period of time equal to the entire period of inability to wrestle, or any portion thereof. Upon certification by WRESTLER or PROMOTER's physician during any period of suspension that WRESTLER is fully recovered and capable of performing all services as required under this Agreement, PROMOTER shall have the right to reinstate this Agreement, and it will thereafter continue to be of full force and effect throughout the remainder of the Term.

10.3   PROMOTER reserves the right to have WRESTLER examined by a physician of its own choosing at its expense at any point during the Term of this Agreement.

## 11. EARLY TERMINATION

11.1   (a)      This Agreement may be terminated by PROMOTER during the Term for any or no reason whatsoever by providing WRESTLER at least ninety (90) days advance written notice of said termination. The ninetieth (90th) day shall be defined as the "Termination Date".

(b)      This Agreement may be terminated prior to the end of its Term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either party.

(c)      This Agreement may be terminated by PROMOTER immediately due to WRESTLER's breach as set forth in Section 12.1.

(d)      In the event of a termination pursuant to Section 11.1(a) or Section 11.1(b), PROMOTER shall be obligated to pay WRESTLER a pro-rated portion of the Minimum Annual Compensation up until the Termination Date and to pay WRESTLER any royalties which may be due WRESTLER in accordance with Sections 7.3 through 7.9 for the use of the WRESTLER Intellectual Property.

11.2   This Agreement shall automatically and immediately terminate upon WRESTLER's death and PROMOTER shall have no further obligation to WRESTLER or WRESTLER's heirs, successors, personal representatives or assigns pursuant to any of the terms herein including but not limited to any payment obligations as described in Section 7.

11.3

(a)      Upon expiration or termination of this Agreement for any reason, the parties acknowledge and agree that: (i) PROMOTER shall own in perpetuity all right, title and interest in all Footage, Works, PROMOTER Intellectual Property and any registrations thereof; (ii) PROMOTER shall also have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items as set forth in Section 4.2

(b)      Upon expiration or termination of this Agreement by PROMOTER pursuant to Section 12.1, WRESTLER shall not work, appear, or perform in any capacity for any professional wrestling, sports entertainment, mixed martial arts and/or ultimate fighting organization, promotion or entity not owned or controlled by PROMOTER (or any affiliated or subsidiary company thereof) in the United States for a period of up to one (1) year from the date of such expiration or termination, as specified by PROMOTER in the notice of termination; provided, however, that if no lesser period is specified by PROMOTER in the notice of termination, such period shall be one (1) year.

18

## 12. BREACH

12.1    In addition to those reasons set forth elsewhere in this Agreement, PROMOTER shall have the right, in its sole discretion, to immediately suspend or terminate this Agreement, both as to services and compensation, if any of the following occurs:

(a)    PROMOTER has the right to terminate WRESTLER pursuant to the provisions of any drug policy adopted by WWE, as well as any and all amendments, additions or modifications to any such drug policy;

(b)    WRESTLER is not in compliance with the representation and warranty set forth in Section 10.2(a), including, without limitation, as evidenced by any cardiovascular test, physical examination or other medical screening implemented by PROMOTER during the Term.

(c)    WRESTLER is habitually late and/or absent for scheduled Events or appearances as PROMOTER determines in its sole discretion;

(d)    WRESTLER fails any physical examination conducted on behalf of PROMOTER, as required herein;

(e)    WRESTLER fails to maintain physical condition or training such that his weight, and/or his performance is unsatisfactory as determined by PROMOTER in its sole discretion;

(f)    PROMOTER, on behalf of WRESTLER, is unable to obtain any necessary athletic commission licenses or immigration documents, including, but not limited to visas; or

(g)    WRESTLER breaches Section 9.13(a).

12.2    In the event that WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law, as provided in Section 13.8.  In addition, in the event of an immediate termination pursuant to Sections 12.1(a) through (f), WRESTLER shall forfeit and shall not be entitled to:  (i) any remaining Minimum Annual Compensation owed and (ii) any future payments that may have been due WRESTLER pursuant to Section 7.  WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the WRESTLER Intellectual Property for the remainder of the Term and the PROMOTER Intellectual Property forever. Further, at PROMOTER's sole option, the Term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period.

12.3    The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, Footage, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief  shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

19

WWE_Alexander0000019

12.4    In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

## 13. MISCELLANEOUS

13.1    Nothing contained in this Agreement shall be construed to constitute WRESTLER as an employee, partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect. WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or any and all of the rights granted to PROMOTER herein.

13.2    This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement. There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3    This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

13.4    If any provision or clause of this Agreement, or portion thereof, shall be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision shall not thereby be affected and shall be given full effect, without regard to the invalid portion. It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce or modify the duration, area, or matter of such provision, and, in its reduced or modified form, such provision shall then be enforceable and shall be enforced.

13.5    PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted by WRESTLER to PROMOTER pursuant to the terms of this Agreement to any person, firm or corporation, provided that such assignee has the financial ability to meet the PROMOTER's obligations hereunder, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall be released from any liability and shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6    Any notices required or desired hereunder shall be in writing and shall be deemed given when personally delivered or if mailed by certified mail, return receipt requested or registered mail, when deposited in the United States Mail, postage prepaid, or if telecopied, when telecopied, or if sent by courier service, when deposited with such service, or if sent by overnight delivery service, on the next business day following delivery to such service. Notices shall be addressed as follows (unless either party at any time or times designates another address for itself by notifying the other party thereof as provided herein):

20

WWE_Alexander0000020

TO PROMOTER:

World Wrestling Entertainment, Inc.
Attn:   General Counsel
1241 E. Main Street
Stamford, Connecticut 06902

TO WRESTLER:

Randal Orton
4352 Austin Pass Drive
St. Charles, Missouri 63304

13.7    This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8    The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

13.9    WRESTLER understands and acknowledges that, from time to time during the Term, he may request that attorneys employed by or associated with PROMOTER represent WRESTLER's interests in connection with certain contracts and/or other matters relating to WRESTLER's career, including, without limitation, in connection with certain Permitted Activities, whether or not utilizing the Intellectual Property. WRESTLER thus confirms his understanding and acknowledgement that, in connection with such representation, such attorneys (including attorneys who may have previously represented, and who may in the future represent, PROMOTER in a role potentially adverse to WRESTLER) may represent WRESTLER, either individually and/or concurrently with representing PROMOTER. Such representation during the Term may constitute a potential conflict of interest. Accordingly, WRESTLER understands and acknowledges by his execution of this Agreement that, he further waives any such conflict of interest arising from such representation of WRESTLER by PROMOTER's attorneys. WRESTLER further understands and acknowledges that he has been encouraged to seek the advice of and retain independent counsel in connection with all matters relating to his interests, including contract negotiation and any and all other issues relating to his career, as well as advice with respect to the meaning and impact of the consent and waiver set forth in this Section 13.9, and WRESTLER hereby represents and warrants to PROMOTER that he knowingly either has and will retained such independent counsel, or has decided or will decide intentionally not to do so. The consent and waiver set forth in this Section 13.9 shall remain in effect during the Term, unless revoked in writing by WRESTLER and delivered to PROMOTER pursuant to Section 13.6.

## 14.  CONFIDENTIALITY

14.1    (a) Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that in further  consideration of PROMOTER's entering into this Agreement, WRESTLER shall not, at any time during the Term of this Agreement, or after the termination of this Agreement for any or no reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of WRESTLER or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as

21

reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances in the Footage, information regarding any contractual relationships maintained by PROMOTER and/or the terms thereof, and/or any and all information regarding wrestlers engaged by PROMOTER.

    (b)  Notwithstanding the foregoing, WRESTLER's obligation of confidentiality shall not include information which:

        (i)    at the time of disclosure was in the public domain;

        (ii)   after such disclosure becomes generally available to the public other than through any act or omission by WRESTLER; and

        (iii)  is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to PROMOTER in a timely manner in order to afford PROMOTER an opportunity to seek a protective order against such disclosure.

14.2   WRESTLER acknowledges and agrees that his agreement to be bound by the terms hereof is a material condition of PROMOTER's willingness to use and continue to use WRESTLER's services. Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either. Notwithstanding the foregoing, WRESTLER shall be free to disclose the terms and conditions of this Agreement to his lawyers, agents, financial advisers and spouse and PROMOTER shall be free to disclose the terms and conditions of this Agreement to its lawyers, accountants and to those employees who have a legitimate need to know such information.

14.3   This Agreement and any amendments thereto may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute the same instrument. Counterparts may be executed either in original or faxed form and the parties adopt any signatures received by a receiving fax machine as original signatures of the parties. All of the terms and conditions of any Exhibits shall be incorporated herein by reference and shall be made a part hereof.

22

Confidential

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written below.

WORLD WRESTLING
ENTERTAINMENT, INC.
("PROMOTER")

By: _____
    John Laurinaitis
    Executive Vice President, Talent Relations

Date: _____8/27/09_____

RANDAL ORTON
("WRESTLER")

By _____
    Randal Orton

Social Security No.: 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

Date: ___8/18/09___

APPROVED

CEO _____
Legal _____
Finance _____

STATE OF CONNECTICUT    )
                         ) ss:  Stamford
COUNTY OF FAIRFIELD    )

On __August 27,__ 2009 before me personally came John Laurinaitis, Executive Vice President of Talent Relations, to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of World Wrestling Entertainment, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this 27th day of August, 2009.

_____
Notary Public
My commission expires: _____

JANET P. COLE
NOTARY PUBLIC
MY COMMISSION EXPIRES MAR. 31, 2014

STATE OF Missouri    )
                   ) ss:
COUNTY OF St. Charles    )

I am a Notary Public for said County and State, do hereby certify that Randal Orton personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this 18 day of August, 2009.

_____
Notary Public
My commission expires: 8/7/2012

BRENT A. LANCE
My Commission Expires
August 7, 2012
St. Charles County
Commission #08410051

23

**EXHIBIT A**

<u>WRESTLER INTELLECTUAL PROPERTY</u>

Randal Orton
Randy Orton

24

Confidential

**EXHIBIT B**

<u>PROMOTER INTELLECTUAL PROPERTY</u>

Evolution
The Big "O"
The Legacy
The Legend
Legacy is Destiny
Bred To Be The Best
The Prodigy
The Legend Killer
Rated-RKO
The Viper

25

Confidential

WWE_Alexander0000025

**EXHIBIT C**

EXCEPTIONS TO WARRANTY
PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR
CONFLICT WITH
<u>WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS</u>

None

26

WWE_Alexander0000026

Take-Two Interactive Software, Inc.
622 Broadway
New York, NY 10012
(646) 536-2842  Fax (646) 536-2923

## World Wrestling Entertainment – Terms of License ("License")

**LICENSOR:**            World Wrestling Entertainment, Inc. ("Licensor")

**LICENSEE:**            Take-Two Interactive Software, Inc. ("Licensee")

**PROPERTY:**            Licensor intellectual property including, but not limited to, trademarks (*e.g.*, WWE, Raw, Legends, ECW), trade names, logos, copyrights, characters, storylines, and other indicia and intellectual property related to or associated with the professional wrestling activities of Licensor and its professional wrestling events, products and services. The Property includes, solely to the extent owned or controlled by Licensor, all music, still photography and video footage, art and sound assets relating to Licensor's professional wrestling activities (the "Multimedia Rights"), *provided, however,* that Licensee will pay Licensor for all direct costs incurred by Licensor (including, but not limited to, all out-of-pocket costs as well as a reasonable allocation of costs for internal resources and personnel) for music and video footage provided to Licensee by Licensor for use in connection with the Games, as defined below. Licensee acknowledges that some of the Multimedia Rights may not be owned or controlled by Licensor, and nothing contained herein shall require Licensor to procure such Multimedia Rights. The Property further includes right of publicity, namely the likenesses, physical characteristics, personalities, characters, and personas of all Licensor Talent (namely, all individuals who are under a booking contract, independent contract or other similar agreement with Licensor and have granted Licensor the licensing rights relating to Licensor's professional wrestling activities for use in connection with the Games). Licensor shall make Licensor Talent available for 3D scanning and photography at no cost to Licensee (to the extent needed and subject to Licensor Talent's scheduling availability). Licensor shall make Licensor Talent available for voice-over recording and non-contact motion capture (to the extent needed and subject to Licensor Talent's scheduling availability) at no cost to Licensor (but without Licensor receiving any profit therefrom and with the parties working together in good faith to minimize the costs to Licensee) and Licensor shall provide reasonable access to Licensor Talent for publicity events. It is understood and agreed that the Property does not include , (i) any film, comic, cartoon, animated designs and/or characterizations of Talent (i.e. not live action simulation), (ii) any brand extension including Talent that is not engaged in unarmed combat for a significant portion of the Game (*e.g.* Stone Cold Hunting Game, a Talent racing or card game, etc) or (iii) or any assets of WWE Studios, Inc. and its subsidiaries ("WWE Studios"), all of which may be exploited by Licensor in its sole discretion except as follows.

CONFIDENTIAL
1

**Exhibit**

**Exhibit 3**

08-4-2020

Notwithstanding the exclusion from the licensed Property of ███████ in clause (i), with respect to any interactive entertainment software game using ███████████████████████████████████████████████████ (1) Licensor shall deliver to Licensee a "request for proposal" which will outline Licensor's requirements for the game and associated license; (2) Licensee shall provide its proposal to Licensor within thirty (30) days after receipt of Licensor's request and shall otherwise comply with Licensor's reasonable scheduling requirements; and (3) if Licensee submits a proposal, such proposal shall be subject to good faith negotiations between Licensor and Licensee for a period of ██ . If Licensee does not submit a proposal timely or if the parties are unable to agree in good faith upon the terms of the license, then Licensor shall be free to license such interactive entertainment software game to any other party (subject to the provisions below in this Section "Property").

Notwithstanding the exclusion from the licensed Property of ██ ██████████ ███ ██████████ and its subsidiaries set forth above, the provisions of this paragraph shall apply unless such rights would conflict with third party agreements then in effect that relate to the rights to a ███ generally (such as, without limitation, a production agreement or a distribution agreement). If WWE Studios wants to license for an interactive entertainment software game its owned and controlled intellectual property which is derived from a ███ ██ ████████████████████████████████████████████ then (1) Licensor shall deliver to Licensee a "request for proposal" which will outline Licensor's requirements for the game and associated license; (2) Licensee shall provide its proposal to Licensor within thirty (30) days after receipt of Licensor's request and shall otherwise comply with Licensor's reasonable scheduling requirements; and (3) if Licensee submits a proposal, such proposal shall be subject to good faith negotiations between Licensor and Licensee for a period of ██ . If Licensee does not submit a proposal timely or if the parties are unable to agree in good faith upon the terms of the license, then Licensor shall be free to license such interactive entertainment software game to any other party (subject to the provisions below in this Section "Property").

Notwithstanding the foregoing, Licensor shall not release an ████████████████████████████████████ in a

CONFIDENTIAL
2

game console format (it being agreed that platforms other than console games such as ███████████████ ████████████████████████████) prior to January 1, 2015 nor within the ninety (90) days immediately preceding, or the ninety (90) days immediately after, the release by Licensee of a Game pursuant hereto. Moreover, if such a console game is released in accordance with the immediately preceding sentence (the "Third-Party Game Termination Trigger"), Licensee may, during a period of forty-five (45) days immediately following the release of such game by Licensor, on prior written notice, terminate this Agreement either (a) immediately upon such notice without the benefit of clause (c) below, or (b) in accordance with clause (c) below, in either case (a) or (b) without further liability on the part of either party other than those provisions which remain in effect pursuant to their terms or by necessary implication (such as indemnities, obligations to pay for product sold, Licensee's sell off rights provided for in Section L(15) of the Standard Terms and Conditions, etc.), and (c) provided, however, that notwithstanding anything to the contrary in this Agreement, in the event of termination pursuant to clause (b) above, Licensee shall have the right and obligation to release the Game(s) then in development and exercise the manufacture, distribution, sale and related rights with respect to such Game(s) (for example, if Licensee terminated the Agreement on February 1, 2016 in accordance with this paragraph, then Licensee would continue to have right and obligation to release the Game in calendar year 2016 as well as the sell-off rights with respect to such Game, but Licensee would have no further right or obligation for new Games after calendar year 2016). Continuing such example, in the event Licensee terminates the Agreement in accordance with this paragraph on February 1, 2016, Licensee shall have the obligation to pay a Guaranteed Minimum for the Game released in calendar 2016 but shall not have any obligation to pay any Guaranteed Minimum for a Game in respect of any years after 2016 For further avoidance of doubt, any ██████████ ███████ ███████████████ released by Licensor or any third party in accordance with this paragraph shall not consist primarily of ███████████████████ ██████.

In the event Licensee is interested in utilizing Multimedia Rights that are not owned and controlled by Licensor, Licensor and Licensee shall reasonably consult and, if Licensor agrees to the inclusion of such Multimedia Rights in a Game(s), Licensor will reasonably assist Licensee in procuring such rights at the lowest cost to Licensee (and, in any event, without profit to Licensor). In addition, if Licensee is granted permission by Licensor, in writing, to license other third party intellectual property (including, without limitation, any professional wrestler formerly

CONFIDENTIAL
3

WWE_Alexander0000029

associated with Licensor agreed upon in the exercise of good faith by the parties), directly from the third party, Licensee agrees to pay such third party all sums due for the use of the rights and to provide Licensor with documentation of same.

**RIGHTS:** Exclusive rights to develop, use, advertise, market, exhibit, manufacture, distribute, sell, copy, host and otherwise exploit interactive entertainment software games, including catalog THQ titles ("Catalog Titles"), based on the Property in any and all manner now known or hereinafter invented and as more fully described in the Section "Platforms" ("Games").

**PLATFORMS:** Except as provided below, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and any successors thereto, including, without limitation, all PC, console and handheld platforms, all mobile devices, including phones, tablets and other similar devices (collectively, "Mobile Rights"), so-called "cloud" computing systems (wherein the Games are synchronized, rendered, and stored on a remote server and delivered online, e.g., OnLive), CD, CD-ROM, DVD, HD, DVD, Blu-Ray or other hardware to play the game; and online rights and multi-player capabilities relating thereto, including digital download rights, DLC, micro-transactions, subscription services, MMOs, web browser-based games and social games (collectively, "Online Rights"). (Online Rights with respect to digital download rights, downloadable content and microtransactions are referred to herein as "DLC Online Rights" and all other Online Rights are referred to herein as "Other Online Rights".) Licensee shall also have the right to distribute game peripherals such as memory cards and strategy guides relating to the Games ("Associated Products") on a non-exclusive basis. Specifically excluded from the Platforms are:

- all coin-operated arcade games and other coin-operated machines, tabletop games.
- DVD-based board games.
- Topps (or any other third party trading card licensee) online community (e.g., Toppstown.com), trading cards and stickers, including all interactive gameplay elements thereof.
- "plug and play" type games.

Licensor acknowledges that the rights granted to Licensee hereunder to produce Games include the right to develop, distribute and/or make accessible and/or actively operate social networking applications and/or on-line communities designed to interact with, promote and market the Games, and the parties agree to discuss in good faith opportunities to jointly promote the Games through social networking applications and/or on-line communities.

