1               UNITED STATES OF AMERICA
               SOUTHERN DISTRICT OF ILLINOIS
2

3  CATHERINE ALEXANDER,            )
                                   )
4                  Plaintiff,      )
   v.                              ) No. 3:18-cv-00966-SMY
5                                  )
   TAKE-TWO INTERACTIVE SOFTWARE, )
6  INC., et al.,                   ) *East St. Louis, IL*
                                   )
7                  Defendants.     )

8

9

10

               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11                      DAY 1 OF 5

12          BEFORE THE HONORABLE STACI M. YANDLE
               UNITED STATES DISTRICT JUDGE
13
                     September 26, 2022
14

15

16

17

18

19

20

21  REPORTED BY:        Christine Dohack LaBuwi, RDR, CRR
                       Official Court Reporter
22                     301 West Main Street
                       Benton, Illinois  62812
23                     (618) 439-7725
                       Christine_Dohack@ilsd.uscourts.gov
24

   Proceedings recorded by mechanical stenography, produced by
25  computer-aided transcription.

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:        R. Seth Crompton, Esq.
                            HOLLAND LAW FIRM
 3                          300 N. Tucker Blvd., Suite 801
                            St. Louis, MO  63101
 4                          314) 241-8111
                            scrompton@allfela.com
 5
                            Anthony R. Friedman, Esq.
 6                          Anthony G. Simon, Esq.
                            Paul J. Tahan, Esq.
 7                          SIMON LAW FIRM, P.C.
                            800 Market Street, Suite 1700
 8                          St. Louis, MO  63101
                            (314) 241-2929
 9                          afriedman@simonlawpc.com
                            asimon@simonlawpc.com
10                          ptahan@simonlawpc.com

11

12    FOR DEFENDANTS TAKE-TWO INTERACTIVE SOFTWARE, INC.; 2K
      GAMES, INC.; 2K SPORTS, INC.; and VISUAL CONCEPTS
13    ENTERTAINMENT:

14                          Dale M. Cendali, Esq.
                            Christopher Ilardi, Esq.
15                          Joshua L. Simmons, Esq.
                            Miranda D. Means, Esq.
16                          KIRKLAND & ELLIS, LLP
                            601 Lexington Avenue
17                          New York, NY  10022
                            (212) 446-4800
18                          dale.cendali@kirkland.com
                            chris.ilardi@kirkland.com
19                          joshua.simmons@kirkland.com
                            miranda.means@kirkland.com
20
                            Michael J. Nester, Esq.
21                          DONOVAN ROSE NESTER, P.C.
                            151 North 1st Street, Suite A
22                          Belleville, IL  62220
                            (618) 212-6500
23                          mnester@drnpc.com

24

25
```

```
 1
        FOR DEFENDANT WORLD WRESTLING ENTERTAINMENT:
 2
                          Curtis B. Krasik, Esq.
 3                        K & L GATES, LLP
                          210 Sixth Avenue
 4                        Pittsburgh, PA  15222
                          9412) 355-8696
 5                        curtis.krasik@klgates.com

 6                        Michael J. Nester, Esq.
                          DONOVAN ROSE NESTER, P.C.
 7                        151 North 1st Street, Suite A
                          Belleville, IL  62220
 8                        (618) 212-6500
                          mnester@drnpc.com
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              I N D E X

2                                                    PAGE:

3         Court Instructions                         5:6
          Opening Statement by Mr. Friedman          9:11
4         Opening Statement by Ms. Cendali           32:4
          Opening Statement by Mr. Krasik            41:14
5         Stipulated Facts by the Court              51:20

6
                                WITNESSES
7
      ALL WITNESSES:                                 PAGE:
8
         JOSE ZAGAL for Plaintiff:
9           Direct Examination by Mr. Friedman       53:25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings continued in open court at 2:20 p.m.,

2    subsequent to voir dire proceedings, jury present.)

3          COURTROOM DEPUTY:  If the jurors will remain

4    standing, please, and everyone else can be seated.

5          (Jury sworn by courtroom deputy.)

6          THE COURT:  Ladies and gentlemen of the jury, we

7    are about to begin the trial of the case you heard about

8    during jury selection.  And before trial begins, I am going

9    to give you instructions that will help you to understand

10   what will be presented to you and how you should conduct

11   yourselves during trial.

12         Soon, you will hear the lawyers' opening statements

13   in which they may explain to you the issues in the case and

14   summarize the facts that they expect the evidence will

15   show.  Then, witnesses will be called to testify under oath

16   and the evidence will begin.  The witnesses will be

17   examined and cross-examined by the attorneys.

18         After all the evidence is in, the lawyers will have

19   the opportunity to make final arguments.  The opening and

20   final statements made by the attorneys are not to be

21   considered as evidence in the case or as your instruction

22   on the law.  Nevertheless, these statements and arguments

23   are intended to help you properly understand the issues,

24   the evidence, and the applicable law, so you should give

25   them your close attention.  Before final arguments are made

1   by the attorneys, I will instruct you on the law.

2        You should give careful attention to the testimony

3   and other evidence as it is received and presented for your

4   consideration, but you should not form or express any

5   opinion about the case until you have received all the

6   evidence, the arguments of the attorneys, and the

7   instructions on the law from me.  In other words, you

8   should not form or express any opinion about the case until

9   you retire to the jury room to consider your verdict.

10       From time to time, the lawyers and I may have

11  conferences on headsets and outside of your hearing.  These

12  are called sidebar conferences.  During sidebars, court is

13  in session and I ask then that you not talk among

14  yourselves.

15       The lawyers are trained in the rules of evidence

16  and trial procedure.  It is their duty to make all

17  objections they feel are proper.  When a lawyer makes an

18  objection, I will either overrule or sustain the objection.

19  If I overrule the objection, the witness will not answer

20  and you must not speculate on what might have happened or

21  what the witness might have said had I permitted the

22  witness to answer the question.  You should not draw any

23  inference from the question itself.

24       I also ask that you not have any contact with the

25  lawyers in this case or with any of the parties or the

1    witnesses.  That includes any kind of exchange of words.  I

2    have asked the lawyers not to communicate with you, so if

3    you see them around the building and they don't speak or

4    talk to you, please don't think they are being rude or

5    unfriendly.  They are simply following the Court's

6    instructions.

7         You, as jurors, must decide this case based solely

8    on the evidence presented here within the four walls of

9    this courtroom.  This means that during the trial you must

10   not conduct any independent research about the case, the

11   matters in the case, and the individuals or organizations

12   involved in the case.  In other words, you should not

13   consult dictionaries or reference materials, search the

14   internet, websites, blogs, or use any other electronic

15   tools to obtain information about this case or to help you

16   decide the case.  Please do not try to find out information

17   from any source outside of the confines of this courtroom.

18        Until you retire to deliberate, you may not discuss

19   this case with anyone, even your fellow jurors.  After you

20   retire to deliberate, you may begin discussing the case

21   with your fellow jurors, but you cannot discuss the case

22   with anyone else until you have returned a verdict and the

23   case is at an end.

24        You must not talk to anyone about this case or use

25   tools of technology -- cell phones, Blackberries, iPhones,

1    or the internet -- to communicate electronically with

2    anyone about the case.  This includes your family and

3    friends.  You may not communicate with anyone about the

4    case on your cell phone, through e-mail, text messaging, or

5    on Twitter, through any blog or website, through any

6    internet chat room, or by way of any other social

7    networking websites, including Facebook, LinkedIn and

8    YouTube.

9         You have the right to take notes during the course

10   of this trial if you choose to do so.  Notepads will be

11   provided for your convenience.  No one else will be allowed

12   to look at your notes.  You do not have to take notes.

13   That's entirely up to you.  I have no preference one way or

14   the other.  You may use your notes to refresh your memory

15   at the appropriate time.

16        Your notes are for your own use only, not for any

17   other jurors.  Do not show them to anyone else at any time;

18   that includes other jurors, and it also includes the time

19   when you are deliberating on your verdict.  Anytime you

20   exit the courtroom, please leave your notebooks on your

21   chair, except of course when you retire to deliberate.

22        You should rely on your own memory of the evidence.

23   If your notes conflict with what you remember, or if

24   someone else's notes conflict with your memory, you are

25   free to use your own memory of the evidence.  Just because

1    a juror has taken notes does not mean his or her memory of

2    the evidence has any more weight or impact than the memory

3    of a juror who has not taken notes.

4        At the end of the trial, when you are discharged

5    from further service in this case, the notes will be

6    collected by the courtroom deputy and will be destroyed.

7    No one will be allowed to look at the notes before they are

8    destroyed.

9        With that, we are prepared to proceed with opening

10    statements.  First, on behalf of the plaintiff.

11        MR. FRIEDMAN:  Thank you, Your Honor.

12        Good afternoon.  My name is Tony Friedman.  I'm an

13    attorney at The Simon Law Firm.  And together with Mr.

14    Simon and Mr. Tahan, who you were introduced to earlier, we

15    have the honor and pleasure of representing Miss Catherine

16    Alexander.  And we thank each of you for your time and

17    attention thus far today, and in advance for your time and

18    attention throughout the week.

19        Ladies and gentlemen of the jury, this is an

20    important and timely case.  For generations, technology has

21    changed the way that we live our lives, what products we

22    purchase, and the way companies make and sell those

23    products.  Our economy, now more than ever, creates

24    tremendous value and wealth not just from the ownership of

25    physical property like farmland and steel plants and

1   railroads, but on the ownership and licensing of intangible

2   or intellectual property like trademarks, patented

3   technologies, and copyrights.

4       These human-made creations of art, science, and

5   technology are every bit as valuable as land or gold.  And

6   just as your right to own your own farm is protected by a

7   deed and a good fence, intellectual property is protected

8   by the United States Constitution itself.

9       This case is about one type of intellectual

10  property.  Copyrights.  A copyright is the exclusive legal

11  right to reproduce or copy artistic expression like a

12  literary work, a piece of music, or a painting.  A

13  copyright is actually a bundle of different rights which

14  the copyright owner can license to different people or

15  companies for different purposes.

16      For example, you could license your copyrighted

17  photograph to a company to copy and use in their newspaper

18  advertisements but not for their television advertisements.

19  Or you could license your song that you created to a record

20  company but not license it to cover bands to play around

21  town.  Tattoos and tattoo art as artistic expressions are

22  also protected by the copyright laws.

23      This case is about the tattoo artist Miss

24  Alexander's copyrighted artwork in the medium of tattoos,

25  and the defendants' use of her copyrights without

1  permission in ways never contemplated by Miss Alexander.

2      Miss Alexander's love of tattoo art began well

3  before she got her first tattoo as a gift to herself, at

4  the age of 18.  She began studying as a tattoo artist at

5  that time, at first as an apprentice, then an established

6  artist in her own right.  She's applied her art and craft

7  across St. Louis at such tattoo shops as the Goldenlands

8  and The Pain Station.

9      Randy Orton -- Mr. Orton -- who probably needs no

10  introduction, may be the greatest professional wrestler of

11  all time.  He is the third generation in a dynasty of great

12  professional wrestlers starting with his grandfather, Bob

13  Orton, then to his father, Cowboy Bob.

14      Randy Orton has carried the torch to a level

15  beyond.  He became the youngest heavyweight champion at the

16  age of 24.  Mr. Orton's on-screen feuds with the

17  Undertaker, for example, are legendary.  And he made famous

18  his signature finishing move, the RKO -- the Randy Knockout

19  -- which I won't even attempt to explain.

20      In 2003, Mr. Orton was just at the start of his

21  professional career.  After he completed wrestling school,

22  Mr. Orton came into the Goldenlands tattoo shop asking to

23  be tattooed.  Miss Alexander agreed to take him on as a

24  client.  At that time, Mr. Orton had a, quote/unquote,

25  flash -- F-L-A-S-H -- flash piece of tribal tattoo on his

1    back.  Flash is industry speak for a generic stenciled

2    tattoo.  Mr. Orton asked Miss Alexander to redo the tribal

3    piece and to add new pieces to it.  Miss Alexander did so,

4    and expanded it using custom artwork that she created.

5          Mr. Zidzik, if you could bring up Plaintiff's Trial

6    Exhibit No. 6, at page four.

7          We'd like to begin showing you some of the artwork

8    that is at issue in this case.

9          Ladies and gentlemen, you are seeing the custom

10   expanded artwork that I just explained, that Miss Alexander

11   placed on Mr. Orton's back, the tribal expansion.

12         Mr. Orton, at that time, was pleased with this

13   work.  He and Miss Alexander became acquainted, even

14   friends.  Over the next six years, from 2003 through 2009,

15   Miss Alexander inked at least five more tattoos on Mr.

16   Orton, and countless touch-ups and edgings.

17         Mr. Orton followed Miss Alexander from the

18   Goldenlands tattoo shop to The Pain Station, and Miss

19   Alexander became for that time period Mr. Orton's tattoo

20   artist.

