1
      UNITED STATES OF AMERICA
     SOUTHERN DISTRICT OF ILLINOIS
2

3 CATHERINE ALEXANDER,      )
               )
4       Plaintiff,  )
 v.            ) No. 3:18-cv-00966-SMY
5             )
 TAKE-TWO INTERACTIVE SOFTWARE, )
6 INC., et al.,      ) *East St. Louis, IL*
               )
7       Defendants.  )

8

9

10
     TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11        DAY 2 OF 5

12   BEFORE THE HONORABLE STACI M. YANDLE
     UNITED STATES DISTRICT JUDGE
13
       September 27, 2022
14

15

16

17

18

19

20

21 REPORTED BY:   Christine Dohack LaBuwi, RDR, CRR
         Official Court Reporter
22         301 West Main Street
         Benton, Illinois  62812
23         (618) 439-7725
         Christine_Dohack@ilsd.uscourts.gov
24
 Proceedings recorded by mechanical stenography, produced by
25 computer-aided transcription.

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:        R. Seth Crompton, Esq.
                            HOLLAND LAW FIRM
 3                          300 N. Tucker Blvd., Suite 801
                            St. Louis, MO  63101
 4                          314) 241-8111
                            scrompton@allfela.com
 5
                            Anthony R. Friedman, Esq.
 6                          Anthony G. Simon, Esq.
                            Paul J. Tahan, Esq.
 7                          SIMON LAW FIRM, P.C.
                            800 Market Street, Suite 1700
 8                          St. Louis, MO  63101
                            (314) 241-2929
 9                          afriedman@simonlawpc.com
                            asimon@simonlawpc.com
10                          ptahan@simonlawpc.com

11

12    FOR DEFENDANTS TAKE-TWO INTERACTIVE SOFTWARE, INC.; 2K
      GAMES, INC.; 2K SPORTS, INC.; and VISUAL CONCEPTS
13    ENTERTAINMENT:

14                          Dale M. Cendali, Esq.
                            Christopher Ilardi, Esq.
15                          Joshua L. Simmons, Esq.
                            Miranda D. Means, Esq.
16                          KIRKLAND & ELLIS, LLP
                            601 Lexington Avenue
17                          New York, NY  10022
                            (212) 446-4800
18                          dale.cendali@kirkland.com
                            chris.ilardi@kirkland.com
19                          joshua.simmons@kirkland.com
                            miranda.means@kirkland.com
20
                            Michael J. Nester, Esq.
21                          DONOVAN ROSE NESTER, P.C.
                            151 North 1st Street, Suite A
22                          Belleville, IL  62220
                            (618) 212-6500
23                          mnester@drnpc.com

24

25
```

1

2
   FOR DEFENDANT WORLD WRESTLING ENTERTAINMENT:

3
                          Curtis B. Krasik, Esq.

4
                          K & L GATES, LLP
                          210 Sixth Avenue
                          Pittsburgh, PA  15222

5
                          9412) 355-8696
                          curtis.krasik@klgates.com

6
                          Michael J. Nester, Esq.

7
                          DONOVAN ROSE NESTER, P.C.
                          151 North 1st Street, Suite A
                          Belleville, IL  62220

8
                          (618) 212-6500
                          mnester@drnpc.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2                                              PAGE:

3         Pretrial Matters                     94:3

4
                              WITNESSES
5
       ALL WITNESSES:                          PAGE:
6
         JOSE ZAGAL for Plaintiff:
7           Direct Examination by Mr. Friedman    98:4
       (cont'd.)
8           Cross-Examination by Mr. Simmons    129:16
            Redirect Examination by Mr. Friedman 187:17
9
         MARK LITTLE for Plaintiff:
10          Video Deposition by dated 08/14/2019,  191:18
       Plaintiff's Exhibit 156
11
         EDWARD KIANG for Plaintiff:
12          Video Deposition by dated 08/04/2020,  196:8
       Plaintiff's Exhibit 157
13
         CATHERINE ALEXANDER for Plaintiff:
14          Direct Examination by Mr. Simon     198:21
            Cross-Examination by Ms. Cendali    227:4
15          Redirect Examination by Mr. Simon   271:20

16       CHRIS SNYDER for Plaintiff:
            Video Deposition by dated 08/14/2019,  273:3
17     Plaintiff's Exhibit 158

18       RYAN CLARK for Plaintiff:
            Direct Examination by Mr. Friedman   274:4
19

20

21

22

23

24

25
```

1          (Proceedings began in open court at 8:55 a.m., jury

2     not present.)

3          COURTROOM DEPUTY:  The Court calls Case No.

4     18-CV-966, *Alexander versus Take-Two Interactive Software*

5     *Inc., et al.*  This matter is called for Day Two of jury

6     trial.

7          Would the parties please state your presence for

8     the record, beginning with plaintiff?

9          MR. SIMON:  Your Honor, Anthony Simon, Anthony

10    Friedman, Paul Tahan and Mr. Crompton for the plaintiffs.

11         THE COURT:  Good morning.

12         MS. CENDALI:  Good morning, Your Honor.  Dale

13    Cendali, Michael Nester, Joshua Simmons, Miranda Means, and

14    Chris Ilardi for the Take-Two defendants.

15         MR. KRASIK:  Good morning, Your Honor.  Curt Krasik

16    for WWE.

17         THE COURT:  Good morning, counsel.

18         It's my understanding that, at 8:55, you guys now

19    want to take something up before we start at 9:00.  I --

20    again, let me just reiterate.  If there are any, any issues

21    that we need to take up before we begin at 9:00, I'm here

22    by 8:30.  And I would ask that you notify Michelle at that

23    time, because I intend to start at 9:00.  I don't like to

24    have the jurors sitting around.

25         What's the issue?

1    MR. SIMMONS:  Your Honor, in reviewing Dr. Zagal's

2  direct binder, we noticed that there are certain images

3  from the Create a Superstar feature where -- as you heard

4  Mr. Friedman, during his opening -- talk about Randy

5  Orton's tattoos appearing on the Create a Superstar

6  feature.

7    We asked Mr. Friedman whether he was going to use

8  these exhibits and he indicated he was not, but that Dr.

9  Zagal would be testifying to that.  He has no disclosure of

10  that in his expert report and so --

11    THE COURT:  No disclosure of what?

12    MR. SIMMONS:  Of talking about the use of Randy

13  Orton's tattoos on this Create a Superstar feature.

14    THE COURT:  He doesn't have to disclose -- so, he

15  -- when I took up your motion to exclude -- your *Daubert*

16  motion as to his testimony -- I don't remember the

17  specifics but as you know, he simply has to disclose his

18  opinions, what he reviewed, and the bases for those

19  opinions.  He doesn't have to disclose what he's going to

20  use during his testimony.  So, I'm not -- you need to be

21  clear about what it is that you are claiming he did not

22  disclose.

23    MR. SIMMONS:  Yes, Your Honor.  He didn't disclose

24  that that was a basis for his opinions.  And he didn't say

25  -- and he has new opinions that relate to the use of Randy

1   Orton's tattoos on the Create a Superstar.  So, there is no

2   basis and no opinions disclosed.

3          THE COURT:  Mr. Simon?  Or Mr. Friedman?

4          MR. FRIEDMAN:  Thank you, Your Honor.

5          Dr. Zagal disclosed that the artwork and the

6   tattoos appeared in the video games.  He reviewed the video

7   games and discussed them across three expert reports.

8          THE COURT:  And that's my understanding.  He did

9   review that his opinions were in part based upon the images

10  that appeared in the video games.  And I took up your

11  motion where you sought to exclude any reference to the

12  Superstar feature and I have ruled on that.  This seems to

13  be an extension of that, so your objection is denied.

14         MR. SIMMONS:  Understood, Your Honor.

15         We had -- the parties, unfortunately -- you had

16  asked us not to have -- or hoped we didn't have disputes

17  until --

18         THE COURT:  I'm sorry, sir.  The other thing is

19  that you need to --

20         MR. SIMMONS:  Sorry.

21         THE COURT:  Because you are not really being picked

22  up on the microphone.

23         MR. SIMMONS:  I'm sorry.

24         I was just going to alert the Court, there are

25  three other disputes the parties have for other witnesses

1    in the course of the day.

2           THE COURT:  We're starting at 9:00 with --

3           MR. SIMMONS:  Understood.

4           THE COURT:  Yes.  So, we will -- you need to let us

5    know what those -- let Michelle know what the disputes are,

6    what the nature of the disputes are, and I'll figure out

7    when we take them up.  But we're not going to take them up

8    now.

9           MR. SIMMONS:  Understood.

10          THE COURT:  Okay.  All right.

11          MR. SIMON:  Your Honor, would you like Dr. Zagal to

12   take the witness stand?

13          THE COURT:  He may go ahead and take the stand.

14          (Proceedings continued in open court, jury

15   present.)

16          THE COURT:  Good morning, ladies and gentlemen.

17          Mr. Friedman, are you ready to proceed?

18          MR. FRIEDMAN:  Yes, Your Honor.

19          THE COURT:  Okay.  Dr. Zagal, you are still under

20   oath, sir.

21          THE WITNESS:  Thank you.

22          MR. FRIEDMAN:  Thank you, Your Honor.

23          Good morning, ladies and gentlemen of the jury.

24                         * * * * *

25                    JOSE ZAGAL,

1    having been previously duly sworn, was examined and

2    testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. FRIEDMAN:

5    Q.      Good morning, Dr. Zagal.

6    A.      Good morning.

7    Q.      When we concluded your testimony yesterday, we were

8    talking about the importance of the tattoos to the video

9    games, the importance of the tattoos to Mr. Orton and, and

10   their ability to create realism and authenticity in the

11   video games.  Okay?  Do you remember that?

12   A.      Yes.  That's correct.

13   Q.      Okay.  My question to you, Dr. Zagal, is:  Does the

14   degree of realism in the WWE 2K Games have an effect on the

15   sales of the video games?

16   A.      Yes, I believe it does.

17   Q.      How so?

18           THE COURT:  Hold on for a second.

19           (Off the record.)

20           THE COURT:  Okay.  We're missing a juror.  So,

21   let's stop.

22           COURTROOM DEPUTY:  He's coming in.

23           (Proceedings continued in open court, Juror No. 8

24   now present.)

25           THE COURT:  Why don't you restate your first

1    question?

2          MR. FRIEDMAN:  Thank you, Your Honor.

3    Q.    (BY MR. FRIEDMAN)  Dr. Zagal, does the realism or

4    authenticity displayed in the WWE 2K series of games have

5    an effect on the sales of the video games?

6    A.    Yes, it does.

7    Q.    How so?

8    A.    So, it goes to these factors of what the fans

9    expect and what the franchise is all about, and the game

10   needs to reflect sort of the spirit, the idea of the

11   franchise, and be authentic to that.  In that sense, the

12   fans have a lot of expectations regarding the realism in

13   terms -- in how the game characters are portrayed and

14   whether they look or not like their real-life counterparts.

15   Q.    Dr. Zagal, Mr. Orton has fairly prominent and

16   recognizable tattoos, wouldn't you agree?

17   A.    Yes, I would agree.

18   Q.    Are these tattoos an important part of his persona?

19   A.    Yes, they are.

20   Q.    Are they parts of his persona that are commented

21   upon by critics and fans alike?

22   A.    Yes, his tattoos get a lot of attention from both

23   fans and, and even the WWE itself.

24   Q.    Dr. Zagal, do you have your exhibit binder in front

25   of you?

1    A.      I do.

2    Q.      Would you turn to Plaintiff's Exhibit 25, please?

3    (Pause.)  Dr. Zagal what is displayed at Plaintiff's

4    Exhibit 25?

5    A.      So, this is a printout of a web page.  And the web

6    page is from the WWE.com website.

7    Q.      Is this something that you found in the course of

8    your studies and review of this case?

9    A.      Yes, I found it myself.

10   Q.      What is the topic of this article?

11   A.      Can I read the title?

12   Q.      Yes.  What is the title of the article?

13   A.      So, the title of the article is:  "The 20 Coolest

14   Tattoos in WWE History."  And there's a couple paragraphs

15   underneath that.

16   Q.      And did -- I'm sorry.  And did you say this came

17   from the WWE website?

18   A.      Yes.

19   Q.      Okay.  Dr. Zagal, is this an article -- one of the

20   articles that you reviewed and that helped to form the

21   basis of your opinions today?

22   A.      Yes, it is.

23   Q.      Okay.

24           MR. SIMMONS:  Your Honor, I'd move for admission of

25   Plaintiff's Exhibit 25 and for publication to the jury?

1        MR. FRIEDMAN:  No objection, Your Honor.

2        THE COURT:  Plaintiff's Exhibit 25 is admitted and

3   it may be published.

4   Q.    (BY MR. FRIEDMAN)  Dr. Zagal, tell us -- in the

5   main -- what is this article about?

6   A.       So, this article is an article written by someone

7   at the WWE or paid for by the WWE -- so, someone paid to

8   write this article -- where they have sort of gone over all

9   of their superstars and athletes and wrestlers and

10  identified 20 of them that have the most interesting,

11  exciting, prominent, or coolest -- as the article's title

12  says -- tattoos.

13  Q.       In the context of your opinions and what you have

14  been discussing yesterday and will discuss today with the

15  jury, what is the significance of this article?

16  A.       So, this article shows that if we think of the WWE

17  universe and experience and try to unpack a bit what that

18  means, it basically provides evidence to support what I'm

19  saying here, is that tattoos are an important part of WWE;

20  that WWE values them, they think they're interesting, they

21  think they're worth highlighting when their athletes have

22  them, they think they are worth commenting on.

23       And this then, obviously, impacts the video games

24  and explains in part why the athletes would have to show up

25  in the video games with their tattoos and their character

1    -- game characters of these athletes would have the tattoos

2    -- why also in the games themselves there are features that

3    allow players to add body art, tattoos to game characters,

4    game characters of their own creation, and why they can

5    also modify them in the game characters of the actual

6    athletes, as well.

7    Q.      Is the WWE Superstar Randy Orton featured on this

8    Top 20 list?

9    A.      Yes, he is.

10   Q.      What rank is he?

11   A.      I believe he's No. 5 along the list.

12           MR. FRIEDMAN:  Mr. Zidzik, could you turn to page

13   17 of Exhibit 25, please?

14   Q.      (BY MR. FRIEDMAN)  Dr. Zagal, you can --

15   A.      So, I'm not seeing anything on my screen.  I don't

16   know if that's --

17   Q.      It's also in your binder.

18   A.      Yes.

19   Q.      Just in case.  Dr. Zagal, Mr. Orton is ranked No. 5

20   in this article of the coolest tattoos on the WWE website.

21   Is that fair?

22   A.      Yes.  That's what was on the website.

23           MR. FRIEDMAN:  And can we display page 17.

24   Q.      (BY MR. FRIEDMAN) Dr. Zagal, which of Mr. Orton's

25   tattoos are featured as the coolest in the WWE?

1    A.       So, specifically the title of his entry says,

2    "Randy Orton, Tattoo:  Tribal design.  Location:  Back and

3    shoulders."

4         And we can see the picture of Randy Orton showing

5    the back tattoo and his shoulders, and the back of his

6    arms, obviously.

7    Q.       Based on this article and other materials that you

8    reviewed, and your background, education, and experience,

9    do you have an opinion whether the Orton character in the

10   Take-Two video game would be perceived by fans as less

11   authentic if he appeared in the games without his tattoos?

12   A.       Absolutely.  I think the fans would notice that his

13   tattoos are -- let's imagine that he would -- like, if the

14   video game character had different tattoos?  The fans would

15   notice that.  Or if he had no tattoos, the fans would also

16   notice that.

17   Q.       Thank you.

18        MR. FRIEDMAN:  Mr. Zidzik, you can take that down.

19   Q.       (BY MR. FRIEDMAN)  Dr. Zagal, we have been talking

20   a lot about these video games and we have seen some videos

21   from them, too.  Have you played each of the 2K16, 17, and

22   18 video games?

23   A.       Yes, I have.

24   Q.       And did you prepare some gameplay to walk the jury

25   through some of the elements of the video game?

1    A.      Yes.  I'm prepared to play the games and also show

2    some videos of recorded gameplay that --

3    Q.      You say you are prepared to play the video games?

4    A.      Yes.

5    Q.      Okay.

6    A.      That's a new one for me, in court.

7    Q.      Dr. Zagal, do you have Plaintiff's Exhibit 46 in

8    front of you?

9            MR. FRIEDMAN:  Your Honor, may I approach?

10           THE COURT:  Yes.

11   A.      Yes, I do.

12   Q.      (BY MR. FRIEDMAN)  Can I have it?

13           Dr. Zagal, I have actually taken Plaintiff's

14   Exhibit 42 from you.

15           MR. FRIEDMAN:  With the Court's permission, I'd

16   like to insert this video game into our Xbox in order to

17   play it for the jury.  This Exhibit 42 has already been

18   admitted.

19           MR. SIMMONS:  Your Honor, no objection at this

20   time.

21           MR. FRIEDMAN:  Thank you.

22           Your Honor, permission to approach?

23           THE COURT:  Yes.

24   Q.      (BY MR. FRIEDMAN)  Dr. Zagal, I'm handing you an

25   Xbox One video game controller.  I've inserted the WWE 2K16

1    game into the Xbox on counsel table.

2         Dr. Zagal, could you show the jury some of the

3    aspects of this video game and, and narrate while you do?

4    A.    Sure.

5    Q.    What are we looking at now, for example?

6         (Video playing.)

7         MR. SIMMONS:  Objection, calls for a narration,

8    Your Honor.

9         THE COURT:  Can we have a sidebar, please?

10        (Proceedings continued at the bench.)

11        THE COURT:  The objection is that it calls for a

12   narration, which it does.  But if this is a demonstration,

13   the narration is necessary.

14        I guess I need to understand, Mr. Friedman, what

15   actually are we doing here?  What is the witness

16   demonstrating?  What is he going to do?  What is -- what is

17   he attempting to demonstrate and show to the jurors?

18        MR. FRIEDMAN:  Thank you, Your Honor.  He is going

19   to go through the first menu screen.  He's going to find

20   the Custom Character creator and he's going to apply the

21   tattoos onto a Custom Character.

22        Then he's going to use that Custom Character to

23   engage in a battle with the Mr. Orton character.  It will

24   take approximately four or five minutes.  I can ask him

25   questions while he goes through it, rather than have him

1    narrate.  But given he's playing the game and demonstrating

2    the gameplay, I thought it would be appropriate that he

3    could narrate and demonstrate as he is going along.

4         THE COURT:  And what are we showing here?  Are we

5    doing all this to simply show the images on the Superstar

6    character?

7         MR. FRIEDMAN:  That's correct, both on the

8    Superstar Custom Character and on Mr. Orton.  And to show,

9    in context, how the artwork is used throughout the game in

10   a couple instances.

11        THE COURT:  Okay.  The objection to the narration

12   is overruled.

13        (Proceedings continued in open court, jury

14   present.)

15        (Video playing -- loud background music.)

16        THE COURT:  Nobody's going to hear him narrate

17   anything.  I didn't know if we were in court or in the

18   club, counsel.

19        MR. FRIEDMAN:  This is a little early in the

20   morning for something like this.

21        THE COURT:  Yeah, I'm awake.  Okay, you ready?

22        MR. FRIEDMAN:  I think that's good.  Thank you.

23   Q.   (BY MR. FRIEDMAN)  Dr. Zagal, could you take us

24   through a little bit of the gameplay of the 2K16 game.

25        MR. FRIEDMAN:  And just to orient the jury, Dr.

1    Zagal is going to go through some of the initial menu

2    screens, he's going to find a Custom Superstar and apply

3    tattoos to it, and then he is going to engage in a battle

4    with the Orton character.

5    Q.    (BY MR. FRIEDMAN)  Dr. Zagal, please proceed and

6    explain what you are doing.

7    A.    Okay.  So this is the -- basically, the start

8    screen, letting me know that there's issues of being --

9    there's a warning.  I'm going to just skip past by pressing

10   a button.

11            THE COURT:  Hold on for a second.  Let's pause.

12            (Off the record.)

13            THE COURT:  Everybody just relax for a second,

14   stretch your legs.  We're going to get this technology

15   aspect figured out.

16            MR. FRIEDMAN:  Thank you, Your Honor.  This is a

17   first for me.  We can proceed without any sound if we are

18   able to mute it, but I have been informed by Technology

19   that we can't do that at counsel table.

20            THE COURT:  We are -- just pause.  We're having our

21   IT person come up and see if they can figure out how to

22   mute the music.

23            (Off the record.)

24   Q.    (BY MR. FRIEDMAN)  Dr. Zagal, there might be some

25   annotations on your screen.  If you could press the lower

1   left corner of your screen to clear those?

2   A.      Yes.  (Complies.)

3   Q.      Thank you.

4   A.      Okay.

5   Q.      And sorry for the technical troubles.  It looks

6   like it was my monitor here that was causing the issue.

7           Dr. Zagal, you are on the menu screen.  Could you

8   please proceed?

9           (Video playing.)

10  A.      This is the menu screen.  Here we can see there are

11  options for playing the game.  This is sort of "Basic" play

12  option;

13          "My Career," which is where you can create your own

14  wrestler and play their career; and,

15          Over here there's a "Creations" menu, which is

16  where you can go in and actually create your wrestler or

17  make changes to existing wrestlers;

18          "Online" obviously isn't working.

19          So, I'm going to go into the Creations menu here.

20  I'm going to pick to Create a Superstar, which is the one

21  that's currently selected.  But I can move around and pick

22  the different ones.

23          So, there's options here to Create a Custom

24  Superstar or a Custom Diva.  Those are the two options on

25  the top.  I can go down and then also make changes to --

1    see the existing Superstars and Divas or edit my own

2    version, as well.

3    Q.      Dr. Zagal, if I could ask you in the context of the

4    2K16 video game, what is a Custom Superstar?

5    A.      A Custom Superstar is a Superstar that I have

6    created.  So, it could be -- I could try to make a version

7    of myself in the game, if I wanted, like a character that

8    looks like me or someone completely invented.

9    Q.      And would that allow you to play that character

10   throughout the course of the game, throughout its

11   storylines and matches?

12   A.      Yes.  In specific play modes, you can play with

13   your own -- your own character, essentially.

14   Q.      Thank you.

15   A.      So, this is the menu for that.  And by default, I

16   am given this, this character, I'll call it.  We think of

17   it like a mannequin.  So, sort of generic.  It doesn't have

18   any sort of specific features.  As you can see here, it

19   gives you options for editing the face, the body, and so on

20   and so forth.

21          So, you can pick the body here.  And so you can

22   see, I can -- I'm not going into the menu.  It's just for

23   -- in the interest of time, you can change its height, make

24   the character look more muscley, less muscley, taller,

25   heavier, and so forth.

1    Select the clothing now.  So, there's different

2  masks and piercings.  Lots of different options -- I'm

3  going down -- glasses, hats, so on.

4    Different face parts, colors, eyebrows, all these

5  kinds of things.  Let's go back a bit here.

6  Q.    Can you also apply tattoo art to the custom

7  characters?

8  A.    Yes.  So, I went into "body" again and "parts" and

9  here we can see -- in this game they are calling it "body

10  art."  In this case, for different body locations, I can

11  select body art on the back.  There's different options for

12  design.  I'm going to pick "body art."  And here's a bunch

13  of different options.  I'm going to select this one.

14  Q.    Dr. Zagal, the tattoo that you selected to apply to

15  the upper back of your mannequin, is that one of the

16  copyrighted artworks that are at issue in this case?

17  A.    Yes.  I'm going to accept that body part, that

18  tattoo.  I'm going to add art to the left arm.  Again,

19  there's lots of different options.  Select this one and

20  accept it.  (Demonstrating.)

21  Q.    Dr. Zagal, the artwork that you just selected to

22  put on the left arm of the mannequin that you are creating,

23  are those also two additional artworks that are the subject

24  of this action?

25  A.    Yes.  We can see the dove and the rose, for

1    example.

2    Q.      And the tribal on the upper arm there?

3    A.      Mm-hmm.

4    Q.      Did you say yes?

5    A.      Yes.  I'm sorry.

6    Q.      And what are you doing now?

7    A.      I am selecting body art in this case for the right

8    arm.

9    Q.      And what you selected there looks like the skull

10   sleeve and tribal.  Is that also the artwork that are at

11   issue in this case?

12   A.      Yes.  I'm going to accept that.

13           So, another feature this game has -- if I press the

14   stick here -- it goes into a special sort of camera mode,

15   and I can rotate this mannequin to which I have applied

16   these tattoos.  I can zoom in, if I want to get more

17   detail.  (Demonstrating.)  Oops.  Sorry.

18   Q.      Dr. Zagal, when you are zooming in, can you show

19   close-up views and details of the artwork on your custom

20   created mannequin's back and arms?

21   A.      Yes.

22   Q.      Can you demonstrate some of that for the jury?

23   A.      Yes.  So, I'll spin around so you can see behind

24   the arms.  (Demonstrating.)  You can spin around a little

25   bit here.  (Demonstrating.)  Zoom out.

1    Q.      Dr. Zagal, will you zoom in on the dove tattoo?

2    A.      Sure.  (Complies.)  You can see the rose there.

3    Q.      So, Dr. Zagal, now you have created a Custom

4    Superstar.  What are you able to do with this Custom

5    Superstar in the game?

6    A.      I can use this Custom Superstar to play the game.

7    Q.      Could you demonstrate that to the jury?

8    A.      Sure.  I'm going to go back, come down here and

9    accept.  I'll accept all the changes I made to my Custom

10   Superstar.  I'm going to go back to the main menu.  I'm

11   just going to select "play" here and play in a one-on-one

12   match.  There's also a few different options.  Let's pick

13   the "table" one.  (Demonstrating.)

14   Q.      Dr. Zagal, as you are proceeding through the menus

15   and the loading screen is going, are you prepared to play a

16   battle in the 2K16 game right now?

17   A.      I'm prepared to lose a battle, how about that?

18   Q.      Can you play to lose?

19   A.      Yes, I can play to lose.

20   Q.      Okay, please do.

21   A.      Okay.  So, I'm going to pick for myself one of my

22   Custom Superstars.  And it says "new" because there's a new

23   one that I just created.  Maybe it's -- there we go.  And

24   then I'm going to pick a Superstar to play against.

25   Q.      You are choosing your opponent?

1    A.       Yes.  (Demonstrating.)

2    Q.       And you have selected Randy Orton as your opponent?

3    A.       I did.  I selected Randy Orton.  You can kinda tell

4    the one on the left is a mannequin, doesn't look quite like

5    a real person does.  And you can tell on the right, it's --

6    that's a photograph -- or came from -- the image came from

7    a photograph.  "Start match."

8    Q.       That's on the menu screen; correct?

9    A.       Yes.

10   Q.       Okay.

11   A.       You can see that in bigger detail.  (Pause.)  The

12   game is currently loading, so.  (Pause.)

13            I'm going to try to run away.  (Demonstrating.)

14            THE COURT:  Okay.  He's not going to narrate the

15   battle, right?

16   Q.       (BY MR. FRIEDMAN)  Dr. Zagal, you don't need to

17   narrate the battle.

18   A.       Okay.

19   Q.       But go ahead and play to lose.  You're the

20   character that's -- whose back is facing us; correct?

21   A.       That is correct.  I am controlling the --

22   Q.       And throughout this gameplay, are the tattoos both

23   on the Orton character and your Custom Character visible?

24   A.       Yes, they are both visible and, and the same.

25   (Demonstrating.)  Okay, I had to get one hit in.

1  Q.      Dr. Zagal, I think that's sufficient.

2          MR. FRIEDMAN:  Mr. Zidzik, you can turn off the

3  Xbox.

4  Q.      (BY MR. FRIEDMAN)  Well played, Dr. Zagal.

5          Dr. Zagal, have you also created videos of gameplay

6  for the 2K16, 17, and 18 gameplays to further explain your

7  opinions to the jury?

8  A.      Yes, I have.

9  Q.      Now, that implies that you are able to record

10 gameplay from the -- from the video game.  Is that

11 accurate?

