1
UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF ILLINOIS
2

3
CATHERINE ALEXANDER,                    )
                                        )
4                   Plaintiff,          )
v.                                      ) No. 3:18-cv-00966-SMY
5                                       )
TAKE-TWO INTERACTIVE SOFTWARE, )
6 INC., et al.,                         ) *East St. Louis, IL*
                                        )
7                   Defendants.         )

8

9

10
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11                     DAY 3 OF 5

12
BEFORE THE HONORABLE STACI M. YANDLE
UNITED STATES DISTRICT JUDGE
13
September 28, 2022
14

15

16

17

18

19

20

21 REPORTED BY:        Christine Dohack LaBuwi, RDR, CRR
                       Official Court Reporter
22                     301 West Main Street
                       Benton, Illinois  62812
23                     (618) 439-7725
                       Christine_Dohack@ilsd.uscourts.gov
24
Proceedings recorded by mechanical stenography, produced by
25 computer-aided transcription.

```
 1   APPEARANCES:

 2   FOR PLAINTIFF:        R. Seth Crompton, Esq.
                          HOLLAND LAW FIRM
 3                         300 N. Tucker Blvd., Suite 801
                          St. Louis, MO  63101
 4                         314) 241-8111
                          scrompton@allfela.com
 5
                          Anthony R. Friedman, Esq.
 6                         Anthony G. Simon, Esq.
                          Paul J. Tahan, Esq.
 7                         SIMON LAW FIRM, P.C.
                          800 Market Street, Suite 1700
 8                         St. Louis, MO  63101
                          (314) 241-2929
 9                         afriedman@simonlawpc.com
                          asimon@simonlawpc.com
10                         ptahan@simonlawpc.com

11

12   FOR DEFENDANTS TAKE-TWO INTERACTIVE SOFTWARE, INC.; 2K
     GAMES, INC.; 2K SPORTS, INC.; and VISUAL CONCEPTS
13   ENTERTAINMENT:

14                         Dale M. Cendali, Esq.
                          Christopher Ilardi, Esq.
15                         Joshua L. Simmons, Esq.
                          Miranda D. Means, Esq.
16                         KIRKLAND & ELLIS, LLP
                          601 Lexington Avenue
17                         New York, NY  10022
                          (212) 446-4800
18                         dale.cendali@kirkland.com
                          chris.ilardi@kirkland.com
19                         joshua.simmons@kirkland.com
                          miranda.means@kirkland.com
20
                          Michael J. Nester, Esq.
21                         DONOVAN ROSE NESTER, P.C.
                          151 North 1st Street, Suite A
22                         Belleville, IL  62220
                          (618) 212-6500
23                         mnester@drnpc.com

24

25
```

FOR DEFENDANT WORLD WRESTLING ENTERTAINMENT:

                    Curtis B. Krasik, Esq.
                    K & L GATES, LLP
                    210 Sixth Avenue
                    Pittsburgh, PA  15222
                    9412) 355-8696
                    curtis.krasik@klgates.com

                    Michael J. Nester, Esq.
                    DONOVAN ROSE NESTER, P.C.
                    151 North 1st Street, Suite A
                    Belleville, IL  62220
                    (618) 212-6500
                    mnester@drnpc.com

1                              **I N D E X**

2                                                              PAGE:

3        Pretrial Matters                              294:3
         Admissions by Mr. Tahan                       309:21
4        Rule 50 motion                                313:16
         Ruling by the Court                           327:13

5                              **WITNESSES**

6
     ALL WITNESSES                                     PAGE:

7
       RYAN CLARK for Plaintiff:
8        Cross-Examination by Mr. Ilardi               301:1
         Cross-Examination by Mr. Krasik               307:19
9        Redirect Examination by Mr. Friedman          308:22

10     RANDY ORTON for Defense:
         Direct Examination by Mr. Krasik              331:9
11       Cross-Examination by Mr. Simon                402:23

12     EDWARD KIANG for Defense:
         Direct Examination by Mr. Krasik              414:17
13       Cross-Examination by Mr. Friedman             438:11

14     NINA JABLONSKI for Defense:
         Direct Examination by Ms. Cendali             450:24
15       Direct Examination by Ms. Cendali             486:18
       (cont'd. followng offer of proof)
16       Cross-Examination by Mr. Simon                503:19

17
       NINA JABLONSKI (offer of proof)
18       Ms. Cendali                                   471:13
         The Court                                     471:19
19       Ms. Cendali                                   474:1
         The Court                                     475:22
20       Ms. Cendali                                   477:11
         The Court                                     478:23
21       Mr. Simon                                     480:1
22

23     ALFREDO BRODY for Defense:
         Direct Examination by Mr. Simmons             512:16
24

25

1        (Proceedings began in open court at 8:34 a.m., jury

2   not present.)

3        COURTROOM DEPUTY:  The Court calls Case No.

4   18-CV-966, Alexander versus Take-Two Interactive Software,

5   Inc., et al.  This matter is called for Day Three of jury

6   trial.

7        Would the parties please state your presence for

8   the record, beginning with plaintiff?

9        MR. SIMON:  Your Honor, Anthony Simon on behalf of

10  the plaintiff, with Mr. Friedman, Mr. Tahan, Mr. Crompton,

11  and my client.

12       THE COURT:  Good morning.

13       MR. SIMON:  Good morning.

14       MS. CENDALI:  Good morning, Your Honor.  Dale

15  Cendali on behalf of the Take-Two defendants, with my

16  colleagues Josh Simmons, Miranda Means, Chris Ilardi.  Mr.

17  Thomas, who's our tech support.

18       MR. KRASIK:  Good morning, Your Honor, Curt Krasik

19  on behalf of WWE.

20       THE COURT:  Good morning.

21       So, I was provided with the information already

22  submitted in terms of issues that they wish the Court to

23  address regarding -- as relates to some impending

24  testimony.  I have reviewed the issues, the parties'

25  positions and the exhibits, and so I'm prepared to rule.

1          As to the issue regarding plaintiff's reading of

2     discovery requests.  The issue seems to be that in the

3     discovery request, plaintiff used the language infringing

4     games to refer to the WWE 2K games.  Obviously, the

5     plaintiff can read discovery responses in as admissions.

6     However, the term infringing games is problematic for

7     obvious reasons; that is something that the jury will

8     determine ultimately.  And so, you may read those but that

9     language needs to be changed.  You can just say the WWE 2K

10    games or the -- that would be the most -- the better way to

11    do it.  Just refer to the games as they are.

12         MR. SIMON:  We will do so, Your Honor.

13         THE COURT:  Okay.  Second.  There's an issue or

14    dispute regarding the defendants' intended use as

15    demonstratives -- and I put that in quotes -- with their

16    experts, including slides that contain certain opinions.

17    The only issue that I can a rule on is the one that -- the

18    summary of opinions because that's the only thing that I

19    have been shown.

20         Demonstratives is a funny word.  It must be

21    demonstrative of something probative, okay?  And,

22    obviously, you can use summaries for different reasons.

23    For instance, summaries where you summarize the relevant

24    portions of voluminous documents that can't be addressed

25    individually during the course of the evidence.  That's one

1    way.

2        However, in this case, the slides I viewed, as I

3    understand it, the defendant wants to put up a slide that

4    says "Summary of Opinions" during, during Dr. Jablonski's

5    testimony.  That is not a summary of any evidence that

6    would -- that is necessary, really, to assist the jury.  It

7    looks like a good slide for closing argument but not during

8    the presentation of evidence.

9        And so, I do not find this to be a useful

10   demonstrative to assist the jury in the consideration of

11   evidence.  That cannot be used as -- that's the only

12   example I was given, so that's what I'm ruling on.

13       And then the demonstratives again that the --

14   Take-Two intends to use three demonstratives with Mr. Brody

15   as he discusses his work at Take-Two.  Again, I have been

16   given copies.  And so, it looks like that the defendant

17   wants to put up slides or pictures of, I assume, other

18   Take-Two games that Mr. Brody has been involved in.

19       Is that what we're talking about here?

20       MR. SIMMONS:  Yes, Your Honor.  It's the other

21   games that Take-Two makes.

22       THE COURT:  Okay.  So, what other games Take-Two

23   makes and Mr. Brody's involvement in those games?  It's

24   totally irrelevant to his opinions in this case, or his

25   testimony in this case.  This is not about Mr. Brody.  And

1    again, it's not demonstrative of anything that's, that's

2    either probative or would assist the jurors in this case.

3          So, we got enough demonstratives that are actually

4    related to the case.  We have heard them.  We have played

5    them.  I'm sure there are going to be more.  But these are

6    not relevant.  And in that regard, because they don't

7    assist the jury, they can be distracting.  So, again, I do

8    not find these to be useful demonstratives that can be or

9    should be used during his testimony.

10          Anything else?

11          MR. SIMON:  Your Honor?  I just want to clarify one

12   thing.  So, you were only provided with one slide of

13   Summary of Opinions.  We have told them the specific slides

14   that have summaries of opinions we object to --

15          THE COURT:  There will be no slides with Summary of

16   Opinions allowed.

17          MR. SIMON:  Thank you.

18          And then we had one issue, Your Honor, to bring up.

19   It will be quick.  It's again about demonstratives that

20   they -- one of their witnesses --

21          MS. CENDALI:  I'm sorry, is this a new --

22          MR. SIMON:  No.  We objected to Dr. Bogost's

23   demonstratives.

24          MS. CENDALI:  This was in the stuff we talked about

25   last night, okay.

```
1          MR. SIMON:  Yes.

2          MR. SIMMONS:  It it's the three slides at the end,

3    I think we sent an e-mail indicating we were --

4          THE REPORTER:  Hold on.  I can't hear you.

5          MR. SIMMONS:  Sorry.

6          If it's -- is it the three slides at the end, that

7    we discussed last night?

8          MR. FRIEDMAN:  There's more than three slides.

9          So, we were discussing the Summary of Opinion

10   slides; that issue's been taken care of.

11         We were discussing the photographs of our client

12   and --

13         THE COURT:  Can I ask why this wasn't included in

14   the information that was submitted to me so I can consider

15   it ahead of time, instead of dealing with this right now?

16         MR. SIMON:  Your Honor, I'll take responsibility

17   for that.  They sent an e-mail which identified our

18   objections to their demonstratives.  It wasn't included and

19   I should have responded.  I apologize.

20         THE COURT:  Is there a way to quickly explain to me

21   what the issue is and so we can get through this?

22         MR. FRIEDMAN:  Yes, Your Honor, there is.

23         Your Honor, the slides that we are concerned about,

24   that plaintiffs have indicated they are intending to use

25   with their --
```

1          THE COURT:  You are the plaintiff.

2          MR. FRIEDMAN:  I'm sorry.  -- that the defendants

3     have indicated they are intending to use with their expert

4     witness Dr. Bogost --

5          THE COURT:  Remind me of his -- the subject matter

6     of his testimony.

7          MR. SIMMONS:  He's a video game expert, Your Honor.

8          THE COURT:  Okay.

9          MR. FRIEDMAN:  First, is a slide replicating what

10    appears to be --

11         THE REPORTER:  Please use a microphone.

12         MR. FRIEDMAN:  Okay.

13         MR. SIMMONS:  And not to preempt Mr. Friedman --

14         THE COURT:  No.  No.  No.  No.  Mr. Simmons, sit

15    down, please.  I'm asking him to present the issue.  I'll

16    give you an opportunity to respond, if necessary.  We're

17    not going to do this, this little food fight first thing

18    this morning.

19         MR. SIMMONS:  Understood, Your Honor.  I just -- we

20    had resolved the issue, was my point.

21         MR. FRIEDMAN:  I wasn't aware that this issue was

22    resolved.  Is this --

23         THE COURT:  Okay.  How about you walk over and talk

24    to Mr. Simmons real quick?

25         (Off the record.)

1           MR. FRIEDMAN:  Your Honor, this appears it's been

2    resolved.

3           THE COURT:  See how that worked?  See you guys in a

4    minute.

5           (Court recessed from 8:42 a.m. to 9:07 a.m.)

6           (Proceedings continued in open court, jury

7    present.)

8           THE COURT:  Good morning, ladies and gentlemen.

9           Juror No. 4, I'm all for you representing those

10   division-winning St. Louis Cardinals this morning.

11          JUROR NO. 4:  (Nonverbal response.)

12          THE COURT:  All right.  We have already called the

13   case, so we are ready to proceed.

14          Mr. Ryan, could you please retake the stand?

15          Okay.  Mr. Ryan -- it's Mr. Clark, isn't it?

16          THE WITNESS:  It's okay.

17          THE COURT:  It takes me a minute, in the morning.

18   Mr. Clark, you are still under oath, sir.

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  You may proceed, counsel.

21                         *  *  *  *  *

22                       RYAN CLARK,

23   having been previously duly sworn, was examined and

24   testified as follows:

25                    CROSS-EXAMINATION

1   BY MR. ILARDI:

2   Q.    Good morning, Mr. Clark.  My name is Christopher

3   Ilardi and I represent the Take-Two defendants.

4         Mr. Clark, when you testified yesterday afternoon,

5   you said that you know defendants' damages expert Mr.

6   Malackowski; right?

7   A.    I don't recall saying I knew him.

8   Q.    You said that you were going to come back later

9   when he testified?

10  A.    Yes.

11  Q.    Okay.  And you are planning to sit through his

12  testimony later in this trial; correct?

13  A.    That's correct.

14  Q.    So, today, we're only going to talk about your

15  brief testimony from yesterday.  Okay?

16  A.    Okay.

17  Q.    Mr. Clark, yesterday afternoon, you said that you

18  were hired to take a look at the financial issues in this

19  case; correct?

20  A.    Correct.

21  Q.    And you were offered as an expert for the plaintiff

22  in the area of damages and accounting; correct?

23  A.    Correct.

24  Q.    And as an expert, you have to keep yourself

25  informed about the relevant facts and the data; correct?

1    A.    Correct.

2    Q.    You have to offer independent opinions?

3    A.    Correct.

4    Q.    And if you learn new information during trial that

5    changes your opinions, you should update your opinions;

6    correct?

7    A.    It's correct, if it impacts my opinion.

8    Q.    And that is true regardless of whether that

9    information benefits or harms the plaintiff; correct?

10    A.    Correct.

11    Q.    Now, Mr. Clark, yesterday afternoon you showed the

12    jury Defendants' Exhibit 28; correct?

13    A.    Correct.

14    Q.    And that was a printout of Take-Two's financial

15    data?

16    A.    Correct.

17    Q.    And you said that it shows, for each of the accused

18    games, Take-Two's gross sales; right?

19    A.    Correct.

20    Q.    You also said that it shows Take-Two's net sales;

21    right?

22    A.    Correct.

23    Q.    But you didn't explain to the jury what net sales

24    were; right?

25    A.    Correct.

1    Q.    The only actual number that you told the jury was

2    Take-Two's gross sales for WWE 2K16, 17, and 18; correct?

3    A.    Correct.

4    Q.    But gross sales are not the money that Take-Two

5    takes home; correct?

6    A.    It's -- it's just a gross sales, correct.

7    Q.    And Plaintiff's Exhibit 28, which you showed

8    yesterday, also shows Take-Two's costs of goods sold;

9    correct?

10   A.    Correct.

11   Q.    And you didn't talk about cost of goods sold

12   either; right?

13   A.    Correct.

14   Q.    Mr. Clark, you were here when Mr. Snyder testified

15   by video; right?

16   A.    Yes.

17   Q.    And you were also here when he testified about

18   Take-Two's costs?

19   A.    Yes.

20   Q.    And the cost of goods sold include the cost to

21   produce the game disk and packaging; correct?

22   A.    Yes.

23   Q.    You were here when he testified that another cost

24   is online support, which is the cost to maintain servers;

25   correct?

1    A.    Correct.

2    Q.    And you were here when he talked about the cost for

3    customer service; correct?

4    A.    Correct.

5    Q.    And then another cost is the amount that Take-Two

6    pays to WWE; correct?

7    A.    Correct.

8    Q.    Another cost is Take-Two -- another cost is WWE

9    2K's marketing budget; correct?

10    A.    Correct.

11    Q.    Another cost that Mr. Snyder testified about was

12    the cost of the marketing team; correct?

13    A.    Correct.

14    Q.    Mr. Snyder testified that all of those costs were

15    directly related to the sales and the marketing of WWE

16    2K16, 17, and 18; correct?

17    A.    I believe that's what was his testimony.

18    Q.    And you were here for that testimony; right?

19    A.    Yes.

20    Q.    So, you understand that Take-Two's take-home money

21    is actually its profits; right?

22    A.    You -- you have to better phrase that question.

23    Q.    Well, you would agree with me that it costs

24    Take-Two money to develop, market, and sell WWE 2K; right?

25    A.    Correct.

1    Q.      And you have to subtract Take-Two's costs from its

2    revenue to calculate its profit; correct?

3    A.      Yes.  But there's gross profit and operating

4    profit, so there's -- you have to distinguish profits.

5    Q.      Yeah, but you didn't explain that yesterday;

6    correct?

7    A.      No.

8    Q.      And you know that Mr. Malackowski did perform the

9    math of determining Take-Two's profits from WWE 2K16, 17,

10   and 18; right?

11   A.      It's my understanding that Barry Charlton at

12   Take-Two created that spreadsheet.

13   Q.      And you understand that Mr. Malackowski has

14   provided opinions related to the financial documents

15   produced by Take-Two; correct?

16   A.      That's the only document that's been produced, to

17   my understanding, is that spreadsheet.

18   Q.      And you agree that Mr. Malackowski has determined

19   Take-Two's take-home profits from the games; correct?

20   A.      From that spreadsheet, correct.

21   Q.      So, after Mr. Malackowski has a chance to discuss

22   Take-Two's costs, then you are going to get around to

23   talking about costs; right?

24   A.      That's correct.

25   Q.      And then you and I will be able to talk about your

1    opinions on cost; correct?

2    A.    That is correct.

3    Q.    But you understand that Mr. Malackowski calculated

4    Take-Two's profits from the WWE games --

5         THE COURT:  Counsel, we have not heard Mr.

6    Malackowski's testimony yet.  Perhaps you may want to wait

7    until that has occurred.

8         MR. ILARDI:  Understood, Your Honor.

9    Q.    (BY MR. ILARDI)  Mr. Clark, I'd like to talk about

10   the one number that you did address yesterday.  Mr. Clark,

11   you're not saying the plaintiff should get 418 million

12   dollars; correct?

13   A.    That's correct.

14   Q.    You are familiar with plaintiff's other expert, Dr.

15   Zagal; right?

16   A.    Yes.

17   Q.    In fact, you have considered Dr. Zagal's opinions?

18   A.    Yes.

19   Q.    And you relied on Dr. Zagal to form your opinions;

20   correct?

21   A.    Yes.

22   Q.    Were you here when he testified yesterday?

23   A.    No.

24   Q.    So, you didn't hear him say that he's not aware of

25   anyone who purchased WWE 2K because of Mr. Orton's tattoos;

1  correct?

2  A.      I'm not aware of that.

3  Q.      And you weren't here when he testified that people

4  don't buy WWE 2K because of the tattoos; correct?

5  A.      Can you ask that again, please?

6  Q.      You were not here when he testified that people do

7  not buy WWE 2K because of the tattoos?

8  A.      That's correct.

9  Q.      Mr. Clark, as I said earlier, we can talk again

10 after you testify later in this trial, but I have no

11 further questions for today.

12 A.      All right.

13          THE COURT:  Anything else?  Any redirect?

14          MR. KRASIK:  Your Honor, I have just a couple

15 questions on behalf of WWE.

16          THE COURT:  I'm sorry, Mr. Krasik.

17          MR. KRASIK:  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19 BY MR. KRASIK:

20 Q.      Good morning, Mr. Clark.

21 A.      Good morning.

22 Q.      We haven't had a chance to meet yet.  My name is

23 Curt Krasik and I represent WWE in this case.

24 A.      Nice to meet you.

25 Q.      Nice to meet you.  I just have a couple questions

1    for you, sir, about your testimony when Mr. Friedman was

2    asking you questions yesterday.

3        At the end of your testimony, you said that the

4    gross revenue number you gave, the 418 million, applied

5    just to the Take-Two defendants.  Do you recall that?

6    A.    That's correct.

7    Q.    Okay.  But WWE doesn't make any money from the WWE

8    2K games that isn't subsumed by that number; right?

9    A.    Correct.  That -- that number is the sales of the

10   games.

11   Q.    Right.  That the only money WWE makes from the WWE

12   2K games comes out of the 418 million.

13   A.    Correct.

14   Q.    Okay.  The way WWE makes money is, Take-Two takes a

15   little bit of the money from that revenue and pays it to

16   WWE for the right to use its IP; right?

17   A.    That's correct.

18   Q.    Okay.

19        MR. KRASIK:  No further questions, Your Honor.

20        MR. FRIEDMAN:  Just briefly, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MR. FRIEDMAN:

23   Q.    Mr. Clark, you were asked a number of questions by

24   Mr. Ilardi about expenses, cost of goods sold, and the

25   like.  Are those the areas of testimony that you are

1    planning on coming back and addressing, once the jury has

2    an opportunity to hear about Mr. Malackowski, the

3    defendants' expert's testimony on those topics?

4    A.    It is.

5    Q.    And you are prepared to address those when you come

6    back?

7    A.    I am.

8    Q.    Thank you.

9         THE COURT:  I believe you may step down.

10        You may call your next witness.

11        MR. SIMON:  Your Honor, at this time Mr. Tahan is

12   going to read some of the discovery responses into the

13   record.

14        THE COURT:  For the jury's information, I believe

15   counsel is about to read responses to discovery in this

16   case.  The Court takes judicial notice of those requests

17   and responses and they are being read to you as evidence in

18   this case.

19        MR. TAHAN:  May I proceed, Your Honor?

20        THE COURT:  You may.

21        MR. TAHAN:  Thank you.

22        To begin, Plaintiff's Trial Exhibit 85, World

23   Wrestling Entertainment, Inc.'s Objections and Responses to

24   Plaintiff's First Set of Interrogatories:

25        Interrogatory No. 1.  State WWE's relationship to

each of the other defendants in this case and its role, if any, in creating, developing, publishing, distributing, promoting, advertising, marketing, and selling of the WWE 2K games, including the supervision of such activities.

Answer:  WWE states that it has licensed Take-Two Interactive Software, Inc. (Take-Two) the right to incorporate intellectual property owned or controlled by WWE, WWE intellectual property, into interactive software entertainment games that would be marketed and sold to the public.

WWE further states that pursuant to its license with Take-Two, WWE approved the depiction of WWE intellectual property and the WWE brand in the content and advertising of the WWE 2K games.

WWE does not otherwise supervise Take-Two's activities with respect to the WWE 2K games.

WWE further states that it does not have a legal relationship with any of the other defendants in the case with respect to the WWE 2K games.

Next, we have Plaintiff's Trial Exhibit 86, World Wrestling Entertainment, Inc.'s Objections and Responses to Plaintiff's First Set of Requests for Admission:

Question No. 20.  Admit that WWE approved the WWE 2K games.

WWE admits only that it approved the depiction of

1  intellectual property owned or controlled by WWE and the
2  WWE brand in the content of the WWE 2K Games.  Request No.
3  20 is otherwise denied.
4      Next, we have Plaintiff's Trial Exhibit 99,
5  Defendant Take-Two Interactive Software, Inc., 2K Games,
6  Inc., 2K Sports, Inc., and Visual Concepts Entertainment's
7  Objections and Responses to Plaintiff Catherine Alexander's
8  First Set of Interrogatories:
9      Interrogatory No. 4.  Describe the role Take-Two/2K
10 Games/2K Sports/Visual Concepts played in the development,
11 design, creation, and sale of the WWE 2K games.
12     Answer:  Take-Two Interactive Software, Inc., 2K
13 Games, Inc., and 2K Sports, Inc., branded and licensed
14 content for the WWE 2K games.  And Visual Concepts
15 Entertainment developed and licensed content for the WWE 2K
16 Games.
17     Plaintiff's Trial Exhibit 102.  Defendants'
18 Take-Two Interactive Software, Inc., 2K Games, Inc., 2K
19 Sports, Inc., and Visual Concepts Entertainment's
20 Objections and Responses to Plaintiff Catherine Alexander's
21 Second Set of Requests for Admissions:
22     Request for Admission No. 65.  Admit that
23 defendants never calculated the percentage of the WWE 2K
24 games computer programs that is made up of the tattoos
25 prior to the filing of the Complaint in this litigation.

1    Answer:  Take-Two admits this request.

2    Plaintiff's Trial Exhibit 148.  Defendant World

3    Wrestling Entertainment, Inc.'s Second Supplemental

4    Objections and Responses to Plaintiff's First and Second

5    Set of Interrogatories:

6    Interrogatory No. 2.  State how many of the WWE 2K

7    games were sold, including how many were sold or shipped to

8    persons or entities in Illinois.

9    WWE responds that based on information reported to

10    WWE, worldwide sales of WWE 2K Games through August 31,

11    2020, were as follows:

12    1.  3,752,961 units sold of WWE 2K16;

13    2.  3,510,450 units sold of WWE 2K17; and,

14    3.  3,071,385 units sold of WWE 2K18.

15    Interrogatory No. 10.  State the amount of

16    revenues, costs, and profits WWE received through the sales

17    of the WWE 2K games.

18    Answer:  WWE responds that as of August 31, 2020,

19    it was paid royalties on the sales of the WWE 2K games as

20    follows:

21    1.  WWE 2K16:  18,539,175 dollars

22    2.  WWE 2K17:  16,589,255 dollars

23    3.  WWE 2K18:  15,268,848 dollars

24    And that's all we have.

25    THE COURT:  Thank you, counsel.

1          Mr. Simon?

2          MR. SIMON:  Your Honor, the plaintiff rests.

3          THE COURT:  Okay.

4          MS. CENDALI:  And, Your Honor, defendants have a

5     motion.

6          THE COURT:  Okay.  Ladies and gentlemen of the

7     jury, the plaintiff has rested.  Meaning, the plaintiff has

8     completed her presentation of the evidence in the case.  At

9     this time, I need to take up some matters outside of your

10    hearing and presence and so we are going to let you take a

11    break until 9:45.

12          COURTROOM DEPUTY:  All rise.

13          (Proceedings continued in open court, jury not

14    present.)

15          COURTROOM DEPUTY:  Please be seated.

16          THE COURT:  Do the defendants wish to present a

17    Rule 50 motion at the close of plaintiff's case?

18          MS. MEANS:  Yes, Your Honor.

19          THE COURT:  All right.

20          MS. CENDALI:  And, Your Honor, Miss Means will

21    argue the motion on behalf of both defendants.

22          THE COURT:  Thank you.

23          MS. MEANS:  Thank you, Your Honor.

24          As plaintiff has rested her case, defendants move

25    pursuant to Federal Rule of Civil Procedure 50(a) for

1  judgment as a matter of law on the grounds that plaintiff

2  has not put forward sufficient evidence of entitlement to

3  actual damages or profits.

4      There are two bases for defendants' motion.  First,

5  plaintiff has not offered sufficient evidence of actual

6  damages.  Under Seventh Circuit law, plaintiff needed to

7  present evidence of a fair market value of the copyright

8  measured in terms of:  One, actual losses to the copyright

9  holder; or, two, the value of a lost licensing fee.  She

10  has not done so.

11      And if Your Honor needs to refer to the Seventh

12  Circuit law on this, it's laid out in *Bell v. Taylor,* 827

13  F.3d 699 (2016).

14      So, I'll take those in turn.

15      First, as to actual losses.  Plaintiff testified

16  that she is not aware of, and could not speculate to, any

17  business or any clients that she lost as a result of Mr.

18  Orton being depicted in the WWE 2K games showing his

19  tattoos.  Plaintiff also testified that it was impossible

20  for her to guess as to whether she lost any clients due to

21  the depiction of Mr. Orton in those games.

22      In fact, plaintiff testified that not only could

23  inking a celebrity lead to referrals, but that some people

24  came to her because she inked Mr. Orton.  There is no

25  evidence in the record that would -- from which a

1  reasonable jury could conclude that plaintiff suffered any
2  actual losses.
3      Second, as to a licensing fee.  None of plaintiff's
4  witnesses were able to identify any licensing fee for
5  licensing a tattoo in a video game.  There is no evidence
6  in the record from which a reasonable jury could determine
7  the fee Miss Alexander was allegedly entitled to charge for
8  use of the tattoos in WWE 2K.
9      Plaintiff is essentially asking the jury to choose
10 a number between one and infinity, and has provided no
11 evidence as to what that number should be.  And in fact,
12 Miss Alexander testified that she had never licensed
13 tattoos in video games, and there's no evidence in the
14 record as to what that license would look like or what
15 someone would charge for such a license.  So, the jury has
16 no basis on which to award actual damages, and any actual
17 damages award would require the jury to unduly speculate.
18     Second, plaintiff has not put forward sufficient
19 evidence of profits and, thus, the jury does not have a
20 legally sufficient evidentiary basis to award disgorgement
21 of defendants' profits.  In particular, plaintiff did not
22 present sufficient evidence of a causal nexus between the
23 alleged infringement and defendants' gross revenues.
24     In *Taylor v. Meirick*, the Seventh Circuit gave the
25 following example.  In general --

1          THE COURT:  What's the citation?

2          MS. MEANS:  Yes.  The citation 712 F.2d 1112,

3    Seventh Circuit (1983).

4          THE COURT:  Thank you, counsel.

5          MS. MEANS:  Yes, Your Honor.

6          So, the Seventh Circuit said this, Your Honor:  If

7    General Motors were to steal your copyright and put it in a

8    sales brochure, you could not just put a copy of General

9    Motors' corporate income tax return in the record and rest

10   your case for an award of infinger's profits.

11         Yet, this is the only methodology in the record a

12   jury could use to arrive at an award.  Any conceivable link

13   between sales of WWE 2K and the five tattoos at issue in

14   this case is unduly speculative.

15         While Dr. Zagal spoke broadly of the importance of

16   realism during his direct examination, he also testified

17   unequivocally that people don't buy WWE 2K because of the

18   tattoos.  In fact, he was not aware of anyone who had

19   purchased the WWE 2K games.

20         Mr. Clark and Miss Alexander did not testify any

21   differently.  There is no evidence that anyone was

22   purchasing these games because of the five tattoos.  So,

23   plaintiff has failed to establish any causal nexus between

24   the profits and the works that they are alleging are

25   infringed.

1          Plaintiff's only theory as to whether or not the

2     tattoos drove sales thus far is -- well, there's two

3     theories that they have presented:  One is that Mr. Orton

4     himself is popular, but they have not shown that Mr. Orton

5     is popular because of his tattoos let alone that his

6     tattoos in the game were driving sales.  And the second is

7     this concept of realism.  That, well, realism is popular

8     and, therefore, you know, that must create that causal

9     nexus.  But again, Dr. Zagal stated that the tattoos were

10    not driving sales.

11         Thus, plaintiff has not put forward sufficient

12    evidence that a jury could use to determine whether

13    plaintiff should be awarded any of defendants' profits.

14         Finally, plaintiff has not put forward evidence of

15    profits attributable to the use of the tattoos in the

16    Create a Superstar feature at all.

17         As an initial matter, it is undisputed that this,

18    the tattoos at issue, do not appear in the Create a

19    Superstar feature in WWE 2K17 or WWE 2K18, at all.

20    Defendants respectfully contend that plaintiff should not

21    be able to derive profits from that feature, from WWE 2K17

22    and WWE 2K18, when that feature did not appear in those

23    games.

24         With regard to WWE 2K16, plaintiff's theories as to

25    realism and Mr. Orton's popularity are even less tenable

1    with regard to the Create a Superstar feature.  Plaintiff

2    has not put forward any evidence that anyone was buying the

3    WWE 2K games for the tattoos, let alone the tattoos in the

4    Create a Superstar feature.

5           Thank you.

6           THE COURT:  who is responding on behalf of the

7    plaintiff?

8           MR. SIMON:  Mr. Friedman, Your Honor.

9           MR. FRIEDMAN:  Your Honor --

10          THE COURT:  Mr. Friedman, if I may.  I'm going to

11   let you respond however you want, but I would ask you to

12   address a couple -- make sure you address a couple of

13   issues.

14          Specifically, I'm interested in the measure of

15   damages or the basis for the measure of damages for -- of

16   actual damages based on the value of the infringers'

17   profits.  In other words, the defendants argue that the

18   evidentiary basis for the jury to decide and to value that

19   is not present, and I need you to address that, sir.

20          MR. FRIEDMAN:  Certainly, Your Honor.  And I -- I

21   will -- I intend to.

22          I'll start with actual damages.

23          The plaintiffs have set forth sufficient evidence

24   from which the jury can assess the value of the infringing

25   copyrights to the defendants, specifically -- and the jury

1  has sufficient evidence to do that without engaging in
2  undue speculation.
3      Dr. Zagal, for example, presented evidence on the
4  importance of authenticity or realism to the video
5  game-buying public specifically in the context of video
6  games such as the WWE 2K games in -- generally in the genre
7  of sports video games.
8      Dr. Zagal further testified that the realistic
9  recreations of wrestlers as well as other elements of the
10 WWE's general intellectual property are an important
11 characteristic for the video game-consuming public when
12 considering purchasing games like this.
13     And Dr. Zagal further testified and provided a
14 direct link to the copyrighted works at issue when he
15 explained that the tattoos of Miss Alexander's that were
16 recreated and copied onto the Orton character in the video
17 games provide the Orton character with both realism and
18 authenticity.
19     THE COURT:  I get that.  I mean, I don't think
20 there's any question about the importance of realism.  I
21 think that that's undisputed.  Even the defendants indicate
22 that that was an important consideration.
23     My question, counsel, is:  What evidence does the
24 jury have to put -- that, that was presented in plaintiff's
25 case to put a value on that?  And I'm assuming that you are

1    saying that the value of the infringing work is tied

2    directly to the popularity of Mr. Orton and the realism of

3    his -- of his character or of the tattoos on, on his

4    character in the game and also available for use in the

5    Superstar feature.

6           MR. FRIEDMAN:  That's correct, Your Honor.  It is

7    plaintiff's contention that those are some of the factors

8    that the jury may consider and weigh when accessing the

9    value of the copyrighted works to the infringer.

