1                    UNITED STATES OF AMERICA
                  SOUTHERN DISTRICT OF ILLINOIS
2

3  CATHERINE ALEXANDER,            )
                                   )
4                  Plaintiff,      )
   v.                              ) No. 3:18-cv-00966-SMY
5                                  )
   TAKE-TWO INTERACTIVE SOFTWARE,  )
6  INC., et al.,                   ) *East St. Louis, IL*
                                   )
7                  Defendants.     )

8

9

10

                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11                         DAY 4 OF 5

12          BEFORE THE HONORABLE STACI M. YANDLE
                  UNITED STATES DISTRICT JUDGE
13

                      September 29, 2022
14

15

16

17

18

19

20

21  REPORTED BY:       Christine Dohack LaBuwi, RDR, CRR
                       Official Court Reporter
22                     301 West Main Street
                       Benton, Illinois  62812
23                     (618) 439-7725
                       Christine_Dohack@ilsd.uscourts.gov
24

    Proceedings recorded by mechanical stenography, produced by
25  computer-aided transcription.

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:        R. Seth Crompton, Esq.
                            HOLLAND LAW FIRM
 3                          300 N. Tucker Blvd., Suite 801
                            St. Louis, MO  63101
 4                          314) 241-8111
                            scrompton@allfela.com
 5
                            Anthony R. Friedman, Esq.
 6                          Anthony G. Simon, Esq.
                            Paul J. Tahan, Esq.
 7                          SIMON LAW FIRM, P.C.
                            800 Market Street, Suite 1700
 8                          St. Louis, MO  63101
                            (314) 241-2929
 9                          afriedman@simonlawpc.com
                            asimon@simonlawpc.com
10                          ptahan@simonlawpc.com

11    FOR DEFENDANTS TAKE-TWO INTERACTIVE SOFTWARE, INC.; 2K
      GAMES, INC.; 2K SPORTS, INC.; and VISUAL CONCEPTS
12    ENTERTAINMENT:

13                          Dale M. Cendali, Esq.
                            Christopher Ilardi, Esq.
14                          Joshua L. Simmons, Esq.
                            Miranda D. Means, Esq.
15                          KIRKLAND & ELLIS, LLP
                            601 Lexington Avenue
16                          New York, NY  10022
                            (212) 446-4800
17                          dale.cendali@kirkland.com
                            chris.ilardi@kirkland.com
18                          joshua.simmons@kirkland.com
                            miranda.means@kirkland.com
19
                            Michael J. Nester, Esq.
20                          DONOVAN ROSE NESTER, P.C.
                            151 North 1st Street, Suite A
21                          Belleville, IL  62220
                            (618) 212-6500
22                          mnester@drnpc.com

23

24

25
```

1
2
FOR DEFENDANT WORLD WRESTLING ENTERTAINMENT:
3                           Curtis B. Krasik, Esq.
                            K & L GATES, LLP
                            210 Sixth Avenue
4                           Pittsburgh, PA  15222
                            9412) 355-8696
5                           curtis.krasik@klgates.com

6                           Michael J. Nester, Esq.
                            DONOVAN ROSE NESTER, P.C.
7                           151 North 1st Street, Suite A
                            Belleville, IL  62220
8                           (618) 212-6500
                            mnester@drnpc.com
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                        **I N D E X**

2                          **WITNESSES**

3   ALL WITNESSES:                              PAGE:

4     ALFREDO BRODY for Defense:
        Direct Examination by Mr. Simmons (cont'd.) 533:6
5       Cross-Examination by Mr. Simon          548:4
        Redirect Examination by Mr. Simmons     573:23
6
        Admissions by Ms. Means                 575:18
7
      IAN BOGST for Defense:
8       Direct Examination by Mr. Simmons       584:8
        Cross-Examination by Mr. Friedman       599:1
9
      E. DEBORAH JAY for Defense:
10      Direct Examination by Ms. Cendali       607:10
        Cross-Examination by Mr. Friedman       636:9
11      Redirect Examination by Ms. Cendali     643:6

12      Admissions by Ms. Means                 652:5

13    JAMES MALACKOWSKI for Defense:
        Direct Examination by Mr. Ilardi        653:5
14      Cross-Examination by Mr. Friedman       681:24

15    RYAN CLARK (rebuttal) for Plaintiff:
        Direct Examination by Mr. Friedman      689:3
16      Cross-Examination by Mr. Ilardi         697:17

17
        Rule 50 motion by Mr. Tahan             706:20
18      Rule 50 motion by Ms. Means             708:6
        Formal Instructions Conference          735:14
19

20

21

22

23

24

25

1          (Proceedings began in open court at 9:06 a.m., jury

2    present.)

3          COURTROOM DEPUTY:  The Court calls Case No.

4    18-CV-966, *Alexander versus Take-Two Interactive Software,*

5    *Inc., et al.*  This matter is called for Day Four of jury

6    trial.

7          Would the parties please state your presence for

8    the record, beginning with plaintiff?

9          MR. SIMON:  Good morning, Your Honor.  Tony Simon,

10   Tony Friedman, Paul Tahan, and Seth Crompton on behalf of

11   the plaintiff.

12         THE COURT:  Good morning.

13         MS. CENDALI:  And good morning, Your Honor.  Dale

14   Cendali, Josh Simmons, Chris Ilardi, Michael Nester, and

15   Miranda Means on behalf of Take-Two.

16         MR. KRASIK:  Good morning, Your Honor.  Curt Krasik

17   on behalf of World Wrestling Entertainment.

18         THE COURT:  Okay.

19         MR. KRASIK:  Here with Mike Nester, as well.

20         THE COURT:  Good morning, counsel.

21         Good morning, ladies and gentlemen.

22         JURORS [in unison]:  Good morning.

23         THE COURT:  Mr. Brody, you may retake the stand,

24   sir.

25         And, Mr. Simmons, you may proceed.

1                              *  *  *  *  *

2                              ALFREDO BRODY,

3     having been previously duly sworn, was examined and

4     testified as follows:

5                    DIRECT EXAMINATION (cont'd.)

6     BY MR. SIMMONS:

7     Q.      Good morning, Mr. Brody.

8     A.      Good morning.

9     Q.      I know it's early in the morning, but would you be

10    comfortable starting with Take-Two's finances?

11    A.      Sure.

12    Q.      Does Take-Two make money on the WWE 2K games?

13    A.      We do.

14            MR. SIMMONS:  Mr. Thomas, would you be able to show

15    Mr. Brody -- and just Mr. Brody and counsel -- the native

16    version of the Defendants' Exhibit 183, please, for

17    identification.

18    Q.      (BY MR. SIMMONS)  Mr. Brody, are you familiar with

19    this document?

20    A.      I am.

21    Q.      And what is it, at a high level?

22    A.      It's a financial statement covering WWE Take-Two

23    2K16, 17, and 18.

24            MR. SIMMONS:  Your Honor, I'd move the admission of

25    Defendant's Exhibit 183 into evidence.

1    THE COURT:  Defendant's 183 is admitted.

2    MR. SIMMONS:  May I publish, Your Honor?

3    THE COURT:  Yes.

4  Q.    (BY MR. SIMMONS)  Mr. Brody, can you explain for

5  the jury at a high level what we're looking at with this

6  document?

7  A.    High level, total number of units.  So, the

8  individual games that we have sold for each of those years,

9  and then the total.

10    Total gross sales.  So, before we deduct any

11  expenses associated with the manufacturing, selling, and

12  marketing of the game.

13    And then, ultimately, down at the bottom, operating

14  profits.  What we actually took back to the company.

15  Q.    Now, you mentioned the term gross sales.  Is that

16  the money that Take-Two actually receives from selling

17  these games?

18  A.    It is not.

19  Q.    And what is -- why do you say that?

20  A.    That is the revenue that comes from selling the

21  game at retail.  But, obviously, it costs money to run the

22  business, and so we have to deduct those expenses and then

23  ultimately get to a profit number that actually we take to

24  the bottom line or back to the company.

25  Q.    You also mentioned costs.  And I was hoping that

1    you could explain to us in lines 28 through 33, and then

2    lines 39 through 41, at a high level, what are those costs?

3    A.       Sure.  So, line 28, product COGS.  COGS are costs

4    of goods sold.  That's essentially the physical packaging.

5    So, you can imagine a video game, there's plastic, you

6    know, cardboard, the disk inside, the manufacturing

7    process.  You put a bunch of games into a box, you ship it

8    all around the world.  There's costs associated with that.

9           Online support, line 29.  A lot of games these days

10   allow you to play online with your friends, so you need

11   server infrastructure to support that.  So, the Amazon

12   Cloud, Google, et cetera, that's that line.

13          Customer service, line 30.  If something goes

14   wrong, you're a gamer, you have questions, you have --

15   something, an issue with your game, you want to call

16   somebody.  There's, obviously, people that answer those

17   calls.

18          31, development, license and internal royalties.

19   That's essentially making the game, right?  The development

20   team that makes it, any licenses like the WWE, or royalties

21   that we have to pay.

22          32, internal development.  We often have folks that

23   are different parts of the organization that contribute to

24   the making or selling of the product that aren't

25   necessarily on the development team.

1          Freight and distribution.  It's exactly that.  It's

2   shipping these games all across the world.

3   Q.     And what are the costs listed on lines 39 through

4   41?

5   A.     39 through 41 are essentially my world.  So, it's,

6   you know, marketing and co-op.  As I mentioned earlier

7   yesterday, you know, TV commercials, all of the media you

8   would see, billboards on the highway, social media,

9   advertising, all of that goes into this bucket.

10          And then the marketing team, specifically.  The

11   team that I manage that works on these products every day.

12          And then publishing and G&A.  General and

13   administrative.  Those are colleagues that don't

14   necessarily work on this product only.  So, HR, finance,

15   legal, that contribute to the product but also work on

16   other products.

17   Q.     And on that last one, are those costs allocated to

18   WWE 2K or they are total --

19   A.     They are allocated.  So, oftentimes, you have

20   people that work on multiple games.  So, you take a

21   percentage of their effort and attribute it to WWE.

22   Q.     Did the numbers in this spreadsheet come from your

23   financial systems?

24   A.     They did.

25   Q.     Now, what is the operating profit listed at line 43

1    of this document?

2    A.      That is the number, by year, and then the total on

3    the right, when you have deducted all of the many expenses

4    for manufacturing, selling, and marketing the game.  So,

5    that is essentially what the company made off of the

6    product.

7    Q.      And what amount of profit did Take-Two make on WWE

8    2K16, 17, and 18?

9    A.      9,713,357 dollars.

10   Q.      All right.

11          MR. SIMMONS:  We can take that down.

12   Q.      (BY MR. SIMMONS)  And I want to turn our attention

13   to tattoos.  What was the first WWE 2K video game that

14   included the wrestlers' tattoos?

15   A.      They have existed since the beginning, since THQ

16   made the game in 2002.

17   Q.      Were the tattoos -- sorry.  Just to be clear.  Were

18   the tattoos in the WWE games before Take-Two took over?

19   A.      Yes.

20   Q.      Now, why does Take-Two include the wrestlers'

21   tattoos in the game?

22   A.      Because they exist on the wrestlers' bodies.  We

23   make a simulation sports game.

24   Q.      What, if any, agreements has Take-Two entered into

25   that relate to the appearance of wrestlers in the WWE 2K

1    Games?

2    A.      We have an agreement with the WWE.

3    Q.      And did Take-Two include WWE wrestlers' tattoos in

4    the game consistent with that agreement?

5    A.      Yes.

6    Q.      Is Randy Orton depicted in WWE 2K16, 17, and 18?

7    A.      He is.

8    Q.      Does that mean that a player will always see Randy

9    Orton when they play the game?

10   A.      No.  As I mentioned yesterday, there's hundreds of

11   wrestlers in the game.  Really depends on where you are,

12   what mode you are in, who you are playing with, who your

13   opponent is.  Really depends on the dynamic of your

14   experience.

15   Q.      When Randy Orton does appear in the game, do the

16   five specific tattoos at issue in this lawsuit appear?

17   A.      Really depends again on the dynamic.  As you saw

18   yesterday, he often wears arm sleeves, clothing.  There's

19   -- you know, the overall experience.  There's crowds,

20   cheering.  It kinda depends on what your first person point

21   of view is and how you are playing the game, opponents.

22   Different modes, there could be an upwards of 12, 15

23   wrestlers in the ring.

24   Q.      What does Take-Two do to make wrestlers like Randy

25   Orton appear in its games?

```
1    A.      We take photographs, and then we use those photos

2    as references to make their in-game likeness.

3            MR. SIMMONS:  I'd like to publish to the jury

4    Plaintiff's Exhibit 22 which was previously admitted into

5    evidence.

6            MR. SIMON:  No objection.

7            MR. SIMMONS:  Oh, I'm sorry, that must have been

8    Defendants' 22.  (Pause.)  Can we take that down for a

9    second?  Let me just check -- oh, 32.  I misspoke.

10   Plaintiff's Exhibit 32.  My apologies.  Okay.  No, that's

11   not right either.  Hold on one second -- Plaintiff's

12   Exhibit 33, which is still admitted into evidence.  I

13   apologize for the confusion there.  There we go.

14   Q.      (BY MR. SIMMONS)  Okay.  Mr. Brody, Plaintiff's

15   Exhibit 33, what is this?

16   A.      It is a photograph of Randy Orton.

17   Q.      And why were these photographs taken of Mr. Orton?

18   A.      We use them as references to build their in-game

19   likeness.  We do this for all of the wrestlers.

20   Q.      And why is Mr. Orton wearing wrestling clothes in

21   these photographs?

22   A.      Because this is exactly what he wears in the ring.

23   Q.      So, how does Take-Two use these photographs to

24   depict Mr. Orton in WWE 2K?

25   A.      We try to make it as close to this as we can.  It's
```

1    -- authenticity is key.  So, every detail from head to toe,

2    hair, eye color, physique, clothing, everything, try to

3    make it look exactly what you see here.

4    Q.    Is there a technical process that you use to do

5    that?

6    A.    Yes.  We take this photograph and we build what we

7    call texture files.  So, they are essentially -- imagine a

8    2D image?  And we flatten this and we wrap it around a wire

9    frame.  And that, at that point, is animated into the game.

10        MR. SIMMONS:  Your Honor, at this point, I'd like

11   to publish to the jury Plaintiff's Exhibit 32 which was

12   previously admitted into evidence.  (Pause.)  All right.

13   Q.    (BY MR. SIMMONS)  Mr. Brody, what are we showing

14   here?

15   A.    This is -- these are the texture files.

16   Q.    And do you know which wrestler's texture files we

17   are looking at?

18   A.    It's Randy Orton.

19   Q.    And does it have Mr. Orton's physical

20   characteristics?

21   A.    Yes.

22   Q.    Can you describe what physical characteristics we

23   are seeing on the slide?

24   A.    Yeah, you can see his arms, hands.  Top right is

25   his chest and torso.  You can actually see his teeth there

1    at the top.

2    Q.    Do these texture files also depict Mr. Orton's

3    tattoos?

4    A.    Yes.

5    Q.    Why does it do that?

6    A.    Because they exist on his body.  And again, we try

7    to make him look exactly how he does in real life.

8          MR. SIMMONS:  Can we go to page 25, please.

9    Q.    (BY MR. SIMMONS)  Does Take-Two use the same

10   approach for all parts of the wrestler that they are

11   including in the game?

12   A.    We use reference photos for the body.  And then

13   there's a second technique called photogrammetry where, as

14   you heard this week, you sit with a bunch of cameras around

15   your head and we take photographs.  And those photographs,

16   again, are used to kinda make the in-game head on the

17   avatar.

18         MR. SIMMONS:  Let's take that down.

19   Q.    (BY MR. SIMMONS)  And, Mr. Brody, would you please

20   review in your binder Defendant's Exhibit 151.

21   A.    Yeah.

22   Q.    Are you familiar with this image?

23   A.    Yes.

24   Q.    What is it, at a high level?

25   A.    High level, it looks to be the back of Randy Orton

1    as he is walking into the ring.

2         MR. SIMMONS:  Your Honor, I'd move to admit

3    Defendants' Exhibit 151 into evident.

4         MR. SIMON:  No objection.

5         THE COURT:  Defendants' Exhibit 151 is admitted.

6         MR. SIMMONS:  Your Honor, may I publish?

7         THE COURT:  Yes.  You may publish -- once it's

8    admitted, you -- publish on, counsel.

9         MR. SIMMONS:  Thank you, Your Honor.

10   Q.   (BY MR. SIMMONS)  Mr. Orton, what is this image --

11   sorry.  Mr. Brody --

12   A.   I wish I had muscles like him.

13   Q.   -- what is this image of Mr. Orton?

14   A.   It is a rear view of him walking into the, the

15   ring.

16   Q.   And how does it compare to real life Randy Orton?

17   A.   Again, as close as we can possibly get.  From him,

18   the signage in the background, the ring itself, the crowd,

19   the runway to the ring, we try to replicate exactly what

20   you would see if you went to a live event or watched it on

21   TV.

22   Q.   Would a user of WWE 2K be able to see the five

23   tattoos at issue in this case when Randy Orton appears in

24   the game?

25   A.   No.  I mean, he's wearing clothing.  It's very

1    dark.  You really can't see them at all.

2    Q.    Could a user Zoom in on the tattoos while playing

3    the game?

4    A.    No.  You don't have that technical capability.

5    Q.    Could Take-Two have omitted Mr. Orton's tattoos

6    from the game?

7    A.    We have the technical capability to do that, but we

8    wouldn't because, one, it wouldn't be fair to him and, two,

9    we want him to look exactly how he does in real life.

10   Q.    Would Take-Two remove blemishes from Mr. Orton?

11   A.    We do have that ability.  We want them to look the

12   best they can.  So, we often remove little blemishes, yes.

13        MR. SIMMONS:  Mr. Thomas, you can take that down.

14   Q.    (BY MR. SIMMONS)  Now, Mr. Brody, for the last

15   three days -- or now four days -- we have heard a lot about

16   something called the Create a Superstar.  Have you been in

17   the courtroom to hear that?

18   A.    Yes.

19   Q.    What is Create a Superstar?

20   A.    It's essentially building your own custom avatar.

21   You can make it look like you.  And then there's many, many

22   elements of customization, personalization.  Kinda choose

23   your own adventure, if you will.

24   Q.    When was Create a Superstar added to the WWE games?

25   A.    It's been in the games since the beginning, since

1    THQ in 2002.

2    Q.    Does Create a Superstar have a menu called "body

3    parts"?

4    A.    Yes.

5    Q.    And what is that menu?

6    A.    Essentially, as I mentioned, more customization,

7    inclusive of tattoos.

8    Q.    And you mentioned tattoos.  Does that mean that all

9    the tattoos in that menu are real world tattoos?

10   A.    No.

11   Q.    What are the other tattoos that are not real world

12   tattoos?

13   A.    There's dozens and dozens of generic imagery that

14   you can use to put on your avatar as tattoos.

15   Q.    Does Take-Two pay to have that generic imagery

16   created?

17   A.    We have paid artists to create imagery.  And then

18   we have put that into the game in different areas,

19   inclusive of generic tattoos.

20   Q.    How much does Take-Two pay to have the images

21   created?

22   A.    Anywhere from 50 to 100 dollars for dozens of

23   images.

24   Q.    Have real world body parts ever been part of the

25   body parts menu?

```
1    A.     Yes.

2    Q.     Were Mr. Orton's tattoos available individually in

3    the body parts menu?

4    A.     They were not.  You can only do full arms or full

5    back.

6    Q.     Does Take-Two consider the body parts menu with

7    real world body parts an important part of WWE 2K16?

8    A.     Can you repeat the question?

9    Q.     Does Take-Two consider the real world body parts in

10   the body parts menu an important part of WWE 2K16?

11   A.     No.  I mean, it's -- the important part is

12   authenticity as a whole, and there's many, many elements to

13   that.  So, in aggregate, the total is what's important to

14   us.

15   Q.     Were you here for Mr. Orton's and Mr. Kiang's

16   testimony?

17   A.     Yes.

18   Q.     Did you see that, that they were shown an exhibit

19   of an edited version of Randy Orton's tattoos on his arms

20   and back?

21   A.     I did.

22   Q.     Have you ever seen WWE 2K used in that way before

23   you saw it at this trial?

24   A.     I have never seen that before.  Yesterday was the

25   first time.
```

1    Q.      Has Take-Two ever marketed WWE 2K based on the

2    tattoos in this lawsuit?

3    A.      Absolutely not.

4    Q.      Can you see tattoos in Take-Two's marketing?

5    A.      They -- as you saw -- you saw a gameplay trailer

6    yesterday.  They are very incidental.  We show hundreds of

7    wrestlers, dozens of wrestlers in our marketing, different

8    views, angles.  Very incidental, if they show up.

9    Q.      Are you aware of anyone having purchased WWE 2K

10   because of the appearance of tattoos?

11   A.      No.

12   Q.      Let's talk about this lawsuit.  How long have real

13   world tattoos been in the WWE series?

14   A.      From the beginning.

15   Q.      When was this lawsuit filed?

16   A.      April 2018.

17   Q.      Did Miss Alexander ever contact Take-Two before

18   filing this suit?

19   A.      She did not.

20           MR. SIMON:  Objection, Your Honor.  Relevance.

21           THE COURT:  Sustained.

22           MR. SIMMONS:  Your Honor --

23           THE COURT:  Sustained.

24           MR. SIMON:  And move that that be stricken, please.

25           THE COURT:  It shall be stricken from the record,

1    the question and answer, and the jury is instructed to

2    disregard.

3           Mr. Simmons, it is stricken, and my ruling is based

4    on my rulings yesterday.

5           MR. SIMMONS:  Yes, Your Honor.

6    Q.     (BY MR. SIMMONS)  Mr. Brody, has Take-Two ever paid

7    a tattooist for the right to depict tattoos that appear on

8    a wrestler in real life in WWE 2K?

9    A.     We have not.

10   Q.     Why not?

11   A.     Because we don't need to.  We have a relationship

12   with the WWE.  And we have the rights to put their wrest --

13   put the wrestlers in the game, how they look in real life,

14   all of them.

15   Q.     What portion of Take-Two's profits does attribute

16   to the five tattoos inked by Miss Alexander?

17   A.     None.

18   Q.     Why is Take-Two defending this lawsuit instead of

19   paying Miss Alexander?

20          MR. SIMON:  Objection, Your Honor, relevance.

21          THE COURT:  Sustained.

22   Q.     (BY MR. SIMMONS)  Mr. Brody, why were the -- Mr.

23   Orton's tattoos included in WWE 2K?

24   A.     Because they exist on his body.

25          MR. SIMMONS:  No further questions, Your Honor.

```
1              THE COURT:  Cross-examination.

2              MR. SIMON:  Yes, Your Honor.

3                       CROSS-EXAMINATION

4    BY MR. SIMON:

5    Q.     I'm going to start with a few of the questions that

6    we just ended with.

7              You believe Take-Two has the rights to put Mr.

8    Orton's tattoos in the games; correct?

9    A.     Correct.

10   Q.     Isn't that what this case is going to be deciding?

11   A.     No.  We have an agreement with the WWE that

12   explicitly says that we have the rights to put his physical

13   likeness in the game.

14   Q.     And not -- and that agreement -- let's look at it.

15   If you look at your binder there?  Plaintiff's Trial

16   Exhibit 29.

17             MR. SIMON:  Please put up Plaintiff's Exhibit 29

18   and publish it.  It's been admitted.

19   Q.     (BY MR. SIMON)  Do you have copy of it there, sir?

20   A.     I do.

21   Q.     And it goes from page -- it's about 44 pages;

22   right?  Big agreement, lots of words.  Yes?

23   A.     Yes.

24   Q.     You had lawyers represent you for this, Take-Two,

25   in this negotiation in drafting?
```

1    A.       They did.

2    Q.       Is the word tattoo anywhere in that agreement?

3    A.       No.  Physical likeness.

4    Q.       Yes.  Okay.  So, let's go back to the exhibit --

5    I'm sorry -- your testimony about, you were asked whether

6    or not Take-Two ever paid anyone to create tattoos and put

7    in the game.  Do you remember that testimony?

8    A.       I remember the question, yes.

9    Q.       And your answer?

10   A.       I do.

11   Q.       And you said, yes, you did.

12   A.       I was asked if we have ever paid a tattoo artist to

13   create real world tattoos to put in the game.  And my

14   answer was no.

15   Q.       Yeah.  That's a different question.  Before that,

16   you were asked the question, has Take-Two ever paid to put

17   those generic -- you called them generic tattoos in the

18   tattoo creator?

19   A.       Yep.

20   Q.       Have you ever paid for tattoos.  And I thought you

21   said yes.

22   A.       I did say yes.

23   Q.       Okay.

24   A.       The question is, have we ever paid an artist to

25   create imagery.

1  Q.      That's a different question.  I'm asking about the

2  question about the generic tattoos, that you said were

3  generic --

4  A.      Mm-hmm.

5  Q.      -- and you paid 50 to 100 dollars for each generic

6  tattoo; right?

7          MR. SIMMONS:  Objection, Your Honor,

8  mischaracterizes the evidence.

9          THE COURT:  Overruled.

10  Q.      (BY MR. SIMON); Is that right?

11  A.      That's not what I said.

12  Q.      Okay.  What did you say?  How much did you say?

13  A.      I said that we paid 50 to 100 dollars for artists

14  to create imagery, and then we put them in the game as

15  tattoos.

16  Q.      Yeah, I'm not talking about putting them in the

17  game.  Here's all I want to get to.  Who did you pay the

18  money to?  The person that created the tattoos?

19  A.      We paid money to people to create imagery, not

20  tattoos specifically.

21  Q.      Are some of the people you paid to create imagery

22  creating tattoos?

23  A.      No.  They are creating imagery.  And we are

24  creating tattoos.

25  Q.      I'll move on.  It's your testimony that the Custom

1  Superstar feature in 2K16 is not important?  I'm just
2  making sure that's what you said on direct.
3  A.     Repeat the question.
4  Q.     I wrote down that you said the Custom Superstar
5  feature in 2K16 was not important.
6  A.     No.  I said the Custom Superstar feature in the
7  game is popular.  The use of real world tattoos is not.  In
8  fact, it was taken out in 2016 because it was minimal
9  engagement in the feature.
10  Q.     How does Take-Two know what users are using and
11  whether they are using real world tattoos in 2K16?
12  A.     It's my job to know.  It's the function of the
13  marketing department to know why our audience buys our
14  game, what they do inside the game, what drives engagement.
15  When it was taken out in 2016, we didn't hear a single peep
16  from our community.
17  Q.     I under --
18  A.     Nothing.
19  Q.     Sir, my question was, how do you know what users --
20  whether they use a generic tattoo that you paid for, or one
21  of the wrestlers' tattoos in 2K16?
22  A.     We have in-game telemetry that could tell us
23  certain items.  I would have to look to see if that is one
24  of them.
25  Q.     Okay.  What is it?  In-game -- what?

1    A.      Telemetry.

2    Q.      Telemetry.

3    A.      Basically, data that the game gives us to review

4    engagement inside a game.

5    Q.      So, when a user is playing the game, sometimes you

6    all collect data about what they're doing?

7    A.      Sure.

8    Q.      That data wasn't given to your expert -- your video

9    game expert Dr. Bogost in this, was it?

10          MR. SIMMONS:  Objection, Your Honor, relevance.

11          THE COURT:  Overruled.

12   Q.      (BY MR. SIMON)  Was it?

13   A.      I don't know.

14   Q.      Has it been produced in this case?  Because I

15   haven't seen it.

16   A.      I don't know.

17   Q.      All right.

18          MR. SIMON:  If you could pull up Exhibit 42,

19   please, and publish it.  It's been admitted.  But I want to

20   go to the back cover.

21          May I approach, Your Honor?

22          THE COURT:  You may.

23          MR. SIMON:  In case you need that.

24          THE WITNESS:  Thank you.

25   Q.      (BY MR. SIMON)  In the marketing on the back of 2K

1    -- no -- 16.  This is Exhibit 42.  Sorry.

2         MR. SIMON:  Back side.  And if you could blow up,

3    please.  It's in evidence.

4         COURTROOM DEPUTY:  Excuse me, counsel.  I think

5    that said 43?

6         MR. SIMON:  Is that the wrong one?  43.

7         COURTROOM DEPUTY:  And that has not been admitted.

8    Q.    (BY MR. SIMON)  Okay.  Do you recognize what I just

9    handed you?  The box?

10   A.    Yeah, it's the back of the game.

11   Q.    Well, that's the cover for the 2K16 game that we're

12   talking about.

13   A.    That is the back of the cover.  The back of the

14   box.

15   Q.    I'm sorry.  What's in your hand?

16   A.    This is the game itself.

17   Q.    But that's the cover for the game; right?

18   A.    This is the cover.  (Indicating).  This is the back

19   of the box.  (Indicating.)

20   Q.    I'm just trying to establish what it is.  It's the

21   box the game comes in.

22   A.    That's correct.

23        MR. SIMON:  I'd move the admission of Exhibit 43.

24        MR. SIMMONS:  Your Honor, I just --

25        THE COURT:  Any objections, counsel?

1    MR. SIMMONS:  Yes, Your Honor.  Exhibit 43, I don't

2    believe, is the box.  So, I think counsel needs to identify

3    what Exhibit 43 is.

4         THE COURT:  Mr. Brody, is there a number on the box

5    that you have in your hand?

6         THE WITNESS:  Yes.  PTX 42.

7         THE COURT:  42.

8         MR. SIMON:  I said 42 and they said it's not 42.

9    I'm sorry.  43 is the packaging.  That number on that box

10   is wrong.  I can fix it.

11        THE COURT:  Okay.  So the record is clear,

12   Plaintiff's Exhibit 43 is the actual packaging or box for

13   2K16.  You need to correct that on the actual exhibit.

14        MR. SIMON:  Do you want me to do that now, Your

15   Honor?

16        THE COURT:  Yes, please, so we're all clear.

17        MR. SIMMONS:  Your Honor, could we have a sidebar?

18   Because I think that we might be able to clear this up at a

19   sidebar.

20        THE COURT:  No, we're going to clear it up right

21   here.

22        MR. SIMMONS:  Because Exhibit 42 is admitted as the

23   physical game disk.

24        THE COURT:  Mr. Simmons?

25        MR. SIMMONS:  Yes, Your Honor.

```
 1            THE COURT:  Thank you.
 2            MR. SIMON:  All right.  I'd move the admission of
 3   Exhibit 43, which is the box that the game comes in, 2K16.
 4            THE COURT:  Any objections Mr. Simmons?
 5            MR. SIMMONS:  No, Your Honor.
 6   Q.       (BY MR. SIMON) Okay.  And, sir, what we have on the
 7   screen --
 8            THE COURT:  Hold on, Mr. Simon.
 9            Plaintiff's Exhibit 43 is admitted.  Is that clear
10   on your list, Stacie?
11            COURTROOM DEPUTY:  We can straighten it out later.
12            THE COURT:  Okay.  All right.  Let's move.
13   Q.       (BY MR. SIMON)  If you look on the back of that
14   box, what I have on the screen here is what's on the back
15   of the box; right?
16   A.       Looks to be, yes.
17   Q.       Okay.  And it says:  "Utilize Creation Suite tools
18   to develop your WWE universe, including" -- and then it
19   says -- "unique superstars, divas, arenas, shows,
20   championships and more."  Right?
21   A.       Correct.
22   Q.       So, you all highlighted that on the packaging?
23   A.       Correct.
24   Q.       Okay.  Now, you said -- you were asked two
25   questions.  The first question was, why do you copy the
```

```
 1    tattoos off Mr. Orton?  And you said, because they're on

 2    his body.  Did I get that right?

 3    A.      You did not.

 4    Q.      Okay.

 5    A.      We don't copy the tattoos.  We take photographs of

 6    his body from head to toe, and then we use those to make

 7    texture files.  And then we wrap those texture files around

 8    a 2D image or structure, skeleton, and then we make the

 9    avatar.

10    Q.      So, that's not really a picture of Randy Orton in

11    the game.  It's a texture file --

12    A.      Yes.

13    Q.      -- with his tattoos?

14    A.      The process is photo, texture files, in-game.

15    Q.      Okay.  And I'm going to get to that.  You were

16    asked -- you said you tried to make -- I'm sorry.  Did you

17    want to say something?

18    A.      Oh, no.

19    Q.      Okay.  You tried to make the wrestlers look exactly

20    like in real life in the game; right?

