1          UNITED STATES OF AMERICA
            SOUTHERN DISTRICT OF ILLINOIS
2

3   CATHERINE ALEXANDER,            )
                                    )
4              Plaintiff,           )
    v.                              ) No. 3:18-cv-00966-SMY
5                                   )
    TAKE-TWO INTERACTIVE SOFTWARE,  )
6   INC., et al.,                   ) *East St. Louis, IL*
                                    )
7              Defendants.          )

8

9

10

            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11                    DAY 5 OF 5

12      BEFORE THE HONORABLE STACI M. YANDLE
            UNITED STATES DISTRICT JUDGE
13

            September 30, 2022
14

15

16

17

18

19

20

21  REPORTED BY:      Christine Dohack LaBuwi, RDR, CRR
                      Official Court Reporter
22                    301 West Main Street
                      Benton, Illinois  62812
23                    (618) 439-7725
                      Christine_Dohack@ilsd.uscourts.gov
24

    Proceedings recorded by mechanical stenography, produced by
25  computer-aided transcription.

```
 1    VIDEO CONFERENCE APPEARANCES:

 2    FOR PLAINTIFF:      R. Seth Crompton, Esq.
                          HOLLAND LAW FIRM
 3                        300 N. Tucker Blvd., Suite 801
                          St. Louis, MO  63101
 4                        314) 241-8111
                          scrompton@allfela.com
 5
                          Anthony R. Friedman, Esq.
 6                        Anthony G. Simon, Esq.
                          Paul J. Tahan, Esq.
 7                        SIMON LAW FIRM, P.C.
                          800 Market Street, Suite 1700
 8                        St. Louis, MO  63101
                          (314) 241-2929
 9                        afriedman@simonlawpc.com
                          asimon@simonlawpc.com
10                        ptahan@simonlawpc.com

11

12    FOR DEFENDANTS TAKE-TWO INTERACTIVE SOFTWARE, INC.; 2K
      GAMES, INC.; 2K SPORTS, INC.; and VISUAL CONCEPTS
13    ENTERTAINMENT:

14                        Dale M. Cendali, Esq.
                          Christopher Ilardi, Esq.
15                        Joshua L. Simmons, Esq.
                          Miranda D. Means, Esq.
16                        KIRKLAND & ELLIS, LLP
                          601 Lexington Avenue
17                        New York, NY  10022
                          (212) 446-4800
18                        dale.cendali@kirkland.com
                          chris.ilardi@kirkland.com
19                        joshua.simmons@kirkland.com
                          miranda.means@kirkland.com
20
                          Michael J. Nester, Esq.
21                        DONOVAN ROSE NESTER, P.C.
                          151 North 1st Street, Suite A
22                        Belleville, IL  62220
                          (618) 212-6500
23                        mnester@drnpc.com

24

25
```

1

FOR DEFENDANT WORLD WRESTLING ENTERTAINMENT:

2

3                          Curtis B. Krasik, Esq.
                           K & L GATES, LLP
                           210 Sixth Avenue
4                          Pittsburgh, PA  15222
                           9412) 355-8696
5                          curtis.krasik@klgates.com

6                          Michael J. Nester, Esq.
                           DONOVAN ROSE NESTER, P.C.
7                          151 North 1st Street, Suite A
                           Belleville, IL  62220
8                          (618) 212-6500
                           mnester@drnpc.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

2

PAGE:

3

Court Instructions by the Court          787:7
4    Closing Argument by Mr. Simon             796:11
Closing Argument by Ms. Cendali           823:15
5    Closing Argument by Mr. Krasik            849:8
Closing Argument by Mr. Simon (rebuttal)  860:20
6    Court Instructions by the Court          868:12
Verdict                                   870:18

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings began in open court at 9:00 a.m., jury

2    present.)

3    COURTROOM DEPUTY:  The Court calls Case No.

4    18-CV-966, *Alexander versus Take-Two Interactive Software*

5    *Inc., et al.*  This matter is called for Day Five of jury

6    trial.

7    Would the parties please state your presence for

8    the record, beginning with plaintiff?

9    MR. SIMON:  Good morning, Your Honor.  Tony Simon,

10   Paul Tahan, Tony Friedman, and Seth Crompton for Miss

11   Alexander, the plaintiff.

12   THE COURT:  Good morning, counsel.

13   Good morning, Miss Alexander.

14   MS. CENDALI:  And good morning, Your Honor.  Dale

15   Cendali, Josh Simmons, Chris Ilardi, Miranda Means, and

16   Yungmoon Chang on behalf of the Take-Two defendants, along

17   with our co-counsel Michael Nester.

18   MR. KRASIK:  Good morning, Your Honor.  Curt Krasik

19   on behalf of WWE.

20   THE COURT:  Good morning, counsel.

21   And good morning, ladies and gentlemen.

22   JURORS [in unison]:  Good morning.

23   THE COURT:  I'm about to read the instructions to

24   you on the law, and we have provided you with copies that

25   you may follow along with.  You don't have to.  Some people

1    like to do that, as I read them.  But you don't have to

2    memorize these.  You will have the instructions back with

3    you in the jury room for your deliberations.

4        I'm going to read the main instructions.  And then

5    after counsel give their closing arguments, I'll wrap it up

6    with four final instructions.

7        Members of the jury, you have seen and heard all

8    the evidence.  Now I will instruct you on the law, and then

9    you will hear the arguments of the attorneys.

10        You have two duties as a jury.  Your first duty is

11   to decide the facts from the evidence in the case.  This is

12   your job and yours alone.

13        Your second duty is to apply the law that I give

14   you to the facts.  You must follow these instructions, even

15   if you disagree with them.  Each of the instructions is

16   important, and you must follow all of them.

17        Perform these duties fairly and impartially.  Do

18   not allow sympathy to influence you.

19        Nothing I say now, and nothing I said or did during

20   the trial, is meant to indicate any opinion on my part

21   about what the facts are or about what your verdict should

22   be.

23        In this case, the defendants are corporations.  All

24   parties are equal before the law.  A corporation is

25   entitled to the same fair consideration that you would give

1    any individual person.

2         The evidence consists of the testimony of the

3    witnesses, the exhibits admitted in evidence and

4    stipulations.

5         A stipulation is an agreement between both sides

6    that certain facts are true.

7         Certain things are not to be considered as evidence

8    and I will list them for you:

9         First, if I told to you disregard any testimony or

10   exhibits or struck any testimony or exhibits from the

11   record, such testimony or exhibits are not evidence and

12   must not be considered.

13        Second, anything that you may have seen or heard

14   outside the courtroom is not evidence and must be entirely

15   disregarded.

16        Third, questions and objections or comments by the

17   lawyers are not evidence.  Lawyers have a duty to object

18   when they believe a question is improper.  You should not

19   be influenced by any objection, and you should not infer

20   from my rulings that I have any view as to how you should

21   decide the case.

22        Fourth, the lawyers' opening statements and closing

23   arguments to you are not evidence.  Their purpose is to

24   discuss the issues and the evidence.  If the evidence as

25   you remember it differs from what the lawyers said, your

memory is what counts.

Certain demonstrative exhibits have been shown to you. Those demonstrative exhibits are used for convenience and to help explain the facts of the case. They are not themselves evidence or proof of any facts.

THE COURT: I'm sorry. Juror No. 2, do you want some water?

JUROR NO. 2: (Nonverbal response.)

THE COURT: Okay. Continuing on then.

Any notes you have taken during this trial are only aids to your memory. The notes are not evidence. If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

I have a duty to caution or warn an attorney who does something that I believe is not in keeping with the rules of evidence or procedure. You are not to draw any inference against the side whom I may caution or warn during the trial.

In determining whether any fact has been proved, you should consider all of the evidence bearing on the question regardless of who introduced it.

You should use common sense in weighing the

evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists.  In law, we call this "inference."  A jury is allowed to make reasonable inferences.  Any inference you make must be reasonable and must be based on the evidence in the case.

You may have heard the phrases "direct evidence" and "circumstantial evidence."  Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact.  Circumstantial evidence is proof of a fact, or a series of facts, that tends to show that some other fact is true.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining."  Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  You should decide how much weight to give to any evidence.  In reaching your verdict, you should consider all of the evidence in the case, including the circumstantial evidence.

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all.  You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

The ability and opportunity the witness had to see, hear, or know the things the witness testified about;

The witness's memory;

Any interest, bias, or prejudice the witness may have;

The witness's intelligence;

The manner of the witness while testifying; and,

The reasonableness of the witness's testimony in light of all the evidence in the case.

You may consider statements given by witnesses under oath before trial as evidence of the truth of what they said in the earlier statements, as well as in deciding what weight to give their testimony.

With respect to other witnesses, the law is different.  If you decide that, before the trial, one of these witnesses made a statement that is inconsistent with their testimony here in court, you may consider the earlier statement only in deciding whether their testimony here in

1    court was true and what weight to give to their testimony

2    here in court.

3         You may find the testimony of one witness or a few

4    witnesses more persuasive than the testimony of a larger

5    number.  You need not accept the testimony of the larger

6    number of witnesses.

7         The law does not require any party to call as a

8    witness every person who might have knowledge of the facts

9    related to this trial.  Similarly, the law does not require

10   any party to present as exhibits all papers and things

11   mentioned during this trial.

12        When I say a particular party must prove something

13   by a "preponderance of the evidence," or when I use the

14   expression "if you find," or "if you decide," this is what

15   I mean:  When you have considered all the evidence in the

16   case, you must be persuaded that it is more probably true

17   than not true.

18        The parties have stipulated, or agreed, to the

19   following facts:

20        1.  World Wrestling Entertainment or "WWE" is an

21   entertainment company that creates and promotes

22   entertainment related to professional wrestling.

23        2.  Randy Orton has been a professional wrestler

24   for the WWE.

25        3.  Catherine Alexander has been a tattooist.

4.   Ms. Alexander inked five tattoos on Mr. Orton.

5.   Plaintiff and Mr. Orton did not discuss whether he had her permission to allow others to use the tattoos that Ms. Alexander inked on him in a video game.

6.   Take-Two Interactive publishes and markets video games.

7.   2K Games develops and publishes video games.

8.   2K Sports develops video games.

9.   Visual Concepts develops video games.

10.  WWE 2K16 was released on or about October 27, 2015.

11.  WWE 2K17 was released on or about October 11, 2016.

12.  WWE 2K18 was released on or about October 17, 2017.

13.  On April 17, 2018, Ms. Alexander filed this copyright infringement lawsuit.

You must now treat these facts as having been proved for the purpose of this case.

Plaintiff claims that defendants have infringed plaintiff's copyright in the five tattoos at issue by copying them into their video games.

The Court has previously ruled that the five tattoos in question are the subject of valid copyrights, that plaintiff owns the copyrights, and that the defendants

1  copied plaintiff's copyrighted works.

2      Defendants contend that their copying is allowed

3  under what the law calls "fair use."  To succeed on this

4  affirmative defense, defendants must prove that they made

5  fair use of plaintiff's works, including for purposes such

6  as of:  criticism, parody, comment, news, reporting,

7  teaching, scholarship, and/or research.

8      In deciding this, you should consider the

9  following:

10      The purpose and character of defendants' use,

11  including whether defendants' use is of a commercial nature

12  or is for nonprofit educational purposes;

13      The nature of the copyrighted works;

14      The amount and substantiality of the portion used

15  in relation to the copyrighted works as a whole; and

16      The effect of the use upon the potential market for

17  or value of the copyrighted works.

18      It is up to you to decide how much weight to give

19  each factor.

20      If you find that defendants have proved this

21  affirmative defense by a preponderance of the evidence,

22  then you must find for defendants and you will not consider

23  the question of damages.

24      If you find that defendants have not proven their

25  affirmative defense, then you must find for the plaintiff

1  and you must consider the amount of damages, if any,
2  plaintiff is entitled to recover.
3        Plaintiff must prove damages by a preponderance of
4  the evidence.
5        Plaintiff may recover for any actual losses she
6  suffered because of the infringement plus any profits that
7  defendants made from the infringement.  I will define these
8  terms in the following instructions.
9        Examples of actual losses from copyright
10  infringement include:
11        A decrease in the market value of the copyrighted
12  work caused by the infringement.
13        Profits that plaintiff proves she would have made
14  without the infringement.  Profits are the revenue
15  plaintiff would have made on sales she would have made
16  without the infringement, less any additional expenses she
17  would have incurred in making the sales.
18        What a willing buyer reasonably would have paid to
19  obtain a license to copy plaintiff's copyrighted works.
20        In addition to actual damages, plaintiff is
21  entitled to recover the profits that she can prove
22  defendants made that are attributable to the infringement.
23  Defendants' profits are recoverable, however, only to the
24  extent that you have not taken them into account in
25  determining plaintiff's actual losses.

1    Defendants' profits are revenues that defendants

2    made because of the infringement, minus defendants'

3    expenses in producing the video games.

4    Plaintiff need only prove defendants' revenues.

5    Defendants must prove their own expenses and any portion of

6    their profits that resulted from factors other than

7    infringement of plaintiff's copyright.

8    And with that, we are ready to proceed with closing

9    arguments.

10    First, on behalf of the plaintiff.

11    MR. SIMON:  Your Honor, may we have the verdict

12    form to use during our argument?