CONFIDENTIAL
4

WWE_Alexander0000030

Licensee acknowledges that the rights granted to Licensee hereunder do not preclude or prevent Licensor from using the Property to license others to engage in or directly engage in (i) activities (but not games, except as set forth in clause (iii) below) over so-called open-ended social network websites such as, but not limited to, MySpace, Facebook, Cyworld, and Bebo, and closed social networking sites operated by hardware manufacturers; (ii) activities (but not games, except as set forth in clause (iii) below) over web-based "virtual world" sites (including, without limitation, the sale of "virtual goods"), regardless of whether such applications include interactive activities generally which may also appear in interactive game products (for convenience "game-like activities"), and regardless of the device through which such applications may be accessed by an end-user and/or (iii) ▇▇▇▇▇▇▇     ▇▇▇▇▇▇▇

for promotional, sponsorship or commercial purposes so long as these games are not (A) initially released in a launch marketing window for a Game (i.e. 45 days immediately prior to, during and 45 days immediately following the commercial release of a Game) or (B) "competitive" with the Games (it being agreed that, if they are "competitive" Licensor shall not use the Property to license others to engage, or directly engage, in these activities). For purposes of the foregoing, a game shall be deemed "competitive" if (a) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ or (b) is developed or published (i.e., this does not include distribution where such distributor does not develop or publish) by one of the following competitors of Licensee: ▇▇▇▇▇   ▇▇▇▇   ▇▇▇▇▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ or (c) is developed or published by one of the following online-based developers or publishers: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. In the event that Licensor desires to use the Property to license or itself engage in the activities permitted by clauses (i), (ii) or (iii) above, (1) Licensor shall deliver to Licensee a "request for a proposal" which will outline Licensor's requirements for the production and delivery of software required for the specified activity; (2) Licensee shall provide its proposal to Licensor within ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇) after receipt of Licensor's request and shall otherwise comply with Licensor's reasonable scheduling requirements; and (3) if Licensee submits a proposal, such proposal shall be subject to good faith negotiations between Licensor and Licensee for a period of ▇▇▇▇▇▇▇ (ten (10) business days, in the case of simple promotional or sponsorship games). If Licensee does not submit a proposal timely or if the parties are unable to agree in good faith upon the terms by

Confidential

WWE_Alexander0000031

which Licensee shall produce and deliver such software within the applicable ▮▮▮ ▮▮ business day period, then Licensor shall be free to engage any other party (except a party listed in clauses (b) or (c) above) to produce (or produce itself) such software without further obligation to Licensee. The parties' actions contemplated by this Section shall be subject to the parties' good faith and fair dealing. Notwithstanding the foregoing, the parties acknowledge and agree that Licensor went through the foregoing process with respect to certain Online Rights with its former licensee and the list attached hereto as Schedule A reflects current partners of Licensor, and the performance of Licensor's obligations with such partners, and any extension, renewal, amendment or new agreement with such partners that is in accordance with the provisions of this Agreement other than the first look procedures included in this paragraph shall not constitute a breach of this Agreement, provided nothing herein shall permit such partners to release games for console platforms.

**TERRITORY and LANGUAGES:**     Worldwide; all languages.

**TERM:**     Commencing on the Effective Date and continuing through ▮▮▮▮▮▮▮▮▮; provided, however, the rights and obligations hereunder shall be of no effect and consequence unless and until (i) Licensee and Yuke's Co., Ltd. ("Yuke's") enter into a Master Developer Agreement ("MDA"), satisfactory to Licensee in its sole discretion, regarding the development of the Games, (ii) the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") enters an order, satisfactory to both parties in their discretion, approving THQ Inc.'s ("THQ") motion seeking approval of THQ's rejection of that certain License Agreement, dated as of December 22, 2009, as amended, by and between THQ and WWE, (iii) the Bankruptcy Court enters an order, satisfactory to both parties in their sole discretion, approving the transfer of all of THQ's right, title and interests in all assets owned by THQ and executory contracts relating to video games based on the Intellectual Property produced or developed by THQ free and clear of all interests, liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code, or (iv) those members of the THQ "Fight Team" who are THQ employees and are crucial to the development of WWE games have agreed to be employed by Licensee on terms satisfactory to Licensee in its sole discretion, in each of cases (i)-(iv), on or prior to February 22, 2013 (the date on which the latest to occur of the events set forth in clauses (i) to (iv), the "Effective Date"). Both parties shall use reasonable commercial efforts to fulfill the conditions to the effectiveness of this Agreement. If despite such efforts, the Effective Date does not occur by February 22, 2013 either party shall have the right, upon written notice to the other party prior to the above conditions in clauses (i) through (iv) having been satisfied, to terminate this Agreement and upon such termination notice, this Agreement shall immediately become null

Confidential                                                                    WWE_Alexander0000032

and void and have no effect, no party shall have any past or future obligation under this Agreement, and all rights and obligations of the parties hereunder shall automatically terminate.

Licensee shall have a nine (9) month sell-off period from the termination (other than as a result of Licensee's material breach) or expiration date of this License to continue to distribute, market and sell such Game or any products or services related to the Property authorized hereunder ("Licensed Products"), provided that: (i) during the first three (3) months of the sell-off period only, Licensee shall be entitled to have manufactured units of Games that Licensee reasonably anticipates will be necessary to meet forecasted demand for the remainder of the sell-off period; and (ii) all sales during the sell-off period shall be subject to the royalties specified herein. The parties acknowledge that, unless prohibited by a new agreement fully executed and delivered by the parties hereto covering the subject matter hereof, Licensor may, on or after January 15, 2016, begin negotiating and/or enter into any agreement with any entity regarding the terms of a videogame license commencing on January 1, 2018. Should Licensor enter into such a new videogame license, the new licensee may: (1) develop and manufacture games on or after January 15, 2016; and (2) market, sell to retailers and/or ship to retailers on or after March 15, 2018; provided, however, no games may be sold at retail under the new license prior to July 1, 2018.

**DISTRIBUTION:**

Unless specifically stated to the contrary herein (or approved in advance in writing by Licensor), the rights granted to Licensee shall not include the right to sell, distribute, manufacture, market, display and/or advertise the Games through any of the following channels of distribution which are reserved specifically for use by Licensor: (i) ███████████; and (ii) ████████████████████████████████ provided, that all Games sold by Licensor through such channels of distribution shall be purchased directly from Licensee in accordance with this Agreement.

**NONRECOUPABLE GAME FEE:**

Within ten (10) days after the release of WWE '14 and, in any event, on or before December 31, 2013 (i.e. whether or not WWE '14 is then or thereafter actually released), Licensee shall pay to Licensor ████████ ███████ as a nonrecoupable, nonrefundable fee for the first game (WWE 2014) and second game (WWE 2015).

CONFIDENTIAL
7



**RECOUPABLE GUARANTEED MINIMUM:**

Unless terminated earlier and subject to conditions set forth below, the recoupable (as provided below) Guaranteed Minimum for the License Term shall be as follows:

████████████████████████████ payable on the Effective Date, which shall be recoupable against Licensor Royalties earned for the first console Game released after execution of this License ("WWE 2014") and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products; provided, however, in the event that both following conditions have been met prior to January 1, 2015: (x) such Game (WWE 2014) does not generate in excess of ████████ ██████████████ and (y) that Guaranteed Minimum has not been fully recouped by Licensee,  then Licensor will credit ████████████████████████████ (the "WWE 2014 Credit") against future payments of Guaranteed Minimums (but not royalties or other fees hereunder) due hereunder and the Guaranteed Minimum for WWE '14 shall be reduced by such amount.

████████████████████████████ payable on January 1, 2014, which shall be recoupable against Licensor Royalties earned for the second console Game released after execution of this License ("WWE 2015") and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products other than the main console simulation Games released in prior years; provided, however, in the event that both following conditions have been met prior to January 1, 2016: (x) such Game (WWE 2015) does not generate in excess of ████████ of Net Sales and (y) that Guaranteed Minimum has not been fully recouped by Licensee,  then Licensor will credit Licensee ████████████████████████████ (the "WWE 2015 Credit") against future payments of Guaranteed Minimums (but not royalties or other fees hereunder) due hereunder and the Guaranteed Minimum for WWE 2015 shall be reduced by such amount.

In the event that Licensee terminates this Agreement either for Licensor's breach of the Agreement or for the Third-Party Game Termination Trigger, and following such termination there are no future Guaranteed Minimums against which to credit the WWE 2014 Credit or WWE 2015 Credit, if applicable, then Licensor shall instead pay the amount of such credits, if applicable, directly to Licensee within fifteen (15) days of such termination.

████████████████████████████ payable on January 1, 2015 and each successive January 1 thereafter during the Term, each of which ████████ annual payment shall be recoupable against Licensor Royalties earned for the Game released in that year (i.e. cross collateralization is

Confidential

allowed between years but not between annually released main simulation Games) and recoupable against Licensor Royalties earned in that calendar year for all Licensed Products other than the main console simulation Games released in prior years.

**MOBILE GAMES:** Licensee shall use reasonable efforts to develop, market and sell at least ███████████████████████████████ including, but not limited to, the iPhone, iPod Touch, iPad and other tablets and Android platforms. Such Game may be a version of the annual console Game or a different Game developed specifically for such platforms.

**LICENSOR ROYALTIES:** Royalties payable to Licensor by Licensee hereunder shall be as follows:



| Game Released in Calendar Year | Platform | Royalty (expressed as a percentage of Net Sales) |
| --- | --- | --- |

Confidential

(c)    In subsections (a) and (b), Net Sales of Mobile Rights and Online Rights shall be counted as Net Sales for purposes of calculating royalties break points above. All Catalog Titles will earn royalties, which will be used to recoup Guaranteed Minimums as set forth under Section "Recoupable Guaranteed Minimum". Such Catalog Title royalties shall be ▮▮▮ of Net Sales. Net Sales of Catalog Titles shall count for purposes of calculating break points above.

(d)    Licensor agrees to consider in good faith Licensee's requests to bundle the Games with other comparable platform interactive entertainment software games created by the Licensee (provided that Licensor hereby approves a bundle of NBA 2K13 with WWE 2013); it being agreed that Licensor may deny such requests in its good faith discretion for any reason such as, without limitation, brand or content avoidance or perceived quality discrepancies. In the event such bundling is allowed by Licensor, Net Sales for the Games will equal Net Sales for the bundle divided by the number of interactive entertainment software games (including the Games) included in the bundle.

(e)    In-Game Advertising (all years): ▮▮▮ split of revenue after deduction of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮.

(f)    Associated Products: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

(g)    "Net Sales" with respect to all Platforms other than Mobile Rights and Online Rights is defined as Licensee's gross invoiced billing price to its customers or distributors for the Licensed Product less only: (i) volume discounts, markdowns, allowances, and rebates (it being agreed that Licensee is free to grant all of these in its sole discretion, but the aggregate maximum deducted from Net Sales for these purposes is capped at ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ of the total gross invoiced billing price for that title); (ii) credits issued or monies paid to customers pursuant to a co-op and retail marketing funds of an amount not to exceed ▮▮▮ of the gross sales by title, for shipments to Licensee's customers based on life to date sales of the title; and (iii) credit or adjustments for returns, subject to a cap of ▮▮▮▮▮▮ of gross invoiced billing price for that title. Licensee shall include a column on the quarterly royalty statements showing the actual co-op and retail marketing fund deductions. For the avoidance of doubt, Licensee shall not be entitled to deduct

CONFIDENTIAL
10

WWE_Alexander0000036

shipping or warehouse price allowances or deductions from Net Sales. If the Licensee sells a Game to a subsidiary or other entity which is an "affiliate" (as defined in Regulation 240.10A-3(e)(1) promulgated under the Securities Exchange Act of 1934), the Licensor royalties hereunder shall be computed on the basis of the Net Sales price for such Game charged by such affiliate on resale of the Game, provided, however, Licensee shall pay only one royalty and only on a resale if such resale price is higher than the price charged by Licensee to the affiliate.

"Net Sales" with respect to Mobile Rights and Online Rights is defined as Licensee's actual gross sales of the Licensed Products received by Licensee, less only unaffiliated third-party expenses actually incurred by Licensee in the form of: (i) customary distribution royalties or similar fees or charges paid to sites, services or platforms through which the Licensed Products are distributed, playable or otherwise made available, (ii) credits, refunds or charge backs for returned or canceled Licensed Product orders subject to a cap of ▮▮▮▮▮▮▮▮ of gross invoiced billing price for that title, (iii) amounts solely and directly attributable to fraudulent or invalid transactions, (iv) with respect to Online Rights an allocable portion of reasonable out-of-pocket, customer service costs not to exceed ▮▮▮▮▮▮▮ of gross revenues from the sale of Licensed Products if Licensee operates such Licensed Product directly (i.e., without any online partner or similar third party), and (v) with respect to Online Rights, server hosting charges if Licensee operates a Licensed Product directly (i.e., without any online partner or similar third party). Notwithstanding anything in the Standard Terms and Conditions to the contrary, the parties hereby acknowledge and agree that currently many digital distributors collect and remit sales, use, value added, good and services and/or similar taxes, which amounts shall not be included in Net Sales, and the parties further acknowledge and agree that to the extent that Licensee is responsible for the collection or remittance of such taxes, such taxes shall not be included in Net Sales.

(h)   All royalty payments, together with a royalty statement, shall be due within forty-five (45) days following the end of each calendar quarter. All royalties due Licensor shall accrue upon the sale of the Games, regardless of the time of collection by Licensee.

**MARKETING COMMITMENT:**   For each Contract Year, Licensor shall spend ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to advertise the Games, including via television, internet and/or social media, radio or billboards, and/or any other form of advertising in accordance with the marketing plan further described in the "Marketing and Sales Plans/Quarterly Reports" section below. Licensee shall keep accurate account and copies of all documents and records relating to said advertising expenditures and shall be required to

CONFIDENTIAL
11

send in reports on a semi-annual basis describing the nature and amount of advertising.

**NON-COMPETE:** Licensee, its parent, subsidiaries, affiliates, successors, and assigns agree that they shall not, while this License Agreement remains in effect, produce any wrestling videogame products using: (a) the names, logos or other trademarks or service marks associated with any professional wrestling organization (other than Licensor); or (b) the names, trademarks or service marks, logos and/or likenesses of any professional wrestlers not associated with Licensor.

**PRODUCT RELEASE:** Licensee shall use its commercially reasonable efforts to exploit the rights granted hereunder.  Licensee shall ███████████ ███████████████████████████████████

**MARKETING AND SALES PLANS/**
**QUARTERLY REPORTS:** Once a year, Licensee shall provide Licensor with a written marketing plan (in a form to be reasonably agreed) with respect to the Games. Each such marketing and sales plan shall include, for each Game, a marketing timetable, sales projections, channels and methods of distribution, nature and amount of advertising and advertising expenditures. Each marketing plan shall contain specific information for the one-year period immediately succeeding its submission and general estimates or projections for subsequent periods during which this License remains in effect. All marketing plans and information therein provided by Licensee to Licensor shall be formulated by Licensee after meaningful consultation with WWE and treated as the confidential information of Licensee. Licensee will provide Licensor semi-annually with reports (in a form to be reasonably agreed) updating the marketing and sales plan going forward for at least the next twelve (12) months and detailing the implementation of the marketing and sales plan and the advertising and marketing expenditures made by Licensee for the past six months.

**SALES TO LICENSOR:** Licensee agrees to sell to Licensor a reasonable amount of product produced hereunder at the lowest legally permissible preferential pricing which, in any event, will be above Licensor's cost for such products, for re-sale on Licensor's website or catalog.  Such product will be sold to Licensor with a royalty rate ████ less than the royalties mentioned above. Such sales shall be recoupable by Licensee against the Minimum Guarantee owed in the year in which such sales are made to Licensor.

**INSURANCE:** Licensee shall obtain during the term a comprehensive general liability insurance policy which shall include coverage for product liability from an insurance company which maintains an A.M. Best rating of at least A- (A minus) or higher and is

CONFIDENTIAL
12

WWE_Alexander0000038

reasonably acceptable to Licensor providing protection (at a minimum, in the amount of Two Million US Dollars ($2,000,000.00 USD) per occurrence and Four Million US Dollars ($4,000,000.00 USD) annual aggregate) applicable to any claims, liabilities, damages, costs, or expenses, arising out of or caused in connection with any defects, alleged defects or deficiencies in the Games.

**INTELLECTUAL PROPERTY:**

Licensee acknowledges Licensor's sole and exclusive ownership of (i) all rights in and to the intellectual property rights being licensed hereunder, and (ii) any intellectual property rights in and to all materials created by Licensee or its developer hereunder as and to the extent provided in, and subject to, Sections E and F of the Standard Terms and Conditions.

Licensee agrees and shall undertake to attach to each licensed product and/or its container an "Officially Licensed WWE Product" hologram tag or label in a form prescribed and/or approved by Licensor ("Official Tag"); provided, however, the exact size, placement and prominence of any such Official Tag shall be determined by Licensee in its reasonable discretion and subject to any applicable guidelines or requirements of any third party Platform manufacturer. During the Term hereof, Licensee agrees to purchase its Official Tag(s) at its own cost and expense. Licensee agrees to purchase its Official Tag(s) from Licensor's approved hologram supplier, but any costs in excess of $0.03 per Official Tag shall be borne by Licensor.

**GOVERNING LAW/
JURISDICTION:**

All disputes, claims, or legal actions arising directly or indirectly out of this License shall be governed by the laws of the State of New York without regard to principle of conflicts of Law, and Licensee and Licensor agree to submit to the exclusive jurisdiction of the United States District Court for the State of New York and the Supreme Court of New York.

CONFIDENTIAL
13

WWE_Alexander0000039

**GENERAL TERMS:**                    This License is subject to all of the provisions of the Standard
                                      Terms and Conditions, which are attached to and made a part of
                                      this License by reference. In the event of a conflict between the
                                      License and the Standard Terms and Conditions, the language of
                                      this License shall govern.

WORLD WRESTLING                       TAKE-TWO INTERACTIVE
ENTERTAINMENT, INC.                   SOFTWARE, INC.
("Licensor")                          ("Licensee")

By:_____           By:_____
Casey Collins
EVP, Consumer Products
                                      Print Name:_____
                                      Title:_____
Date:_____2/11/13_____           Date:_____

CONFIDENTIAL
14

**GENERAL TERMS:**

This License is subject to all of the provisions of the Standard Terms and Conditions, which are attached to and made a part of this License by reference. In the event of a conflict between the License and the Standard Terms and Conditions, the language of this License shall govern.

WORLD WRESTLING
ENTERTAINMENT, INC.
("Licensor")

TAKE-TWO INTERACTIVE
SOFTWARE, INC.
("Licensee")

By:_____
Casey Collins
EVP, Consumer Products

By:_____

Print Name:____Slatoff____
Title:_____Cdo_____
Date:____Feb. 11, 2013____

Date:_____

CONFIDENTIAL
14

WWE_Alexander0000041

## EXHIBIT A
## Online Game Rights

1.  <u>Apptivity</u> – game app for use with a tablet supporting Mattel's WWE Rumblers line;

2.  Genera – WWE Slingshot, 3D Fights, SlideShow Ranking, Bobble and Battle Cry;

3.  Java – based WWE poker tournament;

4.  SummerSlam free online promotional digital games;

5.  Social Channel (in connection with Live Gamer) online social media designed to enhance WWE fan base by engaging users in competitions/achievement including game-style mechanics (specifically excluding any in ring activity) with microtransactions and virtual currency;

6.  The Rock "freemium" mobile app on iOS and Android smart phones and tablets first person game owned and published by the Licensor wherein The Rock in live action tries to solve a mystery behind people trying to kill him.  He utlitizes fighting moves without guns, and users can buy (via micro transactions) upgrades to his strength and fighting tools (but no guns).  The game will launch on or about April 2013.