21         And her tattoos speak for themselves.

22         Mr. Zidzik, could you pull up Plaintiff's Trial

23   Exhibit No. 10.

24         These are depictions of the tribal tattoos that

25   Miss Alexander inked on Mr. Orton's left and right arms.

1          Plaintiff's Exhibit No. 9, please, at page four.

2     These are the skulls.  These are skull tattoos that go up

3     and down both of Mr. Orton's arms.

4          Plaintiff's Exhibit No. 7, please.  This is the

5     dove tattoo inked in 2008.  This dove tattoo is featured on

6     Mr. Orton's left arm just at the elbow.

7          Exhibit 8, please, page four.  And this is referred

8     to as the rose tattoo.  This appears on Mr. Orton's right

9     arm.

10         These are the five tattoos that Miss Alexander

11    created and inked on Mr. Orton that are the subject of this

12    action.  The five copyrighted tattoos.

13         Miss Alexander knew at that time that Mr. Orton was

14    a rising star in the WWE.  While she was his tattoo artist

15    in the 2000s, Mr. Orton was becoming a WWE fan favorite.

16    And during that time, Mr. Orton went through his famous

17    feud with the Undertaker, a beef which propelled his career

18    even further.  And by the time he RKO'd the Undertaker, he

19    was a household name.  And Miss Alexander continued to

20    create unique art to adorn his body.

21         Miss Alexander knew that Mr. Orton was a celebrity.

22    She knew he was often photographed and appeared on

23    television shirtless, showing off his tattoos and his

24    physique.  Mr. Orton even gave Miss Alexander tickets to

25    some of his live events.  Miss Alexander was paid for her

1    labor and for her time.  But Mr. Orton never took ownership

2    of the copyrights.  He never owned the designs and the art

3    themselves.

4        The ownership of those copyrights -- the right to

5    copy the five pieces of art -- remained at all times with

6    Miss Alexander.  This was true in 2009 when Miss Alexander

7    and Mr. Orton parted ways, and it is still true today.

8        Now, you all know by now that this case is about

9    video games.  So, you may be wondering how we get from the

10   normal interactions between a tattoo artist and a customer

11   to a federal case against the WWE and a publicly-traded

12   technology holding company.

13       Ladies and gentlemen, that part of the story is

14   about the copyrights; the licensing and infringement and

15   the business transactions that occur around these valuable

16   assets.

17       Mr. Orton is a WWE wrestler.  He's not a party to

18   this lawsuit.  Miss Alexander has not and did not sue Mr.

19   Orton for anything.

20       As a wrestler, Mr. Orton signed a contract to give

21   the WWE permission to use his intellectual property, his

22   likeness, for WWE business purposes.  This includes the

23   obvious reasons like when casting Mr. Orton in the WWE

24   events on television or on DVDs, but it also gives the WWE

25   the exclusive rights to make more products, exploiting Mr.

1    Orton's likeness to sell more products to its fan base.

2    That's the WWE's business model.

3          For example, the WWE may license its logos and

4    content to Fox, and allow Fox to broadcast Wrestlemania for

5    a fee.  And the WWE did just that.  It licensed its vast

6    intellectual property assets, its logos, its characters,

7    its set designs, even its unique storylines and themes,

8    and, yes, its copyrights, and, yes, Mr. Orton's likeness,

9    to the video game companies in this lawsuit, the

10   defendants, who are Take-Two Interactive, 2K Games, 2K

11   Sports, and Visual Concepts.

12         The Take-Two entities are in the business of

13   creating video games.  And a licensing and development deal

14   was struck between Take-Two and the WWE to create

15   sports-themed wrestling games that take place in the WWE

16   universe.

17         Take-Two sought this license from the WWE, which is

18   not uncommon in the video game industry, because the WWE

19   universe also comes with its own dedicated fan base, some

20   of which will certainly also want to buy WWE-themed video

21   games.

22         Take-Two started making the 2K wrestling games in

23   about 2013 and they have been successful.  They just

24   released the WWE 2K22 game earlier this year.  This case,

25   the reason we are here today, is concerning the three

1   particular games:  The WWE 2K16, 17, and 18.

2        Now, when the WWE licensed its intellectual

3   property to Take-Two to make video games, it could only

4   license what it actually owned.  The WWE did not and does

5   not own the copyrights for the tattoos that Miss Alexander

6   created.  Miss Alexander owns them.  She owns the exclusive

7   right to copy and reproduce the art that she created.  WWE

8   never got a license from Miss Alexander to copy her art

9   into video games or elsewhere.  And the WWE could,

10  therefore, not have granted such a license to Take-Two.

11       Nevertheless, Take-Two and the WWE proceeded to

12  copy and reproduce Miss Alexander's artwork into the 2K16,

13  17, and 18 video games without Miss Alexander's permission,

14  and sold and distributed over 10 million copies of just

15  these three games alone, all of which contain copies of

16  Miss Alexander's art, making hundreds of millions of

17  dollars in the process.

18       Not being a video game person, Miss Alexander found

19  out about this much later when a friend of hers told her

20  that her art appeared in one of the video games and was

21  realistic and lifelike.  Miss Alexander did a search, and

22  was shocked by how realistic her tattoos were.  How

23  authentic they were.  She was shocked that her artwork had

24  been copied, and copied identically into the video games

25  without her permission and without any compensation.

1    She later filed this lawsuit against the WWE and

2    Take-Two to protect her art and, as this is her only avenue

3    to protect her art, to seek compensation.

4    To give you a brief preview of what some of the

5    evidence will look like and we'll show in this case, let's

6    look at some of the ways that Miss Alexander's art is

7    copied into the subject video games.

8    Mr. Zidzik, could you pull up Plaintiff's Exhibit

9    153 which is a video.  And we'd like to play a minute

10   portion of it starting at 7 minutes and 7 seconds.

11   (Video playing.)

12   Ladies and gentlemen, there is no audio for this

13   video.

14   We can see what we saw previously, the dove tattoo,

15   the tribal sleeves and the skulls, appearing on a custom

16   character's right and left arms.  I will also tell you that

17   the video you are watching represents recorded gameplay

18   from the WWE 2K16 game.

19   In addition, now you can see the tribal tattoo on

20   the Custom Superstar's back.

21   (End of video.)

22   What we just showed you, that one-minute section,

23   depicts the tattoo creator module in which Miss Alexander's

24   artwork may be put onto any custom character, manipulated

25   and changed, and then utilized as an asset throughout the

1   video game.

2         Mr. Zidzik, could you play additionally at --

3   starting at minute marker 9 minutes and 20 seconds.

4         And, members of the jury, what we'll show you here

5   is a depiction of a portion of a match in which the custom

6   wrestler -- who you can see on the left, who is called

7   Superstar -- is playing a wrestling match against the Randy

8   Orton character that appears in the video game.  The Custom

9   Superstar, again, is wearing copies of the tattoos at issue

10  in this case.  Here is an example of the gameplay from WWE

11  2K16.

12         (Video playing.)

13         Members of the jury, the tattoos in the video

14  games, Miss Alexander's artwork, may be selected and copied

15  onto custom players, manipulated into different colors, and

16  are also featured as they are in real life on the Orton

17  character.

18         These tattoos in the video games, these pieces of

19  art, are not -- are not photographic representations of Mr.

20  Orton that also happened to show his tattoos, nor are they

21  videos of Mr. Orton, nor are they television or other

22  broadcast of Mr. Orton.  In no way is anybody suggesting

23  that anything Mr. Orton does in his career or with his body

24  can in any way be controlled by Miss Alexander.

25         Video games, however, are entirely different from,

1   for example, photographs.  The video game characters are

2   not photographs.  Nor are they videos.  They are

3   mathematical polygons that are digitally covered not in

4   skin or photos but in textures.  They are copies.  They are

5   creations made for the video game.  And for wrestling fans

6   to want to buy them, they are made as authentic and

7   realistic as possible.  That's the sales pitch,

8   authenticity, realism.  This character is a good copy of

9   Mr. Orton and his tattoos, as good as technology will

10  allow, but it is still an unauthorized copy.

11          Take-Two copied and reproduced Miss Alexander's art

12  into the video games to achieve authenticity and ultimately

13  to drive sales.  These five defendant corporations did this

14  without picking up the phone or paying Miss Alexander one

15  red cent for her artwork, even though, the evidence will

16  show, they knew about Miss Alexander's copyrights and her

17  desire to protect them.

18          We will also show that the defendants, who

19  themselves rely heavily on the copyright laws to protect

20  their businesses, don't always take copyrighted material

21  without permission.  It depends.  They have even licensed

22  from tattoo artists for the created content section of the

23  wrestling games, like what you saw earlier with the custom

24  characters.

25          Now, let's talk a little bit about the claims that

1    Miss Alexander is bringing against the defendants.  In this

2    case, the defendants copied Miss Alexander's copyrighted

3    tattoos into the 16, 17, and 18 video games without her

4    permission.  Miss Alexander's claims are simple:  That WWE

5    and Take-Two infringe her copyrights.  And at the end of

6    this case, there will be no question whatsoever that the

7    defendants copied Miss Alexander's valid copyrights.

8         What is Miss Alexander seeking?  She is seeking

9    what she is entitled to under the U.S. Constitution and the

10   copyright laws of the United States.  She is seeking her

11   actual damages and a portion of the defendants' profits.

12        I will talk to you more about that in just a few

13   minutes.

14        What do we -- what does the plaintiff expect that

15   the defendants will tell you about this case?  We

16   anticipate that they will say that even though they copied

17   Miss Alexander's art into the video games, that there's

18   actually no infringement.  And we anticipate they'll offer

19   up three reasons why they believe there is no infringement:

20   License, fair use, and waiver.

21        On license.  Take-Two may try to prove that Miss

22   Alexander gave Mr. Orton an unwritten and implied license

23   to copy the tattoos into video games, and that Mr. Orton in

24   turn sublicensed that implied license to copy the tattoos

25   into video games to the WWE, and then that the WWE in turn

1    sublicensed the right to copy the tattoos into video games

2    to Take-Two.

3         For this, the defendants may try to prove that Miss

4    Alexander intended for Mr. Orton to copy and distribute his

5    tattoos and to sublicense that right to others.

6         We submit that the evidence will show, however,

7    that Mr. Orton did not receive an implied license to make

8    copies of the tattoos at all and, therefore, could not have

9    given such a license to the WWE, who could not have sent it

10   along to Take-Two to make video games.

11        What can Mr. Orton do with the tattoos on his body?

12   Anything he wants.  He can take photos of them.  He can

13   appear on television.  He can appear in magazines.  He can

14   wrestle live at the convention center.  But he did not get

15   from Miss Alexander the right to make copies of his

16   tattoos.  Just as he did not get the right to make clothing

17   using her artwork.  Just as he did not get the right to

18   make canvas prints of her artwork and sell those.  And just

19   as he did not get the right from Miss Alexander to open up

20   his own tattoo shop and apply Miss Alexander's art onto new

21   customers.  That's copying and it's different from having

22   his photo taken.

23        On the issue of fair use.  The defendants may also

24   try to prove that their use of Miss Alexander's art was

25   fair use under the law and, therefore, okay.  You may have

1    heard of the term fair use.  And the judge may give you

2    instructions on how to apply the law of fair use in this

3    case.

4          But generally, fair use is --

5          THE COURT:  No.  No.  No.  The judge will give

6    instructions and will define it for the jury at the

7    appropriate time, counsel.

8          MR. FRIEDMAN:  Thank you, Your Honor.

9          THE COURT:  All right.  Thank you.

10         MR. FRIEDMAN:  The judge will provide you with

11   instructions on fair use, and instruction on how to apply

12   the law of fair use to issues in this case.

13         An example of fair use:  A teacher may make copies

14   of a newspaper article to give to her students to read and

15   discuss.  That can be fair use.

16         THE COURT:  Counsel, sidebar, please.

17         (Proceedings continued at the bench.)

18         THE COURT:  Mr. Friedman?

19         MR. FRIEDMAN:  Yes, Your Honor.

20         THE COURT:  Okay.  I have tried to give you some

21   leeway, but I made it clear earlier today my expectation

22   that counsel will not argue their cases in opening

23   statement.

24         You may preview what the evidence will show.

25   However, the evidence will not show the jury the definition

1    of fair use.  That will come from the instructions on the

2    law.  And counsel should not and cannot in opening

3    statements or anywhere else attempt to define those terms

4    for the jury.

5            So, I'm going to ask you then to please stick to a

6    preview of the factual evidence that you expect to present

7    and what you expect for it to show in a nonlegal

8    conclusion-type of way.