12 A.      Yes, that's a -- the Xbox has that feature and

13 allows you to record directly.  You can also take

14 screenshots and things like at that.

15 Q.      Thank you.  And in addition, were you able to take

16 any screenshots to illustrate some of the instances in

17 which the tattoos appear in the 2K video games?

18 A.      Yes.

19 Q.      Okay.  Dr. Zagal, what we saw when you were playing

20 the match against Randy Orton, was that gameplay or was

21 that photography?

22 A.      That was gameplay.  All the images there were

23 generated by -- I'll call it the computer, the game console

24 in this case, based on software code and -- the term of the

25 art is sort of -- there are 3D models.

```
 1          So, to give you an idea of what a 3D model is, I'm
 2   going to assume that you are familiar with chocolate Easter
 3   bunnies?  So there's -- let's imagine a really big one,
 4   right?  3D models like the chocolate Easter bunny without
 5   the wrapping.  It's hollow.  There's nothing in the middle.
 6   Right?  There's nothing inside.  It's just an outside
 7   layer.  And there's these textures that are applied to the
 8   outside to dress it up, so it doesn't look blank, as it
 9   were.
10          So, in this case, that's an image that's generated
11   by the game itself.  It's not based on footage of any
12   wrestler.  And they usually, because there are so many
13   wrestlers, what they'll do is they'll use sort of a generic
14   model and then resize it, depending on if the wrestler is
15   taller, wider, and so on and so forth.
16   Q.      Thank you, Dr. Zagal.
17          Dr. Zagal, you mentioned that you prepared some
18   video gameplay.  And have you reviewed Plaintiff's Exhibit
19   153?
20   A.      Yes.
21   Q.      Okay.  What is Plaintiff's Exhibit 153?
22   A.      A video gameplay.
23   Q.      Okay.  From the 2K16 game?
24   A.      Yes.
25          MR. FRIEDMAN:  Your Honor, I'd move for admission
```

1    of Plaintiff's Exhibit 153 and to publish a portion of it

2    to the jury.

3             THE COURT:  Any objections?

4             MR. SIMMONS:  No, Your Honor.

5             THE COURT:  Plaintiff's Exhibit 153 is admitted and

6    may be published.

7             MR. FRIEDMAN:  Thank you, Your Honor.

8             Mr. Zidzik, could you please pull up Plaintiff's

9    Exhibit 153 and play a portion of it, starting at 3 minutes

10   and 13 seconds.

11            THE WITNESS:  Could we show something from the

12   beginning?

13            MR. FRIEDMAN:  Yes.

14            Mr. Zidzik, could you start Plaintiff's Exhibit 153

15   at the beginning?

16            (Video playing.)

17   Q.    (BY MR. FRIEDMAN)  Dr. Zagal, what are we seeing on

18   this screen?

19   A.    If we could pause there?  (Pause.)  So, that's sort

20   of the start-up screen.  And yesterday, I mentioned how

21   game companies will often license stuff from other

22   companies, their IP.  So, here is a list essentially of

23   different kinds of licenses that are in this game.

24            The ones at the top all have to do with the WWE.

25   They're basically saying that the trademark, logos,

1   copyrights having to do with the wrestling characters and

2   their names and so on are part of WWE.

3          And further down, there's other licenses.  We can

4   see Terminator movies and Terminator 2.  I believe there's

5   a special -- a special expansion for this game where you

6   could play as, I believe, as the Terminator from the

7   movies.

8          And some of the other licenses there are specific

9   to technology that's being used in this game.

10  Q.     Are these examples of the licensed IP in video

11  games that you were talking about yesterday?

12  A.     Yes.

13  Q.     Thank you.

14         MR. FRIEDMAN:  Mr. Zidzik, could you advance to

15  3 minutes and 13 seconds, approximately.

16         (Video playing.)

17  Q.     (BY MR. FRIEDMAN)  Dr. Zagal, what are we seeing in

18  this portion of Plaintiff's Exhibit 153?

19  A.     So, in some of the matches you get these animated

20  entrances where you see the wrestler enter the ring.  In

21  this case, we're seeing the character of Andy Orton -- I'm

22  sorry -- Randy Orton -- my mistake.  And he's sort of

23  walking around and strutting and the narrators are

24  commentating and they're saying how great a wrestler he is

25  and commenting on his attitude and his experience, and so

1    on.

2         On the other side there, we can briefly see there's

3    another wrestler.  In this case, it's a custom wrestler

4    that I created.  And this is happening as sort of getting

5    ready to play the game and to make the match more exciting,

6    like you would see on the television broadcast.  So,

7    they're sort of mimicking that.

8         In the background, we're seeing a crowd.  Not very

9    realistic.  They are sort of animated characters, but

10   animated with less quality.

11        And in the back, we can actually see some video

12   footage of Randy Orton in his actual sort of in-person

13   performances in the back.

14   Q.    Now, the video that we are seeing now, Mr. Orton --

15   or the Orton character entering the ring, is that gameplay

16   or is that video footage?

17   A.    So, it's not game from the sense that I'm --

18   there's no one controlling this character; he sort of plays

19   automatically.  But it's generated by the game.  I'll call

20   that game engine footage or generated by the game engine,

21   rather than footage from a video recording that was made

22   elsewhere.

23   Q.    Thank you, Dr. Zagal.

24        And just to conclude on this video, the custom

25   playable character appears to have different color tattoos

1    on his arms.  What's going on there?

2    A.    So, that's a Custom Character that I created using

3    the tattoos I showed you earlier today.  As an additional

4    option, I could change the colors to make them, well, in

5    this case, look uglier, to be honest.  But you can modify

6    in this case the colors specifically, you can add some, add

7    some -- a few effects that I did not show in my

8    demonstration earlier.

9    Q.    Thank you, Dr. Zagal.

10         MR. FRIEDMAN:  Mr. Zidzik, you can take down that

11   video, please.

12   Q.    (BY MR. FRIEDMAN)  And, Dr. Zagal, you did the same

13   thing -- did you do the same think with the 2K17 and 18

14   games, where you created videos of some of the gameplay in

15   order to illustrate what's happening in those games with

16   the jury?

17   A.    Yes, I did.

18   Q.    Is Exhibit 154 one of those?

19   A.    Yes.

20         MR. FRIEDMAN:  Your Honor, I'd move for admission

21   of Exhibit 154, and to publish a portion of it to the jury.

22         MR. SIMMONS:  Your Honor, no objections.

23         THE COURT:  Plaintiff's Exhibit 154 is admitted and

24   may be published.

25   Q.    (BY MR. FRIEDMAN)  Dr. Zagal, we are looking at

1    Plaintiff's Exhibit 154.  Is this recorded video gameplay

2    that you created from the 2K17 video game?

3    A.     This is.

4    Q.     Okay.

5          MR. FRIEDMAN:  Mr. Zidzik, could you skip to about

6    8 minutes and play?

7          (Video playing.)

8    Q.     (BY MR. FRIEDMAN)  Dr. Zagal, what are we viewing

9    at 8 minutes on Exhibit 154?

10   A.     So, this is a camera mode in the editor for the

11   game.  In this case, the wrestler that's been selected is

12   Randy Orton's character for the game.  And you can move the

13   camera around like before, to see all the tattoos and the

14   -- what he looks like in the games, like what his character

15   looks like.

16   Q.     And similarly, can you zoom in on the tattoos to

17   see them in even greater detail?

18   A.     Yeah, you can zoom in.  You can rotate the camera

19   also in different directions.  You can see him from up

20   above.  For this game, the camera controls are a bit more

21   sophisticated.  There's a few more options.  You can also

22   pan your way -- you can get in pretty close in this game.

23   Q.     Thank you, Dr. Zagal.

24         MR. FRIEDMAN:  Mr. Zidzik, you can take down

25   Plaintiff's Exhibit 154.

1    Q.      (BY MR. FRIEDMAN)  Dr. Zagal, did you create

2    Plaintiff's Exhibit 155 of your gameplay in the 2K18 game?

3    A.      Yes, I did.

4         MR. FRIEDMAN:  Your Honor, I'd move for admission

5    of Exhibit 155 and to publish a portion of it to the jury.

6         THE COURT:  Any objections?

7         MR. SIMMONS:  No, Your Honor.

8         THE COURT:  Plaintiff's Exhibit 155 is admitted and

9    may be published.

10        MR. FRIEDMAN:  Mr. Zidzik, could you play a portion

11   of Exhibit 155 starting at about 4 minutes.

12        (Video playing.)

13   Q.      (BY MR. FRIEDMAN)  Dr. Zagal, what are we seeing in

14   this video?

15   A.      This is an in-game match.  It's Seth Rollins versus

16   Randy Orton.

17   Q.      And this is from the 2K18 game?

18   A.      Yes.

19   Q.      All right.  Are the tattoos on the Orton character

20   visible during gameplay like this?

21   A.      Yes, they are.  And in actual gameplay, the quality

22   is better.  The video's a bit, um, sort of laggy in some

23   ways.

24   Q.      When you are referring to the video, you are

25   referring to the video that you created of the gameplay?

1    A.      Yes, the video that we are watching right now.  Or

2    at least on my screen, there's a bit of ghosting.

3    Q.      Okay.

4    A.      Yeah, and the images we are seeing here, again,

5    were created by the game engine.  They are not created from

6    direct footage of any of Mr. Orton's sort of live events.

7    Q.      Thank you, Dr. Zagal.

8            MR. FRIEDMAN:  Mr. Zidzik, you can remove that from

9    the screen.

10   Q.      (BY MR. FRIEDMAN)  Dr. Zagal, we have talked about

11   realism, we have talked about authenticity, and that the

12   more realistic, the better it is for sales; correct?

13   A.      Yes.

14   Q.      Okay.  And about your opinions that the tattoos in

15   the video games give the Orton character a level of realism

16   and authenticity; right?

17   A.      Yes.

18   Q.      Okay.

19   A.      They make the character more realistic.

20   Q.      All right.  Now, do you have an opinion whether the

21   defendants copied the plaintiff's five tattoos into the

22   video games?

23   A.      Yes.  They were --

24   Q.      Is that opinion --

25   A.      -- copied.

Q. I'm sorry. What is that opinion?
A. Yes, they were copied.
Q. Dr. Zagal, you created those videos that we just watched from gameplay. Can normal players, consumers of these video games, also record their gameplay?
A. Yes. They do it all the time. There is a couple services that actually make it really easy to not only create videos of a gameplay, but also share 'em widely on the internet. There's -- one particular website is known as Twitch. It's used for game streaming, where people will play their games live and they'll have people in the chat commenting, and so on. YouTube is also a very popular site for uploading and posting videos of gameplay.
Q. And that's how you created the videos that we just showed the jury, by recording the gameplays, any consumer would?
A. Yes. There's no special hardware is required to do this. It's -- it comes out of the box, essentially.
Q. Dr. Zagal, do you have an opinion whether the inclusion of the five tattoos in the video games was a deliberate design choice?
A. Yes. So --
Q. Go ahead.
A. When you are creating a video game, you basically have to create everything from scratch unless, let's say,

1    you have licensed some sort of technology that you might be

2    using to help you.  But all the content in the video game

3    is put there very deliberately.  Right?  It's a game design

4    decision whether or not to include a certain feature.

5          Adding features costs time and, and money,

6    obviously.  You have to pay one of your employees to work

7    on this feature; it needs to be tested, it needs to be

8    verified, and so on and so forth.

9          So, everything in the game comes from a decision.

10   At some point, someone said, *well, we need to add some more*

11   *camera controls*, or, *we need to add a new character*, and,

12   *we need to add a new option to -- more hats for our*

13   *wrestlers,* and so on and so forth.  So, everything is

14   deliberate and designed.  And game companies are,

15   obviously, under a lot of pressure to make these games, to

16   not run over in terms of schedule, in terms of budget, and

17   so on.

18         For these games specifically, they're coming out

19   yearly.  And so, if we sit down and said, *Hey, we have this*

20   *really cool idea we want to add to the game*, and it turns

21   out that it will take us -- it will take two months to

22   implement that, test it, and get it in the game.  We might

23   -- we might run over, past our schedule, and now the game

24   is coming out after the year it's supposed to be, for

25   example.

1        So, game companies are very deliberate in that

2   sense.  And the choice to add is --

3        THE REPORTER:  Excuse me.  Please repeat that.

4   A.      So, the game companies are very deliberate -- my

5   apologies -- in terms of what should they add, what should

6   they not add, what should they remove.  And sometimes they

7   choose to remove features that might have been present in

8   an earlier year because, let's say, players might not have

9   liked them or they were too buggy or they didn't add value

10  to the game, for example.

11  Q.      (BY MR. FRIEDMAN)  Dr. Zagal, do you have an

12  opinion whether a portion of the sales and profits of the

13  2K video games are attributable to the five tattoos?

14  A.      Yes.

15  Q.      What is that?

16  A.      And the connection is, the game company --

17       THE COURT:  Excuse me for a second.

18       Dr. Zagal, I'm going to ask you, slow down a little

19  bit.

20       THE WITNESS:  Okay.

21       THE COURT:  You speak rapidly, but Chris's head is

22  about to blow up.

23       THE WITNESS:  Okay.

24       THE COURT:  And it won't be caught on video.  So,

25  slow down a little bit.

1        THE WITNESS:  Yes.  My apologies.

2        THE COURT:  You're welcome, Chris.

3        THE REPORTER:  Thank you, Judge.

4        THE WITNESS:  My students also have this issue.

5    Q.    (BY MR. FRIEDMAN)  You have heard that critique

6    before, huh?

7    A.    I have heard it before from my students, so.

8          I'm sorry, could you repeat the question?

9    Q.    Yes.  I asked you whether you had an opinion

10   whether a portion of the sales and profits of the video

11   games are attributable to the five tattoos?

12   A.    So, yes, I do.  And it's a sequence, in a sense.

13   So, the game company has decided that they want the

14   character of Randy Orton in their game.  They know the

15   character needs to look the way Randy Orton, the real

16   person, looks like in the real life.  In order to do so,

17   they need to make sure he shows up in the game with the

18   tattoos.  And they need to look the way they look in -- on

19   the character, they need to look the way they look in real

20   life.

21          Why would they choose to include Randy Orton in

22   their game?  Well, because he's an important star in the

23   WWE.  He's a big star.  He has a long history, long

24   successful history, too.  He's won many championships.  I

25   believe the most recent one, at least when I began my

1    research, was the 2018 American Championship.

2           And so, in order to have Randy Orton as a character

3    in the game, he needs to look right.  He needs to have his

4    tattoos.  And so, in that sense there is a driver.  Right?

5    They have added him because they expect to sell more copies

6    because of that.  Or they expect to not sell fewer copies.

7    If fans are upset that he is not in the game, then they

8    would not buy the game.

9    Q.     Dr. Zagal, have you done an analysis of how much

10   the video games' sales or profits are attributable to the

11   copyrighted tattoos?

12   A.     No, I have not done that analysis.

13   Q.     Why not?

14   A.     I was not asked to.

15   Q.     Dr. Zagal, video games are similar to computer

16   programs.  Is that fair?

17   A.     I'd say they are computer programs, for the most

18   part.

19   Q.     Do video games take up a certain amount of hard

20   drive space or storage space?

21   A.     Yeah, so there's assets and files that need to be

22   downloaded and installed on the device.

23   Q.     In order to find out how important the tattoos are

24   to the video games, couldn't you just calculate the

25   percentage of the hard drive that is taken up by the copied

1    artwork and then compare that to the amount of storage

2    space the entire game takes up?

3    A.      I don't think it would make sense to do that.

4    Q.      Why not?

5    A.      Because they're two unrelated things.  It would

6    sort of be like saying how much is a certain word worth in

7    a book by counting how many words the book has in total.

8    When, in this case, we have a video game that has lots of

9    characters, it has lots of software code, lots of assets.

10          But what really matters is, *How important is this*

11   *character to the game?*  Not all the characters in the game

12   are equally valuable in that sense.  They're not all

13   equally important.  And so, it's not about the file sizes,

14   it's about the significance that this character and this

15   character's tattoos have to the game and the game sales.

16   Q.      Dr. Zagal, from a video game development

17   perspective, if Take-Two wanted to remove the tattoos or

18   cover them up or modify them on the Orton character, is

19   that technically feasible?

20   A.      Just based on what we see in the games and the

21   level of quality they achieve, it's not only feasible but I

22   think it would be pretty easy for them to do so.

23   Q.      So, they could have done that?

24   A.      Yes, they could have done that.

25   Q.      And could Take-Two have included the Orton

1  character or other characters without their tattoos at all,

2  and still kept the characters in?

3  A.      Yes, absolutely.

4  Q.      Okay.  Dr. Zagal, do you think your colleagues will

5  have an opinion about your testimony today?

6  A.      My colleagues?  Yes.

7          MR. SIMMONS:  Objection, Your Honor.

8          THE COURT:  Sustained.

9  Q.      (BY MR. FRIEDMAN)  Dr. Zagal, I have no additional

10 questions.  Thank you very much.

11 A.      Thank you.

12 Q.      At this time.

13         MR. SIMMONS:  Your Honor, may I proceed?

14         THE COURT:  Yes.

15                       CROSS-EXAMINATION

16 BY MR. SIMMONS:

17 Q.      Good morning, Dr. Zagal.

18 A.      Good morning.

19 Q.      We have met before, right?

20 A.      I believe so.

21 Q.      I had the opportunity to ask you some questions in

22 this case and you answered them under oath?

23 A.      If you are referring to my deposition then, then

24 yes.

25 Q.      Now, you offered some opinions on direct and I'd

1    like to go through a few of them, if that's okay.

2          THE COURT:  I'm sorry.  Hang on for one second,

3    counsel.

4          Stacie, is there any way to turn that mic up at the

5    podium?

6          MR. SIMMONS:  I can also try to speak louder, if

7    that helps.

8          (Off the record.)

9    Q.    (BY MR. SIMMONS)  So, I'd like to talk about a few

10   of your opinions that you talked about on direct.  Now, one

11   of your opinions that you ended with was that profits from

12   these games are attributable to Mr. Orton's tattoos.  Do

13   you remember that?

14   A.    To his tattoos, yes.

15   Q.    Now, you admit that people don't buy WWE 2K because

16   of the tattoos; right?

17   A.    I believe I said that in my deposition, yes.

18   Q.    Okay.  And you aren't aware of anyone who purchased

19   WWE 2K because of one of Mr. Orton's tattoos; right?

20   A.    Specifically for the tattoos, that is correct.

21   Q.    In fact, you haven't analyzed Mr. Orton's tattoos

22   separately, have you?

23   A.    I have not.

24   Q.    So, you haven't analyzed the tattoos that Miss

25   Alexander inked separately from the ones inked by other

1    tattoo artists; right?

2    A.      That is correct.

3    Q.      So, for example, you showed Mr. Orton's back

4    tattoo.  Do you remember that?

5    A.      Mm-hmm.  Yes.

6    Q.      Do you understand that Miss Alexander did not ink

7    the entirety of that back tattoo?

8    A.      That is my understanding, yes.

9    Q.      In fact, the majority of it was inked by a

10   different tattoo artist; correct?

11   A.      Sure.  Like I said, I have not analyzed that tattoo

12   specifically.

13   Q.      Right.  What she inked was the extension at the

14   top; right?

15   A.      I believe so.

16   Q.      Now, unlike the examples of Harry Potter that you

17   talked about yesterday, you don't have an opinion that Mr.

18   Orton's tattoos drive more sales than the tattoos of anyone

19   else in WWE 2K; right?

20   A.      I have not examined anybody else's tattoos in the

21   WWE games.

22   Q.      Now, you also talked about fan reviews.  Do you

23   remember that?

24   A.      Yes.

25   Q.      Now, fans complain about a lot of things; right?

```
1    A.      Yes.

2    Q.      And you have talked about one set of things that

3    they complain about, but you didn't talk about sort of the

4    world of fan review; right?

5    A.      Do you mean the world more broadly, covering all

6    video games?

7    Q.      No, in this game.

8    A.      So, as part of my analysis, I did look at other --

9    I -- when fans are complaining, they are often complaining

10   about multiple things at the same time.  Sometimes, they

11   were complaining about graphic elements.  Sometimes, they

12   were complaining about things that were not --

13   Q.      And not all fans complain about video games online;

14   right?

15   A.      I believe so, yeah.  That's fair.

16   Q.      Not everyone puts their complaints into words.

17   A.      No.

18   Q.      And not everyone has complaints about a game,

19   either; right?

20   A.      Of course.

21   Q.      So, there's a certain subset of people that you

22   were focusing on with the game reviews that you were

23   reviewing; right?

24   A.      Yes.

25   Q.      Now, in forming your opinions, you didn't talk to
```

1   anyone else; right?

2   A.      In forming my opinions, no.

3   Q.      Okay.  You didn't talk to Miss Alexander; right?

4   A.      No, I did not.

5   Q.      You didn't talk to Mr. Orton?

6   A.      No, I did not.

7   Q.      You didn't conduct interviews of customers, did

8   you?

9   A.      That is correct.

10  Q.      You didn't study purchasers of WWE 2K at all, did

11  you?

12  A.      Specifically, no.

13  Q.      Now, if you wanted to find out why people bought

14  WWE 2K, you could have conducted a survey; right?

15  A.      I could have done a variety of things, including a

16  survey, yes.

17  Q.      Okay.  Are you aware that Take-Two's survey expert,

18  Dr. Deborah Jay, who will testify later this week, did

19  conduct such a survey?

20  A.      I'm not familiar with what your expert has done.

21  Q.      Okay.  So, in reaching your conclusions, you did

22  not rely on the fact that she found that no purchasers

23  bought the game for the tattoos?

24  A.      I believe I didn't.  But for my research, I did use

25  a lot of documents.  I don't recall right now off the top

1    of my head if that -- if that survey was one of the

2    documents that I, I looked at.

3    Q.      Okay.  So, turning back to your opinions --

4    A.      Mm-hmm.

5    Q.      -- you aren't here to tell the jury a dollar amount

6    of Take-Two's profits that you think are attributable to

7    Mr. Orton's tattoos; right?

8    A.      That is correct.

9    Q.      Similarly, you didn't provide a number of how much

10   the sales of WWE 2K would be affected if Mr. Orton's

11   tattoos were not included; right?

12   A.      That is correct.

13   Q.      And you didn't conduct a study of whether a version

14   of WWE 2K without Mr. Orton's tattoos would lose sales at

15   all; right?

16   A.      I did not do a comparative study of that sort,

17   correct.

18   Q.      Now, what you did do is you focused on Mr. Orton's

19   popularity; right?

20   A.      Amongst other things, yes.

21   Q.      And you view him as a popular person; right?

22   A.      As a person?  I don't know personally -- I don't

23   know him personally, so I have no -- no view on his

24   personality.

25   Q.      Okay.  Well, you refer to him as a Superstar in

1    WWE; right?

2    A.      Yes.

3    Q.      And you sort of touted the fact that he is a

4    Superstar; right?

5    A.      So, if by -- if from your earlier question if you

6    meant a celebrity, yes, I looked at that.

7    Q.      Well, my question is a little different.  Are you

8    aware that all WWE wrestlers are called Superstars?

9    A.      No.

10   Q.      Now, you didn't talk to any fans about why they

11   like Mr. Orton, did you?

12   A.      No, I did not talk directly to any fans.

13   Q.      In fact, Mr. Orton is popular because he's a good

14   wrestler; right?

15   A.      I would imagine so, that that would be a part of

16   his popularity.

17   Q.      He's popular because he's a good entertainer;

18   right?

19   A.      I would imagine that's a part of his popularity,

20   yes.

21   Q.      He's popular because he's got special finishing

22   moves in WWE; right?

23   A.      I imagine that would be a factor, yes.

24   Q.      Are you familiar with the RKO?

25   A.      Yes.

1   Q.      Mr. Orton is charismatic; right?

2   A.      I don't have an opinion on that.

3   Q.      Okay.  Do you think he's handsome?

4   A.      Yeah, I think it's fair to say he's a handsome

5   wrestler.

6   Q.      So, would you agree that Mr. Orton would be popular

7   with or without his tattoos?

8   A.      I think it's hard to disentangle those, to be

9   honest.

10  Q.      Because he wears them in real life?

11  A.      Because they're a big part of his wrestling

12  persona.

13  Q.      And let's say that Mr. Orton changed his tattoos

14  and removed the ones that Miss Alexander inked.  Would it

15  no longer be your opinion that profits from WWE 2K are

16  attributable to those tattoos?

17  A.      Let me see if I understand your question.  If he

18  had completely different tattoos, would I make the same

19  argument here?

20  Q.      Mm-hmm.  Yes.

21  A.      So, I think -- it's the tattoos that are important,

22  in terms of what he looks like, in making sure that his

23  character in the game looks like he likes -- looks the way

24  he does in a real-life event.

25  Q.      But if he changed the skull tattoos to Harry

1    Potter, you would say that he needs to have Harry Potter in

2    the game to be realistic; right?

3    A.      Yes.

4    Q.      It wouldn't -- and it would not be realistic to

5    then use Miss Alexander's tattoos?

6    A.      So, if he had a Harry Potter tattoo, I would expect

7    him to -- fans would expect him to show up in the game with

8    a Harry Potter tattoo.

9    Q.      So, there's nothing about what Miss Alexander inked

10   on his body artistically that leads to your conclusions

11   about profits in the game; right?

12   A.      So, my conclusion is not based on the particular

13   designs of the tattoos and on the artistic value that the

14   tattoos may have.

15   Q.      Your opinions are based on the fact that Mr. Orton

16   elected to have ink permanently placed on his body; right?

17   A.      No, they're based on his appearance in the real

18   world and the need for his appearance in the game, for his

19   game character, to look the way he does in the real world.

20   Q.      But you understand that Mr. Orton decided how he

21   was going to look in the real world; right?

22   A.      I would hope so.

23   Q.      Okay.  And regardless, you didn't conduct a study

24   to determine whether Mr. Orton's popularity contributed to

25   the success of WWE 2K; right?

1    A.       A study focused on that specific question, no.

2    Q.       And you didn't commission a study of what sales of

3    WWE 2K would be without Mr. Orton in it; right?

4    A.       I did not do a comparative study, no, I did not.

5    Q.       Now, you admit that there are a lot of reasons that

6    people buy WWE 2K; right?

7    A.       Yes, I think it's fair to say that.

8    Q.       Some people purchase WWE 2K because they like

9    wrestling games; isn't that true?

10   A.       Yes, fans of wrestling are more likely to buy the

11   games, I believe that is true.

12   Q.       And some people purchase WWE 2K because they like

13   the WWE; right?

14   A.       Isn't that the same question or --

15   Q.       Well, you might have someone who likes wrestling in

16   general, and someone who likes WWE wrestling in particular;

17   right?

18   A.       Oh, yes.  Absolutely.

19   Q.       Okay.  And there are other things in the game, like

20   music; right?

21   A.       That is true.

22   Q.       Someone might like the music in the game.

23   A.       Yes.  I mean, we would hope though, because

24   otherwise they'd have to mute it all the time.

25   Q.       Right.  Some people might want to go to the club

1    when they are playing the video game; right?

2    A.      I don't think so, because if they're playing the

3    video game, they want to play the video game.

4    Q.      I'm sorry.  I meant the club -- the club music that

5    we were talking about earlier, but regardless.

6            In fact, fans of the WWE are more likely to

7    purchase WWE video games; right?

8    A.      In general, yes, I believe that would be the case.

9    Q.      But you didn't determine how many people purchase

10   WWE 2K primarily because they like the WWE; right?

11   A.      No, I did not study that.

12   Q.      Some people purchase WWE 2K because they like the

13   fact that it has so many wrestlers; isn't that true?

14   A.      I think that's plausible.  I don't have any data to

15   support that, though.

16   Q.      But there's over 100 wrestlers in WWE 2K; right?

17   A.      Yes.

18   Q.      In fact, according to you, making the other

19   wrestlers -- not Randy Orton -- look the way they look in

20   real life also drives consumer demand; right?

21   A.      Wait.  I'm sorry.  I don't understand your

22   question.

23   Q.      So, you said that making Randy Orton look the way

24   that he does in real life is -- drives demand for the

25   games; right?