10          With respect to what I believe is Your Honor's more

11   direct question to me, What evidence does the jury have

12   upon which to base an assessment of actual damages, namely,

13   the value to the infringer?  The jury has the evidence that

14   I discussed a moment ago.  In addition, it has an

15   understanding from the testimony of Dr. Zagal of the

16   relative importance of Randy Orton to the overall WWE

17   universe and the relative importance of the Orton character

18   to the WWE universe.  They also have the facts upon which

19   to assess the relative importance of the tattoos on the

20   Orton character.

21          For example, Dr. Zagal testified that the tattoos

22   are unique and characteristic of the Orton character,

23   without which folks might not recognize Mr. Orton.

24          And there is also evidence that Dr. Zagal presented

25   that the video game-buying public, in particular, the

1    subset of WWE fans that may also purchase a video game

2    involving the WWE value realism and authenticity, and it

3    may -- are often driven by consumer complaints, consumer

4    criticisms.

5            THE COURT:  I get that.  And I think what I am

6    indicating is, I get the component of the -- of the

7    argument --

8            MR. FRIEDMAN:  If I may?  I think I can address

9    Your Honor's --

10           THE COURT:  You gotta cut me off?

11           MR. FRIEDMAN:  I'm not cutting you off.  I

12   apologize.

13           THE COURT:  Okay.  What I'm asking for, however, is

14   -- in other words, are you suggesting that the jury just

15   take these concepts of value and popularity and realism,

16   and there's been no value placed on that, and that they

17   somehow then come up with a numerical value in actual money

18   for that?  I understand there are damages that jurors award

19   all the time, when they have to do that.  For instance,

20   pain and suffering.

21           Is it the plaintiff's position that the actual

22   damages in a copyright infringement case, based on the

23   value of the infringers' profits or even disgorgement, may

24   be determined by the jury much like damages for pain and

25   suffering?  In other words, it's a value that's totally

1  determined by the jury and not driven by their

2  consideration of specific figures.

3      MR. FRIEDMAN:  I think the analogy to pain and

4  suffering damages is apt, if, if slightly incomplete.

5      I will offer a quotation from the *McRoberts*

6  *Software, Inc. versus Media 100, Inc.* case in the Seventh

7  Circuit at 329 F.3d 557, where, on page 567, the court

8  stated that the copyright holder was not required to

9  establish the actual value.  I take that as meaning a

10  numerical value.  The court goes on to say that the

11  copyright holder, quote, was required only to provide

12  sufficient evidence of the value so that the jury did not

13  have to resort to undue speculation in estimating actual

14  damages.

15      THE COURT:  Okay.  Let me stop you there.

16      MR. FRIEDMAN:  Going back --

17      THE COURT:  Let me stop you there.

18      Then what, in that case, did the court determine

19  was sufficient evidence of that value?  What was the

20  evidence of that value that the jury had for their

21  consideration?  Because again, that, that I think is the

22  focus of my question.

23      MR. FRIEDMAN:  What was provided to the jury in

24  that case were the infringing company's actual and

25  projected sales of its finished product line incorporating

some of the copyrighted works.  The figures in those case were 10 to 65 million dollars.

Your Honor's analogy of the pain and suffering damages, I said I think was apt, and I'll say that in this way:  When the jury considers actual damages in this case as the value of the --

THE COURT:  Let me stop you.

MR. FRIEDMAN:  Yes.

THE COURT:  Because I know you just tried to run past that real quick.  And, honestly, I'm asking you questions based on the questions that I have and that I need to determine this.

So, in the case that you cited to me where the Seventh Circuit said the -- obviously, that the jury determines the value based on the evidence of value that they -- that was presented during the course of trial, I asked you, what was the evidence of value in that case that the Seventh Circuit found sufficient.

And then I think you told me there were -- that in evidence were specific figures regarding past sales, projected future sales, and I'm assuming that we're talking about evidence of gross revenue, maybe some evidence of profits, et cetera.

Is that -- I'm trying to get clarity.

MR. FRIEDMAN:  Yes.  That is correct, Your Honor.

1    THE COURT:  And it was that evidence that the

2    Seventh Circuit said would be -- or was sufficient from

3    which the jury could make their determination then of the

4    actual damages based on value.

5    MR. FRIEDMAN:  That was a piece of the evidence,

6    Your Honor.  Yes.

7    THE COURT:  You said it was a piece.  What was the

8    other piece?

9    MR. FRIEDMAN:  I'll look to the case itself to

10   describe that.  The Seventh Circuit indicated that the

11   copyright holder presented substantial evidence of the

12   value, including a licensing and software development

13   agreement with another party, the value of those contracts

14   with another party to translate the software at issue in

15   that case, and in addition to that, the infringing party's

16   actual -- I'm sorry -- the infringing party's actual and

17   projected sales.

18   THE COURT:  Hold on.  You can go ahead.  I'll take

19   a look at the case.  Go ahead.

20   MR. FRIEDMAN:  Thank you, Your Honor.

21   With respect to the issues in this case and the

22   damages that the jury is --

23   THE COURT:  Let me back up.

24   MR. FRIEDMAN:  Yes.

25   THE COURT:  I know I keep cutting you off.  You're

1    probably frustrated.  But I'm trying to get to what -- to

2    the meat of what I need to make a determination.  So, let

3    me try to ask it this way.

4         Mr. Friedman, what is plaintiff's position of -- at

5    this point, at the close of plaintiff's case, what evidence

6    is before the jury or would be before the jury of the value

7    of the infringing work to the defendant?  What's the actual

8    evidence beyond, beyond Dr. Zagal's testimony about how

9    important -- what evidence beyond that?  What evidence is

10   there similar to the evidence that was deemed sufficient by

11   the Seventh Circuit in the case you cited?

12        MR. FRIEDMAN:  In addition to that evidence, there

13   is also the license agreement between the WWE and Mr.

14   Orton, and licensing agreement between Take-Two and the

15   WWE, indicating that transactions of this type occur and

16   that tattoo works are licensed by companies regularly, in

17   particular the companies at issue in this case.

18        In addition, Take-Two testified through its

19   corporate representative, Mr. Little, that they in fact

20   will take licenses from certain tattoo artists when they

21   deem it necessary to their business and include such art

22   into their video games.  There was not evidence of the

23   value or the dollar amount of that particular license, but

24   there is evidence that those licensing agreements occur.

25   And not only that, but occur -- not only that they occur

1    within this video game industry, but that this -- these

2    defendants engage in those licenses in these particular

3    games.

4         In addition, the jury has seen a significant amount

5    of gameplay footage, has an understanding of the games, Mr.

6    Orton's -- or the Orton character's role in the games, and

7    the prominence or not of --

8         THE COURT:  Let me cut to the chase, Mr. Friedman.

9         MR. FRIEDMAN:  -- Mr. Orton's tattoos --

10        THE COURT:  Mr. Friedman, is there any evidence

11   before the jury similar to the evidence, the specific

12   evidence as to the gross sales, projected future sales, and

13   profits in this case as it was in the case that you've

14   cited?

15        MR. FRIEDMAN:  Well, this case also has the actual

16   -- the actual gross revenues and profits of the Take-Two

17   entities, in addition to the revenues received by the WWE.

18   We also have the financial aspects of the licensing

19   agreement between Take-Two and the WWE indicating the value

20   that they place on the IP licensed by WWE.

21        In addition, we have testimony from the WWE through

22   its corporate representative, Mr. Kiang, stating that

23   without the tattoos that were inked on Mr. Orton from Miss

24   Alexander, without the tattoos -- those tattoos appearing

25   on the Orton character, the WWE would not have approved the

release of the video game and Take-Two would not have been able to sell any of the video games.

That's the evidence that's in this case, Your Honor.

THE COURT:  Thank you, Mr. Friedman.  I think I've heard enough.  I need to -- I want to take a look at the cases and so we'll go ahead and we'll be on recess.  It shouldn't take me more than 15, 20 minutes or so.

COURTROOM DEPUTY:  All rise.

(Court recessed from 9:46 a.m. to 10:06 a.m.)

(Proceedings continued in open court, jury not present.)

THE COURT:  Okay.  The defendants' Rule 50 motion for judgment at the close of plaintiff's case focuses on essentially the same question, whether there is sufficient evidence of damages presented in plaintiff's case.

They argue that the answer is, no, on a couple of different bases.  First, citing the *Bell* case, that the evidence presented by plaintiff is not sufficient to demonstrate a causal nexus between the infringement or alleged infringement and the gross revenues.

The jury has before it, for its consideration, the testimony of Dr. Zagal and his opinions as to the impact that certain factors have on the value of the works and as a result of the infringement has to do with popularity,

1  realism.  He did not put a dollar figure on that, but the

2  Court does not believe that he is required to do that.

3  Ultimately, that is what the jury will do, as long as they

4  have sufficient evidence in the record to make that

5  determination so that any finding or verdict by them in

6  that regard would be more than speculation.

7        I think they have the evidence from which they can

8  make a determination as to whether there was a nexus and

9  what that nexus is between the infringement and the gross

10 revenues.  They have the evidence of the gross revenues.

11 They have evidence, I believe, from Plaintiff's 28 -- I

12 don't remember the exhibit number -- the spreadsheet that

13 was actually a spreadsheet of information provided from the

14 defendants as to gross revenues and certain deductions.

15 And so, it is not as if they would just be pulling figures

16 out of the air.

17        Yes, they would ultimately be the ones placing the

18 value, but the question is whether there is evidence of

19 that value in the record from which they could do that.

20 And again, it's not the Court's position to put herself in

21 the shoes of the jury and to weigh that evidence.  It's

22 whether or not it is there and the jury will ultimately

23 weigh it.

24        The defendants also argue, citing *Taylor*, which --

25 but in *Taylor,* the issue was with the plaintiff's theory

1    and the evidence of a specific claim for lost profits.  In

2    other words, the issue in that case, the plaintiff

3    presented evidence that she lost profits.  That's not what

4    we're talking about here.

5         As we know, and as the *McRoberts* case cited by the

6    plaintiff points out, actual damages can be, in a case such

7    as this, based on the value of the defendants' use of the

8    information, of the copyrighted material.  And so the

9    question is, is there a reasonable basis in the record to

10   support that theory of damages?  Again, based on the

11   various aspects of Dr. Zagal's testimony, the jury may

12   accept it, they may reject it, but that is for the jury to

13   do.

14        That, combined then with the actual financial

15   evidence that's in -- based on the spreadsheet, based on

16   the defendants' responses to the Requests to Admit

17   regarding certain amounts that were generated by the

18   various games and the sale figures, there are several ways

19   that the jury could use that information to measure the

20   actual damages.  Again, the strength of that evidence?

21   It's not for me to decide.  And I'm sure it's what we will

22   hear in closing arguments.  But that's not the issue at

23   this point.

24        Is the information there from which the jury could

25   reasonably place a value?  The Court finds that it is.

1         Defendants' motion under Rule 50 for judgment as a

2    matter of law on the question of actual damages is denied.

3         Are we now ready to proceed with the defendants'

4    case?

5         MS. CENDALI:  We are, Your Honor.

6         COURTROOM DEPUTY:  All rise for the jury.

7         (Proceedings continued in open court, jury

8    present.)

9         COURTROOM DEPUTY:  Please be seated.

10         THE COURT:  Okay, now you may call your first

11    witness.

12         MR. KRASIK:  Yes, Your Honor.  As their first

13    witness, defendants call Randy Orton.

14         THE COURT:  Please step forward, Mr. Orton.

15         THE WITNESS:  Hi, everybody.  How are you doing?

16    First time.

17         COURTROOM DEPUTY:  Please raise your right hand to

18    be sworn.

19         (Witness sworn by courtroom deputy.)

20         MR. KRASIK:  Your Honor, permission to approach the

21    witness with the witness binder?

22         THE COURT:  Yes.

23         COURTROOM DEPUTY:  Please state your name for the

24    record, and spell your last name for us.

25         THE WITNESS:  All right.  You got it.  Orton,

1    O-R-T-O-N.

2         THE COURT:  You may proceed, Mr. Krasik.

3         MR. KRASIK:  Thank you, Your Honor.

4                    *  *  *  *  *

5                    RANDY ORTON,

6    having been first duly sworn, was examined and testified as

7    follows:

8                    DIRECT EXAMINATION

9    BY MR. KRASIK:

10   Q.     Would you please introduce yourself to the jury,

11   sir?

12   A.     Sure thing.  My name is Randy Orton.  I was raised

13   in St. Louis, grew up in North County, went to Hazelwood

14   Central High School.  Being from this area, we always talk

15   about where we went to high school, right?  So, I figured

16   I'd let you know that.  I grew up in North County,

17   Florissant.  I have five kids.  A beautiful wife at home,

18   waiting for me to get back.  And I am a professional

19   wrestler for the WWE.  And 42 years old.

20   Q.     Thank you, Randy.  You anticipated some of my

21   initial questions, so I can jump ahead.  Thank you.

22          Are you required to be in court today, sir?

23   A.     No.

24   Q.     You weren't served with a subpoena or anything that

25   requires your attendance today?

```
 1    A.      No.

 2    Q.      No.  Are you here voluntarily?

 3    A.      Yes.

 4    Q.      And why did you come voluntarily to court today?

 5    A.      I came today because I feel like this, this whole

 6    case -- this whole case, this lawsuit about me --

 7            MR. SIMON:  Objection, Your Honor, relevance.

 8            THE COURT:  Yeah, and we need to hit the headsets

 9    quickly.

10            (Proceedings continued at the bench.)

11            THE COURT:  Okay.  Mr. Krasik, here's my concern:

12    Why he is here is not relevant, whether it's subpoena or

13    otherwise.  He is here testifying because at least at this

14    point the Court has determined that he has testimony that

15    is relevant and probative in this case.  His feelings about

16    the case are totally irrelevant and improper to express.

17    And that's where we are going.  I'm not going to allow

18    that.

19            What Mr. Orton feels about the case, what Mr. Orton

20    feels about the claims, are irrelevant, improper, and

21    should not and will not be brought before this jury.

22            MR. KRASIK:  Understood, Your Honor.  We'll move

23    on.

24            THE COURT:  And again, I understand he has strong

25    feelings about it.  But to the extent he seems prime and
```

1    ready to make his feelings known -- if you need a break to

2    talk to him to make sure that he doesn't volunteer that

3    information?  Because I feel very strongly about that.

4        MR. KRASIK:  Understood, Your Honor.

5        THE COURT:  All right.

6        (Proceedings continued in open court, jury

7    present.)

8    Q.    (BY MR. KRASIK)  Randy, I'm going to start by

9    asking you about your wrestling career, okay?

10   A.    You got it.

11   Q.    You said you are a professional wrestler for WWE.

12   What do you do as a professional wrestler for WWE?

13   A.    I wrestle a lot.  We do other stuff though, too.

14   We travel the world, put on wrestling shows; but what that

15   really is, is us telling a story.  Just like you might

16   watch a movie or read a book, we tell a story in our own

17   way.  We use our bodies a lot of the time in the ring in a

18   wrestling match.  But we also do other stuff.  We have been

19   in, like, movies and commercials.  There's a lot of

20   merchandise you can -- you can purchase as well, that I am

21   on or involved with.

22        But as far as being a wrestler for the WWE?  We put

23   smiles on people's faces.  I've got five kids at home.

24   Three of my boys are my stepsons.  Before I met them, they

25   were huge wrestling fans and --

```
1          MR. SIMON:  Your Honor?
2    A.       -- of course now --
3          MR. SIMON:  Your Honor?  Could we have question and
4    answer?  I can't interject objections.
5          MR. KRASIK:  Your Honor, would you like me to move
6    on?
7          THE COURT:  Yes.
8          MR. KRASIK:  Okay.
9          THE COURT:  And let me just say this.  Mr. Orton?
10          THE WITNESS:  Yes, ma'am.
11          THE COURT:  I know you got a lot of things you want
12    to say but -- and you said this was your first time?
13          THE WITNESS:  Yes.
14          THE COURT:  Here, please focus on the question
15    that's being asked, and only answer the question that's --
16          THE WITNESS:  Short, sweet, to the point.
17          THE COURT:  There you go.
18          THE WITNESS:  Okay.
19          THE COURT:  All right.  Thank you.
20          THE WITNESS:  I was told otherwise, but I'll give
21    you short and sweet.
22    Q.      (BY MR. KRASIK)  How did you get started performing
23    as a professional wrestler for WWE?
24    A.      My father, my grandfather, and my uncle all
25    wrestled for the WWF, the WWWF, and the WWE.  So, it was
```

1    kind of a natural thing for me to follow my father's

2    footsteps.

3    Q.    And when did you start performing as a professional

4    wrestler for WWE?

5    A.    My very first pro match was January of 2000.  I

6    signed my developmental contract with WWE in January of

7    2000, as well.

8    Q.    And when did you start wrestling for WWE on its

9    television programs?

10   A.    2001, I had my very first on-air match.  2002 --

11   April of '02, I had my first match on Smack Down.

12   Q.    All right.  Randy, when you started, you told us a

13   little bit about what you do as a professional wrestler.  I

14   was hoping to use the demonstratives on this slide for you

15   to help to explain to the jury what you are doing in, in

16   those images as your performance as a professional

17   wrestler.

18   A.    Yeah, so, in the very first picture, my entrance

19   music is playing and I am walking down the ramp to get in

20   the ring.

21         In the second picture, I am wrestling a large

22   Scottish man by the name of Drew McIntyre in a match called

23   the Hell in a Cell.

24         And in the last match, it looks like -- on the end

25   of my entrance, I do my little pose that I have been doing

1    for almost 20 years now.

2        So that's -- in a regular show that we put on?

3    You'd see all three of these images, you know, on one of

4    those shows.

5    Q.    Would you please describe for the jury what you

6    wear when you are performing in a WWE show?

7    A.    Yeah, I mean, you can see right there.  I don't

8    wear much.  My -- my daughter refers to my wrestling trunks

9    as a diaper.  They kinda fit as such.  If you don't

10   understand the terminology of wrestling trunks?  Diaper

11   works.  Kneepads, as well.  Got some leather sharkskin

12   boots on, as well, for my -- for my entrance.  I've got a

13   sleeveless hoodie.  I cut the sleeves off before I walk

14   out.  Usually, before the match, I'll take it off and give

15   it to a child in the front row, make their day.  But, yeah,

16   that's what you are seeing there and that's -- that's what

17   I do at work, most of the time.

18   Q.    When you are wearing the clothes that you wear as a

19   professional wrestler, are your arm tattoos generally

20   visible?

21   A.    Yes.  Yeah, yeah, for my entire 22-year career, my

22   arms have been visible while I am wrestling or, like in

23   this case, walking down to the ring, I've got the

24   sleeveless hoodie on.  So, sleeveless.  You know, I can see

25   my arms.

1    Q.      How do you know what to do when you are performing

2    in a WWE show?

3    A.      I've been doing it a long time and there are some

4    guys that I can -- there was a fella some might know, John

5    Cena.  If I was in the ring with him -- we had been in the

6    ring so much together and come up together, that we could

7    read each other's minds, so to speak.  We knew what each

8    other was going to do before they did it.  In that

9    instance, there's no preparation.

10          If I'm wrestling somebody that's relatively new or

11   somebody I don't have a lot of chemistry in the ring with,

12   then there would be talking beforehand and we would put

13   together little -- I guess you could say choreograph little

14   spots.  And then the finish of the match would most

15   definitely be rehearsed or -- not rehearsed, rather, but

16   talked about, choreographed.  We have time cues, commercial

17   breaks, everything like that.  So, as you are wrestling,

18   you are getting a countdown from the referee in your ear so

19   you know when to wrap it up.

20          So, it's not just, you know, a mess and then a

21   commercial break, but it makes sense.  And we lead into a

22   commercial break to leave that cliffhanger, so people tune

23   in.

24   Q.      Are the wrestling matches scripted?

25   A.      Yes and no.  As I just stated, I think you could

1    have a match that's 100 percent scripted and then you could

2    have a match that's not scripted at all.  If, if you get

3    the vibe, you know.  Yeah.

4    Q.      And how is the winner of a wrestling match

5    determined?

6    A.      We've got a creative team of writers that help us

7    all with the storylines, which is what keeps people, you

8    know, coming back.  And those writers, as well as us, we

9    can have input, interject our ideas, as well.  We all come

10    up collectively with what the best way to end the night is.

11          MR. KRASIK:  Your Honor, I'm going to advance the

12    slide.  Would you like me to request permission to publish

13    with each slide?  These are not -- there are no exhibits.

14    These are just demonstratives that already have been shown

15    to and not objected to.

16          THE COURT:  No, you can go ahead.

17          MR. KRASIK:  I just wanted to make sure for Your

18    Honor.

19          THE COURT:  I appreciate that.

20          MR. KRASIK:  Thank you.

21          MR. SIMON:  No objection, Your Honor.

22          MR. KRASIK:  If we get to anything that has an

23    exhibit on it, we will deal with that in advance and

24    separately.

25          THE COURT:  That's fine.  I appreciate that, Mr.

1    Krasik.

2         MR. KRASIK:  Thank you, Your Honor.

3    Q.     (BY MR. KRASIK)  All right.  Randy, I wanted to

4    talk about the different ways that WWE content is

5    distributed.  How is WWE content distributed on television

6    for -- right now?

7    A.     Well, as you can see on the screen there, on Fox on

8    Friday nights, we got Smack Down.  And then on USA on

9    Monday nights is Raw.  But we, we have been on many

10   different stations and networks and we reach people all

11   over the country, all over the world, for that matter.  So,

12   we're definitely on these channels now, but that changes,

13   and we'll be on other channels in the future, I'm sure.

14   Q.     Randy, what is the WWE network?

15   A.     WWE network is basically a giant library where you

16   can go and, you know, see matches from Randy Orton from

17   when he debuted in 2000, or any other wrestler you want to

18   learn about, or see any other shows or any other things

19   that they have done.  Or things that they are working on,

20   you can go there and you can see it.  It's a library of

21   everything WWE has ever put -- ever put out there.

22   Q.     And, Randy, on the slide in front of you, you can

23   -- the jury is able to see your image.  Is that the way

24   they would select your matches?  To click on that?

25   A.     Yes.

1   Q.     Is the WWE network also the way that WWE's premium

2   events -- which used to be known as Pay Per Views -- are

3   shown?

4   A.     Yes, sir.

5   Q.     Okay.  And could you describe how WWE content is

6   distributed online?

7   A.     Yeah, we have WWE.com, social media all over the

8   place, YouTube.  I feel like, comparatively, we've got

9   quite a big footprint online with everybody else out there.

10  Just -- our fans are worldwide and, and we want to give

11  them access to our WWE wrestlers and this is how we do it.

12  Q.     And, Randy, the -- what's on the slide in front of

13  the jury is the page from WWE.com.  What happens if they

14  click you on the WWE.com listing?

15  A.     If they click on me, they're going to get to find

16  out all kinds of stuff about me, and be able to go look in

17  the archives and see, you know, how my likeness has changed

18  throughout the years.  They can see old pictures of me from

19  when I started.  They can see, you know, what my -- what my

20  facial hair looked like in 2010, if they wanted to.  They

21  click on Randy Orton, they get Randy Orton and everything

22  to do with him.

23  Q.     All right.  Earlier in your career with WWE, was

24  WWE content distributed in hard copy magazines?

25  A.     Yes.  Yeah, before, you know, all the apps and

1  online stuff?  Magazines, magazines, magazines.

2  Q.    If I recall right, there was a WWE magazine and a

3  Raw magazine.  Do you remember any others?

4  A.    Yeah, there was those and there was a lot more and

5  I just don't remember.

6  Q.    And during your career with WWE, have you appeared

7  in each of these different media?

8  A.    Um -- I can't say for certain but I would -- I

9  would assume so.

10  Q.    Okay.  And do you know if you have appeared in each

11  of these different media with whatever tattoos were inked

12  on your body at the time?

13  A.    Yes, most definitely.

14  Q.    All right.  Sir, can you look in the binder of

15  materials that I put in front of you?  And can you turn to

16  what is identified as Defendants' Exhibit 206?

17       And do you recognize that as a promotional poster

18  for WWE with you on it?

19  A.    Yes.  That was the very first poster I was ever on,

20  in fact.  I remember that explicitly because I had them

21  send me a copy home.

22       MR. SIMON:  I'm sorry, I don't have that exhibit on

23  my -- what are you looking at?

24       MR. KRASIK:  Don't you have a binder of --

25       MR. SIMON:  Oh, I'm sorry --

```
1              THE WITNESS:  You can Google it.
2              MR. KRASIK:  I wasn't showing it until we admitted
3    it into evidence.
4              MR. SIMON:  What number?
5              MR. KRASIK:  206.
6              MR. SIMON:  Thank you.  I'm there.
7              MR. KRASIK:  Your Honor, I was going to move
8    Defendant's Exhibit 206 into evidence.
9              MR. SIMON:  No objection.
10             THE COURT:  Defendant's Exhibit 206 is admitted.
11   Q.    (BY MR. KRASIK)  Randy, if you would look in the
12   binder for Exhibit 208.  And do you recognize that as a WWE
13   --
14   A.    Oh, yeah, yeah, yeah.
15   Q.    Do you recognize that as a WWE poster with you on
16   it?
17   A.    I do.  I remember that photo shoot.
18             MR. KRASIK:  Your Honor, I'd move to admit
19   Defendants' 208 into evidence.
20             THE COURT:  Any objections?
21             MR. SIMON:  No objection, Your Honor.
22             THE COURT:  Defendants' Exhibit 208 is admitted.
23   Q.    (BY MR. KRASIK)  Randy, could you look at 209 in
24   your binder.  Do you recognize that as a WWE poster with
25   you on it?
```

1    A.      That's me.

2           MR. KRASIK:  Your Honor, I'd move to admit

3    Defendants' Exhibit 209 into evidence.

4           MR. SIMON:  No objection.

5           THE COURT:  Defendants' Exhibit 209 is admitted.

6    Q.      (BY MR. KRASIK)  And, Randy, if you could look at

7    Defendants' 214.  Do you recognize that as a WWE poster

8    with you on it?

9    A.      Yep, I have seen that poster for years.

10          MR. KRASIK:  Move to admit Defendants' 214 into

11   evidence.

12          MR. SIMON:  No objection.

13          THE COURT:  Defendants' Exhibit 214 is admitted.

14   Q.      (BY MR. KRASIK)  And, Randy, 215, do you recognize

15   that as a WWE poster with you on it?

16   A.      I do.

17          MR. KRASIK:  Your Honor, move to admit Defendants'

18   215 into evidence.

19          MR. SIMON:  No objection.

20          THE COURT:  Defendants' Exhibit 215 is admitted.

21   Q.      (BY MR. KRASIK)  Randy, if you could turn back in

22   the binder to 165.  And do you recognize that, sir, as a

23   T-shirt with your -- with you on it?

24   A.      Yes.

25          MR. KRASIK:  Your Honor, move to admit Defendants'

1    165 into evidence.

2         MR. SIMON:  No objection.

3         THE COURT:  Defendants' Exhibit 165 is admitted.

4    Q.    (BY MR. KRASIK)  Randy, could you turn to 166,

5    please.  And do you recognize that as the image from a

6    T-shirt with you on it?

7    A.    Yes.

8         MR. KRASIK:  Your Honor, I'd move for Defendants'

9    Exhibit 166 into evidence.

10        MR. SIMON:  No objection.

11        THE COURT:  Defendants' Exhibit 166 is admitted.

12        MR. KRASIK:  Your Honor, request to publish these

13   exhibits as part of my next slide to the jury, please?

14        THE COURT:  You may.

15        MR. KRASIK:  Thank you.

16   Q.    (BY MR. KRASIK)  All right.  During your career

17   with WWE, Randy, have you appeared on different types of

18   merchandise?

19   A.    Yes.

20   Q.    And does that merchandise include posters?

21   A.    Yes.

22   Q.    T-shirts?

23   A.    Yes.

24   Q.    What other kinds of merchandise have you appeared

25   on?

1    A.      Gosh, they'll find anything to print something on

2    and sell it.  Pencil erasers, backpacks, umbrellas, beach

3    towels, flipflops, you name it.

4    Q.      Have you appeared on each of these different types

5    of merchandise with whatever tattoos were inked on your

6    body at the time?

7    A.      Of course.

8    Q.      Have you ever appeared in WWE video games?

9    A.      Yes.

10   Q.      When did you first appear in a WWE video game?

11   A.      That would have had to have been after I debuted on

12   television, so probably '02.

13   Q.      And have you appeared in every WWE video game

14   that's been released since 2002, to your knowledge?

15   A.      I have never been asked that question, but I would

16   venture to say most definitely.

17   Q.      Okay.  Have you appeared in WWE video games since

18   2002 with whatever tattoos were inked on your body at the

19   time?

20   A.      Yes.  Yes, I have.

21   Q.      All right.  What gave WWE the right to promote you

22   in all of these different media we have been looking at?

23   A.      I did.  I signed a contract saying that I allowed

24   them to use my likeness to make money and then to give me a

25   little bit of it.

1  Q.      And what do you understand the term likeness to
2  mean?
3  A.      Likeness is, is me.  It's everything from the color
4  of my eyes to the size of my feet to the tattoos that have
5  been permanently etched in my skin.  That's my likeness.
6  And it changes.  Every day, sometimes.  It could change
7  yearly, monthly, daily.  It's my likeness.  It's me.  Yeah.
8  Q.      Thank you.
9          MR. KRASIK:  Your Honor, request to publish
10 previously-admitted Exhibit Defendants' 85 to the jury.
11         THE COURT:  If it's been admitted, you may publish
12 it, counsel.
13         MR. KRASIK:  It was admitted --
14         MR. SIMON:  Yes.
15         MR. KRASIK:  -- by plaintiffs.
16         THE COURT:  No.  No.  I'm saying, if it's been --
17 if it's in evidence --
18         MR. KRASIK:  Oh, I don't have to request
19 permission.
20         THE COURT:  Just go ahead.
21         MR. KRASIK:  Thank you, Your Honor.
22         THE COURT:  You're welcome.
23 Q.      (BY MR. KRASIK)  Mr. Orton, do you recognize this
24 as your booking contract with WWE?
25 A.      I do, yes.

1  Q.      And when did you enter into this booking contract
2  with WWE?
3  A.      It looks like 2009.
4  Q.      Okay.  And what is the term or length of this
5  booking contract?
6  A.      This one is for ten years.
7  Q.      And so, would this be the booking contract that
8  covered the period when the WWE 2K games that are at issue
9  in this lawsuit, 16, 17, and 18 were released?
10  A.      Yes.
11  Q.      There are a lot of terms in this booking contract.
12  But as a general matter, what do you understand is going on
13  in the booking contract?
14          MR. SIMON:  Your Honor, I object.  This calls for a
15  legal conclusion.
16          MR. KRASIK:  I'm asking the person who signed the
17  contract his understanding of it, sir -- Your Honor.  I'm
18  sorry.
19          THE COURT:  Overruled, to the extent that the
20  witness is being asked his understanding.  Although, again,
21  we're getting close here.
22  A.      From what I understand, me signing this contract
23  meant that, just like my father and grandfather, I was
24  going to be a professional wrestler for the WWE and that
25  they were going to pay me to do so.  And I was also aware

1    that I was signing my likeness over to them, essentially.

2    Like, my name is Randy Orton.  But I can't go be Randy

3    Orton somewhere else.  I'm Randy Orton for WWE, and

4    happily.  That's what I understood that to mean.

5         MR. KRASIK:  Mr. Thomas, next slide, please.

6    Q.    (BY MR. KRASIK)  And, Randy, I believe you said it

7    but just so the record's clear, you understood you were

8    granting your likeness to WWE under this contract?

9         MR. SIMON:  Your Honor, I object.  He's leading.

10   And now we have the contract with a legal term in it, he's

11   asking him to define.

12        THE COURT:  I agree, counsel.  I'm not sure that

13   Mr. Orton's understanding is relevant here.

14        MR. KRASIK:  Your Honor --

15        THE COURT:  The contracts and agreement speak for

16   themselves.

17        MR. KRASIK:  Okay, Your Honor.

18        THE COURT:  I don't think there is an issue of

19   whether or not he had an agreement with WWE.  The contracts

20   speak for themselves.  His understanding is not relevant.

21   So --

22        MR. KRASIK:  Okay, Your Honor.

23        THE COURT:  -- objection sustained.  Please move

24   on.