21    A.      Correct.

22    Q.      Why?

23    A.      Because we make a sports simulation game and we

24    want the wrestlers to look like themselves.  We want the

25    arena to look like it would in real life.  We want the
```

crowd, the pyrotechnics, the music, the cheering, every

aspect of the event to look like it does in real life or on

TV.

Q.      Yes, sir.  And my question is, why?

A.      Because we make a simulation sports game.

Q.      Why is it important in a simulation sports game to

look like real life?

A.      I don't know if I understand the question.

Q.      Does that impact whether or not people buy it?

A.      Authenticity is one element of consumer demand.

People also play the game because it's exciting.  It's

competitive.  They can hang out with their friends and have

fun.

Q.      I'll move on.

        MR. SIMON:  If we could pull up Defendants' Exhibit

32, please.

Q.      (BY MR. SIMON) It's in your book there, too, sir.

It's been admitted.  It should be on your screen, also,

sir.

A.      Oh, thank you.

Q.      You said these were texture files; right?

A.      Correct.

Q.      So, what that looks like is something that looks

like skin with a tattoo on it; right?  Or the tattoo --

A.      It's essentially the photograph cut into pieces,

1    flattened and then used to put on -- again, imagine a

2    skeleton, 2D, wrapping it around in order to sculpt the

3    in-game character.

4    Q.      And that process allows you in the Custom Superstar

5    creator to take that texture and wrap it around different

6    wrestlers, like divas or other wrestlers; right?

7    A.      No.  The -- that function in the game allows you to

8    take the full body parts and put it on your customized

9    wrestler.

10   Q.      Why does Take-Two include tattoos in the -- the

11   generic ones in 2K17 and 18?

12   A.      It's one of many customization, personalization

13   elements of that mode.

14   Q.      Okay.  And you testified -- I want to get this

15   right -- that from -- you took out the ability to use

16   wrestlers' real life tattoos in the 17 and 18 games; right?

17   A.      We started phasing it out in 16.  I believe it was

18   out, after that.

19   Q.      Okay.  And I think you told me why, but why don't

20   you tell me why again so I don't say it wrong.

21   A.      Minimal engagement.  We often make business

22   decisions and change the game.  Take components out, put

23   new components in.  Again, our group's sole purpose is to

24   understand what our audience wants and how they engage with

25   the game.  That particular feature was not highly engaged,

1  so it came out.

2  Q.      Okay.  And you have that data available?

3  A.      I don't know if we do or not.  We often --

4  Q.      I'm saying, Take-Two had it available when it made

5  the decision?

6  A.      We have a lot of data points.  We do social

7  listening.  We listen to our consumer on social media.  We

8  do surveys.  We do focus groups.

9  Q.      Sir, I'm sorry.  We're really trying to move

10  forward.  I'm just asking, at the time you made the

11  decision there would have been some data you looked at,

12  whatever it was.

13  A.      We're always looking at data, yes.

14  Q.      I'll take that as a yes.  Okay.  When you

15  negotiated this agreement we talked about with WWE, you

16  all, Take-Two, could have asked WWE who designed Mr.

17  Orton's tattoos; right?

18  A.      We would never do that.  We have an agreement with

19  the WWE to put all of the wrestlers in the game, so we do

20  that.

21  Q.      Sir, I'm going to ask you again.  The question I

22  asked:  You could have asked -- Take-Two could have asked,

23  *Hey, WWE, who designed Randy Orton's tattoos?  Who was the*

24  *tattoo artist?*

25          MR. SIMMONS:  Objection, Your Honor, relevance.

1          THE COURT:  Overruled.

2     A.     I'm not trying to be dismissive, but the

3     hypothetical isn't -- we would never ask about a single

4     wrestler.

5     Q.     (BY MR. SIMON) Is that because you don't want to

6     know the answer?

7     A.     No.  It's because we have an agreement with the WWE

8     that gives us the rights to put them in the game.

9     Q.     And you could have investigated at the time whether

10    WWE's rights included my client's copyrights?

11    A.     Again, we wouldn't focus on a single wrestler when

12    there's hundreds.  It would take up all of our time just to

13    do that.

14    Q.     How many wrestlers are in these games?  Each one?

15    A.     North of 200.  300?  Depends on the year.

16    Hundreds.

17    Q.     Well, I'm talking about 2K16, 2K17, 2K18.  Each

18    game.  How many wrestlers, do you know?

19    A.     Over 200 per game.

20    Q.     Okay.  So, in opening statement when we heard 100,

21    that wasn't correct?

22    A.     No.  Over 100 was the people that work on the game.

23    Q.     Okay.

24    A.     To my recollection.

25    Q.     That's fine.  Now, you testified on direct

1    yesterday that you want to make the game as similar to the

2    TV experience and the live experience as possible; right?

3    A.    Right.

4    Q.    And that Take-Two wants authenticity and realism,

5    you just said that; right?

6    A.    That is correct.

7    Q.    You agree that Take-Two met that goal in the 2K18

8    game?

9    A.    We have a lot of perfectionists on the development

10    team.  I would say that they would answer, *we're always*

11    *trying to get better but we did the best to our ability.*

12    Q.    Okay.  And WWE approved the release of 2K18?

13    A.    Yes.

14    Q.    And you take pictures -- the tattoos are in the

15    games because they appear on the wrestlers' bodies.  That's

16    what you said; right?  And when you take the pictures, they

17    just go with it?

18    A.    The real world -- the tattoos that exist on the

19    actual wrestlers' bodies, yes.

20    Q.    Yes.  The tattoos that exist on the wrestlers'

21    bodies go into the game, every time.

22    A.    The only exception would be if there's something

23    inappropriate.  Right?  So, where there's a governing body

24    -- the ESRB -- it's essentially the rules organization.

25    It's a "T" rated game.  If there was profanity or something

1    inappropriate that put us in jeopardy of that "T" rating,

2    we might have to obscure it.

3    Q.      Is that the only exception?

4    A.      To my knowledge, yes.

5    Q.      Okay.

6         MR. SIMON:  Please pull up, but don't publish yet,

7    Plaintiff's Exhibit 164.  And I'll represent to the Court,

8    this is a still -- a photograph that's in evidence as

9    Exhibit 25, and Game 46 that's in evidence, and this is a

10   still creation of a character model in the game.

11        MR. SIMMONS:  Objection, Your Honor, relevance for

12   the same reasons as yesterday.

13        THE COURT:  I'm sorry?

14        MR. SIMMONS:  I said, for the same reasons as we

15   discussed yesterday.

16        THE COURT:  I don't want to do the sidebar.  What's

17   the relevance?

18        MR. SIMON:  The relevance is, this is a Chris

19   Jericho -- a tattoo artist -- in real life who didn't have

20   profanity and they changed his tattoo in the game, from

21   real life.  And he just said they don't do that.

22        THE COURT:  Overruled.

23        MR. SIMON:  Move the admission of Exhibit 164.

24        THE COURT:  The objection is overruled.  It's

25   admitted.  All right.

1          MR. SIMON:  All right.  Publish it, please.

2    Q.    (BY MR. SIMON)  Sir, do you see on the right,

3    that's a photograph of Chris Jericho.  He's a WWE wrestler;

4    right?

5    A.    Yes.

6    Q.    And he went through this process that you talked

7    about where they took the pictures, just like Randy Orton;

8    right?

9    A.    Correct.

10   Q.    And he's in the 2K18 game?

11   A.    I actually don't -- I believe he is, but I don't

12   know for certain.

13   Q.    Okay.  The picture on the right's his real life

14   tattoo.  Do you see that?  That's the Iron Maiden tattoo

15   for the band Iron Maiden; right?

16   A.    It looks to be.

17   Q.    Okay.  And you recognize that?

18   A.    I don't.

19   Q.    Okay.  And on the left, the same arm in the game,

20   it doesn't have that tattoo in there, does it?

21   A.    I have no ability to tell you the difference

22   between the two, or if it's the same arm or anything like

23   that.

24   Q.    Why -- why -- why did Take-Two not copy Chris

25   Jericho's real life tattoos into the 2K18 game?

1          MR. SIMMONS:  Objection, Your Honor, foundation.

2          THE COURT:  Overruled.

3   A.     I have no familiarity with this tattoo or this

4   subject case at all.

5   Q.     (BY MR. SIMON)  Do you know if it's because Iron

6   Maiden has a copyright on that artwork?

7   A.     I have no idea.

8   Q.     Okay.  There's another wrestler in the games at

9   issue in this case called CM Punk; right?

10  A.     I don't know.

11  Q.     Do I need to get the game out and play it?  I don't

12  want --

13  A.     You're asking me if he's in the game?

14  Q.     In the game.

15  A.     Oh, I'm sorry.  Yes, he's in the game.

16  Q.     Okay.  And he has a Pepsi logo on one arm and a GI

17  Joe Cobra tattoo on the other arm, in real life.  Do you

18  know that?

19  A.     I do not.

20  Q.     Okay.  And those aren't in the game.  Do you know

21  why not?

22  A.     I don't know.

23  Q.     Okay.  Do you know of any other wrestlers that I

24  haven't mentioned in the 2K18 where their tattoos in real

25  life aren't in the game?

1    A.      I do not.

2    Q.      Do you have any explanation based on your company's

3    experience as to why that would be done?

4    A.      I do not.

5    Q.      Okay.

6           MR. SIMON:  We can take that down.  (Pause.)  If we

7    could pull up Exhibit 162, please.

8    Q.      (BY MR. SIMON)  You testified about this on direct.

9           THE COURT:  Is this Plaintiff's 162?

10          MR. SIMON:  Yes.  I'm sorry.  Plaintiff's 162,

11   which is in evidence.

12   Q.      (BY MR. SIMON)  And you testified that you have

13   never seen this, this capability before; right?

14   A.      What capability is that?

15   Q.      The ability to take the wrestler and change his

16   size, shape, height.

17   A.      No, I didn't say that.  You can do that in the

18   game.

19   Q.      Okay.  I just want to make sure, you're not saying

20   that we did something, when we made this exhibit, outside

21   the game, are you?

22   A.      No, you can -- oh, I -- you can customize and

23   personalize your custom avatar from head to toe.  So, you

24   can manipulate -- I'll use the word mannequin, since we've

25   used that this week.  You can manipulate the mannequin any

way you want.

Q.     Okay.  Let's go to page two of that exhibit.  This was one of the custom divas which was talked about on the back of 2K16; right?

A.     No.  This is a generic mannequin that someone created.

Q.     Yes.  I mean, it was created using the game.  You recognize that; right?

A.     It was used -- created using Custom Superstar Diva.

Q.     Yeah, and Custom Superstar Diva is on the back of the 2K16 game?

A.     It's referring to the actual divas in the WWE.

Q.     That's fine.  Now, were you in the courtroom when Mr. Orton testified that these were his arms?

A.     I was.

Q.     Do you believe that?

A.     Those are his body parts.

Q.     The arms or just the skin, the texture that has his tattoos on it?

A.     You manipulated the mannequin size and shape, but those are his arms.

Q.     No, I haven't, sir, and I'll get it out and show you.  I haven't manipulated the size of those arms.

A.     This is a diva.  This is not -- this is a female avatar.  You have clearly gone into the mode and sculpted

1   this to your pleasing and then you --

2   Q.      Sir --

3   A.      -- put his arms -- his body parts on it.

4   Q.      All I did -- if you look in the exhibit on the

5   left, you see that highlighted mannequin?  I just clicked

6   on that.  That's all I did.  You agree with me, you can do

7   that?

8   A.      I can't tell you definitively because I don't know

9   what you did, but if -- I'll take your word for it.  But

10  those are still his body parts on that particular

11  mannequin.

12          MR. SIMON:  Okay.  Let's pull up Orton --

13  Defendants' Orton Demo, Slide No. 10, and put it on the

14  same screen as this.

15  Q.      (BY MR. SIMON)  While they're doing that, sir, did

16  you hear Mr. Orton testify that those were his arms and

17  that was when he was leaner, because he had surgery or

18  something?  So, at some time his arms weren't that big?  Do

19  you remember that testimony?

20  A.      I did hear that.

21  Q.      Okay.

22          MR. SIMON:  Let's pull that up, please.  And let's

23  -- so I'm putting on the screen page 10 of Orton Demo 1,

24  and Exhibit 162, page 2.

25  Q.      (BY MR. SIMON) Sir, your company put this into

1    evidence, 2002 to 2018.  Those are Randy Orton's arms;

2    right?

3    A.      Correct.

4    Q.      And none of those match what's in that custom diva

5    feature that you say are his arms?

6    A.      Again, you are pretty limitless in this mode to

7    customize at -- for your liking.  You can do --

8            THE COURT:  Mr. Brody, I think --

9    A.      -- whatever you want --

10           THE COURT:  Mr. Brody?

11   A.      -- from head to toe.

12           THE COURT:  Mr. Brody?

13           THE WITNESS:  I'm sorry.

14           THE COURT:  If you are asked a yes or no question,

15   so we can move on --

16           THE WITNESS:  Okay.

17           THE COURT:  -- you need to respond accordingly.

18           THE WITNESS:  Okay.  Sorry, Your Honor.

19           THE COURT:  I believe it was a yes or no question.

20           THE WITNESS:  Understood.

21           THE COURT:  Do you want to reask the question, Mr.

22   Simon?

23           MR. SIMON:  Could I have it read back, Your Honor?

24           THE COURT:  Chris?

25           THE REPORTER:  Question:  "And none of those match

1    what's in that custom diva feature that you say are his

2    arms?"

3    A.      I believe they do match.

4    Q.      (BY MR. SIMON)  You and Mr. Orton believe that

5    those match Mr. Orton's arms?

6    A.      Those are his body parts put on a mannequin.

7    Q.      Okay.  I'll move on.  On the back of the cover of

8    the 2K18 game you do feature Randy Orton; right?

9    A.      Can I see the game?

10   Q.      Sure.

11          MR. SIMON:  Pull it up, please, Zack.  It's

12   Plaintiff's 46.  I hope I got it right.  And if you could

13   zoom in on the middle there, Zack, please.  Page two of

14   Plaintiff's Exhibit 46.

15   Q.      (BY MR. SIMON)  That's Randy Orton; right?

16   A.      It is.

17   Q.      Do you agree that Mr. Orton's one of the most

18   popular wrestlers in -- WWE wrestlers?

19   A.      I mean, that's completely subjective.

20   Q.      Okay.  And not all the wrestlers in the game, of

21   the 200, are as popular as each other; right?  There's

22   different levels of popularity?

23   A.      Sure.

24   Q.      Okay.  And with these -- what did you call them

25   again?  The data that you get when people play the game?

1    A.      Telemetry.

2    Q.      Telemetry?

3    A.      T-E-L-E-M-E-T-R-Y.

4    Q.      Telemetry.  That would tell you how many times

5    users select Mr. Orton when they play the game?

6    A.      I would have to check.  I don't think it's that

7    detailed.  It's -- there's varying levels of detail that

8    you can get from the data.  Usually, you try to make a

9    summation --

10   Q.      It's fine.

11   A.      -- from large pools of data.

12   Q.      I just wanted to know if you can or not.  If you

13   don't know, you can say you don't know.

14           Did -- was that -- did Take-Two look for that so

15   they could provide it to Mr. Bogost in this case?

16   A.      I don't know.

17   Q.      Okay.  Now, sometimes -- you talked about in your

18   direct -- you were shown an exhibit of Randy Orton walking

19   up, and you talked about how you try to make it real life,

20   the arena, all this stuff; right?

21   A.      Correct.

22   Q.      Okay.  You also -- he has a walk-up song?

23   A.      Correct.

24   Q.      All right.  And in the game, that walk-up song is

25   played, just like in real life; right?

1    A.    To my knowledge, yes.

2    Q.    Okay.  And then you heard Dr. Zagal say a player --

3    maybe you know this -- can record.  I can play the game and

4    record what I played; right?

5    A.    Correct.

6    Q.    So, I can make a match and record it?

7    A.    Correct.

8    Q.    When I record it and play it back, the music

9    doesn't play.  Why not?

10    A.    Because we have different agreements with different

11    entities.  And in the particular case of music, we are

12    limited with some of the use.

13    Q.    So, the music companies have copyrights.  And in

14    your agreement, they say, *when somebody records a game, we*

15    *don't want them recording our copyrighted music.*

16    A.    We have different agreements with different labels.

17    Sometimes it's fine to use the music, sometimes it's not.

18    Q.    Okay.  And you know how to give credits for using

19    music in the game, right?  You do that?

20    A.    The credits are less contractual and that's more

21    partnership driven.  Sometimes we do, sometimes we don't.

22    Q.    But if Take-Two wanted to respect the copyright

23    artists -- copyrights in the game, you know how to do it?

24    A.    We have the ability to develop a list, yeah.

25    Q.    All right.  So, some companies that Take-Two

1    negotiates license with, who own copyrights, to put them in

2    the game, and others, they don't?

3    A.    Again, we have lots of agreements with many

4    entities.

5    Q.    Is that a yes?  Sometimes you negotiate with

6    people's copyrighted works and sometimes you don't, before

7    you put them in the game?

8    A.    Yes.

9    Q.    Now, on direct you also talked about how sometimes

10   people can play the game and never even see the tattoos;

11   right?

12   A.    Correct.

13   Q.    And that's only -- like in this case, it's only if

14   they don't select Randy Orton; right?

15   A.    I don't understand the question.

16   Q.    Okay.  I'll move on.

17        If you could look at Exhibit 183 in your binder

18   there, please.  Defendants' Exhibit 183.

19        MR. SIMON:  You can pull it up, please, Zack -- you

20   don't need to pull it up.  This is a quick question.

21   Q.    (BY MR. SIMON) If you can just look at it in the

22   binder.

23   A.    Yeah.

24   Q.    Now, first, Exhibit 183, that was created by Mr. --

25   A.    Charlton.

1    Q.      I'm sorry, say that --

2    A.      Charlton.

3    Q.      -- Charlton.  And he works for Take-Two?

4    A.      He works in finance.

5    Q.      And he made it, for purposes of this litigation,

6    Exhibit 183; right?

7    A.      The numbers are used in everyday operations.  The

8    spreadsheet itself was produced for this case.

9    Q.      What is the gross revenue on that spreadsheet,

10   please, for the 2K16, 17, and 18 games, if you could read

11   that?

12   A.      This spreadsheet is separated into a bunch of

13   different pages.  Um -- here we go.  You asked for gross --

14   total gross sales?

15   Q.      Yes.

16   A.      424,679,640.

17   Q.      Okay.

18           MR. SIMON:  And I think that's all I have, Your

19   Honor.  If I could just -- (Pause.)  That's all I have,

20   Your Honor.

21           THE COURT:  Mr. Simmons.

22                       REDIRECT EXAMINATION

23   BY MR. SIMMONS:

24   Q.      Mr. Brody, on -- during Mr. Simon's examination you

25   talked about telemetry data.  Do you remember that?

```
1   A.      Yes.

2   Q.      So, I just want to understand.  Do you know whether

3   the telemetry data exists, or not, that he was asking

4   about?

5   A.      I do not.

6   Q.      Okay.  Do you know whether Miss Alexander's counsel

7   requested that information?

8   A.      I do not.

9   Q.      How do you know that using real world body parts is

10  not important to the WWE 2K games at -- where Mr. Orton's

11  body parts existed?

12          MR. SIMON:  Objection, Your Honor, asked and

13  answered.

14          THE COURT:  Sustained.

15          MR. SIMMONS:  All right.

16  Q.      (BY MR. SIMMONS)  On -- Mr. Simon also asked you

17  about music.  Do you remember that?

18  A.      I do.

19  Q.      And you talked about, there were restrictions and

20  certain agreements; right?

21  A.      Correct.

22  Q.      Do you know whether Miss Alexander put restrictions

23  on Mr. Orton's use of his tattoos?

24          MR. SIMON:  Objection, Your Honor, relevance.

25          THE COURT:  Sustained.  And calls for this witness
```

1    to speculate.  Sustained.

2         MR. SIMMONS:  Okay.

3    Q.    (BY MR. SIMMONS)  Are there any restrictions on, on

4    Take-Two's use of Mr. Orton's likeness in the WWE 2K games

5    with regard to your agreement with WWE?

6    A.    No.

7         MR. SIMMONS:  No further questions.

8         THE COURT:  Anything else, Mr. Simon?

9         MR. SIMON:  No, Your Honor.

10         THE COURT:  Thank you, Mr. Brody.  You may step

11    down.

12         THE WITNESS:  Thank you.

13         THE COURT:  Defendants may call its next witness.

14         MR. SIMMONS:  Your Honor, at this time we'd like to

15    read certain Requests for Admission into the record.

16    There's no objection, I don't believe.

17         THE COURT:  Okay.

18         MS. MEANS:  Good morning, ladies and gentlemen of

19    the jury.

20         So, beginning with Plaintiff Catherine Alexander's

21    Objections and Responses to Defendants Take-Two Interactive

22    Software, Inc., 2K Games, Inc., 2K Sports, Inc., and Visual

23    Concepts Entertainment's First Set of Request for

24    Admissions to Plaintiff Catherine Alexander.  Defendants'

25    Trial Exhibit 94.

1    Request for Admission No. 92.  Admit that you have

2    never been in the video game business.

3    Response:  Plaintiff admits this request.

4    Request No. 97.  Admit that you have not licensed

5    to another person the ability to include the tattoos in

6    another work.

7    Plaintiff admits she has granted no licenses to

8    date.

9    Request for Admission No. 98.  Admit that you have

10    not licensed to another person the ability to include the

11    tattoos in a video game.

12    Plaintiff admits that she has granted no licenses

13    to date.

14    Request for Admission No. 110.  Admit that you

15    received -- excuse me -- admit that you have received no

16    revenues from the depiction of a tattoo when the person

17    inked with such tattoo appeared in the media or on

18    merchandise.

19    Plaintiff admits this request.

20    Request for Admission No. 111.  Admit that you have

21    received no revenues from the use of the tattoos in video

22    games.

23    Response:  Plaintiff admits this request.

24    Request for Admission No. 112.  Admit that you have

25    received no revenues from the use of any tattoo inked or

1    designed by you in video games.

2        Response:  Plaintiff admits this request.

3        Turning to Plaintiff Catherine Alexander's

4    Objections and Responses to Defendants Take-Two Interactive

5    Software, Inc., 2K Games, Inc., 2K Sports, Inc., and Visual

6    Concepts Entertainment's Second Set of Request for

7    Admission to Plaintiff Catherine Alexander, which is

8    Defendant's Trial Exhibit No. 96.

9        Request for Admission No. 124.  Admit that Randy

10   Orton selected the location of the asserted works would be

11   inked on his body.

12       Response:  Plaintiff admits this request.

13       MR. SIMMONS:  Your Honor, at this time we call to

14   the stand Dr. Ian Bogost.

15       THE COURT:  Okay.  We're going to go ahead and take

16   a short break before we proceed with Dr. Bogost.  We will

17   break until 10:15.

18       COURTROOM DEPUTY:  All rise.

19       (Proceedings continued in open court, jury not

20   present.)

21       THE COURT:  Please be seated.

22       Before we proceed with Dr. Bogost, I am trying to

23   nip some things in the bud that I anticipate here.  So,

24   after yesterday, I reviewed the expert reports again.

25   Given the fact that there were no *Daubert* challenges to any

1    of the experts filed ahead of time, the Court had not seen

2    the expert reports.

3    After yesterday and the situation with Dr.

4    Jablonski, I reviewed the expert reports in this case.  And

5    again, based on my obligation even in the absence of any

6    challenge under *Daubert* or Rule 702, I have reviewed those.

7    And on the one hand, I anticipate issues with

8    respect to Dr. Bogost -- and I'm not trying to mispronounce

9    your name -- his testimony.  And I'm trying to nip that in

10   the bud because today we are not going to waste time.

11   We're not going to be on a kazillion sidebars.  We're going

12   to move this case and we're going to stay on track, as I

13   have indicated to the jury.  So, we can take it up now.

14   Again, under Rule 702, an expert's opinion has to

15   meet certain standards, reliability, necessity, or at least

16   establish that the opinions and the testimony will assist

17   the jury in some way.  And, obviously, be determined to be

18   reliable and reliably based on the expert's background,

19   experience, education, training.

20   The one issue that the Court has identified with

21   respect to the -- at least the opinions expressed by Dr.

22   Bogost in his report is -- and the defendants can correct

23   me if I'm wrong -- it appears the defendants intend to

24   elicit opinions from him regarding to what degree tattoos

25   are observable on the wrestler's body during gameplay.  Is

1    that correct?

2         MR. SIMMONS:  Yes, Your Honor.

3         THE COURT:  Okay.  That is not an expert opinion.

4    That is not something that's beyond the jury's province and

5    their lay opinions.  The jury does not need nor do I think

6    that expert testimony is probative of what, what people can

7    observe, which is also what the jurors can observe.  And

8    they have seen the gameplay.  That is not expert opinion

9    that would assist the jurors in this case.  It is not

10   reliable as an expert opinion.  That opinion -- he will not

11   be allowed to give that opinion.

12        Secondly.  The other opinion that I'm aware -- I

13   believe he's going to talk about whether there is a fair

14   market value as it relates to the tattoos in the video

15   games.  Correct, Mr. Simmons?

16        MR. SIMMONS:  Not fair market value, Your Honor --

17        THE COURT:  I'm sorry.  Not fair market.  You tell

18   me, what opinion is he going to give?

19        MR. SIMMONS:  He will speak to whether there is a

20   market for the use of real world tattoos in the video

21   games.

22        THE COURT:  And what's the basis of his opinion in

23   that regard?  I mean, on what does he base that?

24        MR. SIMMONS:  Yes, Your Honor.  Dr. Bogost is

25   himself a game developer, owns a video game company, has

1  also consulted with numerous video game companies,

2  including publishers and others.  He's reviewed contracts

3  related to that in his consulting work and --

4          THE COURT:  Has he done any work, study, research

5  on the specific issue of whether there is a market, which

6  is the opinion that he is giving?

7          And you know, again, I'm aware of the ruling in the

8  *Hayden* case.  I'm not bound by that ruling, but I find it

9  to be sound and rational.

10          I guess what I'm asking you is, is Dr. Bogost going

11  -- does he have a basis for his opinion other than what

12  existed in that case?  Has he done -- because it appears to

13  be the exact opinion, exact basis, identical situation.

14          MR. SIMMONS:  No.  Your Honor, to answer your

15  question directly, I believe his experience is the same.

16  As you can imagine, we -- you know, we disagreed with the

17  court's opinion in that case.  But we -- because Dr. Bogost

18  has significant --

19          THE COURT:  My specific question, Mr. Simmons, so

20  we can move on.  We're not going to have this jury hanging

21  around like we did yesterday.  Does he have any additional

22  basis for his opinions other than what was the bases for

23  his opinions in the *Hayden* case?

24          MR. SIMMONS:  No, Your Honor.

25          THE COURT:  That being the case, I agree that that

1    opinion and that testimony is rank speculation, it is not

2    appropriate expert opinion, and it also -- those opinions

3    will also be excluded in this case.  I see no other

4    problems with his other opinions that are contained in his

5    report.

6            And let me just ask, Mr. Simon, we're trying to --

7    I'm trying to preempt this and keep this moving.

8    Obviously, we'd be in a much better place had there been

9    *Daubert* challenges that the Court could have worked out

10   before, but I acknowledge you are not required to file them

11   and so it is what it is.  But I'm trying to keep this case

12   moving and be efficient today.

13           Do you intend at any point to challenge his

14   qualifications to render any other opinions in this case?

15           MR. SIMON:  The only two have been resolved, Your

16   Honor.  You took -- you ruled on those.  No others.

17           THE COURT:  Okay.

18           MR. SIMON:  We do not intend to challenge any

19   others.

20           THE COURT:  Okay.  Thank you.

21           (Court recessed from 10:07 a.m. to 10:15 a.m.)