13    THE COURT:  You may.

14    MR. SIMON:  Okay.  I don't have one.

15    THE COURT:  Oh, okay.

16    MR. SIMON:  Thank you.

17    Good morning.  It's an honor and a privilege to

18    represent my client Miss Alexander and to present our case

19    to you all.

20    Everything we have done for the past five years in

21    this case was to get here to today to present our case to

22    you.  And as the Court noted in the beginning of this

23    trial, the right to a jury trial is rooted in our

24    Constitution, and that's why we're here, because my client,

25    Miss Alexander, wants to have this case decided by a jury

1    of her peers.

2         You heard evidence that, in 2009, she tried to get

3    the defendants to not to copy her tattoos and told them she

4    had rights in them, and they humiliated her.  Her only

5    recourse later, when she found out that they copied her

6    tattoo designs -- copyrighted tattoo designs -- into their

7    video games, her only recourse was to file this lawsuit.

8         Because here in this courtroom, she's on equal

9    footing.  As the judge's instructions said, corporations

10   and individuals in court are equal.  But out in the real

11   world, she's not equal to them.

12        Now, that right to be here can only happen because

13   you all took the time out of your busy schedules to spend a

14   week with us, and so Miss Alexander and I really want to

15   thank you for taking the time.  And after five years, our

16   job is almost done and your jobs as judges of the facts

17   will begin.

18        Now, in the instructions, I'm not going to

19   highlight or put them up, but I just want to point out a

20   few things that were just read.  You all are judges of the

21   facts from the evidence in this case.  You have to follow

22   the instructions even if you disagree with them, and we ask

23   you to consider all the evidence.  That's what the

24   instruction says.

25        Use your common sense and your own observations in

1    real life.  You all get to decide whether the testimony of

2    a witness is truthful and accurate.  And the instruction

3    says you can believe part of it, all of it, or none of it.

4    And you can consider if a witness is interested or biased,

5    and what their demeanor was on the stand when they

6    testified.  And most importantly in this case, how

7    reasonable was the testimony in light of all the evidence.

8            Now, there's one thing I want to address before I

9    move on.  As you heard, my client's claims in this case is

10   that they copied her copyrighted tattoos in the video

11   games.

12           I have highlighted this because I want to focus on

13   a couple points.

14           The Court has previously ruled that the five

15   tattoos in question are the subject of valid copyrights --

16   and this is on page 18 of your instructions that you have.

17           The five tattoos are the subject of valid

18   copyrights.  My client, Miss Alexander, owns the

19   copyrights, and defendants copied the copyrights.  Those

20   issues have all been decided.

21           So, when you are deliberating, if anyone says,

22   *well, I don't know if she owns those copyrights; I don't*

23   *know if tattoos can be copyrighted; I don't know if they*

24   *really copied.*  Bring them to page 18 and say, those issues

25   are already decided by the Court.

1    The only issues for you to decide were the three

2    that Her Honor just read.  Their defense that their copying

3    is fair use, and if not, actual damages and defendants'

4    profits attributable to the use of the tattoos in the video

5    games.  And that's all I'm going to talk about because

6    that's all that's relevant here.

7    I'm going to put on the screen now the fair use

8    instruction that Her Honor just gave, and that's what I

9    want to talk about first.

10    So, their defense is what the law calls "fair use."

11    To succeed, they have to prove to you that they made fair

12    use of the works, including for purposes such as of:

13    Criticism, parody, comment, news, reporting, teaching,

14    scholarship, or research.

15    And, ladies and gentlemen, even though they have

16    the burden?  We have proven it to you.  It's not fair use.

17    And I'm going to go through that.

18    The first thing I want to point out is, you heard

19    no evidence that what they're doing is criticism, parody,

20    comment, news, reporting, teaching, scholarship, or

21    research.

22    There's four factors listed for fair use.  The

23    first is the purpose and character of the use, including

24    whether defendants' use is of a commercial nature or it's

25    for nonprofit educational purposes.  Another instruction

1    you got were stipulated facts.  There's a fact in there for

2    each defendant that they're a commercial entity.  They're a

3    for-profit entity.  There's no dispute that that factor is

4    in my client's favor, so they can't prove it.

5         The second factor is the nature of the copyrighted

6    works.  And this factor is about whether the tattoos she

7    created are creative, whether they're artistic.  And I want

8    to bring you back to the witnesses on the stand.  And the

9    witness I want to talk about is Mr. Orton.  Now, he didn't

10   like me very much, but he still said that my client is a

11   bad ass tattoo artist.  He stuck with her from 2002 to

12   2009.  He said she's a really good tattoo artist.  That his

13   first tattoos were flash from off the wall and they looked

14   like stamps.  And Cat made his tattoos rhyme.  Cat made

15   Randy feel comfortable in his tattoos.  And he said all

16   that, even though he said she's trying to take money from

17   his children's mouths.  He still agreed they were creative.

18        If we could pull up slide one, please.

19        This is Plaintiff's Exhibit 25.  And what we have

20   done is, I have just taken a couple parts because it's a

21   multiple-page document.  This is WWE -- defendant's website

22   -- and they call it, "The 20 Coolest Tattoos in WWE

23   History."

24        One of the points of emphasis for a strong tattoo

25   is how well the lines follow the natural contours of the

1    body.  Randy Orton's tribal design definitely accomplishes

2    this by coiling around The Viper's neck -- that's his

3    nickname -- shoulders and upper back.  The tattoo also

4    complements Orton's signature full sleeves, which are

5    strewn with various skulls down his arms.

6         They're admitting here that Miss Alexander's

7    tattoos that are on Mr. Orton are creative.  This is the

8    factor.  So, this factor also 100 percent favors Miss

9    Alexander.  So, that's factor two.

10        Factor three -- and you'll have these instructions,

11   as the Court said, when you are deliberating if you need to

12   refer to them.

13        Factor three is the amount and substantiality of

14   the portion used in relation to the copyrighted works as a

15   whole.  How much of the works did they copy?  The answer is

16   100 percent of every single one of them.  This factor is in

17   favor of my client.

18        And then the last factor is the effect of the use

19   upon the potential market for the value of copyrights.

20   Now, from the evidence in this case, we do know that

21   licenses for tattoos existed back when defendants first

22   started copying.  Mr. Little -- who didn't come to court --

23   testified in the deposition that we played for you -- he

24   works for Take-Two -- that they did license tattoos from

25   artists.

1    Mr. Brody was on the stand. And when I asked him

2    that question, he wouldn't call them tattoos, he called

3    them imagery. But he did say they paid for tattoos.

4    Now, what's the effect that if you find that what

5    they are doing is fair use and it's not copyright

6    infringement? What's it going to have on the market for my

7    client's tattoos? They're trying to prevent the market.

8    That's their whole purpose. They want to copy everybody's

9    tattoos in their video games. They're one of the biggest

10   video game companies in the country and they don't want to

11   pay them.

12   Do you remember when I asked Mr. Brody, *Did you ask*

13   *Mr. Orton who her tattoo artist was, so you could pick up*

14   *the phone and call her?* And he said, *we would never do*

15   *that.* You know why? Because he doesn't want to do that.

16   He doesn't want to have to start paying for tattoo artists'

17   copyrighted works. And that's why we're here. That's why

18   we're here.

19   So, all the fair use factors are in Miss

20   Alexander's favor. And even though they have the burden to

21   prove it, we instead proved it to you because we wanted to.

22   If we could go to -- oh, I'm sorry. It's my slide

23   next.

24   This is another instruction. So, it says: If you

25   find -- and this is instruction on page 20.

1    If you find defendants have not proven their

2    affirmative defense -- that's fair use -- then you must

3    find for the plaintiff.

4    And on the verdict form, what that means is --

5    you're going to get this form that you're all going to fill

6    out and sign at the end of the case, once you make your

7    decision.  And that's -- that's Question 1.  And it's going

8    to say:  As to the five tattoos, do you find the defendants

9    have proven that their use constituted fair use?

10    You are going to check "no" because they haven't

11    proven it.  We have proven that it's not fair use.  And

12    then it says, If your answer to Question No. 1 is yes, you

13    don't do anything else.  But since your answer's no, you

14    are then going to consider actual losses, and then

15    defendants' profits that you find is attributable to their

16    use.

17    And I'm going to come back to that on the verdict

18    form.

19    So, I'm going back to page 20 of the instructions.

20    I got the burden to prove by a preponderance of the

21    evidence -- that means more probably true than not true --

22    that, what the actual losses she suffered, plus any profits

23    defendants made from the infringement.  And she has defined

24    them, the Court, and we're going to look at that and we're

25    going to prove it to you.  I mean, I'm going to explain it

1  to you.  We have already proven it, but I'm going to go

2  through that.

3          So, I'm going to start with actual damages.  So,

4  here is the actual damages on the verdict form.  And

5  they're called here, examples of actual losses from

6  copyright infringement.  So, just to make clear for

7  everybody, my client has the right to recover, if it's not

8  fair use, actual losses and defendants' profits.

9          And one point I do want to make on this verdict

10 form -- I want to go back to the verdict form just for a

11 minute.  All the defendants are lumped together here, so --

12 and I'm going to go through our math with you.  But just so

13 you know, so the actual losses against all the defendants

14 would be in line two.  And then in line three here, this

15 will be the defendants' profits.  And that's both WWE's

16 profits plus the Take-Two company's profits.  And I'm going

17 to walk through that.

18         But first, I want to talk about actual damages or

19 actual losses.  And I want to do this to save some time,

20 because I think they're going to get up here and they're

21 going to say, *She didn't lose any money.  She got free*

22 *advertisement from Mr. Orton.*  And I'm here to tell you,

23 we're not claiming that.  She testified on the stand.  Not

24 what the case is about.

25         So, number two here, profits that she would have

1    made from that?  That's not what we're claiming here.

2         Here's what we're claiming for actual damages.

3    Number three.  And these are examples that are given in the

4    instruction.  What a willing buyer reasonably would have

5    paid plaintiff to obtain a license to copy plaintiff's

6    copyrighted works.

7         Okay.  What a willing buyer reasonably would have

8    paid.  And that word "willing" means they would have been

9    willing to pay it five years ago, before we ever came in

10   here and had to fight five years.  If they sat down at the

11   table, if they'd have picked up the phone and said, *what*

12   *are you willing to license us your tattoos for?*

13        And I want you to consider all the evidence.  How

14   important were putting the tattoos into the infringing

15   games?  That has a value to the defendants.  They wanted to

16   put them in the infringing games.  Every one of their

17   witnesses said, we want to.  They stood up here in opening

18   statement and said, *we always copy the tattoos.  We have to*

19   *copy the tattoos.  We want it to be realistic.*  So, that's

20   really not disputed that they wanted that.  How important

21   was it?  What's the value of -- to be able to do that?

22        The first point is, if they didn't copy, WWE would

23   have never given Take-Two the right to sell a single video

24   game.  And here's the testimony -- if you go slide 10,

25   please.

1        This is Mr. Kiang.  And Mr. Kiang was working for

2   WWE when we took his deposition.  And he answered this

3   question and we played it for you in the video.

4        My question is:  "Is it accurate to say that,

5        without WWE approval, Take-Two cannot have utilized

6        the WWE intellectual property?"

7        And the answer is:  "Correct.  Without the license,

8        they could not use the IP that WWE owns and

9        controls."

10       Slide 11, please.

11       "Because without WWE's approval, the Randy Orton

12       talent model would not have appeared in the

13       marketed video games, isn't that right?"

14       "That's correct."

15       Slide 12, please.

16       "So, had that Orton talent model been submitted to

17       the WWE without any tattoos, would WWE have

18       approved it?"

19       "No, it would not have been approved for the uses

20       that are, you know, within the standard play of the

21       game."

22       Slide 13.

23       "All right.  Given the way in which the Orton

24       character appears in the WWE 2K games, had the

25       Orton character talent model been submitted with

1          tattoos that were different from the tattoos that

2          Mr. Orton has in real life, would the WWE have

3          rejected that talent model?"

4          "That's correct."

5          So, that's the testimony of Mr. Kiang.  He came

6  live.  He was the one that was laid off.  They didn't bring

7  anybody else from the WWE, just Mr. Kiang.  And he could

8  have corrected that or changed that testimony.  He didn't.

9  He agreed.  So, there's no question, it's undisputed in the

10  evidence that's in front of you that if they didn't copy

11  the tattoos, they couldn't have sold a single game.

12          Then, Dr. Zagal.  There's another value.  What is

13  the value?  Why do they want those tattoos?

14          Dr. Zagal?  He testified, realism and authenticity

15  drive game sales.  Heck, even Mr. Brody said that.  Absent

16  the realism and authenticity, bad reviews hurt sales.  WWE

17  2K fan base demands realism and authenticity.  Bogost and

18  Zagal and Brody said that.

19          Take-Two knows their fan base far better than

20  anyone knows themselves.  Bad customer reviews by fans that

21  love to go online and voice their own opinions can sink a

22  line of video games like WWE 2K.

23          I mean, people play these video games and they go

24  online and they say, *This is terrible*, or, *It's real*, or,

25  *It's good*, you know, and that helps sales or hurts sales.