CONFIDENTIAL
15

## WORLD WRESTLING ENTERTAINMENT, INC.
## STANDARD TERMS AND CONDITIONS

DEFINITIONS.  For purposes of these Standard Terms and Conditions (together with the Terms of License, this "Agreement") the following definitions shall apply:

a) The term "Advertising Materials" shall mean all advertising and promotional materials and all packaging, wrapping, and labeling materials for the Licensed Products (including, by way of illustration but not limitation, television commercials, radio ads, print ads, catalogs, trade advertisements, sweepstakes, promotions, flyers, sales sheets, labels, package inserts, hangtags, and displays) which are produced by or for the Licensee and which make use of, reference and/or exploit the Intellectual Property.

b) The term "Intellectual Property" shall mean the Property licensed to Licensee as described in the Terms of License to which these Standard Terms and Conditions are attached.

c) The term "Licensed Products" shall collectively mean the use of the WWE Intellectual Property in a form and manner approved by WWE pursuant to the terms hereof, on the following items only:

> • *Games (as such term is defined in the Terms of License between*
> *World Wrestling Entertainment, Inc. and Take-Two Interactive*
> *Software, Inc. dated January    , 2013, hereinafter the "Terms of*
> *License"))*

### SECTION A.   QUALITY CONTROLS AND APPROVAL PROCEDURES FOR LICENSED PRODUCTS AND ADVERTISING MATERIALS

A(1)   Warranty of Quality.  The Licensee warrants, represents and guarantees that the Licensed Products and packaging therefor will be of good quality in design, material, and workmanship and will be suitable for their intended purpose; that no injurious, deleterious, or toxic substances will be used in or on the Licensed Products; that the Licensed Products will not cause harm when used as instructed and with ordinary care for their intended purpose; and that the Licensed Products will be manufactured, sold, and distributed in strict compliance with all applicable laws and regulations. The foregoing shall not be deemed a representation that the Licensed Products shall be free from deficiencies, provided, however, that Licensee shall use all commercially reasonable efforts to correct any and all material deficiencies that affect gameplay, cause user system failures or cause a Game to include unauthorized content (it being agreed that this clause relates to such content included without the knowledge or approval of Licensee and nothing contained herein shall limit any of Licensor's rights in the event Licensee knowingly allows such content unauthorized by Licensor to be included in a Game) in a timely manner and will not ship, sell or have its manufacturer(s) ship or sell any Licensed Products that

1

N:\TK2NYC\Legal\OTHER DOCUMENTS\GREG GIBSON\2K Deals\WWE\WWE - T2 Standard Terms and Conditions DRAFT 20130211(9) clean.docx

Confidential

WWE_Alexander0000043



it knows to contain such problems unless a patch is available therefor and acceptable to Licensor in its good faith discretion.

A(2)   <u>Approval Procedures for Licensed Products and Advertising Materials; Approval Standards; Time for Approval by WWE.</u>

a)   General.   Licensee shall comply with the approval requirements and steps outlined in the following subsections of Section A and such other procedures as agreed in writing by the parties from time to time during the Term.   Licensee agrees to retain all materials relating to approvals in its files while this Agreement remains in effect and for one (1) year thereafter.

b)   <u>Approval of Licensed Products</u>.   With respect to each different Licensed Product (including each individual title for each individual platform) which the Licensee proposes to manufacture or otherwise create (such as in the case of Online Rights) and sell under this Agreement, Licensee shall submit to WWE for its review and approval (such approval right to be exercised in good faith and in a timely fashion) the following materials:

i)   During the development of the Licensed Products (including the design of components of the game), Licensee shall submit to WWE for approval all in-game content, user interface and feature sets, all character renderings and models, all environments and arenas, and a list of all music selections, it being understood that the selection of Talent and other professional wrestlers associated or formerly associated with WWE, music and environment shall be by mutual agreement of the parties.

ii)   Licensee shall also submit for WWE's approval all Licensed Products at the following stages of development: feature complete build, code complete build, quality assurance verifiable build, tuning complete build and gold master submission candidates (prior to submission to a platform manufacturer for approval for manufacture).

iii)   Twelve (12) identical production samples of each of the Licensed Product to be submitted promptly upon commencement of production.

iv)   Licensee shall comply with all the foregoing approval steps for each Licensed Product, obtaining WWE's written approval at each step of the procedure unless by prior written notice from WWE it is exempted from any such step with respect to a specific Licensed Product.

c)   <u>Approval of Advertising and Promotional Materials</u>.   With respect to each different item of advertising or promotional material which Licensee (or any party acting on its behalf) proposes to produce and use or sell under this Agreement, Licensee shall submit to WWE for its review and approval (such approval right to be exercised in good faith and in a timely fashion) the following materials, in the order stated:

i)   proposed written copy for the item of advertising or promotional material, with attached rough art showing how the Intellectual Property will be used in connection with the copy; and

2

WWE_Alexander0000044

     ii) a final printed sample of the item, where feasible (as, for example, in the case of printed brochures, catalogs, and the like).

    d) <u>Approval of Commercial Announcements</u>. For any commercial announcements which Licensee (or a third party acting on its behalf) proposes to produce with respect to the Licensed Products, Licensee shall submit to WWE for its review and approval (such approval right to be exercised in good faith and in a timely fashion) the following:

     i) proposed written copy with story boards for the commercial;

     ii) the rough cut of the commercial; and

     iii) the final version of the commercial.

    e) <u>Approval of Press Releases</u>. Neither party shall distribute any written release, promotional literature, publicity or news story regarding the subject matter of this Agreement or the other party without the other party's prior written approval in each instance, which approval shall not be unreasonably conditioned, withheld or delayed. The parties shall mutually agree upon and distribute a release regarding the parties entering into this Agreement.

    f) <u>Approval Standards</u>. WWE shall have the right to disapprove any materials submitted to it under Sections A(2)(b), A(2)(c) or A(2)(d) if it determines, in its discretion (such approval right to be exercised in good faith and in a timely fashion), that the materials in question would impair the value and good will associated with the Intellectual Property, Talent (as such term is defined in the Terms of License) or WWE events; provided, however, that the WWE acknowledges and agrees that it is the intent of the parties that Licensee be permitted to depict characters, environments and arenas, and performances realistically (e.g., images, costumes and props used, locations used, and actions and happenings occurring, during WWE televised or live program or event).

    g) <u>Time for Approval by WWE</u>. WWE agrees to use reasonable efforts to notify the Licensee in writing of its approval or disapproval of any materials submitted to it under Sections A(2)(b), A(2)(c) and A(2)(d) within ten (10) days after its receipt of such materials, and agrees, in the case of its disapproval, to notify the Licensee in writing of its reasons for disapproval. In the event WWE fails to approve or disapprove of any materials submitted as provided for above within ten (10) days after WWE's receipt of such materials, Licensee shall notify WWE, in writing, of that fact. Upon receipt of such written notice, WWE shall have until the end of the second business day thereafter to either approve or disapprove the materials. If WWE has not responded by the end of the second business day, such material shall be deemed approved. For this clause (g), notices in writing may be via email.

    h) <u>Maintenance of Quality of Licensed Products</u>. Licensee agrees to maintain the quality of each Licensed Product manufactured under this Agreement at or above the specifications, quality, and finish of the production sample for such Licensed Product as originally approved by WWE under Section A(2)(b) WWE shall have the right to inspect Licensee's inventory of such Licensed Product upon reasonable request during normal business hours to insure such quality, with forty-eight (48) hours' prior written notice.

3

i) <u>Limitations on Approval</u>.  WWE's approval of a Licensed Product shall not be construed in any way as an acknowledgement that such Licensed Product is in compliance with the warranty of quality asserted by Licensee in Section A(1) above and/or that such Licensed Product is in compliance with any and all applicable laws, regulations and industry standards. With regard to the Licensed Products' compliance with the warranty of quality asserted in subsection A(1) and/or in all applicable laws and regulations in the Territory, it is understood and agreed that WWE shall rely solely on the representations and warranties of Licensee hereunder.

j) <u>Change of WWE Marks or Logos or Intellectual Property in the Licensed Products</u>.  WWE shall have the right in its sole discretion and for whatever reason, to change the WWE marks or logos and Licensee shall, to the extent possible, upon written notice make all commercially reasonable efforts to do so as soon as practicable; <u>provided that</u> the parties equally bear the costs of Licensee's compliance.  WWE shall also have the right to change the Intellectual Property in the event of an occurrence or factor connected with the Intellectual Property which, in the reasonable opinion of WWE, reflects unfavorably upon the professional or business reputation of WWE, and Licensee shall, to the extent possible, upon written notice, make all commercially reasonable efforts to do so as soon as practical; <u>provided that</u> the parties equally bear the costs of Licensee's compliance. No such changes or Licensee's inability to comply (despite its commercially reasonable efforts) shall result in a breach of this Agreement. It is understood that the Intellectual Property shall not include any printed or written or other visual form or orally the initials "WWF" (in any form including in any logo), the name or phrase "World Wrestling Federation", and/or any words or any combination of words that may be shortened to the initials "WWF" ("Prohibited Marks").  Notwithstanding any other provision of this Agreement, Licensee shall not use the Prohibited Marks on or in any advertising or marketing materials, packaging materials, and/or the exterior of goods, in any form or medium. For the avoidance of doubt, use of the Prohibited Marks incorporated within any THQ Catalog Titles (e.g, in-game content, as opposed to advertising, marketing, packaging, or the exterior of any goods) shall be permitted hereunder.

A(3)   <u>Miscellaneous</u>.

a) Translations.  All translations of written material used on or in connection with the Licensed Products or Advertising Materials shall be accurate and to the extent a word or phrase does not have an applicable translation the English word or phrase shall be used.  No translation shall be made for a Talent name, a logo, the name World Wrestling Entertainment, Inc. or any other trademark or element as specified by WWE.  In all other circumstances the Licensee, when submitting the Licensed Products and the Advertising Materials for approval, shall provide WWE with translations of all such written materials in English.  All translations shall be created as works made for hire and to the extent that they are not created as works made for hire, all right title and interest, including but not limited to copyright in such translations shall be assigned solely and exclusively to WWE and Licensee shall provide WWE with documentation of such work made for hire or assignment agreements.

b) No Endorsement.  Other than as permitted under the terms of this Agreement, Licensee will not use the name or likeness of any Talent or any items contained within the

4

definition of Intellectual Property as set forth above as an endorsement of the Licensee and/or any of the Licensee's products or services, without WWE's prior written consent.

c) <u>Use of Intellectual Property on Licensee Business Forms</u>.  No use of the Intellectual Property will be printed by Licensee on its stationery, envelopes, business cards, invoices, statements, packing slips or other similar documents or materials.

d)  Cheat Codes and Hidden Content.  Licensee shall not knowingly include any cheat codes, "Easter eggs" or hidden features, including but not limited to any objectionable content, in the Licensed Products, without previous written approval from WWE, and will move quickly to address any such issue as to which it becomes aware as contemplated in Section (A)(1).

SECTION B. <u>EFFORTS TO MANUFACTURE, DISTRIBUTE, SELL AND OTHERWISE EXPLOIT THE LICENSED PRODUCTS; RESTRICTIONS ON SALE; COMPLIANCE; CHANNELS OF DISTRIBUTION.</u>

B(1)   <u>Efforts to Design and Manufacture the Licensed Products</u>.  Licensee shall use its commercially reasonable efforts to exploit the rights granted to it for each individual title.

B(2)   Efforts to Distribute the Licensed Products.  In the event Licensee sells or distributes other licensed merchandise of a similar grade or quality as the Licensed Products, but which do not bear the Intellectual Property, Licensee will not discriminate, in a manner which adversely impacts the Licensed Product, in the granting of commissions and discounts to salesmen, dealers and distributors between the Licensed Products and the licensed products of any third party.  Licensee may not package the Licensed Products in combination with other products, whether similar or different, without the prior written approval of WWE as provided in the Terms of License.

B(3)   <u>Selling Practices</u>.  Licensee acknowledges WWE's legitimate and reasonable interest in protecting the value of the Intellectual Property and maximizing the effectiveness of WWE's advertising, promotion and distribution efforts by segmenting the classes of trade into which its licensees sell.  Therefore, Licensee will only sell the Licensed Products to a buyer that, to its knowledge, (i) purchases Licensed Products from Licensee solely for sale directly to the consumer and operates a retail or online distribution establishment that supports the high quality and image of WWE officially licensed products or (ii) sells to retailers or online distributors that support the high quality and image of WWE officially licensed products.

B(4)   <u>Restrictions on the Marketing, Promotion, Advertising and Sale of the Licensed Products</u>.

a)  <u>Prohibition Against Premiums</u>: The term "<u>Premiums</u>" shall mean anything given free or sold at substantially less than its usual selling price (but does not include sales made pursuant to periodic price reductions resulting from "specials," "sales" or volume pricing discounts) for the purpose of increasing the sale of, or publicizing, any product or service, or such other giveaway or promotional purposes.  The exploitation of any and all "Premiums" as it concerns the Licensed Products  by either party shall be by mutual agreement of the parties.

5

WWE_Alexander0000047

b) <u>Promotions; Sweepstakes for the Licensed Products</u>.  Under no circumstances will lotteries, games of chance, sweepstakes or any such other contest or similar type of promotion ("Promotions") be permitted in connection with the Licensed Products without the advance written approval of WWE, not to be unreasonably withheld, conditioned or delayed.  In the event WWE approves such Promotions for Licensee, it is understood that Licensee will be responsible for (i) compliance with all Federal, State and local rules and regulations concerning the Promotions, (ii) implementation and administration of the Promotion including collection of any and all the entries related thereto, the selection of the winners and awarding the prizes; and (iii) the completion of any such other element of the Promotions in order to ensure its fulfillment.

c) <u>Prohibition Against Modifying Licensed Products</u>:   Licensee will not manufacture, sell or distribute the Licensed Products with any party or entity who changes, alters, or adds to the Licensed Products in any manner whatsoever and then resells or distributes the Licensed Products to retailers, wholesalers, vendors or the general public, unless approved in advance in writing by WWE, not to be unreasonably withheld, conditioned or delayed.

B(6)   <u>Compliance</u>.

a)  Licensee will, and will use commercially reasonable efforts to assure that Licensee's representatives will, manufacture, sell, promote, advertise and distribute the Licensed Product(s) in a legal and ethical manner and in accordance with the terms and intent of this Agreement.  To that end, Licensee agrees on behalf of itself, its manufacturers, distributors, agents and/or representatives (collectively referred to throughout the remainder of this subsection B(6) as "Licensee") to adhere to (and ensure compliance by its manufacturers, distributors, agents and/or representatives) WWE's Code of Conduct (attached hereto as Exhibit 1).

b)  Licensee will furthermore at all times conduct all aspects of its business in a fair and reasonable manner and in compliance with all shipment tracking, identification and anti-counterfeiting systems and labels (including the use and display of the Official Tag as provided in Section B(6)(e) and (f) below) that WWE may establish from time to time and all applicable laws, government rules and regulations, court and administrative decrees and the highest standard of business ethics then prevailing in the industry.  Licensee will, and will use commercially reasonable efforts to assure that Licensee's representatives will, use its commercially reasonable efforts to ensure that all channels of distribution purchasing Licensed Products comply with the current WWE anti-counterfeiting systems and labels established and as from time to time thereafter amended by WWE.

c)  It will be Licensee's or Licensee's representatives' sole responsibility, at its sole expense, to obtain all approvals (including approvals of certain Licensed Products and/or Advertising Materials but not including trademark applications or other applications to register intellectual property in any jurisdiction around the world) of all governmental authorities which may be necessary in connection with Licensee's performance under this Agreement.

d)  Licensee acknowledges and fully understands the following meanings established for "Counterfeit Goods" and "Diverted Goods":

6

WWE_Alexander0000048

- "Counterfeit Goods" shall mean and include by way of example and not limitation (i) any goods, material, product or otherwise that bear any Intellectual Property that has been reproduced and/or affixed thereto without authorization from WWE; (ii) goods that bear any Intellectual Property produced for any source in excess of the amount ordered by WWE licensee or designated customer or distributor; and (iii) any goods that bear any Intellectual Property, hereto that has been rejected by or never approved by WWE and nevertheless entered into the stream of commerce.

- "Diverted Goods" shall mean and include any goods produced by someone acting on behalf of Licensee, wherein such goods are not delivered by the producer to Licensee or to a person designated by such Licensee to receive such goods.

If permitted by applicable law Licensee will use all commercially reasonable means to prevent the recreation of any Counterfeit Goods and/or Diverted Goods involving Intellectual Property by its employees, agents, representatives or any others operating under its direction, supervision or control.

e) Licensee agrees and shall undertake to attach to each Licensed Product and/or its container an "Officially Licensed WWE Product" hologram tag or label in a form prescribed and/or approved by WWE ("Official Tag"). During the Term hereof, Licensee agrees to purchase at its own cost and expense its Official Tag(s) from WWE's approved hologram supplier. The specific details and instructions necessary for the purchase of the Official Tag(s) shall be provided to Licensee shortly after the execution of this Agreement. In addition, Licensee shall also cause its own name to appear on a tag or label on each Licensed Product and/or its container in a form prescribed and/or approved (such approval right to be exercised in good faith and in a timely fashion) by WWE.

f) Licensee understands and agrees that it shall not knowingly supply any images it obtains from WWE's artbank, the password to the artbank, any duplicates of films, or any photographs, artwork, video footage or other reproductive media incorporating the Intellectual Property or music to any third party (including other WWE licensees) without the specific written permission of WWE; provided that Licensee may supply such images to its developer for use in accordance with this Agreement.

SECTION C. ROYALTY STATEMENTS AND PAYMENTS

C(1)    Computation of Royalties. All royalties due WWE shall accrue upon the sale of the Licensed Products, regardless of the time of collection by the Licensee. For purposes of this Agreement, a Licensed Product shall be considered "sold" as of the date on which such Licensed Product is billed, invoiced, shipped or processed, whichever event occurs first.

C(2)    Time of Payment. All royalty payments shall be made in accordance with the mandatory payment schedule set forth in the Terms of License and/or as otherwise directed in Section C(5) below. All royalty amounts in this Agreement are stated in US Dollars and all royalty payments shall be made in US Dollars. All royalty statements required to be submitted by the Licensee shall accompany the royalty payments made to WWE.

7

WWE_Alexander0000049

C(3)    Deductions; Taxes.

a) There shall be no deduction from the royalties owed to WWE for uncollectible accounts or for taxes (such as value added taxes or goods and services taxes), and for fees, assessments, quotas, licenses, contingents, commissions, import or export taxes, import or export permits, similar levies, fees or charges imposed or levied or any other expenses of any kind which may be incurred or paid by WWE or the Licensee in connection with: (i) royalty payments to WWE; (ii) the manufacture, sale, distribution, or advertising of the Licensed Products in the Territory; or (iii) the transfer of funds or royalties or the conversion of any currency into U.S. Dollars (if applicable). It shall be the Licensee's sole responsibility at its expense to obtain the approval of any foreign authorities; to take whatever steps may be required to effect the payment of funds from abroad; to minimize or eliminate the incidence of foreign taxes, fees, or assessments which may be imposed; to protect its investments in foreign territories; to enable it to commence or continue doing business in any foreign territory; and to comply in any and all respects with all applicable laws and regulations.

b) Notwithstanding the provisions of the preceding Section C(3)(a), if (i) any country imposes a withholding tax against WWE, as licensor, with respect to the royalties payable to WWE by the Licensee on sales of the Licensed Products in such country, (ii) such tax is paid by the Licensee on behalf of WWE, and (iii) such tax is an income tax as to which a foreign tax credit is allowable to WWE under Section 901 of the Internal Revenue Code of 1986, as amended, the Licensee may deduct the amount of such withholding tax from the royalties owing to WWE. In connection therewith Licensee shall furnish to WWE such information and documentation as WWE requires to evidence WWE's right to credit such withholding tax against its federal income tax liability in the United States.