9            MR. FRIEDMAN:  Thank you, Your Honor.

10           THE COURT:  Okay.  Do you need any clarification?

11           MR. FRIEDMAN:  No, Your Honor.

12           THE COURT:  Okay.  Thank you.

13           (Proceedings continued in open court, jury

14   present.)

15           MR. FRIEDMAN:  Members of the jury, the evidence in

16   this case on the issue of fair use, we contend, will prove

17   that the use by the defendants was not fair based on a

18   number of different factors.

19           The defendants copied Miss Alexander's art, not for

20   scholarly purposes or for commercial gain.  Realism and

21   authenticity drive sales and profits.  The tattoos

22   themselves are artistic and involve skill and creativity.

23   The kind of thing that merits copyright protection.

24           The defendants copied this art in their entirety,

25   not just a sample or a portion of it, but the whole thing.

1    And if this kind of use is considered fair, then any

2    potential market for tattoo artists to license their

3    artistic creations will be destroyed.

4         THE COURT:  Mr. Friedman?

5         MR. FRIEDMAN:  Yes?

6         THE COURT:  The facts won't show that.  Do we need

7    to clarify again?

8         MR. FRIEDMAN:  No, Your Honor.

9         THE COURT:  All right.  Thank you.

10        MR. FRIEDMAN:  The evidence will show that the

11   defendants' use of Miss Alexander's tattoos was not fair

12   use to Miss Alexander and not fair use under the law.

13        Finally, on the issue of waiver.  The defendants

14   may try to prove that they're not liable under the

15   copyright laws because Miss Alexander waived her rights to

16   enforce her copyrights.

17        However, the evidence will show that Miss Alexander

18   has never relinquished her copyrights and has sought in the

19   past to enforce them.  The evidence will show that this

20   isn't her first run-in with the WWE about these very

21   tattoos.

22        In 2009, Miss Alexander heard rumors that the WWE

23   might be selling fake sleeves, fake shirt sleeves with

24   copies of her tattoos on them.  Basically, skin-colored

25   shirts that feature the same tattoos that Miss Alexander

1    inked on Mr. Orton.  She called the WWE to try to negotiate

2    a licensing deal.  She reached an authority on legal

3    matters within the WWE.  And Miss Alexander herself will

4    explain that after she introduced herself as Mr. Orton's

5    tattoo artist and inquired about the fake sleeves and a

6    potential licensing deal, she was turned away and

7    humiliated.

8         The sleeves never came to market, so she did not

9    pursue the matter further.  As a tattoo artist, when she

10   learned the very same people plus a video game group had

11   done it again, this time in video games, she acted within a

12   reasonable time to bring suit, which is her only option to

13   enforce her rights.  She never voluntarily nor

14   intentionally relinquished her right to assert her

15   copyrights and has been litigating this case for now going

16   on five years.

17        These three things are what we anticipate will be

18   the defendants' defenses:  Implied license, fair use, and

19   waiver.  And if the defendants cannot prove one or more of

20   them to you, then you should find in favor of Miss

21   Alexander.

22        Now, I mentioned previously that I would be talking

23   a little bit about the damages that Miss Alexander is

24   seeking and what the plaintiff intends to prove throughout

25   the course of this trial.  She is seeking both actual

1    damages and defendants' profits, a portion of which she is

2    entitled to under the copyright laws.

3          Actual damages can be the value of the infringing

4    work to the infringer and the defendant --

5          THE COURT:  Mr. Friedman?

6          MR. FRIEDMAN:  I'll move on.

7          Ladies and gentlemen of the jury, I am just an

8    attorney.  I'm not a video game designer.  I'm not a video

9    game expert.  And I can't do any accounting.  We hired a

10   professor and an accountant to come here and explain to you

11   how these things and these industries work, what the facts

12   are, and to provide their opinions to you.

13         We hired Dr. Jose Zagal.

14         Dr. Zagal, could you stand?

15         WITNESS ZAGAL:  (Complies.)

16         MR. FRIEDMAN:  A professor in the nationally-ranked

17   Entertainment Arts and Engineering Department at the

18   University of Utah.  He has a Ph.D in Computer Science from

19   Georgia Institute of Technology; a Master's of Science in

20   Engineering Sciences; and, a Bachelor's of Science in

21   Industrial Engineering.

22         Dr. Zagal has offered books on video game design

23   and numerous scholarly articles on the subject.  Dr. Zagal

24   will explain that video game companies like Take-Two often

25   license in big bundles of intellectual property for

1   specific reasons.  One reason, is that there's a built-in

2   fan base that will purchase games involving their favorite

3   franchises or fictional universes such as NBA video games,

4   Star Wars video games, and even WWE-themed video games.

5        These fans demand authenticity and realism, which

6   often means staying true to the source material.  You don't

7   want Batman showing up in Middle Earth, for example.  And

8   as sports video games go, like the WWE games, you need to

9   be hyper-realistic.

10        For the WWE games, this means the over-the-top

11   drama, the spectacle, and your favorite superstars must

12   appear as they appear on TV and in real life.  Authenticity

13   drives sales.  And a lack of authenticity can drown a video

14   game franchise with negative reviews and criticisms.  The

15   fans care, and video game industries take notice and work

16   very hard to achieve authenticity.

17        Dr. Zagal will tell you about the centrality of

18   authenticity and realism to these video games, and about

19   the importance of Mr. Orton's character in these video

20   games in particular.

21        The Orton character is no throwaway character.

22   He's very popular and can drive sales all by himself.  And

23   his tattoos are an important part of his character.  If

24   they were absent or not copied precisely, the video game

25   public would know and would be critical.  In short, it

would hurt sales and hurt value.  Dr. Zagal will explain
that in this case, the defendants copied Miss Alexander's
artwork in order to make the Orton character more realistic
because that's what fans demand, and to drive sales and
value.

Dr. Zagal will tell you that some portion of the
defendants' profits are attributable to the artwork copied
into the video games.

We also hired Mr. Ryan Clark, an accomplished
accountant and financial professional experienced in
valuing companies' assets and intellectual property.  We
will prove to you and show you what the gross revenues are
for these games, and that number is 418 million dollars for
Take-Two, and over 50 million dollars for the WWE.

Take-Two, when they have an opportunity to present
evidence, may try to prove to you what their deductible
expenses are, and to prove to you what aspects of the
defendants' profits are not attributable to the copyrighted
works.

Mr. Clark, the accountant and financial
professional we hired, has looked at the spreadsheets that
Take-Two created for this litigation, showing the millions
of copies sold and the hundreds of millions of dollars in
revenue.  And Mr. Clark had questions about these numbers
and the expenses.  The questions that Mr. Clark has had has

1    still not been answered to this day.

2          THE COURT:  Mr. Friedman, we need a sidebar.

3          MR. FRIEDMAN:  I'm sorry?

4          THE COURT:  We need a sidebar.

5          (Proceedings continued at the bench.)

6          THE COURT:  Mr. Friedman?

7          MR. FRIEDMAN:  Yes, Your Honor.

8          THE COURT:  You do know it's not proper to discuss

9    with the jury what happened during the course of discovery,

10   which may have led to different rulings in this case.  That

11   is totally not proper.  That's not something that will come

12   before this jury.

13         I have asked you, again, to stick to previewing and

14   summarizing the evidence that the jury may hear in this

15   case for their decision making.  And I know it's tough for

16   lawyers not to argue, but I'm intent that lawyers on either

17   side of this case are not going to argue this case.

18         MR. FRIEDMAN:  That's inaccurate.  Mr. Clark's

19   information is, he doesn't have enough information to make

20   a conclusion, that he has questions about it, and was

21   unable to get answers for it.  That's his testimony.

22         THE COURT:  At some point in time, are you going to

23   let them hear their testimony?

24         MR. FRIEDMAN:  When Mr. Clark testifies.

25         THE COURT:  Okay.  So, why are we going through it

1    now?  That's not a preview.

2         MR. FRIEDMAN:  I appreciate it.  I'll move on.

3         MS. CENDALI:  Your Honor?  Is it proper to have a

4    curative instruction for any of this?

5         THE COURT:  No.

6         (Proceedings continued in open court, jury

7    present.)

8         MR. FRIEDMAN:  Mr. Clark will tell you what the

9    gross revenues are for the video games at issue, and he

10   will explain to you his opinions about the deductible

11   expenses and other aspects of this case.

12        You will also hear from representatives of the

13   defendant companies during the plaintiff's case.  You will

14   hear from Mr. Snyder, a corporate representative from

15   Take-Two, about some of the same revenue numbers and other

16   numbers from Take-Two's perspective.

17        You will also hear from Mr. Little, another

18   corporate representative from Take-Two, who will tell you

19   more about the copying of the video games and some of the

20   other licensing activities that Take-Two engages in.

21        You will also hear from a representative of the

22   WWE, Mr. Kiang, who will tell you how much Miss Alexander's

23   art really means to the defendants.

24        They're not just copied into the game for

25   background or atmosphere.  If these tattoos were not copied

1   precisely, the WWE would not have given its approval and no

2   games could have been sold at all.  Without Miss

3   Alexander's art, there would be no 2K16, 17, or 18, and the

4   defendants could not have made the revenues that they did.

5   That's how important the realism is in these video games,

6   and that's how important Miss Alexander's art was to the

7   value of these video games.

8            Ladies and gentlemen, this case is about a career

9   tattoo artist asserting her copyrights against the

10  defendants.  It's about whether these companies can take

11  what they want from small artists without doing the right

12  thing.  And we will prove to you that the defendants copied

13  Miss Alexander's art in their entirety into the video

14  games.  And we will prove to you that they did it because

15  they wanted to drive sales and increase values of their

16  games.  They did it without a license from Miss Alexander,

17  and Miss Alexander never waived her copyrights.

18           The evidence and testimony will also show that the

19  use of Miss Alexander's art by the defendants was for

20  commercial purposes and as far as you can get from fair

21  use, because they copied her art 100 percent.  Copied it

22  precisely.  The defendants' use was not fair use, not to

23  Miss Alexander, and not to the artists whose labors make

24  the world more interesting and beautiful.

25           Artists like Miss Alexander deserve acknowledgment

```
 1    for the value that they add and they deserve compensation.

 2         Thank you.

 3         THE COURT:  Miss Cendali.

 4         MS. CENDALI:  Thank you, Your Honor.

 5         May I proceed, Your Honor?

 6         THE COURT:  You may proceed.

 7         MS. CENDALI:  Thank you.

 8         Good afternoon, ladies and gentlemen of the jury.

 9    I'm Dale Cendali, and it's my honor and privilege to

10    represent the Take-Two defendants in this case.  I'll refer

11    to them together as Take-Two.

12         I'm also honored to introduce you to Alfie Brody,

13    standing right there.  You'll hear him testify.  And as he

14    is going to tell you, he's the head of Global Marketing at

15    the company.  And as he is going to tell you, Take-Two has

16    long made such great games as Grand Theft Auto, Red Dead

17    Redemption, Bioshock, Words with Friends, and many more.

18         Right after I speak, you are going to hear from my

19    co-counsel Curt Krasik, who represents WWE.

20         So, what is this case about?  The evidence will

21    show, this is a case about Take-Two's artistic expression

22    and Randy Orton's personal freedom to show his own body.

23    The evidence will show Randy Orton had the right and gave

24    permission to show his body, including his tattoos, to WWE

25    and Take-Two.
```

1    So, now, let's first talk about Take-Two's artistic

2    expression.  There are three video games at issue in this

3    case, they are called WWE 2K16, 17, and 18, and I'll refer

4    to them as the WWE 2K games.

5    None, as you can see, have Randy Orton on the

6    cover.  Mr. Orton is just one of over 100 wrestlers that

7    fans can choose from in each game.

8    As you will see, the games are gigantic artistic

9    works.  I'd like to show you a couple of short clips of

10    actual gameplay.  And I'm going to show them to you with

11    sound because sound is part of the experience.  This is a

12    clip of the Royal Rumble match in WWE 2K18.

13    (Video playing.)

14    Now, I'd like to show you another clip from that

15    same Rumble after Mr. Orton enters the fray.  Here it is.

16    (Video playing.)

17    Members of the jury, what you just saw was the

18    result of hundreds of people working in game development

19    and marketing to produce as realistic a depiction of WWE as

20    could be.  And you'll hear, they had the right to make that

21    game realistic because this includes countless details like

22    realistic arenas, wrestling rings, crowds, crowd noises,

23    commentators, clothing, wrestlers who look like themselves

24    in real life, and much more.