1    A.      Yes.

2    Q.      But isn't it also true that making the other

3    wrestlers look how they look in real life also drives

4    demand for the games?

5    A.      Yes.  It's the same argument for all the wrestlers.

6    Q.      But you haven't compared different wrestlers to see

7    who drives more sales of these games; right?

8    A.      I have not looked at any sales.

9    Q.      So, the jury can't tell from your opinions what the

10   value of Mr. Orton is versus any other wrestlers; right?

11   A.      An exact number, no.  I have not given any opinion

12   on an exact number.  My opinion is that he's important.

13   He's not an insignificant wrestler in the context of the

14   games.

15   Q.      Sure.  But they can't know how much the sales of a

16   version of WWE 2K, without Mr. Orton in it, would be

17   negatively impacted, can they?

18   A.      Well, that would be for them to decide.

19   Q.      Okay.  Well, WWE 2K has a lot of elements other

20   than Mr. Orton's tattoos that drive sales, doesn't it?

21   A.      I think there are a lot of things that drive sales,

22   yes.

23   Q.      And, for example, WWE 2K -- just like a real match

24   -- has action taking place in a wrestling ring in an arena;

25   right?

1    A.      Are you saying it's -- in the game, you can play in

2    an arena?  Yes.

3    Q.      And the fact that the arenas in the game look the

4    way they do when you are watching on television also drives

5    demand for the game; right?

6    A.      That would go to realism.  Yes.

7    Q.      Okay.  Dr. Zagal, I'd like to ask you a few

8    questions about your education and work background, if we

9    can?

10   A.      Sure.

11   Q.      So, you don't have any degrees in cultural studies;

12   right?

13   A.      I do not.

14   Q.      No degrees in media studies?

15   A.      No.

16   Q.      No marketing degree?

17   A.      I have studied marketing as part of my

18   undergraduate degree, but I do not have a degree in

19   marketing.

20   Q.      Okay.  You don't have a business degree?

21   A.      Hmm.  That's -- I don't have a -- so, my

22   undergraduate degree is in engineering -- in civil

23   industrial engineering.  Civil industrial engineering is

24   not the same as a business degree the way it is in the

25   United States.  But usually, half of the course work is

1  business-related, marketing, finance, accounting,

2  management, and a couple others of that sort.

3  Q.      You don't have a specific degree that's a business

4  degree; right?

5  A.      Not in the way that the business degree exists in

6  the United States.

7  Q.      And you are not an economist, are you?

8  A.      No.

9  Q.      Now, on direct you said that you have not published

10  -- that you had not published any materials on the realism

11  in video games, any publications about realism in video

12  games; is that right?

13  A.      Specific to realism, that is correct.

14  Q.      And you haven't written any books about realism in

15  video games; right?

16  A.      Specific -- so, yes, to an extent.  I have

17  written --

18  Q.      Let me ask you -- I'm sorry.

19  A.      Yeah, it's not in my CV because my CV is outdated,

20  at this point.  So, I have written a book and submitted the

21  manuscript to a publisher, it's under contract, where I am

22  looking at a specific game console that existed -- that was

23  commercially available about 20 years ago now.  And as part

24  of that book, we do talk about realism.  I have a co-author

25  on the book, as well.

1    Q.      That book hasn't been published right?

2    A.      It has not been published, no.

3    Q.      Have you received feedback on the book?

4    A.      Yes, but I'm still waiting for the final round of

5    feedback.

6    Q.      So, you don't know whether the feedback will be

7    extensive on that book yet; right?

8    A.      I have no idea what the feedback will look like.

9    Q.      And you haven't written any books about why

10   consumers buy certain video games; right?

11   A.      Specifically to purchases, no.

12   Q.      You also haven't written about realism in video

13   games in the context of purchasing decisions; right?

14   A.      That is correct.

15   Q.      You have never published any scholarly articles

16   about sports video games; right?

17   A.      Specific to sports video games, no.

18   Q.      Not about wrestling games, certainly?

19   A.      Also not specifically to wrestling games, no.

20   Q.      And you wouldn't say you are an expert in tattoos,

21   would you?

22   A.      No.

23   Q.      You are not an intellectual property licensing

24   expert, are you?

25   A.      That is correct, I am not.

1    Q.      You are not a licensing expert at all; right?

2    A.      That is correct.

3    Q.      You have never negotiated a license for a video

4    game; correct?

5    A.      I'm going to say no, but there's a sort of a gray

6    area.  But for the purposes of the kinds of deals we were

7    talking about, like a big game like this, no.

8    Q.      You haven't licensed content to include in a video

9    game that you were designing; right?

10   A.      Technically, yes.  But for the purposes of this

11   trial, this kind of a deal, a big franchise, no, I have not

12   done that.

13   Q.      Let me just be clear.  The kinds of deals you were

14   talking about on direct, you have never actually negotiated

15   those before; right?

16   A.      Correct.

17   Q.      You have never published any scholarly articles

18   about intellectual property licensing in video games;

19   right?

20   A.      That is correct.

21   Q.      Now, you don't own a video game company, do you?

22   A.      Not anymore.

23   Q.      Okay.  And you have never sold a game that you

24   designed to consumers; right?

25   A.      So, I used to work at an internet company where I

1   was responsible for the design of many games.  These games

2   were available to consumers to play for free.  But I have

3   not owned -- I have not owned or participated in a game

4   company that has sold games to consumers at the retail

5   level.

6   Q.      Okay.  Now, are you familiar with Take-Two's video

7   game expert Dr. Ian Bogost, who is going to testify later

8   this week?

9   A.      Yes.

10  Q.      Now, you actually went to school when he was a

11  professor; right?

12  A.      Yes.  I was getting my Ph.D. when he joined Georgia

13  Tech as a professor.

14  Q.      And would you agree that Dr. Bogost is

15  well-regarded in the field of video games?

16  A.      He's an excellent scholar.

17  Q.      He is also a member of the Digital Games Research

18  Association that you mentioned on direct; right?

19  A.      He has participated -- I don't know if he's a -- if

20  his membership is active right now.  But, yes, he's a

21  member -- he's a very well-respected member of the game

22  scholarly community, correct.

23  Q.      Do you know if he is an inaugural member?

24  A.      Not off the top of my head.

25  Q.      Okay.  But you'd agree, he is a prolific author?

1    A.       Oh, absolutely, yes.

2    Q.       In fact, you have cited his work, haven't you?

3    A.       Yes.  I use it in my classroom, as well.

4    Q.       In fact, you cited it in one of your books; right?

5    A.       Probably, yes.

6    Q.       And Dr. Bogost is well-known in the areas beyond

7    his academic work; right?

8    A.       I believe so, yeah.

9    Q.       In fact, he's made video games that have received a

10   lot of critical and media attention; right?

11   A.       Yes.

12   Q.       Now, Dr. Bogost also analyzed WWE 2K; right?

13   A.       I believe so.

14   Q.       And you actually agree with some of his

15   conclusions, don't you?

16   A.       Some of them, yes.

17   Q.       You agree that the game is realistic; right?

18   A.       Yep.

19   Q.       And you agree that the games are large; right?

20   A.       Large in the sense of options for -- of things for

21   players to do and options to play, absolutely.

22           MR. SIMMONS:  Mr. Thomas, would you please bring

23   up, for Dr. Zagal, Defendant's Exhibit 28.  And what I'd

24   like to do is play it without sound for about five seconds,

25   if that's okay.

1          THE COURT:  And it's not in evidence, counsel.

2          MR. SIMMONS:  Correct.  I just wanted to play it

3    for Dr. Zagal for identification purposes, Your Honor, so

4    that we can then move it into evidence.

5          THE COURT:  Oh, okay.  It wasn't clear -- you said

6    you wanted to play it.  It wasn't clear whether you were

7    talking about publication.  You just want it played for the

8    witness?

9          MR. SIMMONS:  Yes, Your Honor.

10         THE COURT:  All right.

11         (Video playing.)

12   Q.    (BY MR. SIMMONS)  Now, Dr. Zagal, this is a video

13   of WWE 2K18; right?

14   A.    That's what it looks like, yes.

15   Q.    And it's an accurate depiction of the game?

16   A.    As far as I can tell, yes.

17         MR. SIMMONS:  Your Honor, I'd move the admission of

18   Defendant's Exhibit 28 into evidence.

19         THE COURT:  Mr. Friedman, any objections?

20         MR. FRIEDMAN:  No objection.

21         THE COURT:  Defendant's Exhibit 28 is admitted.

22         MR. SIMMONS:  Your Honor, may I publish it to the

23   jury?

24         THE COURT:  You may.

25         COURTROOM DEPUTY:  Would you like the volume on?

1        MR. SIMMONS:  No.  There's only one exhibit I think

2   I'll need sound for, I hope.

3        COURTROOM DEPUTY:  Okay.

4        MR. SIMMONS:  All right.  Can we bring that up for

5   the jury, please?  There we go.

6        Mr. Thomas, would you play the first five seconds

7   of the clip for the jury?

8        (Video playing.)

9   Q.    (BY MR. SIMMONS)  Now, Dr. Zagal, you admit that

10  there are different modes of gameplay in WWE 2K; right?

11  A.    Yes.

12  Q.    And on direct, you showed us one mode which is the

13  custom player menu; right?

14  A.    I showed two things.

15  Q.    Okay.  You showed us the custom player menu and you

16  showed us one way of playing the game in the ring; right?

17  A.    That is correct.

18  Q.    And there are a lot of wrestlers in this game,

19  aren't there?

20  A.    Yep.

21       MR. SIMMONS:  Okay.  If we can take that down from

22  the jury.  And, Mr. Thomas, what I'd like to do is play

23  just for Dr. Zagal, for identification, Defendant's Exhibit

24  16 with no sound.

25       (Video playing.)

1    Q.      (BY MR. SIMMONS)  Dr. Zagal, this is a video of WWE

2    2K17; right?

3    A.      That's what it looks like.

4    Q.      And it's an accurate depiction of the game; right?

5    A.      As far as I can tell, yes.

6            MR. SIMMONS:  Your Honor, I'd move the admission of

7    Defendant's Exhibit 16 into evidence.

8            THE COURT:  Any objections?

9            MR. FRIEDMAN:  No objection.

10           THE COURT:  Defendant's Exhibit 16 is admitted.

11           MR. SIMMONS:  Your Honor, may I publish it to the

12   jury?

13           THE COURT:  You may.

14           MR. SIMMONS:  Mr. Thomas, would you advance

15   Defendant's Exhibit 16 to 55 seconds in, and play it with

16   no sound -- continue to play it with no sound.

17           (Video playing.)

18   Q.      (BY MR. SIMMONS)  Now, Dr. Zagal, as you can see in

19   this clip, WWE 2K has a stadium with a crowd; right?

20   A.      Yes.

21   Q.      And the wrestlers wear realistic costumes in WWE

22   2K?

23   A.      Yes, generally.  Yes.

24   Q.      The lighting is what you'd expect of a WWE

25   wrestling match?

1    A.    Generally, yes.

2    Q.    It looks the way you'd see something on television;

3    right?

4    A.    Within the constraints of the technology, yes.

5    Q.    Now, WWE 2K also has sounds that replicate the real

6    world; right?

7    A.    Yes.

8          MR. SIMMONS:  What I'd like to do is, just for

9    maybe for ten seconds, can we play the game with sound?

10   And, Mr. Thomas, if you could take us to 2 minutes and 35

11   seconds to do that.

12         (Video playing.)

13   Q.    (BY MR. SIMMONS)  Dr. Zagal, the sounds in WWE 2K

14   include crowds responding to a match; right?

15   A.    Yes.

16   Q.    And buzzers?

17   A.    Yes.

18   Q.    And announcers providing a play by play of the

19   match?

20   A.    Yes.

21   Q.    It includes music?

22   A.    Yes.

23   Q.    And the physics of the gameplay contributes to the

24   game's realism, too; right?

25   A.    Yes, I agree.

1    Q.      So, what I'd like to do is look at Plaintiff's

2    Exhibit -- switch gears and talk a little bit about Mr.

3    Orton, and I'd like to bring up Plaintiff's Exhibit 25,

4    which you were shown on direct, if that's okay.

5           MR. SIMMONS:  Mr. Thomas, can you bring up

6    Plaintiff's Exhibit 25?  And could we show that to the

7    jury, please.

8    Q.      (BY MR. SIMMONS)  So, this is the article that you

9    were talking about on direct; right?

10   A.      Correct.

11   Q.      It's a piece of marketing?

12   A.      I guess you'd have to ask the WWE how they consider

13   it.  But I think it's fair to say that they're using it to

14   promote and to talk to their fans, absolutely.

15   Q.      You didn't investigate why this article was

16   created; right?

17   A.      That is correct.

18   Q.      You didn't investigate how it was created?

19   A.      That is correct.

20   Q.      Okay.

21          MR. SIMMONS:  Let's go to page 17.

22   Q.      (BY MR. SIMMONS)  Okay.  So, this is the page you

23   showed the jury earlier; right?

24   A.      Yes.

25   Q.      Now, at the top of this page it says:

```
 1              "5.   Randy Orton."

 2         You see that?

 3   A.        Yes.

 4   Q.        And it says:

 5              "Tattoo:   Tribal design.

 6              "Location:   Back and shoulders."

 7         Correct?

 8   A.        Correct.

 9   Q.        Now, you already testified that Miss Alexander did

10   not ink the entirety of that back tattoo; correct?

11   A.        Of the back one?   Correct.

12   Q.        Okay.   And if we go down to the second paragraph,

13   it indicates that Orton -- Mr. Orton had the back piece of

14   the tattoo since his days training in Ohio Valley

15   Wrestling; correct?

16   A.        Correct.

17   Q.        So, the tattoo that this article is talking about

18   has existed since before Miss Alexander inked Mr. Orton;

19   right?

20   A.        So, the tattoo in the picture is not the tattoo

21   that he had when he was training at Ohio Valley Wrestling.

22   Q.        Right.   But you understand that when he was at Ohio

23   Valley Wrestling, he had a back tattoo that is the subject

24   of this article; right?

25   A.        No, because the subject of the article is the
```

tattoo he actually has in the picture.

Q.     Okay.  So, you are saying that -- well, let me try it this way:  You would agree that the tattoo existed without Miss Alexander's back extension when he was playing for Ohio State; right?

A.     Yes.  That would be my understanding.

Q.     Okay.  Now, I want to go to a different page of this document.  Page eight, if we can.  Now, this is a piece about Mr. Goldberg; right?

A.     Yes, I believe so.

Q.     And he's another WWE Superstar; right?

A.     Mm-hmm.  I would imagine.

Q.     And this is touting his tribal design; correct?

A.     Correct.

Q.     And if we go down in the article to the -- I think it's the first paragraph -- or, I'm sorry, the second paragraph -- no, that's right.  That's right.  I'm sorry. My fault.

       It talks about tribal tattoos; right?

A.     Generally, yes.

Q.     And it says:  "Tribal tattoos in the U.S. may have developed a bit of reputation for being unoriginal and cliche."  Right?

A.     That's how the sentence begins, yes.

Q.     Right.  And then it goes on and says that Mr.

1    Goldberg had his own unique tattoo; right?

2    A.      I don't think it says unique.  It says his tribal

3    ink was the perfect representation of his brute strength

4    and ferocious attitude.

5    Q.      Do you understand that Mr. Goldberg had this tattoo

6    before Mr. Orton's tattoos were inked?

7    A.      I'm not sure about the timeline here.

8            MR. SIMMONS:  Well, Mr. Thomas, would you show us

9    side by side, Mr. Goldberg's tattoo from this page on the

10   left and Mr. Orton's tattoo on the right?

11   Q.      (BY MR. SIMMONS)  Now, Dr. Zagal, would you agree

12   with me that the tattoos, the tribal tattoos, are similar?

13           MR. FRIEDMAN:  Your Honor, object to the relevance

14   of this line of questioning.

15           THE COURT:  Counsel?

16           MR. SIMMONS:  Your Honor, the plaintiff is speaking

17   to the value of her tattoos.  And so, comparing them to

18   other tattoos that are very similar shows the lack of

19   value.

20           THE COURT:  Headset, please.  Sidebar.

21           (Proceedings continued at the bench.)

22           THE COURT:  Counsel, I'm not aware that any part of

23   plaintiff's claim in terms of her -- the value and her

24   actual damages is the measure that you are talking about,

25   so I'm not clear what the relevance is here.  And I'm not

1    sure you've satisfied my curiosity.

2          MR. SIMMONS:  Your Honor, their claim for damages,

3    on actual damages, the value of the work which turns on --

4    the value of the work as a tattoo as a work of art.  And

5    so, from our perspective, other tattoos that look similar

6    show that it doesn't have a particular artistic value.

7          THE COURT:  Are you going to have somebody testify

8    to that?

9          MR. SIMMONS:  We will have people talking about

10   tattoos --

11         THE COURT:  No.  No.  That's not my question.

12         MR. SIMMONS:  Okay.

13         THE COURT:  Specifically what you just represented,

14   are you going to have an expert or someone who testifies

15   that there is a diminished value in Miss Alexander's

16   tattoos based on the similarity with other tattoos?

17         MR. SIMMONS:  Yes, Your Honor.

18         THE COURT:  Mr. Friedman?

19         MR. FRIEDMAN:  Your Honor, our objection is to

20   relevance.  Dr. Zagal's testimony is that relates to the

21   tattoos in their incorporation of the video games, and the

22   realism and authenticity that they provide.  It does not

23   have to do with the merits of the tattoos as art.

24         THE COURT:  Well, you can make that argument, but

25   that doesn't -- it -- my understanding on the relevance

1  that the defendants are asserting is that part of your

2  claim for actual damages goes to the value of Miss

3  Alexander's tattoos within the context of the games, as I

4  understand it.

5        I don't know who this Mr. Goldberg -- is Mr.

6  Goldberg in the game?

7        MR. SIMMONS:  Yes, ma'am.

8        THE COURT:  Okay.  So he -- so this testimony or

9  his questions goes to the similarity of other tattoos that

10  appear in the game.  Correct, counsel?

11        MR. SIMMONS:  Yes, ma'am.

12        THE COURT:  Okay.  The objection is overruled.

13        (Proceedings continued in open court, jury

14  present.)

15  Q.     (BY MR. SIMMONS)  Dr. Zagal -- could we bring back

16  up the images?  Dr. Zagal, so the other tattoos in this

17  game look similar to the tattoos that Miss Alexander inked;

18  right?

19  A.     I have not examined other tattoos in this game.

20  Q.     So, you didn't look at any other tattoos in the

21  game at all?

22  A.     I mean, I get to see some of them when I was going

23  through the menus and -- but I did not analyze any of the

24  other tattoos in the game.

25  Q.     Didn't notice them while you were playing?

1    A.      I did notice them.

2    Q.      Okay.

3    A.      But I wasn't examining them.

4    Q.      But you couldn't tell whether they were similar to

5    Miss Alexander's tattoos?

6    A.      I mean, for some wrestlers they look very

7    different.

8    Q.      Okay.  Now, let's turn back to WWE 2K.  Mr. Orton

9    doesn't appear in every match that someone plays; right?

10   A.      Yes.  Like, you can play the game and not play with

11   Randy Orton as a character.

12   Q.      Right.  So, you showed some clips of gameplay on

13   your direct, but there is a whole wealth of other ways you

14   could play this game and never see Mr. Orton; right?

15   A.      I think it's technically possible to play the game

16   and never play or see the character of Randy Orton.

17   Q.      Okay.

18   A.      The game also features sort of interstitials that

19   appear that feature wrestlers, and so you might see Randy

20   Orton in that context.

21   Q.      But you haven't analyzed whether you actually do

22   that; right?  That's speculation on your part?

23   A.      So, I have not specifically analyzed the

24   interstitials in the games, no.

25   Q.      Okay.  And it almost goes without saying, but when

1   Mr. Orton doesn't appear in the game, his tattoos don't

2   appear in the game either; right?

3   A.     I mean, you're asking me to speculate on whether or

4   not, if 2K chose not to put Mr. Orton, would they leave his

5   tattoos in the game?  I don't know.  I mean, that would be

6   their decision, not mine.

7   Q.     I guess I'm asking a different question.  My

8   question is:  If you don't select Randy Orton to play, then

9   you are not going to see his tattoos with the players in

10  the ring; right?

11  A.     So, I showed how you could add his tattoos to a

12  Custom Character.  So, I could play a game with a Custom

13  Character with Randy Orton's tattoos and play against other

14  characters, not playing Randy Orton.  So --

15  Q.     Okay.  Let me -- let me try this a different way.

16         MR. SIMMONS:  Mr. Thomas, what I'd like to do is

17  bring up, for Dr. Zagal, Defendant's Exhibit 11 for

18  identification purposes and to play it without sound for

19  five seconds.

20         (Video playing.)

21  Q.     (BY MR. SIMMONS)  Now, Dr. Zagal, this is a video

22  of WWE 2K16; right?

23  A.     Yes, that's what it looks like.

24  Q.     And it's an accurate depiction of the game; right?

25  A.     As far as I can tell, yes.

1          MR. SIMMONS:  Your Honor, I'd move for admission of

2    Defendant's Exhibit 11 into evidence.

3          MR. FRIEDMAN:  No objection.

4          THE COURT:  Defendant's Exhibit 11 admitted.

5          MR. SIMMONS:  May I publish it to the jury, Your

6    Honor?

7          THE COURT:  You may.

8          MR. SIMMONS:  All right.  Let's go ahead and play

9    that at 40 seconds into the clip, if we can, for the jury,

10   without sound.

11         (Video playing.)

12   Q.    (BY MR. SIMMONS)  Now, Dr. Zagal, this is a match

13   between Seth Rollins and Stone Cold Steve Austin; right?

14   A.    That's what it looks like, right.

15   Q.    And Randy Orton doesn't appear anywhere in this

16   video; right?

17   A.    I cannot see Randy Orton in this video.

18   Q.    And because he doesn't appear in the video, his

19   tattoos don't appear right -- either; right?

20   A.    I don't see his tattoos in the video either.

21   Q.    Okay.

22         MR. SIMMONS:  Let's take that down.  And what I'd

23   like to do is play for Dr. Zagal, for identification,

24   Defendant's Exhibit 10 without sound for five seconds.

25         (Video playing.)

1    Q.      (BY MR. SIMMONS) Dr. Zagal, this is also a video of

2    WWE 2K16; right?

3    A.      That's what it looks like, yes.

4    Q.      And it's an accurate depiction of the game?

5    A.      As far as I can tell, yes.

6            MR. SIMMONS:  Your Honor, I'd move the admission of

7    Defendant's Exhibit 10 into evidence.

8            MR. FRIEDMAN:  No objection.

9            THE COURT:  Defendant's Exhibit 10 is admitted.

10           MR. SIMMONS:  Your Honor, may I publish it to the

11   jury.

12           THE COURT:  You may.

13           MR. SIMMONS:  All right.  Mr. Thomas, would you

14   advance Defendant's Exhibit 10 to 4 minutes in, and play it

15   to the jury with no sound.

16           (Video playing.)

17   Q.      (BY MR. SIMMONS)  Now, even when Mr. Orton is on

18   the screen during a match in WWE 2K, you would agree that

19   he moves around the ring; right?

20   A.      Yes.

21   Q.      And he and other wrestlers move around each other;

22   right?

23   A.      Yes.

24   Q.      Mr. Orton and other wrestlers perform wrestling

25   moves on each other?

1    A.      Yep.

2    Q.      Like, they tackle each other; right?

3    A.      Yes.

4    Q.      And they grapple with each other?

5    A.      Yes.

6    Q.      Mr. Orton and other wrestlers might use props in

7    the ring against each other in WWE 2K; right?

8    A.      Yes.  In some modes, they do.

9    Q.      For example, a wrestler could pick up a table and

10   hit someone with it?

11   A.      Yep.  In some modes, yes.

12   Q.      The wrestlers in WWE 2K try to knock each other

13   down?

14   A.      Generally.  It depends on the mode.  The goals

15   might be different.  But, yes, generally.

16   Q.      And they wrestle each other to the ground?

17   A.      Yes.

18   Q.      You would agree that, given all this activity,

19   other wrestlers could get in the way of seeing Mr. Orton;

20   right?

21   A.      In the way of the player -- yes.

22   Q.      Okay.

23           MR. SIMMONS:  Let's take that down.  And I'd like

24   to show just Dr. Zagal Defendant's Exhibit 153, which is

25   not a video.

1    Q.      (BY MR. SIMMONS)   Dr. Zagal, this is an image from
2    WWE 2K; right?
3    A.      I don't know which version of the game though but,
4    yes, it looks like from one of the games.
5    Q.      And it's an accurate depiction of one of the games;
6    right?
7    A.      Um -- it's been cropped in, but I think it comes
8    from -- it's part of a screenshot, is what it looks like to
9    me.
10   Q.      It comes from WWE 2K; right?
11   A.      I would guess so, yes.
12   Q.      Okay.
13           MR. SIMMONS:  Your Honor, I'd move for admission of
14   Exhibit 153 into evidence.
15           MR. FRIEDMAN:  No objection.
16           THE COURT:  Defendant's Exhibit 153 is admitted.
17           MR. SIMMONS:  May I publish it to the jury, please?
18           THE COURT:  You may.
19   Q.      (BY MR. SIMMONS)  Now, during gameplay, Dr. Zagal,
20   a referee can get in the way of seeing Mr. Orton's tattoos
21   when the referee is standing between Mr. Orton and the
22   camera; right?
23   A.      Yes, that is possible.
24   Q.      So can the ropes?
25   A.      Yes.

1   Q.      So can words on the screen, like the word
2   "cancel" which we can see in this image; right?
3   A.      Yes.
4           MR. SIMMONS:  All right.  Let's take that down.
5   And, Mr. Thomas, what I'd like to do is bring up, for Dr.
6   Zagal, Defendant's Exhibit 5.  Just Dr. Zagal.
7   Q.      (BY MR. SIMMONS)  Dr. Zagal, this is another image
8   from WWE 2K; right?
9   A.      I can't tell which game it's from, though.  But,
10  yes, it looks like it's from one of the 2K Games.
11          MR. SIMMONS:  All right.  Your Honor, I'd move the
12  admission of Defendant's Exhibit 5 into evidence.
13          THE COURT:  Any objection?
14          MR. FRIEDMAN:  No objection.
15          THE COURT:  Defendant's Exhibit 5 is admitted.
16          MR. SIMMONS:  Your Honor, may I publish it to the
17  jury?
18          THE COURT:  Yes.
19  Q.      (BY MR. SIMMONS)  Now, Dr. Zagal, you showed us one
20  set of attire for Randy Orton in the game, but there are
21  other kinds of attire; right?
22  A.      Correct.
23  Q.      And a wrestler's own clothing might block the
24  tattoos; right?
25  A.      Yes, there are clothing items he can wear.

1    Q.      And so, in this image from WWE 2K, Mr. Orton's

2    tattoos are blocked by the shirt that he is wearing; right?

3    A.      Correct.

4    Q.      And the armbands around his elbows?

5    A.      Yes.  They partially cover parts of his arms, yes.

6    Q.      And his wrist guards?

7    A.      Yes.

8    Q.      Okay.

9            MR. SIMMONS:  Let's take that down.  And what I'd

10   like to do is bring up Defendant's Exhibit 24 for just Dr.

11   Zagal.

12   Q.      (BY MR. SIMMONS)  Dr. Zagal, this is another image

13   from WWE 2K; right?

14   A.      I can't tell which game it's from, but it looks

15   like it's from one of the games.

16           MR. SIMMONS:  Your Honor, I'd move the admission of

17   Defendant's Exhibit 24 into evidence.

18           MR. FRIEDMAN:  No objection.

19           THE COURT:  Defendant's Exhibit 24 is admitted.

20           MR. SIMMONS:  May I publish it to the jury, Your

21   Honor?

22           THE COURT:  Yes.

23   Q.      (BY MR. SIMMONS)  Now, Dr. Zagal, Mr. Orton

24   sometimes wears a vest in WWE 2K, like he does in the WWE

25   games; right?  Or WWE wrestling?

1    A.    So, you are asking me if he can sometimes wear a

2    vest in the game?