25        MR. KRASIK:  I'll move on.

```
 1          THE COURT:  That's not to say you are not relevant,
 2    Mr. Orton.  I don't want you to --
 3          THE WITNESS:  I'm sorry?
 4          THE COURT:  I said, that's not to say you are not
 5    relevant.  I didn't want you to take offense.
 6          THE WITNESS:  You're the boss.
 7          THE COURT:  You're bigger than me, though.
 8          THE WITNESS:  I ain't messing with you.
 9          THE COURT:  I ain't messing with you.
10          THE WITNESS:  We have an understanding then.
11          THE COURT:  All right.
12          Go ahead, Mr. Krasik.
13    Q.    (BY MR. KRASIK)  Randy, we'll move on to the next
14    question.  Under your -- under your booking contract, did
15    you grant WWE the right to use your likeness in connection
16    with merchandise made by WWE and its business partners?
17    A.    Yes.
18          MR. SIMON:  Same objection, Your Honor.
19          THE COURT:  Sustained.
20          MR. KRASIK:  Okay, Your Honor.
21          THE COURT:  We have the -- we have the agreements,
22    Mr. Krasik.
23          MR. KRASIK:  Okay.  I was just trying to help --
24    understood.  I'll move on, Your Honor.
25          THE COURT:  I think they understand.  We're in Day
```

1    Three here.

2        MR. KRASIK:  Okay.

3    Q.    (BY MR. KRASIK)  Randy, if I could refer you back

4    to the binder in front of you.  Starting at 255, there are

5    a number of photographs of you chronologically through your

6    career at WWE, starting in 2002 and going until 2018.  And

7    those are Defendants' Exhibits 255 through 329.

8        Do you recognize those -- which we had looked at as

9    we were preparing for your deposition -- as photos of you

10   taken by WWE throughout your career at WWE?

11   A.    Yes.

12       MR. KRASIK:  Your Honor, I'd like to move for the

13   admission of Defendants' Exhibits 255 through 329, in the

14   effort of trying to save time, Your Honor.

15       THE COURT:  Mr. Simon?

16       MR. SIMON:  Your Honor, I have to look at them, I

17   guess.

18       THE COURT:  Go ahead.

19       MR. SIMON:  Okay.

20       THE COURT:  Just give us a second.

21       (Pause.)

22       MR. SIMON:  329 was the last one?

23       THE COURT:  Yes.

24       MR. KRASIK:  Yes.

25       MR. SIMON:  No objection, Your Honor.

```
 1          THE COURT:  Exhibits 255 through 329 -- Defendants'
 2  Exhibits 255 through 329 are admitted.
 3          MR. KRASIK:  Thank you, Your Honor.  And request to
 4  publish certain of the photos on my next slide.
 5          THE COURT:  You may.
 6          MR. KRASIK:  Thank you, Your Honor.
 7  Q.      (BY MR. KRASIK)  Randy, did your likeness change
 8  over the ten years of this booking contract?
 9  A.      Yes.
10  Q.      Did your hairstyle change?
11  A.      Yeah -- yes.
12  Q.      Did your body muscle structure change?
13  A.      It was 20 years.  Yes.
14  Q.      Did you get any new tattoos?
15  A.      A few.  Yes.
16  Q.      Did -- excuse me.  Did your facial hair change?
17  A.      Yes.
18  Q.      In your booking contract, did you give WWE the
19  right to your likeness, whatever you looked like, over the
20  term of your contract?
21  A.      Yes.
22          MR. SIMON:  Objection, Your Honor, relevance.
23          THE COURT:  I'm not sure it's irrelevant but,
24  again, we're getting into the legal conclusion, counsel.
25          MR. KRASIK:  I'm moving on, Your Honor.
```

1    THE COURT:  You're asking this witness to interpret

2   and give a legal conclusion as to an agreement.  Again, we

3   have the agreement.

4    MR. KRASIK:  Yeah, it was really his understanding

5   in entering into the agreement, Your Honor, but I'll move

6   on.

7    THE COURT:  His understanding is not relevant on

8   that -- on these issues.

9    MR. KRASIK:  Okay.

10    THE COURT:  It's relevant for other areas, but not

11   this one.

12    MR. KRASIK:  Okay, Your Honor.  I'll move on.

13    THE COURT:  Thank you.

14   Q.    (BY MR. KRASIK)  Randy, I asked you earlier but I

15   think the question got broken up.  Did you, in your booking

16   contract, grant WWE and its business partners the right to

17   use your likeness to manufacture --

18   A.    Yes.  Yes.

19   Q.    Okay.  And is Take-Two one of the business partners

20   that WWE's allowed to use your likeness in video games?

21   A.    Yes.  Yes.

22   Q.    All right.  All right.  I want to talk about the

23   tattoo -- I want to move on to another area completely.  I

24   want to talk about the tattoos that you had before you met

25   Ms. Alexander.

1    A.       Okay.

2    Q.       All right.  What tattoos did you have before you

3    met Ms. Alexander?

4    A.       The ones you see right here now, that one that --

5    that's my left arm.  That's just a tribal on my left arm.

6    The middle picture there is another picture of that same

7    tribal.  And then a tribal that I got when I was 18 on my

8    shoulder.  And then, of course, the last one is the back

9    piece that I got when I was young and dumb.

10    Q.       How did you meet Ms. Alexander?

11    A.       I was getting a tattoo.  Go figure, right?  I was

12    in Goldenlands tattoo parlor on the Rock Road.  I forget

13    the guy's name but -- Dave or Daley or something -- he was

14    giving me a tattoo.  And I don't remember where, exactly.

15    But I met Cat there.  And I think that we had a mutual

16    friend that had spoken about her being a pretty bad ass

17    tattoo artist.  So, when I wasn't happy with the work I was

18    getting from Dave or Daley or whatever, I was like, let me

19    see if this chick can -- how good she is.  I looked up her

20    work and then I made the decision to have her start

21    tattooing me.

22    Q.       Approximately when did you first hire Ms. Alexander

23    to ink a tattoo on your body?

24    A.       That's hard to say.  Early 2000s? '02? '03?  I'm --

25    I don't remember exactly.

1   Q.      Were you already performing as a wrestler for WWE
2   at that time?
3   A.      Yes.
4   Q.      So, at that time were you appearing on a WWE
5   television programs?
6   A.      Yes.
7   Q.      At that time, were you appearing in magazines,
8   photos, and other media for WWE?
9   A.      Yes.
10  Q.      At that time, were you appearing on WWE
11  merchandise?
12  A.      Yes.
13  Q.      At that time, were you appearing in WWE video
14  games?
15  A.      Yes.
16  Q.      I asked you earlier when you first appeared in a
17  video game.  Do you know what -- what video game you first
18  appeared in?
19  A.      I -- I do.  I can picture the cover but not the
20  name, but I believe it was in '02.
21  Q.      Okay.  And do you know the company that made WWE
22  video games at that time?
23  A.      THQ, back then.  We have somebody -- somebody else
24  now, but THQ did those, I believe.
25  Q.      And were you shown in the WWE video games made by

1    THQ with the tattoos you had before you met Ms. Alexander?

2    A.    Yes.

3    Q.    Randy, in the binder of materials before you, Nos.

4    197 to 205 refer to video footage from THQ video games that

5    you and I looked at before.  Do you recall --

6    A.    Yes.

7    Q.    Do you recall that footage?

8    A.    Yes.  Yes.

9    Q.    And that --

10          MR. SIMON:  Your Honor?  May we have a sidebar,

11    please?

12          THE COURT:  Yes.

13          (Proceedings continued at the bench.)

14          THE COURT:  Okay.  Mr. Simon, yes, sir?

15          MR. SIMON:  Yes, Your Honor.  It's my understanding

16    they're about to put in a bunch of exhibits from these

17    PlayStation video games that my client testified she never

18    saw.  I'm not sure how it's relevant, but he appeared in

19    video games that aren't at issue in this case and that she

20    never saw.  The issue of implied license and fair use?

21    It's not relevant to any of them.

22          THE COURT:  What is the relevance, Mr. Krasik?

23          MR. KRASIK:  The video games were made by a company

24    called THQ.  And it's relevant to show what was publicly

25    available at the time, that was -- and how Randy was

1    depicted in those games.

2         THE COURT:  Why is that relevant to the issues in

3    this case?

4         MR. KRASIK:  Well, because I think public notice of

5    how he's being depicted and what he's -- and the product

6    that's at issue is very relevant.

7         THE COURT:  No.  How he's being depicted in terms

8    of the products and games at issue is relevant.  How he's

9    depicted historically in other games is not.

10        MR. KRASIK:  Well, because it's the evidence of

11   what was -- it was in the market available at the time, it

12   is objective evidence of knowledge and intent to license

13   because that's what's out there.

14        THE COURT:  Knowledge of -- whose knowledge and

15   intent to license?

16        MR. KRASIK:  Well --

17        THE COURT:  The only relevance -- whose knowledge

18   and intent to license -- the implied license issue only

19   deals with Mr. Orton and Miss Alexander.  These games are

20   not relevant or probative of implied license.  They're not

21   relevant and probative of fair use.  They're not relevant

22   and probative of damages.  They're not relevant and

23   probative of waiver or estoppel.  These are all games that

24   predated if -- not only predated the games in issue, but

25   predated the tattoos at issue.  So, they're not relevant.

1    MR. KRASIK:  Your Honor, if I may?  The fact that
2    Mr. Orton appeared in these games with his tattoos, and
3    he's going to testify the licenses or any special
4    permissions were granted to his tattoos --
5        THE COURT:  I'm sorry.  He's going to testify --
6    what?
7        MR. KRASIK:  That no licenses or special
8    permissions with respect to the tattoos were granted.
9        THE COURT:  He can testify -- he can say, "I had
10   tattoos before, I never granted anybody or nobody granted
11   me a license with respect to those tattoos."
12       These exhibits are irrelevant.
13       MR. KRASIK:  Right.  But -- well, so it goes to the
14   custom and practice in the video game industry, and showing
15   the games is helpful to the jury to --
16       THE COURT:  No, it's not helpful to the jury.  At
17   this point, it -- it -- I'm really -- it's irrelevant.
18   Objection sustained.
19       MR. KRASIK:  Okay.
20       (Proceedings continued in open court, jury
21   present.)
22       MR. KRASIK:  Your Honor, may I continue the sidebar
23   on a related point?
24       THE COURT:  Sure.
25       (Proceedings continued at the bench.)

1      THE COURT:  Yes, sir?

2      MR. KRASIK:  I understand, Your Honor, that I'm not

3  going to show these to the jury.  However, the introduction

4  of these games may be relevant to certain expert reports

5  that only Mr. Orton can provide.  Can we admit --

6      THE COURT:  I'm sorry?

7      MR. KRASIK:  I'm sorry.  That the introduction of

8  these exhibits into evidence is important because it may be

9  relevant to one or more of the expert reports.  I don't

10  know the answer to that but --

11      THE COURT:  Well, the experts can testify based on

12  information that they reviewed.  It doesn't have to be

13  admissible information.

14      MR. KRASIK:  Okay.

15      THE COURT:  It doesn't have to be admissible

16  evidence.

17      MR. KRASIK:  Your Honor, we also have some still

18  shots from THQ games.

19      THE COURT:  No.  The THQ games are irrelevant in

20  this case.

21      MR. KRASIK:  Okay.

22      THE COURT:  All right.

23      (Proceedings continued in open court, jury

24  present.)

25      THE COURT:  And with this break, I think this may

1  be a good point -- the Court needs a quick break, ten

2  minutes, and then we will come back and finish.

3         MR. KRASIK:  Thank you, Your Honor.

4         COURTROOM DEPUTY:  All rise.

5         (Court recessed from 10:53 a.m. to 10:58 a.m.)

6         (Proceedings continued in chambers.)

7         THE COURT:  Okay.  A couple of things we need to

8  take up, hopefully, so we can move through this smoothly.

9  First of all, on the -- I don't want to continue to

10 interrupt the flow of the defendants' case.  However, I'm

11 concerned, as I have been throughout the course of the

12 case, with the continued extension of the scope of what is

13 relevant here.  And I tried to be clear at every stage

14 what's relevant to the issues we have left.

15        MR. KRASIK:  Mm-hmm.

16        THE COURT:  Mr. Orton has, obviously, material and

17 evidence relevant to issues remaining in the case, but it's

18 limited.  Okay?  And so his understanding is only relevant

19 as it relates to implied consent.  His understanding of

20 anything else in this case is totally irrelevant.  And any

21 evidence that doesn't go specifically to implied consent,

22 the damages or the -- and the damage theory, fair use,

23 waiver and estoppel, is irrelevant.  We're not going to

24 extend that scope and it's not contextual at this point.

25 So, I don't want to keep interrupting.

1    MS. CENDALI:  Your Honor, may I --

2    THE COURT:  No.  No.  Let me finish.

3    MS. CENDALI:  I'm sorry, Your Honor.

4    THE COURT:  That's number one.

5    We have another issue.  I didn't address it at the

6    time because I didn't want to draw more attention to it,

7    and I was hoping it wasn't a preview of things to come from

8    Mr. Orton.  His entrance into the courtroom was

9    inappropriate.

10   But beyond that, during our sidebar, according to

11   my staff, Mr. Orton continued to make faces and gestures to

12   the jury, like, *what is going on?*  Mr. Orton actually made

13   the statement, "What the fuck is going on."

14   Mr. Orton continues to look at the court security

15   officer, making gestures, raising -- in front of the jury.

16   Need I say more?

17   MR. KRASIK:  I'll instruct him, Your Honor.  He's

18   never been in a courtroom before.

19   THE COURT:  He's never been in a courtroom before,

20   but I am confident that you explained to him before he came

21   to court this morning.  And I understand, some people have

22   difficulty.

23   MR. KRASIK:  Your Honor -- as a private

24   practitioner yourself for as long as -- you can only

25   control your clients to a point.

```
 1              THE COURT:  You can control your clients to a
 2    point.  And to the point your clients are uncontrollable,
 3    then we have an issue.
 4              MR. KRASIK:  Oh, no.
 5              THE COURT:  Because if there's a -- if there -- if
 6    you have a limit on your ability to control your client
 7    such that he is acting improperly in front of the jury, not
 8    just disrupting but in a prejudicial way, it's not as if
 9    I'm going to continue to allow that to happen because he
10    just doesn't know.
11              MR. KRASIK:  I'll specifically instruct him.
12              THE COURT:  So, I will give you time to talk to him
13    before we continue.
14              MR. KRASIK:  Thank you.
15              THE COURT:  Yes, sir, Mr. Simon?
16              MR. SIMON:  Your Honor, one thing I just wanted to
17    point out.  You said his understanding of, you know, the
18    implied license.  There's a stipulation in the case, in the
19    pretrial order, "Plaintiff and Mr. Orton did not discuss
20    whether he had her permission to allow others to use the
21    tattoos that Miss Alexander inked on him in a video game."
22              They never discussed that.  That's stipulated.  So,
23    if they're going to get into discussions between him and my
24    client about what he understood --
25              THE COURT:  Well, here's the deal.  On implied
```

1    consent, the standard is, it may be proven by objective

2    evidence absent, you know, some affirmative conversation.

3    The question is, what is objective evidence?

4          And again, his understanding that he can do what he

5    wants to do with his body and license everybody else to do

6    what he -- is irrelevant.  That's irrelevant to implied

7    consent.  You're going to have experts that testify that

8    custom and practice in the industry is evidence, or what

9    the custom and practice in the industry is.

10          I have said -- and the cases say -- that can be

11    objective evidence for implied consent.

12          MR. KRASIK:  Mm-hmm.

13          THE COURT:  Those experts testify based on their

14    experience, education, training, research.  It would not,

15    for instance -- it's not objective evidence of custom and

16    practice for Mr. Orton or one other individual to testify

17    to what they did.  That's not sufficient.

18          MR. KRASIK:  Mm-hmm.

19          THE COURT:  Okay?  So, all of this stuff is

20    irrelevant and I'm -- and it -- and it is -- there is more

21    than a risk of confusing the jury on this stuff.  So, what

22    I do know is, whether counsel agrees with my rulings or

23    not, they are aware of what my rulings are and what the

24    scope and relevance is in this case, as I have said it.  We

25    are not going to extend it.  I do not want to continue to

1    interrupt.

2         I will -- and I will not tolerate at all -- at all

3    -- Mr. Orton's -- his behavior.  He's popular.  We get it.

4    Okay?  But his -- what he has to offer this case in terms

5    of relevant evidence is limited.  And to the extent that he

6    can't control his behavior, you should get to it, get it

7    out of him and get him the hell out of here.

8         MR. KRASIK:  May I briefly be heard, Your Honor?

9         THE COURT:  Seriously, interacting with the jury

10   is --

11        MR. KRASIK:  Inappropriate.

12        THE COURT:  Is beyond inappropriate.  Okay.  That's

13   where I draw the line.

14        MR. KRASIK:  On the relevance points.  I will

15   instruct Mr. Orton on his behavior.  Case closed.

16        I asked the initial question about his

17   understanding of why he was here because Mr. Simon --

18        THE COURT:  I don't want to know why you asked a

19   question.  I ruled on that.  I've ruled on that.

20        MR. KRASIK:  But I don't believe there is any other

21   "his understanding" questions.  His understanding of the

22   contracts is -- we've agreed on that.  We'll move on.

23        THE COURT:  What does his understanding of the

24   contracts have to do with whether or not those contracts

25   give a license?

1          MR. KRASIK:  Okay.  Okay.  We'll move on.

2          THE COURT:  A parties' understanding -- a contract

3     speaks for itself.

4          MR. KRASIK:  Okay.  We moved on.

5          THE COURT:  And we do disagree on that and we're

6     not going to spend any time disagreeing on that.

7          MR. KRASIK:  Because you win.  You win.  I

8     understand that.

9          THE COURT:  I don't know about that, but I win

10    today.

11         MR. KRASIK:  On the THQ stuff.  You stated what are

12    relevant.  Two things I point out.  I do think it's

13    relevant to the license issue, but it's also waiver,

14    because we're going to show that her tattoos were in these

15    games in '02, '03, '04, '05, '06, '07, '08.

16         THE COURT:  Hold on.  The presence of her tattoos

17    -- it's the presence of her tattoos in the games involved

18    in this case.

19         MR. KRASIK:  Well, the fact that they have been

20    in --

21         THE COURT:  No.  No.  Waiver applies to the issues

22    between the parties in this case.

23         MR. KRASIK:  We also have estoppel as a defense,

24    which is, as you know --

25         THE COURT:  And what is the estoppel defense?  That

1  she should be estopped from making claims -- the claims

2  between these parties?

3          MR. KRASIK:  Right.

4          THE COURT:  It's not about relationships and

5  contracts and things with unrelated parties.  That's not

6  relevant.

7          Now, to the extent, even though she says she didn't

8  know, the jury gets to weigh that.  But they can only weigh

9  it as far as the presence of her work in the video -- in

10  whatever medium.

11          MR. KRASIK:  Can I show the next -- so the first

12  two years, her stuff wasn't in.  But for the next nine

13  years, it was.

14          THE COURT:  Absolutely.

15          MR. KRASIK:  I can show that?

16          MR. SIMON:  Your Honor, the objection was

17  sustained.  He --

18          THE COURT:  No.  No.  What are you objecting to?

19          MR. SIMON:  Here's what I'm objecting to.  He's

20  trying to show video games from 2002 through 2011.  And

21  I'll concede some of them do --

22          THE COURT:  Only the ones that show her work.

23          MR. SIMON:  I understand.  But none of that is

24  relevant to waiver.  Waiver is an intentional

25  relinquishment of the rights, and she's not required to go

1    out and police and see if anybody's using them.  She's

2    testified she never saw them.  If she never saw them -- I

3    mean, if they could say she saw --

4        THE COURT:  Waiver isn't -- but the estoppel issue

5    -- what's the estoppel?

6        MR. SIMON:  Estoppel is where she does something

7    that they can rely on.  Inaction is not estoppel.  I have

8    case law --

9        MR. KRASIK:  There's case law --

10       MS. CENDALI:  Well --

11       THE REPORTER:  Hold on.

12       THE COURT:  No.  No.  Here's the deal.  We already

13   have the evidence that there were games out there for years

14   and whatever.  We know when she got the copyright

15   certificate.  We know when she filed the lawsuit.  You

16   already have -- we have the stipulation about what -- there

17   was no discussion.  She's already testified that -- of

18   whatever she testified.  It's already there.  You can make

19   your arguments as to how -- what the effect of that is.

20       MR. KRASIK:  Right.

21       THE COURT:  But we're not going beyond what's

22   probative of those issues.  And I said that these other

23   games are not.

24       MR. KRASIK:  If I may, Your Honor?

25       THE COURT:  You may.

1          MR. KRASIK:  That her argument was, *I just saw how*
2    *detailed the tattoos were and that's what -- you know, why*
3    *I did something.*
4          But I want to show what they looked like -- her
5    tattoos -- in these other games, that they look like her
6    tattoos.  So, it's -- it's --
7          THE COURT:  But she -- but there's no evidence that
8    she saw them.
9          MR. KRASIK:  But if they were --
10         THE COURT:  No.  No.  Wait a minute.  How can you
11   waive -- how can you waive something that you are not aware
12   of?  And what -- what in waiver law puts -- what in waiver
13   law says that a person is charged to know something because
14   it's out there.
15         MR. KRASIK:  I don't know if it's in waiver law,
16   but in estoppel, I believe --
17         THE COURT:  What's --
18         MR. KRASIK:  In estoppel, I think there's an
19   element of constructive knowledge.  We'd be happy to --
20         THE COURT:  No.  No.  No.  No.  Again, we're not
21   going there.
22         MR. KRASIK:  Okay.
23         THE COURT:  All right.
24         MR. KRASIK:  Even the games that --
25         THE COURT:  Yes.

1         MR. KRASIK:  -- her --

2         THE COURT:  Miss Cendali?

3         MS. CENDALI:  On behalf of my client, Your Honor,

4  I'm speaking to the issues of implied license and fair use.

5  The fact that these other games -- which by the way were

6  not objected to -- Mr. Simon --

7         THE COURT:  I don't care about the objection.

8         MS. CENDALI:  Okay.

9         THE COURT:  We're here.

10        MS. CENDALI:  The fact that these other games

11  showed Ms. Alexander's tattoos in them, and that they're --

12  and that there was objective evidence at the time that, at

13  the time that they were being inked, that the custom and

14  practice was, that was not something that one would get a

15  license for, from the tattoo artist.  It goes to the

16  industry custom and practice.

17        THE COURT:  No.  No.  You're mixing and matching

18  apples, oranges, and watermelons.  It may go to the custom

19  and practice, but it has nothing to do with the fact that

20  these other games were out there.  That has nothing to do

21  with implied consent.

22        MS. CENDALI:  Well, it goes to the custom and

23  practice which is, as you know from the Seventh Circuit,

24  evidence of implied license that other games were out

25  there, that had tattoos, and there was no license from --

1          THE COURT:  No.  No.  No.  No.  No.  No.  It does

2     not.  Industry practices though are objective evidence

3     that --

4          MS. CENDALI:  Your Honor?

5          THE COURT:  We're not going to debate this today.

6     I just ruled it's not.  It's not relevant.  Period.

7          MR. KRASIK:  Can I ask a clarification question --

8          THE COURT:  Yes.

9          MR. KRASIK:  -- so I don't run afoul of Your

10    Honor's rulings?  May I ask questions that the tattoos Miss

11    Alexander inked on him were shown in these other video

12    games without showing the visual?

13         THE COURT:  Here's the deal.  Without any evidence

14    that she saw them or was in a position to see them, it

15    doesn't matter.  It doesn't matter that, that these other

16    games were out there without evidence that she was aware.

17    You can't charge her with waiving a right that she was not

18    aware of, of the information being out there.  And you have

19    no evidence, not even evidence for the jury to weigh, that

20    she was aware.

21         MR. KRASIK:  I have no evidence of that, Your

22    Honor.

23         THE COURT:  No.

24         MR. KRASIK:  However -- however, the best evidence

25    of the custom and practice is what the actual games on the

1    market look like.  Right?

2           THE COURT:  But it doesn't matter.  I don't know

3    what the -- what the actual games look like, so I can't be

4    charged to have waived some right I've never seen.  You

5    can't charge me with waiving a right that I have for

6    something that I don't -- that I don't know exists or that

7    you don't have evidence that would -- that would support

8    constructive knowledge.  And you don't.

9           Just because the games are out there -- I've never

10   seen a damn WWE game before -- I've seen more than I need

11   to see today.

12          MR. KRASIK:  Yes.

13          THE COURT:  So, it is not probative.  And it is

14   irrelevant.  It is -- there is a significant danger of

15   prejudice and misleading the jury and I have ruled.

16          MR. KRASIK:  Okay.  So, no questions.

17          THE COURT:  No.

18          MR. KRASIK:  Okay.

19          MR. SIMON:  Thank you, Your Honor.

20          THE COURT:  And I'm going to give you some time to

21   have a "Come to Jesus" talk with your client.

22          MR. SIMON:  Thank you, Your Honor.

23          THE COURT:  So, I don't want to have to ask him to

24   leave the courtroom.  Because I will.

25          MR. SIMON:  Thank you, Your Honor.  We did not see

1    it.  I was --

2           THE COURT:  No.  My staff saw it, because we were

3    in sidebar.

4           (Court recessed from 11:13 a.m. to 11:19 a.m.)

5           (Proceedings continued in open court, jury

6    present.)

7           THE COURT:  You may proceed, Mr. Krasik, whenever

8    you are ready.

9           MR. KRASIK:  We're good.

10          THE COURT:  Okay.

11   Q.     (BY MR. KRASIK)  Mr. Orton, I want to talk about

12   the tattoos that Ms. Alexander inked, and the process of

13   inking those tattoos for you.

14          Randy, during the time that Ms. Alexander was

15   inking your tattoos, did you discuss with Ms. Alexander

16   that you were a professional wrestler?

17   A.     Yes.

18   Q.     Did you sign an autograph for Ms. Alexander?

19   A.     I believe so, yeah.

20   Q.     Was it is on a photograph?

21   A.     Yeah, um -- I did sign an autograph.  And she put

22   it in her little station, you know, to drum up business,

23   get people talking, I think.

24   Q.     Did you discuss with Ms. Alexander that your

25   tattoos that she was going to ink on you would be visible

1    when you perform as a professional wrestler?

2    A.    To say that I said to her flat out, "these are

3    going to be visible on my arms on television because I'm a

4    wrestler," I don't know that I said that.  But I would say

5    she knew, because she was well aware of what did I for a

6    living.

7    Q.    Was this --

8    A.    She had an autographed picture of me on her wall,

9    so, you know.

10   Q.    I'm sorry to interrupt your answer.

11   A.    Yeah, sorry.

12   Q.    Did Ms. Alexander express any problem with that?

13   A.    No.

14   Q.    Did Ms. Alexander ever have you sign any form

15   saying that she owned the copyrights in any of the tattoos

16   she was inking on you?

17   A.    No.

18   Q.    Did Ms. Alexander ever tell you she thought she

19   owned copyrights on any of the tattoos she was inking on

20   you?

21   A.    No.

22         MR. SIMON:  Objection, Your Honor, relevance.

23         THE COURT:  Overruled.

24   Q.    (BY MR. KRASIK)  Did Ms. Alexander ever tell you

25   there were restrictions on what you could do with your body

1    once she inked the tattoos?

2    A.      No.

3    Q.      Did Ms. Alexander ever tell you you needed her

4    permission to be shown with a tattoo she was inking on you?

5    A.      No.

6    Q.      Do you think you would have remembered if she said

7    that?

8    A.      I do.  I do.  Because she wouldn't have done my

9    tattoos if she -- if that was a request.  I would not have

10   proceeded with the tattooing.

11   Q.      What would you have done?

12   A.      I would have left and went somewhere else, where I

13   could get tattoos and, you know, wear them wherever I

14   wanted, you know?

15   Q.      You are saying you would have gone to a different

16   tattoo artist?

17   A.      Yeah.  If she said that there was going to be

18   restrictions as to where I could display my tattoos, I

19   would have went and sought out a different tattoo artist.

20   Q.      I want to talk about the tattoos that Ms. Alexander

21   inked on you.

22           MR. KRASIK:  Does the witness have slide 15?  And

23   the jury?  These have all been admitted.

24           COURTROOM DEPUTY:  Yes.

25           MR. KRASIK:  Thank you.

1    Q.      (BY MR. KRASIK)  What were the first tattoos that

2    Ms. Alexander inked on you, Randy?

3    A.      Again, it's been a very long time.  But like

4    looking back in photos, that's like the best way that I

5    have been able to kinda put the timeline together.  And I

6    would think that on this very far left picture that --

7    those forearm tattoos?  She had something to do with those.

8          THE COURT:  I'm sorry.  Can we -- and counsel, if

9    you don't mind doing it, can we make a specific reference

10   to the exhibit number that he is referring to, so the

11   record reflects what he is talking about?

12         MR. KRASIK:  Of course.  Thank you, Your Honor.

13   Q.      (BY MR. KRASIK)  Randy, when you are referring to

14   the images, do you see the little number underneath it?  If

15   you could use that, that would be helpful for us.

16   A.      Got it.  Got it.

17         So, on Exhibit 255, you can see my -- both

18   forearms?  I'm not sure if she did both or one.  I'm pretty

19   sure she did.  But, yeah, that's 255.

20         259?  You can see the tattoos there.  My left arm

21   and right arm are different than the previous tattoos that

22   you saw on those arms because Cat has added to, or altered,

23   or adjusted the prior tattoos that I had before seeing her.

24         And then in the last picture, 269, that is the back

25   piece that you see in 259.  Now in 269, it looks slightly

1    different.  And that is because she added to that today, as

2    well.

3    Q.      Randy, can you describe how these tribal tattoos

4    that we see on the slide came about?

5    A.      Yeah.  So, when I was 18 and I didn't need mom's

6    permission anymore, I went to a tattoo parlor and I got a

7    tribal tattoo on my right shoulder.  And so, it was a

8    18-year-old kid who was able to go out and get a tattoo.

9    And that's what he did.

10          That's how the tribal came about, is, I saw

11   something on a wall somewhere in a tattoo parlor and I

12   thought it was cool and I wanted it on my arm.

13          Any of you parents out there, keep that in mind, if

14   you have kids.

15   Q.      Randy, the tribal tattoos that Ms. Alexander inked

16   on you, why -- how -- why specifically do those tribal

17   tattoos come about?

18   A.      The tribal tattoos on my forearms?  I remember

19   wanting them to kinda even out all the junk that I had on

20   my back and upper arms.  I think, at this point, I was

21   trying to kinda make everything kinda rhyme a little bit on

22   my body, or make sense, or flow.

23          It felt like, before Cat, I just kinda had stamps

24   of tribal tattoos on my body, and I didn't like 'em.  So my

25   -- my -- going to her was an effort to begin the long

```
1    process of making me comfortable with the tattoos that I

2    had.

3    Q.      Randy, did you give Ms. Alexander direction on what

4    the design of these tribal tattoos should look like?

5    A.      Of course.  Yes.

6    Q.      And what was that?

7    A.      Well, so, I'm not sure which tattoo it was, but I

8    feel like there was one tattoo where it might have been on

9    the wall, like some tribal.  But we took it down off the

10   wall, turned it upside-down, changed it a little bit.  I

11   was always in control of what was going to end up on my

12   body.  She -- I think she's a really good tattoo artist.

13   So, like, she of course had input as well.

14           And, you know, with the way my body looks and like

15   the way my musculature looks, I guess like with the back

16   piece specifically, instead of just being a smaller stamp

17   on my upper back, we wanted to bring it and make it a

18   little bigger to like extend over my rear delts and up my

19   neck a little bit.  You know, so like when I'm wearing a

20   T-shirt, it comes up off my neck, because I was young and I

21   thought that was cool, is why I got it.

22   Q.      Did you approve of what the tribal designs looked

23   like before they were inked?

24   A.      100 percent.

25   Q.      And did you give Ms. Alexander direction on where
```

1    the tribal designs should be inked on your body?

2    A.      Yes.  Yes.

3    Q.      And did you approve of where the tribal designs

4    would be inked on your body before they were inked?

5    A.      Yes.

6    Q.      All right.  Earlier, you mentioned as part of your

7    answer that certain of these tattoos altered prior tattoos

8    that you had.  Can you describe for the jury what we are

9    seeing in the slide that's before you?

10    A.      Yeah.  So, in the 258 -- Exhibit 258 -- on the left

11    there, you see what is a preexisting tattoo, before I met

12    Mrs. Alexander.  And then on the right, in Exhibit 262, you

13    can see what she did to that preexisting tattoo.  And that

14    is, make it look better, in my opinion, to where I was

15    comfortable with sporting that thing for the rest of my

16    life.

17    Q.      All right.  Randy, could you look at the slide 17

18    before you, and describe the alterations that we're seeing

19    on that slide?

20    A.      Yes.  Like I said a few minutes ago, on the back

21    piece, it was added to, as well.  So, on 257, on the left

22    there?  You can see the original back piece.  And then --

23    yep, there you go, 269 there, you can see where we -- where

24    she, rather -- added in the extra tribal.

25              She also -- and it's very hard to see -- but she

1    did a little bit of outlining like in a lighter, like a

2    white ink.  And it looked cool, too.  I always liked that.

3    It would fade out real quick because in my profession, I'm

4    in the tanning bed a lot.  And tanning beds are tattoos'

5    worst nightmare.  So, a lot of, you know, touch-ups.  But,

6    yeah, that's the back piece.

7    Q.    The white shading that you are talking about, did

8    you approve that before Ms. Alexander inked that on your

9    body?

10   A.    Yes.

11   Q.    All right.  Randy, could you describe for the jury

12   the alteration to your preexisting tattoo that we are

13   seeing in slide 18 before you?