22           (Proceedings continued in open court, jury not

23   present.)

24           THE COURT:  All right.  Sort of piggybacking on

25   where we broke, let me just ask you, Mr. Simon, again -- we

1    have one more expert after Mr. Bogost?  Is that correct?

2         MR. SIMMONS:  Two.

3         THE COURT:  Two more?

4         If you have -- if you anticipate making any

5    challenges, tell me now.  Again, I get it, but there is a

6    purpose for *Daubert*.

7         MR. SIMON:  Yes.  I'll remember that, Your Honor.

8    We don't have a *Daubert* issue with Dr. Malackowski.  And we

9    have notified the other side, it's a supplementation.  That

10   Exhibit 183 that was talked about today?  Was never given

11   to Dr. Malackowski.  We never got a supplemental report on

12   it.

13        We're not objecting to his qualifications or any of

14   that, just that he can't talk about updated data and

15   categories of expenses that were never provided in the

16   supplemental report.  Even as of today, we haven't gotten a

17   supplemental report.

18        THE COURT:  Did they -- was the report

19   supplemented, Mr. Simmons?

20        MR. SIMMONS:  Your Honor, no.  But may I be heard

21   for one -- two sentences?

22        THE COURT:  Yes.

23        MR. SIMMONS:  Mr. Malackowski's report discussed a

24   previous version of the same spreadsheet, which was updated

25   at plaintiff's request and then produced to them two years

1    ago.

2            THE COURT:  That wasn't my question.  My question

3    was, the spreadsheet that was used this morning -- or the

4    spreadsheet that you anticipate using with him today, as I

5    understand it, contains updated information.  Did you

6    supplement that information and provide the updated

7    information to the plaintiff?

8            MR. SIMMONS:  No, Your Honor.

9            THE COURT:  Then he may not use it.

10           MR. SIMON:  And then for Dr. Jay, we have no

11   challenges, Your Honor.

12           THE COURT:  Okay.

13           (Proceedings continued in open court, jury

14   present.)

15           COURTROOM DEPUTY:  Please be seated.

16           THE COURT:  Okay.

17           MR. SIMMONS:  Your Honor, defendants call Dr. Ian

18   Bogost to the stand.

19           THE COURT:  Okay.  Dr. Bogost?

20           (Witness sworn by courtroom deputy.)

21           THE WITNESS:  Ian Bogost, B-O-G-O-S-T.

22           THE COURT:  You may proceed.

23           MR. SIMMONS:  Your Honor, may I approach the

24   witness with the binder?

25           THE COURT:  Yes.

1          MR. SIMMONS:  May I proceed, Your Honor?

2          THE COURT:  You may.

3                       *  *  *  *  *

4                       IAN BOGOST,

5     having been first duly sworn, was examined and testified as

6     follows:

7                       DIRECT EXAMINATION

8     BY MR. SIMMONS:

9     Q.     Dr. Bogost, would you please introduce yourself to

10    the jury?

11    A.     Good morning.  I am Ian Bogost.  I am a professor

12    at Wash U, across the river.

13    Q.     What was your title there?

14    A.     I am the Barbara and David Thomas Distinguished

15    Professor in Arts and Science, the Director of Film and

16    Media Studies, and a Professor of Computer Science and

17    Engineering.

18    Q.     What courses do you teach?

19    A.     Media studies, computer science, film, video games.

20    Q.     And what is the highest degree that you have

21    earned?

22    A.     I have a doctorate, a Ph.D.

23    Q.     In preparation for your testimony today, did you

24    prepare a set of slides to assist you?

25    A.     Yes, I did.

1         MR. SIMMONS:  Your Honor, I request permission to

2    publish DDX 170 to the jury, which is also contained in the

3    binder provided to opposing counsel.

4         THE COURT:  Hold on for a second.  (Pause.)  Okay.

5    These are demonstratives only?

6         MR. SIMMONS:  Yes, Your Honor.

7         THE COURT:  Any objection?

8         MR. FRIEDMAN:  No objections.

9         THE COURT:  Okay.  You may publish them.

10        MR. SIMMONS:  Mr. Thomas, would you take us to

11   slide two, please.

12   Q.    (BY MR. SIMMONS)  Dr. Bogost, what was your path to

13   becoming a professor at Washington University?

14   A.    So, in the 90s, I worked in the technology

15   entertainment industries in LA, then I got my Ph.D at UCLA.

16   After that, I became a professor at Georgia Tech in

17   Atlanta.  And then last year, I moved here to join Wash U.

18   Q.    And what was the Georgia Tech program?

19   A.    So, I was appointed in liberal arts, in business,

20   in computer science, and in design at Georgia Tech.

21   Q.    And what brought you to St. Louis?

22        THE COURT:  Mr. Simmons, could you --

23        MR. SIMMONS:  Oh, I'm sorry.

24        THE COURT:  No.  No.  No.  Because I'm having

25   problems hearing you, I don't know if the jury -- well,

1  don't tear it up.  Okay.

2          MR. SIMMONS:  I'm just auditioning for the WWE

3  today, Your Honor.

4          THE COURT:  Thank you.

5  Q.      (BY MR. SIMMONS)  What brought you to St. Louis?

6  A.      Wash U recruited me to run its media program, to

7  bring my experience to their offerings.

8          MR. SIMMONS:  Mr. Thomas, would you please go to

9  slide three.

10  Q.      (BY MR. SIMMONS)  What work have you done in the

11  video game industry?

12  A.      Yeah, so back in the '90S, among my work, I made

13  games for companies such as Sony and Disney and Honda, and

14  others.  Then I started my own game studio in the early

15  2000s.  And I also maintain an independent game practice,

16  where I show my games at festivals and exhibitions and also

17  sell them to people.

18  Q.      Have any of your games been successful?

19  A.      Yeah, I like to think so, maybe not in the same way

20  as 2K's games, but my games have been played by, by

21  millions of people.  They have been exhibited all around

22  the world.  One of them is in the Smithsonian.

23  Q.      Have you worked for any video games that, you know,

24  an ordinary person would have heard of?

25  A.      Yes.  I have also done work for big companies such

1  as Electronic Arts.

2          MR. SIMMONS:  Would you go to slide four, please.

3  Q.      (BY MR. SIMMONS) Have you published any books

4  relevant to this lawsuit?

5  A.      I have written or co-written ten books, most of

6  which are about video games or technology, or both.

7          MR. SIMMONS:  Mr. Thomas, would you take us to

8  slide five, please.

9  Q.      (BY MR. SIMMONS)  Have you published any scholarly

10 papers on topics related to this lawsuit?

11 A.      Yes.  I have also published some hundreds of

12 scholarly articles, many of which are about video games.

13         MR. SIMMONS:  Mr. Thomas, would you take us to

14 slide six, please.

15 Q.      (BY MR. SIMMONS)  Dr. Bogost, have you given

16 presentations on these topics, academic or otherwise?

17 A.      I have had the opportunity to give many keynote

18 presentations in academia and in the games and media

19 industries.

20 Q.      Why have industry conferences requested your

21 participation?

22 A.      They have been interested in my work and my

23 perspective on games, and have brought me in to communicate

24 that perspective.

25 Q.      Have other professors relied on your work in their

1  own research for teaching?

2  A.      I have been pretty fortunate in my career in that

3  almost anyone who studies games today, around the world,

4  probably uses some of my work.

5          MR. SIMMONS:  Let's go to slide seven.

6  Q.      (BY MR. SIMMONS) Has your work been recognized by

7  any industry groups or trade associations?

8  A.      So, our main trade associations, which is the

9  Digital Games Research Association and the Higher Education

10 Video Game Alliance -- DGRA -- made me an Inaugural

11 Distinguished Scholar, and I'm a Lifetime Fellow in HEVGA.

12         MR. SIMMONS:  Let's go to slide eight.

13 Q.      (BY MR. SIMMONS)  As a leader in video game

14 studies, do you hold any academic or advisory positions

15 relevant to this case?

16 A.      Many.  I review or organize events or journals or

17 other sorts of materials for organizations in government,

18 in private industry, in museums, and in other

19 organizations.

20         MR. SIMMONS:  Let's go to slide nine.

21 Q.      (BY MR. SIMMONS)  Has your work received

22 recognition in any media publications?

23 A.      Yeah, again, I have been fortunate to get some

24 attention here.  The New York Times has covered my work;

25 Wired did a feature on one of my games.  I also write for

1    _The Atlantic_, where I often write about video games.

2    MR. SIMMONS:  Your Honor, defendants tender Dr. Ian

3    Bogost as an expert in video games.

4    THE COURT:  Objection?

5    MR. FRIEDMAN:  No objection.

6    THE COURT:  Dr. Bogost is noted on the record,

7    qualified to render opinions in the area of video games.

8    Q.    (BY MR. SIMMONS)  Now, Dr. Bogost, what were you

9    asked to do in this case?

10    A.    I was asked to look at the similarities between

11    video games and other kinds of media, and the size of the

12    materials in the 2K games that contain the tattoo imagery

13    as compared to the rest of the game.

14    Q.    Were you compensated for your time?

15    A.    Yes.  I -- like, like Dr. Zagal and all the other

16    experts testifying, I was compensated for my time.

17    MR. FRIEDMAN:  Object, foundation.

18    THE COURT:  Yeah, I don't know that this witness

19    has any information or knowledge as far as what Dr. Zagal

20    was compensated or if he was compensated.  That's not in

21    evidence.

22    MR. SIMMONS:  Your Honor, but Dr. Bogost was

23    responding to Dr. Zagal's report in which that material is

24    found.

25    MR. FRIEDMAN:  Objection, foundation and testimony

1    by counsel.

2        THE COURT:  Sustained.

3        MR. FRIEDMAN:  Move to strike.

4        THE COURT:  Without any foundation -- if he has

5    foundation for the knowledge, I'll let you re-ask the

6    question.  But without that --

7        MR. SIMMONS:  His foundation comes --

8        THE COURT:  Let him testify to that.  I don't want

9    you testifying to it, Mr. Simmons.

10       MR. SIMMONS:  Understood, Your Honor.  I'll ask the

11   foundational question.

12       THE COURT:  There you go.

13   Q.     (BY MR. SIMMONS) Dr. Bogost, have you reviewed Dr.

14   Zagal's report from this case?

15   A.     Yes.

16   Q.     Did that contain information about what he is being

17   paid?

18   A.     Yes, it listed his rate and that he was being paid.

19   Q.     And --

20       THE COURT:  The objection is overruled based on

21   that foundation.

22       MR. SIMMONS:  Mr. Thomas, if you could bring up the

23   demonstrative slides again and go to slide 10, please.

24   Q.     (BY MR. SIMMONS)  What did you review to reach your

25   conclusions in this case?

1    A.      So, I looked at and played the games themselves.  I

2    looked at many of the materials produced in the case.  I

3    also relied on my knowledge and background in game design

4    and in the history of games, as well as materials and

5    research in that domain.

6    Q.      Did you reach any conclusions?

7    A.      Yes.

8    Q.      And at a high level, what conclusions did you

9    reach?

10   A.      So, there are two important conclusions for me.

11   One, is that video games are very similar in a lot of ways

12   to other popular media, including television and film.  And

13   the second is that the tattoo materials in the game

14   comprise a very small part of the game itself.

15   Q.      Let's turn to your opinion that video games are

16   similar to other media.

17          MR. SIMMONS:  If we could go to slide 11, please.

18   Q.      (BY MR. SIMMONS)  How does the user's experience of

19   playing a video game compare to watching television?

20   A.      Yes, so if you think about it, it's almost the

21   same, right?  You sit down on the same couch in front of

22   the same apparatus, and everything looks almost like it

23   does on TV when you play a video game.  Its only difference

24   is, you are holding a controller and participating in the

25   action itself.

Q.      If you were -- if there were testimony concerning a
line being drawn between photographs and television on the
one hand and video games on the other hand, from your
research in media studies what's your view of that
difference?

A.      I don't think it makes a lot of sense, especially
today.  Almost everything we use is a computer.  So, when
you take a picture, for example, with your smart phone,
it's actually taking a bunch of pictures and using
computers to assemble them together.

        When you make a poster, you are taking photographs
and then manipulating them in computer software and
compositing them.

        Films are made using some of the same computer
graphics, techniques that video games use.  In fact, in
some cases when you film a movie or a TV show, you see the
green screens and the people in the suits, and all of it's
put in digitally after the fact, in a similar manner, and
sometimes using the same technologies that video games use.

        MR. SIMMONS:  Let's go to slide 12.

Q.      (BY MR. SIMMONS)  What camera techniques are
available to creators of filmed or televised content on the
one hand and video game content on the other hand?

A.      This is one example of what I mean.  If you imagine
a set like a TV set, and you'd have people sitting in

1  chairs or something and then you've got a camera filming

2  and recording the action, a similar thing exists in video

3  games such as the WWE 2K Games where we have the virtual

4  set of the ring and a virtual camera that's filming the

5  scene and showing it to the player.

6          MR. SIMMONS:  Let's animate the slide, please.

7          (Video playing.)

8  Q.      (BY MR. SIMMONS)  Dr. Bogost, what were we seeing

9  just there?

10 A.      So, that's yet another example.  In this case, a

11 camera technique like panning, which is possible in the

12 physical world, is also in the game world.

13         MR. SIMMONS:  Let's go to slide 13, please.

14 Q.      (BY MR. SIMMONS)  What, if any, trends in video

15 games are relevant to this lawsuit?

16 A.      Yeah, I've already talked a little bit about this.

17 But if we drill down more, realism and realistic depictions

18 of the actual world make it so that video games and movies

19 and television are almost indistinguishable today.  So, the

20 level of realism that we are able to achieve in games

21 reaches that, almost, of what we are able to achieve in

22 film.

23         And then at the same time, some of the kind of

24 fantastic elements that computer graphics make possible,

25 they may have been previously relegated to games, are

1    brought in to film and TV with increasing frequently.

2        In addition to that, there's a convergence of, of

3    subject matter.  So, the stuff that you see on TV ends up

4    in games, and vice versa.  You might have video games made

5    based on Harry Potter or based on the Avengers.  And then

6    you have television and film content based on games like

7    Halo or like The Last Of Us or like WWE.

8    Q.      Do WWE 2K16, 17, and 18 specifically fit into these

9    trends?

10   A.      Yes.  But both of these trends are represented in

11   the WWE games.  They are highly realistic and they're also

12   moving between the television world and the video game

13   world.

14       MR. SIMMONS:  Let's bring up Plaintiff's Exhibit

15   33, which was previously admitted.

16   Q.      (BY MR. SIMMONS)  Dr. Bogost, we heard about these

17   photographs in Mr. Brody's testimony.  What are these

18   photos showing?

19   A.      These are photographs of Mr. Orton taken during the

20   creation of the WWE 2K games.

21   Q.      And once these photos were taken, what did Take-Two

22   do with them?

23   A.      So, they use these photographs in the construction

24   of, of that, that skin layer and the rest of Mr. Orton's

25   body as it gets created for the game.

1    Q.      When Take-Two photographs Mr. Orton, does that

2    process also capture Mr. Orton's tattoos?

3    A.      Well, it captures his whole appearance, everything

4    about him.  His facial hair, any scars or marks, his

5    musculature, the shape of his body, and, yes, the tattoos

6    as well, as they're a part of his body.

7    Q.      As these photographs were taken, what's the next

8    step in WWE 2K's development process?

9    A.      So, the developer uses these photographs as

10   reference material in the creation of texture files.

11        MR. SIMMONS:  Mr. Thomas, would you please bring up

12   Plaintiff's Exhibit 32, which was previously admitted.

13   Thank you.

14   Q.      (BY MR. SIMMONS)  So, are these the texture files

15   you were just discussing?

16   A.      Yes.  This is an example of a texture file.

17   Q.      And what aspects of Mr. Orton's appearance are in

18   the texture files?

19   A.      So, as we heard from Mr. Brody earlier, all of the

20   elements of Mr. Orton's appearance that came from the

21   photographs make their way into these texture files, which

22   just flatten out the skin.

23   Q.      Are Mr. Orton's tattoos depicted in the texture

24   files?

25   A.      Yes.  They're here among all the other elements of

1  his appearance.

2      MR. SIMMONS:  Mr. Thomas, would you bring us back

3  to Dr. Bogost's demonstratives at slide 14, please.

4  Q.    (BY MR. SIMMONS)  Dr. Bogost, what are we looking

5  at on this slide?

6  A.    So, earlier, we heard Mr. Brody refer to a wire

7  frame, and this is an example of what that means.  It's

8  the, the kind of bare 3D object around which those texture

9  files will be wrapped.

10      MR. SIMMONS:  Let's animate the slide.

11      (Video playing.)

12 Q.    (BY MR. SIMMONS)  What were you showing us there?

13 A.    It's actually pretty cool, right?  You can take

14 this thing -- that doesn't look like anything -- and turn

15 it into Mr. Orton.  That's what we were seeing.

16 Q.    Why did Take-Two include Mr. Orton's tattoos on Mr.

17 Orton in WWE 2K?

18 A.    So, 2K's expressive goal was to create a realistic

19 game, as we've heard.  And in so doing, they try to

20 reproduce as much of the real world of wrestling as

21 possible in the game, including all the details of all the

22 wrestlers, among them Mr. Orton.

23      MR. SIMMONS:  Let's go to slide 15.

24 Q.    (BY MR. SIMMONS)  Based on your review of Mr.

25 Orton's real world appearance and his appearance in WWE 2K,

1    what opinions have you formed related to his depiction in

2    the video games at issue?

3    A.      They're almost identical, almost photographically

4    identical.  I think, if I had shown you these two images

5    last week before you heard about any of this, you would

6    have had a hard time distinguishing one as a photograph and

7    one as coming from a video game.

8          MR. SIMMONS:  Let's go to slide 24.

9    Q.      (BY MR. SIMMONS) Dr. Bogost, I'd like to talk to

10   you about your second opinion which relates to the amount

11   of material in the game.  What is stored on the WWE 2K game

12   disks that were previously admitted into evidence?

13   A.      Yeah, so, when you buy the game, everything that

14   makes the game run is on that disk.  That includes all of

15   the compiled code, the software that makes the game work,

16   all of the assets, the arenas, all of the sounds, all of

17   the materials that are used to create the WWE world in the

18   game.

19   Q.      How does the size of the WWE 2K games compare to

20   other games, like if I downloaded Farmville for my phone,

21   or something?

22   A.      So, this is -- it's a big game.  It's one of the

23   biggest kinds of games that get made.  It's much larger

24   than a mobile game such as Farmville.

25   Q.      Did you perform a calculation to determine the size

1  of Mr. Orton's tattoos in terms of how much space they take

2  up on the game disk?

3  A.     Yes, I did.

4         MR. SIMMONS:  Can we go to slide 25, please.

5  Q.     (BY MR. SIMMONS)  According to your calculations,

6  what amount of the game data is taken up by Randy Orton's

7  tattoos?

8  A.     So, looking at those texture files as an asset on

9  disk, and then comparing that to the overall size of the

10 game disk -- and I did a really generous calculation here,

11 I think -- the tattoos are no more than .008 percent of the

12 entire game on disk.

13 Q.     Why did you perform that calculation?

14 A.     The purpose of the calculation is just to show what

15 a small part of the whole game these tattoos are.

16        MR. SIMMONS:  Your Honor, I have no further

17 questions.

18        MR. FRIEDMAN:  Redirect, Your Honor?  Or, I'm

19 sorry, cross -- cross-examination, Your Honor?

20        THE COURT:  When you figure out which one you're

21 going to do, you may proceed.

22        MR. FRIEDMAN:  I think I will on cross.

23        THE COURT:  You may proceed.

24        MR. FRIEDMAN:  Thank, you, Your Honor.

25                     CROSS-EXAMINATION

1  BY MR. FRIEDMAN:

2  Q.      Dr. Bogost, nice to meet you.  My name is Tony

3  Friedman.  We've not met before.  Is that correct?

4  A.      That's right.  Good morning, Mr. Friedman.

5  Q.      Good morning.  I will have a few questions for you.

6  Hopefully, I won't keep you too long.  I think we'll start

7  from the end and go back through the beginning.

8          This calculation that you performed where you

9  determined that .008 percent of the disk space of the 2K18

10  game is comprised of Mr. Orton's tattoos -- is that right?

11  Is that the calculation you made?

12  A.      That's correct.  And when I say Mr. Orton's tattoos

13  in this case, I mean the entirety of the tattoos that

14  appear on his body.

15  Q.      You are talking about all five tattoos that Miss

16  Alexander inked on Mr. Orton?

17  A.      I'm talking about all of Mr. Orton's tattoos.

18  Q.      Okay.  And what you are looking at is really the

19  storage space required to hold those image files or those

20  texture files in the game disk itself; correct?

21  A.      That is correct.

22  Q.      All right.  So, you are taking that number, which

23  is a small number, and you are dividing it by the total

24  storage space required for the entire game, the 2K18 game;

25  correct?

1    A.    That sounds right.

2    Q.    Okay.  And you just made the calculation.  You did

3    the division and came out with .008 percent; right?

4    A.    Yes.

5    Q.    Okay.  You were asked the question, why did you do

6    that calculation.  What is the purpose of that calculation?

7    A.    Well, as I mentioned, it's a way of looking at the

8    game, which is extremely large.  I mean, we really haven't

9    gotten to see yet just how big this game is, how much goes

10   into it.  And this is one way of looking at the relative

11   size of Mr. Orton's tattoos in their entirety, as compared

12   to the whole game.

13   Q.    All right.  Dr. Bogost, you understand that one of

14   the issues in this case is the value of the tattoos to the

15   video games in terms of sales and profits; right?

16        MR. SIMMONS:  Objection, Your Honor, relevance and

17   beyond the scope.

18        THE COURT:  Overruled.

19   A.    Do you mind repeating the question?

20   Q.    (BY MR. FRIEDMAN)  You understand that one of the

21   issues in this case is the value of the tattoos to the

22   sales and profits of the video games?

23   A.    I was not asked to look at those matters.  I

24   understand that they may be at issue.

25   Q.    Okay.  Now, with respect to your calculation

1  concerning the storage space of the texture files, you are

2  not saying that the value of the tattoos to the realism or

3  authenticity can be determined based on your calculation;

4  correct?

5  A.    I'm not making any opinions about the, the value of

6  the tattoos.

7  Q.    Okay.  You are not utilizing your .008 percent in

8  any way to make any determinations or provide any opinions

9  concerning the value of the tattoos to the game or their

10  relationships to sales or profits; correct?

11  A.    That's right.

12  Q.    You are merely making a calculation based on the

13  disk space taken up by certain texture files in the context

14  of the overall game; correct?

15  A.    Right.  Just, just one way of showing the relative

16  size of the materials that we have been considering in

17  relation to the whole game.

18  Q.    Thank you.  Dr. Bogost, you would agree that some

19  video game elements are more important than others?

20  A.    Well, it depends on what you mean by elements but

21  certainly, yes.

22  Q.    So, it's not really the amount of disk space that a

23  particular video game element takes that is determinative

24  of its value to the overall game.  Is that fair?

25  A.    Well, you know, it really depends on, in this case,

1   the value of the tattoos, if I had to make a judgment about

2   them --

3   Q.      I'm not asking -- I'm sorry.  I'm not asking you to

4   make a judgment.  I'm just asking you if -- I'll just move

5   on.

6   A.      Okay.

7   Q.      I think we've -- I think we've exhausted that.

8           Dr. Bogost, you had talked a lot about realism, and

9   you agree that realism and authenticity are very important

10  for the 2K16, 17, and 18 video games.  Fair?

11  A.      I think the way I had put it is that the developers

12  of these games were after realism.  That's what they wanted

13  to do, was to make a realistic game.

14  Q.      It was Take-Two's goal to achieve a realistic and

15  authentic game; correct?

16  A.      Yeah, I think that's what I said.

17  Q.      Okay.  That's both because of the genre of the 2K

18  games, being sports video games; right?

19  A.      They're sports video games, for sure.

20  Q.      Right.  And it's important in sports video games,

21  especially of these kinds, that realism is achieved?

22  A.      Well, there are lots of different kinds of games,

23  lots of different kinds of sports games, and even lots of

24  different kinds of wrestling games.  But in this case, with

25  respect to these games, the developer's goal was to create

1    a realistic one.

2    Q.    You'd agree with me that Take-Two had the goal of

3    achieving a realistic and authentic video game in order to

4    drive sales?

5    A.    You know, I've -- no.  Not really.  I think the

6    fact that this is a commercial product is, is true.  There

7    are lots of commercial products out there, but this is

8    artwork, this is a creative industry.  And just as a film

9    maker makes a film to express themselves, so game

10   developers do, too.  And yeah, yeah, they want to

11   commercialize them and sustain their business, but that's

12   not the purpose.

13   Q.    The purpose was not to drive sales, it was for the

14   artistic expression; right?

15   A.    When you -- I'm not sure --

16   Q.    The purpose of the realism was not to drive sales,

17   it was not for commercial purposes, is that what you are

18   saying?

19   A.    I'm just saying that the developer's expressive

20   goal was to create a realistic game.

21   Q.    Dr. Bogost, you provided a report in this case;

22   correct?

23   A.    Yes.

24   Q.    Okay.  And as an expert witness, it's your duty to

25   be fair and impartial, to look at all the evidence and

1    material provided to you and come up with an independent

2    judgment, independent opinions that you can then explain to

3    the jury; is that right?

4    A.    I certainly do my best.

5    Q.    And you agree that you should be fair and impartial

6    when looking at evidence and materials provided to you;

7    correct?

8    A.    Yes.

9    Q.    You are not taking a side here?

10   A.    That's right.

11   Q.    Right.  Okay.  And if the basis of your opinions

12   turns out to be incorrect, you would have a duty to

13   supplement your opinion or modify your opinions, wouldn't

14   you agree?

15   A.    Sure.

16   Q.    Okay.  And, Dr. Bogost, you have been sitting

17   through the testimony throughout this trial; is that

18   correct?

19   A.    I have been.

20   Q.    Okay.  Dr. Bogost, do you have a copy of your

21   expert report in your binder there?

22   A.    Yes.

23   Q.    Could you turn to paragraph 106, second sentence.

24   (Pause.)  Tell me when you are there.

25        MR. SIMMONS:  Objection, Your Honor, improper

1    impeachment.  Counsel's about to read from his report into

2    the record.

3              THE COURT:  You cannot read from the report,

4    counsel.  You can ask him a question about his report.

5    Q.      (BY MR. FRIEDMAN)  Dr. Bogost, do you agree that

6    there is no way in the 2K video games to apply the tattoos

7    at issue in this case onto other wrestling characters?

8    A.      Yes.

9    Q.      You saw pictures and videos of the custom character

10   creator in the 2K games; correct?

11   A.      I think we have all seen those many times, yes.

12   Q.      All right.  Dr. Bogost, you are being paid for your

13   time; correct?

14   A.      Yes.

15   Q.      All right.  What is your hourly rate?

16   A.      In this case, it's 500 dollars.

17   Q.      And how many hours have you put into this case

18   since you were brought in by the defendants?

19   A.      I don't have a -- I don't have my accounting

20   materials with me.  I couldn't tell you right now.

21   Q.      Approximately how many hours have you put into this

22   case since it started?

23   A.      It's been going on a long time and, I'm sorry, I

24   would just be guessing.

25   Q.      Have you been hired by these law firms before?