1    And Randy Orton was a big part of that.  He's

2    popular.  Look at his star power.  He's a headliner.

3    Now, Mr. Brody admitted on the stand when I

4    cross-examined him yesterday, we do -- I think it was

5    called -- telemetry.  We collect data.  So, they know

6    exactly how important Mr. Orton is to their video games.

7    But did they show you any of that data in this case?

8    Nothing.  What did they do?  They paid 65,000 dollars for a

9    survey, for Dr. Jay to go ask people, 418 of them -- some

10    of whom are parents who bought the game for their kids --

11    if they bought the games because Mr. Orton's tattoos were

12    in it.

13    They hired four experts to come in here and tell

14    you that nobody cares about the tattoos.  And even without

15    the tattoos on the Randy Orton, no sales would have been

16    lost.  That's what they testified to, those four experts.

17    Bring up slide 16, please.

18    Now, I tried to get him to say how much they have

19    been paid in the case.  And the first witness -- the first

20    expert remembered, and then the next day, nobody knew how

21    many hours they worked.  But here's what I did:

22    Malackowski was 850 an hour;

23    Jablonski was 750;

24    Jay was 700, plus her 65,000-dollar survey;

25    Bogost was 500.

1    That's 2800 dollars per hour.  They sat in this

2    courtroom all day, and they worked from last weekend to

3    yesterday.  I'm guessing ten hours a day?  That's 28,000

4    dollars a day, times 7 days.  That's 196,000 dollars for

5    them to come in here and tell you those tattoos aren't

6    worth anything.

7    Now, Mr. Malackowski told you that they had zero

8    value.  Remember?  He said the way -- and this man has

9    valued thousands of pieces of IP -- patents and trademarks

10   and copyrights -- and he didn't have a single time where he

11   said, well, tell me how much storage space on a disk the

12   copyrighted work or the patent uses, and then I'll

13   calculate .0008 percent.  And however much data that is,

14   that's what the value of the tattoos are.

15   Ladies and gentlemen, that's not reasonable.  It's

16   not credible for a man charging 850 dollars an hour to

17   value the tattoos to them with that method.

18   Now I want to move on to -- I'm sorry.  Let me make

19   sure I'm not missing something.  (Pause.)  Let's move on --

20   my slides are out of order.  I apologize.

21   All right.  Now, here is the other thing I want to

22   talk about.  And this goes to common sense and

23   reasonableness.  The defendants have, throughout this case,

24   taken two opposite positions.  We watched the same evidence

25   you did.  We have to copy the tattoos to achieve

1    authenticity and realism and, therefore, it's fair use.  We

2    have to have 'em.  But if we -- if it's not fair use, we

3    shouldn't have to pay anything because nobody really cares

4    about Randy Orton's tattoos anyway.

5         Those two statements are inconsistent.  Either you

6    need the tattoos and they're worth something, or they're

7    not.  But what they want to say is, *we need 'em so it's*

8    *fair use.  Oh, but, gosh, if you find it's not fair use,*

9    *they're not worth nothing.*  And they paid their expert, Mr.

10   Malackowski, to come in here and say my client gets zero.

11   That's not reasonable.

12        Please, under the instructions it says use your

13   common sense, look at reasonableness.  At the beginning of

14   this case, I mentioned frivolous defenses, and frivolous

15   defenses lead to unreasonable results.  Of course they

16   needed to copy the tattoos.  They all admitted they needed

17   to copy the tattoos.  So, if somebody back there in

18   deliberations says, *I don't think they would have paid her*

19   *anything*, go back to the instruction.

20        And it says, on page 21:  What a willing buyer

21   reasonably would have paid plaintiff to obtain a license of

22   the copyrighted works.  So, that means a willing buyer.

23   Not this defendant.  What would a willing buyer had paid,

24   back in time, before it started, knowing what they know?

25        Now, they needed the tattoos to sell the game or

1    WWE wouldn't have approved it.  That's one factor.  We

2    talked about that.

3         How much would a willing buyer pay to obtain a

4    license to make 418 million dollars in revenue?  Because

5    that's what they made.  They made 418 million dollars in

6    revenue by selling that game.  So, if they sat down at a

7    table or called Miss Alexander and said, *Hey, we need to*

8    *get Orton's tattoos.  We know you got a copyright.  We want*

9    *to take a license.*  What would they have paid her?

10         We're not going to tell you what number should be.

11   You're the judges of the facts and we trust your judgment.

12   But I do want to make a suggestion for you to consider

13   based on the importance of the tattoos, and realism and

14   authenticity, WWE's requirement that Take-Two copy the

15   tattoos, and Miss Alexander saying she would have taken a

16   small piece of a big pie.  It's called a license.  It's a

17   royalty.  Right?

18         And what I'm going to submit to you is that a

19   willing buyer would have reasonably paid two dollars a

20   game.  Two bucks.  Two dollars.  Not very much.

21         And if you could pull up slide 10, please.

22         This was the interrogatory that was read to you

23   from WWE.  How many games were sold?  10,334,796.

24   10,334,796.

25         If you go to slide 17.

1    And I made this as a demonstrative to show you the

2    math because I didn't want to stand up here with a

3    calculator.  Actual losses.  What a willing buyer

4    reasonably would have paid, two bucks a game, times the

5    number of games sold is 20,669,592.

6    Now, ladies and gentlemen, I'm not standing here

7    telling you to give us that number.  We leave it in your

8    hands.  I'm making a suggestion that a willing buyer who is

9    going to make 418 million dollars, or nothing, who needs

10   the tattoos for realism and authenticity, wouldn't mind

11   giving two bucks a game.  If you decide it's three dollars

12   or five or a dollar?  It's your decision and we trust in

13   your judgment.

14   Now I want to talk about defendants' profits, and

15   that's slide 22 -- not slide 22.  Sorry.  It's jury

16   instruction, page 22, in your packet.

17   And I want to go slow over this because it's

18   important.  Plaintiff -- that's my client -- is entitled to

19   recover the profits she can prove defendants made that are

20   attributable to the infringement.  And defendants' profits

21   are only recoverable -- however, profits are recoverable

22   only to the extent you have not taken them into account in

23   determining plaintiff's actual losses.  That's this number.

24   (Indicating.)  Okay?  And we have the burden to prove this

25   and we welcome it.  And we've proven it to you, and I'm

1    going to show you how.

2          They -- technically, under the copyright law?  You

3    see that sentence?  "Plaintiff need only prove defendants'

4    revenues."  All I gotta do is say 418 million dollars, and

5    sit down.  I don't think that's reasonable.  Even though

6    it's their burden to say, *well, we've these other losses*

7    *and we had these other things that -- why people buy the*

8    *games.*  That's their burden, not mine, but we proved it to

9    you.

10          Okay.  I'm going to go back to the verdict form now

11   just -- this is what I talked about before, so actual

12   damages, actual losses, it's called right here?  That's

13   this one.  (Indicating.)  And then there's another line for

14   profits, and that's what I'm going to talk about next.  And

15   once you find there's no fair use, you have to go to these

16   two.

17          Okay.  So, the verdict form has both.  Now, again,

18   we watched the same evidence you did.  We all sat in this

19   courtroom for four days.  Defendants knew that they did not

20   have a license to copy Miss Alexander's copyrighted tattoos

21   because she told them in 2009, hey -- that was for sleeves,

22   but she called 'em.  WWE Legal.  Nobody denied that.

23          Mr. Brody said, *well, we went and looked to see if*

24   *there's any documents from 13 years ago and couldn't find*

25   *nothing.*  Okay.  But they didn't deny it happened.

1       And in the beginning of the case, again, I talked

2  to you about frivolous defenses.  Defendants are arguing

3  that they get to copy the tattoos because they own Randy

4  Orton's likeness and image and needed to present him in the

5  game.  They own his likeness and image.  They said that so

6  many times.

7       Pull up slide four, please.

8       These are my client's copyrighted tattoos.  That

9  ain't Randy Orton.  Not his likeness.  Not his image.  So,

10  even if they had owned his likeness and image and, and it

11  included tattoos, it doesn't give them the right to do

12  this.  What did they tell you?  And this is what I want to

13  point out.  Those -- I said, well, here I put the tattoos

14  on this guy.  And I made a mannequin, you know.  And what

15  did they tell us?  They said those are Mr. Orton's body

16  parts in the games, not your tattoos.

17       So, we went home that night and I created another

18  one.  Number five.  And let's think about, why are they

19  saying that?  Why?  Because they're trying to hide from you

20  that the tattoos are in the games, not on Randy Orton's

21  body parts.  Because if that's true, this case has nothing

22  to do with likeness and image.  Nothing.  Because they took

23  the body -- the tattoos off the body parts.

24       Frivolous defenses lead to unreasonable results.

25  This is an unreasonable result.  You remember Mr. Orton and

1   Mr. Brody testifying about this slide?  They sat there and

2   said -- well, Mr. Orton said, "You modified it" -- no, that

3   was Mr. Brody.  Mr. Orton said those are his arms.  So, I

4   thought he might say that because it's a man.  So, I made

5   another slide.

6        Go to the next slide, please.

7        This is a Custom Superstar Diva.  And lo and

8   behold, Mr. Orton sat here and told you those were his

9   arms.  And I knew he would do it because that's their

10   position, because they don't want you to know that the

11   tattoos are in the video games.  They want to hide it.

12        So, what I did -- and he didn't notice -- I took

13   his left arm tattoos and put them on the right arm.  So,

14   there's no way possible that can be his left arm because --

15   if it is? -- the tattoo wouldn't be the dove, which is on

16   his left arm, and the rose for his daughter.

17        Now, Mr. Brody took the stand and he agreed with

18   Mr. Orton's testimony.  And Randy Orton said, *Oh, well, my*

19   *arms were small because I had surgery and I couldn't work*

20   *out.*  He actually said that.  And I said, *Are you saying*

21   *that to this jury?*  And I gave him a chance to fix it.  And

22   he said, *Yeah, we'll just have to agree to disagree.*

23        So, with Mr. Brody I made another slide.

24        Go to the next one, please.

25        And this is their evidence of Randy Orton from 2002

1    to 2018.  And I asked Mr. Brody, *Are you still saying those*

2    *are his arms when he couldn't work out?*

3    Now, let me ask you this:  Is it reasonable to

4    think that when Randy Orton was home having surgery,

5    couldn't work out, he ran back to Take-Two and got in their

6    big camera thing and took a bunch of pictures just to make

7    arms for a diva?  With his tattoos on them?  That's not

8    reasonable.

9    Common sense.  Reasonableness.  Frivolous defenses

10   lead to unreasonable results.  This is an unreasonable

11   result.  Everyone knows these are not Mr. Orton's body

12   parts.  And Dr. Bogost -- at least he was honest about it.

13   Let's go to slide three.

14   That's what's in the game.  That's a canvas.  It

15   looks like skin.  It's not a body part.  It's skin.  And

16   what did Dr. Jablonski -- the one thing she did tell us for

17   700 dollars an hour -- is that you can put artwork on skin.

18   It's just like putting it on paper, it's just a different

19   canvas.  That's what's in there.  That's a copy of the

20   copyrighted tattoos in the games, not on anybody at all,

21   and certainly not on Randy Orton's.

22   And then go to Exhibit 8.

23   And Dr. Bogost showed us a pretty nifty slide.  I

24   used it.  I'm going to use it right here.  And if you could

25   animate it, please?

1    (Video playing.)

2    That's how you get Randy Orton.  You make a

3 mannequin thing and then you put the tattoos on him.  And

4 that's how you get the diva.  You take those same tattoos

5 that aren't on Randy Orton and you put them on a

6 diva-shaped one of those things.  That's pretty nifty.  But

7 it's not Randy Orton.  And the tattoos are in the game, not

8 on Randy Orton.

9    And by the way, Dr. Malackowski's saying that -- if

10 you could go back to the beginning of the slide, please?

11    (Video playing.)

12    Those two -- stop.  Pause it, please.

13    These two arm -- the two -- the two skins with the

14 tattoos on 'em?  That's the .0008 percent and how much

15 storage space they take in the disk when you buy it.

16 That's why they use that calculation.

17    And we asked Dr. Bogost, why did you do that

18 calculation?  *I don't know, I was just asked to determine*

19 *data.  I'm not saying what the value is.*  Okay.  But the

20 850-dollar-an-hour man told you that.

21    Now, I don't say this many times, but I think it's

22 fair to say that some of the testimony in this case was

23 untruthful.  And, ladies and gentlemen, you are the judges

24 of the facts.  And they didn't lie to me.  They were lying

25 to you.  And if they weren't untruthful, that's a frivolous

1    defense and it's going to lead to unreasonable results.

2        Another defense that you heard over and over and

3    over:  How many times did I have to come up here and

4    confirm with a witness what my client's not claiming?  I

5    said:  *You understand my client's not claiming, we're*

6    *telling Randy Orton what to do with his body.*

7        No, we don't understand that.

8        *We're not saying he can't be in photos, on*

9    *flipflops, you know, on TV, on posters.*  Not our case.  Not

10    our case.

11        Ask yourself why they're arguing those defenses?

12    Maybe they don't want you to focus on the evidence that

13    we're putting on.  Maybe they're trying to hide that fact.

14        Defendants told you in opening statement, they

15    always copy all the tattoos in the games, and they said

16    they had to do it.