C(4)    Royalty Statements. Licensee shall furnish to WWE within forty-five (45) days after the close of each and every calendar quarter during the Term hereof, as defined in the Terms of License, along with any royalty payments then due, if any, full, complete and accurate statements in the form attached hereto as Schedule B, showing the number of each type of Licensed Product sold during the calendar quarter in question, the total gross sales revenues for each such Licensed Product in U.S. Dollars, an itemization of all allowable deductions taken pursuant to the definition of Net Sales, if any, the Net Sales for each Licensed Product sold, the amount of royalties due with respect to such sales, and all information necessary for the calculation of the Net Sales together with such other pertinent information as WWE may reasonably request from time to time. All payments shall be made in U.S. Dollars.

C(5)    Royalty Adjustments. The receipt or acceptance by WWE of any royalty statements furnished pursuant to this Agreement or the receipt or acceptance of any royalty payments made, shall not preclude WWE from questioning their accuracy at any time within two (2) years from the conclusion of any audit relating thereto allowed under this Agreement. If any inconsistencies or mistakes are discovered in such statements or payments, appropriate adjustments shall be made immediately by the parties. The Licensee shall pay WWE interest on a late royalty payment at the then current prime rate (as announced by JP Morgan Chase Bank, New York branch) from the date such amount should have been paid until the date of payment.

8

WWE_Alexander0000050

C(6)   Method of Payment.  Simultaneous with the submission of each and every royalty statement due during the Term of this Agreement, Licensee will make payment of any and all royalties then due, as required by the Terms of License, by electronic transfer directly to WWE in accordance with the following instructions (or such other wire transfer information as WWE shall provide):

> Bank Name:   JP Morgan Chase
> Bank Address: 270 Park Avenue
> 41st Floor
> New York, NY  10017

C(7)   Reserves.  Licensee shall be entitled to establish each quarter a reserve of ████ of "Gross Sales" (as defined herein) for all platforms existing and distributed for sale (with the exception of personal computer ("PC") game platforms for which the reserve shall be ████ of Gross Sales); provided, however, that any reserve taken shall be liquidated within ████ months of the date the reserve is first taken.  For purposes of this subsection, "Gross Sales" shall be defined as the dollar amount equal to the number of individual units of Licensed Products sold multiplied by the Licensed Product's price charged to the retailer before any deductions, credits and/or allowances. Further, Licensee shall provide a line item detail with respect to any such reserves in the royalty statements (as more fully described in Section C(4) above).

## SECTION D.   BOOKS OF ACCOUNT AND OTHER RECORDS; AUDITS

D(1)   Retention of Records.  While this Agreement remains in effect and for two years thereafter, the Licensee shall keep full and accurate books of account and copies of all documents and other material relating to this Agreement at the Licensee's principal office. WWE, by its duly authorized agents and representatives, shall have the right, upon at least thirty (30) days written notice, to have a nationally recognized independent third party accounting firm reasonably acceptable to Licensee audit such books, documents, and other material relating to this Agreement, and shall have access thereto during ordinary business hours no more than once during any calendar year soley for purposes of the audit and such information shall not be disclosed to Licensor except as necessary to report the results of the audit in customary form. Any period being audited may only be done so once during the Term of the Agreement. All material obtained during any such audit shall be confidential information of Licensee. At the request of such accounting firm, the Licensee shall provide an authorized employee to assist in the examination of the Licensee's records.

D(2)   Audits by WWE.  If any audit of the Licensee's books and records reveals that the Licensee has failed properly to account for and pay royalties owing to WWE, and the amount of

9

any royalties which the Licensee has failed properly to account for and pay for any quarterly accounting period exceeds, by ten percent (10%) or more, the royalties actually accounted for and paid to WWE for such period, then Licensee shall, in addition to paying WWE such undisputed past due royalties, reimburse WWE for its direct out-of-pocket expenses incurred in conducting such audit, together with interest on the overdue royalty amount at the then current prime rate (as announced by JP Morgan Chase Bank, New York branch) from the date such amount should have been paid until the date of payment.

D(3)   Rights Reserved by WWE.   Except as provided in Section C(5), the exercise by WWE, in whole or in part or at any time or times, of the right to audit records and accounts or of any other right herein granted under Section D, the acceptance by WWE of any statement or statements or the receipt and deposit by WWE of any payments tendered by or on behalf of Licensee shall be without prejudice to any rights or remedies of WWE, whether at law, equity or otherwise, and WWE shall not be stopped or prevented from thereafter disputing the accuracy of any such statement or payment.

SECTION E.   TRADEMARK PROTECTION

E(1)   Trademark Uses Inure to WWE's Benefit.   Licensee recognizes the exclusive right of WWE to all Intellectual Property and any translations thereof and will not use such Intellectual Property or any such translations in any manner or for any reason except as expressly contemplated by this Agreement. All uses of the Intellectual Property owned by the WWE and any translations thereof by Licensee will inure to the exclusive benefit of WWE, which will own all rights, including trademark rights, created by such uses of such Intellectual Property and/or translations, together with the goodwill of the business in connection with which such trademarks are used. Nothing herein shall be deemed to give WWE any rights in and to any trademarks owned and/or controlled by Licensee, including, but not limited to, its corporate name and all associated trademarks.

E(2)   Trademark Registrations.   WWE will have the exclusive right, but not the obligation, to file at its own expense trademark applications relating to the use or proposed use by Licensee of any of WWE's Intellectual Property and any translations thereof in connection with the Licensed Products, specifically excluding Licensee Intellectual Property (as defined below); provided that, upon reasonable request by Licensee to register such a trademark that may be used against actual or potential competitors to Game, WWE shall file, pursue and maintain appropriate applications in appropriate jurisdictions around the world. Any and all such filings will be made in the name of WWE or its designee. Licensee will execute all documents and perform such other acts as may be reasonably necessary to secure, perfect, or record WWE's or its designee's trademark rights, provided, however, WWE shall reimburse Licensee for any reasonable expenses incurred in connection therewith beyond the mere execution of the documents. Licensee and/or its employees, agents, contractors, and representatives will not (a) oppose, petition to cancel, or otherwise contest WWE's trademarks, trademark applications, and/or trademark registrations or (b) challenge WWE's ownership of and/or the validity of WWE's trademarks, trademark applications, and/or trademark registrations. The provisions of Section E(2) will survive any termination or expiration of this Agreement.

10

E(3)    Records Relative to Trademark Uses.  Licensee will keep appropriate records (including copies of pertinent invoices and correspondence) relating to the dates each of the Licensed Products is first placed on sale or sold in each country of the Territory and the dates of first use in each country of each different element of the Intellectual Property and any translations on the Licensed Products and Advertising Materials.  If requested to do so by WWE in writing, Licensee will supply WWE with samples of the trademark usage in question and other information which will enable WWE to complete and obtain trademark applications or registrations, or to evaluate or oppose any trademark applications, registrations, or uses of other parties.   The provisions of Section E(3) will survive any termination or expiration of this Agreement.

E(4)    Registered User Laws.  As to those countries which require applicants to register Licensee as a registered user of a trademark or other element of the Intellectual Property or any translations used on or in connection with the Licensed Products or which require the recordation of this Agreement, Licensee will execute and deliver to WWE such documents as may be necessary and as are furnished by WWE for such purposes.

E(5)    Trademark Notices.  Licensee will affix or cause its authorized manufacturing sources to affix to the Licensed Products, the Advertising Materials and any other materials containing the Intellectual Property trademark notices in the name of WWE as provided by WWE in each instance or as follows: the names of all World Wrestling Entertainment televised and live programming, talent names, images, likenesses, slogans and wrestling moves and all World Wrestling Entertainment logos are trademarks which are the exclusive property of World Wrestling Entertainment, Inc.  All other trademarks are the property of their respective owners. The exact site, placement and prominence of any such notices shall be reasonably agreed upon by the Parties and subject to the approval of third party platform providers such as Sony, Nintendo and Microsoft.

SECTION F.    COPYRIGHT PROVISIONS

F(1)    Copyright Notices.  The authorization by WWE to Licensee to make public distribution of the Licensed Products and Advertising Materials is expressly conditioned upon the following agreement of Licensee: Licensee will place on all Licensed Products, on all Advertising Materials and on any other materials containing the Intellectual Property the copyright notice or notices in the name of WWE as follows: "©20xx World Wrestling Entertainment, Inc. All Rights Reserved"; or as otherwise directed in writing by WWE.

F(2)    Design Work.  Licensee acknowledges that all designs of the Licensed Product, including drawings, artwork, sketches, layouts, patterns and material compositions, employed or developed for the production (through CAD/CAM or otherwise) of the Licensed Products, and the codification, recording and reproduction, thereof, however maintained, organized, or derived therefrom including any computer tapes, hard copy of machine readable copies (collectively, the "Specs") are created and developed for the sole benefit of WWE and any and all proprietary interests and ownership rights related thereto including but not limited to copyright belong exclusively to WWE, provided, however, nothing herein is intended, or shall vest, ownership in the underlying source or object code in the Games in WWE, and Licensee or its developer shall

11

WWE_Alexander0000053

retain sole ownership thereof. Furthermore, gameplay mechanisms and/or controls shall be owned by Licensee.

F(3)   Work For Hire.   Licensee acknowledges that all material created under this Agreement (the "Work") was specifically ordered or commissioned by the WWE; that the Work constitutes and will constitute a work-made-for-hire as defined in the United States Copyright Act of 1976; that WWE is and will be the author of the Work and the owner of all rights in and to the Work throughout the universe, in perpetuity, in all languages, for all now known or hereafter existing uses, media and forms, including the copyrights therein and thereto throughout the universe for the initial term and any and all extensions and renewals thereof; and that the WWE will have the right to make such changes therein and such uses thereof as it may deem necessary or desirable.   The term "Work" will include any and all material and information created by Licensee in the course of or as a result of the terms and conditions of this Agreement that are fixed in a tangible medium of expression, including without limitation the Specs, Licensed Products, Games, Advertising Materials, translations, composite works, notes, drawings, memoranda, correspondence, documents, records, notebooks, flow charts, and derivative works, regardless of the medium in which they are fixed.   The "Work" shall not include: (i) the source or object code to any underlying software; and (ii) any intellectual property rights already owned by Licensee or developer prior to the execution of the Agreement. For the sake of clarity, Licensee or its developer shall be the sole and exclusive owner of any and all underlying software (including object and source code), tools, subroutines, engines used in connection with or embodied in the Games (which, together with Licensee's trademarks and logos shall collectively be referred to as "Licensee Intellectual Property").

F(4)   Assignment by Licensee.   In addition to Section F(3), and to the extent that the Work is not recognized as a "work-made-for-hire," Licensee hereby sells, assigns, and transfers to WWE its entire, worldwide right, title and interest in perpetuity in and to the Work, specifically excluding Licensee Intellectual Property.   If parties who are not employees of Licensee (or who are employees of Licensee acting outside the scope of their employment) make or have made any contribution to the creation of the Work so that such parties might be deemed to be "authors" of such Work as the term "author" is used under present or future United States copyright law, or other such applicable laws, then Licensee will obtain from such parties a full assignment of rights so that the foregoing assignment by Licensee vests in WWE full and absolute right and title in the Work free of any claims, interests, or rights of other parties. Licensee will not permit any of its employees to obtain or reserve by oral or written employment agreements any rights as "authors" of any such Work.   At WWE's request, Licensee will furnish WWE with any and all information concerning the creation of any Work and with any and all copies of the assignments of rights obtained from the foregoing parties.

F(5)   Copyright Registrations.   WWE will have the exclusive right, but not the obligation, to file at its own expense copyright applications for the Work.   In the event WWE elects not to file copyright applications for the Work after receiving a written request to do so from Licensee, Licensee will have the right to do so.   Any and all copyright filings (whether by WWE or Licensee) will be made in the name of WWE, provided, however, Licensee or its developer shall be listed as the owner of the Licensee Intellectual Property.   As is reasonably practicable, Licensee will execute all documents and perform such other acts as WWE may deem

12

WWE_Alexander0000054

necessary to secure, perfect, or record WWE's or its designee's copyrights. Licensee and/or its employees, agents, contractors, and representatives will not (a) oppose, petition to cancel, or otherwise contest WWE's copyright, copyright applications, and/or copyright registrations or (b) challenge WWE's ownership of and/or the validity of WWE's copyrights, copyright applications, and/or copyright registrations. The provisions of Section F(5) will survive any termination or expiration of this Agreement.

F(6)    Waiver of Moral Rights.  Licensee waives any and all of its moral rights, including but not limited to rights of attribution, paternity, and integrity, arising under any federal or state law of the United States or any law of any other region, country, or subdivision thereof in and to the Work, and any contribution thereto, for any and all past, present, or future uses or purposes now known or hereafter discovered, including without limitation the right to modify said work, ("Moral Rights") in favor of WWE and its predecessors, successors, assigns and licensees or sub-licensees.  If other parties, including but not limited to Licensee's employees, agents, and subcontractors, have made any contribution to the creation of the Work so that such parties might be deemed to have Moral Rights under present or future United States law or any law of any other region, country, or subdivision thereof, then, to the extent possible under applicable laws, Licensee will obtain from such parties a full waiver of any and all of his or her Moral Rights in favor of WWE and its predecessors, successors, assigns and licensees or sub-licensees.

F(7)    Enforcement.  Licensee warrants that the covenants contained in this Agreement are reasonable, that valid considerations have been and will be received therefor and that the terms set forth in this Agreement are the result of arms-length negotiations between the parties to this Agreement.  Licensee recognizes the vital importance to the continuing welfare of the WWE and its affiliates of (x) the provisions of Sections E and F; and (y) the uninterrupted continuation of its videogame business in the event of a valid termination of this Agreement by Licensor due to a material breach by Licensee; and that in either clause (x) or (y) money damages may not be an adequate remedy for any violation thereof.  Therefore, in either such case, WWE and its affiliates, in addition to any other remedies they may have available to them pursuant to this Agreement or any other agreement, or whether at law or in equity, will have the right to seek equitable relief including continuing access to Licensee Intellectual Property that is owned by Licensee and solely as embodied in the Licensed Products and solely to the extent necessary to put Licensor in the same position as it would be if the Licensee had not materially breached this Agreement, if such equitable relief is granted by a court of competent jurisdiction.

SECTION G.    REPRESENTATIONS AND WARRANTIES

G(1)    WWE's Representation and Warranty.  WWE hereby covenants, represents and warrants that it is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated; that it is the sole and exclusive proprietor of the Intellectual Property, has the full right, power, legal capacity and authority to enter into this Agreement, to carry out the terms hereof and to grant Licensee the rights and privileges granted hereunder.  WWE also covenants, represents and warrants that (i) WWE has the right to license the exploitation rights granted in this Agreement and that the rights granted herein will not violate or infringe upon the rights of any third persons and/or parties, (ii) WWE has not

13

WWE_Alexander0000055

granted, assigned, licensed, in any manner encumbered, committed to perform any act by which the rights granted herein and to be granted herein to Licensee could or will be encumbered, diminished, or impaired; (iii) the Intellectual Property or any part thereof does not constitute libel, slander, or unfair competition; (iv) the Intellectual Property has not used the name or personality of any person so as to constitute an invasion of the right of privacy; (v) any and all permissions and clearances to the Intellectual Property for its authorized use as contemplated herein (to the extent the Intellectual Property does not include Multimedia Rights not owned or controlled by WWE) have been obtained by WWE; (vi) WWE shall be responsible for any and shall pay any third party payments or residuals for use of the Intellectual Property as contemplated and to be allowed hereunder (to the extent the Intellectual Property does not include Multimedia Rights not owned or controlled by WWE); (vii) WWE has no knowledge of any claim which, if sustained, would be contrary to WWE's warranties, representations, and agreements herein contained; and (viii) WWE shall comply with all applicable laws, rules, and regulations. WWE hereby agrees that its covenants, representations, warranties and agreements are of the essence to this Agreement and shall survive the expiration or termination of the Term.

G(2)    Licensee's Covenants, Warranty and Representation.

a) Licensee hereby covenants, represents and warrants that it is a corporation duly incorporated, validly existing and in good standing of the laws of the jurisdiction in which it was incorporated; that it has full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms hereof. Licensee further covenants, represents, and warrants that, with the exception of WWE's Intellectual Property, it owns or has the rights to any and all designs, products, artwork, photographs and intellectual property Licensee uses to develop, create and/or manufacture the Licensed Product, including without limitation any algorithms, software, hardware, processes, patents, copyrights and/or trade secrets. It is understood and agreed that during the Term of this Agreement, Licensee and WWE, either individually or collectively may be considered the promoter and advertiser of the Licensed Products. In those circumstances, Licensee acknowledges and agrees that on behalf of itself and on behalf of WWE it shall comply with all federal, state and local laws, rules, regulations and industry standards concerning the manufacture, promotion and advertisement of the Licensed Products and Licensee furthermore agrees not to engage in any unconscionable commercial practice, fraud, false pretense, false promise, knowing misrepresentation, or the knowing concealment, suppression of omission of any material fact in the manufacture, advertising or promotion of the Licensed Products ("Product Compliance"). To that end, in addition to the indemnification provisions set forth throughout this Agreement, Licensee agrees to fully indemnify, defend and hold WWE harmless from any and all claims, damages or injuries relating to, in connection with or arising out of Product Compliance for the Licensed Products, unless such Product Compliance claims are the direct result of actions of WWE, or the Intellectual Property as provided by WWE.

b) Licensee hereby agrees that its covenants, representations, warranties and agreements are of the essence to this Agreement and shall survive the expiration of the Term.