25    What you saw was only a teeny sliver of what this

1   game has to offer.  And you'll see more of the games during

2   this trial.  You'll see that there's multiple arenas

3   players, users, fans can choose from; different play modes;

4   different ways the wrestlers can wrestle; you can pit

5   wrestlers against each other one-on-one or in bigger

6   matches like you just saw.  The object of the game is for

7   players to try to win wrestling matches.

8        Now, during the trial, you are going to hear how

9   Take-Two worked hard to make the games as realistic as if

10  you were watching a wrestling match on television or at the

11  arena itself at a WWE event, including by showing wrestlers

12  accurately like they look in real life.  This includes

13  everything about the wrestlers' appearance:  Their faces,

14  their heights, their builds, their costumes, their

15  haircuts, their facial hair and, yes, their tattoos.

16       As Mr. Brody will testify, when it comes to the

17  wrestlers, it's not about the tattoos, it's about making

18  the wrestlers look like themselves.  If wrestlers choose to

19  have tattoos in real life, then they'll be depicted in the

20  game with tattoos.  But if they don't -- like for a long

21  time John Cena don't have tattoos in real life -- well,

22  then they won't have tattoos in the game.  It's up to the

23  wrestlers.  Take-Two just wants the game to be accurate and

24  realistic.

25       The evidence will also show that the three games

1    that the subject are of this lawsuit were not the first WWE

2    video games.  They aren't even the first ones to have Mr.

3    Orton with his tattoos.  Take-Two only got a license from

4    WWE to make WWE wrestling games in 2013.  And it released

5    WWE 2K14 -- which is not one of the games being sued on --

6    in the fall of 2013, so, long after this phone call that

7    you have heard about.

8            As you will hear from Ed Kiang, WWE's former Vice

9    President of Interactive Media Licensing, prior to 2013,

10   WWE licensed another company, a company called THQ, to make

11   WWE wrestling games.

12           Mr. Orton has been shown, as you will see in the

13   evidence, with his tattoos in video games since 2002, in

14   the 2002 edition of the THQ series and every game after

15   that.  And these video games were also designed to

16   realistically depict wrestling, including how the wrestlers

17   look in real life.

18           This is a stillshot of Mr. Orton with his tattoos

19   in the game released in '22 [sic];

20           Here he is in the game released in 2003;

21           Here he is in the 2004 release of the game;

22           Now we see him in the 2005 release of the game;

23           This is Mr. Orton in the 2006 edition of the game;

24           This slide shows him in the 2007 release of the

25   game;

1    Now, we see him in the 2008 version of the game;
2  and,
3    Now, we see him holding his championship belt, one
4  of several, I believe, in the game released in 2009; and,
5    This slide shows Mr. Orton in the WWE wrestling
6  game released in 2010.
7    All of these games show Mr. Orton with his real
8  world, real life, realistic tattoos, including the ones Ms.
9  Alexander inked on him.
10    As you will hear, Mr. Orton has tattoos on his body
11  that other tattoo artists inked, too.  They have not
12  claimed that Mr. Orton needed their permission to be shown
13  in a video game.  Mr. Alexander [sic] inked the five
14  tattoos at issue in this case between approximately 2003 --
15  counsel says maybe 2002 -- to 2008.
16    And as we just saw, Mr. Orton appears with his
17  tattoos in the years before, during, and after Ms.
18  Alexander inked him.
19    You will hear that Mr. Orton continued to be shown
20  in WWE games with his tattoos year after year, including
21  after Take-Two began releasing WWE 2K games in the fall of
22  2013.  Ms. Alexander never complained about any of this,
23  nor did any tattoo artist, for anyone in the game, for all
24  the wrestlers in the Complaint, not a single tattoo artist.
25    THE COURT:  Counsel?

1    MS. CENDALI:  Yes?

2    THE COURT:  I don't think there is any relevancy as

3    to what any other wrestling -- that --

4    MS. CENDALI:  I'll move --

5    THE COURT:  I'm not going to let the plaintiff

6    argue.  I'm not going to let the defendants argue.

7    MS. CENDALI:  Ms. Alexander continued to take no

8    action, even as Take-Two released game after game, year

9    after year.  The games in issue were released in October of

10   '15, '16, and '17, as this slide shows.

11   Mr. Thomas, can you help me get the slide before

12   that up?

13   (Off the record.)

14   MS. CENDALI:  As this slide shows, the games in

15   issue were released in October of 2015, '16, and '17, and

16   as the slide shows -- and she did not make any complaint or

17   file a lawsuit.

18   Ms. Alexander waited until March of 2018 to file a

19   registration for copyrights on Mr. Orton's tattoos, more

20   than ten years after inking him.  And then she filed this

21   lawsuit right afterwards, in April of 2018.

22   She never gave Mr. Orton, the WWE, or Take-Two any

23   prior notice that she was going to file this lawsuit or

24   file for copyright registrations.

25   You heard Mr. Friedman talk about, *well, video*

1    *games are different from being on television*, or something

2    to that effect.  Well, the evidence will show, whether Mr.

3    Orton is appearing on television or in video games, he is

4    still being shown realistically as he looks in real life.

5    Someone on television isn't really in your living room.

6    Both are digital representations of what the person looks

7    like.

8         So, now I'm going to talk about Mr. Orton's

9    personal freedom to show his body.  You heard counsel for

10   plaintiff say that defendants violated her rights by

11   depicting Randy Orton in the WWE 2K games with his tattoos

12   without her permission.  You are going to hear the

13   testimony of various witnesses, including professional

14   wrestler Randy Orton himself.

15        Mr. Orton, himself, gave WWE and Take-Two

16   permission to use his likeness, what he actually looks

17   like, tattoos and all, in the WWE 2K games.  And the

18   evidence will show, he had the right to do so.

19        You will hear Mr. Orton testify that he asked for

20   the tattoos at issue to be inked on his body; that he

21   approved the tattoos before they were inked; and, he paid

22   Ms. Alexander for those tattoos.

23        The evidence will show that Ms. Alexander never

24   said one word to him about needing to come back to her for

25   permission or to pay her more money before he could show

his body realistically in media of any kind with his tattoos.

She knew he was a professional wrestler who would show his body and would show his tattoos.  That was the purpose of the whole thing.

Mr. Orton paid Ms. Alexander for her services and left that tattoo parlor thinking he could show his body as he wished, no strings attached.

And you will hear that this was not limited to just Ms. Alexander's experience with Mr. Orton.  Ms. Alexander never told any clients in her entire career that they needed to get back to her for permission to show their bodies with their tattoos.

You will also hear Ms. Alexander has never licensed any of her tattoos that she inked on Mr. Orton to anyone. In fact, she's never licensed any tattoo that she's ever inked on anyone to anyone.

She has never licensed any tattoos to anyone in the video game industry, a super creative industry.

As you will hear, when people get tattoos, including Mr. Orton and Ms. Alexander themselves, they remove them, they cover them up, they alter them as they wish, without needing the permission of the tattoo artist who inked them originally.  The tattoos are a permanent part of a person's body.  People control their own bodies.

1    Now, I have mentioned the witnesses as to the facts

2    who are going to testify, but you are also going to hear

3    testimony from certain experts.  And I'm going to ask each

4    of them to stand when I mention their names.

5    You will meet Dr. Nina Jablonski, a professor at

6    Penn State, who is going to talk about tattoos.

7    WITNESS JABLONSKI:  (Nonverbal response.)

8    MS. CENDALI:  Dr. Ian Bogost, a professor at

9    Washington University in St. Louis -- known really as Wash

10   U -- who is going to talk about the video games.

11   WITNESS BOGOST:  (Nonverbal response.)

12   MS. CENDALI:  Dr. Deborah Jay, a survey specialist

13   who studied why people bought the WWE 2K games.

14   WITNESS JAY:  (Nonverbal response.)

15   MS. CENDALI:  And Mr. Malackowski, an economist,

16   who will discuss whether there is a market for licensing

17   real life tattoos in video games and plaintiff's claim for

18   damages.

19   WITNESS MALACKOWSKI:  (Nonverbal response.)

20   MS. CENDALI:  Members of the jury, after you hear

21   from all the witnesses, we believe the evidence will show

22   five bedrock facts:

23   1.  The five tattoos at issue are a teeny part of a

24   gigantic game;

25   2.  Mr. Orton hired Ms. Alexander to ink the

1    tattoos he directed;

2        3.  Ms. Alexander was paid for the tattoos;

3        4.  Ms. Alexander never told Mr. Orton that he

4    needed to get her permission to be shown with his tattoos

5    in the future, and until now, never acted otherwise; and,

6        5.  Mr. Orton and WWE granted a license to Take-Two

7    to depict Mr. Orton's likeness in WWE 2K.

8        Members of the jury, when you have heard all the

9    evidence, listened to all the witnesses, looked at all the

10   exhibits, we will ask you to find in favor of defendants

11   Take-Two and WWE.

12       With the Court's permission, I'll cede the floor or

13   podium to Mr. Krasik.

14       MR. KRASIK:  Good afternoon, ladies and gentlemen.

15       I'm grateful for my first opportunity to talk to

16   you guys directly today.  My name is Curt Krasik and it's

17   my privilege to represent WWE in this case.

18       You met him earlier briefly, but I'd like to

19   acknowledge the gentleman from WWE, Mr. Matthew Geyer.

20   Would you please stand for a second?

21       MR. GEYER:  (Complies.)

22       MR. KRASIK:  Matthew is the Senior Vice President

23   of Gaming for WWE.  So, in that position, he runs the

24   department that is responsible for all WWE's video games

25   and he manages the relationship with Take-Two.

1        Thank you for being here, Matthew.

2        I want to talk to you guys about that guy you kept

3    hearing about in the opening statements of Mr. Friedman and

4    Miss Cendali.  WWE Superstar Randy Orton.  I suspect some

5    of you may know of him already.

6        Randy has been a WWE Superstar for over 20 years,

7    and he also grew up in St. Louis, went to Hazelwood Central

8    High School and still lives in the area with his family.

9        Randy is not a defendant in this case, but he is

10   deeply invested in the outcome.  Randy is voluntarily

11   coming to court to testify to you in this case.

12       As you heard from Mr. Friedman, Ms. Alexander is

13   claiming that Randy needed her permission to appear in the

14   WWE 2K video games as he looks in real life with his

15   tattoos.  To Randy, that means that Ms. Alexander's

16   essentially claiming that when she inked Randy's tattoos,

17   she got control over his body --

18       THE COURT:  Mr. Krasik?  Do I need to talk to you

19   about argument, too?

20       MR. KRASIK:  Thank you, Your Honor.

21       THE COURT:  All right.

22       MR. KRASIK:  Randy will tell you that he believes

23   he controls his own body, and he has volunteered to come to

24   court to testify to you that Ms. Alexander's claims in this

25   case are wrong.

1        Randy will tell you that he is really into tattoos.

2   He likes the way they make him -- his body look when he's

3   performing before thousands of fans in arenas or on

4   television.  And he likes them as a form of self-expression

5   that reflects how he wants to present himself to the world.

6   Randy has other tattoos on his body besides the ones inked

7   by Ms. Alexander, and he will tell you that no other tattoo

8   artist has ever claimed he needs their permission to be

9   shown as he appears in real life with his tattoos.

10       Randy will tell you that his tattoos are part of

11  his body, and he never needs to go back to a tattoo artist

12  to get permission for what he can do with his own body.

13       As you are listening to all the evidence in this

14  case, I want you to focus on one thing that you are not

15  going to hear:  Ms. Alexander never told Randy, when she

16  was inking any of his five tattoos, that there were

17  restrictions on what Randy could do with his body once she

18  inked the tattoos.  Not before she started, not during the

19  hours and hours they spent inking the tattoos, and not

20  after she was finished.

21       You are not going to hear anything different in Ms.

22  Alexander's testimony.  And you are not going to hear

23  anything different from Ms. Alexander's counsel, because it

24  just never happened.

25       Randy will tell you that if Ms. Alexander had said

1  anything to him about restrictions on what he could do with

2  his body or needing permission to be shown with his

3  tattoos, he would have just walked.  Gone to a different

4  tattoo artist.  Randy will tell you he would never agree to

5  give Ms. Alexander control over his body for the rest of

6  his life.  He wasn't asked to, and he didn't.

7       As a WWE Superstar, Randy is a professional

8  entertainer who appears on national television, in

9  advertisements, on WWE's website and social media

10  platforms, at live WWE events around the country, and on

11  WWE merchandise like T-shirts, posters and, yes, video

12  games.

13       So, how Randy chooses to present himself to the

14  public, including his tattoos, is crucial to his

15  livelihood.  Randy will tell you that he must be free to

16  promote and market himself as he sees fit.  His likeness --

17  likeness is a term you are going to hear a lot during this

18  case.  I believe you heard it during Mr. Friedman's

19  opening, as well -- and it's a legal-sounding word, but

20  really all it means is what Randy looks like.  Everything

21  on his body from his facial features to his hair to his

22  muscle structure, to his tattoos.  And, naturally, Randy's

23  likeness changed over time.  But whatever Randy's body

24  looked like was his likeness.