3    Q.    Yes.

4    A.    The answer is yes.

5    Q.    And he sometimes wears one in real life; right?

6    A.    I would assume so.  I don't follow WWE wrestling,

7    so.

8    Q.    Not something you watch?

9    A.    Not generally, no.

10    Q.    Okay.  Well, you would agree that when he wears a

11    vest in the game, you can't see all of his tattoos; right?

12    A.    Yes.

13    Q.    And because the vest blocks his back tattoos;

14    right?

15    A.    Yes.

16    Q.    Now, you also can't see all sides of Mr. Orton's

17    body at the same time; right?

18    A.    No.

19    Q.    And if Mr. Orton is moving around the screen

20    quickly, he might be blurred or out of focus; right?

21    A.    I -- I don't really agree with that.

22    Q.    Okay.  Well, you described the videos we were

23    showing in court earlier as ghosting.  Do you remember

24    that?

25    A.    Yeah, that was the video and not the actual

1    gameplay.

2    Q.      I understand.  But in the actual game when someone

3    is moving quickly, they are still being represented by

4    pixels moving across the screen; right?

5    A.      Sure.

6    Q.      So, it could get blurry; right?

7    A.      It would depend on the quality of your television.

8    But I have not found any evidence of people calling the

9    game blurry.  We see blurriness in the footage sometimes,

10   but that's because of the downgrade in the quality of the

11   image.

12   Q.      Okay.  But you would agree that when you are

13   observing wrestlers like Mr. Orton in WWE 2K, the tattoos

14   aren't always visible as you are watching the match; right?

15   A.      Yes, I agree with that.

16   Q.      And when Mr. Orton does appear on screen, he

17   appears smaller than he does in real life; right?

18   A.      That would depend on the size of your television

19   and whether or not the image is zoomed in.  But I think

20   it's fair to say that Mr. Orton can and often will appear

21   smaller than in real life.

22   Q.      Are you aware that he is six-foot-five?

23   A.      No.  He's really tall.

24   Q.      Yeah.  And he appears on a small television; right?

25   A.      I think nowadays people are not playing the games

1   on really small televisions, especially not this size.  It

2   would depend on the device.  But again, if your point is,

3   does Mr. Orton ever appear smaller on the screen than he is

4   in real life, the answer is yes.

5        MR. SIMMONS:  All right.  Mr. Thomas, you can take

6   that down.

7   Q.    (BY MR. SIMMONS)  Now, Dr. Zagal, on direct you

8   talked about this Create a Superstar or Custom Superstar

9   feature in WWE 2K16.  Do you remember that?

10  A.    Yes.

11  Q.    Now, you only showed WWE 2K16; right?

12  A.    Correct.

13  Q.    Did you look to see whether Mr. Orton's appeared in

14  that feature in the subsequent versions of WWE 2K?

15  A.    If Mr. Orton appears in that feature?

16  Q.    No, if Mr. Orton's tattoos appear in the Create a

17  Superstar feature of games after WWE 2K16?

18  A.    If only tattoos, separate from Mr. Orton?

19  Q.    Yes.

20  A.    Do they appear in the other games?

21  Q.    Correct.

22  A.    No, not that I could find.

23  Q.    And in that feature, you can only add Mr. Orton's

24  entire arms or entire back; right?

25  A.    Yes.

1    Q.      You can't pick the tattoos out individually; right?

2    A.      Correct.

3    Q.      So, you would have to include tattoos that Miss

4    Alexander did not ink, when you are making those

5    selections; right?

6    A.      Yeah.  So, the specific options which I showed were

7    each arm separately and the back.

8    Q.      And you would agree that Mr. Orton's tattoos are

9    part of his likeness; right?

10   A.      Likeness in -- how are you using the term?

11   Q.      Well, you have used the term before; right?

12   A.      I'm not sure I used the term likeness.

13   Q.      Okay.  Is it your view -- let me just ask it to you

14   this way:  Do you think that Mr. Orton's tattoos are part

15   of his likeness?

16          MR. FRIEDMAN:  Objection, calls for a legal

17   conclusion.

18          THE COURT:  Sustained, unless you further define

19   that.

20          MR. SIMMONS:  Okay.

21   Q.      (BY MR. SIMMONS)  In your video game research, you

22   are analyzing what people look like; right?

23   A.      No, not specifically.

24   Q.      Well, you did in this case; right?

25   A.      Well, not in what people look like in general.

1    Q.       Okay.  But what Randy Orton looks like.

2    A.       So, I'm analyzing whether his game character looks

3    like the wrestler.  That, yes.

4    Q.       Okay.  And when you are talking about that, in the

5    course of this case, you are relying on your prior

6    research; right?

7    A.       Yes.

8    Q.       And in your prior research, have you ever used the

9    term likeness before?

10   A.       I'm not sure.  I'd have to go back to the report

11   and see if that word appears.

12   Q.       Okay.  But outside of this case, you can't remember

13   a single time that you talked about the word likeness;

14   right?

15           THE COURT:  Counsel, can we have a sidebar, please?

16           (Proceedings continued at the bench.)

17           THE COURT:  Mr. Simmons, as you know in the context

18   of this case, likeness is not a generic term.  It has

19   certain legal significance.  To the extent you are

20   questioning -- again, if you are attaching the legal

21   significance, that's inappropriate.

22           So, perhaps you can use another term.  But when you

23   talk about, is it part of his likeness?  Then you are

24   getting into the legal significance and legal conclusion in

25   terms of how it relates to the infringement question.  So,

1    I think that's the issue.

2         You guys like to use certain terms that have legal

3    significance as if you are using it generically, and you

4    are not.

5         MR. SIMMONS:  Understood, Your Honor.  During his

6    deposition, he admitted in the deposition that Randy

7    Orton's tattoos are part of his likeness.  That's --

8         THE COURT:  Then why don't you impeach him?

9         MR. SIMMONS:  I can do that, Your Honor.

10         THE COURT:  Okay.  Thank you.

11         (Proceedings continued in open court, jury

12    present.)

13         MR. SIMMONS:  Your Honor, request permission to

14    read Dr. Zagal's deposition transcript, page 104, lines 1

15    through 3?

16         THE COURT:  No, you cannot read it.  You know how

17    to -- if you are attempting to show inconsistent testimony,

18    you know how to do that.

19         MR. SIMMONS:  Yes, ma'am.

20    Q.    (BY MR. SIMMONS)  All right.  Dr. Zagal, you gave a

21    deposition in this case; right?

22    A.    Yes.

23    Q.    And you were under oath; right?

24    A.    Now and during the deposition, yes.

25    Q.    And you swore to tell the truth; right?

1    A.      Yes.

2    Q.      And you did tell the truth; right?

3    A.      Mm-hmm.

4    Q.      And after that deposition, you were given a copy of

5    your deposition transcript; correct?

6    A.      Yes.

7    Q.      And you were given the opportunity to make any

8    corrections you wanted to that transcript; right?

9    A.      I don't think anything I wanted, but I -- yes, I

10   was allowed to review it and make corrections.

11   Q.      And you made two pages of corrections; right?

12   A.      I believe so.

13   Q.      And then you signed that transcript; right?

14   A.      I believe so, yes.

15   Q.      And you, in fact, had that notarized; isn't that

16   right?

17   A.      I did not have it notarized.

18   Q.      Okay.

19   A.      Like by me, personally.

20   Q.      Okay.  But someone notarized it for you; right?

21   A.      I -- I don't know.

22   Q.      Okay.  You don't remember.

23           During the course of that deposition, I asked you

24   this --

25           THE COURT:  Counsel?  I'm going to ask you to

1    refrain from the extra statements.  You just made one.  You

2    probably didn't even know that you did it.  Okay?  But

3    could you stick to the questions?

4            MR. SIMMONS:  Yes, ma'am.

5            THE COURT:  All right.

6            MR. FRIEDMAN:  Your Honor, I object as improper

7    impeachment.  And again, for relevance --

8            THE COURT:  We haven't gotten there yet, Mr.

9    Friedman.  I'm thinking we're going to get to some citation

10   to the transcript where you are claiming --

11           MR. SIMMONS:  Yes, Your Honor.

12           I direct counsel to page 104, lines 1 through 3.

13           THE COURT:  Okay.  Are you going to read the

14   question and the answer?

15           MR. SIMMONS:  Yes, Your Honor.

16   Q.    (BY MR. SIMMONS)  I asked you this question and you

17   gave this answer:

18           "Randy Orton's tattoos are part of his likeness;

19           true?"

20           Answer:  "Correct."

21           THE COURT:  Are you going to ask him if --

22   Q.    (BY MR. SIMMONS)  Was that your testimony at the

23   time?

24   A.    Can I check the transcript -- well, I assume the

25   transcript is correct so, yes, that was my testimony.

1    Q.      Okay.   Now, you -- I'd like to end by talking about

2    why the works in this case were -- in this case were

3    created.  Now, your view is that video game companies

4    license material to make money; right?

5    A.      Yes.

6    Q.      But, Dr. Zagal, that's not the only reason that

7    companies create video games; right?

8    A.      Like any kind of company?  Correct.  There are

9    companies that make video games not to make money.

10   Q.      And that's because creating video games is

11   creative; right?

12   A.      Yes.

13   Q.      Video games are a form of artistic expression,

14   aren't they?

15   A.      Yes.

16   Q.      There are even video game makers who are considered

17   artists; right?

18   A.      Correct.

19   Q.      When a video game is created, the creator has to

20   make choices to make it better; right?

21   A.      Choices to make it -- what was the last word?

22   Q.      Better?

23   A.      Yes.

24   Q.      So, one choice could be to increase the quality of

25   the video game; right?

1   A.      Correct.

2   Q.      Another choice would be adding details to make it

3   more fun for people to play; right?

4   A.      Correct.

5   Q.      And not every choice made in creating a video game

6   is dictated by the goal of achieving profit; right?

7   A.      For games that are not made for profit, yes.  For

8   games that are made for profit, the ultimate goal is to

9   make profit.  And so, everything leads up to that.

10  Q.      So, is it your testimony that if I am selling a

11  game, and trying to sell it to people to make money, every

12  single decision I make in the course of that game is to

13  make profit?

14  A.      So, video games are made by large companies with

15  lots of employees.  Individual employees might have their

16  own personal reasons to do things but, ultimately, there

17  are levels of approval.  And ultimately, the goal of the

18  company, the reason they're -- the reason for existence is

19  to make profit.

20  Q.      So, some things might be in the game for reasons

21  other than profit; right?

22  A.      I guess, yes, there are some things that could be

23  in the game not for -- well --

24  Q.      Now -- oh, I'm sorry.  I didn't mean to cut you

25  off.

```
1    A.      So, for example, we could say that the initial

2    screen that had all those -- it was explaining all the

3    licenses that were in the game?  You might say, well, the

4    initial reason for that is, they are in there for legal

5    reasons, to avoid lawsuits and things like that.

6            But I think, ultimately, it comes down to the

7    reason of existence for the company, which is to make a

8    profit.  And paying money on licenses is not good for

9    business, generally.

10   Q.      Okay.  Well, let's talk about WWE 2K specifically.

11   You admit that it's a realistic depiction of WWE

12   wrestling; right?

13           THE COURT:  Excuse me, counsel.  I'm sorry.

14   Headsets, sidebar.

15           (Proceedings continued at the bench.)

16           THE COURT:  I'm sorry, Mr. Simmons.  I didn't mean

17   to cut you off.  Are you going to a new area?  And my

18   question is, how much longer you have, because I'm trying

19   -- I'm contemplating the need for a break at this point?

20           MR. SIMMONS:  Your Honor, if you wanted to take a

21   break now, that would be fine.  I can pick up --

22           THE COURT:  That wasn't my question.

23           MR. SIMMONS:  I have about five minutes left in my

24   exam.

25           THE COURT:  Okay, then we'll finish.
```

1        MR. SIMMONS:  Okay.

2        (Proceedings continued in open court, jury

3   present.)

4   Q.    (BY MR. SIMMONS)  So, turning back to WWE 2K, you

5   admit that WWE 2K is a realistic depiction of WWE

6   wrestling; right?

7   A.    Well, that's its goal, yes.

8   Q.    And you also admit that making the game more

9   realistic is an artistic choice; right?

10  A.    I think that's fair, yes.

11  Q.    The focus of WWE 2K is playing as a wrestler in a

12  wrestling ring; correct?

13  A.    Broadly speaking, yes.

14  Q.    But there are many things that are part of the

15  realism of WWE 2K; right?

16  A.    Yes.

17  Q.    And all of the professional wrestlers who appear in

18  WWE 2K are depicted how they appear in real life; true?

19  A.    I did not analyze all the wrestlers and how they

20  are depicted.  However, I did find examples of fans

21  complaining about some wrestlers appearing not well in the

22  game and not -- and comparing them to other wrestlers that

23  were in the game.

24  Q.    Okay.  But you would agree that the wrestlers in

25  the game, Take-Two is trying to make them look like they

1    look in real life; right?

2    A.      Yes.  As a general goal, yes.

3    Q.      And Randy Orton is just one of all of those

4    wrestlers; right?

5    A.      He's an important one but, yes, he is one of many.

6    Q.      And when Take-Two decided to include Mr. Orton in

7    WWE 2K, it wanted him to look like he looks in real life;

8    correct?

9    A.      Yes.

10   Q.      So, the purpose of including Mr. Orton with his

11   tattoos was to make the game more realistic; right?

12   A.      Yes.  To make the game character more realistic,

13   yes.

14   Q.      Okay.  And as part of that process, Take-Two tried

15   to make his tattoos look how they look in real life; right?

16   A.      Correct.

17   Q.      And you -- your review is that Take-Two

18   accomplished that goal; right?

19   A.      Yes.

20   Q.      Do you also admit that there is a license between

21   WWE and Take-Two; right?

22   A.      Yes.  I imagine there is, based on the information

23   in the beginning of the games.

24   Q.      And you are aware that WWE licensed Mr. Orton's

25   rights to Take-Two; right?

1   A.      That is my understanding, yes.

2   Q.      And Randy Orton's tattoos are part of his likeness;

3   true?

4           MR. FRIEDMAN:   Objection, calls for legal

5   conclusion.

6           THE COURT:   Sustained.

7           MR. SIMMONS:   All right.

8   Q.      (BY MR. SIMMONS)   Well, Mr. Orton's tattoos were

9   created for a different purpose; right?

10  A.      I am not Mr. Orton, so I can't -- or Miss

11  Alexander.  I can't speak to the reasons of those tattoos.

12  Q.      You don't know whether they reflect Mr. Orton's

13  personal expression; right?

14  A.      I think it's fair to say that, in general, Mr.

15  Orton wanted those tattoos because he wanted them.  He has

16  his own reasons for that.

17  Q.      And no one is purchasing WWE 2K instead of getting

18  tattooed by Miss Alexander; is that right?

19  A.      I'm sorry.  Could you repeat the question?

20  Q.      No one is purchasing WWE 2K instead of getting

21  tattooed by Miss Alexander; true?

22  A.      I have not studied that, so I have no opinion on

23  that.

24  Q.      Dr. Zagal --

25          MR. SIMMONS:   I direct counsel to page 178, lines

1    20 to 22 of your deposition.

2    Q.    (BY MR. SIMMONS)  178, lines 20 to 22.  Did I ask

3    you this question and did you give this answer:

4          "No one is purchasing WWE 2K instead of getting

5          tattooed by Miss Alexander; right?"

6          Answer:  "I do not think so."

7    A.    I'm sorry.  What was the question?

8    Q.    Was that your answer to my question, when I deposed

9    you --

10   A.    If you read that in my deposition then, yes.

11   Q.    Now, I want to be crystal clear here.  WWE 2K is

12   not a substitute for the tattoos Miss Alexander inked;

13   right?

14   A.    Are they different things?  Yes, they are different

15   things.

16   Q.    They are not substitutes for each other; correct?

17         MR. FRIEDMAN:  Objection, calls for a legal

18   conclusion.

19         MR. SIMMONS:  Your Honor, I can read his deposition

20   again.

21         THE COURT:  I'm not even sure what you mean by

22   substitution, so I don't even understand the question.

23         MR. SIMMONS:  Fair enough.

24   Q.    (BY MR. SIMMONS)  Dr. Zagal, WWE 2K is not a

25   substitute for the tattoos at issue in this case; right?

```
 1              MR. FRIEDMAN:  Objection, calls for legal
 2   conclusion.
 3              THE COURT:  Can we -- sidebar, please.
 4              (Proceedings continued at the bench.)
 5              THE COURT:  Again, it is not clear to me what we're
 6   referring to when we talk about substitution, so I don't
 7   know whether it's calling for a legal conclusion or not.
 8              Perhaps, Mr. Simmons, you can clarify for me what
 9   it is you are asking.
10              MR. SIMMONS:  Yeah.  Your Honor, he -- this is
11   another situation where I am reading straight out of his
12   transcript and he's --
13              THE COURT:  I know, but some context.  What were
14   you referring -- substitution meaning what?
15              MR. SIMMONS:  You wouldn't buy a WWE 2K game
16   instead of buying -- going to get inked, get a tattoo
17   inked.
18              THE COURT:  Perhaps you can clarify the question.
19              MR. SIMMONS:  Okay.
20              THE COURT:  Thank you.
21              (Proceedings continued in open court, jury
22   present.)
23   Q.    (BY MR. SIMMONS)  Dr. Zagal, you wouldn't buy a WWE
24   2K game instead of getting inked with one of Miss
25   Alexander's tattoos; right?
```

1    A.      Personally?

2    Q.      A person would not do that; right?

3    A.      Oh.   A person?   I don't know.

4    Q.      Okay.   You haven't studied the tattoos?

5    A.      In what way do you mean?

6    Q.      Do you think someone's buying a WWE 2K video game

7    and would be happy with that, instead of getting inked by

8    Miss Alexander?

9    A.      Like, right now on the stand, I would say I could

10   imagine some people might want to make that choice or not.

11   But it's not something I believe I studied.

12   Q.      So, someone goes into a tattoo parlor and says, "I

13   want a tattoo," and instead I hand them a video game and

14   they say, "Great.   That's what I wanted."

15           THE COURT:   At this point, counsel, I'm not sure --

16   what's the relevance here?

17           MR. SIMMONS:   Your Honor, it goes to fair use, Your

18   Honor.

19           THE COURT:   Whether or not someone would walk into

20   a tattoo parlor and say, "Oh, instead just give me a game

21   to play"?

22           MR. SIMMONS:   Yes, Your Honor.   It goes to the

23   question --

24           THE COURT:   No.   Move on, counsel.   This is, this

25   is --

1          MR. SIMMONS:  Sure.

2          THE COURT:  -- this is --

3          MR. SIMMONS:  Yes, Your Honor.

4          THE COURT:  -- tenuous at best.

5   Q.     (BY MR. SIMMONS)  Dr. Zagal, you told me, when we

6   last met, that you were not aware of a video game company

7   ever licensing tattoos to be used on the people that bear

8   them in real life; right?

9   A.     I believe so.

10         MR. SIMMONS:  No more questions, Your Honor.

11         THE COURT:  Okay.  Ladies and gentlemen, this is a

12  good time for us to go ahead and take a morning break.

13  Please remember my instructions to you and my admonitions,

14  and we will be in recess until 11:00.

15         COURTROOM DEPUTY:  All rise.

16         (Proceedings continued in open court, jury not

17  present.)

18         THE COURT:  Okay.  Please be seated.

19         Before we go out to recess, Mr. Simmons indicated

20  that there are other issues related to other witnesses.

21  Could you please enlighten me?

22         MR. SIMMONS:  Yes, Your Honor.  There are three

23  issues -- Your Honor, there are three issues that the

24  parties wanted to raise to the Court in the course of

25  today.  The first one is with regard to Miss Alexander's

testimony.  Plaintiff's counsel indicated to us last night
that they intend to use our opening slides as
demonstratives with Miss Alexander.  We'd like to address
that with the Court.

        THE COURT:  Hold on.  Hold on.  They intend to use
slides with Miss Alexander that you used during opening
statements; correct?

        MR. SIMMONS:  Yes, Your Honor.

        THE COURT:  I assume that you used those slides in
opening statement in anticipation, of course, that at some
point they would be admitted into evidence.

        MR. SIMMONS:  Yes, Your Honor.

        THE COURT:  Is there a reason why then -- so, are
you suggesting that only -- that you intend to admit
something into evidence, but that the plaintiff cannot use
it in their testimony?

        MR. SIMMONS:  Your Honor, our understanding is that
plaintiff does not intend to admit the exhibits that are
inside those demonstratives before showing them to the jury
as part of presentation of evidence, and we wanted to
clarify your preferences as to that.

        THE COURT:  I have no idea what you are even asking
me.

        MR. SIMMONS:  Plaintiff is not planning to admit
the exhibits that are in those demonstratives before they

1   would be shown to the jury.

2          THE COURT:  What -- hold on.  Exhibits and

3   demonstratives?

4          MR. SIMMONS:  Yes, ma'am.

5          THE COURT:  Could somebody -- Mr. Simon, could you

6   help me understand what we're talking about here?

7          MR. SIMON:  Yes, Your Honor.

8          They showed the jury demonstratives.  We didn't

9   object to them.  We have agreed to exchange demonstratives

10  the night before.

11         I have questions for Miss Alexander because, as you

12  know in their opening, they talked about, for example, a

13  bunch of video games where they claim Randy Orton was in

14  there.  And I want to show her what they showed the jury

15  and say, *Have you ever heard of this before?*

16         They're arguing waiver, which means that -- a

17  deliberate relinquishment of a known right.  I'm just going

18  to show her what they showed here.  *Here's these video*

19  *games before, that were earlier.  Have you ever heard of*

20  *them before?  Have you ever seen them?*  And I just want to

21  put it in context.  They showed it.

22         THE COURT:  I'm not understanding the objection.

23         MR. SIMMONS:  Our concern, Your Honor, was that we

24  would be violating Your Honor's preferences.  Some courts

25  we have been in, would not allow a demonstrative, to show

1    an exhibit, if it hasn't been admitted before.  We just

2    wanted to confirm what your practices were.

3           THE COURT:  Mr. Simmons, do you deny that you

4    intend to admit the exhibit at some point?

5           MR. SIMMONS:  We do intend to admit it at some

6    point.

7           THE COURT:  Okay, then your objection is overruled.

8    What's next?

9           MR. SIMMONS:  The second issue has to do with RFA

10   responses.  Plaintiff --

11          THE COURT:  I'm sorry?

12          MR. SIMMONS:  Request for Admission responses.

13   Plaintiff has indicated that they plan to read into the

14   record responses from the parties as to Request for

15   Admission.

16          THE COURT:  Yes?

17          MR. SIMMONS:  And our concern is, we are trying to

18   meet-and-confer on the issue, and we weren't clear whether

19   Your Honor's practices were to read the question and our

20   substantive response, because we didn't write the question,

21   Your Honor.  So, that's an out-of-court statement, from our

22   perspective.

23          THE COURT:  They can read discovery responses,

24   including your responses to Requests to Admit.  In order to

25   understand the response, you have to understand the

1    question.

2         MR. SIMMONS:  Okay.

3         THE COURT:  They may read the question and the

4    response.

5         MR. SIMMONS:  Understood, Your Honor.

6         The last issue has to do with Mr. Kiang.

7    Plaintiff's counsel has objections to certain

8    demonstratives.

9         And Mr. Krasik could address that with the Court.

10        MR. KRASIK:  Yes, Your Honor.  When we exchanged

11   the demonstratives for Mr. Kiang's deposition, plaintiffs

12   indicated they objected to Slides 5 through 14 of the

13   demonstratives.

14        THE COURT:  So -- let's back up.  What are we

15   talking -- demonstrative means something that you use to

16   demonstrate but will not come into evidence.

17        MR. KRASIK:  That's correct, Your Honor.

18        THE COURT:  So, what are we talking about here?

19        MR. FRIEDMAN:  Your Honor, if I could, this is our

20   objection -- I think I can cut through this.  The plaintiff

21   has objected to showing certain demonstratives, to

22   publishing certain demonstratives.  In particular --

23        THE COURT:  To who publishing certain

24   demonstratives?

25        MR. FRIEDMAN:  To the defense publishing certain

1    demonstratives during the anticipated testimony of the

2    corporate representative of WWE, Mr. Kiang, or a witness

3    for them.

4            THE COURT:  In the defendants' case?

5            MR. FRIEDMAN:  That's correct.

6            THE COURT:  Oh.  Talk to me about this --

7            MR. FRIEDMAN:  We can talk about this later.

8            (Court recessed from 10:44 a.m. to 11:05 a.m.)

9            (Proceedings continued in open court, jury

10   present.)

11           THE COURT:  Do you have any questions -- any

12   additional questions for this witness, Mr. Friedman?

13           MR. FRIEDMAN:  Yes, Your Honor, I do.

14           THE COURT:  You may proceed.

15           MR. FRIEDMAN:  Thank you.  And I'll be brief.

16                     REDIRECT EXAMINATION

17   BY MR. FRIEDMAN:

18   Q.      Dr. Zagal, I'd like to address just three points

19   that were brought up by Mr. Simmons.  You'll recall that

20   Mr. Simmons had asked you questions about fan complaints,

21   whether it be on websites or social media, complaining

22   about appearance or other aspects of the 2K games?

23   A.      Yes, I do.

24   Q.      Do you remember that?  And Mr. Simmons had asked

25   you whether there was a group of fans out there who choose

1    not to complain; right?

2    A.     Yes, I believe he did.

3    Q.     All right.  Is there a subset of fans or

4    prospective buyers out there that consume reviews about

5    video games before they make purchasing decisions?

6          MR. SIMMONS:  Objection, Your Honor, leading.

7          THE COURT:  Overruled.

8    A.     So, I can answer, right?

9    Q.     (BY MR. FRIEDMAN)  You may answer.

10   A.     Okay.  Yes, there are people who will consult

11   reviews before purchasing a game.

12   Q.     And those folks might include people who never make

13   a decision to go and complain online; right?

14   A.     That is possible, yes.

15   Q.     And yet the criticism online may affect their

16   purchasing behavior?

17   A.     Yes.

18   Q.     Dr. Zagal, you were asked a few questions about the

19   Custom Superstar feature that you displayed to the jury in

20   the 2K16 game.  Do you remember that?

21   A.     Yes.

22   Q.     All right.  And I believe you were asked whether or

23   not the tattoos of Miss Alexander's appeared in the 2K17

24   and 18 versions of the game; right?

25   A.     I believe I was asked specifically about the custom

1    creator.

2    Q.      Okay.  Does the custom creator exist in the 2K17

3    and 18 games, like it does in the 2K16 game that you showed

4    the jury?

5    A.      Yes, it does.

6    Q.      Do the custom creators include the ability to add

7    Miss Alexander's tattoos to custom wrestling characters in

8    the '17, and '18 versions of the game?

9    A.      No, I believe they do not.

10   Q.      Do they include other tattoos that you can add to a

11   superstar?

12   A.      Yes.

13   Q.      Okay.  But between the 2016 game, moving on to the

14   '17 and '18 games, does it appear that the tattoos of Miss

15   Alexander's were removed from that particular feature in

16   the game?

17   A.      In the specific feature of the custom creator, it

18   was my understanding that, yes, they have been removed.

19   Q.      Thank you.  And, Dr. Zagal, you were asked some

20   questions about -- or concerning this word or issue of --

21   likeness.  I believe you were asked whether or not Mr.

22   Orton's tattoos are a part of his likeness.  Do you

23   remember that?

24   A.      Yes.

25   Q.      All right.  Now, what did you mean by likeness?

1   A.      So, as a layperson, likeness is, *Could I recognize*

2   *this person from a certain element or a certain aspect?*

3   *Does this person look similar?*  Oh, these two people look

4   like each other.  They share certain features which you may

5   not be able to specifically call out, but they look similar

6   to each other.  They bear a resemblance, for example.

7          Likeness, in the case of my analysis, is, *Does the*

8   *character Randy Orton look like the character -- the person*

9   *of Randy Orton the wrestler?*

10  Q.      When you were answering those questions and during

11  that portion of your testimony, were you referring to the

12  legal definition of the word likeness?