14   A.    Yeah, and it's -- I mean -- exactly what I said

15   about the two prior exhibits, you know, preexisting on the

16   left there, Exhibit No. 256.  And there's the after,

17   Exhibit No. 260, where you can see how she gave that right

18   shoulder tattoo a little TLC and made it better, in my

19   opinion.  Better.  And comfortable -- made me comfortable

20   with that piece.

21   Q.    Randy, before you altered these preexisting

22   tattoos, or in altering these preexisting tattoos, did you

23   think you needed to get the permission of the tattoo artist

24   who inked your original tattoos?

25   A.    Oh, of course not.

Q.      And why not?

A.      Because that's just silly.

        MR. SIMON:  Your Honor, objection, relevance.  He's
giving his opinion.

        THE COURT:  Sidebar, please.

        (Proceedings continued at the bench.)

        THE COURT:  Okay.  I know -- again, we have heard
this quite a bit in the case already.  But what is the
relevance of whether or not Mr. Orton believed or thought
that he needed to have Miss Alexander's permission have to
do with anything other than whether or not -- again, it
goes to implied license.  But again, you guys continue to
conflate a lot of things here.

        The only thing that's relevant here is whether
there was an implied license to him that he can then
license the defendants to use in video games.  You all keep
talking about whether or not he needed permission to
display the tattoos on his body in all these different ways
and mediums.  That's not at issue in this case.

        The issue is whether or not there was a license and
he was licensing -- any implied license for him to grant a
license to copy the images into a video game.

        MR. KRASIK:  May I respond, Your Honor?

        THE COURT:  You may.

        MR. KRASIK:  Yeah.  The claim in this case is that

1   there are restrictions on what Mr. Orton can do with his

2   body without getting permission --

3         THE COURT:  There's never been an allegation in

4   this case that Mr. Orton can't do anything with his body.

5   The question is what Mr. Orton can do with the images of

6   the -- of the works in this case, with the copyrighted

7   images in this case.  I understand the canvas in this case

8   is his body, but that does not expand the inquiry to the

9   extent that the defendants continue to allege in this case.

10  You continue to conflate it.  Maybe you don't understand

11  it.

12        The issue here is whether or not there was an

13  implied license that your clients owned that allowed them

14  to copy the works into a video game.  Not a photograph.

15  Not a poster.  Not any of that.  So --

16        MR. KRASIK:  Your Honor, two points, if I may.

17        The law in the Seventh Circuit is absent specific

18  limitation.  The scope of an implied license is all of the

19  copy holder's rights.  And that comes from *Lime* --

20        THE COURT:  We're not even in implied license

21  because we don't even have that.  But again, what is --

22  again, this whole issue of what -- of what he's given

23  permission for and his anticipated -- and the question and

24  the answer he started, which is nothing but his opinion as

25  to what he could do, that's not relevant.  It's not

1  relevant.

2       MR. KRASIK:  Your Honor, the fact that -- and my

3  next question is going to be his dealings with Ms.

4  Alexander about those modifications.

5       THE COURT:  Well, now that -- again -- but the

6  issue of -- or the whole fact of what Mr. Orton thought he

7  could do with his body is not relevant.

8       MR. KRASIK:  Respectfully, Your Honor, by -- you

9  have limited this, narrowed it in your question with --

10 being an issue, but what that's saying is, he doesn't have

11 the right to grant permission for his body to be in this

12 video game.  So, that is a restriction on his body.

13      THE COURT:  Well, that's -- it's not because --

14 we're not going to argue this point.

15      MR. KRASIK:  Okay.

16      THE COURT:  But again, the probative value of Mr.

17 Orton's testimony in this case is much more limited than I

18 think the defendants would have it be.  And I'm -- and

19 again, given the fact that he is a powder keg, I intend to

20 limit it to what's relevant.

21      MR. KRASIK:  Okay, Your Honor.  May I ask the

22 question -- just so I'm clear on your rulings.  I don't

23 want to overstep --

24      THE COURT:  Sure.

25      MR. KRASIK:  -- may I ask the question about if Ms.

```
1    Alexander said anything to him about the -- about the --
2            THE COURT:  Absolutely.
3            MR. KRASIK:  Okay.  Thank you.
4            (Proceedings continued in open court, jury
5    present.)
6            MR. KRASIK:  May I proceed, Your Honor?
7            THE COURT:  You may.
8    Q.      (BY MR. KRASIK)  Randy, let me ask you a slightly
9    different question.
10           When you and Ms. Alexander were altering the
11   preexisting tattoos that you had, did Ms. Alexander express
12   any concern about altering another tattooist's work without
13   getting their permission?
14   A.      No.
15   Q.      Randy, after doing the tribal tattoos, did you hire
16   Ms. Alexander to ink additional tattoos on your body?
17   A.      Yes.
18   Q.      Okay.  I want to go through individually what each
19   of those were.  Was one of them a rose tattoo?
20   A.      Yeah.  Exhibit 281 here was a red rose.  It's the
21   only color that I have on any of the tattoos, and it was
22   for my only child at the time, Alanna, and her birth date
23   there in Roman numerals, as well.  And there's an angel
24   wing behind the Alanna.  It faded over time, you can't see
25   it in that picture, but that was for my little girl, yeah.
```

1  Q.     And did you give direction on the -- on what that

2  tattoo should be?

3  A.     Most definitely.  Every -- yeah.  The rose, the

4  name, the Roman numerals.  Yes.

5  Q.     And did you approve of what the design would look

6  like before Ms. Alexander inked it on your body?

7  A.     Yes.

8  Q.     Okay.  Was the dove tattoo another tattoo that Ms.

9  Alexander inked on your body?

10  A.     Yeah, in Exhibit 283 and 285 there, on my left arm

11  there is a dove.  And Miss Alexander did indeed tattoo that

12  dove.

13  Q.     And how did that -- the dove tattoo come about,

14  Randy?

15  A.     It was one of those things where, you know, like I

16  said, I wanted the sleeves and we had come up with the

17  skulls, and we needed something else to kinda take up some

18  space.  And she told me she drew a good bird, so I was

19  like, all right, let's do it.

20  Q.     And did you approve the design before it was inked

21  on your body?

22  A.     Of course.

23  Q.     And did Ms. Alexander follow your instructions?

24  A.     Yes.

25  Q.     I'm not sure I asked that with respect to the

1    tattoo of your daughter's name and rose.  Did Ms. Alexander

2    follow your instructions in inking that tattoo, as well?

3    A.      Yes.

4    Q.      Okay.  Did Ms. Alexander ink skulls on your arms?

5    A.      Yes.

6    Q.      And how did those come about?

7    A.      That -- I had broken a collarbone at work and I had

8    about four months where I was going to be out of work.  And

9    it had been years since I wasn't on the road year-round and

10   actually had some time, so I was like, all right, I'm going

11   to get this all done in this amount of time.  I went to

12   Cat, you know, *what are we going to do?*

13            And I'm at her tattoo shop.  And I had driven my

14   newly-acquired 10-foot-long motorcycle up there.  And it

15   had a big fender on the back, and that fender was laced

16   with smoked skulls.  And the smoked skulls -- how do you

17   describe that?  Kinda like what you see there.  But just

18   skulls and flames kinda just disappearing and faint, like

19   in the background, too.  And I said, *Cat, I want what's on*

20   *my fender of my motorcycle.  I would like to pay you to put*

21   *that on my arm.*

22            And she did.  And she took a ballpoint pen and just

23   freehanded on my arm.  And I think we did a whole arm in a

24   day.  And that's how all the skulls got started.

25   Q.      And did you approve the design of the skulls before

1    Ms. Alexander inked it on your arm?

2    A.      Each and every one of them.

3    Q.      And did Ms. Alexander follow your instructions in

4    inking the skulls tattoos?

5    A.      Yes.

6    Q.      Okay.  How much time would you estimate that Ms.

7    Alexander spent inking tattoos on your body?

8    A.      That's a really hard question to answer but I'd say

9    100 hours, easy, just because of all the touch-ups.  I'd

10   get ink from her and then I'd be wrestling a week later.

11   That ink would get tattered up, destroyed, scabbed up.  I'd

12   have to go back.

13        I probably had -- like, all the ink you see has

14   probably been gone over like five, six, seven times,

15   because of all the tanning and fading and the tearing it up

16   in the ring.  So, I acquired a lot of time with tattoo

17   artists in general.

18        Cat?  I would bet the house that she's got 100

19   hours, sitting a foot from me, with a needle in my arm.

20   Q.      During any of those 100 -- approximately 100 hours,

21   did Ms. Alexander ever say you needed her permission to be

22   shown with the tattoo she was inking on your body?

23        MR. SIMON:  Your Honor, objection, relevance.

24        THE COURT:  Overruled.

25   Q.      (BY MR. KRASIK)  During any of those 100 hours,

1    Randy, did Ms. Alexander ever say you had any restrictions

2    whatsoever on what you could do with your body once she

3    inked your tattoos?

4    A.    My body, you know, up to me what I do with it.  So,

5    no.  The answer is no.

6    Q.    To be clear, did she ever say to you there were any

7    restrictions on what you could do?

8    A.    She did not say that there were any restrictions

9    regarding my tattoos, no.

10   Q.    And during any of those --

11        MR. SIMON:  Objection, Your Honor.  Nonresponsive.

12   The question was whether --

13        THE COURT:  Overruled, Mr. Simon.  I heard the

14   question.  And the answer, sir.

15   Q.    (BY MR. KRASIK)  During any of those 100 hours, did

16   Ms. Alexander ever say she owned copyrights in your

17   tattoos?

18   A.    No.

19   Q.    Okay.  Did you pay Ms. Alexander for the tattoos

20   that she inked on your body?

21   A.    Yes.

22   Q.    And how did you pay Ms. Alexander?

23   A.    Cash.  And I was generous.  And -- very generous,

24   if I remember correctly.  Because she did a really good job

25   and I liked her as a person.  A hundred hours is a long

1    time.  So, you know, we talked and chatted and I thought

2    she was cool, so I took care of her, you know.  Are you

3    asking how much?

4    Q.     I was going to ask if you recall the rate, yes.

5    A.     I would -- I think it was 100 dollars an hour, that

6    I was paying her.  And then I betcha -- I mean, you'd have

7    to ask her, but I betcha if she worked on me eight hours,

8    instead of giving her 800, I'd just give her a grand, I'm

9    thinking.  Like, I tipped the hell out of her, too, yeah.

10   Q.     Would you, too, estimate -- if you estimate you

11   spent 100 hours with her at 100 dollars an hour, would you

12   estimate you spent 10,000 dollars for her work in inking

13   your tattoos?

14   A.     I'd throw a couple grand on top of that, just for

15   the tips and the whatnots.  But, but, yeah, 11 or 12 grand,

16   maybe.

17   Q.     Was Ms. Alexander paid in full for inking your

18   tattoos?

19   A.     Yes.  Yeah.  And, I'm sorry, there was never any

20   receipts or paperwork or signatures or anything.  I'd --

21          THE COURT:  Mr. Krasik?

22          MR. SIMON:  Your Honor?

23   A.     -- give her cash.

24          THE COURT:  Mr. Krasik -- Mr. Orton, sir, I need

25   you to respond only to the question that's being asked.

1    And I know you understand that.

2          THE WITNESS:  Yes, ma'am.  I --

3          THE COURT:  So, respond to the question that's

4    being asked, please.

5          THE WITNESS:  I'm sorry.

6          THE COURT:  Go ahead Mr. Krasik.

7          MR. KRASIK:  Thank you, Your Honor.

8    Q.    (BY MR. KRASIK)  When you paid Ms. Alexander, did

9    she ever say to you that she expected additional payments

10   in the future if your tattoos were shown in certain ways?

11   A.    Of course not.

12   Q.    Did Miss Alexander ever tell you that she expected

13   additional payments in the future if you appeared with your

14   tattoos in video games?

15   A.    No.

16   Q.    My colleagues are reminding me, as they are

17   listening more closely than I am to all the answers.  I'm

18   not sure there was an answer to the question of whether,

19   during any of those 100 hours spent inking your tattoos,

20   Ms. Alexander ever said to you that you needed her

21   permission --

22         THE COURT:  That was asked and answered.

23         MR. KRASIK:  Okay.  So my -- I was right and my

24   colleagues were wrong, for the record.

25         THE COURT:  The record reflects.

1        MR. KRASIK:  All right.

2    Q.     (BY MR. KRASIK)  Prior to filing this lawsuit,

3    Randy, did Ms. Alexander ever complain to you about being

4    shown in any video games with the tattoos that she inked on

5    your body?

6        MR. SIMON:  Objection, Your Honor, relevance.

7        THE COURT:  Overruled.

8    A.     No.

9    Q.     (BY MR. KRASIK)  And prior to filing this lawsuit,

10   did Ms. Alexander ever complain to you about your tattoos

11   that she inked being shown in any media?

12   A.     No.

13   Q.     Okay.  Was this lawsuit the first time that you

14   heard Ms. Alexander had a problem with you being shown with

15   your tattoos in any media?

16   A.     Yes.

17   Q.     Okay.  During your 100 hours together, or whatever,

18   did Ms. Alexander ever say to you that you affirmatively

19   had her permission to show your tattoos on television?

20   A.     No, because I don't think that ever came up.

21   Q.     During the time you spent together, did she ever

22   affirmatively tell you you had her permission to show your

23   tattoos in photographs?

24   A.     No.

25   Q.     What about on T-shirts?

1    A.      No.  No.

2    Q.      But you did show yourself with your tattoos on all

3    of those media; right?

4    A.      Of course, yeah, yeah, yeah.

5         MR. KRASIK:  I just want to be very careful, Your

6    Honor, that we go to the right slide, since we skipped

7    over.

8         Mr. Thomas, if you could go to slide 31.

9    Q.      (BY MR. KRASIK)  Randy, after Ms. Alexander

10    finished inking the tattoos on your body, did you later

11    have a different tattoo artist alter the tattoos?

12    A.      Yes.  Each skull -- I think there was a count done,

13    and there's 38.  Each skull was gone over and changed, you

14    know, in some cases a great deal from the original.  In

15    some cases, just kinda darkened or whatever.  But I want to

16    say each skull has an eye socket that's shaded, or that

17    wasn't, or an extra tooth or a missing tooth or a crack or

18    an eyeball, or whatever.  They were all altered in 2016.

19         Again, I was blessed with an injury that gave me

20    some time home with my family and I got some more tattoos.

21    And I shouldn't say I got some more tattoos, I got these

22    skulls reworked.

23         And time and the sun fade tattoos, so it was about

24    that time anyway.  And I found a different tattoo artist,

25    other than Miss Alexander, to do that work.

1    Q.    Did Ms. Alexander express any problem with you

2    altering her tattoos?

3         MR. SIMON:  Your Honor, objection, this is not

4    relevant to our case.

5         MR. KRASIK:  I'm asking specifically what Ms.

6    Alexander may have expressed to Mr. Orton.

7         THE COURT:  There is no evidence that she knew.

8    Over -- I mean, sustained.

9         MR. KRASIK:  Well then -- sustaining the objection.

10   Understood, Your Honor.

11   Q.    (BY MR. KRASIK)  Randy, did you ever have any

12   conversation with Ms. Alexander about the alterations that

13   you made to her tattoos?

14   A.    Could you repeat that one more time?

15   Q.    Did you ever have any conversation with Ms.

16   Alexander about the alterations that you made to her

17   tattoos?

18   A.    Oh.  No.

19   Q.    Okay.  Do you -- withdrawn.

20        So, the tattoos that you currently have on your

21   arms are, are not tattoos inked by Ms. Alexander; is that

22   correct?

23   A.    Right.

24   Q.    Okay.  And do you have other tattoos on your body

25   that were not inked by Ms. Alexander?

1      THE COURT:  What's the relevance, counsel, of what
2  he has now?
3      MR. KRASIK:  Would you like to go to sidebar, Your
4  Honor?
5      THE COURT:  Yes.
6      (Proceedings continued at the bench.)
7      MR. KRASIK:  The relevance was the fact that he is
8  being shown in the games with tattoos that are Ms.
9  Alexander's, but also other tattoo artists.
10      THE COURT:  You're talking about today.
11      MR. KRASIK:  I can --
12      THE COURT:  We're not talking about -- 2K16, 2K17,
13  2K18.  You said today.
14      MR. KRASIK:  You're right.  I can limit it to that
15  time frame, Your Honor.  Thank you.
16      THE COURT:  Okay.
17      (Proceedings continued in open court, jury
18  present.)
19  Q.    (BY MR. KRASIK)  Randy, when Take-Two is making one
20  of their video games, they take a lot of photographs --
21  how, how -- they just get a lot of photographs taken of you
22  for purposes of putting in the game.  Now, I don't want to
23  go far down this path, it's more just for setting the
24  context for my next question.
25  A.    Okay.

1        THE COURT:  I'm not sure we need to go down this

2  path.  Could you just get to the relevant question, Mr.

3  Krasik?

4        MR. KRASIK:  Sure.

5  Q.    (BY MR. KRASIK)  During the time that you were

6  going through these photo shoots for the 16, 17, and 18

7  games, the ones that are at issue in this lawsuit, did you

8  have other tattoos on your body?

9  A.    Yes.

10  Q.    And how many other tattoos?

11  A.    Because of the fashion of them?  It's hard to say

12  how many tattoos I have.  Like I said, I think there's 38

13  skulls, because me and my wife, you know, counted one night

14  when we were bored.  But I don't know the answer to that

15  question.

16  Q.    Okay.  Have you seen your -- the image of your

17  playable character in the 2K16, 17, and 18 games?

18  A.    Oh, of course.  Yeah.

19  Q.    Do you think it's a accurate representation of

20  yourself?

21  A.    Yes.

22  Q.    Okay.  Would it be an accurate representation of

23  how you look in real life, if it didn't have tattoos?

24  A.    Well, no.

25        MR. KRASIK:  No further questions.

1          THE COURT:  Can we have a sidebar real quick?

2          (Proceedings continued at the bench.)

3          THE COURT:  Mr. Simon?

4          MR. SIMON:  Yes, Your Honor.

5          THE COURT:  Are you doing the cross-examination?

6          MR. SIMON:  Yes.  Yes, ma'am.

7          THE COURT:  Okay.  And about how long do you have?

8          MR. SIMON:  20 minutes.

9          THE COURT:  I know we have taken several breaks.

10    I'm concerned about holding the jurors too long before

11    lunch.

12          MR. SIMON:  Whatever your preference is, Your

13    Honor.  We can do it before or after.

14          THE COURT:  We'll go ahead and break.

15          (Proceedings continued in open court, jury

16    present.)

17          THE COURT:  Ladies and gentlemen, we're going to go

18    ahead and break for lunch.  We will reconvene at 12:45.

19          COURTROOM DEPUTY:  All rise.

20          (Court recessed from 11:53 a.m. to 12:38 p.m.)

21          (Proceedings continued in open court, jury not

22    present.)

23          THE COURT:  Okay, counsel.  I hope you had a good

24    lunch.  I spent my lunch on an attempt to manage further

25    this trial.  Specifically, you know, it's my job and my

1    obligation to make sure that what comes in here and what

2    takes place in this trial is relevant and it is governed by

3    the issues in the case.  And I have made my intention

4    known, that I intend to keep it to what's relevant and

5    what's probative, and not allow it to go outside the scope

6    of that.

7         The concept of what is relevant here seems to

8    continue to extend itself, or there's attempt to extend it,

9    such that I find there is a danger in getting beyond the

10   scope of what's relevant and, more importantly, misleading

11   and confusing the jury as to what is relevant on two

12   specific issues -- neither of which, I would point out for

13   the record, were presented to me for my determination on

14   summary judgment, and had it been, perhaps we wouldn't have

15   this issue -- estoppel and waiver.

16        There has been much evidence or attempt to

17   introduce evidence that the parties claim is relevant to

18   the issue of estoppel and relevant to the issue of waiver,

19   which the defendants asserted as affirmative defenses in

20   this case.

21        However, at this point it is clear to me -- now

22   that we are past the plaintiff's case and based on my

23   understanding of the evidence that will come in and won't

24   come in, and I'll give the defendants an opportunity to

25   tell me I'm wrong -- but it is clear that neither -- that

1    there is not a basis for neither of those affirmative

2    defenses not only to ultimately go to the jury but to still

3    be in the case because, to the extent they're still in the

4    case, and if there is no basis for them still being in the

5    case from an evidentiary standpoint, that is creating an

6    issue with the parties' attempts to introduce evidence that

7    they say is probative of those issues.

8         So, we're going to streamline that and we're going

9    to do it now.  So, there will be no question that, that

10   there -- as far as the relevancy of certain evidence.

11        As to estoppel.  Estoppel is a determination to be

12   made by the Court.  It is not a jury issue.  And for

13   estoppel to apply in this context as an affirmative

14   defense, the defendants must show that the copyright owner

15   was aware of the infringing conduct and yet acted in a way

16   that induced the infringer to reasonably rely upon such

17   action to his detriment.

18        In this case, as is clear from the defendants'

19   trial memorandum, the allegation is that Miss Alexander's

20   silence after she found out the use of her images in the

21   games in question is the evidence of the -- that supports

22   estoppel.  However, the cases in this circuit are clear

23   that while misleading conduct may include inaction or

24   silence in the face of a clear duty to speak, it must be

25   combined with other facts; other facts that involve the

relationship or communication between the parties to give

rise to the necessary inference that plaintiff would not

enforce the rights.

So, in other words, silence is not sufficient in

and of itself to support the defense of estoppel.  It must

be silence combined by some communication between Miss

Alexander and the defendants, or some relationship between

Miss Alexander and the defendants, and other facts such

that her silence in the face of those facts misled the

defendants to continue the conduct which is alleged to be

infringing.

To my knowledge, the only evidence that is in the

record and that the defendants will offer is Miss

Alexander's silence from whenever it was that she

discovered that her images were being used in these games.

If that in fact is the case, and there will be no

other evidence of any communication between she and the

defendants, no relationship between she and defendants, no

other facts that will even support an inference that the

defendants were misled by her silence after that point,

then there is no estoppel as a matter of law.

So, let me ask the defendants.  I already know

what's in evidence at this point.  And it's a simple

question.  By way of proffer, does defendant -- is the

defendant in a position to proffer that there will be any

1    evidence of any action, communication, relationship between

2    Miss Alexander and the defendants after 2014, 2016,

3    whenever she discovered her images in this game, that

4    misled the defendants that they were in a position to

5    continue the conduct?  Beyond silence.  Not talking about

6    silence.  I'm asking in addition to silence.  Will there be

7    any evidence other than Miss Alexander's silence?

8         Whoever wants to speak, may speak.  Would you come

9    to the podium, please.

10        Yes, ma'am?

11        MS. MEANS:  Yes, Your Honor.

12        First, there's been evidence already in the record

13   that Miss Alexander reached out to WWE in 2009 about her

14   alleged tattoos.

15        THE COURT:  No.  No.  No.  No.  I think you

16   understood my question.  My question was:  Was there any

17   action beyond her silence after she discovered her works in

18   these games.  That's my question.

19        MS. MEANS:  Your Honor, I would -- Miss Alexander

20   -- our contention just for the record is that Miss

21   Alexander --

22        THE COURT:  Not contention.

23        Counsel, do you understand my question or should I

24   restate it one more time?  My question is:  Will there be

25   any evidence of something other than silence by Miss

1  Alexander, specifically, evidence of some type of

2  communication or other relationship between Miss Alexander

3  and any of the defendants after she discovered the use of

4  her works in the games in question.

5      MS. MEANS:  Yes, Your Honor.  I understand your

6  question.

7      No.  Miss Alexander did not contact Take-Two or WWE

8  after.

9      THE COURT:  So, the only evidence that, that the

10  defendants have to offer in support of their affirmative

11  defense of estoppel is her silence until she filed this

12  lawsuit; correct?

13      MS. MEANS:  Your Honor, we -- we think that her

14  failure to assert her right -- that is, that is our

15  evidence, that she failed to assert it.  So, yes.

16      THE COURT:  That's silence.

17      MS. MEANS:  Yes.  It's our contention that that is

18  sufficient, but we understand Your Honor's question.

19      THE COURT:  Okay.  And I'm just making sure that

20  there will be no other evidence; is that correct?

21      MS. MEANS:  There's no evidence of communications

22  between Miss Alexander and Take-Two or WWE before this

23  lawsuit was filed.

24      THE COURT:  Then I find right now as a matter of

25  law that there is no basis -- there will be no legal basis

to support the affirmative defense of estoppel and I am

deciding that issue as a matter of law right now.  So, we

don't have to quibble about evidence that's relevant to the

issue of estoppel.

Thank you, counsel.

MS. MEANS:  Understood, Your Honor.

THE COURT:  On waiver.  As counsel are aware, they

both cited the same standard in their trial memorandum.

Waiver is an intentional relinquishment of a known right.

And although mere silence can be a basis for a claim of

estoppel when a legal duty to speak exists, waiver must be

manifested in an unequivocal manner.

In other words, when it comes to waiver, it has to

be more than mere silence.  There has to be some

unequivocal manifestation by the plaintiff of her intent to

relinquish her right, her known right in her copyright.

Same question.  Other than, I understand the

defendants' position that her silence supports a waiver,

I'm saying silence in and of itself is insufficient.

I'm asking, is there some unequivocal manifestation

of her intent to relinquish a known right that the

defendant believes will come into evidence from this point?

Because there is none in the record up to this point.

MS. CENDALI:  There is nothing other than what is

said.  Although I note, Your Honor, that the standard you

1    just read -- the case law you just read -- supports the

2    idea that --

3         THE COURT:  No.  No.  No.  Miss Cendali, I didn't

4    ask you to get up and give me legal argument.  I'm very

5    clear of what my intent is, at this point.  I'm giving the

6    defendants an offer -- an opportunity to make a proffer.  A

7    proffer of evidence of an unequivocal manifestation of Miss

8    Alexander's intent to relinquish her right beyond her

9    silence.

10        MS. CENDALI:  Well, our proffer would also be --

11   and we'll also do this at the end of our case -- is we

12   would also, like under the federal rules that let us read

13   into the record evidence -- from her transcript, not show

14   anything but read into the record the part of her

15   transcript where she said that she knew about this from

16   2014.  Under the federal rules, we're allowed to do --

17        THE COURT:  Miss Cendali, did you just not hear me?

18   Her silence from 2014, 2010, 2008, is not sufficient

19   without an unequivocal manifestation beyond her silence of

20   her intent to relinquish her right.  I'm asking you if

21   there is --

22        MS. CENDALI:  We have nothing --

23        THE COURT:  -- evidence of that?

24        MS. CENDALI:  We have nothing further than that,

25   Your Honor.

1        THE COURT:  Thank you, ma'am.

2        Then, as a matter of law, there would not be

3   sufficient evidence for the jury to decide waiver in this

4   case.  I'm deciding it as a matter of law now, so that all

5   parties are clear what is relevant and what is not relevant

6   as it relates to the issues that are remaining in this

7   case.

8        The only remaining affirmative defenses are implied

9   license and fair use.  Waiver and estoppel are off the

10  table, and any evidence relevant to that will be excluded.

11  We will not take up the time and resources of the jury or

12  the Court to hear that evidence.

13       Okay?  Now, I need ten minutes to eat a banana.

14  We'll be back out.

15       COURTROOM DEPUTY:  All rise.

16       (Court recessed from 1:02 p.m. to 1:09 p.m.)

17       (Proceedings continued in open court, jury

18  present.)

19       COURTROOM DEPUTY:  Please be seated.

20       THE COURT:  Mr. Simon, you may inquire.

21       MR. SIMON:  Thank you, Your Honor.

22                      CROSS-EXAMINATION

23  BY MR. SIMON:

24  Q.   Good afternoon, Mr. Orton.  I would like to clear

25  up, once and for all, a few things.  You understand that

1    Miss Alexander is not claiming you need her permission to

2    show your tattoos in public; correct?

3    A.      I consider my tattoos in the game to be me.

4    Q.      I understand.  But you understand, she's not making

5    a claim in this case that you -- Randy Orton -- can't use

6    your tattoos in public in real life?

7    A.      But real life is paying my bills and putting my

8    kids to college, and some of that money comes from those

9    games that my likeness appears in, sir.

10   Q.      All right.  Let me say it this way.

11   A.      Okay.

12   Q.      I'm her lawyer and I'm agreeing that she is not

13   claiming you need her permission to use your tattoos in

14   real life, to alter your tattoos, to do what you want with

15   your body, to be photographed, to go about your life as you

16   see fit, to be videotaped or to alter your tattoos, to

17   appear on T-shirts or appear on posters.  Do you understand

18   that?

19   A.      Mmm --

20   Q.      I'm telling you that.

21   A.      No.  No.

22   Q.      You don't under --

23   A.      No.

24   Q.      Okay.  Thank you.

25   A.      What does that mean as far as video games are

1  concerned?

2  Q.     I'm sorry.  If you don't understand, that's fine.

3  I'll move on.

4  A.     Okay.

5  Q.     You understand you are not a defendant in this

6  lawsuit.  You understand that, right?

7  A.     Yeah.

8  Q.     And you get money when those games are sold, right?

9  You get a cut of that?

10        THE WITNESS:  Can I respond, Your Honor?

11        THE COURT:  Yeah, you can --

12        THE WITNESS:  Like, without a yes or a no?

13        THE COURT:  If you can answer with a yes or no, you

14  should answer with a yes or no.

15        THE WITNESS:  Okay.

16  A.     Ask the question again, please.

17  Q.     (BY MR. SIMON)  You get a cut of the money the

18  defendants make when they sell tattoo [sic] games?

19  A.     Yes.

20  Q.     Just a little piece of a really big pie; right?

21  A.     Yes.

22  Q.     Now, you understand the only thing that Miss

23  Alexander's claiming in this case is that Take-Two and WWE,

24  the defendants, they don't have a right to make copies of

25  the tattoos she created in the video games.  Do you

1  understand that?  Yes or no.

2  A.      No.

3  Q.      Okay.  You are one of the most popular wrestlers --

4  popular WWE wrestlers of all time.  Do you agree with that?

5  A.      No.

6  Q.      Okay.  And you headline numerous Pay Per Views and

7  live events, didn't you?

8  A.      Yes.

9  Q.      What does headline mean?

10 A.      Usually, you're on the marquee or you are one of

11 the selling points to that particular show.  And we have

12 500 a year --

13 Q.      Okay.

14 A.      -- collectively.

15 Q.      And, and so headline means you are the main

16 attraction for those events?

17 A.      Yes.

18 Q.      And you have been that for many of them; correct?

19 A.      Oh, yeah.

20 Q.      All right.  Now, have you ever told -- let me back

21 up.  Withdraw that.

22         When you were getting your pictures taken for

23 putting the tattoos and reproducing them in the video game,

24 did you tell WWE or Take-Two -- the defendants here -- who

25 created your tattoos?

1    A.      No.

2           MR. KRASIK:  Objection, Your Honor, that's hearsay.

3           THE COURT:  No, he's being asked what he said.

4           MR. KRASIK:  I know, Your Honor.  But what he said

5    -- he's not a party to this case.  That's an out-of-court

6    statement.

7           THE COURT:  Overruled.

8    Q.      (BY MR. SIMON)  You testified that you've seen

9    yourself in the game?

10   A.      Yes.

11   Q.      Do you know that the tattoos that Miss Alexander

12   inked on you are in the Custom Superstar feature?

13   A.      Yes.  Yes.  I believe I -- I know exactly what you

14   are referring to, yes.

15   Q.      When did you find that out?

16   A.      When they first created it and they started taking

17   the, the more detailed pictures of our likeness.  They sit

18   us in a big dome with, like, hundreds of cameras.  It's

19   pretty --

20   Q.      Thank you.

21   A.      -- bright --

22   Q.      You have answered my question.

23   A.      Oh, okay.

24          MR. SIMON:  Pull up Exhibit 153 -- and this is

25   already in evidence -- and publish it please.  Time stamp

1  7:51 and 18:56 -- I'm sorry.  Let's start with 7:51.

2  Q.      (BY MR. SIMON) Now, what you see in front of you on

3  that exhibit, that's not a representation of you; correct?

4  A.      Those are my arms, sir.

5  Q.      Okay.  I'm going to get to that in a minute.  Right

6  now I'm asking if that's you, your likeness?

7  A.      So, the new Custom Superstar banner is across the

8  eyes, and I did have a shaved head once, so I can't be -- I

9  can't honestly say yes or no as to whether or not that's

10  me, based on how my likeness changed across my 22-year

11  career.

12  Q.      That's fine.  I'll move on.

13         MR. SIMON:  18:46 of Exhibit 153, please.

14  Q.      (BY MR. SIMON) Now, that is a representation of you

15  in the game; correct?

16  A.      Yes.  Yes, sir, with the same arms as the previous

17  exhibit.

18  Q.      Yes.

19         MR. SIMON:  Now I'm going to go to Exhibit 42,

20  which is in evidence, and I have created some stills from

21  Exhibit 42.  Could you show the witness but not publish

22  that exhibit, please.

23  Q.      (BY MR. SIMON) Sir, you understand -- you recognize

24  this as the custom tattoo feature; right?

25  A.      Yes.

Q.      And you said those are your arms --

A.      Yes.

Q.      -- before, right?

A.      Yes.

        MR. SIMON:  I'd move the admission of 162 please, Your Honor.

        THE COURT:  Any objection?

        MR. KRASIK:  No objection, Your Honor.

        THE COURT:  Plaintiff's Exhibit 162 is admitted.

Q.      (BY MR. SIMON)  Okay.  Now, sir, on the right, what I did, I played the game.  And I was trying to see if those were your arms, as we have been told.  On the right, that's not your body, right?  Those aren't your arms?