```
 1    A.      I'm not sure --

 2    Q.      By the defendants' law firms before?

 3    A.      I -- I don't know which law firms you are referring

 4    to.  Maybe you could clarify?

 5    Q.      Okay.  Have you been hired by the Kirkland and

 6    Ellis firm before?

 7    A.      Yes, I have.

 8    Q.      To provide opinions in litigation?

 9    A.      Yes.

10    Q.      All right.  And that's a normal part of your

11    professional practice, is to provide opinions in

12    litigation?

13    A.      I mean, I wouldn't call it a normal part.  This is

14    a small part of what I do.  My main job is teaching kids at

15    Wash U.  But I do do this from time to time.

16    Q.      Thank you, Dr. Bogost.  I have no further

17    questions.

18    A.      Thank you.

19           MR. SIMMONS:  No redirect, Your Honor.

20           THE COURT:  All right.  Sir, you may step down.

21           THE WITNESS:  Thank you.

22           THE COURT:  You may call your next witness.

23           MS. CENDALI:  Defendants call Dr. Deborah Jay to

24    the stand.

25           (Witness sworn by courtroom deputy.)
```

1          THE WITNESS:  Evelyn Deborah Jay, J-A-Y.

2          THE COURT:  You may proceed.

3          MS. CENDALI:  Your Honor, may I approach?

4          THE COURT:  You may, Miss Cendali.

5                        *  *  *  *  *

6                      E. DEBORAH JAY,

7    having been first duly sworn, was examined and testified as

8    follows:

9                      DIRECT EXAMINATION

10   BY MS. CENDALI:

11   Q.     Good morning, Dr. Jay.

12   A.     Good morning.

13   Q.     Could you please introduce yourself to the jury?

14   A.     Good morning.  My name is Deborah Jay.  I'm

15   originally from Michigan, but I now live in California with

16   my husband.  I have adult children, no grandchildren yet.

17   For many years, I managed a very large marketing and public

18   opinion research firm.  And about five years ago, I founded

19   my own firm, Jay Survey Strategics.  We specialize in

20   conducting consumer surveys and public opinion surveys for

21   marketing purposes as well as for court cases.

22   Q.     What's your educational background, Dr. Jay?

23   A.     I have Bachelor's Degrees in Psychology and

24   Political Science from UCLA.  I also have a Ph.D degree in

25   Political Science.

1    For my Ph.D degree that I received from UC-Berkley,

2  I took courses in statistics and survey research.  I also

3  had to take exams, Ph.D-qualifying exams, in statistics and

4  survey research to get my degree.  And while at Berkley, I

5  also trained at the Survey Research Center at Berkley.

6  Q.    Were you asked to do anything in relation to this

7  case?

8  A.    Yes.  I was asked to conduct a survey of persons

9  who had bought one of the relevant games, in this case

10  2K16, 2K17, and 2K18, to find out their reasons for

11  purchasing the games.

12  Q.    Are you being compensated for your work?

13  A.    Yes.  I am being compensated.  This is what I do

14  for a living, and I'm being compensated at the same rate I

15  would be compensated when I do straight marketing research,

16  whether that's for a government agency, a private

17  corporation, or a law firm.

18  Q.    And what is your rate?

19  A.    I -- when I began working on this project, it was

20  650 an hour.  It is now 700 dollars an hour.

21    MS. CENDALI:  Your Honor, permission to publish

22  Defendants' Demonstrative 172 to the jury.  I believe

23  there's no objections.

24    THE COURT:  Any objection, Mr. Friedman?

25    MR. FRIEDMAN:  No objections.

1          THE COURT:  You may publish it.

2          MS. CENDALI:  Thank you, Your Honor.

3          And, Mr. Thomas, could you please turn to slide

4    two.

5    Q.     (BY MS. CENDALI)  Have you worked anywhere prior to

6    Jay Survey Strategics?

7    A.     Yes.  For 23 years, I was President and Chief

8    Executive Officer of Field Research Corporation.  It's one

9    of the oldest survey research firms in the United States,

10   founded by a man named Mervin Field in 1945.

11         I also worked as a Program Director and Senior

12   Research Social Scientist for ten years at SRI

13   International, which is a think tank founded by Stanford

14   University, and then it became SRI International.

15         In addition to that, I also worked at KPMG Peat

16   Marwick as a Management Consultant.

17         MS. CENDALI:  Mr. Thomas, please let's turn to

18   slide three.

19   Q.     (BY MS. CENDALI)  Dr. Jay, how long have you been

20   conducting surveys?

21   A.     Well over 40 years.  I'd like to say I was young

22   when I started.

23   Q.     We have been discussing the word surveys.  Could

24   you tell the jury what you mean by survey in this context?

25   A.     Yes.  The purpose of a survey is to collect

1  accurate information about a very large group of people,

2  when it is not possible to interview everyone in that group

3  of people.

4        So, a scientific survey interviews a subset of

5  people, called a sample, who are selected in a way so that

6  their opinions represent those of all of the people in the

7  larger group you are trying to represent.

8  Q.    In the course of your career, Dr. Jay, what types

9  of surveys have you conducted?

10  A.    So, I have conducted a wide variety of surveys.

11  I've done many surveys about attitudes, awareness, usage,

12  reasons for purchasing, different types of products, from

13  low tech like Beanie Babies to high tech computers and cell

14  phones.  I have done consumer satisfaction, advertising,

15  branding surveys.  And, of course, consumer perception

16  surveys.

17  Q.    Approximately how many surveys have you conducted

18  in your career?

19  A.    So, over the past 40 years, I have conducted well

20  over 800 surveys, and at least 400 surveys in the context

21  of litigation or court cases.

22  Q.    Have you published anything in the area of survey

23  research or methodology?

24  A.    I have authored over 50 presentations and articles

25  on public opinion research and survey methods, including

1    articles and book chapters on trademark surveys.

2        I have also been on the editorial board of

3    different publications involving surveys and intellectual

4    property.  So, I have served on the editorial board for The

5    Trademark Reporter, Public Opinion Quarterly, and an online

6    journal called Survey Practice.

7        MS. CENDALI:  Let's turn to slide four.

8    Q.    (BY MS. CENDALI)  Dr. Jay, have you taught or

9    lectured on survey-related topics?

10   A.    Yes.  I have taught college courses on public

11   opinion research, and lectured in marketing courses at

12   business schools, and in courses on intellectual property

13   at law schools.

14       I have been a faculty member of continuing legal

15   education seminars sponsored by bar associations, trade

16   associations, professional associations such as the Better

17   Business Bureau, the American Intellectual Property Law

18   Association.

19       And these seminars have been held throughout the

20   United States.  So, for example, I have presented seminars

21   in Chicago, Atlanta, Tampa, Washington DC, and many other

22   cities in the United States.

23       MS. CENDALI:  Let's turn to slide five.

24   Q.    (BY MS. CENDALI)  Dr. Jay, have you been active in

25   any professional organizations related to survey research?

1    A.      Yes.  I served on the board of CASRO -- the Counsel

2    of American Survey Research Organizations -- for seven

3    years, and was elected Chair of the organization by the 200

4    members.  The members of CASRO -- which is now called the

5    Insights Association -- represent the largest survey

6    research firms in the United States.

7           I also was elected Standards Chair of the American

8    Association for Public Opinion Research -- or AAPOR -- and

9    that includes over 2,000 individuals who conduct surveys.

10   This includes people in the Government such as the Census

11   Bureau, the Bureau of Labor Statistics, as well as

12   universities such as Washington University, and individuals

13   in private companies such as Gallup and my own company.

14          MS. CENDALI:  Your Honor, defendants respectfully

15   tender Dr. Deborah Jay as an expert in survey, survey

16   methodology, and market research.

17          MR. FRIEDMAN:  No objection.

18          THE COURT:  She is so certified.

19          MS. CENDALI:  Thank you, Your Honor.

20          THE COURT:  You may proceed.

21   Q.      (BY MS. CENDALI)  Dr. Jay, let's turn to the survey

22   you conducted in this case.  Can you flip to the exhibit

23   binder you have in front of you, please look at the

24   documents in that binder that are marked Exhibit 154 and

25   Exhibits 157 and 158.  (Pause.)  So, Dr. Jay, could you

1    tell me what those documents are?

2    A.    So, Exhibit 154 contains a copy of the

3    questionnaire that I used for my survey, and it shows how

4    the questions that I asked appeared on the computer when

5    people took the survey.

6          And Exhibits 157 and 158 include how the people who

7    took my survey answered the open-ended questions, the

8    questions where they had to answer in their own words.  It

9    includes their answers to the questions in my survey.

10   Q.    So, Dr. Jay, if the jury wanted to look at all the

11   questions you asked, could they do that by looking at

12   Exhibit 154?

13   A.    Yes.

14   Q.    And if the jury wanted to look at the answers to

15   the open-ended questions, could they do that by looking at

16   Exhibits 157 and 158?

17   A.    Yes.

18        MS. CENDALI:  Your Honor, defendants move Exhibits

19   154 and 157 and 158 into evidence.

20        THE COURT:  Any objections?

21        MR. FRIEDMAN:  No objection.

22        THE COURT:  Defendants' Exhibits 154, 157, and 158

23   -- is that correct, counsel?

24        MS. CENDALI:  Yes, Your Honor.

25        THE COURT:  They are admitted.

1          MS. CENDALI:  Thank you.

2          Let's go back, Mr. Thomas, to the demonstrative

3    slide deck and turn to slide six, if you please.

4    Q.     (BY MS. CENDALI)  Dr. Jay, you alluded to this

5    earlier, but what was the purpose of the survey you

6    conducted in this case?

7    A.     So, the purpose of my survey was to find out why

8    consumers bought the WWE 2K games at issue in this case,

9    and specifically whether the tattoos on Mr. Orton were one

10   of the reasons why consumers bought the games in this case.

11   Q.     And what did you conclude as a result of your

12   survey?

13   A.     So, I found that consumers bought the games for

14   many reasons, principally because they like wrestling or

15   the WWE.  But also for other reasons, such as the quality

16   of gameplay; it's fun; it's exciting.  None of my

17   respondents said that they had purchased the games for the

18   tattoos on Mr. Orton.

19   Q.     Let's turn to slide seven and let's talk about how

20   you got there.  How did you go about designing your survey,

21   Dr. Jay?

22   A.     So, I designed the survey the way I normally do for

23   any survey.  When you conduct a survey, you need to, first

24   of all, decide, *who are the people I need information from?*

25   Then you need to figure out, *How am I going to go find*

1    *those people?*  And once I find them, *what am I going to ask*

2    *them?*

3          MS. CENDALI:  Let's turn to slide eight, please.

4    Q.    (BY MR. SIMON) Let's start with your first

5    question.  In this case, who are the people you needed

6    information from?

7    A.    So, I needed information from people who had bought

8    the relevant games.  Of course, I couldn't interview all of

9    the people who bought the relevant WWE 2K games, so I

10   interviewed a scientific sample of people who had bought

11   the games.

12   Q.    How many people did you interview?

13   A.    I interviewed 418 purchasers of the relevant games.

14   Q.    And why did you interview 418 as opposed to some

15   other number?

16   A.    So, a sample of 400 consumers, when selected in a

17   representative way, will provide accurate and reliable

18   results.  When you do a survey, you need to do a large

19   enough sample to have reliable results, and that's what I

20   did here.  In a typical litigation survey, between 200 and

21   250 people are interviewed.  That's fairly standard.

22         In this case, I decided to interview almost twice

23   as many individuals just to ensure the results were

24   reliable.

25   Q.    Dr. Jay, let's turn to slide nine.  And let's go to

1    the second question that you mention you considered when

2    you went about designing your survey.  How did you find the

3    people to interview?

4    A.      So, I used two internet panels.  One is Research

5    Now SSI -- it's now called Dynata -- and another is YouGov.

6    And these are panels include large groups of people who are

7    selected in a scientific way across the United States so

8    that they're representative, and these people periodically

9    participate in internet surveys.

10   Q.      Is this standard in the field?

11   A.      Yes.  When I started, of course, most surveys were

12   done door to door.  But now, almost all of the surveys that

13   are done during marketing research, as well as litigation

14   research, are conducted over the internet.

15   Q.      Let's go to that third question you raise.  How did

16   you determine what to ask survey takers?

17   A.      So, I started by looking at the Complaint and the

18   items referenced in the Complaint, specifically the WWE --

19   or the WWE 2K games at issue in this case.  So, I looked at

20   2K16, 2K17, and 2K18.  I also looked at the Take-Two

21   website.

22          MS. CENDALI:  Let's turn to slide ten, please, Mr.

23   Thomas.

24   Q.      (BY MS. CENDALI)  And let's talk about some of the

25   questions you asked and why you asked them.  Now, you

1    mentioned earlier that you interviewed people who had

2    actually purchased WWE 2K games.  How did you determine who

3    to interview?

4    A.    So, I started by randomly selecting a sample of

5    persons in the United States, age 16 to 55.  But then we

6    asked questions to see if they had purchased the relevant

7    games, and these would be called eligibility questions.

8    Q.    So, what kinds of questions did you ask to

9    determine if someone was eligible to participate in the

10   survey?

11   A.    So, we start a survey by asking a series of

12   background questions, what types of items somebody

13   purchased, to find out if they had purchased video games.

14   If they purchased video games, what type of video games;

15   had they purchased sports video games, and then whether

16   they had purchased wrestling video games; and, ultimately,

17   whether they had purchased one of the games at issue in

18   this case.

19        MS. CENDALI:  Let's please, Mr. Thomas, put Exhibit

20   154, which has already been admitted in evidence, on the

21   screen so the jury can see it.  Thank you, Mr. Thomas.

22   Q.    (BY MS. CENDALI)  Dr. Jay, does this document show

23   the questions you asked in your survey?

24   A.    Yes.

25        MS. CENDALI:  Please, Mr. Thomas, take us to page

1    nine of this exhibit.  And maybe you can blow that up so

2    it's easier to see?  Thank you, Mr. Thomas.

3    Q.    (BY MS. CENDALI)  Dr. Jay, what are we looking at

4    on this page?

5    A.    I think this is not the question -- oh, this is the

6    question.  This is --

7    Q.    So, just to be clear, we are looking at Question S8

8    at D8; is that right?

9    A.    Correct.

10   Q.    Okay.

11   A.    So, this is an excerpt from the survey.  And this

12   is the principle question that was asked to determine

13   whether someone was eligible to participate.  So, people

14   who had said that they had purchased video games, and then

15   that they had purchased sports video games, and then they

16   had purchased wrestling games, were specifically asked:

17   "In the past three years, did you buy any of the following

18   WWE 2K video games?"  And I listed the relevant games, as

19   well as a "none of the above" and "don't know" category.

20        All of the people who had -- who qualified for my

21   survey had purchased at least one of the relevant games,

22   and the majority had purchased more than one of the

23   relevant games.

24   Q.    Dr. Jay, were there any other factors that

25   qualified people to participate in the survey?

A.      Yes.  As I indicated, I started with a random

sample of individuals age 16 to 55, because I wanted the

demographic which I understand purchases the vast majority

of these types of games.

        I also asked survey takers to agree to take the

survey on their own.  And I also asked survey takers

whether they worked in marketing or advertising research,

or whether they worked for a video game company.  And if

they did work in advertising or marketing research, they

weren't eligible.  And if they did work for a video game

company, they were not eligible.  Because those people

might have special knowledge and wouldn't necessarily be

representative of the tip purchaser.

        MS. CENDALI:  Mr. Thomas, let's go back to the

demonstrative slide deck and please turn to slide 11 there.

Thank you.

Q.      (BY MS. CENDALI)  So, Dr. Jay, for people who

qualified for the survey, what kinds of questions were they

asked next?

A.      Well, I asked open-ended questions about the

reasons why consumers bought the relevant games.  And then

I also asked what are called closed-ended questions on the

same topic.

        MS. CENDALI:  Let's turn to slide 12.

Q.      (BY MS. CENDALI)  Could you explain to the jury

what you mean by an open-ended versus a closed-ended question?

A.    I -- yes.  The question on the left is an open-ended question, and you can think of it as like a fill in the blank question.  So, here we ask:  "which McDonald's McFlurry flavor(s) do you like?"  And the survey taker was asked to write the response below.  If the survey was on the computer, they would be instructed to type their answer.

        The question on the right is a closed-ended question, and you can think of it as a multiple choice question.  Here, I asked virtually the identical -- or it's an example of virtually the identical question where we ask:  "which of the following McDonald's McFlurry flavor(s) do you like?"  And here the survey taker is instructed to "select all that apply" but they are also given a "none of the above" or "don't know" category that they can choose from.

Q.    Why did you ask a mix of open-ended and closed-ended questions?

A.    So, I asked open-ended questions because I wanted to give survey takers the ability to answer in their own words, and I did not want to limit them to a preset set of responses.  I wanted them to be able to say absolutely anything.  But I also wanted to collect more detail in

1    certain areas, so I asked some closed-ended questions.

2         MS. CENDALI:  Let's turn to slide 13.

3    Q.     (BY MS. CENDALI)  And let's start with the first

4    set of questions, the open-ended questions you asked.

5         What type of information were you trying to learn

6    from the open-ended questions you asked at the beginning of

7    your survey?

8    A.     So, I was trying to find out the main reasons why

9    people bought the relevant 2K games, as well as their other

10   reasons for buying the 2K Games.

11        MS. CENDALI:  Let's put up on the screen

12   Defendants' Exhibit 154 again, and this time go to page 12

13   in the document.

14   Q.     (BY MS. CENDALI) Dr. Jay, can you tell us what we

15   are looking at here?

16   A.     So, again, this is an excerpt from the

17   questionnaire.  This is the first -- once somebody

18   qualified for the survey, this is the first question they

19   were asked.  And the question was:  "What was the main

20   reason why you bought the following WWE 2K video game(s)."

21        And the games that were listed are only the games

22   that the survey taker bought.  So, if they had only

23   purchased WWE 2K16, that's the only game that would have

24   been listed.  But if they had purchased all three games,

25   then all three games would be listed.  And here, the survey

1  taker is instructed to type their answer in the box.  And

2  they're also permitted to say "don't know".

3  Q.    Now, were you also asked -- did you also ask --

4  well, let's turn to the next page of the exhibit, slide 13.

5       What question were you asking here?

6  A.    So, the next question I asked is, after our survey

7  takers told us their main reason, we asked:  "What were the

8  other reasons, if any, why you bought the WWE 2K video

9  games?"

10 Q.    And why did you ask that follow-up question?

11 A.    So, I didn't just want to find out the main reason

12 people bought the video games or what was the first thing

13 that came to mind.  I wanted to give survey takers an

14 ability to tell us their other reasons for buying the

15 games.

16     MS. CENDALI:  Let's go back, Mr. Thomas, to the

17 demonstrative deck, this time at slide 14.

18 Q.    (BY MS. CENDALI)  And let's discuss, Dr. Jay, some

19 of the responses you received to these open-ended

20 questions.  Okay?

21 A.    Yes.

22 Q.    So, what were some of the comments that people made

23 in response to the question, what were the main reasons

24 they bought WWE 2K?

25 A.    So, because survey takers wrote in their own words,

1    some survey takers gave very general responses:  "I love

2    wrestling", "it's a challenging game", and some mentioned a

3    specific feature such as they wanted to "play online with

4    friends."

5         MS. CENDALI:  Mr. Thomas, could you please put

6    Defendant's Exhibit 157 up on the screen?

7         And, Your Honor, this has already been admitted in

8    evidence.

9         THE COURT:  Thank you, counsel.

10   Q.    (BY MS. CENDALI)  And, Dr. Jay, does defendants'

11   Exhibit 157 let jurors see, if they wanted, a full list of

12   the responses to these open-ended questions?

13   A.    Yes.  This exhibit shows you how people answered

14   the two questions.  And you could see their exact words and

15   even decide for yourself how you understand their answers.

16   Q.    Let's go to page two of the document.  And there's

17   two columns here, Dr. Jay, A1 and A2.  Could you explain to

18   the jury what those columns are?

19   A.    Yes.  So, this is the first page of the exhibit,

20   which includes a compilation of all of the answers, the 418

21   answers to Question A1.

22         Question A1, which is the middle column, are the

23   main reasons our survey takers typed when they -- for

24   buying the game.

25         And column A2 reflects the answers to the follow up

1    question as to, what are the other reasons why you bought

2    the games.

3         MS. CENDALI:  Let's turn back to the demonstrative

4    deck at slide 15, Mr. Thomas.

5    Q.    (BY MS. CENDALI) Dr. Jay, how did you analyze the

6    results of these open-ended questions about the reasons

7    consumers bought the games?

8    A.    So, I started by reading all of the answers, and

9    then I came up with a list of categories that primarily

10   summarized the main reason -- or -- the reasons that were

11   most common.  Then I sorted the responses into different

12   categories.

13        And to be clear, a survey answer may appear in more

14   than one category because they may have given more than one

15   reason.

16        And then I counted the number of responses that

17   ended up in each category.

18   Q.    So, what was the most common response to the

19   open-ended questions?

20   A.    So, by far the most typical type of response or

21   most common were that people liked wrestling, the WWE,

22   wrestling games, and almost half -- 48 percent -- of the

23   survey takers mentioned something like that.

24   Q.    What was the next most common response?

25   A.    So, the next most common response is, people talked

1  about the quality of gameplay.  They didn't necessarily use

2  the word gameplay.  They talked more about the experience,

3  that it was fun; it was exciting; it was challenging.  And

4  about 29 percent -- not quite one-third of the survey

5  takers -- mentioned words about their experience of the

6  game.

7  Q.     I see on this demonstrative that three percent of

8  the people said realism.  Is that a reference to Randy

9  Orton's tattoos?

10  A.     No.  This is just a general reference to realism or

11  lifelike characters.  None of the people who mentioned

12  realism in response to the first two questions mentioned

13  Mr. Orton or tattoos.

14        And as I'll discuss later, when these particular

15  people -- the three percent -- were later asked questions

16  about the depiction of the appearance of particular

17  wrestlers, the people who mentioned realism in the initial

18  question did not mention Mr. Orton's tattoos.

19  Q.     Did anyone mention, as one of the reasons that they

20  bought the game, the Create a Superstar feature?

21  A.     Yes.  I believe about -- they didn't necessarily

22  restrict it to "Create a Superstar."  They talked generally

23  about Creation Suite; a few people mentioned Create a

24  Superstar; some people, Create a Storyline.  I think it was

25  about five percent mentioned that.

1  Q.      And was that a reference to Randy Orton's tattoos?

2  A.      No.   That was just a general reference to the

3  Creation Suite in the 2K games.   These people did not

4  mention Mr. Orton's tattoos either at the beginning of the

5  survey or at the end of the survey.

6          MS. CENDALI:  So, let's turn to the next slide.

7  Slide 16.

8  Q.      (BY MS. CENDALI)  Did anyone mention specific

9  wrestlers in response to the open-ended questions?

10  A.      Yes.   Four percent mentioned the wrestlers on this

11  particular slide or demonstrative.   So, people mentioned

12  "Stone Cold" Steve Austin; John Cena; AJ Styles -- I'm not

13  going to read all of them, but they mentioned a variety of

14  different wrestlers in response to the first two questions

15  that I asked.

16          MS. CENDALI:  Let's turn to slide 17.

17  Q.      (BY MS. CENDALI)  In answering these open-ended

18  questions, did anyone mention Mr. Orton's tattoos as one of

19  their reasons for purchasing the games?

20  A.      No.

21  Q.      Now, leaving aside his tattoos, did anyone even

22  mention Mr. Orton as one of their main reasons for buying

23  the games?

24  A.      No.

25  Q.      Did anyone mention Mr. Orton as one of their other

1    reasons for buying the games?

2    A.      No.

3          MS. CENDALI:  Let's turn to slide 18 of the

4    demonstrative.

5    Q.      (BY MS. CENDALI)  So, Dr. Jay, did you stop your

6    survey after the open-ended questions?

7    A.      No.  I asked -- I next asked some closed-ended

8    questions on the same topic.

9    Q.      Why did you do that?

10   A.      Well, I thought the initial open-ended questions

11   are the most reliable because they allowed survey takers to

12   answer in their own words and to say anything.  However, I

13   did want to see if people would mention Mr. Orton's tattoos

14   when encouraged to think about the depiction of particular

15   wrestlers in the game, and when encouraged to think about

16   particular aspects of those wrestlers' appearance.

17         MS. CENDALI:  Mr. Thomas, would you please put back

18   on the screen Defendants' Exhibit 154, this time at page

19   14, so we can talk more about the closed-ended questions.

20   Thank you.

21   Q.      (BY MS. CENDALI)  Dr. Jay, what are we looking at

22   here?

23   A.      So, this is the first closed-ended question that I

24   asked:  "which of the following, if any, were reason(s) why

25   you bought the following WWE 2K game(s)" and I included a

1    list of possible reasons that a consumer might buy the

2    game, and one of those features was the depiction of the

3    wrestler's face, body, or other aspects of their

4    appearance.  And the survey taker was instructed to select

5    all answers that apply.

6    Q.    So, the survey taker wasn't limited.  They could

7    choose as many as they wanted?

8    A.    Yes.  And some survey takers did check all or

9    almost all of the reasons.

10    Q.    What were some of the other response choices that

11    you gave?

12    A.    So, there are a wide -- there are hundreds of

13    features in the 2K games.  I tried to include a list of

14    features of different types of things you can find in the

15    games.  So, I included the selection of movesets.  You can

16    pick the finishing moves, the music, what you thought about

17    the ease of gameplay, the backstage action.  The fighting

18    style options.  *Do you want a brawler or a high flyer?*  I

19    also included a fictitious feature that does not exist in

20    the game, and that's the TJBD feature.

21         And I would like to point out that the order of

22    these features was randomized across respondents.  So, for

23    some of the respondents, the depiction of the wrestler's

24    face, body, or other aspects of their appearance was the

25    very first choice, and sometimes it was the very second

1    choice, and so on.

2    Q.      Now, you said you included a fictitious made-up

3    feature?  Is that what I heard?

4    A.      Yes.

5    Q.      Why did you do that?

6    A.      So, in survey, a fictitious feature is called a

7    control, sort of like a control group in a clinical trial

8    where you give people a sugar pill?  Well, in a survey, the

9    fictitious feature is to determine -- the purpose is to

10   determine the amount of guessing or noise in a survey to

11   estimate it, and then subtract it from the other results,

12   so that you get an accurate reflection of the percentage

13   who bought the game for specific reasons.

14          And you determine the amount of noise by looking at

15   the number of people who actually selected the TJBD

16   feature, calculating a percentage -- that represents the

17   amount of noise -- and subtracting it from the number of

18   people who selected the other features.  And that -- just

19   like in a clinical trial, you would subtract out the people

20   who got well on a sugar pill from the people who got well

21   on the active ingredient, to determine the effectiveness of

22   the active ingredient.

23   Q.      And is that subtraction standard in the industry?

24   A.      Yes.

25   Q.      All right.

1      MS. CENDALI:  Mr. Thomas, let's go back to the

2  demonstrative, this time at slide 19.

3  Q.     (BY MS. CENDALI)  Dr. Jay, focusing now on the

4  closed-ended questions, what did you find was the most

5  common response to the question about what reason people

6  bought the WWE 2K games?

7  A.     So, the most common reason by far is that people

8  selected "I or a family member likes wrestling", 46

9  percent; almost half, after counting for noise, selected

10  that response.

11      The next most common responses were the inclusion

12  of wrestling legends, these are usually wrestlers who were

13  retired from the game, and NXT wrestling stars -- the up

14  and coming wrestlers -- that would be about 33 percent of

15  the survey takers checked that box.

16      And then another 33 percent check the overall

17  quality of the graphics.

18      More than a fourth checked the fighting style

19  options, the size of the player roster, and the ability to

20  customize matches.

21  Q.     What were some of the other common responses?

22  A.     Oh, I think I -- I just went through them.  As I

23  say, people talked about the quality of the graphics, the

24  fighting style options, the size of the player roster, and

25  the ability to customize matches.

1    Q.      Fair enough.  Let's go to slide 20.  Does this

2    demonstrative reflect the other reasons people bought WWE

3    2K?

4    A.      So, this includes the next ranked responses.  So,

5    it includes things like the ease of gameplay and the price

6    and value of the games, as well as the depiction of the

7    wrestlers' movements and the depiction of the wrestlers'

8    face, body, or other aspects of their appearance.

9    Q.      So, let's drill down on that, Dr. Jay.  How many

10   survey takers said that the depiction of the wrestlers'

11   face, body, or other aspects of their appearance was at

12   least one of the reasons they bought the WWE 2K games?

13   A.      So, this wasn't the most common response.

14   Twenty-two percent said the depiction of the wrestlers'

15   face, body, or other aspects of their appearance was a

16   reason for buying the game, and that reflects the true

17   percentage after accounting for noise.

18   Q.      When survey takers said that the depiction of the

19   wrestlers' appearance was a reason they bought the WWE 2K

20   games, could you tell from that what particular features

21   the wrestler -- about the wrestler the survey taker had in

22   mind?

23   A.      No.  They could have been thinking about the

24   wrestler's hair, the wrestler's height, weight, muscle

25   build, even the attire they wear.  There are a lot of

1    different features of wrestler's appearance.

2         MS. CENDALI:  Let's go to slide 21.

3    Q.    (BY MS. CENDALI)  So, did you ask any follow-up

4    questions to see what specific features or if they had any

5    specific features or on any specific wrestlers in mind?

6    A.    I -- yes.  I asked additional questions to make

7    that determination.

8         MS. CENDALI:  Mr. Thomas, could you please put back

9    up on the screen Defendants' Exhibit 154, this time at page

10   17.  And go, if you would, to the first -- top of that

11   page, Mr. Thomas.  Thank you.

12   Q.    (BY MS. CENDALI)  So, let's start with this

13   question at the top of the page, Dr. Jay.  What follow-up

14   questions did you ask these survey takers?

15   A.    So, if someone had selected that one of their

16   reasons was the depiction of the wrestlers' appearance, we

17   then ask them:  "Was the depiction of the appearance of any

18   particular wrestler or wrestlers a reason why you bought

19   the following game(s)?"  And I was interested whether

20   consumers had a specific wrestler in mind or whether they

21   didn't have any specific wrestler in mind.

22        MS. CENDALI:  Mr. Thomas, could you now show the

23   question on the bottom part of that page.

24   Q.    (BY MS. CENDALI)  Now, if the survey taker

25   confirmed the depiction of a particular wrestler was a

1    reason for buying the WWE 2K video game, what did you ask

2    next?

3    A.    We asked:  "Which wrestler or wrestlers' depiction

4    was a reason why you bought the following WWE 2K video

5    game(s)?"  And the survey taker was instructed to type

6    their answer in the box.

7    Q.    Did any survey takers at this point mention Randy

8    Orton?

9    A.    Yes.  Four survey takers typed in Randy Orton.

10    Q.    Now, did any of those four survey takers mention

11    Randy Orton in response to the open-ended questions at the

12    beginning of the survey?

13    A.    No.

14    Q.    Now, could you tell, though, even from that answer,

15    what aspect of Mr. Orton's appearance was a reason these

16    four survey takers bought WWE 2K?

17    A.    Not based on this question.  I asked additional

18    follow-up questions to make that determination.

19         MS. CENDALI:  Let's go then, Mr. Thomas, to --

20    still on Exhibit 154 -- page D-17.

21    Q.    (BY MS. CENDALI)  What did you ask next?

22    A.    So, I asked whether there were:  "Any particular

23    features or aspects you thought were important to depict of

24    the following wrestler or wrestlers' appearance."

25         And instead of Wrestler 1 and Wrestler 2, the --

1    what people had actually typed in would appear.  So, if

2    they had named John Cena, "Stone Cold" Steve Austin, Randy

3    Orton, whoever they named would appear where it says

4    "Wrestler 1."  And it could have listed five wrestlers.  We

5    just put that in to give you an example.

6    Q.    So, Dr. Jay, did any of the survey takers, any of

7    these four people who mention Randy Orton, say it was

8    important to depict Randy Orton's tattoos?

9    A.    So, we asked people who said it was important to

10   depict a feature, a particular feature or aspect of the

11   wrestler's appearance.  We then asked them which features

12   or aspects were important to depict of the following

13   wrestler or wrestlers' appearance.

14         And in response to this question, none of the four

15   people who mentioned -- specifically mentioned Randy Orton,

16   mentioned his tattoos.  Two people said it wasn't important

17   to depict any particular feature of Mr. Orton's appearance,

18   and the other two people referred to -- one referred to his

19   finishing move and the other just referred to his moves in

20   general.

21         I think several people have talked about Mr.

22   Orton's RKO, that he's known for that move, so I -- this is

23   what people -- they didn't specifically say the RKO, but

24   they did refer to his finishing move and his moves.

25   Q.    Did anyone in the survey even mention tattoos at

1    all?

2    A.    Yes.  Yes, three people mentioned tattoos.  But the

3    people who mentioned tattoos did not specifically refer to

4    Mr. Orton's tattoos.

5    Q.    And do you understand this case is just about Mr.

6    Orton's tattoos?

7    A.    Yes.

8    Q.    And do you know, when they mentioned tattoos, whose

9    -- what tattoos those survey takers were referring to?

10    A.    Yes.  Two of the people who mentioned tattoos

11    referred to Brock Lesnar's tattoos, and they were actually

12    quite specific; one referred to, I think, the sword tattoo,

13    and the other talked about the tattoo on his chest and

14    other tattoos.

15        The third person who mentioned tattoos didn't

16    mention any specific wrestler.  That person mentioned the

17    facial expressions and the tattoos on all the players.  But

18    she did not name Mr. Orton specifically, and she didn't

19    mention Mr. Orton at the beginning of the survey, or even

20    mentioned tattoos at the beginning of the survey.

21    Q.    Dr. Jay, based on your work in this survey, what

22    was your overall conclusion about whether Randy Orton's

23    tattoos drove purchases of WWE 2K?

24    A.    So, I found that people purchased the WWE 2K games

25    for many reasons, principally, that they like wrestling.

1    But like -- just as Mr. Zagal testified he did not believe

2    any consumer purchased the games for the tattoos on Mr.

3    Orton, I did not have any survey taker say specifically

4    that they bought the games for the tattoos on Mr. Orton.

5    Q.      Thank you, Dr. Jay.

6            MS. CENDALI:  No further questions at this time.

7            THE COURT:  You may proceed, Mr. Friedman.

8                          CROSS-EXAMINATION

9    BY MR. FRIEDMAN:

10   Q.      Good morning, Dr. Jay.

11   A.      Good morning.

12   Q.      It's nice to meet you.

13   A.      Nice to meet you, too.

14   Q.      Just to reorient us, I think you did a good job at

15   the end there of restating your opinion.  Your opinion --

16   is it correct that your opinion is that no consumers

17   purchased the WWE 2K games because of Mr. Orton's tattoos?

18   A.      Yes.

19   Q.      Okay.  And you understand that plaintiff's claim

20   that the Take-Two defendants copied the tattoos in order to

21   add the qualities of realism, and that that drives sales of

22   the video games; right?

23   A.      Correct.

24   Q.      And you heard Dr. Zagal testify to that, in part.

25   You mentioned him a moment ago; right?

1   A.      I heard Dr. Zagal's testimony.

2   Q.      Okay.  You are not offering any opinions on the

3   ability of the tattoos copied into the video games to add

4   to the quality of realism or authenticity into the video

5   games; is that right?

6   A.      Well, I believe my finding that no consumers bought

7   the games for Mr. Orton's tattoos sheds light on that

8   issue.

9   Q.      In as much as, your conclusion is that no consumers

10  purchased the video games because of Mr. Orton's tattoos;

11  right?

12  A.      Yes.

13  Q.      Okay.  Dr. Jay, you have been sitting in the

14  courtroom throughout the course of this trial; is that

15  correct?

16  A.      Yes.

17  Q.      All right.  And you heard the testimony of Mr.

18  Brody for the Take-Two defendants?

19  A.      Correct.

20  Q.      Thank you.  Did you ask Mr. Brody for any of the

21  data that Take-Two has on consumer behavior and consumer

22  purchasing decisions with respect to the 2K games?

23          MS. CENDALI:  Objection.

24  A.      No.  I wanted to conduct --

25          THE COURT:  Sorry.

1    A.        -- an independent study.

2              THE COURT:  Excuse me.  Excuse me, ma'am.

3              Yes?

4              MS. CENDALI:  Objection, foundation.

5              THE COURT:  Overruled.

6              You may answer, Dr. Jay.

7    A.        No.  I wanted to conduct an independent objective

8    survey.

9    Q.        (BY MR. FRIEDMAN)  Okay.  Dr. Jay, in the survey

10   that you conducted that you explained to the jury, you had

11   control over what questions were asked each survey taker?

12   A.        Yes.

13   Q.        Okay.  And you had a hand in crafting those

14   questions, or crafted them yourself?

15   A.        I, 100 percent, formulated the questions in the

16   survey.

17   Q.        Okay.  And throughout the course of the survey,

18   with multiple subparts, did you ask any survey takers

19   whether they would have bought the video games if Mr. Orton

20   didn't appear in them with his tattoos?

21   A.        I did not ask that question because it would be --

22   Q.        Did you --

23   A.        -- extremely --

24             THE COURT:  Excuse me.  Excuse me.  Ma'am?

25             THE WITNESS:  No.

1    THE COURT:  No.  No.  Please respond to the

2    question that's being asked and only the question that's

3    being asked.

4    Q.    (BY MR. FRIEDMAN)  Dr. Jay, did you ask any survey

5    takers whether they would have bought the video games if

6    Mr. Orton's tattoos appeared differently than they do in

7    real life?

8    A.    No.

9    Q.    Did you ask any survey takers whether they would

10   have purchased the video games if they had the impression

11   that the video games were not realistic?

12   A.    I didn't ask a question worded in the manner, but I

13   believe --

14            THE COURT:  Dr. Jay?

15            THE WITNESS:  Okay.  Sorry, Your Honor.  I

16   apologize.

17            THE COURT:  Okay.  Did you get an answer, counsel?

18            MR. FRIEDMAN:  I believe the answer was no.

19   Q.    (BY MR. FRIEDMAN)  Is that correct, Dr. Jay?

20   A.    I believe so.

21   Q.    So, you don't know what the effect on sales would

22   be if Mr. Orton's character appeared in the video games

23   without his tattoos; correct?

24   A.    I don't specifically know, although I think the

25   survey sheds light --

1   Q.      And similarly -- I'm sorry, Dr. Jay.  I'm trying to

2   move along here.  Similarly, you don't know what the effect

3   would be on the sales of the video games if Mr. Orton's

4   tattoos were different in the video game, as they appear in

5   real life; correct?

6   A.      Correct.

7   Q.      And similarly, you don't know what the effect would

8   be on the sales of the video games if consumers believed

9   that the video games were not realistic or authentic; is

10  that correct?

11  A.      That's a -- I don't know what the sales would be.

12  Q.      Dr. Jay, you are being compensated for your time

13  today?

14  A.      Yes.

15  Q.      And throughout the course of this litigation, as

16  Miss Cendali had asked you about; correct?

17  A.      Yes.

18  Q.      I believe you are currently at 700 dollars an hour?

19  A.      Yes.

20  Q.      How many hours have you put into this case since

21  you first started working on it?

22  A.      I have no idea.

23  Q.      Okay.  You heard me ask that question to the

24  experts yesterday, didn't you?

25  A.      I don't -- I must not have been paying attention

1  regarding that specific -- I recall your asking them how

2  much they were billing per hour.

3  Q.      But sitting here today, you don't have an estimate

4  of how many hours you have put into this case so far?

5  A.      No, I do not.

6  Q.      Okay.  Is the amount of hours that you put into

7  this case something that would be relatively easy for you

8  to find out?

9  A.      Well, I would have to go back several years,

10  because work on this case has stopped and started several

11  times.  So, the initial work, I believe, was almost five

12  years ago.  So, I would have to go back and find those

13  records.

14  Q.      Okay.  Thank you.  And the survey that, that you

15  have been discussing, the survey that you, that you

16  conducted, what was the cost of that survey?

17  A.      I believe the survey was between 65 and 75,000

18  dollars.  But that included the amount I paid to the

19  internet subcontractors, as well as my research assistant,

20  which constituted more than half of the cost of the survey.

21  Q.      Okay.  And, Dr. Jay, I'd like to conclude with

22  looking at Slide No. 16 from the demonstratives that you

23  just utilized on --

24          THE COURT:  What's the demonstrative exhibit

25  number, counsel, for the record?

1        MR. FRIEDMAN:  Slide No. 16 is Demonstrative

2   Exhibit No. --

3        MS. CENDALI:  172, counsel.

4        MR. FRIEDMAN:  Thank you.

5        Defendants' Exhibit 172, page 16.

6   Q.      (BY MR. FRIEDMAN)  Dr. Jay, you just explained this

7   slide in your analysis to the jury.  One category here

8   under your analysis of results is that 48 percent of survey

9   respondents stated that they liked wrestling, WWE wrestling

10  games, and/or the WWE 2K franchise; correct?

11  A.      Yes.

12  Q.      And if we could turn to page 20 of the same

13  exhibit?  You agree that fully 46 percent of respondents

14  stated that they or a family member likes wrestling;

15  correct?

16  A.      Yes.

17  Q.      And with respect to just that 46 percent, some or

18  all of those survey respondents could have been parents

19  purchasing their -- the titles for their children; is that

20  right?

21  A.      No.  We actually have verbatims on that.  And I

22  calculated the percentage who said they had purchased the

23  games for someone else, and I believe it was about 17

24  percent.  And I compared the results for people who

25  purchased it for themselves versus people who just

1    purchased it for someone else, and the results did not

2    differ.  They were the same.

3    Q.    All right.  Thank you, Dr. Jay.

4          MR. FRIEDMAN:  No further questions.

5                      REDIRECT EXAMINATION

6    BY MS. CENDALI:

7    Q.    Dr. Jay, why didn't you ask the survey takers

8    whether they would have bought the game if Randy Orton's

9    tattoos weren't in it or if they were different?

10   A.    I did not ask that question because it doesn't

11   produce reliable results, and courts have actually excluded

12   surveys for asking that question.  And the reason --

13         MR. FRIEDMAN:  Objection.

14   A.    -- why --

15         MR. FRIEDMAN:  Objection --

16   A.    -- is --

17         MR. FRIEDMAN:  -- recounting legal argument, legal

18   opinion from -- I don't know what court.  She's

19   interpreting court orders.

20         THE COURT:  Overruled.

21         Go ahead, ma'am.

22   A.    So, the reason for that is people --

23         THE COURT:  I'm sorry.  Hold on, Dr. Jay.  Are you

24   talking about --

25         THE WITNESS:  I'm not going to talk about the --

```
1              THE COURT:  No.  No.  Are you talking about the
2      reason for the court's exclusion or are you talking about
3      the reason you didn't include it?
4              THE WITNESS:  I'm talking about the reasons I
5      wouldn't include it.
6              THE COURT:  Okay, go ahead.
7      A.      So, the reasons why you don't ask people whether
8      they would purchase something if it didn't include X is
9      because people don't like the idea of having something
10     removed.  So, they tend to say they wouldn't, even if they
11     didn't know about the feature when they bought the game.
12             Also, it's an incomplete question because people
13     don't know, well, would I be getting something else in its
14     place?  Would I be getting a larger roster of players?
15     Would there be other features that I would be getting
16     instead?
17             So, that question used to be asked in surveys but
18     it's, since then, become considered very unreliable
19     particularly, as I said, because people -- even if they had
20     no idea that a product included a particular feature and
21     even if they don't use that feature -- they tend to say, I
22     don't want to get less for what I paid for, and, what are
23     you going to give me instead?
24     Q.      (BY MS. CENDALI ) Dr. Jay, in creating survey
25     questionnaires, to what extent is it -- the practice to --
```

1    is it good or bad to use leading questions?

2    A.    Okay.  So, I assume by a leading question, is a

3    question that suggests the answer.  That the survey

4    designer is sort of communicating to you what they're

5    testing, what might or might not be important.  That's what

6    a leading question is.  And it's considered very bad

7    practice to ask a leading question.

8    Q.    Did you try to do anything in your survey to not

9    ask leading questions?

10   A.    Yes.  So, generally speaking, open-ended questions

11   are considered less leading than closed-ended questions.

12   I'm not saying all open-ended questions aren't leading.

13   I'm not saying all closed-ended are leading.  But in the

14   survey profession, in most instances, open-ended questions

15   are considered far less leading, and that's why they are

16   typically asked first in a survey, before you ask more

17   focused questions in a survey.

18        MS. CENDALI:  No further questions.  Thank you.

19        MR. FRIEDMAN:  No redirect, Your Honor.

20        THE COURT:  Thank you.

21        Thank you, Dr. Jay.  You may step down.

22        THE WITNESS:  Thank you, Your Honor.

23        THE COURT:  Okay, ladies and gentlemen.  We're

24   going to go ahead and break for lunch.  We will reconvene

25   at 1:00.

1    COURTROOM DEPUTY:  All rise.

2    (Proceedings continued in chambers.)

3    THE COURT:  I'm trying to get a lay of the land.  I

4    know we have one expert and then rebuttal.  You guys have

5    any idea how long to put on -- is it Dr. Malackowski?

6    MS. CENDALI:  Malackowski.

7    THE COURT:  Malackowski.

8    MS. CENDALI:  I don't think it's that long, Your

9    Honor.  I mean, we should be done with everything -- we

10    should be done -- I don't know how they're --

11    THE COURT:  That's not helpful.  Miss Cendali, you

12    know, you wouldn't make it on the stand because you just do

13    not answer questions.  Do you have any idea of how long

14    your direct of him is?

15    MS. CENDALI:  I think it's about 35 minutes.

16    THE COURT:  Okay.  And then I would say, so maybe a

17    total hour for him, and then the rebuttal will be brief --

18    remember we had that conversation?

19    MR. FRIEDMAN:  The rebuttal will be brief.

20    THE COURT:  So, then I would anticipate being able

21    to send the jurors home by 2:00 or 2:30.  But my intent is

22    finish it up, send them home, take a short break, hash out

23    the instructions.

24    MR. SIMON:  Yes, Your Honor.

25    MS. CENDALI:  Yes, Your Honor.

1      THE COURT:  Okay.  So the question I have -- I'm

2  kinda looking at the instructions on an ongoing basis.  I

3  think I have a plan, but I have a couple of questions and

4  I'm going to be looking at it over lunch.

5      How do you guys anticipate or believe defendants

6  should be treated?  We've got all the subsidiaries, you

7  know what I'm saying?  So, you know, we have -- generally,

8  when we have five defendants, we have an instruction that

9  says, "You will make a determination as to each defendant

10  separately."  But this case has not really been tried

11  against the separate subsidiaries.

12      So, do you anticipate that they will be making a

13  determination as to the 2K defendants collectively and

14  then, separately, WWE?  Or all defendants collectively?

15      MR. KRASIK:  Yeah.

16      THE COURT:  So, you are not asking that they be

17  treated separately?

18      MR. KRASIK:  Correct.  That's the way -- both of

19  the proposed verdict forms read that way.

20      THE COURT:  I just wanted to make sure.  So, we

21  will just reference the defendants, period.

22      MS. CENDALI:  Correct.

23      MR. SIMON:  I'm sorry, Your Honor.  So, there will

24  be a WWE and a Take-Two?

25      THE COURT:  No, he said altogether.  He said

1    collectively.

2        MR. KRASIK:  That's your verdict form.

3        MR. FRIEDMAN:  We provided a verdict form along

4    that line.

5        THE COURT:  What do you mean?  You don't agree with

6    it?

7        MR. SIMON:  Well, I think there's two separate

8    defendants.

9        THE COURT:  I do --

10        MR. SIMON:  And two separate profits.  And if we're

11    talking about disgorgement of profits --

12        MR. KRASIK:  That's not true.  There's --

13        THE COURT:  Hold on.  She's still taking --

14        MR. KRASIK:  Apologize.

15        THE COURT:  Let me start from this situation.

16    Plaintiff has filed claims against all of the defendants.

17    Now, I think it's fair to say that the claims have been

18    pursued collectively against the 2K defendants, but they

19    have not been pursued collectively against WWE and 2K.

20    She's asserted separate claims.  Correct?

21        MR. SIMON:  Yes.

22        MS. CENDALI:  No, Your Honor.

23        MR. KRASIK:  No, Your Honor.  Separate -- they're

24    collective counts against all the defendants.

25        THE COURT:  Mr. Simon, do you separate out the

1   defendants in the Amended Complaint?

2       MR. SIMON:  I separate them in each count.  I don't

3   have a separate count for each defendant.

4       THE COURT:  Well -- so, here's the thing, and I

5   think it's fair -- I think the defendants are right.  At no

6   point in time, in no way, has there been a separate -- have

7   you pursued these claims separately against these

8   defendants.  It's all been collective.  Everything we have

9   dealt with, summary judgment -- and so for you now to want

10  to separate them out?  I don't think that's appropriate.

11      MR. SIMON:  As far as liability, Your Honor, I

12  agree 100 percent.

13      THE COURT:  At all.

14      MR. SIMON:  All I'm going to say is that in the

15  damages part of the case, the experts are not giving damage

16  opinions about WWE, but we do have an interrogatory we put

17  into evidence about their profits and they have indicated

18  they have --

19      THE COURT:  No.  We're not doing that.

20      MR. SIMON:  Okay.

21      THE COURT:  You have no expert opinion -- you have

22  not sought expert damages against --

23      MR. SIMON:  Not on actual damages, just

24  disgorgement --

25      THE COURT:  Mr. Simon, you can't --

1        THE REPORTER:  Please slow down.

2        THE COURT:  Mr. Simon, you have not pursued it in

3    that manner up to this point.  That's not even how the

4    evidence has been developed up to this point.  It will be

5    totally confusing and I have heard no expert give any

6    separate opinions whether, in terms of numbers or anything

7    else regarding WWE.  There is no -- for instance, there has

8    been no spreadsheets about any gross revenues that are

9    attributed -- that you have attributed to them from, from

10   the sublicense or whatever you want to call it.  We're not

11   going there.

12       MR. SIMON:  I understand.  Can I, just for the

13   record?

14       THE COURT:  You can make your record.

15       MR. SIMON:  Okay.  The reason we don't have expert

16   testimony, the expert testimony all deals with costs that

17   aren't attributable through the infringement.  That's what

18   Malackowski testifies to.  That's what Clark rebuts on.

19       Clark testified about the gross revenues of the

20   Take-Two defendants only because he's testifying about the

21   expenses.

22       THE COURT:  Get to it.  Make your record.

23       MR. SIMON:  My record is, we have a separate

24   interrogatory we read into the record for WWE that said

25   "state your profits and any expenses."  They said, "we

1    stated 50 million in profits, no expenses."

2         MR. KRASIK:  May I briefly respond for the record?

3    I'm sorry, Your Honor.  But since he made the record, I

4    just want to say --

5         THE COURT:  Do you guys complicate everything in

6    life unnecessarily, like you have done in this case?

7    Because if you do, life must be really difficult.

8         MR. KRASIK:  My wife might agree with you.  But if

9    I could, Your Honor?

10         THE COURT:  I'm sure she does.

11         MR. KRASIK:  In response to what Mr. Simon said,

12    their own expert said that any moneys that WWE received

13    relating to these games came out of the gross revenues

14    that, that were -- that were identified for the Take-Two

15    defendants.  There is no separate --

16         THE COURT:  We're not doing them separate.

17         MR. SIMON:  That's fine.  I agree with what he

18    said, that's a deductible expense.

19         THE COURT:  We're not doing it separately.  You can

20    keep talking but Chris is getting up.

21         (Court recessed from 12:00 p.m. to 1:11 p.m.)

22         (Proceedings continued in open court, jury

23    present.)

24         THE COURT:  You may call your next witness.

25         MS. CENDALI:  Your Honor, with permission, we would

1    like to read one more RFA into the record.

2           THE COURT:  Okay.

3           MS. CENDALI:  Thank you.

4           Ms. Means?

5           MS. MEANS:  Good afternoon.  I am reading from

6    Plaintiff Catherine Alexander's Objections and Responses to

7    Defendants Take-Two Interactive Software, Inc., 2K Games,

8    Inc., 2K Sports, Inc., and Visual Concepts Entertainment's

9    First Set of Request for Admission to Plaintiff Catherine

10   Alexander.

11          Request for Admission No. 38 reads:  Admit that in

12   WWE 2K a depiction of Randy Orton's likeness without his

13   tattoos would not be realistic.

14          Plaintiff admits that defendants copied Mr. Orton's

15   tattoos onto a character in the WWE 2K games in order to

16   make the character resemble Mr. Orton in real life.

17          MR. ILARDI:  Your Honor, defendants call their last

18   witness, Mr. James Malackowski.

19          (Witness sworn by courtroom deputy.)

20          THE WITNESS:  James Malackowski,

21   M-A-L-A-C-K-O-W-S-K-I.

22          THE COURT:  You may proceed, counsel.

23          MR. ILARDI:  May I approach the witness?

24          THE COURT:  You may.

25                      *  *  *  *  *

```
 1                      JAMES MALACKOWSKI,

 2   having been first duly sworn, was examined and testified as

 3   follows:

 4                      DIRECT EXAMINATION

 5   BY MR. ILARDI:

 6   Q.      Good afternoon.  Would you please introduce

 7   yourself to the jury?

 8   A.      Good afternoon.  My names is James Malackowski --

 9   or Jim.  I grew up in Northern Indiana, literally on my

10   great-grandfather's farm.  I was the first in my family to

11   go to college.  Attended the University of Notre Dame,

12   where I studied accounting and philosophy.  Went straight

13   into the workforce after undergraduate.

14           I have lived in Chicago most of my professional

15   career, though now I live with my family in Florida.  Two

16   kids, one just graduated college and one's at Notre Dame,

17   which I am very excited about.

18   Q.      Mr. Malackowski, did you prepare slides to assist

19   in presenting your testimony today?