17        Exhibit slide 9, please.

18        This is Mr. Brody's examination on my

19    cross-examination.  This is the WWE wrestler Chris Jericho.

20    His real life tattoo's an album cover from a band called

21    Iron Maiden.  He said that.  He recognized it.  When they

22    copied Chris Jericho's tattoos into the games, they

23    modified his tattoos.  So, they didn't infringe Iron

24    Maiden's copyrighted artwork even though they said, *we have*

25    *to have the tattoos.  We always copy the tattoos.*  Ask

1    yourself why.  Maybe because it's a big company that owns

2    that copyright.  Big music company.

3          And I asked them when they play -- when I play it,

4    you know, I played the game and then I recorded it to

5    present it to you.  And I noticed, Wow, Randy Orton's

6    walk-up song doesn't play when I record it.  And I asked

7    him about that.  And he said, *well, we gotta honor our the*

8    *agreements with the copyright owners of those songs.*  So,

9    they honor the big companies' copyrighted works and, and

10   their copyrights.  And they take licenses from them.

11         And I asked him, I said, Isn't there a wrestler

12   named CM Punk who has a Pepsi tattoo in real life?  And he

13   said, all of a sudden, *I don't remember.  I don't know.*

14   And I would have gotten out the game and showed you, but we

15   have been through it.  Okay?  We've watched the game.

16         Frivolous defenses lead to unreasonable results and

17   they make witnesses say silly things that aren't

18   reasonable.  Defendants know how to respect big companies'

19   copyrights and they don't respect individual tattoo

20   artists' copyrights.  And they shouldn't be allowed to make

21   a profit from their infringement.

22         COURTROOM DEPUTY:  25.

23         MR. SIMON:  Thank you.

24         As judges of the facts, you are required to

25   determine how much of defendants' profits are attributable

1    to the copying, and take those profits away from the

2    defendant.  And what I want to go through now is how to

3    calculate the profits.

4         I'll pull up Jury Instruction 22.

5         In addition to actual damages, plaintiff's entitled

6    to recover the profits she can prove defendants made that

7    are attributable to the infringement.  Defendants' profits

8    are only recoverable -- we read this before -- and the

9    profits are the revenues defendants made because of the

10   infringement, minus the expenses.

11        Again, I only need to prove their revenues.  But I

12   didn't do that.  I want to prove to you what the profits

13   should be.

14        We can take that down, please.

15        Now, Mr. Malackowski took the revenue and the

16   expenses and determined 20.9 percent profit margin.  And

17   Mr. Clark -- we brought him in because what their SEC

18   filing with the Government and what they tell all their

19   shareholders is, "We make a 45 percent profit margin."  But

20   for purposes of this argument, I'm going to use their guy's

21   -- their 850-dollar-an hour guy's number -- 20.9 percent.

22        Slide 18, please.

23        So, to get the amount of the profits attributable

24   to the infringement, it's a couple steps.  And the first

25   step is, what's the profit?  And again, we have two

1   companies, Take-Two and WWE, and they each have separate

2   profit.  So, what I did here, I took Take-Two's total

3   revenue and then I used Mr. Malackowski -- their witness's

4   profit margin -- and I got three -- oh, I missed a step.

5        And then right here, ladies and gentlemen, where it

6   says actual losses?  (Indicating.)

7        Zack, can you highlight that?

8        Remember the instruction says:  Profits are

9   recoverable -- on Instruction 22 -- only to the extent not

10  taken into account in determining actual losses.

11       So that actual loss?  I subtracted it from their

12  gross revenue.  So, we're not getting any profit from that.

13  That's what they would have paid her had they sat down and

14  negotiated a license, if you use two dollars a game.

15  Whatever number you all use, is your number.

16       And then I got a total revenues then of

17  398-million-022.  And then I multiplied that by Mr.

18  Malackowski's opinion, and I got 83,186,793.  And that's

19  Take-Two's total profits from the sale of infringing games.

20       Two points here:  That's just the games in this

21  case, and that's profit.  That's, everybody's paid.  All

22  them hundreds of people they talked about and the CEO and

23  -- they're all paid.  All the work they did, paid.  All the

24  time they took doing it.  That's profits.  And it's only

25  from the games here.  That's total profit.

1          Go to the next slide, please.

2          This is WWE's profits.  Because we got combined two

3     defendants in that line that says profits on the verdict

4     form.  WWE's total revenue is 50,397,278.  They put on no

5     evidence of cost or expenses.  That was pure profit.

6          So, we multiply that by the profit margin of 100

7     percent, and their profit is 50,397,278, again, just from

8     the sales of these three games.  No other games.

9          Go to the next slide, please.

10         What I did is, I took Take-Two's profits from the

11    games, WWE's profits from the games, and I got 133,584,071.

12         Again, you are the judges of the facts.  It's up to

13    you to determine what percentage of those profits are

14    attributable to the infringement.  We would suggest five

15    percent.  If you want something higher or less, you are the

16    judges of the facts, we trust your judgment.

17         If you apply five percent, then on the verdict form

18    -- that's why I added the two profits together to get 133

19    million -- and then you take whatever profit percentage you

20    say is appropriate, and it's 6,679,203.

21         We're not saying all their profits are attributable

22    to Randy Orton's tattoos.  That would be unreasonable.

23    We're not telling you that.  Not what we're arguing.  Even

24    though, if they didn't copy 'em, WWE wouldn't approve the

25    game.  You are the judges of the facts.

1          So, I want to go back to the verdict form.  And so,

2     what we'd ask you to do is say, no fair use.  Put your

3     number in for actual losses, whatever you think they would

4     have paid her per game times 10-million-something per

5     games, and then figure out what percentage of 133 million

6     dollars and put it in this line right here.  (Indicating.)

7          Thank you very much.  I'll be back to respond to

8     whatever they're going to tell you.

9          THE COURT:  And, Mr. Simon, when you -- could you

10    put your --

11         MR. SIMON:  Yes.  Do you want me to move it and

12    turn it around?

13         THE COURT:  Thank you.

14         You may proceed, Miss Cendali.

15         MS. CENDALI:  Thank you, Your Honor.

16         Good morning.  I'd like to start off by thanking

17    you for your time, your attention, and your patience.  It's

18    been a long time for us, too, and we are really eager for

19    this chance to clear our name and remove this cloud over

20    our heads.

21         When this trial started on Monday, I told you that

22    this was a case about Take-Two's artistic expression and

23    Randy Orton's personal freedom to show what's on his body.

24    The evidence at trial this week has only confirmed that

25    that's exactly true.

1          Now, as Her Honor's instructions explain, certain

2     uses of copyrighted works can be fair uses and as such are

3     not copyright infringement.  And this is a really important

4     principle, as otherwise it would be really difficult to use

5     other people's copyrighted material in ways that might

6     benefit the public or create new works of artistic

7     expression.

8          Ladies and gentlemen of the jury, if there were

9     ever a case of fair use, we submit to you that this is that

10    case.

11         As a threshold point, Her Honor instructed you that

12    fair use includes certain uses, not that it is limited to

13    them.  No one thinks this case is about news reporting or

14    scholarly research.  But I just want to make clear from Her

15    Honor's instruction that that doesn't mean that Take-Two's

16    use is not a fair use.  It could be anything that fits the

17    requirements in your mind of these four factors as you

18    weigh them.

19         Now, as you heard from Your Honor, to determine

20    fair use you need to look at these four factors, and you

21    see them on the screen.  You know, the purpose and

22    character of the defendants' use, the nature of the

23    copyrighted work, the amount and substantiality of the use,

24    the effect of the use on the potential market.  You can see

25    that and look at those actual words in full.

1    And as Your Honor's told you, it's up to you to ask

2    how much -- to decide how much weight to give each of these

3    factors.  We don't need to win every factor.  You can

4    decide how to weigh them and that's up to you.

5    Now, Mr. Simon rushed through the fair use factors,

6    you might have noticed.  Just sorta said, well, you know,

7    we won them all.  And that's really telling.  Because the

8    truth is, every single one of the fair use factors strongly

9    favor defendants in this case, and I'm going to explain to

10    you why.  Because credibility is really important in this

11    case and, and we're the side that has it.

12    So, now let's start with the first factor, the

13    purpose and character of defendants' use.  So, what is the

14    purpose and character of Take-Two's use?  Well, as you see

15    from this slide, all week you have heard about three

16    extremely creative audiovisual works of artist expression,

17    the WWE 2K16, 17, and 18 games.  And while there are lots

18    of different types of games that Take-Two could have

19    created, it specifically chose to create a wrestling

20    simulation game.  That was Take-Two's artistic choice.

21    Take-Two's goal was to create an exciting

22    interactive WWE experience that looked just like a live WWE

23    event, in real -- as if you were there in real life or

24    watching it on television.  And to create this massive

25    extremely detailed game, it took the hard work of over 100

1    employees and lots of creativity.

2         Mr. Brody told you about how it took development

3    folks, software engineers, visual artists, sound engineers,

4    and more to create a game like this.

5         Now, we saw and heard the results of those team

6    members' efforts in choosing the numerous components of the

7    game, the crowds, the commentators, the signs, the lights

8    and everything.  And the games speak for themselves.  If

9    you hadn't seen a WWE 2K game before this trial, you have

10   certainly seen a lot of it now.  And it's stunning, I

11   suggest, how much a game can include so many details.  And

12   it's stunning how real it can look.

13        The fact that WWE 2K is a commercial product --

14   which Mr. Simon just emphasized right now -- is not the

15   only thing to think about in assessing the purpose and

16   character of Take-Two's use.  Classic examples of fair use,

17   like news reporting and criticism, which were given to you

18   in Her Honor's instructions, are also made for profit.  You

19   need to dig deeper into the evidence.

20        Dr. Bogost, a video game expert, explained to you

21   that video games are, yes, commercial.  But they're also an

22   art form and a growing, important, creative art form that a

23   lot of people love.

24        Take-Two's artistic purpose was realism, and

25   accurately depicting Mr. Orton and all the other wrestlers

1   with his tattoos is part of that.  Mr. Orton is a small

2   piece of it, but he's a part of the game.

3       Mr. Brody testified about how the tattoos, just

4   like Mr. Orton's hands, chest, torso and teeth, were

5   incorporated into the game because they were what he looked

6   like in real life.  If Mr. Orton didn't have tattoos in

7   real life, then he wouldn't have been shown with tattoos in

8   the game.  But because he does, they're in the game.

9       This is the texture file we were talking about,

10  showing how Mr. Orton's skin was created in the game using

11  photographs, lots of them, from Mr. Orton's body.  And as

12  you can see from these many photographs, they captured

13  every detail of him.  Not just the tattoos.  Everything.

14      Unlike plaintiff, whose purpose was to execute Mr.

15  Orton's personal expression such as by putting a rose on

16  his body in color to represent Mr. Orton's daughter, it

17  didn't matter to Take-Two whether the rose on Mr. Orton's

18  arm was inked in color or black and white.  It didn't even

19  matter that it was a rose.  What mattered was that it was

20  on his body.  If it was on his body, it went into the game.

21      Plaintiff admits that Take-Two's purpose in

22  including the tattoos in WWE 2K was to make the character

23  resemble Mr. Orton in real life.

24      Defendants' purpose is precisely the type that

25  should be encouraged.  People should be able to, as a

1    matter of fair use, go out and create artistic works that

2    represent real aspects of the real world and real people as

3    they actually look.  Factor one favors defendants.

4         Now, let's turn to the second factor which looks to

5    the nature of the copyrighted work.  The nature of the

6    works here -- this is a really important factor -- are

7    tattoos permanently inked on Mr. Orton's body.  We're not

8    dealing with paintings or drawings or sculptures or songs.

9    These are works that are permanently embedded on someone's

10   skin.  And painfully, at that.  This makes all the

11   difference under factor two.

12        Being embedded permanently in someone's skin sets a

13   tattoo apart from buying a painting or a sculpture.  Mr.

14   Orton received a tattoo that he -- or tattoos -- that he

15   specifically commissioned, paid for and approved, that were

16   put permanently on his body.  Mr. Orton can't leave his

17   house without his tattoos.  He can't leave home without

18   them.  And he wouldn't look like himself without them

19   either.  The fact that these tattoos are a permanent part

20   of Mr. Orton's body is why factor two so strongly favors

21   defendants, and goes directly to the heart of Mr. Orton's

22   control over his own body.

23        Now, the nature of the works as tattoos on real

24   people make them something that it's more fair to copy, as

25   otherwise you wouldn't be able to accurately depict a

1    tattooed person.  Sounds like here, Ms. Alexander's like,

2    *Pay me 20 million dollars and I'm okay with this.*  But you

3    can see lots of other people who might say, *well, I don't*

4    *really want it.*  Then what?  That you can't show your body

5    in some way?

6          Or suppose there was people -- you just couldn't

7    find them because you got a tattoo when you were 18, and

8    God knows what happened to them ever since.  Does that make

9    sense?  Is that consistent with principles of fair use and

10   creativity?

11         Consistent with all of this, Mr. Orton testified

12   about how personal each of these tattoos were, and what a

13   loss it would be for him personally not to be able to walk

14   around with them.  He committed to spending over 100 hours

15   getting them, and he paid about 12,000 dollars for them.