SECTION H.    INDEMNIFICATION; PRODUCT LIABILITY INSURANCE

14

WWE_Alexander0000056

H(1)   Licensee's Indemnification.   Licensee will be solely responsible for and will indemnify, defend and hold WWE and its successors and assigns, parent corporations, subsidiaries and affiliates and its and their respective officers, directors, stockholders, employees, advertisers, insurers, and representatives (collectively referred to as "Indemnified Parties") harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fees arising from or by reason of or in connection with the manufacture, distribution, advertising, promotion, offering for sale and sale of the Licensed Products which includes any claims or suits against the Indemnified Parties by reason of: (i) any unauthorized use, infringement or alleged infringement of any trademark, service mark, copyright, patent, process, trade secret, algorithm, software, method or device owned or controlled by a third party and exploited by Licensee in connection with the Licensed Products, the Advertising Materials and/or this Agreement, specifically excluding claims directly related to Licensee's use of the Intellectual Property in accordance with the terms of this Agreement; (ii) any defects, alleged defects and/or deficiencies (whether obvious or hidden and whether or not present in any sample approved by WWE) in said Licensed Products or the use thereof, or for any false advertising, fraud or misrepresentations or other claims related to the Licensed Products and/or the Advertising Materials (not involving a claim of right to the Intellectual Property or Licensee's use thereof in the development, marketing and sale of Games in accordance with the terms hereof) or in any packaging or other materials relating to the Licensed Products (including Advertising Materials); (iii) any claim that the use of any audio, music, design or other graphic component of any Licensed Product (other than the Intellectual Property) violates or infringes upon the trademark, copyright or other intellectual property rights (including trade dress, right of publicity or right of privacy) of a third party; (iv) any uses of the Licensed Products or Advertising Materials by Licensee not in accordance with this Agreement; (v) any libel or slander against, or invasion of the right of privacy, publicity or property of, or in violation or misappropriation of any other right of any third party as it relates in any manner whatsoever to the exploitation of Licensee's rights under this Agreement other than those directly related to Licensee's use of the Intellectual Property in accordance with the terms of this Agreement; (vi) any agreements or alleged agreements, whether written or oral, made or entered into by or with Licensee to effectuate the terms of this Agreement, including any employment or consulting agreements entered into by Licensee related in any manner to the exploitation of this Agreement and any such other agreements entered into by Licensee that relates to the manufacture, distribution, exploitation, advertising, sale or use of the Licensed Products by Licensee, its agents and/or representatives; (vii) any Promotions or contests conducted by Licensee related to this Agreement; (viii) any breach of the terms, representations and warranties under this Agreement by Licensee, its subsidiaries, manufacturers, distributors, advertisers or other persons, employees or agents of any of the foregoing; (ix) any act concerning the unconscionable commercial practice, fraud, false pretense, false promise, knowing misrepresentation, or the knowing concealment, suppression of omission of any material fact in the advertising or promotion of the Licensed Products; or (x) any failure to comply with the terms and conditions of Section B(6)(e) which includes without limitation Licensee's failure to affix the Official Tag and its own name to any Licensed Product or its container.

H(2)   WWE's Indemnification.   WWE agrees to indemnify, defend and hold the Licensee and its successors and assigns, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, stockholders, employees, advertisers, insurers and

15

WWE_Alexander0000057

representatives harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fee (but excluding lost profits or consequential damages) made by third parties against the Licensee (i) based on a claim of right in one or more elements of the Intellectual Property or (ii) any breach of WWE's representations, warranties, covenants or obligations under this Agreement.

H(3)    Claims Procedures.  With respect to any claims falling within the scope of the foregoing indemnifications:  (a) each party agrees promptly to notify in writing the other party of, and to keep the other party fully advised with respect to, such claims and the progress of any suits in which the other party is not participating; (b) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (c) each party shall have the right to participate, at its sole expense, in any suit instituted against it and/or to approve any attorneys selected by the other party to defend it, which approval shall not be unreasonably withheld, conditioned or delayed; and (d) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld, conditioned or delayed.

H(4)    Insurance.  The Licensee agrees to obtain and maintain during the Term of this Agreement, at its own expense, a comprehensive general liability insurance policy which shall include coverage for product liability from an insurance company which maintains an A.M. Best rating of at least A- (A minus) or higher and is reasonably acceptable to WWE providing protection (at a minimum, in the amount of Two Million US Dollars ($2,000,000.00 USD) per occurrence, Four Million US Dollars ($4,000,000.00 USD) annual aggregate) applicable to any claims, liabilities, damages, costs, or expenses, arising out of or caused in connection with any defects, alleged defects or deficiencies in the Licensed Products. Such insurance shall also include coverage of WWE, its directors, officers, shareholders, affiliates, employees, agents, licensees, insurers, advertisers, assignees, and successors. Within thirty (30) days after execution of this Agreement by WWE and again within thirty (30) days of the policy's renewal date, the Licensee shall cause the insurance company issuing such policy to issue a duplicate original certificate to WWE naming WWE as an additional insured together with evidence of current payments for the policy, confirming that such policy has been issued and is in full force and effect and provides coverage for WWE as required by this Section H(4). Said insurance policy shall also contain an endorsement that the insurance coverage shall not be reduced, modified or cancelled and that the insurance company will use best efforts to inform WWE of changes.

SECTION I.    RESERVATION OF RIGHTS

Except as provided for under the Terms of License, all rights in and to the Intellectual Property (including any premium rights related to the Licensed Products) are retained by WWE for its own use and exploitation (including the right to license said rights or portion thereof to third parties for their exploitation).  Licensee shall not acquire any rights whatsoever in the Intellectual Property as a result of its use hereunder and all use of the Intellectual Property will inure to WWE's benefit.  For the purpose of absolute certainty, it is understood and agreed that WWE reserves the right to use, and to license other parties to use, the Intellectual Property within the Territory for any purpose WWE may determine in its sole discretion, provided such

16

WWE_Alexander0000058

use does not violate the exclusivity provisions hereunder. All use of the Licensee Intellectual Property shall inure to the benefit of Licensee.

SECTION J.    INFRINGEMENTS; CLAIMS

J(1)    Representations and Warranties by Licensee.  Licensee represents and warrants to WWE that all designs and products submitted for approval (other than the Intellectual Property) are not subject to any valid patent, copyright, trademark or other proprietary rights of any third party, provided, however, with respect to patents such representation is made to the best of Licensee's knowledge.  It is understood and agreed that WWE shall not be liable (and Licensee shall fully indemnify and hold WWE harmless therefrom) for any activities of Licensee under this Agreement that may infringe or alleged to infringe any patent, copyright, trademark or other proprietary rights belonging to any third party, or for damages or costs involved in any proceeding based upon such infringement or alleged infringement, or for any royalty or obligation incurred by Licensee because of any patent, copyright, trademark or other proprietary interest held by a third party, other than claims based solely upon a right to or in one or more elements of the Intellectual Property

J(2)    Infringements.  When either party learns that a third party is making unauthorized uses of the Intellectual Property or the Licensee Intellectual Property, such party agrees to promptly give the other party written notice containing full and complete information with respect to the actions of such party.  Each party agrees not to make any demands or claims, bring suit, effect any settlements, or take any other action against such infringing third party without the prior written consent of WWE in the case of Intellectual Property or the Licensee in the case of Licensee Intellectual Property.  Each party agrees to cooperate with the other party in connection with any action taken by the owner to terminate infringements of its intellectual property.

J(3)    Claims.

a)  If claims or suits are made against WWE or the Licensee by a party asserting the ownership of rights in a name or design which is the same as or similar to one of the elements of the Intellectual Property, and asserting further that the use of a particular element of the Intellectual Property by the Licensee infringes the rights of such party, or if the parties learn that another party has or claims rights in a trademark, name or design which would or might conflict with the proposed or actual use of an element of the Intellectual Property by the Licensee, WWE and the Licensee agree in any such case to consult with each other on a suitable course of action. In no event shall the Licensee have the right, without the prior written consent of WWE, to acknowledge the validity of the claim of such third party, to obtain or seek a license from such third party, or to take any other action which might impair the ability of WWE to contest the claim of such third party if WWE so elects. The Licensee agrees at the request and cost of WWE to make any and all reasonable modifications requested by WWE in the Licensee's use of the element of the Intellectual Property in question or to discontinue use of such element in the country of the territory in question on the particular Licensed Product or Licensed Products which are involved, if WWE, in its sole discretion, reasonably exercised, determines that such action is necessary or desirable to resolve or settle a claim or suit or eliminate or reduce the

17

WWE_Alexander0000059

threat of a claim or suit by such party.  WWE shall have the right to participate fully at its own expense in the defense of any claim or suit instituted against the Licensee with respect to the use by the Licensee of an element of the Intellectual Property.

b)  If claims or suits are made against the Licensee or WWE by a party asserting the ownership of rights in a name or design which is the same as or similar to one of the elements of the Licensee Intellectual Property, and asserting further that the use of a particular element of the Licensee Intellectual Property by WWE infringes the rights of such party, or if the parties learn that another party has or claims rights in a trademark, name or design which would or might conflict with the proposed or actual use of an element of the Licensee Intellectual Property by WWE, Licensee and WWE agree in any such case to consult with each other on a suitable course of action.  In no event shall WWE have the right, without the prior written consent of the Licensee, to acknowledge the validity of the claim of such third party, to obtain or seek a license from such third party, or to take any other action which might impair the ability of the Licensee to contest the claim of such third party if the Licensee so elects.  WWE agrees at the request of the Licensee to make any and all reasonable modifications requested by the Licensee in WWE's use of the element of the Licensee Intellectual Property in question or to discontinue use of such element in the country of the territory in question on the particular Licensed Product or Licensed Products which are involved, if Licensee, in its sole discretion, reasonably exercised, determines that such action is necessary or desirable to resolve or settle a claim or suit or eliminate or reduce the threat of a claim or suit by such party.  Licensee shall have the right to participate fully at its own expense in the defense of any claim or suit instituted against the WWE with respect to the use by WWE of an element of the Licensee Intellectual Property.

SECTION K.   NO   SUBLICENSING   OF   RIGHTS;   AGREEMENTS   WITH MANUFACTURERS

K(1)   Sublicensing.  The Licensee shall not have the right to sublicense any of the rights granted to it under this Agreement except (i) to a subsidiary wholly owned by Licensee solely in respect of the period during which the sublicense remains a wholly-owned subsidiary of Licensee, (ii) to a developer of a Game (solely to the extent required in order to allow such developer to create the Game) and (iii) otherwise with WWE's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.  To the extent that a distributor is in any way involved in duplication, manufacturing, advertising, marketing, or promotion of the Licensed Products, such entity shall be considered a sublicensee.  For the sake of clarity, to the extent a distributor is solely involved with the sale of finished Licensed Products, consent shall not be required.  No sublicense shall terminate or limit any of Licensee's obligations hereunder, and Licensee shall be responsible for any sublicensee's acts and omissions hereunder.

K(2)   Agreements with Manufacturers.  For purposes of this Agreement, Licensee is the manufacturer of the Licensed Products.  With the prior written approval of WWE, Licensee may arrange with another party to manufacture the Licensed Products or components of the Licensed Products for exclusive sale, use and distribution by the Licensee, which manufacturers shall each be considered sublicensees.  In that instance, Licensee agrees to enter into a written agreement with all such manufacturers, and agrees to incorporate into such written agreements all of the provisions, for the protection of the rights of WWE.  Licensee further agrees to furnish WWE,

18

WWE_Alexander0000060

within thirty (30) days of their execution, copies of all agreements with such manufacturers. Notwithstanding the foregoing, WWE acknowledges and accepts that third-party platform providers such as Sony, Nintendo and Microsoft will only sign their own form of manufacturing agreements. No agreement with a manufacturer shall terminate or limit any of Licensee's obligations hereunder, and Licensee shall be responsible for any manufacturer's acts and omissions hereunder.

K(3)   Enforcement of Manufacturer Agreements.   The Licensee agrees strictly to enforce against its manufacturers all of the provisions which are required to be included in such agreements for the protection of WWE, as provided in Section K(2), to advise WWE of any violations thereof by manufacturers, and of corrective actions taken by the Licensee and the results thereof; and at the request of WWE to terminate such an agreement with any manufacturer which violates any such provisions; all for the protection of WWE.

SECTION L.   BREACH AND TERMINATION; EXPIRATION OF AGREEMENT

L(1)   Right Of Termination.

   a)   WWE Rights of Termination.

      i)   Immediate Right of Termination.   In addition to the termination rights stated elsewhere in this Agreement, WWE will have the right to terminate this Agreement immediately, by giving written notice to Licensee, in the event Licensee either willfully and knowingly breaches any of the material terms of this Agreement, or is grossly negligent and such gross negligence causes Licensee to breach any of the material terms of this Agreement, and such willful and knowing breach or such gross negligence causing Licensee to breach any of the material terms of this Agreement materially and detrimentally impacts the WWE brand. WWE shall abide by the principals of good faith and fair dealing in making such a determination.

      ii)   Right to Terminate upon Ten (10) Days Written Notice. WWE shall have the right to terminate this Agreement if Licensee breaches any financial term of this Agreement, including without limitation, failing to make any payments in excess of Two Hundred Fifty Thousand US Dollars ($250,000.00 USD) by the date such payment is required under the provisions of this Agreement or if Licensee fails to submit royalty statements and/or any other statements to WWE during the time periods specified in the Terms of License and/or Section C, and Licensee fails to cure the breach within ten (10) days after receipt of a written default notice from WWE by registered, express or certified mail.

      iii)   Right to Terminate upon Thirty (30) Days Written Notice (curable breach).   If Licensee breaches any of the following material terms and provisions of this Agreement, and Licensee fails to cure the breach within thirty (30) days after receiving written notice by registered, express or certified mail from WWE specifying the particulars of the breach, then WWE will have the right to terminate this Agreement immediately, as of the thirty first (31) day, in the form of written notice to Licensee by registered, express or certified mail.

      (1)   If Licensee has failed to comply with any requirements of quality or the approval process for Licensed Products or advertising and promotional materials, including

19

WWE_Alexander0000061

without limitation those described in Sections A(1), A(2)(b), A(2)(c), A(2)(d) and A(2)(e);

(2) If Licensee makes, sells, offers for sale, or distributes or uses any Licensed Product or Advertising Material without having the prior written approval of WWE, as required by Section A, or makes any use of the Intellectual Property, if applicable, not authorized under this Agreement at any time thereafter;

(3) If Licensee fails to comply with the terms and conditions of Section B(6)(e);

(4) If Licensee fails to comply with the terms and conditions of Section B(6)(f);

(5) If Licensee fails to deliver to WWE or to maintain in full force and effect the insurance referenced to in Section H of this Agreement;

(6) If Licensee fails to deliver any statements or notices required to be delivered to WWE under the terms of this Agreement, retain all records pursuant to the terms of this Agreement or to give access to the premises and/or licensing records pursuant to the provisions of this Agreement to WWE or WWE's authorized representatives for the purposes permitted under this Agreement;

(7) If Licensee fails to comply the terms and conditions of the Code of Conduct contained in Section B(6)(a);

(8) If Licensee knowingly improperly distributes the Licensed Products to retailers or distributors outside of the scope of this Agreement;

(9) If Licensee sells to any third party that Licensee knows, or has reason to know, is altering or modifying the Licensed Products prior to sale to the ultimate customer;

(10) If Licensee fails to comply with the terms and conditions contained in Section E(4) concerning Licensee's execution and delivery of documents required to register Licensee as a registered user of the Intellectual Property or if License fails to take any actions reasonably necessary in order for WWE to perfect its ownership rights in the Intellectual Property, as required by the Terms of License;

(11) If in any material manner, a governmental agency or court of competent jurisdiction determines that the Licensed Product(s) is subject to a required recall;

(12) If, other than under Chapter 11 of the United States Code which is covered under Section L(2) hereof, Licensee becomes subject to any voluntary or involuntary insolvency, cession, bankruptcy, or similar proceedings, or an assignment for the benefit of creditors is made by Licensee, or an agreement between Licensee and its creditors generally is entered into providing for extension or composition of debt, or a receiver is appointed to administer the assets of Licensee, or the assets of Licensee are liquidated, or any distress, execution, or attachment is levied on such of its manufacturing or other equipment as is used in the production and

20

WWE_Alexander0000062

distribution of the Licensed Products and remains undischarged for a period of thirty (30) days;

(13) If Licensee discloses any material Confidential Information concerning this Agreement, as defined in Section N(12), which, it acknowledges, it may become privy to during the Term of this Agreement;

(14) If Licensee fails to comply with the terms and conditions of Section N(1) relating to Licensee's assignment of its rights under this Agreement and Section K relating to sublicenses and agreements with manufacturers; or

(15) If Licensee fails to make any payment due under the Terms of License in excess of Fifty Thousand US Dollars ($50,000.00 USD) up to Two Hundred Fifty Thousand US Dollars ($250,000.00 USD) by the date such payment is required under the provisions of this Agreement;

(16) If Licensee sells, distributes, manufactures, markets, displays or advertises the Licensed Products in the channels of distribution reserved to WWE in the Terms of License;

(17) If Licensee spends less than ████████████ for each Contract Year to advertise the Licensed Products as required in the Terms of License;

(18) If Licensee breaches the Non-Compete clause of the Terms of License in any material respect;

(19) If Licensee fails to use its commercially reasonable efforts to exploit the rights granted hereunder, including the release of a ████████████████████████; provided, however, solely with respect to calendar years 2013 and 2014, the failure to release an original title caused solely by a breach by Yuke's Co., Ltd, the Licensee's developer ("Yukes"), of its development agreement with Licensee (which failure occurs despite all reasonable commercial efforts of Licensee to mitigate Yukes' breach) shall not be deemed a breach of this Agreement by the Licensee and will not allow termination under this provision but all Guaranteed Minimums for such unreleased Game(s) shall be paid by Licensee to Licensor in accordance with the terms of the License.

(20) If Licensee fails to sell product to WWE as required under the Terms of License.

a) <u>Right of Termination</u>. Either party shall have the right to immediately terminate this Agreement, by giving written notice to the other party, in the event that (i) Licensee and Yuke's Co., Ltd. fail to enter into a Master Developer Agreement, satisfactory to Licensee in its sole discretion, regarding the development of the Games, (ii) the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") does not enter an order, satisfactory to both parties in their sole discretion, approving THQ Inc.'s ("THQ") motion

21

seeking approval of THQ's rejection of that certain License Agreement, dated as of December 22, 2009, by and between THQ and WWE, (iii) the Bankruptcy Court does not enter an order, satisfactory to both parties in their sole discretion, approving the transfer of all of THQ's right, title and interests in all assets owned by THQ and all executory contracts relating to video games based on the Intellectual Property produced or developed by THQ free and clear of all interests, liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code or (iv) those members of the "Fight Team" who are THQ employees and are crucial to the development of WWE Games have agreed to be employed by Licensee on terms satisfactory to Licensee in its sole discretion, in each case, on or prior to February 22, 2013. Both parties shall use reasonable commercial efforts to fulfill the conditions to the effectiveness of this Agreement. If despite such efforts, the Effective Date does not occur by February 22, 2013 either party shall have the right, upon written notice to the other party prior to the above conditions in clauses (i) through (iv) having been satisfied, to terminate this Agreement and upon such termination notice, this Agreement shall immediately become null and void and have no effect, no party shall have any past or future obligation under this Agreement, and all rights and obligations of the parties hereunder shall automatically terminate.

        b) Licensee Cure Period. With respect to any non-monetary breach, failure or default by Licensee, in the event that Licensee cannot cure same with the exercise of reasonable diligence within thirty (30) days, then WWE's right to terminate this Agreement shall be tolled for thirty (30) days provided Licensee uses its best efforts to commence taking steps to cure the breach, failure or default within the initial thirty (30) day period and completes such cure within the subsequent thirty (30) day period.

    L(2)   Assumption and Rejection Pursuant to United States Bankruptcy Code. After any order for relief under the Bankruptcy Code is entered against the Licensee, the Licensee must assume or reject this Agreement within sixty (60) days after the order for relief is entered. If the Licensee does not assume this Agreement within such sixty (60) day period, WWE may, at its sole option, terminate this Agreement immediately by giving written notice to the Licensee, without further liability on the part of WWE.

    L(3)   Effect of Termination. Termination of this Agreement shall be without prejudice to any rights or claims which a party may otherwise have against the other for a breach hereof prior to such termination.