25       Randy will tell you that, as a professional

1   entertainer, he has the right to control how his likeness

2   is used and be paid for the use of his likeness, just like

3   any other celebrities or social media influencers with

4   which you may be familiar.

5        Randy has chosen to grant the rights to his

6   likeness to WWE and to WWE's business partners like

7   Take-Two.  Randy will tell you that he's been doing this

8   for over 20 years, and this lawsuit is the first time that

9   anyone, including Ms. Alexander, has suggested that Randy

10   cannot grant the rights to his own likeness without getting

11   permission from a tattoo artist.

12        Now, let's talk more specifically about Randy's

13   tattoos so you can better understand all of the

14   opportunities that the evidence will show Ms. Alexander

15   had, but failed, to tell Randy that for the rest of his

16   life he supposedly needs her permission to be shown with

17   his tattoos.

18        Randy already had a couple of tattoos before he met

19   Ms. Alexander.  One of those tattoos, the one on the right

20   on your screen, was a back tattoo that was inked by a

21   different tattoo artist at Goldenlands tattoos in St.

22   Louis.  Randy went back to Goldenlands sometime in 2002 or

23   2003 and met Ms. Alexander, who was working there at the

24   time.

25        Randy hired Ms. Alexander to ink tribal tattoos on

1   his forearms and upper arms in the same style as the back

2   tattoo he already had.  Randy also hired Ms. Alexander to

3   alter his existing back tattoo by adding shading and

4   extending it up his neck and across his shoulders.

5       It was Randy's idea for the forearm and upper arm

6   tattoos to be in the same style of tribal tattoo as his

7   existing back tattoo, and he directed Ms. Alexander where

8   to ink the tattoos.

9       Following his instructions, Ms. Alexander then

10  sketched the way the tattoos would look on his skin, and

11  Randy approved them before Ms. Alexander inked the tattoos.

12      Later, Randy hired Ms. Alexander to ink tattoos on

13  both arms, what are sometimes called sleeves.  Randy was

14  very particular about the tattoos that he wanted.

15      He wanted a rose tattoo on his left arm, which he

16  wanted to be his only tattoo in color, with the name of his

17  daughter Alanna and Alanna's birth date in Roman numerals.

18      Randy also wanted a dove on his left arm in soft

19  tones with no true black.

20      And over both arms he wanted skulls, but in shades

21  of soft gray and black, or gray scale, so they would look

22  like a background and not compete with his tribal tattoos.

23      Just like with the tribal tattoos, Randy gave Ms.

24  Alexander direction on what tattoos he wanted and where he

25  wanted them to be inked.  Ms. Alexander then sketched the

way the tattoos would look on his skin and Randy approved

them, before Ms. Alexander inked the tattoos.

When she was done, Randy will tell you that he paid

her in full for his work.  And she certainly never told him

that she expected additional payments in the future, if he

appeared with his tattoos, whether in video games or

anywhere else.

So, let's go back to our count of the opportunities

that the evidence will show Ms. Alexander had to tell Randy

that they had supposedly begun this lifelong relationship

where he needed to get her permission to show his tattoos:

The tribal tattoos on Randy's arm is one;

The extension of the back tattoo is two;

The rose tattoo with the name and birth date of

Randy's daughter is three;

The dove tattoo is four; and,

The skulls tattoos is five.

Five separate times that Ms. Alexander never said

there were any restrictions on what Randy could do with his

body, once she inked the tattoos.  Five separate times that

Ms. Alexander never said that Randy needed her permission

to be shown with the tattoos.

Now, Randy estimates that he spent approximately

100 hours with Ms. Alexander inking his tattoos.  So, they

had a lot of time to talk.  Over that time, they talked

1   about how Randy was a professional wrestler for WWE, and he

2   even signed an autographed photo for Ms. Alexander that she

3   displayed in her workstation at the tattoo parlor.

4        From the very first session together, Ms. Alexander

5   knew full well that Randy's tattoos would be visible in any

6   media, promotional materials or merchandise that showed

7   him.  And she knew that he, in fact, was shown in all these

8   media because she has acknowledged that there were people

9   who came to her for tattoos because they said they heard

10   that she inked Randy's tattoos.

11        But in the approximately 100 hours that Ms.

12   Alexander and Randy spent together, Randy will tell you

13   that Ms. Alexander never said she had any problem with

14   Randy's tattoos being shown in all of the media in which he

15   appeared; never said that Randy had any restrictions on

16   what he could do with his body once she inked the tattoos;

17   never said that Randy needed her permission to be shown

18   with the tattoos.

19        As I have talked about, Ms. Alexander's claims in

20   this lawsuit are inconsistent with what the evidence shows

21   Ms. Alexander said -- or more accurately didn't say -- to

22   Randy at the time the tattoos were being inked.  But they

23   also are inconsistent with what the evidence shows she did

24   in the ten years after she stopped inking Randy's tattoos,

25   in 2008.

1    Before this lawsuit was filed out of the blue, as
2    you have heard, in 2018, Ms. Alexander never complained
3    about Randy appearing in any media with his tattoos.  As
4    Ms. Cendali told you, tattoos have been appearing in WWE
5    video games since the early 2000s when a different company,
6    called THQ -- not Take-Two, T-H-Q -- made video games
7    before Take-Two.
8        And we are going to show you that Randy appeared in
9    these WWE video games with his tattoos throughout this time
10   that Ms. Alexander was inking Randy's tattoos.  We'll show
11   you an example today.
12       (Video playing.)
13       You can see in Smack Down versus Raw, in 2006, the
14   game on the left, and Smack Down versus Raw 2011, the game
15   on the right, both made by THQ, Randy was shown with the
16   tattoos that Ms. Alexander had inked at the time those
17   video games were released.
18       In Smack Down versus Raw 2006, the one on the left,
19   you can see the tribal tattoos that Ms. Alexander inked.
20   And in Smack Down versus Raw 2011, the game on the right,
21   you can see the tribal tattoos.  But now you can also see
22   the sleeves of skulls tattoos and the rose tattoo.
23       After Ms. Alexander finished inking tattoos on
24   Randy in 2008, we will show you that Randy continued to be
25   shown in the WWE video games every year for the next ten

years, while Ms. Alexander did nothing.

Randy will also tell you that he had a different tattoo artist alter all of the tattoos that Ms. Alexander inked, except for the rose.

As you can see from a side-by-side comparison, the lines of the tattoos were reinked and darkened.  But also, the faces and expressions of the skulls Ms. Alexander inked were changed.  For example, in the highlighted skull's eye, the new -- the altered skull's eye was filled in and the shape of the eye was changed.

In this highlighted example of the skull, the original skull's eye was covered over, but now it's not, and the shape of the skull are completely different.

Despite these changes to Randy's tattoos, the same tattoos that are at issue that she is suing on in this lawsuit, Ms. Alexander again did nothing.

Ms. Alexander, in fact, has never claimed that Randy didn't have the right to alter the tattoos that she inked.  As far as Randy was concerned, he could alter his tattoos just like he could grant the rights to show his tattoos, because they were his tattoos and his body.

As you were listening to all of the evidence about what Ms. Alexander has not done over the last ten years, remember to focus on the undisputed fact that five times Ms. Alexander inked tattoos on Randy, and all five times

```
1    she never said there were any restrictions on what Randy
2    could do with his body once she inked the tattoos.  She
3    never said Randy needed her permission to be shown with the
4    tattoos.  But now she is asking you to award her money
5    simply because Randy was shown in video games as he looks
6    in real life --
7              THE COURT:  Counsel?
8              MR. KRASIK:  -- with his tattoos.  I'm sorry, I was
9    just --
10             THE COURT:  You will have an opportunity to argue
11   your case at the end of the case.
12             MR. KRASIK:  Thank you, Your Honor.  I'm wrapping
13   up right now.
14             THE COURT:  Thank you.
15             MR. KRASIK:  Ms. Alexander's wrong in the claim she
16   is making in this case.  And at the end of the case, we
17   will urge you to say no to what she is asking in this case,
18   and return a verdict for the defendants.
19             Thank you.
20             THE COURT:  Ladies and gentlemen, we are now about
21   to begin the actual evidence in the case, and we'll start
22   with -- I want to give you and read to you certain
23   stipulations that the parties have arrived at.  In other
24   words, there are certain facts in this case that have been
25   stipulated to by the parties.  In other words, they are not
```

1    disputed.  You don't need to remember them.  You don't need

2    to write them down.  You will get them again at the end of

3    the case.  But I just want to give them to you now for

4    context, as you hear the evidence coming in.

5            So, the following facts are stipulated to by the

6    parties, in other words, they are not disputed:

7            World Wrestling Entertainment or "WWE" is an

8    entertainment company that creates and promotes

9    entertainment related to professional wrestling.

10           Randy Orton has been a professional wrestler for

11   the WWE.

12           Catherine Alexander has been a tattooist.

13           Miss Alexander inked five tattoos on Randy Orton.

14           Catherine Alexander and Randy Orton did not discuss

15   whether he had her permission to allow others to use the

16   tattoos that Alexander inked on him in a video game.

17           Take-Two Interactive publishes and markets video

18   games.

19           2K Games develops and publishes video games.

20           2K Sports develops video games.

21           Visual Concepts develops video games.

22           WWE 2K16 was released on or around October 27,

23   2015;

24           WWE 2K17 was released on or around October 11,

25   2016;

1          WWE 2K18 was released on or around October 17,

2     2017;

3          Alexander filed this copyright infringement lawsuit

4     on April 17, 2018.

5          With that, Mr. Simon, is the plaintiff ready to

6     call her first witness?

7          MR. SIMON:  Yes, Your Honor.  We call Dr. Zagal.

8          THE COURT:  Okay.  Dr. Zagal, could you please step

9     forward to be sworn.

10          (Witness sworn by courtroom deputy.)

11          THE WITNESS:  My name is Jose Zagal.  Last name,

12     Z-A-G-A-L.

13          THE COURT:  Mr. Friedman, I believe you are able to

14     turn that podium.

15          MR. FRIEDMAN:  If I may be able to approach and

16     hand this to the witness?

17          THE COURT:  Yes.

18          MR. FRIEDMAN:  May I proceed?

19          THE COURT:  You may.

20                         *  *  *  *  *

21                    JOSE ZAGAL,

22     having been first duly sworn, was examined and testified as

23     follows:

24                    DIRECT EXAMINATION

25     BY MR. FRIEDMAN:

1    Q.      Good afternoon.

2    A.      Good afternoon.

3    Q.      Please state your name and introduce yourself to

4    the jury.

5    A.      Hi.  Good afternoon.  My name is Jose Zagal.

6    Q.      And, Dr. Zagal, what is your occupation?

7    A.      I am a professor at the University of Utah's

8    Entertainment Arts and Engineering program.  We are

9    colloquially known as the Games Program on campus.

10   Q.      I'm sorry, could you say that again?  You are

11   colloquially known as what?

12   A.      The Games Program.  Entertainment Arts and

13   Engineering is a bit of a mouthful.

14   Q.      Thank you.  Dr. Zagal, you are a professor, is that

15   what you said?

16   A.      Yes.

17   Q.      All right.  Where do you teach?

18   A.      At the University of Utah.

19   Q.      Thank you.  And what do you teach?

20   A.      I teach a variety of classes.  They're all related

21   to games and video games.  This includes game design, video

22   game ethics.  I also often teach some of our -- what we

23   call our projects classes, where students collaboratively

24   develop games in teams.

25           I also teach some critical game design seminars, as

1    well.  That's a new one this semester, I'm pretty excited

2    about.

3    Q.     Dr. Zagal, how long have you been teaching courses

4    on video game design, video game development, and the like?

5    A.     For over 20 years, at this point.  I first taught a

6    video game class in the year 2000.  I was freshly graduated

7    from my master's program and I was hired as a professor at

8    a university in Chile.  And in my first semester there, I

9    developed a new class, a video game class.  I then taught

10   it in three successive years, of 2000, 2001, and 2002.

11          As a bit of trivia, as a part of that class, a

12   significant number of the students in that class went on to

13   found companies in Chile, video game companies.  And so, I

14   like to say that I have had an indirect hand in helping

15   create the Chilean video game industry.

16   Q.     Thank you.  Dr. Zagal, you have a binder of

17   documents in front of you.  Could you turn to Exhibit No.

18   37, please.

19   A.     37, yes.  (Pause.)  There we go.  Sorry it took me

20   a bit.