13  A.      No.

14  Q.      Do you know what the legal definition of likeness

15  is?

16          THE COURT:  Counsel, that's not relevant.

17          MR. FRIEDMAN:  Thank you, Your Honor.  That's all

18  the questions I have.

19          THE COURT:  All right.  Thank you.

20          Any further examination of this witness, Mr.

21  Simmons?

22          MR. SIMMONS:  No, Your Honor.

23          THE COURT:  All right.  Thank you, Doctor.  You may

24  step down.

25          Mr. Simon, you may call your next witness?

1          MR. SIMON:  Yes, Your Honor.

2          At this time we will call through video deposition

3     the Defendants' Take-Two Interactive Software, Inc., 2K

4     Games, Inc., 2K Sports, Inc., and Visual Concepts

5     Entertainment, through the representative of Mark Little.

6          And we have designated that as Plaintiff's 156, for

7     the record.

8          THE COURT:  All right.  So, ladies and gentlemen,

9     you are about to hear testimony through the presentation of

10    a videotaped deposition.  You should consider that

11    testimony as if that testimony were being given right here

12    in court, consider it for the same purposes and in the same

13    way.

14         The transcript -- what's the number on it?

15         MR. FRIEDMAN:  156.

16         THE COURT:  -- 156 will be as part of the record

17    but it is not admitted as substantive evidence.

18         (Whereupon, the videotaped deposition of Mark

19    Little, dated August 14, 2019, Plaintiff's Exhibit 156, was

20    played to the jury at this time.)

21         MR. SIMON:  Thank you, Your Honor.  That concludes

22    the deposition testimony from both sides.

23         And at this time, I'd move the admission of

24    Plaintiff's Exhibits 29, 30, 31, 32, 33, 35.

25         MS. CENDALI:  No objection, Your Honor.

1        THE COURT:  Okay.  Give me those again?

2        MR. SIMON:  Yes.  29, 30, 31, 32, 33, and 35.

3        THE COURT:  Plaintiff's Exhibits 29, 30, 31, 32,

4   33, and 35 are admitted without objection.

5        All right.  Then we will go ahead and -- what's

6   your next -- do you plan on calling another live witness --

7        MR. SIMON:  We have a deposition, Your Honor.

8   Another one.  So, we thought a break here would be ideal.

9        THE COURT:  All right.  So, ladies and gentlemen,

10  we're going to go ahead and break for lunch.  We will take

11  45 minutes for lunch and so -- 12:35?

12       Is that right, Stacie?

13       COURTROOM DEPUTY:  Yes.

14       THE COURT:  Okay.  So, we will be on recess.  We

15  will reconvene at 12:35.

16       COURTROOM DEPUTY:  All rise.

17       (Proceedings continued in open court, jury not

18  present.)

19       THE COURT:  Okay, counsel, please be seated.

20       I'm going to take one more quick stab to see if I

21  can figure out this other issue, even though it doesn't

22  come until defendants' case.  But I'm just having a hard

23  time understanding, what is the issue.

24       Can someone please articulate the issue?

25       MR. KRASIK:  Your Honor --

1          THE COURT:  Mr. Krasik, hold on.

2          MR. FRIEDMAN:  Thank you, Your Honor.

3          Your Honor, this has to do with the fact witness,

4     Mr. Edward Kiang.  We object to Page Nos. 5 -- I have a

5     copy for the Court, if the Court would like to see it.

6          We object to Page Nos. 5 through 14.  They don't

7     contain any exhibit numbers --

8          THE COURT:  Hold on.  Hold on.  Hold one.  I don't

9     know what you are talking about.

10          MR. FRIEDMAN:  Permission to approach?

11          THE COURT:  Yes.  Could you just hand that to Miss

12     Hurst?

13          MR. FRIEDMAN:  Yes.

14          THE COURT:  Okay.  So, what are we talking about

15     here?  You are calling Mr. Kiang by video.

16          MR. FRIEDMAN:  That's correct, Your Honor.

17          This is a copy of the demonstratives that the

18     defendants have provided to the plaintiff that they intend

19     to use with Mr. Kiang, when they call him live in their

20     case.

21          THE COURT:  All right.  Now, by demonstratives, Mr.

22     Krasik, during the course of your case you will be calling

23     Mr. Kiang to the trial -- I mean, to the stand.  And you

24     intend -- are these stills?  Or you intend to use video

25     demonstratives with him during the course of his testimony?

1      MR. KRASIK:  The pages that are at issue of the

2  slides are still photos, Your Honor.  There are certain

3  videos we intend to use, but not these.

4      THE COURT:  Okay.  So you -- so, what you handed to

5  me, this, this packet of information says "Ed Kiang

6  direct."  What is this?  These are demonstratives that you

7  intend to use during his direct examination?

8      MR. KRASIK:  Correct.

9      THE COURT:  And, Mr. Friedman, you have -- what is

10  your objection?  Your objection is to what, page five?

11      MR. FRIEDMAN:  Pages 5 through 14.  The objection

12  for those pages are the same.

13      THE COURT:  And what is the basis of your objection

14  to the defendant using these demonstrative exhibits with

15  Mr. Kiang during his testimony?

16      MR. FRIEDMAN:  There are no exhibits associated

17  with these demonstratives, and there are no exhibits that

18  are going to be admitted that support the images that are

19  shown on here.  That's one objection.

20      We further object --

21      THE COURT:  First of all, demonstrative and

22  exhibits are different.  The whole point is that there are

23  certain things that you can use, whether you create them or

24  whether you have them, that you can use as demonstratives

25  as long as it is actually demonstrative, that are not part

1  of the evidence.  I'm still not understanding the objection

2  here.

3      MR. FRIEDMAN:  That --

4      THE COURT:  So, here's the deal.

5      MR. FRIEDMAN:  Yes.

6      THE COURT:  Obviously, this is something that I

7  can't decide on in a vacuum, because I don't understand the

8  objection.  I'm not clear under what context they intend to

9  use the demonstratives, whether it's demonstrative or not.

10  So, you will just need to make your objection at the

11  appropriate time.

12      MR. FRIEDMAN:  Thank you, Your Honor.

13      THE COURT:  All right.

14      MR. KRASIK:  Your Honor, so that we can have some

15  clarity, I'd be happy to give you the context so you can

16  understand.

17      THE COURT:  I'll take the context from the stand.

18      MR. KRASIK:  Okay.  Thank you.

19      THE COURT:  Thank you.

20      COURTROOM DEPUTY:  All rise.  Court's in recess.

21      (Court recessed from 11:55 a.m. to 12:36 p.m.)

22      (Proceedings continued in open court, jury

23  present.)

24      THE COURT:  Mr. Simon, call your next witness,

25  please.

1          MR. SIMON:  Yes, Your Honor.  At this time, the

2     plaintiff calls through video deposition World Wrestling

3     Entertainment, Inc. through Edward Kiang.  And this is both

4     parties' designations and it's Plaintiff's Exhibit 157.

5          This one was done by Zoom because of COVID, so we

6     might have to turn the volume up just a bit.

7          THE COURT:  Okay.

8          (Whereupon, the videotaped deposition of Edward

9     Kiang, dated August 4, 2020, Plaintiff's Exhibit 157, was

10     played to the jury at this time.)

11          MR. SIMON:  Your Honor, at this time, we'd move the

12     admission of Plaintiff's Exhibits 57 and 58.

13          THE COURT:  Any objection?

14          MS. CENDALI:  No objection, Your Honor.

15          THE COURT:  Plaintiff's 57 and 58 are admitted.

16          MR. SIMON:  We also used Plaintiff's Exhibit 29,

17     but I believe that's already admitted, Your Honor?

18          THE COURT:  Yes.

19          MR. SIMON:  Okay.  And then also, we'd move the

20     admission of Defendant's Exhibit 85, which was used in

21     that.

22          THE COURT:  Any objections?

23          MS. CENDALI:  No objection, Your Honor.

24          THE COURT:  Defendant's Exhibit 85 is admitted.

25          MR. SIMON:  I'm sorry, Your Honor.  We have one

1  more.  Plaintiff's Exhibit 55.

2       MS. CENDALI:  And again, no objection, Your Honor.

3       THE COURT:  Plaintiff's Exhibit 55 is admitted.

4       Okay, where are we going -- are we doing

5  counter-designations now or what -- what are we doing?

6       MR. SIMON:  That was both sides' designations, Your

7  Honor.

8       THE COURT:  Oh, okay.  What's your next witness

9  going to be?

10       MR. SIMON:  Catherine Alexander will be our next

11  witness.

12       THE COURT:  Why don't we go ahead and take a break?

13  I think the --

14       MR. SIMON:  Very good, Your Honor.

15       THE COURT:  -- the jurors could use a stretch and a

16  break.

17       And in the future, anytime -- I try to take breaks

18  appropriately.  But if anybody needs a break at anytime,

19  raise your hand and let us know and we'll take a break.

20       I also notice you guys getting a little cold when

21  they kicked that air back up.  We're going to try to --

22  it's hard to regulate.  We're going to try to deal with

23  that, as well.

24       Why don't we go ahead and break until 1:45.

25       COURTROOM DEPUTY:  All rise.

1          (Court recessed from 1:25 p.m. to 1:49 p.m.)

2          (Proceedings continued in open court, jury

3     present.)

4          THE COURT:  Plaintiffs may call her next witness.

5          MR. SIMON:  Your Honor, the plaintiffs called the

6     plaintiff, Miss Catherine Alexander.

7          THE COURT:  All right.  Miss Alexander, can you

8     please step forward?

9          (Witness sworn by courtroom deputy.)

10          THE WITNESS:  Catherine Ann Alexander.

11          THE COURT:  And you may remove your mask, if you

12     wish.

13          THE WITNESS:  A-L-E-X-A-N-D-E-R.

14          THE COURT:  You may proceed.

15          MR. SIMON:  Thank you, Your Honor.

16                    *  *  *  *  *

17                CATHERINE ALEXANDER,

18     having been first duly sworn, was examined and testified as

19     follows:

20                DIRECT EXAMINATION

21     BY MR. SIMON:

22     Q.     Could you state your name and address, please?

23     A.     Catherine Ann Alexander, 2451 Delmar Avenue in

24     Granite City, Illinois.

25     Q.     And how long have you lived in Granite City?

1    A.      About 20 years.

2    Q.      All right.  And did you grow up in Granite City?

3    A.      Yes, sir, I did.

4    Q.      Where did you go to high school?

5    A.      Granite City Senior High School.

6    Q.      Okay.  What's your occupation?

7    A.      A tattoo artist.

8    Q.      And how long have you been a tattoo artist?

9    A.      I have been a tattoo artist over 20 years.

10   Q.      And tell the jury please how you became a tattoo

11   artist.

12   A.      So, for my 18th birthday, that was my gift to

13   myself, was, I got my first tattoo.  And, um -- yeah.  That

14   was, that was how it all started.

15   Q.      Okay.  And did you have training after that?

16   A.      Yes, sir.  I actually became friends with one of

17   the artists that worked at the shop.  It was a lengthy

18   tattoo so, you know, we talked, discussed my artistic

19   ability, how I enjoyed drawing, painting, sculpting, bead

20   work, a multitude of different artistic mediums.  And he

21   suggested that I might be good at trying to be a tattoo

22   artist.

23   Q.      Okay.  And how long approximately did you train?

24   A.      It's hard to say.  You are always learning.  So,

25   several years that I observed and helped this individual,

1   Chris Lewis, with, you know, his -- his work.  But again,

2   I'm still learning after 20 years, so.

3   Q.      Okay.

4           MR. SIMON:  Are you okay -- I'm asking the court

5   reporter -- if you are understanding her okay with the

6   mask?

7           THE REPORTER:  Yes.  Thank you.

8           MR. SIMON:  Okay.  Very good.

9   Q.      (BY MR. SIMON)  Now, there's been some -- we've

10  heard of two things in this case.  I want to ask you the

11  difference.  What's the difference between a tattoo artist

12  and a tattooist?

13  A.      So, typically, a tattooist -- and the term that we

14  use, you know, would be someone who can copy, and that's

15  what they do.  So, they may come into the shop only knowing

16  how to use an image to put art on skin.  But they do not

17  create custom tattoos.  They don't generate their own art.

18  Q.      And a tattoo artist?

19  A.      A tattoo artist would be someone who is

20  accomplished in art.  They are familiar with different, you

21  know, ways to put art on skin, and that's what they do, is,

22  is custom art.

23  Q.      What is flash?

24  A.      Flash is -- I'm sure you have all seen it when you

25  walk into a tattoo shop -- images on the walls or in books

1    that provide something you can choose without you having to

2    bring in your own design.  You choose what they have and go

3    from there.

4    Q.     What is the process when someone uses flash to put

5    on a tattoo?

6    A.     So, flash is something that includes an outline

7    sheet.  So, when you choose your design, whether it be

8    black and gray or color, they take the flash sheet and make

9    a direct transfer of that outline and then apply it to the

10   skin with what's called green soap.  So, it's a direct

11   transfer.

12   Q.     Is it kinda like a stencil?

13   A.     It is, sir.  Yes.

14   Q.     And then the tattoos that you did for Mr. Orton,

15   that you created, were they custom tattoos or were they

16   flash?

17   A.     They were all custom.

18   Q.     Now, I want to move into when Mr. Orton first came

19   into your tattoo shop.  Did you end up inking tattoos that

20   you designed on Mr. Orton?

21   A.     Yes, sir, I did.

22   Q.     And did those include the five tattoos that are at

23   issue in this case?

24   A.     Yes, sir.

25   Q.     Did those tattoos exist before you created them?

1    A.      No, sir, they did not.

2    Q.      Did the designs exist before you created them?

3    A.      No, sir, not that I'm aware -- as far as the

4    existing piece?  I do not know if that was flash.  The

5    tribal addition -- tribal addition tattoo?  That's the only

6    one I don't know.

7    Q.      Okay.  The one on his back that was there before

8    you extended it.

9    A.      Yes, sir.

10   Q.      What are some of the challenges, when you apply

11   tattoos in a custom way to a person's body?

12   A.      So, one of the biggest challenges is body

13   structure.  His muscle structure is, is quite unique, so

14   that was definitely something -- if we're speaking about

15   Mr. Orton -- a challenge that would be to put a custom

16   tattoo on him.

17   Q.      Do you know approximately when you inked the first

18   one of your tattoos on Mr. Orton?

19   A.      I would say around 2002, 2003.  It's --

20   approximately.  It was a very long time ago, but.

21   Q.      Was Mr. Orton famous back then, when he first came

22   in?

23   A.      I wouldn't say famous in his own right.  Now, St.

24   Louis knows the Orton name.  But he, himself, had just

25   began his journey in wrestling.

1    Q.     Okay.

2           MR. SIMON:  If you could pull up exhibit -- I'm

3    sorry.  If you could show Exhibit 11 to Miss Alexander,

4    please.

5    Q.     (BY MR. SIMON) Do you recognize that?

6    A.     Yes, sir, I do.

7    Q.     Okay.  What is it?

8    A.     That is myself and Randy Orton, and I am tattooing

9    a custom tattoo on him.

10          THE COURT:  Hold on for a second.  We lost the

11   image off the screen.  (Pause.)  There you go.

12          MR. SIMON:  Your Honor, I'd move the admission of

13   Exhibit 11 -- Plaintiff's Exhibit.

14          MS. CENDALI:  No objection.

15          THE COURT:  Plaintiff's Exhibit 11 is admitted.

16          MR. SIMON:  May I publish it for the jury?

17          THE COURT:  And you may publish any exhibit -- once

18   it's admitted, feel free to publish it.

19          MR. SIMON:  Thank you, Your Honor.

20   Q.     (BY MR. SIMON)  So, where was this picture taken?

21   A.     That was at a shop called The Pain Station.

22   Q.     Okay.  And during approximately what time period

23   did you ink the tattoos that you created on Mr. Orton, the

24   five that are the subject of this case?

25   A.     Like I said, approximately 2002, 2003, up to late

1    2008, early 2009.

2    Q.      Okay.

3            MR. SIMON:  Your Honor, I'd move the admission of

4    Exhibit 84.

5            THE COURT:  Any objection?

6            MS. CENDALI:  What is that, Your Honor?  We just

7    did a previous exhibit.

8            THE COURT:  I'm not sure.

9            MR. SIMON:  We did 11.  It's --

10           THE COURT:  Mr. Simon, you need to --

11           MR. SIMON:  Okay.  I'm sorry, Your Honor, I was

12   trying to -- I didn't think there were any objections so I

13   thought --

14           THE COURT:  You still need to lay a foundation for

15   the record.

16           MR. SIMON:  Please publish for Miss Alexander --

17           MS. CENDALI:  I'm sorry, Mr. Simon.  Could we have

18   a copy of that?  I don't think that's in the binder.

19           MR. SIMON:  Exhibit 84?  I don't have a copy on

20   hand, but I'll put it up on the screen here for the

21   witness, please.

22           MS. CENDALI:  Okay, we'll work with that.

23   Q.      (BY MR. SIMON)  Do you recognize Exhibit 84,

24   please?

25   A.      Yes, sir, I do.  That would be the tribal addition

1    tattoo on Mr. Orton's back that I created for him.

2         MR. SIMON:  Your Honor, I'd move the admission of

3    Exhibit 84.

4         THE COURT:  Any objections, Miss Cendali?

5         MS. CENDALI:  No, Your Honor.

6         THE COURT:  Plaintiff's Exhibit 84 is admitted.

7         MR. SIMON:  Please publish it to the jury.

8    Q.    (BY MR. SIMON)  So, can you draw on the screen,

9    kinda show what portion was on there before you added what

10   you did?

11   A.    I can.  And I can say it will be approximate, for

12   the fact that we did extend some of the points and -- you

13   know, from the existing tattoo to make it more graceful.

14   (Indicating.)  So, yes, and what I am circling, there were

15   some fine-tuning on the centerpiece as I added the, the

16   addition.

17   Q.    Okay.  Now, so what you have outlined in red on the

18   screen is what was existing before, when Mr. Orton first

19   came in?

20   A.    Yes, sir.  But for the shading and white.  It's

21   harder to see in this picture, but I did add a gray shade

22   with white between the actual tribal and, and his skin, so.

23        MR. SIMON:  Okay.  If you could show the witness

24   Exhibit 4, please?

25   Q.    (BY MR. SIMON)  Do you recognize this exhibit?

1    A.      Yes, sir, I do.  That is the copyright registration

2    for the tattoo we just looked at.

3            MR. SIMON:  Okay.  Your Honor, I'd move the

4    admission of Exhibit 4.

5            THE COURT:  Any objection?

6            MS. CENDALI:  No, Your Honor.

7            MR. SIMON:  Please publish it.

8            THE COURT:  Okay.  Before we get there, Mr. Simon,

9    let me just make a point.  We kinda missed it on Exhibit

10   84.  But if you are going to have her draw on the screen,

11   try to describe it for the record, because the record's not

12   going to reflect what she outlined.

13           MR. SIMON:  I'm sorry, Your Honor.  Yes.  Yes, Your

14   Honor.

15           THE COURT:  Okay.

16   Q.      (BY MR. SIMON)  So -- I'm sorry.  So, just to catch

17   up.  Plaintiff's Trial Exhibit 4, which is on the screen

18   now, is your copyright registration for the tattoo we just

19   looked at?

20   A.      Correct, sir.

21           MR. SIMON:  If we could show the witness, please,

22   Exhibit 83.

23   Q.      (BY MR. SIMON)  What is Exhibit 83?

24   A.      Those are the custom tribal tattoos that I created

25   for Mr. Orton.

1  Q.      Where on his body?

2  A.      They're tattooed on his forearms and upper arms.

3  Q.      Okay.

4          MR. SIMON:  Your Honor, I'd move the admission of

5  Exhibit 83.

6          MS. CENDALI:  No objection.

7          THE COURT:  Plaintiff's Exhibit 83 is admitted.

8          MR. SIMON:  Please publish it for the jury.

9  (Pause.)  Okay.  Let's -- please show the plaintiff

10  Plaintiff's Exhibit 80.

11  Q.      (BY MR. SIMON)  Do you recognize Exhibit 80?

12  A.      Yes, sir, I do.  It's the custom rose tattoo I had

13  created for Mr. Orton, tattooed on his left forearm, with

14  his daughter's name, Alanna, and her birth date in Roman

15  numerals.

16          MR. SIMON:  Okay.  Your Honor, I'd move the

17  admission of Exhibit 80.

18          MS. CENDALI:  No objection.

19          THE COURT:  Plaintiff's Exhibit 80 is admitted.

20          MR. SIMON:  Please publish it for the jury.

21  (Pause.)  Now, I'd like to show the witness Plaintiff's

22  Exhibit 2, please?

23  Q.      (BY MR. SIMON)  Do you recognize Exhibit 2, Miss

24  Alexander?

25  A.      Yes, sir.  That's the copyright registration for

1    the tattoo that we just saw.

2          MR. SIMON:  Your Honor, I'd move the admission of

3    Exhibit 2.

4          THE COURT:  Any objection?

5          MS. CENDALI:  No objection.

6          MR. SIMON:  Please publish it for the jury.

7          THE COURT:  Plaintiff's Exhibit 2 is admitted.

8          MR. SIMON:  I'm sorry, Your Honor.  Apparently, I

9    missed one.

10         If you could show the witness Plaintiff's

11   Exhibit 5, please.

12   Q.    (BY MR. SIMON)  Do you recognize Plaintiff's

13   Exhibit 5?

14   A.    Yes, sir, I do.  This is the copyright registration

15   for the tribal designs we previously looked at, for his

16   forearms and upper arms.

17         MR. SIMON:  Your Honor, I'd move the admission of

18   Exhibit 5.

19         MS. CENDALI:  No objection.

20         THE COURT:  Plaintiff's Exhibit 5 is admitted.

21         MR. SIMON:  Please publish it for the jury.

22   (Pause.)  And if you could show the witness, please,

23   Exhibit 82, Plaintiff's Exhibit 82.

24   Q.    (BY MR. SIMON)  Do you recognize these -- this

25   picture?

1    A.       Yes, sir, I do.  Those are the custom gray shade
2    skulls I created for Mr. Orton and tattooed them on both
3    arms.
4            MR. SIMON:  Your Honor, I'd move the admission of
5    Plaintiff's 82.
6            MS. CENDALI:  No objection.
7            THE COURT:  Plaintiff's Exhibit 82 is admitted.
8            MR. SIMON:  If you could show the witness, Mr.
9    Zack, please, Plaintiff's Exhibit 3.
10   Q.       (BY MR. SIMON)  Do you recognize Exhibit 3?
11   A.       Yes, sir, this is the copyright registration for
12   the skull tattoos we just looked at.
13           MR. SIMON:  Your Honor, I'd move the admission of
14   Exhibit 3.
15           MS. CENDALI:  No objection.
16           THE COURT:  Plaintiff's Exhibit 3 is admitted.
17           MR. SIMON:  Please publish it for the jury.
18   (Pause.)  Mr. Zack, if you could show the witness Exhibit
19   81, please.
20   Q.       (BY MR. SIMON)  Do you recognize Exhibit 81?
21   A.       Yes, sir, I do.  This is the dove that I created
22   and tattooed for Mr. Randy Orton on his left arm.
23           MR. SIMON:  I'd move the admission of Exhibit 81.
24           MS. CENDALI:  No objection.
25           THE COURT:  Plaintiff's Exhibit 81 is admitted.

1          MR. SIMON:  If you could please publish it.

2  (Pause.)  If you could show the witness Exhibit 1, please.

3  Q.      (BY MR. SIMON)  Do you recognize Exhibit 1?

4  A.      Yes, sir.  This is the registration for copyright

5  for the dove that we just looked at, the dove tattoo.

6          MR. SIMON:  Your Honor, I'd move the admission of

7  Exhibit 1.

8          MS. CENDALI:  No objection.

9          THE COURT:  Plaintiff's Exhibit 1 is admitted.

10          MR. SIMON:  If you could publish it for the jury.

11  (Pause.)  We can take down Exhibit 1.

12  Q.      (BY MR. SIMON)  So, I want to ask you a few

13  questions about the tattoos we just looked at, those five.

14  Did you create them?

15  A.      Yes, sir.

16  Q.      Who owns the design?

17  A.      I own the designs.

18  Q.      Did you get paid for inking them on Mr. Orton?

19  A.      I got paid for the labor of tattooing the designs

20  on Mr. Orton.

21  Q.      Did that payment include ownership of the design?

22  A.      The ownership did not transfer.  The ownership is

23  mine.

24          MS. CENDALI:  [Inaudible.]

25          THE COURT:  I'm sorry?

1    MS. CENDALI:  Objection, calls for legal

2    conclusion.

3         THE COURT:  Sustained.

4    Q.    (BY MR. SIMON)  All right.  Did you and Mr. Orton

5    ever have any discussion about who owned --

6         MS. CENDALI:  Your Honor, may I move to strike then

7    that last question and answer?

8         THE COURT:  The last question and answer will be

9    stricken from the record, and the jury is instructed to

10   disregard the same.

11   Q.    (BY MR. SIMON)  Did you and Mr. Orton ever have a

12   discussion about ownership of the designs of these tattoos?

13   A.    Yes.  He said I created the designs and if someone

14   were to ask for me to tattoo them on their body, he said,

15   *Do what you want with them, you made them, you can do what*

16   *you want.*

17   Q.    Okay.

18        MS. CENDALI:  Objection, Your Honor, it's hearsay.

19        THE COURT:  Overruled.

20   Q.    (BY MR. SIMON)  At the time you inked these -- your

21   tattoos on Mr. Orton, did you know that character models of

22   Mr. Orton with copies of your tattoos would appear in video

23   games?

24   A.    No, sir, I did not.

25   Q.    At the time you inked these tattoos on Mr. Orton,

1  did you know that copies of your tattoos, on a different

2  character -- not Mr. Orton, a different character model --

3  would appear in video games?

4  A.    Definitely not.

5  Q.    At the time you inked these tattoos on Mr. Orton,

6  did Mr. Orton tell you that a character model of him,

7  including your tattoos, would appear in video games?

8  A.    No, sir, he did not.

9  Q.    Did Mr. Orton at that time tell you that he

10  intended to authorize third parties to copy the tattoos

11  into video games?

12  A.    No, sir, he never said that.

13  Q.    Okay.

14       MR. SIMON:  I'd like to now pull up Plaintiff's --

15  Take-Two's demonstrative used in this morning's open -- in

16  the opening statement?  This is plaintiff's demonstrative

17  exhibit used in opening statement -- I'm sorry.

18       This is Defendant Take-Two's demonstrative exhibit

19  used in opening statement.  And go to slide 7, please.

20  Q.    (BY MR. SIMON)  Were you in the courtroom

21  yesterday?

22  A.    Yes, sir.

23  Q.    And you heard the opening statement and what was

24  said about this slide here?

25  A.    I did.

```
1    Q.      Okay.  Prior to yesterday, had you ever seen a 2002

2    video game that included a character model of Randy Orton?

3    A.      No, sir, I did not.

4            MR. SIMON:  If you could go to slide 8, please.

5    Q.      (BY MR. SIMON)  Prior to yesterday, did you ever

6    see a 2003 video game -- sorry -- prior to yesterday, had

7    you ever heard of a 2003 video game that included a

8    character model of Randy Orton?

9    A.      No, sir, I did not.

10           MR. SIMON:  Go to slide 8 [sic], please.

11   Q.      (BY MR. SIMON) Prior to yesterday, had you ever

12   seen a 2004 video game that included a character model of

13   Randy Orton?

14   A.      No, sir, I did not.

15           MR. SIMON:  I'm sorry.  My -- I'm being told this

16   hasn't been published to the jury.

17           May I publish it to the jury, Your Honor?  The

18   demonstrative exhibit that was already shown to the jury.

19           THE COURT:  Miss Cendali?

20           MS. CENDALI:  We don't have -- in light of Your

21   Honor -- we have no objection.

22           THE COURT:  Yes, you may.

23           MR. SIMON:  I'm sorry.  So, if we could go back to

24   slide 7.

25           So, you already testified about that.  I'm just
```

 1    going to loop through them for the jury.