A.      Now, are you -- this isn't a photograph of a person.  This is a video game character.  You know that, right, sir?

Q.      Yes.

A.      Okay.  So, my arms can easily be put on another torso.

Q.      I'm asking you a simple question.  Are those your arms in Exhibit 162?

A.      Yes, with the tattoos on them, sir.

Q.      Okay.  In that character model?

A.      Yeah.

Q.      Okay.  And on the left, do you see all those

1  choices that you can make?

2  A.      I do, yes.

3  Q.      Those are lots of different tattoos of different

4  wrestlers, some of which you recognize; right?

5  A.      Not from here because I can't -- there's -- they're

6  not lit up.

7  Q.      Do you know that in the Custom Superstar creator,

8  other wrestlers that have tattoos are in there, in the 2K16

9  game?

10 A.      Yes, of course.

11 Q.      Like The Rock?

12 A.      Yes.

13 Q.      And his tattoo, if it's in here -- do you see it?

14 A.      No, sir.  But I'm looking.  Can you lighten up the

15 picture?

16 Q.      How about that?  (Pause.)  Do you recognize any of

17 the ones that I am showing you in this exhibit?

18 A.      I see an arm tattoo that looks like it belongs to

19 someone else, but I don't see The Rock.

20 Q.      Okay.  Who?

21 A.      Rey Mysterio, I believe, has a cross on his body

22 somewhere that looks like the, the cross on one of those

23 shoulders.

24 Q.      And is it still your testimony that that's his

25 tattoo on your arm in this game?

1    A.      Say that one more time?

2    Q.      Is it still your testimony that that's his tattoo

3    on your arm in this game?

4    A.      Yes, as far as I can tell.

5            MR. SIMON:   Okay.   Let's go to page two, please.

6    Q.      (BY MR. SIMON) Do you recognize this?

7    A.      No.

8    Q.      Now, this -- I used it to create a Custom Superstar

9    diva.   Those -- that's not a representation of your arms,

10   is it?

11   A.      Well, no, because you made a diva, sir.

12   Q.      And those aren't your body parts; right?

13   A.      The arms are, but only when I was -- earlier in my

14   career, when I was going through like a little bit of a

15   weight-cutting regimen because I wanted to get real lean.

16   Q.      Okay.   So, it's your testimony under oath to this

17   jury that those are your arms when you were more lean?  Is

18   that what you are saying, sir?

19   A.      They look like it post-surgery, post-op.

20   Q.      Let me ask you this:  Do you see the tattoo on the

21   right arm?

22   A.      My right or the other -- their right?

23   Q.      The diva's right arm.

24   A.      The diva's right, so my left.  Yes.

25   Q.      That's not --

A.      It looks the identical to the other arm on the diva.

Q.      It's a right arm and a left arm, but they both got your left arm tattoos, don't they?

A.      Right.

Q.      So, that can't be a picture of your left arm, right?  Because that's a right arm.

A.      Well, sir, if you take a picture and you flip it, it's the opposite -- I don't understand what you are getting at.

Q.      We'll move on.

A.      Okay.

Q.      We'll move on.  I don't want to keep doing this, if you don't understand.

A.      Yeah, thanks.

Q.      Those aren't your body parts though, right?

A.      Agree to disagree?

Q.      Okay.  Now, you're aware that some WWE wrestlers in the game -- the games at issue in this case -- that have tattoos in real life, don't have those same tattoos in the video games?

A.      Is that a question?

Q.      Yes.  Are you aware of that?

A.      No.

Q.      Okay.  So, you didn't know that?

1    A.        No.   That there is talent that has games in the

2    game, that they don't have in real life?   No.

3    Q.        No.   Let me make sure we're clear.   There's

4    wrestlers in WWE who have tattoos.   You understand that,

5    right?

6    A.        Yes.

7    Q.        Other than you?

8    A.        Yes.

9    Q.        And your tattoos are reproduced in the game on your

10   game character; right?

11   A.        Okay.  Right.  Follow.

12   Q.        Okay.  And there's others who have tattoos in real

13   life, but their game character in the game doesn't have

14   those tattoos reproduced --

15   A.        Ahh --

16            MR. KRASIK:  Objection, Your Honor, relevance.

17   Q.        -- did you know that?

18   A.        Well --

19            THE COURT:  Hold on.  Hold on for a minute.

20            MR. KRASIK:  Objection, Your Honor, relevance.

21            THE COURT:  Overruled.

22            You can answer the question.

23   Q.        (BY MR. SIMON)  Did you know that --

24            THE WITNESS:  Oh, okay.

25   A.        Well, here's why.  Because --

1    Q.      I'm not asking why, sir.

2    A.      -- if you get a tattoo or --

3    Q.      I'm just asking --

4    A.      -- they make a game --

5            THE COURT:  Mr. Orton?

6    A.      -- after you got the tattoo --

7            THE COURT:  Mr. Orton?  Mr. Orton?

8            THE WITNESS:  I'm sorry.  Yes?

9            THE COURT:  Mr. Orton?

10           THE WITNESS:  Yes, Your Honor?

11           THE COURT:  Can you answer the question that he is

12   asking you?

13   Q.      (BY MR. SIMON)  Which is, did you know?

14   A.      Could you repeat the question?

15   Q.      Yes.  Did you know that there's WWE wrestlers that

16   have tattoos in real life that are not in the video games

17   at issue in this case?

18   A.      No.

19   Q.      Thank you.

20           MR. SIMON:  I have nothing further, Your Honor.

21           THE COURT:  Mr. Krasik?

22           MR. KRASIK:  No further questions, Your Honor.

23           THE COURT:  Okay.  You may step down, Mr. Orton.

24   Thank you.

25           THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  You may call your next witness.

2          MR. KRASIK:  Thank you, Your Honor.  Defendants

3   call Ed Kiang, who is in the hallway.  So, we'll just let

4   him know to come in.

5          THE COURT:  Please step forward.

6          (Witness sworn by courtroom deputy.)

7          THE WITNESS:  Ed Kiang.  K-I-A-N-G.

8          THE COURT:  You may proceed.

9          MR. KRASIK:  Permission to approach the witness

10  with a witness binder?

11         THE COURT:  Yes.

12                    *  *  *  *  *

13                    EDWARD KIANG,

14  having been first duly sworn, was examined and testified as

15  follows:

16                  DIRECT EXAMINATION

17  BY MR. KRASIK:

18  Q.     Good afternoon, sir.  Would you please introduce

19  yourself to the jury?

20  A.     Hi.  I'm Ed Kiang.

21  Q.     Earlier in the trial, Mr. Kiang, the jury saw a

22  portion of your deposition by videotape.  So, we're not

23  going to repeat any of the testimony that they have heard

24  already, which I'm sure they're thankful for.  And -- but

25  I'll just ask one foundational question.  Could you remind

1    the jury of your position with WWE?

2    A.    Sure.   It's Vice President Interactive Media

3    Licensing.

4    Q.    Okay.   And are you still employed by WWE?

5    A.    No.

6    Q.    Okay.   When did your employment with WWE end?

7    A.    January 2022.

8    Q.    And why did your employment with WWE end?

9    A.    My role was impacted by layoffs.

10   Q.    So, you were laid off by WWE?

11   A.    Correct.

12   Q.    Okay.   And are you currently employed, sir?

13   A.    I am.

14   Q.    And by who are you currently employed?

15   A.    The National Football League.

16   Q.    You'll understand if I refer to it as the NFL?

17   A.    Yes.

18   Q.    Okay.   What's your position with the NFL?

19   A.    Vice President Video Gaming.

20   Q.    And what do you do, sir, as Vice President Video

21   Gaming of the NFL?

22   A.    I manage the overall, you know, video game

23   portfolio including our flagship product, the Madden NFL

24   franchise.

25   Q.    And is your role as Vice President Video Gaming at

1  the NFL different than what you did as Vice President

2  Interactive Media Licensing at WWE?

3  A.      There are some similarities and differences.  I

4  would say, you know, at WWE, we had a smaller team, so we

5  wore a lot more hats in terms of just the different

6  products that we produced.

7          At the NFL, we have more resources to work with, so

8  I focus just on video games.  And even within the video

9  game category alone, we have a larger team.  So, you know,

10  I focus a lot of my time more on the business strategy and

11  business development, less so on day-to-day account

12  management and product approvals.

13  Q.      Mr. Kiang, since you no longer work at WWE, why are

14  you here today?

15          MR. FRIEDMAN:  Objection to relevance.

16          THE COURT:  Sustained.

17  Q.      (BY MR. KRASIK)  Are you the person with relevant

18  knowledge about the 2K16, 17, and 18 games?

19  A.      Yeah, I -- I managed the business when those games

20  came out.

21  Q.      Okay.  Sir, let me ask you if I could, when you

22  were laid off by WWE in January 2022, did you enter into a

23  severance agreement with WWE?

24  A.      I did, thankfully.

25  Q.      And are you being paid for your testimony here

1    today?

2    A.      No.

3    Q.      And do you get paid more or less money under your

4    severance agreement depending on what you testify in this

5    lawsuit?

6    A.      No.

7    Q.      Sir, if I could, let me take you back to your time

8    at WWE.  For those members who might be unfamiliar with

9    WWE's business, would you please describe, what is WWE's

10   business?

11   A.      Sure.  So, you know, WWE produces live events and

12   shows around, you know, a unique style of professional

13   wrestling.  They refer to it as sports entertainment.

14   Q.      And would you describe for the jury what happens in

15   a WWE show?

16   A.      Sure.  So, you know, any of the WWE shows, we have

17   a number of performers.  And, you know, they are commonly

18   referred to as pro wrestlers.  At WWE, they refer to them

19   as WWE Superstars.  And those Superstars, you know, some of

20   them will play the role of a good guy; sometimes you have

21   instances with people playing a bad guy.  Through the

22   narrative in the storyline of the programming, sometimes

23   the good guys become bad guys, and vice versa.

24           What would make WWE programming fairly unique and

25   distinct is the fact that their version of conflict and

1   resolution happens inside of a wrestling ring.

2   Q.    Mr. Kiang, how is WWE content distributed to its

3   fans?

4   A.    There are a variety of platforms.  So, a lot of

5   people watch it through television, you know, broadcast and

6   cable.  It's also available to stream over the internet

7   through WWE Network, which is available on Peacock here in

8   the United States.  WWE.com, as well as a variety of social

9   media platforms, have WWE content.  And people can enjoy

10  the show at live events in arenas around the world.

11  Q.    Now, how did your position as WWE's Vice President

12  Interactive Media Licensing fit into WWE's business?

13  A.    Well, WWE works with a number of partners to

14  produce this, you know, merchandise and products around the

15  content and the shows that they create.  Interactive

16  products like video games are a category within that

17  merchandising business.

18  Q.    And what types of products did you manage as WWE's

19  Vice President Interactive Media Licensing?

20  A.    It covered video games; it covered home videos like

21  DVDs and Blue Ray; also, managed publishing and

22  location-based entertainment.

23  Q.    And I believe you said WWE gives the rights to

24  these other companies to make these products based on

25  content?

A.      Correct.

Q.      Can you explain what you mean by that?

A.      Sure.  So, WWE works with a variety of partners, you know, like a Take-Two, to grant them certain rights in terms of the intellectual property that they own or control, so that they can produce a variety of different types of products, again, T-shirts, hats, hoodies, title belts.  People love those.

Q.      What are examples of the intellect -- when you say the intellectual property, what are examples of the intellectual property that WWE owns or controls?

A.      So, I'm not a lawyer.  But, you know, the way it impacts my business is that there is all sorts of intellectual property that, that -- you know, whether it's like trademarks in terms of the WWE marks and the logos. The company owns a number of events.  So, I think Wrestlemania, Survivor series, the Royal Rumble, shows that they produce like Monday Night Raw or Friday Night Smack Down, as well as the name and likenesses of the WWE Superstars.

Q.      Mr. Kiang, in the testimony that the jury saw earlier from your deposition, you testified that WWE has a contract with Randy Orton that gave WWE the right to use his name and likeness.  Do you recall that?

A.      That's correct.

1    Q.      Okay.  And what do you understand his likeness to

2    mean, in your business?

3           MR. FRIEDMAN:  Objection, calls for legal

4    conclusion.

5           THE COURT:  I'm sorry.  Counsel, I can't hear you.

6           MR. FRIEDMAN:  I'm sorry.  Objection, calling for a

7    legal conclusion.

8           THE COURT:  I think the question was what he

9    understood from the context of his business.  Overruled.

10   Q.      (BY MR. KRASIK)  You can answer, sir.

11   A.      Okay.  Yeah, I think just everything about his

12   appearance in terms of, you know, his hair or his face, his

13   body type, the clothes he wears, the tattoos on his body.

14   Q.      Do many WWE Superstars have tattoos, sir?

15   A.      Yes.

16   Q.      And what is your understanding about WWE's right to

17   use and to authorize its business partners to use the

18   tattoos that are inked on WWE Superstars?

19   A.      Well, my understanding is that those rights are

20   granted by the WWE Superstars to WWE and its partners for

21   the creation of WWE products.

22   Q.      While you were WWE's Vice President of Interactive

23   Media Licensing, were the tattoos inked on WWE Superstars

24   depicted in WWE video games?

25   A.      Yes, they were.

1    Q.      And while you were WWE's Vice President Interactive

2    Media Licensing, did WWE ever seek permission from a tattoo

3    artist to use a tattoo that is inked on a WWE Superstar in

4    a video game?

5    A.      No.

6    Q.      Okay.  You testified earlier that, as WWE's Vice

7    President Interactive Media Licensing, you managed, among

8    other things, the licensing of video games --

9    A.      That's correct.

10   Q.      -- do you recall that?

11   A.      Yes.

12   Q.      Why is WWE involved in the business of licensing

13   video games?

14   A.      Well, we found that a lot of our fans, and people

15   who are WWE fans, like video gaming in general.  But in

16   addition, I think it's a great tool for keeping people

17   engaged outside of our weekly programming.

18   Q.      And while you were WWE's Vice President Interactive

19   Media Licensing, how many video games did WWE license?

20   A.      We created a number of games.  So, the WWE 2K

21   franchise alone released a title about every year.  And in

22   addition to that, we produced about eight new video game

23   franchises during my time there, as well as a number of

24   branded integrations.

25   Q.      And why does WWE license so many different video

1  games?

2  A.     Well, WWE has a really diverse audience.  I think

3  one of the things that we found is that when you look at,

4  you know, the people that come to our live events, you

5  have, you know, folks that are grandparents, who have been

6  watching the brand for decades, literally; you have little

7  kids coming in to discover WWE for the first time; and, you

8  have everyone in between.

9       And so, when you look at the types of games that

10 people enjoy, they gravitate towards different gameplay

11 mechanics.  You know, anyone that has kids knows that, you

12 know, what a 5-year-old plays is really different than what

13 a 12-year-old plays, which is really different than what a

14 15-year-old plays, and then, you know, 25 and 45.

15      So, what we really wanted to do was create a

16 portfolio of games that mirrored the diversity of our

17 audience.

18 Q.     Mr. Kiang, in the testimony that the jury saw

19 earlier from your deposition, you were asked a lot of

20 questions about the process by which WWE reviews and

21 approves aspects of video games.  And we're not going to go

22 over any of that.

23      But what I do want to focus on is, you were asked

24 the question but didn't have an opportunity to expand upon

25 it, that you said that the review of games differs in light

1    of the style of game you were reviewing.  Do you recall

2    that testimony in general?

3    A.      Yeah.

4    Q.      What do you mean by that?

5    A.      Well, you know, like I was saying before, we have

6    created a number of games.  So, you know, for example, we

7    had one game titled WWE Mortals, which was a little more

8    fantastical and supernatural in nature.  So, the idea was

9    one of the Superstars, who's supernatural in nature, opens

10   a portal and brings in Superstars from other dimensions.

11   And so, in that regard, it gave you a lot more freedom to

12   create characters that contain the essence of the WWE

13   characters but, you know, were more overpowered in terms of

14   like superhero in terms of, you know, the design that they

15   had.

16          You know, someone like -- if you are familiar with

17   one of our Superstars, Cain.  In our storyline, he's

18   supposed to be a demon.  He wears a mask and an outfit.

19   But in the game, we make him look like an actual demon.

20   And so, it's true and authentic to who he is in our show,

21   but also authentic to what we're trying to create in that

22   game environment.

23          And something that would have been approved for

24   that type of game might not have been approved for like a

25   more cartoony kids game that we were making, you know, for

1    our youth audience, versus like our more, you know, super

2    realistic games that we have done with the WWE 2K

3    franchise.

4    Q.    Okay.  So, let's start there.  For WWE 2K, could

5    you -- we have heard testimony, but just briefly describe

6    to the jury from your perspective, as the executive who

7    oversaw the 2K games at issue in this case, what kind of a

8    game is 2K and what kind of gameplay experience is

9    intended?

10   A.    Sure.  So, the WWE 2K franchise is what we refer to

11   as sports simulation.  So, the idea is that it replicates

12   what fans watch on TV, whether, you know, Monday Night Raw

13   or one of our Pay Per View events.  It's just a true

14   reflection of what the Superstar looks like, what the ring

15   environment looks like, lighting, pyro, just the overall

16   WWE experience.

17   Q.    Sir, did WWE make a game while you were there

18   called WWE 2K Battlegrounds?

19   A.    Yes, it did --

20         MR. FRIEDMAN:  Your Honor, objection.  Objection

21   to --

22         THE COURT:  I'm sorry?  Counsel, you need to get to

23   a microphone.  I can't hear you.

24         MR. FRIEDMAN:  Your Honor, I object as to

25   relevance.  Video games that are not involved in this case

1    are being displayed on the screen, and questions are being

2    asked about them.  This is not about 2K.

3            THE COURT:  Mr. Krasik?

4            MR. KRASIK:  Sidebar, Your Honor?

5            THE COURT:  Please.

6            (Proceedings continued at the bench.)

7            THE COURT:  You heard the objection, correct?

8            MR. KRASIK:  Yes, I did, Your Honor.  This is what

9    was previewed the other morning.

10           THE COURT:  Okay.

11           MR. KRASIK:  And, hopefully, there's a little more

12   context that Your Honor can understand the question now

13   that Mr. Friedman specifically introduced this issue in Mr.

14   Kiang's deposition that we saw by video.

15           THE COURT:  What's the issue?

16           MR. KRASIK:  The issue is the type of review --

17   what is reviewed and what is, what is the intent of the

18   review of the -- of different video games.  And what Mr.

19   Kiang is illustrating is that the type of review and the

20   issues that are looked at in review of one type of game

21   such as the 2K games may not be relevant in other games.

22   And he's going to explain that different analysis.

23           THE COURT:  He just testified to that, for

24   instance, when he talked about -- what's the -- Cain.

25           MR. KRASIK:  Mm-hmm.

1          THE COURT:  He explained that --

2          MR. KRASIK:  And I was going to go through other

3    ones, so he could do that for the jury, because I think it

4    would be helpful for them to understand that concept.

5          THE COURT:  I'm not sure what -- why it's relevant.

6    I mean, again, the fact that they go through different

7    reviews for different things, how does that relate to

8    implied consent?  How does that relate to fair use?  How

9    does that relate to damages?  How does that relate -- I

10   mean --

11         MR. KRASIK:  Right.  Two ways, Your Honor.  First

12   of all, the plaintiff has spent a lot of time and effort in

13   this case emphasizing that WWE approved these tattoos and

14   required them to be as accurate as possible for the 2K

15   games.

16         THE COURT:  Yes.

17         MR. KRASIK:  The reason they did that was the type

18   of game that it was.  That's -- that it is different than

19   these other games and their review would not have been --

20   would not have been necessary or appropriate for these

21   other games.

22         THE COURT:  But it doesn't matter.  The fact --

23   what matters is the reason they did it in this case or with

24   respect to the games in question -- which I don't think

25   there's any dispute --

1    MR. KRASIK:  There isn't -- I'm sorry, Your Honor,

2    did I cut you off?

3    THE COURT:  Yes.  -- there isn't any dispute.  And

4    again, I'm trying to give you leeway, Mr. Krasik.  But the

5    fact that -- the reason that they did it with respect to

6    the 2K games, that it -- that the realism was important and

7    why it may not be important someplace else is irrelevant to

8    the issues in this case with respect to the 2K games.

9    MR. KRASIK:  Your Honor, I -- I'm sorry.

10    THE COURT:  Honestly?  The -- not everything about

11    WWE's operations, their approach, that what's important,

12    was relevant to the issues in this case.  And that's what

13    I'm trying to keep it to.  And again, I'm not understanding

14    why a -- I forgot the name of the game -- that is not one

15    of the games alleged to be an infringing game in this case.

16    Any discussion about that game is irrelevant unless it's --

17    there is some issue which contains Miss Alexander's works,

18    or there is some other issue that is probative in this

19    case.  And I'm not seeing it, Mr. Krasik.

20    MR. KRASIK:  Two reasons, Your Honor.  One, it

21    shows how WWE treated video -- tattoos in all of their

22    video games consistently.  There was nothing unique about

23    the 2K games.  And secondly, to give -- when you say they

24    -- that what's at issue here is their review of the 2K

25    games?  That's right.  But the jury doesn't understand the

1    context in which that review took place.  And therefore,

2    they think, *Oh, they just want to copy accurately the*

3    *tattoos in every circumstance*.  And that's not right.  It's

4    based on the purpose of the game.

5         THE COURT:  But it doesn't matter.  It doesn't

6    matter what they do in every circumstance.  What matters

7    is, did they copy the works in this case.  All right?  And

8    things that are relevant about the works that were copied

9    in this case.  It doesn't matter what you do generally.  It

10   doesn't matter.

11        MR. KRASIK:  We think that context for the jury

12   would be very helpful, in addition to showing them the

13   consistency of WWE's position in all of its video games.

14        THE COURT:  He already testified that they have

15   never had a license with any tattoo artist.

16        MR. KRASIK:  Okay.

17        THE COURT:  I think that's pretty consistent.

18        MR. KRASIK:  Okay.

19        THE COURT:  Let's move on.

20        (Proceedings continued in open court, jury

21   present.)

22        MR. KRASIK:  Your Honor, may I have a moment with

23   my trial tech?

24        THE COURT:  Sure.

25        (Off the record.)

1    Q.      (BY MR. KRASIK)  Mr. Kiang, a few minutes ago, I

2    believe, you testified that you are unaware of WWE ever

3    entering into -- or ever licensing from a tattoo artist the

4    rights for a tattoo to appear on a WWE wrestler who is in a

5    video game; is that correct?

6    A.      That's correct.

7    Q.      Okay.  And that applies to all of WWE's video games

8    and any art style, any genre, no matter what?

9    A.      That's correct.  Yes.

10   Q.      Okay.  Mr. Kiang, I want to go to another topic

11   that was first raised at the deposition testimony that the

12   jury saw by video earlier.  You were asked in a lot of

13   different ways if WWE would have approved Randy Orton's

14   model in the WWE 2K games, if the model did not have

15   tattoos.  Do you recall that line of questioning, sir?

16   A.      I do.

17   Q.      Okay.  Would WWE have approved Randy Orton's model

18   in the WWE 2K games if he had blond hair?

19   A.      Not in the normal course of the game, no.

20   Q.      Would WWE have approved Randy Orton's model in WWE

21   2K games if he was wearing jeans in the ring?

22   A.      Again, no, not for normal play.

23   Q.      Would WWE have approved Randy Orton's model in the

24   WWE 2K games if he was wearing sneakers instead of black

25   wrestling boots?

1    A.        No.

2    Q.        Would WWE have approved Randy Orton's model in the

3    WWE 2K games if he was wearing a mask?

4    A.        Again, not -- not for normal play

5    Q.        Would WWE have approved Randy Orton's depiction in

6    the WWE 2K games if his ring entrance had the wrong song?

7    A.        No.   That, that would have been flagged.

8    Q.        Would WWE have approved Randy Orton's depiction in

9    the WWE 2K games if any aspect of his model was different

10   than the way fans are used to seeing him in WWE

11   programming?

12   A.        No.   Again, if we noticed it, we would have flagged

13   if for, for further comment.

14   Q.        In your review of Randy Orton's model, his tattoos

15   were only one of many aspects that would have caused you

16   not to approve the model for the game; is that right?

17   A.        That's correct.

18   Q.        In your deposition testimony that the jury saw

19   earlier by videotape, you were asked a question -- several

20   questions, I think -- about the royalties that WWE is paid

21   by Take-Two for the WWE 2K games.  Can you explain -- and

22   -- but you weren't given a chance to really explain that

23   concept.  Could you explain to the jury what royalties are,

24   first of all?

25   A.        Yeah.  So, you know, the way we work with Take-Two

1    is that, you know, they generate revenue from the sale of

2    the games.  And we enter into a licensing agreement with

3    Take-Two, where we earn a royalty off of the sales that

4    they generate.  So, in this case, they would earn revenue

5    off of the sale of the game and then we get a, you know,

6    certain percentage of that for WWE.

7    Q.    So, all -- is all of the money that WWE makes from

8    the WWE 2K games what Take-Two pays it?

9    A.    That's correct.

10   Q.    WWE doesn't make it -- there's no other pool of

11   money that WWE makes, separate from what Take-Two pays it?

12   A.    No.

13   Q.    Okay.  And so, whatever -- all of the money that

14   Take-Two makes from sales of the games, only the -- some

15   subset of that is paid to WWE?

16   A.    That's correct.

17   Q.    Okay.  Let me direct your attention to the screen,

18   please, sir.  I'm showing you on slide 16 a screen from a

19   feature in WWE 2K16.  Do you see that, sir?

20   A.    I do.

21        THE COURT:  I'm sorry, counsel.  Is this already in

22   evidence?  And if so, could you identify the exhibit

23   number?

24        MR. KRASIK:  Oh, I'm sorry.  It's on the screen,

25   Your Honor, but Plaintiff's 42.

1        THE COURT:  Okay.  Thank you.

2   Q.      (BY MR. KRASIK)  And I'm going to click through two

3   other screens to show other parts of this feature.

4   (Pause.)  Okay.  Are you familiar with this feature in WWE

5   2K16?

6   A.      I am.  It's the Create a Superstar.

7   Q.      Okay.  And for how long has the Create a Superstar

8   feature been part of the WWE 2K Games?

9   A.      My understanding is, the Create a Superstar has

10  been in WWE games for a number of years, starting with THQ.

11  And, you know, when Take-Two took over the business, they

12  used the same development studio, a company called Yuke's,

13  in Japan.  So, a number of these features carried forward

14  into the Take-Two franchise when they took over.

15  Q.      Let's break down that answer for the jury.  So, the

16  Create a Superstar feature has been in the game before

17  Take-Two made WWE video games?

18  A.      That's correct.

19  Q.      Okay.

20  A.      In the original THQ games.

21  Q.      And who is THQ?

22  A.      It was another video game partner that WWE had

23  worked with, prior to Take-Two.

24  Q.      So, THQ was the company that made WWE video games

25  before Take-Two?

1    A.      Correct.

2    Q.      Okay.  And you mentioned another company that

3    helped with the development of the game.  Can you explain

4    what that means, sir?

5    A.      Yeah.  So, when we work with these partnerships,

6    like the relationship that we have with Take-Two, they are

7    the publishing partner, and they may work with a

8    development studio that actually writes the code for the

9    game.  So, in this case, Yuke's had actually been the

10   developer for both THQ and for Take-Two.

11   Q.      Okay.  So, a company called Yuke's develops the

12   game first for THQ; is that right?

13   A.      Correct.

14          MR. FRIEDMAN:  Objection to relevance, foundation.

15          THE COURT:  And a little leading.  I mean, counsel,

16   you don't need to restate what the witness said.  And what

17   is the relevance, again?  I know you want to have context.

18          MR. KRASIK:  Well, I'm getting to what the

19   Superstar game is, but I want the jury to understand how it

20   got in there.

21          THE COURT:  From the standpoint of the case, they

22   don't care because it's not relevant.  Could you --

23          MR. KRASIK:  Okay.

24          THE COURT:  -- counsel -- for three days, we have

25   been hearing about the Superstar.

1          MR. KRASIK:  Mm-hmm.

2          THE COURT:  And in all due respect, context is not

3    always relevant and I'm trying to keep us, in terms of what

4    is relevant for this jury's consideration.

5          MR. KRASIK:  Okay.  I'll move on, Your Honor.

6          THE COURT:  Thank you.

7    Q.    (BY MR. KRASIK)  To go back to your answer, so we

8    could move on.  The Create a Superstar feature was in WWE

9    video games before Take-Two ever made a video game; right?

10   A.    Yes.

11   Q.    Okay.  A WWE video game, to be clear?

12   A.    Yes.

13   Q.    What does the Create a Superstar feature allow a

14   player to do?

15   A.    It allows a player to make customizable versions of

16   WWE Superstars in the game.

17   Q.    Okay.  And what are examples -- different aspects

18   of the playable character that a player can choose?

19   A.    Yeah.  They can pretty much customize anything, so,

20   body type, hairstyle, facial features, tattoos, clothing,

21   their entrances, the music.  Pretty much anything that has

22   to do with this Superstar itself.

23   Q.    And for body art.  Can a player use Randy Orton's

24   tattoos for their own playable character?

25   A.    My understanding is that in WWE 2K16, in, you know,

1    this particular version, you are able to select these body

2    parts that you just showed here, so the back, the left arm

3    and the right arm, and those are just available from a menu

4    within, within the system.

5         But you aren't able to like cherry pick a, you

6    know, aspect of that tattoo.  You couldn't just take a

7    skull out and put it somewhere else or, you know, take away

8    the rest of the tattoos.

9         So, in that regard, you are not really picking the

10   tattoos as much as you are picking the parts of Randy Orton

11   that happen to have the tattoos on them.

12   Q.    I'm sorry.  If you --

13   A.    I was just going to say that, you know, the other

14   thing worth noting, though, is that -- and I think it goes

15   back to the Yuke's piece -- is that this particular feature

16   was no longer available when the next generation versions

17   of the game came out, for 2K17 and 2K18.

18   Q.    So, the Create a Superstar feature where you could

19   pick Randy Orton's arm with the tattoos, or back with the

20   tattoos, that was not in WWE 2K17 or 18?

21   A.    That's correct.

22   Q.    Okay.  Mr. Kiang, as the Senior Vice President

23   Interactive Media Licensing who oversaw the WWE 2K games

24   that are at issue, did WWE understand that what we see in

25   this Create a Superstar game is part of Randy Orton's

1    likeness rights that WWE -- or that Randy Orton had granted

2    to WWE?

3    A.    That's correct.  They appear as he appeared as a

4    person.

5    Q.    Okay.  Mr. Kiang, in connection with your

6    involvement in this lawsuit, have you heard Ms. Alexander's

7    claim that she contacted WWE sometime in 2009?

8    A.    Yes, I have heard that.

9    Q.    Okay.  And do you recall that that was in response

10   to a rumor she heard that WWE intended to manufacture faux

11   nylon sleeves with Randy Orton's tattoos on them?

12   A.    Yes, that was my understanding.

13   Q.    Okay.  Now, in connection with this lawsuit, did

14   WWE investigate to try to determine if any such

15   communication ever occurred?

16   A.    Yes.  The company looked through documents and

17   e-mails, all e-mail records from, from the period.

18   Q.    And what was the result of WWE's investigation?

19   A.    They didn't find any evidence of that

20   communication.

21   Q.    Were e-mails and documents searched of everyone who

22   was in the law department in 2009?

23   A.    That was my understanding, yes.

24   Q.    And there was no evidence that could be found that

25   this call ever occurred?

1    A.    Correct.

2    Q.    So, from WWE's perspective, it has no reason to

3    believe that this call ever occurred?

4         THE COURT:  Counsel?

5    A.    No.

6         THE COURT:  You Know that is not a proper question.

7         MR. KRASIK:  Move on, Your Honor.

8         THE COURT:  Mr. Krasik?  Again, I'm trying to give

9    you all the leeway to defend your case, but you must

10   properly do so.

11        MR. KRASIK:  Yes, Your Honor.

12        THE COURT:  Okay?

13        MR. KRASIK:  Yes, Your Honor.

14   Q.    (BY MR. KRASIK)  Sir, I'm going to wrap up with a

15   couple questions from your experience as a licensing

16   executive for two of the biggest brands in the licensing

17   world.  In your experience as a licensing executive, have

18   you ever sought permission from a tattoo artist for someone

19   to appear in a video game as he or she looks in real life,

20   with tattoos inked by the tattoo artist?

21   A.    No.

22   Q.    Mr. Kiang, in your experience as a licensing

23   executive, are you aware of any company seeking permission

24   or a license from a tattoo artist for someone to appear in

25   a video game as he or she looks in real life, with tattoos

1    inked by the tattoo artist?

2    A.      No.

3    Q.      In your experience as a licensing executive, are

4    you aware of a market for licensing tattoos in video games?

5    A.      No.

6            MR. KRASIK:  No further questions at this time,

7    Your Honor.

8            THE COURT:  Cross-examination?

9            MR. FRIEDMAN:  Yes, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. FRIEDMAN:

12   Q.      Good afternoon, Mr. Kiang.

13   A.      Hi, there.

14   Q.      You'll remember me.  We met briefly via Zoom for

15   your deposition sometime ago.

16   A.      (Nonverbal response.)

17   Q.      I have a few things I'd like to ask you questions

18   about.  I shouldn't take up too much of your time.

19           I'd like to start with this Custom Superstar

20   creator that you just nearly concluded your testimony with.