20   A.      Yes, sir.

21           MR. ILARDI:  Permission to publish Defendant's

22   Demonstrative Exhibit 175?

23           THE COURT:  Any --

24           MR. FRIEDMAN:  No objection.

25           THE COURT:  Defendants' Demonstrative Exhibit 175
```

1    may be published.

2    Q.      (BY MR. ILARDI)  Mr. Malackowski, what is your

3    educational background?

4    A.      As I mentioned, I have an undergraduate degree from

5    Notre Dame in Accounting and Philosophy, where I was a

6    double major.

7    Q.      Can you briefly describe your work history after

8    leaving Notre Dame?

9    A.      Following graduation, I went to Chicago to work for

10   a consulting firm that focused on litigation damage

11   accounting, calculating damages in lawsuits just like this.

12   I volunteered to work on their first intellectual property

13   case.  It was a patent case.  And because I did the first,

14   they let me work on the second.  And by the third, I was

15   part of an expert, very small team.  Did that for three

16   years.

17           And a client then came and asked me to value a

18   piece of intellectual property outside of the courtroom.

19   And as excited as I was about that, that was not the

20   business of the firm.  And so, I left at age 25 and started

21   what was the country's first intellectual property

22   valuation and litigation accounting boutique.  We started

23   with five people and eventually we grew to just under 300.

24   Sold that business to a public company.

25           After that, I was helping investors to look at

1    companies with strong intellectual property -- patents,

2    trademarks, and copyrights -- and make investment

3    decisions.  Then, about 20 years ago, I put it all back

4    together to create my current firm which is called Ocean

5    Tomo.  We are about 100 people focused on IP valuation,

6    strategy, investment banking on the financial side, and we

7    have about 1500 engineers.

8    Q.     In your career, have you worked for both plaintiffs

9    and defendants?

10   A.     Absolutely.  With respect to my litigation work,

11   which is about half of what I do, we try to balance that so

12   there's no perception of bias one way or the other.

13   Q.     Have you also worked for individuals?

14   A.     Yes.  Most of our clients are companies.  And some

15   of the largest companies in the world, frankly, are

16   governments.  But we also work with individual creators or

17   inventors to help them monetize their intellectual property

18   either in the courtroom or in business.

19   Q.     Do you hold any professional credentials?

20   A.     I do.  As an accountant, I have been a CPA since I

21   passed the exam immediately after college, and I'm still

22   registered in the State of Illinois.  In addition to that,

23   I am certified in Financial Forensics, which we heard

24   earlier is the study of historical accounting and financial

25   statement recreation.  Business valuation.

1           And then, also, I'm a Certified Licensing

2    Professional, which I'm sure no one's ever heard of.  But

3    that's someone that has a degree of experience and passes

4    an exam in the valuation and transfer of intellectual

5    property from one business to another.  It's a very niche

6    field.

7    Q.      Are you involved in any professional activities

8    outside of your current job?

9    A.      Yes.  Primarily in three areas.  First, I have been

10   very active in our industry because we were so early as a

11   pioneer in starting this type of work.  So I ran, for

12   example, the largest trade association in our industry --

13   it's shown on the screen -- LES, the Licensing Executive

14   Society.  When I ran that group, we had 10,000 members in

15   32 countries, so it was a big organization.

16          Aside from professional organizations, I'm very

17   active in teaching or working with universities.  So, I

18   just finished a term with the University of Chicago as a

19   director advisor for their School of Molecular Engineering.

20   I have worked at my alma mater, Notre Dame, and I have

21   taught from Harvard to California.

22          And then the third area would be the business and

23   nonprofit activities, where I sit as a director or a board

24   of advisors.  And in that capacity, I really help with two

25   things.  I'm helping creators -- inventors and artists and

1    the like -- document their intellectual property for the

2    business or the nonprofit.  And then also helping them to

3    get recognition, whether that be inventor recognition,

4    distribution of royalties, distribution of profits, that

5    are generated by that intellectual property.

6    Q.     Have you been involved in creating markets for

7    intellectual property?

8    A.     Yes.  One of the things that really distinguishes

9    my firm and my career, I suppose, now after 35 years, is

10   we're recognized with pioneering the most known

11   marketplaces for intellectual property.  We started, you

12   know, 20 years ago, almost, creating auctions for IP.  So,

13   you might have seen a car auction on TV or an auction for

14   art?  We had the idea that we could create an auction for

15   selling patents, copyrights, and trademarks.  At first,

16   people didn't think that was going to work.  But it worked,

17   and we sold, you know, well over 100 million dollars before

18   we sold that part of our business.

19          We then moved into a traded exchange for license

20   rights for IP, built that business and sold it in

21   partnership with the Chicago Board of Options Exchange, the

22   largest options market in the world, I think.

23          And then, currently, we are focused on an online

24   marketplace.  Sometimes, we called it an eBay for IP, but

25   we really don't like that description.  But you can go to

1    the website and post a patent or a copyright or a trademark

2    and people will bid on it.  And you'll see every bid and

3    every sale.

4    Q.    Have you been recognized with any awards?

5    A.    So, over my career I have been -- my name's been on

6    a number of awards, but frankly most of them are team-based

7    and I'm the CEO, so they put my name on it.  There's one,

8    though, that is meaningful.  This year, I was inducted,

9    along with the Chief Supreme Court Justice Breyer and two

10   others, into the Intellectual Property Hall of Fame.  I'm

11   sure people haven't heard of it.  But since its beginning,

12   there are now 94 people in the hall of fame, most of them

13   are judges or directors or former patent officers.  And to

14   my knowledge, I'm the only accountant valuation person

15   that's been inducted.

16        MR. ILARDI:  Your Honor, the defendants tender Mr.

17   James Malackowski as a expert in valuation of intellectual

18   property, damages, and markets.

19        THE COURT:  Any objection?

20        MR. FRIEDMAN:  No objection.

21        THE COURT:  So certified.

22   Q.    (BY MR. ILARDI)  Mr. Malackowski, what were you

23   asked to do in this case?

24   A.    I was asked to do two things:  One, to provide my

25   opinion as an expert as to the amount of damages the jury

1    should award, in my opinion, if they find liability; and

2    then, second, I was asked to review the work of any experts

3    proposed by Miss Alexander -- in fact, we heard Mr. Clark

4    earlier this week -- to make sure that they didn't raise

5    anything I hadn't thought of, or they didn't have any

6    critique that I needed to respond to.

7    Q.      Were you compensated for your time in this case?

8    A.      Of course.  My firm was.  And to dispel any

9    mysteries, my rate is 895.  And I have spent about 30 hours

10   before I got here, and I have sat here through the whole

11   trial.

12   Q.      Mr. Malackowski, how did you go about your

13   assignment in this case?

14   A.      So, the process I followed here is one I followed,

15   you know, more than 100 times before, which, as the damages

16   expert, you have to assume liability.  And, obviously,

17   that's something that people are fighting about.  But we

18   begin with that point.  If there is liability, are there

19   damages?  And if so, how much?

20           If the jury finds no liability, you can pretty much

21   forget what I say.  Because no liability, no damages.

22           Second then, with that assumption, I have to go to

23   work and understand the accounting and business documents,

24   conduct any sort of financial analysis that's necessary,

25   and then form my opinion based upon accepted methods for

1    making such calculations.

2          And most people, frankly, stop there.  But at our

3    firm, the third step is equally important, which is, you

4    know, common sense, step back.  Does your result make

5    sense?  Have you tested to see if it's reasonable?  And the

6    reason I have sat in the court the last week is because I

7    am just listening to make sure there is nothing that's come

8    up that I need to consider that would change my opinions.

9    Q.    What evidence did you consider?

10   A.    So, much of what we have heard in the last week.

11   So, obviously, I focused on the business information

12   regarding the games that are at issue, the 2K16, 17, and

13   18.

14         As an accounting expert, that's, obviously, a great

15   area of interest to me.  So, I focused in detail on the

16   accounting records in this case, including interview with

17   the underlying executive at Take-Two that actually produced

18   the spreadsheets that you all have seen over the last week.

19         And then as an expert, I signed an agreement -- I

20   think, really, with the court -- that says I'll keep

21   everything confidential.  And so, because I agree to keep

22   things confidential, I get a sneak preview as to what all

23   of the other experts are going to say, by reading their

24   reports before they come here and share them with you.

25         THE COURT:  I'm sorry, counsel.  I think we need to

1    clear this up.  This witness has signed no agreements with

2    the court.

3         THE WITNESS:  I'm sorry, Your Honor.  I was

4    referring to the protective order with the court.

5         THE COURT:  You have signed no agreements with this

6    court.

7         THE WITNESS:  Yes, Your Honor.

8         THE COURT:  All right.  Go ahead.

9    Q.    (BY MR. ILARDI)  Mr. Malackowski, after you

10   reviewed the evidence did you form any opinions?

11   A.    Of course, yes.

12   Q.    How many opinions did you form?

13   A.    So, essentially my opinions are:  That there is no

14   market for the tattoos at issue; that Miss Alexander has

15   not been damaged; and, that there are no profits associated

16   with the use of these tattoos in these video games.

17   Q.    Let's take those in order, beginning with markets.

18   What do you mean by a market?

19   A.    So, a marketplace is really an information set

20   where you can go to find the price that a willing buyer or

21   willing seller would pay to acquire or use a particular

22   asset.  You know, the market that we are most familiar with

23   are things like eBay, I mentioned, or the listing service

24   for real estate.

25   Q.    What is the relevant market in this case?

1    A.       So, I considered a number of options.  I considered

2    what I call the primary market, which is when someone walks

3    into a tattoo parlor and hires a tattoo artist and pays for

4    their tattoo.  That's the primary market for tattoos.

5            I also considered the secondary market of where

6    tattoos may be put on posters, T-shirts, or other products.

7            And then I considered the market that would be

8    specific to this case, which is the use of real-life

9    tattoos within video games.

10           And in my opinion there are important distinctions

11   between those three choices, and we have to focus on the

12   third because it's most relevant in my opinion to the

13   question of damages.

14   Q.       What evidence have you seen of payments for

15   real-life tattoos in video games?

16   A.       I have not seen any.  I have explored and done

17   research extensively, and I don't believe there is such a

18   market.

19   Q.       What evidence have you considered?

20   A.       So, I started by considering the evidence of the

21   direct parties at issue.  So, first, Miss Alexander.  Has

22   she ever licensed the use of her tattoos for use in video

23   games?  The evidence of that has been clear this week that,

24   no, she has not.

25           Second, I look to the WWE.  Have they ever paid for

1    the use of tattoos, of real-life tattoos, within video

2    games?  They have not.  We understood they paid an artist

3    to create some designs that ultimately got converted to

4    generic tattoos, but that's not what we are discussing

5    here.

6            Third.  Then I went to Take-Two.  Have they ever

7    paid anyone for the use of real-life tattoos in video

8    games?  Again, no.

9            So, after looking at the direct players, I then

10   went to sort of second sources, one of which was Mr. Orton,

11   who we heard testify.  And his testimony was that he has

12   not paid anyone for such use.

13           And then, lastly, I looked at the expert reports,

14   and I found nothing.

15   Q.      What would be the practical impact of creating a

16   market for real-life tattoos?

17   A.      A market for real-life tattoos within video games

18   would not be practical.

19   Q.      And why not?

20   A.      A number of reasons.  First and foremost, there's

21   no valuation standard that would be used.  You -- there's

22   no accounting ability to quickly come back to a tattoo

23   artist a year -- or in this case, you know, decades later

24   -- and say, *How much do I owe you for that?*

25           The second thing is the impracticality of the

1    industry.  We have heard testimony that with Miss Alexander

2    -- and I think, generally speaking -- people don't keep

3    records of the tattoos they have inked on individuals, how

4    much they paid.  There's no database where you could go

5    look that up.  And so, it simply wouldn't be practical.

6         And then the last point is, because it's a

7    permanent part of you, you can't say, well, then I don't

8    want to use your tattoo when I make a bobblehead or an

9    action figure, or I'm in a cartoon or a video game, because

10   you can't take it off.  At least not easily.

11   Q.    What does the evidence that Miss Alexander was paid

12   for the tattoos she inked on Mr. Orton mean for the market

13   that you and I are talking about?

14   A.    So, it means that, one, there is a market for

15   tattoos, which is the primary market of, you walk into a

16   parlor and you get a tattoo and you pay.  And we know Miss

17   Orton -- I'm sorry -- Miss Alexander was paid for that,

18   because Mr. Orton testified he paid her 10 to 12 thousand

19   dollars for that.  But that is distinct from, and does not

20   suggest a market for the use of real-life tattoos within

21   video games.  Those are very different.

22   Q.    I'd like to turn now to actual damages, which was

23   the second issue that you identified.  What materials did

24   you consider to evaluate Miss Alexander's actual damages in

25   this case?

1    A.      So, again, common sense would tell you, if you want

2    to know if Miss Alexander was damaged, you should look to

3    her business -- her business model, the evidence,

4    concerning her work.

5           In this case, both her testimony and the

6    stipulations that were read in court, there's really no

7    controversy.  Miss Alexander did not lose customers or

8    clients because these tattoos of Mr. Orton's were included

9    in video games.  She didn't have to lower her price for

10   other clients.  If anything, Mr. Orton explained to us that

11   he signed a photograph that she put in her booth that might

12   have actually helped her business.  So, there's no evidence

13   of her being directly damaged as a result of what we're

14   talking about.

15   Q.      If it were possible to determine the amount of a

16   hypothetical license negotiated between Miss Alexander and

17   Take-Two, what is the value that would be measured?

18   A.      You would have to -- you would have to measure the

19   value of the creative work as distinct from what we would

20   call hold-up value.  So, there's been some reference in the

21   case, *well, if Miss Alexander doesn't approve, then Mr.*

22   *Orton can't be in a video game with his tattoos*, and that

23   would be a bad thing.  But that's the value of keeping him

24   out of the game, which is a hold-up value.  It's not the

25   value of the asset itself.  And again, those are very

1    different.

2         So, you know, my friends, I'm a car guy and -- for

3    better or for worse.  And so, the analogy I would use is, a

4    steering wheel has a value in a car.  Right?  You can go to

5    the auto parts store and see exactly what a steering wheel

6    is worth.  But you can't drive a car without the steering

7    wheel.  So, you can't say the value of the steering wheel

8    is the hold-up value.  Meaning, if you don't buy it, well,

9    you don't buy mine, you can't drive your car, and so it's

10   worth 20,000 dollars.  That's the distinction that we need

11   to make here.

12   Q.      What about the value of the use to Take-Two?

13   A.      So, the value of the use to Take-Two would be

14   measured by any incremental additional dollars and cents.

15   So, did including these videos [sic] in these games result

16   in more sales?  A higher price?  A lower cost?  And there's

17   no evidence to suggest that any of that is true.  In fact,

18   the evidence is clearly the opposite.

19   Q.      Having considered all of those issues, what was

20   your conclusion as to whether Miss Alexander has suffered

21   actual damages?

22   A.      In two part, because there is no market, there is

23   no ability for her to have that opportunity.  But even

24   still, specifically given the evidence of the record and my

25   investigation, I think it's pretty straightforward.  She

1    was not directly damaged by losing clients as a result.

2    Q.      I'd like to turn now to the third issue you

3    identified.  That was whether the tattoos contributed to

4    Take-Two's profits.  So, what materials did you consider to

5    evaluate that question?

6    A.      There's really two sets of material that are

7    relevant, and the jury's now heard about them.  One is the

8    accounting data.  What is the revenue for the games, the

9    cost of the games, the profits of the games.

10           And then second, what, if any, of those profits are

11   attributable to the tattoos at issue?  And that was through

12   the testimony of Dr. Jay, through her survey.  So, I looked

13   through both theses.

14   Q.      I'd like to turn back to demonstratives now.

15   Looking at slide five, can you explain how did you conduct

16   your evaluation?

17   A.      Fortunately, this is a case where the accounting is

18   pretty simple.  So, in order to determine profits, we have

19   to start with the revenues.  That's the amount of money

20   that Take-Two collected from the sale of the game.  Pretty

21   straightforward.  And then, we have to deduct all of the

22   costs and only the costs that are directly associated with

23   the development, manufacture, distribution and service of

24   those games.  And then the simple difference is

25   profitability.

1    Q.      Once you have that number, what is the next step?

2    A.      Importantly, there is a next step.  You would never

3    stop at just profits.  You have to determine, first, what

4    percentage of those profits are due to things other than

5    the copyrights at issue in this case.  And if there is any

6    residual, if there is any unexplained amount, then that

7    would be a candidate to consider as a measure of profits

8    associated with the copyrights.

9    Q.      You mentioned the need to deduct costs.  What are

10   the appropriate costs to look at?

11   A.      Well, there's three categories of costs to

12   consider.  The first are the direct costs.  And Mr. Brody

13   explained that those are things like, you know, the

14   packaging of the game and the disk itself and direct

15   advertising.

16          And then there are operating expenses that are

17   specifically dedicated and used for these games.  Mr. Brody

18   admitted that -- admitted -- Mr. Brody explained that he

19   and his team are direct operating expense for these games.

20          And then, lastly, there might be costs that are

21   unrelated to the game.  So, there might be people working

22   on other projects that you wouldn't allocate to this game,

23   you shouldn't consider those.

24   Q.      Why is it appropriate to deduct the first two

25   categories of costs that you just talked about?

A.      Because ultimately, the goal is to determine if there are any profits or value associated with the copyrights.  And, obviously, the company doesn't get to take to the bank the revenues.  They have to incur those costs.  So we, are focused on profits and we need to make sure we accurately measure that as the starting point, before we see if any of it relates to the copyrights.

Q.      Now, taking a step back and looking at the broader picture, where do those costs come from?

A.      So, the accounting data comes from Take-Two's general accounting corporate records.  And importantly, what I learned in my investigation is, you know, Take-Two's a pretty big company and they make a lot of games.  And what I am showing here on the screen are just a few of them.  We talked about NBA 2K as one example, the basketball game.

        But there are, literally, more than 100 games over this period that Take-Two has been involved with.  And so, the first thing I needed to do as an expert, is get to the right accounting information.  Not -- it's not the total company cost and profit, it's the cost and profit the three games that are at issue here.

Q.      Taking a look at your Slide No. 7, what are you showing here?

A.      This is the conclusion, which is, although we have

1    data for Take-Two overall, and we have data for the three

2    games, it would be incorrect, inaccurate, if you based your

3    analysis on the overall company data.  You have to do the

4    work to get to the games' specific information.

5    Q.    Mr. Malackowski, were you here when the video of

6    Chris Snyder was played, and he testified that the costs

7    shown in Take-Two's financials are directly attributable to

8    the WWE 2K games?

9    A.    Specifically, that the financials he presented on

10   the screen were limited to those costs that were directly

11   attributable to the games and did not include other costs.

12   Q.    Were you here when Alfie Brody testified that the

13   costs shown in Take-Two's financials are directly

14   attributable to the WWE 2K Games?

15   A.    Again, yes, specifically the costs that were in the

16   exhibit that he displayed on the screen, it was a

17   spreadsheet with rows and columns, and they highlighted

18   them in yellow.

19   Q.    Did you hear Mr. Brody testify as to Take-Two's

20   profits from the WWE 2K Games?

21   A.    Yes.  He testified over the entire period.  It was

22   approximately 9.7 million dollars.

23   Q.    As an expert, do you consider that to be the most

24   accurate and reliable --

25         MR. FRIEDMAN:  Your Honor, objection.  I have an

1  objection to this.  It goes against prior rulings.

2      MR. ILARDI:  We may need a sidebar on that.

3      (Proceedings continued at the bench.)

4      THE COURT:  Okay.  Mr. Friedman, what's the basis

5  of your objection?

6      MR. FRIEDMAN:  The basis of the objection is that

7  the witness is now discussing Exhibit 183, which is the

8  exhibit Mr. Brody testified about concerning the updated

9  revenue numbers, and his revenue numbers were not provided

10 to Mr. Malackowski.  Mr. Malackowski did not supplement his

11 report and the Court already ruled on this issue.

12     THE COURT:  Mr. Ilardi?

13     MR. ILARDI:  Your Honor, that spreadsheet was

14 produced two years ago.  Mr. Malackowski has looked at it

15 and the jury has seen that document.

16     THE COURT:  No.  No.  Did you understand my ruling

17 this morning?  Were you here for my ruling this morning?

18     MR. ILARDI:  I was not in the courtroom but I was

19 told your ruling.  I --

20     THE COURT:  So my question is, the exhibit -- what

21 exhibit are we talking about here?

22     MR. FRIEDMAN:  Defendants' Exhibit 183.

23     THE COURT:  The figures -- Mr. Ilardi, are the

24 figures included in Exhibit 183, are those exhibits

25 supplemented and updated or figure -- are figures that have

1    been supplemented and/or updated by this witness?

2         MR. ILARDI:  He has not submitted a supplemental

3    report with that figure.  He was in court when he heard it.

4         THE COURT:  No.  No.  No.  What was your

5    understanding of my ruling this morning, Mr. Ilardi?

6         MR. ILARDI:  My understanding was that you could

7    not introduce that exhibit or show it to the jury or talk

8    about that exhibit.

9         THE COURT:  So, why are we talking about that

10   exhibit now?

11        MR. ILARDI:  Because now he's just saying what Mr.

12   Brody said.

13        THE COURT:  No.  No.  No.  Let me make it clear.

14   He cannot discuss or express any opinions based on the

15   exhibit that incorporated updated or supplemented --

16   updated figures that were not provided to the plaintiff by

17   way of supplement.  That's my ruling.

18        MR. ILARDI:  Okay.  Understood.

19        MR. FRIEDMAN:  Can we request a motion to strike

20   the last answer?

21        THE COURT:  I don't even know -- what was the last

22   answer?

23        MR. FRIEDMAN:  He repeated the gross profit number

24   or operating profit number from Exhibit 183, and he said he

25   had heard that and that he recognized that Mr. Brody

1    testified about it.

2         THE COURT:  Okay.  Thank you.

3         (Proceedings continued in open court, jury

4    present.)

5         THE COURT:  The jury is instructed to disregard the

6    last answer of this witness with respect -- I think it was

7    specifically with respect to a gross revenue figure in

8    reference to this exhibit, and it will be stricken from the

9    record.  The jury is instructed to disregard.

10   Q.    (BY MR. ILARDI)  Okay, Mr. Malackowski.  So, I'm

11   not asking you for a number.  But once you have Take-Two's

12   profits -- profits from the WWE 2K Games, what is the next

13   step in the analysis?

14   A.    The next step would be, determine if any of those

15   profits are attributable to things other than the

16   copyrights.  And after you consider that, is there any

17   residual left that would suggest there are profits due to

18   the copyrights.

19   Q.    What evidence did you consider to conduct that

20   analysis?

21   A.    Generally, the record of the case, more

22   specifically the testimony of Dr. Jay and her survey

23   results.

24   Q.    I'd like to go back to your demonstratives and go

25   to slide eight.  And what are you showing on slide eight?

A.      This is actually a slide taken from the
presentation of Dr. Jay, just before lunch.  And this is
the evidence showing that the reason customers purchase the
games, the reason for the sales and profits, were for
elements unrelated to the copyrights.

Q.      What conclusions did you reach from Dr. Jay's
survey?

A.      So, looking at her survey in its totality,
including the closed and the open questions, it is my
opinion that there -- that the profits are fully accounted
for by other elements, and that there are no profits that
are directly attributable to the copyrights at issue.
Another way of thinking about it, is that the profits would
not have been any different or they did not increase as a
result specifically of the use of those tattoos.

Q.      How, if at all, does the popularity of Mr. Orton in
real life impact your opinions?

A.      It does not.  The popularity of Mr. Orton -- and I
accept that he's a very popular wrestler -- that's not a
measure of the value of his tattoos.  So, that's -- you
wouldn't use that as a measure of damage.  If anything, it
would point to other reasons that account for
profitability.  It teaches away from that being a measure
from damages.

Q.      Mr. Malackowski, based on this evidence, did you

1    form an opinion as to the amount of profits that are

2    attributable to the five tattoos?

3    A.      Yes.

4    Q.      And what was that?

5    A.      In my opinion, this is an example of a case where

6    the copyrights at issue did not contribute to the tattoos

7    earned by Take-Two and, therefore, the answer to that

8    question is zero.

9    Q.      You heard from the other side that Mr. Clark is

10    going to come back and critique your work.

11    A.      He may, yes, of course.

12    Q.      If he said that you failed to consider company-wide

13    profits, what would be your response?

14    A.      Well, of course I considered them.  I quickly set

15    them aside, because it would be inaccurate to focus on

16    company-wide profits instead of the profits of the games

17    specifically.  To suggest to look at company-wide profits

18    would -- that would just be a mistake.

19    Q.      If Mr. Clark simply put up a measure of Take-Two's

20    profit total --

21          THE COURT:  I'm not sure this is even appropriate.

22    You are asking the witness to speculate about testimony

23    that we have not heard.

24          MR. ILARDI:  Mr. Clark has said he will -- he's

25    going to come back and critique Mr. Malackowski's --

1          THE COURT:  No, he did not say he was going to

2    critique.  He was going to come back and testify in

3    rebuttal, which is his right to do.  You speculating as to

4    what he may say, grabbing it from anywhere, is not

5    appropriate.

6          MR. ILARDI:  Understood, Your Honor.

7    Q.    (BY MR. ILARDI)  Mr. Malackowski, you have also

8    considered the opinions of Dr. Zagal; correct?

9    A.    Yes.  All of the experts.

10   Q.    Did you form any opinions on Dr. Zagal's opinion

11   regarding consumer demand for the WWE 2K Games?

12   A.    Yes.

13   Q.    And what were those opinions?

14   A.    Dr. Zagal, an expert for Ms. Alexander, spoke about

15   the reasons why people buy video games.  But in my review

16   of his reports and in listening to his testimony, he did

17   not identify any specific measure that was focused on the

18   copyrights at issue.  They were related to other elements

19   of the game, or general concepts like realism, which is an

20   inappropriate benchmark for damages.

21   Q.    Okay.  Now I want to ask you, if there was a

22   determination that some amount is due to Miss Alexander,

23   did you form an opinion as to the maximum percentage of

24   Take-Two's profits that could reasonably be attributable to

25   the copyrights at issue?

1    A.      Yes.

2    Q.      How would you determine that amount?

3    A.      So, I would use the same methodologies that I use

4    when I advise universities, research labs, companies, as to

5    how they would recognize inventors or creators, which is a

6    metric of -- that can be measured.  In this case, we heard

7    Dr. Bogost talk about the weighting of the digital asset

8    associated with the copyright versus the game overall.  His

9    opinion was that it was .008 percent.

10           And so, what I would do is take the profitability

11   of the game, whatever that's determined to be, and multiply

12   it by .008 percent.  Or actually in a calculator, you would

13   you go .00008, and that would be the result.

14   Q.      And just to be clear, you would multiply .00008 by

15   the profit number that was determined?

16   A.      Correct.

17   Q.      Do you recall Dr. Zagal's testimony regarding the

18   use of this measure?

19   A.      I do.

20   Q.      What do you recall?

21   A.      Dr. Zagal expressed concern over use of such metric

22   because it would be unfair -- or words to that extent --

23   because some wrestlers are more popular, more important

24   than others.  And this implies a somewhat equal weighting

25   for all wrestler tattoos.

1    Q.    Do you agree with Dr. Zagal?

2    A.    No.  No, I don't.  I think that if you look to

3    industry experience -- my experience specifically -- when

4    it comes to allocating economics between contributors such

5    as inventors at a university or researchers, what is

6    typically done almost in every case is an equal

7    attribution, either by the number of inventors on the

8    patent or the number of patents that the inventor

9    contributed.

10          Recognizing that all inventors aren't the same, all

11   patents aren't the same, but to avoid -- to deal with the

12   lack of evidence, to try to make it more precise, the

13   industry practice would be to apply the metrics as Dr.

14   Bogost suggested them.

15   Q.    Did you perform any testing to confirm whether your

16   opinions were reasonable?

17   A.    Of course.  As I mentioned, the reason I sat -- I

18   am participating in the trial for the whole week is to

19   constantly listen to the testimony, to look at the

20   documents that are in the court, to make sure my results

21   are reasonable.

22   Q.    And what reasonableness testing did you conduct?

23   A.    So, the evidence that I focused most on was the

24   testimony of Mr. Orton, who explained that he paid for the

25   tattoos, 10,000 dollars, which would be greater than any

1    measure of profits multiplied by .0008 by almost tenfold.

2          MR. FRIEDMAN:  Objection, outside the scope of this

3    expert's report.

4          THE COURT:  Mr. Ilardi?

5          MR. ILARDI:  Your Honor, Mr. Malackowski was been

6    sitting in court and he's been listening to the testimony

7    as it --

8          THE COURT:  He still can't go outside the scope of

9    the opinions.  The scope of the opinions that he expressed

10   in his report or that have been previously disclosed.

11   Q.     (BY MR. ILARDI)  Mr. Malackowski, if --

12         THE COURT:  That objection -- I'm sorry -- is

13   sustained.  Go ahead.

14   Q.     (BY MR. ILARDI)  If Miss Alexander was awarded no

15   money in this case, would you consider that to be

16   reasonable?

17   A.     In light of the actual payment that was received in

18   a primary market, yes.

19         MR. FRIEDMAN:  Objection -- same objection.

20   Outside the scope.

21         THE COURT:  Mr. Ilardi?

22         MR. ILARDI:  I think it is well -- it is within the

23   scope.  I don't understand the objection.

24         THE COURT:  I don't --

25         MR. FRIEDMAN:  Mr. Malackowski --

1          THE COURT:  Hold on.  Hold on.  You're not talking

2     to Mr. Friedman, and Mr. Friedman is not talking to you.

3     Your response needs to be to me.

4          The objection is, is that the testimony you are

5     eliciting is outside the scope of the opinions previously

6     disclosed in this case.  I'm asking you for a response.

7          MR. ILARDI:  Okay.  I would direct counsel's

8     attention to page 30 of Mr. Malackowski's expert report.

9          THE COURT:  Does he disclose that opinion in the

10    report?

11         MR. ILARDI:  Yes, Your Honor.

12         THE COURT:  Mr. Friedman?

13         MR. FRIEDMAN:  Your Honor, I'm sorry, I missed that

14    last Q and A.  I don't see any disclosure on page 30 of Mr.

15    Malackowski's report of the questions that are being asked

16    of him and the responses that are being elicited right now.

17         THE COURT:  Counsel, can we please resolve this

18    without going to a sidebar and taking a half an hour?

19         Mr. Ilardi, anywhere previously in your disclosures

20    of this expert's opinion, did you disclose his opinion that

21    there was zero -- the value of the actual damages was zero?

22    I think that's what you just asked.

23         MR. ILARDI:  Yes, Your Honor.  And I can read it

24    from the report.

25         THE COURT:  No.  I didn't ask you to read from the

1    report.  I just asked for your response.  Did you --

2         MR. ILARDI:  Yes, Your Honor.  It is the first

3    sentence of page 30.

4         THE COURT:  Mr. Friedman, are you all not looking

5    at the same sentence?

6         MR. FRIEDMAN:  I see the sentence that Mr. Ilardi

7    is referring to --

8         THE COURT:  No.  Let me ask you a different

9    question.

10        MR. FRIEDMAN:  Please.

11        THE COURT:  Mr. Friedman, did -- was this witness's

12   opinion that the value of the actual damages in this case

13   was zero, was that ever -- was that disclosed?

14        MR. FRIEDMAN:  Yes, Your Honor.

15        THE COURT:  Then objection overruled.  Move on.

16   Q.   (BY MR. ILARDI)  Last question, Mr. Malackowski.

17   In your opinion, what amount would be owed to Miss

18   Alexander if there was a liability finding in this case?

19   A.    Given the specific economics of this case and this

20   industry, this is one of those instances where there are no

21   damages to recover.  Zero.

22        MR. ILARDI:  No further questions.

23                        CROSS-EXAMINATION

24   BY MR. FRIEDMAN:

25   Q.    Good afternoon, Mr. Malackowski.

1    A.      Good afternoon, sir.

2    Q.      Mr. Malackowski, just get -- orient ourselves here.

3    You have a couple of opinions in this case.  I want to go

4    through them and see if you agree.  Okay?  Your first

5    opinion is that the tattoos -- and you assume liability;

6    right?

7    A.      Yes, sir.

8    Q.      When you make your analysis and form your opinions;

9    correct?

10   A.      That's my starting point.

11   Q.      All right.  So, I'll assume liability in this

12   circumstance, as well.  Okay?

13   A.      That's fair.

14   Q.      So, assuming liability.  Assuming there was

15   copyright infringement of the five --

16          THE REPORTER:  I'm going to need you to slow down,

17   please.

18          THE COURT:  For clarification, Mr. Friedman.

19          Mr. Friedman, you know, my goal is we're getting

20   through this and we're staying on track.  Are you about to

21   simply ask him -- I think what you just said was, you were

22   going to ask him if he has these opinions.  If you're going

23   to re-ask him the same thing that he just testified to?

24   I'm going to ask that you move on.

25   Q.      (BY MR. FRIEDMAN)  Mr. Malackowski, you testified

1    your opinion is -- one of your opinions is that the maximum

2    percentage of profit that can be measured in -- for damages

3    here is the .008 percentage that you got from Dr. Bogost;

4    is that correct?

5    A.     More specifically, if I was asked to come up with a

6    measure of compensation, that would be the alternative

7    measure that I would use, yes.

8    Q.     And so, you would utilize the .008 percent as a

9    measure of the value of the copyrighted works to the

10   Take-Two defendants and to the WWE; is that correct?

11   A.     No.  Value has a very special meaning to me as a IP

12   expert.  It's not a measure of value.  There is no value,

13   as we would use that technical term because --

14   Q.     Well, then let me ask you -- let me ask you this,

15   Mr. --

16          THE COURT:  No.  No.  You can't -- Mr. Friedman?

17   You cannot cut off the witness.  He was answering your

18   question.

19   A.     There is no value.  The .008 percent is an

20   alternative measure of compensation.  I was asked, if I had

21   to come up with a recognition similar to what I do with

22   inventors at research centers or universities, that's what

23   I would use.

24   Q.     (BY MR. FRIEDMAN)  So, the .008 percent has nothing

25   to do with the measure of value of the copyrights to the 2K

1    games?

2    A.      Not as I would use the term value, because there is

3    no value from an accounting perspective.  It's an

4    alternative measure of compensation based upon the

5    apportionment analysis of Dr. Bogost.

6    Q.      Who told you that .008 percent could be an

7    alternative measure of compensation for the use of the

8    copyrighted works in this case?

9    A.      No one told me.  I was asked the question and that

10   was my answer.

11   Q.      Mr. Malackowski, you testified that you received

12   some financial documents from Mr. Charlton at Take-Two?

13   A.      More specifically, that I interviewed Mr. Charlton

14   at Take-Two.  I think the documents came through the legal

15   process.  I didn't get them from him directly.

16   Q.      Okay.  And those documents were created for

17   purposes of this litigation, is that your understanding?

18   A.      Mr. Charlton extracted from the accounting system

19   at Take-Two the information for these games.  That's

20   what's --

21           THE COURT:  Doctor -- excuse me, sir.

22           THE WITNESS:  Yes, sir -- yes, ma'am?  Yes.

23           THE COURT:  You also must respond yes or no to yes

24   or no questions.

25           THE WITNESS:  Yes.

```
1              THE COURT:  You have been here all week.  You know

2    how this works.

3              THE WITNESS:  I do.

4              THE COURT:  All right.

5    Q.     (BY MR. FRIEDMAN)  So, is it fair to say that your

6    opinions, in as much as certain of your opinions are based

7    on financial information from Take-Two, you are relying on

8    the financial information provided to you by Mr. Charlton

9    for purposes of this litigation?

10   A.     Yes, in part.

11   Q.     Mr. Malackowski, you understand that my client's

12   not asking for her actual losses of business or her

13   business profits in this case; correct?

14   A.     That's my understanding, yes.

15   Q.     Okay.  And that she doesn't sell video games?

16   A.     Of course.

17   Q.     And that Take-Two doesn't sell tattoos?

18   A.     Correct.

19   Q.     And that the WWE doesn't ink tattoos on people's

20   bodies; right?

21   A.     Correct.

22   Q.     Okay.  That the actual damages she is seeking is

23   the value of her copyrighted works to the defendants.  You

24   understand that?