16         The unusual nature of the copyrighted works here,

17   and the impact on a person's freedom to show his body and

18   authorize others to show his body as he wishes, favors fair

19   use.

20         While the nature of the copyrighted work is tattoos

21   is enough for factor two to favor defendants, I want to

22   make a few other words about factor two as additional

23   reasons that goes our way.

24         First, you heard Dr. Jablonski testify the five

25   tattoos at issue, while plaintiff did a good job in inking

1    them, that's not an issue.  She did a good job in inking

2    them, but they reflect common tattoo imagery, tribal,

3    skulls, and they were done at the direction and the

4    specific direction and approval of Mr. Orton.  Mr. Krasik's

5    going to talk more about that.

6          And also, when you look at some in particular, that

7    back tattoo, as we know, Ms. Alexander only did the top

8    part of it.  Second, with regard -- and Ms. Alexander

9    contributed very modestly to that, as Dr. Jablonski said.

10   These aspects of the copyrighted works make them a little

11   less original and a little less protectable, as well, in

12   terms of fair use factor two.

13         Now, let's look at the amount and substantiality of

14   the work.  That's the third factor.  The amount and

15   substantiality of the portion used in relation to the

16   copyrighted work as a whole.

17         Yes, Take-Two used all the tattoos, just like it

18   used everything else on Mr. Orton's skin to accurately

19   depict him in the game.  But that does not mean that factor

20   three should favor the plaintiff.  This is because the

21   evidence showed that it was necessary to use Mr. Orton's

22   tattoos to make him accurately look like himself in the

23   game and fulfill its artistic purpose.

24         Mr. Orton himself testified, it would not be an

25   accurate representation of how he looks in real life if he

didn't have tattoos.  And Ms. Alexander herself testified

that, now that the tattoos are there, it's hard to imagine

Mr. Orton without them.  Factor three also weighs in favor

of the defendants.

Now, let's turn to factor four, the effect of the

use.  The last fair use factor.  The effect of the use on

the potential market for or value of the copyrighted work.

As part of this inquiry, it makes sense to look at whether

there is a market for licensing tattoos on real life people

in video games, or whether this is the first try.  What do

we know from the evidence about whether this market exists?

What do you know?  What was presented to you?

Well, we know two things.  First, we know that Ms.

Alexander has admitted that she never licensed any tattoo

that she has inked for use in a video game.  She actually

admitted she's never licensed any tattoo for any purpose.

Second, we know that Mr. Kiang testified that not

once in the history of WWE in making video games has WWE

ever entered into licenses with tattoo artists to depict

tattoos on real world people in WWE video games.  Any art

style, any genre.

Similarly, Mr. Brody testified that Take-Two has

never paid a tattooist for the right to depict tattoos that

appears on a wrestler in real life.  Because it's fair use.

Thus, plaintiff has put forward no evidence that there is a

1    market for licensing people's real world tattoos in video

2    games.  All the evidence is to the contrary.

3        Plaintiff, as they did during the trial -- and

4    again this is where credibility comes up -- tries to

5    confuse the issue by saying, *well, Take-Two has entered*

6    *into a license to create artwork that could be used to be*

7    *turned into digital tattoos for video games.*

8        Hiring an artist to create new artwork is a

9    different situation than depicting a real life person in a

10   game with their real life tattoos.  It's apples and

11   oranges.  And by the way, those folks that would do some of

12   those digital files?  Mr. Brody testified that it was like,

13   something like 50 to 100 dollars for dozens of that kind of

14   art.  A little bit less than 20 million dollars.

15       Moreover, Mr. Malackowski, an esteemed expert on

16   valuation of intellectual property and markets, concluded

17   from lots of research that there is no market for the

18   tattoos at issue.  He testified that such a market would be

19   impractical.  There's no valuation standard.  People don't

20   keep records that they have inked, as I talked about a

21   little bit.  You heard Ms. Alexander say that she's moved

22   tattoo shops repeatedly and didn't tell clients, you know,

23   where she was going.  And that it wasn't a custom of tattoo

24   shops to provide customer information of where people live.

25       Again, the evidence shows that there is no market

for licensing tattoos in video games.  Plaintiff is trying
to change established practices.  Now, since there is no
market for licensing real world tattoos in video games,
plaintiff could not have suffered any loss.

But in any case, there's even more evidence than
what I just went through that would let you find in favor
of defendants with regard to factor four.  Namely, Ms.
Alexander testified, one, she didn't lose any business as a
result of Mr. Orton's tattoos being in the game; two, she
didn't lose any clients as a result of Mr. Orton's tattoos
being included in the game; she also testified that she
doesn't consider herself to be in competition with Take-Two
and WWE, which makes sense.  Buying a video game is hardly
a substitute for getting a tattoo.  And there's no evidence
at all that Ms. Alexander was harmed by the WWE 2K Games.

Instead, the only evidence is that, by inking Mr.
Orton, Ms. Alexander benefited, including by being paid at
the time of the original inking generously.  And she also
admitted that people came to her because they heard she had
inked Mr. Orton.  As Mr. Orton discussed, he even signed a
photograph for her, which she put up on her tattoo station
to drum up business.

The bottom line, ladies and gentlemen of the jury,
is that the evidence shows that every fair use factor
favors defendants.  Defendants should be able to, under

1    fair use law, to put Mr. Orton, like other wrestlers, in

2    their massively-creative technically awesome artistic work,

3    looking like he does in real life so people can enjoy it,

4    just like they have done with these other wrestlers for

5    many years.

6           All right.  Now let's talk about -- because this

7    also sort of goes to credibility a little bit -- this

8    Create a Superstar feature.  We have heard so much again

9    and again, the same pictures again and again all week about

10   this feature, which should tell you something that -- how

11   much they have overemphasized the feature.  But that same

12   fair use analysis that I just went through applies just as

13   much, 100 percent, to this Create a Superstar feature.

14   Again, the purpose and character of the use.

15          We all saw that the body parts -- which is what it

16   is called in Create a Superstar -- are Mr. Orton's entire

17   arms or entire back, and are used creatively for real world

18   body parts in a mode of the game, along with other real

19   world body parts.  You can't pluck out any individual

20   tattoos.  It's the whole arm or the whole back, and the

21   body parts appeal in the context of a video game about WWE

22   in which Randy Orton appears.

23          In addition, as the body parts menu relates to the

24   rest of the video game experience, it's just a teeny piece

25   of this massive world.  As the nature of the copyrighted

1    work, these are still tattoos that were permanently inked

2    on Mr. Orton's body and everything I said about factor two

3    applies here.

4         Same with regard to the amount of substantiality of

5    the use.  Same with regard to the effect of the potential

6    market.  The evidence shows there is no market for

7    licensing real world tattoos in video games, nor does it

8    make sense that there would be one, given all the practical

9    difficulties which would harm -- I would argue -- the, the

10    -- not just people who might be deterred from getting

11    tattoos, but also harm the tattoo industry from having

12    fewer clients.

13         I also want to make three other related points on

14    this Create a Superstar thing.  What plaintiff repeatedly

15    fails to mention -- again, credibility point -- do you

16    remember when Mr. Simmons was deposing Dr. Zagal?  He said,

17    *By the way, did you find this feature that we have seen 100*

18    *times over this trial in any game other than the 2K 2016*

19    *game?  No, my investigation showed -- not.*

20         Well, you didn't hear that mentioned much

21    affirmatively, and you didn't hear it mentioned by Mr.

22    Simon just now.

23         Mr. Zagal even testified that -- the other thing

24    is, as, as Mr. Bogost said, this was put in the game by

25    THQ, it wasn't engaging, people didn't like it, they took

1   it out.  And Dr. Zagal even said the game companies remove

2   features the players may have liked.

3          So, again, plaintiff's counsel went out of their

4   way to manipulate that feature having like, you know, a

5   very fat wrestler, a very skinny wrestler.  But whatever --

6   as Mr. Kiang had said, however texture files -- remember,

7   you take the arm and put it on a mannequin.  A texture

8   file.  That's why it looks different.  It's based on what

9   you chose it to be.  But it's still the arm or back of

10  Randy Orton.  Mr. Brody said he's never seen anybody do

11  that in real life.

12         Third.  Ms. Alexander, until this very moment, has

13  not identified a -- well, any damages theory at all for the

14  whole case, but nothing with regard to Create a Superstar.

15  We never heard anything during the trial and we didn't hear

16  anything now.

17         As Her Honor explained, if you find for the

18  defendants on fair use, which would be a vitally important

19  thing to do, to let people continue to create artistic

20  works and not being handcuffed by people trying to, to, to

21  interfere with creative expression, you don't even need to

22  reach the issue of damages.  That's it.  Done.

23         But now let's talk about damages because I don't

24  know what you are going to do.  And, therefore, I wouldn't

25  be doing my job if I didn't talk about it.

1          And the damages part goes to credibility, too.

2     Because we have been sitting here all week.  We have heard

3     from their damages expert, Mr. Clark, remember?  And Dr.

4     Zagal.  And did you hear anything about 20.7 million

5     dollars?  I didn't hear that.  I never heard any

6     quantification of damages.  I never heard, *Oh, we want two*

7     *dollars a case*.

8          Out of the blue, we're hearing that without any

9     basis, without any justification, without anything other

10    than kind of counsel's numbers on a board.  And think about

11    that.  Think how credible that is.  Think how credible that

12    is, in a world where Ms. Alexander was paid in full, about

13    12,000 dollars -- good amount of money back in the day.

14         Think about it in the scheme of the fact that

15    Take-Two's only profits from the game as Mr. -- for all

16    three years, as Mr. Brody testified -- were about nine

17    million dollars.  And so they think, oh, we think it's

18    reasonable to get all of your profits doubled?  What does

19    that tell you about credibility?  The kind of overreaching

20    that you are seeing is emblematic of the, the approach to

21    liability as well as damages.

22         And while I'm at it, let's talk about that 2009

23    call.  You know, we were trying to be polite about it, but

24    there's no record that that call ever existed.  Mr. Kiang

25    searched for it.  She doesn't remember who she spoke to.

1    Doesn't know if they were a lawyer.  Doesn't have any notes

2    about it.  As I questioned her on the stand, her account of

3    the call was different.  Sometimes she says that she was

4    offered 450 dollars.  Sometimes she says, oh, I wasn't

5    offered anything.  Oh, I forgot.

6          Think about that.  And think about one thing,

7    though, that is directly relevant to all of this.  You

8    know, even if this call happened, one, it was about sleeves

9    not about video games.  Two, it was in 2009.  You know that

10   my client, Take-Two, didn't even get the license for this

11   until 2013.  Right?  So, why is Mr. Simon saying, again and

12   again and again, defendants knew all about that call.

13   That's not fair.  That's not credible.  You can think about

14   that.

15         Now, let's talk a little bit -- I'm going to talk

16   to you about the actual law and what the experts say with

17   regard to damages.  But I want to make a few basic points,

18   before I do.  It's important to remember -- I respectfully

19   ask you -- that plaintiff's claim here is about five

20   specific tattoos on Randy Orton's body in a massive

21   wrestling video game.  Again, she didn't do the big one on

22   his back.  She didn't do one -- you'll see on the pictures

23   -- it's like a Bible verse, you know, that -- where --

24   that's not one that is part of the claim in this case.

25   Right?  So, it's not even all of his tattoos.

1          So, this case isn't about all the tattoos in the

2    game.  It's about the specific ones, the five ones at issue

3    here.  It's not about the overall realism in the game.  And

4    it isn't about Randy Orton's popularity as a wrestler.

5          It's plaintiff's burden to prove damages, as Your

6    Honor instructed you.  That means it's more probably true

7    than not true.  So, what do we know?  What does the

8    evidence actually show?  Not speculative, kinda let's just

9    subtly write something in closing statements on a board,

10   but what does the evidence show?  There are two things to

11   talk about here.  Ms. Alexander's actual losses, if any,

12   and her claim for some of defendants' profits.  Again, if

13   any.

14         Let's talk about actual losses.  What actual losses

15   has Ms. Alexander proved?  Her Honor's instruction talks

16   about the ways in which Ms. Alexander may prove her actual

17   losses.

18         You remember when you heard about this issue

19   yesterday -- time flies -- from Mr. Malackowski, an

20   experienced and highly respected economist?  He considered

21   and analyzed all the evidence and testimony in this case,

22   provided by both plaintiff and defendants.  He applied his

23   decades of experience in intellectual property, valuation,

24   markets and damages, and he concluded that Ms. Alexander

25   suffered no actual damages.

1    Let's look at Your Honor's instructions -- you'll

2  have them -- which provide examples of how plaintiff could

3  try to show her actual losses.  The first example is the

4  decrease in the market value of the copyrighted work caused

5  by the infringement.  But for there to be a decrease in the

6  market value for Mr. Orton's tattoos for licensing for

7  video games, there needs to be market value for that

8  purpose to begin with.

9    Mr. Malackowski testified, he researched

10  extensively, he couldn't find any evidence for payments for

11  real world tattoos on real world people for video games.

12  And as I told you, that's consistent and unrebutted as an

13  evidentiary matter by the testimony of Mr. Kiang and Mr.