    L(4)   Discontinuance of Use of Intellectual Property, etc. Subject to the provisions of Section L(5), upon the expiration or earlier termination of this Agreement, the Licensee agrees promptly and permanently to discontinue manufacturing, selling, advertising, distributing, and using the Licensed Products and Advertising Materials; promptly and permanently to discontinue using the Intellectual Property; immediately to destroy (unless advised otherwise by counsel) any films, molds, dies, CD's, electronic data files, patterns, or similar items from which the Licensed Products and Advertising Materials were made, where any element of the Intellectual Property is an integral part thereof; and in an orderly fashion to terminate all agreements with manufacturers, distributors, and others which relate to the manufacture, sale, distribution, and use of the Licensed Products.

22

WWE_Alexander0000064

L(5)   Disposition of Inventory Upon Expiration.  Notwithstanding the provisions of Section L(4), if this Agreement expires in accordance with its terms, or is terminated for a reason other than a material breach by Licensee, the provisions of this Section L(5) apply.  Licensee shall have the right to distribute and sell any Licensed Products for a period of nine (9) months from the termination or expiration date of the License subject to the payment of royalties to WWE on any such sales in accordance with the terms of this Agreement.  During the first three (3) months of the sell-off period, Licensee shall have the right to cause to be manufactured units of Games Licensee reasonably anticipates will be necessary to meet forecasted demand for the remainder of the sell-off period.

L(6)   Equitable Relief.   Licensee acknowledges that WWE is entering into this Agreement not only in consideration of the royalties paid, but also for the promotional value, goodwill and intrinsic benefit resulting from the manufacture, advertisement, distribution, sale and promotion of the Licensed Products by Licensee within the Territory.   Licensee further acknowledges that the Intellectual Property, possesses a special, unique and extraordinary character that cannot be replaced or the loss thereof adequately compensated for in money damages and that any breach by Licensee of this Agreement may cause irreparable injury and harm to the WWE.  Therefore, if it is alleged by the WWE or any third party affiliated with the WWE that (i) Licensee has failed to manufacture, advertise, distribute, market, promote and/or sell the Licensed Products in strict accordance with the terms of this Agreement and/or (ii) Licensee has used the Intellectual Property in an unauthorized manner, as WWE will determine in its sole discretion, then, in each such case, WWE, any third party affiliated with the WWE and/or their assignees (in addition to any other remedies that may be available to them under this Agreement, at law or in equity or pursuant to such other applicable laws) will have the right to seek from any court having jurisdiction such equitable relief as may be available and appropriate, including such necessary injunctive relief.

### SECTION M.   DISPOSAL OF SECONDS

If, during the manufacture of the Licensed Products, any seconds (the "Seconds") are produced, Licensee will destroy such Seconds and will send WWE an affidavit attesting to the destruction.  The provisions of this Section will not apply to any Seconds from which all references to the Intellectual Property are completely and permanently obliterated, which Seconds shall be disposed of as Licensee elects in its sole discretion.

### SECTION N.   MISCELLANEOUS PROVISIONS

N(1)   Restriction on Assignments. Without the prior written consent of WWE, (which consent may be withheld in WWE's sole discretion) the Licensee shall not, directly or indirectly, assign, hypothecate, convey, pledge, encumber or otherwise transfer ("Transfer") any of its rights under this Agreement.  For example, a Transfer which requires the consent of WWE as provided in this Section shall include without limitation (i) any assignment, sale, conveyance, transfer, hypothecation, pledge, encumbrance or other transfer of 50% or more of stock of Licensee within any consecutive 12 month period, (ii) the sale of all or substantially all of the assets of Licensee, (iii) any merger, consolidation or reorganization into or with the assignor, regardless of whether Licensee is the surviving entity and (iv) any other action or event which

23

WWE_Alexander0000065



would constitute a transfer of the benefits of this Agreement by operation or force of law.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of WWE.

N(2)   Independent Contractor Relationship:  Parties Not Joint Venturers.  At all times the parties hereto shall be considered independent contractors and this Agreement shall not create an agency, franchise, partnership or employment relationship between the parties and nothing contained in this Agreement shall be construed so as to make the parties partners or joint venturers or to permit the either party to bind the other to any agreement or purport to act on behalf of the other party in any respect.

N(3)   Modifications of Agreement; Remedies.  No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by the respective duly authorized representatives of each of the parties.  Failure by either party to enforce any rights under this Agreement shall not be construed as a waiver.

N(4)   No Waiver of Termination Rights. The waiver, expressed or implied, by either party of any rights hereunder or either party's failure to perform or act upon any provision of this Agreement, will not constitute or be deemed a waiver of any of such party's rights hereunder and such rights shall be exercisable when it is deemed appropriate by such party.

N(5)   Invalidity of Separable Provisions. If any provision or clause of this Agreement, or portion thereof, will be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision will not thereby be affected and will be given full effect, without regard to the invalid portion.  It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unforceable in such jurisdiction, the remainder of such provision will not thereby be affected and will be given full effect, without regard to the invalid portion.  It is intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court will reduce or modify the duration, area or matter of such provision, and, in its reduced or modified form, such provision will then be enforceable and will be enforced.

N(6)   Notices.  All notices to be given under this Agreement shall be in writing and shall be delivered either by personal delivery, regular mail, overnight courier or facsimile (provided that a copy of such notice is also given by mail on the same day) (except as herein otherwise expressly provided) at the respective addresses of the parties as set forth above, unless notification of a change of address is given in writing.  Notice given by regular mail shall be deemed given on the date of mailing thereof and notice given by facsimile shall be deemed given on the date of confirmation of receipt of such facsimile (provided a copy of such notice is also sent by regular mail).

N(7)   Headings.  The paragraph and section headings of this Agreement are inserted only for convenience and shall not be construed as a part of this Agreement.

24

WWE_Alexander0000066

N(8)   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

N(9)   Interpretation.  Each party, with the assistance of its respective counsel, has read this agreement and has had an opportunity to negotiate fully the terms of this Agreement. Accordingly, any rule of construction seeking to resolve ambiguities against the drafting party shall not be applicable in the interpretation of this Agreement.

N(10)  No Third Party Beneficiaries. There are no intended third party beneficiaries to this Agreement.

N(11)  Disclaimer.

a)   Disclaimer.  Each party disclaims all warranties of any kind, except for the warranties contained in Section G(l ) hereof.

b)   Limitation of Liability.  Except in the case of a violation of any provision herein protective of a party's intellectual property, no party will be liable to the other party for any indirect, incidental, reliance, special or consequential damages (including but not limited to lost profits or revenue or any expense or cost related to or arising out of any inventory or goods on hand or any expense or cost incurred with regard to the research and development of the Licensed Product) arising out of or related to this Agreement, however caused and by any theory (including negligence of any kind or degree) and regardless of whether such party has been advised of the possibility of such damages and whether such damages were foreseeable.

c)   Subject to Section N(l 1)(b), in the event Licensee breaches the terms of this Agreement, WWE shall be entitled to seek a recovery based on any and all remedies available at law and/or equity, including any additional monetary damages related to or caused by the breach by Licensee.

N(12)  Confidential Information.

a) During the Term of this Agreement, each party may have access to confidential information of the other party ("Confidential Information").  Confidential Information for the purposes of this Agreement shall be defined to include, but not be limited to, software (regardless of the stage of development), designs, drawings, specifications, models, technical information, unreleased or undisclosed Intellectual Property or Licensee Intellectual Property, as applicable, hardware, source codes, object codes, documentation diagrams, flow charts, marketing and development plans, business plans, or records, financial information, market reports, customer lists, talent lists, storylines, scripts, story boards or ideas, employee lists, business manuals, policies and procedures, the terms and conditions of this Agreement, billing information and procedures and all other information; provided such information shall be marked "confidential" or "proprietary".  The parties agree both during the Term and for a period of five (5) years after the expiration or termination of this Agreement for any reason whatsoever to hold each other's Confidential Information in confidence, employing the same degree of care that the party employs for its own proprietary information.  The parties agree not to make each other's

25

Confidential Information available in any form to any third party, except as otherwise permitted in this Agreement, or to use each other's Confidential Information for any purposes other than for the implementation or exploitation of this Agreement.

b) Notwithstanding the foregoing, the parties' obligations of confidentiality shall not include information which:

i) at the time of disclosure was in the public domain;

ii) after such disclosure, becomes generally available to the public other than through any act or omission by the party herein releasing said information;

iii) is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to the non-disclosing party in a timely manner in order to afford such party an opportunity to seek a protective order against such disclosure and the disclosure is strictly limited to the information which the disclosing party is required or compelled to disclose;

iv) was already known to the non-disclosing party without restriction, prior to receipt from the disclosing party

v) is lawfully disclosed to the non-disclosing party by a third party who is not under any obligation, whether contractual, fiduciary, statutory, or otherwise, of confidentiality to the disclosing party with respect to such Confidential Information; or

vi) is at any time developed by the non-disclosing party independently (as as shown by documents and other competent evidence) without use of, or reference to, the Confidential Information of the disclosing party.

N(13)  Binding Effect. The parties represent and warrant that the person executing this Agreement has the authority to bind the party on behalf of which he/she is signing.

N(14)  Rules of Construction.  As used in this Agreement, unless the context otherwise requires (i) references to " "Sections" are to the sections of the Standard Terms and Conditions of this Agreement; (ii) all "Exhibits" and "Schedules" referred to in this Agreement are to Exhibits and Schedules attached to this Agreement and are incorporated into this Agreement by reference and made a part of this Agreement; (iii) "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (iv) the singular includes the plural, (v) the masculine, feminine and neutral genders include the others; and (vi) headings of the various Sections and subsections are for convenience of reference only and will not be given any effect for purposes of interpreting this Agreement.  Furthermore, unless specifically stated to the contrary in the Terms of License, all of the rights and licenses granted to Licensee under this Agreement shall be deemed non-exclusive.

26

WWE_Alexander0000068

N(15)  Force Majeure.  If either party is prevented from performing its obligations under this Agreement as a result of a force majeure event, then the non-performing party will not be liable to the other parties for its failure to perform such obligations.  As used in this Agreement, force majeure will mean any act of God, fire, flood, war, public disaster, other calamity, strike, or labor difficulties, or any governmental determination, action, regulation, or order, or any other occurrence beyond the reasonable control of the non-performing party, which, despite the non-performing party's reasonable efforts, prevents the performance of its obligations under this Agreement.

WORLD WRESTLING
ENTERTAINMENT, INC.
("WWE")

By:_____
Casey Collins
EVP, Consumer Products

Date:_____2/11/13_____

TAKE-TWO INTERACTIVE
SOFTWARE, INC.
("Licensee")

By:_____

Print Name:
Title:
Date:_____

27

Confidential

WWE_Alexander0000069

N(15)  Force Majeure.  If either party is prevented from performing its obligations under this Agreement as a result of a force majeure event, then the non-performing party will not be liable to the other parties for its failure to perform such obligations.  As used in this Agreement, force majeure will mean any act of God, fire, flood, war, public disaster, other calamity, strike, or labor difficulties, or any governmental determination, action, regulation, or order, or any other occurrence beyond the reasonable control of the non-performing party, which, despite the non-performing party's reasonable efforts, prevents the performance of its obligations under this Agreement.

WORLD WRESTLING
ENTERTAINMENT, INC.
("WWE")

By:_____
Casey Collins
EVP, Consumer Products

Date:_____

TAKE-TWO INTERACTIVE
SOFTWARE, INC.
("Licensee")

By:_____

Print Name: SLATOFF
Title:    COC
Date:_____Feb. 11, 2013_____

27

WWE_Alexander0000070

## EXHIBIT 1

### WWE'S CODE OF CONDUCT

COMPLIANCE WITH APPLICABLE LAWS.  Licensee shall comply with all applicable laws and regulations of the countries, states and localities in which it operates.

EMPLOYMENT PRACTICES.  Licensee must comply with the following employment practices:

- Wages and Benefits: Licensee shall provide wages, overtime compensation and benefits at not less than the minimum levels required by applicable laws and regulations or the prevailing local industry levels, if higher.

- Working Hours: Licensee shall, at a minimum, comply with all applicable working hours' laws and regulations.

- Child Labor: Licensee shall not employ any person under the age of 15 (or 14 where allowed by local law) or under the local age for completing compulsory education, if higher.

- Forced Labor: Licensee shall not use any corporal punishment, threats of violence or other forms of physical abuse, forced labor, whether in the form of prison labor, indentured labor, bonded labor or otherwise.

- Non discrimination: Licensee shall not discriminate in employment practices on the basis of race, religion, age, nationality, social or ethnic origin, gender, sexual orientation or disability.

- Health and Safety: Licensee shall provide employees with a safe and healthy working environment.

ENVIRONMENTAL REQUIREMENTS. Licensee shall comply with all applicable environmental laws and regulations.

28

WWE_Alexander0000071



# *Product Submission*

| Submission Number: 3540 | |
|---|---|
| Licensee Name | Take-Two Interactive Software, Inc. |
| Address | 622 Broadway |
| Contact | Dino Zucconi |
| Phone | 646-536-2842 |

| Current Stage | Pre-Production |
|---|---|
| Revision # | 1 |
| Submission Code | 001 WWE16 XB1_PS4 Models 01 |
| IP | Randy Orton |
| Contracts | Take-Two Interactive Software, Inc. |
| Created By | Dino Zucconi |
| Status | Stage    4 Approved |

| | |
|---|---|
| Languages | ALL |
| Approved Territories | |
| Unapproved Territories | |
| Sales Channels | ALL |
| Markets | ALL |
| Manufacturers | No Manufacturers |
| Expected Trade Introduction | 10/27/2015 |
| Expected Retail Intoduction | 10/27/2015 |
| Wholesale Cost | 48.000000 - 0.000000 |
| Retail Price | 60.000000 - 0.000000 |

| Product | Video Games |
|---|---|
| Category | Console/Handheld |
| Subcategory | Microsoft/PC |
| Article | N/A |
| License Type | General License Type |
| Related Submission (s) | |
| SKUs | No SKUs |
| Description | Current Gen (XB1/PS4) Model Submission Video |

| Attached Files | |
|---|---|
| File Title | Uploaded |
| CG Randy Orton | 5/12/2015 |
| 001 WWE16 XB1/PS4 Models 001 | 5/12/2015 |



**1 / 2**

WWE_Alexander0000109

| Details | Comments |
|---|---|
| #: 7 Stage 1.1<br>Posted On: 5/18/2015<br>By: Diane Udin<br>Type: External | Design Approved |
| #: 6 Stage 1.1<br>Posted On: 5/18/2015<br>By: Diane Udin<br>Type: External | Design Approved, thanks! |
| #: 5 Stage 1.1<br>Posted On: 5/15/2015<br>By: Lauren Middlen<br>Type: Internal | REDACTED |
| #: 4 Stage 1.1<br>Posted On: 5/14/2015<br>By: Joe Giorno<br>Type: Internal | Design Approved. |
| #: 3 Stage 1.1<br>Posted On: 5/13/2015<br>By: JD Sestito<br>Type: Internal | Approved |
| #: 2 Stage 1.1<br>Posted On: 5/13/2015<br>By: Mike  Archer<br>Type: Internal | good |
| #: 1 Stage 1.1<br>Posted On: 5/12/2015<br>By: Ashley Zuzik<br>Type: Internal | see attached files section to review |

**Activity Log Respond Dates**

| Stage | Revision | Date | Action |
|---|---|---|---|
| Concept | 1 | 5/18/2015 | Approved |

**2 / 2**

Confidential

WWE_Alexander0000110



# *Product Submission*

| Submission Number: 17984 | |
|---|---|
| Licensee Name | Take-Two Interactive Software, Inc. |
| Address | 622 Broadway |
| Contact | Dino Zucconi |
| Phone | 646-536-2842 |

| Languages | ALL |
|---|---|
| Territories | |
| Sales Channels | |
| Markets | ALL |
| Manufacturers | No Manufacturers |
| Expected Trade Introduction | 10/17/2017 |
| Expected Retail Intoduction | 10/17/2017 |
| Wholesale Cost | 48.000000 - 0.000000 |
| Retail Price | 60.000000 - 0.000000 |

| Current Stage | Final Art/Media File/Other |
|---|---|
| Revision # | 1 |
| Submission Code | 001_WWE18_Renders_01 |
| IP | Adrian Neville, Aiden English, AJ Styles, Akam, Alexa Bliss, Alicia Fox, Alundra Blayze, Andre the Giant, Apollo Crews, Asuka, Bam Bam Bigelow, Baron Corbin, Batista, Bayley, Big Boss Man/Big Bubba Rogers, Big Cass, Big Daddy Cool, Big E, Big Show, Billie Kay, Bo Dallas , Bobby The Brain Heenan, Booker T, Braun Strowman, Bray Wyatt, Bret Hart, Brian Kendrick, Brie Bella  , British Bulldog, Brock Lesnar, Bushwhacker Butch, Bushwhacker Luke, Carmella, Cedric Alexander, Cesaro, Chad Gable, Charlotte Flair, Chris Jericho, Curt Hawkins, Curtis Axel, Dana Brooke, Daniel Bryan , Darren Young, Dash Wilder, Dean Ambrose, Diamond Dallas Page, Dolph Ziggler, Dusty Rhodes, Earthquake, Eddie Guererro, Edge, Ember Moon, Emma, Enzo Amore, Epico, Eric Young, Erick Rowan, Fandango, Finn Balor, Godfather, Goldberg, Goldust, Greg The hammer Valentine, Heath Slater, Hideo Itami, Jack Gallagher, Jake The Snake Roberts, Jason Jordan , JBL, Jey Uso, Jim "The Anvil" Neidhart, Jimmy Uso, Jinder Mahal, John Cena, Johnny Gargano, Kalisto, Kane, Karl Anderson, Kerry Von Erich, Kevin Nash, Kevin Owens, Kevin Von Erich, Killian Dane, Kofi Kingston, Konnor, Kurt Angle, Lana , Larry Zbyszko, Lex Luger, Lita, Luke Gallows, Luke Harper, Macho Man Randy Savage, Mark Henry, Maryse, Michael Hayes, Mick Foley, Mickie James, Mojo Rawley, Mr. McMahon , Mr. Perfect, Naomi, Natalya   , Nia Jax, Nikki Bella, No Way Jose, Paige , Papa Shango, Paul Heyman, Peyton Royce, Randy Orton, Ravishing Rick Rude, Razor Ramon, Rezar, Rhyno, Ric Flair, Rich Swann, Ricky The Dragon Steamboat, Rikishi, Robert Roode, Roderick Strong, Roman Reigns, R-Truth, Rusev, Sami Zayn, Samoa Joe, Sawyer Fulton, Scott Dawson, Scott Hall, Seth Rollins, Shane McMahon, Shawn Michaels, Sheamus, Shinsuke Nakamura, Sid Justice, Sin Cara, Stephanie McMahon, Sting, Stone Cold Steve Austin, Summer Rae, Tamina Snuka  , Tatsumi Fujinami, Ted DiBiase, The Miz, The Rock, Titus O'Neil , TJ Perkins, Tommaso Ciampa, Triple H, Trish Stratus, Tye Dillinger, Tyler Breeze, Typhoon, Tyson Kidd , Ultimate Warrior, Undertaker, Vader, Viktor, WWE Divas Logo, WWE Legends Logo, Xavier Woods, Zack Ryder |
| Contracts | Take-Two Interactive Software, Inc. |
| Created By | Dino Zucconi |