21   Q.     Do you recognize what has been previously marked as

22   Plaintiff's Exhibit No. 37?

23   A.     Yes, I do.

24   Q.     And what is Exhibit 37?

25   A.     It is a copy of my CV dated as of March 2018, which

1   is when I first became involved in this case.

2   Q.      Thank you, Dr. Zagal.

3           MR. FRIEDMAN:  Your Honor, I'd move for admission

4   of Plaintiff's Trial Exhibit No. 37, Dr. Zagal's CV?

5           THE COURT:  Any objections?

6           MR. SIMMONS:  Your Honor, we don't object to this

7   as a demonstrative --

8           THE COURT:  You need to get to a microphone.

9           MR. SIMMONS:  We do not object to its use as a

10  demonstrative, but we do object to its use as an

11  evidentiary exhibit as it is not evidence in the case.

12          THE COURT:  It's not evidence in this case?

13          MR. SIMMONS:  Yes, Your Honor.  It's his --

14          THE COURT:  It will be if it's admitted.

15          MR. SIMMONS:  Yes, Your Honor.

16          THE COURT:  And what is the objection to the

17  admission of an expert witness's curriculum vitae into

18  evidence?

19          MR. SIMMONS:  Yes, Your Honor.  It's not evidence

20  between the parties, Your Honor.

21          THE COURT:  Overruled.  Exhibit 37 is admitted.

22          MR. FRIEDMAN:  Your Honor, permission to publish

23  Exhibit 37.

24          THE COURT:  You may.

25          MR. FRIEDMAN:  Thank you.

```
1    Q.      (BY MR. FRIEDMAN)  Dr. Zagal, I believe you can see
2    on your screen -- and members of the jury can see on their
3    screens -- a copy of Exhibit 37.  Is this a copy of your
4    CV, or resume, as most of us might call it?
5    A.      Yes, it is, the first page.
6    Q.      All right.  Dr. Zagal -- and Mr. Zidzik, our
7    technologist over there, can assist in scrolling through.
8            I'd like to highlight a few portions of your CV for
9    the jury.  Could you take us -- or explain to the jury your
10   educational background?  I know you mentioned Chile.  Maybe
11   you can explain that in context of your educational
12   background?
13   A.      Yes.  So, I did my undergraduate work and my
14   Master's Degree in Chile, which is where I am from
15   originally.  I then moved to United States for my Ph.D.
16   So, my background in Chile, I have a Bachelor in
17   Engineering Sciences.  I am also a civil industrial
18   engineer with a computer science diploma.  The
19   undergraduate degrees are a bit different in Chile.  This
20   is a six-year undergraduate degree.  That's why it has
21   these two things kind of mushed together.  That's also
22   where I got my Master's in Engineering Sciences.
23           My Ph.D came later.  I got that at -- here in the
24   United States at the Georgia Institute of Technology --
25   that's also known as Georgia Tech -- as a Ph.D in Computer
```

1   Science.

2   Q.      Thank you, Dr. Zagal.

3           Dr. Zagal, have you worked as a researcher as well,

4   in addition to your teaching responsibilities?

5   A.      Yes.  As part of my regular job duties, I do

6   research, academic research.  So, publishing articles,

7   writing books, writing book chapters, giving presentations,

8   and so on.

9   Q.      In what areas do you or have you focused your

10  scholarly research?

11  A.      In a variety of areas.  I'd say primarily in video

12  game ethics, in game design, related topics to game design.

13  I have also focused on specific kinds of video games like

14  role playing games.  I have also published a lot in games

15  education, sort of examining how to better support students

16  who want to learn how to make video games and how to learn

17  about video games.

18  Q.      Dr. Zagal, has your scholarly research or your

19  teaching experiences or your background in the video game

20  community, has it related any way to the marketing and

21  sales of video games?

22  A.      Yes.  So, as part of my job, even though I have not

23  published explicitly on marketing for video games, it is

24  very important for me to understand how the industry works,

25  what the trends are over the years, how they have been

1   changing.  It's an important part of my job as an educator.

2   I have most of my students want to become video game

3   professionals, and helping them through their education so

4   that they can have successful careers is really important.

5        And the video game industry moves very fast, it's

6   very competitive, so things are changing all the time.  So,

7   I need to stay up to date, know what the trends are, how

8   things have changed, what opportunities are coming down the

9   line as it were.

10       I maintain a lot of contact with games industry

11  professionals.  I attend games industry events to stay up

12  on what's happening, sort of not quite behind the scenes,

13  but almost.  So, in that sense I am very much attuned to

14  what's going on in video game culture and also the

15  industry.

16  Q.    Dr. Zagal, throughout your career thus far, are

17  there certain times when you have been recognized by your

18  peers or by industry with any teaching awards or similar?

19  A.    Yes.  So, I am quite often honored within the

20  University of Utah's College of Engineering as one of their

21  top instructors, top teachers, as it were.  Also, within

22  the professional space, I have received recognitions from

23  the Digital Games Research Association and also from the

24  Higher Education Video Game Alliance.  I was named a

25  Distinguished Scholar and also a Fellow, for each of these

1    respectively.

2    Q.      Dr. Zagal, do you participate in any editorial

3    responsibilities or peer review responsibilities for

4    journals or publications in your field?

5    A.      Yes.  That is also a regular part of my job.  I am

6    often reviewing articles, examining Ph.D dissertations,

7    looking at -- reviewing articles for both journals as well

8    as conferences.  I am also the Editor in Chief of the

9    journal Transactions of the Digital Games Research

10   Association, and have been for a few years now.

11   Q.      Have you been published on the topics that you have

12   been discussing, video game design, video game development?

13   A.      Yes.  Conference articles, presentations.  I have a

14   book that isn't in the CV because it came out afterwards, a

15   book specifically dedicated to giving advice on game

16   design, which I wrote together with a group of my students.

17   It was a really exciting project for them to have a

18   published book with some game design wisdom.  Yes, I am

19   very much active in that space.

20   Q.      And, Dr. Zagal, apart from sort of your academic

21   career, have you designed video games yourself?

22   A.      Yes.  I have done so professionally, very early in

23   my career.  At this point in time, it's mostly -- I am

24   either designing games for research purposes or sometimes

25   for my own intellectual curiosity and pursuit.  But I do

1    try to stay active in making games as well as teaching

2    about how to make them.

3    Q.    As a professor of graduate students, does some of

4    your faculty work include mentoring graduate students or

5    higher-level students?

6    A.    Yes, both -- our program has both -- we both have a

7    graduate program with masters students as well as an

8    undergraduate program.

9    Q.    And in connection with that program, do you often

10   -- or do you see your graduate students taking careers in

11   the video game industry?

12   A.    Yes.  We have been very successful.  Our program is

13   highly ranked.  And I think part of that ranking is because

14   we get -- we are very successful in getting students --

15   helping students achieve their dreams of getting jobs in

16   the industry.  So, I have a lot of alumnae working at games

17   studios all over the world, working on from very famous big

18   titles to much smaller sort of independent titles, as well.

19   Q.    Do you take it as a point of pride when your

20   students end up working on some of the biggest game titles

21   in the country?

22   A.    Yes, I do.  In fact, a couple years ago they

23   started sending me signed copies of the games they worked

24   on.  And so, I started putting them in my office window.

25   And I have reached the point where I now had to take some

1  out to put -- to fit the new ones in.  And the alumnae

2  really enjoy it and we talk about it often.  It's a really

3  good opportunity for me to connect with them and hear what

4  they're up to, what they have been doing.  And that's also

5  another way for me to kinda stay up to date with what's

6  happening in the industry at different companies, and so

7  on.

8  Q.      Thank you, Dr. Zagal.

9          Dr. Zagal, did my law firm hire you to look at and

10 study some of the copyright issues, technical issues, and

11 other issues involved in this case?

12 A.      Yes, I was hired to work on this case.

13 Q.      All right.  And you agreed to take a look at this

14 case for us, didn't you?

15 A.      I did.

16 Q.      And what is it that we asked you to do?

17 A.      To examine a variety of documents, to look at the

18 games themselves, and to form my opinion on whether certain

19 things had happened during -- or happened or not happened

20 during this case.

21 Q.      Thank you.  You mentioned that my law firm provided

22 you with a number of documents.  Did we provide you with

23 documents about the development of the 2K video games?

24 A.      I was provided a lot of documents.  I wasn't

25 provided with specific technical details on the development

1    themselves.  It was not really necessary for the kind of

2    analysis I needed to do, though.

3    Q.      We provided you documents from Take-Two and the WWE

4    in this case; right?

5    A.      Yes, that is correct.

6    Q.      And did we provide you with copies of the video

7    games?

8    A.      Yes.

9    Q.      And did you play those video games?

10   A.      Yes.

11   Q.      Okay.  Did you play them enough that you learned

12   your way around each of the video games, the 2K16, 17, and

13   18 video games at issue in this suit?

14   A.      I played them enough that I could form an opinion

15   to write the report and to be here to testify in front of

16   you today.

17   Q.      Thank you.

18           Have you completed your review of all the materials

19   we provided to you?

20   A.      Mm-hmm.  Yes.

21   Q.      And are you prepared today to offer your opinions

22   and explain those opinions to the jury?

23   A.      Yes, I am prepared.

24           MR. FRIEDMAN:  Your Honor, I submit that Dr. Zagal

25   has met the qualifications as an expert witness.  I'd like

1    to proceed with his opinion testimony.

2            MR. SIMMONS:  No objection, Your Honor.

3            THE COURT:  The record should note that he is

4    qualified to provide expert testimony in the area as stated

5    in this case.

6            You may proceed.

7            MR. FRIEDMAN:  Thank you, Your Honor.

8    Q.      (BY MR. FRIEDMAN)  Dr. Zagal, I'd like to talk to

9    you a little bit about the idea of licensed intellectual

10   property in video games.  Okay?

11   A.      Okay.

12   Q.      Now, from the perspective of a video game designer

13   or developer, do video game companies sometimes obtain

14   licenses to intellectual property to use in their video

15   games?

16   A.      I would say it happens very often, actually.

17   Q.      And what are some examples of this, if you could

18   explain that to the jury?

19   A.      Yeah, so there's a variety of reasons and a variety

20   of different things that might be licensed.  So, for

21   example, a video game company might license someone else's

22   technology, especially if they think it will save them time

23   or money in developing a video game.

24           A video game company might license certain content.

25   Certain, for example, music.  For example, you might want

1    to license some songs by a famous artist if you want it to

2    appear in your video game.

3         You might license an entire universe, an entire

4    property.  You know, I might want to make Harry Potter

5    video games, and so you would license the Harry Potter

6    universe and all the characters and storylines and places,

7    and so on and so forth.

8    Q.    Do video game developers pay for these licenses?

9    A.    Yes, they do.

10   Q.    Now, there's a very basic question:  Why do video

11   game developers pay for licensed intellectual property in

12   the way that you are describing?

13   A.    Because --

14        MR. SIMMONS:  Objection, Your Honor.  May we have a

15   sidebar?

16        THE COURT:  Yes.

17        (Proceedings continued at the bench.)

18        THE COURT:  Go ahead, counsel.

19        MR. SIMMONS:  Your Honor, the witness was asked to

20   speak to all -- to video game companies in general.  The

21   report that he drafted does not speak to all video game

22   companies.  I'm concerned about the scope of his answer.

23   It may go beyond the scope of his report.

24        THE COURT:  Mr. Friedman?

25        MR. FRIEDMAN:  In addition to Dr. Zagal's report,

1    Dr. Zagal was deposed by the defendants, all of them, for

2    many hours.  His opinions are broader than just one very

3    specific company.  He's here as an expert witness on the

4    video game industry, he has opinions concerning what video

5    companies do generally, and we will move on to specifics as

6    well.

7            THE COURT:  Well, it may go beyond the scope of his

8    report, but the specific questions or question as to why

9    video game companies in general license certain things

10   calls for rank speculation, even given this expert's

11   background.

12           You can ask him for what his knowledge is based on

13   his own experience, but perhaps it was your question.  But

14   as stated, the question to this expert asking him why a

15   whole universe of individuals do something, the way that

16   you phrased it, it does call for rank speculation and the

17   objection is sustained.

18           You may rephrase the question.

19           MR. FRIEDMAN:  Thank you, Your Honor.

20           (Proceedings continued in open court, jury

21   present.)

22           THE COURT:  You may proceed, Mr. Friedman.

23           MR. FRIEDMAN:  Thank you, Your Honor.

24   Q.      (BY MR. FRIEDMAN)  Dr. Zagal, in your experience,

25   why do video game developers pay for licensed intellectual

1    property?

2            MR. SIMMONS:  Objection, Your Honor.

3            THE COURT:  Sustained.

4    Q.      (BY MR. FRIEDMAN)  Dr. Zagal, you have experience

5    in the video game industry; correct?