 2           And slide 8, please.  (Pause.)  And slide 9,

 3    please.

 4           THE COURT:  These were all shown during opening

 5    statements; is that correct?

 6           MR. SIMON:  Yes, Your Honor.

 7    Q.    (BY MR. SIMON)  And this is slide 9.  I don't think

 8    I asked you about slide 9.  Prior to yesterday, had you

 9    ever seen a 2004 video game that included a character model

10    of Randy Orton?

11    A.    No, sir.

12           MR. SIMON:  Go to slide 10, please.

13    Q.    (BY MR. SIMON) Prior to yesterday, had you ever

14    seen a video game from 2005 that included a character model

15    of Randy Orton?

16    A.    No, sir.

17           MR. SIMON:  Go to slide 11, please.

18    Q.    (BY MR. SIMON) Prior to yesterday, had you ever

19    seen a 2006 video game that included a character model of

20    Randy Orton?

21    A.    No, sir.

22           MR. SIMON:  Go to slide 12, please.

23    Q.    (BY MR. SIMON) Prior to yesterday, had you ever

24    seen a 2007 video game that included a character model of

25    Randy Orton?

1    A.      No, sir.

2            MR. SIMON:  Go to slide 13.

3    Q.      (BY MR. SIMON) Prior to yesterday, had you ever

4    seen a 2008 video game that included a character model of

5    Randy Orton?

6    A.      No, sir, I did not.

7            MR. SIMON:  Go to the next slide, please.

8    Q.      (BY MR. SIMON) Prior to yesterday, had you ever

9    seen a 2009 video game that included a character model of

10   Randy Orton?

11   A.      No, sir, I have not.

12           MR. SIMON:  Next slide, please.

13   Q.      (BY MR. SIMON) Prior to yesterday, had you ever

14   seen a 2010 video game that included a character model of

15   Randy Orton?

16   A.      No, sir.

17           MR. SIMON:  And the next slide, please?  (Pause.)

18   Was there one for 2011?  I'm sorry, did we jump, Mr. Zack?

19           VIDEO TECHNICIAN:  No.

20           MR. SIMON:  Okay.  So, go to slide 17.

21   Q.      (BY MR. SIMON) Now, what's shown in slide 17 here

22   are the video games that are at issue in this case; right?

23   A.      Yes.

24   Q.      When was the first time you became aware of any of

25   the video games that are the subject of this litigation?

1    A.      2016.

2    Q.      Okay.

3            MR. SIMON:  And if we could go to slide 18, please.

4    Q.      (BY MR. SIMON) Now, Miss Alexander, this is a

5    photograph of Randy Orton.  Do you have any objection to

6    Mr. Orton appearing in photographs?

7    A.      No, sir, not at all.

8            MR. SIMON:  Okay.  If we could go to it WWE's

9    demonstratives used in opening statement, please, and

10   publish them for the jury.  And go to slide 17.

11   Q.      (BY MR. SIMON)  You were here during the opening

12   statement and you saw this, that was displayed?

13   A.      Correct, sir.

14   Q.      All right.  Prior to yesterday, had you ever seen

15   these THQ video games that are shown with character models

16   of Randy Orton?

17   A.      No, sir, I had not.

18           MR. SIMON:  Go to slide 15, please.  And you can

19   just list all of them.

20   Q.      (BY MR. SIMON) Now, were you here in opening when

21   there was a discussion about your missed opportunities to

22   tell Mr. Orton he needed certain of your permissions?  Do

23   you remember that?

24   A.      I do remember it, sir.

25   Q.      Okay.  Why didn't you tell Mr. Orton he needed your

1   permission to be photographed?

2   A.      He doesn't need my permission to be photographed.

3   Q.      Why didn't you tell him he needed your permission

4   to be videotaped?

5   A.      He does not need my permission to be videotaped.

6   Q.      Why didn't you tell him he needs your permission to

7   show his body in public?

8   A.      He does not need my permission to show his body in

9   public.

10  Q.      Does Mr. Orton need any permission from you to do

11  whatever he wants with, to his body and with his body?

12  A.      Absolutely not.  He can do whatever he wants with

13  that body.

14          MR. SIMON:  Okay.  You can take that down, please.

15          If you could pull up Plaintiff's Exhibit 153,

16  please, and start at 15 and go to 30 -- I'm sorry.

17          Your Honor, this exhibit has been admitted already.

18  So, if we can publish it for the jury, as well.

19          COURTROOM DEPUTY:  Do you need sound for this?

20          MR. SIMON:  No, I do not need sound.  Thank you.

21          (Video playing.)

22  Q.      (BY MR. SIMON)  Okay.  Do you recognize the game

23  character on Exhibit 153 that's shown in the screen at

24  00:21 -- I'm sorry, 00:22?

25          (Video playing.)

1          MR. SIMON:  If you could pause it, please.

2   A.     Recognize it?

3   Q.     (BY MR. SIMON) It's -- yes.  Do you know who that

4   is?  Who that's a depiction of?

5   A.     I don't think it's a depiction of anyone.

6   Q.     Okay.  Is that a game character of Randy Orton in

7   the video game?

8   A.     No, sir.

9          MR. SIMON:  Okay.  Now, if you could go to 40

10  seconds, please?

11         (Video playing.)

12  Q.     (BY MR. SIMON) Do you recognize what's shown in the

13  Exhibit 153 at 40 seconds?

14  A.     That is a copy of the tribal addition tattoo that I

15  created for Mr. Orton.

16         MR. SIMON:  Okay.  If you could play from 40 to 55

17  of Plaintiff's Exhibit 153, please?

18         (Video playing.)

19  Q.     (BY MR. SIMON) Do you recognize what's shown in 153

20  at 55 seconds, on the left arm of the character model?

21  A.     I do, sir.

22  Q.     What are they?

23  A.     Those are the custom tattoos that I created for

24  Randy Orton, but they are copied and put on this

25  mannequin-like character in the video game.

1    MR. SIMON:  Okay.  And if you can go to 1:08,

2    please, Zack?

3    Q.    (BY MR. SIMON) Do you recognize what's shown at

4    1:08 of Exhibit 153?

5    A.    I do, sir.  Those are copies of the custom tattoos,

6    the skulls and some of the tribal, that I created for Mr.

7    Orton also, applied to this blank character.

8    MR. SIMON:  Okay.  And if you go to 1:19, please,

9    Mr. Zack.

10   Q.    (BY MR. SIMON) And what do you see here, ma'am?

11   A.    I see copies of the tattoos that I created on this

12   character.  However, they have been grossly altered, the

13   color.

14   Q.    Did you ever give anyone permission to include

15   these tattoos in this video game?

16   A.    Never.

17   MR. SIMON:  All right.  If we could go to Exhibit

18   154, please, which is already admitted, and go to 5

19   minutes, 4 seconds.

20   Q.    (BY MR. SIMON) And this is video game, ma'am, WWE

21   2K17.  Do you recognize what's shown here at 5:04 of

22   Exhibit 154?

23   A.    Yes, sir, I do.

24   Q.    What is it?

25   A.    It appears to be the copy of Randy Orton for the

1    video game, with copies of my custom tattoos that I had

2    created also on the character's skin.

3    Q.      And did you ever give anyone permission to include

4    your tattoos in this video game?

5    A.      No, sir, never.

6            MR. SIMON:  And if you'll go to 7:27, please.

7    Q.      (BY MR. SIMON) What is that a picture of -- or

8    what's depicted there at 7:27?

9    A.      That's a copy of the tattoo I had created for Mr.

10   Orton.  It looks like it's on, also, the wrestling

11   character depicted in the game.  And also, you could see

12   some of the other copyrighted work.

13   Q.      All right.  Now, for all the tattoos we just saw --

14           MR. SIMON:  You can take that down, please.

15   Q.      (BY MR. SIMON)  For all the tattoos we just saw,

16   both the ones on the end game character that represents

17   Randy Orton and the character that does not look like Randy

18   Orton, did you ever give permission to anyone to copy the

19   tattoos into the video games?

20   A.      No, sir.  Never.

21   Q.      Did you ever do or say anything to indicate to

22   anyone that they had permission to copy those designs in

23   video games?

24   A.      No, sir, definitely not.

25   Q.      Did you ever say or do anything to indicate you

1    were relinquishing your copyrights in those designs?

2    A.      No, sir.

3            MS. CENDALI:  Objection, calls for legal

4    conclusion, and misstates the law.

5            THE COURT:  I did hear a statement of the law, but

6    overruled.

7    Q.      (BY MR. SIMON)  I'd like to switch gears now.  Have

8    you ever interacted in the past with the defendants

9    regarding your tattoos?

10   A.      Yes, sir, I did.

11   Q.      Please tell the jury about when it happened.

12   A.      Well, it was 2009.

13   Q.      That's fine.  I just wanted you to say when, first,

14   so they have the date.

15   A.      Oh, okay.

16   Q.      Now, tell them what happened.

17   A.      I had heard someone -- acquaintance, friend, I'm

18   not sure -- tell me there may be some nylon sleeves created

19   with my custom designs that I had tattooed on, on Mr.

20   Orton.  You know, the pull-on kind of sleeves that appear

21   as though you have the tattoos.  So, I had -- that was the

22   first I had heard of anything like that.

23           I Googled the number for WWE Legal in Stanford,

24   Connecticut -- you can actually do that -- and called the

25   number to address that issue and see what they had to say.

1    Q.      Did someone answer?

2    A.      Yes, sir, they did.

3    Q.      And what did -- what did you say to them?

4    A.      I, you know, introduced myself as Catherine

5    Alexander.  I am the tattoo artist for Mr. Randy Orton.  I

6    mentioned these possible products that they may come out

7    with, asked them if that was in fact a thing, and expressed

8    to them that if they were to do that, I gave them no

9    permission to use my custom designs on that merchandise.

10   Q.      Okay.  And did you tell them that you had

11   copyrights?

12   A.      No.

13   Q.      Okay.  And did you give them any permission to use

14   your designs?

15   A.      I did not.  They were actually very condescending

16   on the phone.  When they came across as they did, I said,

17   *well, I'm sorry that you feel as though I'm some stupid*

18   *hick from the Midwest and I don't know any better.*

19           And that was the end of the phone call.  I didn't

20   feel the need to speak with them any further after that

21   conversation.

22   Q.      Did you say anything about whether you were willing

23   to negotiate a license agreement?

24   A.      If they were to come forth with anything, that was

25   the only way.  I said I would be willing to negotiate, yes,

1    a percentage of their revenue if they were to -- want to

2    create a product.

3    Q.      Okay.  Now, in the interest of time, I'm going to

4    talk about several games that were mentioned yesterday.

5    I'm just going to name them, first, and then I'm going to

6    ask you some questions.

7    A.      Okay.

8    Q.      WWE Smack Down Shut Your Mouth game from 2002.  Had

9    you ever heard of that one before yesterday?

10   A.      No, sir.

11   Q.      WWE Smack Down Here Comes the Pain from -- Pain

12   Game from 2003.  Had you ever heard of that game before

13   yesterday?

14   A.      No, sir.

15   Q.      The game WWE Smack Down versus Raw 2004.  Had you

16   ever heard of that game before yesterday?

17   A.      No, sir.

18   Q.      WWE Smack Down Raw 2006.  Had you ever heard of

19   that game before yesterday?

20   A.      No, sir.

21   Q.      WWE Smack Down versus Raw 2007.  Had you ever heard

22   of that game before yesterday?

23   A.      No, sir.

24   Q.      WWE Smack Down versus Raw 2008.  Had you ever heard

25   of that game before yesterday?

1    A.     No, sir.

2    Q.     WWE Smack Down versus Raw 2009.  Had you ever heard

3    of that game before yesterday?

4    A.     No, sir.

5    Q.     WWE Smack Down versus Raw 2010.  Had you ever heard

6    of that game before yesterday?

7    A.     No, sir.

8    Q.     And, finally, WWE Smack Down versus Raw 2011.  Had

9    you ever heard of that game before yesterday?

10   A.     No, sir.

11   Q.     All right.  So, for all those games I just

12   mentioned, they were -- they were PlayStation 2 games,

13   okay?  Had you ever played the game?

14   A.     No, sir.

15   Q.     Ever seen the game played?

16   A.     No.

17   Q.     Have you even ever owned a PlayStation 2?

18   A.     I have never owned a video game console.

19   Q.     And had you ever seen a character model of Randy

20   Orton in any of those games?

21   A.     No, sir.

22   Q.     All right.  Now, you said you first learned about

23   the infringing games in this case in approximately 2016?

24   A.     Correct, sir.

25   Q.     And the point was made, you filed the lawsuit in

1    2018.  Was there anything between 2016 and 2018 that

2    happened to you, physically, that prevented you from taking

3    action?

4    A.     Yes, sir.  Unfortunately, I had a bi-level spinal

5    fusion in early 2017, with some complications.  And also, a

6    car accident following that, in 2018.

7    Q.     Okay.  There was some discussion about whether you

8    -- you filed a lawsuit.  You didn't call WWE or Take-Two.

9    Why not?  In 2018, before you filed suit.

10   A.     They were so dismissive and ugly on the previous

11   phone call, I didn't feel as though they would be

12   receptive.

13   Q.     Okay.  And how did you find out?  A friend -- I

14   think you said a friend mentioned about -- let me ask you

15   this.  How did you find out about the video games that are

16   the subject of this case, and your tattoos appearing in

17   them?

18   A.     An associate actually had mentioned that the video

19   game was extremely realistic, and my tattoos that were

20   depicted were amazing.

21   Q.     And what -- did you do any investigation on your

22   own to confirm that?

23   A.     Well, yes.  I got on the computer and Googled only

24   a portion, and it was the walk-out portion of the game

25   where Mr. Orton is shown approaching the ring for his

1    performance.

2    Q.      Now, why did you file applications to register your

3    copyrights in 2018?

4    A.      It was necessary to go forth with the lawsuit.

5    Q.      Okay.  Now, let me ask you:  What are you asking

6    for, from this jury, in this suit?

7    A.      You know --

8           MS. CENDALI:  Objection, Your Honor.

9           THE COURT:  I'm sorry?

10          MS. CENDALI:  Objection.  This isn't the time to be

11   asking the jury for anything.

12          THE COURT:  Overruled.

13   A.      I am asking for what's fair.  These are large

14   corporations that used my custom creations for their

15   benefit, without any compensation at all, and I just want a

16   very small piece of a very big pie.

17          MR. SIMON:  Your Honor, may I have one moment?

18          THE COURT:  Yes.

19          (Pause.)

20          MR. SIMON:  That's all I have at this time, Your

21   Honor.

22          THE COURT:  Miss Cendali.

23          MS. CENDALI:  Your Honor, may I approach the

24   witness?

25          THE COURT:  Yes.

1          MS. CENDALI:  May I take my mask off?

2          THE COURT:  You may.

3                        CROSS-EXAMINATION

4     BY MS. CENDALI:

5     Q.     Good afternoon, Ms. Alexander.

6     A.     Good afternoon.

7     Q.     I guess we last met back in 2019, when I took your

8     deposition.  Do you remember that?

9     A.     Yes, ma'am, I do.

10    Q.     Now, Ms. Alexander, you knew during the time that

11    you were inking Mr. Orton that he was a famous wrestler;

12    right?

13    A.     Not in the beginning.

14    Q.     Well, in the beginning, you knew that he was going

15    to wrestling school; right?

16    A.     Yes, ma'am, I did.

17    Q.     Yeah.  And it took more than five tattoo sessions

18    to ink those large tattoos on Mr. Orton; right?

19    A.     Yes, ma'am, it did.

20    Q.     So, you were spending a lot of time with him;

21    right?

22    A.     To a degree, for the work.

23    Q.     Yeah.  And you also were seeing him socially, too;

24    right?

25    A.     At times, yes.

1    Q.      And during those sessions, you talked to Mr. Orton

2    about his wrestling career; right?

3    A.      On occasion.

4    Q.      You understood that he had gotten into the WWE;

5    right?

6    A.      Yes, ma'am.

7    Q.      And you knew that he -- even before he got in the

8    WWE -- he was excited.  He told you from the beginning, he

9    wanted to be a professional wrestler.  Right?

10   A.      I don't remember him telling me prior to anything.

11   It was -- when I first tattooed him, we were discussing his

12   wrestling school where he had just been at.

13   Q.      Ms. Alexander, Mr. Orton told you about his desire

14   to be a professional wrestler; correct?

15   A.      Correct.  Yes.  That's why he was going to

16   wrestling school.

17   Q.      Okay.  And did you ever discuss with Mr. Orton that

18   he had won his first WWE championship in 2004?

19   A.      No, ma'am.

20   Q.      Did you know he had won the championship in 2004?

21   A.      Not that I recall.

22   Q.      Well, Ms. Alexander, you knew by 2008 that Mr.

23   Orton was a very successful professional wrestler; right?

24   A.      He became very successful, yes, ma'am.

25   Q.      And you also knew that when you were inking Mr.

1    Orton, that as a professional wrestler he would appear in

2    media showing his tattoos; right?

3    A.      Correct.

4    Q.      You watch Mr. Orton wrestle on television; right?

5    A.      Occasionally.

6    Q.      And you knew that he was on television all the

7    time, by 2008; right?

8    A.      Yes, ma'am.

9    Q.      And wasn't part of the point, Mr. Orton's point in

10   getting his tattoos, so he would look good when he was on

11   TV?

12   A.      I would assume so.

13   Q.      And didn't you even have a conversation with Mr.

14   Orton about how the tattoos you inked on him would look

15   good on television?

16   A.      Yes, they do accent his muscle structure.

17   Q.      And you knew when you were inking Mr. Orton that he

18   would appear on merchandise showing his tattoos; right?

19   A.      Yes, ma'am.

20   Q.      And you knew he would be in magazines and on the

21   internet; right?

22   A.      Yes, ma'am.

23   Q.      And you knew that when he appeared in costume, the

24   tattoos would be visible; right?

25   A.      Absolutely.

1    Q.      Is it fair to say, a wrestler typically wrestles in

2    kind of a bathing suit, trunk-type outfit?

3    A.      That's part of the job.

4    Q.      Maybe part of the attraction, too; right?

5    A.      Quite possibly.

6    Q.      Yeah.  And tattoos -- would you agree with me that

7    tattoos are part of what makes Mr. Orton look like Mr.

8    Orton?

9    A.      Yes, ma'am.

10   Q.      It's part of his persona; correct?

11   A.      It is.

12   Q.      In fact, would you agree with me that Mr. Orton

13   wouldn't look as much like himself without his tattoos?

14   A.      Now that they're there, it's hard to imagine Randy

15   without his tattoos.

16   Q.      Now, in the years from around 2002, 2003, to 2008,

17   2009, when you were inking Mr. Orton, you never told him

18   that you expected to be compensated when he appeared in the

19   future with his tattoos; right?

20   A.      We never had that discussion.

21   Q.      So, you never told him that you needed to go back

22   -- he needed to go back to you for permission or

23   compensation for showing what was on his skin; correct?

24   A.      No.

25   Q.      And you have inked thousands of tattoos on clients

1    in your career; right?

2    A.      Yes, ma'am, I have.

3    Q.      And you never told any client, including Mr. Orton,

4    that they needed your permission to appear on a T-shirt

5    showing the tattoos you inked; right?

6    A.      No, ma'am.

7    Q.      And you never told a client, including Mr. Orton,

8    that they needed your permission to appear in a photograph

9    showing the tattoos you inked; right?

10   A.      No, ma'am.

11   Q.      And you never told any client, including Mr. Orton,

12   that they needed to pay you before posting pictures of

13   themselves with their tattoos on social media; right?

14   A.      Absolutely not.

15   Q.      And you never told a client, including Mr. Orton,

16   they needed your permission to appear on television showing

17   the tattoos you inked; right?

18   A.      That's correct.

19   Q.      And you never told any client, including Mr. Orton,

20   that they needed your permission to be depicted in a video

21   game showing their tattoos; right?

22   A.      No, I never told anyone that.

23   Q.      Yeah.  And you never told a client, including Mr.

24   Orton, that they needed to pay you before they were

25   depicted in a video game showing their tattoos; right?

1    A.      No, I have never told anyone that.

2    Q.      In fact, you understand that when a client leaves

3    your tattoo shop, the client's free to go about their life

4    without going back to you for permission to show their

5    tattoos; correct?

6    A.      To show their tattoos on their physical body?  No,

7    they don't need my permission.

8    Q.      And you never told any client, including Mr. Orton,

9    that you own copyrights in their tattoos; right?

10   A.      I was never asked.

11   Q.      Does -- is Mr. Orton a copyright expert?

12   A.      I don't believe he is.  He might be by now.  He's

13   very smart.

14   Q.      So, did you tell Mr. Orton or any of your clients

15   that you own copyrights in their tattoos?

16   A.      I was never asked.

17   Q.      My question is different.  Did you tell any client,

18   including Mr. Orton, that you own copyrights in their

19   tattoos?

20   A.      No, ma'am.

21   Q.      Now, if you had told Mr. Orton before you inked him

22   that he would have to come back to you for permission and

23   pay you money in the future, that -- would you agree with

24   me that that would have given him an opportunity to maybe

25   select a different tattoo artist?

Case 3:18-cv-00966-SMY   Document 306   Filed 10/16/22   Page 144 of 200   Page ID #5559

A.      Pay him money for what?  Could you please clarify?

Q.      Sure.  Let me try it again.

        Would you agree with me that, if you had told Mr.
Orton that he would have to come back to you in the future
for permission or to pay you money, in some way he might
want to show his body, he could have then said, *Oh, thanks
for letting me know, I'm going to go to a different tattoo
artist*.

A.      I'm still not sure -- you didn't clarify in what
way he would -- if it's his body?  No, I wouldn't request
that he pay me to show his body.

Q.      Well, his body is being shown in WWE 2K games;
right?

A.      That's not his body.

Q.      Would you say it looks like his body?

A.      From what I'm aware, they recreated that character
to look very close to what they could achieve with video
game art.

Q.      And if you had told -- you never told Mr. Orton
that there would be some circumstance in the future where
he would need to go back to you for permission to authorize
people to show his likeness; right?  You never told him
that; correct?

A.      No, I didn't speculate on anything that may happen
in the future.

1    Q.      And therefore, you never gave Mr. Orton any warning

2    that in the future, 20 years later, you might come back and

3    file a lawsuit against him; right?

4    A.      No --

5            MR. SIMON:  Objection.

6    A.      -- it would be impossible.

7            THE COURT:  I'm sorry?

8            MR. SIMON:  Objection.  There's no lawsuit against

9    Mr. Orton here.

10           THE COURT:  Sustained.

11   Q.      (BY MS. CENDALI)  You never gave Mr. Orton the

12   ability to seek out a different tattooist by letting him

13   know that in the future you might demand additional

14   payment; correct?

15   A.      I'm not asking for additional payment from Mr.

16   Orton.

17   Q.      You understand that Mr. Orton has licensed his

18   likeness to WWE and Take-Two?

19   A.      That's between him, WWE, and Take-Two.

20   Q.      Right.  You understand that that's the case though,

21   right?

22   A.      I do now.

23   Q.      Now, in your experience in the tattoo field,

24   clients and tattooists don't sign agreements about

25   copyright issues; right?

1    A.      Not in any shop that I have worked in.

2    Q.      And the only agreement you ever had Mr. Orton sign

3    was a health form required by the State of Missouri;

4    correct?

5    A.      Correct, the standard state health certificate.

6            MS. CENDALI:  Your Honor, I'd like to show to the

7    witness, the Court, and opposing counsel what has been

8    previously marked as Defendant's Exhibit 103.

9            MR. SIMON:  No objection, Your Honor.

10   Q.      (BY MS. CENDALI)  Is this the -- do you have it in

11   front of you, Ms. Alexander?

12   A.      Yes, ma'am, I do.

13   Q.      Is this the State of Missouri's required form to be

14   given to someone receiving a tattoo?

15   A.      Yes, it appears to be.

16   Q.      And did you have Randy Orton sign one of these

17   forms for you?

18   A.      It depends on which shop he was being tattooed at.

19   I didn't always control the desk.

20   Q.      He signed one of these forms for you at The Pain

21   Station tattoo shop; correct?

22   A.      Yes.  Correct.

23           MS. CENDALI:  I move Defendant's Exhibit 103 in

24   evidence.

25           MR. SIMON:  No objection.

1           THE COURT:  Defendant's Exhibit 103 is admitted.

2           MS. CENDALI:  Permission to publish?

3           THE COURT:  You may.

4    Q.    (BY MS. CENDALI)  So, there's nothing in this form

5    that tells tattoo people they need to go back to their

6    tattoo artist before showing their tattoos in media;

7    correct?

8    A.    The State of Missouri does not require that on the

9    form.

10   Q.    The form deals with health issues; right?

11   A.    Correct, ma'am.

12   Q.    And just to be clear, you never told Mr. Orton he

13   couldn't authorize others, like WWE, to show his likeness

14   either; right?

15   A.    Can you define likeness?

16   Q.    What he looks like.  You never told Mr. Orton, you

17   can't tell WWE to show what he looks like to people; right?

18   A.    I never told him that, no.

19   Q.    Now, I believe you said on direct that there's --

20   that there -- that Mr. Orton doesn't need your permission

21   to appear in a photograph; right?

22   A.    Correct.

23   Q.    And do you believe he doesn't need your permission

24   to appear on television, too?

25   A.    No, ma'am, he does not.

1    Q.      And what about on merchandise like T-shirts?  Does
2    he need your permission for that?
3    A.      If it's a photograph of him, no.
4    Q.      Well, suppose it's a -- a T-shirt that shows him,
5    that is not made directly from a photograph of him.  Would
6    that need your permission?
7    A.      It would depend on the circumstance.
8    Q.      So, sometimes he might need your permission to --
9    for his likeness, his -- what he looks like -- to be on a
10   T-shirt.  Is that your point?
11   A.      If it's a copy or it's been altered in any way,
12   yes.
13   Q.      So, anything but a photograph on a T-shirt, you
14   think, needs your permission; is that right?
15   A.      If my custom designs are represented on that
16   merchandise and they are not photographs of Mr. Orton
17   directly, yes.
18   Q.      You have been to WWE events, haven't you?
19   A.      Only a couple.
20   Q.      And you know that they sell T-shirts at those
21   events; right?
22   A.      I have seen the T-shirt booths.
23   Q.      Right.  So, when you were inking Mr. Orton, you
24   knew he would likely be on T-shirts; right?
25   A.      Correct.

1    Q.      And you never said, *By the way, there's only some*

2    *T-shirts that you can be on, without paying me.* Right?

3    A.      No, ma'am.

4    Q.      Now, what is it -- what's the distinction you are

5    making, what's the difference in your mind between why it's

6    okay for Mr. Orton to be in a photograph or on television

7    without your permission, but in a video game or a T-shirt

8    that looks like him, then he needs to pay you?

9    A.      Because in the video games, that is not Mr. Orton.

10   That is a recreation of Mr. Orton with my custom designs.

11   Q.      It's recreation that looks a lot like him; right?

12   A.      They may do a good job at rendering what he looks

13   like, but that still doesn't make it Mr. Orton.

14   Q.      In fact, isn't it true that in a video game, Mr.

15   Orton's appearance is not altered in any way?

16   A.      Really, that's not what it appeared whenever the

17   testimony from the computer experts were.

18   Q.      Well, I'm asking you because you looked at the

19   games; right?

20   A.      I did.

21   Q.      So, isn't it true that, in your view, Mr. Orton's

22   appearance is not altered in any way by the WWE 2K Games?

23   A.      My observation is, in the one video game it looks

24   like his nose is broken.  So, I don't think that that's a

25   very direct representation or realistic representation.

1              MS. CENDALI:  Your Honor?  I direct opposing

2    counsel to Catherine Alexander's deposition transcript at

3    page 173, lines 16 to 20.

4    Q.      (BY MS. CENDALI)  Ms. Alexander, as we mentioned,

5    you were deposed in connection with this case; right?

6    A.      Correct.

7    Q.      You were under oath; correct?

8    A.      Yes, ma'am.

9    Q.      You swore to tell the truth in that deposition;

10   correct?