21   The Custom -- the Custom Superstar creator, I think what

22   you were trying to explain was that it utilizes Randy

23   Orton's body parts in order to allow a video game user to

24   mix and match different players' body parts into a Custom

25   Superstar.  Is that fair?

1    A.      Yeah, I think that's correct.

2    Q.      Okay.  So -- and I think you also concluded that it

3    was your understanding that the likeness that WWE licenses

4    for Mr. Orton allows them to utilize Mr. Orton's body

5    parts, tattoos and all, in the Custom Superstar creator; is

6    that right?

7    A.      Well, his entire likeness for anywhere in the game,

8    yes --

9    Q.      And that would include --

10   A.      -- inclusive of Create a Superstar.

11   Q.      Right.  And that would include, in your view,

12   utilizing just an arm or a torso or a back; right?

13   A.      Yes.

14   Q.      Okay.

15           MR. FRIEDMAN:  Could we look at Exhibit 162,

16   please, which has been admitted.

17   Q.      (BY MR. FRIEDMAN) Mr. Kiang, do you recognize

18   Plaintiff's Exhibit 162 as that same Custom Superstar

19   feature?

20   A.      I do.

21   Q.      All right.  Do you see the arms displayed on this

22   Custom Superstar?

23   A.      I do.

24   Q.      They appear to bear the tattoos that Mr. Orton

25   bears in real life and that Miss Alexander has asserted in

1    this case; right?

2    A.      Yes.

3    Q.      They're the same tattoos.

4    A.      They are Randy Orton's tattoos.

5    Q.      Okay.  Is what you are saying then that these arms,

6    in Exhibit 162, are also Mr. Orton's arms?

7    A.      I believe they have been edited.

8    Q.      Okay.  They're his arms, but they have been edited?

9    A.      Yes.

10   Q.      Similarly, in the arms of this woman in Exhibit

11   162, this Custom Superstar diva, is it also your contention

12   that these are also Mr. Orton's arms?

13   A.      Yes.

14   Q.      Including the diva's right arm?

15   A.      I'm not really an expert on Randy Orton's arms.

16   Q.      Okay.  Were you in the courtroom during the

17   testimony of Mr. Orton?

18   A.      No.

19   Q.      You were not, okay.  You see the right arm bears

20   the dove tattoo?

21   A.      Okay.

22   Q.      Okay.  Are you aware that Mr. Orton carries the

23   dove tattoo on his left arm?

24   A.      I wouldn't know which arm it was on, but.

25   Q.      Okay.  That's fine.  That's fine.  We can move on.

1          MR. FRIEDMAN:  Can we go back to the first page of

2     this exhibit?  And, Zack, could you blow up the chart

3     there, the number of boxes that you can select?  All the

4     different tattoos?

5     Q.     (BY MR. FRIEDMAN)  Mr. Kiang, what you are seeing

6     on your screen right now, is it also your contention then

7     that all of these arms are also Mr. Orton's arms, all

8     appearing on the same model?

9     A.     In every box?

10    Q.     Yes.

11    A.     I can't tell what they are.

12    Q.     Okay.  Well, you see --

13    A.     They're grayed out.

14    Q.     -- a model -- or I think Dr. Zagal called it a

15    mannequin -- in the same pose repeated a number of times,

16    at least in rows 2, 3, 4.  Do you see those?

17    A.     2, 3, and -- okay.

18    Q.     You'll agree with me that that mannequin is in the

19    same pose in each of those --

20    A.     Yes.

21    Q.     -- boxes?

22    A.     Yes, they're in the same pose.

23    Q.     And that his arm's in the same place, his face is

24    in the same place.  It's the same mannequin.

25    A.     Okay.

1   Q.      Is that fair?

2   A.      Yes.

3   Q.      And yet, that mannequin has different tattoos.  You

4   agree with that?

5   A.      Yes.

6   Q.      So, in each of those mannequins, is that also Mr.

7   Orton's arm in every one of those?

8   A.      I don't know whose arm that -- I think that's just

9   a mannequin.

10  Q.      But you'll agree with me, it's the same arm?

11  A.      It's -- yes.

12  Q.      With different tattoos?

13  A.      Correct.

14  Q.      Okay.  But the arm that is lightened up, that's

15  being selected right now, is Mr. Orton's arm with Mr.

16  Orton's tattoos?

17  A.      I believe it is Randy Orton's arm applied to a

18  mannequin.

19  Q.      Okay.  All right.  And these other arms then are

20  Mr. Orton's arms, but with different tattoos?

21  A.      Those may be different arms on a mannequin.

22  Q.      I thought they were the same arms?

23  A.      Well, you're saying -- it's the same mannequin.

24  Q.      Okay.  It's the same mannequin with different arms;

25  is that right?

1    A.      Well, applied from different body parts from

2    different Superstars.

3    Q.      Okay.  Thank you.

4           MR. FRIEDMAN:  We can take that down.

5    Q.      (BY MR. FRIEDMAN)  Mr. Kiang, you testified on

6    direct examination that the WWE approves all the content

7    that WWE may license, all of the WWE intellectual property

8    that it may license to a company like Take-Two; is that

9    right?

10   A.      That's correct.

11   Q.      All right.  And approval is required before any

12   sales can commence?

13   A.      Approval of individual assets, yes.

14   Q.      And with respect to these particular games -- to

15   keep it focused on this case, the 2K16, 17, and 18 games --

16   WWE's approval was required before Take-Two could release

17   and sell any of those games; right?

18          MR. KRASIK:  Objection, Your Honor.  This was

19   covered at great length in the videotape deposition.

20          THE COURT:  I agree.  Sustained.

21          MR. FRIEDMAN:  Okay.  Very good.

22   Q.      (BY MR. FRIEDMAN)  I just wanted to set that up as

23   a predicate for my next questions.

24          THE COURT:  Mr. Friedman, could you limit your

25   examination at this point to what was covered in court.

1  We're not doing repetitive of what has been testified to by

2  deposition.

3        MR. FRIEDMAN:  Yes, Your Honor.

4        THE COURT:  Thank you.

5  Q.    (BY MR. FRIEDMAN)  Mr. Kiang, it's your contention

6  that WWE's license that it obtained from Mr. Orton contains

7  rights to his tattoos; correct?

8  A.     To his entire likeness, inclusive of his tattoos,

9  yes.

10 Q.     And are you aware that other WWE wrestlers besides

11 Mr. Orton also bear tattoos on their bodies?

12 A.     Yes.

13 Q.     And you are aware that other wrestlers, other than

14 Mr. Orton, who have tattoos also appear as characters in

15 the Take-Two games at issue here; right?

16 A.     That's correct.

17 Q.     Okay.  Mr. Kiang, are you familiar with the WWE

18 wrestler Chris Jericho?

19 A.     I am.

20 Q.     And in fact, Mr. Jericho also has a number of

21 prominent tattoos; right?

22 A.     He does.

23 Q.     In fact, he appeared on the WWE's website of "The

24 Top 20 Coolest Tattoos"; right?

25        MR. KRASIK:  Objection, Your Honor --

1    A.      I have no idea.

2          MR. KRASIK:   -- relevance with respect to Chris

3    Jericho's tattoos.

4          THE COURT:   Overruled.   I'm assuming -- I think I

5    know where you're going, but I'm assuming you're going to

6    get there pretty quickly.

7          MR. FRIEDMAN:   Yes.   I am getting there very

8    quickly.

9          Zack, would you please pull up Plaintiff's Exhibit

10   25, page 15.   This has been admitted into evidence already.

11   Q.      (BY MR. FRIEDMAN)   Mr. Kiang, what you are being

12   shown is an article entitled "The Top 20 Coolest Tattoos"

13   on the WWE website.   Tattoo No. 7 is Chris Jericho's Iron

14   Maiden's "Eddie."   Do you see that?

15   A.      I do.

16   Q.      Okay.   And that would be the tattoo on the left

17   there; right?

18   A.      Yes.

19   Q.      Are you familiar with that, too, on Chris Jericho?

20   A.      I am not familiar with Chris Jericho's tattoos

21   but --

22   Q.      Okay.

23   A.      -- I'll take it at face value.

24   Q.      Sure.   Are you aware that Mr. Jericho appears in

25   the WWE Take-Two games?

1          THE REPORTER:  Please repeat that.

2          MR. FRIEDMAN:  Sorry.

3    Q.    (BY MR. FRIEDMAN) You agree that Chris Jericho

4    appears as a playable character in the 2K games; right?

5    A.    When he was with WWE, yes.

6    Q.    Okay.  So, you would agree then that the WWE has

7    rights to Chris Jericho's tattoos, as it does with Mr.

8    Orton's tattoos?

9    A.    That's correct.

10   Q.    Okay.  So, then you would expect Mr. Jericho to

11   appear in the Take-Two 2K games as he appears in real life,

12   wouldn't you?

13         MR. KRASIK:  Objection, Your Honor, calls for

14   speculation and relevance.

15         THE COURT:  Overruled.

16   A.    Sorry.  Could you repeat the question?

17   Q.    (BY MR. FRIEDMAN)  You would expect Mr. Jericho's

18   character to appear in the 2K games as he does in real

19   life, tattoos and all; right?

20   A.    That's correct.

21   Q.    Okay.

22         MR. FRIEDMAN:  I'd like to show the witness and

23   counsel Plaintiff's Exhibit 160.  It's a video from

24   gameplay from -- I'm sorry -- 161.  It's a video taken from

25   gameplay from Plaintiff's Exhibit 46, which has been

1    admitted.  But this particular clip has not been admitted.

2    And there should be no sound attached to this.

3          (Video playing.)

4    Q.     (BY MR. FRIEDMAN)  Mr. Kiang, can you see what's

5    playing on your screen there?

6    A.     Yes, I can.

7    Q.     Is that a character of Mr. Jericho?

8    A.     Yes.

9    Q.     And can you see his tattoos?

10   A.     Yes.

11   Q.     Okay.  And do you see the tattoo on his left arm

12   interior?

13   A.     Yes.

14   Q.     The location where the "Eddie" tattoo is?

15   A.     Yes.

16   Q.     Okay.

17         MR. FRIEDMAN:  I'd move for admission of

18   Plaintiff's Exhibit 161.

19         MR. KRASIK:  Objection, Your Honor.  I don't think

20   there's any basis that Mr. Kiang knew anything about this,

21   before he was just shown it today.

22         THE COURT:  I'm not sure what the relevance is.

23         MR. FRIEDMAN:  I can answer now or a sidebar.

24   My --

25         THE COURT:  You can answer now, because I've been

1    trying to get you to get here for the last ten minutes.

2         MR. FRIEDMAN:  Okay.  Very good, Your Honor.

3         THE COURT:  What is the relevance?

4         MR. FRIEDMAN:  The relevance to this is that Mr.

5    Kiang and WWE's contention that it owns the copyrights --

6         THE COURT:  No.  No.  No.  Mr. Friedman, what is

7    the relevance of 161?  What is 161?

8         MR. FRIEDMAN:  161 shows --

9         THE COURT:  No, what is it?

10        MR. FRIEDMAN:  It's a video.  It shows Mr.

11   Jericho's tattoos.  That they were in fact altered, from

12   what he has in real life, into what is in the Take-Two

13   games.  It shows that WWE respects some copyrights, but not

14   others.

15        THE COURT:  No, Mr. -- no, it doesn't -- it doesn't

16   show that.  You have not shown anything else -- this is

17   irrelevant.  All right.

18        MR. KRASIK:  Your Honor, can we ask for an

19   instruction or striking --

20        THE COURT:  Yes.

21        MR. KRASIK:   -- of this whole line of questioning?

22        THE COURT:  Yeah.  The jury's instructed to

23   disregard the questions and answers with respect to

24   Superstar Chris Jericho.

25   Q.   (BY MR. FRIEDMAN)  Mr. Kiang, you testified on

1    direct about -- or you were reminded about this 2009

2    telephone call that Miss Alexander placed to the WWE

3    concerning her rumors that she heard about fake sleeves

4    bearing her tattoos.  Do you remember that?

5    A.    Yes.

6    Q.    Okay.  Were you an employee of the WWE in 2009?

7    A.    I was not.

8    Q.    Okay.  You mentioned that there is a search that

9    had been -- that had taken place inside of the WWE based on

10   the -- Miss Alexander's phone call; is that correct?

11   A.    That's correct.

12   Q.    When did that search take place?

13   A.    I am not certain.

14   Q.    Was it after the lawsuit was filed?

15   A.    I believe so.

16   Q.    Okay.  Mr. Kiang, you mentioned that you are not

17   aware of the WWE ever having taken a license in any tattoos

18   of its Superstars; is that correct?

19   A.    That's correct.

20   Q.    Were you aware that Take-Two has taken a license

21   for tattoos for inclusion in video games?

22   A.    I was not.

23   Q.    Mr. Kiang, thank you.  I have no more questions.

24   A.    Thank you.

25        THE COURT:  Any additional questions from the

1    defendants?

2         MR. KRASIK:  No additional questions -- no redirect

3    from me, Your Honor.

4         THE COURT:  Okay.  You may step down.

5         Members of the jury, you guys okay?  You want to

6    take a break now or do you want to go a little while longer

7    before we take a break?

8         JURORS [in unison]:  Keep going.  Thanks for

9    asking.

10        THE COURT:  Call your next witness.

11        MS. CENDALI:  Defendants call Dr. Nina Jablonski to

12   the stand, Your Honor.

13        Your Honor, may I approach and hand the witness a

14   witness binder?

15        THE COURT:  Yes, ma'am.

16        (Witness sworn by courtroom deputy.)

17        THE WITNESS:  My name is Nina Jablonski.

18   J-A-B-L-O-N-S-K-I.

19                         * * * * *

20                       NINA JABLONSKI,

21   having been first duly sworn, was examined and testified as

22   follows:

23                     DIRECT EXAMINATION

24   BY MS. CENDALI:

25   Q.    Dr. Jablonski, would you please introduce yourself

1    to the jury?

2    A.      Yes.  My name is Nina Jablonski.  I'm a professor

3    at Penn State University and -- yes, I'm a professor at

4    Penn State University and I'm an anthropologist.

5    Q.      Are you married?

6    A.      I'm married.

7    Q.      Where do you live?

8    A.      I live in State College, Pennsylvania, the same

9    town in which University Park Campus is located.

10   Q.      You mentioned you are a professor of anthropology.

11   What is anthropology?

12   A.      Anthropology is the study of all aspects of

13   humanity, really, the biological evolution of humans, the

14   culture of humans, human languages, and all of human

15   material culture, archeology.

16   Q.      At a high level, what were you asked to do in this

17   case?

18   A.      At a high level, I was asked to consider three

19   basic areas.  Firstly, tattoos as a form of personal

20   self-expression.  The second, how tattoos are actually

21   placed onto people, the process of getting a tattoo.  And

22   the third, basically, an overview of tattoo industry

23   customs and practices.

24   Q.      Before we get to your specific opinions in this

25   case, let's review your background.  Did you prepare any

1    slides for your testimony today?

2    A.    I did.

3          MS. CENDALI:  Your Honor, permission to publish

4    Defendant's Demonstrative Exhibit 171 to the jury.

5          THE COURT:  Any objection?

6          MR. SIMON:  No objection to this, Your Honor.

7          MS. CENDALI:  Mr. Thomas, would you please bring up

8    Dr. Jablonski's slides?  (Pause.)  Thank you.  And would

9    you please turn to slide two.

10   Q.    (BY MS. CENDALI)  So, Dr. Jablonski, what's your

11   current position at Penn State?

12   A.    I hold the Evan Pugh University Professorship of

13   Anthropology, and I co-direct the Center for Human

14   Evolution and Diversity at Penn State.

15   Q.    Is there anything special about being the Evan Pugh

16   University Professor?

17   A.    That title is given to only the top one percent of

18   Penn State professors.

19   Q.    What degrees do you have?

20   A.    I hold a Bachelor's Degree and a Ph.D in

21   Anthropology.

22   Q.    And when did you -- and when and where did you

23   obtain that Ph.D?

24   A.    I obtained my Ph.D in 1981 from the University of

25   Washington in Seattle.

1    Q.      Dr. Jablonski, how do you conduct research as

2    anthropologist?

3    A.      Anthropologists, including me, use a lot of

4    different techniques.  But one of them that is particularly

5    important here is that we conduct field interviews with

6    people to find out about their beliefs, ideas and so forth.

7    Q.      Do you also do academic research as an

8    anthropologist?

9    A.      I do a lot of academic research, scholarly

10   research, looking at what has been written before on topics

11   in books, articles.  And in these days, online, this is an

12   enormously important part of my research.

13   Q.      Have you studied tattoos as a part of your work as

14   an anthropologist?

15   A.      Yes.  I'm interested particularly in the evolution

16   and meaning of skin, and tattoos as a mode of communication

17   through skin are really, really important.

18   Q.      When did you start researching tattoos?

19   A.      I started researching tattoos over 20 years ago,

20   when I first began to consider writing a book about skin,

21   and I realized that they were just an important part --

22   they were going to be an important part of the book.

23   Q.      What kinds of research have you conducted on

24   tattoos and tattoo industry practices?

25   A.      Well, I have done a lot of traditional scholarly

1    research looking at articles and books.  But I have talked

2    to many, many tattooed people and numerous tattoo artists.

3    And I have looked -- in the last ten years, especially --

4    at the increasing social media presence of tattooed people

5    and tattoo artists.  This is something that's been really

6    important.

7    Q.      Have you attended tattoo fairs or anything like

8    that?

9    A.      Yes, I have.  I'm really interested in tattoo

10   culture and I enjoy going to tattoo fairs and just seeing

11   how people -- what people are interested, what prospective

12   clients are interested, and what tattoo artists are

13   interested in.

14          MS. CENDALI:  Let's turn to slide three.

15   Q.      (BY MS. CENDALI)  Have you published any books or

16   articles on your research?

17   A.      Yes.  I have published many, including the book

18   Skin that you see on the left, many scholarly articles on

19   skin as a mode of communication.  And many articles have

20   been written about my work by various journalists and

21   others.

22   Q.      When was your book Skin published?

23   A.      The first -- the first printing was in 2006.  And

24   then a second printing in 2013, with a new preface.

25   Q.      Did you discuss tattoos in your book?

```
1    A.      I did.

2    Q.      Is all the information you gleaned about tattoos

3    and the tattoo industry in your book?

4    A.      No, it's not.  A lot had to be left out because

5    there was just a copious amount of information that I

6    gathered from various sources.  And so, the amount that I

7    could actually put in the book to do justice to other

8    content was relatively small.

9    Q.      Since publishing your book in 2006, what, if

10   anything, have you done to continue researching tattoos and

11   tattoo industry practices?

12   A.      Because tattoos are such a vital part of modern

13   skin culture, I have continued a lot of research, going to

14   talk to tattooed people, basically where I find them,

15   talking to tattoo artists, attending tattoo fairs, and

16   really, really honing in on social media, looking at tattoo

17   artists' Instagram pages, Facebook presences, and so forth.

18   People love to talk about their tattoos.

19   Q.      Do you supervise any doctoral students in the area?

20   A.      At Penn State, I supervise doctoral students.  I

21   also teach an undergraduate course in skin, in which many

22   tattooed students and tattoo artists partake.  The course

23   is very popular.  And tattoos are one of the reasons it is

24   popular.

25   Q.      Do you teach tattoos as part of that class?
```

1    A.       Yes, I do.

2    Q.       Do you have any tattoos?

3    A.       I don't.  But my husband does.

4    Q.       Okay.

5             MS. CENDALI:  Let's go to slide four.

6    Q.       (BY MS. CENDALI)  Have you been invited to speak

7    about your research?

8    A.       Yeah.  I have given a lot of, of high profile

9    lectures.  I have given a TED talk.  I appeared on The

10   Colbert Report.  And I have given numerous lectures, public

11   lectures, general public lectures on the topic of skin,

12   skin evolution, the meaning of communication through skin.

13   And most of these lectures have included some mention or

14   elaboration of tattoos because they are so important in

15   human visual culture.

16            MS. CENDALI:  Let's go to slide five.

17   Q.       (BY MS. CENDALI)  What kind of recognition have you

18   received from your peers for your research?

19   A.       I have been fortunate to receive fellowships, like

20   a Guggenheim Fellowship.  And I have also been selected to

21   numerous honorary scholarly societies like the National

22   Academy of Sciences.

23   Q.       Have you received any invitations to participate in

24   industry research on skin?

25   A.       Yes.  I have been invited to participate in the

1    scientific advisory board of L'Oreal, and I have been on

2    that scientific advisory board for ten years.

3    Q.    Any other boards?

4    A.    I am on another board for L'Oreal, and I advise

5    other industries, as well.

6          MS. CENDALI:  Your Honor, defendants tender Dr.

7    Nina Jablonski as an expert in tattoos as a form of

8    self-expression, including the process of getting a tattoo,

9    and tattoo industry customs and practices.

10         MR. SIMON:  Your Honor, may we sidebar?

11         THE COURT:  Yes.

12         (Proceedings continued at the bench.)

13         THE COURT:  Okay, Mr. Simon?

14         MR. SIMON:  Yes, Your Honor.  We have -- we have no

15   objection to her being qualified as the expert on tattoos

16   as a personal statement and the first part of what Miss

17   Cendali said.

18         But with respect to her being an expert on custom

19   and practice in the tattoo industry, other than how people

20   get tattoos, there's no foundation laid that she can speak

21   to whether or not people with tattoos, when they leave the

22   tattoo shop, have a right to copy the tattoos.  That hasn't

23   been established.

24         MS. CENDALI:  Your Honor, she has the *Daubert* --

25   Ms. -- Dr. Jablonski's second -- she clearly testified that

1  she has extensive experience in the tattoo industry

2  process, the process of getting a tattoo, and tattoo

3  industry customs and practices.

4      THE COURT:  She did testify to that in a conclusory

5  way.  I agree with that.  She said that -- her research has

6  included that.  I'm not sure that she's -- that you have a

7  sufficient foundation at this point in terms of her

8  qualification to give opinions on industry custom and

9  practice as it relates to the issue of implied license,

10  without more.  Only because I -- at this point, she hasn't

11  -- I don't know what her experience is.  I don't know what

12  her research is.  I don't know what she's done.

13      I understand she wasn't challenged by the

14  plaintiffs or -- with their *Daubert* motion.  But as you

15  know, Miss Cendali, regardless of that challenge, it

16  remains my responsibility -- as I hate the word gatekeeper

17  -- but to make sure that the expert's opinions are reliable

18  and based on sufficiently -- have a sufficient basis and

19  experience, education, and training.

20      I'm simply saying, I don't believe -- at this

21  point, I'm -- the foundation is -- she has not laid the

22  specific foundation to render opinions on industry and

23  standard practice -- custom and practices on the specific

24  issues in this case.

25      MS. CENDALI:  Well, can I ask her more questions,

1    Your Honor?

2         THE COURT:  Yes.  You can lay the foundation.

3         (Proceedings continued in open court, jury

4    present.)

5    Q.    (BY MS. CENDALI)  Let me just ask you some more

6    questions about your experience, Dr. Jablonski.

7    A.    Sure.

8    Q.    Approximately how many people have you spoken to in

9    the tattoo industry about the process of getting a tattoo?

10   A.    So, does that include tattooed people who know

11   something about the process?  Or do you mean only tattoo

12   artists?

13   Q.    Both.

14   A.    I've spoken to hundreds of tattooed people.  And

15   many of them are very knowledgeable about getting tattoos

16   because they -- they have had many.  And I have spoken to

17   dozens of tattoo artists over many years.

18   Q.    Have you also -- can you talk a little bit about

19   what else you have done with regard to tattoo fairs or

20   other things so that it makes you knowledgeable to talk

21   about the process of getting a tattoo?

22   A.    I have -- I have watched many tattoos being given.

23   I have talked to people while they are getting tattoos, and

24   tattoo artists who are working.  So, I have watched the

25   process.  I am intimately aware of, of how basically what

1    is going on throughout -- from the client's first ideas

2    until the time they finish up.

3    Q.       And what experience do you have to be able to talk

4    about the kind of custom and practice, the expectations

5    that someone would have after they get a tattoo, about what

6    they can do when they leave the tattoo parlor, with their

7    body?

8    A.       I talk to people all the time about, about how they

9    want to show them off and how they want to be able to

10   display them.  So, I -- that is part of the communication

11   of tattoos, is what people can do and say about them,

12   whether they can show them, including all forms of media.

13           MS. CENDALI:  Your Honor, I tender Dr. Jablonski

14   again as an expert in the form of tattoos -- as tattoos as

15   a form of self-expression, including the process of getting

16   a tattoo, and tattoo industry custom and practices.

17           MR. SIMON:  Your Honor, may we sidebar?

18           (Proceedings continued at the bench.)

19           THE COURT:  Yes, sir, Mr. Simon?

20           MR. SIMON:  Your Honor, she said dozens of tattoo

21   artists.  Assuming that's more than a couple dozen, she

22   interviewed them about the process of getting a tattoo and

23   they can show them off and display them, not whether or not

24   they have a right to make a copy.

25           She hasn't said she asked a single person whether

1    they felt they had the right to make a copy, and that's the

2    custom and practice in the industry and that's the implied

3    license issue.

4        MS. CENDALI:  Your Honor, this goes to not

5    qualifications --

6        THE COURT:  No, it does go to qualifications.  So,

7    this is what I'm going to do.  We're going to excuse the

8    jury from the courtroom and I'm going to let you do an

9    offer of proof.

10       Miss Cendali, the specific issue -- she definitely

11   is an expert on skin, on tattoos, and many things about

12   tattoos.  She's had conversations with tattooists and those

13   who are tattooed.  But as far as her qualifications based

14   on experience, research, education, or her own personal

15   experience as to -- that's relevant to implied consent, is

16   any industry standards and practice as it goes to

17   expectation or the relationship between a tattooist and the

18   person who is tattooed and how that person -- this is not

19   about expression on their body, but how that person may

20   then, whether they have then a license to copy that tattoo

21   themselves and certainly the ability to sublicense that art

22   or that work for copying.  That's what the issue is in this

23   case.

24       MS. CENDALI:  Well, Your Honor, I -- as you said at

25   the pretrial conference, evidence of custom and practice is

1    probative of the issue of implied license --

2         THE COURT:  But it depends on which custom and

3    practice.  Evidence of custom and practice about how people

4    walk into a tattoo parlor and can choose something off a

5    wall or -- like I did -- and have the artist ink it on

6    them, pay them, you know, pay them a fee or whatever.

7    That's -- that is an example of custom and practice.  But

8    that's not relevant on the issues here.

9         So, the issue is this --

10         MS. CENDALI:  Okay.

11         THE COURT:  -- implied license.  As you know,

12    because we have been talking about it, one of the ways that

13    you can prove implied license is by objective evidence of

14    the intent -- of the owner's intent.  The cases do say that

15    industry custom and practice can be objective evidence of

16    that, but it depends on the industry custom and practice.

17    And as far as an expert having the ability to testify to

18    that, it has to be based on their own experience, knowledge

19    -- whether that came from research, education, training --

20    their own personal experience.  That is why I would not

21    allow Dr. Jablonski to testify about custom and practice

22    based on those declarations.

23         No witness, expert or lay, can get up here and

24    testify that this is what they do and, therefore, that is

25    custom and practice.  So, I'm giving you an opportunity to

1    do an offer of proof, you know, to get out -- because I'm

2    not sure whether she has that, that necessary foundational

3    basis.

4        MS. CENDALI:  I understand, Your Honor.  What I'm

5    trying --

6        THE COURT:  I mean, if she has -- if she has talked

7    to however many number of -- in the industry and she's

8    surveyed them and interviewed them and studied and

9    researched what is the understanding or expectation or the

10   practice amongst tattooists and tattoo artists and tattooed

11   people about whether they may copy a copyrighted work,

12   whether they then leave with a license and ability to do

13   that, and to transfer it to another person, then that's --

14   that's -- I mean, that is expert opinion.  That's expert

15   opinion that can assist this jury.  But it has to be

16   specific to the issues in this case.

17       MS. CENDALI:  So I understand, Your Honor, because

18   I want to do what Your Honor wants, obviously, is -- your

19   thought is, excuse the jury and --

20       THE COURT:  Let you do an offer of proof.

21       MS. CENDALI:  -- let me do an offer of proof where

22   I would essentially ask Dr. Jablonski the questions you

23   just did, so you can --

24       THE COURT:  To establish she has that basis.

25       MS. CENDALI:  And then you can decide that from

1    there.  Okay, that's fine.  Thank you, Your Honor.

2        THE COURT:  Let me say this.  Your whole point is

3    to get to the bottom of it because I'm not -- I'm not

4    sitting here saying that I don't think she has, but I am

5    saying that it has not been established.  The foundation

6    has not been laid.

7        So, I'm not going -- yeah, I'm not going to get

8    caught up on leading questions.  I want to get to the

9    bottom of it.  Make sure you do an offer of proof so that

10    we know you have it or you don't.

11        MS. CENDALI:  I understand.

12        THE COURT:  Let's just cut to the chase.

13        MS. CENDALI:  Okay.

14        THE COURT:  Okay?

15        (Proceedings continued in open court, jury

16    present.)

17        THE COURT:  Okay.  Ladies and gentlemen, we need to

18    take up a matter outside of your presence.  I am hopeful

19    that it will be -- we can reconvene at 2:50.

20        And so, I'm going to excuse the jurors from the

21    courtroom.  Counsel, give me ten minutes to take a break

22    because I need to take a break, too.

23        MS. CENDALI:  I'm sorry, I can't hear you.

24        THE COURT:  Ten minutes and then we'll come back

25    out and take up the hearing.

1        COURTROOM DEPUTY:  All rise.

2        (Court recessed from 2:38 p.m. to 2:44 p.m.)

3        (Proceedings continued in open court, jury not

4    present.)

5        COURTROOM DEPUTY:  Please be seated.

6        THE COURT:  Okay.  So, let me see if I can use one

7    of you guys' favorite word -- to give some context to what

8    -- the determination the Court is intending to make here.

9        The question is:  Dr. Jablonski's qualification to

10   render opinions on industry custom and standards as it

11   relates to the issues in this case.

12       I don't think she's offered any opinions that

13   relates to any issues other than the implied licensing

14   issue, and perhaps damages.

15       But let's talk about the implied licensing issue

16   because --

17       MS. CENDALI:  May I -- I'm sorry, Your Honor.

18       THE COURT:  You can go ahead.

19       MS. CENDALI:  Thank you.

20       THE COURT:  But that's where -- that's where we are

21   and that's the determination that needs to be made.

22       Now, as the defendants point out, I did indicate in

23   my -- one of the Orders, one of the pretrial Orders -- that

24   industry custom and practice may be objective evidence or

25   can be objective evidence of the third prong or the third

1    element under implied license.

2        I already found that there was no issue as to

3    whether or not Miss Alexander -- or Mr. Orton requested the

4    work.  Miss Alexander makes the particular work and

5    delivered it to Mr. Orton.

6        The question, the third element that has to be

7    established is that the licensor -- in this case, Miss

8    Alexander -- intended that Mr. Orton copy and distribute

9    her work in a particular manner.

10       As I understand it, the defendants are offering

11   evidence of custom -- industry custom and standard on that

12   third element.  What I'm struggling with is, industry

13   custom and standard is not objective evidence of

14   everything, and it depends on what particular industry is

15   standard.

16       So, the question is:  Are there industry customs

17   and standards that are probative of Miss Alexander's

18   intent?  Because that's the only thing that's an issue.

19       MS. CENDALI:  A couple of things, Your Honor.

20   First, Dr. Jablonski's expert report and testimony is in

21   different pieces.  Part of it -- the first part of it is

22   going to be, very briefly, the history of tattoos as a mode

23   of personal expression.  And then from there, talking about

24   the specific tattoos in this case and how they are not --

25   we heard -- we talked about this the other day and we said

that we were going to introduce expert testimony on this --

that they were common motifs and trends and things like

that.  And that goes to fair use, not just implied license.

That goes to factor two and it goes to factor four, both in

terms of market, but also is there -- it goes to damages,

too.  What's the value of the tattoo?

So, part of what --

THE COURT:  I follow that.

MS. CENDALI:  Okay.  So, now on the -- I just

wanted to make sure you're all -- you -- I don't want any

surprises or anything like that.

And so, the other part of what we plan on having

her testify about is her experience in the tattooing

process, how it works, and what the custom and practice is

with regard to whether a tattoo artist says to someone, *You

need to come back to me for permission to be shown in media

or to do anything else.*

What she's going to say or proffer is that at the

end of when someone leaves a tattoo parlor, that's usually

the end of the relationship.  People, as you heard Ms.

Alexander testify, they don't keep phone numbers, they

don't give forwarding information.  Everybody goes off and

lives their life.  The transaction is over.

And she's going to establish, not just with regard

to Ms. Alexander and Mr. Orton, that the practice is that

tattoo artists don't say to people, *You need to come back to me for permission.*  That that's not done, and that they don't do anything to keep in touch with the person to even make that happen.

And she's also going to say that part of the reason that it's relevant that when someone gets a tattoo, that they can alter it and change it without going back to the original tattooist, is it reflects the fact that once someone leaves the tattoo parlor, they are free to do what they want with their tattoos.  And that the fact that somebody's a celebrity doesn't change that at all

THE COURT:  Okay.  Let me stop you for a second.

You would agree, counsel, that -- or -- well, first of all, is it the defendants' position that industry custom and practice, as you have just described it, is relevant to the issue of implied license?

MS. CENDALI:  Yes, Your Honor.

THE COURT:  So, if that is your position, you would agree that it must be relevant to the third element, the licensor's intent.