25             MR. ILARDI:  Objection, legal conclusion.
```

1          THE COURT:  Overruled.

2    A.      I -- yes, that's the third opinion that I

3    addressed.  I do understand that.

4    Q.      (BY MR. FRIEDMAN)  Okay.  And with respect to

5    disgorgement of profits, you also understand my client is

6    seeking the defendants' profits that are attributable to

7    her copyrighted works?

8    A.      Absolutely.

9    Q.      Okay.  Mr. Malackowski, I'd like to look just

10   briefly at Plaintiff's Exhibit 28, which has been admitted

11   previously.  If you could pull that up, I'd like to ask you

12   a couple questions about it.

13   A.      Is that in my binder, sir?

14   Q.      If it is not, I can give you a copy.  It's also --

15   Mr. Malackowski, it's also on your screen.

16          MR. ILARDI:  It is in your binder, too.

17   A.      Yes, I have it.

18   Q.      (BY MR. FRIEDMAN)  All right.  Is this one of the

19   spreadsheets that you were provided by Mr. Charlton?

20   A.      One of several.

21   Q.      Okay.  The line there, total gross sales, is that

22   what we've also been referring to as gross revenues?

23   A.      Generally, yes.

24   Q.      Okay.  And then you explained to the jury the

25   process of coming up with a profit number whereby you

1   subtract costs from revenues to obtain profits; right?

2   A.      Generally, yes.

3   Q.      All right.  With respect to the costs involved in

4   this case, do the costs to Take-Two include the licensing

5   fees paid over to the WWE for licensing their intellectual

6   property?

7   A.      Of course.  Mr. Brody spoke to that.

8   Q.      And such a cost to Take-Two that is deducted from

9   their gross revenues, you do not consider that to be a cost

10  to the WWE; correct?

11  A.      Correct.

12  Q.      All right.  That would be of the WWE's profits?

13          MR. ILARDI:  Objection, Your Honor, outside the

14  scope.

15          THE COURT:  Overruled.

16  A.      Revenues, yes, sir.

17  Q.      (BY MR. FRIEDMAN)  Revenues.

18          MR. FRIEDMAN:  Thank you, Mr. Malackowski.  I have

19  no further questions.

20          THE WITNESS:  Thank you, sir.

21          MR. ILARDI:  No further questions.

22          THE COURT:  You may step down.  Thank you.

23          THE WITNESS:  Thank you, ma'am.

24          MS. CENDALI:  Your Honor?  Defense rests.  And we

25  have a motion.  I'm not sure how Your Honor wants to handle

1    it, but we understand --

2         THE COURT:  Not now.

3         MS. CENDALI:  -- there's more testimony.

4         THE COURT:  Yes.

5         MS. CENDALI:  But we don't want to waive anything

6    so --

7         THE COURT:  The record will reflect you are not

8    waiving anything, and we will take it up when we complete

9    it.

10         MS. CENDALI:  Thank you, Your Honor.

11         MR. SIMON:  Both parties, Your Honor.

12         THE COURT:  I understand that.

13         MR. SIMON:  Okay.

14         THE COURT:  Do you intend to call -- so, the

15    defendants have rested their case, ladies and gentlemen.

16         Does the plaintiff wish to call any rebuttal

17    witnesses -- brief rebuttal witnesses?

18         MR. FRIEDMAN:  Yes, Your Honor.  We call Mr. Clark

19    -- recall Mr. Clark in rebuttal.

20         THE COURT:  Mr. Clark, would you please step

21    forward, sir?  And I'll remind you that you are still under

22    oath, sir.

23                        * * * * *

24                     RYAN CLARK,

25    having been previously duly sworn, was examined and

1  testified as follows:

2  DIRECT EXAMINATION

3  BY MR. FRIEDMAN:

4  Q.    Mr. Clark, welcome back.

5  A.    Thank you.

6  Q.    You were in the courtroom while Mr. Malackowski was

7  testifying on direct and cross-examination?

8  A.    I was.

9  Q.    Okay.  Mr. Clark, did you agree with all of Mr.

10  Malackowski's opinions?

11  A.    No.

12  Q.    What did you disagree with Mr. Malackowski about?

13  A.    His calculation of gross profits.

14  Q.    You are speaking of the gross profits of

15  Take-Two's, earned from the sale of the accused video

16  games?

17  A.    That is correct.

18  Q.    Okay.  Why do you disagree with Mr. Malackowski's

19  calculation of the gross profits?

20  A.    Mr. Malackowski's calculation of gross profits were

21  derived from the spreadsheet created for this litigation.

22  And when comparing the gross profit percentage to

23  Take-Two's total company gross profit margin, which was 45

24  percent, the gross profit margin used by Mr. Malackowski

25  was 21 percent, so less than half of the company's total

1  gross profit.

2  Q.     And, Mr. Clark, didn't Mr. Malackowski calculate

3  the gross profit margin of the Take-Two -- for Take-Two in

4  this case?

5  A.     He did.

6        MR. ILARDI:  Objection, Your Honor.  Outside the

7  scope.

8        THE COURT:  Overruled.

9  Q.     (BY MR. FRIEDMAN)  And, Mr. Clark, in your opinion,

10  is it unusual to have such a deviation between a product

11  line such as the 2K video games and a company's overall

12  profit margin?

13  A.     It is unusual.  And in a typical case like this, I

14  am able to review the underlying documents from which the

15  profits were derived from.  But unfortunately, I was not

16  able to do that in this case.  All I had was the

17  spreadsheet.  So, I could not verify, recalculate, analyze,

18  the profit numbers that were included.

19  Q.     Those were not made available to you in the course

20  of this litigation?

21  A.     They were not.

22        MR. ILARDI:  Objection, outside the scope.

23        THE COURT:  Overruled.

24  Q.     (BY MR. FRIEDMAN)  Mr. Clark, do you have an

25  opinion whether the number calculated by Mr. Malackowski

1    for gross profits is itself accurate?

2         MR. ILARDI:  Objection, Your Honor.  That did not

3    come in.  We didn't discuss that during --

4         MR. FRIEDMAN:  I'll withdraw that question.  Thank

5    you.

6    Q.    (BY MR. FRIEDMAN)  Mr. Clark, you stated that the

7    company 2K's overall profit margin was about 45 percent.

8    Where did you get that number from?

9    A.    That came directly from what's called their 10-K.

10   Q.    What is a 10-K?

11   A.    So, a 10-K is a annual report that is submitted to

12   the Securities and Exchange Commission which gives an

13   overall, you know, financial performance of the company.

14   Q.    Mr. Clark, could you turn to Tab Exhibit 36 in the

15   binder in front of you?

16   A.    All right.  (Complies.)

17   Q.    What is this document?

18   A.    This is Take-Two Interactive's 10-K for the fiscal

19   year ending March 31, 2018.

20   Q.    Is a Form 10-K -- are you familiar with Form 10-Ks?

21   A.    Yes.

22   Q.    And is that a public document?

23   A.    It is.

24   Q.    What does that mean?

25   A.    It's available to the public.  So, I was able to

1    find this online, like anyone else could.

2    Q.     Is this a document that's filed with the Federal

3    Government by publicly-traded companies?

4    A.     It is.

5    Q.     Does the Form 10-K break out the results of sales

6    of the accused games as compared to the rest of the

7    company?

8    A.     It does not, unfortunately.

9         MR. FRIEDMAN:  Your Honor, I'd move for admission

10    of Exhibit 36, the Take-Two's Form 10-K.

11        MR. ILARDI:  No objection.

12        THE COURT:  You said 36, counsel?

13        MR. FRIEDMAN:  Yes, Your Honor.

14        THE COURT:  Plaintiff's Exhibit 36 is admit.

15    Q.     (BY MR. FRIEDMAN)  Mr. Clark, did you rely on this

16    Exhibit 36, the Take-Two's Form 10-K, in forming your

17    opinions expressed right now?

18    A.     I did.

19    Q.     And to your knowledge, has this Form 10-K been

20    modified in any way?

21    A.     No, not to my knowledge.

22    Q.     Is this document signed by executives of the

23    company Take-Two?

24    A.     It is.

25    Q.     Let's very briefly walk through some of the

1    contents of the Form 10-K.

2           MR. FRIEDMAN:   Mr. Zidzik, could you turn to page

3    93, please?

4    Q.      (BY MR. FRIEDMAN)   Mr. Clark, what's the overall

5    structure of the 10-K, such as the 10-K we are seeing here?

6    A.      So, what we are looking at here is Take-Two

7    Interactive's Income Statement -- or Statement of

8    Operations, it's also referred to -- for the three years,

9    fiscal year ending March 31, 2016, through 2018.

10          And it shows the company's net revenue, cost of

11   goods sold, to arrive at a gross profit.  And we've talked

12   a little bit about that.  And then various operating

13   expenses to arrive at operating income, and then finally

14   net income.  So, it shows the net profit of the company in

15   total.

16   Q.      And from this information, were you able to obtain

17   the average profit margin over the years 2018, '17, and '16

18   for Take-Two?

19   A.      I was.

20   Q.      And what is that number?

21   A.      So, just to explain real quick what that is.  It's

22   the gross profits.  So, for example, in 2018 of 894,581,

23   you divide that into the net revenues.  And for those three

24   years, it's 45 percent.

25   Q.      And that 45 percent then is the overall profit

1    margin for Take-Two?

2    A.      That's correct.

3    Q.      All right.  And what was the profit margin

4    calculated by Mr. Malackowski for the 2K games?

5    A.      From the 2K spreadsheet, it precisely was 20.9

6    percent, or 21 percent.

7    Q.      Does that mean that based on Mr. Malackowski's

8    analysis and the financial information provided by Mr.

9    Charlton, that the 2K games are less than half as

10   profitable as the overall company?

11   A.      That's what it indicates, yes.

12   Q.      Okay.  Based on the documents that you have

13   reviewed, do you have an opinion why the profit percentage

14   is alleged by Take-Two to be so low?

15   A.      Yes, I do.

16   Q.      What is -- what is that reason?

17   A.      It's -- it appears from the litigation spreadsheet

18   that was shown earlier to the jury where they've

19   highlighted cost of goods sold and it says or reads,

20   "Including overhead allocation," so overhead --

21          MR. ILARDI:  Objection, Your Honor, undisclosed.

22          THE COURT:  It's rebuttal opinion.  Overruled.

23          MR. FRIEDMAN:  Mr. Zidzik, if you could pull up

24   Plaintiff's Exhibit 28, please.

25          MR. ILARDI:  Your Honor, I want to clarify.  It's

1    undisclosed in his report.

2         THE COURT:  Overruled.

3    Q.      (BY MR. FRIEDMAN)  Mr. Clark, up on the screens

4    right now is Plaintiff's Exhibit 28.  This is one of the

5    financial documents prepared by Mr. Charlton.  You were

6    explaining why you believe that the profit margin for the

7    2K games was 21 percent, when the overall profit margin was

8    45 percent.  What did you mean by overhead allocation and

9    where are you looking on this document?

10   A.      So, it is the fourth line down, where it reads

11   C-O-G-S, COGS -- which is an acronym for cost of goods sold

12   -- including overhead allocation, and I was explaining what

13   overhead is.  And that's the operating expenses and that

14   was below gross profit.  So, it appears that they have

15   allocated expenses that are typically included below gross

16   profit into cost of goods sold, to bring that gross profit

17   number down.

18   Q.      Mr. Clark, is so-called overhead allocation a

19   standard item found in financial statements?

20   A.      It is not a standard item because the -- it's

21   comprised of various expense accounts of operating

22   expenses.

23   Q.      Where do such expenses usually appear in a

24   financial statement?

25   A.      So, they would be included under operating

1    expenses.  So, various expenses there, is where they would

2    be included, not in cost of goods sold.

3    Q.      Thank you, Mr. Clark.

4            And just stepping back a couple steps.  What is

5    overhead allocation from a big picture point of view?

6    A.      So, big picture point of view, is, it's an attempt

7    to include overhead or operating expenses in the profit of

8    the company here, in this sense, gross profit.  Which in my

9    opinion it, you know, is not appropriate for calculating

10   gross profit.

11   Q.      What types of expenses would be comprised in a

12   calculation of overhead allocation?  What does it mean to

13   allocate overhead?

14   A.      It means to make an attempt to take expenses that

15   are not -- the company did not directly track, okay?  So,

16   as you heard earlier testimony about specific expenses that

17   are included in cost of goods sold that are attributable to

18   the games, an allocation would be looking at expenses that

19   were not directly tracked and then allocating that to cost

20   of goods sold.

21   Q.      What is an example of an overhead expense that

22   might further --

23           THE COURT:  Briefly.

24   Q.      -- explain your testimony?

25           MR. FRIEDMAN:  I'm sorry?

1          THE COURT:  Brief?  We're pushing the limits of

2     brief beyond --

3          MR. FRIEDMAN:  One final question.

4     Q.    (BY MR. FRIEDMAN)  This is the final question.  Mr.

5     Clark, could you give us an example of an overhead expense

6     that might arise in a financial statement in order to

7     further explain your opinion to the jury?

8     A.    Research and development.  You know, various

9     compensation to upper management, things of that nature.

10    Q.    Mr. Clark, I have no additional questions.  Thank

11    you.

12         THE COURT:  Mr. Ilardi?

13         MR. ILARDI:  Your Honor, may I approach the

14    witness?

15         THE COURT:  Yes.

16                    CROSS-EXAMINATION

17    BY MR. ILARDI:

18    Q.    Good afternoon, Mr. Clark.

19    A.    Good afternoon.

20    Q.    I want to clarify a few things.  One is, am I

21    correct that you are not offering any opinion that Miss

22    Alexander has suffered actual damages?

23    A.    Correct.

24         THE COURT:  Counsel, that is beyond the scope of

25    his rebuttal examination.  We are not expanding this.  The

1   whole idea is, we're going to complete it and stop.  Not

2   expand.  So, that's beyond the scope of his rebuttal

3   testimony.  Could you stick within the scope of his

4   rebuttal testimony, please?

5           MR. ILARDI:  Yes, Your Honor.

6           THE COURT:  Thank you.

7   Q.    (BY MR. ILARDI)  Mr. Clark, you testified about

8   overhead allocation just now; correct?

9   A.    Correct.

10  Q.    You agree with me that overhead allocation is a

11  cost that is incurred to create the WWE 2K games?

12  A.    It is an indirect expense, correct.

13  Q.    And you agree with me that Take-Two makes video

14  games; right?

15  A.    Yes.

16  Q.    And Take-Two incurs overhead costs to do its

17  business; right?

18  A.    Correct.

19  Q.    And that business is creating, developing,

20  producing video games; correct?

21  A.    Correct.

22  Q.    And one of those games is WWE 2K; correct?

23  A.    Correct.

24  Q.    Mr. Clark, you looked at Take-Two's financial

25  documents showing its gross and net revenue for WWE 2K16,

1    17, and 18; correct?

2    A.    Correct.

3    Q.    And those revenue numbers are correct, aren't they?

4    A.    Yes.

5    Q.    But you, Mr. Clark, have not calculated Take-Two's

6    profits from WWE 2K16, 17, or 18; correct?

7    A.    Correct.

8    Q.    Now, on direct, you testified that Mr.

9    Malackowski's calculation of Take-Two's -- or -- the

10   calculation of Take-Two's profits was wrong because it had

11   discrepancies or was different than what Take-Two's 10-K

12   reported for all of its video games; right?

13   A.    No, I did not testify to that.

14   Q.    Well, on direct, you testified with regard to the

15   profit margin for Take-Two's video games as a whole;

16   correct?

17   A.    Correct.

18   Q.    And you considered Take-Two's Form 10-K to make

19   that determination; correct?

20   A.    Correct.

21   Q.    And a 10-K contains a summary of Take-Two's

22   financial performance for all of its video games; correct?

23   A.    Correct.

24   Q.    And you agreed, the revenue reported in the 10-K is

25   not broken down game by game; right?

1    A.      Correct.

2    Q.      And you agreed that you cannot determine Take-Two's

3    revenue from WWE 2K16, 17, or 18 from its 10-K; correct?

4    A.      Correct.

5    Q.      You would agree with me that Take-Two's 10-K

6    reports a percent of Take-Two's revenue that is profit for

7    all games; right?

8    A.      Correct.

9    Q.      And you are not saying that Take-Two's profit

10   margin for WWE 2K is the same for its other games; right?

11   A.      That is correct.

12   Q.      Given that one game is not like another, that

13   doesn't make sense, does it?

14   A.      I'm sorry, I don't understand your question.

15   Q.      It doesn't make sense that the profit margin for

16   one game is going to be the same as the profit margin for

17   another game because one game is not the same as another;

18   correct?

19   A.      I don't agree with that.  I simply said I was not

20   able to verify why there was such a discrepancy.

21   Q.      I'd like to look at the -- Mr. Clark, do you play

22   any video games?

23           THE COURT:  This is outside the scope.

24           MR. ILARDI:  All right.

25           THE COURT:  Counsel, do you have anymore questions

1    from the scope of his rebuttal direct examination?  If not,

2    we need to move on, Mr. Ilardi.

3         MR. ILARDI:  Okay.  Can we look at PTX 36, Mr.

4    Thomas, which was just introduced during Mr. Clark's

5    examination.

6    Q.    (BY MR. ILARDI)  And, Mr. Clark, this is one of the

7    Form 10-Ks that you relied on in performing your analysis;

8    right?

9    A.    Correct.

10        MR. ILARDI:  Mr. Thomas, could you please turn to

11   page 28 of the 10-K, which is page 51 of the exhibit.  And

12   would you please blow up the middle graph?

13   Q.    (BY MR. ILARDI)  Mr. Clark, this is the specific

14   financial information that you relied on; correct?

15   A.    Correct.

16   Q.    And there is no way to tell from this table how

17   much it cost to make WWE 2K; correct?

18   A.    Correct.

19        MR. ILARDI:  Mr. Thomas, could you turn to page six

20   and enlarge the first full paragraph?

21   Q.    (BY MR. ILARDI)  Mr. Clark, do you see with me in

22   the second sentence, it says that "Rockstar games is a

23   developer and publisher of the interactive entertainment

24   industry's most iconic and critically acclaimed brand,

25   Grand Theft Auto, as well as other successful franchises,

1     including L.A. Noire, Max Payne, Midnight Club and Red

2     Dead."  Correct?

3     A.      Correct.

4     Q.      Those are all Take-Two games; correct?

5     A.      Correct.

6     Q.      None of them is WWE 2K; correct?

7     A.      That's correct.

8     Q.      And then in the second to last sentence, it says,

9     "2K is a publisher of a number of critically acclaimed

10    multi-million unit selling franchises, including Bioshock,

11    Borderlands, Carnival Games, Evolve, Mafia, NBA 2K, Sid

12    Meier's Civilization, WWE 2K, and XCOM."  Correct?

13    A.      Correct.

14    Q.      Those are all different 2K games?

15    A.      Correct.

16    Q.      And different -- different Take-Two video games

17    have different gross profit numbers; correct?

18    A.      Presumably.

19    Q.      Okay.  And different Take-Two titles have different

20    operating profit numbers; correct?

21    A.      Presumably.  I haven't done that analysis.

22    Q.      Different games have different costs and expenses

23    that must be deducted to arrive at a profits number;

24    correct?

25    A.      Correct.

1    Q.      And the revenues and the costs for all of the

2    games, all of Take-Two's games, are presented together in

3    Take-Two's 10-K; correct?

4    A.      Correct.

5    Q.      Mr. Clark, just to make sure we are on the same

6    page, do you understand the amount of money that was paid

7    by Take-Two to WWE?

8    A.      Yes.

9    Q.      Do you understand that there are 200 wrestlers in

10   each game?

11          MR. FRIEDMAN:  Objection, outside the scope.

12          THE COURT:  Sustained.

13          MR. ILARDI:  Your Honor, he discussed the WWE

14   licensing fee during his examination.

15          THE COURT:  Could you get to the point?

16   Q.      (BY MR. ILARDI)  Well, would the amount that Randy

17   Orton got paid for his likeness to appear in WWE 2K16, 17,

18   and 18 be relevant to your opinions?

19   A.      I'm not sure I follow.

20   Q.      Would the amount of money that Randy Orton got paid

21   for his entire likeness to appear in WWE 2K16, 17, and 18

22   be relevant to your opinions in this case?

23          THE COURT:  Which -- are you talking about his

24   opinions on rebuttal?  Because those are the only opinions

25   we are talking about.

```
 1          MR. ILARDI:  On rebuttal, he discussed the cost
 2   that is paid to the WWE in the form of a licensing
 3   amount --
 4          THE COURT:  I'm asking you for clarification.  Are
 5   you speaking of his opinions given in rebuttal examination?
 6          MR. ILARDI:  Yes, Your Honor, because this is
 7   included within the costs that he discussed during his
 8   rebuttal examination.
 9          MR. FRIEDMAN:  Objection --
10          THE COURT:  Mr. Friedman?
11          MR. FRIEDMAN:  My objection is, this is outside of
12   the scope.  Mr. Clark didn't testify to these costs or to
13   the IP agreement on rebuttal direct.
14          THE COURT:  I didn't think he did.  The objection
15   is sustained.
16          Again, Mr. Ilardi, for the third time, do you have
17   something from the rebuttal examination?
18          MR. ILARDI:  Okay.
19          THE COURT:  If not, cut the dead horse loose.
20   We've killed him.  He got up.  We shot him again.
21          MR. ILARDI:  We will -- I will wrap up, Your Honor.
22          THE COURT:  Okay.
23   Q.    (BY MR. ILARDI)  Mr. Clark, Mr. Malackowski
24   determined that none of defendants' profits, after looking
25   at the cost information, are attributable to the tattoos
```

1    Miss Alexander inked on Mr. Orton; correct?

2    A.    Correct.

3    Q.    And Mr. Malackowski apportioned no profits to the

4    accused games; correct?

5    A.    That's correct.

6    Q.    And although you were rebutting Mr. Malackowski,

7    you did not do a similar analysis; correct?

8    A.    I have not provided a rebuttal opinion for that --

9    for his opinion on that.

10   Q.    Okay.  You are not giving any opinion on the amount

11   of profits that are attributable to the five tattoos --

12         THE COURT:  Mr. Ilardi --

13   Q.    -- in this case?

14         THE COURT:  -- we get it.  We get it.  He didn't

15   give the opinion.  He didn't testify about that.

16   Seriously?

17         MR. ILARDI:  No further questions, Your Honor.

18         THE COURT:  Oh, thank you.

19         THE WITNESS:  Thank you.

20         MR. FRIEDMAN:  No redirect, Your Honor.

21         THE COURT:  Thank you.

22         Thank you.

23         THE WITNESS:  Thank you.

24         THE COURT:  Ladies and gentlemen of the jury, that

25   completes the evidence in the case.  And, lucky for me,

1    there is more that I need to take up with counsel outside

2    of your presence, but the point of it would be to have the

3    case ready for you when you come back tomorrow.

4            So, we're going to recess -- or at least let you go

5    for the day, ask you to come back at 8:45.  We will

6    reconvene at 9:00 in the morning.

7            At that time, I will be instructing you on the law,

8    you will then hear closing arguments by counsel, and then

9    it will be your time to deliberate.  Okay?

10           Please remember my admonitions, instructions, and

11    be safe.  Have a safe trip home.  And I'll see you at 8:45

12    in the morning.

13           COURTROOM DEPUTY:  All rise.

14           (Proceedings continued in open court, jury not

15    present.)

16           THE COURT:  Okay.  I want to take up the motions at

17    the close of the evidence, take a break, and then come back

18    and do the instructions.  Then I'm going home.

19           So, plaintiffs?

20           MR. TAHAN:  Thank you, Your Honor.

21           Your Honor, pursuant to Federal Rule of Civil

22    Procedure 50(a), plaintiff respectfully moves for judgment

23    as a matter of law on one of defendants' remaining

24    affirmative defenses of implied license.

25           Defendants have two affirmative defenses remaining,

1    implied license and fair use.  Plaintiff is not required to
2    prove defendants' copying was unauthorized in order to
3    state a prima facia case of copyright infringement.
4    Rather, the burden of proving that the copying is
5    authorized rests with the defendants.  And that comes from
6    the *Muhammad-Ali v Final Call, Inc.,* case, 832 F.3d 755.
7        To establish an implied license, defendants must
8    prove that:  One, a person, the licensee, requests the
9    creation of a work; two, the creator, the licensor, makes
10   that particular work and delivers it to the licensee who
11   requested it; and, three, the licensor intends that the
12   licensee request or copy and distribute the work.  That's
13   also from the *Muhammad-Ali* case.
14       The issue defendants have here is with the third
15   element, that the licensor intends that the licensee
16   request or copy and distribute the work.  As this Court
17   knows, the defendants must prove this third element with
18   objective evidence of my client's intent that Mr. Orton
19   sublicense his right to recreate tattoos into the game.
20       Defendants have failed to put forward any evidence
21   of my client's intent.  And although this may be shown by
22   industry evidence, defendants' sole witness on this issue,
23   Dr. Jablonski, was not qualified to testify in industry
24   standard.  In fact, even though plaintiff does not have to
25   rebut their affirmative defenses, the only evidence in the

1    record on this issue is that comes from Miss Alexander, and

2    it was that she never intended for Mr. Orton or the

3    defendants to copy or distribute her work in video games.

4             THE COURT:  Thank you, Mr. Tahan.

5             MR. TAHAN:  Thank you, Your Honor.

6             MS. MEANS:  Would Your Honor prefer if I rebut that

7    and then I can move on to our motions?

8             THE COURT:  That would make sense, yeah.  Could you

9    address plaintiff's motion, first?

10            MS. MEANS:  Yes, Your Honor, I'll address

11   plaintiff's motion.

12            THE COURT:  Don't feel compelled to address it.  If

13   you want to concede it, I'm all for it.

14            MS. MEANS:  No, absolutely, I'll address it.  We

15   would absolutely like to address it.

16            So, there is evidence in the record of intent.  The

17   Seventh Circuit and courts in the Seventh Circuit look at

18   several different types of evidence for objective intent.

19   Custom and practice is one type of evidence, but it's

20   certainly not the only type of evidence.  So, I'd like to

21   walk through the different types of evidence and what

22   testimony was elicited on each.

23            THE COURT:  If you could just direct -- counsel,

24   I'm on -- I don't have many fumes left and we still have a

25   long day to go.

1    MS. MEANS:  I will go quickly, I promise.

2    THE COURT:  I will ask, please direct me to where

3  there is evidence, objective evidence --

4    MS. MEANS:  Yes, Your Honor.

5    THE COURT:  -- of the plaintiff's intent to -- that

6  Mr. Orton copy and distribute her works, or allow somebody

7  or license somebody else to do it.

8    MS. MEANS:  Yes, Your Honor.

9    THE COURT:  Tell me where it is.

10    MS. MEANS:  So, plaintiff testified that she

11  understood that Mr. Orton could do whatever he wanted with

12  his body.  Photographs and magazines, images of Mr. Orton

13  on television, and images of Mr. Orton on T-shirts, are all

14  copies of the tattoos that in plaintiff's view Mr. Orton

15  had authorization to create or have created with his

16  authorization.  So, these are not just situations where Mr.

17  Orton was appearing walking around in the real world.  They

18  are all situations involving a sublicense, in which Mr.

19  Orton was allowing others to show his body.

20    And both Mr. Orton and plaintiff testified that

21  Miss Alexander had a conversation with Mr. Orton about how

22  the intent of inking the tattoos was that they would look

23  good on television.  In other words, the evidence shows

24  that not only did plaintiff believe that Mr. Orton could do

25  whatever he wanted once the tattoos were inked on his body,

1    but that plaintiff specifically intended and specifically

2    communicated that to Mr. Orton.

3         Courts also consider whether the parties were

4    engaged in a, quote, short term discrete transaction as

5    opposed to an ongoing relationship.  That's one type of

6    objective evidence.  And that's in the record.

7         You heard plaintiff testify that she did not notify

8    any of her clients of her departure from Goldenlands

9    Tattoos so that they could keep in contact with her.

10        Mr. Orton testified that he paid for the tattoos

11   once.  He didn't have an ongoing relationship with Miss

12   Alexander that required him to go back to her for

13   permission to show his tattoos later on.  This is all

14   evidence that tattooing and, specifically, plaintiff's

15   relationship with Mr. Orton was a discrete transaction.

16   That when the tattoo was delivered to Mr. Orton and inked

17   on his body, that was a discrete transaction, not an

18   ongoing relationship, and courts have found that to be

19   objective evidence of intent.

20        Additionally, courts look at whether the creator of

21   the copyrighted work used, quote, written contract

22   providing that copyrighted materials could only be used

23   with the creator's future involvement or express permission

24   in assessing whether an implied license has been

25   established.  Where there were no such contracts, as is the

1    case here, and the only contract in the record that Mr.

2    Orton signed is a health form, that doesn't mention

3    copyrights, courts have found that to be evidence of

4    intent, objective evidence of intent on the third factor

5    specifically, Your Honor.

6          I can direct the Court to some case law, if you

7    would like, if that would be helpful.  Or I can continue on

8    with the evidence.

9          THE COURT:  You got any in the Seventh Circuit, you

10   can cite it.

11         MS. MEANS:  Well, I have several different cases

12   from the Seventh Circuit that decide that the creator's

13   conduct during the creation or delivery is relevant.

14   Specifically, I would direct the Court to *Shaver -- I.A.E.*

15   *v. Shaver* -- let me just take a second to pull the exact

16   cite for Your Honor -- 74 F.3d 768 (1996).

17         So, in that case the court looked at the delivery

18   of the copyrighted material -- sorry, this is quoting --

19   the delivery of the copyrighted material without warning

20   that its further use would constitute copyright

21   infringement.  That was further objective evidence of

22   intent.

23         I'd also direct the Court to some additional

24   evidence showing intent.  First, plaintiff testified that

25   inking a celebrity leads to referrals; that doing a good

job inking someone was a good source of referrals;

plaintiff testified that customers came to her because of

Mr. Orton; and, plaintiff testified that she knew Mr. Orton

was a famous professional wrestler who would appear in all

sorts of media bearing his tattoos.

This is the type of testimony that the jury could

rely on in determining that Miss Alexander intended Mr.

Orton to widely distribute his body with his tattoos on it

in television, as she specifically testified, and in other

forms of media.

So, a large part of plaintiff's argument is that

there's no evidence of Miss Alexander's tattoos because she

did not -- she testified she didn't subjectively think of

or, you know, know of video games in the moment that she

was tattooing him.  But that's not the test for determining

whether there is an implied license.

The fact that Miss Alexander didn't expressly

mention video games or, or say to Mr. Orton, *You can't go

do this*, is not the test.  If Miss Alexander said, *You can

go do this*, that would be an oral license, Your Honor; that

would be an example of something that's express.

What we're looking at here is the conduct.  You

know, what were the parties' expectations?  What were they

doing in the moment?  And one of the things that the

Seventh Circuit consistently looks at is whether there was

1   any warning that the copyrighted material, once it's

2   delivered to the person, can't be used in a particular way.

3          So, this combined with the fact that Miss Alexander

4   knew that Mr. Orton was a celebrity who is appearing in all

5   sorts of media, that it was benefiting her, and that it was

6   actually her intent -- which she testified to -- that he

7   appear in some forms of media with his tattoos, and that

8   that would -- you know, that would lead to -- excuse me,

9   Your Honor -- referrals to Miss Alexander.  That's all

10  evidence of objective intent that the jury should be able

11  to rely on in making its decision.  This decision should

12  not be taken away from the jury and to the plaintiff.

13         And, Your Honor, in fact, the -- you know, I can

14  move on to our other motion if that would be --

15         THE COURT:  No.  I'm going to rule on this motion.

16         MS. MEANS:  Okay.

17         THE COURT:  Are you done?

18         MS. MEANS:  I believe custom and evidence practice

19  also came in --

20         THE COURT:  No.  No, it didn't.

21         MS. MEANS:  -- in the testimony of Ed Kiang.

22         THE COURT:  No.

23         MS. MEANS:  Okay.

24         THE COURT:  No.  There is no evidence of custom and

25  industry practice in this case.

1    MS. MEANS:  Yes, Your Honor.  And I will say that

2    *I.A.E. v. Shaver* and -- I can find some other cases in the

3    moment -- did not consider -- that was not the reason the

4    court found that there was objective evidence of intent.

5    So it's -- it's not as though custom and practice is the

6    sole standard, that's just one type of evidence that can be

7    provided.

8            THE COURT:  I understand.

9            MS. MEANS:  Okay.

10           THE COURT:  So, the bottom line is, we all agree

11   the first two elements of, for the finding of an implied

12   license are not in dispute in this case.  They never were

13   from the beginning.

14           It's always been about whether or not Miss

15   Alexander intended that Mr. Orton copy and distribute her

16   work and, more importantly in this case, that he licensed

17   somebody else to, to copy and distribute the work.  In

18   other words, whether she intended that Mr. Orton be able to

19   copy and distribute the work in a particular manner --

20   which is the phrase that is also part of the standard -- in

21   a particular manner and whether she intended that third

22   parties would be able to copy and distribute her work in a

23   particular manner.  That's the question.

24           The particular question at this point is whether

25   there is any evidence from which the jury could reasonably

1    conclude that in fact Miss Alexander had that intent such

2    that she granted an implied license to Mr. Orton, who then

3    granted an implied license to third parties.

4          It is true that it can be proven by objective

5    evidence.  One of the ways it can be proven by objective

6    evidence is through evidence of industry standard and

7    custom.  That has not been done in this case.  There is no

8    evidence of that.  But truthfully, there are some things

9    for which no industry standard exists.  You know, not

10   everything is subject to standard practices or customs.

11         But as I indicated before, the practices and

12   feelings of eight people does not an industry standard

13   make.  So, there's no evidence of industry standard.  The

14   only evidence as to her intent came directly from Miss

15   Alexander through her testimony, and there is nothing else.

16         I understand there certainly could be other

17   evidence that would be considered objective evidence to

18   establish Miss Alexander's intent, but it ain't here.

19   There is not sufficient evidence from which a reasonable

20   jury could conclude that Miss Alexander intended Mr. Orton

21   to copy and distribute her works in the particular manner

22   that he did through a third party license.  It's not here.

23         The motion for judgment at the close of the

24   evidence on the issue of implied license is granted.

25         What's the defendants' motion?

1          MS. MEANS:  Yes, Your Honor.  We need to preserve

2     our rights, as well, on this.  So, defendants move pursuant

3     to Rule 50 for judgment as a matter of law in defendants'

4     implied license and fair use defense.

5          May I put our motion into the record?

6          THE COURT:  I assume it's on the same basis that

7     you just argued in, in objection to plaintiff's motion?

8          MS. MEANS:  It's on many of the same bases.  I --

9          THE COURT:  If you would like to add to it -- I

10    don't -- I don't see any benefit to you rearguing the same

11    motion.  I understand that your motion would be on the same

12    bases that you just argued in opposition to plaintiff's

13    motion.  If you want to add something to that to make the

14    record, certainly.

15         MS. MEANS:  Well, Your Honor, yes, I would like to

16    add a few points, if I may?

17         THE COURT:  You may.

18         MS. MEANS:  So, the Seventh Circuit test for

19    establishing implied license is laid out in *I.E.A. v.*

20    *Shaver*, 74 F.3d 768.

21         And that test, the third prong of that test, is the

22    licensor intends the licensee request or copy or distribute

23    his work full stop.  That is the test for determining the

24    existence of an implied license.  Then the Seventh Circuit

25    determines the scope of that license.  So, whether it

1    extends to the specific uses at issue.  That is the second

2    step, once that first step of the test is met.

3         So, defendants contend that that first step of the

4    test, the existence of an implied license, has been met

5    here.  Plaintiff testified she understood that Mr. Orton

6    could do whatever he wanted with his tattoos.  Plaintiff

7    testified that she intended that Mr. Orton show his tattoos

8    on television.  That was explicitly elicited testimony of

9    intent to, quote, copy and distribute his work.  That meets

10   that standard.

11        And for the reasons I explained earlier, there's

12   additional objective evidence meeting the Seventh Circuit's

13   requirements, including evidence that, that licensee and

14   licensor -- which is Mr. Orton and Miss Alexander --

15   engaged in a short term discrete transaction as opposed to

16   an ongoing relationship, which is laid out in --

17        THE COURT:  Counsel, you already stated that basis

18   in opposition.  I'm asking you for anything additional.

19   Your record will be preserved.  Trust me.  Your record will

20   be preserved.  But we're not -- again, we're not --

21        MS. MEANS:  Yes, Your Honor.

22        THE COURT:  -- going to continue to beat this drum.

23        MS. MEANS:  Yes, Your Honor.  I'll add additional.

24        Plaintiff also testified that she has been

25   tattooing people since 2002.  She has inked over a thousand

1    tattoos, clients.  And in her experience, clients and

2    tattoo artists do not sign copyright agreements or reach

3    any agreements on copyrights.  She does not license her

4    tattoos to anyone.

5            Miss Alexander testified that she did not give Mr.

6    Orton any warning that the further use of Mr. Orton's

7    tattoos would be copyright infringement.  Miss Alexander

8    testified that she knew -- she couldn't remember when --

9    but she knew that sometime, maybe around 2016 but she

10   couldn't remember, she learned about Mr. Orton appearing in

11   WWE 2K.  She was not clear in her testimony when that

12   occurred.  But there is evidence that Mr. Orton was

13   appearing in video games since 2002; that those games were

14   publicly available, so she could have known about them.

15           THE COURT:  Could have.  We got any evidence that

16   she did?

17           MS. MEANS:  Your Honor, this is for the jury to

18   decide her credibility.

19           THE COURT:  No.  No.  Well, they -- yeah, it is for

20   the jury to decide her credibility based on evidence, not

21   rank speculation, counsel.

22           MS. MEANS:  Well, the evidence in the record is

23   that the video games were --

24           THE COURT:  You want to argue with me or you want

25   to make your argument for the record?

1        MS. MEANS:  Apologies, Your Honor.

2        Plaintiff contends that all of this evidence

3   establishes as a matter of law under Seventh Circuit law

4   that Mr. Orton and Miss Alexander entered into an implied

5   license to distribute -- copy and distribute her tattoos.

6        The remaining question then is the scope of the

7   license, which I have not addressed yet.  So, I would like

8   to just briefly address it, if I may.

9        THE COURT:  You may.

10       MS. MEANS:  The Seventh Circuit found in *LimeCoral*

11  *v. CareerBuilder*, 889 F.3d 847, Seventh Circuit (2018),

12  quote, absent a limitation imposed on a license at the time

13  these works were delivered, the license impliedly granted

14  all of the rights of *LimeCoral* as the copyright holder.

15       This is also consistent with some of the most cited

16  cases on implied license in the copyright context,

17  including *Asset Marketing Systems v. Gagnon*, which is

18  regularly relied upon in this circuit, in which the court

19  found that the copyrighted work which as here was created

20  at the request of the defendant and was delivered to the

21  defendant, was impliedly licensed when delivered without

22  any caveats or limitations on its use.

23       So, it's defendants' view that this is -- not only

24  is it sufficient evidence to go to the jury, but that

25  defendants are entitled to judgment as a matter of law on

1    implied license.

2          Moving on to defendants' second motion.  Defendants

3    are entitled to judgment as a matter of law because, based

4    on the undisputed facts in the record, no reasonable jury

5    could find that Take-Two's use of the tattoos in WWE 2K was

6    not a fair use.

7          Each of the fair use factors weighs in favor of

8    defendants, starting with fair use factor one, the purpose

9    and character of the use.  One of the biggest

10   considerations is whether the defendants' work is

11   transformative.  That's from *Campbell v. Acuff-Rose Music,*

12   *Inc.*, 510 U.S. 569 (1994) from the Supreme Court.

13         Whether the works serve distinct purposes is key to

14   the transformative use analysis.  Specifically, courts

15   consider, quote, whether the new work merely supersedes the

16   original work or instead adds something new with a further

17   purpose or a different character.  That's *Brown Mark Films,*

18   *LLC v. Comedy Partners*, 682 F.3d 687, Seventh Circuit

19   (2012).

20         It is undisputed that plaintiff's purpose and

21   defendants' purpose were different.  Plaintiff's purpose

22   was to execute the expression of Mr. Orton.  That's what

23   she testified to.  That's what Mr. Orton testified to.

24         Defendants' purpose, which is also undisputed, was

25   to create a realistic depiction of Mr. Orton in a video

1  game.

2         THE COURT:  How is that different from executing

3  the expression of Mr. Orton?

4         MS. MEANS:  Because Mr. Orton went into the tattoo

5  parlor and he chose what he wanted based on -- he testified

6  he, he chose a rose --

7         THE COURT:  No.  No.

8         MS. MEANS:  -- that represented his daughter --

9         THE COURT:  No.  I'm saying, what you just said as

10 to Miss Alexander's purpose in inking the tattoos was to

11 provide -- and I'm paraphrasing here -- or was for Mr.

12 Orton to engage basically in personal expression on his

13 skin.

14        MS. MEANS:  Yes, Your Honor.  That was --

15        THE COURT:  Okay.  Or to -- was his personal

16 expression.  My question is, what's the difference -- what

17 -- isn't that what Take-Two did?  They copied the tattoos

18 to present Mr. Orton's personal expression in the games?

19        MS. MEANS:  No, Your Honor.

20        THE COURT:  What did they do?

21        MS. MEANS:  Defendants -- sorry.  I didn't mean to

22 interrupt you.

23        THE COURT:  No, I said -- no.  What did they do?

24        MS. MEANS:  Yes.  Defendants' purpose was to -- was

25 to represent Mr. Orton as he looks in real life.  That was

1    not Miss Alexander's purpose.  Miss Alexander's purpose was

2    to execute his expression.

3          So, I'll give you an example, Your Honor.  Whatever

4    Mr. Orton had on his body was going to be in that game.

5    So, it didn't matter whether, if it was a rose for his

6    daughter or if it was some sort of different tribal tattoo

7    or whether it was nothing.  Take-Two's purpose was simply

8    to put Mr. Orton as he realistically looks in the game.

9    That was his undisputed purpose.  That's throughout the

10   testimony, but it's also in the RFA in which plaintiff

11   admitted.

12         Plaintiff's purpose was not to show Mr. Orton

13   realistically.  Plaintiff had a specific purpose.  She was

14   designing tattoos and inking them on Mr. Orton at his

15   direction in order to execute his personal expression.

16   That wasn't the purpose of Take-Two's inclusion of the

17   tattoos in the game.

18         THE COURT:  Let me ask you something, counsel.  To

19   the extent the reality is, when you've got these two

20   different situations where you have the artist who creates

21   the art and the person who copies the art, won't there

22   always be some difference in purpose between the two of

23   them, so there is -- there will never be an exact

24   identification of purpose, so that the argument that from

25   one to the other is a transformation will always exist?

1      MS. MEANS:  No, Your Honor.  In fact, there's many

2  instances where the copying is the same purpose, such as

3  where a photograph -- a photographer takes a photograph.

4      THE COURT:  From one tattoo to another tattoo.

5      MS. MEANS:  But in the leading cases on copyright

6  and on fair use out of the Supreme Court, there was a

7  different purpose.  There was, you know -- with *Campbell*,

8  for example, that case involved music.  And there was music

9  on the one hand that was a Roy Orbison song, and the song

10  was then put in a different song, so they were both two

11  songs.  You could see how that would be a similar purpose,

12  but the Supreme Court found that in fact the purposes were

13  different.  Because the purpose of the original song was

14  different from --

15      THE COURT:  Was the sample.  The second song was

16  the sample.

17      MS. MEANS:  It wasn't a sample.  It was actually a,

18  a --

19      THE COURT:  Okay.  What was the difference in

20  purpose?

21      MS. MEANS:  But you see what I mean.

22      THE COURT:  No.  What was the difference in

23  purpose?

24      MS. MEANS:  The difference there?  That was a case

25  in which the -- I'm sorry.  That was a case in which --