14  Brody.

15    What else happened?  Mr. Malackowski looked at Ms.

16  Alexander's testimony.  She said she's never licensed or

17  earned revenue from licensing any tattoos, including video

18  games.  And again, he relied on Mr. Kiang and Brody.

19    He also considered the evidence of Take-Two that's

20  -- that's developed video games in the same way, and he did

21  his own independent research as the former head of the

22  world licensing association -- LES -- and found no evidence

23  that there ever was a license or a market for such a

24  license.

25    As there's no market, there's no market value for

1    this purpose, licensing real world tattoos for video games.

2    Which makes sense because they're part of the person's

3    body.  Remember factor two?  They're part of the human

4    being's body.  The idea that that would be something

5    someone else would license is not reflected in actual

6    practice.

7         COURTROOM DEPUTY:  Thirty minutes.

8         MS. CENDALI:  So, the next example is plaintiff's

9    lost profits.  Those are profits that plaintiff proved she

10   would have made without the infringement.  In other words,

11   plaintiff needs to identify revenue she would have made on

12   sales, she would have made without the infringement, less

13   any additional expense she would have incurred in making

14   the sales.  I know that's a mouthful.

15        But the basic point is, Ms. Alexander needs to show

16   what she would have made if Mr. Orton's tattoos were not

17   included in WWE 2K.

18        But you heard directly from Ms. Alexander that she

19   was not aware of any business she lost as a result of Mr.

20   Orton being depicted.  You also heard Ms. Alexander say

21   that she's not aware of any clients she lost.  She provided

22   no evidence of lost sales.  She provided no evidence that

23   she had to lower her prices.  She never even told us what

24   her prices were.  Think about that.  In fact, the evidence

25   shows, Ms. Alexander actually benefited, as we discussed,

1  from inking Mr. Orton.

2       Take-Two and Ms. Alexander, she admits, are not

3  competitors, they are not in their same business, their

4  products are not substitutes.  That's what this goes to.

5       Now, let's go to, on the instructions, actual

6  damages, example three.  The final example in the

7  instructions.  What a willing buyer reasonably would have

8  paid plaintiff to obtain a license to copy plaintiff's

9  copyrighted works.

10      But the evidence shows that no willing buyer would

11  reasonably pay to obtain such a license.  As Mr.

12  Malackowski explained, a license would make no sense in

13  this situation, for three reasons.  One, as we have been

14  discussing, there's no market for licensing real world

15  games -- real world tattoos of real people in video games;

16  two, it would be impractical, as we discussed; three,

17  similar to what I was talking about again with factor two,

18  tattoos are a real part of a person's body.  The idea that

19  somebody else could get to license them and maybe veto how

20  they could be used or say, no, you can, or, no you can't,

21  is unlikely and impractical.

22      Now, you heard that Mr. Malackowski testified that

23  plaintiff had zero actual damages.  Remember that testimony

24  yesterday?  Well, remember Mr. Clark also, plaintiff's

25  damages expert?  He was here to provide rebuttal testimony

1   to Mr. Malackowski's opinions that there was no actual

2   damages.  You remember Malackowski said there was no actual

3   damages.  And given the lack of evidence of actual damages,

4   it's no surprise that when asked for his opinion on actual

5   damages, Mr. Clark admitted he simply didn't have any.

6        The preponderance of the evidence clearly

7   establishes Ms. Alexander has suffered no actual damages.

8   This is a quest for a windfall and an unexpected one.  It's

9   not someone who has actually been injured in any way.

10   That's what this is about.  That's what this is about.

11        Now, as shown in -- let's turn to profits.  As

12   shown in Her Honor's instructions, plaintiff's entitled to

13   recover profits that she can prove defendants made that are

14   attributable to the infringement.  And that's an important

15   concept because she has to prove not just that Take-Two

16   made profits -- of course it made profits, I hope -- but

17   that they have to have been attributable to the fact that

18   one of 200 characters in the game happened to have these

19   tattoos.

20        She can't just speculate what profits are

21   attributable.  There has to be evidence of that

22   attribution.  So, what do we know?  What's in the record?

23   What came out at trial as to whether there is evidence

24   attributable?

25        You heard the testimony yesterday of renowned

1    survey expert Dr. Deborah Jay, who did an extensive

2    research survey using accepted methodology of experts in

3    the field.  And her survey, which was designed to identify

4    the reasons consumers purchase WWE 2K, determined that no

5    one buys the game because Mr. Orton's tattoos appear in the

6    game.

7            Instead of presenting any evidence to rebut Dr.

8    Jay's survey evidence, plaintiff instead asks you, the

9    jury, to engage in guesswork based on calculations on a

10   paper that you are hearing for the first time today,

11   despite all these experts that could have been asked these

12   questions or presented a report.

13           Dr. Jay's uncontradicted survey establishes that no

14   consumers purchased WWE 2K for Mr. Orton's tattoo.  No one

15   mentioned Mr. Orton's tattoos as one of their reasons for

16   buying the game.  No one said it was a main reason for

17   buying the game.  No one said it was one of their other

18   reasons for buying the game.

19           Why do people say they bought the game?  Well, it

20   makes sense, because they like wrestling.  You know, they

21   like gameplay.  They like video games.  They thought it was

22   exciting.  They wanted to play with friends and family.

23   Yeah, maybe the graphics were good.  But none of them said,

24   because Randy Orton's tattoos.  None.

25           And what's interesting about that is that their own

1    expert, Dr. Zagal, as you heard, said the same thing.  He

2    said people don't buy the game because of the tattoos.  And

3    yet, plaintiff, who has inked five tattoos -- not even all

4    -- of one person is saying, "I want 20.7 million

5    dollars" for the first time.  Think about that, aware that

6    there are no profits that defendants made as a result of

7    including tattoos in the game.

8         So, let's talk about this lack of attribution.  The

9    way this works is, Malackowski did the simple math.  You

10   take the gross revenues and you subtract the expenses and

11   you see what's left.  And because Dr. Jay showed that there

12   is nothing attributable of profit to the tattoos in

13   question, there is no attribution, there is zero profit to

14   be attributable to use of the tattoos here.  Since no one

15   bought the game because of -- let me make it very simple --

16   because no one bought the game, as the research studies

17   showed, because of Mr. Orton's tattoos, then that means

18   that there are no profits attributable to Ms. Alexander's

19   tattoos.  Which means, she should get no share of the

20   profits.

21        Dr. Zagal didn't do a quantification, if you

22   recall.  His main focus was that Mr. Orton was popular, if

23   you recall.  Right?  Never tried to quantify that and what

24   it means.  But let's remember, plaintiff doesn't own a

25   copyright on Mr. Orton.  She only owns a copyright to some

1    of his tattoos.

2         There's lots of reasons Mr. Orton is popular.  He's

3    a charismatic guy.  He has a great finishing move like the

4    RKO.  And he's an attractive man.  And those kinds of

5    things are him.  She shouldn't be able to glom on to his

6    popularity and say, now give me 20.7 million dollars.

7         The other thing to remember is that these tattoos

8    are a teensy, teensy, teensy part of the game.  Dr. Bogost

9    said that .008 percent of the overall game data is what

10   they make up.  That's like trying to find four people in a

11   sold-out cardinals game at Busch Stadium.  Teeny, teeny.

12        So, if you do need -- again, we think the answer

13   is, it's fair use, you don't need to get to damages, we

14   think that there's no attribution of any -- there's no

15   actual damages.  There's no attribution of any damages, of

16   profits.

17        But if you wanted to assign, if you were looking

18   for something to assign a value, you could take the overall

19   profits of the game, the 9.7 million Mr. Brody confirmed,

20   and multiply that by the .008 percent, and you get 777

21   dollars.

22        Now, if you needed to look up the profit figures

23   yourself, they're in Defendants' Trial Exhibit 183, which

24   is shown on this slide.

25        Likewise, for the WWE?  You would multiply their

profits, too, by .008.  Their profits are an expense of Take-Two, but we know that counsel has been arguing them. So, let's -- WWE made, and is a licensing fee, 50.4 million dollars.  You multiply that by .008 and you get 4,032 dollars.

These figures are reasonable, given the other evidence you heard throughout this case.  The games are complex, myriad, expensive to make.  These are a teeny, teeny part of even one player, one of over 200 wrestlers, one part of his persona.

You heard that Ms. Alexander was paid 12,000 dollars.  You also heard from Mr. Malackowski that the result should be that nothing is, is owed.

I'd like to now walk you briefly through the verdict form.  The first question on the verdict form is whether defendants have proven their use constituted fair use.  For the reasons we discussed, all four fair use factors -- and we don't need to win all of them, but we should, we respectfully suggest, you'll decide -- should go in defendants' favor.  As a result, you should check yes there.

If you check yes on question one, you should not fill in the remaining questions.

If you answer no to question one, then you should fill in the remaining questions.  And we submit, the

1     evidence shows that the number to be filled in there is

2     zero because plaintiff has no actual damages and she cannot

3     prove that any of defendants' profits are attributable to

4     these five tattoos.

5         Ladies and gentlemen of the jury, you have heard

6     all the evidence in this case.  Both sides have worked

7     really hard to present it to you, and it shows that

8     defendants' use of Mr. Orton's tattoos was fair use.  Think

9     about the consequences to society, to people with tattoos,

10     to the world.  If people with tattoos suddenly have this

11     giant string attached, a sword of Damocles over their head,

12     this concept that 20 years later someone's going to come

13     back and say, *Oh, by the way, you don't really own your*

14     *body,* and, *Oh, by the way, you can't replicate reality in*

15     *an artistic work, be it a movie or a video game,* that's why

16     this is fair use.

17         We respectfully and honorably ask you to find in

18     favor of defendants Take-Two and WWE.

19         If the Court permits, I'll turn the podium over to

20     my co-counsel Mr. Krasik.

21         THE COURT:  Okay.  Hold on for one second.  I just

22     want to check in with the jurors.

23         We probably got another 40 minutes total to go.

24     You need to take a break?

25         JURORS [in unison]:  (Nonverbal response.)

1           THE COURT:  We're going to go ahead and break and

2    then we'll come back with Mr. Krasik.

3           We'll reconvene at five minutes til the hour.

4           (Court recessed from 10:44 a.m. to 10:55 a.m.)

5           (Proceedings continued in open court, jury

6    present.)

7           THE COURT:  Mr. Krasik, you may proceed.

8           MR. KRASIK:  May I proceed, Your Honor?

9           THE COURT:  Yes.

10          MR. KRASIK:  Thank you.

11          Ladies and gentlemen of the jury, on behalf of my

12   client, the WWE, and Mr. Matthew Geyer from WWE, who's been

13   in the courtroom with you all week, we want to thank you

14   for your time, for your service, and for your attention to

15   a lot of difficult facts that have been going on this week.

16   But we want to thank you.

17          Ladies and gentlemen of the jury, now that you have

18   heard all of the evidence, you have to answer the question

19   of fair use, which here will decide who controls the rights

20   to Randy Orton's body.  Randy or Ms. Alexander?  Your

21   decision is really that simple.

22          Either Randy's body can be displayed as he wants,

23   including in the WWE 2K video games, or Ms. Alexander has

24   lifelong control over when and how Randy's allowed to show

25   his body, and let others show his body, with his tattoos.

1    There is no in-between.

2         Mr. Simon said, we have been telling you again and

3    again, we're not claiming he can't show his body.  And he

4    has been saying that.  I've heard that a lot of times.  But

5    I would say, Mr. Simon, then what are we doing here?

6    Because Mr. Orton -- Randy -- wants to be shown in the 2K

7    video games with his tattoos as he looks in real life.  WWE

8    and, and Take-Two want him to be shown in the WWE 2K video

9    games with his tattoos as he looks in real life.  It's Ms.

10   Alexander who is saying he can't.  You need my permission.

11        So, when Mr. Simon keeps saying, we're telling

12   Randy he can do whatever he wants?  They're not.  That's

13   why we're here.  And who knows, if she is successful here,

14   what else she'll say he can't do.

15        As Miss Cendali explained to you, we submit that

16   Randy's depiction in the WWE 2K Games is fair, as a fair

17   use, under the law.

18        Now, Miss Cendali went through in detail all of Her

19   Honor's instructions on fair use and how they apply to this

20   case.  I want to expand specifically on what you see

21   highlighted on your screens.  The second fair use factor,

22   and that is the nature of the copyrighted works.

23        As you have heard, the copyrighted works in this

24   case are not paintings or photographs or sculptures.  They

25   are not artwork on canvas.  They are tattoos.  They are

permanently inked on Randy's body.  Randy cannot separate

his tattoos from his body.  Randy's tattoos and his body

are one and the same.  Randy cannot show his body as it

looks in real life without showing his tattoos.  And WWE

and Take-Two cannot accurately show that body in the WWE 2K

Games without showing his tattoos.

As Randy told you when he was here testifying, if

he was shown in the WWE 2K Games without his tattoos, it

would not look like him.  It also would not reflect how he

has chosen to present himself to the world.  This is not

like artwork that you can just pick up at a craft fair.  It

is artwork that was specifically designed for Randy.

The nature of tattoos as a copyrighted work is

unique.  You need to consider the unique nature of tattoos

on the human body in deciding whether showing Randy with

his tattoos in the WWE 2K Games is a fair use.