Exhibit

Exhibit 5

08-4-2020

exhibitsticker.com

1 / 1

| Statue | Stage | Approved |
|---|---|---|

| | |
|---|---|
| **Product** | Video Games |
| **Category** | Console/Handheld |
| **Subcategory** | Microsoft/PC |
| **Article** | N/A |
| **License Type** | General License Type |
| **Related Submission(s)** | |
| **SKUs** | No SKUs |
| **Description** | WWE 2K18 Renders for Superstars, Managers, Referees |

| Attached Files | |
|---|---|
| File Title | Uploaded |
| 001_WWE18_Renders_01 | 8/21/2017 |
| 001 Renders 01 RESUB | 8/31/2017 |
| 001 Renders RESUB_3 | 9/6/2017 |

1 / 1

WWE_Alexander0000208

| Details | Comments |
|---|---|
| #: 11 Stage 1.3<br>Posted On:<br>9/7/2017<br>By: Zachary Maxwell<br>Type: External | Approved |
| #: 10 Stage 1.3<br>Posted On:<br>9/7/2017<br>By: Joe Giorno<br>Type: Internal | Looks fine. |
| #: 9 Stage 1.3<br>Posted On:<br>9/6/2017<br>By: Dino Zucconi<br>Type: External | Hello,<br><br>Resubmitting Billie Kay render with her pose changed.<br><br>Thanks,<br><br>Dino Zucconi<br>Production Assistant, 2K Sports |
| #: 8 Stage 1.2<br>Posted On:<br>9/5/2017<br>By: Zachary Maxwell<br>Type: External | Billie Kay still has an issue with her left leg looking like it is missing a piece. Her arms seem disproportioned as well<br><br>Rest look good. |
| #: 7 Stage 1.2<br>Posted On:<br>9/5/2017<br>By: Joe Giorno<br>Type: Internal | Overall better. Please route internal ones for approval.<br><br>Billie Kay still has an issue with her left leg looking like it is missing a piece. Her arms seem disproportioned as well. |
| #: 6 Stage 1.2<br>Posted On:<br>9/5/2017<br>By: David Woldman<br>Type: Internal | These seem shippable to me.  PLease route all internal ones pending any other notes. |
| #: 5 Stage 1.2<br>Posted On:<br>8/31/2017<br>By: Dino Zucconi<br>Type: External | Hello,<br><br>We are resubmitting the Renders, with comments addressed.  Please consider the following notes when reviewing:<br><br>Undertaker - Hat is too big. He looks small overall.   - we can't edit the model but we changed the pose and scaled the hat down.<br><br>Kane - Too small overall. - We can't edit the model but we changed the pose to make him feel bigger.<br><br>Booker T - Looks a bit bloated. - We can't edit the model but we changed the pose to make him look less bloated.<br><br>Edge - Chest looks very flat. - We can't edit the pose but we added the jacket he wears in his entrance.<br><br>RVD - Eyes look sleepy.  - Updated pose.<br><br>Eddie Guerrero - Looks yellow.  - Updated skin tone.<br><br>Andre - Lessen dark circles under eyes.  - Updated lighting.<br><br>Mick Foley Manager - Hair looks too black / slick.  We can't change the shader on his hair without causing it to look flat in game.<br><br>Retro Rock - should look a little more toned in image. - We can't edit the model but we changed the pose to make him feel bigger.<br><br>Shane Jersey - Make updates to hair color and shape. Face looks old. - Now using updated model and changed expression on the face.<br><br>British Bulldog - Too red. - Updated skin tone.<br><br>Miz - Forehead is too big. Eyes seem closed. - Updated expression on face.<br><br>Greg Valentine - Too red. Some hair clipping issues.  - Updated lighting, and skin tone.<br><br>Michael Hayes - Too dark.  - Updated skin tone.<br><br>Ultimate Warrior - Should be bigger.  - We can't edit the model but we changed the pose to make him feel bigger. |

1 / 1

Confidential

Nikki Bella's nose/mouth area needs adjustment. - Updated pose.

Bray lighting needs adjusting. Beard and chest blend together. - Updated lighting.

Luke Harper has no gap between mouth/mustache/beard. - Updated lighting.

Open DDP's eyes more in the pose. - Updated pose.

Xavier has a lighting artifact giving the appearance of a nose ring. - Updated lighting.

Tyler Breeze's face is mushed. - Updated pose.

Need legal clearance on Ohno gear

Maybe have AOP more front facing to minimize stomach. - Updated poses.

Odd discoloration on Kofi's bridge of nose. - Updated lighting.

New facial expression for Kendrick please. - Updated pose.

Re-pose Natty, she looks off. - Updated pose.

Natty - Lessen face thickness. - We can't edit the model but we changed the pose.

Maryse - Hair issues. - Updated lighting.

Jinder Mahal - Upper body looks too big and lower doesn't seem proportioned. - We can't edit the model but we changed the pose.

Daniel Bryan - Looks ghostly. - Updated skin tone.

Kevin Nash - His eyes look like he has allergies. - Updated lighting.

Brock Lesnar - Looks great overall. There is a line on his stomach. - Updated render.

Kane - Looks small overall. - We can't edit the model but we changed the pose to make him feel bigger.

Ric Flair 88 - Looks like an old woman. Too wide in general. - We can't edit the model but we updated the pose.

Nikki Bella - Face is very off. Need to recapture for better look. Nose and mouth. - Updated pose.

Bray Wyatt - Might be a tad too dark. - Updated lighting.

DDP - Too red. - Updated skin tone.

Bo Dallas - Looks really small overall. - Updated pose.

Sami Zayn - Lessen belly. - We can't edit the model but we changed the pose.

Tyler Breeze - Face, lips, mouth all look really off. - We can't edit the model but we updated the facial expression.

Charlotte - Lessen shadowing in her face. - Updated lighting.

Asuka - Remove line on her crotch. - Updated pose.

Nia Jax - A bit too wide. - We can't edit the model but we updated the facial expression.

Ohno - Is gear fine... Please confirm with legal.

Billie Kay - Right arm / shoulder doesn't seem proportioned right. - Updated pose.

Shane Jacket - Facial expression is really bad. Need to fix hair shape and coloring. - Now using updated model and changed expression on the face.

Thank you,

Dino Zucconi
Production Assistant, 2K Sports

| #: 4 Stage 1.1 Posted On: 8/29/2017 By: Zachary Maxwell Type: External | Referees overall have a ghostly look to the faces. |
| | Triple H - Lessen bottom lip. |
| | Undertaker - Hat is too big. He looks small overall. |
| | Kane - Too small overall. |

1 / 1

Booker T - Looks a bit bloated.

Edge - Chest looks very flat.

RVD - Eyes look sleepy.

Eddie Guerrero - Looks yellow.

Andre - Lessen dark circles under eyes.

Mick Foley Manager - Hair looks too black / slick.


Retro Rock - should look a little more toned in image

Shane Jersey - Make updates to hair color and shape. Face looks old.

British Bulldog - Too red.

Miz - Forehead is too big. Eyes seem closed.

Greg Valentine - Too red. Some hair clipping issues.

Michael Hayes - Too dark.

Ultimate Warrior - Should be bigger.


New pose for Dean with shoulders not so slumped forward and concave chest

Nikki Bella's nose/mouth area needs adjustment

Bray lighting needs adjusting.  Beard and chest blend together

Luke Harper has no gap between mouth/mustache/beard.

Open DDP's eyes more in the pose

Xavier has a lighting artifact giving the appearance of a nose ring

Tyler Breeze's face is mushed

Need legal clearance on Ohno gear

Maybe have AOP more front facing to minimize stomach

Odd discoloration on Kofi's bridge of nose

New facial expression for Kendrick please

Re-pose Natty, she looks off


Natty - Lessen face thickness.

Maryse - Hair issues.

Jinder Mahal - Upper body looks too big and lower doesn't seem proportioned.

Daniel Bryan - Looks ghostly.

Kevin Nash - His eyes look like he has allergies.

Brock Lesnar - Looks great overall. There is a line on his stomach.

Kane - Looks small overall.

Ric Flair 88 - Looks like an old woman. Too wide in general.

Nikki Bella - Face is very off. Need to recapture for better look. Nose and mouth.

Bray Wyatt - Might be a tad too dark.

DDP - Too red.

Bo Dallas - Looks really small overall.

Sami Zayn - Lessen belly.

1 / 1

WWE_Alexander0000211

| | |
|---|---|
| | Charlotte - Lessen shadowing in her face. |
| | Asuka - Remove line on her crotch. |
| | Nia Jax - A bit too wide. |
| | Ohno - Is gear fine... Please confirm with legal. |
| | Billie Kay - Right arm / shoulder doesn't seem proportioned right. |
| | Shane Jacket - Facial expression is really bad. Need to fix hair shape and coloring. |
| #: 3 Stage 1.1<br>Posted On:<br>8/28/2017<br>By: Joe Giorno<br>Type: Internal | Referees overall have a ghostly look to the faces. |
| | Triple H - Lessen bottom lip. Have his approved. |
| | Undertaker - Hat is too big. He looks small overall. |
| | Kane - Too small overall. |
| | Booker T - Looks a bit bloated. |
| | Edge - Chest looks very flat. |
| | Mr. McMahon - Have his reviewed by CC |
| | RVD - Eyes look sleepy. |
| | Eddie Guerrero - Looks yellow. |
| | Andre - Lessen dark circles under eyes. |
| | Mick Foley Manager - Hair looks too black / slick. |
| | Shane Jersey - Make updates to hair color and shape. Face looks old. |
| | British Bulldog - Too red. |
| | Miz - Forehead is too big. Eyes seem closed. |
| | Greg Valentine - Too red. Some hair clipping issues. |
| | Michael Hayes - Too dark. |
| | Ultimate Warrior - Should be bigger. Show TR. |
| | Natty - Lessen face thickness. |
| | Maryse - Hair issues. |
| | Jinder Mahal - Upper body looks too big and lower doesn't seem proportioned. |
| | Daniel Bryan - Looks ghostly. |
| | Kevin Nash - His eyes look like he has allergies. |
| | Brock Lesnar - Looks great overall. There is a line on his stomach. Show TR. |
| | Kane - Looks small overall. |
| | Ric Flair 88 - Looks like an old woman. Too wide in general. |
| | Nikki Bella - Face is very off. Need to recapture for better look. Nose and mouth. |
| | Bray Wyatt - Might be a tad too dark. |
| | DDP - Too red. |
| | Sting Renders - Show to Sting for approval. |
| | Triple H Retro - Show to Triple H. |
| | Bo Dallas - Looks really small overall. |
| | Sami Zayn - Lessen belly. |
| | Stephanie McMahon - Show her for approval. Doesn't look great. |
| | Tyler Breeze - Face, lips, mouth all look really off. |
| | Charlotte - Lessen shadowing in her face. |

Confidential

WWE_Alexander0000212

Asuka - Remove line on her crotch.

Nia Jax - A bit too wide.

REDACTED

Billie Kay - Right arm / shoulder doesn't seem proportioned right.

Shane Jacket - Facial expression is really bad. Need to fix hair shape and coloring.

| #: 2 Stage 1.1<br>Posted On:<br>8/23/2017<br>By: David<br>Woldman<br>Type: Internal | New pose for Dean with shoulders not so slumped forward and concave chest<br><br>Nikki Bella's nose/mouth area needs adjustment<br><br>Bray lighting needs adjusting.  Beard and chest blend together<br><br>Luke Harper has no gap between mouth/mustache/beard.<br><br>Open DDP's eyes more in the pose<br><br>Xavier has a lighting artifact giving the appearance of a nose ring<br><br>Tyler Breeze's face is mushed<br><br>REDACTED<br><br>Maybe have AOP more front facing to minimize stomach<br><br>Odd discoloration on Kofi's bridge of nose<br><br>New facial expression for Kendrick please<br><br>Re-pose Natty, she looks off<br><br><br><br>Unsure how many need internal routing if model has been approved, so please do that step.<br><br><br><br>Rest approved. |
| --- | --- |
| #: 1 Stage 1.1<br>Posted On:<br>8/21/2017<br>By: Dino<br>Zucconi<br>Type: External | Hello,<br><br>We are submitting Renders for the 2K18 Playable and Non Playable Characters.<br><br>Superstars, Managers, Referees, are included.<br><br>Thank you so much,<br><br>Dino Zucconi<br>Production Assistant, 2K Sports |

| Activity Log Respond Dates | | | |
| --- | --- | --- | --- |
| Stage | Revision | Date | Action |
| Concept | 1 | 8/29/2017 | Needs Revision |
| Concept | 2 | 9/5/2017 | Needs Revision |
| Concept | 3 | 9/7/2017 | Approved |

Confidential

WWE_Alexander0000213



Confidential



# *Product Submission*

| Submission Number: 4073 | |
|---|---|
| Licensee Name | Take-Two Interactive Software, Inc. |
| Address | 622 Broadway |
| Contact | Dino Zucconi |
| Phone | 646-536-2842 |

| Current Stage | Concept |
|---|---|
| Revision # | 4 |
| Submission Code | 01 WWE16 Character Renders |
| IP | Adam Rose , Adrian Neville, Alicia Fox, Bad News Barrett (Wade Barrett), Big E, Big Show, Bo Dallas , Bray Wyatt, Brie Bella   , Brock Lesnar, Cameron, Cesaro, Chris Jericho, Curtis Axel, Damien Sandow, Daniel Bryan , Darren Young, Dean Ambrose, Dolph Ziggler, Emma , Erick Rowan, Eva Marie , Fandango, Goldust, Heath Slater , Jack Swagger, Jey Uso, Jimmy Uso, John Cena, Kalisto, Kane, Kofi Kingston, Konnor, Layla , Luke Harper, Mark Henry, Naomi, Natalya   , Nikki Bella, Paige , Randy Orton, Roman Reigns, R-Truth, Rusev , Ryback , Santino Marella, Seth Rollins, Sheamus, Sin Cara, Stardust (Cody Rhodes), Summer Rae, The Miz, The Rock, Titus O'Neil , Triple H, Tyson Kidd , Viktor, Xavier Woods, Zack Ryder |
| Contracts | Take-Two Interactive Software, Inc. |
| Created By | Dino Zucconi |
| Status | Needs Revision |

| Product | Video Games |
|---|---|
| Category | Console/Handheld |
| Subcategory | Microsoft/PC |
| Article | N/A |
| License Type | General License Type |
| Related Submission (s) | |
| SKUs | No SKUs |
| Description | WWE16 Character Renders.  These images will appear in the character select screen. |

| Languages | ALL |
|---|---|
| Approved Territories | |
| Unapproved Territories | |
| Sales Channels | ALL |
| Markets | ALL |
| Manufacturers | No Manufacturers |
| Expected Trade Introduction | 10/27/2015 |
| Expected Retail Intoduction | 10/27/2015 |
| Wholesale Cost | 48.000000 - 0.000000 |
| Retail Price | 69.000000 - 0.000000 |



**Exhibit**

**Exhibit 6**

08-4-2020

**1 / 8**

Attachments:

| File Title | Uploaded |
|---|---|
| Main Roster Renders | 6/17/2015 |
| Divas Renders | 6/17/2015 |
| UI Renders Resub | 7/1/2015 |
| WWE 2K16 Render Request | 7/1/2015 |

| Activity Log | | | | | |
|---|---|---|---|---|---|
| User Name | Action | Stage | Revision | Date | Log Description |
| Ashley Zuzik | Sent | Concept | 3 | 7/1/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Sent | Concept | 3 | 7/1/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Sent | Concept | 3 | 7/1/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Sent | Concept | 3 | 7/1/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Needs Revision | Concept | 3 | 7/1/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 3 | 7/1/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 3 | 7/1/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 3 | 7/1/2015 | User Requested Revision |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | External Comment |
| Joe Giorno | Reviewed | Concept | 3 | 7/1/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 3 | 7/1/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 3 | 7/1/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 3 | 7/1/2015 | User Reviewed Product Submission |
| Joe Giorno | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Joe Giorno | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Joe Giorno | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Joe Giorno | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Ashley Zuzik | Forwarded | Concept | 3 | 7/1/2015 | Product Submission Forwarded to: Joe Giorno |
| Ashley Zuzik | Forwarded | Concept | 3 | 7/1/2015 | Product Submission Forwarded to: Joe Giorno |
| Ashley Zuzik | Forwarded | Concept | 3 | 7/1/2015 | Product Submission Forwarded to: Joe Giorno |
| Ashley Zuzik | Forwarded | Concept | 3 | 7/1/2015 | Product Submission Forwarded to: Joe Giorno |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 3 | 7/1/2015 | Internal Comment |
| Dino Zucconi | Submitted | Concept | 3 | 7/1/2015 | Product Submission Submitted |
| Dino Zucconi | Submitted | Concept | 3 | 7/1/2015 | Product Submission Submitted |
| Dino Zucconi | Submitted | Concept | 3 | 7/1/2015 | Product Submission Submitted |
| Dino Zucconi | Submitted | Concept | 3 | 7/1/2015 | Product Submission Submitted |
| Dino Zucconi | File Added | Concept | 3 | 7/1/2015 | User Added File: WWE2K16_render_request.zip |

Confidential

WWE_Alexander0000113

| Dino Zucconi | | | | | WWE2K16_render_request.zip |
|---|---|---|---|---|---|
| Dino Zucconi | File Added | Concept | 3 | 7/1/2015 | User Added File: WWE2K16_render_request.zip |
| Dino Zucconi | File Added | Concept | 3 | 7/1/2015 | User Added File: WWE2K16_render_request.zip |
| Dino Zucconi | File Added | Concept | 3 | 7/1/2015 | User Added File: UI_Renders_Resub.zip |
| Dino Zucconi | File Added | Concept | 3 | 7/1/2015 | User Added File: UI_Renders_Resub.zip |
| Dino Zucconi | File Added | Concept | 3 | 7/1/2015 | User Added File: UI_Renders_Resub.zip |
| Dino Zucconi | File Added | Concept | 3 | 7/1/2015 | User Added File: UI_Renders_Resub.zip |
| Dino Zucconi | New Comment | Concept | 3 | 7/1/2015 | External Comment |
| Dino Zucconi | New Comment | Concept | 3 | 7/1/2015 | External Comment |
| Dino Zucconi | New Comment | Concept | 3 | 7/1/2015 | External Comment |
| Dino Zucconi | New Comment | Concept | 3 | 7/1/2015 | External Comment |
| Ashley Zuzik | Approved | Concept | 3 | 6/30/2015 | User Approved Product Submission |
| Ashley Zuzik | Approved | Concept | 3 | 6/30/2015 | User Approved Product Submission |
| Ashley Zuzik | Approved | Concept | 3 | 6/30/2015 | User Approved Product Submission |
| Ashley Zuzik | Approved | Concept | 3 | 6/30/2015 | User Approved Product Submission |
| Ashley Zuzik | New Comment | Concept | 3 | 6/30/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 3 | 6/30/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 3 | 6/30/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 3 | 6/30/2015 | Comment Deleted |
| Ashley Zuzik | Sent | Concept | 2 | 6/30/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Sent | Concept | 2 | 6/30/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Sent | Concept | 2 | 6/30/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Sent | Concept | 2 | 6/30/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Needs Revision | Concept | 2 | 6/30/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 2 | 6/30/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 2 | 6/30/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 2 | 6/30/2015 | User Requested Revision |
| Ashley Zuzik | New Comment | Concept | 2 | 6/30/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 2 | 6/30/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 2 | 6/30/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 2 | 6/30/2015 | External Comment |
| Joe Giorno | Reviewed | Concept | 2 | 6/29/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 2 | 6/29/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 2 | 6/29/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 2 | 6/29/2015 | User Reviewed Product Submission |
| Joe Giorno | New Comment | Concept | 2 | 6/29/2015 | Internal Comment |
| Joe Giorno | New Comment | Concept | 2 | 6/29/2015 | Internal Comment |
| Joe Giorno | New Comment | Concept | 2 | 6/29/2015 | Internal Comment |
| Joe Giorno | New Comment | Concept | 2 | 6/29/2015 | Internal Comment |
| Ashley Zuzik | Forwarded | Concept | 2 | 6/26/2015 | Product Submission Forwarded to: Joe Giorno |
| Ashley Zuzik | Forwarded | Concept | 2 | 6/26/2015 | Product Submission Forwarded to: Joe Giorno |
| Ashley Zuzik | Forwarded | Concept | 2 | 6/26/2015 | Product Submission Forwarded to: Joe Giorno |
| Ashley Zuzik | Forwarded | Concept | 2 | 6/26/2015 | Product Submission Forwarded to: Joe Giorno |
| Ashley Zuzik | Canceled | Concept | 2 | 6/26/2015 | User Canceled Response |
| Ashley Zuzik | Canceled | Concept | 2 | 6/26/2015 | User Canceled Response |