6    A.      That is correct.

7    Q.      Okay.  And you mentioned previously that video game

8    developers sometimes license intellectual property; is that

9    right?

10   A.      Yes.

11   Q.      All right.  Do you have an understanding why

12   certain video game developers might license intellectual

13   property?

14   A.      Yes, I do.

15   Q.      All right.  What is that understanding based on?

16   A.      It is based on the -- what I would call sort of a

17   common sense understanding that, when you license

18   something, you are doing it because it will allow you to

19   make more money or to perhaps even make money in the first

20   place.  There's a couple reasons that I can give for that.

21   Q.      What are the reasons?

22   A.      So, for example, brand recognition is one of them.

23   All right.  So, if I'm making a video game -- let's say I'm

24   making a wrestling video game.  I might have to spend a lot

25   of money marketing that video game and getting the word out

1    there that there is a new video game about wrestling.  But

2    if I could license someone else's intellectual property, a

3    very famous wrestling universe, for example, I would be

4    able to take advantage of the brand recognition that comes

5    with that.  Someone walking into the store or going to a

6    digital store might say, *well, there's this generic*

7    *wrestling game but there's this other one that has a brand*

8    *that I know, that I've heard about.*  And so, I'm more

9    likely to buy that game if all other things are similar.

10           An additional reason is that there's an installed

11   consumer base.  There's already a fan base that will be

12   interested in, or might be interested in playing, let's

13   say, a video game that is using someone else's IP.  The

14   Harry Potter fans of the world would be interested

15   potentially in playing a Harry Potter video game, as well.

16   So, that's a good reason to do that, too.

17           You can save some money on marketing, but you are

18   also getting access to a large consumer base, a fan base,

19   which is already interested in the product that you are

20   hoping to sell.

21   Q.      Thank you, Dr. Zagal.

22           Is the video game industry in your experience a

23   competitive industry?

24   A.      Yes, it is a very competitive industry.

25   Q.      All right.  Does licensing popular intellectual

1  property help a video game company be more competitive in
2  that industry?
3  A.      Yes, it can help with that.  It can help you stand
4  out.  As I mentioned, maybe you're -- you have a generic
5  sports game but now you have attached or licensed a famous
6  league to that sports game.  You can rely on certain
7  celebrities, certain characters, certain songs and music
8  that the consumers might be aware of, and thus make that
9  product more enticing to them, more interesting, because it
10 has something that's familiar or exciting for them to, to
11 participate in, to play with.
12 Q.      Does licensing intellectual property in a video
13 game, in the way you are describing, make the video games
14 more expensive to design or create?
15 A.      Well, you are doing it to make more money in the
16 long run, obviously, so there is a cost associated to
17 licensing.  You have to pay the license.  But the idea is
18 that you are going to make up that in increased sales,
19 increased revenue, and increased value of that game.
20         The other thing to keep in mind also in the case of
21 video games, pretty much all the content in the game needs
22 to be created by the people making the game.  So, if I'm
23 going to make a video game about children going to magical
24 school, it isn't necessarily any additional effort to make
25 a video game where those children happen to be, let's say,

1    the characters from Harry Potter, for example.  There isn't

2    necessarily any additional work in that set.  Or if there

3    is, it can be a bit marginal.

4          So, you are basically doing it because you want to

5    make more money.  That's the business sense behind it.

6    Q.     Do the WWE 2K Games --

7          THE COURT:  Mr. Friedman?  I'm sorry to interrupt

8    you.  Perhaps could you pull the microphone closer or down?

9          MR. FRIEDMAN:  Sure.

10         THE COURT:  Because I'm having problems hearing

11   you.

12         MR. FRIEDMAN:  Thank you.

13   Q.     (BY MR. FRIEDMAN)  Dr. Zagal, can you hear me okay?

14   A.     Yeah.

15   Q.     Dr. Zagal, do the WWE 2K games -- 16, 17, and 18,

16   which I'll refer to as the WWE 2K games -- do those games

17   use licensed intellectual property?

18   A.     Yes, they do.

19   Q.     Where?  Where inside them?

20   A.     They have a lot of music featuring sort of famous

21   pop stars, and so on.  And they're also using the WWE

22   intellectual property, the wrestlers, their names, their

23   personae's, all those kinds of things.

24   Q.     Dr. Zagal, I'd like to talk to -- talk to you a

25   little bit about the concepts of realism or authenticity in

1    video games.  Is realism -- first of all, what is meant by

2    realism and authenticity in a video game?

3    A.       So, it can have several meanings.  One meaning is

4    realism to the real world.  Right?  So, if I'm making a

5    game about flying an airplane around, and it's a realistic

6    game that's meant to show how flying an airplane works in

7    the real world, that would be sort of, *How like the real*

8    *world is this?  Does gravity work the way it is in the real*

9    *world?  Does wind, weather*?  And so on, so forth.

10           In the video game culture, there's also this notion

11   of realism in graphics.  And over the years, as computers

12   and video game consoles have gotten better, they are able

13   to display graphics that look more like they -- like things

14   do in the real world, so there's better quality in that

15   sense.  Maybe you have heard of resolution, for example.

16           So, there's that notion of graphics being more

17   realistic, being more precise or with more colors, and

18   with, you know, sort of deeper, richer textures, and so on.

19   So, that's another notion that comes across.  And I think

20   we saw in the earlier videos a different -- the older video

21   games that we saw looked worse, in the sense the graphics

22   were less realistic.

23           There's a third notion which I think is important

24   in this case which has to do with maintaining sort of

25   truthness -- truthness with air quotes here -- to the

1   source material.  Right?  So, I have mentioned Harry Potter

2   a couple of times.  If I was making a video game about

3   Harry Potter and there's magic, well, we know that magic,

4   the way it appears in Harry Potter, doesn't appear -- it

5   doesn't exist in the real world.  But in that sense, my

6   video game is authentic to the Harry Potter experience.

7   And that's an important aspect to consider, as well.

8   Q.      It sounds like you might be a Harry Potter fan.

9   A.      I have kids.

10  Q.      Dr. Zagal, are these ideas of realism and

11  authenticity, are they considerations when developing a

12  video game?

13  A.      Absolutely.  And I think we've heard that already

14  from opposing counsel, basically saying how important

15  realism is for them in the games, and it's something that I

16  agree with.  The wrestling sports games have to maintain --

17  a WWE video game needs to be true to the WWE universe and

18  experience.

19  Q.      I believe you mentioned that realism -- one of the

20  aspects of realism is staying true to the source material.

21  Is -- would that be a consideration in a sports video game

22  like the WWE 2K games?

23  A.      Yes.  So, here in this case we have these two

24  factors coming together.  One is the WWE wrestlers are

25  wrestlers in real life; these are actual human beings that

1    perform in live events, and so on, and so you want them to

2    look in the video game like they do in the real world.  But

3    there's also realism to the WWE experience.  That has its

4    own certain larger-than-life interests and excitement it

5    has to do.

6           Watching Olympic wrestling is not the same as

7    watching WWE wrestling or random high school wrestling or

8    other professional wrestling, as well.  So, there's an

9    additional layer there that means, *Is this reflective of*

10   *the spirit?  The notion?  The excitement?*  What WWE means

11   in their experience and in their universe.

12   Q.    Thank you, Dr. Zagal.

13          Are these concepts of realism and authenticity used

14   to market the WWE 2K Games?

15   A.    Yes, they are.  They're an important part of the

16   marketing efforts.

17   Q.    Could you turn to Exhibit 46 in your trial binder

18   there?

19   A.    Okay.

20   Q.    Are you ready, Dr. Zagal?

21   A.    You said 47, correct?

22   Q.    You are right.  Thank you.  Dr. Zagal, what is

23   Exhibit 47?

24   A.    I'm seeing a picture of a game disk --

25   Q.    Mm-hmm.

1    A.       -- of the Xbox One version of WWE 2K18.

2    Q.       Dr. Zagal, would you turn to Exhibit 46?  Do you

3    have the cover of the game disk -- or -- I'm sorry -- the

4    cover -- the box in which the game disk comes from?

5            MR. FRIEDMAN:  Your Honor, permission to approach?

6            THE COURT:  Are you asking him about those or in

7    the binder?

8            MR. FRIEDMAN:  These are reproduced in there.  It

9    might be much simpler if he could just look at these.

10           THE COURT:  That's fine.

11           MR. FRIEDMAN:  Thank you.

12   A.       Thank you.  Sorry about that.

13   Q.       (BY MR. FRIEDMAN)  That's okay.  I think it was my

14   fault.

15           Dr. Zagal, I have just handed you three plastic

16   boxes.  Are you familiar with those?

17   A.       Yes, I am.

18   Q.       Okay.

19   A.       [Displaying items to the jury.]

20           THE COURT:  No, sir.

21           THE WITNESS:  Sorry.

22           MR. FRIEDMAN:  Thank you, Your Honor.

23   Q.       (BY MR. FRIEDMAN)  Dr. Zagal, what are you holding?

24   A.       These are Xbox One versions of three video games.

25           THE COURT:  I'm sorry, counsel.  For the record, we

1    need exhibit numbers.

2         MR. FRIEDMAN:  Is this 42, 44 and 46?

3         MR. TAHAN:  Yes.

4         MR. FRIEDMAN:  Your Honor, I have handed Dr. Zagal

5    what are marked as Plaintiff's Exhibits 42, 44, and 46.

6    They are physical copies.

7    Q.    (BY MR. FRIEDMAN)  Dr. Zagal, are you familiar with

8    Exhibits 42, 44, and 46?

9    A.    Yes, I am.

10   Q.    What are those exhibits?

11   A.    These are physical copies of the Xbox One versions

12   of three video games, WWE 2K16, 17, and 18.

13   Q.    Thank you, Dr. Zagal.

14         Now, I was asking you whether the concepts of

15   reality and authenticity are used to market the WWE 2K

16   games.  Do you remember that?

17   A.    Yes.

18   Q.    Okay.  Do the -- I'm sorry.

19         MR. FRIEDMAN:  Your Honor, permission to move for

20   admission of Exhibits 42, 44, and 46, the physical copies

21   of the video games for the Xbox platform?

22         THE COURT:  Any objections?

23         MR. SIMMONS:  No, Your Honor.

24         THE COURT:  And for the record, Exhibit 42 is 2K16;

25   Exhibit 44 is 2K17; and, Exhibit 46 is 2K18.  Correct?

1          MR. FRIEDMAN:  That's correct, Your Honor.

2          THE COURT:  Then Exhibits 42, 44, and 46 are

3    admitted.

4          MR. FRIEDMAN:  Thank you, Your Honor.

5    Q.     (BY THE COURT)  Dr. Zagal, how is it that the WWE

6    2K games market realism and authenticity?

7    A.     Well, we can look at what it says on the back of

8    the box.  And I can give you a couple examples.

9          So, for WWE 2K18, the back of the box says -- and

10   this is highlighted in red -- the most realistic -- sorry,

11   a quote -- "most realistic WWE video game ever."

12         And then it continues, but now in white: "A new

13   graphics engine delivers a visual overhaul and the most

14   realistic WWE graphics to dates."

15   Q.     Does similar marketing language appear on other

16   video games?

17   A.     Yes, there's similar language.

18   Q.     Okay.

19   A.     And reading here from WWE 2K17, again the back of

20   the box in red text which is highlighted from the rest of

21   it:  "Immersive gameplay and more."

22         And underneath that, in white:  "Experience the

23   most authentic WWE gameplay ever."

24         And then it continues.

25   Q.     Thank you, Dr. Zagal.

1          Clearly, realism is a very important consideration

2     in the 2K video games; right?

3     A.     Yes.

4     Q.     Thank you.

5          Is realism or authenticity more important in some

6     video game genres than others?

7     A.     Yes, I think that's a fair thing to say.

8     Q.     In particular, is realism and authenticity an

9     important consideration in the sports game genre?

10    A.     Yes.  Because they are featuring characters that

11    are based on copies of sort of human, actual real life

12    humans, there are additional considerations there for

13    realism.

14         If I was making a video game about The Simpsons,

15    The Simpsons don't look like real humans.  I think we can

16    all agree.

17    Q.     Dr. Zagal, do the tattoos that Miss Alexander inked

18    on Mr. Orton, do their appearance in the WWE 2K games

19    affect the perceived realism or authenticity of those video

20    games?

21    A.     Yes.  They're an important part of that.  I think

22    we have heard already how important it is that the

23    characters that appear in the video game look like they're

24    real life counterparts in the real world, and that includes

25    of course their tattoos, when they have them.

1   Q.      Dr. Zagal, have you studied the critical reception

2   of the 2K video games?

3   A.      Yes, I have examined that, as well.

4   Q.      Okay.  And have you looked into the critical

5   reception and fan reception of the 2K series of games as

6   they relate to their authenticity or realism?