11   A.      Yes, ma'am.

12   Q.      And you did tell the truth in that deposition;

13   right?

14   A.      Correct.

15   Q.      And after that deposition, you received a copy of

16   the transcript; right?

17   A.      Yes, ma'am.

18   Q.      And you had an opportunity to review and make

19   corrections; correct?

20   A.      I did.

21   Q.      And in fact, you did make corrections; right?

22   A.      I don't recall, but.

23   Q.      Do you remember that you signed a notarized copy of

24   the transcript?

25   A.      I didn't have anything notarized.  I don't remember

1    if it was notarized.

2    Q.    You don't know whether your counsel did that?

3    A.    I don't, no.

4    Q.    All right.  At your deposition, I asked you the

5    following question and you gave the following answer.

6          Question:  "Is Mr. Orton's appearance altered in

7          any way by WWE 2K video games?"

8          Answer:  "Other than him appearing in digital form,

9          unfortunately, no."

10         Was that your testimony at the time?

11   A.    I recall, yes, it was.

12   Q.    Now, would you agree that the tattoos were included

13   in WWE 2K in order to make Mr. Orton's character in the

14   game resemble Mr. Orton in real life?

15         MR. SIMON:  Objection, Your Honor, calls for

16   speculation.

17         THE COURT:  Sustained.

18         MS. CENDALI:  Your Honor, we have an RFA on this

19   point.  Can I read it now?

20         THE COURT:  I'd like to see it, first.

21         MS. CENDALI:  Can we have a copy of Request for

22   Admission No. 38, which is labeled as Defendant's Exhibit

23   94, page 16.

24         Can we give a copy to the Court?

25         THE COURT:  You can hand it to Miss Hurst.

1      MR. SIMON:  I'm sorry.  What number, please?

2      MS. CENDALI:  It's Defendant's Exhibit 94, Request

3 for Admission, page 16, No. 38.

4      (Off the record.)

5      THE COURT:  I have -- this is Document 95, that I

6 have.  You are reading from -- your reference is to

7 Document 94?

8      MS. MEANS:  That was my fault, Your Honor.

9      (Off the record.)

10      THE COURT:  Are you referring to 94 in the docket

11 citation?  Because the sticker says 94 down --

12      MS. CENDALI:  Your Honor, it's Exhibit 94, not

13 Document 95.  I think that's the confusion.

14      THE COURT:  So, Exhibit 94 --

15      MS. CENDALI:  It's Exhibit 94 and it's Request for

16 Admission No. 38, which is on page 16 --

17      THE COURT:  It's at the bottom of page 16?

18      MS. CENDALI:  Correct.

19      THE COURT:  Hold on for a second.

20      MS. CENDALI:  Sure.

21      (Off the record.)

22      THE COURT:  That's not the same question you just

23 asked this witness.

24      MS. CENDALI:  I asked --

25      THE COURT:  I believe your specific question -- you

1    asked this witness if Mr. Orton's likeness was included in

2    WWE to make it realistic.  The objection was, it calls for

3    speculation.

4         I sustained the objection because you are asking

5    this witness why WWE included the likeness, without any

6    knowledge.  That calls for speculation.  This is something

7    different.

8         So, counsel, this is not impeaching at all and my

9    -- I don't know if it was meant to be impeaching, but my

10   ruling as far as the specific question that you asked calls

11   for speculation, that is my ruling and it stands.

12        MS. CENDALI:  Your Honor --

13   Q.    (BY MS. CENDALI)  Ms. Alexander, would you agree

14   that a depiction of Randy Orton's likeness without his

15   tattoos would not be realistic?

16   A.    No, ma'am, it wouldn't.

17   Q.    Now, let's just go back to this.  So, whether he's

18   on television or in video games, Mr. Orton looks like

19   himself; correct?

20   A.    To a degree.

21   Q.    And you understand that television is a digital

22   recreation of a real-life person; right?

23   A.    To a degree.

24   Q.    Well, we all know that when we're watching

25   something on television, they aren't there in real life;

1    right?

2    A.      Of course.  No.

3    Q.      They're not really in your living room; you can't

4    reach in and take out a Randy Orton from the TV.  Correct?

5    A.      No, ma'am.

6    Q.      So, television and photos also recreate what

7    somebody actually looks like; correct?

8    A.      They directly record the person's image.

9    Q.      And they are a recreation of that person's image;

10   right?  It's not the real person.

11   A.      I don't believe the term recreation in this case is

12   the same as what we're speaking about with the video games.

13   Q.      That's not my question.  You understand that in a

14   photograph or in a -- on television, you are still looking

15   at something that is not the person standing before you in

16   real life; correct?

17   A.      Correct.  It's the person as they are.

18   Q.      Right.  It's the -- it's not the real person,

19   right, Ms. Alexander?

20   A.      Of course not.

21   Q.      Okay.  Now, you claim -- you testified that you

22   learned that Mr. Orton was appearing in WWE 2K when someone

23   who played the game brought it to your attention; correct?

24   A.      That sounds right.

25   Q.      And you would estimate that this occurred sometime

1    in 2014; correct?

2    A.      2016.

3    Q.      Well, when we spoke at your deposition, you

4    estimated that you were told about Mr. Orton appearing in

5    the WWE 2K games more than four years before that

6    deposition; correct?

7    A.      It was so long ago, it's -- I don't remember exact

8    dates, ma'am.

9    Q.      Well, Ms. Alexander, more than four years before

10   that deposition would have been before January 15th of 2025

11   -- 2015; correct?

12   A.      Again, I -- I -- kinda confusing me with the dates.

13   Q.      Well, isn't it true that at your deposition you

14   thought that you might have first seen the WWE 2K games

15   more than five years before your deposition?

16   A.      I had not seen them, no.

17   Q.      Didn't you say at your deposition that the WWE 2K

18   games, you might have seen them and been aware of Mr. Orton

19   appearing in the WWE 2K games more, as much as five years

20   before that deposition of January 2019?

21   A.      I believe --

22           MR. SIMON:  Objection, Your Honor.  Could we get a

23   page and line number in the deposition?

24           MS. CENDALI:  Okay.

25           THE COURT:  Miss Cendali?

1          MS. CENDALI:  Okay.  So --

2          THE COURT:  Proper impeachment.  If you believe

3    that was her testimony, could you cite counsel and the

4    Court to the page and can we impeach in that way?

5          MS. CENDALI:  Thank you, Your Honor.  Sorry.

6          THE COURT:  Mm-hmm.

7          MS. CENDALI:  I am directing opposing counsel to

8    Ms. Catherine Alexander's deposition transcript at page 18,

9    line 21, through page 19, line 18.

10   Q.    (BY MS. CENDALI)  Ms. Alexander, at your deposition

11   I asked you the following question and you gave the

12   following answers:

13           "What -- are you saying that -- what caused you to

14           know that Randy Orton appears in the WWE 2K video

15           games?"

16           Answer:  "It was brought to my attention by someone

17           who plays the game."

18           Question:  "By whom?"

19           Answer:  "I don't recall."

20           Question:  "You don't remember who told you this?"

21           Answer:  "No, ma'am."

22           Question:  "Do you know when they told you this?"

23           Answer:  "No, ma'am."

24           "Can you give me any period of time about when they

25           told you this?"

```
1        Answer:  "I cannot."
2        Question:  "Was it in the past two years?"
3        "No."
4        Question:  "Was it in the past more than three
5        years ago?"
6        "Yes."
7        Question:  "Was it more than four years ago?"
8        "Yes."
9        Question:  "More than five years ago?"
10       Answer:  "I'm not sure."
11       So --
12       THE COURT:  Excuse me, counsel.  That's not
13  impeaching.
14       MS. CENDALI:  Can I refresh the witness's
15  recollection then that that's what she said in her
16  deposition?
17       THE COURT:  No.  No.  No.  No, Miss Cendali.  If
18  we're going to impeach witnesses, we're going to do it
19  properly.
20       MS. CENDALI:  Okay.
21       THE COURT:  First of all, I have read and instruct
22  the jury to disregard that exchange on the reading of the
23  deposition and -- because that was not inconsistent.
24       Now, if there's a matter that you want to refresh
25  her recollection on, if you can do that appropriately --
```

1    but I'm not sure how you're refreshing her recollection.

2    She said in the deposition she didn't remember, and she's

3    saying now she didn't remember, so it's unclear to the

4    Court what the approach is here, Miss Cendali.

5    Q.      (BY MS. CENDALI)  Ms. Alexander, isn't it true

6    that, in approximately 2014, more than four years before I

7    took your deposition in January of 2019, is when this

8    person told you that Randy Orton appears in the WWE 2K

9    video games?

10   A.      Ma'am, I don't remember.

11          MS. CENDALI:  May I refresh her recollection as to

12   what she said in her deposition, Your Honor?

13          THE COURT:  You may attempt to do that, yes.

14          MS. CENDALI:  Okay.

15   Q.      (BY MS. CENDALI)  Your deposition transcript is in

16   the binder in front of you, Ms. Alexander.

17          THE COURT:  Counsel, can we have a sidebar, please?

18          MS. CENDALI:  Sure.

19          THE COURT:  It may get us past this.

20          (Proceedings continued at the bench.)

21          THE COURT:  Miss Cendali, again, and I don't think

22   you're trying to do anything that's untoward, but

23   refreshing a witness's recollection with their deposition

24   transcript, I don't think that's -- if you are trying to

25   establish that she at some point in her deposition

1  testified differently, then of course you need to impeach

2  her with that.  My only issue is, what you just read in an

3  attempt for impeachment is not impeaching.

4  MS. CENDALI:  I'm trying to solve the problem, Your

5  Honor.  I -- you're not letting us play -- I understand --

6  any excerpts of her deposition testimony where she said

7  this.  And I could read in -- I can ask her, was it more

8  than four years before your deposition?  And -- and --

9  THE COURT:  You did ask her that.  She said she

10  doesn't remember.

11  MS. CENDALI:  Right.

12  THE COURT:  But the problem is, what you are

13  reading from the deposition is not inconsistent with that.

14  So, again, that is the purpose, and the only purpose, of

15  impeachment.  So, it doesn't matter whether it's a video or

16  not.  What the Court is not going to allow is you to

17  confront a witness with their deposition testimony that is

18  not inconsistent.

19  MS. CENDALI:  Well, Your Honor, she's taking the

20  position now that this happened in 2016.  I have a problem

21  because she's saying she doesn't remember.  But I have

22  sworn testimony it was more than --

23  THE COURT:  Well, if you read that sworn testimony,

24  it would be impeachment.  But that's not what you read.

25  MS. CENDALI:  So, I'm just trying to do -- I did

1    read in -- what is it you'd like me to do, Your Honor, to

2    resolve the problem?

3            THE COURT:  I'd like you to either impeach her or

4    move on.  The only thing I'm saying is, what you read is

5    not impeaching in terms of what her testimony has been.

6            MS. CENDALI:  Well --

7            THE COURT:  And what I'm not going -- so, that's

8    what you can't do.

9            MS. CENDALI:  But --

10           THE COURT:  If it's not impeaching, you cannot

11   confront her with that testimony.

12           MS. CENDALI:  Could I just read in -- impeach her

13   then, Your Honor, if the -- the whole rest of it is too

14   long.

15           I'd like to impeach her then with page 18, lines 15

16   through 18, you know, where I asked, didn't she -- "was it

17   more than four years ago?"  "Yes."  "More than five years

18   ago?"  "I'm not sure."

19           THE COURT:  No, because that's not -- that's no

20   different than what she testified here.

21           MS. CENDALI:  Yes, because she -- she answered yes,

22   Your Honor.

23           THE COURT:  Miss Cendali, I have ruled and we're

24   moving on.

25           (Proceedings continued in open court, jury

1    present.)

2    Q.     (BY MS. CENDALI)  Ms. Alexander, isn't it true that

3    you -- this person told you about Mr. Orton appearing

4    realistically in video games sometime approximately six

5    years ago, in 2014?

6          THE COURT:  Six years ago would be 2016.

7          MS. CENDALI:  Excuse me.

8    Q.     (BY MS. CENDALI)  It's approximately eight years

9    ago, in 2014?

10   A.     I don't -- I don't remember exactly when it was.  I

11   even said in my deposition, I'm terrible with dates.

12   Q.     Can you approximate at all -- but it could have

13   been in 2014, right, Miss Alexander?

14   A.     Ma'am, I'm not sure.

15   Q.     But -- and it could have been -- okay.  But it

16   could have been in 2014, right?

17         THE COURT:  Miss Cendali?

18         MR. SIMON:  Objection.

19         MS. CENDALI:  OKAY.

20         THE COURT:  I get it, but you have asked that.  I

21   ruled.  We need to move on.

22         MS. CENDALI:  Okay.

23         THE COURT:  And actually, if you are moving on, we

24   need to take a quick break because the Court needs a break.

25         MS. CENDALI:  That's fine, Your Honor.

1          THE COURT:  No one else needs the bathroom?  I do.

2          MS. CENDALI:  That's fine, Your Honor.

3          COURTROOM DEPUTY:  All rise.

4          THE COURT:  So, we will be in recess until 3:15.

5          (Court recessed from 3:00 p.m. to 3:14 p.m.)

6          THE COURT:  Miss Cendali, you may proceed.

7          MS. CENDALI:  Thank you, Your Honor.

8  Q.     (BY MS. CENDALI)  Hello again, Ms. Alexander.

9  A.     Hello.

10  Q.     Now, you don't remember who told you about Mr.

11  Orton appearing in WWE 2K video games; right?

12  A.     No, ma'am.

13  Q.     But you do remember this person saying that the

14  wrestlers in WWE 2K video games look like they were in a

15  movie because it was really realistic; right?

16  A.     Correct.

17  Q.     And shortly after that, which may have been in

18  2014, you were told this, you looked at the video game

19  yourself; right?

20  A.     I looked at the walk-out segment.

21  Q.     And when you looked at this, you couldn't believe

22  the quality of the graphics in the game; right?

23  A.     No, I couldn't.

24  Q.     And in fact, you thought Mr. Orton was depicted

25  very realistically when you looked at it; right?

1    A.       It looked very realistic.

2    Q.       And in fact, you were impressed by the realism,

3    weren't you?

4    A.       Yes, ma'am.

5    Q.       And when you saw Mr. Orton appearing in WWE 2K, you

6    felt your rights were being violated; right?

7    A.       Yes, ma'am, I did.

8    Q.       And this may have been, as we discussed, in 2014.

9    And when you saw Mr. Orton appearing realistically in WWE

10   2K then, you didn't contact Take-Two; right?

11   A.       No, ma'am, I did not.

12   Q.       And you didn't try to contact Mr. Orton; right?

13   A.       There was no reason to.  No, ma'am.

14   Q.       And you didn't contact WWE; right?

15   A.       After the first phone call, I saw no reason to.

16   Q.       Well, we'll talk about that in a minute.  But you

17   didn't do anything when, in around 2014, you saw Mr. Orton

18   appearing in a video game, like a movie, to alert Take-Two

19   that you had any issue with Mr. Orton being depicted

20   realistically in the game; right?

21   A.       No, ma'am.

22   Q.       And Take-Two, you know, kept releasing new video

23   games after 2014; right?

24   A.       I assume so, yes.

25   Q.       Well, you know that after 2014 because you are

1    suing them, that Take-Two released 2K16; right?

2    A.      Yes, ma'am, I do know.

3    Q.      And you know that the next --

4            MR. SIMON:  Your Honor?

5            THE COURT:  Yes?

6            MR. SIMON:  May we have a sidebar, please?

7            THE COURT:  Yes.

8            (Proceedings continued at the bench.)

9            THE COURT:  Yes, sir, Mr. Simon?

10           MR. SIMON:  Your Honor, this is not relevant

11   because waiver -- waiver is a voluntary relinquishment.

12   Silence cannot be waivered.  And they keep going over this,

13   that she didn't call them, she didn't call them, she didn't

14   tell them.  It's just not relevant.

15           THE COURT:  What's the relevance, Miss Cendali?

16           MS. CENDALI:  It goes to not just waiver -- where

17   we disagree on the law, and that will be subject to the

18   Court's instructions.  We need to make our evidentiary

19   record -- also to the implied license.  This is the heart

20   of the implied license.

21           THE COURT:  What's the heart of the implied

22   license?

23           MS. CENDALI:  Because it shows that she acted in a

24   way consistent with the idea that she did not -- that Mr.

25   Orton was able to use -- authorize his likeness in the

1   games.  And this is vitally material evidence to that.

2          THE COURT:  I don't know that that's an element of

3   implied license.

4          MS. CENDALI:  Yes, it is.

5          THE COURT:  Well, let me say this.  All of those

6   are legal determinations.  Okay?  As far as what she did

7   and did not do?  That dead horse has been beaten.  She

8   admits that she never had any conversation, she never took

9   these steps.

10          And, oh, by the way, your questions now are

11   premised on 2014, which you are free to do that, but that's

12   not what she testified to.

13          So, again, I'm trying to give you some leeway here.

14   But I don't -- I don't agree with the extent to which you

15   are alleging that this is relevant and I am going to cut

16   that off.

17          MS. CENDALI:  I'll try to move on, Your Honor.

18          THE COURT:  Thank you.

19          (Proceedings continued in open court, jury

20   present.)

21          MS. CENDALI:  May I proceed, Your Honor?

22          THE COURT:  You may.

23   Q.     (BY MS. CENDALI)  So, let's move along to the near

24   present.  You filed this lawsuit in April of 2018; correct?

25   A.     Correct.

1  Q.      And you filed it without giving any of the

2  defendants any prior notice; correct?

3  A.      Prior notice?

4  Q.      You didn't tell WWE, Take-Two, and you didn't tell

5  Mr. Orton that you were filing this before you filed it;

6  right?

7          MR. SIMON:  Objection, Your Honor, relevance.

8          THE COURT:  Sustained.

9  Q.      (BY MS. CENDALI)  Ms. Alexander, you mentioned

10 copyright registrations on your direct with -- do you

11 remember that?

12 A.      Yes, ma'am.

13 Q.      Okay.  And you didn't file your copyright

14 registrations -- right? -- until March of 2018; correct?

15 A.      Yes, ma'am.

16 Q.      Did you ever tell Mr. Orton that you were filing

17 copyright registrations at any time?

18         MR. SIMON:  Objection, Your Honor, relevance.

19         THE COURT:  Sustained.

20         MS. CENDALI:  Sidebar, Your Honor?

21         THE COURT:  Sure.

22         (Proceedings continued at the bench.)

23         MS. CENDALI:  Your Honor?  This is a different

24 question and this goes to a different point of our implied

25 license defense that the -- that custom and practice was

1    not to get copyright registrations and that she did not --

2    he -- give him warning or tell him anything about how she

3    had filed for copyrights.

4         THE COURT:  But that's not relevant to implied

5    consent.  That's -- let's just hold on for a second.  Let

6    me nip this in the bud.  Hold on.

7         MS. CENDALI:  I can explain that in the implied

8    license argument the law says --

9         THE COURT:  No.  No.  No.  I just asked you to hold

10   on, Miss Cendali.

11        MS. CENDALI:  I'm sorry.  Forgive me, Your Honor.

12        (Pause.)

13        THE COURT:  So, actually, the elements of implied

14   license -- implied license is created when a person

15   requests the creation of the work; the creator makes that

16   particular work and delivers it to the licensee who

17   requested it; and, the licensor intends that the licensee

18   copy and distribute the work; objective evidence of the

19   copyright owner's intent is relevant.

20        What you are doing and what the areas that you are

21   going into, I don't see the connection.

22        MS. CENDALI:  Well, Your Honor, in the *LimeCoral*

23   case, in the Seventh Circuit case of 2018, the Court said:

24   Absent a limitation imposed on the license at the time the

25   works were delivered, the license impliedly granted then

1   would encompass all of the rights of the copyright holder.

2          The Court also said that you look to objective

3   evidence --

4          THE COURT:  I just went over that.  I'm not saying

5   -- what I'm saying is, the areas that you are getting into,

6   this Court does not find that they are relevant to that.  I

7   have given you some leeway but you are not going to keep

8   beating this drum.

9          MS. CENDALI:  Okay, Your Honor, I'll move on.

10         THE COURT:  All right.

11         (Proceedings continued in open court, jury

12   present.)

13   Q.     (BY MS. CENDALI)  Let's talk about this phone call

14   that you say you made in 2009 to WWE.  Okay?

15   A.     Yes, ma'am.

16   Q.     Now, you don't remember who you spoke to; right?

17   A.     I do not.

18   Q.     Okay.  And you don't know whether you spoke to a

19   lawyer; right?

20   A.     I do not.

21   Q.     And you don't have any notes from that call; right?

22   A.     No, ma'am.

23   Q.     And you didn't follow up in writing in any way

24   after that call; right?

25   A.     No, ma'am.

1    Q.      And the call was about a rumor that you had heard

2    that WWE was going to sell a product depicting your

3    tattoos; right?

4    A.      Correct.

5    Q.      And the product that you had heard a rumor about

6    was faux nylon sleeves; right?

7    A.      Yes, that's correct.

8    Q.      The call wasn't about video games; right?

9    A.      No, ma'am.

10   Q.      And to your knowledge, these faux nylon sleeves

11   never came out; right?

12   A.      No, ma'am.

13   Q.      Now, you testified on direct that this person -- I

14   believe you said -- could do whatever they wanted because

15   -- with Mr. Orton; is that right?

16          MR. SIMON:  Objection, Your Honor.  It's just not

17   clear to me what's being asked.

18          MS. CENDALI:  Okay.

19   Q.      (BY MS. CENDALI)  I'm just trying to frame what you

20   had said on direct.  Could you tell me what was said on

21   this call again?

22   A.      By whom?

23   Q.      By the person at WWE?

24   A.      The person who represented themselves as a

25   authority at the number I called, which is WWE Legal, said

1    that Mr. Orton is their wrestler and they can do whatever

2    they want with him.

3    Q.      Was there anything else said on that call?

4    A.      They made a offer to me, a rather insulting offer

5    of 450 dollars for complete basic ownership, from what they

6    said, of my custom tattoos to use as they wish.  And I

7    declined because it was very insulting.

8    Q.      You didn't mention that on your direct, did you?

9    A.      I wasn't asked.

10   Q.      And you didn't mention the 450 dollars when I asked

11   you what took place during that conversation at your

12   deposition; correct?

13   A.      It wasn't asked.

14   Q.      Didn't I ask you, at your deposition, to please

15   tell me everything you can about what you said and what the

16   person said to you in this conversation?"

17   A.      Ma'am, I was nervous, so forgetting sometimes

18   happens.  And I forgot.

19   Q.      And you didn't mention it?

20   A.      I didn't mention during the deposition?  No, ma'am,

21   I did not.

22   Q.      Okay.  So, is it -- so, in 2009, in your view of

23   the world, you knew that WWE might be coming out with some

24   kind of merchandise involving Mr. Orton's tattoos; right?

25   A.      I didn't know that.

Q.      You heard a rumor that they might be; right?

A.      I did hear a rumor, yes, ma'am.

Q.      Okay.  So, at this time in 2009, did you do anything to look into whether there might be any other products out there that might be showing Mr. Orton with his tattoos?

A.      No, ma'am.

Q.      I take it you have heard of video games?

A.      I have.

Q.      Okay.  Now, you also were asked some questions about the Create a Superstar feature in the WWE 2K games. Remember that?

A.      Yes, ma'am.

Q.      And you understand that, that the specific subpart of the Create a Superstar feature that you were asked about is called the body parts feature; right?

A.      If that's what it's called, I believe you.  Yes.

Q.      Okay.  But you understand that you could take Mr. Orton's whole arm and back to create a superstar; right?

A.      You can take a rendering of Mr. Orton's arms and back to create a superstar.

Q.      I don't think anyone's thinking that you would cut off Mr. Orton's arm and back and put it in the --

A.      I was referring to a digital copy.

Q.      Right.  Like -- like a photograph.  So --

1  A.      No.

2  Q.      -- would you -- would you --

3          MR. SIMON:  Objection, Your Honor, argument.

4          THE COURT:  I'm sorry, Mr. Simon?

5          MR. SIMON:  Argument.

6          THE COURT:  It's sustained.

7  Q.      (BY MS. CENDALI)  You understood that this feature

8  wasn't limited to Mr. Orton's arms and back; right?

9  A.      I do now.

10 Q.      You understand that other wrestlers' body parts

11 were included; right?

12 A.      Recreations of other wrestlers' body parts.

13 Q.      And you -- as we talked about -- understand that

14 Mr. Orton believes that he gave permission to show his

15 likeness, image, in the video game; right?

16 A.      Could you repeat the question, please?

17 Q.      Sure.  You understand that Mr. Orton gave WWE and

18 Take-Two permission to show his body in the video game;

19 right?

20         MR. SIMON:  Objection, Your Honor, hearsay.  And it

21 calls for a legal conclusion.

22         THE COURT:  The question is what she understands.

23 That's overruled.

24         You can answer the question, Miss Alexander.

25         THE WITNESS:  Yes, ma'am.

1    A.      Not his body.  It's a rendering of his body.  But,

2    yes, I understand the rest of your question.  But it's not

3    his body.

4    Q.      (BY MS. CENDALI)  Well, do you understand that this

5    body parts feature was put in the game by THQ?

6    A.      I'm not familiar with THQ.

7    Q.      Did you -- do you know when this body parts

8    feature, that you talked about on direct, was put in the

9    games?

10   A.      No, ma'am.

11   Q.      Do you know when it was taken out?

12   A.      Whatever they had said earlier.  I believe on maybe

13   the last two games, 17, and 18, I believe that they

14   mentioned that.

15   Q.      So, let's -- let's move back a step and talk a

16   little about the inking process.  Okay?  Am I correct that

17   when you ink someone, the client normally selects the

18   subject matter of their tattoo?

19   A.      Not always.

20   Q.      Well, isn't it true that the client normally

21   selects the subject matter of their tattoo?

22   A.      I'll say yes, for the purpose of where we're at.

23   But anymore, not completely, no.

24          MS. CENDALI:  Mr. Simon, I direct you to Alexander

25   transcript page 77, lines 20 to 23 -- excuse me -- 76,

1    lines 20 to 23.

2    Q.      (BY MS. CENDALI)  Question:  "And so does the

3            client normally select the subject matter of the

4            tattoo?"

5            Answer:  "They do, yes."

6            Did you -- was that your testimony at the time?

7    A.      At the time.

8    Q.      You only help with the execution; correct?

9    A.      With the execution and the creation.

10           MS. CENDALI:  Mr. Simon, again, Alexander

11   transcript, page 51, lines 14 to 23.

12   Q.      (BY MS. CENDALI)  "And when you work with clients,

13           you try to help them pick something that fits how

14           they want to see themselves.  Is that fair to say?"

15           Answer:  "Not the subject."

16           Question:  "What do you mean, not the subject?"

17           Answer:  "I never choose the subject.  Only help

18           with the execution."

19           Question:  "So, who chooses the subject?"

20           Answer:  "The client."

21           Was that your testimony at the time?

22   A.      At the time, yes.

23   Q.      And that was true in this case.  Mr. Orton selected

24   the subject matter of each of his tattoos; right?

25   A.      To a degree.

1    Q.      Told you where he wanted the tattoos inked; right?

2    A.      Correct.

3    Q.      He told you what he wanted the tattoos to look

4    like; right?

5    A.      More so the subject and, say, gray shade as opposed

6    to using black.

7    Q.      So, as you were saying when he asked you to tattoo

8    the skulls tattoo on him, he said he wanted it in a soft

9    gray color so it would be in the background of the tribal

10   tattoos; right?

11   A.      Yes, ma'am.  That's correct.

12   Q.      And he also told you he wanted the dove tattoo to

13   be in this soft gray, too; right?

14   A.      Yes, ma'am.  That's correct.

15   Q.      And he told you he wanted you to ink a rose tattoo

16   on his arm in honor of his daughter; right?

17   A.      Yes, ma'am.

18   Q.      And he wanted it to be the only tattoo on his body

19   in color; correct?

20   A.      Yes, ma'am.

21   Q.      And he wanted his daughter's name underneath it in

22   Roman numerals with her birth date; right?

23   A.      The birth date in Roman numerals, and her name in

24   beautiful script, yes.

25   Q.      And, I take it, you only inked these tattoos on Mr.

1    Orton only after getting his permission to do so?

2    A.      At his request, yes, ma'am.

3    Q.      And some of the tattoos you inked on Mr. Orton were

4    additions to preexisting tattoos; right?

5    A.      Correct.

6    Q.      He asked you to create an addition to his existing

7    tribal upper back tattoo; right?

8    A.      Yes, ma'am.

9    Q.      And the existing tribal tattoo had been inked by

10   another tattooist at Goldenlands; correct?

11   A.      That wasn't my understanding.

12   Q.      You never heard that Mr. Glatstein had designed and

13   Mr. Daley had inked that original upper back tattoo?

14   A.      No, ma'am.  I wasn't there all the time.

15   Q.      Do you have -- do you understand that it is

16   possible that Mr. Glatstein and Mr. Daley did that original

17   tattoo at Goldenlands?

18   A.      Mr. Orton said differently.

19   Q.      Okay.  Well, Mr. Orton wanted you to add to the

20   tattoo in the same style as the original; correct?

21   A.      To -- to follow the same style, yes.

22   Q.      And you agreed to do that; right?

23   A.      Of course.

24   Q.      And you didn't feel like you needed to get the

25   permission of the original person, whoever they were, who

1    inked the tattoo, before you altered it and added to it at

2    Mr. Orton's request; right?

3    A.      No, ma'am.

4    Q.      And Mr. Orton also requested that you ink tribal

5    designs on his arms; is that right?

6    A.      Correct.

7    Q.      And you used, again, the same style of the tribal

8    design on his arms as the tribal design on his back; right?

9    A.      It's similar in the way that it's black work with

10   shading of gray surrounding it, and white in between.

11   Q.      And in your experience, clients have the right to

12   decide whether they want their tattoos removed; right?

13   A.      Yes, ma'am.

14   Q.      And they -- and tattooed people have the right to

15   alter or modify their tattoos using a different tattooist,

16   if they want?

17   A.      Yes, ma'am, absolutely.

18   Q.      And they can do all this without going back to the

19   permission -- for permission from the original tattoo

20   artist; right?

21   A.      That's correct.

22   Q.      And in fact, you understood that Mr. Orton,

23   himself, has altered the tattoos you originally inked on

24   him; right?

25   A.      Yes, ma'am, I do.

1    Q.      And you didn't feel Mr. Orton needed your

2    permission to do that; correct?

3    A.      No, ma'am.

4    Q.      And you know that when a client leaves your tattoo

5    shop, they might show other people their tattoos; right?

6    A.      Correct.

7    Q.      Clients might even buy dresses with open backs to

8    show off their tattoos; right?

9    A.      They very well could.

10   Q.      Or others might wear kinda muscle shirts to show

11   off their tattoos; right?

12           MR. SIMON:  Objection, Your Honor, relevance.

13           THE COURT:  Where are we going with this, Miss

14   Cendali?

15           MS. CENDALI:  Pardon me?

16           THE COURT:  Where are we going with this?

17           MS. CENDALI:  Okay.

18           THE COURT:  No, I'm asking you here.  I mean --

19           MS. CENDALI:  Okay, so let me move on.

20   Q.      (BY MS. CENDALI)  Ms. Alexander, if you do a good

21   job inking someone, that becomes a good source of referrals

22   for you; correct?

23   A.      It can, but not necessarily.

24           MS. CENDALI:  Alexander transcript, page 82, lines

25   18 to 21.

```
1   Q.       (BY MS. CENDALI)  Question:  "Okay.  Is it fair to

2            say, if you do a good job inking a person, that's a

3            good source of referrals for you?"

4            Answer:  "Absolutely."

5            Was that your testimony at the time?

6   A.       I'm sure it was.

7   Q.       And inking a celebrity can also lead to referrals;

8   correct?

9   A.       Of course.

10  Q.       Now, moving on.  You worked at at least five tattoo

11  shops in your career; right?

12  A.       Give me a moment.  (Pause.)  That sounds about

13  right.

14  Q.       Well, you worked at Slinging Ink; right?

15  A.       Correct.

16  Q.       And at Pain Station; right?

17  A.       Correct.

18  Q.       Not a great name but, okay.  You worked at Diablo

19  Ink; correct?

20  A.       Correct.

21  Q.       You worked at Sunshine Daydream; right?

22  A.       That was The Pain Station in a different location.

23  Q.       Gotcha.  You worked at Goldenlands Tattoos; right?

24  A.       Correct.

25  Q.       And when you stopped working at Goldenlands, you
```

1    didn't tell all the people you inked there that you were

2    going to a new tattoo shop; right?

3    A.      No, ma'am.

4    Q.      And you didn't take with you the names and

5    addresses of the clients you inked at Goldenlands; right?

6    A.      That is not a custom of tattoo shops, to provide

7    you with the information for your customers when you leave.

8    Q.      And in fact, when you left subsequent tattoo shops,

9    you didn't tell all the clients you had inked there that

10   you were going to a new shop so they could find you; right?

11   A.      No, ma'am, I did not.

12   Q.      And you didn't take your clients' names and

13   addresses with you, either?

14   A.      Only ones I was very familiar with.

15   Q.      Now, you think that Mr. Orton should not be

16   permitted to be depicted realistically with his tattoos in

17   the WWE 2K games without compensating you; is that correct?

18   A.      Correct.

19   Q.      You are not aware, though, of any business you have

20   lost as a result of Mr. Orton being depicted in the WWE 2K

21   games showing his tattoos; right?

22   A.      I can't speculate on any business I have lost.  No,

23   ma'am.

24   Q.      So, your answer is no?

25   A.      No, ma'am, I don't speculate.

1  Q.      You are not aware of any clients you have lost due

2  to the depiction of Mr. Orton in the WWE 2K games with his

3  tattoos; right?

4  A.      Again, it's impossible to guess.

5          MS. CENDALI:  Alexander transcript, page 186, lines

6  10 to 13.

7  Q.      (BY MS. CENDALI)  Question:  "And you are not aware

8          of any clients you have lost due to the depiction

9          of Mr. Orton in WWE 2K with his tattoos; correct?"

10         Answer:  "Correct."

11         Was that your answer at the time?

12 A.      Yes, ma'am.

13 Q.      And in fact, there were people who came to you

14 because they heard you had inked Mr. Orton's tattoos;

15 right?

16 A.      I believe some did.

17 Q.      And you don't consider yourself to be in

18 competition with Take-Two, do you?

19 A.      No, ma'am.

20 Q.      And you are not in competition with WWE either;

21 right?

22 A.      No, ma'am.

23 Q.      And to be clear, you haven't worked full time in

24 the tattoo industry since 2009; right?

25 A.      Correct.

1    Q.     Tattooing people is not your primary means of

2    support; correct?

3    A.     I don't know exactly how to answer that.  I have

4    tattooed people.  I am supported by tattooing people, to a

5    degree.

6    Q.     Okay.  Well, let's -- let's move on from that.  To

7    be clear, you've never licensed a tattoo you have inked on

8    anyone, to anyone; correct?

9    A.     No, ma'am.

10   Q.     And you have never licensed a tattoo for use in a

11   video game; correct?

12   A.     No, ma'am.

13          MS. CENDALI:  No questions at this time.

14          THE COURT:  Mr. Krasik?

15          MR. KRASIK:  No, Your Honor.  No questions, Your

16   Honor.

17          THE COURT:  All right.

18          MR. SIMON:  I just have a couple follow-up.

19                      REDIRECT EXAMINATION

20   BY MR. SIMON:

21   Q.     Do you have any objection to Mr. Orton having

22   photographs of himself on a T-shirt?

23   A.     No, sir.

24   Q.     You mentioned you looked at -- when you heard about

25   the video games, you looked -- you were asked if you had

1    looked at the walk-out.  Was that on a game or was that on

2    YouTube?

3    A.     It was on like a YouTube, like, I -- I had looked

4    it up.  I Googled it.  And I'm sure the source was probably

5    YouTube.

6    Q.     But you didn't have a game at that time to --

7    A.     Oh, no, sir.

8    Q.     Did Mr. Orton ever tell you that he wanted to give

9    anyone rights to make copies of the tattoos?

10   A.     No, never.

11   Q.     Did the defendants in this case ever ask for

12   permission to make copies of the tattoos?

13   A.     No.

14   Q.     In 2009, you did tell them that they couldn't make

15   copies of the tattoos; right?

16   A.     I did.

17          MR. SIMON:  That's all, Your Honor.

18          MS. CENDALI:  No further questions, Your Honor.

19          THE COURT:  Thank you.

20          Thank you, Miss Alexander.  You may step down.

21   Please watch your step.

22          Are you ready for your next witness, Mr. Simon?

23          MR. SIMON:  Yes, Your Honor.

24          We have a 16-minute combined video clip that we'd

25   like to play, and it is of the Take-Two defendants through

1    the witness Chris Snyder.  And it is Plaintiff's Trial

2    Exhibit 158.

3            (Whereupon, the videotaped deposition of Chris

4    Snyder, dated August 14, 2019, Plaintiff's Exhibit 158, was

5    played to the jury at this time.)

6            MR. SIMON:  That's the end of that testimony, Your

7    Honor.

8            Ryan Clark is our next witness, and we can finish

9    him before.

10            THE COURT:  Are you admitting any exhibits?

11            MR. SIMON:  Oh, yes.  I'm sorry.

12            MR. FRIEDMAN:  Your Honor, we would move for

13    admission of PTX 26, 27, and 28.

14            THE COURT:  Any objection?

15            MS. CENDALI:  No objection, Your Honor.

16            THE COURT:  Plaintiff's Exhibits 26, 27, and 28 are

17    admitted.

18            MR. FRIEDMAN:  Thank you, Your Honor.

19            Your Honor, with permission, plaintiffs call Mr.

20    Ryan Clark as our final witness.

21            (Witness sworn by courtroom deputy.)

22            THE WITNESS:  It's Ryan Clark.  The last name

23    C-L-A-R-K.

24                        *  *  *  *  *

25                        RYAN CLARK,

1    having been first duly sworn, was examined and testified as

2    follows:

3                         DIRECT EXAMINATION

4    BY MR. FRIEDMAN:

5    Q.      Good afternoon, Mr. Clark.

6    A.      Good afternoon.

7    Q.      Welcome.  And please state your name for the record

8    and introduce yourself to the jury.

9    A.      My name is Ryan Clark, and I'm a CPA.

10   Q.      Mr. Clark, did my law firm hire you to take a look

11   at some of the financial issues involved in this case?

12   A.      Yes.

13   Q.      All right.  And did my law firm provide you with a

14   number of materials --

15   A.      Yes.

16   Q.      -- to review?

17   A.      Yes.

18   Q.      Just in general, what did those materials include?

19   A.      They included various expert reports and any of the

20   documents that those experts relied upon.

21   Q.      Mr. Clark, if you could, I'm having a little

22   trouble hearing.  Could you pull that a little bit closer?

23   A.      Sorry.

24   Q.      Thank you.

25           Mr. Clark, you stated that you are an accountant.

1    Could you let the jury know your educational background,

2    starting with your undergrad?

3    A.     Sure.  I've got Bachelor of Science degree in

4    Accounting in Business Administration from Truman State

5    University.  And I also have a MBA from St. Louis

6    University.

7    Q.     Mr. Clark, you have a binder of materials in front

8    of you right now.  Could you turn to Exhibit No. 38?  It's

9    the second to the last in, in the binder you have?

10   A.     (Complies.)

11   Q.     Mr. Clark, do you recognize this document,

12   Plaintiff's Exhibit No. 38?

13   A.     I do.

14   Q.     What is it?

15   A.     It's a copy of my CV.

16   Q.     Okay.  And your CV -- your CV lists a number of

17   pertinent information about your professional background,

18   including your education, previous work history,

19   certifications, publications, things like that; is that

20   right?

21   A.     That's correct.

22   Q.     You probably didn't need to review that to let the

23   jury know where you went to undergrad and graduate school,

24   but is this CV current and up to date?

25   A.     Yes, it is.

1          MR. FRIEDMAN:  Okay.  Your Honor, I'd move for

2     admission of Plaintiff's Exhibit 38 into evidence?

3          MR. ILARDI:  No objection, Your Honor.

4          THE COURT:  Plaintiff's Exhibit 38 is admitted.

5          MR. FRIEDMAN:  Thank you.

6          Mr. Zidzik, could you please pull up Plaintiff's

7     Exhibit No. 38 and publish to the jury.  And you can go to

8     the second page, under Professional Certifications.

9     Q.     (BY MR. FRIEDMAN)  Mr. Clark, when did you obtain

10    your graduate degree at St. Louis University?

11    A.     In 1998.

12    Q.     Okay.  And since then, have you obtained any

13    professional licenses in your field of accounting and

14    finance?

15    A.     I have.

16    Q.     Let us know which ones.

17    A.     Sure.  I'll start with the CPA, the Certified

18    Public Accountant.  I received that license in May -- on

19    May 25, 2000.

20    Q.     And you are, as stated in your CV, you are a

21    Certified Valuation Analyst?

22    A.     Sure.  I have two credential certifications in

23    Business Valuation and IP Valuation.  One is the Certified

24    Valuation Analyst, which is issued by the National

25    Association of Certified Valuation Analysts, as well as

1    accredited in Business Valuation, which is issued by the

2    American Institute of Certified Public Accountants.

3    Q.     It also states in your resume that you are

4    accredited in Business Valuation.  Is that what you just

5    explained?

6    A.     It was.

7    Q.     Okay.  It also says that you are certified in

8    Financial Forensics.  What does that mean?

9    A.     So, that's a certification from the American

10   Institute of Certified Public Accountants.  And it is

11   issued to those who have experience in, in forensic

12   accounting, and that means using your accounting education

13   and background in an investigative manner.

14   Q.     What is investigative manner?  What is meant by

15   forensic accounting?  What kinds of things do forensic

16   accountants do?

17   A.     We investigate various matters.  So, if there is

18   suspicion of any wrongdoing at a company or suspicion of

19   fraud, we will investigate those type of matters and look

20   into the accounting records and such.

21   Q.     Mr. Clark, do any of these certifications or

22   accreditations require you to take an examination?

23   A.     They do.

24   Q.     Which ones?

25   A.     They all require exams that you have to pass.

1    Q.      Let's take just the CPA exam.  Could you tell the

2    jury a little bit about what it takes to pass the CPA exam?

3    A.      Sure.  The CPA exam, it's a four-part exam.  I

4    believe it -- they estimate it takes around 16 hours to

5    complete.  And in order to sit for that exam, you have to

6    have 150 hours of undergraduate hours.  So, it's equivalent

7    to five years in college.

8    Q.      Thank you, Mr. Clark.  You are also affiliated with

9    a number of professional societies.  Is that fair?

10   A.      That's fair.  Correct.

11   Q.      Having to do with accounting and forensic

12   accounting and intellectual property valuation?

13   A.      Yes.

14   Q.      Where are you currently employed?

15   A.      Hoffman Clark.

16   Q.      Are you the Clark in Hoffman Clark?

17   A.      I am.

18   Q.      You are one of the founding members of Hoffman

19   Clark?

20   A.      I am.

21   Q.      What is it that Hoffman Clark does?

22   A.      So, Hoffman Clark is a certified public accounting

23   firm.  We -- our specialty is consulting in the areas of

24   intellectual property, valuation and, and just general

25   business consulting.

1    Q.      How long has Hoffman Clark been in existence?

2    A.      So, it's been 19 years.  Since 2003.

3    Q.      Congratulations.

4    A.      Thank you.

5    Q.      What types of companies does Hoffman Clark consult

6    or advise?

7    A.      It's various types.  It kinda runs the gamut from

8    construction to real estate to technology-type companies.

9    Q.      Is litigation or providing opinions for folks who

10   might be contemplating or in litigation something that

11   Hoffman Clark does?

12   A.      It is.  It's essentially what we had started the

13   firm back in 2003 to do, was to work in the area of

14   litigation, but also do consulting and valuation and things

15   of that matter.

16   Q.      Thank you, Mr. Clark.

17           Mr. Clark, do you have any particular interest in

18   intellectual property valuation or licensing?

19   A.      The firm, we do some work in that area, in

20   intellectual property valuation.  But say, primarily our

21   work in the IP area is, is in the litigation setting,

22   though.

23   Q.      Okay.  Thank you, Mr. Clark.

24           Mr. Clark, I take it, based on your background and

25   what you have been doing for your career thus far, you have

1   experience on the topic of interpreting financial

2   statements; right?

3   A.      I do.

4   Q.      So, financial statements talking about these large

5   spreadsheets that have a lot of numbers and rows and

6   columns; right?

7   A.      That's correct.

8   Q.      Often a lot of mathematical analysis involved in

9   those?

10  A.      That's correct.

11  Q.      And to that extent, do you have experience in

12  valuing damages from a litigation context?

13  A.      Yes, I do.

14  Q.      Okay.

15          MR. FRIEDMAN:  Your Honor, at this time, I would

16  offer Mr. Ryan Clark as an expert on behalf of the

17  plaintiff in the area of damages and accounting?

18          MR. ILARDI:  No objection, Your Honor.

19          THE COURT:  The Court certifies and the record

20  would note that Mr. Clark is an expert in the area of

21  financial analysis and damages.

22          MR. FRIEDMAN:  Thank you.

23  Q.      (BY MR. FRIEDMAN)  Mr. Clark, before we turn to

24  your opinions --

25          THE COURT:  No.  No, not before you turn to 'em --

1          MR. FRIEDMAN:  Turn to his opinions.

2          THE COURT:  It's 4:30, counsel.

3          MR. FRIEDMAN:  Thank you, Your Honor.

4          THE COURT:  Let's do a quick sidebar.

5          (Proceedings continued at the bench.)

6          THE COURT:  Just because I don't want anybody to be

7   taken by surprise, if we're not done at 4:30, this witness

8   is going to have to come back tomorrow.

9          MR. FRIEDMAN:  Thank you, Your Honor.  Understood.

10         THE COURT:  All right.

11         (Proceedings continued in open court, jury

12  present.)

13  Q.     (BY MR. FRIEDMAN)  Mr. Clark, I asked you earlier

14  whether my firm asked you to look into some of the

15  financial aspects of this litigation; right?

16  A.     Correct.

17  Q.     Okay.  And did we ask you specifically to look at

18  remedies and damages for copyright infringement?

19  A.     You did.

20  Q.     Do you have an understanding of the remedies that

21  exist under the law for copyright infringement?

22  A.     Yes.

23  Q.     Okay.  Mr. Clark, what is your understanding of the

24  remedies for copyright infringement and the assessment of

25  damages in a case such as this one?

```
 1   A.      It's my understanding --
 2           MR. ILARDI:  Objection sustained.
 3           THE COURT:  What's your objection, counsel?
 4           MR. ILARDI:  Your Honor, it calls for a legal
 5   conclusion.
 6           THE COURT:  Sustained.
 7   Q.      (BY MR. FRIEDMAN)  Mr. Clark, could you turn in
 8   your binder to Tab No. 29 -- I'm sorry -- Tab No. 28.
 9   Plaintiff's Exhibit 28.
10           Mr. Clark, do you recognize Plaintiff's Exhibit 28?
11   A.      I do.
12   Q.      And in fact, Plaintiff's Exhibit 28 has already
13   been admitted in this case.
14           Mr. Clark, is Plaintiff's Exhibit 28 one of the
15   documents you utilized in order to assess some of the
16   financial aspects of this case?
17           THE COURT:  Hold on for a second, counsel.  You
18   said Plaintiff's Exhibit 28?
19           Has that been admitted, Stacie?
20           MR. FRIEDMAN:  28 has.  I called it 29.  I may have
21   just done it again.  I'm referring to Plaintiff's 28.
22           THE COURT:  If you called it 29 -- then it hasn't
23   been admitted as 28, counsel.  So, is this --
24           MR. FRIEDMAN:  I misstated it.
25           THE COURT:  Hold on.  Time out.  We have to keep
```

1    the record straight, counsel.

2         Miss Hurst, do you have Plaintiff's Exhibit 28

3    admitted into evidence?

4         COURTROOM DEPUTY:  No, I do not.

5         THE COURT:  It has not been admitted.

6         MR. FRIEDMAN:  I'm sorry, Your Honor.  I thought I

7    had sought for the admission of Plaintiff's Exhibit 28

8    following the deposition video of Mr. Snyder.

9         THE COURT:  I do not have it in the record, Mr.

10   Friedman.  We can spend time arguing about --

11        COURTROOM DEPUTY:  Oh, yes.  Yes, I'm sorry.

12        THE COURT:  So you have --

13        MS. HURST:  Yes, we do have it.

14        THE COURT:  Okay.  I apologize.  It's Miss Hurst's

15   fault.

16        Okay, let's get to it.  Plaintiff's Exhibit 28 is

17   in evidence and you may question this witness about

18   Plaintiff's Exhibit 28.

19        MR. FRIEDMAN:  Thank you, Your Honor.

20   Q.   (BY MR. FRIEDMAN)  Mr. Clark, Plaintiff's Exhibit

21   28, what is it?

22   A.   It's -- my understanding is -- a spreadsheet that

23   was prepared by the defendants for this litigation.

24   Q.   Thank you.  And it contains a number of financial

25   data.  Is that fair?

1    A.       That's fair, yes.

2    Q.       Are you basing your opinions today on this

3    spreadsheet and others like it?

4    A.       Yes.

5         MR. FRIEDMAN:  Mr. Zidzik, could you please publish

6    Plaintiff's Exhibit 28?  Just start on the first page.

7    Q.       (BY MR. FRIEDMAN)  Mr. Clark, could you walk the

8    jury through how this document is set up?  You are much

9    more familiar with it.  Just briefly from a high level, and

10   we can turn the pages and end up at the end.

11   A.       Sure.  This document has the total units for the

12   WWE games.  It has the gross sales, net sales, cost of

13   goods sold, gross profit and operating profit margins

14   depicted for each year of the game for, I believe, '16,

15   '17, and '18, and then it also totals it up in total.

16   Q.       Mr. Clark, was this document audited?

17   A.       No, not to my knowledge.

18   Q.       Okay.  Does this document contain gross revenue

19   information for each game 2K16, 17, and 18?

20   A.       It does.

21   Q.       Mr. Clark, did you do a calculation as to the gross

22   revenues for the WWE 2K16, 17, and 18 games?

23   A.       I did.

24   Q.       Mr. Clark, what were -- what are the gross revenues

25   for the WWE 2K16, 17, and 18 games?

1   A.      So, I'd have to total those up or refer to my

2   report for that.

3   Q.      Yeah, if you could take us through.  And can you

4   determine that from Exhibit 28?

5   A.      I can.  So, what we're looking at right now, I

6   believe, is just the gross revenue for WWE 16.  And so,

7   that contains three of the fiscal years.  So, we'd have to

8   total up each of those years.  And I understand that

9   there's a short year, as well.

10  Q.      Mr. Clark, have you already done these

11  calculations?

12  A.      I have.

13  Q.      And what is your conclusion?  What are the total

14  gross revenues for all the games 2K16, 17, and 18 combined?

15  A.      The exact amount is in my report and I'd like to

16  refer to that.  I'd --

17          MR. ILARDI:  No objection, Your Honor.

18          MR. FRIEDMAN:  To refreshing his memory?

19  Q.      (BY MR. FRIEDMAN)  Mr. Clark, if you could turn in

20  your binder to Tab No. -- February 2019 report, rebuttal

21  expert report.

22          THE COURT:  What's the tab number, counsel?

23          MR. FRIEDMAN:  It's the second tab in the exhibit

24  binder.

25  A.      Okay.  (Complies.)

1    Q.      (BY MR. FRIEDMAN)  Mr. Clark, does looking at this

2    document that you wrote refresh your recollection as to

3    what the gross revenue numbers are?

4    A.      It does.

5    Q.      Mr. Clark, what are the gross revenues for the WWE

6    2K16, 17, and 18 video games?

7    A.      The gross revenues for the 2K16, 17, and 18 video

8    games, for the period April 2015 through August 2018, is

9    418,692,526 dollars.

10   Q.      Thank you, Mr. Clark.

11           Now, Mr. Clark, during opening statements in this

12   case the defendants introduced a Mr. Malackowski as an

13   economist from Chicago.  He may testify as to the

14   deductible expenses, the profitability of the 2K games, and

15   other areas.  Are you available to sit in the courtroom

16   tomorrow or the next day and hear that testimony?

17   A.      I am.

18   Q.      Okay.  And if you have additional opinions that may

19   be helpful to the jury in rebuttal, will you be available

20   to briefly address those issues, to come back after the

21   defendants put on their case and provide those additional

22   opinions or observations?

23   A.      Yes.

24   Q.      And just to be clear, the revenue number that you

25   just stated, did that apply just to the defendants, the

1    Take-Two defendants?

2    A.    It's -- yes.  It's related to the sale of those

3    games.

4    Q.    Okay.

5    A.    Yeah.

6    Q.    Not with respect to the WWE defendant.

7    A.    Correct.

8    Q.    Thank you, Mr. Clark.

9          MR. FRIEDMAN:  No additional questions at this

10   time.  Subject to recall in rebuttal.

11         THE COURT:  Could we have a quick sidebar, please?

12         (Proceedings continued at the bench.)

13         THE COURT:  Is this Mr. Ilardi?  I don't recognize

14   people with their mask on.  Is this Mr. Ilardi?

15         MR. ILARDI:  This is, Your Honor.

16         THE COURT:  Okay.  Mr. Ilardi, I would assume you

17   have more than ten minutes for this witness --

18         MR. ILARDI:  That is correct.

19         THE COURT:  All right.  So, here's the deal.  My

20   understanding is, he is going to be sitting in the

21   courtroom tomorrow anyway.  So, he will be here -- Mr.

22   Clark will be here.  I'm not going to have counsel rush

23   through his cross-examination under those circumstances and

24   I really don't intend to go past 4:30.

25         So, that being the case, why don't we just cut it

1   off today.  Let Mr. Ilardi conduct his examination first

2   thing in the morning.

3           MR. FRIEDMAN:  No objection from plaintiff.

4           MR. ILARDI:  That's okay with us, Your Honor.  It

5   will just -- our intention was to do a short cross of this,

6   and we will cross him again --

7           THE COURT:  I don't trust lawyers when they say --

8   they don't do anything within 10 minutes other than pack up

9   their bags and walk out the door.  And I don't really want

10  to pressure you.  I don't need to -- just do what you need

11  to do.  He's going to be here.  We'll do it in the morning.

12          MR. ILARDI:  Okay.  Your Honor, if that's what you

13  prefer, that's okay with us.

14          THE COURT:  And I'm glad that's okay with you, Mr.

15  Ilardi.  You were raised right.  You're so mannerable.

16  Okay.  Thank you.

17          (Proceedings continued in open court, jury

18  present.)

19          THE COURT:  Okay.  So, we're going to go ahead and

20  recess for the day.

21          I will tell you -- this may help you with your

22  evenings -- I think we're still on track to be finished by

23  Friday.  And so, please, remember my instructions and

24  admonitions to you.  Don't discuss the case, don't do any

25  research.  Be safe going home and we'll see you tomorrow

1    morning.  We will reconvene at 9:00 a.m.

2         And, Juror No. 8, I need you to attach yourself to

3    Jurors No. 1 and 7 when they walk back in the courtroom

4    tomorrow morning at 9:00.  Please be here at 8:45.

5         (Court adjourned at 4:21 p.m.)

6

7

8

9

10

11

12                    REPORTER'S CERTIFICATE

13         I, Christine Dohack LaBuwi, RDR, CRR, Official

14   Court Reporter for the U.S. District Court, Southern

15   District of Illinois, do hereby certify that I reported

16   with mechanical stenography the proceedings contained in

17   pages 90-289; and that the same is a full, true, correct

18   and complete transcript from the record of proceedings in

19   the above-entitled matter.

20

21         DATED this 5th day of October, 2022,

22

23             s/Christine Dohack LaBuwi, RDR, CRR
               _____
24             Christine Dohack LaBuwi, RDR, CRR

25