MS. CENDALI:  Which can be est --

THE COURT:  Ah --

MS. CENDALI:  Yes.

THE COURT:  And is it your position that in this case the defendants can establish Miss Alexander's intent

1    in that regard, as far as that the -- that Mr. Orton may

2    copy and distribute her work in a particular manner, in

3    this case sublicensing her work to a third party, that your

4    evidence of that through Dr. Jablonski is -- her testimony

5    and her knowledge -- based on her knowledge, experience,

6    research, or whatever -- as to industry standard and

7    practice.

8        In other words, that you can prove Miss Alexander's

9    intent that specifically relates to the implied license in

10   this issue, which includes a sublicense, by the way --

11       MS. CENDALI:  That's right.  If the evidence is as

12   I say, which is the industry practice that when you leave,

13   that's the end of it, you can live your life, that means

14   that -- well, certainly someone could always say, *Oh, I

15   didn't mean that*.  But the Seventh Circuit says that's not

16   useful.  Someone can always secretly have, you know, some

17   other thought.

18       What matters is the objective manifestation, and

19   that includes what the practices are in the industry.  And

20   if the practices are in the industry that if a tattoo

21   artist doesn't limit the person -- and that's also what

22   that *LimeCoral* case says, there has to be an express

23   limitation, so the two dovetail -- if there's no limitation

24   and the industry practice is, unless there's a limitation

25   spoken, that the person can go do whatever they want,

1    including being media, including sublicense, et cetera,

2    that's directly relevant to our implied license argument.

3              THE COURT:  So, for this purpose, let me just leave

4    it there.  I'm not sure I'm all the way there, but I'm --

5    Mr. Simon, let me accept that for this purpose.  Because

6    what we need to move beyond is whether or not Dr.

7    Jablonski, there is a basis for her opinions on industry

8    custom and standard, and that is what this offer of proof

9    is about.

10             As you know, the expert is qualified to give

11   opinions based on personal experience, education, training,

12   research.  And what I'm saying is, up to this point, at the

13   point that you endorsed her as an expert on these issues, a

14   sufficient foundation had not been laid for her to render

15   opinions on industry customs and standards as it relates to

16   that specific element of implied license.

17             MS. CENDALI:  Okay.

18             THE COURT:  Are you clear?

19             MS. CENDALI:  Yes.  I understand that you want me

20   to make an offer of proof to further establish her ability

21   and a background to be able to testify as to industry --

22             THE COURT:  What's the basis of her knowledge of

23   industry -- what -- the bottom line is, she has to know and

24   have knowledge of industry standards.  And industry

25   standards, as you know, goes beyond what one particular

artist may do.

So, she, obviously, needs to have a basis and experience, education, training.  It can be research.  She talked about all of the conversations.  All I'm saying is, what's lacking at this point is a sufficient basis for her to offer opinions on industry custom and standard as it relates to that third element.

MS. CENDALI:  Okay.  So, to be clear, I'm not going to bother to go into the stuff I already did about her knowledge as tattoos as personal expression or anything like that.  Okay.  All right.

EXAMINATION

BY MS. CENDALI:

Q.    So, Dr. Jablonski, as you heard the Court say, the question before us is to what extent you, Dr. Jablonski, have --

THE COURT:  Let me make it easy.

EXAMINATION

BY THE COURT:

Q.    Dr. Jablonski, I'm interested in your knowledge as it relates to tattoo industry custom and practice and standards regarding the intent of tattoo artists when, at the conclusion of inking as it relates to the individual they inked, having the ability to copy and distribute their work -- if it's copyrighted -- in a particular manner, and

1    sublicense it to somebody else.  And all I'm interested in

2    is the basis of -- the basis and source of your knowledge

3    in that regard as it relates to industry practice.

4        Am I clear on that?

5    A.    Yes, Your Honor.  I understand your question.  May

6    I answer?

7    Q.    Yes, please.

8    A.    I have spoken to numerous tattoo artists about this

9    question of what, what can be done by a client with their

10   art after they are finished getting inked.  And those

11   tattoo artists, to a person, have said that those people

12   can go about living their lives, not only showing off their

13   tattoo in casual ways, but also that they can -- they can

14   license their likeness.  That they in fact -- tattoo

15   artists with whom I have spoken have said that they want

16   their clients to appear -- for their likenesses to appear

17   in video games and in other forms of very modern media.

18        So, I have experience in speaking with tattoo

19   artists on this subject concerning how they feel about

20   their -- the tattoos that they have inked being shown and

21   distributed widely.

22   Q.    I appreciate that.

23        THE COURT:  Can I continue, counsel?

24        MS. CENDALI:  You're doing a good job, Your Honor.

25   Q.    (BY THE COURT) And let me ask you this, Dr.

1    Jablonski.  You said numerous.  Do you have an estimate as

2    to how many artists you have spoken in that regard?

3    A.      Yes.

4    Q.      And can you give me an idea of the context of those

5    conversations?  Was this based on some other independent

6    research you were conducting or just casual conversation or

7    for purposes of your -- specifically for purposes of your

8    opinions in this case?

9    A.      I was interested in this phenomenon because I

10   wanted to know for my general knowledge and research what

11   tattoo artists expected of their clients, what they could

12   do in terms of not only normal distribution of their art by

13   social media but beyond that, in commercial avenues.  I

14   have spoken to eight tattoo artists about this matter

15   specifically.

16   Q.      Over what period of time?

17   A.      Over the last year.

18           MR. SIMON:  I'm sorry, Your Honor.  Was that eight?

19           THE COURT:  Eight.

20           THE WITNESS:  Eight, yes.

21           THE COURT:  Okay.  Thank you.  That answers my

22   question.

23           MS. CENDALI:  May I ask some additional questions?

24           THE COURT:  (Nonverbal response.)

25                              RE-EXAMINATION

1    BY MS. CENDALI:

2    Q.      Dr. Jablonski, have you also spoken to tattooed

3    people about the -- their -- the expectations and process

4    of getting a tattoo and what they are able to do with their

5    bodies afterwards?

6    A.      Yes, I have.  I have spoken to dozens, if not

7    hundreds, of people about what they expect to be able to do

8    with their bodies in terms of showing them off in public

9    and in media.

10    Q.      And have you spoken to tattooed people about how

11    they have actually showed their bodies, not just what they

12    could expect?

13    A.      Yes.  I have talked to them about what they have

14    actually done.

15    Q.      Have you also spoken to them about whether any

16    tattoo artist has ever tried to limit their ability to

17    display their tattoos, license -- or license their tattoos?

18    A.      Yes.  I have spoken to numerous individuals about

19    this, and they -- they have all had very strong opinions.

20    Q.      Did they discuss their understanding of what the

21    tattoo artist thought about their ability to show their

22    bodies?

23              THE COURT:  That's not helpful to me.

24              MS. CENDALI:  Okay.

25    Q.      (BY MS. CENDALI)  And now leaving aside the

1    different interviews that you have conducted with regard to

2    this, do you rely in part on any academic experience or

3    background to help provide a basis for your opinion that

4    when people leave the tattoo parlor, the mutual expectation

5    of the tattooed person and the tattoo artist is that the

6    tattooed person can display and license their tattoos as

7    they see fit?

8    A.     Yes.  As I mentioned, I have been researching

9    tattoo culture broadly for 20 years, including the matters

10   that you just discussed, the expectations of tattooed

11   people to be able to go about their business, show off

12   their tattoo, have their tattoo appear in media.  And I

13   have talked to tattoo artists about their expectations of

14   how their tattoos are going to appear in real life and in

15   media.

16   Q.     And have you searched for any articles that have

17   said, no, the tattoo artist needs to be -- you need to go

18   back to the tattoo artist, with regard to this?

19   A.     No such articles exist, to my knowledge.

20          THE COURT:  I do have a couple of follow-ups.

21                        RE-EXAMINATION

22   BY THE COURT:

23   Q.     Dr. Jablonski, you mentioned that you have talked

24   to, in addition to the tattoo artists, you talked to

25   numerous tattooed people about their expectations.  Again,

1    I'm interested in an estimate of how many and over what

2    period of time.

3    A.      Yeah.  Your Honor, are you asking about media in

4    general?  Or just video games?

5    Q.      Let's start with -- well, video games.

6    A.      Video games, because this matter came up relatively

7    recently, I have spoken to about 20 people specifically

8    about how they would feel about their image appearing in a

9    video game.

10           MS. CENDALI:  And maybe asking more broadly on --

11           THE COURT:  No.  Miss Cendali?

12           MS. CENDALI:  Sorry.

13           THE COURT:  Are you just going to walk all over me

14    like that?

15           MS. CENDALI:  I apologize, Your Honor.

16           THE COURT:  All right.

17    Q.      (BY THE COURT) And I think you mentioned that you

18    have spoken with numerous tattooed people specifically

19    about whether or not -- I think -- I think I understood you

20    to say specifically licensing their -- the tattoo art,

21    transferring that license for commercial purpose.  Did you

22    say you spoke specifically to people about that?

23    A.      I spoke to people broadly about what I called

24    paperwork.  How they would feel about signing paperwork

25    about granting a license or paying a tattooist for a

1    license.

2    Q.     Right.  How they would feel, versus the practice.

3    A.     Yes.

4    Q.     Okay.  And then I had one other question.  And I

5    think I just forgot.  (Pause.)  It may come back to me.

6            THE COURT:  Miss Cendali, did you have something

7    else?

8            MS. CENDALI:  I just wanted -- wasn't sure about

9    the last answer.

10                   FURTHER RE-EXAMINATION

11   BY MS. CENDALI:

12   Q.     I just wanted to say:  Dr. Jablonski, did you speak

13   to people, tattoo artists or tattooed people, about the

14   expectation that they could be in media and that they could

15   grant -- celebrities could grant rights to their bodies to

16   be in social -- to be in any form of marketing and

17   celebrity culture?

18   A.     Are you talking, if I asked the celebrities or if I

19   asked people about the rights of celebrities?

20   Q.     I guess what I'm asking is -- well, both.  Why

21   don't you address both.

22   A.     Oh, I don't know very many celebrities, so -- but I

23   asked a lot of people about how they would feel if they had

24   to ask a tattoo artist for a license or pay a license in

25   order to appear in a video game, if they were that famous.

1    And so, I -- yes, I canvassed many tattooed people.

2    Q.      Well, let me put it this way:  Isn't it true that,

3    including in your book, you have studied how celebrities

4    have chosen to be on media with their tattoos?

5    A.      Yes.  Absolutely.  I mean, my -- Miss Cendali, my

6    book was written at a time when video games were less

7    popular, but people loved showing off their tattoos.

8    Celebrities, I featured, especially.

9    Q.      And your understanding from your research in that

10   book was that the celebrities were free to do that without

11   having to pay anything back to the tattoo artist; is that

12   correct?

13   A.      They were -- they were entirely free to do that.

14   Q.      And when you reference paperwork --

15           THE COURT:  Miss Cendali?

16           MS. CENDALI:  What?  Enough?

17           THE COURT:  Because we're talking about feelings

18   and I'm not interested in feelings.  I'm interested in

19   industry custom and practice -- hold on.  I get it.  I have

20   one other question for Dr. Jablonski.

21           And I think, Mr. Simon, you wanted to inquire.

22                       FURTHER RE-EXAMINATION

23   BY THE COURT:

24   Q.      The other question I have, Dr. Jablonski:  The

25   tattoo artists that you mention that you spoke with?

1    A.      Yes.

2    Q.      I think the eight artists over the last year or so?

3    A.      Yes.

4    Q.      Did any of them have a copyright in their work?

5    A.      No, none of them did.

6    Q.      All right.

7    A.      But actually, if I may add, two of them were

8    celebrity tattooists.

9    Q.      Okay.  But none of them had a copyright?

10          MS. CENDALI:  Your Honor --

11          THE COURT:  Miss Cendali?

12          MS. CENDALI:  Okay.

13          THE COURT:  Miss Cendali?

14          MS. CENDALI:  I was just trying to clear up the

15   issue of having a copyright and what that means.

16          THE COURT:  I know.

17          MS. CENDALI:  Okay.

18          THE COURT:  Thank you.

19          Mr. Simon did you have something you wanted to ask?

20          MR. SIMON:  I was going to ask a few questions,

21   unless Your Honor's going to rule.  I was going to ask a

22   few questions of the witness.

23          THE COURT:  Yes.

24          MR. SIMON:  Okay.

25                        EXAMINATION

BY MR. SIMON:

Q.      You haven't done a survey of any tattoo artists?

A.      No, I have not done a systematic survey.

Q.      You haven't done any survey, right?

A.      No, I have not.

Q.      Okay.  And there's nothing in your report about these eight tattoo artists you interviewed that said -- that told you they felt they had a right -- I'm sorry -- that they gave away their copyright when they put a tattoo on somebody?

A.      That's correct.

Q.      Okay.  And industry custom and practice, did you ever ask any of the tattoo artists specifically, *when you tattoo somebody are you giving them a right to make copies of your tattoo and sublicense that to other people?*

A.      No, I did not phrase it in that way.

Q.      Okay.

A.      I was having structured interviews but avoiding technical language.

Q.      Okay.  Eight people?

A.      Yes.

Q.      Were some of those the people that signed declarations that were stricken in this case?

A.      No.

Q.      Okay.  What was the name of the video games that

1    these celebrities appeared in?

2    A.    I said that these celebrities appeared -- that

3    these celebrities who had been tattooed by the tattoo

4    artists I spoke with were celebrities, so they -- in one

5    case where the -- I was speaking to a tattoo artist from

6    San Rafael, California, who had tattooed some NBA players.

7    And he thought that his tattooed players had appeared in

8    NBA 2K games, and he said he was happy to have his work

9    appear.

10   Q.    That was one?

11   A.    That was one individual.

12   Q.    Okay.

13   A.    That was one of the two celebrity tattooists.

14   Q.    Okay.

15   A.    The other did not tattoo any sports celebrities.

16   Q.    Okay.  And how many of these eight actually owned

17   copyrights on their tattoos?

18        MS. CENDALI:  I object to that question, Your

19   Honor.

20        THE COURT:  Miss Cendali?  No.

21        Go ahead.

22   Q.    (BY MR. SIMON) Go ahead.

23   A.    None of them referred to their art as copyright.

24   Q.    Okay.  And a lot of what you talked about was how

25   the people that had the tattoos feel; right?

1    A.      Yes, that's right.

2    Q.      Okay.  And did any of the tattoo artists actually

3    tell you that when they tattoo somebody with a copyrighted

4    design, they automatically give up -- and they understand

5    it's custom and practice in the industry to give up -- any

6    rights to copy that tattoo, and that person can go, not in

7    media but in video games, and make copies of it?

8    A.      They -- especially the two individuals in question

9    who -- with whom I spoke about this and who had experience

10   with celebrities, they recognized that those celebrities

11   would do what they wanted, including appear in video games,

12   and they were fine with it.

13   Q.      Okay.  That's just two?

14   A.      Those were two individuals, yes.

15   Q.      Okay.  And then your test -- you have been excluded

16   from testifying to custom and practice in another case

17   where Take-Two used you as an expert for this basis; right?

18   A.      I was excluded for part of my testimony only.

19   Q.      And the part was custom and practice in the

20   industry.

21   A.      That's -- that is correct.

22   Q.      Thank you.

23        MR. SIMON:  I don't have anything else, Your Honor.

24        THE COURT:  As to the proffer of Dr. Jablonski on

25   the issue of custom and practice in the tattoo industry, as

1   it relates specifically to element three that needs to be

2   established for implied license, which is the licensor's

3   intent regarding copying and distribution of her work, I do

4   not believe that Rule 702, 703, that it is met.  I mean,

5   specifically -- on the specific issue, Dr. Jablonski has

6   spoken to eight tattoo artists over the last year, and she

7   explored with them their feelings about what their clients

8   can do with their tattoos.

9       I don't believe the -- she explored with them

10  specifically in ways that's relevant to this case in terms

11  of licensing of a tattoo -- of a copyrighted work.  And at

12  any rate, eight folks involved in an industry does not an

13  industry standard make, in any case.

14      And I understand that much of the information she

15  has was based on the feelings of tattooists, tattoo artists

16  and their clients, but again, feelings in and of themselves

17  are not demonstrative of a industry custom and standard.

18      The whole point here is, without direct evidence of

19  Miss Alexander's intent, yes, there needs to be objective

20  or there can be objective evidence.  But this information

21  upon which Dr. Jablonski bases -- intends to base her

22  opinion would not constitute objective evidence.  This is

23  not -- given the basis of her opinions, I find that her

24  opinions are not reliable under *Daubert* as it relates to

25  industry custom and practice in the tattoo world.

1          So, she may not offer opinions in that regard.

2          MS. CENDALI:  I take it, Your Honor, that we may

3     question her about tattoos as a form of self-expression,

4     and Mr. Orton's tattoos that she studied in this case and

5     detailed in her report, which were not part of a *Daubert*

6     report, about their trends and motifs that we discussed

7     earlier in the trial?

8          THE COURT:  I think to the extent that those are --

9     that area of testimony, I think, is probative on the

10    question of actual damages from a value standpoint and may

11    be probative of fair use.

12         I don't even believe there's an objection to that,

13    is there, Mr. Simon?

14         MR. SIMON:  No, Your Honor.  But I did have a

15    question about the process of tattooing.  I just don't want

16    to spend a lot of time on that.  I mean, I don't know that

17    that's disputed in this case.

18         THE COURT:  I don't think it is.  And I understand

19    the historical context.  But I think, at this point, we all

20    understand the process of tattooing, tattooing as a

21    personal expression, only -- I mean, I think the jurors --

22    the jurors get it.  That's not the type of information that

23    juries need the assistance on, from an expert standpoint.

24         But I'm -- but again, I'm going to allow defendant

25    to offer Dr. Jablonski's opinions regarding self-expression

1    and -- as it relates to -- and I think she's going to

2    piggyback on how it relates in Mr. Orton's situation --

3            MS. CENDALI:  Yes, Your Honor.

4            THE COURT:  -- and I think it must -- it's going to

5    touch fair use and the value theory that the plaintiff is

6    pursuing.

7            Is that correct?

8            MS. CENDALI:  That is right, Your Honor.

9            MR. SIMON:  Just to make clear, we believe it's not

10   relevant to fair use because she's talking about Mr.

11   Orton's use of the tattoos.  And what's relevant to fair

12   use of the defendants' use, which isn't -- Mr. Orton's use

13   is displaying himself and that kind of thing.  The

14   defendants' use is copying and putting it in a video game.

15   So, it's not relevant to fair use.

16           MS. CENDALI:  It's relevant to factor two of fair

17   use but --

18           THE COURT:  What is factor two?

19           MS. CENDALI:  That -- that -- it's the nature of

20   the copyrighted works.  Works that are deeply creative get

21   more protection than works that are merely -- that are less

22   creative and more copied from previous --

23           THE COURT:  We can sort that out.  At this point,

24   I'm going to let her testify on those issues.  If it's not

25   probative, you know, we can deal with that as far as what

1    goes to the jury.

2         But I did specifically want to deal with this issue

3    of industry practice and standards based on the plaintiff's

4    objection as to the -- Dr. Jablonski's qualification to

5    offer those opinions in this case.  I have dealt with that.

6    I'm not -- I'm striking her opinions -- the other opinions.

7         Okay?

8         MS. CENDALI:  Understood, Your Honor.

9         MR. SIMON:  Thank you, Your Honor.

10        THE COURT:  Okay.  I hate to keep doing this to you

11   all, but I need another ten minutes.

12        (Court recessed from 3:16 p.m. to 3:26 p.m.)

13        (Proceedings continued in open court, jury

14   present.)

15        MS. CENDALI:  May I resume, Your Honor?

16        THE COURT:  You may.

17             DIRECT EXAMINATION (cont'd.)

18   BY MS. CENDALI:

19   Q.    Hello again, Dr. Jablonski.

20   A.    Hello, Miss Cendali.

21   Q.    Dr. Jablonski, did you form any opinions with

22   respect to tattoos as a mode of personal expression and, in

23   particular, the creativity of Mr. Orton's tattoos?

24   A.    Yes, I did.

25        MS. CENDALI:  Mr. Thomas, could you please put

1   demonstrative exhibit -- slide six on the stand.

2   Q.      (BY MS. CENDALI)  Dr. Jablonski, how long have

3   humans been getting tattoo?

4   A.      Well, it's hard to know exactly because skin

5   doesn't preserve in the fossil record.  So, the oldest

6   evidence we have is about 5,300 years old, but probably

7   people have been getting tattooed much longer.  And

8   beginning around 4,500 years ago, we find tattoos on bodies

9   all over the place, throughout much of Siberia, South

10  America, Egypt.  There's just a lot of tattooing that

11  begins to go on, and gets very widespread.

12          MS. CENDALI:  Let's turn to slide seven, please,

13  Mr. Thomas.

14  Q.      (BY MS. CENDALI)  Do people still get tattoos

15  today?

16  A.      Oh, yeah.  They get tattoos in large numbers.  And

17  many of them are like the tribal designs that you see here.

18  One of the things that's so interesting about these tribal

19  tattoos that are very popular among sports people is, they

20  are classic warrior tattoos that first were used in

21  Polynesian societies.

22          In fact, in the previous slide -- if we can just --

23  if I may ask to back up?  3200 years ago, in the image in

24  the lower right-hand corner, what we see is a piece of

25  Polynesian pottery with a geometric design.  You can't see

1    it so well in this particular version of the image, but

2    this specific image, as well as many other geometric

3    designs, are, are basically used exactly as they were 3,000

4    or more years ago.

5            MS. CENDALI:  Can you turn back to slide seven.

6    Q.      (BY MS. CENDALI)  Can you give me an example of

7    that?

8    A.      Yes.  So, when we look at actor Jason Momoa in the

9    lower right-hand corner?  On his left forearm, we see a

10   regular geometric design that is basically copied from a

11   Polynesian tattoo design.

12   Q.      So -- just so -- we have heard in this case the

13   word tribal tattoos a lot.  Could we just sort of take a

14   half-step back and just explain what these pictures are on

15   slide seven and what you mean by tribal tattoos?

16   A.      Well, tribal tattoos is a very broad category of,

17   of geometric -- repetitive geometric designs.  Sometimes

18   with, you know, sharp corners, other times with lots of

19   curves.  But the key point is that these are, are black

20   designs, generally with very little gray shading.  They're

21   geometric designs.  They are stylized representations,

22   sometimes of animals.  As we see the turtle and the lizard

23   are tribal designs that are then reproduced on -- as

24   tattoos.

25           So, these -- these identical Polynesian and Pacific

1  islander designs that are in many cases thousands of years

2  old, are used as tattoo designs today on athletes like the

3  New Zealand rugby player, on Dwayne "The Rock" Johnson,

4  Jason Momoa, and many others.

5          THE COURT:  Let's turn to slide eight.

6  Q.      (BY MS. CENDALI)  What role, if any, have

7  celebrities played in the popularity of tattoos?

8  A.      Oh, celebrities have played a huge role in the

9  popularity of tattoos because they're visible, and they're

10  popular, and they're considered to be people of high

11  status.  And so, especially when young people see

12  celebrities and people they admire who are tattooed, they

13  want to do it, too.  And this has just skyrocketed in the

14  last 30 years.  More celebrities are getting tattooed, that

15  encourages more celebrities to get tattooed, and then more

16  regular folks want to look like celebrities.  And, and

17  tattoo culture has just become outrageously popular because

18  people love this aspect of visual culture.

19  Q.      Have clothing styles been influenced at all by

20  tattoo culture?

21          MR. SIMON:  Your Honor, objection, relevance.

22          THE COURT:  Overruled.

23  A.      Quite dramatically.  We see lots of backless

24  wedding dresses for displaying tattoos; cut-out styles,

25  especially for women, but also for men.  So, a lot of

1    fashion has actually been designed specifically to

2    accommodate modern tattoo culture.

3    Q.      (BY MS. CENDALI)  What, if anything, does the role

4    of tattoos in culture today have in common with the role in

5    tattoos in historical times?

6    A.      Basically, they're the same.  People want to

7    express themselves.  They want to express their group

8    identity, their membership.  They want to memorialize

9    something through their tattoo that really signifies.  And

10   they want to communicate.  Tattoos are about communicating

11   your identity and what is really important to you.  And

12   they're there, they're in your face, they're permanent.

13   You just can't miss 'em.

14   Q.      Are tattoos a mode of self-expression?

15   A.      Enormously, yes.  They're a really important mode

16   of self-expression.  And they don't change.  I mean,

17   tattoos are permanent.  And so, you know, you can change

18   your hair, you can change your clothes, but it's much, much

19   harder to change your tattoo.  It's a real commitment.

20           MS. CENDALI:  Let's turn to slide 13, Mr. Thomas.

21   Q.      (BY MS. CENDALI)  You have sat through the trial to

22   date; correct?

23   A.      Yes.  Yes, I did.

24   Q.      Do you consider Mr. Orton's tattoos reflective of

25   his personal expression?

1    A.      Yes, absolutely.  He made that clear, mm-hmm.

2    Q.      Who came up with the idea for the tattoos inked on

3    Mr. Orton?

4           MR. SIMON:  Objection, Your Honor, speculation.

5           MS. CENDALI:  She's -- I am laying the foundation

6    for the opinion she is about to give, and this relates to

7    just like their video --

8           THE COURT:  Hold on.  Hold on.  If we need to have

9    a discussion, we need to do it on the headsets.

10          MS. CENDALI:  Okay.

11          THE COURT:  But on this specific objection at this

12   time is that your question about who came up with the idea

13   without more is speculation, calls for speculation.  That

14   is sustained.

15   Q.      (BY MS. CENDALI)  Did you hear Mr. Orton discussing

16   that he came up with the idea for his tattoos?

17   A.      Yes, I did.

18          MR. SIMON:  Ob --

19          THE COURT:  I'm sorry?

20          MR. SIMON:  Your Honor, I don't think it's

21   appropriate for her to be rephrasing Mr. Orton's testimony

22   with her expert.  It couldn't have been in her report

23   because he didn't testify in her report.

24          THE COURT:  Counsel, I think the appropriate way is

25   to ask it as a hypothetical.  Otherwise, the objection is

1    sustained.

2    Q.       (BY MS. CENDALI)  Well, you studied as part of your

3    work on this case the tattoos that were inked on Mr. Orton;

4    correct?

5    A.       I did.

6    Q.       Okay.  All right.  Well, let's -- let me ask you

7    about specifically the rose, skulls, and dove tattoos.

8    A.       Mm-hmm.

9    Q.       To what extent, if at all, do those tattoos reflect

10    common motifs in the tattoo industry, in the history of

11    tattoos?

12    A.       These -- these three themes, the rose, the dove,

13    and skulls, are some of the most commonly-tattooed images

14    ever in, in most western societies.  They are -- they have

15    been tattooed on people for more than a century.  They're

16    extremely common and, and people love them still.  They're

17    very popular with people and, and -- yes, they're just

18    extremely common and popular and they've -- there are whole

19    groups of tattooists who get together and talk about how

20    they do rose tattoos; how they do skull tattoos.

21           These are just really, really important images for

22    tattoos, and they have been for more than a century.

23    Q.       Is Mr. Orton the only one in the world that has

24    rose, skull, and dove tattoos?

25    A.       I would think not.  I mean, there are probably --

1    if we just take one kind -- I mean, there must be, at this

2    point, if you count dead people as well, many millions of

3    people with rose tattoos, similarly with skulls.

4    Q.    Now, does Mr. Orton have any other -- turning to

5    slide 14.  Does Mr. Orton have any other types of tattoos

6    that reflect common and historical motifs?

7    A.    Yes.  He has numerous tribal tattoos.  He described

8    these.  And here we see Mr. Orton with other WWE wrestling

9    talent who also have tribal tattoos.

10        MS. CENDALI:  And turning to slide 15.

11   Q.    (BY MS. CENDALI)  What's depicted here, Dr.

12   Jablonski?

13   A.    We see some close-ups of the ink on the same

14   artists that we looked at, and these are close-ups of the

15   tattoos.  And the similarity, especially between Mr.

16   Goldberg's tattoo and Mr. Orton's, part of -- some of Mr.

17   Orton's tribal tattoos is striking.

18   Q.    What's your understanding about when Mr. Goldberg

19   first appeared with his tattoos?

20        MR. SIMON:  Objection, Your Honor, relevance.  Not

21   in her report.

22        MS. CENDALI:  She discusses this, Your Honor.  It's

23   the foundation for this opinion.

24        MR. SIMON:  It's not --

25        THE COURT:  Was it a foundation that was set forth

1  in a report?

2  MS. CENDALI:  Yeah, she discussed these -- this

3  exact slide was in her report.

4  THE COURT:  Mr. Simon?

5  MR. SIMON:  Can we have a page number, please?

6  MS. CENDALI:  Page 23 of her expert report reflects

7  the Bautista, Goldberg --

8  THE COURT:  Hold on.  Hold on.

9  MS. CENDALI:  I'm sorry.

10  THE COURT:  Let him get there.

11  (Pause.)

12  MR. SIMON:  Your Honor?  The pictures in the report

13  -- I have no objection to the picture.  It's up on the

14  screen.  She asked her when Mr. Goldberg got this tattoo.

15  That's not in her report and it's not relevant.

16  MS. CENDALI:  It's relevant --

17  THE COURT:  Sidebar.

18  (Proceedings continued at the bench.)

19  THE COURT:  Miss Cendali, what is the -- who is Mr.

20  Goldberg, first of all?

21  MS. CENDALI:  Mr. Goldberg is another wrestler, who

22  is another famous wrestler who preceded Mr. Orton and had a

23  very similar tattoo.  And we're just trying to point out

24  that -- she explained in her report -- that it's common for

25  wrestlers to have these tattoos, and that Mr. Orton's

tattoos -- these particular pictures here are images of

tattoos that incorporate tribal designs on other current

and former WWE wrestlers.  That was in her report.

THE COURT:  What's the relevance?

MS. CENDALI:  The relevance is these tattoos are

not created under -- to be -- under factor two of the fair

use factor.  They are not as -- should not be given the

highest level of creativity under --

THE COURT:  What is the factor two?  What is the

second factor?

MS. CENDALI:  Factor two looks at the nature of the

copyrighted work, and looks at it on a scale of a continuum

with maybe at the maximum scale something like the Harry

Potter books, where everything is completely fanciful and

original.  On the other end of the scale, you might have

something like a very technical computer program.  And the

concept is, if you have a work like Mr. Orton's tattoos

that are playing on old motifs and have been copied or have

similar elements, as her report indicates, that are common

in the industry or that were on former wrestlers preceding

Mr. Orton -- as again, her report said former WWE wrestler

-- that pushes hers down the scale of continuity.  And

that's the evidence we are trying to illicit.

THE COURT:  Is that -- are we talking about

components of tattoo works?  Because all of the works come

1    from different components.  There's no question but that

2    her work in its entirety is not a copy.

3         MS. CENDALI:  No, we're not -- it doesn't go to,

4    Your Honor, whether her works were copied or anything like

5    that.

6         THE COURT:  I'm not sure it goes to anything at

7    this point, Miss Cendali.  That's my problem.

8         MS. CENDALI:  Well, as she said in her report, it

9    goes to the idea -- and as I explained earlier -- that in

10   factor two of fair use, the fact that a work is not that

11   creative but is in fact using common motifs and is built on

12   things that others have done before them, like former

13   wrestlers, that's what she discussed in her report and

14   that's why she has these pictures --

15        THE COURT:  Is that what you are trying to

16   establish?  That generic and generally tribal motifs have

17   been used as part -- as tattoos by a whole lot of people

18   before Mr. Orton, including wrestlers?  I don't think --

19        MS. CENDALI:  Yes.

20        THE COURT:  -- that's an issue that's in dispute.

21        MS. CENDALI:  Well, yes, this is in dispute because

22   I'm not letting -- to have the testimony out there and

23   specifically --

24        THE COURT:  No.  No.  That is not even a fact that

25   needs to be proven.  I don't think there is any dispute but

1    that the tribal motif generally and generically has been

2    used in tattoos and other art forms -- I mean, generically

3    speaking, I don't think that's the question here.  The

4    question -- unless you are saying that the specific

5    components of Miss Alexander's work, then I don't know how

6    it applies to the fair use.

7        MS. CENDALI:  Yes, Your Honor.  I'm trying to

8    establish, as she said in her report, citing these

9    pictures, including the Goldberg tattoo that I am trying to

10   talk about, is, she says that it's common to have tribal

11   designs and tattoos and that, in my review of tattoos,

12   wrestlers have things that incorporate tribal designs and

13   -- for example --

14       THE COURT:  Miss Cendali?  Miss Cendali?  I'd be

15   willing to bet that Mr. Simon will stipulate that tribal

16   motif and tattoos are common, they are -- they were common

17   in wrestlers and other folks before and after, Miss --

18   that's not an issue that's disputed, is what I am saying.

19       MS. CENDALI:  Your Honor, let me try again.  As we

20   said earlier during the break, one of the other things that

21   her testimony goes to is the value of the work.  It goes to

22   damages.  And to the extent that the tattoo, as she said in

23   her report, is common and copied, incorporated tribal

24   designs on other current and former wrestlers such as Mr.

25   Goldberg, that goes to part of why it's less valuable.

1    THE COURT:  Okay.  Let me say this, because we need

2    to get past this.  I'm not totally persuaded.  I'm going to

3    give you some leeway on this, but not a whole lot.  So, the

4    objection is overruled at this point.

5    MS. CENDALI:  Thank you.

6    (Proceedings continued in open court, jury

7    present.)

8    Q.    (BY MS. CENDALI)  So, Dr. Jablonski, do you have a

9    view as to whether Mr. Orton's tattoos resemble the tattoos

10   of other former wrestlers?

11   A.    Yes.  Yes, I have an opinion on this.  And they --

12   his -- his tribal tattoo on his back resembles very closely

13   that of Mr. Bill Goldberg's tattoo on his left shoulder,

14   that we can see in the upper left of this slide.

15   Q.    And then what about Mr. Goldberg's tattoo?  Does

16   that have any bearing on your view with regard to the

17   creativity or value of Miss Orton's [sic] tattoos?

18   A.    Well, what's so interesting about Mr. Goldberg's

19   tattoo is that it's, it's basically a Pacific islander

20   design.  So, it was copied from a preexisting design.  And

21   then Mr. Orton originally had a similar design --

22   MR. SIMON:  Your Honor?  I'm sorry.  She's saying

23   this design was copied?  That's not in her report.  She's

24   talking about Mr. Goldberg's design was copied.  This is --

25   this case isn't about that.

1        MS. CENDALI:  Your Honor, she's talking about the

2    history of tribal design from Maori culture.  I believe my

3    exam is being improperly riddled with objections.

4        THE COURT:  I don't think it's being improperly

5    riddled with objections.  I think counsel is objecting.

6        And this objection is, is that your witness is now

7    testifying that she based her opinions or testifying to

8    bases for her opinions that were not previously disclosed.

9    That's what I'm hearing Mr. Simon say.

10       MS. CENDALI:  As we discussed, I'm -- I'm just

11   asking -- let me ask a different question.  I'm discussing

12   what we -- I'm trying to ask the question we asked at the

13   sidebar, which is with regard to the similarity of Mr.

14   Orton and Mr. Goldberg's tattoos.

15       THE COURT:  But, counsel, the whole question is

16   whether or not you are eliciting testimony and evidence at

17   this point that was not previously disclosed.

18       MS. CENDALI:  But, Your Honor, we just talked about

19   that it was.  I just read you from her expert report during

20   the sidebar where she talked about that.

21       THE COURT:  No, as a bases for her opinion.  Her

22   opinion was disclosed.

23       MS. CENDALI:  Correct.

24       THE COURT:  But the bases for her opinion.

25       MS. CENDALI:  Well, yes, she talked about that and

1    cited this wrestler as an example.

2          THE COURT:  Miss Cendali?  I'm trying to give you

3    leeway here.  Okay?  But I can't give you leeway and you

4    keep expanding.  So, could you ask the question and let's

5    move on?

6          MS. CENDALI:  Okay.

7    Q.    (BY MS. CENDALI)  One more question on this, then

8    I'm going to move on to the next and last slide, Dr.

9    Jablonski.

10          Do you see similarities between Randy Orton's

11    tattoos and Mr. Goldberg's tattoos?

12    A.    Yes, I do.

13    Q.    Okay.  All right.  Now let's look at slide 16.  Do

14    you remember testimony you discussed in your expert report,

15    the additions that Ms. Alexander made to Mr. Orton's back

16    tattoo --

17    A.    Yes.

18    Q.    -- do you remember that?

19    A.    Yes, I do remember.

20    Q.    Do you have a view as to the relevant --

21          THE COURT:  Pardon me, Miss Cendali.  I do have to

22    stop you.  Are these in evidence?

23          MS. CENDALI:  Yes, Your Honor.  Both -- both of the

24    two documents -- this is just a demonstrative.  But the top

25    is Defendants' Exhibit 259 and the bottom is Defendants'

1    Exhibit 303.

2         THE COURT:  Okay.  And I'm going to ask that -- and

3    to the extent -- could you make sure you reference that in

4    the record?  Because the record's not going to tell us what

5    you are discussing.

6         MS. CENDALI:  Fair enough, Your Honor.  Sorry about

7    that.

8         THE COURT:  Oh, that's okay.

9         MS. CENDALI:  Okay.

10   Q.    (BY MS. CENDALI)  So, can you speak to us about, to

11   what extent Miss -- the relative contribution of what Miss

12   Alexander did to what was there already?

13   A.    Yes.  What we see in the top view, 259, is the

14   original tattoo, the original tribal tattoo that Mr. Orton

15   had done, not by Ms. Alexander.  And then below, in 303, we

16   see the extension and modifications done by Ms. Alexander.

17        What is important here is that, first of all, it

18   was Randy's decision to, to make those changes.

19        MR. SIMON:  Your Honor?  Objection.  Again, Mr.

20   Orton wasn't deposed.  Mr. Orton testified in court.

21   Nothing about what Mr. Orton said in court is in her report

22   as a basis and it's improper.

23        MS. CENDALI:  Your Honor, she is trying to give

24   context to the question that I asked.  But in any case,

25   their own expert, Mr. Zagal, was consistently asked

1 numerous questions about, did he hear the testimony of

2 other witnesses, and then relied on it, as did their expert

3 Mr. Clark.

4      THE COURT:  Hold on.  To the extent --

5      MR. SIMON:  No, we didn't.

6      THE COURT:  This whole area was disclosed as, as

7 part of her opinions in this case, Mr. Simon.

8      MS. CENDALI:  Yes.

9      THE COURT:  That's one thing.

10      MR. SIMON:  Yes.

11      THE COURT:  Secondly, to the extent -- and you all

12 asked me if the experts could all sit in the trial during

13 the course of the trial?  Your own expert is sitting here,

14 and, and based on his previous information and anything he

15 gleaned from court, is expressing opinions.  She was here

16 when Mr. Orton testified.

17      But again, Miss Cendali, part of the problem is the

18 formulation of the question.  If you would ask this witness

19 from a hypothetical if she were to assume that Mr. Orton

20 did X, Y, Z, and ask her opinions, that's not a problem.

21      MS. CENDALI:  Well, let me use Your Honor's

22 guidance and ask Dr. Jablonski.

23 Q.    (BY MS. CENDALI)  Assuming that the bottom image --

24 that the top image reflected Mr. Orton's original tattoo,

25 and that the bottom image reflected what Ms. Alexander

1    added to it, can you -- explain to us what -- what that

2    means in terms of the relative contribution of Ms.

3    Alexander to that tattoo.

4    A.       Well, it means that Miss Alexander contributed

5    modestly to that tattoo because she was asked to extend it

6    in the same style as had been done by a previous artist.

7            MS. CENDALI:  No further questions.

8            THE COURT:  Okay.  Mr. Simon?

9            MR. SIMON:  Yes, Your Honor.  Thank you.  May I

10    approach the witness, Your Honor?

11            THE COURT:  You may.

12            MR. SIMON:  Dr. Jablonski, I'm going to give you a

13    cope of your book, in case you want to look at it.

14            THE WITNESS:  Thank you.

15            MS. CENDALI:  Do you have a copy for me or is this

16    one I happened to bring good enough?

17            MR. SIMON:  That's fine.

18                          CROSS-EXAMINATION

19    BY MR. SIMON:

20    Q.       Dr. Jablonski, do you agree that in the modern

21    realm with the growth of digital communications media,

22    where people increasingly learn about the world and each

23    other through fast-paced imagery and auditory signals,

24    appearance has come to assume an overwhelming primacy?

25    A.       Yes.  I wrote that.  I agree.

1    Q.    And do you agree people use their skin as a canvas?

2    A.    Yes.

3    Q.    And tattoos are body art?

4    A.    Yes.

5    Q.    And you agree that the appeal of tattooing is not

6    only permanence but also the richness of expression that

7    the media makes possible?

8    A.    Yes.

9    Q.    And the large canvas of the skin permits images

10   widely varying in sizes, colors, and complexity; correct?

11   A.    Yes.

12        MR. SIMON:  If you could put on the witness's

13   screen 163 -- Plaintiff's Exhibit 163.

14   Q.    (BY MR. SIMON)  Do you recognize this as a copy of

15   a page from your book?

16   A.    Yes.  I recognize it.

17   Q.    Okay.  And if you can't read it --

18   A.    Yes.

19   Q.    -- you can open your book at 151.

20        MR. SIMON:  I'd move the admission of Exhibit 163,

21   please, Your Honor.

22        MS. CENDALI:  Objection, relevance as an exhibit.

23        THE COURT:  What is the relevance?

24        MR. SIMON:  Your Honor, I am cross-examining her on

25   the -- what she just testified about, how some tattoos that

1    have very little design --

2         THE COURT:  But you haven't laid the foundation

3    yet.  You just asked to admit the exhibit but there's been

4    no testimony --

5         MR. SIMON:  I'm sorry.

6    Q.    (BY MR. SIMON)  This is a copy of a page from your

7    book; correct?

8    A.    That's correct.

9    Q.    Okay.  And you wrote the book?

10   A.    Yes, I did.

11        MR. SIMON:  Okay.  And now I move the admission of

12   Exhibit 163.

13        THE COURT:  And again, what's the relevancy?

14        MR. SIMON:  The relevance is, it goes to the exact

15   testimony she was just giving about the complexity of the

16   tribal tattoos.

17        MS. CENDALI:  I -- let's move along.  No objection.

18        THE COURT:  Plaintiff's Exhibit 163 is admitted.

19        MR. SIMON:  Okay, so we can publish that for the

20   jury, please.

21   Q.    (BY MR. SIMON)  Now, these are pictures in your

22   book of someone tattooing somebody; right?

23   A.    That's right.

24   Q.    And on the -- you say in the caption on the

25   picture.

1        MR. SIMON:  If you could blow that up, please.

2   Q.      (BY MR. SIMON)  "On the left, artist Kira Od works

3   on the details of a complex Celtic cross design on the

4   front of Daniel McCune's lower leg."  Right?

5   A.      Yes.

6   Q.      "On the right, the finished tattoo of the Muiredach

7   Cross provides a good example of modern ink, rich in

8   detail, tailored to the body, and celebrating a

9   life-changing event in a person's history."  Correct?

10  A.      That's correct.

11  Q.      And then you say courtesy -- give courtesy to the

12  tattoo artist for using this picture in the book.  Right?

13  A.      Yes.

14  Q.      Okay.

15  A.      That was required by my publisher.

16  Q.      I have one more question from the book.  Do you

17  agree that many of the people --

18      MS. CENDALI:  Objection, Your Honor, and move to

19  strike as outside the scope of her testimony.  She was

20  limited in her testimony --

21      THE COURT:  Hold on.  He didn't even ask the

22  question, Miss Cendali.

23      MS. CENDALI:  Can I have a sidebar, Your Honor?

24      THE COURT:  Yes.

25      (Proceedings continued at the bench.)

1        MS. CENDALI:  Your Honor, Mr. Simon successfully

2   fought to let her testify -- to let her testify about

3   industry custom and practice and I wasn't able to do that.

4        THE COURT:  What does that have to do with this?

5        MS. CENDALI:  She -- he is clearly trying to use

6   and intends to use -- and the fact that she had a courtesy

7   of Kira Od, the tattoo artist, and the publisher here to

8   try to establish that there is some rights situation.  I

9   think that's going to confuse the jury and it's outside the

10  scope of her exam, where I was trying to get her to be able

11  to testify --

12       THE COURT:  Now, Mr. Simon, I asked you when you

13  put that photo up for the relevancy because I didn't

14  understand the relevancy.  I still don't understand the

15  relevancy.

16       MR. SIMON:  Can I go grab it?  I'll give you the

17  exact --

18       THE COURT:  Yes.  Yes.

19       MR. SIMON:  Your Honor, she was shown Randy Orton's

20  tattoos and talked about how common they were and how they

21  weren't rich in detail.  This is a cross on a leg, and she

22  calls it rich in detail, tailored to the body and

23  celebrating a life-changing moment.

24       THE COURT:  Okay.

25       MS. CENDALI:  So the --

1       THE COURT:  Hold on, Miss Cendali.

2       Am I understanding the relevancy is, you are

3  offering her something from her book, a photograph and her

4  description where she -- I guess you are going to argue --

5  where she characterizes common motif as richly detailed, et

6  cetera, et cetera?

7       MR. SIMON:  Yes.

8       THE COURT:  Okay.  Then overruled.

9       MS. CENDALI:  Well, Your Honor -- Your Honor --

10      THE COURT:  I'm sorry?

11      MS. CENDALI:  That's -- that's not what my

12 objection is.  I'm not objecting to the part where he's

13 talking about the -- that this particular tattoo, though I

14 don't see it's relevant, which has nothing to do or look

15 like Mr. --

16      THE COURT:  What are you objecting to exactly, Miss

17 Cendali?

18      MS. CENDALI:  I'm objecting to his question where

19 he asked her about courtesy of Kira Od, the tattoo artist,

20 because he is violating the prohibition that she said she

21 couldn't talk about industry practice.

22      THE COURT:  She hasn't talked about industry

23 practice.

24      MS. CENDALI:  But he's trying to establish by that

25 that she gave a -- that there was a permission from the

1  tattoo artist in this context.  I think that's confusing

2  and misleading to the jury and unfair.

3        MR. SIMON:  Your Honor?

4        THE COURT:  Mr. Simon?

5        MR. SIMON:  I didn't ask a question --

6        MS. CENDALI:  And --

7        THE COURT:  Mr. Simon?

8        MR. SIMON:  I didn't ask that question and I don't

9  intend to.  I'm moving on.

10        MS. CENDALI:  But he already elicited, that's why I

11  move to strike.  He specifically asked, why did -- courtesy

12  of Kira Od, and why she did that.

13        THE COURT:  No.  She -- he did not ask her why she

14  did that.  She volunteered that.  Overruled.

15        (Proceedings continued in open court, jury

16  present.)

17  Q.    (BY MR. SIMON)  Ma'am, do you agree that many

18  people who get tattoos in affluent countries today exercise

19  great care in choosing the design and composition of their

20  tattoo and the artist who will create it?

21  A.      They think deeply about the design; they think long

22  and hard about the design; and, when they have the luxury

23  of time and money, they -- they search out a specific

24  tattoo artist.  But it's important to say, Mr. Simon, that

25  many people also go to tattoo artists that are convenient

1    to their homes.

2    Q.     Can you pick up your book, please, and turn to page

3    152.

4    A.     Yes, I'm there.

5    Q.     Didn't you say in your book:  Many of the people

6    who get tattoos in affluent countries today exercise great

7    care in choosing the design and composition of their tattoo

8    and the artist who will create it?

9    A.     Yes.  I wrote that.  Yes.

10   Q.     Thank you.  And that's specifically true for

11   celebrities like Mr. Orton; right?

12   A.     Yes, it -- yes, it is true.

13   Q.     Okay.  And then you were in the courtroom when Mr.

14   Orton testified.  He was very complimentary of my client

15   about her abilities.  Do you agree?

16   A.     Yes.  Yes.  He used very complimentary terms.

17   Q.     You are getting paid to be an expert in this case?

18   A.     Yes, I am.

19   Q.     What do you charge hourly?

20   A.     My rate over the --

21          MS. CENDALI:  Objection, relevance.  Are we going

22   to do this for all the experts, Your Honor?

23          THE COURT:  Overruled.

24   Q.     (BY MR. SIMON)  Go ahead.  What's your rate?

25   A.     My rate varied over the course of this case because

1    it's gone on for a long time.  So, it started at 600

2    dollars per hour, and it is now at 750 dollars per hour.

3    Q.     And that's what you are charging to sit in court

4    every day?

5    A.     Yes.

6    Q.     Okay.  Do you know how many hours you have billed

7    in this case?

8    A.     Up to the beginning of this case, up to the

9    beginning of, of our being here, about 30 hours.

10   Q.     Okay.  And then in addition to -- in addition to

11   sitting here all day, are you working after the trial every

12   day?

13   A.     For variable amounts of time.

14   Q.     Do you know how many hours since the trial started

15   you are going to bill for, or have billed for?

16   A.     I haven't --

17          MS. CENDALI:  Objection, relevance.

18          THE COURT:  Overruled.

19   Q.     (BY MR. SIMON)  Pardon me?

20   A.     I haven't -- I haven't counted the hours.  I

21   haven't added them all up.

22   Q.     Do you know the total amount you have been paid or

23   are owed?

24   A.     No, I don't.

25          MR. SIMON:  Okay.  That's all I have, Your Honor.

1         THE COURT:  Anything else, Miss Cendali?

2         MS. CENDALI:  No further questions.

3         THE COURT:  Thank you, Dr. Jablonski.

4         Prepared to call your next witness?

5         MR. SIMMONS:  Your Honor, defendants call Alfie

6    Brody to the stand.

7         May I approach the witness with a binder?

8         THE COURT:  You may.

9         (Witness sworn by courtroom deputy.)

10        THE WITNESS:  Alfie Brody, B-R-O-D-Y.  A-L-F-I-E.

11                       * * * * *

12                    ALFREDO BRODY,

13   having been first duly sworn, was examined and testified as

14   follows:

15                  DIRECT EXAMINATION

16   BY MR. SIMMONS:

17   Q.    Would you please introduce yourself to the jury?

18   A.    Sure.  I'm Alfie Brody.  I'm the Vice President of

19   Global Marketing for 2K Games.

20   Q.    What is 2K Games?

21   A.    2K Games is a publisher of interactive

22   entertainment, specifically video games.

23   Q.    Does 2K Games have a parent company?

24   A.    We do.  Take-Two Interactive.

25   Q.    Now, I'd like to start by talking about your

1  background.  Where did you grow up?

2  A.    I grew up in Ohio.

3  Q.    And where did you go to college?

4  A.    I went to a small liberal arts school called West

5  Virginia Wesleyan.

6  Q.    And what did you study?

7  A.    I studied psychology and physical education.

8  Q.    Did you do any graduate school?

9  A.    I did.  I went to Xavier University in Cincinnati,

10 Master's of Education.  And then I went to Case Western

11 Reserve University in Cleveland, Ohio, and I got a Master's

12 in Business Administration.

13 Q.    Why did you choose those schools?

14 A.    Undergrad, just wanted to extend my mediocre

15 basketball career out of high school.  Grad school at

16 Xavier, I wanted to coach basketball, so I spent a couple

17 years there coaching basketball.  And then Case was -- I

18 lived in Cleveland, was working there.  It was a local

19 school.

20 Q.    What did you do after school?

21 A.    Entered the workforce.  First job was an agency in

22 Baltimore, Maryland, sports marketing agency.  From there,

23 I worked at Red Bull Energy Drink, and then the National

24 Basketball Association in New York City, and then spent a

25 few years in Chicago working for Gatorade.  And then I have

1    now been at 2K for about eight and a half years.

2    Q.    When did you start working at 2K Games

3    specifically?

4    A.    I joined in January of 2014.

5    Q.    And why did you join the company?

6    A.    My family -- my wife and I were looking to move to

7    California, had an obvious affinity for sports and video

8    games.

9    Q.    While working at 2K, what games have you worked on?

10   A.    I have worked on NBA 2K, WWE 2K, and PGA 2K.

11   Q.    What have your responsibilities included across the

12   time you have worked at 2K Games?

13   A.    All in a marketing capacity.  So we -- myself and

14   my team are responsible for building our annual marketing

15   campaigns, so all of our media, anytime you see a TV

16   commercial or advertising on social media.  I'm in charge

17   of all of our event programming, working with our various

18   licensors, and picking our cover athletes.

19   Q.    Now, in your role do you interface with other

20   departments?

21   A.    I do.

22   Q.    And what other departments do you interface with?

23   A.    We interface with the development team, the folks

24   that actually make the game.  We interface with all facets

25   of the publishing organization, so, marketing, sales,

1    finance, HR, legal.  We also interface with, as I mentioned

2    earlier, the licensors, so, WWE, the NBA, PGA, et cetera.

3    Q.      Have you ever appeared in a video game?

4    A.      I have.

5    Q.      In what context?

6    A.      Our development team has a sense of humor, so they

7    put me into NBA 2K as an usher.  So, I show you to your

8    seat when you go to games.

9    Q.      Let's talk about Take-Two.  Now, when was Take-Two

10   founded?

11   A.      1995.

12   Q.      And, Mr. Brody, what video games does Take-Two

13   publish?

14   A.      I'm sorry.  1993, I misspoke.

15   Q.      What video games does Take-Two publish?

16   A.      They publish a whole portfolio of games under

17   different studios and labels, Grand Theft Auto, Red Dead

18   Redemption.  Our Rockstar games is a label.  They also will

19   publish 2K games, NBA 2K,  WWE 2K, PGA.  There's also other

20   games like Borderlands or Bioshock.  And then a portfolio

21   of mobile games as well, Farmville, Words with Friends, are

22   examples.

23   Q.      And, Mr. Brody, what category of games does

24   Take-Two produce?

25   A.      Yeah, we have action and role playing.  So, that's

1    more like fantasy-driven.  You live in a fantasy world, you

2    build an avatar and go through various adventures.  And

3    then sports simulation, where we try to replicate what you

4    would see on the court, on the field, on the course, in the

5    ring, as best we can.

6    Q.    What have you observed about the reaction among

7    purchasers of Take-Two's games?

8    A.    It's an incredible enthusiastic global community,

9    very passionate about their products, very loyal, often buy

10   the game every year and engage a lot, really focus on the

11   quality of the games to drive that.

12   Q.    Let's talk about sports games in particular.  When

13   did Take-Two start developing sports games?

14   A.    Around 2005.

15   Q.    And when did Take-Two start producing WWE video

16   games?

17   A.    We acquired the license in 2013 from THQ, after

18   they went bankrupt.  And then our first release was WWE 2K

19   14.

20   Q.    Were you familiar with the WWE before then?

21   A.    I was.

22   Q.    And in what way?

23   A.    I was a fan as a, as a kid.

24   Q.    Who was your favorite wrestler?

25   A.    It has to be Hulk Hogan.

1    Q.    Now, you mentioned THQ.  Could you explain a little

2    bit more how you came to take over the video game WWE 2K

3    from THQ?

4    A.    Yeah, they started making games around 2002,

5    continued to do so through 2013, at which they declared

6    bankruptcy.  And at that point, we acquired the license

7    from the WWE, and our first entry into the space was 2K14.

8    Q.    How many editions of WWE 2K have been produced to

9    date?

10    A.    Nine total.

11    Q.    And what editions of WWE 2K are at issue in this

12    lawsuit?

13    A.    2K16 -- WWE 2K16, 17, and 18.

14    Q.    Now, Mr. Brody, did you prepare any demonstratives

15    to assist you with your testimony today?

16    A.    I did.

17          MR. SIMMONS:  Your Honor, may I request permission

18    to publish Defendant's Exhibit 330?

19          THE COURT:  Any objection?

20          MR. SIMON:  No.  No objections, Your Honor.

21          THE COURT:  You may publish it.

22          MR. SIMMONS:  Thank you.

23          THE COURT:  And this is a demonstrative only?

24          MR. SIMMONS:  Yes, Your Honor.  And can we display

25    slide five and show that to the jury.

1    Q.      (BY MR. SIMMONS)   Now, Mr. Brody, what are you

2    showing here?

3    A.      These are the covers of the three games in

4    question.

5    Q.      Now, how many people worked on developing these

6    three games?

7           THE COURT:  I'm sorry, counsel.  Could you please

8    note for the record that this group demonstrative does

9    actually include exhibits that have been admitted, I

10   believe, so that we know -- again, when we look at the

11   record, we don't know what he's referring to.

12          MR. SIMMONS:  Yes, Your Honor.

13          THE COURT:  I understand the exhibit itself is a

14   demonstrative, but it incorporates exhibits that have been

15   admitted; is that correct?

16          MR. SIMMONS:  Yes, Your Honor.  So, the

17   demonstrative exhibit includes images, the front covers of

18   PTX-42 -- Plaintiff's Exhibit 42, 44, and 46, which were

19   previously admitted.

20          THE COURT:  Thank you.

21   Q.      (BY MR. SIMMONS)   Mr. Brody, how many people worked

22   on developing these games?

23   A.      Over 100.

24   Q.      And do they work in different areas of the company?

25   A.      They do.

1   Q.    In what areas do the people who worked on these

2   three games work?

3   A.    On the development side, you have software

4   engineers, the folks that actually code the game and make

5   them; you have visual artists; you have sound engineers;

6   you have folks that focus on presentation, so the overall

7   experience; lighting experts.

8         And then on the publishing side, you have

9   marketing, sales and finance, HR, legal, and other

10  functions, as well.

11  Q.    Who are the wrestlers on the covers of these games?

12  A.    Steve Austin, Brock Lesnar, and Seth Rollins.

13  Q.    Is Randy Orton on the cover of any of these games?

14  A.    He is not.

15  Q.    How many other wrestlers appear in WWE 2K16, 17,

16  and 18?

17  A.    Hundreds.

18        MR. SIMMONS:  Now, I'd like to look at a clip of

19  gameplay.  Your Honor, I'd like permission to play for the

20  jury Defendant's Exhibit 28, which was previously admitted

21  into evidence.

22        THE COURT:  You may.

23        MR. SIMMONS:  Mr. Thomas, would you mind starting

24  Defendant's Exhibit 28 at the 2-minute mark, and let's play

25  that for 15 seconds.  And if we can do it with audio for

1    those 15 seconds, that would be appreciated.

2            (Video playing.)

3    Q.      (BY MR. SIMMONS)  Mr. Brody, what are we seeing

4    there?

5    A.      You saw a scene from the game, three wrestlers in

6    the ring battling.  You heard the crowd in the background.

7    You heard commentators, various lighting, crowds cheering,

8    people holding up signs.  It's really what you would see if

9    you went to a live match or if you were watching on TV.

10   Q.      Now you said that -- compared to a live match.  In

11   what ways is WWE 2K similar to watching WWE wrestling on

12   television?

13   A.      Yeah, as you have heard a couple times this week,

14   the objective for the game is simulate real life.  So, as

15   close as we can possibly get to what you would experience

16   if you went to a live event or if you are watching on TV.

17           So, you heard the words authenticity and realism.

18   There's a lot of elements that make up authenticity.

19   Dozens and dozens.  Imagine if you are going to a sporting

20   event.  Everything that you experience, the spectacle, we

21   try to replicate that inside the game.

22   Q.      Does Take-Two provide functionality in the video

23   game that goes beyond what someone might see on television?

24   A.      Oh, we have.

25   Q.      What kind of functionality exists in the game?

1    A.    We add storylines, various modes that we have come

2    up with to make it more fun and engaging, just give -- you

3    know, kinda choose your own adventure.  Give the gamer

4    different options besides wrestling in the ring.

5    Q.    Prior to your testimony today, were you able to

6    review Defendants' Exhibits 7 and 9, which are -- the

7    slipsheets for which are in your binder?

8    A.    Yes.

9    Q.    And are you familiar with them?

10   A.    Yes.

11   Q.    What are they?

12   A.    7 is WWE 2K16 gameplay, Roman Reigns versus Randy

13   Orton.  And 9 is WWE 2K16 gameplay, Royal Rumble.

14         MR. SIMMONS:  Your Honor, I'd move into evidence

15   Defendants' Exhibits 7 and 9.

16         MR. SIMON:  No objection, Your Honor.

17         THE COURT:  Defendants' Exhibits 7 and 9 are

18   admitted.

19   Q.    (BY MR. SIMMONS)  Now, Mr. Brody, how does Take-Two

20   tell players when it releases a new game?

21   A.    We usually make a big announcement, a TV

22   commercial, press release.  Try to garner as much press and

23   hype as we can.

24         MR. SIMMONS:  All right.  I'd like to show just Mr.

25   Brody another clip.  This is going to be Plaintiff's

1    Exhibit 105.  And so, for the purposes of identification,

2    can we play it without sound for five seconds, Mr. Thomas.

3            (Video playing.)

4    Q.      (BY MR. SIMMONS)  Mr. Brody, are you familiar with

5    this video?

6    A.      I am.

7    Q.      And what is it?

8    A.      It's the announce spot for WWE 2K16.

9            MR. SIMMONS:  Your Honor, I'd move the admission of

10   Plaintiff's Exhibit 105 into evidence.

11           MR. SIMON:  No objection.

12           THE COURT:  Plaintiff's Exhibit 105 is admitted.

13           MR. SIMMONS:  Your Honor, may we publish?

14           THE COURT:  You may.  I have a question for

15   clarification.  At least on my list, it's also showing as

16   Defendants' 331.  Is that correct or is that a mistake?

17           MR. SIMMONS:  I would have to check it on my list

18   at counsel table.

19           MR. SIMON:  (Nonverbal response.)

20           THE COURT:  That's correct?  Okay.  But just for

21   clarity then, you referred to it by the plaintiff's number.

22   We'll continue to use -- it's no different, right?

23           MR. SIMMONS:  No.  They're the same video.

24           THE COURT:  So, let's continue to refer to it as

25   Plaintiff's 105, so we're not confused.

1          MR. SIMMONS:  Yes, Your Honor.

2          THE COURT:  And you may publish it, counsel.

3          MR. SIMMONS:  Thank you, Your Honor.

4          What I'd like to do is play that video clip with

5     sound for the jury.  So, Mr. Thomas, if you could turn that

6     back to the beginning and play that video for the jury,

7     please.

8          (Video playing.)

9     Q.     (BY MR. SIMMONS)  Mr. Brody, what was that video

10    showing?

11    A.     It was showing various wrestling action, the

12    various walk-ins, the crowd, pyrotechnics, music.  It's

13    really, again, to show the depth and breadth of the WWE

14    experience and try to replicate that in its entirety to the

15    best of our abilities.

16    Q.     Is it representative of your marketing for WWE

17    2K16, 17, and 18?

18    A.     Could you clarify?

19    Q.     Is it the kind of marketing you use for all the

20    games at issue in this lawsuit?

21    A.     Yes, it's pretty standard.  We do TV spots,

22    gameplay trailers, and the like.

23    Q.     Now, I'd like to switch gears and talk about

24    Take-Two's finances.  Does Take-Two make money on the WWE

25    2K --

1    THE COURT:  Hold on for a second, Mr. Simmons.  Can
2    we have a quick sidebar?

3    MR. SIMMONS:  Yes, Your Honor.

4    (Proceedings continued at the bench.)

5    THE COURT:  I stopped you because you are getting
6    ready to move into a whole other area, the finances, and I
7    assume you're going to spend a lot of time on that.  We
8    have about 10 minutes left.  And instead of cutting you off
9    in 10 minutes, I believe this would be a good stopping
10   point because you're about to -- you're going to be in
11   finances for a minute.  Right?

12   MR. SIMMONS:  We'll be in finances and we'll have
13   other questions.  I don't think I'll finish in ten minutes.

14   THE COURT:  Yeah, I know you won't finish in ten
15   minutes.  I'm just saying, this is a good breaking point so
16   you can start fresh in this area in the morning.

17   MR. SIMMONS:  That sounds good, Your Honor.

18   THE COURT:  Okay.  All right.  Thank you.

19   (Proceedings continued in open court, jury
20   present.)

21   THE COURT:  Okay.  Ladies and gentlemen, we're
22   about to segue to a whole other area and so we have reached
23   a breaking point for the day.  You have heard a lot today,
24   so please remember my instructions, admonitions to you, and
25   we will again reconvene at 9:00 tomorrow.

1          Please be here by 8:45.  And fear not, we're still

2     on track.

3          COURTROOM DEPUTY:  All rise.

4          (Proceedings continued in open court, jury not

5     present.)

6          THE COURT:  So, counsel, you heard me just tell

7     them that.  I hope you're not going to make a liar out of

8     me.  I think we're still on track, like we thought?

9          MS. CENDALI:  We hope so, Your Honor.

10         MR. SIMMONS:  Yes, Your Honor.  We have Mr. Brody

11    and then three other witnesses.

12         THE COURT:  Okay.

13         MR. SIMMONS:  Bogost, Jay, and Malackowski.

14         MR. FRIEDMAN:  And then a brief rebuttal with Mr.

15    Clark.

16         THE COURT:  Brief rebuttal, Mr. Friedman?

17         MR. FRIEDMAN:  Yes.

18         THE COURT:  I'm going to hold you to that, too.

19    Okay?

20         MR. SIMON:  I'm certain you will.

21         THE COURT:  I am.  I'm going to lean into the

22    microphone and say, "Mr. Friedman, brief rebuttal."

23         MR. SIMON:  Your Honor, I'm going to hold him to

24    it.

25         THE COURT:  I'm going to count on you to do that,

1    Mr. Simon.

2         No, but seriously, again, I just want to make sure

3    -- like I said, one way or the other, we should be in a

4    position -- I'm hoping we'll be in a position at the end of

5    the day tomorrow to go through the instructions, so that

6    even if we're -- you know, we go over into evidence on

7    Friday, we'll have most of that stuff worked out.  I just

8    want to make sure that we get the case to the jurors no

9    later than Friday.  And you think we're still on track to

10   do that?

11        MS. CENDALI:  Yes, Your Honor.

12        MR. SIMON:  Yes, Your Honor.

13        THE COURT:  Okay.  Thank you.

14        (Court adjourned at 4:23 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          <u>REPORTER'S CERTIFICATE</u>

2          I, Christine Dohack LaBuwi, RDR, CRR, Official

3    Court Reporter for the U.S. District Court, Southern

4    District of Illinois, do hereby certify that I reported

5    with mechanical stenography the proceedings contained in

6    pages 290-527; and that the same is a full, true, correct

7    and complete transcript from the record of proceedings in

8    the above-entitled matter.

9

10          DATED this 7th day of October, 2022,

11

12                    *s/Christine Dohack LaBuwi, RDR, CRR*

13                    _____
                      Christine Dohack LaBuwi, RDR, CRR

14

15

16

17

18

19

20

21

22

23

24

25