```
 1        THE COURT:  And again, I'm sorry, counsel, but I

 2   need to get to -- we are doing --

 3        MS. MEANS:  Yes.

 4        THE COURT:  -- these instructions today, as well.

 5   Which is going to take us -- well, no, it's not going to

 6   take us forever but -- I don't mean to cut you off.  I

 7   understand, you're arguing that it's transformative.

 8        MS. MEANS:  Yes, we're arguing it's transformative.

 9   I can move on to the next few factors and just make the

10   record.

11        THE COURT:  And then I will say, in all fairness to

12   both counsel, obviously, you can supplement your arguments

13   if you want to file a written submissions on it, as well.

14        MS. MEANS:  Thank you, Your Honor.

15        THE COURT:  Mm-hmm.

16        MS. MEANS:  That makes it a little less pressure on

17   me to get all my words out.

18        THE COURT:  You can supplement the record.

19   Regardless of my rulings, you can supplement the record.

20        MS. MEANS:  All right.  So, in factor two, the

21   nature of the copyrighted works favors Take-Two.  So,

22   there's no dispute that those tribal tattoos were copied

23   from a preexisting back tattoo which plaintiff admits she

24   did not create.  Mr. Orton testified to that.  Mr. Orton

25   also testified to where the skulls tattoo came from, which
```

was copied from his motorcycle.  And there's additional

evidence in the record on that, so that that shows that

these are not highly creative works.

Factor three, the amount used was reasonable in

light of the transformative purpose.  Take-Two's purpose

was to show Mr. Orton exactly how he looks in real life,

and Take-Two used his tattoos to do that and nothing more.

That's consistent with *Billy Graham Archives*, which

involved a similar situation in which the entirety of the

work was used, but it was used for a different purpose.  In

that case, there was a historical purpose.  And so the

court found that -- and I can give -- just to give a little

bit more detail to that case, that involved Grateful Dead

posters that were reproduced in a book about the Grateful

Dead.  Full reproduction, but the purpose was different.

The original posters were to drum up support for that show,

and the posters as used in the book were recording, you

know, *This is what happened.  This is what the posters*

*looked like.*  Very similar to the differing purposes here.

And there, the entirety of the work was used and the court

found that there was still fair use because the amount used

was reasonable in light of the transformative purpose.

And finally, on factor four, in the Seventh Circuit

the fourth factor is usually the most important.  That's

from *Sconnie Nation*.  The Court considers whether the use

1  will result in a substantially adverse impact on the

2  potential market for the original.  There's been extensive

3  testimony in the record, including today from Dr.

4  Malackowski, that there is no market for these tattoos.

5  Plaintiff admitted that she never licensed the tattoos to

6  anyone.  She admitted not to being harmed by the use of the

7  tattoos.  She lost no business from them.  The tattoos in

8  the video games are not a substitute.  And that's something

9  that the Supreme Court considers when it's looking at fair

10  use cases.

11      So, all of this evidence shows that defendants are

12  entitled to judgment as a matter of law on the issue of

13  fair use.  Every single fair use factor weighs in favor of

14  Take-Two and the defendants.

15      MR. KRASIK:  Your Honor, may I briefly be heard on

16  behalf of my client WWE?

17      THE COURT:  Yes.

18      MR. KRASIK:  Just to address briefly our Rule 50

19  motion on the implied license.  The evidence is undisputed

20  and favors directed verdict in favor of defendants on the

21  implied license.

22      The evidence is undisputed by Miss Alexander's

23  admissions that she consented to the use of -- or to the

24  appearance of Mr. Orton's tattoos in photographs and

25  merchandise.  That could not have happened without a

1    license, an implied license.  That's an exercise of Rule --

2    of Section 106 rights.  So, that happened.  She said she

3    consented to it.  By definition, there is implied consent.

4    It's an implied license.

5        And, Your Honor, once there is a license, once

6    there is an implied license, it's controlling law in the

7    Seventh Circuit that absent a limitation imposed at the

8    time of creation, the license includes all of the rights of

9    the copyright holder.  It's a stipulated fact that there

10   was no limitation placed on the license.  So, we have

11   undisputed admissions by Miss Alexander that she consented

12   to the depiction of the tattoos.

13       THE COURT:  No, there is no evidence that she

14   consented.  In fact -- no.  No.  For there to be evidence

15   that she consented, there would have to be evidence that

16   there was a discussion.  The evidence is, there was no

17   discussion.

18       MR. KRASIK:  Your Honor, respectfully, if there was

19   a discussion, then it's an express license.

20       THE COURT:  No.  No.  No.  But where -- so how do

21   you get to a consent --

22       MR. KRASIK:  She testified on the stand, she

23   consented to it.  She testified in response --

24       THE COURT:  Hold on.  Hold on.

25       MR. KRASIK:  -- to counsel's questions.

1      THE COURT:  Bring it down.  Bring it down.

2      MR. KRASIK:  Of course, Your Honor.

3      THE COURT:  Like three octaves, bring it down.

4      MR. KRASIK:  Of course, Your Honor.

5      THE COURT:  All right.  Go ahead.

6      MR. KRASIK:  In response to counsel's questions, to

7  make clear what she was not alleging in this lawsuit, she

8  said she consents to his appearance on television.  She --

9      THE COURT:  No.  She said she had no issue -- so,

10  you all -- I tell you what?  No.  Let me be quiet.  Let you

11  move on and then I'll make my ruling.  Because we -- look,

12  we're not going to be doing this for the next hour.  We are

13  getting to these instructions.

14      MR. KRASIK:  I just wanted to be heard on that

15  issue, Your Honor.

16      THE COURT:  And I want you to be heard.  So, let me

17  be quiet.  Go ahead, counsel.

18      MR. KRASIK:  Okay.  So, based on admissions of Miss

19  Alexander on the stand that she consented to the depiction

20  of Mr. Orton's tattoos on television, in photographs, and

21  on merchandise, by definition there was an implied license.

22      Once it's established there was an implied license,

23  the scope of that license is determined based on the

24  *LimeCoral* case.  And *LimeCoral* says, absent a limitation

25  imposed on the license at the time these works were

1  delivered to the defendant, the license impliedly granted

2  would encompass all of the rights of the copyright holder.

3        So, the evidence is actually undisputed that we

4  have a license and that the scope is everything.  So, it's

5  defendants that are entitled to directed verdict on the

6  issue of implied consent.  Those facts are undisputed.

7        Thank you, Your Honor.

8        THE COURT:  You're welcome.

9        MS. CENDALI:  One just -- thing for the record,

10  Your Honor?  I just wanted to add, in addition to the

11  evidence --

12        THE COURT:  No.  No.  No.  No.  No.  Counsel has

13  already argued this motion.  We don't have tag teams here,

14  and we have one counsel arguing the issue.  All right?

15        Mr. Tahan, would you like to respond to the

16  defendants' motion?

17        MR. TAHAN:  Very briefly, Your Honor.

18        I have here the *I.A.E., Inc. v. Shaver* cited by

19  counsel.  The cite on that is 74 F.3d 768.  By granting an

20  implied nonexclusive license does not transfer ownership of

21  the copyright to the licensee.  The *I.A.E.* case makes clear

22  that implied licenses do not grant the entire scope of

23  rights under 17 U.S.C.

24        That's all I have.

25        MS. MEANS:  Your Honor, may I be heard on that?

1          THE COURT:  No.

2          MS. MEANS:  No?

3          THE COURT:  Mr. Tahan, do you have a response to

4    the -- on the fair use to the -- or --

5          MR. SIMON:  Your Honor, I was going to argue that,

6    the fair use response.  He was arguing in response to Mr.

7    -- Curt.  All I would say is, all those factors, all the

8    testimony she talked about?  It's all dispute -- there's

9    credibility issues with these -- with these witnesses.

10          And they're relying on witnesses like, Mr. Orton

11    testified to this and that?  I think Mr. Orton lied on the

12    stand, and I think the jury's going to think that.

13          THE COURT:  No.  We're talking about fair use.

14          MR. SIMON:  I know.  One of the factors -- when she

15    went through the factors of fair use, the evidence they're

16    saying is conclusive was testimony of witnesses.  And the

17    jury, as you know under the instructions, can believe some,

18    all, or none of the witnesses' testimony.  So, there are

19    credibility issues to be determined.  And they're assuming

20    that every witness is going to be believed by the jury.

21          For example, her fair use factor, one of them was,

22    Mr. Orton testified X, Y, Z -- I don't remember what it

23    was.  But if they're basing it on testimony of witnesses,

24    they can't win on JMOL.  That has to go to the jury.

25          THE COURT:  Well, in terms of the fair use issue,

1    we're not in a different place coming -- at this point in

2    the trial than we were at the beginning, or when we came

3    here, which was, the Court ruled that the -- there were

4    questions of fact or material issues of fact that prevented

5    summary judgment.  In other words, those factors need to be

6    determined by the jury on fair use.

7         The Court's position on implied consent remains the

8    same as it was in granting the plaintiff's motion at the

9    close of evidence on implied consent, in response to

10   defendants' motions, and I have been clear on what it is,

11   and the positions and arguments are clear on the record.

12   And again, counsel will be able to and is -- are invited to

13   supplement the record with written submissions.

14        But the defendants' motion -- Rule 50 motion --

15   motions at the close of the evidence are denied in their

16   entirety.  This case will go to the jury on the remaining

17   issues -- under fair use, with fair use as the affirmative

18   defense.

19        We'll take up the jury instructions at 3:30.

20        (Court recessed from 2:55 p.m. to 3:54 p.m.)

21        (Proceedings continued in open court, jury not

22   present.)

23        THE COURT:  Before we get into the instructions, I

24   want to clarify and make a fuller record specifically

25   regarding my ruling on the granting the motion for judgment

1    as a matter of law to the plaintiff on the issue of implied

2    consent -- I'm sorry -- implied license.

3          I think, what I did not address specifically --

4    and, frankly, I think we've continued to glaze over it

5    throughout the course of the case -- is that the implied

6    license issue in this case encompasses not just a question

7    of whether or not Miss Alexander granted Mr. Orton an

8    implied license, but whether or not Mr. Orton -- and even

9    if you assume that -- whether or not he granted an implied

10   license then to, or whether an implied license was granted

11   to the defendants in this case.

12         I did specify my reasons as it relates to the fact

13   that I did not believe there was sufficient evidence of

14   Miss Alexander's intent, as is necessary to meet that

15   element, for her to have granted an implied license to Mr.

16   Orton.  But I want to also state on the record, even if you

17   assume that that's the case, the implied license

18   affirmative defense gets decided against the defendants as

19   a matter of law, and that is something that we have not

20   addressed.

21         And it is discussed extensively in a case that --

22   at least the *LimeCoral* case that defendants have cited to,

23   and I believe they have also cited to this case, it's

24   discussed in *Itofca* -- I-T-O-F-C-A -- *Inc. versus Megatrans*

25   *Logistics*, 322 F.3d 928, and specifically in the concurring

1    opinion where it talks about the fact that a nonexclusive

2    license, not only does it not transfer ownership of the

3    copyright to the licensee, that it simply permits the use

4    of a copyrighted work in a particular manner.

5        It goes on to cite another case that has been cited

6    here, *I.A.E., Inc. versus Shaver*, for the proposition that

7    in its simplest form a license means only leave to do a

8    thing which the licensor would otherwise have a right to

9    prevent.  And that a nonexclusive license, therefore, gives

10   a licensee permission to do whatever is within the scope of

11   that license.

12       A copyright owner can grant a nonexclusive license

13   orally or may even be implied from conduct.  A licensee

14   infringes the owner's copyright if its use exceeds the

15   scope of the license.  So, the critical question is not the

16   existence but the scope of the license.

17       So, as it relates to that, even if you assume that

18   there was an implied license and my -- and I stand on my

19   ruling that there is not even enough evidence to go to the

20   jury -- but beyond that, noting -- I think it's *Gilliam*

21   *versus American Broadcast Cos., Inc.*, 538 F.2d 14, is also

22   cited in this decision -- noting that one who obtains

23   permission to use a copyrighted work may not exceed the

24   specific purpose for which permission was granted.

25       So, there's been a lot of argument about the fact

1   that Miss Alexander testified that she didn't have a

2   problem with or gave permission or consent, whatever word

3   you want to use, for the tattoos, and expected that they

4   would be displayed on television, in photographs, et

5   cetera.  But again, the issue is scope.

6        The decision goes on to note:  Also, it has been

7   held by several courts and noted by commentators that a

8   nonexclusive license cannot be transferred without

9   permission of the copyright owner.

10       So, we've got almost like a hearsay situation

11  inside a hearsay situation.  We've got an implied license

12  situation within an implied license situation.  I've made

13  my ruling that I do not believe there is sufficient

14  evidence to even give the jury the question based on Miss

15  Alexander's intent, but also based on the specific notion

16  as it involves a sublicense.  That issue again, I do not

17  believe that -- well, not -- I do not believe, but judgment

18  as a matter of law on the issue of implied consent

19  specifically as it relates to the context of this case is

20  warranted because this case is about sublicensing.

21       And under this case that I just cited, which I

22  think is well-reasoned, there is absolutely no evidence

23  that even if Mr. Orton had an implied license, that Miss

24  Alexander granted permission for him to transfer the rights

25  to a third party, which is what we are talking about here.

So, I wanted to clarify that for the record.

MR. KRASIK:  Your Honor, Curt Krasik.  Just want to note for the record our exception to Your Honor's ruling and note that in the same *LimeCoral* case you just read from, the burden is actually flipped.  The burden is on her to show that there was a limitation imposed at the time the license was granted.

THE COURT:  It's noted.  And you're going to have an opportunity --

MR. KRASIK:  Thank you.

THE COURT:  -- to do a written submission, which I indicated.  But I do not -- did not intend to do further written submission, so I wanted to clarify the record.

All right.  Now we're at the instructions.  And what I -- basically, so I have gone through, and as a result of going through, I think you all had information as to the Court's general instructions that I intended to give, which would be reflected in this chart through Court's 14.

I have added Court's 15 through 21 that I intend to give, and I will go through and talk about why.  Some of them are the substantive issue instructions.  In other words, I intend to give the instruction in this form versus the proposed instructions by either party on the issue of -- well, first of all, there was no instruction proposed by

1    the parties to define copyright.  But these are the Seventh

2    Circuit Pattern Instructions defining copyright, the

3    allegation, copyright infringement, and then also the

4    general damages instruction. But let's just go through and

5    we'll take them in order.

6         So, again, Court's Instruction 1 is based on

7    Seventh Circuit Pattern Instruction describing the

8    functions of the Court and Jury.  The Court will give that

9    instruction.

10        Any objections from the plaintiff?

11        MR. SIMON:  No objection, Your Honor.

12        THE COURT:  Any objections from the defendants?

13        MR. SIMMONS:  No objections, Your Honor.

14        THE COURT:  All right.  Court's Instruction No. 2

15   based on Seventh Circuit Pattern Instruction 1.04,

16   describing the evidence.

17        Any objection from the plaintiff?

18        MR. SIMON:  No objection.

19        THE COURT:  Any objection from the defendant?

20        MR. SIMMONS:  No objection.

21        THE COURT:  Court's Instruction No. 3 based on

22   Seventh Circuit Pattern Instruction 1.06, instructing the

23   jury as to what is not evidence.

24        Any objection from the plaintiff?

25        MR. SIMON:  No objection.

1          THE COURT:  Any objection from the defendant?

2          MR. SIMMONS:  No objection.

3          THE COURT:  Court's Pattern Instruction -- I'm

4     sorry -- Court's Instruction No. 4 based on Seventh Circuit

5     Pattern Instruction 1.07 regarding note taking.

6          Any objection from the plaintiff?

7          MR. SIMON:  No objection.

8          THE COURT:  Any objection from the defendant?

9          MR. SIMMONS:  No objection.

10          THE COURT:  Court's Instruction No. 5 based on

11     Seventh Circuit Pattern Instruction 1.08, determining the

12     facts.

13          Any objections from the plaintiff?

14          MR. SIMON:  No objection.

15          THE COURT:  Any objection from the defendants?

16          MR. SIMMONS:  No objection.

17          THE COURT:  Court's Instruction No. 6 based on

18     Seventh Circuit Pattern Instruction 1.11, weighing the

19     evidence.

20          Any objection from the plaintiff?

21          MR. SIMON:  No objection.

22          THE COURT:  Any objection from the defendant?

23          MR. SIMMONS:  No objection.

24          THE COURT:  Court's Instruction No. 7 based on

25     Seventh Circuit Pattern Instruction 1.12 regarding direct

1    and circumstantial evidence.

2            Any objection from the plaintiff?

3            MR. SIMON:  No objection.

4            THE COURT:  Any objection from the defendant?

5            MR. SIMMONS:  No objection.

6            THE COURT:  Court's Instruction No. 8 based on

7    Pattern Instruction 1.13 regarding the testimony of

8    witnesses.

9            Any objection from the plaintiff?

10           MR. SIMON:  No objection.

11           THE COURT:  Any objection from the defendants?

12           MR. SIMMONS:  No objection.

13           THE COURT:  Court's Instruction No. 9 based on

14   Pattern Instruction 1.17 regarding the number of witnesses.

15           Any objection from the plaintiff?

16           MR. SIMON:  No objection.

17           THE COURT:  Any objection from the defendants?

18           MR. SIMMONS:  No objection.

19           THE COURT:  Court's Instruction No. 10 based on the

20   use of witnesses or exhibits.

21           Any objection from the plaintiff?

22           MR. SIMON:  No objection.

23           THE COURT:  Any objection from the defendants?

24           MR. SIMMONS:  No objection.

25           THE COURT:  Court's Instruction No. 11 based on

1    Pattern Instruction 1.27, the burden of proof.

2         Any objection from the plaintiff?

3         MR. SIMON:  No objection.

4         THE COURT:  Any objection from the defendants?

5         MR. SIMMONS:  No objection.

6         THE COURT:  Court Instruction No. 12 regarding

7    presiding juror selection.

8         Any objection from the plaintiff?

9         MR. SIMON:  No objection.

10        THE COURT:  Any objection from the defendants?

11        MR. SIMMONS:  No objection.

12        THE COURT:  Court Instruction No. 13 based on

13   Pattern Instruction 1.33 regarding communicating with the

14   Court.

15        Any objection from the plaintiff?

16        MR. SIMON:  No objection.

17        THE COURT:  Any objection from the defendant?

18        MR. SIMMONS:  No objection.

19        THE COURT:  Court Instruction No. 14 regarding no

20   outside communication.  It is a AO recommended instruction.

21        Any objection from the plaintiff?

22        MR. SIMON:  No objection.

23        THE COURT:  Any objection from the defendant?

24        MR. SIMMONS:  No objection.

25        THE COURT:  Before we move on.  Michelle, I think I

just remembered one Court Instruction that is not in here,

1.34?  Is that the right one?

          LAW CLERK:  Disagreement among jurors?

          THE COURT:  Hold on for one second, counsel.

          (Off the record.)

          THE COURT:  And 1.34, just so I can let counsel

know, talks about disagreement among jurors and tells them

how to work out the disagreement.  It's a precursor

instruction that must be given in case -- if the jury

deadlocks later down the road?  I can't give the deadlock

instruction unless I have given the precursor, which is

1.34.

          We'll give you copies in a minute, but it just

occurred to me that it was not on our chart.  So, we'll

come back to that.

          Court's Instruction No. 15 based on Pattern

Instruction 2.14 regarding the judge's comments to a

lawyer.

          Any objection from the plaintiff?

          MR. SIMON:  No objection.

          THE COURT:  Any objection from the defendant?

          MR. SIMMONS:  No objections.

          THE COURT:  Court's Instruction No. 16 based on

Pattern Instruction 2.05 regarding the stipulated facts,

and it incorporates the facts that were originally read to

1    the jury.

2           Any objection from the plaintiff?

3           MR. SIMON:  No objection.

4           THE COURT:  Any objection from the defendant?

5           MR. SIMMONS:  No objection.

6           THE COURT:  Court Instruction No. 17 based on

7    Pattern Instruction 1.14 regarding prior inconsistent

8    statements.  There was impeachment in this case.

9           Any objection from the plaintiff?

10          MR. SIMON:  No objection.

11          THE COURT:  Any objection from the defendant?

12          MR. SIMMONS:  No objection.

13          THE COURT:  Court's Proposed Instruction No. 18

14   based on Seventh Circuit Pattern Instruction 1.03 regarding

15   instructing the juries that all parties are equal before

16   the law, including defendant corporations.

17          Any objections from the plaintiff?

18          MR. SIMON:  No objection.

19          THE COURT:  Any objection from the defendants?

20          MR. SIMMONS:  No objection.

21          THE COURT:  Okay.  Now, Court's Instruction No. 19

22   is based on Seventh Circuit Pattern Instruction 12.1.1, and

23   it's really just the introduction of the claims in this

24   case and simply states what plaintiff claims.  And it is

25   Pattern Instruction 12.1.1 -- Seventh Circuit Pattern

Instruction.

Any objections from the plaintiff?

MR. SIMON:  No objection, Your Honor.

THE COURT:  Any objection from the defendants?

MR. SIMMONS:  Your Honor, we would request that the term "their video games" be replaced with "WWE 2K16, 17, and 18" as those are the accused games in the case?

THE COURT:  No, we're not -- we don't need to get that specific.  It's the medium that's important.

MR. SIMMONS:  Your Honor, in addition, we would ask that the instruction be -- include the phrase "defendants deny that allegation" as the fair use is not an infringement.

THE COURT:  No.  We're using the pattern instruction as-is.  There's no need to go beyond the pattern.  They're going to get the fair use instructions. This is not -- this is just the introduction.  They're going to get the elements instruction that will include the affirmative defense of fair use.

MR. SIMMONS:  Understood, Your Honor.

THE COURT:  Okay.  So, I will note the defendants' objection, but the Court's 19 will be given over defendants' objection.

Court's 20, based on Pattern Instruction 12.2.1. And actually, I do intend to give this but I intend to

1    revise it further.  And I'll just read what it -- how it

2    will read:

3            The Court has previously ruled that the five

4    tattoos in question are the subject of a valid copyright,

5    that plaintiff owns the copyright, and that the defendants

6    copied plaintiff's copyrighted work.

7            And it will read:  You must consider the

8    affirmative defense of fair use raised by the defendants.

9    If you find that defendants have proven this affirmative

10   defense by a preponderance of the evidence, then you must

11   find for the defendants.

12           And just so you know, there is a fair use

13   instruction that defines it, that we're going to get to.

14   This is the precursor to that.

15           So, any objections from the plaintiff on

16   Instruction No. 20?

17           MR. SIMON:  As far as the instruction, no, Judge.

18   But we would request that the copyrights be plural and

19   works be made plural.  So, instead of "a valid copyright"?

20   The valid copyrights.  Plaintiff owns the copyrights, as,

21   you know, plural.  And "defendants copied plaintiff's

22   copyrighted works."  Just making them plural, because there

23   are five.

24           THE COURT:  Understand.

25           MR. SIMON:  Other than that, no objection.

1    THE COURT:  So, it would read that the five tattoos

2    in question are the subject of valid copyrights.

3    MR. SIMON:  Yes.

4    THE COURT:  That plaintiff owns the copyrights.

5    MR. SIMON:  Correct.

6    THE COURT:  And that the defendants copied

7    plaintiff's copyrighted works.

8    MR. SIMON:  Yes.  With that change, no objections

9    from the plaintiff, Your Honor.

10   THE COURT:  Any objections from the defendant?

11   MR. SIMMONS:  Your Honor, the defendants renew

12   their objections to the Court's prior Order, but do not

13   object to the language given the prior Orders.

14   THE COURT:  Okay.  Then Court's 20 will be given.

15   Court's Proposed No. 21 is based on Seventh Circuit

16   Pattern Instruction 12.8.1.  And again, it is the general

17   introductory instruction regarding damages.  There is a

18   detailed instruction on actual damages, but this is the

19   precursor.  Any objections from -- oh, hold on.  And I

20   intend to revise this further.  Let me read to you how I

21   intend to revise it:

22   "If you find that defendants have not proven their

23   affirmative defense then you must find for the plaintiff

24   and you must consider the amount of damages, if any,

25   plaintiff is entitled to recover."  And then the rest of it

1    will read as it reads now.

2        Any objection from the defendants -- I'm sorry --

3    from the plaintiff?

4        MR. SIMON:  No objection, Your Honor.

5        THE COURT:  Any objection from the defendants?

6        MR. SIMMONS:  Your Honor, we would ask that the

7    phrase --

8        THE COURT:  I can't hear you.

9        MR. SIMMONS:  I'm sorry, your Honor.

10        In the fourth paragraph, first sentence, we would

11    ask that the phrase "defendants made from the infringement"

12    be changed to defendants -- that -- attributable to the

13    infringement.

14        THE COURT:  I can't -- didn't hear what you said.

15        MR. SIMMONS:  Sorry.  I would read our proposed

16    sentence.  It would say, "Plaintiff may recover for any

17    actual losses she suffered because of the infringement plus

18    any profits that are attributable to the infringement."

19        THE COURT:  I believe this instruction as drafted

20    is based on a specific Pattern language.

21        Is that correct, Michelle?

22        LAW CLERK:  Let me verify.

23        THE COURT:  Let me look.  I think I have it here,

24    too.

25        LAW CLERK:  Yes, it's the Pattern.

1          THE COURT:  I am inclined to use the Pattern

2   language.  There's no reason to go beyond that.

3          MR. SIMMONS:  Your Honor --

4          THE COURT:  So, your objection is noted.  Go ahead.

5          MR. SIMMONS:  Thank you, Your Honor.  I was just

6   going to note that the language attributable to the

7   infringement comes from the Copyright Act 17 U.S.C. 504(b).

8          THE COURT:  The language in this instruction comes

9   from the Pattern Instruction from the Seventh Circuit and

10  that's -- it's this Court's custom and practice to use that

11  unless there is a reason to modify it, and there is not

12  here.  So, the objection is noted.

13         Court's Jury Instruction No. 21 will be given over

14  defendants' objection.

15         Then that brings us to the parties' proposed

16  instructions.

17         The Joint Proposed Instruction J-1 will be refused

18  given the Court's previous ruling on waiver.

19         The Court's -- I'm sorry -- the Parties' Proposed

20  Joint Instruction No. 2.

21         MR. SIMMONS:  Your Honor, I may not have the same

22  document you are looking at?

23         THE COURT:  Hold on.  I'm sorry.  Which document

24  are you talking about?  Which document are you referring

25  to, that you say you may not have?

1          MR. SIMMONS:  Your Honor, you referenced Parties'

2     Instruction No. 2.  The document I have is Parties'

3     Instruction No. 3.  I wasn't sure if you were referencing a

4     different instruction?

5          THE COURT:  No.  I'm going through the chart.  The

6     parties originally proposed a Joint 2, which was a damages

7     instruction?

8          MR. SIMMONS:  Understood.

9          THE COURT:  You don't have it in the new packet.

10    In other words, we didn't regive you the same instructions.

11    So, it would be in the old packet.

12         MR. SIMMONS:  I'm with you now, Your Honor.

13         THE COURT:  Okay.  I'm sorry I didn't explain that.

14         So, the Joint Proposed Instruction 2 is refused and

15    what we will be giving -- we'll get there.  But what we

16    will be giving instead is Plaintiff's Proposed Instruction

17    No. 4, which is the actual damages instruction based on

18    12.8.2, but it will be modified.  And I'll get there, when

19    I get there in the chart.  So, there is a damages

20    instruction and I am refusing the Joint Instruction No. 2.

21         I guess at this point any objections -- you can

22    come back after you see it, but any objections from the

23    plaintiff?

24         MR. SIMON:  No objection from the plaintiff.

25         THE COURT:  Any objections from the defendants?

1    MR. SIMMONS:  Your Honor, the joint instruction

2    included the language that I had indicated with regard to

3    Court's Instruction 21, and we maintain that objection with

4    regard to the refusal, as well.

5    THE COURT:  It will be refused over defendants'

6    objection.

7    Parties' Joint Instruction No. 3 is based on

8    Seventh Circuit Pattern Instruction 1.24 regarding

9    demonstrative evidence.  I trust there's no objection to

10   this one.

11   Mr. Simon, any objection from the plaintiff?

12   MR. SIMON:  No objection, Your Honor.

13   THE COURT:  Any objection from the defendants?

14   MR. SIMMONS:  Although we'd like to spend more time

15   with you, Your Honor, no objection.

16   THE COURT:  You do agree they need to be instructed

17   on demonstrative evidence?

18   MR. SIMMONS:  Yes, Your Honor.

19   THE COURT:  Okay.  All right.  Then that takes us

20   to Plaintiff's Proposed Instructions.

21   Plaintiff's Proposed Instruction No. 1 was an

22   introduction into affirmative defenses.  That is refused.

23   Again, the Court has covered that in the elements

24   instruction as far as the fair use affirmative defense and

25   that, what must be proven.  So, the Plaintiff's P-1 is

1    refused.

2        Any objection Mr. Simon?

3        MR. SIMON:  No objection, Your Honor.

4        THE COURT:  Any objections from the defendant?

5        MR. SIMMONS:  Your Honor, just because we were

6    having a discussion, we're on plaintiff -- which

7    plaintiff's instruction?  I'm sorry?

8        THE COURT:  We're on Plaintiff's Instruction No. 1,

9    which would be in the original packet.

10       MR. SIMMONS:  Understood.  Subject to our prior

11   conversation --

12       THE COURT:  Your position --

13       MR. SIMMONS:  Is that it should be refused.

14       THE COURT:  Yeah, your position on all of the

15   rulings that I have made on affirmative defenses, et

16   cetera, is noted for the record and preserved.  And I'm

17   specifically saying on the record that the parties and the

18   defendant does not waive any of those positions or

19   objections on the instruction.

20       MR. SIMMONS:  Thank you, Your Honor.

21       THE COURT:  That -- I got it.  It is clear.

22       Plaintiff's Proposed Instruction No. 2 was, again,

23   originally proposed regarding implied license.  Given the

24   Court's ruling, it is refused.

25       Any objections, Mr. Simon?

1      MR. SIMON:  No objection, Your Honor.

2      THE COURT:  And again, preserving your arguments,

3  any objections Mr. Simmons?

4      MR. SIMMONS:  Your Honor, subject to our Rule 50

5  discussion, no --

6      THE COURT:  How many times -- you want -- all of

7  these are subject -- you are not waiving your Rule 50, you

8  are not waiving in the -- your -- you're not waiving any of

9  your objections to my rulings on this.  And I'm making it

10  clear for the record.  I understand that.

11      MR. SIMMONS:  I understand, Your Honor.

12      THE COURT:  You just feel the need to say it?

13      MR. SIMMONS:  Well, I am concerned that a group of

14  judges at the Seventh Circuit may feel differently and I

15  just wanted to sure it was clear for the record.

16      THE COURT:  That they may feel differently that you

17  are waiving it?

18      MR. SIMMONS:  Yes, Your Honor.

19      THE COURT:  Okay.  Then, go ahead.

20      So, any objections to the Court's refusing

21  plaintiff's -- you are objecting to me refusing the

22  plaintiff's instruction on implied consent?

23      MR. SIMMONS:  No, Your Honor.

24      THE COURT:  That was my question.

25      MR. SIMMONS:  Thank you, Your Honor.

1          THE COURT:  On P-2, no objections from the

2   defendants; correct?

3          MR. SIMMONS:  No.

4          THE COURT:  Okay.  Plaintiff's Proposed Instruction

5   No. 3 on the affirmative defense fair use.  It is the

6   Court's intent to give Plaintiff's Instruction No. 3 as

7   modified, and to refuse Defendants' Instruction No. 4 and 5

8   on fair use.

9          On the modification that's contained in the Court's

10  proposal, it's a modification even of the plaintiff's.  And

11  the reason is, the Court believes it's important to give a

12  clear instruction on fair use and this -- and the Court's

13  Proposed Instruction is consistent with the Seventh

14  Circuit's decision and opinion in *Kienitz* -- K-I-E-N-I-T-Z

15  -- *versus Sconnie Nation LLC*.  And specifically, that the

16  factors to be considered with respect to fair use, the

17  Seventh Circuit specifically directed the courts that it is

18  best to stick with the statutory list of which the most

19  important usually is the fourth.

20         In other words, in that case -- I think it was

21  Judge Easterbrook -- specifically said, fair use is a

22  statutory defense to infringement.  The Copyright Act sets

23  out the four nonexclusive factors for a court to consider

24  at 17 U.S.C., Section 107.  The district court and the

25  parties have debated whether the T-shirts are a

1    transformative use of the photo and, if so, just how

2    transformative the use must be.  The Court noted:  That's

3    not one of the statutory factors, though the Supreme Court

4    mentioned it in *Campbell versus Acuff-Rose Music*.

5        It also noted that the Second Circuit has run with

6    this suggestion, and concluded that transformative use is

7    enough to bring a modified copy within the scope of Section

8    107.

9        Judge Easterbrook noted the Seventh Circuit's

10   skepticism of *Cariou*'s approach -- and that's the Second

11   Circuit case -- and noted that because asking exclusively

12   whether something is transformative not only replaces the

13   list in Section 107 but also could override Section 1062

14   which protects derivative works.

15       To say that a new use transforms the work is

16   precisely to say that is derivative and thus, one might

17   suppose, protected under Section 106(2).  *Cariou* and its

18   predecessors in the Second Circuit do not explain how every

19   transformative use can be fair use without extinguishing

20   the author's rights under Section 106(2).  We think it best

21   to stick with the statutory list, of which the most

22   important usually is the fourth, market effect.

23       So, following that direction and that instruction,

24   I am proposing and intend to instruct the jury based on

25   Modified Plaintiff's Instruction No. 3, the factors that

1    are listed or specifically the statutory factors from 107.

2        Any objection from the plaintiff?

3        MR. SIMON:  No objection.

4        THE COURT:  Any objection from the defendant?

5        MR. SIMMONS:  Yes, Your Honor.  We do object.

6        THE COURT:  Go ahead.

7        MR. SIMMONS:  Your Honor, the proposed -- or the

8    Court's Proposed Instruction does not reflect

9    transformative use, as you just mentioned.

10        Subsequent to the *Sconnie Nation* decision in the

11   Seventh Circuit, the U.S. Supreme Court, in *Google v.*

12   *Oracle*, reaffirmed the transformative use test.  It

13   specifically said that with regard to fair use in answering

14   this question, we have used the --

15        THE REPORTER:  Please slow down.

16        THE COURT:  You need to slow down.

17        MR. SIMMONS:  Sorry.  Apologize.

18        The Supreme Court specifically said that in

19   answering the question about fair use, we have used the

20   word transformative to describe a copying use that adds

21   something new and important.  It goes on to say, an

22   artistic painting might, for example, fall within the scope

23   of fair use even though it precisely replicates a

24   copyrighted advertising logo to make a comment about

25   consumerism.  Or as we held in, *Campbell,* a parody can be

1    transformative because it comments on the original or

2    criticizes it for parody.  Parody needs to mimic an

3    original to make its point.

4          Our request would be, given that the Supreme Court

5    has reaffirmed the use of transformativeness in the fair

6    use inquiry in its *Google v. Oracle* decision, after the

7    *Sconnie Nation* decision, that the jury should be instructed

8    on transformativeness.

9          THE COURT:  Have you got that case in front of you?

10         MR. SIMMONS:  Yes, ma'am -- yes, Your Honor.

11   Apologize.

12         THE COURT:  I'm "ma'am" sometimes.  Could you hand

13   it to Miss Hurst?

14         MR. SIMMONS:  Yes.  And to the extent it helps,

15   there's a section on the purpose and character of the use.

16   That's what I was quoting from.  I think it's page 1203,

17   although I am not sure what the numbering of what I just

18   handed you is, versus what I was reading.

19         THE COURT:  Okay.  Hold on for a second.

20         (Off the record.)

21         THE COURT:  Does it -- Mr. Simmons, does it

22   reference the *Sconnie* case here?

23         MR. SIMMONS:  Your Honor, I can't hear you.  I'm

24   sorry.

25         THE COURT:  Does it -- I'm sorry.  Does it

1    reference the *Sconnie* case?  I'm not -- I don't think so,

2    but I'm not --

3         MR. SIMMONS:  No, Your Honor.

4         THE COURT:  My problem with the transformative

5    language is the same problem that's expressed in *Sconnie*.

6    And even in *Sconnie*, they acknowledge *Campbell* and the

7    Supreme Court's reference to that use in *Campbell*.

8         Mr. Simon, while I'm looking at this, what's the

9    plaintiff's response here?

10        MR. SIMON:  Your Honor, my problem with this has

11   always been, if transformative use means, *I use it in a*

12   *different manner than the copyright owner, it swallows up*

13   *the copyright*.

14        THE COURT:  Well, I think that's the criticism even

15   from the Seventh Circuit.

16        I guess, Mr. Simmons -- and I have not read this

17   entire case.  I'm still not sure the application of this --

18   I'm not sure this factor is required under the statute even

19   given the Supreme Court case.  I think it is one of the

20   factors that can be considered, but I'm not sure it's

21   required.  And it's required that that be given to the jury

22   in this case.

23        MR. SIMMONS:  Your Honor, one thing to note.

24   Plaintiff's Instruction No. 3 actually contained a

25   transformative use instruction, so the parties agreed --

1          THE COURT:  I noted that.

2          MR. SIMMONS:  And so, Your Honor, given that fair

3     use is judge-made law, although there is a statute that

4     provides for it, it actually is a codification of

5     judge-made law as discussed in *Google v. Oracle* itself.  We

6     think that you have to give the jury some context for what

7     that judge-made law means.  I know we haven't gotten there

8     yet but our instruction -- but there is a --

9          THE COURT:  You don't have to give the jury any

10    context for what judge-made law means.  The jury doesn't

11    concern themself with that type of thing.  The jury's --

12         MR. SIMMONS:  Well, I'm --

13         THE COURT:  We have to give the jury instruction on

14    what the law is to be applied.  Period.

15         MR. SIMMONS:  Our concern, Your Honor, is that

16    there are subsidiary facts in the fair use analysis.  And

17    so, if you don't instruct them on the law of transformative

18    use, then they won't know what facts are relevant to that

19    inquiry.

20         THE COURT:  No.  No.  No.  No.  The statutory

21    factors are set out.  Even in the Seventh Circuit Pattern

22    Instruction, there are other factors which are bracketed

23    which can be included, but they don't have to be included.

24         And I guess what I'm saying is, at least so far

25    what I see, I do not think *Google versus Oracle* requires

1    that the Court instruct the jury on transformative use.

2         MR. SIMMONS:  Your Honor, I think that it does.

3    The *Google v. Oracle* -- the procedural posture of *Google v.*

4    *Oracle* was in fact a jury trial on fair use, which went to

5    the Supreme Court on that issue.  And so, we think that the

6    jury -- that the jury instructions in that case are similar

7    to our proposed -- defendants' model of Proposal No. 5, in

8    that it provided an explanation of what the law was to the

9    jury.  And we think that is important in this case.

10        THE COURT:  Mr. Simon?  What's the plaintiff's

11   position on whether or not the Supreme Court's *Google*

12   *versus Oracle* decision, even combined with the previous

13   1994 *Campbell* decision, requires that transformative use --

14   that the jury be instructed that transformative use is a

15   factor that they must consider?

16        MR. SIMON:  We do not believe the *Oracle versus*

17   *Google* [sic] case requires it, Your Honor.  In that

18   particular case, it was related to software, where if

19   someone wanted to make things and they, by necessity, had

20   to use it.  It's not required.  The statutory factors are

21   all that are required.

22        THE COURT:  I totally understand the defendants'

23   position.  But again, I believe that *Sconnie* is still

24   appropriate and intend to follow the directives of the

25   Seventh Circuit and give the statutory factors.

1        MR. SIMMONS:  Your Honor, we have additional

2   objections to the jury instruction, if you are prepared to

3   hear them.

4        THE COURT:  On -- we're on --

5        MR. SIMMONS:  Plaintiff's Instruction 3.

6        THE COURT:  Yes, go ahead.

7        MR. SIMMONS:  So, Your Honor, additional grounds

8   for things we would change in the instruction:  In the

9   *Sconnie Nation* case to which Your Honor referred, the

10  Seventh Circuit specifically discusses the concept of

11  substitutive use as being the consideration in fair use.

12       Defendants' Instruction No. -- I think it was -- 4

13  suggested that in the list of purposes, we could include

14  other nonsubstitutive use.

15       The line from *Sconnie Nation* is -- I think it was

16  at the beginning of the paragraph Your Honor was reading

17  from -- we think it best to stick with the statutory list,

18  of which the most important usually is the fourth, market

19  effect.  We have asked whether the contested use is a

20  complement to the protected work, allowed, rather than a

21  substitute for it, prohibited.

22       We think that the jury should be instructed that

23  fair use exists when it's not a substitute for the

24  original.  That's also consistent with *Campbell* and *Google*

25  *v. Oracle*, as well.

1    THE COURT:  What now?  That fair use exists when

2    it's not a substitute for the original?

3    MR. SIMMONS:  Yes, Your Honor.  That's what we

4    believe *Sconnie Nation* says at 766 F.3d at 758.

5    THE COURT:  Your objection is noted.  Anything

6    else?

7    MR. SIMMONS:  Yes, Your Honor.

8    In the -- there's a third bullet on:  The amount

9    and substantiality of the portion used in relation to the

10    copyrighted work as a whole.

11    We would ask that that consideration include

12    whether the amount used is central to the copier's valid

13    purpose.

14    That's a direct quote out of, again, *Google v.*

15    *Oracle* out of the Supreme Court with regard to the third

16    factor.

17    THE COURT:  Your objection is noted.  And I will

18    take your objection really in context that it would

19    encompass your proposed instruction on fair use, which sets

20    all of that out.  And the Court is refusing your proposed

21    instruction, and the Court acknowledges that that is the

22    instruction that the defendants are tendering and it

23    encompasses all of your objections and arguments.

24    MR. SIMMONS:  Thank you, Your Honor.

25    We have an additional thing we would ask for, on

1    the fourth factor.  I'm sorry.

2         The fourth factor currently says:  The effect of

3    the use upon the potential market for a value of the work.

4         Again, going back to *Google v. Oracle* the Supreme

5    Court is very clear, you have to consider the public

6    benefits of the copying.  And we have other ways of

7    phrasing that in our instruction.  But again, *Google v.*

8    *Oracle* makes clear, the fourth factor to be considered is

9    not just the effect of the use upon the potential market,

10   but what the effect would have on the public in general.

11        THE COURT:  Noted.  Anything else?

12        MR. SIMMONS:  Your Honor, I believe that's -- at

13   this point, our objections are noted for the record.  We

14   would, obviously, when we get to our refused instructions,

15   we will continue to preserve the objections to --

16        THE COURT:  No.  Your -- it is preserved.

17        MR. SIMMONS:  Thank you, Your Honor.

18        THE COURT:  Okay.  Next is Plaintiff's Proposed

19   Instruction No. 4 on the actual damages.  It will be given

20   as the Court has modified it.  And I think, the

21   modification, I took a sentence out of the Plaintiff's

22   Proposed Instruction that is not part of the Pattern

23   Instruction.

24        Any objection from the plaintiff?

25        MR. SIMON:  Your Honor, the only thing I would

1    suggest is, what was talked about a lot in this case is --

2    and this is right out of the *McRoberts* case -- it says,

3    actual damages are usually determined by the loss of the

4    fair market value of the copyrighted work measured by the

5    profits lost due to the --

6         THE COURT:  Slow down Mr. Simon.

7         MR. SIMON:  Sorry.  I was reading.

8         -- measured by the profits lost due to the

9    infringement or by the value of the use of the copyrighted

10   work to the infringer.

11        All the testimony in this case was, *what was that*

12   *value to the defendants*.  And that's not in this

13   instruction.  And it was our fault.  We -- I think instead

14   of market value, I would -- I would suggest replacing the

15   market value with the value of the use of the copyrighted

16   work to the infringer.

17        THE COURT:  Mr. Simmons?

18        MR. SIMMONS:  Your Honor, Miss Means will address

19   that instruction.

20        THE COURT:  Miss Means?

21        MS. MEANS:  Your Honor, defendants propose going

22   with the Seventh Circuit Pattern Instruction.  This is

23   inconsistent with that.

24        The Seventh Circuit Pattern Jury Instruction

25   provides three examples:  A decrease in the market value of

the copyrighted work caused by the infringement; profits that plaintiff proves she would have made without the infringement, profits are the revenue plaintiff would have made on sales she would have made without the infringement less any -- oh, I think that that's an error there.  But the third one is what a willing buyer reasonably would have paid plaintiff to obtain a license to copy plaintiff's copyrighted work.

I can pull up the Seventh Circuit Pattern Instructions now to confirm --

THE COURT:  No.  No.  No.  No.

MS. MEANS:  -- but our first objection is, these are inconsistent.

THE COURT:  Hold on.  Hold on.  So we don't get confused on the record.  This is the Seventh Circuit Pattern Instruction.

Plaintiff's 4 has been modified so that it is the Seventh Circuit Pattern Instruction.

MS. MEANS:  Hold on one second, Your Honor.  Let me just take a look.

THE COURT:  I believe that is correct.  Isn't it, Michelle?

LAW CLERK:  We usually -- but she is right.

THE COURT:  Oh, so you -- yeah, my intent was to give the Seventh Circuit Pattern Instruction.

```
 1            LAW CLERK:  Yeah, so I --
 2            MS. MEANS:  So this is not -- what's currently in
 3    here, I don't believe, is the Pattern Instruction --
 4            THE COURT:  Michelle didn't follow instructions.
 5            LAW CLERK:  It is not.
 6            MS. MEANS:  I understand.
 7            THE COURT:  So, just so the record is clear, the
 8    Court intends to give the Seventh Circuit Pattern
 9    Instruction.  And I note Mr. Simon's objection, but I will
10    give the Seventh Circuit Pattern Instruction over the
11    plaintiff's objection.
12            You can argue what you want to argue, but --
13            MR. SIMON:  Okay.
14            THE COURT:  -- this is -- I'm giving the Pattern
15    Instruction.
16            MR. SIMON:  And, Your Honor, we are not claiming,
17    though, profits that we would have made without the
18    infringement.  That's not an issue in the case.  We
19    conceded that.
20            THE COURT:  It's just giving them examples of that
21    -- of actual damages.
22            MR. SIMON:  Okay.
23            THE COURT:  So -- all right.  Michelle, you will
24    fix --
25            LAW CLERK:  Yes.
```

1      THE COURT:  All right.

2      MS. MEANS:  Your Honor, I apologize.  We -- I

3  missed one objection that we also want to put on.  I think,

4  in our proposed instruction, we had provided that Your

5  Honor instruct on the causal nexus between --

6      THE COURT:  When we get here, you can make your --

7  I mean, I'm going to go through your instructions and you

8  can make your record on your proposed instruction, which

9  I'm refusing.

10      MS. MEANS:  Okay.

11      THE COURT:  Okay?  That way, we keep it clean.

12      Plaintiff's Instruction No. 5 on defendants'

13  profits will be given.

14      Any objection from the plaintiff?  You are not

15  objecting to your own instruction, are you?  This has not

16  been modified.  (Pause.)  Somebody?

17      MR. SIMON:  I'm sorry, Your Honor.  The plaintiff

18  has no objection to what you have here.

19      THE COURT:  All right.  So, Plaintiff's Proposed

20  Instruction No. 5 on defendants' profits has not been

21  modified.  It is the Pattern Instruction, I believe, and it

22  will be given.

23      I'm sorry.  Defendants' objections?

24      MS. MEANS:  Other than our objection on causal

25  nexus, which I understand we'll discuss in a second, that

1    we have no objections other than that.

2          THE COURT:  Plaintiff's Proposed Instruction No. 6

3    was a -- and it's not in the new packet.  It's in the old

4    packet.  It was a proposed instruction about the purpose of

5    awarding damages and disgorgement of profits.

6          The whole point here is to instruct the jury in a

7    way that is clear, concise, understandable, and not

8    confusing.  And the Court does not believe there is a need

9    to go beyond the Pattern Instruction on that issue with

10   this jury, and Plaintiff's Proposed Instruction No. 6 is

11   refused.

12         You may state your objection for the record, Mr.

13   Simon.

14         MR. SIMON:  Your Honor, the reason we proposed it

15   is just because disgorgement is not a word I think the jury

16   would understand.

17         THE COURT:  And you need a whole page to explain it

18   to them?  And you think they're going to follow that?

19         MR. SIMON:  No, Your Honor.  I mean, as long as I

20   can argue what disgorgement means.  I mean --

21         THE COURT:  I don't know -- you can argue it if

22   it's used in this -- it's not used in the defendants'

23   profits instruction.

24         MR. SIMON:  No.  What I'm saying, though, is the

25   jury might think we're double dipping and --

1    THE COURT:  You can argue whatever you want to
2    argue.  What you can't do, is instruct them on the law.
3    And what I'm suggesting is that the Pattern Instruction on
4    defendants' profits, which is what you propose in
5    Plaintiff's Instruction No. 5, does not use the word
6    disgorgement.
7         MR. SIMON:  Understood, Your Honor.
8         THE COURT:  Disgorgement is not part of the
9    instruction on the law.
10        MR. SIMON:  And I stand corrected.
11        THE COURT:  Okay.  Plaintiff's verdict form.  We're
12   going to use a version of defendants' verdict form.  And
13   I'll let you make an objection when we come back -- you
14   don't care?
15        MR. SIMON:  We don't have an objection on it, other
16   than number one is no longer in the case.
17        THE COURT:  Okay.  All right.  So, then that takes
18   us to Defendants' Proposed Instructions.
19        The affirmative defense intro again is --
20   Defendants' 1 is refused.  I don't think that's necessary,
21   given the elements instruction that incorporates the
22   introduction regarding an affirmative defense.
23        You may make any further record you want on the
24   refusal of Defendants' 1.
25        MR. SIMMONS:  Your Honor, I believe we have noted

1   our objections on the record when we dealt with it before.

2       THE COURT:  Okay.  Defendants' 2, the affirmative

3   defense regarding implied license.

4       Any objections you want to note on the record

5   beyond your Rule 50 arguments?

6       MR. SIMMONS:  No, Your Honor.

7       THE COURT:  Defendants' 3 -- and so it's refused.

8       Defendants' 3 on the affirmative defense of

9   license, scope.  I think that goes to implied license.

10      Again, preserving your objections to the Court's

11  Rule 50 rulings, any objections beyond that?

12      MR. SIMMONS:  No further objections, Your Honor.

13      THE COURT:  Defendants' Proposed Instruction No. 4

14  is refused in lieu of the Plaintiff's 3 as modified, that

15  the Court is giving.  You can add to your argue -- note

16  your specific objections, if you want to add to your

17  objections for the record.

18      MR. SIMMONS:  Your Honor, we addressed our issues

19  previously which we understand the Court refused.  We note

20  a general objection to not giving our instruction for the

21  reasons stated earlier today.

22      THE COURT:  Defendants' Proposed Instruction No. 5,

23  which is a nonpattern instruction regarding considerations

24  with fair use.  Again, it is refused.

25      You may make your record, counsel.

1      MR. SIMMONS:  Your Honor, we would note for the

2  record that this instruction is based on the instruction

3  from the District Court in the *Google v. Oracle* case that

4  we discussed earlier, that was used at that trial.  The

5  jury reached a verdict.  The Supreme Court affirmed that

6  decision.  We think that giving the jury a similar

7  instruction would be important and helpful here for the

8  reasons we discussed earlier.

9      THE COURT:  Defendants' Proposed Instruction No. 6

10  on actual damages is refused in lieu of Plaintiff's 4,

11  which will be given as modified.

12      You may make your record, counsel.

13      MR. SIMMONS:  Your Honor, we would -- as Miss Means

14  indicated earlier, we think it's important to indicate to

15  the jury that there needs to be a relationship between the

16  actual losses suffered in the use of the tattoos that's not

17  speculative.  That is from the cases that we have cited to

18  you previously.

19      THE COURT:  And then Defendants' 7 on defendants'

20  profits.  That instruction is refused in lieu of the

21  Court's -- the Court will be giving Plaintiff 5.

22      Make your record.

23      MR. SIMMONS:  Your Honor, in your court -- in the

24  Court's -- in this Court's previous Order, Docket 228, it

25  indicated that plaintiff must prove a causal connection or

1   nexus between the infringement and defendants' gross

2   revenues.

3          Given the Court's prior Order, we think that it is

4   important to instruct the jury on that issue which is not

5   reflected in the Order the Court intends to adopt.  That is

6   also from *Bell versus Taylor*, which is the Seventh

7   Circuit's 2016 decision, 827 F.3d 699.

8          In addition -- I can take up a second issue, if

9   you'd --

10         THE COURT:  Go ahead.

11         MR. SIMMONS:  We also believe that the instruction

12   should include a instruction on how you deal with profits

13   that are attributable to the material -- the alleged

14   infringing material as proposed in our instruction.

15         And that the jury be instructed that delay may be a

16   factor in determining disgorgement of profits.  That comes

17   from the Supreme Court's decision in *Patrella versus MGM*,

18   where the Supreme Court specifically said that delay is

19   relevant to disgorgement of profits.

20         THE COURT:  Again, the position objection is noted

21   for the record.  I would just reiterate that the Court's

22   whole purpose in instructing the jury is to instruct them

23   accurately on the law, as brief and concisely as possible,

24   and not to do so in such a way that would be further

25   confusing, and that is what -- that's what the Court

1    intends to do.

2          And so, I recognize that there are many correct

3    statements of the law that have been proposed by the

4    parties.  But because it may be a correct statement of the

5    law does not mean that it is appropriate, necessary, or

6    even wise to instruct the jury on every accurate statement

7    of the law.

8          So, all of the objections and positions are noted,

9    except we need to talk about the verdict form.

10          I'm using a modified version of the defendants'

11    verdict form.  And basically the modification, the

12    defendant had two steps at every point.  In other words, do

13    you find that plaintiff has proven actual damages, and then

14    you go to, if so, X, Y, Z.

15          Again, I think just to make it more direct and less

16    confusing -- although, I do have one revision.

17          So, Question No. 1 would be as the defendants

18    proposed:  As to the five tattoos in question, do you find

19    that defendants have proven that their use was authorized?

20          As to Question No. 2 --

21          MR. SIMON:  Your Honor?  That's what I was saying

22    before.  That's the implied license that's no longer in the

23    case.

24          THE COURT:  Okay.  I'm sorry.

25          Michelle, why you keep setting me up?

1      LAW CLERK:  [Nonverbal response.]

2      THE COURT:  So, paragraph one will be deleted.

3      So, paragraph one will now read:  As to the five

4  tattoos in question, do you find defendants have proven

5  that their use constituted fair use?

6      The next question will be:  As to the five tattoos

7  in question, what is the dollar amount of actual losses, if

8  any, that you find that plaintiff is entitled to recover as

9  a result of defendants' use?

10      The next question will be:  As to the five tattoos

11  in question, what is the dollar amount -- and, Michelle,

12  please, put in "if any" --

13      LAW CLERK:  Okay.

14      THE COURT:  -- of defendants' profits that you find

15  is attributable to their use?

16      And that would be the questions that will be

17  submitted to the jury on the verdict form.

18      MR. SIMON:  Your Honor?  I have no objection.  I do

19  have one question, just so I don't run afoul of anything

20  you say.

21      THE COURT:  I'm sorry?

22      MR. SIMON:  I just have one question, so I don't

23  run afoul of anything you said in chambers.

24      The defendants are all combined.  I can certainly

25  argue that if the jury finds profits from WWE and profits

1    from Take-Two, they should combine them and put them in

2    that --

3         THE COURT:  You can argue the itemization.  If you

4    want to argue the itemization or what portion of the

5    defendants' profits was WWE -- yeah, you can do that.  I'm

6    saying, I wasn't going to instruct them separately to find

7    a separate verdict.

8         MR. SIMON:  I misunderstood that before.  We have

9    no objection to this form.

10        THE COURT:  Okay.

11        MR. SIMMONS:  Your Honor, I do need to note some --

12        THE COURT:  I'm sorry?

13        MR. SIMMONS:  Your Honor, I didn't get a chance to

14   note a few suggestions to the verdict form.

15        THE COURT:  This is your verdict form?

16        MR. SIMMONS:  Yes, Your Honor.  But it's been

17   modified in two ways that we think will be confusing for

18   the jury.

19        THE COURT:  Really?  Okay, go ahead.

20        MR. SIMMONS:  Yes, Your Honor.

21        First of all, in our proposed verdict form, we have

22   instructions to the jury that if they found one of our

23   affirmative defenses, they should skip the remaining

24   damages instructions.

25        One of the concerns that has been noted in the case

1    is, if you end up with a jury that both says it's fair use

2    and then puts in a number, it's hard for us to know what

3    they found, and we would want to avoid an inconsistent

4    verdict on that issue.

5          So, we would suggest including the following

6    sentence between the fair use question and the actual

7    damages.  We would just include:  "If you answered no to

8    question one, proceed to Question 2.  If you answered yes

9    to question 1, proceed to the end of the verdict form."

10         THE COURT:  That confuses me, but I understand the

11   concept.  I think we probably need to add something after

12   Question 2 that says, "If the answer is yes, then you do

13   not need to answer questions" -- whatever, whatever,

14   whatever.  As opposed to that going back and forth.

15         MR. SIMMONS:  Understood, Your Honor.

16         MR. SIMON:  No objection to that, Your Honor.

17         THE COURT:  So, Michelle, after Question 2 --

18   should it be another number or should it be --

19         MR. SIMMONS:  The way I have done it, Your Honor,

20   is to use an italicized sentence without a number, so the

21   jury's clear that that's not something for them to decide

22   but rather an instruction.

23         THE COURT:  So, we would use a bolded, italicized

24   statement, Michelle, that says:  "If your answer to

25   Question No. 2 is no, then you need not answer any further

1    questions and you may proceed to signing the verdict form"

2    or something like that.

3              MR. SIMMONS:  No, Your Honor, I think you meant --

4    two suggestions:  One, it will be Question 1, once Question

5    1 is deleted.  And then, two, I think it's "if you answered

6    yes, then you can move on."  Because if they found fair

7    use, they don't answer the damages questions.

8              THE COURT:  I'm sorry.  If you answered "yes" then

9    you don't -- then you should not answer numbers -- whatever

10   the following numbers are -- and you should proceed to

11   signing the verdict form.

12             MR. SIMMONS:  Yes, Your Honor.

13             MR. SIMON:  We agree, Your Honor.  Plaintiffs

14   agree.

15             THE COURT:  Michelle, you got that?  Although, I'm

16   not sure I trust you -- no.  Okay.

17             Okay.  So, what will happen is, we will take all of

18   this and revise and come up with the final packet of the

19   instructions that I intend to give in the morning based on

20   my rulings.  Michelle will e-mail those this evening when

21   we get them finalized, so you guys can take a look at them,

22   make sure she doesn't make anymore mistakes.

23             And then in the morning, we will make clean final

24   copies.  I provide the jurors with a copy to follow along

25   with as I read the instructions, because some people like

1    to follow along.  So, they will have their own copies.

2            I will read the instructions and then we will

3    proceed with closing arguments.

4            Counsel, how long do you anticipate -- or do you

5    think you need for closing arguments tomorrow?

6            MR. SIMON:  I'm -- it won't be an hour.  Maybe 45

7    minutes to an hour.

8            THE COURT:  Defendants?

9            MS. CENDALI:  I think that's about right, Your

10   Honor, for us, too.

11           THE COURT:  Which one?  45 minutes?  An hour?

12           MS. CENDALI:  More likely an hour since, you know,

13   there's two parties and stuff.

14           THE COURT:  Well, both parties should have the same

15   amount of time, whether you use it or not.  So, we'll just

16   say an hour.  Although, I'm sure you guys have noticed

17   they're already glazed over, so -- but an hour.  You don't

18   have to use it all, of course.  And let Stacie know how you

19   want that split up and any warnings that you would like.

20           MR. SIMON:  And, Your Honor, is your procedure,

21   plaintiff will go first and then defendants, and then I

22   rebut?

23           THE COURT:  Yes.

24           MR. SIMON:  Thank you.

25           MS. CENDALI:  And, Your Honor, on that rebuttal

1    point, could we -- obviously, the rebuttal should not raise

2    anything new, as I understand the -- Your Honor's rules on

3    this.  Can we -- is that going to be clear?

4        THE COURT:  I think the Federal Rules of Procedure

5    are clear in terms -- I mean, everybody knows what rebuttal

6    is.  They, obviously, can't raise anything new.  I'm not

7    sure what you -- what you're asking me.

8        MS. CENDALI:  Well, I just want to make sure we're

9    not in one of those situations where somebody, you know,

10   reserves like a half-hour for rebuttal and then it's really

11   not a rebuttal.

12       THE COURT:  They can reserve as much time as they

13   want for rebuttal.  And as long as it's rebuttal, it's

14   rebuttal.  But I'm not putting any guardrails on that.  If

15   they go outside, you'll object.

16       But I -- I've never had to instruct lawyers on

17   that, Miss Cendali.  I think all the lawyers know what the

18   purpose of the rebuttal is, that they can't raise new

19   issues.  But I'm certainly not going to tell any party how

20   much time they reserve.  If he wants to do 30 minutes and

21   30 minutes, he can do 30 minutes and 30 minutes.

22       MS. CENDALI:  And, Your Honor, another just

23   question?  The transcripts so far have been understandably

24   marked not yet final, not to be --

25       THE COURT:  What transcripts are you talking about?

1          MS. CENDALI:  The trial transcripts of the court's

2   proceedings every day.  They're not yet final transcripts

3   and they're -- does that mean we can't quote from them?

4          THE COURT:  First of all, the jury -- no.  No, you

5   cannot.

6          They're rough, aren't they, Chris?

7          THE REPORTER:  Yes.

8          THE COURT:  Yeah.  No, you cannot.

9          Okay.  Anything else?  Yes, Mr. Nester?

10          MR. NESTER:  I just wanted to make sure that I

11   understood you.  Your process is to instruct the jury prior

12   to --

13          THE COURT:  First, yes.

14          MR. NESTER:  -- oral argument.  Okay.  That's

15   different than I suspected.

16          And then, Your Honor, one other issue.  I note that

17   with regard to -- I think it's Jury Instruction No. 1 --

18   you have deleted the reference to sympathy and, and that's

19   in the bracketed portions of the Seventh Circuit

20   instruction.

21          THE COURT:  I didn't.

22          MR. NESTER:  And, Your Honor, I just want to make

23   sure that would not foreclose defense counsel to make an

24   argument that would address sympathy and I'm just

25   suggesting --

1          THE COURT:  I don't -- I did not intend to -- what
2    instruction are you talking about?
3          MR. NESTER:  Judge --
4          THE COURT:  Which instruction, Mr. Nester?
5          MR. NESTER:  I think it's the very first
6    instruction, Your Honor.
7          MR. SIMMONS:  Your Honor, it's Jury Instruction
8    No. 1, and Mr. Nester's referring --
9          THE COURT:  The Court's Instruction?
10          MR. NESTER:  Yes, Your Honor.
11          MR. SIMMONS:  Yes, Your Honor.  And the Seventh
12    Circuit's model's 1.01.
13          MR. NESTER:  Thank you, Josh.
14          THE COURT:  I'm not understanding what they're
15    asking, Michelle.  What are we talking about here?  What --
16    what Seventh Circuit instruction?  These are our standard
17    instructions, so --
18          MR. NESTER:  Your Honor, it's Instruction 1.01,
19    functions of the -- entitled Functions of the Court and the
20    Jury.
21          LAW CLERK:  They're talking about the bracketed
22    material which says "perform these duties fairly and
23    impartially" and there's brackets that say "do not allow
24    sympathy/prejudice/fear/public opinion to influence you."
25    We don't use that --

1    THE COURT:  Unless there's a specific issue.

2    LAW CLERK:  Right.

3    MR. NESTER:  And, Your Honor, my only question is

4    this:  Given the fact that that has been deleted, I want to

5    make sure that we don't run afoul of the Court if we make

6    an argument to the jurors that this is a court of law and

7    it is not a court of sympathy, or something to that effect.

8    THE COURT:  Are you going to also tell them it's

9    not a WWE production?  We want to make sure they know that,

10   too.  But hold on.

11       I did not realize that we -- we don't always take

12   that out.  We take out -- for instance if -- like

13   prejudice.  We take that out, unless there's a specific

14   issue.  I have no problems with sympathy being in there.

15   In fact, I think it's appropriate in this case.

16   MR. SIMON:  Plaintiff has no objection, Your Honor.

17   THE COURT:  So, read it to me again.  What's the

18   bracket?

19   LAW CLERK:  The bracket says, "Do not allow

20   sympathy/prejudice/fear/public opinion to influence you."

21   THE COURT:  I think sympathy is sufficient.

22   MR. NESTER:  Thank you, Your Honor.  That addresses

23   my issue or concern.

24   THE COURT:  We'll put sympathy back in there.

25       It's Michelle, Mr. Nester.  It's Michelle.  I

1    wasn't aware -- she's just taking stuff out and I'm like --

2    Michelle, you don't even have the right -- the citation to

3    the Pattern Instruction.  You took that out, too?

4        LAW CLERK:  I don't know why that's not in there.

5        THE COURT:  Okay.  Anyway.  Anything else?

6        MR. SIMON:  Not from the plaintiffs, Your Honor.

7        THE COURT:  So, again, we have asked the jurors to

8    be here at 8:45 and we intend to start with my instructions

9    right at 9:00.  I'll be here at 8:30, again.

10       MR. SIMON:  Thank you.

11       MS. CENDALI:  Thank you, Your Honor.

12       THE COURT:  Have a good evening.

13       (Court adjourned at 5:07 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                            <u>R E P O R T E R' S   C E R T I F I C A T E</u>

2          I, Christine Dohack LaBuwi, RDR, CRR, Official

3    Court Reporter for the U.S. District Court, Southern

4    District of Illinois, do hereby certify that I reported

5    with mechanical stenography the proceedings contained in

6    pages 528-781; and that the same is a full, true, correct

7    and complete transcript from the record of proceedings in

8    the above-entitled matter.

9

10            DATED this 8th day of October, 2022,

11

12                        *s/Christine Dohack LaBuwi, RDR, CRR*
                          _____
13                        Christine Dohack LaBuwi, RDR, CRR

14

15

16

17

18

19

20

21

22

23

24

25