The copyrighted works in this case, Randy's

tattoos, are permanently inked on his body that he chose to

express himself.  As Randy told you, it was his idea to do

the tribal tattoos on his forearms and upper arms in the

same style as his existing back tattoo.  He gave direction

to Ms. Alexander on what designs they should look like and

where they should go, and Ms. Alexander followed his

instructions.

He also gave direction to Ms. Alexander on the

1  extensions of his existing back tattoo up his neck and

2  across his shoulders, based on how he wanted it to look.

3  And Ms. Alexander, again, followed his instructions.

4  Later, Randy chose the rose tattoo with his

5  daughter's name and birthday in Roman numerals, and

6  directed Ms. Alexander that the rose tattoo should be his

7  only tattoo in color.

8  Randy also picked out the dove tattoo and directed

9  Ms. Alexander on how he wanted it to look.  Ms. Alexander

10  followed those directions, as well.

11  Lastly, Randy directed Ms. Alexander to ink the

12  skulls tattoos on both arms based on the smoked skulls

13  covering the fender of his motorcycle.

14  So, Randy selected all of his tattoos that Ms.

15  Alexander inked, and directed and approved their design

16  before they were inked on his body.  As you consider

17  whether it is fair for WWE and Take-Two to be able to

18  display Randy's body in the WWE 2K Games as it looks in

19  real life with his tattoos, remember that all of Randy's

20  tattoos reflect his self-expression and how he chooses to

21  present himself to the world.

22  What would not be fair is if Ms. Alexander is able

23  to control how Randy shows his body to the world with the

24  tattoos that reflect his self-expression.

25  After Ms. Alexander inked Randy's tattoos, Randy

1  paid her approximately 12,000 dollars for her work and

2  Randy left, understanding that Ms. Alexander was paid in

3  full, no strings attached, while he was free to live his

4  life and never needed to go back to Ms. Alexander to get

5  permission for how he wants to display his own body.

6       Is it fair that, ten years later, Ms. Alexander

7  should be able to come back and say that WWE and Take-Two

8  cannot show Randy's body as it looks in real life without

9  her permission, because his tattoos that she inked remain a

10  permanent part of his body?  Under the second fair use

11  factor, that's not fair.

12       If Ms. Alexander's right, then when you walk into a

13  tattoo parlor to get some ink, wham, your tattoo artist --

14  who you maybe just met -- has control over how you can

15  display your own body for the rest of your life.

16       There's another thing that you need to consider

17  about the unique nature of the copyrighted works in this

18  case.  Everyone agrees that tattooed people have the right

19  to alter or modify their tattoos using a different

20  tattooist, without getting permission from the original

21  tattooist.  You will recall that Randy's tattoos were

22  altered twice in this case.

23       First, Ms. Alexander altered Randy's preexisting

24  arm and back tattoos in inking his tribal tattoos.  Both

25  Randy and Ms. Alexander testified that they did not need

1    the permission from Randy's original tattooist for that.

2    Second, after Ms. Alexander finished inking Randy's

3    tattoos in 2008, Randy had a different tattoo artist alter

4    all of the tattoos that Ms. Alexander inked, except for the

5    Rose.  We saw the altered skulls earlier in the trial.

6    I'll just highlight the changes for you again.

7    This reflects the tattoos are fundamentally

8    different from other kinds of artwork because they're on

9    somebody's body.  And it makes no sense and would not be

10    fair for Randy to be able to alter his tattoos but not be

11    free to display his tattoos when, either way, they are his

12    tattoos on his body.

13    A final point to consider regarding the nature of

14    Randy's tattoos is that they are inked on a professional

15    wrestler.  As a celebrity and a professional entertainer,

16    how Randy chooses to display his body with his tattoos is

17    important to his persona as a WWE Superstar and important

18    to his livelihood.  These tattoos were put on someone who

19    had an obvious need to display them.  That is another

20    reason why the second fair use factor favors defendants.

21    Again, what would not be fair is if Ms. Alexander

22    had control over how Randy can promote and market his

23    likeness, including his tattoos, in the WWE 2K Games.

24    What does this all tell you?  The nature of the

25    copyrighted works in this case, Randy's tattoos, are unique

and different than other artwork.  Randy's tattoos are a permanent part of his body.  Randy's body cannot be shown as it looks in real life without his tattoos.

If you find that showing Randy's body with his tattoos in the WWE 2K Games is not a fair use, then Ms. Alexander -- and not Randy -- would control the right to display Randy's body.  That is not fair.

Now, at this point, I'd like to respond to a couple of points that Mr. Simon made in his open -- in his argument to you.  I'd like to start with the damages.  Ms. Cendali addressed those already and I won't go over anything she said.  But probably like you, we have been in court all week waiting to hear what their damage theory was.  And more importantly, what the evidence of the damage theory was.  And we never heard it.  We heard all their experts testify; never heard anything.

And then we get to today and what do we hear?  He put the burden on you guys.  He said, I'm not going to tell you what it is.  You guys figure out.

Now, there's a couple problems with that.  Number one is, he can't do that.  The instruction that Her Honor gave you says, plaintiff must prove damages by a preponderance of the evidence.  That's on page 20.

Saying, *I don't know how much the actual damages are, you know, could be two bucks -- could be two bucks a*

1  *game, give me 20 million dollars.* That's not evidence. I

2  don't know what the evidence is. He's never identified any

3  evidence.

4  The disgorgement? Saying, *You figure out -- I'll*

5  *tell you what the revenues are.* But on that key question,

6  what are the revenues attributable to the infringement --

7  because he doesn't get all the revenues, he knows that --

8  what are the revenues attributable to the infringement?

9  *Again, you guys figure it out. I don't know.*

10  And do you know why he's saying that? It's not an

11  oversight. It's not because he doesn't want to do the

12  work. There is no evidence. He doesn't know. There is no

13  evidence of damages here. And by asking you just to come

14  up with an amount of damages, he's trying to avoid the fact

15  that there is no evidence of damages. So, they're asking

16  you to speculate. Pick a number out of thin air because

17  they can't come up with evidence for their number. This is

18  wrong. There is no evidence of damages. So, you should

19  award no damages.

20  Now, when you are thinking about damages, these

21  numbers that he's talking about, 20 million dollars of

22  actual damages? 133 million dollars of disgorgement?

23  Those are huge numbers.

24  Do you think you would want to know what Randy

25  Orton made from the three WWE 2K Games that we're talking

1    about?  For all of his likeness to be in those games?  Not

2    just the tattoos, all of his likeness?  Let's look at that.

3         Showing you -- I'm going to walk you through what's

4    on your screen.  This is an excerpt from Randy Orton's --

5    this is an excerpt from Randy Orton's booking contract.

6         (Indicating.)

7         What this says is that 25 percent of the money

8    that's paid to WWE goes in a pool for the wrestlers who are

9    in the games.  And that 25 percent is divided pro rata,

10   evenly, among all of the wrestlers who are in the game.

11   All right.  So, that's the calculation.

12        Now what are the numbers?  As Mr. Simon told you --

13   and we don't disagree with that -- WWE made just over 50

14   million from the three games we are talking about here.

15   So, that's the first number you need to know.

16        Now the second thing you need to know is, what is

17   25 percent of that?

18        And then the third number -- the video jumped ahead

19   of me -- how many wrestlers are in the game?

20        Mr. Brody from Take-Two testified, it's more than

21   200.  But we were conservative.  We said just 200.

22        So, if you take the amount of money that WWE made,

23   times 25 percent -- which is the pool that goes to the

24   wrestlers -- and then divides that pool by the number of

25   wrestlers in the game, which is 200 -- each wrestler from

those three games got 63,000 dollars.  Randy didn't get any more.  He got 63,000 dollars.  And that's for all of his likeness and who he is.

As Ms. Cendali accurately pointed out, he's a popular wrestler.  People buy -- people, you know, like him just for him, for a lot of reasons.  And he has tattoos.  But how are they asking for these kinds of numbers when Randy Orton only made 63,000 dollars?  Let me address --

COURTROOM DEPUTY:  Three minutes.

MR. KRASIK:  Thank you.

-- briefly address a couple of other points.

Mr. Simon brought up the testimony of Ed Kiang, about the fact that WWE wouldn't have approved these games if the tattoos weren't in it.  And this was on the video that he played.  So, I don't know if you remember that, but that was in the video portion.

Well, if you remember, Mr. Kiang then came to court live.  And I asked him some questions.  And some of the questions I asked him included:  Would you have not approved Randy Orton's model in the game if he had blond hair?  Would you not have approved Randy Orton's model in the game if he had sneakers instead of black boots?  Would you not have approved Randy Orton's model in the game if he was wearing long pants?  Would you have not have approved Randy Orton's model in the game if his entrance music was

1   wrong?  And he said yes to all of them.

2       And then I asked him, so, tattoos aren't anything

3   special?  It's just one thing that wasn't accurate.  And

4   that's what he said.  He said we -- it's not disputed here.

5   They are -- they are -- WWE and Take-Two are trying to

6   create a simulation game that's as accurate as possible.

7   We all agree on that.  But tattoos are a very small part of

8   that, and it's no more important than any other aspect of

9   the game.

10      Now, let me briefly address this 2009 call that Mr.

11  Simon mentioned.  And Ms. Cendali addressed it a little

12  bit.  But since it was made to WWE, I feel like I should

13  say something about it, too.

14      Mr. Simon said that they don't deny it occurred.

15  That's not true.  Mr. Kiang said, based on all the

16  information we have, we have no reason to believe that call

17  ever occurred.

18      Ms. Alexander has no records of the call.  No phone

19  records.  No notes.  No name of someone she spoke with.

20  She doesn't even know who she spoke with.  She doesn't know

21  if it was a receptionist.  Anybody.  No corroborating

22  witness, who witnessed the call.  Just her word.  And she

23  said that.

24      But what did WWE do?  WWE searched its records,

25  searched its documents, searched its e-mails, of everybody

1  who was in the law department in 2009.  Found no evidence

2  that someone -- that she had placed that kind of a call.

3  So, yes, WWE denies that that call occurred.  There is no

4  evidence of it, other than Ms. Alexander's testimony in

5  this case, which obviously benefits here.

6        So, ladies and gentlemen, Her Honor instructed you

7  to use your common sense in weighing the evidence, and

8  consider the evidence in light of your own observations in

9  life.  You know that the nature of a tattoo is different

10 from any other kind of copyrighted work.  A tattoo is

11 inseparable from a body on which it's inked.  That means

12 Randy cannot display his body as it looks in real life

13 without showing his tattoos.  Ms. Alexander did not get

14 lifelong control over the rights to Randy's body when she

15 inked his tattoos.  That is not fair.

16       You can make things fair by finding that Randy's

17 depiction in the WWE 2K Games with his tattoos was a fair

18 use and returning a verdict for the defendants.  Thank you.

19       THE COURT:  Mr. Simon.

20       MR. SIMON:  Yes, Your Honor.

21       So, let me cut right to this, so we're not all

22 worried about society.  What are the consequences going to

23 be in society if you find in our favor?  Take-Two will pick

24 up the phone, like they do with the big companies, and call

25 the tattoo artist and say, *Hey, can we have a license for*

1    *your tattoos?* That's the consequences. It's not a

2    consequence that they can't use it. What's right is right.

3    What's wrong is wrong. She owns the intellectual property.

4    The Court has already ruled on that. They know it. And if

5    they continue to use it, it's improper. They need to take

6    a license. They do it with big companies and they should

7    do it with individuals.

8         This part about Randy Orton only getting 60,000?

9    That's between Randy Orton and WWE. If Randy Orton wants

10    more money from WWE, he should talk to them. We're not

11    suing Randy Orton. It's not about Randy Orton's profits.

12    But here's the thing. Randy Orton doesn't own the

13    copyright. Randy Orton owns a copy of his tattoos.

14         I have this 2K game. I bought it. It's mine. I

15    can do whatever I want to it. I can smash it. Throw it

16    away. Alter it. Give it away. Play it. I can't make

17    copies. And it says it right on there, because it's

18    copyright protected. Randy Orton owns his body. Randy

19    Orton owns the copies of the tattoos on his body. But he

20    can't make copies and he can't let them make copies.

21         If you own books at home, they're your books. You

22    can do whatever you want with them. But you can't make

23    copies.

24         Defendants -- they talked about profits.

25    Defendants should not be able to profit from infringing the

1  copyright law.  If they do that, exactly what happened in

2  this case is what happens.  The tattoo artist or the

3  copyright owner, unless it's a big company, has to file a

4  lawsuit and fight five years and get you to here.  And if

5  all you give Ms. Alexander is what they should have given

6  her in the beginning, it's not going to stop.  They're not

7  going to follow the copyright law.

8          You need to do something about that, and so you

9  need to take away the profits attributable to the

10 infringement.

11         Mr. Krasik said I said it was 133 million dollars.

12 I didn't.  And he said I didn't give you a number.  I gave

13 you a number.  Right here.  Use this number.  (Indicating.)

14         I think there's evidence and I went through the

15 evidence to support it.  It's a percentage of 133 million,

16 and it's 6.6 million dollars, is what you should give.

17 That's my suggestion, five percent.

18         You can give more or less.  But look in the

19 instructions.  You are the judges of the facts.  It's not

20 my position to tell you what you should decide.  We want

21 you to decide the case.  We want to be judged.  We think we

22 have presented a pretty good case of evidence.

23         The first 30 minutes of argument that you saw here?

24 You saw pictures of the 28,000 dollars a day team.  You

25 didn't see any evidence.  It was a PowerPoint slide of

1  their experts, some of the jury instructions, no evidence.

2  And what did you hear?  She didn't lose any money.

3  Everything that I told you they have been saying, that

4  we're not arguing.  Okay?  That's what they presented to

5  you.  Frivolous defenses lead to unreasonable results.

6          Pull up DTX 183, please.

7          You were shown Defendants' Exhibit 183, and this is

8  how they calculate -- what was the number?  400-something

9  dollars?  If you blow up that corner there?  The profit of

10 9.7 million?  That's at -- go back out and show me the

11 bottom line there.  It says operating profits here.  That

12 2.8 percent profit margin?  Where did that come from?

13         They paid an expert 850 dollars an hour to sit here

14 and tell you -- and he said 20.9 percent.

15         They bring Mr. Brody in, and he says 2.8 percent.

16         Why didn't the 850-dollar-an-hour man tell you 2.8

17 percent?  And they stood in front of you here and told you

18 that's what you should do, instead of the 20.9 percent that

19 their expert said for 850 dollars an hour.

20         I'm finished with that exhibit.

21         Here's the other thing.  That 9.7 million that she

22 said was the profit?  That's five times WWE's.  WWE made

23 five times the profit that Take-Two did?  Not reasonable.

24 Not credible.  Not.

25         And I can't believe I have to say this, but we're

1  not telling Randy Orton what he can do with his body.  If

2  you rule in our favor, Randy Orton's going to keep living

3  his life the way he is, and he can be displaying his

4  tattoos.  But here's the thing.  See how, when they came up

5  here and they argue to you, he said he can't appear in the

6  game?  He doesn't appear in the game.  Copies of the

7  tattoos appear in the game.  A game character that looks

8  like him appears in the game.  Why are they using the word

9  appear in the game?  Because they're trying to hide that

10  fact from you.  But the Court's already found, copies of

11  the tattoos are in the game.  The Court's ruled on that.

12       Frivolous defenses.  I think I heard her argue --

13  you be the judges of this -- not allowing them to copy my

14  client's copyrighted works hurts their creativity.  Not

15  allowing them to copy hurts their creativity.  That's what

16  she said.  Again, pick up the phone.  You can negotiate a

17  license.  You do it with the big boys.

18       Everything that was said to you about fair use, and

19  it's fair, and we got a right to use those tattoos?  That

20  was true for the Chris Jericho tattoos.

21       Pull up slide nine.

22       That's his real life tattoo.  They don't use it in

23  the game.  Why not?  Because they know what will happen.  A

24  big company owns that.  It's fair use.  Why don't they go

25  tell Iron Maiden it's fair use?  Go tell everybody else,

1  when you steal their songs, it's fair use; we're just

2  helping our guys make creative video games.  You know why

3  they're not doing it.

4       If we can go to the document camera, please.

5       Please, please, please, read the instructions.  You

6  have them.  The first factor is -- I'm sorry -- the bottom

7  factor, "The effect of the use upon the potential

8  market" -- and they said there is no market.  There is no

9  market -- and let's see how narrow they defined it --

10 there's no market for tattoos on real life people in video

11 games.  Yeah, there isn't.  But there could be a potential

12 one, if you treat the artist, the tattoo artist like you

13 treat the other people that have IP.  And today is the day

14 they get to be told that.

15      It's the potential market, not the market.  There's

16 not a market and there's a reason for that.  Because

17 they're stopping it.  And they don't want to.  You know

18 why?  Because all those wrestlers got tattoos and they

19 don't want to pay that money.  They don't want to pay that

20 money.  It will cut into those profits.  Even though

21 they're just doing it for creative artistic entertainment.

22      There's another one.  Frivolous defenses.  This was

23 argued.  If you make Take-Two pay a royalty to tattoo

24 artists, it will hurt tattoo artists.  We'll take that

25 chance.  Go ahead and award us.  We'll give you the chance.

1    We'd love to have it.

2           And then, what are they saying now?  They have been

3    in altogether and then all of a sudden Take-Two is up here

4    saying, *we never got a call.  we never got a call.*  Well,

5    WWE got the call.  Maybe you should have asked them.  Maybe

6    they should have told you about it.

7           And Mr. Krasik, by the way, said Mr. Kiang said, we

8    found no evidence to exist -- that the call exists,

9    therefore, it doesn't exist.  No.  No.  No.  No.  No.

10          Mr. Kiang said, we didn't find any e-mails.  We

11   didn't find any papers.  And then Mr. Krasik said, so that

12   means you, you -- your opinion is that it didn't exist.

13   And then there was an objection and then it was stricken.

14   That's not in evidence.

15          We're not claiming that they can't rightfully use

16   copies of tattoos and keep doing everything they want.

17   They can do that, they just gotta do it the right way.  And

18   until they do, they shouldn't be able to profit from it.

19          You know, ladies and gentlemen, five children, when

20   they were young?  There's right and there's wrong, and my

21   wife and I try to teach them that.  And if my child were

22   copying music that they shouldn't be copying?  It's not

23   right.  There's an artist on the other end of that.  They

24   own the intellectual property rights.  That's what our

25   founding fathers put in the Constitution.  Congress can

1    give authors and artists copyrights so people can't copy

2    their stuff.  Why?  Because that's what makes people want

3    to create things.

4         They own copyrights on all their games.  And they

5    enforce 'em and they use it and they warn you about it.

6    They benefit from the copyright law.  And sometimes, with

7    other big companies, they honor it.  But not with

8    individuals.  That's not right.  It's your opportunity to

9    tell them, don't let them make a profit from bad acts.

10        You were told that we didn't bring an expert in

11   here to tell you damages.  Nothing in those instructions

12   says I need an expert.  You are the fact finders.  It's

13   your decision.  We trust you.  We don't need an expert.  I

14   don't need to pay somebody 850 dollars an hour to come in

15   here and tell you what you should do.

16        The percentage of profits that we suggest is five

17   percent, but that's up to you.  We're not telling you what

18   to do.

19        Ladies and gentlemen, I think I have worn you out

20   here with, with this closing, so I'm going to end early.

21   But what we're asking you to do today is use your common

22   sense.  Understand what happens in real life.  Remember the

23   evidence you saw.  Look at the evidence.  Look at the

24   evidence.  And make a decision for my client and award her

25   actual damages -- whatever you think per game should be --

1    10.3 million games.

2         And defendants' profits?  Whatever percentage of

3    133 million you think that ought to be.  And we're asking

4    you to return a verdict of, it's not fair use, and here

5    it's wrong and that's why you gotta give up this much

6    profits.  That's line number three on the verdict form.

7         And then -- I'm not going to put it up here again,

8    you'll see it, you'll have it -- and then whatever actual

9    damages.  We trust your judgment.  Our case is in your

10   hands.

11        Thank you, Your Honor.

12        THE COURT:  All right, ladies and gentlemen.  Upon

13   retiring to the jury room, you must select a presiding

14   juror.  The presiding juror will preside over your

15   deliberations and will be your representative here in

16   court.

17        A verdict form has been prepared for you.

18        Take this form to the jury room, and when you have

19   reached unanimous agreement on the verdict, your presiding

20   juror will fill in the form and all of you will sign it.

21        During your deliberations, you must not communicate

22   with or provide any information to anyone by any means

23   about this case.  You may not use any electronic device or

24   media, such as a telephone, cell phone, smart phone,

25   iPhone, Blackberry or computer; the internet, any internet

1    service, or any text or instant messaging service; or any

2    internet chat room, blog, or website such as Facebook,

3    MySpace, LinkedIn, YouTube or Twitter, to communicate to

4    anyone any information about this case or to conduct any

5    research about this case until I accept your verdict.

6    I do not anticipate that you will need to

7    communicate with me.  If you do need to communicate with

8    me, the only proper way is in writing.  The writing must be

9    signed by the presiding juror, or, if he or she is

10   unwilling to do so, by some other juror.  The writing

11   should be given to the Court Security Officer who will give

12   it to me.  I will respond either in writing or by having

13   you return to the courtroom so that I can respond orally.

14   If you do you communicate with me, you should not

15   indicate in your note what your numerical division is, if

16   any.

17   The verdict must represent the considered judgment

18   of each juror.  Your verdict, whether for or against the

19   parties, must be unanimous.

20   You should make every reasonable effort to reach a

21   verdict.  In doing so, you should consult with one another,

22   express your own views, and listen to the opinions of your

23   fellow jurors.  Discuss your differences with an open mind.

24   Do not hesitate to reexamine your own views and change your

25   opinion if you come to believe it is wrong.  But you should

1    not surrender your honest beliefs about the weight or

2    effect of evidence solely because of the opinions of other

3    jurors or for the purpose of returning a unanimous verdict.

4         All of you should give fair and equal consideration

5    to all the evidence and deliberate with the goal of

6    reaching an agreement that is consistent with the

7    individual judgment of each juror.  You are impartial

8    judges of the facts.

9         All right.  With that, Miss Hurst will lead the

10   jurors into the jury deliberation room.

11        Please swear in the Court Security Officer.

12        COURTROOM DEPUTY:  Please raise your right hand.

13        (CSO sworn by courtroom deputy.)

14        COURTROOM DEPUTY:  All rise for the jury.

15        (Jury out to begin deliberations at 11:32 a.m.)

16        THE COURT:  We are in recess.

17        (Court recessed from 11:32 a.m. to 2:58 p.m.)

18        (Notification of verdict at 2:58 p.m.)

19        (Proceedings continued in open court, jury

20   present.)

21        COURTROOM DEPUTY:  Please be seated.

22        THE COURT:  It's my understanding that the jury has

23   reached a verdict in this case.  Who is the presiding

24   juror, please?

25        FOREPERSON:  (Nonverbal response.)

1    THE COURT:  Juror No. 1, has the jury reached a
2    unanimous verdict?
3        FOREPERSON:  Yes, Your Honor.
4        THE COURT:  All right.  Could you hand the jury
5    form to the Court Security Officer?  Thank you.
6        (Pause.)
7        Okay.  I have reviewed the verdict form and it is
8    appropriately and properly completed, and I will now
9    publish the jury's verdict.
10       In the matter of *Catherine Alexander versus*
11   *Take-Two Interactive Software, Inc., et al.*, the jurors
12   have reached the following verdict:
13       1.  As to the five tattoos in question, do you find
14   defendants have proven that their use constituted fair use?
15       The answer is:  No.
16       2.  As to the five tattoos in question, what is the
17   dollar amount of actual losses, if any, that you find that
18   plaintiff is entitled to recover as a result of defendants'
19   use?
20       Answer:  3,750 dollars.
21       3.  As to the five tattoos in question, what is the
22   dollar amount, if any, of defendants' profits that you find
23   attributable to their use?
24       Answer:  Zero.
25       Okay.  I will now poll the jurors.

1          (Whereupon, the jury was polled and the verdict

2    rendered unanimous.)

3          THE COURT:  All right.  Now having polled the

4    jurors, I will enter judgment on the verdict and direct the

5    Clerk of Court to do so.

6          Ladies and gentlemen, you have now completed your

7    service in this case and you will be discharged.

8          On behalf of the United States District Court for

9    the Southern District of Illinois, I want to thank you for

10   your service in this case.  It's been a long week.  You all

11   have been engaged.  You have paid attention.  You have been

12   patient, and you have done your jobs.  And so, we

13   appreciate that.

14         We're going to ask you to go back to the jury room

15   for just a few more minutes.  Miss Hurst needs to give you

16   paperwork and things like that, to process you out, and

17   then you will be free to go.

18         COURTROOM DEPUTY:  All rise for the jury, please.

19         (Proceedings continued in open court, jury not

20   present.)

21         THE COURT:  Please be seated for one second.

22         Counsel, I want to thank you all for your civility,

23   particularly with each other.  It's been a long hard fight

24   for everyone concerned, but you have been civil.  We have

25   had some rough patches, but you have remained professional

1   and I certainly appreciate it.  And I want to thank you and

2   wish you all well.

3           COURTROOM DEPUTY:  All right.

4           MS. CENDALI:  Your Honor, I have a question.

5           THE COURT:  Yes, ma'am?

6           MS. CENDALI:  Is there -- are we allowed to talk to

7   the jurors at all?

8           THE COURT:  No, ma'am.  We maintain their privacy.

9           Okay.  We are in recess.

10          (Court adjourned at 3:12 p.m.)

11                          * * * * *

12

13                     REPORTER'S CERTIFICATE

14          I, Christine Dohack LaBuwi, RDR, CRR, Official

15  Court Reporter for the U.S. District Court, Southern

16  District of Illinois, do hereby certify that I reported

17  with mechanical stenography the proceedings contained in

18  pages 782-873; and that the same is a full, true, correct

19  and complete transcript from the record of proceedings in

20  the above-entitled matter.

21

22          DATED this 14th day of October, 2022,

23

24              s/Christine Dohack LaBuwi, RDR, CRR
                _____
25              Christine Dohack LaBuwi, RDR, CRR