**3 / 8**

WWE_Alexander0000114

| Ashley Zuzik | Canceled | Concept | 2 | 6/26/2015 | User Canceled Response |
|---|---|---|---|---|---|
| Ashley Zuzik | Needs Revision | Concept | 2 | 6/26/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 2 | 6/26/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 2 | 6/26/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 2 | 6/26/2015 | User Requested Revision |
| Ashley Zuzik | New Comment | Concept | 2 | 6/26/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 2 | 6/26/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 2 | 6/26/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 2 | 6/26/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 2 | 6/26/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 2 | 6/26/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 2 | 6/26/2015 | Comment Deleted |
| Ashley Zuzik | New Comment | Concept | 2 | 6/26/2015 | Comment Deleted |
| Dino Zucconi | Submitted | Concept | 2 | 6/26/2015 | Product Submission Submitted |
| Dino Zucconi | Submitted | Concept | 2 | 6/26/2015 | Product Submission Submitted |
| Dino Zucconi | Submitted | Concept | 2 | 6/26/2015 | Product Submission Submitted |
| Dino Zucconi | Submitted | Concept | 2 | 6/26/2015 | Product Submission Submitted |
| Dino Zucconi | New Comment | Concept | 2 | 6/26/2015 | External Comment |
| Dino Zucconi | New Comment | Concept | 2 | 6/26/2015 | External Comment |
| Dino Zucconi | New Comment | Concept | 2 | 6/26/2015 | External Comment |
| Dino Zucconi | New Comment | Concept | 2 | 6/26/2015 | External Comment |
| Ashley Zuzik | Sent | Concept | 1 | 6/25/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Sent | Concept | 1 | 6/25/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Sent | Concept | 1 | 6/25/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Sent | Concept | 1 | 6/25/2015 | Product Submission Needs Revision |
| Ashley Zuzik | Needs Revision | Concept | 1 | 6/25/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 1 | 6/25/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 1 | 6/25/2015 | User Requested Revision |
| Ashley Zuzik | Needs Revision | Concept | 1 | 6/25/2015 | User Requested Revision |
| Ashley Zuzik | New Comment | Concept | 1 | 6/25/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/25/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/25/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/25/2015 | External Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/25/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/25/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/25/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/25/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/24/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/24/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/24/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/24/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/24/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/24/2015 | Internal Comment |
| Ashley Zuzik | New Comment | Concept | 1 | 6/24/2015 | Internal Comment |
| Lauren Middlen | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |

**4 / 8**

| Lauren Middlen | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
|---|---|---|---|---|---|
| Lauren Middlen | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
| Lauren Middlen | New Comment | Concept | 1 | 6/19/2015 | Internal Comment |
| Lauren Middlen | New Comment | Concept | 1 | 6/19/2015 | Internal Comment |
| Lauren Middlen | New Comment | Concept | 1 | 6/19/2015 | Internal Comment |
| Lauren Middlen | New Comment | Concept | 1 | 6/19/2015 | Internal Comment |
| David Woldman | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
| David Woldman | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
| David Woldman | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
| David Woldman | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
| Ignacio Borbolla | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
| Ignacio Borbolla | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
| Ignacio Borbolla | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
| Ignacio Borbolla | Reviewed | Concept | 1 | 6/19/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 1 | 6/18/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 1 | 6/18/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 1 | 6/18/2015 | User Reviewed Product Submission |
| Joe Giorno | Reviewed | Concept | 1 | 6/18/2015 | User Reviewed Product Submission |
| Joe Giorno | New Comment | Concept | 1 | 6/18/2015 | Internal Comment |
| Joe Giorno | New Comment | Concept | 1 | 6/18/2015 | Internal Comment |
| Joe Giorno | New Comment | Concept | 1 | 6/18/2015 | Internal Comment |
| Joe Giorno | New Comment | Concept | 1 | 6/18/2015 | Internal Comment |
| JD Sestito | Reviewed | Concept | 1 | 6/17/2015 | User Reviewed Product Submission |
| JD Sestito | Reviewed | Concept | 1 | 6/17/2015 | User Reviewed Product Submission |
| JD Sestito | Reviewed | Concept | 1 | 6/17/2015 | User Reviewed Product Submission |
| JD Sestito | Reviewed | Concept | 1 | 6/17/2015 | User Reviewed Product Submission |
| JD Sestito | New Comment | Concept | 1 | 6/17/2015 | Internal Comment |
| JD Sestito | New Comment | Concept | 1 | 6/17/2015 | Internal Comment |
| JD Sestito | New Comment | Concept | 1 | 6/17/2015 | Internal Comment |
| JD Sestito | New Comment | Concept | 1 | 6/17/2015 | Internal Comment |
| Ashley Zuzik | Forwarded | Concept | 1 | 6/17/2015 | Product Submission Forwarded to: Lauren Middlen, Joe Giorno, JD Sestito, Ignacio Borbolla, David Woldman |
| Ashley Zuzik | Forwarded | Concept | 1 | 6/17/2015 | Product Submission Forwarded to: Lauren Middlen, Joe Giorno, JD Sestito, Ignacio Borbolla, David Woldman |
| Ashley Zuzik | Forwarded | Concept | 1 | 6/17/2015 | Product Submission Forwarded to: Lauren Middlen, Joe Giorno, JD Sestito, Ignacio Borbolla, David Woldman |
| Ashley Zuzik | Forwarded | Concept | 1 | 6/17/2015 | Product Submission Forwarded to: Lauren Middlen, Joe Giorno, JD Sestito, Ignacio Borbolla, David Woldman |
| Dino Zucconi | Submitted | Concept | 1 | 6/17/2015 | Product Submission Submitted |
| Dino Zucconi | Submitted | Concept | 1 | 6/17/2015 | Product Submission Submitted |
| Dino Zucconi | Submitted | Concept | 1 | 6/17/2015 | Product Submission Submitted |
| Dino Zucconi | Submitted | Concept | 1 | 6/17/2015 | Product Submission Submitted |
| Dino Zucconi | File Added | Concept | 1 | 6/17/2015 | User Added File: Divas_Renders.zip |
| Dino Zucconi | File Added | Concept | 1 | 6/17/2015 | User Added File: Divas_Renders.zip |
| Dino Zucconi | File Added | Concept | 1 | 6/17/2015 | User Added File: Divas_Renders.zip |
| Dino Zucconi | File Added | Concept | 1 | 6/17/2015 | User Added File: Divas_Renders.zip |

Confidential

WWE_Alexander0000116

| Dino Zucconi | File Added | Concept | 1 | 6/17/2015 | User Added File: MainRosterRenders.zip |
| Dino Zucconi | File Added | Concept | 1 | 6/17/2015 | User Added File: MainRosterRenders.zip |
| Dino Zucconi | File Added | Concept | 1 | 6/17/2015 | User Added File: MainRosterRenders.zip |
| Dino Zucconi | New Comment | Concept | 1 | 6/17/2015 | External Comment |
| Dino Zucconi | New Comment | Concept | 1 | 6/17/2015 | External Comment |
| Dino Zucconi | New Comment | Concept | 1 | 6/17/2015 | External Comment |
| Dino Zucconi | New Comment | Concept | 1 | 6/17/2015 | External Comment |

| Details | Comments |
|---|---|
| #: 16 Stage 1.3<br>Posted On: 7/1/2015<br>By: Ashley Zuzik<br>Type: Internal | yes we are getting remaining images.. |
| #: 15 Stage 1.3<br>Posted On: 7/1/2015<br>By: Ashley Zuzik<br>Type: External | We feel the color is overall better but still think that The Rock and Erik Rowan are a but dark. Please fix scratches and marks on Kane and Heath Slater. Please remove third party logo on Wade Barrett's knee pads. |
| #: 14 Stage 1.3<br>Posted On: 7/1/2015<br>By: Joe Giorno<br>Type: Internal | Color looks better on all. The only two that still seem a bit dark, is The Rock and Erick Rowan. I would still fix scratches, marks and lines on Kane and Heath Slater.<br><br>There is a third party logo on Wade Barretts knee pads.<br><br>Did we get them the highlighted images they are looking for to submit in the future? |
| #: 13 Stage 1.3<br>Posted On: 7/1/2015<br>By: Ashley Zuzik<br>Type: Internal | Joe they are fixing issues but just submitted to show if the color issue is better. |
| #: 12 Stage 1.3<br>Posted On: 7/1/2015<br>By: Dino Zucconi<br>Type: External | Apologies regarding the misunderstanding about the all images coming from Source.<br><br>We are also providing our Renders Request doc.  Superstars colored in RED were images that were specifically called out.  Kane, Heath Slater, and Bray Wyatt have been addressed.<br><br>For Natalya and Layla, we have put in a request for new images, and hope to have them soon for submission.<br><br>For Cameron, we have a note in the doc:  "This is the attire we have in game, please reconsider approval."<br><br>Superstars colored in YELLOW are superstars that we have yet to receive images for.  They will be submitted in the future.<br><br>Thank you,<br><br>Dino Zucconi<br><br>Production Assistant, 2K Sports |
| #: 11 Stage 1.2<br>Posted On: 6/30/2015<br>By: Ashley Zuzik<br>Type: External | Please note, not all of these images are from Source. The ones that need retouching are not on Source. ( Summer Rae. Heath Slater and Kane)W e are fine with the images but they need to be retouched.<br><br>Please use the Bray Wyatt image that we have provided.<br><br>Please update the Natalya image with one from Source. This is a little too revealing. |

**6 / 8**

Confidential

| | |
|---|---|
| #: 10 Stage 1.2<br>Posted On: 6/29/2015<br>By: Joe Giorno<br>Type: Internal | Not all of the images are from WWE Source. There are a bunch that don't live there. I give some of the same comments...<br><br>For Main Roster: Trim Heath Slater and Kane's waists. Please Update Bray Wyatt to image with hat on. This image lives on WWE Source content library.<br><br>The "dark" comment refers to the blacks being to saturated in the images. Open them up a bit, so they don't look too dark. I downloaded them and they still seemed slightly dark.<br><br>For Divas: There is a slight line on Summer Raes stomach. Natalya image looks good, but it is a bit revealing in the cleavage area. I would use one from WWE Source content library.<br><br>Do we have any newer images to give them for Naomi and Layla? If not, then we should live with it. |
| #: 9 Stage 1.2<br>Posted On: 6/26/2015<br>By: Dino Zucconi<br>Type: External | We have a few notes:<br><br>All images were taken from WWE Source.<br><br>Naomi:  This image matches what she will be wearing in-game.<br><br>Layla:  This attire closely matches what she will be wearing in game, the color is different (black).  If you have something more recent we could use, please send it our way.<br><br>Bray Wyatt:  Do you have any images of him wearing a hat plus the jacket he wore at WrestleMania?<br><br>The background itself is placeholder;  they will be placed on top of our menus.<br><br>When you say "too dark," to you mean there is too much contrast?  Or is it too desaturated?  Or simply a lack of brightness?<br><br>We will make adjustments to the other call outs.<br><br>Thank you so much-<br><br>Dino Zucconi<br><br>Production Assistant, 2K Sports |
| #: 8 Stage 1.1<br>Posted On: 6/25/2015<br>By: Ashley Zuzik<br>Type: External | For Main Roster: Trim Heath Slater and Kane's waists. Please  Update Bray Wyatt to image with hat on. All images seem slightly dark. Will this be the background that they will appear against.<br><br>For Divas: There is a slight line on Summer Raes stomach. Natalya image looks good, but it is a bit revealing in the cleavage area. Naomi and Layla are out of date- please confirm if we can update. |
| #: 7 Stage 1.1<br>Posted On: 6/25/2015<br>By: Ashley Zuzik<br>Type: Internal | Checked Randy image and it does not look like one he did not approve. |
| #: 6 Stage 1.1<br>Posted On: 6/24/2015<br>By: Ashley Zuzik<br>Type: Internal | For Main Roster: Trim Heath Slater and Kane's waists. Please  Update Bray Wyatt to image with hat on. All images seem slightly dark. Will this be the background that they will appear against.<br><br>For Divas: There is a slight line on Summer Raes stomach. Natalya image looks good, but it is a bit revealing in the cleavage area. Naomi and Layla are out of date- please confirm if we can update. |
| #: 5 Stage 1.1<br>Posted On: 6/24/2015<br>By: Ashley Zuzik<br>Type: Internal | Karra approved Triple H. Image of Brock is approved its on Content Library. |
| #: 4 Stage 1.1<br>Posted On: 6/19/2015<br>By: Lauren Middlen<br>Type: Internal | REDACTED |

Confidential

WWE_Alexander0000118

| #: 3 Stage 1.1<br>Posted On: 6/19/2015<br>By: Joe Giorno<br>Type: Internal | For Main Roster: Trim Heath Slater and Kanes waists. I believe image of Randy Orton is no longer approved by him. Confirm with creative. Update Bray Wyatt to image with hat on. Confirm Triple H and Brock are approved images. All images seem slightly dark. Will this be the background they go with?<br><br>For Divas: There is a slight line on Summer Raes stomach. Natalya image looks good, but it is a bit revealing in the cleavage area. |
| #: 2 Stage 1.1<br>Posted On: 6/17/2015<br>By: JD Sestito<br>Type: Internal | Naomi and Layla are put of date, i say we replace with updated shots |
| #: 1 Stage 1.1<br>Posted On: 6/17/2015<br>By: Dino Zucconi<br>Type: External | These images are to be used in the character select screen for WWE 16. |

**Activity Log Respond Dates**

| Stage | Revision | Date | Action |
|---|---|---|---|
| Concept | 1 | 6/25/2015 | Needs Revision |
| Concept | 2 | 6/30/2015 | Needs Revision |
| Concept | 3 | 7/1/2015 | Needs Revision |

**8 / 8**

Confidential

WWE_Alexander0000119

| From: | Bryce Yang \(2K Sports\) <Bryce.Yang@2k.com> |
| --- | --- |
| Sent: | Wednesday, August 06, 2014 9:55 PM |
| To: | Kiang, Ed; Archer, Mike; Giorno, Joe; Zuzik, Ashley; Skidmore, Megan; Sykucki, Michael |
| Cc: | Chris Snyder \(2K Sports\); Ediz Basol \(2K Sports\); Jaime Jensen \(2K Sports\); Jared Rea \(2K\); Robert Hearon \(2K\); Mark Little \(Visual Concepts\) |
| Subject: | RE: 2K15 - Screenshots/Approvals |

First screens of Randy Orton are going into Mediabox now.  Attached.

Thanks.


Bryce Yang
Director, Brand Marketing - WWE
**2K Sports**
10 Hamilton Landing
Novato, CA 94949
310-283-1937 (c)
415-507-7941 (o)
bryce.yang@2k.com



**From:** Bryce Yang (2K Sports)
**Sent:** Wednesday, August 06, 2014 5:16 PM
**To:** Ed Kiang; Archer, Mike; Giorno, Joe; Zuzik, Ashley (Ashley.Zuzik@wwecorp.com); Skidmore, Megan (Megan.Skidmore@wwecorp.com); Skidmore, Megan (Megan.Skidmore@wwecorp.com)
**Cc:** Chris Snyder (2K Sports) (chris.snyder@2ksports.com); Ediz Basol (2K Sports); Jaime Jensen (2K Sports); Jared Rea (2K); Robert Hearon (2K); Mark Little (Visual Concepts) (mlittle@vcentertainment.com)
**Subject:** 2K15 - Screenshots/Approvals
**Importance:** High


Hey guys –

Apologies for the essay.  As you guys know, the slogan for this year is – things are coming in hot!  We are working with IGN to have some assets released over the next week or so, and want to give a heads up of what is coming in because we are asking for a favor for some very quick turnarounds.  We are very appreciative that the Cena shot was flipped around as quick as it was, and are asking for the same here if possible. That one screen has pushed our momentum even higher after Sting.

The IGN First initiative has been HUGE for us.  Our social metrics are off the charts vs prior weeks, and those were big weeks.  Looking at the 5 days since IGN First announce vs same period a week earlier, we are up across the board in just about every metric.

For example:
- Facebook
  - Facebook impressions (potentially seen in newsfeed) by number of unique users:

1

Exhibit

Exhibit 7

08-4-2020

- July 25-29 - 802K impressions by 590K users
    - August 1-5 - 1.3M impressions by 570K users
    - o  Organic (ie, not paid) reach vs viral (ie, shared content) for our posts on Facebook:
        - July 25-29 - 504K organic, 289K viral
        - August 1-5 - 856K organic, 411K viral
- Twitter
    - o  Clicks
        - July 25-29 - 17.1K
        - August 1-5 - 107K (yep, a 5x increase)

These numbers are driven by info from IGN about in-game content and the Cena screenshot debut via his twitter.  We are under pressure to give IGN more content the first half of the month, since our in-game footage etc is loaded in the end of the month.  To satiate the fans and our biggest media partner, IGN, (biggest gaming site in the world), screens would be the answer.

This is what we're looking at delivering to them before GamesCom starts next week.  Cena and Orton are two of the better looking models in the game, so we want to build a story to a screen showing those two characters against each other.

**For IGN – Cena Vs Orton story**
- 8/4 – Cena shot: Shot of Cena staring down Orton.  (DONE)
- 8/8 – Orton screens (1 or 2): shots of Orton in the ring at end of entrance sequence
- 8/11 - Orton intro video (ORTON ENTRANCE IS APPROVED AND THIS IS A STRAIGHT CAPTURE FROM GAME)
- Later that week - screens of Orton battling Cena in-ring.

**GamesCom/SummerSlam screens –** looking to debut these screens before they leak out via the show floor at GamesCom.  We'll work with CPG/Megan on pushing these through talent/WWE social.  Screens will feature:
-  Goldust
-  Cesaro
-  Cena
-  Orton

We appreciate this very much in advance.  Please let us know if you have any questions.

Thanks

Bryce Yang
Director, Brand Marketing - WWE
**2K** Sports
10 Hamilton Landing
Novato, CA 94949
310-283-1937 (c)
415-507-7941 (o)
bryce.yang@2k.com



Confidential                                                                              WWE_Alexander0000095

Confidential

WWE_Alexander0000096



Confidential



Confidential

WWE_Alexander0000098