7   A.      Yes.  So, I have looked at sort of the series as a

8   whole, including also the titles in the case here.

9           What you find there is -- and this is not uncommon

10  in video game culture -- is that it's one thing for the

11  companies to say, *we want our games to be more realistic*,

12  but we can also look and see what the fans are saying.  Do

13  they care?  Maybe they don't care.  Well, it turns out that

14  they do care.  And they are, I would say, pretty loud -- at

15  least on the internet -- in terms of their opinions.

16          And so, they will complain about games that they

17  feel are not up to the standards that they have.  They

18  complain about the way the characters look, when they feel

19  they don't look the way they look in a real live event, for

20  example.  They'll complain when they feel that there is a

21  decrease in quality of the graphics of the representations

22  of the wrestlers in the video games, compared to previous

23  years.

24          We find this basically -- there's lots of evidence

25  online.  They collect evidence.  They're very much

1    interested in, *How do these characters look?  Do they look*

2    *better?  Do they look good?  Do they look great?*

3         They're excited by this or sometimes disappointed

4    and very critical.

5    Q.     Do such complaints by the fan base concerning the

6    realism or authenticity of the 2K games affect the sales or

7    the value of the video games themselves?

8    A.      Yes.  I think there's at least two ways in which

9    this can have an effect.  The first is that if the game is

10   perceived poorly, because of its realism, because its

11   graphics are not up to snuff, this leads to negative

12   reviews, a lot of criticism online, and that can lead to

13   decreased sales.

14        Basically, if your game has very bad scores online,

15   both by professionals as well as by the fans, this can lead

16   to reduced sales.  So, that's on the negative side.  Right?

17   There are people that might choose now no longer to buy the

18   game -- they wanted to -- because they heard this year was

19   not a particularly good year for that title.  And they'll

20   wait until next year, perhaps.

21        There's also the perception of fans who are

22   interested in -- who haven't perhaps bought the game

23   before.  And so, if I am doing my research, I want to

24   figure out, *should I buy this game or not?  I'm going to*

25   *read reviews.  I'm going to go online.  I'm going to see*

1    *what people said about the game.*   If I'm finding a lot of

2    negative reviews online for a particular video game, and I

3    am reading them and they are complaining that the graphics

4    don't look right, that the characters don't look

5    appropriate the way I should expect them, and I'm a fan,

6    for example, of WWE, I'd say, *well, I am not going to buy*

7    *this game.*   I'm going to -- I will not -- I may not be

8    impressed.   Right?   So, people that haven't bought it

9    before won't be impressed.   So, I'd say you're going to

10   lose those potential sales, as well.

11   Q.     Dr. Zagal, the video games that we have been

12   discussing have many characters in them, as do many video

13   games.   Can the inclusion of a single character in a video

14   game that has many characters in it affect the value of

15   that game?

16   A.     Absolutely.   You have to take into account the --

17   at least two things.   So, number one is the popularity of

18   that character.   I mentioned Harry Potter before, so I'll

19   go back to Harry Potter.   If I'm buying a Harry Potter book

20   and it's Harry Potter Book No. 3, but Harry Potter the

21   character is not there?   Well, Harry Potter is kind of an

22   important character.   Right?   He is -- might be very

23   popular with a lot of fans behind Harry Potter.

24   Additionally, the character might be important, too.

25          Voldemort, the character in Harry Potter, doesn't

1   appear a lot in any of the books.  He appears in some of

2   them.  But he's still a very important character.  He's a

3   big villain.  Drives a lot of the plot in the narrative.

4         And so, in the context of WWE, there are hundreds

5   of wrestlers.  And technically, I think there's a lot more

6   than that because the WWE franchise has many years of

7   existence.  So, there's a lot of wrestlers who are retired,

8   who have passed away, some of them, at this point.

9         So, how important are those wrestlers to the brand,

10  to the franchise, and how many fans do they have, are two

11  ways to think of how important a particular wrestler might

12  be over another wrestler.

13  Q.     Is the real life Mr. Randy Orton a popular wrestler

14  in the WWE in his own right?

15  A.     Yes, it is -- I believe he is very popular.

16  There's a lot of reasons, and we have heard that already.

17  We have heard him described as a Superstar.  Not just a

18  star, but a Superstar with a long and luscious career in

19  the WWE.  Not everyone is active for as long as he has been

20  active.  I believe we can -- in social media, when I

21  started my research, he had almost six million followers on

22  Twitter.  I believe he had four and a half million

23  followers on Instagram.  That's a significant social media

24  presence, especially when you compare it to some of the

25  other -- some of the other sort of stars that the WWE has.

1    So, he's definitely up there as an important wrestler

2    within their universe.

3    Q.      You say, especially when comparing the social media

4    followers of other WWE stars.  What are you referring to?

5    A.      So, at the time when I started doing my research,

6    the WWE official Twitter account had -- I believe it was

7    something around approximately 10 million followers.  So,

8    more than Randy Orton.  And that makes sense, right?  It's

9    a much bigger franchise and brand.

10          But there are other wrestlers -- I believe the

11   wrestler who is on the cover of WWE 2K18 had, I think,

12   about less than half of what Mr. Orton had.  Right?  And so

13   there's -- that's a measure of popularity, and I think it's

14   important to consider it in that context.

15   Q.      So that's -- so, what you are discussing then is

16   Mr. Orton's popularity in real life.  What about within the

17   2K universe of video games?  Now referring to the Orton

18   character.  What of the Orton character and his popularity

19   within the 2K universe?

20   A.      I think we heard already that he's popular enough

21   that he's appeared in many video games already, many more

22   titles in fact even than were shown.  I believe at some

23   point -- maybe this could have been about ten years ago --

24   Mr. Orton in an interview mentioned that he didn't remember

25   exactly how many video games he had been in, because it had

1    been so many.  He's -- he's -- he's a regular member of

2    these video games.  He is often there.  He is expected to

3    be there by the fans.

4    Q.    Does the Orton character itself in the 2K series of

5    video games have its own fan base that might be critical of

6    his appearance or comment on his appearance in video games?

7    A.    Yes.  So there are --

8          MR. SIMMONS:  Objection, Your Honor.

9          THE COURT:  Hold on.

10         MR. SIMMONS:  Calls for hearsay.

11         THE COURT:  Overruled.  Counsel, I would ask that

12   you lay a better foundation as to the basis for his

13   knowledge.

14         MR. FRIEDMAN:  Yes, Your Honor.

15   Q.    (BY MR. FRIEDMAN)  Dr. Zagal, in connection with

16   your research into this case, did you -- you have mentioned

17   that you looked at the social media following of Mr. Orton

18   in real life.  And then, in addition, you did research as

19   to the critical reception of the 2K video games, both the

20   ones that are involved in this case as well as other ones

21   that are not involved in this case; is that right?

22   A.    That is correct.

23   Q.    Okay.  In connection with that research, did you

24   also research and look into the critical reception of

25   individual characters within the 2K video games, not Mr.

1    Orton in real life?

2    A.      That is correct.

3    Q.      Okay.  Including the Orton character?

4    A.      Yes.

5    Q.      Okay.  In connection with your research concerning

6    the Orton character, did you find that the Orton character

7    is a popular 2K video game character?

8    A.      Yes.  I found numerous examples of people

9    interested in Randy Orton's appearance, like the character,

10   the video game character.  There's lots of YouTube videos

11   where fans have sort of collected different snippets from

12   the titles and put them all together in a sort of medley.

13   "Here are all of Randy Orton's entrances."  "Here are all

14   of his finishing moves."  Things of that sort.  There are

15   even videos made by fans who have tracked Orton's

16   appearance in video games over the years in comparing how

17   he has looked.

18           And in fact, I have also found evidence of Mr.

19   Orton himself describing the interest he follows, in seeing

20   how he appears in the video games as well, and how he's --

21           MR. SIMMONS:  Your Honor?

22           THE COURT:  Yes?

23           MR. SIMMONS:  Could we have a sidebar, Your Honor?

24           THE COURT:  Yes.

25           (Proceedings continued at the bench.)

```
1          MR. SIMMONS:  Your Honor, you had granted a motion
2   in limine concerning Randy Orton's statements about
3   himself, and I believe the witness is testifying regarding
4   those statements.
5          THE COURT:  Mr. Friedman, that is correct.
6          MR. FRIEDMAN:  Your Honor, now there is some
7   additional context.  If I am permitted to continue this
8   examination, I am -- with that additional context.
9   Otherwise, I can move on.
10          THE COURT:  What do you mean, additional context?
11   My ruling is my ruling.  My ruling remains the same.
12          MR. FRIEDMAN:  My apologies, Your Honor.  I'll pull
13   him back and move on.
14          THE COURT:  Right.  But this is Day One.  We have a
15   number of days left.  So, let me make sure that we get this
16   clear, Mr. Friedman.  You may not knowingly violate my
17   rulings on motions in limine.  That was -- that was a clear
18   ruling.  It was specifically with respect to this
19   testimony.  And whether you think you can provide context
20   or not, my ruling is my ruling, counsel.
21          MR. FRIEDMAN:  Thank you, Your Honor.
22          THE COURT:  All right.
23          (Proceedings continued in open court, jury
24   present.)
25          THE COURT:  Objection sustained.
```

```
 1    Q.      (BY MR. FRIEDMAN)  Dr. Zagal, following in that

 2    same vein, does the degree of realism in the WWE 2K games

 3    have an effect, in your opinion, on the sales of the video

 4    games?

 5    A.      I believe it does.

 6    Q.      In what way?

 7    A.      In the sense that, as I mentioned earlier, when

 8    people find the realism is not up to standards or up to

 9    expectations, they will complain about the game, the

10    reviews will come in, they'll post low reviews, and that

11    will lead to depressed sales.  I also believe that people

12    intending to buy the game will then see these scores and

13    then choose not to buy it.

14    Q.      And in the context of the realism or perceived

15    authenticity of the 2K games, do the appearance of Miss

16    Alexander's tattoos have an effect on that?

17    A.      Yes, they do.

18    Q.      Okay.  In what way, if you could just summarize?

19    A.      So, fans are very much aware of what Mr. Orton

20    looks like, what his tattoos are like.  And so, when they

21    see him in the game, they are expecting him to appear --

22    they are expecting the character in the game to have the

23    tattoos that he has in real life, within of course the

24    limitations of the technology of the time.

25            So, in much older video games, they would not
```

1    necessarily have the same expectations they have today,

2    where we can expect things to look pretty close to the real

3    world.

4            THE COURT:  Mr. Friedman, are you about to go into

5    another area now?

6            MR. FRIEDMAN:  Yes, Your Honor, I am.

7            THE COURT:  This will be a good time --

8            MR. FRIEDMAN:  Okay.

9            THE COURT:  -- to stop for the day, before you go

10   into another area.

11           MR. FRIEDMAN:  Yes, I am.  Thank you, Your Honor.

12           THE COURT:  Okay.  All right.  Ladies and gentlemen

13   of the jury, we are going to recess for the day.  Please

14   remember my instructions and admonitions to you.  We will

15   reconvene tomorrow morning at 9:00.  I believe you should

16   try to be here by 8:45.

17           But again, remember my instructions.  Do not

18   conduct any research, discuss the case with anyone, and,

19   most importantly, have a good evening.  All right.

20           COURTROOM DEPUTY:  All rise for the jury.

21           (Proceedings continued in open court, jury not

22   present.)

23           THE COURT:  Okay.  Do we need to take up anything

24   else before -- if not, I'll see you at -- I'll be here at

25   8:30, if we need to take up anything else.  And again,

1    remember, if something comes up that's not logistical or

2    procedural, you should e-mail Miss Hayde.

3         MS. CENDALI:  Believe it or not, I don't think we

4    have an issue for you right now.

5         THE COURT:  I don't believe that will still be the

6    case by the time I get home.  No, I'm just joking.  Have a

7    good evening.

8         (Court adjourned at 4:28 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>R E P O R T E R ' S   C E R T I F I C A T E</u> |
| 2 | I, Christine Dohack LaBuwi, RDR, CRR, Official |
| 3 | Court Reporter for the U.S. District Court, Southern |
| 4 | District of Illinois, do hereby certify that I reported |
| 5 | with mechanical stenography the proceedings contained in |
| 6 | pages 1-89; and that the same is a full, true, correct and |
| 7 | complete transcript from the record of proceedings in the |
| 8 | above-entitled matter. |
| 9 | |
| 10 | DATED this 3rd day of October, 2022, |
| 11 | |
| 12 | *s/Christine Dohack LaBuwi, RDR, CRR* |
| 13 | _____ <br> Christine Dohack LaBuwi, RDR, CRR |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |